**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

XAVIER WALKER,                )
                             )
                 Plaintiff,  )
                             )
         v.                  )    No. 20 CV 7209
                             )
CITY OF CHICAGO, STANLEY SANDERS,)
MICHAEL PIETRYLA, DAVID WRIGHT,  )
BRIAN HOLY, JOHN CRUZ, DONALD    )
WOLVERTON, JOHN RIORDAN, ROBERT)
BARTIK, ANTHONY BRZENIAK,        )
THOMAS MAHONEY, and COOK         )
COUNTY,                          )
                             )
                 Defendants.  )

## COMPLAINT

NOW COMES the Plaintiff, XAVIER WALKER, by and through counsel,

SHILLER PREYAR JARARD & SAMUELS, complaining of the Defendants, CITY OF

CHICAGO, STANLEY SANDERS, MICHAEL PIETRYLA, DAVID WRIGHT, BRIAN

HOLY, JOHN CRUZ, DONALD WOLVERTON, JOHN RIORDAN, ROBERT BARTIK,

ANTHONY BRZENIAK, THOMAS MAHONEY, and COOK COUNTY, states as

follows:

### INTRODUCTION

At the age of 19, Xavier Walker was arrested and abused by Chicago Police

Officers in connection with their investigation into the murder of Marek Majdak. After

beating a false confession out of him, Xavier was charged with murder and found

guilty. This egregious miscarriage of justice is the result of the well-documented policy

1

and practice of the Chicago Police Department to coerce false confessions. Despite this, the Chicago Police Department refuses to systemically discipline officers who engage in misconduct and disclose that information to criminal defendants in violation of their Constitutional obligations. As result, Xavier Walker is one of the latest, but unfortunately not the last, victims coming before this Honorable Court situated in the false confession capital of the world seeking the vindication of his constitutional rights.

**JURISDICTION**

1.    This action is brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

2.    The jurisdiction of this Court is invoked pursuant to the judicial code 28 U.S.C. § 1331 and 1343 (a); and the Constitution of the United States.

3.    Pendent jurisdiction as provided under 28 U.S.C. § 1367(a).

**PARTIES**

4.    Plaintiff XAVIER WALKER is a 40- year old man who, at the time of his arrest, was 19 years old and resided in Chicago. During his 19-year long wrongful incarceration, Mr. Walker received his General Education Diploma and Certificate in Paralegal Studies. Mr. Walker is currently working as a baker while studying for his real estate license.

5.    Defendants STANLEY SANDERS, MICHAEL PIETRYLA, DAVID WRIGHT, and BRIAN HOLY, JOHN CRUZ, DONALD WOLVERTON, JOHN RIORDAN, and ROBERT BARTIK ("Defendant Officers") were, at the time of this occurrence, duly licensed Chicago Police Officers. They engaged in the conduct complained

of in the course and scope of their employment and under color of law. They are sued in their individual capacity.

6.    Defendant THOMAS MAHONEY was, at the time of this occurrence, a duly authorized agent of the Cook County State's Attorney's Office. He engaged in the conduct complained of in the course and scope of his employment and under color of law. He is sued in his individual capacity. Defendant Mahoney was acting as an investigator when he conspired with Defendant Officers to coerce and fabricate false witness testimony and evidence.

7.    Defendant ANTHONY BRZENIAK was, at the time of this occurrence, a duly authorized agent of the Cook County Sheriff's Police. He engaged in the conduct complained of in the course and scope of his employment and under color of law. He is sued in his individual capacity.

8.    Defendant CITY OF CHICAGO ("City") is a municipal corporation duly incorporated under the laws of the State of Illinois and is the employer and principal of Defendant Officers.

9.    Defendant COOK COUNTY is a governmental entity duly incorporated under the laws of the State of Illinois and is the employer and principal of Defendants Mahoney and Brzeniak.

## FACTS

10.    On 13 May 2000, Marek Majdak was shot twice between 1:00 am and 1:14am at 4721 West Ohio Street in Chicago, Illinois.

11.     Majdak was found lying face down in the street, feet away from his van, with his pockets emptied of money in an area known for sex work.

12.     Early on in the investigation, Defendant John Cruz received information that "Red" and "Darnell" may be involved in the murder.

13.     This information was given to the Defendants by a female sex worker with "Red" tattooed on her.

14.     None of the Defendants ever tracked down or questioned a "Red" or "Darnell".

15.     Instead, Defendants turned their attention to Jovanie Long.

16.     On May 25, 2000, Defendants Sanders and Wright picked up Mr. Long's girlfriend and brought her to Area 4 Detective Headquarters.

