# EXHIBIT 5

```
 1                IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                       EASTERN DIVISION

 4

 5   XAVIER WALKER,                  )
                                     )
 6                                   )
                   PLAINTIFFS,       )
 7                                   )
                   vs.               )No. 20 C 7209
 8                                   )
     CITY OF CHICAGO, STANLEY SANDERS )JUDGE GUZMAN
 9   MICHAEL PIETRYLA, DAVID WRIGHT, )
     BRIAN HOLY, JOHN CRUZ,          )MAGISTRATE
10   DONALD WOLVERTON, JOHN RIORDAN, )JUDGE FUENTES
     ROBERT BARTIK, ANTHONY BRZENIAK, )
11   THOMAS MAHONEY and COOK COUNTY  )
                                     )
12                 DEFENDANTS,       )

13

14             This is the discovery deposition of

15   JOHN CRUZ, taken in the above-entitled cause before

16   GWENDOLYN BEDFORD, a Certified Shorthand Reporter

17   within and for the County of Cook, State of Illinois,

18   taken via a multi-video conference held on the 20th day

19   of July 2022 at the hour of 10:30 a.m. pursuant to

20   notice.

21

22

23

24
```

1    APPEARANCES:

2    MR. WILLIAM B. OBERTS

3    TRIBLER OPETT & MEYER, P.C.

4    Attorneys at Law

5    225 West Washington Street

6    Suite 2550

7    Chicago, Illinois 60606

8    Phone: 312-201-6400

9    E-mail: worbets@tribler.com

10   appeared on behalf of the Defendants Brzeniak and

11   Mahoney

12

13   MS. JEANETTE S. SAMUELS

14   SAMUELS & ASSOCIATES

15   53 West Jackson Boulevard

16   Suite 831

17   Chicago, Illinois 60604

18   Phone: 872-588-8726

19   E-mail:samuels.jeanette@gmail.com

20   appeared on behalf of Xavier Walker, Plaintiff

21

22

23

24

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

 1  APPEARANCES:

 2  MS. BRIANA BRILL

 3  MS. NATALIE ADEEYO

 4  Special Assistant Corporation Counsel

 5  33 West Monroe Street

 6  Suite 1830

 7  Chicago, Illinois 60603

 8  Phone: 312-612-1079

 9  appeared on behalf of the City of Chicago, Defendant

10

11  MS. MISHA ITCHHAPORIA

12  MR. GRANT MILLER

13  BORKAN & SCAHILL, LTD.

14  Attorneys at Law

15  20 South Clark Street

16  Suite 1700

17  Chicago, Illinois 60603

18  Phone: 312-580-1030

19  E-mail:mitchhaporia@borkanscahill.com

20  appeared on behalf of the Defendants,

21  Individual Police Officers

22

23  ALSO PRESENT:

24  MR. DAVID WRIGHT, POLICE OFFICER

```
 1                        I N DE X

 2   WITNESS                              PAGE

 3   JOHN CRUZ

 4   Examination by Ms. Samuels           4

 5

 6                 E X H I B I T S

 7             (NO EXHIBITS MARKED)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                        (WITNESS SWORN)

 2                        JOHN CRUZ,

 3   called as a witness herein, after having been first

 4   duly sworn, was examined and testified as follows:

 5                        EXAMINATION

 6   BY MS. SAMUELS:

 7       Q    Can you please state and spell your name for

 8   the record, sir?

 9       A    John Cruz.

10       Q    Can you spell that, please?

11       A    I didn't hear you.

12       Q    Can you spell that, please?

13       A    J-O-H-N C-R-U-Z.

14            MS. ITCHHAPORIA:  This is Counsel for the

15   Officer.  Mr. Cruz is very hard of hearing.  It is

16   going to be very important that you speak up.  And

17   he'll tell you repeatedly, but he is very hard of

18   hearing.

19   BY MS. SAMUELS:

20       Q    Let's see how we do.  And if not, I'll run

21   and check my car.  Is this volume, okay?

22       A    Yes.  I can hear you right now, yes.

23       Q    So this is the deposition of John Cruz taken

24   in the case of Walker v. City of Chicago, et. al., Case
```

```
 1   Number 20 CV 7209.  This deposition is taken pursuant
 2   to notice and agreement of the parties under all
 3   applicable rules.
 4                   Have you ever given a deposition
 5   before, sir?
 6        A    Yes, I have.
 7        Q    How many times?
 8        A    I believe twice.
 9        Q    And when was that?
10        A    I think the recent one was a couple of years
11   ago and the other one was about -- let's see, in 2010
12   maybe.
13        Q    Did you prepare for today's deposition?
14        A    Yes, I did.
15        Q    I'm sorry.  I forgot to get on the record who
16   is present.  If you want to go ahead and state your
17   appearances.  Go ahead.
18             MS. ITCHHAPORIA:  Misha Itchhaporia and Grant
19   Miller for the individual Chicago Police Officers,
20   Defendants.
21             MS. BRILL:  Briana Bill and Natalie Adeeyo,
22   City of Chicago.
23             MS. SAMUELS:  And then Defendants --
24             MS. ITCHHAPORIA:  Also joining us is Officer
```

1   David Wright.

2   BY MS. SAMUELS:

3       Q    How did you prepare for your deposition?

4       A    I reviewed reports and notes and that's it.

5       Q    And I know you've sat through some other

6   depositions in this case, so I won't belabor you with

7   the rules.  But essentially all your answers have to be

8   verbal.  If any of my questions are unclear, otherwise

9   I'm going to assume that you understood the question

10  and your answer is responsive to the question, okay?

11      A    Okay.

12      Q    And if you want to take a break at any time,

13  just let me know, okay?

14      A    All right.

15      Q    When you sat through the other depositions in

16  this case, did you hear any testimony that you

17  remembered about what occurred that you remembered

18  differently?

19           MS. ITCHHAPORIA:  Objection.  Form.  Go

20  ahead.

21           THE WITNESS:  No, not essentially.

22  BY MS. SAMUELS:

23      Q    Was there anything that stuck out to you

24  either about the investigation or what you heard any of

1    the other officers talked about that you disagreed with

2    or you thought was mischaracterized?

3              MS. ITCHHAPORIA:  Objection.  Form.

4    Foundation.  Go ahead.

5              THE WITNESS:  I didn't find -- I sat through

6    the whole deposition.  I didn't find anything that was

7    counter to what happened.

8    BY MS. SAMUELS:

9        Q    So when you say you reviewed reports, what

10   reports are you talking about?

11       A    Case Reports, Medical Examiner's Reports,

12   everyday reports.  My testimony at the hearing and

13   GPRs.

14       Q    And when you say you reviewed notes, what are

15   you referring to?

16       A    GPRs.

17       Q    Did you review any transcripts besides your

18   testimony?

19       A    No, not that I recall.

20       Q    The last deposition -- well, the first

21   deposition that you gave around 2010, do you recall

22   what that was on?

23       A    I'm sorry.  I didn't hear that.

24       Q    The deposition that you gave around 2010, do

1   you recall what that was about?

2       A    I'm not certain, but I think it was a

3   complaint of false arrest.

4       Q    Do you remember anything about that case more

5   specifically?

6       A    Only that I don't remember the names of the

7   participants.  There was an allegation that the

8   arresting officer had no cause to arrest a particular

9   party.

10      Q    And the deposition that you gave a couple of

11  years ago, do you recall what that was about?

12      A    Again, it is -- I don't recall the

13  particulars.  It was an allegation that the Plaintiff

14  alleged he did not commit a particular crime.

15      Q    Do you know what happened to the 2010 case?

16      A    I'm not certain, but I believe the officer

17  was found liable.

18      Q    And when you say "officer", you mean somebody

19  other than you?

20      A    Yes.  Somebody was accused.

21      Q    Okay.  Were you just a witness in that case?

22      A    Originally, I was accused and they dropped

23  the case against me and I was just a witness then.

24      Q    And the one from a couple of years ago, were

1   you a witness or were you a Defendant?

2        A    I am a Defendant.

3        Q    Do you know what happened with that case?

4        A    It is still pending as far as I know.

5        Q    What year did you graduate high school?

6        A    I'm sorry.  I didn't hear the question.

7        Q    What year did you graduate high school?

8        A    1966.

9        Q    All right.  Are you from Chicago?

10       A    Again I didn't hear that.

11       Q    Are you from Chicago?

12       A    Yes, I am.

13       Q    What area of Chicago are you from?

14       A    Mostly the southwest side.

15       Q    Do you have any people in your family who are

16   police officers?

17       A    No.  I'm sorry.  I have a son who is an FBI

18   agent.

19       Q    After graduating high school, what did you

20   do?

21       A    I attended the University of Illinois for one

22   semester or one quarter, whatever they called it back

23   then.  I think they called it a trimester back then.

24       Q    And then after however long that was, what

1    did you do after that?

2        A    I enlisted in the United States Air Force.

3        Q    Full-time or as a reservist?

4        A    Full-time.

5        Q    How long were you in the Air Force?

6        A    Just a week short of four-years.

7        Q    What is the highest rank you received?

8        A    I was an E-5.  I was a Sergeant, Staff

9    Sergeant, I think.  Yeah, Staff Sergeant.

10        Q    That is not bad in four years.

11             What was your job duties or

12    responsibilities in the Air Force?

13        A    I was a Craft Mechanic 1 and 2, Jet Engine

14    Aircraft Mechanic.  I was an Aircraft Mechanic.  But

15    the plane I had worked on had one or two engines.

16        Q    And was that your primary job duties for the

17    entire time that you were in the Air Force?

18        A    Yes.  I did all my active duties after

19    training was all those aircrafts.

20        Q    What made you decide to leave the Air Force?

21        A    I suppose I wanted to see what the outside

22    world could offer.

23        Q    Were you ever subject to any discipline or

24    investigations while you were in the Air Force?

1     A    No, I wasn't.

2     Q    Were you honorably discharged?

3     A    Yes, I was.

4     Q    And that would have been around '71, '72?

5     A    '71, May of '71.

6     Q    After you left the Air Force, what did you

7  do?

8     A    I worked in a factory.  I'm sorry.  I had

9  difficulty finding a job for about six months.  Then I

10  worked in a factory for about a year.

11     Q    I'm sorry.  When you were in the Air Force,

12  what bases were you stationed to?

13     A    When I worked in the Air Force -- I am sorry.

14  I didn't hear the whole question.

15     Q    Where were you stationed?

16     A    I was stationed -- well, first for basic

17  training at Lackland Air Force Base in northern Texas.

18  Sheppard Air Force Base for further training and Luke

19  Air Force base in Arizona for a year at a regular Air

20  Force base.  And then I went to Vietnam for 18 months,

21  19 months.  And then I went to Lake Mead Air Force Base

22  in England for a year, occasionally being sent to Italy

23  for temporary duty.

24     Q    The base in Naples?

13

```
 1      A      Again I didn't catch that last word.

 2      Q      The base in Naples?

 3      A      No.  It was in Aviano Air Force base in the

 4  Alps.

 5      Q      And so my understanding is that after you got

 6  out, you had difficulty finding a job for about six

 7  months and you began working in a factory?

 8      A      Yes.

 9      Q      All right.  What type of factory was it?

10      A      They made sausage casings.  I worked for --

11  what the heck is the name of that company?  I don't

12  recall the name of the company offhand.

13      Q      Where was the factory located?

14      A      It was just south of Chicago, around 65th and

15  Narragansett.  I don't remember the name of the company

16  like I said.

17      Q      And about how long were you working in that

18  factory?

19      A      I worked there for about a year.

20      Q      What made you decide to leave?

21      A      I'm sorry.  I didn't hear that.

22      Q      What made you decide to leave?

23      A      I got accepted by the Police Department.

24      Q      What made you want to become a Police
```

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

1    Officer?

2         A    Mostly for -- it paid better than factory

3    work.

4         Q    That is a good reason.

5              And so my understanding is -- well,

6    actually let me ask.  So that would have been around

7    '73, the beginning of '73?

8         A    Yes, of '73.  We were still going 19, if that

9    is correct.

10        Q    And that would have been your date of

11   assignment?

12        A    That was when I went to the Academy.

13        Q    And back then was the Academy six months or

14   do you recall?

15        A    It was -- I believe it was around six months,

16   yes.

17        Q    And then after the Academy where were you,

18   what was your first assignment?

19        A    I was assigned to the 11th District.

20        Q    Just as a Patrol Officer?

21        A    Yes.

22        Q    Roughly, what area did the 11th District

23   cover at that time?

24        A    Let's see.  It went from oh, what were the

15

1    boundaries back then?  It ran from about 2600 West to

2    like 4600 West from 1200 South Roosevelt to 800 North

3    Chicago, and then there was a little cut out there that

4    they picked up.  So let's go -- yeah, that was pretty

5    generally the boundaries.  2600 West, 4600 West, 1200

6    south to like 800 north.

7         Q    Got you.  Did you have a regular partner

8    while you were a Patrol Officer in the 11th District?

9         A    No, not at first.

10        Q    Well, let me ask you this.  How long did you

11   stay a patrol officer in the 11th District?

12        A    As a uniformed officer I was there for a

13   little short of ten years.

14        Q    So from basically '73 to '83?

15        A    I'm sorry.  I didn't hear that.

16        Q    So basically from '73 to '83?

17        A    Yes.

18        Q    And then during that time, did you have any

19   other assignments or responsibilities other than being

20   a Patrol Officer?

21        A    No.

22        Q    And then it sounds like in '83 or soon

23   thereafter you stopped being a uniform officer?

24        A    Essentially, I became a Tactical Officer.

1    Q    Was that still in the 11th District?

2    A    Still in the 11th District, yes.

3    Q    How long were you in the 11th District,

4  Tactical Officer?

5    A    Until sometime in November of 1998, I

6  believe.

7    Q    So about 15 years?

8    A    About 15 years, yes, a little over.

9    Q    And then my understanding is Tactical

10  Officers -- actually I have a terrible understanding of

11  what you guys do.  Can you provide a brief description

12  of the job responsibilities of a Tactical Officer

13  during the time that you were one?

14    A    Tactical Officers are assigned essentially to

15  any vice kind of crimes to crimes that are recurring in

16  certain areas like violent crimes to help suppress the

17  crime.  And then of course you go into uniform for

18  details like Taste of Chicago and things like that.  So

19  you have to be pretty versatile.  Your hours change

20  quite often.  And you are working with a team.  You are

21  working with a team of other officers.  Again that

22  becomes pretty fluid.

23    Q    Were any of the Defendants in this case Tact

24  Team Officers with you for the 11th District?

```
 1         A     No, I don't believe so.
 2         Q     And then so you did that until roughly
 3    November 1990, correct?
 4         A     1998.
 5         Q     And then after that, what was your next
 6    assignment?
 7         A     I was promoted to Detective.
 8         Q     And what made you want to be a Detective?
 9         A     It seemed like it was an interesting move and
10    it did have an increase in pay.
11         Q     As I understand, there is a Detective school
12    that you go to once -- prior to the beginning as a
13    Detective?
14         A     I didn't understand that question exactly.
15         Q     Is it my understanding there is some sort of
16    Detective school that you go to once you become a
17    Detective?
18         A     Yes.
19         Q     What do you recall about going to Detective
20    school?
21               MS. ITCHHAPORIA:  Objection.  Form.  Go
22    ahead.
23               THE WITNESS:  It was a full shift of classes
24    Monday through Friday.  They taught us the basics of
```

1    becoming -- what a Detective does, including how to

2    handle different kinds of cases.  It's pretty much it.

3    BY MS. SAMUELS:

4        Q    And so, do you recall any training you

5    received on how to question witnesses?

6            MS. ITCHHAPORIA:  Objection.  Form.

7    Foundation.  Go ahead.

8            MS. BRILL:  Join.

9            THE WITNESS:  On interviewing witnesses, I

10   don't have a recollection of that.  It's possible.  It

11   was in the training.

12   BY MS. SAMUELS:

13       Q    Is there a difference between how you would

14   interview a witness as opposed to how you would

15   interview a potential suspect?

16           MS. ITCHHAPORIA:  Objection.  Form.  Are you

17   talking about the training or what he did generally?

18           MS. SAMUELS:  I don't know.

19   BY MS. SAMUELS:

20       Q    Is there -- I guess are you confused about my

21   question?

22       A    For any interview it is getting to the truth

23   of the matter.  That is all you are looking for is

24   truth and evidence.

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

1     Q    And I guess what I'm looking at is, sometimes

2     I have a habit of using witness and suspect

3     interchangeably.  And so when you are questioning a

4     person about a potential crime, are there different

5     things that you would do when questioning a witness as

6     opposed to when you are questioning someone who is a

7     suspect?

8     A    Oh, I see what you got.  You would advise a

9     suspect of his constitutional rights before

10    questioning.

11    Q    Is there anything else that you could think

12    of?

13    A    A witness would be free to leave.

14    Q    Do you recall if at Detective school you

15    received any training on how to document statements?

16              MS. ITCHHAPORIA:  Objection.  Form.

17              THE WITNESS:  What do you mean "how"?

18    BY MS. SAMUELS:

19    Q    Like when you are talking to someone, what

20    you are supposed to do to make sure that it has been

21    accurately preserved?

22    A    We would take notes on GPRs of statements

23    that were made to us.  That is pretty much it.

24    Q    Is there certain things that you are supposed

1   to be a part of -- well, let me go through it one by

2   one, because I sort of have something.

3                  When you are talking with a potential

4   witness or a suspect, are there ever times when you

5   wouldn't expect there to be notes on a GPR to

6   reflect that you have spoken with that individual?

7                  MS. ITCHHAPORIA:  Objection.  Form.

8   Foundation.  Go ahead.

9                  THE WITNESS:  Yes, there could be information

10  that you know or that you could recall.

11  BY MS. SAMUELS:

12      Q    And so if somebody provided you with

13  information that you can recall, then you would not

14  expect that to be reflected in a GPR?

15                 MS. ITCHHAPORIA:  Objection.  Form.

16  Mischaracterizes.  Go ahead.

17                 THE WITNESS:  It might or might not be.

18  BY MS. SAMUELS:

19      Q    Does it depend on how important the

20  information is?

21                 MS. ITCHHAPORIA:  Same objection.

22                 THE WITNESS:  That could be one of the

23  criteria.

24

1    BY MS. SAMUELS:

2        Q    Well, when you were a Detective, was that one

3    of the things that you used to determine whether or not

4    to have information you were given reflected in the

5    GPR?

6              MS. ITCHHAPORIA:  Objection.  Form.

7    Incomplete hypothetical.  Go ahead.

8              THE WITNESS:  I would try to be as thorough

9    and complete as possible.  Sometimes you recall things

10    that somebody said that you hadn't documented yet.

11    BY MS. SAMUELS:

12        Q    So the name of the person you are speaking

13    with, would you expect that to be documented in a GPR?

14              MS. ITCHHAPORIA:  Objection.  Form.  An

15    incomplete hypothetical.  Go ahead.

16              THE WITNESS:  More than likely, yes.

17    BY MS. SAMUELS:

18        Q    And I am sorry.  I saw Mike's in the waiting

19    room.  I am assuming that's Mr. Petrella?

20              MS. ITCHHAPORIA:  Yeah, that's correct.

21              MS. SAMUELS:  I don't know how long he was

22    there, so I apologize.  Are you in, Mr. Petrella?  All

23    right.  I see you.

24

1    BY MS. SAMUELS:

2        Q    So the location where you are speaking with

3    an individual, would you expect that to be reflected in

4    notes you are taking relative to the information that

5    somebody gave you?

6              MS. ITCHHAPORIA:  Same objection.

7              THE WITNESS:  Possibly.

8    BY MS. SAMUELS:

9        Q    When would you expect that to be indicated?

10             MS. ITCHHAPORIA:  Objection.  Form.

11             THE WITNESS:  Again it's possible it would be

12   documented.

13   BY MS. SAMUELS:

14       Q    Right.  So I guess what I'm getting at is,

15   I'm trying to understand sort of what the baseline is

16   for what should be in a GPR if that makes since, right?

17   And I understand that some people have special ways or

18   forms that they do it.  But I've never been a

19   Detective.  So when you are looking at a GPR, the thing

20   that I want to know, if you looked at a GPR where it is

21   recording somebody's statement, what are the things

22   that you would always expect to be recorded?  Does that

23   make sense?

24       A    I guess it does, yes.

23

```
 1      Q    And so that is my question.  So when I say
 2   "location", is that -- I understand sometimes that
 3   could be there and sometimes not be there.  But as a
 4   Detective, would you expect that to be something that
 5   is in a GPR?
 6              MS. ITCHHAPORIA:  Objection.  Form.
 7   Foundation.  Just to clarify, you are asking him about
 8   his practice, right?
 9              MS. SAMUELS:  I'm asking him about -- Sure.
10   Yeah.
11   BY MS. SAMUELS:
12      Q    So when you were a Detective, right, sure.
13   Precinct to your practice, would you expect the
14   location of where you are speaking to the individual to
15   be recorded on a GPR?
16      A    Possibly.
17      Q    And so if it wasn't in a GPR, you wouldn't
18   think anything of it because sometimes you guys just
19   don't write that down?
20              MS. ITCHHAPORIA:  Objection.  Form.
21   Incomplete hypothetical.  Go ahead.
22              THE WITNESS:  I would probably recall where
23   it happened.
24
```

1   BY MS. SAMUELS:

2       Q    How about -- we'll ask it this way.  Pursuant

3   to your training as a Chicago Police Detective, what

4   information would you expect to be contained on every

5   recorded recollection of a witness statement?

6           MS. ITCHHAPORIA:  Objection.  Form.

7   Foundation.

8           THE WITNESS:  That is pretty broad.  A lot of

9   information particular, I guess, if it was particular

10  information, then it would be documented.

11  BY MS. SAMUELS:

12      Q    All right.  And what particular information

13  would be documented, would you expect to be documented?

14          MS. ITCHHAPORIA:  Same objection.

15          THE WITNESS:  Again that is rather broad.

16  The name of the person or the party information about

17  maybe the address and identifying information.  Things

18  that are rather difficult to remember, so you make a

19  note of it.

20  BY MS. SAMUELS:

21      Q    What about the time that you begin speaking

22  with someone?

23          MS. ITCHHAPORIA:  Objection.  Form.

24  Incomplete hypothetical.

```
 1              THE WITNESS:  Possibly.
 2   BY MS. SAMUELS:
 3       Q    So what about the time you've done speaking
 4   with somebody?
 5       A    That last part I didn't hear.  I'm sorry.
 6       Q    What about the time you are done speaking
 7   with someone?
 8       A    It hasn't been my practice, no.
 9       Q    What about if you speak to someone on
10   multiple occasions?
11       A    I speak to somebody on what?
12       Q    Multiple occasions?
13            MS. ITCHHAPORIA:  Objection.  Form.
14            THE WITNESS:  Possibly.
15   BY MS. SAMUELS:
16       Q    And so when you say "possibly", I understand
17   that to mean that an officer could do it, but it is not
18   something that you would think of as being required, is
19   that fair?
20            MS. ITCHHAPORIA:  Objection.  Form.  Lack of
21   foundation.  Incomplete hypothetical.  Go ahead.
22            THE WITNESS:  Yes.
23   BY MS. SAMUELS:
24       Q    And my understanding is that generally when
```

1    you are talking to a witness, the only notes that would

2    be taken would be the GPRs that you guys didn't have a

3    practice of generally like audio recording statements

4    or anything like that?

5             MS. ITCHHAPORIA:  Object to form.  Go ahead.

6        A    Not generally, no.

7        Q    So after you went to Detective school, where

8    were you assigned?

9        A    I was assigned to the Area 4 Detective

10   Division.

11       Q    And was there a particular assignment that

12   you had there?

13       A    I was assigned to the evening shift in

14   property crimes.

15       Q    And how long were you in property crimes?

16       A    Approximately a year.

17       Q    Then after a year, what was your next

18   assignment?

19       A    I was assigned to midnights.

20       Q    Was it still with property crimes?

21       A    Midnights handles everything that comes in.

22       Q    And how long was that your assignment?

23       A    Until February of 2008.

24       Q    And during this time, you still just had the

1    general title of Detective?

2        A    I was a Detective.

3        Q    And did you have any other special

4    assignments outside of just being a Detective on

5    midnight shift?

6        A    No.

7        Q    And then after February of 2008, what was

8    your next assignment?

9        A    I retired.

10       Q    Have you had any employment since February of

11   2008?

12       A    I did.  I started a job in 2010, I believe.

13       Q    And what was that job?

14       A    I was working for the U.S. Marshals as a

15   Court Security Officer.

16       Q    And how long did you do that?

17       A    I believe eight years, nine years, I think.

18       Q    So roughly until 2019?

19       A    Let's see.  I believe -- I think it was 2019

20   I left.

21       Q    And then after leaving that job, did you have

22   any other employment?

23       A    No.

24       Q    All right.  Was that your first employment

```
 1    after leaving the Chicago Police Department?

 2         A    Yes.

 3         Q    Were you ever subject to any discipline while

 4    working as a Court Security Officer?

 5         A    No.

 6         Q    What made you retire from CPD in 2008?

 7         A    I had turned 60 and I was eligible for

 8    healthcare for a while, so it was the optimal time for

 9    me.  I couldn't get anymore pension.

10         Q    To your knowledge, were you under

11    investigation for anything at the time that you

12    retired?

13         A    I'm sorry.  I didn't hear that.

14         Q    To your knowledge, were you under

15    investigation for anything at the time that you

16    retired?

17         A    No.

18         Q    To your knowledge, have you had a citizen

19    complaint against you?

20         A    I believe I did have one.

21         Q    What was that for?

22         A    For being off my beat.

23         Q    When was that?

24         A    That was in -- shoot, 1975.  1975.
```

```
 1        Q    Other than that, you are not aware of any
 2   other sustained allegations of misconduct against you
 3   as a Chicago Police Officer?
 4        A    No, I'm not.
 5        Q    Can I take a quick break for one second?
 6
 7             MS. SAMUELS:  No problem.  You want to come
 8   back like at 11:25?
 9             MS. ITCHHAPORIA:  Yes.  He's already left the
10   room.
11                      (BRIEF RECESS)
12             MS. SAMUELS:  Back on the record.
13   BY MS. SAMUELS:
14        Q    When I say Xavier Walker, do you know who I'm
15   referring to?
16        A    When you say Xavier Walker what?
17        Q    Do you know who I'm referring to?
18        A    Yes.
19        Q    When I say Maurice Wright, do you know who
20   I'm referring to?
21        A    Yes.
22        Q    When I say Mary Curry, do you know who I'm
23   referring to?
24        A    Yes, I do.
```

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

```
 1        Q     When I say Ashanti Wright, do you know who

 2   I'm referring to?

 3        A     Yes.

 4        Q     When I say Jermaica Wright, do you know who

 5   I'm referring to?

 6        A     Yes.

 7        Q     When I say Antwoine Waddy, do you know who

 8   I'm referring to?

 9        A     Yes.

10        Q     When I say Jovanie Long, do you know who I'm

11   referring to?

12        A     Yes.

13        Q     Do you have an independent recollection of

14   your interactions with Xavier Walker as it relates to

15   your investigation into the murder of Marek Majdak?

16              MS. ITCHHAPORIA:  Objection.  Form.

17   Foundation. go ahead.

18              THE WITNESS:  I have never seen Mr. Walker

19   outside of court.

20   BY MS. SAMUELS:

21        Q     I guess what I'm saying is, do you have an

22   independent memory of any interactions you had with

23   them during the time that you were investigating?

24        A     I never had any interaction with Mr. Walker.
```

```
 1      Q     All right.  Same question, but relative to
 2   Maurice Wright?
 3      A     I interviewed Maurice Wright.  I'm sorry.
 4   Can I qualify that?
 5      Q     Yes, sir.
 6      A     I believe I was present during his interview.
 7      Q     And my question is, do you remember that or
 8   you know that because you read some reports?
 9      A     I only know it.  I only recall it from the
10   report, yes.
11      Q     And with regard to Mary Curry, do you have a
12   memory of interacting with her?
13      A     Not independent memory, no.
14      Q     With regard to Ashanti Wright, do you have a
15   memory of interacting with her?
16      A     Not specifically, no.
17      Q     With regard to Jermacia Wright, do you have a
18   memory of interacting with her?
19      A     Not independent recollection either, no.
20      Q     With regard to Antwoine Waddy, do you recall
21   interacting with him?
22      A     I don't recall him.  I don't recall
23   interacting with him, no.
24      Q     And with regard to Jovanie Long, do you
```

1    recall interacting with him?