17.     These Defendants then interrogated her about the murder.

18.     When she truthfully told Defendants that she knew nothing about the murder, the Defendants threatened that she would be arrested for murder and she would lose her children.

19.     These Defendants attempted to coerce her to falsely claim that Long had confessed the murder to her, but she refused to lie and falsely implicate him.

20.     Nevertheless, Defendants Pietryla, Sanders, and Wright falsely reported that she stated that she heard a rumor that (a) Long and Mr. Walker committed the murder, and (b) Long refused to deny it when she confronted him.

21.     Defendants used this knowingly false statement to target Mr. Walker.

**FABRICATING EVIDENCE AGAINST XAVIER**

22.     At approximately 11 a.m. on 27 May 2000, Defendants Pietryla, Riordan, and

Brzeniak, along with other Defendant Officers, forced their way into Wright's home.

23.     Wright lived across the street from Long and was acquainted with Mr. Walker.

24.     However, Wright knew nothing about the murder.

25.     Nevertheless, Defendant Officers handcuffed Wright and brought him to Area 4 Detective Headquarters where he was held for over three days in a small windowless room with no toilet, sink, or running water.

26.     Defendants Sanders and Wright interrogated Wright for sixty hours following his illegal arrest. These Defendants, acting in concert with other Defendant Officers who were aware of the tactics Sanders and Wright employed and under the supervision of Defendant Holy who approved of their tactics, knew that Wright had no knowledge of the murder.

27.     Accordingly, Defendants Sanders and Wright threatened to charge Wright with the murder and told him that his mother would lose her foster children unless he implicated Plaintiff and Long in the murder.

28.     Defendant Officers fed Wright details of the shooting to make his knowingly false statement implicating Mr. Walker and Long seem credible.

29.     Pursuant thereto, over two and a half days after being kidnapped and held at Area 4, Wright acceded to Defendant Officers' demands and falsely claimed that Long and Mr. Walker told him that Long committed the murder.

30.     Defendant Mahoney conspired with Defendant Officers and aided their framing of Mr. Walker by locking Wright into a statement inculpating him.

31.     Defendant Mahoney, an assistant state's attorney, knew that Wright's statement was false, as evidenced by the fact that Mahoney fabricated several details in Maurice's eventual statement.

32.     Walker only signed the false statement because of the Defendants' coercion and fabrications.

33.     Over 60 hours after he was originally kidnapped, Walker signed the false statement at or after 10:30 pm on 29 May 2000.

34.     Even after complying with Defendant Officers' demands, Wright was not released.

35.     Instead, Defendant Officers kept him in the locked interrogation room before driving him to testify before a grand jury the next morning.

36.     Immediately prior to the grand jury, Defendant Officers threatened Wright that if he did not repeat his knowingly false and coerced statement before the grand jury then they would torment him and make his mother lose her foster children.

37.     As a result of the Defendant Officers' threats and coercion, Walker repeated the fabricated story to the grand jury.

38.     Defendant Officers, including Defendants Wolverton and Cruz, also fabricated and coerced false statements from Wright's mother and foster daughters in an effort to falsely corroborate their false story.

### THE ARREST OF XAVIER WALKER

39.     Defendant Officers then used Wright's knowingly false statement to target Mr. Walker.

40. On 28 May 2000, Xavier was falsely arrested by Defendants Brzeniak, Sanders, Wright, and Pietryla.

41. Defendant Officers claimed they saw Mr. Walker as he was walking down his front porch; in fact, his home does not even have a front porch.

42. Rather, without identifying themselves, Defendant Officers chased and then kicked Mr. Walker in the stomach, causing him to double over before he was thrown to the ground and handcuffed.

43. Xavier was kicked so hard the detective's foot left a print on his shirt.

44. Mr. Walker was taken to Area 4 Headquarters in Chicago, Illinois where he was questioned by Defendant Officers.

### COERCING XAVIER'S FALSE CONFESSION

45. Once Xavier arrived at Area 4, he was placed in a locked room without windows and was handcuffed to the wall with both hands for at least 30 minutes.

46. An officer then entered to room to remove one of the cuffs, enabling Xavier to sit down on a bench but his other hand remained handcuffed to the wall.

47. Eventually, Xavier was taken to the restroom and then returned to the locked interrogation room where the Defendant Officers began to interrogate him.

48. Defendants did not read Mr. Walker his *Miranda* rights prior to initiating the interrogation.

49. Xavier was repeatedly cursed at, grabbed, slapped, smacked, and otherwise abused by Defendant Officers.

50.     Xavier was told that if he repeated the story Defendant Officers fed him, then he would not be charged and they would figure out how to get Jovani Long into custody.