2              MS. ITCHHAPORIA:  Objection.  Foundation.  Go

3    ahead.

4              THE WITNESS:  No, I did not.

5    BY MS. SAMUELS:

6        Q    What do you remember doing in relation to

7    investigating the murder of Marek Majdak?

8              MS. ITCHHAPORIA:  Objection.  Form.  Go

9    ahead.

10             THE WITNESS:  I remember vaguely.  I remember

11   going to the scene and being one of the initial

12   investigators of his murder.

13   BY MS. SAMUELS:

14       Q    Anything else?

15       A    Just the investigation?

16       Q    Right.  So like what about the investigation

17   do you actually remember yourself doing?

18       A    Vaguely, I remember the scene.

19       Q    Is it fair to say that you don't remember

20   questioning any witnesses?

21       A    I don't independently remember, no.

22       Q    Is it fair to say you don't remember

23   reviewing any evidence?

24             MS. ITCHHAPORIA:  Objection.  Form.

```
 1              THE WITNESS:  Review evidence when?
 2  BY MS. SAMUELS:
 3      Q    During the course of the investigation into
 4  Mr. Majdak's murder.
 5      A    I don't independently remember it.  I vaguely
 6  remember it.  Yeah.  Go ahead.
 7      Q    All right, so --
 8      A    A general memory.
 9      Q    When you say that you have a "general
10  memory", can you describe what you are recalling?
11      A    I remember it was at night.  I remember the
12  weather had been raining earlier in the evening.  It
13  was fairly well lit.  There was a van on the north side
14  of the street.  I recall that.  I remember the victim
15  lying on the sidewalk.  I remember the van was pretty
16  much parked inside of a small park, a small playground.
17  There were trees on the -- I know there is trees on the
18  south side of the street.  I don't recall on the north
19  side.  I remember there were police officers there,
20  that the scene was taped off for security purposes.
21  There was officers on the scene securing the scene and
22  that is pretty much it.
23      Q    All right.  Did you help secure the scene?
24      A    No.  The scene was already secured before my
```

1    partner and I got there.

2        Q    And your partner would have been Detective

3    Wolverton?

4        A    Yes.

5        Q    And when you say -- did you help look for

6    evidence?

7        A    Did I help what?

8        Q    Look for evidence?

9        A    Yes.

10       Q    Do you recall if you found any?

11       A    The only -- I can recall bloody footprints

12   leaving from the scene, a pool of blood around the

13   victim's head and body.  That's pretty much any

14   evidence.  I don't recall exactly seeing the cartridge

15   casings.  I remember the van on the north side of the

16   street.  I remember his passenger door was open and

17   there was glass mostly on the seat, but in the street

18   and there appeared to be some blood on the passenger,

19   front passenger seat.  Otherwise, I don't have much of

20   a recollection.  Of course, the body, you know, I saw

21   the body.

22       Q    What do you recall about seeing Mr. Majdak's

23   body?

24       A    He was facing primarily up, face up.  I

                    LIGHTFOOT COURT REPORTING, P.C.
                            312-701-1090
                     E-mail: lighfootpc@att.net

1    believe his head -- I believe it was to the east and

2    his feet were generally to the east and his legs I

3    think were towards the west.  I believe his upper left

4    shoulder was against the fence that was there.  I said

5    he was face up.  There appeared to be a -- appeared to

6    be a gunshot wound midway between his left eye and left

7    ear.

8        Q    And when you got to the scene, had the

9    paramedics already been there?

10            MS. ITCHHAPORIA:  Objection.  Foundation.

11   Form.  Go ahead.

12            THE WITNESS:  Who was already there?

13            MS. SAMUELS:  The paramedics.

14            MS. ITCHHAPORIA:  Objection.

15            THE WITNESS:  They weren't there when I got

16   there.

17   BY MS. SAMUELS:

18       Q    Did the body appear to be disturbed at all?

19       A    No.

20       Q    So you said shell casings, bloody footprints,

21   you described seeing a bloody footprint.  Where do you

22   remember seeing that?

23            MS. ITCHHAPORIA:  Objection.  Form.

24   Mischaracterizes.

```
 1              THE WITNESS:  There was a number of bloody

 2   footprints with the direction of the print.  It

 3   appeared as though the blood was from the victim.  They

 4   proceeded eastbound on Ohio and then crossed into the

 5   Parkway, then into the street and then disappeared.

 6   BY MS. SAMUELS:

 7        Q    Did you search the van?

 8        A    I don't recall that I did.

 9        Q    And so to the best of your recollection, you

10   just sort of took a look in there?

11        A    I may have.

12        Q    So when you say -- when you testified earlier

13   that you recall that there was glass in the passenger

14   seat and there was blood in the passenger seat, is that

15   from the pictures or do you actually remember looking

16   at that and seeing that on the seat?

17        A    Do I have a vivid recollection?  No.  But I

18   do believe I made note of it at the time that I

19   remembered it.  I remember there being glass on the

20   seat and what appeared to be blood on the seat.

21        Q    All right.  Do you do a walk-through with the

22   Evidence Technician?

23        A    I don't know what you mean by a

24   "walk-through".
```

37

1      Q    So after the Evidence Technician has sort of

2   marked stuff, do they tell you what they found or do

3   you just wait to read it from the report?

4           MS. ITCHHAPORIA:  Objection.  Form.

5   Foundation.  Incomplete hypothetical.  Go ahead.

6           THE WITNESS:  In these instances we have to

7   confer with one another.  There may be something that I

8   may have not seen.  They may have not seen.

9   BY MS. SAMUELS:

10     Q    And so if I'm understanding you correctly,

11  you guys are sort of in a dialogue about what you're

12  finding on the scene, is that fair?

13     A    That is pretty fair, yes.

14     Q    Do you recall searching the alley west of

15  where the body was found?

16          MS. ITCHHAPORIA:  Objection.  Form.

17  Foundation.

18          THE WITNESS:  I don't recall searching it,

19  no.

20  BY MS. SAMUELS:

21     Q    Do you know if anybody did?

22          MS. ITCHHAPORIA:  Objection.  Foundation.  Go

23  ahead.

24          THE WITNESS:  I don't know.

1   BY MS. SAMUELS:

2       Q    Do you recall conducting a search for a gun?

3       A    At that location you mean?

4       Q    Yes, sir.

5       A    I don't know if anybody searched for a gun.

6       Q    Is that something that you would generally

7   expect to do at the scene of a shooting?

8            MS. SAMUELS:  Objection.  Form.  Foundation.

9   Incomplete hypothetical.  Go ahead.

10           THE WITNESS:  We search for any kind of

11  evidence, whether it is a gun, anything that might be

12  relevant or you think might be relevant to the case.

13  Then you would note that and have it -- if it can be

14  recovered, have it recovered.  Have that memorialized.

15  So it wouldn't just be specifically a gun.  It would be

16  anything that would be relevant.

17  BY MS. SAMUELS:

18      Q    Do you remember finding a note in the

19  victim's car?

20           MS. ITCHHAPORIA:  Objection.  Foundation.  Go

21  ahead.

22           THE WITNESS:  I don't recall a note, no.

23  BY MS. SAMUELS:

24      Q    Is it your general practice coming to a scene

1    where there is still a body to examine the body or do

2    you let the ME do that?

3                MS. ITCHHAPORIA:  Objection.  Form.  Go

4    ahead.

5                MS. BRILL:  Join.  And just to make it

6    easier, the City will join all objections made by

7    counsel for Defendant Cruz.

8                THE WITNESS:  So what specifically are you

9    asking me?  If I look at the body or if I wait for the

10   ME?

11   BY MS. SAMUELS:

12        Q    Right.  So I'm asking if you look at the body

13   at all while you are at the scene?

14        A    Generally, you see the --

15        Q    I guess my question is, how in depth I guess

16   would that be?  Do you like try to get as close as you

17   can, but not touch?  Would you touch a body?  Those are

18   my questions.

19                MS. ITCHHAPORIA:  Objection.  Form.

20   Compound.  Go ahead.

21                THE WITNESS:  I generally look at the body

22   with any obvious observations.  I'll wait for it to be

23   memorialized by the crime scene investigators.  Get

24   permission from the medical examiner as to whether the

1    body can be removed to the morgue.  And then once that

2    happens, take a cursory look at anything else that

3    might be obvious to injuries or anything of evidence.

4    That would be it.

5    BY MS. SAMUELS:

6        Q    Besides the gunshot wound, you noticed to

7    Mr. Majdak's face, do you remember seeing any other

8    signs of injury?

9        A    There was blood on his pants I believe above

10   his left buttock.  And I'm not sure if we took a look.

11   No, we didn't open his pants.  So we just noted that

12   there appeared to be a gunshot wound above his left

13   buttocks.

14       Q    Do you recall moving the body?

15       A    I don't recall moving the body, no.

16       Q    Do you recall who did move the body?

17            MS. ITCHHAPORIA:  Objection.  Form.

18   Foundation.  Go ahead.

19            THE WITNESS:  With permission from the

20   Medical Examiner's office, the body was permitted to be

21   removed.  It was moved by a police wagon.

22   BY MS. SAMUELS:

23       Q    So my understanding is when you first see

24   Majdak's body, he's face up?

41

1        A    Yes.

2        Q    Is that correct?

3        A    Mostly face up.  I said his left shoulder I

4   believe was against the fence.  So that would make him

5   at a slight angle upward, but essentially he was face

6   up, yes.

7        Q    So like part of his shoulder was off the

8   ground, if I'm understanding you correctly?

9        A    I would -- it appeared to be, yes.

10        Q    Meanwhile, the rest of his body was prone?

11        A    Rest of the body was laying down on the

12   sidewalk.

13        Q    And so is it fair to say that in the crime

14   scene photos of Majdak's body, none of them portray how

15   he was found?

16             MS. ITCHHAPORIA:  Objection.  Form.

17   Foundation.

18             THE WITNESS:  The photos appeared to be how

19   he was found, yes.

20   BY MS. SAMUELS:

21        Q    Hold on.  I think we are talking past each

22   other.  Let me see if I could pull these up.  Give me

23   just a second.  I'm going to share some photos with you

24   so I can -- I'm showing you what has been Bates marked

1    City NK 1536 to 1575.  Can you see this okay?

2        A    I can see it as well as I can see it, yeah.

3        Q    And so this is City NK 1536 which is I

4    believe a shot on the -- facing east.  Is that your

5    understanding as well?

6        A    His head is towards the east and feet are

7    towards the west generally.

8        Q    So this is looking west?

9        A    Looking west, yes.

10       Q    And so are you saying that -- and can you see

11   my cursor where it is sort of indicating his shoulder?

12       A    Yes.

13       Q    And so are you saying that there were more of

14   it on the fence or that's how it was?

15       A    That's how it was.

16       Q    And to the best of your recollection, this is

17   how his body was found by you?

18       A    That is how I observed the body from what I

19   could recollect.

20       Q    And then I'm now showing you what has been

21   marked City NK 1544.  I apologize.  You see how he now

22   has been maneuvered now that he is faced down?

23       A    Yes.

24       Q    And then I'm going to take it off screen.  Do

1    you know who maneuvered him or who turned him over?

2         A    I don't recall.

3         Q    And then showing you City NK 1552 and this is

4    basically looking down on the victim's body, is that

5    fair?

6         A    Yes.

7         Q    And then from this view it looks like he is

8    completely clear of the fence and might actually be

9    under it.  And so do you remember him being more on the

10   fence?

11        A    No.  That looks like -- it doesn't look like

12   he is under the fence.  It looks like he has a shoulder

13   up against the fence or his left arm.  And I believe

14   that is like a little curb there, concrete curb.

15        Q    But his body appears to be flat on whatever

16   surfaces is under him?

17        A    Yes.

18        Q    Is that how you remember him?

19        A    Again, I don't have an independent memory,

20   but I believe that's the way he was found when I

21   first saw him.

22        Q    So the house that he was found in front of,

23   do you recall talking to the person or attempting to

24   make contact with the person who lived inside that

1    location?

2        A    Do I recall what?

3        Q    Talking to those persons or trying to make

4    contact with them?

5        A    I'm sorry.  I'm not hearing something.

6        Q    So his house essentially -- his body is

7    essentially found right in front of a house, right?

8        A    Yes.

9        Q    And the people who lived in that house, do

10   you remember talking to them?

11       A    I don't independently recall, no.

12       Q    Do you recall conducting a canvass within

13   this case?

14       A    Again, I don't recall doing a canvass, but I

15   know we did.

16       Q    And are there general steps you would expect

17   to be taken in every homicide investigation?

18            MS. ITCHHAPORIA:  Objection.  Form.

19   Foundation.  Go ahead.

20            THE WITNESS:  Every kind of case that you are

21   involved in is unique.

22   BY MS. SAMUELS:

23       Q    And is it fair to say that in a homicide

24   investigation there is no step or no tasks that you

1    expect to be completed in all of them?

2           MS. ITCHHAPORIA:  Objection.  Form.

3    Foundation.  Mischaracterizes.

4           THE WITNESS:  Circumstances are different in

5    all of them.  There are general things, but

6    circumstances are unique again.

7    BY MS. SAMUELS:

8       Q    Right.  And so I understand that there is

9    certain things that are unique about them.  I'm trying

10   to get to what is similar about them.  And so what are

11   some of the things that you would expect to see

12   completed in a homicide investigation?

13          MS. ITCHHAPORIA:  Objection.  Foundation.

14          THE WITNESS:  Way too big for me to -- I

15   don't know what you are getting at, honestly.

16   BY MS. SAMUELS:

17      Q    When you were trained, I guess, is being --

18   were you trained especially to be a Homicide Detective

19   or just to be a Detective in general and the skills

20   transfer?

21      A    Just general.  Yes, generally.

22      Q    All right.  And were there certain

23   investigatory steps that you were trained to complete

24   to become a Detective?

     1              MS. ITCHHAPORIA:  Objection.  Form.

     2              THE WITNESS:  Again, I'm not certain what you

     3     are referring to.  You would try to find the facts as

     4     best you could, document.  And as I say, seek the

     5     truth.

     6     BY MS. SAMUELS:

     7          Q     And so if I'm understanding you correctly,

     8     they wouldn't say in an investigation like this is the

     9     first thing you are supposed to do and this is what you

    10     are supposed to do after that?  Nothing like that?

    11          A     No.

    12          Q     And so were you required to corroborate

    13     evidence or -- yes, were you required to corroborate

    14     statements that a witness gave you?

    15          A     Was I required to corroborate what?

    16          Q     Statements that a witness gave you.

    17              MS. ITCHHAPORIA:  Objection.  Form.

    18     Foundation.  Incomplete hypothetical.  Go ahead.

    19              THE WITNESS:  As best I could.

    20     BY MS. SAMUELS:

    21          Q     Were you required to corroborate statements

    22     that the suspect gave you?

    23              MS. ITCHHAPORIA:  Same objection.

    24              THE WITNESS:  Again, as best I could.

                         LIGHTFOOT COURT REPORTING, P.C.
                                  312-701-1090
                            E-mail: lighfootpc@att.net

```
 1   BY MS. SAMUELS:

 2        Q    Were you trying to document the evidence to

 3   corroborate statements that a witness gave you?

 4             MS. ITCHHAPORIA:  Same objection.

 5             THE WITNESS:  Corroboration, if I could do

 6   it, if I could corroborate something I would do it.

 7   Again it would have to be pertinent to the case.

 8   BY MS. SAMUELS:

 9        Q    Right.  My question -- I'm sorry.  I didn't

10   mean to cut you off.  Go ahead.

11        A    No, no, no.  That is pretty much what I was

12   trying to get at.

13        Q    So my question is, were you expected to

14   document attempts made to corroborate information that

15   was given to you?

16             MS. ITCHHAPORIA:  Same objection.

17             THE WITNESS:  That's rather vague.  Was I

18   required to corroborate -- again, as best I can.  As

19   best I could.  Not everything could be corroborated.

20   BY MS. SAMUELS:

21        Q    Right.  I understand that.  Say somebody

22   gives you information and you try to corroborate it and

23   you find out that it's inaccurate.  Would you expect

24   that to be documented?
```

```
 1              MS. ITCHHAPORIA:  Objection.  Form.
 2    Incomplete hypothetical.  Move for speculation.  Go
 3    ahead.
 4              THE WITNESS:  Not necessarily.
 5    BY MS. SAMUELS:
 6        Q    And if somebody gives you information and you
 7    attempted to corroborate it and you couldn't
 8    corroborate it one way, or you couldn't prove it was
 9    false, you couldn't prove that it was accurate, would
10    you expect that to be documented?
11              MS. ITCHHAPORIA:  Same objection.
12              THE WITNESS:  Not necessarily.
13    BY MS. SAMUELS:
14        Q    Is it fair to say that the attempt to
15    corroborate statements that were given to you weren't
16    required to be documented?
17              MS. ITCHHAPORIA:  Same objection.  Form and
18    foundation.
19              THE WITNESS:  There are -- you would look for
20    what's pertinent to the case and whether you could
21    verify something or not.
22    BY MS. SAMUELS:
23        Q    So if somebody said I saw a shooting and I
24    was ten feet away from them because att I was at this
```

1    location, right, would you go to that location and see

2    if that is actually ten feet away or would you like --

3    would that be something that you would be expected to

4    document?

5              MS. ITCHHAPORIA:  Objection.  Form.

6    Compound.  Incomplete hypothetical.  Calls for

7    speculation.

8              THE WITNESS:  No.  Again -- well, if it is

9    reasonable and if it is something that might have a

10   bearing, then I would probably take a look at it and

11   see if that was the case.  Otherwise, I don't see the

12   point of it.  I don't see what you are getting at.  I'm

13   not trying to be difficult.  I just don't see -- I

14   don't know what you are getting at.

15        Q    That is fine.  And again I'm not trying to

16   belabor the point.  One of the allegations in this case

17   you understand is that Xavier Walker is saying I told

18   the police officers that I had an alibi.  I was with

19   certain individuals, correct?

20             MS. ITCHHAPORIA:  Objection.  Form.  Are you

21   asking if he is aware of the allegations?

22             MS. SAMUELS:  Yes.

23             THE WITNESS:  I'm not aware of it.

24

```
 1   BY MS. SAMUELS:

 2       Q    Let's assume that Xavier Walker is saying

 3   when he was questioned by the police, he told them I

 4   was with certain individuals at the date and time that

 5   the murder occurred.  And I understand that it's --

 6   well, first, would you consider that to be material?

 7              MS. ITCHHAPORIA:  Objection.  Form.

 8   Incomplete hypothetical.  Go ahead.

 9              THE WITNESS:  I don't know the circumstances

10   under which he would have made that statement.  I don't

11   know if he further changed the scenario.  I don't have

12   specific knowledge of any of this.  And that is all

13   hyperbole.

14   BY MS. SAMUELS:

15       Q    How do you determine whether the information

16   you receive is material enough to require

17   corroboration?

18              MS. ITCHHAPORIA:  Objection.  Form.

19   Foundation.  Incomplete hypothetical and calls for

20   speculation.  Go ahead.

21              THE WITNESS:  If something was reasonable,

22   you know, again it depends on the circumstances.  The

23   statements that somebody gives.  There are so many

24   variables.  It is not something that you could say
```

1   generally.  So I can't respond to that.

2   BY MS. SAMUELS:

3        Q    It is just a case-by-case basis?

4        A    I'm sorry?

5        Q    It is just a case-by-case basis?

6        A    I would say generally, yes.

7        Q    Do you remember speaking with the victim's

8   sister about this case?

9        A    Speaking with whom?

10       Q    The victim's sister.

11       A    Yes, I did.  I don't recall exactly.  I do

12  recall that we spoke to her.

13       Q    So besides the first night and going to the

14  scene, is it fair to say that you don't have an

15  independent recollection of anything else that you did

16  in this murder investigation?

17       A    Not independently, no.

18       Q    Do you know why the murder scene sticks out

19  to you so much where you can remember it all these

20  years later?

21            MS. ITCHHAPORIA:  Objection.  Form.  Go

22  ahead.

23            THE WITNESS:  Again this is a rather general

24  view.  I remember doing a scene.  I remember how the

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

 1   body was laying.  I remember about the vehicles and the

 2   way the door was open and glass was broken.  Those are

 3   what I recall.  With photographic memory, no.  I don't

 4   have a photographic memory.  These are general things

 5   that I recall.

 6        Q    Was there anything about the murder of Marek

 7   Majdak that you thought was unusual or strange?

 8             MS. ITCHHAPORIA:  Objection.  Form.

 9   Foundation.  Go ahead.

10             THE WITNESS:  I did find it unusual that it

11   was -- he was white.  But I didn't have any

12   preconceptions about how it occurred.  I'm sorry.  I

13   got to hit the bathroom again.

14             MS. ITCHHAPORIA:  Can we take a break?

15                    (BRIEF RECESS)

16             MS. SAMUELS:  Back on the record.

17   BY MS. SAMUELS:

18        Q    All right.  I think the last question I asked

19   was there anything odd or unusual about the scene of

20   Marek Majdak murder to you?

21        A    Well, one, that it was a murder.  There was a

22   murder there.  It is not a place where you find murders

23   regularly.  There is not many places that you find

24   murders regularly.

53

1      Q     Were you familiar with that area at all?

2      A     I've been in that area, not frequently, but

3   regularly.

4      Q     Why would you regularly be in that area?

5      A     When I was with the 11th District, Tactical

6   Unit we sometimes had complaints of narcotics sales

7   within I would say oh, twelve blocks from that area in

8   each direction.

9      Q     Can you be more specific about that area that

10  you are complaining about of there being narcotics

11  sales?

12           MS. ITCHHAPORIA:  Object to form.  Go ahead.

13           THE WITNESS:  It seems down in that area --

14  of course by that time this occurred, I had been out of

15  there for about a year and a half.  But even before

16  that, occurrences of narcotic sales had -- complaints

17  of narcotic sales seemed to have diminished.

18  BY MS. SAMUELS:

19     Q     And when you are describing that area, can

20  you be more specific about that?  The specific blocks

21  that you were referring to earlier?

22           MS. ITCHHAPORIA:  Objection.  Form.

23           THE WITNESS:  I never made an arrest on that

24  block.  But I believe that I recall other officers

54

1    making arrests in that vicinity for narcotics.

2    BY MS. SAMUELS:

3        Q    And when you were talking about that box or

4    that area that was known for narcotics sales, can you

5    be more specific about what that -- the geographic

6    limitations of that area?

7        A    Again, most of the investigations I did were

8    not specifically on that block.  There were, I guess,

9    we only extended from the railroad tracks to Cicero

10   which is about two blocks.  And then Brach's Candy I

11   believe was to the south.  So maybe three blocks north

12   of Brach's Candy and two blocks west of the railroad

13   tracks.  So it is not a lot of area.  But we did have

14   some investigations and a number of arrests.

15       Q    And what is Brach's Candy?  Is that an actual

16   store?

17       A    I'm sorry.  Brach's Candy was a business

18   there for a long time, took up several square blocks.

19   Employed a lot of people.

20       Q    So like a factory?

21       A    It was a candy factory, right.

22       Q    And from the candy factory to Cicero, if I'm

23   understanding you correctly?

24       A    From the candy factory to Chicago.

1       Q     And then from Cicero to the railroad tracks?

2       A     Right.  The railroad tracks is 4600 West, the

3    street there to Cicero.

4       Q     Did you have any knowledge of the gangs that

5    operated in that area?

6       A     I had very little first-hand knowledge of

7    gangs over there.  I didn't investigate gangs that

8    much.

9       Q     Did you know what gangs were known to sell

10   drugs in that block?

11      A     Again, I don't know what gangs inhabited that

12   area.  I think those things are fluid anyway.  They vie

13   for territory mostly for the selling of narcotics.

14      Q     Do you have a reason to believe that the

15   death of Marek Majdak was gang-related?

16            MS. ITCHHAPORIA:  Objection.  Form.

17            THE WITNESS:  Do I have reason to believe

18   that Mr. Majdak what?

19   BY MS. SAMUELS:

20      Q     That his death was gang-related?

21      A     I don't believe he was, no.

22      Q     My question is, do you believe that his

23   murder was gang-related?

24      A     That is a rather vague way to put it.  Gangs

1    controlling that area wouldn't -- you couldn't be in

2    that area unless you had some affiliation with the

3    gangs.  That is my understanding.  But people would

4    visit that area.  They wouldn't be in gangs.  People

5    lived in the area.  They had a lot of civilians, older

6    people.  Of course they wouldn't be in a gang more than

7    likely.  Do I think his is gang-related?  I couldn't

8    say.

9        Q    Do you have any reason to believe that the

10   murder of Marek Majdak was related to the sale of

11   narcotics?

12       A    I wouldn't know.  I have my doubts.

13       Q    When you say "I have my doubts", what do you

14   mean?

15       A    Once we interviewed family and friends, it

16   did not appear that he was a narcotics user.

17       Q    You have any other thoughts on whether or not

18   the murder of Marek Majdak was drug-related?

19       A    Other than his autopsy report indicated no

20   indications of narcotics.  Just alcohol.

21       Q    Do you have any reason to believe that the

22   murder of Marek Majdak was related to prostitution?

23            MS. ITCHHAPORIA:  Objection.  Form.

24   Foundation.

1              THE WITNESS:  Was related to what?

2              MS. SAMUELS:  To prostitution.

3              MS. ITCHHAPORIA:  Same objection.  Form.  Go

4    ahead.

5              THE WITNESS:  I have no way of knowing that.

6    BY MS. SAMUELS:

7        Q    I'm sorry?  I missed your answer.

8        A    I have no way of knowing that.  There was no

9    indication.

10       Q    Do you recall going to Mr. Majdak's

11   autopsy?

12       A    I don't believe I did, no.

13       Q    Do you recall reviewing the reports from his

14   autopsy?