51.     Defendant Officers made it clear that the only way for Plaintiff to go home was to tell them what they wanted to hear; additionally, by doing that, Defendant Officers would "get off his back."

52.     Mr. Walker asked for phone calls to contact his family in hopes of getting an attorney but was denied. He was denied bathroom breaks and kept in tight handcuffs despite repeated requests that they be loosened.

53.     Scared for his life, Mr. Walker repeatedly and loudly protested his innocence and ignorance of the crime.

54.     Defendant Officers used physical force against the handcuffed Mr. Walker in response.

55.     When Mr. Walker continued to protest his innocence, Defendant Holy told him that he was "disobeying" his officers and would never be released.

56.     Antwoine Waddy, who had also been kidnapped to Area 4, was in a neighboring interrogation.

57.     Waddy had grown up with Mr. Walker and knew what his voice sounded like.

58.     Through the wall of their adjoining rooms, Waddy could hear the Defendant Officers accusing Plaintiff of being with Long when Long allegedly shot the victim, as well as Plaintiff yelling back that he was not with Long.

59.   Waddy also heard loud, banging noises coming from the room that held Mr.
      Walker.

60.   Defendant Officers tried to coerce Waddy into falsely implicating Mr. Walker
      and Long for the murder. When he refused, Defendant Officers struck him in the
      side of the head.

61.   During a lull in the interrogations, Waddy was able to talk to Mr. Walker
      through the wall.

62.   Xavier told Waddy that he was being beaten by his interrogators and that he was
      not with Long at the time of the murder.

63.   Defendant Officers' interrogation of Mr. Walker continued throughout the night
      and well into the next day.

64.   Xavier received no food until, after being coerced and denied basic comforts for
      approximately 24 hours, he agreed to falsely implicate himself and Long.

65.   Defendant Officers knew Xavier's statement was false.

66.   In fact, Defendant Officers had to feed Mr. Walker details to include in his false
      confession, including that (a) he was with Jovanie, (b) he was acting as Jovanie's
      lookout, and (c) that he participated in the robbery.

67.   Defendant Officers told Mr. Walker that he would be sentenced to 50 years if he
      got the story they'd fabricated wrong.

68.   In truth, Mr. Walker had absolutely nothing to do with the murder. At the time
      of the murder, he was with Simeon Dorsey and Deon Baylock—and had been the
      entire evening.

69.     None of the three had anything to do with the murder whatsoever.

70.     In fact, Mr. Walker repeatedly told Defendant Officers that he was with Dorsey and Baylock.

71.     Defendant Officers falsely told Mr. Walker that they had spoken with Dorsey and Baylock and neither corroborated his story.

72.     To this day, Defendant Officers have never spoke to either Dorsey or Baylock.

73.     After making these threats, Defendant Pietryla and ASA Joanna Leafblad took Mr. Walker's videotaped statement wherein he made false, inculpatory statements.

74.     Prior to recording, Defendant Pietryla made Mr. Walker practice his statement.

75.     Mr. Walker told Defendant Pietryla that what they were doing was wrong, that it was a lie, and he knew it.

76.     Defendant Pietryla told Mr. Walker to do what he's told or he wouldn't go home.

77.     Soon after the confession was recorded, Mr. Walker spoke with Deborah Bedsole from First Defense Legal Aid.

78.     During that interview, Xavier told Ms. Bedsole that his "confession" was the result of physical torture and had been fed to him by the Defendant Officers.

79.     In so doing, Ms. Bedsole documented the visible bruising to Mr. Walker's face and stomach. She also took pictures of Mr. Walker's bruising, took copious notes by hand, and filled out a worksheet regarding Mr. Walker's injuries.

80.     After beating a false confession out of Walker, then turned all their attention to Long.

## LONG'S FALSE CONFESSION

81.    Defendant Officers repeatedly visited Long's mother, informing her that her son was wanted and pressuring him to come in for questioning.

82.    Defendant Officers told Long's mother that if he did not turn himself in they would kill him if and when they found him out and about on the street.

83.    Knowing that he was innocent, Long turned himself into the police with his mother and pastor.

84.    After nearly 40 hours in custody, Defendant Officers brought Long to Defendant Bartik to be polygraphed.

85.    According to Defendant Bartik, before he even administered a polygraph test, Long confessed to the murder within 5-10 minutes of meeting him.

86.    In the realm of polygraph administration, it is extremely rare for someone to confess prior to the examination.

87.    The pre-test portion of a polygraph examination is supposed to be non-confrontational by design, so as to not throw off the eventual results by stressing the test subject.