15       A    I believe I have reviewed those reports, yes.

16       Q    Do you remember doing that during the course

17   of the murder investigation?

18       A    I don't remember when I reviewed those

19   reports.

20       Q    As you sit here today, do you have any reason

21   to believe that you would have reviewed the autopsy

22   reports of Marek Majdak during the murder

23   investigation?

24             MS. ITCHHAPORIA:  Objection.  Form.

```
 1              THE WITNESS:  I don't recall that I got the
 2    results of the autopsy.
 3    BY MS. SAMUELS:
 4        Q     When you were investigating homicides, was it
 5    your general practice to review autopsy reports?
 6        A     Yes.  If they were directed to me, perhaps.
 7        Q     So is it fair to say --
 8        A     More than likely.  I would have reviewed them
 9    if it was my -- it was directed to me.  If the results
10    of the autopsy was directed to me.
11        Q     And if the results of the autopsy weren't
12    directed to you, is it fair to say that you likely
13    would not have reviewed them?
14        A     I may or may not have.
15        Q     Just depends on the case of whether or not
16    you reviewed the autopsy results?
17        A     Again, if it is not directed to me, then I
18    might not have even know it existed.
19        Q     In a murder investigation?
20        A     If I wasn't, yeah.  I do all kinds of
21    investigations when I'm on midnights.  I'm not given
22    cases that follow through until it is over.  That is
23    not how that works.
24        Q     How does that work?
```

1              MS. ITCHHAPORIA:  Objection.  Form.

2              THE WITNESS:  I would work on the case until

3    I had no more leads.

4    BY MS. SAMUELS:

5         Q    So I'm confused.  In a case like this, where

6    I assume that you are sent to the scene because the

7    murder was discovered during your shift, is that fair?

8         A    That what?

9         Q    So I'm assuming that you were assigned to go

10   to the scene because the murder was discovered during

11   your shift?

12        A    Yes.

13        Q    And so after that, the initial canvass and

14   the initial inventory of evidence, would you generally

15   be done with the case unless somebody specifically

16   assigned you a task or how would that work?

17             MS. ITCHHAPORIA:  Objection.  Form and

18   incomplete hypothetical.

19             THE WITNESS:  That is pretty much it.  I was

20   somewhat assigned the case for that day.  Unless I was

21   assigned the case, then I would be -- I wouldn't be --

22   I would not be expected to follow unless I was given

23   information.  That is as far as it would go for me.

24

```
 1   BY MS. SAMUELS:

 2       Q    And so my understanding is basically there

 3   weren't any cases that you were expected to follow.

 4   You would just do a task as assigned for an

 5   investigation?

 6       A    Up to a point unless I was advised to do a

 7   follow-up, then I wouldn't have to do anything.  Again

 8   if you learn something, then you would probably act on

 9   it.

10       Q    I'm sharing what has been marked as City 108,

11   I think.

12       A    Yes.

13       Q    Can you see that?

14       A    I can't because the photo box is blocking it.

15   I believe my attorney is going to find the page and let

16   me review it.

17            MS. ITCHHAPORIA:  I'm going to hand him a

18   copy of City of 108, a hard copy.

19            THE WITNESS:  I see that.

20   BY MS. SAMUELS:

21       Q    You want to go ahead and have a chance to

22   review it and then let me know when you are ready?

23       A    Okay.  I've reviewed it.  My writing is less

24   than perfect.
```

```
 1      Q    Do you recognize this as a report that you
 2   authored?
 3      A    I made the GPR, yes.
 4      Q    And my understanding is that this report was
 5   written on the 14th of May 2000,  is that correct?
 6      A    Probably.
 7      Q    So at the top right where it says, "Date of
 8   This Report", that is where I'm getting at.
 9      A    Yes, right.
10      Q    And then, I'm sorry.  What is the First
11   Watch?
12      A    That is the midnight shift.
13      Q    When did that begin and when does it end?
14      A    You want the hours?
15      Q    Yes, please.
16      A    We start around midnight and we can end at
17   8:30 in the morning.
18      Q    And then in this handwritten portion, the
19   first line looks like it's a time and a date?
20      A    Right.
21      Q    09:20, would that be 9:20 in the morning?
22      A    It looks like 9:20.
23      Q    Are you writing in military time, so that
24   would be a.m.?
```

```
 1        A     Yes, that would have been military time.

 2        Q     Would that be the date that you are writing

 3   the report -- or would that be the time that you are

 4   writing the report or the time that you spoke with the

 5   witness in this statement?

 6        A     I'm not certain.

 7        Q     Do you know or do you remember how this

 8   person got into contact with you?

 9        A     It says "telephone".  So I imagine called the

10   station.

11        Q     That was my question.  Have you already spoke

12   with the family or to the best of your recollection she

13   probably just called the station and you were the

14   person on the case so they transferred her to you?

15              MS. ITCHHAPORIA:  Objection to form and

16   foundation.  Go ahead.

17              THE WITNESS:  Possibly.

18   BY MS. SAMUELS:

19        Q     As you sit here today, do you have any reason

20   to believe that she would have had your direct contact

21   information?

22        A     That she would have had my contact

23   information?

24        Q     Yes, sir.
```

1      A     She was left with it the day before when we

2   visited her to advise her of her brother's demise.

3      Q     Do you remember meeting with her?

4      A     I remember that we met with her.  I do not

5   remember her specifically, no.

6      Q     Where do you recall meeting with her?

7      A     I believe it was at her residence.

8      Q     Who all was present?

9      A     Again, I don't have an independent

10  recollection.  I believe it was me, my partner, her

11  boyfriend and her.  I think that was just the four of

12  us.

13     Q     Can you read what this report says?

14     A     With some difficulty, yes.

15     Q     Go for it.

16     A     My handwriting is not the greatest.  So what

17  would you like me to --

18     Q     Hello?

19           MS. ITCHHAPORIA:  Are you asking him to read

20  out loud?

21           THE WITNESS:  What do you want me to read,

22  the narrative part there?

23  BY MS. SAMUELS:

24     Q     Yes, please.

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

```
 1      A    I believe it says that she talked to Marsenna
 2   and then there is a home phone number.  Sometime -- I
 3   can't read the next word very well.  Of her brother,
 4   girlfriend of her brother who told her that Mark was
 5   seen by a musician at the Cardinal Club at Laramie and
 6   Belmont whose name is Yager.  Mark left by himself
 7   about 00:30 hours saying that he was going to Michelle
 8   Palace on Irving Park and Laramie.
 9      Q    Is it your understanding that the information
10   Majdak's sister was relating to you, came from Marek
11   Majdak's girlfriend?
12      A    That is what it seems like, yes.
13      Q    Do you recall doing any follow-up after you
14   received this information?
15      A    I didn't, no.
16      Q    Do you recall asking anyone else to conduct
17   any follow-up?
18      A    I don't know if I talked to a Sergeant and
19   told him what I learned.  Other than that, I don't
20   know.  I don't believe I was told to give it to
21   somebody in particular.
22      Q    Is there anybody that you would be expected
23   to report to or let them know about the information
24   that you discovered?
```

```
 1        A    I would -- I specifically know, but I believe
 2   that I would have talked to my Sergeant or a Sergeant.
 3        Q    I'm sorry.  And in that GPR where it says
 4   0:30, my understanding is that is military time and
 5   that is 12:30 midnight?
 6        A    That it was what?
 7        Q    That would have been 30 minutes after
 8   midnight?
 9        A    Oh, you mean at the bottom?  Thirty minutes
10   after midnight, yes.
11        Q    I have some more GPRs for you that we are
12   going to walk through.
13        A    You want to put this one back then?
14        Q    So this is City NK 102.  I think they are
15   like 105 or 109.  I'm sorry through 108.  We just did
16   109.
17             MS. ITCHHAPORIA:  Just a second.  I'll give
18   him the hard copies.  We just did 108, right?
19             MS. SAMUELS:  Yes.
20             MS. ITCHHAPORIA:  I'm going to hand him 102
21   through 107.
22             MS. SAMUELS:  Yes.
23             MS. ITCHHAPORIA:  Is that Exhibit 2?
24             MS. SAMUELS:  Yes.
```

1    BY MS. SAMUELS:

2        Q     This is City NK 102.  Do you recognize this

3    document?

4        A     Yes.

5        Q     This is one of the documents that you

6    reviewed in preparation for your deposition?

7        A     Is it what?

8        Q     One of the documents you reviewed in

9    preparing for your deposition?

10       A     Yes, it is.

11       Q     And then this doesn't look like your

12   handwriting, but your name is signed as one of the

13   reporting officers?

14       A     Right.  Not mine.

15             MS. ITCHHAPORIA:  Let her get her question

16   out.

17   BY MS. SAMUELS:

18       Q     So is it my understanding that this report

19   would have been created in conjunction with Detective

20   Wolverton?

21       A     Yes.

22       Q     How often did you work with Detective

23   Wolverton?

24             MS. ITCHHAPORIA:  Objection.  Form.

1    Foundation.  Go ahead.

2            THE WITNESS:  What was the question again?

3            MS. SAMUELS:  How often did you work with

4    Detective Wolverton?

5            THE WITNESS:  We weren't regular partners if

6    that is what you are getting at.

7    BY MS. SAMUELS:

8        Q    I'm just wondering how familiar you were with

9    him?

10       A    I had known him in the 11th District.  When

11   he was -- well, I only worked with him once in my 25

12   years there, but I knew him.  I knew him.

13       Q    When you say in the 11th District, where was

14   he assigned and where were you assigned?

15       A    Let's see.  Now that I think about it, maybe

16   I never worked with Donnie.  I knew his partner.  I

17   worked with his partner, Curtovitch a number of times.

18   But I encountered Donnie -- I remember him being a

19   pretty good officer.  He worked the midnight Tact Team,

20   just him and his partner.

21       Q    So is it fair to say you both were on the

22   Tact Team for the 11th District during the same time

23   period?

24       A    We didn't work together.  He was on a

1    midnight team.  I was just a —— it was just him and

2    Steve Curtovitch worked together.  They worked

3    midnights.  I don't remember when it started.  I don't

4    remember when it ended.

5         Q    All right.  So you were both tactical

6    officers at the same time for the 11th District, but

7    you guys were never partners together, is that fair?

8         A    We never partnered together.  I don't believe

9    we ever partnered together.  As far as the Tact team

10   goes, we did not work at the same time.  We never

11   partnered.

12        Q    And so, the way that this is set up, is the

13   south side of the street is on the north side of the

14   street, is that fair?

15        A    The south side of the street is on the what?

16        Q    On the north side of the paper.

17        A    You are talking about the diagram?

18        Q    Yes, sir.

19        A    It is not how maps are usually laid out, but

20   it depicts how the area was at that time.  You could

21   say the north side of the street was on the bottom end

22   and the south side of ths street is on the top end.

23        Q    All right.  And so this diagram indicates a

24   knee and a shoe print sort of in front of 2747.  Do you

1   see that?

2          A    Yes.  All that is at the bottom.

3          Q    Do you have any reason to believe that this

4   knee print or shoe print was related to the shooting of

5   Marek Majdak?

6               MS. ITCHHAPORIA:  Objection.  Form.

7   Foundation.

8               THE WITNESS:  I'm misunderstanding the

9   question.  Would you repeat it, please?

10  BY MS. SAMUELS:

11         Q    So on your crime scene diagram, there is a

12  lot of different things indicated, right?

13         A    Yes.

14         Q    And one of the things that is indicated is a

15  knee print and the shoe print next to a tree?

16         A    That is what it indicates.

17         Q    So my question is, do you have a reason to

18  believe that the knee print and/or shoe prints were

19  related to the murder of Marek Majdak?

20              MS. ITCHHAPORIA:  Same objection.  Form.

21  Foundation.  Go ahead.

22              THE WITNESS:  I don't know whether it was or

23  not.

24

1   BY MS. SAMUELS:

2       Q    You just put everything down and if it is

3   relevant, at least you have it.

4            MS. ITCHHAPORIA:  Objection.  Form.  It

5   mischaracterizes.  Go ahead.

6            THE WITNESS:  You put down what you can see

7   and what could be relevant.

8   BY MS. SAMUELS:

9       Q    And then do you see how this alley is

10  indicated right before you get to the lot where the

11  playground, where the van was parked in front of?

12      A    Yes.

13      Q    Does that refresh your recollection at all

14  about whether or not you searched that alley?

15      A    I don't recall searching the alley.

16      Q    Were you ever able to identify the owners of

17  all the other vehicles that were found on the street?

18           MS. ITCHHAPORIA:  Objection.  Foundation.  Go

19  ahead.

20           THE WITNESS:  I don't recall.

21  BY MS. SAMUELS:

22      Q    Is that something that you would normally do?

23           MS. ITCHHAPORIA:  Objection.  Form.

24           THE WITNESS:  I don't know.

                LIGHTFOOT COURT REPORTING, P.C.
                        312-701-1090
                  E-mail: lighfootpc@att.net

```
 1   BY MS. SAMUELS:

 2        Q    Did it seem weird to you that the flashers

 3   were on in the vehicle?

 4             MS. ITCHHAPORIA:  Objection.  Form.

 5             THE WITNESS:  I don't independently remember

 6   that.

 7   BY THE WITNESS:

 8        Q    That the flashers were on or that you thought

 9   it might be weird?

10             MS. ITCHHAPORIA:  Compound.

11             THE WITNESS:  That the flashers were on.

12   BY MS. SAMUELS:

13        Q    Do you see where my cursor is indicating

14   right here?

15        A    Was what?

16        Q    Can you see where my cursor is indicated on

17   the screen?

18             MS. ITCHHAPORIA:  Her cursor is right here.

19   That is what she is pointing to.

20             THE WITNESS:  Okay.  All right.  You are

21   indicating the description of the vehicle?

22   BY MS. SAMUELS:

23        Q    Right.  Yes, sir.

24        A    Okay.
```

1        Q    All right.  Do you remember seeing the

2    flashers on when you arrived at the scene?

3        A    I don't independently recall that, no.

4        Q    Do you recall drawing any conclusions based

5    upon the flashers being on in the vehicle?

6             MS. ITCHHAPORIA:  Objection.  Form.

7    Foundation.  Go ahead.

8             THE WITNESS:  Not that I recall.

9    BY MS. SAMUELS:

10       Q    Do you remember finding the keys on the floor

11   in between the seats?

12       A    I don't independently recall.

13       Q    And do you know when they say "between

14   seats", does that mean between the two front seats or

15   between the front seat and the back seat?

16            MS. ITCHHAPORIA:  Objection.  Foundation.

17   Form.  Go ahead.

18            THE WITNESS:  From what I've read, again I

19   don't independently recall.  What I read, it was under

20   the dash.  So it would be in the front seat.

21   BY MS. SAMUELS:

22       Q    Do you remember drawing any conclusions about

23   where the victim was sitting in the vehicle?

24       A    No.

```
 1      Q    Do you remember -- well, do you have any

 2  reason to believe that the victim drove himself to this

 3  location?

 4      A    Circumstantially, yes.

 5      Q    And what's that?

 6      A    I don't know if anybody else having been in

 7  the car with him and friends saying that he was driving

 8  that car.

 9      Q    Did it seem weird to you that the passenger

10  door was open?

11           MS. ITCHHAPORIA:  Objection.  Form.

12  Foundation,  Go ahead.

13           THE WITNESS:  I do recall that the passenger

14  door was open.  I do recall that.

15  BY MS. SAMUELS:

16      Q    Did it look or seem to you that the car had

17  been rifled through?

18           MS. ITCHHAPORIA:  Objection.  Form.  Assumes

19  facts.  Go ahead.

20           THE WITNESS:  Not that I recall.

21  BY MS. SAMUELS:

22      Q    Did you draw any conclusions or make any

23  suppositions about why the passenger door was open?

24      A    Supposition.  Just generally.  Somebody had
```

1    opened the passenger door.  I don't know if it was the

2    victim or somebody else.

3         Q     Moving on to NK City 103?

4         A     Okay.

5         Q     It looks like this GPR was completed in the

6    First Watch 13th of May 2000, is that correct?

7         A     Yes.

8         Q     And can you read the contents of this?

9         A     Sure.  At 01:40 hours military time we were

10   assigned by Sergeant Vail to conduct the investigation

11   of a possible homicide on Ohio.  We arrived around

12   2 o'clock.  It was 200 hours.  Then we took down --

13   let's see 1:11, arrived about 01:15, 1:15, Officers,

14   Burke, Star Number and M. Jackson Star Number.  1123 is

15   the first on the scene.  And it looks like Officer Leo

16   and Officer -- I don't know what that is.  It could be

17   Goins.  1110 Sergeant Lewison, Star 465.  He was there

18   I gather about 1:20 a.m.  Let's see.  A call came out a

19   person beat up on the street by a car.  The car was

20   from 4658 West Erie.  There is a name there.  I think

21   Landon. 4725 and 4723 that were .40 caliber shell

22   casings.  Let's see.  I'm not certain what the next one

23   says.  I don't know.  I can't really make out what that

24   said.  Toll left from two dot of foot, 5-foot eight.

1    Might have been to his height.  And there is a drawing

2    with some numbers on it.  And there is lines through

3    the numbers.  I believe I redrew the scene.  I didn't

4    leave myself enough room.  Then we took down —— at some

5    point I took down the victim's name, which had to be

6    corrected.

7                    Okay.  Notifications, let's see.  Oh,

8    boy, I'm not sure what those are.  Medical

9    investigator.  And then Star Number 51.  I can't make

10   out what the name is.  Let's see.  Again medical

11   Institute, ME Number.  And so this is somebody that

12   apparently I made these notes when we got to the ME's

13   office.  We confirmed that what we saw was a gunshot

14   wound to the left cheek bone and the buttocks.  And

15   let's see.  I believe it is part of that —— our part of

16   the canvas.  4723 West Ohio.  Brookins, clearance.

17   Male black, 28 August 62, possibly one shot.  And I

18   can't make out the rest of that.  I don't know what the

19   significance of that next line is.  4815 West Huron.

20   No —— that might be where he lived.  That is pretty

21   much it.

22        Q    Do you recall where you got this information

23   about Marek?

24        A    Where we got the information about the

1    victim?

2        Q    Yes, sir.

3        A    I believe he had an Illinois ID card on him.

4    And then the name was so long, apparently they didn't

5    make a space between it, his middle name and his last

6    name.

7        Q    And then do you remember speaking with the

8    Medical Examiner's investigators?

9        A    I don't independently recall that, no.

10        Q    Do you recall if that would have, generally

11    speaking, would that be in person or over the phone?

12            MS. ITCHHAPORIA:  Objection.  Form.

13    Foundation.  Go ahead.

14            THE WITNESS:  I don't recall.  I don't -- I

15    don't think that I talked to anybody on the phone.

16    BY MS. SAMUELS:

17        Q    And then it looks like it says that he was

18    pronounced dead, 03:35, is that correct or am I reading

19    that wrong?

20        A    Okay.  I could not make out my own

21    handwriting.  It looks like when he was pronounced,

22    yes.

23        Q    And then going to the next page, which I

24    think is the continuation of the canvass, 104.  Can you

1   read these reports?

2       A    Okay.  It says 4717 West Ohio.  3:20 hours.

3   No answer.  04715 West Ohio 03:30, didn't -- let's see.

4   Apparently I didn't see anything or hear anything.  And

5   then that is Maria Ott.  It gives her date of birth and

6   her phone number. 4711 West Ohio 0:30 hours.  That is

7   Mary Jackson, 03:40 hours.  And there is -- again she

8   didn't say anything or she didn't give us anything.

9   Mary Jackson, date of birth, Phone Number 4709, no

10  answer.  And apparently that other addresses there were

11  no answers.

12              Then there is a diagram then with the

13  addresses on it and marked as though they were

14  footprints.  I made a note they are all partials except

15  for one.  And then with the other information we

16  learned about the victim, where he lived at.

17              MS. ITCHHAPORIA:  Read it.

18              THE WITNESS:  5:10 Clavey Lane, Highland

19  Park.  There is a phone number, 817-432-0756.  And I

20  believe it is a name -- let me see.  I can't make out

21  the first name, Romanska, R-O-M-A-N-S-K-A, is the last

22  name.  And Jan Ostoja, O-S-T-O-J-A.  Let's see, unknown

23  residents, Logan Square Aluminum Roofing at 2500 North

24  Pulaski.  I can't make out the first name L-U-K-E-R-Z,

```
 1    I think, W-E-G-L-O-W-S-K-I.  And I mentioned April 77
 2    is at 10453 West Touhy, second floor, social of
 3    ███████████.  Then Joanna J-O-A-N-N-A D.
 4    R-O-M-A-N-S-K-A.  Driver's license R588 -- I can't make
 5    out the rest of it.  Phone number is 847-699-1844;
 6    Apparently social of ███████████.  I believe the date
 7    of birth of ████████████ and I can't make out what
 8    the other numbers are.  It looks like a phone number,
 9    but I can't make it out.
10    BY MS. SAMUELS:
11         Q    This report was completed as well on the
12    First Watch of May 13, 2000?
13         A    It was made on the same day as the
14    occurrence, yes.
15         Q    And so my understanding for the first
16    paragraph for West Ohio, 03:20.  I'm guessing that is
17    the time that you went and spoke to the people at this
18    address?
19              MS. ITCHHAPORIA:  Objection.  Form.
20              THE WITNESS:  Apparently.
21    BY MS. SAMUELS:
22         Q    My understanding from your notation is that
23    they didn't answer?
24         A    That is what I put, yes.
```

```
 1        Q    And for 4715 West Ohio, it looks like you
 2   went to talk to them at 3:30 a.m.?
 3        A    Yes.
 4        Q    And it looks like you got a name and some
 5   contact information?
 6        A    Yes.
 7        Q    And it looks like you wrote "didn't".  What
 8   do you understand that to mean?
 9             MS. ITCHHAPORIA:  Objection.  Foundation.  Go
10   ahead.
11             THE WITNESS:  That they didn't see or hear
12   anything.
13   BY MS. SAMUELS:
14        Q    For 4711 West Ohio it looks like you went to
15   talk to them at 3:40 a.m.?
16        A    Yes.
17        Q    And you are also able to get some name and
18   contact information?
19        A    Yes.
20        Q    But there is nothing indicated about what
21   they may have seen or heard, is that fair?
22        A    Right.
23        Q    Do you understand that to mean anything?
24        A    That she had nothing to tell me about
```

1    anything that she had seen or heard.

2        Q    For 4709 it looks like you put "no answer"?

3        A    Correct.

4        Q    All right.  For 4707, 4703 and 4701, there is

5    nothing indicated?

6        A    Correct.

7        Q    What do you understand that to mean?

8            MS. ITCHHAPORIA:  Objection.  Foundation.  Go

9    ahead.

10            THE WITNESS:  That I was not able to raise

11   anybody at those addresses.

12   BY MS. SAMUELS:

13       Q    And you also drew a diagram showing

14   footprints?

15       A    Generally, yes.

16       Q    Is it fair to say that these are all the

17   footprints that you were able to -- that you were able

18   to identify from the scene?

19            MS. ITCHHAPORIA:  Objection.  Form.

20            THE WITNESS:  It looks similar to one another

21   and it seems to have -- they seem to be red and they

22   appeared that they may have had blood on them.  And I

23   went into the street, which it started raining too.  I

24   remember that.  It started raining.

1    BY MS. SAMUELS:

2        Q    And so it started raining before and after

3    the murder?

4            MS. ITCHHAPORIA:  Objection.  Form.

5    Foundation.  Go ahead.

6            THE WITNESS:  My belief, yes.

7    BY MS. SAMUELS:

8        Q    And it looks like the information below is

9    from where you were notifying the victim's family?

10       A    Yes.  That is what it looks like.

11       Q    And you recall doing this in person, I

12   believe you said?

13       A    Yes.  My partner and I went to the sister's

14   house.

15       Q    Do you know how you got that contact

16   information?

17       A    We went to the address where we believe the

18   victim worked.  We found someone who knew him who

19   happened to be the boyfriend of his sister.

20       Q    And he directed you to her?

21       A    He took -- he accompanied us to the victim's

22   sister's residence.

23       Q    Going on to 105, it looks like this report

24   was also created on the 13th of May 2000?

1    A    Yes.

2    Q    You can go ahead and read this report.

3    A    Okay.  The narrative says, Lindor L-I-N-D-O-R

4  Thomas E. or L., a male Black, date of birth of █████

5  ████████ at 4657 Erie in a house, west.  I believe that

6  social ████████████ disabled.  And his phone number is

7  773.  It it looks like 656-3427.  The interview says he

8  was told by his brother-in-law, a gentleman by the name

9  of Jesse Wallace, a male black about 53.  He was at

10 Pullmon's Restaurant and was coming home on the north

11 side of the street.  I assume that was Ohio.  Saw a van

12 with the window broken out and unknown body across the

13 street.

14   Q    Do you remember how you came to know about

15 Mr. Lindor?

16   A    I believe the phone call that -- I'm not

17 certain.  But I believe the phone call came in from

18 that address that relates to us.  We went to interview

19 whom we could at that address.

20   Q    So like a 9-1-1 call?

21   A    Yes.

22   Q    Moving on to City NK 106.  It looks like it

23 is a report that was written by Detective Wolverton but

24 you are also a signatory at the bottom as well?

1    A    Right.

2    Q    And in this report it looks like it was

3    completed on May 13, 2000 in the First Watch?

4    A    Yes.

5    Q    And you can go ahead and read this report.

6    A    Okay.  Assignment, Sergeant Vail.  I don't

7    know.  He put White 29 with Detective Cruz, Beat 111,

8    paper car, S. Burke 8940 and POM Jackson 19284. Beat

9    1110 and 1120 Sergeant Lewison.  1265, 1123 was the

10   first on scene, protected the scene, 1115.  Police

11   officer L. Alejo, Star 10380, Beat 1171 transported at

12   03:50 hours.  Police Officer, J. Felton, Star Number

13   5968.  Police Officer W. Bartkowicz,

14   B-A-R-T-K-O-W-I-C-Z, Star 7156.  And 7602 STR Robby

15   Tovar 12847.  Those are the crime lab guys.  And Pat

16   Moran 7718 indicated a shell casing at 4725 on the

17   sidewalk, center of the sidewalk and shell casings at

18   4723 on the sidewalk, on the center of the sidewalk.

19   Indicates a footprint.  He puts down ME.  235 May '00,

20   the year 2000.  Medical Examiner, Anderson Star Number

21   51, pronounced at 03:35 hours.  And then indicates the

22   van, which was a 1977 Dodge Van with a VIN Number

23   2B4FP25B7VR129126.  There is a temporary tag marked

24   V149546. I don't know if this is part of the tag.  I'm

1   not sure what it is.  It says 6226300R345741.  Expires

2   6/28/2000.  Going by the VIN.  It had been registered

3   to Magpayo Enrico and Macpago Lucia, 4684 North Mason

4   in Chicago.  And then it has their driver's license

5   numbers it looks like, ▓▓▓▓▓▓▓▓▓▓ and

6   ▓▓▓▓▓▓▓▓▓.  I'm not sure what this says.  Cicero

7   and I can't make out what that says.