88.    In truth, Defendant Bartik Long that if he took the test and passed Defendant Officers would shoot him and make it look like he was trying to escape.

## XAVIER'S WRONGFUL CONVICTION

89.    On 21 June 2000, Xavier Walker was charged with the first-degree murder of Marek Majdak, in addition to armed robbery.

90. Fabricated statements and confessions, including his own, were admitted into evidence and used against him at trial.

91. Although no physical evidence whatsoever tied Mr. Walker to this crime, he was found guilty on 22 June 2004, after a bench trial.

92. Mr. Walker was then sentenced to 35 years in prison for first-degree murder.

## XAVIER'S EXONERATION

93. Despite his wrongful conviction, Xavier Walker continued to fight to prove his innocence.

94. In 2007, Mr. Walker filed a *pro se* post-conviction petition alleging actual innocence. A supervisory order was entered in 2011 and a supplementary petition was filed in 2015.

95. In February of 2015, Mr. Walker also sought review from the Cook County State's Attorney's Conviction Integrity Unit in conjunction with his pending post-conviction petition.

96. Mr. Walker likewise filed a complaint with the Torture Inquiry and Relief Commission.

97. On 17 July 2018, Mr. Walker's conviction was vacated and he was granted a new trial.

98. Then, on 11 December 2019, the Cook County State's Attorney's Office dismissed all charges against Mr. Walker in a manner consistent with his innocence.

99. While awaiting his new trial, Mr. Walker was denied bond.

100. Accordingly, Mr. Walker spent more time in custody proving his innocence than he was originally sentenced to serve.

## CHICAGO POLICE'S POLICY AND PRACTICE OF
## COERCING FALSE CONFESSIONS

101. The Chicago Police Department is responsible for scores of miscarriages of justice like those inflicted by Defendant Officers on Mr. Walker by virtue of its policies and practices.

102. Since 1986, no fewer than 70 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit; many of those cases involve Defendant Officers.

103. Often, these cases include the same tactics employed by Defendant Officers in this case, such as (a) using physically coercive tactics to obtain involuntary, false, and fabricated confessions; (b) fabricating witness statements; and (c) concealing exculpatory evidence.

104. At all times relevant hereto, members of the Chicago Police Department, including Defendant Officers, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false.

105. As a matter of widespread custom and practice, members of the Chicago Police Department, including Defendant Officers, contrived false narratives that were

fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of innocent people.

106. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

107. The municipal policy and practice set out in the paragraphs above was described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that CPD detectives physically abused witnesses and fed them information, coaching them through court-reported and handwritten statements.

108. The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which CPD detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

109. Before and during the period in which Plaintiff was falsely charged with the Majdak murder, and then later convicted of the Majdak murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating civilians' civil and constitutional rights. And the Chicago Police

disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

110. As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

111. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including Defendant Officers) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

112. The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

    a.   The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses;

    b.   The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding;

    c.   The risks of engaging in tunnel vision during investigation; and

    d.   The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

113.   The need for police officers to be trained in these areas was and remains obvious.

114.   The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

115.   The City's failure to train, supervise, and discipline its officers, including the Defendant Officers, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff in this case.

116.   Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

117.   The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

118. The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

## DEFENDANTS' HISTORY OF MISCONDUCT
## AND COERCING FALSE CONFESSIONS

119. Each of the Defendant Officers has a substantial history of misconduct. Defendant Holy alone has been accused misconduct on 70 separate occasions, for instance.

120. Likewise, Defendant Riordan had a complaint against him sustained for excessive force among the 35 allegations of misconduct that have been made against him.

121. Other examples of misconduct specific to the use of excessive force and coercion of false confessions by these Defendants include:

    a. On February 6, 1993, Defendant Holy beat Lawrence Adams in an alleyway. Holy hit Adams in the back of the head, rendering him unconscious. Holy also hit him with a flashlight, struck him in the face, pulled him into standing water, handcuffed him, and threatened to put false charges on him if he did not provide him with information.

    b. On February 6, 1995, Defendant Holy beat Robert Watson in an alleyway by hitting him in the head with a flashlight, throwing him to the ground, tricking him about the body, standing on his hands and feet while handcuffing him, and allowing other officers to hit him while he was on the ground.

    c. On August 22, 1996, Mark Smith was assaulted by Defendant Wright when he punched him; struck him in the face, nose, and body; broke Mr. Smith's nose, and forced Mr. Smith to the ground without justification and arrested him.