8        Q    It looks like it says Insanes?

9        A    Cicero Insanes.

10       Q    What do you understand that to mean?

11            MS. ITCHHAPORIA:  Objection.  Form.  And

12   foundation.  Go ahead.

13            THE WITNESS:  It might be the name of a gang.

14   BY MS. SAMUELS:

15       Q    Do you remember learning anything about the

16   Cicero Insanes relative to the murder of Marek Majdak?

17       A    I don't recall any.

18       Q    Do you know why it would be noted on this

19   report that --

20            THE WITNESS:  I don't know where that came

21   from.

22            MS. ITCHHAPORIA:  I'm sorry, Jeanette.  Were

23   you done?

24            MS. SAMUELS:  Go ahead.

```
 1                MS. ITCHHAPORIA:  Objection.  Foundation.
 2    And then you go ahead.
 3                THE WITNESS:  I don't recall where that
 4    information came from.
 5    BY MS. SAMUELS:
 6        Q    Do you recall reviewing this report before
 7    your name was signed to it?
 8                MS. ITCHHAPORIA:  Objection.  Form.  Go
 9    ahead.
10                THE WITNESS:  I didn't actually sign it.  I
11    just put my name on it.
12    BY MS. SAMUELS:
13        Q    Do you have any reason to believe that
14    anything in this report is inaccurate?
15        A    Not to the best of my knowledge.
16        Q    So my understanding is this murder occurred
17    approximately a block or on the block immediately east
18    of Cicero, is that your understanding?
19        A    Yes.
20        Q    Do you have any reason to believe that that
21    area is not Cicero Insanes' territory?
22                MS. ITCHHAPORIA:  Objection.  Foundation.
23                THE WITNESS:  I don't know where the
24    territory begins and ends.  I don't have specific
```

```
 1    knowledge about the Cicero Insanes.

 2    BY MS. SAMUELS:

 3        Q    So my question is, do you have any reason to

 4    believe that the 4700 block of West Ohio is Cicero

 5    Insanes' territory?

 6        A    I have no idea.

 7        Q    Do you know why gang affiliation might be

 8    noted on a GPR where a body was found?

 9             MS. ITCHHAPORIA:  Objection.  Foundation.

10    Asked and answered.  Go ahead.

11             THE WITNESS:  I have no idea where the

12    information came from, what it pertains to.

13    BY MS. SAMUELS:

14        Q    Continuing to City NK 107.  This report was

15    also completed on 13 May 2000 during the First Watch.

16        A    Yes.

17        Q    My understanding is this is all Detective

18    Wolverton's handwriting, but your signature too as

19    well?

20             MS. ITCHHAPORIA:  Objection.  Form.

21             THE WITNESS:  I did not sign it, but put my

22    name on it.

23    BY MS. SAMUELS:

24        Q    Do you believe that Detective Wolverton
```

1    should not have signed your name to his report?

2         A    No.

3         Q    Can you go ahead and read this report for me?

4         A    Okay.  Look like in the narrative, OCC, the

5    current 0110, 03:35 pronounced, 4721 West Ohio, single

6    bungalow.  There is a gate with a steel fence and there

7    is a drawing of where the steel fence would be at and

8    where the address is at and where the body was, how the

9    body was laying.  Let's see.  It looks like it says GSW

10   which is gunshot wound two inches from ear, left eye.

11   Two inches from earlobe and two inches from left eye.

12   Gunshot wound to the upper cheek.  Okay that is the

13   description of that one.  And there is a gunshot wound

14   to the left buttocks.  I don't know what the SS card

15   means.  Oh, I got ahead of myself.  It gives the

16   description of what he was wearing.  Light white

17   T-shirt, gray corrody pants, white socks, blue and

18   white gym shoes.  Any marks:  Well, he did put in there

19   ME, ME phone number, Fax Number 312-997-4533 or 4400.

20   And he write out the identification card.  The

21   Secretary of State Identification Card he writes the

22   name ERYK MAJDAK and the last name and Marek is the

23   first name.  He puts in their drivers' license.  I

24   don't know if he meant drivers' license or ID card.

```
 1   Put in the address of 6952 West Diversey.  Then he puts
 2   old MG, I don't know what that means.
 3                Date of birth, ███████████.  Social
 4   Security Number ███████████, 6' 203, brown hair and
 5   brown eyes.  Driver's license number of ██████ -- I'm
 6   sorry.  ███████████.  Again repeats, shell casings
 7   at 4725 on sidewalk.  And 4723, 4725 on parkway it is a
 8   footprint in the mud.  Also appear to be a knee print.
 9   Victim's vehicle is parked at 4726 West Ohio.  The
10   passenger door open.  They put the passenger door
11   window.  Bloody footprints from body on sidewalk at
12   4721, 4717.  At 4715 ran through the parkway crossing
13   street.  Oh, I see.  The passenger window broken out
14   and hazard lights are on.  That's the narrative.
15        Q    It says, "hazard lights".  What do you
16   understand that to mean?
17                MS. ITCHHAPORIA:  Objection.  Foundation.
18                THE WITNESS:  Flashing lights, you know, the
19   emergency lights, flashing lights.
20   BY MS. SAMUELS:
21        Q    How were you able to determine that the
22   occurrence happened at ten after 1:00 a.m.?
23                MS. ITCHHAPORIA:  Objection.  Form.
24   Foundation.
```

89

```
 1              THE WITNESS:  That is an approximate time.
 2    BY MS. SAMUELS:
 3        Q    Do you remember what that was based on?
 4        A    I believe the time that the call came in.
 5        Q    I'm showing you what is marked as City 109.
 6    Do you have that?
 7              MS. ITCHHAPORIA:  No.  Are you marking 109 as
 8    Exhibit 3 or is it part of Exhibit 2?
 9              MS. SAMUELS:  Part of Exhibit 2.
10    BY MS. SAMUELS:
11        Q    And it looks like this report was completed
12    on May 2000 during the First Watch?
13        A    That is what it looks like, yes.
14        Q    And then that is your signature at the
15    bottom?
16        A    That is my signature.
17        Q    Can you go ahead and read this report for me?
18        A    15 May 0830 call Marsalane Nonakie, 1220
19    South Imbria Drive in Schaumburg, phone number
20    847-923-1841.  She was told by musician at the Cardinal
21    Club.  You last saw Marek after midnight.  I can't read
22    the name too well.  It looks like J-A-R-S-K-I.  Phone
23    number, 847-806-0966.  Lives at 2411 South Gobert Road.
24    In Arlington Heights.  And then it looks like a time,
```

1    0005 hours.  Girlfriend said he worked late last night.

2    And will be awake later in the day and in the PM.

3         Q    All right.  Do you recall following up with

4    this individual?

5         A    I don't believe I made a call no.  I would

6    have been off work then.

7         Q    And so would you have passed it on to someone

8    else or how would that work?

9              MS. ITCHHAPORIA:  Objection.  Form.

10             THE WITNESS:  I believe I would have told a

11   Sergeant.

12   BY MS. SAMUELS:

13        Q    So you would have told the Sergeant that

14   there is a witness that needs to be followed up with?

15             MS. ITCHHAPORIA:  Objection.  Form and

16   foundation.  Go ahead.

17             THE WITNESS:  Yes.  Generally, yes.

18   BY MS. SAMUELS:

19        Q    And then would you do that expecting that the

20   Sergeant would assign somebody else to follow up with

21   him?

22             MS. ITCHHAPORIA:  Objection.  Form.

23   Foundation.  Calls for speculation.  Go ahead.

24             THE WITNESS:  That would have been the

                    LIGHTFOOT COURT REPORTING, P.C.
                           312-701-1090
                    E-mail: lighfootpc@att.net

1    intent, yes.

2              MS. SAMUELS:  We can stop sharing that.

3              MS. ITCHHAPORIA:  Are you at a good stopping

4    point?  Can we take a lunch break?

5              MS. SAMUELS:  I was about to recommend that.

6    How long do you guys want?

7              MS. ITCHHAPORIA:  Go to like 1:45.

8              MS. SAMUELS:  That's good.

9              MS. ITCHHAPORIA:  Thanks everyone.

10                       (LUNCH BREAK)

11             A F T E R N O O N   S E S S I O N

12             MS. SAMUELS:  Okay.  Going back on the

13   record.  I'm going to show you what's been marked 127

14   through 130, I believe.

15             MS. ITCHAPORIA:  I'm sorry.  What was that?

16             THE WITNESS:  130.

17             MS. ITCHAPORIA:  Exhibit 30?

18             MS. SAMUELS:  Yes.

19             THE WITNESS:  Okay.

20   BY MS. SAMUELS:

21        Q    Have you had a chance to look over these GPRs

22   before?

23        A    Yes.

24        Q    And it looks like City NK 127.  It likes like

1    this report was written by Wolverton and you also

2    signed it, is that correct?

3        A    I didn't sign it, but he wrote my name down

4    there.

5        Q    All right.  Do you believe that your name

6    shouldn't have been signed to this report?

7        A    It is.  Yeah, it's pretty general.  It would

8    have been the same information that I would have

9    learned.

10           MS. ITCHAPORIA:  I don't think he heard the

11   question?

12   BY MS. SAMUELS:

13       Q    Do you need me to repeat the question?

14       A    Please.

15       Q    So my question was, do you think that your

16   name should not have been signed to this report?

17       A    No.  I think the report is accurate.

18       Q    And it looks like it was completed on 13, May

19   2000 during the First Watch?

20       A    Yes.

21       Q    Can you go ahead and read the report?

22       A    Okay.  It starts, Employer Logan Supply, 2500

23   North Pulaski, factory worker.  Okay.  I'm not sure.

24   Let's go with the 773-235-2500.  Only been at the place

1    of employment for two weeks.  The first payment was the

2    12th of May.  Fellow unknown workers after work on 12

3    May to a bar, Vontage 2600 North Pulaski.  Also met a

4    female white Polish at a bar unknown.  He told his

5    mother.  On the other side it says Employer 10483 West

6    Touhy, Apartment 2E, Rosemont 60018.  Phone number

7    847-699-1844.  There are arrows.  There is a name or --

8    excuse me, Joanna Romaska.  There is an arrow saying

9    sister.  10485 West Touhy, second floor in Rosemont

10   60191.  Phone Number 847-699-1844.  It is also another

11   phone number under the name of Joanna Romaska

12   773-259-4928.  An arrow pointing to -- it says

13   boyfriend, Lukerz Weglowski.  Same address as the 10485

14   West Touhy in Rosemont.  And there is an address that

15   is stricken out, 2525 North Nordica.  Address on paper

16   found in van.  The sister went to the Medical Examiner

17   and identified the body.  That's it.

18        Q    Does this refresh your recollection about

19   finding a paper in the van?

20        A    I don't recall a paper in the van.

21        Q    Do you know whether or not that was

22   inventoried?

23             MS. ITCHHAPORIA:  Objection.  Form.

24   Foundation.

 1              THE WITNESS:  I don't know.  I don't recall

 2    it.

 3    BY MS. SAMUELS:

 4        Q    Should that have been inventoried?

 5        A    Not necessarily.

 6        Q    Why not?

 7        A    It doesn't seem relevant to the case.

 8        Q    Why don't you think that's relevant?

 9              MS. ITCHHAPORIA:  Objection.  Form.

10    Argumentative.

11              THE WITNESS:  Like I said, I don't know

12    anything about this piece of paper.  I don't recall

13    seeing it.  Go ahead.  I'm sorry.

14        Q    So if you had found a piece of paper with the

15    information that you thought was relevant --

16              MS. ITCHHAPORIA:  Form.  Foundation.

17    BY MS. SAMUELS:

18        Q    If you had found a piece of paper with the

19    information that you thought was relevant to the case,

20    would it have been inventoried?

21              MS. ITCHHAPORIA:  Same objection.

22              THE WITNESS:  Probably.

23    BY MS. SAMUELS:

24        Q    Do you know whether Majdak's key or the keys

95

```
 1   to the vehicle were inventoried?

 2        A    I don't recall.

 3        Q    Would they have been inventoried?

 4             MS. ITCHHAPORIA:  Objection.  Form.

 5   Foundation.

 6             THE WITNESS:  Should they have been

 7   inventoried?

 8   BY MS. SAMUELS:

 9        Q    Yes, sir.

10        A    I don't know why it would be.

11        Q    If you did not think the keys were relevant

12   to the investigation, would they have been inventoried?

13             MS. ITCHHAPORIA:  Objection.  Form.

14   Incomplete hypothetical.

15             THE WITNESS:  Keys possibly stay with the

16   vehicle.

17   BY MS. SAMUELS:

18        Q    So that is a no?

19        A    Well --

20             MS. ITCHHAPORIA:  Object to form.

21             THE WITNESS:  When you impound the vehicle,

22   it is essentially inventoried.

23   BY MS. SAMUELS:

24        Q    All right.  Do you have any reason to believe
```

1    that there had been some sort of struggle in the

2    vehicle?

3              MS. ITCHHAPORIA:  Objection.  Foundation.  Go

4    ahead.

5              THE WITNESS:  Well, there was broken glass in

6    the vehicle and it appeared to be some blood on the

7    passenger seat of the vehicle.  I would say yes.

8    BY MS. SAMUELS:

9       Q    All right.  And if I remember correctly, the

10   keys were found under the dash, correct?

11      A    I believe that was noted that way.  I don't

12   recall.  I don't have an independent recollection where

13   they were at, but I believe there is a notation -- it

14   is in a report somewhere, I believe.  I can't swear to

15   it.

16      Q    Do you know -- I'm sorry.  When I say "dash",

17   I'm thinking of like the area like under the front

18   console and the front passenger seat.  That is what we

19   are thinking of, right?

20      A    Again, I don't recall.  I don't have an

21   independent recollection of where the keys were found.

22      Q    A semi-automatic, assuming they are found

23   under the front passenger seat dashboard.  That would

24   have been the area where some it looked like some kind

1  of struggle had occurred, right?

2          MS. ITCHHAPORIA:  Objection.  Form.

3          THE WITNESS:  I don't know.

4  BY MS. SAMUELS:

5      Q     What don't you know?

6      A     Why anything would have been anywhere.

7      Q     Right.  I'm just saying, my understanding is

8  that you saw broken glass and blood in the front

9  passenger seat, right?

10     A     Glass and blood.  What appeared to be blood,

11 yes.

12     Q     And from that use, you surmised that there

13 had probably been some sort of struggle?

14         MS. ITCHHAPORIA:  Objection.  Form.

15 Mischaracterizes.  Go ahead.

16         THE WITNESS:  It could be believed, yes.

17 BY MS. SAMUELS:

18     Q     So do you know why the keys weren't tested

19 for the presence of DNA or fingerprints?

20         MS. ITCHHAPORIA:  Objection.  Form.

21 Foundation.  Assumes facts.  Go ahead.

22         THE WITNESS:  No, I don't.

23 BY MS. SAMUELS:

24     Q     Is that something that should have been done?

```
 1              MS. ITCHHAPORIA:  Same objection.

 2              THE WITNESS:  Not necessarily.

 3   BY MS. SAMUELS:

 4        Q    And why not?

 5        A    We don't know.

 6              MS. ITCHHAPORIA:  Objection.  Foundation.  Go

 7   ahead.

 8              THE WITNESS:  We don't know how the keys got

 9   to where they were.

10   BY MS. SAMUELS:

11        Q    Wouldn't that be a reason to test it?

12              MS. ITCHHAPORIA:  Objection.  Form.

13   Argumentative.  Go ahead.

14              THE WITNESS:  Would they have what?

15              MS. SAMUELS:  Would that be a reason to test

16   it?

17              MS. ITCHHAPORIA:  Same objection.

18              THE WITNESS:  I don't know.

19   BY MS. SAMUELS:

20        Q    Do you know whether the paper -- do you know

21   where in the van that paper was found?

22              MS. ITCHHAPORIA:  Objection.  Foundation.

23              THE WITNESS:  Again, I don't recall anything

24   about the paper.
```

```
 1   BY MS. SAMUELS:

 2       Q    Should it be noted where that paper was found

 3   in the van?

 4            MS. ITCHHAPORIA:  Same objection.

 5   Foundation.

 6            THE WITNESS:  Not necessarily.

 7   BY MS. SAMUELS:

 8       Q    And would you indicate where something was

 9   recovered?

10            MS. ITCHHAPORIA:  Objection.  Form.

11   Incomplete hypothetical.  Calls for a legal conclusion.

12   Go ahead.

13            THE WITNESS:  I don't know anything about the

14   paper for one.  And I -- looking at this report it says

15   uncle address.  I don't know what to say.  It didn't

16   seem to be relevant to what we were investigating.

17   BY MS. SAMUELS:

18       Q    So hypothetically -- not hypothetically, you

19   are investigating a murder, right?

20       A    Yes.

21       Q    And is it fair to say that this individual

22   was found dead in a neighborhood where you wouldn't

23   really expect him, correct?

24       A    Okay.
```

```
 1       Q     I mean I believe you testified to that
 2   earlier.  If I'm misstating your testimony, let me
 3   know.
 4       A     Okay.  You are saying that the victim was
 5   found and I wouldn't have expected it.  Is that what
 6   you said?
 7       Q     Right.
 8       A     Okay.  So what do you want to know about it?
 9       Q     I'm wondering how you knew that the paperwork
10   that had an uncle's name on it wasn't relevant --
11   that had his uncle's address on it wasn't relevant?
12             MS. ITCHHAPORIA:  Objection.  Form.
13   Foundation.  Asked and answered.
14             THE WITNESS:  I'm sorry.  If everything was
15   relevant, then you would take, I don't know, the seat
16   covers out.  I don't know what else you would take.  If
17   there is anything in the van, would I just take
18   everything that was in the van, not really.  There is a
19   limit as to what is reasonable that is involved with
20   this case.
21   BY MS. SAMUELS:
22       Q     And my question is, how do you make those
23   determinations?
24             MS. ITCHHAPORIA:  Objection.  Form.
```

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

1           THE WITNESS:  By being reasonable.

2    BY MS. SAMUELS:

3       Q    And so in your opinion, it would have been

4    unreasonable to inventory the paper found in the van,

5    is it fair to say?

6       A    Can I have that read back?  There is some

7    feedback.

8                   (WHEREUPON the record was read as

9                    follows:

10                   "Q  And so in your opinion, it

11                   would have been unreasonable to

12                   inventory the paper found in the

13                   van, is it fair to say?")

14          MS. ITCHHAPORIA:  Objection.  Form.

15   Foundation.  Argumentative and incomplete hypothetical.

16   Calls for speculation.

17          THE WITNESS:  I couldn't guess how the -- if

18   there had been some sort of look like evidence or

19   something trace on that, perhaps the explanation of how

20   the paper was there and what it refers to indicates it

21   had nothing to do with the case.

22   BY MS. SAMUELS:

23      Q    Do you ever come to learn why Majdak was on

24   the 4700 block on West Ohio at one in the morning?

1      A    Do I have any what?

2      Q    Did you ever come to learn why Marek Majdak

3   was on the 4700 block of West Ohio at one in the

4   morning?

5      A    I don't know why.

6      Q    And a similar question to before.  Is it my

7   understanding that you believe it would have been

8   unreasonable to send the keys found in the van for

9   testing?

10          MS. ITCHHAPORIA:  Objection.  Form.

11   Argumentative.  Incomplete hypothetical.  Calls for

12   speculation.  Go ahead.

13          THE WITNESS:  I don't know what we would have

14   gleaned from the keys.

15   BY MS. SAMUELS:

16      Q    Well, my understanding is that the police --

17   the case is actually, you know, what -- so it is based

18   on your understanding of the facts of the case that the

19   presence, whether or not there is the presence of --

20   I'm sorry.  Let me ask it this way.

21              Based on what you know into the

22   investigation of Marek Majdak, is it your

23   understanding that, as you sit here today, that

24   there would have been no forensic value to testing

1    the keys found in the car for the presence of DNA?

2              MS. ITCHHAPORIA:  Objection.  Form.

3    Foundation and incomplete hypothetical.  Calls for

4    speculation.

5              THE WITNESS:  I have no reason to believe

6    that had any evidentiary -- there was anything

7    evidentiary about the keys.

8    BY MS. SAMUELS:

9        Q    And then going on to the City NK 128?

10       A    Okay.

11       Q    This similarly looks like a GPR that was

12   written by Defendant Wolverton where he also signed

13   your name, is that fair, sir?

14       A    He printed my name, yes.

15       Q    Do you believe that your name should not have

16   been signed to this report?

17       A    No.  I have no reason to believe that there

18   is anything that is not factual in this report.

19       Q    Was it common practice for him to sign your

20   name to the report and or vice versa?

21       A    What?

22       Q    Was it common practice for him to sign your

23   name to reports?

24       A    I don't know if it was common or not.  We

1   have seen it on several of his reports.  On other

2   reports he doesn't have my name.  He may have just felt

3   that it would be good to do at that time.  I don't know

4   what Donnie was thinking.

5        Q    Do you ever sign his name to your reports?

6        A    Again I'm not -- would you repeat that

7   please?

8        Q    Do you ever sign his name to your reports?

9        A    I don't believe I did.

10       Q    Why not?

11       A    It wasn't my practice.

12       Q    This looks like this report was completed on

13  May 13, 2000?

14       A    Yes.

15       Q    You can go ahead and read this report.

16       A    Okay.  4727 and 4731 locked gate 6 foot gate.

17  No response, 4725 West Ohio house.  Female 30, Phone

18  Number, 773-378-4210.  Didn't hear or see anything.

19  Kenneth Wallace, male black, 18, no information.  So I

20  assumed the same.  4723 West Ohio, house, Danny

21  Brookins, male, 32, date of birth, ▮▮▮▮▮▮▮ phone

22  number, 773-379-9175.  At a friend's house at 7106

23  West.  It doesn't say where.  And then there is F.

24  Robert, male 59, okay.  I'm sorry.  It looks like at

1    706 West, probably -- no that is all it says.  And then

2    white female 38, ████, Diane Holmes.  No phone.

3    Didn't hear anything.  M -- female 57, 4721 West

4    probably Ohio.  No response.  4704, no response.  4717

5    Betty Edwards, female black, 62, 773-626-3580.  Nothing

6    follows.  2715 West John, didn't hear, sleeping.  4711

7    West, John -- I don't know what that says.  4709 West,

8    no response.  4707 West, no response, 4703 West, no

9    response.  Pope Lisa, female 121, no phone.  Heard

10   shots, saw nothing.  Daton, Ken, male black, 18,

11   address 4701 West, no response.  There are other notes

12   here, 4704, no response, 4708, vacant.  4710, vacant.

13   That is the whole of the report.

14        Q    And is this all in Wolverton's handwriting or

15   in your handwriting?

16        A    Is all this what?

17        Q    Is all of this in Wolverton's handwriting or

18   is any in your handwriting?

19        A    It is his handwriting.

20        Q    When you canvass, do you canvass as a team?

21        A    No.

22        Q    Can you explain to me how you canvass?

23        A    You go door to door.  See, if you can get a

24   response and see if somebody answers the door and

1   interview them, if you can.  If they have anything to

2   say, if they have -- whatever, they say, usually that

3   is how it is done.

4        Q    And so you would generally be speaking to a

5   person one on one?

6        A    Generally, yes.

7        Q    Continuing to City NK 129, it looks like this

8   was a report written by Detective Wolverton with your

9   name signed at the bottom?

10       A    My name is printed at the bottom, yes.

11       Q    Do you feel that your name should not have

12  been printed at the bottom?

13       A    No.  I don't.  I believe what I wrote down is

14  accurate and truthful.

15       Q    And it looks like this report was completed

16  on 13 May 2000.

17       A    13 May 2000, yes.

18       Q    It looks like this report indicates the cars

19  that were parked on the street?

20       A    Right.

21       Q    Why would that be noted?

22            MS. ITCHHAPORIA:  Objection.  Form.  And

23  calls for speculation.  Go ahead.

24            THE WITNESS:  Just documenting what was

```
 1   present.

 2   BY MS. SAMUELS:

 3       Q    You wouldn't expect to do any follow up with

 4   this information?

 5            MS. ITCHHAPORIA:  Objection.  Form.

 6   Incomplete hypothetical.  Calls for speculation.

 7            THE WITNESS:  Not necessarily, no.

 8   BY MS. SAMUELS:

 9       Q    When you say "not necessarily", what does

10   that mean?

11       A    I have no reason to -- it is -- yeah,

12   relevancy.

13       Q    So you had no reason to believe this

14   information was relevant?

15       A    At the time, no.

16       Q    Would you have run the plates?

17            MS. ITCHHAPORIA:  Objection.  Calls for

18   speculation.

19            THE WITNESS:  Possibly.

20   BY MS. SAMUELS:

21       Q    Did it seem weird to you that this was a

22   truck parked outside 2721, but no one answered at the

23   door?

24            MS. ITCHHAPORIA:  Objection.  Form.
```

1    Foundation.  Calls for speculation.

2            THE WITNESS:  A vehicle that necessarily gets

3    parked in front of where it was -- the driver, it could

4    have parked on a different part of the street.  Maybe

5    lived on another part of the street.  I have no idea.

6    BY MS. SAMUELS:

7        Q    Right.  My question was, does that seem weird

8    to you?

9        A    No.

10       Q    Do you recall running or checking with Elite

11   Rental to see who had that truck out at 4721?

12       A    No.

13       Q    4721 was where the body was found, right?

14       A    I believe.

15       Q    And going to City NK 130, this too looks like

16   a report that was written by Detective Wolverton that

17   had your name at the bottom as the reporting officer?

18       A    Yes.

19       Q    Do you believe that your name should not be

20   listed as a reporting officer on this GPR?

21       A    No.  I trusted Donnie to be factual and

22   truthful.

23       Q    And it looks like this report was created on

24   30 May 2000 during the First Watch?

                    LIGHTFOOT COURT REPORTING, P.C.
                           312-701-1090
                    E-mail:  lighfootpc@att.net

1        A       That is what it indicates, yes.

2        Q       Do you recall learning that a statement had

3    been given by Xavier Walker --

4               MS. ITCHHAPORIA:  Objection.  Form.

5    Foundation.  Go ahead.

6               THE WITNESS:  At the time of this report?

7    BY MS. SAMUELS:

8        Q    Yes, sir.

9        A    I don't know.  I don't recall that I knew

10   much about Xavier.  I just knew that he had been

11   arrested, but I didn't know anything about the

12   hospital, anything about what was done or how he was --

13   I didn't know anything about it.

14       Q    Do you know why the vehicle wasn't checked

15   for prints sooner?

16              MS. ITCHHAPORIA:  Objection.  Form.

17   Foundation.

18              THE WITNESS:  Okay.  This is a process that

19   took -- with the dusting, it can prevent some of --

20   another method they use for testing prints.  And that

21   is using, I believe, superglue to raise the prints on

22   different surfaces.  So if it had been dusted on the

23   scene, it might not -- the print might not -- some

24   prints might be missed then.  And you could compromise

1  those prints.  When they took it, they took it to be --

2  it is called superglue.

3      Q    My question is, the first time the

4  supergluing in the question is May 2000?