d.  In 1997, Defendants Wright and Sanders coerced a false confession from a 19-year-old Don Olmetti relative to the robbery and murder of his schoolteacher. As a result of the Defendants' misconduct, Olmetti was charged with murder despite credible alibi evidence demonstrating that he was, in fact, at school at the time of the crime. Although the charges against Mr. Olmetti were eventually dismissed, this *Brady* evidence was never disclosed to Walker's trial counsel.

e.  On May 15, 1997, Defendant Holy arrested and beat Jeremie Lander. Holy told Lander that, "he was a strong n*gger"; shined a flashlight in his face; grabbed his wrist and attempted to handcuff him without cause; pushed him against a wall; stepped on his groin; jumped on his back causing him to fall to the floor; swung a flashlight at him; choked him; bent his thumb; and purposely tripped him.

f.  On June 26, 1997, Defendant Holy punched Ron Herman Jr. in the face numerous times.

g.  On August 3, 1998, Defendant Sanders arrested and coerced Richard Guyton at Area 4. Guyton was questioned for three days, kicked about the legs, and handcuffed so tightly that his wrists began to bleed.

h.  From November 15-17, 1998, Defendant Wright physically abused Timothy Stephens while he was being held in an interview room at Area 4. The acts of physical coercion and abuse included slapping Stephens repeatedly about the face, stepping on his neck, punching him in the stomach and chest, sticking him repeatedly with a blackjack about the torso, stomping and kicking him in the groin, and refusing to provide him with food and water.

i.  On 6 March 2000, Defendant Wright punched Allen Jones in the head; verbally abused Jones, telling him he would "shoot his ass" and to "shut the fuck up"; drove Jones around in his squad car before releasing him in a different neighborhood; then arrested Jones in retaliation for filing a complaint against him.

j.  On May 24, 2002, Defendant Holy falsely arrested and coerced Carl Chattman into giving a false confession while being held at Area 4. Chatman was questioned while not taking his medications for mental illness; was threatened with physical violence; and fed the details of a crime he knew nothing about by Holy. Additionally, Holy manufactured evidence, failed to disclose exculpatory evidence, and maliciously

prosecuted Chattman. Chattman would later receive a certificate of innocence.

k. On September 24, 2002, Defendant Pietryla took Jose Lopez to an unknown address to question him about a murder. Defendant Pietryla perjured himself, arrested Lopez without probable cause, conducted impermissibly suggestive lineups, coerced three false statements to implicate him in the murder, and withheld exculpatory evidence.

l. In 2003, Defendant Pietryla punched and kicked Francisco Ayala about the body.

m. In 2006, Defendant Holy entered the apartment of Sigmund Naszke, handcuffed him to the floor, used profanities, kicked him, and falsified documents about the incident.

n. In 2006, Defendant Pietryla questioned Austin Lathon for 72 without providing him any food. Lathon was handcuffed to a pole and forced to stand for hours while being questioned.

o. In 2007, there were three complaints against Defendant Holy for denying arrestees access to a phone and their attorney.

p. In 2007 and 2016, there were complaints against Defendant Pietryla for illegal arrest.

q. On June 6, 2008, Defendant Wright falsely arrested Gregory Hale and maliciously prosecuted him.

r. In 2009, 2010, and 2011, there were complaints against Defendant Wright for abuse of authority and illegal arrest.

s. In 2010, Defendant Wright misused his position as a police officer to obtain information on parents and staff members of John Cook School to intimidate and/or smear their reputations.

t. On July 6, 2011, Defendant Wright issued false misdemeanor complaints against Colin Ryan and coerced other Area 2 officers to investigate him before signing off on the reports. Additionally, he threatened Ryan and tried to get false hate crime charges brought on Ryan. All five allegations against Wright were sustained related to this incident and he was suspended for 30 days.

     u.  In 2013, Defendant Wright continued to misuse his position as a police officer to obtain information on a staff member of John Cook School to intimidate and/or smear their reputations.

     v.  In 2014 and 2015, there were complaints against Defendant Pietryla for illegal searches.

     w.  In 2015, there was a complaint against Defendant Pietryla for conduct unbecoming an officer.

122.   All of these complaints show a pattern of practice using physical abuse to coerce and punish persons in their custody, and a penchant for misusing their police power to accomplish unlawful means.

123.   Furthermore, Defendant Bartik has claimed to have obtained more than 100 confessions over a five-year period during the "pre-test" period, in defiance of all statistical probability.

124.   The fabricated confession of Long was not an aberration, but a practice Defendant Bartik employed in numerous other cases.