5      A    Correct.

6      Q    Do you know why that wasn't requested sooner?

7      A    It was requested.  They don't always get

8  around -- it is a rather elaborate process.  As I'm

9  reading this report, it seems as though Tovar and Moran

10 dusted the car for prints at the scene, and then they

11 had it superglued to see if there were any other prints

12 that they might be able to bring up.  It is a process

13 that's rather complicated.  You have to isolate the

14 vehicle.  You have to tint it.  I'm not sure of the

15 whole process.  But I know it was originally dusted for

16 prints, but then superglued it and see if there is any

17 other prints.

18     Q    Because information about who was inside the

19 vehicle was very important?

20     A    Yes.

21     Q    To your knowledge, was there ever any

22 evidence that Mr. Walker had been inside that vehicle?

23          MS. ITCHHAPORIA:  Objection.  Foundation.

24          THE WITNESS:  Not to the best of my

1    knowledge.

2    BY MS. SAMUELS:

3        Q     And so my understanding is based upon

4    interviews that Marek Majdak had just got paid for the

5    first time on the 12th of May basically hours before

6    his murder, is that your understanding?

7        A     Yes.  That is my understanding.

8        Q     Did you ever inquire about how he could

9    afford to purchase a car from 1997 without a paycheck?

10             MS. ITCHHAPORIA:  Objection.  Form.

11    Foundation.  Assumes facts.  Go ahead.

12             THE WITNESS:  I understand his mother helped

13    him buy the car.

14    BY MS. SAMUELS:

15        Q     Was that recorded anywhere?

16        A     I don't know if it is or not.

17        Q     You just remember that?

18        A     Yeah.  I remember that his mother -- he was

19    living with his mother and that she was trying to help

20    him get money through working to bring his wife and

21    children over from Poland.

22        Q     Did it seem weird to you that he was

23    ostensibly saving money to bring to America his wife

24    and children but he had two girlfriends in America?

```
 1              MS. ITCHHAPORIA:  Objection.  Form.

 2    Foundation.  Calls for speculation.  Assumes facts.  Go

 3    ahead.

 4              THE WITNESS:  I don't know.  He was lonely.

 5    BY MS. ITCHHAPORIA:

 6        Q    Was that ever an area of inquiry when trying

 7    to figure out who might want him dead?

 8        A    I don't know.

 9        Q    Did it ever seem weird to you -- actually

10    never mind.  Never mind.

11              Do you recall inventorying some

12    shoes?

13        A    Yes.

14        Q    Why were those shoes inventoried?

15        A    Why?

16        Q    Yes.

17        A    They had -- we received information that

18    Jovanie Long had given a pair of shoes to somebody.

19    And I thought it possible that those were the shoes

20    that he had worn those shoes during the homicide that

21    those shoes might have evidence.

22        Q    What type of evidence did you expect to find

23    on the shoes?

24              MS. ITCHHAPORIA:  Objection.  Form.
```

1   Foundation.  Assumes facts.

2          THE WITNESS:  I didn't expect to find any.  I

3   was hoping to find maybe some blood and maybe some DNA

4   from the sweat.

5   BY MS. SAMUELS:

6      Q    When you say "DNA", you mean from the victim

7   or from Mr. Long?

8      A    Blood from the victim and sweat from the

9   offender.  He had been wearing the shoes.

10     Q    Were those the only shoes in the house or

11  were those that -- they said belonged to him or did

12  they point out that particular pair?

13         MS. ITCHHAPORIA:  Objection.  Form.

14  Foundation.

15         THE WITNESS:  These were shoes given by

16  Jovanie through somebody and there was just hope that

17  those could be tied together.

18  BY MS. SAMUELS:

19     Q    Before you inventoried them, do you compare

20  the treads on those shoes with the treads that were on

21  the sidewalk?

22     A    I don't believe they were compared, no.

23     Q    Did you think that those were -- might have

24  been the shoes that left the treads on the sidewalk?

1      MS. ITCHHAPORIA:  Objection.  Form.

2  Foundation.

3      THE WITNESS:  I don't know.  There was no

4  traces of blood on the shoes and I told them that they

5  could not get DNA from sweat.  And it didn't come back

6  for like three years, the examination.  I think it was

7  2003.  By that time, Court had already been.  We had

8  already been to court.

9  BY MS. SAMUELS:

10     Q    I guess my question is, so at the time that

11  you are inventorying the shoes, did you think that

12  those were -- the possibility that those were the shoes

13  that had left the footprint?

14     A    It's possible, yes.

15     Q    Do you recall reviewing the autopsy photos

16  from Marek Majdak?

17     MS. ITCHHAPORIA:  Objection.  Form,

18  Foundation.

19     THE WITNESS:  Do I recall reviewing the

20  autopsy reports?

21     MS. SAMUELS:  Yes.

22     MS. ITCHHAPORIA:  The reports or photos?

23  BY MS. SAMUELS:

24     Q    I said reports.  I said photos, but he said

1    reports.  But that was going to be my next question

2    anyway.

3        A    I looked at them.  I don't recall them.

4        Q    Is that something that you would have looked

5    at during the time that you were investigating his

6    murder?

7        A    Sometime afterwards.

8        Q    You mean after you were investigating his

9    murder you would have looked at them?

10            MS. ITCHHAPORIA:  Objection.  Form.

11    Foundation.

12            THE WITNESS:  My part of the investigation

13    was essentially the crime scene and then the interviews

14    afterwards.  But as to when I saw the actual autopsy

15    results, I don't know when I saw those.

16    BY MS. SAMUELS:

17        Q    Is it fair to say when investigating a

18    homicide, you wouldn't normally read autopsy reports?

19        A    If they weren't addressed to me, maybe not.

20        Q    All right.  Do you recall learning that Marek

21    Majdak had a bite mark on his arm?

22        A    I did not know at the time.  No, I didn't

23    know.

24        Q    How would you learn what other individuals

1    were doing in relation to the investigation of

2    Marek Majdak?

3              MS. ITCHHAPORIA:  Objection.  Form.

4              THE WITNESS:  Usually, I guess with

5    conversations I might have with other people who were

6    investigating.

7    BY MS. SAMUELS:

8         Q    Would you regularly update one another on

9    progress that was occurring in the investigation?

10        A    If I -- I would like to have known about some

11   of the progress, progress that has been made in the

12   investigation.  But as far as me keeping up with it, I

13   had way too many jobs to concern myself with just a

14   particular investigation.

15        Q    And so would you have ever looked up

16   Supplementary Reports to see what was going on in the

17   investigation?

18             MS. ITCHHAPORIA:  Objection.  Form.

19             THE WITNESS:  Not generally.

20   BY MS. SAMUELS:

21        Q    Why not?

22             MS. ITCHHAPORIA:  Same objection.  Form.

23             THE WITNESS:  Why would I?

24

1  BY MS. SAMUELS:

2      Q    To see what was going on in an investigation?

3           MS. ITCHHAPORIA:  Objection.  Form.

4           THE WITNESS:  Again, I worked on a lot of

5  cases.  If I had known, if I had learned some

6  information, of course I would have delved into it

7  more.  But until I actually learned some sort of

8  progress in the investigation, something evidentiary or

9  somebody to be spoken to or a witness of some sort,

10  then I wouldn't have been involved in anything.

11  BY MS. SAMUELS:

12      Q    What is the purpose of the Case Supplementary

13  Report?

14      A    What?

15      Q    What is the purpose of the Case Supplementary

16  Report?

17      A    Let me point the speaker right at me.  Go

18  again, go ahead and say it again.

19      Q    What the purpose of the Case Supplementary

20  Report.

21      A    To document progress of a case.  Investigate

22  any investigation?

23      Q    And who is the documentation for?

24           MS. ITCHHAPORIA:  Objection.  Form.

 1    Foundation.

 2            THE WITNESS:  She keeps trailing off, I'm

 3    afraid.

 4    BY MS. SAMUELS:

 5        Q     Who are you documenting the progress of the

 6    case for?

 7        A     For any possible use in prosecution of the

 8    case and also for maintaining -- yeah.  If there is

 9    prosecution or if there isn't prosecution, however the

10    case is going to be resolved, those things have to be

11    documented.

12        Q     And is it fair to say to your understanding,

13    Case Supplementary Reports were not created to advise

14    other police officers on what is going on in a

15    particular case?

16            MS. ITCHHAPORIA:  Object to form.

17    Foundation.  Calls for speculation.

18            THE WITNESS:  If you have something that you

19    are investigating in the case, they will let you know

20    where the case stands.  I didn't generally follow

21    anybody's case, because I don't have that.  It wasn't

22    my responsibility for one.

23    BY MS. SAMUELS:

24        Q     So when you were asked to provide assistance

1    on different cases, you would never check to see where

2    the case stood?

3        A    Not unless I was gleaning other evidence or

4    doing interviews for the purpose of solving the case.

5        Q    So if you were expected to help gain evidence

6    and conduct interviews, would you check Case

7    Supplementary Reports to see where the case stood?

8        A    If I was going to be interjected into the

9    case, yes, I would.

10       Q    Were there cases that you were in charge of

11   that you were expected to lead the investigation?

12            MS. ITCHHAPORIA:  Objection.  Form.

13   Foundation.

14            THE WITNESS:  Again, I'm not picking up your

15   thread there.

16   BY MS. SAMUELS:

17       Q    Were there cases that you were in charge of

18   where you were expected to lead the investigation?

19            MS. ITCHHAPORIA:  Same objection.

20            THE WITNESS:  Yes.

21   BY MS. SAMUELS:

22       Q    And how would you know cases where you were

23   expected to lead the investigation as opposed to cases

24   where you weren't?

```
 1        A    Well, usually cases when I could identify an
 2   offender and either make an arrest or officers who had
 3   made an arrest for the purposes of prosecution usually,
 4   although some cases were -- people didn't want to
 5   prosecute, like maybe some robbery cases.  Yeah, I --
 6   again, my field, I was no expert in any kind of
 7   criminal cases.  I handled anything from homicides to
 8   thefts, burglaries, batteries.  You know usually if
 9   there is somebody in custody, I'll do that.  I'll
10   finish the case off.
11        Q    Do you understand that you are listed as one
12   of the assisting arresting officers for Xavier Walker?
13        A    I'm one of the what officers?
14        Q    Assisting arresting officer for Xavier
15   Walker?
16        A    Yes, I know that my name is on the report.
17        Q    Do you think that's inaccurate?
18        A    What I was told, it was information that my
19   partner and I had gleaned -- that we should be included
20   in that arrest.
21        Q    So you believe it is accurate that you are
22   listed as an assisting arresting officer for Xavier
23   Walker?
24             MS. ITCHHAPORIA:  Objection.  Asked and
```

1    answered.

2              THE WITNESS:  I believe so, yes.

3    BY MS. SAMUELS:

4       Q    And my understanding is you deny being

5    physically present at the scene of his arrest?

6       A    That's correct.

7       Q    Do you know where you were at the time he was

8    arrested?

9       A    Probably at home.

10      Q    And you understand him to have been arrested

11   on the 5700 -- 5400 block of West Potomac, is that your

12   understanding?

13             MS. ITCHHAPORIA:  Objection.  Form.

14   Foundation.

15             THE WITNESS:  If that is what is on the

16   arrest report, that is the address I suppose.  I wasn't

17   there for the arrest.  In fact I don't think I ever saw

18   Mr. Walker until I went to court.

19   BY MS. SAMUELS:

20      Q    Besides family members of Marek Majdak, do

21   you remember seeing any witnesses personally?

22      A    Do I remember what?

23      Q    Seeing any witness personally?

24      A    Seeing any witness personally?  Yes.

```
 1        Q     What witnesses do you recall seeing

 2   personally?

 3              MS. ITCHHAPORIA:  Objection.  Form.

 4   Foundation.

 5              THE WITNESS:  Now the witnesses that I was

 6   part of the interviews with?  You are talking about

 7   them?

 8   BY MS. SAMUELS:

 9        Q     Yes, sir.

10        A     You want me to name them, list them?  Is that

11   what you want?

12        Q     Yes, sir.

13        A     Maurice Wright, Eric Curry, Ashanti Wright,

14   Jermaica Wright, Antwoine Waddy, and those are the ones

15   that I recall.

16        Q     Where do you recall interacting with Antwoine

17   Waddy?

18        A     I believe that was -- oh, shoot.  I think I

19   was in Area 4, Detective Division.

20        Q     How did you get to Area 4, the Detective

21   Division?

22        A     How do you what?

23        Q     How do you get to the Area 4, Detective

24   Division?
```

1               MS. ITCHHAPORIA:  How do you get -- is that
2    what you are saying?
3               THE WITNESS:  What do you mean, how do I get
4    there?  I was assigned there, assigned there after the
5    Academy.
6    BY MS. SAMUELS:
7         Q    So if I enter the police station, how would I
8    navigate myself to get to Area 4, Detective Division?
9         A    Then you would be directed upstairs to the
10   second floor.
11        Q    And is the second floor the Detective
12   Division?
13        A    Let's see.  I believe so.
14        Q    And what do you recall about your interaction
15   with Antwoine Waddy?
16        A    Actually, I don't have a recollection or
17   independent recollection of my interaction with him.
18        Q    And so my understanding is you independently
19   recollect speaking with some of Marek Majdak's family
20   members, is that fair?
21        A    I remember we made contact with them, yes.
22        Q    I believe you said that the people that you
23   remember are the sister and the mother, correct?
24        A    I believe we talked to the sister first and

1    then I think the mother later on, yes.

2         Q    And so besides speaking with the sister and

3    the mother, do you have an independent recollection of

4    speaking with any of the witnesses in this case?

5         A    Independent?  No, I don't recall.  I don't

6    recall.  It is very generally.

7         Q    Generally, what do you remember?

8         A    That -- let's see.  Maurice Wright, I believe

9    I went out looking for him.  He volunteered to come to

10   the station with us.  Actually everything that I recall

11   about them was actually refreshed from the report that

12   I read and the GPRs I read.  I just vaguely remember

13   Mary Curry.  She was about my age.  Heavyset,

14   otherwise, I don't have an independent recollection.

15        Q    Where do you remember speaking with Mary

16   Curry?

17        A    What on Mary Curry?

18        Q    Where do you remember speaking with Mary

19   Curry?

20             MS. ITCHHAPORIA:  Objection.  Foundation.

21             THE WITNESS:  Okay.  I remember speaking to

22   her at her house momentarily.  And after that, I don't

23   really independently remember speaking to her.  I

24   remember that we brought her back home after she was

1    interviewed at the station.  I kind of remember that.

2    But other than that I don't recall what we, you know,

3    independently said to one another or anything of that

4    nature.  I just don't.

5    BY MS. SAMUELS:

6        Q    Why are some people interviewed at home while

7    others are interviewed at the station?

8                MS. ITCHAPORIA:  Objection.  Form.

9    Foundation.  Incomplete hypothetical.  Go ahead.

10               THE WITNESS:  Some things have to be.  It

11   was -- I guess you have to say to be able to do certain

12   things.  For example, if you interview somebody at the

13   home, if someone is present, it might compromise.

14   Another person might have information, it might

15   compromise that information.  So it is best to

16   interview them separately.  And the station was a good

17   place to do it.

18   BY MS. SAMUELS:

19       Q    Is that the only reason that you could think

20   of?

21               MS. ITCHHAPORIA:  Objection.  Form.

22   Foundation.  Incomplete hypothetical, mischaracterizes.

23               THE WITNESS:  Also at the station you could

24   run name checks.  You could verify certain other bits

1   of information.  It was just what was most expedient

2   for advancing the case.

3   BY MS. SAMUELS:

4        Q    When you say "run name checks", what does

5   that refer to?

6        A    You would have a person's name, their

7   birthday, their home address, and you could check their

8   criminal background, verify certain -- whether there

9   were nicknames, depending on what information that you

10  learned from them, you could verify some of those

11  things at the station.  You couldn't do it on the

12  street.

13       Q    Is it fair to say at that time there was no

14  computer in your car to run information?

15       A    I'm sorry.  I didn't hear that either.

16       Q    Is it fair to say at that time, there were no

17  computers in your car to run information?

18       A    No, there weren't.

19       Q    And is it fair to say at that time you

20  couldn't call in information to dispatch to have them

21  run it?

22       A    Not in a -- not in a functional way.  You

23  could learn from the dispatcher whether there was an

24  active warrant or not.  Other than that, no.

1      Q   And so essentially when you are at the

2  station, you could easily put a person's name in and

3  try to corroborate evidence that way?

4         MS. ITCHHAPORIA:  Objection.  Form.

5  Foundation.  Mischaracterizes.

6         THE WITNESS:  It could be used to corroborate

7  certain statements.

8  BY MS. SAMUELS:

9      Q   Do you recall why you wanted to question

10  Maurice Wright?

11      A   Generally.  I believe that we learned that

12  one of the suspects, Jovanie Long, lived with Maurice.

13      Q   And what was your understanding of why you

14  were questioning Maurice Wright?

15      A   To see if we could determine the whereabouts

16  of Jovanie Long and if he had information that he had

17  learned about the occurrences of the night of May 13th

18  on Ohio there.

19      Q   And what was your reason for questioning Mary

20  Curry?

21      A   She had given us a statement before Maurice

22  accompanied us to the station that she had information

23  about what Jovanie had done.

24      Q   So if I'm understanding you correctly, you go

```
 1    to the Curry residence looking for Maurice, is that

 2    fair to say?

 3         A    I believe so, yes.

 4         Q    And then when you go looking for Maurice, you

 5    meet Mary and she informs you that she knows

 6    information relative -- that is important to your

 7    investigation?

 8         A    I believe so, yes.

 9         Q    And so you guys ask Mary to come to the

10    station and you guys transferred her to the station?

11         A    Not then, no.

12         Q    Not then.  So she just gives you a statement

13    at the house at that time?

14         A    She was allowed to stay in the home, yes.

15         Q    She just gives you a statement at the house.

16    And then does Maurice come while you guys are there or

17    how does that work?

18              MS. ITCHHAPORIA:  Objection.  Form.

19    Mischaracterizes his prior testimony.  Go ahead.

20              THE WITNESS:  Maurice do what?

21    BY MS. SAMUELS:

22         Q    After she gives you the statement, do you

23    leave?

24              MS. ITCHHAPORIA:  Objection.  Form as to
```

1    statement.  Go ahead.

2            THE WITNESS:  Yes.

3    BY MS. SAMUELS:

4        Q    Do you go back a second time?

5        A    Yes.

6        Q    Why do you go back a second time?

7        A    To ask Mary what she knew and if she would

8    accompany us to the station.

9        Q    Why did you think that she knew more than

10   what she had already told you?

11       A    We wanted details, if she had them.

12       Q    Didn't you ask her about that the first time?

13       A    The time was to talk to Maurice.  We had not

14   set up to bring Mary in yet.  She needed to stay home

15   for a little bit.  I think she had children.

16       Q    And so she tells you what she can, but she

17   isn't able to go with you the first time, is that fair

18   to say?

19           MS. ITCHHAPORIA:  Objection.  Form.

20   Mischaracterizes.  Foundation.  Go ahead.

21           THE WITNESS:  I believe that was our

22   understanding, yes.

23   BY MS. SAMUELS:

24       Q    So a short while later -- well, how about --

1    do you remember how much time later you go back to get

2    Mary so that she could come to the station?

3         A    I don't recall.

4         Q    In any event, you go back to get Mary and she

5    can come to the station and give you guys more details?

6         A    Did we what?

7         Q    I said the second time you guys go to pick up

8    Mary so that she can come to the station and give a

9    statement with more details?

10        A    Yes.

11        Q    All right.  How did you guys end up finding

12   Maurice?

13        A    Maurice was home, I believe.  I believe

14   Maurice was home.

15        Q    So the second time you go to talk to Mary,

16   Maurice is home?

17             MS. ITCHHAPORIA:  Objection.  Form.

18   Mischaracterizes.

19   BY MS. SAMUELS:

20        Q    Can you explain to me sort of the timeline

21   between Mary and Maurice?  I keep messing it up.

22             MS. ITCHHAPORIA:  Objection.  Foundation.

23   But go ahead.

24             THE WITNESS:  Maurice went to the station

1    with us.  We went back and got Mary and she came to the

2    station with us.

3    BY MS. SAMUELS:

4        Q    My question is, when do you find Maurice?

5        A    When we went to the house the first time.

6        Q    So when you go to the house the first time

7    you are looking for Maurice, correct?

8        A    Yes.

9        Q    He is at the house and you say we got to take

10   you.  You ask him if he would come to the station to

11   give you a statement, is that fair to say?

12       A    Yes.

13       Q    At that same time, Mary Curry is at the house

14   and she gives you a statement before you go take

15   Maurice to the station?

16           MS. ITCHHAPORIA:  Objection.  Form

17   Foundation.

18           THE WITNESS:  I believe a report, yes.

19   BY MS. SAMUELS:

20       Q    So she gives you a statement.  You guys take

21   Maurice to the station.  While Maurice is at the

22   station, you go back to the house and get Mary Curry

23   and then bring her to the station to give a more

24   detailed statement?

1        A    Yes.

2        Q    How do Ashanti and Jermaica get into this?

3             MS. ITCHHAPORIA:  Objection.  Form.

4    Foundation.

5             THE WITNESS:  I'm not certain as to how we

6    determined that they had information as well.  I'm not

7    certain as to how they got involved.

8    BY MS. SAMUELS:

9        Q    Do you remember if you talked to them at the

10   station or at some other location?

11            MS. ITCHHAPORIA:  Objection.  Form.

12   Foundation.

13            THE WITNESS:  I believe we talked to them at

14   the house.

15   BY MS. SAMUELS:

16       Q    When you go to get Maurice, who is with you?

17       A    My partner at the time, Donnie Wolverton.

18       Q    Anybody else?

19       A    Not that I recall.

20       Q    And then when you go back the second time to

21   pick up Miss curry, who's with you?

22       A    I believe Don is still with me.

23       Q    Anybody else?

24       A    Not that I recall.

1        Q    And when you go to talk to Ashanti and

2   Jermaica, who is with you?

3        A    Donnie Wolverton and a State's Attorney.

4        Q    Do you know why there was a State's Attorney?

5        A    I believe -- I don't know why she came with

6   us.  But it would have been possibly to find out if

7   anybody is going to make a handwritten statement.

8        Q    Before you show up to talk to Ashanti and

9   Jermaica, had you made arrangements with them?

10       A    I don't recall.

11       Q    Is that something that you would normally do?

12       A    Everything is different.  I mean, yeah, I

13   don't recall.  Oh, you mean -- it depends on the

14   circumstances.

15       Q    And are Ashanti and Jermaica both at the

16   Curry house when you go to speak to them?

17       A    I believe so, yes.

18       Q    Do you know what happened to the kids that

19   Mary was watching?

20            MS. ITCHHAPORIA:  Objection.  Form.  Assumes

21   facts.  Go ahead.

22            THE WITNESS:  What do you mean what happened

23   to the kids?  As far as I know the kids were sleeping.

24

```
 1   BY MS. SAMUELS:

 2        Q    The reason Mary didn't come with you the

 3   first time is because she said that she had children

 4   and she needed to stay with or something to that

 5   effect.

 6             MS. ITCHHAPORIA:  Objection.  Foundation.

 7             THE WITNESS:  I believe so.  I can't say that

 8   is what she said, but words to that effect.

 9   BY MS. SAMUELS:

10        Q    And then the second time that you come and

11   she is able to go to the station with you guys, are you

12   aware of where the kids are, had somebody come to watch

13   him or did they leave, do you know?

14             MS. ITCHHAPORIA:  Objection.  Form.

15   Foundation.

16             THE WITNESS:  I don't know what arrangements

17   had been made, but I believe the children were going to

18   be cared for while she was gone.

19   BY MS. SAMUELS:

20        Q    And then after you take the first statement

21   from Mary Curry, did you make arrangements with her?

22   Like did you guys have an agreed upon time where you

23   would come back and bring her to the station?

24             MS. ITCHHAPORIA:  Objection.  Form.
```

```
 1  Foundation.  Go ahead.

 2  BY MS. SAMUELS:

 3     Q    Is that something that you would generally

 4  do?

 5     A    We would want to accommodate her as best we

 6  could.

 7     Q    Is there a reason why you didn't bring an ASA

 8  to speak to Mary at her house?

 9          MS. ITCHHAPORIA:  Objection.  Form.

10  Foundation.

11          THE WITNESS:  We didn't know what she had to

12  say.

13  BY MS. SAMUELS:

14     Q    She had already given you one statement,

15  right?

16     A    A very general --

17     Q    And so you didn't bring -- so based upon her

18  first statement, you didn't have a reason to believe

19  that she might have more relevant information?

20          MS. ITCHHAPORIA:  Objection.  Form.

21  Foundation.  Mischaracterizes.

22          THE WITNESS:  We didn't know the value of the

23  information, what in detail she had to say.  And

24  without that, the State's Attorney is not just going to
```

1    come out and take a statement.  She wanted something

2    more.  We didn't know what she had to say.

3         Q    Do you recall an ASA --

4         A    I don't know.  I don't what she looked like

5    or --

6         Q    Do you know if you have worked with her

7    before?

8         A    The name sounds familiar, but I don't have

9    much information on that.

10        Q    Do you recall ASA Mahoney?

11        A    Again, I don't know the attorneys and neither

12   one of them am I familiar with.  I may have worked with

13   them before or since.  I don't recall them.  They are

14   not people that I would -- yeah, I kind of remember the

15   name -- maybe once or twice.  Otherwise, under what

16   circumstances, I don't know.

17        Q    Do you recall ASA Levara?

18        A    Again, I don't know the person.

19        Q    So you just know you went to the house with

20   an ASA.  You are not sure who?

21             MS. ITCHHAPORIA:  Objection.  Form.

22   Foundation.  Mischaracterizes his direct testimony.

23        A    ASA L-E-A-F-L-E-A-D, I think.

24        Q    Do you know why it was her?

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

1          MS. ITCHHAPORIA:  Objection.  Foundation.

2          THE WITNESS:  Why it was her?

3          MS. ITCHHAPORIA:  Calls for speculation.  Go

4    ahead.

5          THE WITNESS:  When we call the State's

6    Attorney's office and ask them if they want to take a

7    statement, whoever is up, whosever turn it is, wind up

8    being sent out.  And then once you arrive at the area,

9    or wherever we are going to take the statement at, she

10   would want to review the reports and review of what we

11   had learned and find out whether a statement was worth

12   being taken.

13   BY MS. SAMUELS:

14      Q    So the ASA would determine whether or not the

15   statement was worth being taken?

16      A    Yes.

17      Q    And they would do that based upon you

18   informing them of what you anticipate that person is

19   going to say?

20          MS. ITCHHAPORIA:  Objection.  Form and

21   foundation.  Calls for a legal conclusion.

22          THE WITNESS:  I believe that they would make

23   a decision, based on the nature of the case, what we

24   had learned, when we did the interview, what relevant

1    information they would have had, whether it was

2    something that they wanted to memorialize.  And then

3    they would ask the person to make a statement if they

4    wanted to or handwritten statement.  And if they agreed

5    to it, they would do the statement and it would be

6    signed.  That is pretty much it.  It is the State's

7    Attorney's call.

8    BY MS. SAMUELS:

9        Q    Was there any way that you could memorialize

10   the statement without having to go through an Assistant

11   State's Attorney?

12       A    I don't know.  No.  Not that I know of.

13       Q    Do you know why you went to the Curry

14   household so late?