125.   Other examples of Defendant Bartik's misconduct that coerced false confessions include:

     a.  In 1999, Bartik falsely claimed that Rory Cook confessed to him about committing a murder. According to Bartik, Mr. Cook also blurted out his confession before he could administer a polygraph exam.

     b.  In 2001, Bartik claimed that, before he had the opportunity to give teenager Dany Lanza a polygraph exam, Mr. Lanza blurted out a confession to child molestation. All the charges against Lanza were dropped almost four years later when the actual perpetrator confessed to the crime.

     c.  In 2001, Bartik claimed that Donny McGee orally confessed to a

gruesome murder before Bartik had the chance to administer a polygraph exam to him. Despite Bartik's claim that McGee confessed, he was acquitted at trial after the evidence revealed that he was making phone calls to his groomsmen in preparation for his upcoming wedding at the time of the murder. DNA testing performed on blood found at the scene of the murder also excluded McGee as the perpetrator.

d.  In 2001, Bartik falsely claimed that Michael Banks made inculpatory statements to him regarding a murder investigation. Bartik claimed these statements took place at the polygraph office but outside of the formal polygraph exam.

e.  In 2003, Bartik claimed that Lamar Blount confessed to murder. Blount alleged in court records that Bartik tricked him into falsely confessing during the pre-test interview by telling him he had to admit being involved in the murder before he could take the polygraph exam. At trial, Blount was acquitted without even requiring him to put on a defense.

f.  In 2003, Bartik falsely claimed that John Fulton confessed to murder, again supposedly before Bartik had the chance to give him a polygraph exam. Fulton was wrongly convicted based on Bartik's false accusation and served over 15 years in prison before being exonerated.

g.  In 2003, Bartik falsely claimed that Lee Murphy confessed to him about committing a murder, again (according to Bartik) doing so before Bartik even began administering the polygraph exam.

h.  In 2003, Bartik falsely claimed that Robert Robinson made inculpatory statements to him before Bartik had begun administering the polygraph exam.

i.  In 2004, Bartik falsely claimed that Demetrius Daniels made inculpatory statements to him regarding the death of Mr. Daniels' three-month-old daughter during the "pre- test" period of the polygraph exam.

126.    In addition to the practice described above, Defendant Bartik has a pattern of

misconduct related to the improper and unconstitutional questioning of

criminal suspects and the improper and corrupt use of polygraph

examinations, including, for example:

a. In 2000, Bartik participated in a physically violent and psychologically coercive interrogation of Anteleto Jones, forcing Mr. Jones to falsely confess to a murder. Several eyewitnesses have come forward to explain that Jones was not involved in the shooting, but Mr. Jones was convicted due to Bartik's misconduct.

b. In 2000, Bartik helped to frame Larry Scott for a murder he did not commit by falsely claiming a polygraph examination of an alternative suspect was inconclusive, even though that suspect admitted to stabbing the murder victim during the exam.

c. In 2005, Bartik participated in a physically violent and psychologically coercive interrogation of Nicole Harris, including lying about a polygraph exam, forcing Ms. Harris to falsely confess to murdering her four-year-old son, who had in fact died as a result of a tragic accident. Ms. Harris was exonerated after her conviction was thrown out due to violations of her constitutional right to a fair trial.

d. In 2006, Bartik helped frame Sara Bridewell for a murder she did not commit by coercing a witness to falsely implicate her. This included failing to analyze the results of the polygraph exam while telling the witness that she was not telling the truth. It was later determined that the decedent had committed suicide and the murder charges against Bridewell were dismissed by the State's Attorney's Office.

127. As a result of the Defendants' misconduct, Xavier Walker was wrongfully

convicted.

## XAVIER'S DAMAGES

128. Arrested at the age of 19, Xavier was forced to live in a cage and serve out a

punishment for crimes he did not commit for the next 19 years of his life.

129. As a result, Xavier lived in conditions that have been described by a judge

and watchdog groups as inhumane and damaging to the physical and

mental health of prisoners. A constant atmosphere of fear, distrust, and threats of violence from prisoners and staff alike permeated the prison environment. For 19 years, Xavier's life was marked by a steady stream of human rights abuses.

130. During his wrongful incarceration, Xavier was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, funerals, and other life events with loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

131. Xavier's 19 years of wrongful incarceration forced him into a world of isolation in which he lost contact with many of his friends and family in the outside world.

132. Xavier must now attempt to make a life for himself outside of prison without the benefit of more than two decades of life experiences, which normally equip adults for the task.