15          MS. ITCHHAPORIA:  Objection.  Form.

16   Foundation.

17          THE WITNESS:  Why we went to --

18   BY MS. SAMUELS:

19       Q    Why you went so late?

20       A    After she made her statement return her to

21   her house.

22       Q    First Watch was from midnight to 1:00 a.m.,

23   right?

24       A    Midnight to 8:30, yeah.

```
 1      Q    Do you know why you took Maurice Wright into
 2  the station to take his statement?
 3           MS. ITCHHAPORIA:  Objection.  Form.
 4  Foundation.
 5           THE WITNESS:  I don't recall the reason why.
 6  BY MS. SAMUELS:
 7      Q    Do you know why you didn't take Jermaica
 8  Wright -- do you know why you didn't take Ashanti
 9  Wright into the station to take her statement?
10           MS. ITCHHAPORIA:  Objection.  Form.
11  Foundation.
12           THE WITNESS:  I'm not certain as to why.
13  BY MS. SAMUELS:
14      Q    Was it common for you to take handwritten
15  statements from people at their home?
16           MS. ITCHHAPORIA:  Objection.  Form.
17  Foundation.  Mischaracterizes his prior testimony.
18           THE WITNESS:  I don't know of any reason why
19  not.  I don't know if it is common or not.
20  BY MS. SAMUELS:
21      Q    Well, in your experience, because you were a
22  Homicide Detective from '98 to '08, right?
23      A    Yes.
24      Q    You were a Detective from '89 to '08, not
```

1    necessarily homicide, though, correct?

2         A    Correct.

3         Q    And so during your ten years as a Detective

4    for the Chicago Police Department, was it common for

5    you to take handwritten statements for persons at their

6    house?

7              MS. ITCHHAPORIA:  Objection.  Foundation.

8    Calls for speculation.

9              THE WITNESS:   In my experience, no, it is not

10   common.

11             MS. ITCHAPORIA:  Is this a good stopping

12   point for a bathroom break?

13             MS. SAMUELS:  Okay.

14                      (BRIEF RECESS)

15             MS. SAMUELS:  Back on the record.

16   BY MS. SAMUELS:

17        Q    And so my understanding is you went looking

18   for Maurice Wright trying to see if he had information

19   about Jovanie's whereabouts and to learn if he knew

20   anything about the murder, is that fair?

21        A    Yes.

22        Q    Do you recall how many times you questioned

23   Maurice Wright?

24             MS. ITCHHAPORIA:  Objection.  Foundation.  Go

1  ahead.

2          THE WITNESS:  I believe we only interviewed

3  him once.

4     Q    And when you say that you interviewed him

5  once, can you describe what you recall from that

6  interview?

7          MS. ITCHHAPORIA:  Objection.  Form.

8  Foundation.  Mischaracterizes.  Go ahead.

9          THE WITNESS:  Do I recall what he said?

10 BY MS. SAMUELS:

11    Q    No.  Can you describe what you recall from

12 that interview?

13    A    Yes, okay.

14         MS. ITCHHAPORIA:  Objection.  Form.

15 Foundation.

16         THE WITNESS:  Okay.

17 BY MS. SAMUELS:

18    Q    I recall he told us that Jovanie Long and

19 Xavier Walker, they pulled up in a car.  He was sitting

20 in a car in an alley and they pulled up.  And then he

21 had a conversation with them.  That conversation,

22 Xavier Walker told them that Jovanie Long just killed

23 somebody.  Okay.  You want to ask -- be a little bit

24 more --

```
 1              MS. ITCHHAPORIA:  Just stop.  And she'll ask
 2    you a question.
 3    BY MS. SAMUELS:
 4        Q    So how long after he was brought to the
 5    station did he provide this information?
 6              MS. ITCHHAPORIA:  Objection.  Form.
 7    Foundation.
 8    BY MS. SAMUELS:
 9        Q    I believe it was fairly soon after he was
10    brought to the station?
11        A    Matter of minutes.
12              MS. ITCHHAPORIA:  Objection.  Form.
13    Foundation.
14              THE WITNESS:  I don't know about that.
15    BY MS. SAMUELS:
16        Q    Well, was it your common practice -- let me
17    ask it this way.
18                   When you bring somebody into the
19    station who is coming with you voluntarily to give a
20    statement, would you expect there to be any
21    significant delay in bringing them in and you
22    beginning to speak with them to take their
23    statement?
24              MS. ITCHHAPORIA:  Objection.  Form.
```

1    Foundation.  Incomplete hypothetical.  Calls for

2    speculation.  Go ahead.

3            THE WITNESS:  Well, I guess it would depend

4    on the person as to what information -- we had to get

5    our notes together.  We had to make sure we had -- who

6    we believed we had.  Get a picture.  Make sure we have

7    a picture that we could match them with.  Get some

8    general information.  So it might take a few minutes

9    before we get to him.  I wouldn't say within minutes.

10   It could have been within minutes.  It could have been

11   almost right away.  I don't recall.

12   BY MS. SAMUELS:

13       Q    I guess what I'm getting at, so I know some

14   persons I've spoken with, when they bring in a subject

15   for questioning like they might leave them in the room

16   by themselves for a while to think about stuff or

17   whatever, and then sort of like as a tactic and then go

18   speak with them.  Have you heard of that?

19       A    The logistics can be -- they can vary, you

20   know.  It might be something you are doing.  Might be

21   something you have to check out before you talk to

22   them.

23       Q    And so because Mr. Wright was coming in

24   voluntarily to give a statement, is it fair to say it

1    may have taken some time to get something together, but

2    you wouldn't expect an hour's delay between the time he

3    was brought in and the time you begin questioning him?

4            MS. ITCHHAPORIA:  Objection.  Form.

5    Foundation.

6            THE WITNESS:  Probably not.

7    BY MS. SAMUELS:

8        Q    And when you go in to speak with him, do you

9    recall whether you had any trouble getting him to

10   answer questions or anything like that?

11           MS. ITCHHAPORIA:  Foundation.  Go ahead.

12           THE WITNESS:  I don't recall, but I don't

13   think there was any problem.

14   BY MS. SAMUELS:

15       Q    And then after -- well, do you recall how

16   long it took to get that statement out of Maurice?

17   That sounded terrible.  Do you recall how long it

18   took -- it has been a long day.

19               Do you recall how long, I guess, the

20   interview process took with Maurice?

21           MS. ITCHHAPORIA:  Objection.  Form.

22   Foundation.

23           THE WITNESS:  I really don't recall.  It was

24   before he gave us a statement, before he gave it.  He

1    was rather -- we were very subtle with each other.  By

2    that, about how long it took.  I have no idea.  I don't

3    recall.

4    BY MS. SAMUELS:

5         Q    And then after Maurice gave his statement, do

6    you recall having any other interactions with him?

7              MS. ITCHHAPORIA:  Objection.  Foundation.

8              THE WITNESS:  I don't recall.  Perhaps we --

9    if he wanted something that -- I don't recall.

10   Checking on his well-being for -- and I don't know what

11   he did after we took the statement.  I don't recall.

12   That was a long time ago.

13   BY MS. SAMUELS:

14        Q    My understanding is after he gives the

15   statement to you, you called the State's Attorney's

16   office to take a handwritten statement from him?

17             MS. ITCHHAPORIA:  Objection.  Form.

18   Foundation.

19             THE WITNESS:  I don't remember doing that.

20   BY MS. SAMUELS:

21        Q    Are you saying I don't recall, I'm not sure

22   if that was necessary or just like I don't remember one

23   way or the other?

24             MS. ITCHHAPORIA:  Objection.  Form.

                LIGHTFOOT COURT REPORTING, P.C.
                        312-701-1090
                   E-mail: lighfootpc@att.net

1           MS. SAMUELS:  I don't recall what we did

2    after we talked to Maurice.

3    BY MS. SAMUELS:

4        Q    Other than -- do you recall dropping Maurice

5    off back at home any time?

6           MS. ITCHHAPORIA:  Objection.  Form.

7    Foundation.

8           THE WITNESS:  I don't believe we did.  No.

9    BY MS. SAMUELS:

10       Q    Besides having the Assistant State's Attorney

11   come and take a handwritten statement from Maurice, can

12   you think of any other reason why he would have stayed

13   at the police station?

14          MS. ITCHHAPORIA:  Objection.  Form.

15   Foundation.  Calls for speculation.  Go ahead.

16          THE WITNESS:  I don't know why no.  No.

17   BY MS. SAMUELS:

18       Q    And then do you recall bringing Mary Curry to

19   the station to give her statement?

20       A    Do I recall actually bringing her in?  No, I

21   don't.

22       Q    Do you recall anything about your

23   communication with Mary Curry while she was at the

24   station?

1      A     Not to my immediate recollection.  But she

2    was interviewed and after the interview a State's

3    Attorney was called in and she gave a handwritten

4    statement.

5      Q    Is it fair to say that at no time did you

6    consider Maurice Wright a suspect in the murder of

7    Marek Majdak?

8              MS. ITCHHAPORIA:  Form.  Foundation.  Go

9    ahead.

10             THE WITNESS:  I would -- well, I didn't know

11   if he was a suspect.  I don't believe after his

12   statement, he wouldn't have been a suspect.

13   BY MS. SAMUELS:

14     Q    So if I'm understanding you correctly, at the

15   time you bring Maurice Wright in, you are not sure

16   whether or not if he is a suspect.  After he gives his

17   statement, it is clear he is not a suspect?

18             MS. ITCHHAPORIA:  Objection.  Form.

19   Foundation.  Mischaracterizes.  Go ahead.

20             THE WITNESS:  I didn't have any reason at

21   that time to believe that he was a suspect.

22   BY MS. ITCHHAPORIA:

23     Q    And so, if I'm understanding you correctly.

24   At the time that Maurice -- that you bring Maurice

1    Wright in.  You had no reason to believe he was a

2    suspect and that never changed?

3             MS. ITCHHAPORIA:  Objection to form.  Asked

4    and answered.

5             THE WITNESS:  What was the last part of the

6    question?

7    BY MS. SAMUELS:

8        Q    And that never changed?

9             MS. ITCHHAPORIA:  Same objection.

10            THE WITNESS:  It is not -- my assumption did

11   not change.

12   BY MS. SAMUELS:

13       Q    Is it fair to say at the time that you

14   brought Maurice Wright in -- the two suspects in for

15   the murder of Marek Majdak were Xavier Walker and

16   Jovanie Long?

17       A    At the time that he was brought in, the only

18   person that we had strong belief was involved was

19   Jovanie Long.

20       Q    Do you know why you believed Jovanie Long was

21   a suspect at that time?

22            MS. ITCHHAPORIA:  Objection.  Foundation.

23            THE WITNESS:  Because in an interview that we

24   took, there was a young lady who identified that Long

1    told -- Long in essence admitted to her that he shot

2    and killed somebody.

3         Q    But was that Herschela Bird?

4         A    Yes.  Herschela Bird.

5         Q    Did you ever give Maurice Wright a polygraph?

6         A    Did I -- no.

7         Q    I guess did you ever request that Maurice

8    Wright have a polygraph?

9         A    No.

10        Q    Why not?

11             MS. ITCHHAPORIA:  Objection.  Form.

12             THE WITNESS:  Well, his statement pretty well

13   fit with statements of other people who were also

14   circumstantial witnesses.

15   BY MS. SAMUELS:

16        Q    You say that his statement fit with other

17   circumstantial witnesses.  Who are you referring to?

18        A    Mary Curry, of course Herschela Bird, Ashanti

19   Wright and Jermaica Wright.

20        Q    Do you know why you took a handwritten

21   statement from Ashanti Wright but not Jermaica Wright?

22             MS. ITCHHAPORIA:  Objection.

23             THE WITNESS:  I don't make the determination

24   as to who gives the written statement.  The State's

```
 1   Attorney does.

 2   BY MS. SAMUELS:

 3        Q    And so your understanding is that the State's

 4   Attorney said she didn't want a handwritten statement

 5   from Jermaica Wright?

 6             MS. ITCHHAPORIA:  Objection. Form.

 7   Foundation.  Mischaracterizes his testimony.

 8             THE WITNESS:  She said she didn't want to

 9   take one.  Then she just didn't take one.

10   BY MS. SAMUELS:

11        Q    And to the best of your recollection, Ashanti

12   and Jermaica were talked to by you and the ASA at

13   roughly the same time, right?

14             MS. ITCHHAPORIA:  Objection.  Form.

15   Foundation.  Mischaracterizes.  Go ahead.

16             THE WITNESS:  Within a short time of one

17   another, yes.

18   BY MS. SAMUELS:

19        Q    And at the same location, yes?

20        A    Yes.

21        Q    Does it seem reasonable to you that a person

22   would -- well, let me ask you this.  As you sit here

23   today, are you aware of the content of Jermaica

24   Wright's alleged statement in the GPRs as recorded in
```

1    the GPRs?

2         A    Jermaica Wright is what?

3         Q    The statement that is attributed to Jermaica

4    Wright in the GPR.

5         A    Yes, she is in the GPR.  Okay.

6         Q    I'm saying do you know what the contents of

7    that is?

8         A    Off the top of my head, no, I don't.

9         Q    Do you recall anything about your interview

10   with Ashanti?

11             MS. ITCHHAPORIA:  Objection.  Form.

12   Foundation.

13             THE WITNESS:  I don't have an independent

14   recollection, no.

15   BY MS. SAMUELS:

16        Q    Do you recall anything about your interview

17   with Jermaica Wright?

18             MS. ITCHHAPORIA:  Objection.  Form.

19   Foundation.

20             THE WITNESS:  Is there anything what about?

21   BY MS. SAMUELS:

22        Q    Do you recall anything about your interview

23   with Jermaica?

24        A    Not -- go ahead.

```
 1              MS. ITCHHAPORIA:  Objection.

 2              THE WITNESS:  Not independently, no.

 3    BY MS. SAMUELS:

 4         Q    So you understand that Xavier Walker, his

 5    conviction was overturned, correct?

 6         A    I've learned that, yes.

 7         Q    When did you first find that out?

 8         A    As a result of this lawsuit.

 9         Q    Are you aware of any other cases of yours

10    that -- are you aware of any other cases where you were

11    an investigating Detective and the suspect's conviction

12    was later overturned?

13         A    Just one.

14         Q    What's that?

15         A    Yeah.  There is one with a guy name Valez.

16    V-A-L-E-Z.

17         Q    What do you recall about that?

18              MS. ITCHHAPORIA:  Objection.  Form.

19              THE WITNESS:  What about it?

20    BY MS. SAMUELS:

21         Q    Yes.

22         A    It is still pending.

23         Q    What was your role in the investigation?

24              MS. ITCHHAPORIA:  Objection.  Form.
```

 1    Foundation.

 2              THE WITNESS:  I was the same Detective.

 3    BY MS. SAMUELS:

 4        Q    Did you interview any witnesses?

 5              MS. ITCHHAPORIA:  Objection.  Form.

 6    Foundation.

 7              THE WITNESS:  What, in that case?

 8    BY MS. SAMUELS:

 9        Q    Yes, sir.

10        A    Not that I recall.

11        Q    And so to your knowledge the only role you

12    played in this other case was securing the scene?

13              MS. ITCHHAPORIA:  Objection.  Form.

14    Foundation.  Mischaracterizes and asked and answered.

15              THE WITNESS:  Not securing the same, but also

16    again conferring with the crime lab guys.  Conferring

17    with officers who were on the scene and who did do

18    interviews.  That is what my job was, to lay the

19    foundation for the investigation, to find out how we

20    might proceed, what evidence we had, work with other

21    Detectives to try to resolve it.

22    BY MS. SAMUELS:

23        Q    When was that case?

24              MS. ITCHHAPORIA:  Objection.  Foundation.

1           THE WITNESS:  I don't recall.

2    BY MS. SAMUELS:

3        Q    Do you recall what type of investigation it

4    was?

5        A    It was a homicide investigation.

6        Q    And to your knowledge, you never interviewed

7    any witnesses in that case?

8           MS. ITCHHAPORIA:  Objection.  Foundation.

9    Asked and answered.

10          THE WITNESS:  I don't recall interviewing

11   anybody in that case, any witnesses.

12   BY MS. SAMUELS:

13       Q    I think you answered a slightly different

14   question.  My question was, to your knowledge, did you

15   interview any witnesses in that case?

16          MS. ITCHHAPORIA:  Same objection.  Asked and

17   answered.  Lack of foundation.

18          THE WITNESS:  I don't believe there was a

19   confession in that case.

20   BY MS. SAMUELS:

21       Q    Right.  So my question was, to your

22   knowledge, did you interview any witnesses in that

23   case?

24       A    The best of my knowledge, I do not recall

1    interviewing any witnesses in that case.

2       Q   I'm not talking about with your memory or

3    recollection.  What I'm saying, have you reviewed

4    anything that lets you know whether or not you

5    interviewed any witnesses?

6           MS. ITCHHAPORIA:  Same objection.

7    Foundation.  Asked and answered.  Go ahead and answer.

8           THE WITNESS:  I haven't looked at the reports

9    of that case for quite a while.  I don't recall

10   anybody -- reviewing any witnesses in that case.

11   BY MS. SAMUELS:

12      Q   And this would have been for Area 4 -- that

13   was while you were at Area 4 as a Detective?

14      A   Right.  There were other area Detectives that

15   I worked with, yes. Detectives.

16      Q   So I'm going to show you some GPRs, some

17   more.

18           And this is 117 to 120, I believe or

19   119, excuse me.

20          MS. ITCHHAPORIA:  117, 118 and 119?

21          THE WITNESS:  Yes.

22          MS. ITCHHAPORIA:  Wait.  It has more pages.

23   BY MS. SAMUELS:

24      Q   And it looks like this report was written on

```
 1   28 May 2000 during the First Watch.  Is that your

 2   understanding?

 3        A    Yes.

 4        Q    And it looks like it was written by Defendant

 5   Wolverton and also has your signature at the bottom?

 6        A    Right.

 7        Q    Do you think it is -- do you think your

 8   signature should have been signed at the bottom?

 9        A    That was fine with me.  Donnie was -- I was

10   with Donnie when we did the interview.  And I have no

11   reason to doubt that his report isn't truthful and

12   accurate.

13        Q    Do you ever recall reviewing this report

14   prior to this lawsuit?

15        A    What about it?

16        Q    Do you recall reviewing this report prior to

17   this lawsuit?

18        A    Prior to the lawsuit?  I don't recall

19   reviewing it, no.

20        Q    What would have been your practice of

21   reviewing reports when you are listed as a reporting

22   officer?

23        A    Seeing how I did -- I probably did review

24   this report, but I don't recall doing that.
```

1      Q    So it looks like it is an interview of

2   Ashanti Wright taken at 4653 West Eerie?

3      A    Correct.

4      Q    And it looks like it has 5:30 in the morning?

5      A    Yes.

6      Q    And when it says 5:30, do you understand that

7   to be the time that the interview is beginning or the

8   time that it is ending or something else?

9      A    Probably the time at the beginning.

10     Q    Was it common to interview people at 5:30 in

11  the morning?

12          MS. ITCHHAPORIA:  Objection.  Form.

13  Foundation.  Go ahead.

14          THE WITNESS:  Whenever they are available.

15  BY MS. SAMUELS:

16     Q    Did you have any reason to believe prior to

17  showing up at 4653 -- did you ever have any reason to

18  believe prior to showing up at 4653 West Erie that

19  Ashanti Wright would be up and available at 5:30 in the

20  morning?

21          MS. ITCHHAPORIA:  Objection.  Foundation.

22          THE WITNESS:  I don't know.

23  BY MS. SAMUELS:

24     Q    Should that be reported somewhere?

```
 1      A      That she was sleeping?

 2      Q      Yes.

 3      A      I don't know.  Not necessarily.

 4      Q      Why not?

 5      A      Why?

 6      Q      So it could be clear the person was available

 7   and that this wasn't -- there is no indices of -- or

 8   anything like that?

 9              MS. ITCHHAPORIA:  Objection.  Form.

10              THE WITNESS:  I don't recall that we woke

11   anybody up.

12              MS. SAMUELS:  Well, you don't recall speaking

13   with Miss Wright, do you?

14              THE WITNESS:  I have no independent

15   recollection, no.

16   BY MS. SAMUELS:

17      Q      And so you don't recall one way or the other

18   what she was doing prior to you showing up at her house

19   at 5:30 in the morning?

20      A      No. I had no idea.

21      Q      And was it just you Wolverton and Leafblatt?

22      A      Yes.  And of course, John -- well, I imagine

23   Mary Curry was with us because we were returning her

24   home.
```

```
 1        Q     Do you know one way or another if she was
 2    there?
 3              MS. ITCHHAPORIA:  Objection.  Form.
 4    Foundation.
 5              THE WITNESS:  Whether she was present for the
 6    interview?
 7    BY MS. SAMUELS:
 8        Q     Yeah.
 9        A     I don't know if she was present for the
10    interview.  I don't believe so.
11        Q     Do you know one way or the other whether Miss
12    Curry had been returned home at the time that you began
13    questioning Ashanti Wright?
14        A     Yeah, as we return her home.
15        Q     And so you specifically recall returning Mary
16    Curry home at 5:30 in the morning?
17              MS. ITCHHAPORIA:  Objection.  Foundation.
18              THE WITNESS:  I believe so.
19    BY MS. SAMUELS:
20        Q     And it's my understanding that even though
21    they would have been in the same house, Ashanti would
22    have been in a separate location while you are talking
23    to her, is that fair to say?
24        A     I believe so, yes.
```

1      Q    And it says, well, can you just read the

2    narrative portion, not the biographical information?

3      A    Okay.   It says "Heard gunshot.   Went

4    downstairs.   No one there.   Went back downstairs and

5    Jovanie there.   Jovanie asked her to walk out there to

6    see what happened.   Jovanie was crying saying it is one

7    of our guys.   Police asked the group if they can ID the

8    victim.   Returned home and told Miss Curry that a white

9    man was killed.   She denies Jovanie told her he killed

10   the man.   She states Jovanie told her to tell —— she

11   described the scratches on his neck that he had.   She

12   states Jovanie got in the car, the night Jovanie told

13   her about shooting the man.   Jovanie came to the house

14   again.   Jovanie comes to the house often and Jovanie

15   was acting funny the night of the shooting and Jovanie

16   called his home.   Jovanie called this home stating

17   that —— at the police station tooken on me.   Jovanie

18   told her and her sister, that he was robbing the man

19   and he wouldn't let the money go.   He started fighting

20   and the man was getting the best of him."   You want me

21   to go to the next page?

22     Q    No.   And so, do you know why her statement

23   changed so dramatically?

24          MS. ITCHHAPORIA:   Objection.   Form.

1    Argumentative.  Foundation.

2              THE WITNESS:  Do I know or do I have a

3    belief?

4              MS. SAMUELS:  Well, let's start with know.

5              MS. ITCHHAPORIA:  Objection.  Foundation.

6    Form.

7              THE WITNESS:  I don't have any recollection

8    may have been confronted with the Mary's statement.

9    BY MS. SAMUELS:

10        Q    And so, is it your belief after being told

11   about Mary's statement that sort of the claims now is

12   where she started telling a different story?

13             MS. ITCHHAPORIA:  Objection.  Form.  And you

14   said maybe she was confronted with.

15             THE WITNESS:  She may have been confronted

16   with it?  She was not confronted with the entire

17   statement.  She would have been -- she might have been

18   told that a statement was made that implicated her in

19   telling what happened.

20   BY MS. SAMUELS:

21        Q    So you are not sure how much -- what level of

22   detail from Mary's statement that Ashanti was

23   confronted with, is that fair to say?

24             MS. ITCHHAPORIA:  Form.  Foundation.  And

1    mischaracterizes his prior testimony.

2            THE WITNESS:  Not in the details.  But

3    perhaps -- again this is surmised that she -- that Mary

4    may have implicated her as far as what they both knew.

5    BY MS. SAMUELS:

6        Q    And did you have a reason to believe that

7    Mary was telling the truth and Ashanti wasn't?

8        A    I believe that --

9            MS. ITCHHAPORIA:  Form or foundation.

10            THE WITNESS:  I believe Mary was telling the

11    truth.

12    BY MS. SAMUELS:

13        Q    Why?

14        A    She was very straightforward.  She did not --

15    she was rational, clear in her thinking and the way she

16    is presented herself, I had no reason to doubt the

17    veracity of her statement.

18        Q    How did Mary present herself?

19        A    Forthright.

20            MS. ITCHHAPORIA:  Objection.  Foundation.  Go

21    ahead.

22            THE WITNESS:  She was forthright.  Again she

23    seemed -- I think a reasonable, rational person.

24

1    BY MS. SAMUELS:

2        Q    Is it fair to say in the times that you were

3    speaking with Mary Curry, she never gave you a reason

4    to believe that she was being dishonest?

5        A    Never.

6        Q    Besides Mary Curry's statement, do you

7    recall anything that Ashanti said or did that gave you

8    a reason for thinking she was being dishonest?

9            MS. ITCHHAPORIA:  Objection.  Foundation.

10           THE WITNESS:  Well, she said she didn't know.

11   She was never told that Jovanie did it.  Jovanie never

12   admitted to her that he did it.  We had reason to

13   believe that she was present when he did say -- made

14   those statements that he had done it.

15   BY MS. SAMUELS:

16       Q    The only person who said that she was there,

17   was Mary Curry, correct?

18       A    I believe that is true.  I'm not certain, but

19   I believe that is true.

20       Q    And I'm going to 118.  This looks like this

21   is a continuation of when you are talking with Ashanti,

22   is that your understanding as well?

23       A    Yes.

24       Q    And it looks like this report was completed

 1   28 May 2000 during the First Watch.  Is that your

 2   understanding from your recollection looking at this

 3   report?

 4       A    Yes.

 5       Q    And this is also in Officer Wolverton's

 6   handwriting.  It looks like your name is down there as

 7   well?

 8       A    Yes.

 9       Q    Do you have any reason to believe that your

10   name shouldn't be signed at the bottom?

11       A    No.

12       Q    And then it looks like your statement

13   continues.  She stated Vanie said he pulled out the gun

14   and shot the man.  This was told to her in the Curry

15   house.  Vanie told I killed him.  He wouldn't let the

16   money go.  I killed the white guy."  Did see that?

17       A    Yes.

18       Q    And do you have a specific recollection of

19   her saying that or you just read off the report?

20       A    On the reviewed report.

21       Q    Do you remember Ashanti's demeanor when she

22   was speaking with you?