133. Defendants caused Mr. Walker to suffer tremendous damage, including psychological trauma and emotional damages.

## COUNT I: 42 U.S.C. § 1983 – Due Process/False Confession

134. Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

135. As described more fully above, each individually-named defendant, while acting individually, jointly, and/or in conspiracy, as well as under color of law and

within the scope of their employment, forced Plaintiff to incriminate himself

falsely and against his will, in violation of his rights secured by the Fifth

Amendment.

136.  As described more fully above, the Defendant Officers participated in,

encouraged, advised, and ordered an unconstitutional and unlawful

interrogation of Plaintiff that caused him to make involuntary and false

statements implicating himself in the murder of Marek Majdak.

137.  The coerced, involuntary, false statement the Defendants fabricated and

attributed to Plaintiff was used against him to his detriment in a criminal case.

138.  The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice and reckless indifference to the rights of

others, and with total disregard for the truth and Plaintiff's clear innocence.

139.  As a result of Defendants' misconduct described in this Count, Plaintiff suffered

loss of liberty, great mental anguish, humiliation, degradation, emotional pain

and suffering, and other grievous and continuing injuries and damages as set

forth above.

140.  Plaintiff's injuries were caused by the policies, practices, and customs of

Defendant City of Chicago.

141.  At all relevant times, the City of Chicago promulgated rules, regulations,

policies, and procedures for the conduct of interrogation, testing, and

questioning of criminal suspects by officers and agents of the Chicago Police

Department. In addition, the City of Chicago promulgated rules, regulations,

policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects.

142. These rules, regulations, policies, and procedures were implemented by officers and agents of the Chicago Police Department, including the Defendant Officers who were responsible for interrogating suspects and witnesses in connection with the murder of Marek Majdak.

143. Additionally, at all times relevant, Defendant City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department under which individuals like Plaintiff, who were suspected of criminal activity, were routinely coerced against their will to implicate themselves in crimes of which they were innocent. It was common for suspects interrogated by the Chicago Police Department to falsely confess under extreme duress and after suffering abuse to committing crimes that they had no connection to and for which there was scant evidence to suggest they were involved.

144. Specifically, at all relevant times and for a period of time before the events giving rise to this case, there existed a widespread practice among officers, employees, and agents of the Chicago Police Department under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (a) individuals who were subjected to actual and threatened physical and psychological violence; (b) individuals who were interrogated at length without the proper protection of their constitutional right

to have an attorney present or to remain silent; (c) individuals who were forced to sign false statements fabricated by the police; (d) officers and employees who were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (e) supervisors, with knowledge of permissible and impermissible interrogation techniques, who did not properly supervise or discipline police officers and employees, such that the coercive interrogations continued unchecked.

145. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the Chicago Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue, by failing to adequately train, supervise, and control their officers, agents, and employees as to proper interrogation techniques, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those that affected Plaintiff.

146. The above widespread practices were so well-settled as to constitute *de facto* policy of the Chicago Police Department and were able to exist and thrive because policymakers exhibited deliberate indifference to the problem, thereby effectively ratifying it.

147. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations

committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

148. The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confessions at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation techniques.

149. Plaintiff's injuries were caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually-named Defendants who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT II: 42 U.S.C. § 1983 – 14h Amendment False Confession**

150. Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

151. In the manner described more fully above, the Defendants, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

152. As described in detail above, the misconduct described in this Count was carried out using techniques of physical and psychological coercion and torture against Plaintiff. This misconduct was so severe as to shock the conscience. It was

designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

153.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

154.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

155.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT III:  42 U.S.C. § 1983 – Due Process/Fabrication of Evidence**

156.    Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

157.    As described more fully above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by fabricating false evidence against Plaintiff.

158.    In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from witnesses implicating Plaintiff in a crime that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

159.    Defendants' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby depriving him of his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution could not, and would not, have been pursued.

160.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff s clear innocence.

161.    As a result of Defendants' misconduct, Plaintiff suffered loss of liberty, great emotional pain and suffering, and other grievous and continuing injuries and damages.

### COUNT IV: 42 U.S.C. § 1983 – Due Process/*Brady* Violations

162.    Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

163.    As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by withholding and suppressing exculpatory evidence. In the manner

described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from the prosecution, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

164. In addition, in the manner described more fully above, the Defendants knowingly fabricated and solicited false evidence implicating Plaintiff in the crime; obtained Plaintiffs conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

165. The Defendant Officers' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

166. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

167. As a result of the Defendants' misconduct, Plaintiff suffered loss of liberty, great emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT V:  42 U.S.C. § 1983 – Unlawful Pretrial Detention

168. Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

169. In the manner described more fully above, the Defendants, individually, jointly, and in conspiracy with each other, as well as under color of law and within the

scope of their employment, used fabricated evidence to accuse Plaintiff of criminal activity and detain him without probable cause.