23       A    I don't recall.  I don't have an independent

24   recollection.  No.

```
 1        Q    Do you remember Mary Curry's demeanor when
 2   she was speaking with you?
 3        A    Do I remember what?
 4        Q    Mary Curry's demeanor when she was speaking
 5   with you?
 6        A    I don't believe Mary was in the room with us.
 7        Q    Right.  I mean when you -- like during the
 8   times when you were speaking with Mary, do you remember
 9   what her demeanor was?
10        A    Mary was -- like I said, she was very calm,
11   rational and forthright.
12        Q    Did it seem weird to you that somebody was
13   calm about another person confessing to murder to them?
14             MS. ITCHHAPORIA:  Objection.  Form.
15   Foundation.  Calls for speculation.
16             THE WITNESS:  No.
17   BY MS. SAMUELS:
18        Q    Did it seem weird to you that this person had
19   confessed a murder to her approximately two weeks
20   ago -- two weeks prior and she never made any attempt
21   to inform the police?
22             MS. ITCHHAPORIA:  Objection.  Form.
23   Foundation.  Calls for speculation.  Assumes facts.
24             THE WITNESS:  I can't -- I don't know why she
```

```
 1    didn't contact the police.

 2              MS. SAMUELS:  Did you ask her?

 3              MS. ITCHHAPORIA:  Objection.  Foundation.

 4              THE WITNESS:  No.

 5    BY MS. SAMUELS:

 6         Q    And then it looks like there is sort of a

 7    break and then the lower two-thirds of this GPR relates

 8    to a statement attributed to Jermaica Wright, is that

 9    fair to say?

10         A    Yes.

11         Q    Do you know what time you were speaking with

12    Jermaica Wright?

13              MS. ITCHHAPORIA:  Objection.  Foundation.

14              THE WITNESS:  I don't recall.

15    BY MS. SAMUELS:

16         Q    Do you know when it is not indicated?

17         A    No, I don't.

18              MS. ITCHHAPORIA:  Objection.  Speculation.

19              THE WITNESS:  No, I don't.

20    BY MS. SAMUELS:

21         Q    Is that something that should be indicated?

22         A    Not necessarily.

23         Q    Why not?

24         A    Exact times are not necessary.
```

1      Q      What about approximate times?

2      A      Okay.  It was subsequent to the interview

3   with Ashanti.

4      Q      How do you know?

5      A      On the same report and it would have been the

6   most convenient time to interview her.

7      Q      So it is your understanding that you spoke

8   with Jermaica Wright after Ashanti, but before Ashanti

9   gave a handwritten statement to Joanna Leafblatt?

10          MS. ITCHHAPORIA:  Objection.

11          THE WITNESS:  As to the time -- to that

12   order, I have no idea.  I don't recall.

13   BY MS. SAMUELS:

14      Q      When this report indicates -- well, can you

15   read what is under Jermaica?

16      A      Okay.  After her identifiers.  She stays on

17   Erie, 5714 West Eerie.  Works sanitation for Entemann's

18   bakery in Northlake.  Looks like different times, 4:00

19   a.m. to 3:00 p.m. and 2:00 a.m. to 10:00 a.m.  Last

20   seen BoBo which is Maurice Wright, Friday morning about

21   10, 11 in the morning on the 12th of May.  And next saw

22   BoBo when Vanie came back after leaving with Xavier or

23   Xav.  That is when Vanie told her he did it.  And she

24   identifies Boss Hog and a female with braids in her

1   hair.  I don't know what that means.  And then

2   afterwards it says --

3        Q    And then after that, the GPR indicates that

4   ASA Joanna Leafblatt took a handwritten statement from

5   Ashanti Wright?

6              MS. ITCHHAPORIA:  Objection.  Form.

7              THE WITNESS:  Correct.

8   BY MS. SAMUELS:

9        Q    This is City 119, I believe.  It says that

10  this is a re-interview with Maurice Wright?

11       A    That is what it says.

12       Q    Why was Maurice Wright re-interviewed?

13             MS. ITCHHAPORIA:  Form.  Foundation.  Go

14  ahead.

15             THE WITNESS:  I don't know.

16  BY MS. SAMUELS:

17       Q    After you spoke with Maurice Wright, could

18  you think of any reason why he would need to be

19  re-interviewed?

20       A    Well, for one thing, I don't believe that I

21  interviewed him alone.  I think Donnie and I

22  interviewed him together.

23       Q    And it looks like this report was created on

24  27 May, 2000 during the first shift?

1      A    Well, yeah.

2      Q    And it looks like this one was just signed by

3  Wolverton and not you, correct?

4      A    That is what it says, right.

5      Q    Can you think of why Detective Wolverton

6  would have interviewed Maurice Wright without you?

7           MS. ITCHHAPORIA:  Form.  Foundation.

8  Mischaracterizes.  Go ahead.

9           THE WITNESS:  I don't believe he did.

10  BY MS. SAMUELS:

11      Q    So if I understand correctly, you remember

12  one interview with Maurice Wright, but there could have

13  been others that you just don't specifically recall, is

14  that fair?

15      A    I may have.

16           MS. ITCHHAPORIA:  Form or foundation.  Go

17  ahead.

18           THE WITNESS:  I might not have done the

19  interview.  I may have been present for the interview.

20  I do not recall.

21  BY MS. SAMUELS:

22      Q    Have you had a chance to review this GPR

23  before?

24      A    This report, yes.

 1      Q    Having reviewed the information contained

 2   therein, do you have any reason to believe it is

 3   inaccurate?

 4      A    No, I don't.

 5      Q    Having reviewed the information contained

 6   therein, do you have any reason to believe that you

 7   were not present during the interview?

 8      A    I don't know whether I was present for the

 9   entire interview.  I may have left, come back.  I don't

10   recall the circumstances under which the interview was

11   conducted.

12      Q    Do you know why they would ask Maurice Wright

13   whether or not he sells drugs?

14      A    Whether or not what?

15      Q    He sells drugs.

16           MS. ITCHHAPORIA:  Objection.  Form.

17   Foundation.

18           THE WITNESS:  Again, let me hold this up.

19   Whether or not he what?

20           MS. SAMUELS:  Sells drugs.

21           MS. ITCHHAPORIA:  Objection.  Form.

22           THE WITNESS:  I still can't hear it.

23           MS. ITCHHAPORIA:  Can I get the whole

24   question, please?

1    BY MS. SAMUELS:

2        Q    Do you know why it might be important to ask

3    Maurice write about whether or not he sells drugs?

4              MS. ITCHHAPORIA:  Objection.  Form.

5    Foundation.

6              THE WITNESS:  I don't know if that is what he

7    was actually asked.  He may have volunteered that.

8    BY MS. SAMUELS:

9        Q    After somebody gives a statement, would you

10   just go back and keep questioning them?

11             MS. ITCHHAPORIA:  Objection.  Form.

12   Incomplete hypothetical.  Go ahead.

13             THE WITNESS:  Yes, if there was something

14   that I had to clarify, yes.

15   BY MS. SAMUELS:

16       Q    After speaking with Maurice Wright and taking

17   the statement from him that you do recall, do you

18   remember anything that needed to be clarified?

19             MS. ITCHHAPORIA:  Objection.  Form.

20   Foundation.

21             THE WITNESS:  Not that I know of.  Not that I

22   recall.

23   BY MS. SAMUELS:

24       Q    Do you know why you would be asking about

1    where Maurice Wright was or what he was doing the day

2    of Marek Majdak's murder or the day before Marek

3    Majdak's murder?

4              MS. ITCHHAPORIA:  Objection.  Form.

5    Foundation.

6              THE WITNESS:  I don't have a specific

7    knowledge about why he would have been asked that or if

8    he was asked that.  Perhaps we were trying to establish

9    how he gained his information.

10   BY MS. SAMUELS:

11       Q    Do you know why you would ask or why someone

12   might ask Maurice Wright about conversations he was

13   having the day before the murder?

14              MS. ITCHHAPORIA:  Objection to form.

15   Foundation.

16              THE WITNESS:  About conversations that he was

17   having before the murder?

18   BY MS. SAMUELS:

19       Q    Yes, the day before the murder.

20       A    Yeah.  There could be certain things that

21   maybe to establish where and how he learned information

22   and whether there was going to be anything he said --

23   that was said or done earlier before the murder.

24       Q    Have you ever been accused of manufacturing

                    LIGHTFOOT COURT REPORTING, P.C.
                           312-701-1090
                    E-mail:  lighfootpc@att.net

1    motive for a suspect in a murder investigation?

2        A    No, not in any investigation.

3        Q    It looks like in this statement that Maurice

4    Wright indicates that Xavier and Jovanie pulled up in a

5    Ford Taurus car immediately after the murder, is that

6    fair to say?

7            MS. ITCHHAPORIA:  Objection.  Form.

8    Foundation.  Misstates.

9            THE WITNESS:  I don't know.  Immediately

10   after or soon after.  It was the same night or the same

11   morning.

12   BY MS. SAMUELS:

13       Q    Do you ever remember attempting to identify

14   or search that file for evidence?

15       A    I'm sorry.  I don't think that I heard that

16   properly.

17       Q    Do you remember ever attempting to find the

18   car that is indicated in this report?

19       A    Which car?

20       Q    The green Ford Taurus that Xavier and Jovanie

21   are in after the murder?

22       A    No, I don't believe we did.

23       Q    Why not?

24           MS. ITCHHAPORIA:  Objection.  Form.

1    Incomplete hypothetical.

2            THE WITNESS:  I don't know that it would have

3    any value.

4    BY MS. SAMUELS:

5        Q    Well, you thought that Jovanie might have

6    blood on him from the murder, right?

7        A    Possible.

8        Q    And then after the murder he get into this

9    car, right?

10       A    That is some time later.

11       Q    And so you didn't think that maybe we should

12   look at the car to see if there is any evidence of

13   blood in there?

14       A    At this point, you are talking about quite a

15   bit later after the murder.

16       Q    And so by this point it would have been 14

17   days after the murder, fair to say?

18       A    Two weeks, yeah.

19       Q    And so you wouldn't expect to be able to find

20   or recover blood evidence more than 14 days later?

21           MS. ITCHHAPORIA:  Objection.  Form.

22   Mischaracterizes.  Go ahead.

23           THE WITNESS:  I don't believe so, no.

24

1   BY MS. SAMUELS:

2        Q    Do you recall how long after the murder it

3   was that you inventoried those shoes?

4        A    It was approximately two weeks later.

5        Q    I'm showing you what has been marked as City

6   NK something or other, 123.

7             MS. ITCHHAPORIA:  You have that?

8   BY MS. SAMUELS:

9        Q    And this report is dated 27 May 2000, during

10  the First Watch.  Is that fair to say?

11       A    Right.

12       Q    And as reporting officers is Wolverton, Cruz

13  and I think that is Stanley Sanders, is that correct?

14       A    Sanders, yes.

15       Q    Do you know why your name is signed at the

16  bottom?

17       A    Because I was probably present at the time of

18  the report.

19       Q    And at the time of the report or at the time

20  that you are talking to Mary Curry?

21       A    At the time that the report is being made.

22       Q    And so whoever is present when the report is

23  being made, you would expect them to be reporting

24  officers?

```
 1        A     Yeah.   If you were to report them, you heard
 2    or saw some part of being reported.
 3        Q     Do you remember going with the Sanders and
 4    Wolverton to talk to Mary Cruz?
 5        A     I don't have an independent recollection, but
 6    I believe I did.
 7        Q     And based upon this report and seeing
 8    Stanley's name listed, you would interpret that to mean
 9    that he was present for part or all of the discussion
10    with Mary Cruz?
11              MS. ITCHHAPORIA:   Form.   Foundation.   Do you
12    mean "Mary Curry"?
13              MS. SAMUELS:   Mary Curry.
14              THE WITNESS:   Are you asking if me and
15    Sanders went with Don?
16    BY MS. BRILL:
17        Q     I'm saying when you see Stanley's name at the
18    bottom --
19        A     Yeah.
20        Q     -- does that indicate to you that Stanley was
21    present for part or all of the interview with Mary
22    Curry?
23              MS. ITCHHAPORIA:   Objection.   Form.
24    Foundation.
```

1          THE WITNESS:  I'm not certain.  I may have

2    been acting on information we got from Stanley that I

3    think Maurice Wright, that Jovanie Long went to pick up

4    Maurice and I think that is when we talked to Mary.

5    BY MS. SAMUELS:

6          Q    So if I'm understanding you correctly,

7    Stanley's name being indicated as the reporting

8    officer indicates that you received the information

9    from him and that was used to find this witness?

10         MS. ITCHHAPORIA:  Objection.  Form.

11   Foundation.  Mischaracterizes.

12         THE WITNESS:  Very possible.

13   BY MS. SAMUELS:

14         Q    And that would be all it would indicate to

15   you, fair enough?

16         MS. ITCHHAPORIA:  Same objection.

17         THE WITNESS:  Yes.

18   BY MS. SAMUELS:

19         Q    All right.  And it looks like she indicated

20   that she told RV Saturday 27, May 2000 at 11 am.  Would

21   that be the time that you guys spoke with her?

22         A    Probably.  I can't be certain.  That would --

23   that is my belief.

24         Q    That would have been outside of your normal

1    shift?

2         A    Yes.

3         Q    Do you know why you would have been

4    interviewing somebody outside your normal shift?

5              MS. ITCHHAPORIA:  Objection.  Foundation.

6              THE WITNESS:  No, I don't.

7    BY MS. SAMUELS:

8         Q    Can you tell from this report where Mary

9    Curry is when she is relaying this information?

10        A    Not from this report.

11        Q    And then there is an arrow from 27 May 2000

12   that points to Jovanie told her he shot the V because

13   he wouldn't give up the money, let the money go,

14   correct?

15        A    Yes.

16        Q    And so you understand that to mean that

17   Jovanie confessed to murder to Mary Curry?

18        A    Yes.

19        Q    And then there is a line under that.  Do you

20   know why there is lines between the statements?

21             MS. ITCHHAPORIA:  Objection.  Form.

22   Foundation.  Calls for speculation.  Go ahead.

23             THE WITNESS:  No, I don't.

24

1    BY MS. SAMUELS:

2        Q    And then under the line it says, "Said V

3    scratch him on the back of the neck."  Correct?

4        A    Yes.

5        Q    Did you have any evidence that Marek Majdak

6    had scratched anybody prior to his death?

7        A    No.

8        Q    Did you check the autopsy report to see if

9    there was evidence of injury to his fingernails?

10            MS. ITCHHAPORIA:  Objection.  Form.  Assumes

11   facts.  Go ahead.

12            THE WITNESS:  I don't recall any injuries to

13   his fingernails.

14   BY MS. SAMUELS:

15       Q    Is that something that you would have checked

16   for?

17       A    Whatever was in the autopsy report is what is

18   in the autopsy report.  Nothing of particular.

19       Q    Yes, sir, but my question is, is that

20   something that you would have checked to look for in

21   the autopsy report?

22            MS. ITCHHAPORIA:  Objection.  Form.

23   Foundation.

24            THE WITNESS:  Again, it is the autopsy report

1   speaks for itself.  Whatever is in there.  You are not

2   looking for anything in particular that I would.

3   BY MS. SAMUELS:

4       Q    Well, say, for instance, they say "I knocked

5   a tooth out of the victim during a fight", would you

6   check if they had a tooth knocked out?

7            MS. ITCHHAPORIA:  Objection.  Incomplete

8   hypothetical.  Go ahead.

9            THE WITNESS:  I don't know, again the autopsy

10  speaks for itself.  Whatever is in the autopsy report

11  is what I don't know how to answer that other than

12  that.

13  BY MS. SAMUELS:

14      Q    And I think that's where the confusion is.  I

15  understand what's in the autopsy report.  My question

16  is about your attempts to corroborate witness

17  statements available evidence, right?  So if they said

18  that the victim scratched his assailant on the neck,

19  did you check the autopsy report to see if that was

20  consistent with the Medical Examiner's findings?

21            MS. ITCHHAPORIA:  Objection.  Form.

22  Incomplete hypothetical.  Calls for speculation.

23            THE WITNESS:  I don't believe a Medical

24  Examiner mentioned anything about the victim's

1    fingernails.

2    BY MS. SAMUELS:

3         Q    Yeah.  Did you check to see whether or not

4    that was in there?

5              MS. ITCHHAPORIA:  Incomplete hypothetical and

6    asked and answered a couple of times.

7              THE WITNESS:  I can't add something to the

8    Medical Examiner's report.  You are asking me to check

9    on something that is not mentioned in the report, as

10   far as I know, as far as I recollect.

11   BY MS. SAMUELS:

12        Q    No, sir.  What I'm asking is, when you

13   received information about the victim and his actions

14   immediately prior to his death whether or not you

15   checked the report that you had to see if there was

16   evidence that could either corroborate or disprove it?

17             MS. ITCHHAPORIA:  Objection.  Form.

18   Foundation.  Asked and answered.

19             THE WITNESS:  Again, I don't know that that

20   would be something that could be -- I don't know if I

21   scratch myself, there is no damage to my fingernails.

22   I don't know what to tell you.

23   BY MS. SAMUELS:

24        Q    And your understanding was that the victim

1    scratched Jovanie Long at least with enough force to

2    leave marks on Jovanie's neck, correct?

3        A    That's what they say.

4        Q    Did you ever ask the Medical Examiner or

5    Evidence Technician to check Mr. Majdak's fingernails

6    to see if DNA can be recovered that linked him to

7    Mr. Long?

8            MS. ITCHHAPORIA:  Objection.  Form.

9    Foundation.  Assumes facts.  Calls for speculation.

10           THE WITNESS:  Did I ask them to do that?  No,

11   I did not.

12   BY MS. SAMUELS:

13       Q    Is that something that should have been

14   asked?

15           MS. ITCHHAPORIA:  Same objection.

16           THE WITNESS:  I don't know that.

17   BY MS. SAMUELS:

18       Q    Why not?

19           MS. ITCHHAPORIA:  Objection.  Form.

20   Argumentative.

21           THE WITNESS:  If I don't know that —— you

22   know, you are talking about the year 2000.  I don't

23   know what else could have been recovered from the

24   victim.  If I had known at the time perhaps his hands

1    could have been bagged, but once they do the autopsy

2    everything is compromised at that point.

3    BY MS. SAMUELS:

4        Q    So to the best of your recollection, that

5    area of inquiry was never looked into?

6        A    I did not request that fingernails be

7    checked.

8        Q    Do you know whether anyone else is working on

9    Marek Majdak's murder case?

10           MS. ITCHHAPORIA:  Objection.  Assumes fact in

11   evidence.

12           THE WITNESS:  I don't believe anyone else

13   neither.

14   BY MS. SAMUELS:

15       Q    And then the next line it says -- actually I

16   know it says, "Regina Long, mother of Jovanie knows

17   where he is."  But to the left of it, do you know what

18   that says?

19       A    Crystal on Kildare, which is probably in the

20   area where Regina Long lives.

21       Q    And then a box, 626-3427 4657 West Erie, Earl

22   Landor.  Do you see that?

23       A    Yes.

24       Q    Do you know what that is referring to?

```
 1        A     Actually that's the gentleman that we spoke

 2    to on the very first day where the call came in from

 3    reporting the body on the street.

 4        Q     Do you know why Mary Curry was giving you

 5    this information?

 6        A     Well --

 7              MS. ITCHHAPORIA:  Objection.  Form.

 8    Foundation.  Go ahead.

 9              THE WITNESS:  I believe Earl Landor is the

10    uncle of Jovanie.

11    BY MS. SAMUELS:

12        Q     Do you know why Mary Curry was giving you

13    that information?

14              MS. ITCHAPORIA:  Objection.  Form.  Calls for

15    speculation.

16              THE WITNESS:  It was a location maybe she

17    thought that Jovanie would go to.

18    BY MS. SAMUELS:

19        Q     Do you recall attempting to find Jovanie at

20    4767 West Erie?

21        A     I don't have any independent recollection of

22    that.

23        Q     Can you think of any reason why you wouldn't

24    have gone there to look for him?
```

1      A      There was a lot of things we were doing.  I

2  thought we had time at the time.

3      Q      I'm sorry?  Say that again.

4      A      There was a lot of things we were doing.  I

5  don't believe we had time at the time.  We were still

6  at the interview.  Maurice Wright and Mary Curry and

7  the others interviewed, we may have passed on the

8  information.  I don't know if we did or not.

9      Q      So you are not sure if there was time to find

10  the main suspect?

11           MS. ITCHHAPORIA:  Objection.  Form.

12  Foundation.  Mischaracterizes.  Go ahead.

13           THE WITNESS:  But it was speculation as to

14  where he might be.  We did talk to Mr. Landor on the

15  day of the murder.  These are family members, known

16  family members.  It doesn't mean he went to the family.

17  We don't know that.  But we had -- there were things

18  that we -- like I said, we had to go and interview

19  Maurice.  We had to come back and Mary, had to

20  interview her.  We had a lot of things going on.  A lot

21  of irons in the fire at the time.

22  BY MS. SAMUELS:

23      Q      And so what about -- what Mary Curry told you

24  in this statement suggested that she had more

1    information?

2              MS. ITCHHAPORIA:  Objection.  Form.

3    Foundation.

4              THE WITNESS:  Well, she told us that we

5    needed to get things -- to get more detailed

6    information.  We had Maurice that we had to interview

7    and we hadn't interviewed him yet.  Mary couldn't

8    accompany us to the station.

9    BY MS. SAMUELS:

10       Q    And so it would have been on May 27, 2000

11   roughly at 11 a.m. when Maurice volunteered to go to

12   the station?

13       A    I don't have an independent recollection, but

14   it seems reasonable.

15       Q    You don't remember going -- so, my

16   understanding is, it was during this first conversation

17   with Mary when you spoke with Maurice and he

18   volunteered to come to the station, correct?

19       A    Right.

20       Q    And so we know that you spoke with Mary on

21   May 27th at or around 11 a.m., right?

22       A    Right.

23       Q    And so that would have been the time when

24   Maurice would have volunteered to go to the police

```
 1   station?

 2        A    Probably.

 3        Q    What other times might it have been?

 4        A    I don't know.

 5             MS. ITCHHAPORIA:  Can we take a five-minute

 6   break?

 7             MS. SAMUELS:  Yes.

 8                      (BRIEF RECESS)

 9   BY MS. SAMUELS:

10        Q    Back on the record.

11             Is there anything about the testimony

12   that you have given that you would like to clarify

13   or edit?

14        A    Any testimony that what?  I would like to

15   clarify?

16        Q    That you would like to clarify or edit.

17        A    No.  I think I have been pretty clear.

18        Q    Back to the GPRs.  I'm going to show you what

19   has been Bates marked City NK 110 through 113.  No just

20   kidding.  Through 116.  Do you have those reports?

21        A    Yes.

22        Q    To the best of your recollection, were you

23   present for the interview with Mary Curry back at the

24   police station?
```

1     A     I believe we were at Area 4.

2     Q     And then if you look at 110 through 116, the

3  page numbers -- what I think are page numbers to the

4  top left, the narrative section, do you see that?

5     A     Top left of the --

6     Q     Of the narrative section.

7     A     Oh, yes.  I see that, yes.

8     Q     And then so my understanding is that sort of

9  the numbering the pages of her statement, because it is

10  multiple pages, is that accurate to your knowledge?

11    A     I believe so, yes.

12    Q     And it looks like at the top of the first

13  page it says that this interview is at the Area 4

14  office at 01:30 hours.  So that would be 1:30 a.m.?

15    A     Yes.

16    Q     And do you know whether that indicated the

17  time that the interview began, the time that the

18  interview ended or something else?

19          MS. ITCHHAPORIA:  Objection.  Form.  Go

20  ahead.

21          THE WITNESS:  It is my assumption that's the

22  beginning of the interview.

23  BY MS. SAMUELS:

24    Q     And then on Page 2 of her statement --

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

```
 1        A    Okay.

 2        Q    -- in the -- what is this?  It is like the

 3   last major paragraph on the page.  It starts, "Miss

 4   Curry stated..."

 5        A    Yes.  Almost every paragraph states that way.

 6   But it says, "Miss Curry stated Long was gone about

 7   five minutes."  Do you see that paragraph?

 8        A    Yes.

 9        Q    And then it indicates Ashunta, spelled

10   A-S-H-U-N-T-A.  Do you see that?

11        A    Yes.

12        Q    And was that just a phonetic spelling of how

13   Miss Curry would say her name?

14        A    Yes.

15             MS. ITCHHAPORIA:  Objection.  Form.

16   Foundation.

17   BY MS. SAMUELS:

18        Q    And then same question.  It looks like it

19   says, Jamacia, J-A-M-A-C-I-A.  Do you understand that

20   to be a phonetic spelling of how Miss Curry was saying

21   her name?

22             MS. ITCHHAPORIA:  Objection.  Form.

23   Foundation.

24             THE WITNESS:  That would be my belief, yes.
```

1   BY MS. SAMUELS:

2        Q    And then it looks like on Page 2 that Jovanie

3   indicated that after the murder that he was going to

4   his uncle's house?

5        A    On Page 2?

6        Q    Yes.

7        A    Right.

8        Q    After learning that, do you recall ever

9   attempting to get a search warrant for the uncle's

10  house?

11            MS. ITCHHAPORIA:  Objection.  Form.

12  Foundation.

13            THE WITNESS:  I don't think that we had

14  grounds for a search warrant.

15  BY MS. SAMUELS:

16       Q    So does that mean no?

17            MS. ITCHHAPORIA:  Objection.  Form.

18  Foundation.

19            THE WITNESS:  He was gone.  I don't know if

20  he reached there.

21  BY MS. SAMUELS:

22       Q    And so my question isn't about whether you

23  were ever able to verify Mr. Long's movements.  My

24  question is whether or not it was his uncle's house,

1    any attempt was made to see whether evidence related to

2    the murder of Marek Majdak could be recovered from his

3    uncle's house?

4            MS. ITCHHAPORIA:  Objection.  Form.

5    Foundation.  Incomplete Hypothetical.  Go ahead.

6            THE WITNESS:  Not to the best of my

7    recollection.

8    BY MS. SAMUELS:

9        Q    Do you recall ever going to the uncle's

10   house to see whether or not Jovanie Long was there?

11       A    No, I do not recall that.

12       Q    Where is he?  I'm sorry.  I forgot to ask.

13   On the first page, the page before this, it indicates

14   that at the time that the shooting happened they

15   believed that Timothy Long was in their basement

16   playing video games with one of the neighborhood kids.

17   Do you see that?

18       A    Yes.

19       Q    All right.  Do you know why two neighborhood

20   kids that she wasn't related to was in her house

21   playing video games at one in the morning?

22           MS. ITCHHAPORIA:  Form.  Foundation.  Calls

23   for speculation.

24           THE WITNESS:  I have no idea why somebody may

1    have been down there.

2    BY MS. SAMUELS:

3        Q    Did that seem weird to you?

4             MS. ITCHHAPORIA:  Same objection.  Form.

5    Foundation.

6             THE WITNESS:  No.

7    BY MS. SAMUELS:

8        Q    All right.  On Page 3 there is like a

9    sentence or part of a sentence that is crossed out?

10       A    Okay.

11       Q    Do you know why that is crossed out?

12            MS. ITCHHAPORIA:  Objection.  Form.

13   Foundation.  Calls for speculation.

14            THE WITNESS:  I don't know why it was crossed

15   out.

16   BY MS. SAMUELS:

17       Q    Any information that would have been written

18   down would have been information you already was

19   receiving in from Mary Curry, correct?

20            MS. ITCHHAPORIA:  Objection.  Form.

21   Foundation.  Calls for speculation.  Go ahead.

22            THE WITNESS:  That I wrote down, yes.

23   BY MS. SAMUELS:

24       Q    Did it seem -- she didn't seem nervous at all

1    when she was talking to you?