170.    In so doing, the Defendants caused Plaintiff to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth and Fourteenth Amendments. Specifically, Plaintiff was incarcerated from the date of his arrest continuing for 19 years.

171.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

172.    As a result of the Defendants' misconduct, Plaintiff suffered loss of liberty, great emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT VI:  42 U.S.C. § 1983 – Excessive Force/Torture

173.    Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

174.    The actions of the Defendant Officers constituted unreasonable, unjustifiable, and excessive force against Plaintiff, thus violating his rights under the Fourth Amendment to the Constitution of the United States and 42 U.S.C. §1983.

175.    As a direct and proximate result of the above-detailed actions of the Defendants, Plaintiff was injured, including severe pain, physical injury, mental suffering, anguish and humiliation, emotional distress, and fear.

## COUNT VII:  42 U.S.C. § 1983 – Failure to Intervene

176.    Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

177. In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violations of Plaintiff's constitutional rights, even though they had the opportunity to do so.

178. As a direct and proximate result of these violations of his constitutional right to due process, a fair trial, and be free of excessive force, Plaintiff suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

179. These Defendants had a reasonable opportunity to prevent this harm but failed to do so.

180. Defendants' misconduct was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

181. Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

### COUNT VIII:  42 U.S.C. § 1983 – Conspiracy

182. Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

183. As described more fully above, Defendant Officers reached an agreement amongst themselves to punish Plaintiff for a crime he did not commit, and to thereby deprive Plaintiff of his Constitutional rights, all as described more fully throughout this Complaint.

184. In this manner, Defendants, acting in concert with each other, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

185. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

186. As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered damages, severe emotional distress and anguish, and a deprivation of his liberty, as is more fully alleged above.

187. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff and others.

188. As a proximate result of the above-detailed actions of the Defendants, Plaintiff was injured, including the deprivation of his liberty. In addition, the violations proximately caused Plaintiff mental anguish, embarrassment, and humiliation, exposed him to public scandal and disgrace, and caused him to incur various expenses, all to Plaintiff's damage.

## COUNT IX: Malicious Prosecution

189. Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

190.    By the actions detailed above, Defendants knowingly sought to and did in fact maliciously prosecute Plaintiff on false charges for which they knew there was no probable cause.

191.    Defendant City is sued in this Count pursuant to the doctrine of *respondeat superior*, in that Defendant Officers performed the actions complained of while on duty and/or in the employ of Defendant City, and while acting within the scope of this employment.

192.    Defendant County is sued in this Count pursuant to the doctrine of *respondeat superior*, in that Defendants Mahoney and Brzeniak performed the actions complained of while on duty and/or in the employ of Defendant County, and while acting within the scope of this employment.

193.    As a direct and proximate result of the malicious prosecution, Plaintiff was damaged, including the loss of his liberty, exposure to public scandal and disgrace, damage to his reputation, mental and emotional suffering, humiliation, embarrassment, and anguish.

## COUNT X:  Intentional Infliction of Emotional Distress

194.    Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

195.    The acts and conduct of the Defendants as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, emotional distress to Plaintiff, as is more fully alleged above.

196.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer emotional distress.

### COUNT XI: 745 ILCS 10/9-102 - Indemnification

197.    Plaintiff realleges each of the foregoing paragraphs as though fully set forth here.

198.    Defendant City of Chicago is the employer of the Defendant Officers.

199.    Defendant Officers committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

200.    Defendant Cook County is the employer of Defendants Mahoney and Brzeniak.

201.    Defendants Mahoney and Brzeniak committed the acts alleged above under color of law and in the scope of their employment as employees of Cook County.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff, XAVIER WALKER, respectfully requests that this Honorable Court enter judgment in his favor against each of the Defendants, CITY OF CHICAGO, STANLEY SANDERS, MICHAEL PIETRYLA, DAVID WRIGHT, BRIAN HOLY, JOHN CRUZ, DONALD WOLVERTON, JOHN RIORDAN, ROBERT BARTIK, ANTHONY BRZENIAK, THOMAS MAHONEY, and COOK COUNTY, awarding compensatory damages, punitive damages, attorney's fees and costs, and any such other further relief it deems equitable and just.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully Submitted,

**XAVIER WALKER**

By:    /s/Jeanette Samuels
                *One of Plaintiff's Attorneys*

Jeanette Samuels
SHILLER PREYAR JARARD & SAMUELS
601 South California Avenue
Chicago, Illinois 60612
T: 312-226-4590
F: 773-346-1221
E: sam@chicivilrights.com