2             MS. ITCHHAPORIA:  Objection.  Form.

3    Foundation.

4             THE WITNESS:  Not at all.

5    BY MS. SAMUELS:

6        Q    She didn't seem to be under any distress or

7    anything like that?

8             MS. ITCHHAPORIA:  Same objection.

9    Foundation.  Go ahead.

10            THE WITNESS:  No, she did not.  She was very

11   calm and forthright.

12   BY MS. SAMUELS:

13       Q    Okay.  Is that normal?

14            MS. ITCHHAPORIA:  Objection.  Form.

15            THE WITNESS:  I don't know why it wouldn't

16   be.  If you are truthful, you had nothing to be afraid

17   of.

18   BY MS. SAMUELS:

19       Q    And then it says, "Miss Curry stated she

20   observed in Xavier's vehicle two other male blacks, one

21   in the front vehicle seat and the other in the seat."

22            Did you see that?

23       A    Yes.

24       Q    Did you ever try to determine who those

```
 1    individuals were?

 2         A    No.

 3         Q    Why not?

 4         A    How were we going to do that?

 5         Q    By talking to Xavier.

 6              MS. ITCHAPORIA:  Is there a question?

 7    BY MS. SAMUELS:

 8         Q    Why didn't you ask Xavier if there were other

 9    people in the car after he picked up Jovanie?

10              MS. ITCHHAPORIA:  Objection.  Form.

11              THE WITNESS:  We never talked to Xavier.

12    BY MS. SAMUELS:

13         Q    Why wasn't that an area of inquiry in the

14    investigation?

15              MS. ITCHAPORIA:  Objection.  Form.  Calls for

16    speculation.  Go ahead.

17              THE WITNESS:  I don't know what would be

18    gleaned from that?

19              MS. SAMUELS:  Corroborating evidence.

20              MS. ITCHAPORIA:  There is no question

21    pending.

22    BY MS. SAMUELS:

23         Q    Did you think it was important to corroborate

24    Mary Curry's statement about what she observed?
```

1                    MS. ITCHHAPORIA:  Objection.  Form.

2                    THE WITNESS:  A lot of it was corroborated.

3       BY MS. SAMUELS:

4           Q    Does Mary Curry ever say she saw Xavier at

5       her house?

6           A    At her house, you mean inside the house?

7           Q    Yes.

8           A    I believe she only said that she saw from

9       outside the house.

10          Q    And the only time she saw him was when he was

11      coming to pick up Jovanie?

12                   MS. ITCHAPORIA:  Objection.

13                   THE WITNESS:  I would have to take a look at

14      the report again, because I thought there was another

15      time that she was outside.

16      BY MS. SAMUELS:

17          Q    Go ahead and take a look.

18          A    She said that -- Page 4, yeah, "Miss Curry

19      stated she went to her room to go to sleep.  Heard

20      Maurice come to her room to get cigarettes.  Got the

21      cigarettes and left the room.  She stated she heard

22      Xavier calling for Ashanti from outside in front of her

23      house at the front door, the side basement."  So she

24      knows that Xavier was there.

```
 1        Q    And what is your understanding of what time

 2   this is occurring?

 3             MS. ITCHHAPORIA:  Objection.  Form.

 4   Foundation.

 5             THE WITNESS:  That is in the morning hours

 6   there.  It is still -- it is not too soon after because

 7   they want someone to go over and wipe the prints off

 8   the car, I believe.

 9   BY MS. SAMUELS:

10        Q    So your understanding is that is within the

11   hour or two of the murder happening?

12             MS. ITCHHAPORIA:  Objection.  Form.

13   Mischaracterizes.  Asked and answered.

14             THE WITNESS:  It could be.

15   BY MS. SAMUELS:

16        Q    Did you ever consider charging Miss curry

17   with any crimes?

18             MS. ITCHAPORIA:  Objection.  Foundation.

19             THE WITNESS:  Considered what?

20             MS. SAMUELS:  Charging Miss curry with any

21   crime?

22             MS. ITCHAPORIA:  Same objection.

23             THE WITNESS:  No.

24
```

1   BY MS. SAMUELS:

2       Q    You didn't have a problem that she let a

3   confessed murderer stay at her house after finding out

4   about it?

5            MS. ITCHAPORIA:  Objection.  Form.

6            THE WITNESS:  Is that a crime?

7   BY MS. SAMUELS:

8       Q    I'm asking you.  Apparently not.

9       A    I don't think it is a crime.

10      Q    And then at the end of Page 6 you see where

11  it says, "Miss Curry stated she had spoken to Regina

12  Long who told her the police had no evidence.  We

13  burned the gym shoes and they got rid of the gun.  They

14  ain't got nothing on Jovanie."

15      A    Yeah.  Right that is at the bottom, right.

16      Q    Did you believe her when she told you that

17  they had burned the gym shoes?

18      A    She is repeating something that Regina Long

19  said.  That is not what she knew.  It was what she

20  heard Regina say.

21      Q    Right.  But that is the same thing with her

22  saying -- well, never mind.

23               So is it fair to say that you formed

24  no opinion one way or another about whether or not

1   the gym shoes had been burned based upon Miss

2   Curry's statement?

3          MS. ITCHHAPORIA:  Objection.  Form.

4   Foundation.  Calls for speculation.  Go ahead.

5          THE WITNESS:  Do I have a belief of what?

6   BY MS. SAMUELS:

7     Q   Did you form an opinion one way or the other

8   about whether Jovanie's gym shoes had been burned based

9   upon Miss Curry's statement?

10         MS. ITCHHAPORIA:  Objection.  Form.

11   Foundation.  Go ahead.

12         THE WITNESS:  I had no reason to believe or

13   disbelieve it.

14   BY MS. SAMUELS:

15     Q   I'm sorry if I missed this, but did you ask

16   Miss Curry to describe the shoes that they were

17   harboring for Jovanie?

18         MS. ITCHAPORIA:  Objection to form.

19   Mischaracterizes.

20         THE WITNESS:  For one thing I don't know if

21   Miss Curry knew anything about the gym shoes.

22   BY MS. SAMUELS:

23     Q   I thought she was the one who pointed them

24   out to you?

1      A     I don't believe so.

2            MS. ITCHAPORIA:  Form.  Foundation.

3            THE WITNESS:  I don't think so.  That was

4      Ashanti.

5      BY MS. SAMUELS:

6      Q     Did you ask Ashanti for the shoes that she

7      was harboring for Jovanie Long?

8            MS. ITCHAPORIA:  Objection.  Form.

9      Foundation.  Go ahead.

10           THE WITNESS:  Did I ever describe them?

11     BY MS. SAMUELS:

12     Q     Yes.

13     A     She produced them.

14     Q     Would that be before or after you confronted

15     her with Mary Curry's statement?

16           MS. ITCHHAPORIA:  Objection.  Form,

17     mischaracterizes its prior testimony.

18           THE WITNESS:  I don't recall.

19     BY MS. SAMUELS:

20     Q     And then this is 117 through -- no, we just

21     did that one.  Where is the other one?  Here is -- this

22     is the one I want.  Is this Maurice Wright?  This is

23     120 through 122.

24           MS. ITCHHAPORIA:  I think you marked the

1    first pages before.

2              MS. SAMUELS:  But not the rest of them.

3    BY MS. SAMUELS:

4         Q    All right.  So it looks like the re-interview

5    of Maurice Wright occurred on 27 May 2000 during the

6    first shift.  Is that your understanding?

7         A    Yes.

8              MS. ITCHAPORIA:  What page are you looking

9    at?

10   BY MS. SAMUELS:

11        Q    It is 119 through 122, City NK, correct?

12        A    Yes.

13             MS. ITCHAPORIA:  That is 119.

14   BY MS. SAMUELS:

15        Q    And your signature does not appear on 119,

16   but it does appear on the bottom of 120, 121 and 122?

17        A    My signature -- Donnie would have done that.

18   My signature looks nothing like that.

19        Q    You have any reason to believe that your

20   signature should not be on these reports?

21        A    As far as my reviewing them, my reviewing the

22   notes, they seemed like they are -- they depict what

23   Donnie took down.  I had no reason to believe that they

24   are not factual and accurate.

1      Q    And you would have reviewed these during your

2   preparation for the criminal trial, for your testimony

3   in the criminal trial, correct?

4           MS. ITCHAPORIA:  Objection.  Form.  And

5   foundation.  Mischaracterizes the evidence in this

6   case.

7           THE WITNESS:  I don't know if I reviewed them

8   then.  I don't believe I testified at the trial.

9   BY MS. SAMUELS:

10     Q    Your testimony during the criminal

11  proceedings?

12     A    I did.

13     Q    So the first shift from May 27, 2000 would

14  have been from midnight to 8:30 a.m., correct?

15     A    Yes.

16     Q    Do you know why it doesn't indicate what time

17  you began speaking with him?

18     A    No, I don't know why.

19     Q    Do you have any recollection of this second

20  interview with Maurice Wright?

21          MS. ITCHAPORIA:  Objection.  Form.

22  Mischaracterizes.

23          THE WITNESS:  Independent recollection, no.

24

1    BY MS. SAMUELS:

2        Q    On Page 4 of this GPR, which I believe is

3    122, the second to the last paragraph says "Wright

4    stated Jovanie first met him at Bubba's house.  He

5    started crying when he told Wright he shot the man."

6                Do you see that?

7        A    Yes.

8        Q    Do you know who Bubba is referring to?

9             MS. ITCHAPORIA:  Objection.  Form.

10            THE WITNESS:  What was the question then?

11   BY MS. SAMUELS:

12       Q    Do you know who Bubba is referring to?

13            MS. ITCHAPORIA:  Same objection.

14            THE WITNESS:  I believe it was Antwoine

15   Waddy.

16   BY MS. SAMUELS:

17       Q    And then this last sentence right here, what

18   do you understand that to mean?

19       A    What Wright stated?

20       Q    Yes, that sentence.  What does that mean?

21            MS. ITCHAPORIA:  Objection.  Form.

22   Foundation.

23            THE WITNESS:  Just seems to say he hadn't

24   seen them the day of the shooting.  And that Jovanie

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

```
 1   was seen with new grand white gym shoes.
 2   BY MS. SAMUELS:
 3        Q    So after the shooting, Jovanie got new shoes?
 4             MS. ITCHAPORIA:  Objection.  Form.
 5             THE WITNESS:  It could be.
 6   BY MS. SAMUELS:
 7        Q    Well, that is what I'm asking.  Is that what
 8   that statement is trying to indicate?
 9             MS. ITCHHAPORIA:  Objection.  Form.
10   Foundation.  Calls for speculation.  Go ahead.
11             THE WITNESS:  That could be -- that is what
12   he said.  I don't know.  They may have been new looking
13   shoes.  I don't know.
14   BY MS. SAMUELS:
15        Q    The thing that I'm trying to be clear, the
16   thing that I'm trying to figure out is whether or not
17   that sentence is saying the last time I saw Jovanie,
18   which would have been the day of the murder, he was
19   wearing gray and white gym shoes, or after the murder
20   he started wearing new gray and white gym shoes?
21             MS. ITCHHAPORIA:  Objection.  Form.  Calls
22   for speculation.  Go ahead.
23             THE WITNESS:  It would be my impression, and
24   it would be just an impression, he was wearing newer
```

LIGHTFOOT COURT REPORTING, P.C.
312—701—1090
E—mail:  lighfootpc@att.net

1    looking gym shoes later that day, not soon after the

2    murder.

3    BY MS. SAMUELS:

4        Q    So if we were looking for a pair of shoes

5    that might be tied to the murder, it would be those

6    gray and white gym shoes?

7            MS. ITCHHAPORIA:  Form.  Foundation.

8    Mischaracterizes what he just said.

9            THE WITNESS:  I don't believe those are the

10   shoes.  No.

11   BY MS. SAMUELS:

12       Q    The gray and white gym shoes would have been

13   the shoes he put on after the murder.

14           MS. ITCHAPORIA:  Objection.  Speculation.

15           THE WITNESS:  That would be a surmise on my

16   part.

17   BY MS. SAMUELS:

18       Q    Do you recall Maurice's demeanor when you

19   were interviewing him?

20           MS. ITCHHAPORIA:  Objection.  Form.

21   Foundation.

22           THE WITNESS:  His demeanor.

23   BY MS. SAMUELS:

24       Q    Yes.

```
 1       A    He was fairly calm, cooperative.  I would say
 2   pretty forthright.
 3       Q    Do you recall when Maurice was returned home?
 4            MS. ITCHHAPORIA:  Objection.  Form.
 5   Foundation.  Assumes facts.
 6            THE WITNESS:  I don't know.
 7            MS. BRILL:  It would have been at the same
 8   time that you brought Mary back?
 9            MS. ITCHHAPORIA:  Objection.  Form.
10   Foundation.  Mischaracterizes.  Go ahead.
11            THE WITNESS:  No.
12   BY MS. SAMUELS:
13       Q    Why not?
14       A    Because he wasn't with us.
15       Q    Do you know why it took so long to get his
16   statement recorded by an ASA?
17            MS. ITCHHAPORIA:  Form.  Foundation.  Calls
18   for speculation.  Go ahead.
19            THE WITNESS:  I don't know why.
20   BY MS. SAMUELS:
21       Q    You understand that at the trial Maurice
22   Wright claims that he was coerced into giving this
23   statement, correct?
24            MS. ITCHAPORIA:  Objection.  Form.
```

 1            THE WITNESS:  When did he make this

 2    statement?

 3    BY MS. SAMUELS:

 4        Q    At the trial you understand that Maurice

 5    Wright claims that he was coerced into giving a

 6    statement, right?

 7        A    I don't have first-hand knowledge of that.

 8        Q    Is this the first time of you ever learning

 9    about that?

10        A    I don't know anything about that.  Never

11    heard of it before.

12        Q    Do you know how many hours Mr. Wright was in

13    the police station?

14        A    No, I don't.

15        Q    Do you know if there are any reports that

16    could be used to determine that?

17        A    I don't know of any reports that say what

18    time he left the station.

19        Q    Is that usual?

20            MS. ITCHAPORIA:  Objection.  Form.

21    Foundation.

22            THE WITNESS:  After we interviewed him -- it

23    was already a long day.  I'm sure we went home.

24

                    LIGHTFOOT COURT REPORTING, P.C.
                          312-701-1090
                    E-mail: lighfootpc@att.net

1    BY MS. SAMUELS:

2        Q    Is there anybody else that would have been

3    responsible for bringing him home?

4              MS. ITCHHAPORIA:  Objection.  Form.

5    Foundation.

6              THE WITNESS:  I don't know probably a

7    supervisor might have made a determination.

8    BY MS. SAMUELS:

9        Q    What do you mean?

10             MS. ITCHAPORIA:  Objection.  Form.

11             THE WITNESS:  I don't know what criteria they

12   used for keeping him there or whether he was asked to

13   stay.  That he was cooperative with us.  I would just

14   be speculating as to what the reason why he stayed.

15   BY MS. SAMUELS:

16       Q    Did you ever find out about the female that

17   he met -- I'm sorry.  That was complete change of

18   subject.

19                   So in the earlier GPRs it indicated

20   that Marek Majdak met a woman at a nightclub name

21   Fontasha.  Do you remember that?

22       A    I believe I saw something of that nature.

23       Q    Did you ever find out where that nightclub

24   was?

1          MS. ITCHHAPORIA:  Object to form.

2          THE WITNESS:  I didn't.

3   BY MS. SAMUELS:

4      Q    Do you know if anybody else did?

5      A    I don't know.  I know Mike Pietryla may have

6   gone out looking for witnesses at the bar.

7      Q    Go ahead.

8      A    Sorry?

9      Q    I thought there was more.

10     A    No.  I said Mike Pietryla might have.  I

11  didn't.

12     Q    And do you know whether or not the woman he

13  was with at the club, Fontasha, if she was ever

14  identified?

15     A    Again the microphone was kicking in and out

16  here.

17     Q    Do you know the woman he was with at the

18  nightclub, Fontasha, was ever identified?

19     A    I do not know.

20     Q    You know there was a bite mark found on his

21  body?

22          MS. ITCHAPORIA:  Objection to form.

23  Foundation.  Go ahead.

24          THE WITNESS:  I since learned that, yes.

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

```
 1   BY MS. SAMUELS:
 2        Q    Do you know if there was any attempt to
 3   identify who bit Majdak?
 4             MS. ITCHHAPORIA:  Objection.  Form.
 5   Foundation.
 6             THE WITNESS:  Again, I didn't hear that
 7   clearly.
 8   BY MS. SAMUELS:
 9        Q    Do you know if any attempts were made to
10   identify who had bitten Marek Majdak?
11        A    I don't believe so.
12        Q    Why not?
13             MS. ITCHAPORIA:  Objection.  Form.
14   Foundation.  Calls for speculation.
15             THE WITNESS:  When he had his shirt on, the
16   marks would not have been very identifiable.  I believe
17   his skin was -- there was no evidence of saliva on his
18   skin.  So matching a bite mark to clothing is -- well,
19   I don't know if it could be done.
20   BY MS. SAMUELS:
21        Q    If he had a shirt on, why not send the shirt
22   for DNA testing?
23             MS. ITCHHAPORIA:  Objection.  Form.  Calls
24   for speculation.  Go ahead.
```

1          THE WITNESS:  I believe it was a while later

2   that it was determined that there was no DNA on the

3   bite mark.  It would have been —— that information was

4   learned quite a bit after the case was closed.

5   BY MS. SAMUELS:

6       Q    When you say that information was learned

7   after the case was closed, are you talking about the

8   bite mark or that there was no DNA recovered from his

9   skin?

10       A    The DNA.

11       Q    So my question is, when you are sending in

12   evidence to be tested to see if there is a forensic

13   value, if you know that he was bitten while he was

14   wearing a shirt, why wasn't the shirt sent for DNA

15   testing?

16          MS. ITCHHAPORIA:  Calls for speculation.

17   Asked and answered?

18          THE WITNESS:  My partner did send —— he

19   thought that would be sufficient to test for the skin.

20   And it came up —— by the time we found out that there

21   wasn't any DNA, the case was already closed.

22   BY MS. SAMUELS:

23       Q    And so if I'm understanding you correctly,

24   the reason the shirt wasn't sent out for DNA testing,

1    you didn't think it was necessary?

2              MS. ITCHHAPORIA:  Objection.  Form.

3    Foundation.  Mistakes his testimony.  Argumentative.

4              THE WITNESS:  Myself, I did not know about

5    the bite mark, but Donnie did.  And Donnie had it

6    tested.  Had the bite mark on Mr. Majdak and he had it

7    tested.  Then it came back quite a while later after

8    the case was closed that there was no DNA.

9    BY MS. SAMUELS:

10        Q    Why didn't you write in the GPRs relative to

11   when you were talking to witnesses?

12        A    I did a few in the beginning.  Donnie, as you

13   have seen in my GPRs are difficult to read and Don

14   just -- he took to right away writing.  I trusted

15   his -- I was present for every interview that he did.

16   Not every interview, but almost every interview.  When

17   I reviewed them, it was like -- I didn't have any

18   reason to make changes.  So I just didn't do anything

19   with the GPRs.  I think I had what, four GPRs in this

20   whole case.

21        Q    Have you ever been accused of physically

22   abusing a person in custody?

23        A    I'm sorry.  I didn't hear what you said.

24        Q    Have you ever been accused of physically

1    abusing a person in custody?

2         A    Never.

3         Q    Have you ever been accused of coercing a

4    false statement?

5         A    No.

6              MS. SAMUELS:  I think that about does it for

7    me.  Give me five minutes to look over my notes.

8                        (BRIEF RECESS)

9    BY MS. SAMUELS:

10        Q    Just real briefly.  Have you reviewed the

11   GPRS from the first interview with Maurice Wright?

12        A    Actually, the first interview with Maurice

13   Wright was just like -- from what I can gather, it is

14   my understanding, that it was just at his house.  And

15   what we asked him about his -- well, I shouldn't say --

16   I believe we asked him about what he might have known

17   about Jovanie Long and the murder.

18        Q    So have you reviewed the GPRs from the first

19   interview with Maurice Wright?

20             MS. ITCHHAPORIA:  Objection.  Form.

21   Foundation.  Assumes evidence exist that doesn't exist.

22   Go ahead.

23             THE WITNESS:  I believe we learned that when

24   we went to pick him up.  We didn't make that a GPR for

 1    that cursory interview.

 2    BY MS. SAMUELS:

 3        Q    And so the first time you interviewed Maurice

 4    Wright that wasn't recorded anywhere?

 5        A    I believe we were at his house and just

 6    quickly understand whether it involved -- his

 7    information that he had might clarify some of what

 8    happened that night.

 9        Q    And what day was that?

10        A    Sorry?

11        Q    What day was that?

12             MS. ITCHAPORIA:  Objection.  Form.

13    Foundation.

14             THE WITNESS:  I believe he indicated he knew

15    that information about what happened that night, about

16    the night of the murder.

17    BY MS. SAMUELS:

18        Q    And my question is, what day was this when

19    you guys do the brief interview with Maurice Wright at

20    his home?

21             MS. ITCHHAPORIA:  Objection.  Form.

22    Foundation?

23             THE WITNESS:  I believe that was earlier in

24    the same day, the 27th.  Actually where is my little

1    one with Mary Curry, my real short one?  It would have

2    been just around the time that we picked him up.  It

3    would have been 11 o'clock in the morning on Saturday,

4    May 27th, a little bit before that.

5    BY MS. SAMUELS:

6        Q    And you are basing that from the time that

7    you have a GPR for Mary Curry's statement?

8        A    Yes.  Well, her -- when she made that

9    statement, we had to go and pick Maurice up and asked

10   him if he would come into the station because we were

11   working on information from Herchela Bird, Stanley --

12   yeah so we were working on information from Herchela

13   Bird that Maurice might have some information because

14   Jovanie Long lived with Maurice Wright.

15       Q    And so my understanding is you were working

16   on information that Mr. Sanders had received from Bird

17   and she said in essence that Jovanie lived with Maurice

18   Wright?

19       A    Yes.

20       Q    What did Maurice say at this first interview?

21            MS. ITCHHAPORIA:  Form.  Foundation.  Asked

22   and answered.

23            THE WITNESS:  You mean when we first talked

24   to him?

1    BY MS. SAMUELS:

2        Q    Yes.

3        A    He indicated -- it is my belief he indicated

4    that he had some knowledge about what had happened that

5    night.

6        Q    What knowledge?

7             MS. ITCHHAPORIA:  Objection.  Form,

8    foundation.

9             THE WITNESS:  What was that question?

10   BY MS. SAMUELS:

11       Q    What knowledge?

12            MS. ITCHAPORIA:  Same objection.

13            THE WITNESS:  About what happened at the

14   homicide on the 4700 block of Ohio on the 13th of May.

15   BY MS. SAMUELS:

16       Q    My question is, what did he say he knew about

17   the homicide that occurred?

18            MS. ITCHHAPORIA:  Objection.  Form.  Assumes

19   facts.  Go ahead.

20            THE WITNESS:  That again, I don't know

21   specifically what he said at that particular time.  But

22   it indicated to us that he had knowledge of what

23   happened that night.  I don't remember what he exactly

24   said.

1    BY MS. SAMUELS:

2        Q    Anything else that you recall from your first

3    interview with Maurice?

4        A    What about the interview with Maurice?

5        Q    Is there anything else that you recall about

6    your first interview with Maurice?

7        A    Not really that I remember.  I don't

8    independently remember anything.

9        Q    And there is nothing that you could look at

10   to refresh your recollection?

11       A    The first page.

12            MS. ITCHHAPORIA:  Can you hear us?  Go ahead.

13   Go ahead.  We accidentally disconnected the phone line.

14   BY MS. SAMUELS:

15       Q    My question was, is there anything that could

16   refresh your recollection about what was said during

17   that first interview?

18            MS. ITCHHAPORIA:  Now the volume is coming

19   from -- we'll have to recall him.

20            THE WITNESS:  My apologizes.

21   BY MS. SAMUELS:

22       Q    So my question was, is there anything in your

23   report that you can review to refresh your recollection

24   about what was said during the first interview with

1    Maurice Wright?

2              MS. ITCHAPORIA:  Objection.  Form.  Go ahead.

3              THE WITNESS:  I don't think there is.

4    BY MS. SAMUELS:

5        Q    Is there any other specific action you recall

6    taking relative to investigating the murder of Marek

7    Majdak?

8              MS. ITCHHAPORIA:  Objection.  Form.  Go

9    ahead.

10             THE WITNESS:  No.  Other than seeing and the

11   interviews that we discussed, there is nothing more

12   that I had to do with the case other than testifying

13   here eventually.

14             MS. SAMUELS:  No further questions.

15             MS. ITCHAPORIA:  No questions from us.

16             MS. BRILL:  No questions.

17             MS. ITCHHAPORIA:  We'll reserve signature.

18             MS. BRILL:  The City doesn't need a copy at

19   this moment.

20             MS. ITCHAPORIA:  Miss Bedford, we'll let you

21   know if we want to order.

22

23                      (WHEREUPON the deposition was

24                      adjourned at 5:30 p.m.)

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4

5    XAVIER WALKER,                      )
                                         )
6                                        )
                  PLAINTIFFS,            )
7                                        )
                     vs.                 )No. 20 C 7209
8                                        )
     CITY OF CHICAGO, STANLEY SANDERS    )JUDGE GUZMAN
9    MICHAEL PIETRYLA, DAVID WRIGHT,     )
     BRIAN HOLY, JOHN CRUZ,              )MAGISTRATE
10   DONALD WOLVERTON, JOHN RIORDAN,     )JUDGE FUENTES
     ROBERT BARTIK, ANTHONY BRZENIAK,    )
11   THOMAS MAHONEY and COOK COUNTY      )
                                         )
12                DEFENDANTS,            )

13

14              C E R T I F I C A T E

15         I, JOHN CRUZ, do hereby certify that I have

16   read the foregoing transcript in the above-entitled

17   cause and do assert that this is my testimony.

18                        _____
                              JOHN CRUZ
19

20   SUBSCRIBED AND SWORN

21   ON THE _____DAY OF

22   _____, 2022.

23   _____
        NOTARY PUBLIC
24
```

LIGHTFOOT COURT REPORTING, P.C.
312-701-1090
E-mail: lighfootpc@att.net

```
 1    STATE OF ILLINOIS    )

 2                         )

 3    COUNTY OF  C O O K  )

 4

 5                   C E R T I F I C A T E

 6

 7              The within and deposition was taken before

 8    GWENDOLYN BEDFORD, Certified Shorthand Reporter in the

 9    City of Chicago, County of Cook and State of Illinois,

10    and there were present at the deposition Counsel as

11    previously set forth.

12              The witness reserved signature.

13              The undersigned is not interested in the

14    within case, nor of kin or counsel to any of the

15    parties.

16              IN TESTIMONY WHEREOF, I have hereunto set my

17    hand this 10th day of August 2022.

18

19                         _____

                           GWENDOLYN BEDFORD, C.S.R.
20                         No. 084-003700

21

22

23

24
```