# EXHIBIT 10

1

            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2
                     EASTERN DIVISION
3

4
XAVIER WALKER,                    )
5                                 )
                  Plaintiff,      )
6                                 )
        vs.                       )   No. 20 CV 7209
7                                 )
CITY OF CHICAGO, et al.,          )   Judge Guzman
8                                 )
                  Defendants.     )
9

10

11          Deposition of **MICHAEL PIETRYLA**, taken

12    before Traci Elice Bourbeau, C.S.R., pursuant to

13    the Federal Rules of Civil Procedure for the

14    United States District Courts, pertaining to the

15    taking of depositions, taken remotely via Zoom,

16    commencing at 10:05 p.m. on the 11th day of May,

17    2022.

18

19

20

21

22

23

24

2

```
 1    APPEARANCES:

 2         SAMUELS & ASSOCIATES, LTD.
           BY:  Ms. Jeanette S. Samuels
 3              53 West Jackson Boulevard
                Suite 831
 4              Chicago, Illinois  60604
                (872) 588-8726
 5
 6                   On behalf of the Plaintiff;

 7
           NATHAN & KAMIONSKI, LLC
 8         Special Assistant Corporation Counsel
           BY:  Ms. Breana Brill
 9              Mr. Ryan Janski
                33 West Monroe Street
10              Suite 1830
                Chicago, Illinois  60603
11              (312) 612-1079
                bbrill@nklawllc.com
12
                     On behalf of the Defendant - City of
13                   Chicago;

14
           BORKAN & SCAHILL, LTD.
15         Special Assistant Corporation Counsel
           BY:  Mr. Graham Miller
16              Ms. Misha Itchhaporia
                20 South Clark Street
17              Suite 1700
                Chicago, Illinois  60603
18              (312) 580-1030
                gmiller@borkanscahill.com
19
                     On behalf of the Defendant Officers;
20
      ALSO PRESENT:
21
      Mr. David Wright
22    Mr. John A. Cruz

23

24
```

3

```
 1                    I N D E X

 2

 3    WITNESS                                  PAGE

 4

 5    MICHAEL PIETRYLA

 6    Direct Examination by Ms. Samuels          4

 7

 8

 9

10              E X H I B I T S

11

12    EXHIBIT                                  PAGE

13    No.  1                                    112

14    No.  2                                    129

15    No.  3                                    159

16

17         (Exhibits retained by Ms. Samuels)

18

19

20

21

22

23

24
```

```
 1                    (Witness sworn remotely pursuant
 2                     to Section 319 and pursuant to
 3                     agreement of counsel.)
 4    WHEREUPON:
 5                    MICHAEL PIETRYLA,
 6    called as a witness herein, having been first duly
 7    sworn, was examined upon oral interrogatories and
 8    testified as follows:
 9                    DIRECT EXAMINATION
10    BY MS. SAMUELS:
11        Q.   Can you please state and spell your name
12    for the record, sir?
13        A.   Michael Pietryla, P I E T R Y L A.
14             MS. SAMUELS:  All right.  This is the
15    deposition of Michael Pietryla taken in the case
16    of Xavier Walker versus the City of Chicago,
17    et al., Case Number 20 CV 7209.
18                  This deposition is taken pursuant to
19    notice and agreement of the parties, under all
20    applicable rules.
21    BY MS. SAMUELS:
22        Q.   Have you ever given a deposition before,
23    sir?
24        A.   Yes.
```

```
 1        Q.    How many?

 2        A.    A couple, at least two.

 3        Q.    At least two.  Are those all the ones you

 4   can recall?

 5        A.    The only ones I can recall right now.

 6        Q.    Okay.  And when is the last time you

 7   gave a deposition?

 8        A.    Oh, let's see, I've been retired eight

 9   years.  Probably about 15 years ago, maybe --

10   maybe 18 years ago.

11        Q.    All right.  Since it's been a while, I'll

12   go over the rules real briefly for you sort of

13   just to refresh it.  What you're doing today is

14   the equivalent of testifying in court, all your

15   answers are under oath.  Do you understand what

16   that means?

17        A.    Yes.

18        Q.    As you can see, we have a court reporter

19   taking down everything that's being said,

20   therefore, your answers to my questions need to be

21   verbal.  Things like nodding, shaking of the head,

22   I understand what you mean but so that the record

23   is clear, to the extent you can remember, please

24   make sure to verbalize all your answers.  Also,
```

1    yes or no is preferred to an uh-huh or uh-uh just

2    so that we can make sure we're understanding your

3    intent correctly.  Okay?

4        A.    Okey-doke.

5        Q.    If any of my questions are unclear for

6    you, please ask me to rephrase them; otherwise I'm

7    going to assume that the question that -- the

8    answer you're providing is responsive to the

9    question that's being asked.  Fair enough?

10       A.    I understand.

11       Q.    And then if at any time you want to take

12   a break, please let me know.  My only request

13   would be if there is a question pending to wait

14   until -- to answer the question pending and then

15   ask for a break.  Okay?

16       A.    I will.

17       Q.    Did you prepare at all for your

18   deposition today --

19           MS. SAMUELS:  Actually, we need to get

20   everybody on the record who is on here.  I am

21   sorry.

22               So if you want to go ahead and

23   identify yourself and your clients, Counsels.

24           MR. MILLER:  Sure.  It's Graham Miller

7

```
 1    and Misha Itchhaporia on behalf of Mr. Pietryla,
 2    the other defendant officers.
 3              MS. BRILL:  Breana Brill and Ryan Janski
 4    on behalf of the City defendant.
 5              MS. SAMUELS:  And I also believe we have
 6    some of the defendants who are present, David
 7    Wight and John Cruz.  Is that correct?
 8              MR. MILLER:  Correct.
 9    BY MS. SAMUELS:
10         Q.   Okay.  So back to the questions.  All
11    right.  Did you prepare at all for your
12    deposition, sir?
13         A.   I couldn't understand you.
14         Q.   Did you prepare for your deposition?
15         A.   Yes.
16         Q.   How did you prepare?
17         A.   Met with my attorneys.
18         Q.   How many times did you meet with your
19    attorneys?
20         A.   I believe three times.
21         Q.   Did you prepare for your deposition on
22    your own at all?
23         A.   Yes.
24         Q.   All right.  When you were preparing on
```

```
 1    your own, how did you prepare?
 2         A.   I read reports and transcripts that were
 3    provided to me.
 4         Q.   Did you ever speak with this case about
 5    your -- did you ever speak about this case with
 6    the other defendants?
 7         A.   No.
 8         Q.   When you met with your attorneys, was
 9    anyone else present besides yourself and your
10    attorneys?
11         A.   Yes.
12         Q.   Okay.  Who else was present?
13         A.   John Cruz and David Wright.
14         Q.   All right.  And was that for each of the
15    three times you met with your attorneys or just
16    one or two of them?
17         A.   It was for each of the three times.
18         Q.   All right.  When is the last time you met
19    with your attorneys besides today?
20         A.   Yesterday.
21         Q.   Oh.
22         A.   Okay.  Yesterday.
23         Q.   And how long did you meet with them
24    yesterday?
```

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

9

1      A.   Excluding lunch, approximately three

2   hours, four hours.

3      Q.   And prior to yesterday, when was the last

4   time you met with your attorneys?

5      A.   Last week Friday.

6      Q.   And how long did you meet with them last

7   week Friday?

8      A.   Approximately the same, three to

9   four hours.

10     Q.   And the other meeting that you had with

11  your attorneys, when was that?

12     A.   You turned your head when you -- I didn't

13  catch the end of that sentence.

14     Q.   I apologize.  So the third time that you

15  met with your attorneys, when was that?

16     A.   Actually, it is the first time, and that

17  was Thursday.

18     Q.   All right.  And how long did you meet on

19  Thursday?

20     A.   I don't -- I believe it was about --

21  approximately the same, three to four hours.

22     Q.   Did you review any video during the

23  meeting that occurred on Thursday?

24     A.   Partial video.  I am not sure if it was

```
1    Thursday or Friday, but it was just partial video.
2         Q.   All right.  What video?
3         A.   Xavier Walker's statement.
4         Q.   The one you were present for?
5         A.   Yes.
6         Q.   All right.  Did you review any other
7    statements of Xavier Walker?
8         A.   Just the transcribed -- the entire video
9    statement that was transcribed into paper form.
10        Q.   And was that for the one you were present
11   for, the transcript you're talking about?
12        A.   No, the transcript I reviewed at home.
13        Q.   And so when you say you reviewed the
14   entire video statement transcript, are you talking
15   about for his statement that he gave in 2000 or
16   the statement he gave in 2018?
17        A.   The -- his confession with the State's
18   Attorney present, the State's Attorney, myself,
19   Xavier Walker at Area 4 video room.
20        Q.   All right.  Did you review any other
21   videos at that meeting on Thursday?
22        A.   No.
23        Q.   All right.  Did you review any police
24   reports at the meeting on Thursday?
```

1     A.   I believe I -- yes, I believe I glanced

2 through them, through some of them.

3     Q.   All right.  What reports do you remember

4 reviewing?

5     A.   Interviews of witnesses, the original

6 case report, some supplementary reports that were

7 done on the case.

8     Q.   Any GPR's?

9     A.   Yes.

10     Q.   Did you review your trial transcript --

11 the trial transcript?

12     A.   Not at that time I didn't.

13     Q.   Is there anything else you recall

14 reviewing on Thursday?

15     A.   No, that's about it.

16     Q.   When you reviewed these things on

17 Thursday, did anything stand out as inaccurate to

18 you?

19     A.   No.

20     Q.   On Friday what did you review?

21     A.   Basically the same thing.

22     Q.   Was there anything on Friday that you

23 reviewed that you did not review on Thursday?

24     A.   I don't believe so.

1      Q.   When you met yesterday with your

2  attorneys, what did you review?

3      A.   Basically the same thing.

4      Q.   When -- is there anything you reviewed

5  yesterday that you did not review on Thursday or

6  Friday?

7      A.   Best of my recollection, no.

8      Q.   Besides what we've talked about, did you

9  do anything else to prepare for your deposition?

10     A.   No.

11     Q.   When is the last time you have spoken

12  with -- well, have you spoken with John Cruz

13  outside the presence of your attorney?

14     A.   Just at lunch.

15     Q.   All right.  And have you spoken with

16  David Wright outside the presence of your

17  attorney?

18     A.   Same thing, just at lunch.

19     Q.   Have you spoken with former Cook County

20  Sheriff's Police Officer Brzeniak in the last two

21  years?

22     A.   Yes.

23     Q.   When is the last time you spoke with him?

24     A.   This is just a guess, but I would say

13

1    about five months ago.

2        Q.   Who was present with you when you spoke

3    with him?

4        A.   No one.

5        Q.   What did you speak about?

6        A.   It was -- Tony Brzeniak is a friend of

7    mine besides being a -- we talked about our

8    families and vacation.

9        Q.   When is the last time you spoke with

10   Brzeniak about either this lawsuit or the

11   allegations raised in the lawsuit?

12       A.   I haven't talked to him about it.

13       Q.   How often do you speak with Brzeniak?

14       A.   Oh, a couple times a year, usually around

15   holidays.

16       Q.   How long have you known Brzeniak?

17       A.   22 years.

18       Q.   Did you first meet him in or around the

19   time that this investigation took place?

20       A.   I met him once before.

21       Q.   When was that?

22       A.   Oh, boy, if I had to guess, I would say

23   at least 25 years ago.

24       Q.   What was the nature of your meeting him

14

1    for the first time?

2        A.    He was responding to a police matter, and

3    when I seen the blue lights going, I stopped.

4        Q.    Then what happened?

5        A.    We dealt -- he was dealing with a problem

6    on the street, I just stood there and afterwards

7    just he thanked me and -- for stopping and that

8    was it.

9        Q.    Did you keep in touch with him after that

10   first initial meeting?

11       A.    No.

12       Q.    Okay.  And then the next time you

13   interacted with him -- materially interacted with

14   him, was that for this incident?

15       A.    About -- I don't recall exactly, it was a

16   week or two weeks when he was sent to Area 4,

17   before this I believe, before the incident.

18       Q.    Okay.  Did you work with him during the

19   two-week period?

20       A.    Yes, ma'am.

21       Q.    And would you characterize that as sort

22   of the beginning of your friendship?

23       A.    Yeah, that's when we met and we became

24   friends, yes.

15

```
 1       Q.    Okay.  Mr. Sanders, I understand he's
 2   deceased; is that correct?
 3       A.    Yes.
 4       Q.    How long had you known Mr. Sanders?
 5       A.    Since I've been -- got promoted to
 6   detective and went to Area 4.
 7       Q.    How would you classify your relationship
 8   with Mr. Sanders?
 9       A.    We were detectives working in the same
10   area.
11       Q.    You wouldn't consider him your friend
12   outside of work?
13       A.    No, ma'am.
14       Q.    What year did you retire?
15       A.    2014.
16       Q.    At the time you retired, was Mr. Sanders
17   still alive?
18       A.    I don't know.
19       Q.    When is the last time you remember
20   communicating with Mr. Sanders?
21       A.    When we were both working in Area 4,
22   before he retired or he left.  I think he went to
23   a different -- he was transferred to a different
24   unit, I think he went to Cold Case.
```

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

```
 1        Q.    After you stopped working together, you
 2   no longer maintained contact with him?
 3        A.    No.
 4        Q.    Would you consider Mr. Sanders a good
 5   police officer?
 6        A.    Yes, I did.
 7        Q.    Had you ever seen him engage in
 8   misconduct?
 9        A.    Am I -- I didn't hear the question.
10        Q.    Had you ever seen him engage in
11   misconduct?
12        A.    No.
13        Q.    Had you ever known him to be suspended,
14   disciplined or reprimanded for any misconduct?
15        A.    I -- I had no idea about his history.
16        Q.    Do you know Mr. Wolverton?
17        A.    I remember him, yes.
18        Q.    How did you first come to know
19   Mr. Wolverton?
20        A.    Through work.  I worked afternoon shift,
21   and I believe Wolverton worked midnights.
22        Q.    How would you describe your relationship
23   with Mr. Wolverton?
24        A.    Just like every other detective out
```

17

1    there, we'd say hello and, you know, that would be

2    about it.

3        Q.   At some point did you stop working in the

4    same Area with Mr. Wolverton?

5        A.   I didn't catch the first part.

6        Q.   At some point did you stop working in the

7    same Area with Mr. Wolverton?

8        A.   Yes, I don't recall if he retired from

9    Area 4, but they busted up Area 4 and detectives

10   were sent to different areas.  We got to choose

11   based on seniority.

12       Q.   Did you maintain contact with

13   Mr. Wolverton after Area 4 was busted up?

14       A.   No, ma'am.

15       Q.   When is the last time you communicated

16   with Mr. Wolverton?

17       A.   Before I got -- before they broke up the

18   Area.  I would say I -- and if he hadn't retired,

19   I would have talked to him eventually, said hello

20   to him or something.  I can't give you an exact

21   date or even a year.

22       Q.   Have you spoken to Mr. Wolverton in the

23   last three years?

24       A.   No.

1    Q.    What about Mr. Riordan, do you know who

2    I'm referring to?

3    A.    James -- I am sorry, John Riordan?

4    Q.    Yes.

5    A.    When is the last time I talked to him?

6    Q.    Yes, sir.

7    A.    Maybe about four months ago, three months

8    ago.  I am not really sure when I spoke with him

9    again but it was recent.

10    Q.    What did you speak about?

11    A.    Excuse me?

12    Q.    What did you speak about?

13    A.    I just haven't seen him in years so I

14    talked to him briefly about how he's doing, how I

15    was doing.

16    Q.    Where did you run into him?

17    A.    Outside the law firm on the street here.

18    Q.    Did he tell you about his deposition?

19    A.    No, ma'am.

20    Q.    Did you talk about the case at all?

21    A.    No, ma'am.

22    Q.    Did you talk about the incidents that

23    gave rise to this case?

24    A.    No, ma'am.

19

1     Q.   Besides the interaction you had with

2  Mr. Riordan about three or four months ago, have

3  you had any other interactions with him in the

4  last three years?

5     A.   No, ma'am.

6     Q.   How would you describe your relationship

7  with John Cruz?

8     A.   John Cruz was a hard-working detective on

9  midnights.

10     Q.   So how would you describe your

11  relationship with him?

12     A.   Oh, we got along, you know, we spoke.

13     Q.   At some point did you stop working in the

14  same Area as Mr. Cruz?

15     A.   Yes.

16     Q.   Did you keep in touch with him after you

17  stopped working together?

18     A.   No, ma'am.

19     Q.   In the last three years, have you spoken

20  with Mr. Cruz outside of the presence of your

21  attorneys with the exception of the three times at

22  lunch you have already identified?

23     A.   That's about it.

24     Q.   Have you written or texted with John

1    Cruz?

2        A.    No, ma'am.

3        Q.    What about with Wolverton?

4        A.    No, ma'am.

5        Q.    What about with Brzeniak?

6        A.    I have called him.

7        Q.    But you don't write or text with

8    Brzeniak?

9        A.    I may have texted him something also,

10   I -- but that's the only way we communicated.  I

11   haven't seen Tony in years.

12       Q.    How do you know Mr. Wright?

13       A.    Through work.

14       Q.    How would you describe your relationship

15   with him?

16       A.    Very good.  He was a hard-working

17   detective in the Area.

18       Q.    Were there detectives in the Area that

19   you knew were not hard-working?

20       A.    Do I know any?

21       Q.    Yeah.

22       A.    The office -- the ones that are assigned

23   to the office, they're detectives but they do

24   paperwork.

```
 1      Q.   All right.  And so you would describe
 2 those detectives as not hard-working?
 3      A.   No, they work hard at what they do but
 4 they don't -- they're not field detectives
 5 anymore.
 6      Q.   All right.  At the time that you were in
 7 the field, were there any Area detectives who
 8 worked in the field that you would describe as not
 9 hard-working?
10      A.   No, ma'am.
11      Q.   So every detective was hard-working?
12      A.   Yes, ma'am.
13      Q.   When is the last time you communicated
14 with David Wright outside the presence of your
15 attorneys?
16      A.   When he was -- when he and I were both
17 assigned to Area 4.
18      Q.   Did you keep up with Mr. Wright after you
19 stopped working together?
20      A.   Did I what, ma'am?  You keep breaking up,
21 I don't know if it's -- you're turning your head
22 or this microphone, I don't know.
23      Q.   Did you keep up with Mr. Wright after you
24 stopped both being assigned to Area 4?
```

22

```
 1        A.    No, ma'am.
 2        Q.    Do you write or text with Mr. Wright?
 3        A.    No.
 4        Q.    When I say Xavier Walker, do you know who
 5   I'm referring to?
 6        A.    Yes, ma'am.
 7        Q.    When I say Jovanie Long, do you know who
 8   I'm referring to?
 9        A.    Yes.
10        Q.    When I say Mary Curry, do you know who
11   I'm referring to?
12        A.    Yes.
13        Q.    When I say Jamaica (phonetic) Wright, do
14   you know who I'm referring to?
15        A.    Yes.
16        Q.    When I say Maurice Wright, do you know
17   who I'm referring to?
18        A.    Yes.
19        Q.    When I say Ashonti (phonetic) Wright, do
20   you know who I'm referring to?
21        A.    Yes.
22        Q.    When I say Antwoine Waddy, do you know
23   who I'm referring to?
24        A.    Yes.
```

```
 1        Q.   When I say Hershula Berg, do you know who
 2   I'm referring to?
 3        A.   Yes.
 4        Q.   When I say Yvette Anderson, do you know
 5   who I'm referring to?
 6        A.   Yes.
 7        Q.   When I say Miriam (phonetic) Tillman, do
 8   you know who I'm referring to?
 9        A.   Mary who?  Mary who, ma'am?
10        Q.   Miriam Tillman.
11        A.   No, ma'am.
12        Q.   All right.  Do you have an independent
13   recollection of the parts you played in
14   investigating the murder of Marek Majdak?
15        A.   Yes.
16        Q.   When did you first become a Chicago
17   police officer?
18        A.   I believe it was June of '86.
19        Q.   At that time did you already have -- at
20   the time you decided to become a Chicago police
21   officer, what were you doing for employment?
22        A.   I was an independent contractor.
23        Q.   For who?
24        A.   Independent, ma'am, I worked -- I -- I
```

24

1    was a -- how would you say?  I did rehabs, I did

2    roofs, I put up siding, I installed windows,

3    doors.

4        Q.    So like general construction; would that

5    be fair?

6        A.    That would be fair, yes.

7        Q.    How long had you been doing that?

8        A.    Approximately five or six years.

9        Q.    What made you decide to become a Chicago

10   police officer?

11       A.    I've always wanted to be a Chicago police

12   officer.

13       Q.    How old were you when you joined the

14   Chicago police?

15       A.    I was pretty old.  I want to say I was

16   33, 34.  Not good with math in my head.

17       Q.    All right.  So if you were an independent

18   contractor before that for about five or six

19   years, that would have meant you were doing it

20   from roughly the ages of like 27 or 28, fair?

21       A.    That's -- yeah, yeah, that's fair.

22       Q.    Okay.  Did you have any other careers

23   besides construction or like that area prior to

24   becoming a Chicago police officer?

```
 1        A.    Prior to that, yes.

 2        Q.    What did you do?

 3        A.    I was -- I worked for Prudential

 4   Insurance Company.

 5        Q.    What did you do for Prudential?

 6        A.    I was an insurance agent, sold it, filed

 7   claims for people.  That's when they used to have

 8   insurance agents that would come to your house.

 9        Q.    Okay.  And just generally, how long did

10   you do that?

11        A.    I believe at least six years, five years;

12   five, six years, in that neck of the woods.

13        Q.    And so that would have been roughly from

14   the time you were like in your early 20s, right?

15        A.    Yes, ma'am.

16        Q.    So did you have any other careers during

17   that time frame when you were an insurance agent?

18        A.    When I was an insurance agent or prior to

19   that it?

20        Q.    While.

21        A.    No.

22        Q.    Were you ever subject to any complaints

23   or any discipline while you were an insurance

24   agent?
```

26

```
 1        A.    No, ma'am, not to my knowledge anyway.
 2        Q.    All right.  And did you terminate your
 3   employment with the insurance company?
 4        A.    Yes, I did.
 5        Q.    When you were an independent contractor,
 6   did you have your own business or something like
 7   that?
 8        A.    Yes, ma'am.
 9        Q.    What was the name of your business?
10        A.    MJP Construction.
11        Q.    MJ, Inc., Construction?
12        A.    No, MJP, like in Paul.
13        Q.    Oh.
14        A.    My initials.
15        Q.    That makes sense.  Does that company
16   still exist?
17        A.    No, ma'am.
18        Q.    When did that company stop existing?
19        A.    I believe when I started with the police
20   department.
21        Q.    So in or around '86?
22        A.    Yeah, in or around June of '86.
23        Q.    Did you ever hire any people to work for
24   you for your company?
```

```
 1        A.    For MJP Construction?

 2        Q.    Yes, sir.

 3        A.    Just my sons.  I didn't hire them, they

 4   would just come and I would pay them.

 5        Q.    Were you ever subject to any complaints

 6   or any discipline while working at MJP

 7   Construction?

 8        A.    Not to my knowledge, no, ma'am.

 9        Q.    And then after that is when you began

10   with the Chicago Police Department, correct?

11        A.    Yes.

12        Q.    Prior to applying to join the Chicago

13   Police Department, had you ever applied to work

14   for any other police departments?

15        A.    No, ma'am.

16        Q.    Do you have any family members who are

17   affiliated with the Chicago Police Department?

18        A.    Two retired cousins, four active police

19   officers.

20        Q.    All right.  What are the names of the two

21   cousins?

22        A.    William Tock, T O C K; Peter Tock,

23   T O C K.

24        Q.    And I think you mentioned four other
```

28

1    individuals.  Who are they?

2        A.    My sons.

3        Q.    Okay.  All four of them?

4        A.    All four of them -- well, that's four of

5    the six.

6        Q.    Can you give me their names, please?

7        A.    Scott, same last name as mine; Michael,

8    same last name as mine, he is a Junior; John, same

9    last name as mine, and Joshua, same last name as

10   mine.

11       Q.    And they're all currently active duty,

12   correct?

13       A.    Yes.

14       Q.    Are you related to any persons who used

15   to work for -- who used to be a correctional

16   officer for Cook County?

17       A.    My son -- actually, Michael, John, Joshua

18   were correction -- they worked for Cook County as

19   correctional officers.  Also assigned by the name

20   of Josh -- I am sorry, Jacob, J A C O B, same last

21   name as mine who is no longer a Cook County

22   correctional officer.

23       Q.    Okay.  Do you have any military

24   background or service?

29

```
 1        A.   Yes, ma'am.

 2        Q.   Can you describe that for me?

 3        A.   I enlisted into the United States Army,

 4   the date I'm not exactly sure, I'll have to do it

 5   backwards.  I believe I came out in '73, so

 6   probably '70 to '73 or '74, it might have been

 7   '74.  I am sorry.

 8        Q.   No, I didn't mean to cut you off, I

 9   apologize.  So give or take roughly from 1970 to

10   1974?

11        A.   That's correct, and then I was assigned

12   to the National Guard for an additional two years.

13        Q.   That would have been after '74 -- after

14   you were done with the U.S. Army?

15        A.   When I was done with the U.S. Army, I

16   went to the National Guard for two years --

17   roughly two years.

18        Q.   With the U.S. Army, what was the highest

19   rank you received?

20        A.   Specialist Fourth Class.

21        Q.   With the National Guard, what was the

22   highest rank you attained?

23        A.   Remained the same, Specialist Fourth

24   Class.
```

```
 1        Q.   Were you ever assigned any duties related

 2   to investigations or anything of that nature with

 3   the U.S. Army?

 4        A.   Yes, ma'am, yes.

 5        Q.   All right.  What were those?

 6        A.   I was a military policeman and then --

 7        Q.   For how long?

 8        A.   -- I was assigned -- the -- our

 9   primary -- that was my primary MOS, and that's

10   called military occupational skill, that's the

11   number.

12        Q.   Uh-huh.

13        A.   I was assigned to the Army Security

14   Agency which is a branch of -- it is a branch of

15   the Army but it is -- requires a very

16   high-security clearance.

17        Q.   So I am sorry, how long were you MP?

18        A.   The entire time through including the

19   National Guard, they don't change your MOS.

20        Q.   Oh, okay.  Were you -- did you receive

21   any training on how to be an MP?

22        A.   Yes.

23        Q.   Can you describe that for me?

24        A.   In general?
```

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

31

1    Q.   Well, let's begin with, did you have to

2    go to a special school or something like that?

3    A.   Yes, ma'am, it is at Fort Gordon,

4    Georgia, Military Police School.

5    Q.   And how long did Military Police School

6    last?

7    A.   I believe they called it advanced

8    individual training, I believe it is three months.

9    Q.   Before becoming an MP with the U.S. Army,

10   had you had any investigatory or sort of policing

11   training?

12   A.   No, ma'am.

13   Q.   And so after three months at AIT, did you

14   receive any other additional training related to

15   being a military police officer?

16   A.   Training, no, ma'am.

17   Q.   When you were at AIT, what kind of -- can

18   you describe, was this on-the-job training, was it

19   like an in-school course?

20   A.   No, it was -- it's -- how do I explain

21   that?  They -- you're assigned to a post and --

22   not a post.  A fort and that entire -- that

23   requires military police training, that's all

24   you're trained to do.  So you had classes the

32

1     entire -- maybe not the entire three months but

2     the bulk of it excluding weekends.

3          Q.   All right.  And then after your three

4     months of AIT, are you -- is there a probationary

5     period or are you fully --

6          A.   No, you're an MP.  When you do three

7     months, you're done.

8          Q.   All right.  Do you remember if AIT, if

9     they covered Brady obligations?

10         A.   I don't recall.

11         Q.   How about do you remember any specific

12    areas of training at AIT?

13         A.   United States Military Justice Code,

14    procedures for arresting and procedures for --

15    anything that involves what military policemen do,

16    arrest procedures, processing procedures.  That's

17    about all.  I -- I mean, there was other things,

18    but they taught you how to use a -- you know, a

19    weapon that you carried.  That's about all I can

20    remember.

21         Q.   Did you -- did you ever conduct any

22    investigations to any murders while you were with

23    the U.S. Army?

24         A.   No, ma'am.

33

1   Q. What about any -- I am sorry, go ahead.

2   A. When I was stationed in Sinop, Turkey,

3 which is no longer there, Sinop is but the base is

4 not, another MP did get murdered.  And they

5 arrested another soldier, I was there, had some

6 initial investigation as a military policeman, not

7 as a detective.  I testified in a court proceeding

8 against the offender.

9   Q. Did you receive any training on how to

10 testify while you were with the U.S. Army?

11   A. No, not that I can recall.

12   Q. All right.  While you were -- were you

13 honorably discharged from the Army?

14   A. Yes, ma'am.

15   Q. Are you aware of any complaints or

16 discipline that you received while you're with the

17 U.S. Army?

18   A. No, ma'am.

19   Q. While you were with the National Guard,

20 did you -- did you -- well, let me start with

21 this.  Did you receive any additional training

22 when you became a guardsman?

23   A. On-the-job, mock activations at Fort

24 McCoy, Wisconsin.

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

1      Q.    All right.  Did you receive any

2   additional training with regard to investigatory

3   procedures and/or policing?

4      A.    I am sure we -- I know we had training.

5   What exactly it involved, I can't recall.

6      Q.    Did you ever investigate any murders

7   while you were a guardsman?

8      A.    No.  No, I did not.

9      Q.    What about any shootings?

10     A.    No, ma'am, I did not.

11     Q.    And you were honorably discharged from

12   the National Guard?

13     A.    Yes.

14     Q.    Besides Turkey, were you stationed in any

15   other countries?

16     A.    Yes.

17     Q.    Which countries?

18     A.    Well, I wasn't actually stationed, we

19   were just mobilized from Turkey.  Germany,

20   Ireland, Greece, Vietnam.

21     Q.    Did you ever have to deploy your weapon

22   while you were with the U.S. military?

23     A.    No.

24     Q.    Is there anything else material to your

1    time with the U.S. Army that may have -- that may

2    have contributed or affected your ability to be a

3    Chicago police officer?

4        A.    No, ma'am.

5        Q.    Is there anything else material to your

6    time as a National Guardsman that may have

7    contributed to or affected your ability to be a

8    Chicago police officer?

9        A.    No, ma'am.

10       Q.    Then you did construction for -- was

11   that -- no.  So you went from the U.S. Army to

12   insurance, correct?

13       A.    Yeah, a little break in there, but yes.

14       Q.    But roughly?

15       A.    Roughly, yeah.

16       Q.    Did you have a specific career field

17   between the U.S. Army and insurance?

18       A.    Prior to the military, I worked for --

19   the business that is no longer in existence,

20   United Desoto was a wallpaper firm, they printed

21   wallpaper.  And when I came out of the service,

22   they had to hire me back, that's federal law.  And

23   I went back to work for them for a couple months

24   and then they went out of business.  They just

```
 1    couldn't cut it.
 2        Q.   All right.  And then is that when you got
 3    into the insurance field?
 4        A.   Yes, roughly -- no -- yes, that would be
 5    roughly right, I believe so.
 6        Q.   Okay.  And then from insurance you went
 7    to becoming an independent contractor, correct?
 8        A.   Yes.
 9        Q.   Okay.  Did you take any classes or
10    training on contracting?
11        A.   No.
12        Q.   Did you receive any certifications in
13    contracting?
14        A.   No.
15        Q.   And then from contracting you went to the
16    Chicago Police Department, correct?
17        A.   Yes, that's correct.
18        Q.   Have you ever been -- prior to becoming a
19    Chicago police officer, had you ever been arrested
20    or detained by police?
21        A.   Once.
22        Q.   Can you describe that for me?
23        A.   Drank too much and I got disorderly.
24        Q.   Roughly when was this?
```

```
 1         A.   Roughly in the '70s.
 2         Q.   Would this have been before, during or
 3   after your time with the military?
 4         A.   I can't recall.  I -- I -- I know it
 5   was -- no, I know it was before the police
 6   department.
 7         Q.   Okay.  Do you recall what the outcome of
 8   the disorderly was?
 9         A.   It was dismissed.
10         Q.   Besides your -- the disorderly arrest,
11   have you ever been arrested or detained by Chicago
12   police prior to becoming a Chicago police officer?
13         A.   No, ma'am.
14         Q.   Once you became a Chicago police officer,
15   had you ever been arrested or detained by police?
16         A.   No.
17         Q.   Since retiring from the Chicago Police
18   Department, have you ever been arrested or
19   detained by police?
20         A.   No.
21         Q.   The disorderly, was that in Chicago?
22         A.   Yes.
23         Q.   Do you recall where that occurred?
24         A.   In a bar in my old neighborhood.
```

38

```
 1        Q.   Was it like a bar fight or something?

 2        A.   No, I actually just drank too much, I

 3   believe I fell down the stairs or something and

 4   they called the police and they arrested me.

 5        Q.   All right.  Let me -- so right now I'm

 6   going to sort of go through your background with

 7   the Chicago Police Department.

 8             So your date of appointment was I

 9   think you said June of '86?

10        A.   Yes, ma'am.  That's when I got hired,

11   yes, ma'am.

12        Q.   All right.  Then after you got hired, did

13   you have to go to like basic -- well, not basic

14   training, it's not military.  But did you have to

15   go to some sort of training?

16        A.   Yes, at the academy, Chicago Police

17   Academy on Adams and -- well, the old block, Adams

18   and Jackson, I think it's the 1300 block.

19        Q.   And do you recall roughly how long you

20   were in the academy?

21        A.   I believe it was three months, it could

22   have been four.

23        Q.   All right.

24        A.   It could have been longer, I just don't
```

39

1    remember.

2        Q.    And while you're in the academy, are you

3    trained on arrest procedures?

4        A.    Yes.

5        Q.    Report writing?

6        A.    Yes.

7        Q.    Do you remember anything else you're

8    trained on?

9        A.    Firearms.  You said arrest procedures,

10   right?

11       Q.    Yes, sir.

12       A.    Reports, various classes on reports,

13   Illinois state law.  That's about all I remember.

14   Oh, traffic accidents, that's big too, and gym,

15   they made sure you stayed in shape.

16       Q.    And then after academy, do you remember

17   where you were assigned?

18       A.    They assigned me to the 9th District,

19   that was at 35th and Lowe, L O W E, it's no longer

20   there.

21       Q.    And at the time was your job title

22   patrolman?

23       A.    Probationary police officer.

24       Q.    How long were you a probationary police

1    officer?

2        A.   I believe it was for an entire year.

3        Q.   And during your probationary year, what

4    type of things would you do?

5        A.   You rode -- you were taught on-the-job

6    training by a field officer -- well, they didn't

7    even call them field training officers then.

8             You were assigned to somebody, an

9    experienced patrol officer who would actually

10   implement what you learned in the academy.

11       Q.   Did you stay in your 9th District for

12   that -- excuse me, did you stay in the 9th

13   District for that entire first year?

14       A.   Yes.

15       Q.   All right.  And at the time they weren't

16   called field training officers, but it was the

17   functional equivalent of what we know now as a

18   field training officer?

19       A.   Yes, that's fair.

20       Q.   It was the same person or was it

21   different individuals?

22       A.   Changed a whole lot.  I -- every day it

23   could be somebody different or you could work with

24   the same guy more than once, I'm sure I did, a lot

1   of guys.

2       Q.   During your time as a probationary police

3   officer, did you ever have -- did you ever

4   participate or engage in any investigations for

5   any serious or violent crimes?

6       A.   Yes.

7       Q.   What types of -- what types of things

8   would you do to participate in these

9   investigations for serious or violent crimes?

10          MR. MILLER:  Are you saying serious

11  crimes?

12          MS. SAMUELS:  Yes, so I said serious or

13  violent crimes.

14          MR. MILLER:  Object to the form of the

15  question.

16  BY THE WITNESS:

17      A.   Do you mean conducting investigation or

18  was I there?  I -- I am not sure what you're

19  asking me.

20  BY MS. SAMUELS:

21      Q.   I am just asking what role you would

22  play.

23      A.   We would be assigned whatever job we

24  would -- to answer calls from 911 basically is

42

```
1    what it was and you would respond to them, and
2    sometimes they were violent crimes.
3        Q.   And so sometimes you would have to
4    interview witnesses?
5        A.   No.
6        Q.   How about canvassing a neighborhood?
7        A.   No, patrolmen didn't do that then.
8        Q.   All right.  Securing a scene?
9        A.   Yes.
10       Q.   Would you author like any case reports?
11       A.    If we were assigned to the crime, it
12   would be the primary duty to fill out the case
13   report of the crime.
14       Q.   Were there any other tasks you might be
15   assigned to do for a serious or violent crime?
16            MR. MILLER:  Object to the form of the
17   question.
18                 Go ahead.
19   BY THE WITNESS:
20       A.   Any other tasks, is that what you said?
21   BY MS. SAMUELS:
22       Q.   Yes, sir.
23       A.   Whatever the detectives told you to do
24   you would do on a violent crime.
```

```
1        Q.   Fair enough.  After your probationary

2   year, did you stay in the 9th District?

3        A.   Yes.

4        Q.   How long did you stay in the 9th

5   District?

6        A.   It was less than a year I think.  I

7   couldn't give you the exact months, somewhere

8   between six and twelve months.

9        Q.   Then where did you go after the 9th

10  District?

11       A.   1st District.

12       Q.   How long did you stay in the 1st

13  District?

14       A.   I believe I stayed in the 1st District

15  for six -- five or six years.

16       Q.   So roughly from like '87 to '92, '93?

17       A.   That's correct.

18       Q.   And when you first went to the 1st

19  District, was your job title still a patrolman?

20       A.   Yes.

21       Q.   At any point during your time at the 1st

22  District, did you have any other job title than

23  patrolman?

24       A.   Periodically we would be -- we would fill
```

1    in for -- on the tact teams.

2        Q.   So besides the tactical team, were you a

3    member of any other specialized team or unit while

4    you were in the 1st District?

5        A.   No.

6        Q.   Do you remember when you first began --

7    or when you first joined the tact team?

8        A.   That -- that was an arbitrary thing, if

9    somebody was going on vacation, a couple guys,

10   they would pull some patrolmen and ask them if

11   they wanted to go to tact.

12       Q.   Okay.  So is it fair to say that that

13   wasn't one of your regular assignments, you just

14   filled in as needed?

15       A.   Yes.

16       Q.   Did you have a regular partner while you

17   were assigned to the 1st District?

18       A.   Yes, several regular partners over that

19   course of years.

20       Q.   Can you identify your partners?

21       A.   First one would be Art Buckley,

22   B U C K L E Y, I believe I think that's the

23   correct spelling.

24       Q.   Okay.

45

```
 1        A.    Michael Martiare, M A R T I A R E.

 2        Q.    Okay.

 3        A.    Neil Crotty, C R O T T Y.

 4        Q.    Okay.

 5        A.    That's about it.

 6        Q.    Then these would have been your partners

 7   while you were assigned to patrol, correct?

 8        A.    That's correct.

 9        Q.    Do you recall how long you were partnered

10   with Buckley?

11        A.    No.

12        Q.    What about with Michael?

13        A.    A year and a half.

14        Q.    All right.  How about --

15        A.    (Indecipherable).

16        Q.    I am sorry, what was that?

17        A.    Neil Crotty, is that who you asked about?

18        Q.    Yes, sir.

19        A.    Until he went to the Mayor's Office, so

20   maybe about -- approximately two years.

21        Q.    And then after spending about I think you

22   said five or six years in the 1st District, yeah,

23   where did you go after that?

24        A.    After that I was promoted to youth
```

46

1    officer, which they don't have anymore but they're

2    detectives now.  So it was the same rank as a

3    detective.

4         Q.   That would have been in or around

5    '83-ish?

6         A.   No, that's not correct, not '83.

7         Q.   Oh, I am sorry, '93?

8         A.   Yeah, that would be around '93, yes, I'm

9    not exactly sure.

10        Q.   At the time you became a youth officer,

11   what was -- what were the responsibilities of a

12   youth officer?

13        A.   The responsibility, you process

14   juveniles, you investigate child abuse.  That's

15   about it.  You handle all juvenile arrests --

16   well, not all of them.  Anything that's a felony

17   they would call youth officers.

18        Q.   Okay.

19        A.   On a misdemeanor.

20        Q.   Did you have to receive any special

21   training to become a youth officer?

22        A.   Yes.

23        Q.   How were you trained?

24        A.   At the academy.

47

```
 1        Q.   For how long?

 2        A.   My best guess is three months, maybe

 3   four.

 4        Q.   Do you recall what training they went

 5   over at the academy to become a youth officer?

 6        A.   The difference between an adult arrest

 7   and juvenile arrest 'cause they're completely

 8   different, the processing and handling of

 9   juveniles, they gave you how to investigate

10   crimes, all relative to that.  It was basically

11   that, various things but all relative to handling

12   of juveniles, predominantly.

13        Q.   When you were a youth officer, did you

14   work out of a particular District or Area?

15        A.   Area 4.

16        Q.   All right.  Beginning in '93?

17        A.   Yes, ma'am, I believe it's '93, whatever

18   the month, you know, I...

19        Q.   Give or take?

20        A.   Yes.

21        Q.   Okay.  And when you say you received

22   training on how to investigate, what did that

23   training detail or what was that about?

24        A.   How to interview witnesses, how to
```

48

1    process arrestees, juvenile arrestees

2    specifically, court procedures.

3        Q.    When you say court procedures, you mean

4    like juvenile court?

5        A.    Yes, juvenile court's a little different

6    than adult court.

7        Q.    Okay.  How long did you remain a youth

8    officer?

9        A.    I am not really sure.  I would say

10   roughly a year, year and a half.

11       Q.    And then what was your next job title

12   after youth officer?

13       A.    They sent me across the hall, I was a

14   detective and went to Area 4, Violent Crimes.

15       Q.    So that would have been around '94, '95?

16       A.    Yes, that's about right.  My memory is

17   not so good with the dates 'cause it's -- it's

18   not.

19       Q.    Okay.  When you became a detective with

20   Area 4, Violent Crimes, did you have to undergo

21   any additional training?

22       A.    Yes, ma'am.

23       Q.    And can you describe that training for

24   me?

49

1      A.   We went back to the academy, and I

2   believe it was for two months or three months, got

3   classes in the law, classes in investigating crime

4   scenes, how to conduct interviews, went to the

5   morgue, a lot of morgue procedures, a lot of law.

6   That's about all I can remember.

7      Q.   Okay.  Was there something about how you

8   would -- okay.  So let me preface this question by

9   saying, you previously testified that you had

10  learned how to interview witnesses to become a

11  youth officer, correct?

12     A.   Yes.

13     Q.   Were the procedures on how to -- were --

14  when you learned how to interview officers

15  pursuant to your training to become a detective,

16  was that different than how you would interview or

17  how you were trained to interview to become a

18  youth officer?

19     A.   They were basically the same except

20  detectives was a little more intense, more

21  thorough.

22     Q.   How were you trained to conduct

23  interviews as a detective?

24          MR. MILLER:  Object to the form of the

```
 1    question.
 2    BY THE WITNESS:
 3        A.    Through classes.
 4    BY MS. SAMUELS:
 5        Q.    All right.  Did those classes go over
 6    documenting statements?
 7        A.    I'm sure it did.  I'm -- I can't recall
 8    exactly.
 9        Q.    Is there anything you specifically recall
10    being taught about how to interview witnesses in
11    order to become a detective?
12        A.    No, but we had various people coming in
13    to talk to us about it, various instructors.
14        Q.    Is there anything you specifically recall
15    that was different but how to interview -- that
16    you learned as a detective as opposed to how you
17    learned as a youth officer?
18        A.    Well, I found out as detectives you do it
19    a lot more often, interview witnesses.
20        Q.    Were you trained about how long an
21    interview should last with a witness?
22        A.    I don't recall that specifically.
23        Q.    Were you trained about how to perceive
24    whether a person you're interviewing is under
```

```
 1   duress?
 2        A.   I don't understand what you mean by
 3   duress.
 4        Q.   Sure.
 5        A.   Sick?
 6        Q.   Right.
 7        A.   I wouldn't conduct an interview if
 8   somebody was sick.
 9        Q.   All right.
10        A.   I would make sure he's taken care of
11   first.
12        Q.   So how can I ask this question more
13   broadly.  Were you trained on what condition an
14   individual had to be in in order to conduct an
15   interview?
16             MR. MILLER:  Object to the form of the
17   question.
18                  Go ahead.
19             MS. BRILL:  The City joins the objection.
20   BY THE WITNESS:
21        A.   Would you repeat the question?
22   BY MS. SAMUELS:
23        Q.   Yes.  Were you trained on what condition
24   a subject had to be in in order to conduct an
```

1      interview?

2          A.   I don't recall.  I am sure maybe it was,

3      but I'm -- I just specifically don't remember

4      that.  No, I...

5          Q.   Okay.  Were you trained on any services

6      you had to provide to a subject who was being

7      detained for an interview?

8              MR. MILLER:  Object to the form of the

9      question.

10             MS. BRILL:  Join.

11     BY THE WITNESS:

12         A.   Again, Counselor, what do you mean by

13     services?  Or I just...

14     BY MS. SAMUELS:

15         Q.   Sure.  So were you trained that you have

16     to provide them with say a certain number of hours

17     where they could rest or anything like that?

18         A.   I can't specifically recall that I had to

19     provide a witness or -- with rest.  I -- I...

20         Q.   Okay.  What about food?

21         A.   Was I trained to give them food?

22         Q.   Yes, sir.

23         A.   I -- I don't recall that either, but I

24     would feed anybody so it doesn't matter.

53

1          Q.   And I understand some of these things may

2      sort of seem like common sense, and I'm going to

3      ask you sort of about your practices as a

4      detective a little bit later.  But I just want to

5      make sure we're concentrating on the training that

6      you received.  Okay?

7          A.   Okay.

8          Q.   So do you remember being trained about

9      any bathroom breaks you had to provide to subjects

10     who were being interviewed or detained?

11         A.   I am sure it was covered.  I don't

12     specifically remember.

13         Q.   Okay.  What about any phone calls?

14         A.   I am sure I was told they were entitled

15     to have it or not, a phone call.  I just don't

16     specifically remember the training, it's a long

17     time ago.

18         Q.   Understandable.  How about handcuffing?

19         A.   Would be the same thing, ma'am, I -- I'm

20     sure they -- I'm sure there was a class on

21     handcuffing, how to do it procedures, different

22     ways of handcuffing, I am sure of it.  I just

23     don't specifically recall what was done in those

24     classes.

54

```
 1        Q.   All right.  What about the use of
 2   restraints on a person who's being interviewed or
 3   detained for an interview?
 4        A.   Again, I'm sure there was something on
 5   that, I just don't recall the specifics.
 6        Q.   And you say you're sure there is
 7   something on that, that's because you would
 8   generally consider that something that should be
 9   covered; is that fair to say?
10        MR. MILLER:  Object to the form of the
11   question.
12   BY THE WITNESS:
13        A.   I don't know what they should -- what
14   they do, you know, you're at the receiving end of
15   this.  Whatever they teach you, they teach you.  I
16   just don't recall.
17   BY MS. SAMUELS:
18        Q.   Okay.  So you have no specific
19   recollection of whether any of those areas, rest,
20   food, bathroom breaks, phone calls, handcuffing
21   slash the use of restraints were covered; is that
22   fair to say?
23        MR. MILLER:  Object to mischaracterizes
24   the testimony, form of the question.
```

55

```
1                Go ahead and answer.
2           MS. BRILL:  Join.
3    BY THE WITNESS:
4        A.   I am sure we -- I'm sure we -- those --
5    everything you just mentioned is covered in some
6    manner, shape or form, I just don't recall --
7    recall it.
8    BY MS. SAMUELS:
9        Q.   And that's what I'm trying to get at.
10   When you say I'm sure that this was covered, is
11   that just because you think those are generally
12   the things that would be covered or because you
13   have sort of some recollection of it being in a
14   handbook or somebody talking to you about it?
15          MR. MILLER:  Object to the form of the
16   question.
17          MS. BRILL:  Join.
18   BY THE WITNESS:
19       A.   I just believe there are procedures -- I
20   believe there are procedures for doing that, and I
21   believe that at some point in detective school
22   they taught them to you, but I just don't recall
23   it.
24
```

56

```
 1    BY MS. SAMUELS:
 2         Q.   Gotcha.  And do you recall anything
 3    specifically related to how to document statements
 4    that you were trained about in order to become a
 5    detective?
 6         A.   In general, yes.
 7         Q.   Generally what do you recall?
 8         A.   That when we interview anyone, whether it
 9    is -- he's in custody or a witness, we would
10    generally do a GPR which is general progress
11    report, and if -- those GPR's would be eventually
12    used to create a supplementary report or some form
13    of a typewritten report, computer-generated
14    report.
15         Q.   And the GPR's, are those supposed to be
16    filled out contemporaneously with you speaking
17    with the individual?
18         A.   Yes.
19         Q.   And then the supplementary reports, you
20    would essentially just -- well, how would that
21    work, how would you turn a GPR into a
22    supplementary report?
23         A.   Me personally?
24         Q.   Yes, sir.
```

1    A.   GPR's would be -- you know, once I'm done

2    with the GPR's, I would use those to create my

3    report.  Once the report was approved, I would

4    attach the GPR's to the report.

5    Q.   Okay.  Is there any time frame for

6    turning a GPR into a supplementary report or sort

7    of does it just depend on the situation?

8    A.   It depends on the situation, ma'am.

9    Q.   All right.  Were you ever trained to

10   audio record statements?

11   A.   I am sorry, I didn't -- audio?

12   Q.   Yes, sir.

13   A.   I believe that training -- I don't recall

14   if we went to the academy for that or not.  I am

15   not really sure.  It may have been an online one

16   that we did, may have gone to the academy.  But

17   most of that was taught on the job with a more

18   experienced detective.

19   Q.   Can you describe how you were trained

20   related to audio recording statements?

21        MR. MILLER:  Object to the form of the

22   question.

23   BY THE WITNESS:

24   A.   We didn't conduct the -- we did not -- we

1    participated in the video audio statement but we

2    never conducted it, most of that was conducted by

3    the State's Attorney's Office.

4        Q.   Okay.  So you were never trained on how

5    to conduct an audio recorded statement?

6             MR. MILLER:  Object to the

7    mischaracterization of the testimony.

8             MS. BRILL:  Join.

9    BY THE WITNESS:

10       A.   They may -- they may or may not have

11   trained me, I just don't recall.  Some of this

12   stuff I just don't remember.

13   BY MS. SAMUELS:

14       Q.   Okay.  And so were you ever trained to

15   carry around like a personal recorder to record

16   statements that you were taking?

17       A.   No, ma'am, I -- I would remember that.

18   But I don't recall any training on me -- I -- I

19   don't believe we even did that.

20       Q.   Well, that was going to be my next

21   question.  And so when you were a Chicago police

22   detective, did you ever carry a personal audio

23   recording device to memorialize statements?

24       A.   No, ma'am, I did not.

59

```
 1       Q.   Okay.  I guess the same would go for a
 2  camera to video record statements, fair?
 3       A.   Yes, I never did that either.
 4       Q.   So during your time as a Chicago police
 5  detective, any audio or video recorded statements
 6  would have been conducted with the State's
 7  Attorney's Office?
 8       A.   They would conduct them, yes.  We would
 9  call them, they would come out and they would do
10  them.
11       Q.   Okay.  So you mentioned that when you
12  interview anyone, you would do a GPR, correct?
13            MR. MILLER:  Just object to
14  mischaracterizes the testimony.
15            MS. BRILL:  Join.
16  BY THE WITNESS:
17       A.   I would do a GPR when I felt like I
18  needed a GPR, not everybody.
19  BY MS. SAMUELS:
20       Q.   So under what circumstances would you
21  interview someone but not complete a GPR?
22       A.   If they -- if the information they're
23  giving me -- it depends.  Number one, depends if
24  I'm doing a canvass or if I'm doing an interview
```

1    with somebody who I believe to be a witness, then

2    I would.  But sometimes you talk to people and

3    won't get information from them or it doesn't

4    sound right so I would document something like

5    that.  Doesn't necessarily have to be -- I -- I

6    lost my train of thought, sorry.

7        Q.   Okay.  So and I am just trying to make

8    sure I understand you correctly.  So you said when

9    you're conducting a canvass, you would expect

10   yourself to complete a GPR for every person you

11   talked to; is that fair?

12           MR. MILLER:  Object to mischaracterizes

13   the testimony.

14           MS. SAMUELS:  That's what I'm trying to

15   figure out.

16           MS. BRILL:  Join.

17   BY THE WITNESS:

18       A.   I would fill out a GPR on a canvass for

19   every address I went to, if nobody was home, they

20   weren't home.

21   BY MS. SAMUELS:

22       Q.   Oh.

23       A.   But I would generally document that also,

24   not home, no answer, something like that.

61

1      Q.   Okay.  And if you were conducting a
2   formal interview, you would expect a GPR to be
3   completed, correct?
4      A.   I -- I generally do it.
5      Q.   Okay.
6      A.   I can't speak for other detectives.
7      Q.   That's fine.  I just want to talk about
8   your sort of general practice so I can make sure
9   we're understanding each other.  So if you
10   interviewed somebody, you would generally expect
11   there to be a corresponding GPR to document that,
12   correct?
13      A.   Yes, normally there would be.
14      Q.   And if there wasn't a GPR to correspond
15   with a time that you talked to somebody who might
16   have been a witness, you stated that that would be
17   because you believed that the information that
18   they were telling you didn't sound right or was
19   inaccurate or something like that, correct?
20      A.   Yeah, that would be fair.
21      Q.   Are there any other instances you can
22   think of when you might talk to a witness or
23   potential subject and that conversation wouldn't
24   be documented in the GPR?

62

```
 1       A.   No.

 2       Q.   Okay.  Besides a GPR, are there any other

 3   reports you would expect to complete when you're

 4   doing an interview or a canvass?

 5            MR. MILLER:  Object to the form of the

 6   question.

 7            MS. BRILL:  Join.

 8   BY THE WITNESS:

 9       A.   If you're -- if you're doing an -- if I'm

10   doing an interview, I would do a GPR, that GPR

11   would be generated in some manner referred to in

12   my report --

13   BY MS. SAMUELS:

14       Q.   Right.

15       A.   -- okay, but it wouldn't be included.  A

16   canvass even isn't included in a report.

17       Q.   Okay.  And I guess what I'm just trying

18   to get at is to make sure I understand sort of the

19   universe of reports that we're talking about, if

20   that makes sense, right.

21            And so if you're talking to somebody,

22   you're conducting an interview or anything like

23   that, the report we should be looking for is GPR.

24   There is no other reports you're aware of where
```

63

1    you would say oh, well, that's where I would

2    document a statement?

3        A.    There shouldn't be, but there have been

4    times when I have done a report on an interview

5    and not submitted a GPR, I've done that.

6        Q.    Okay.  And why would you -- so I'm

7    guessing the report you would submit is like a

8    case report or a supplementary report or something

9    like that?

10       A.    You mean -- I'm misunderstanding your

11   question.  I -- try it again, please.

12       Q.    Okay.  So you're saying there is times

13   when you've seen reports that document a time you

14   have talked to somebody but there was no

15   corresponding GPR, fair?

16       A.    That's correct.

17       Q.    Okay.

18       A.    I would be typing --

19       Q.    Go ahead.

20       A.    Are we losing you or just there is a

21   delay, sometimes you get cut off, I don't know

22   what it is.

23       Q.    No, okay.  And so those times when there

24   is a police report or like a typed report but not

64

1    a GPR, those typed reports would be a case report

2    or an arrest report?

3        A.   Generally, yes, that would be an arrest

4    report.  There is definitely not going to be a

5    GPR, not -- I wouldn't do one on an arrest, maybe

6    other policemen do.  But case report is -- is --

7    it wouldn't require a GPR on our end.

8             And I believe in my past I have

9    interviewed a witness while I was entering it on

10   the report, that's why another GPR may not

11   necessarily be accompanying that.  I didn't

12   handwrite an interview when the person was sitting

13   next to me and I was typing her statement or

14   her -- her answers to my questions.

15       Q.   Okay.  And when you say -- I think you

16   sort of just alluded to it.  But when you say

17   you're entering it on the report, essentially

18   you're talking to a witness and you're sort of

19   typing it into the computer as you're speaking

20   with them?

21       A.   Yes.

22       Q.   Okay.  So in those instances, there

23   wouldn't be a corresponding GPR, fair?

24       A.   Fair.

65

```
 1      Q.    Okay.

 2      A.    And that's about all I can think of.

 3      Q.    Okay.  Are you -- when -- do you have

 4  specific recollection of doing that in this case

 5  or in some other case?

 6      A.    No, I just remember I've done it in the

 7  past.

 8      Q.    And then were you trained on how to take

 9  handwritten statements from either witnesses or

10  subjects?

11      A.    I've never taken a handwritten so, and I

12  don't recall if I ever was trained on how to do

13  that.

14      Q.    Okay.  Is there anything else specific to

15  your training on how to be a detective that you

16  recall that we haven't talked about?

17          MR. MILLER:  Object to the form of the

18  question.

19          MS. BRILL:  Join.

20  BY THE WITNESS:

21      A.    Not that I can recall right now.

22  BY MS. SAMUELS:

23      Q.    Okay.  If you recall it at any point in

24  this deposition, just let me know.  Okay?
```

66

```
1              THE WITNESS:  I would like to go to the
2    bathroom.
3              MS. SAMUELS:  Actually, I was about to
4    say that too.  Yes, no problem.  Five minutes.
5                   (Short break.)
6              MS. SAMUELS:  Back on the record.
7    BY MS. SAMUELS:
8        Q.   Did you have a chance to consult with
9    your attorney over the break?
10       A.   No.
11       Q.   When I left off, we were talking about
12   handwritten statements; is that fair?
13       A.   Yes, handwritten statements.
14       Q.   I believe you said that you had never
15   taken one and you had never been trained on how to
16   take one; is that fair?
17       A.   That's correct, as far as I recall,
18   that's -- I don't believe I ever received training
19   on that.
20       Q.   Okay.  And so how long -- so in or around
21   I think you said '94 is when you became a
22   detective with Area 4, Violent Crimes; is that
23   correct?
24       A.   Yeah, I believe I said that, yes.
```

1          Q.    And then how long were you a detective

2     with Area 4, Violent Crimes?

3          A.    Until they closed the Area, I want to

4     say -- I am not really sure.  I think it was in

5     2012 I believe.  I am not really sure.  Whenever

6     they closed that area, I...

7          Q.    So let's go with that.  So you were at

8     Area 4, Violent Crimes until they closed the area?

9          A.    That's correct.

10         Q.    Okay.  Did you ever have any change in

11    job title while you're at Area 4, Violent Crimes?

12         A.    No, ma'am.

13         Q.    Did you have any significant change in

14    job responsibilities while you were at Area 4,

15    Violent Crimes?

16         A.    No, ma'am.

17         Q.    After they closed Area 4, Violent Crimes,

18    where did you go?

19         A.    51st and Wentworth -- or was that 81st --

20    I am sorry.  Area 1, but they didn't call it that,

21    they called it something else, Area Central.

22         Q.    When you went to Area Central, were you

23    still a detective at that time?

24         A.    Yes, ma'am.

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

68

```
 1        Q.    Did you have any change in job
 2   responsibilities?
 3        A.    Yes, ma'am.
 4        Q.    How did your job responsibilities change?
 5        A.    I became a cold case detective for Area
 6   1.
 7        Q.    Did you have to -- or did you receive any
 8   additional training about how to be a cold case
 9   detective?
10        A.    No.
11        Q.    Were you -- did you request the change in
12   assignment or were you just told you were going to
13   be working cold cases?
14        A.    I was asked to come on the Cold Case
15   Team.
16        Q.    Okay.  Who asked you?
17        A.    Sergeant Lombard, L O M B A R D.
18        Q.    Was investigating a cold case materially
19   different than investigating I guess other cases?
20        A.    Just a little more in depth what you do,
21   and there is no -- generally there is no time
22   period or anything, you're pretty much given free
23   reign.
24        Q.    Okay.  When you're a detective, what time
```

69

1    periods did you have?

2         A.    When I was a detective where?

3         Q.    At Area 4, Violent Crimes.

4         A.    I reluctantly had to go to days.

5         Q.    And did you have time periods for when

6    you were expected to complete certain things for

7    an investigation?

8         A.    No.

9         Q.    How long were you at 51st and

10   Wentworth -- well, let me ask you this first.  Did

11   you work cold cases the entire time you were at

12   51st and Wentworth?

13        A.    Yes.

14        Q.    How long were you at 51st and Wentworth?

15        A.    Until I retired.

16        Q.    And that would have been around 2014?

17        A.    November 14th, 2014.

18        Q.    Since your retirement, have you had any

19   occupations?

20        A.    Yes.

21        Q.    What are they?

22        A.    I do investigative consulting for

23   numerous security investigation consulting firms.

24        Q.    When did you begin doing that?

```
 1        A.    I did it actually when I was a police
 2   officer -- I mean a detective also.  So when did I
 3   start or how long total?
 4        Q.    When did you begin?
 5        A.    Exact time I don't know, but I would say
 6   at least I've done that for 30 years all the way
 7   up to present.
 8        Q.    As an investigative consultant, what do
 9   you do?
10        A.    It varies from job to job.  We do
11   surveillances, we do executive protection, we
12   conduct investigations.  That's about it.
13        Q.    What firms do you work with?
14        A.    Excuse me?
15        Q.    What firms do you work with?
16        A.    Quest Consultants International, I've
17   been with them the longest.
18        Q.    Can you spell that for me?
19        A.    Q U E S T.
20        Q.    Who is the head of Quest Consultants?
21        A.    Robert Scigalski, S C I G A L S K I.
22        Q.    And how did you meet Mr. Scigalski?
23        A.    He's a retired ex-FBI boss, he was a
24   boss, I -- ASAC or something like that.
```

71

```
 1      Q.   Did you work with him while you were a
 2  CPD officer?
 3      A.   No.
 4      Q.   All right.  How did you learn about Quest
 5  Consultants?
 6      A.   I was actually brought into Quest
 7  Consultants through a retired F -- retired United
 8  States Marshal, Steve Marshall of the Midwest
 9  region who also worked for Quest.
10      Q.   And did you receive any training on how
11  to conduct -- on -- did you receive any training
12  for these independent investigations that you were
13  conducting?
14      A.   No, they hired me 'cause I was
15  experienced.
16      Q.   For your independent investigations that
17  you were conducting, do those ever involve violent
18  crimes?
19      A.   No.
20      Q.   Have you ever been required to testify as
21  part of your role for the independent consulting
22  investigation?
23      A.   No.
24      Q.   Were you ever trained on how to apply for
```

1    an arrest warrant?

2         A.   I don't specifically recall if I was --

3    if there was training.  It might have been --

4    might have been the computer courses that CPD

5    makes us do.

6         Q.   Did you ever come to learn or understand

7    how to apply for an arrest warrant when you were a

8    CPD detective?

9         A.   Yes, general idea anyway.

10        Q.   All right.  Can you explain to me your

11   understanding of how to apply for an arrest

12   warrant?

13        A.   There is various paperworks, I don't

14   remember what form they are in, they are required.

15   We also have to present it to a state's attorney

16   who will approve the -- who will give us the

17   initial approval that they'll sign off on which is

18   I believe a summary and a 101, felony minute

19   sheet.

20              Once they -- once they say yeah,

21   we'll -- this is okay, they sign off on it and we

22   bring it in front of a judge.  I didn't do many

23   arrest warrants.  I'm -- maybe one or two.

24        Q.   Okay.  Do you know why you didn't do many

73

```
 1    arrest warrants?
 2              MR. MILLER:  Object to the form of the
 3    question.
 4              MS. BRILL:  Join.
 5    BY THE WITNESS:
 6         A.   We -- as a homicide detective, you
 7    generally -- we generally don't get a warrant
 8    unless we know this guy has fled, I mean, the
 9    offender is gone, out of our area or out of our
10    jurisdiction.  For something local we would
11    generally tend to look for him extensively.
12    BY MS. SAMUELS:
13         Q.   Okay.  Instead of applying for
14    warrants -- for arrest warrants, would you
15    generally just issue a stop report?  Is that what
16    it is called?
17              MR. MILLER:  Object to the form of the
18    question.
19              MS. BRILL:  Join.
20    BY THE WITNESS:
21         A.   Stop order, is that what you're talking
22    about?
23    BY MS. SAMUELS:
24         Q.   There you go.  Stop order, yes.
```

74

1    A.    A stop order is not equivalent to a

2    warrant.

3    Q.    Understood.  But if you're looking for

4    somebody who you wanted -- if you're looking for a

5    subject who you believe may have been involved in

6    a murder, did you just generally use stop orders?

7    A.    We would -- we would use stop orders for

8    not only wanted to people, we would issue stop

9    orders for witnesses.

10   Q.    I guess what I'm getting at is, you said

11   sometimes there were people who you believed were

12   involved in a murder, correct?

13   A.    Yes.

14   Q.    And if you believed that they weren't in

15   that area anymore, you would apply for an arrest

16   warrant, correct?

17   A.    No, that's not what I said.  I said

18   generally we did not ask for a warrant unless we

19   had information he might have fled the -- fled the

20   jurisdiction like out of state, Mexico.  We --

21   'cause then you need the warrant -- to get a UFAP

22   warrant from the FBI or the marshal service to

23   find them.

24   Q.    Gotcha.  So let me ask it this way.  When

75

```
1    you were looking for a subject who you believe had

2    committed a homicide but you believed them to

3    still be in the area, were there any sort of

4    reports or orders that you would put into the

5    system to alert other police officers about this

6    individual?

7         A.   Yes.

8         Q.   Okay.  And what would that be?

9         A.   That would be the stop order.  They call

10   it something different today, I don't know what

11   they call it.

12        Q.   All right.  And what was the process in

13   order to obtain a stop order?

14        A.   At the beginning?

15        Q.   In or around 2000.

16        A.   Okay.  We would have reasonable belief

17   that this guy did it, probable cause to arrest

18   him.  So the reason for the stop order would be to

19   make sure that policemen out there -- if we can't

20   find him, he's hiding.  So I didn't -- we didn't

21   necessary -- it was not only to locate the guy if

22   he's stopped locally but also to inform the other

23   police officers that if they run his name, he's

24   wanted for murder, they're going to treat him a
```

76

1   little differently.

2       Q.   Did you have to get approval from anybody

3   to issue a stop order?

4       A.   One of the sergeants, yeah.

5       Q.   And in order to get an approval from a

6   sergeant, what was that process?

7       A.   You would type up the entire form, and he

8   would sign it and then it would be entered.

9       Q.   Do you ever recall going to a sergeant

10  for a stop order and your request being denied?

11      A.   I don't recall, no.

12      Q.   So in some of the reports related to this

13  incident, the -- it looks like a CI was used.  Are

14  you aware of what I'm referring to?

15      A.   I am aware of what a CI, yes.

16      Q.   Do you recall a CI being involved in this

17  investigation at all?

18      A.   Yes.

19      Q.   And when in relation to this

20  investigation -- when I say CI, what do you

21  understand that to mean?

22      A.   A person that doesn't want to be

23  identified.

24      Q.   And what does the CI actually stand for?

1    A.   CI actually stands for confidential

2  informant.

3    Q.   In May of 20 -- well, let me ask it this

4  way.  Were you ever trained on how to use or

5  interact with a CI as a detective?

6         MR. MILLER:  Object to the form of the

7  question.

8         MS. BRILL:  Join.

9  BY THE WITNESS:

10   A.   Not that I -- not that I recall because

11 that's generally something that narcotics does or

12 gangs do.  Detectives generally do not have

13 registered CI's, and there is a big difference

14 between a registered CI and somebody I write down

15 as a CI.

16 BY MS. SAMUELS:

17   Q.   Okay.  When you say a registered CI, what

18 does that mean?

19   A.   To the best of my knowledge, a registered

20 CI, it is documented through -- again, I don't --

21 I've never had a registered CI.  So but what I

22 have been told is that they are registered with

23 the City of Chicago, probably Cook County as a

24 registered confidential informant and generally

78

1   they have to be entered into the computer system.

2       Q.   And then you also said that there were

3   people who didn't want to be identified that you

4   would -- that would be indicated as a CI; is that

5   fair?

6       A.   Yes.  It is a matter of expediency when

7   you're talking to people, conducting canvasses and

8   everything else.  Instead of writing unknown

9   person, you just hit -- you just write CI, you

10  know, a person that's telling me he doesn't want

11  to be identified.  They're willing to give you

12  some information, what they know, but they're not

13  going to give you their name.

14      Q.   Okay.  And in the latter case -- can I

15  just call them unregistered CI's; is that fair?

16      A.   No, I wouldn't call them unregistered.

17  It is just a -- some detectives just write down CI

18  instead of unknown person, that's all.  Matter of

19  fact, I think a lot of detectives do that.

20      Q.   Were you trained to just write CI instead

21  of unknown person?

22      A.   I don't think we were trained to do it.

23  I just think -- I just believe that was something

24  that while you were working with other detectives

1    became part of your daily habit.  If somebody

2    refused to give you their name, you wrote down CI.

3         Q.   Okay.  And if -- I'll hold that for

4    later.  Okay.  And I think at -- I believe at some

5    point you said you received training on like going

6    to the ME or something like that?

7         A.   Yes, yes, we did.

8         Q.   Okay.

9         A.   At the ME's Office.

10        Q.   So you were trained by the actual ME's?

11        A.   There was a detective there, I can't

12   recall his name, when I was in training for

13   detectives' class, that presented the case,

14   they -- I believe a couple medical examiners came

15   in and talked to us about what they do.  It was

16   just to familiarize you with what you're going to

17   be doing almost every day going down to the

18   morgue.

19        Q.   Were you trained on how to I guess

20   observe autopsies?

21        A.   I've actually stood autopsy, yes, ma'am.

22   We weren't trained, you just go in there and watch

23   them.

24        Q.   Did you ever receive any training about

1    how do understand a -- well, let me ask this
2    first.  What are the reports that the ME issues
3    after conducting an autopsy?
4        A.   The ME does -- while they're doing the
5    autopsy, they speak what they're doing, number
6    one, and there is tons of pictures taken after the
7    autopsy.  They do the autopsy, they tell -- there
8    is detectives and forensic investigators assigned
9    from Chicago to Cook County Medical Examiner's
10   Office.
11            They get an initial report as to
12   cause and manner, and he subsequently does a
13   supplemental case report called an ME report, and
14   that just -- that's for our purposes, say it was,
15   you know, a robbery slash homicide, personal, you
16   know, and that's the way they rule it.
17            And then months later we generally
18   get a copy of the protocol which is the actual --
19   her talking is transcribed, and whatever
20   toxicology comes back and whatever they sent the
21   tests that were performed is incorporated in that.
22       Q.   Were you trained on how to understand an
23   autopsy report or an ME's report?
24       A.   I don't believe we were trained.  It is

1    just reading it.  I mean, it tells you what they

2    do and, you know, I'm sure during the time we

3    spend at the morgue during our training as being a

4    detective, I'm sure it was shown to us and told us

5    and -- but there was nothing specific as far as

6    like a manual or something like that.  I don't --

7    no, I don't think so.

8         Q.   Okay.  So was there anything -- was there

9    any specific training you've had to take regarding

10   collecting evidence from the ME's Office?

11        A.   Again, it might have been incorporated

12   into the time we spent there, the couple days we

13   were there, it might have been incorporated there

14   and you could probably say that's training.

15   Everything that we ever take from the Medical

16   Examiner's Office has already been inventoried by

17   the medical examiner intake people, I don't know

18   what they call them.

19        Q.   Okay.  If there was evidence -- so if a

20   person was murdered and evidence was found on

21   their person, right, would the ME's Office be

22   responsible for sending that to the State Police

23   for testing or would they send it to CPD and then

24   CPD would send it for testing?

82

1      A.    I believe if any evidence that's there
2   that's already been inventoried would -- they
3   would notify the detectives that the -- we called
4   them morgue detectives, those are the guys that
5   would get it and they would just submit the report
6   to us.  I don't know if that answers your question
7   or not but.
8      Q.    Okay.
9      A.    But the -- was your question does the ME
10  do it directly?  I don't believe so.
11     Q.    Okay.  So you would expect the evidence
12  to come through Chicago Police Department and then
13  the detectives would send it out for further
14  testing if they thought it was relevant?
15     A.    Yes.
16     Q.    Do you have any tattoos?
17     A.    Do I have tattoos?  No.  I have blood
18  marks 'cause I take blood thinners, but no
19  tattoos.
20     Q.    Do you have a Polish background?
21     A.    Yes, ma'am.
22     Q.    Can you speak Polish?
23     A.    No, ma'am.
24     Q.    Does Brzeniak speak Polish?

83

```
 1        A.   Yes, fluently.

 2        Q.   And I believe earlier you stated you have

 3   an independent recollection of this murder

 4   investigation, correct?

 5        A.   Yes, somewhat, yes.

 6        Q.   All right.  Can you tell me what you

 7   recall about this murder investigation?

 8        A.   In general?

 9        Q.   Whatever you recall.

10        A.   I recall I interviewed a lot of people, a

11   lot of Polish people.  I recall furthering

12   interviews with possible -- at the time they were

13   possible witnesses, gathering information, making

14   an arrest, two arrests, typing supplementary

15   reports, testifying at a Grand Jury and testifying

16   in trial.  There might be more, but that's what I

17   recall.

18        Q.   Okay.  From the conclusion of trial, when

19   is the next time you heard or this case came up?

20             MR. MILLER:  Object to the form of the

21   question.

22             MS. BRILL:  Join.

23   BY THE WITNESS:

24        A.   Approximately two years ago roughly.
```

84

```
 1    BY MS. SAMUELS:
 2        Q.    And that would have been when you
 3    received notice -- notification of the lawsuit?
 4        A.    It was prior to that.
 5        Q.    Okay.  How did it come up?
 6        A.    The only reason I recall is because I was
 7    shopping at a store and I got -- my cell phone
 8    rang and it said Cook County State's Attorney's
 9    Office and I answered it, and it was -- I believe
10    it was Jennifer Raven, Cook County State's
11    Attorney, and she asked me if I recall this case.
12        Q.    And did you?
13        A.    I told her I vaguely remember it I said,
14    and I asked her why.
15        Q.    What did she say?
16        A.    She said you might have to be interviewed
17    and you may -- this case may go to retrial.
18        Q.    All right.  Then what happened?
19        A.    Never heard from her again.  She says
20    you'll be notified, I says okay.
21        Q.    Did you know who Jennifer Raven was
22    before that phone call?
23        A.    Yes, I knew she was a state's attorney
24    when I was a detective.
```

1      Q.   Did you work with her often?

2      A.   You know, maybe on one, two cases.  I

3   don't general -- I just don't remember

4   specifically.

5      Q.   Did you ever receive any sort of

6   notification that somebody had requested a copy of

7   any complaints that had been lodged against you?

8      A.   No, I never was notified.

9      Q.   During your time as a police officer, had

10  you ever received a notification like that?

11     A.   No, not unless it was a suit and then I

12  was -- would go to 35th Street to pick it up.

13     Q.   Got you.  Did Jennifer -- is she the same

14  ASA who handled the case initially?

15     A.   I -- to be perfectly honest with you, I

16  don't remember who handled it initially.

17     Q.   Okay.  So I believe one of the things you

18  said you recalled was interviewing a lot of Polish

19  people?

20     A.   Yes, ma'am.

21     Q.   Do you specifically remember any of the

22  individuals that you interviewed?

23     A.   I remember some of them at -- I don't

24  recall -- I think specifically the one I do

86

1    remember is a door girl at one of the clubs.

2         Q.   What do you remember about her?

3         A.   Very pretty girl, and I had to get my

4    partner away from her, he seemed to excessively

5    talk Polish to her so.

6         Q.   Is there anything else you recall

7    specifically about any of the other Polish people

8    you interviewed?

9         A.   Specifically, no, it is just general, and

10   basically they all said the same thing.

11        Q.   Okay.  Another thing you said is that you

12   interviewed some possible witnesses, correct?

13        A.   That's correct.

14        Q.   All right.  Is there anything about the

15   interviews with possible witnesses that you

16   specifically recall?

17             MR. MILLER:  Object to the form of the

18   question.

19             MS. BRILL:  Join.

20   BY THE WITNESS:

21        A.   I remember -- I remember some of them;

22   some of them I don't.  But anything in specific, I

23   don't know what that means.  I...

24

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

```
 1    BY MS. SAMUELS:
 2        Q.   Sure.  Which ones do you -- I am sorry,
 3    go ahead.
 4        A.   No, I wasn't saying anything.
 5        Q.   Okay.  So which ones do you remember?
 6        A.   Yvette Anderson, Yvette Hill, Hershula
 7    Berg, and the only other thing I remember about
 8    other witnesses is that I read some of the other
 9    detectives, their interviews of them.
10        Q.   Okay.
11        A.   There may be somebody else I skipped
12    or -- but I just can't recall.
13        Q.   That's fair.  What do you recall about
14    the interview with Yvette Anderson?
15        A.   I remember coming into the Area to work
16    my shift and I was told to interview her.  She was
17    in the Area, and she was a witness or has some --
18    not -- well, we write her down as a witness, but
19    sergeant says she has some kind of information
20    about the murder.
21        Q.   And when you say sergeant, who are you
22    referring to?
23        A.   Whoever the sergeant was at the time, I
24    don't remember.  I'm sure it's indicated on my
```

88

1   report.

2       Q.   Okay.  What else do you recall about your

3   interview with Yvette Anderson?

4       A.   It was -- she was, for lack of a better

5   word, seemed nervous, kind of shaky, and told me

6   in general something to the effect that she heard

7   that two male blacks had killed this white boy on

8   Ohio.  That's what I remember about the interview.

9       Q.   What else do you recall about Yvette

10  Anderson?

11      A.   I -- since I think she's the first person

12  to be talked about in -- that I was aware of that

13  was actually in the Area and I'm getting vague

14  information from her and it seemed to me that

15  maybe she knew more and was just not telling me

16  everything.

17              I wanted to check -- her story didn't

18  change, it was always two unknown male blacks did

19  this, shot the white boy on Ohio.  And she would

20  be specific about things like what -- when it

21  happened and everything else but then she couldn't

22  tell me who they were or give me a description.

23  So I thought she was withholding from me a little

24  bit.  That's what I thought, that was my personal

```
 1    opinion as a detective.
 2                  So I asked her would you be willing
 3    to take a box, a polygraph test, and she agreed
 4    and she passed it.
 5        Q.   What else do you recall?
 6        A.   About her?
 7        Q.   Yes, sir.
 8        A.   I believe that's it.
 9        Q.   What do you recall about Yvette Hill?
10        A.   What I do recall is that a bunch of us
11    detectives were out canvassing street prostitutes
12    on Cicero Avenue, and one of them, I don't recall
13    if she told me or she told another detective, but
14    we somehow wound up with her name, that she may
15    know something about it.  But it was specific as
16    to her name.
17                  And then her name was ran, I don't
18    know how we ran it, we went back to the Area,
19    typed it in or did we do it over the air, I don't
20    recall.  We got her address and we went to -- I
21    believe Detective Sanders was there, Wright, me,
22    Brzeniak or we were made aware of it later.
23                  And she basically said the same
24    thing, gave -- this was done at her house.  I
```

1    mean, I -- so I must have been there, why that

2    sticks in my head, I don't know.

3              But she basically said the same

4    thing, was two unknown male blacks and she heard

5    it and it was just street talk, that's just what

6    she heard, kind of basically was what the -- the

7    unknown person that gave us her name was basically

8    the same story.

9       Q.   Is there anything else you recall about

10   Yvette Hill?

11      A.   I'm trying to think.  It's been a while.

12   I think I did a GPR on it.  I would like -- you

13   want to show it to me and I'll tell you what else

14   she said at the time.  Right now I'm not -- it's

15   not...

16      Q.   Do you remember anything about her

17   demeanor, anything like that?

18      A.   I remember she -- I think she just didn't

19   like that we were at her house, but she talked to

20   us.  I think she was just interviewed.

21      Q.   Okay.  And you don't have -- do you have

22   any other independent recollections of your

23   interactions with Yvette Hill?

24      A.   I believe -- I don't think so.  I don't

1      recall off the top of my head if she gave us any

2      further information or -- it's just escaping me

3      right now.  I...

4           Q.   And then I believe you said the other

5      person you remember speaking with was Hershula

6      Berg?

7           A.   Yes.

8           Q.   What do you recall about your

9      interactions with Hershula Berg?

10          A.   Well, I didn't speak -- I don't believe I

11     spoke with Hershula Berg, I believe Detective

12     Sanders interviewed her.  And Detective Sanders

13     told me in essence what she had said.

14               She stated to him that she heard that

15     on the street, again, that her boy -- ex-boyfriend

16     or her boyfriend Jovanie Long and Xavier Walker

17     shot and killed that boy on Ohio.  I also remember

18     that she had confronted Long a little bit

19     afterwards, after the murder, and something to the

20     effect that I can't believe you shot that white

21     boy or something like that, and he threatened her.

22          Q.   So is it fair to say you don't recall any

23     interactions with Hershula Berg?

24          A.   I don't think so.

92

```
 1        Q.   Okay.  But you do recall Mr. Sanders
 2   relaying his interactions with Hershula Berg?
 3        A.   Yes.
 4        Q.   All right.
 5        A.   And I may have gone in afterwards with
 6   Sanders, and he might have made her repeat it,
 7   that's possible.  I don't remember for sure, but
 8   sometimes we do that.
 9        Q.   All right.  So this would have been at
10   the police station?
11        A.   Yeah, I think I came in and they told me
12   she was in a room.
13        Q.   And besides Sanders, do you know who else
14   might have talked to you about Hershula Berg?
15        A.   I don't specifically recall, but I -- you
16   know, Sanders and Wright are partners.  I don't
17   know if Wright was in there, I don't know, I don't
18   remember.  But I -- no, I think that's about it as
19   far as she's concerned.
20        Q.   Are there any other possible witnesses
21   you specifically recollect interacting with?
22        A.   No.
23        Q.   You stated that you have an independent
24   recollection of making two arrests in this case?
```

93

```
 1        A.    Yes, ma'am.

 2        Q.    And who are those arrests?

 3        A.    The first one would be Xavier Walker.

 4        Q.    All right.  And the second?

 5        A.    Would have been Jovanie Long.

 6        Q.    What do you recall about the arrest of

 7    Xavier Walker?

 8        A.    I remember that we were given -- or

 9    Stanley -- Stanley or Wright, somebody found out

10    where he may be staying or where he was at right

11    now, that -- and I don't know how they got that

12    information but they wanted to go.

13              So they gathered up some policemen,

14    we told the sarge we would be going out there,

15    some other detectives.  I went with Tony Brzeniak,

16    Stanley and Sanders went in their car.  I don't

17    recall who else came, I don't.

18              And then we proceeded to his address,

19    I believe it was on Potomac or maybe I'm wrong

20    with Potomac.

21        Q.    Then what?

22        A.    Then we went out there, and we went out

23    to the address and we just kind of sat out -- I

24    believe out so we would have an eye on the house,
```

1    the front of the house.

2              And I believe Stanley got out of the

3    car, Sanders and Wright, and we were kind of

4    watching them.  And then I remember seeing -- or

5    Stanley yelling and yelling he's coming your way

6    or he's coming down the stairs or something to

7    that effect, and then I seen him running, I seen a

8    male black, I didn't know who it was at the time.

9              And then he actually ran down a few

10   houses and was stopped by Dave Wright and then he

11   struggled with Wright.  And that's when I jumped

12   out and got down there and Tony got out, and we

13   went down there, we assisted him.  He got

14   handcuffed and put in the back of a squad car or

15   the unmarked car.

16   Q.   And --

17   A.   That's what I remember.

18   Q.   Okay.  Do you remember if you were in

19   uniform or plainclothes?

20   A.   Detectives never wear a uniform, unless

21   we're instructed to by the superintendent or a

22   chief of detectives.

23   Q.   Do you specifically recall what you were

24   wearing that day?

```
 1        A.    Pretty much -- well, no, this is more of
 2   a suit.  But basically a pair of khakis, a dress
 3   shirt, a tie, that would be probably it, probably
 4   had a vest on if we were going to look for
 5   somebody wanted for murder.
 6        Q.    Do you recall what anybody else was
 7   wearing specifically?
 8        A.    They would be dressed similar to me
 9   except Sanders, he always dressed up a little bit
10   more, he liked wearing suits and fancy ties and
11   shirts.
12        Q.    Would you have been in marked or unmarked
13   cars?
14        A.    I didn't hear you.
15        Q.    Would you have been in marked or unmarked
16   cars?
17        A.    Oh, unmarked cars.
18        Q.    Do you recall if anybody else was -- if
19   any civilian witnesses were around?
20        A.    I don't recall seeing any -- anybody.
21   I -- there could have been, but I don't remember
22   seeing -- I was focused on him.
23        Q.    Do you recall what time of day it was?
24        A.    I want to say it was probably about 8:30,
```

96

 1    9:00, 9:30, something like that, at night.

 2         Q.   Okay.  So this is summer, so was -- did

 3    the sun already set or was this like just getting

 4    dark?

 5         A.   It was in May already, I would have to

 6    say it was like sunset where the sun is just

 7    setting down and so it is still a little bit light

 8    outside there.

 9         Q.   Do you recall giving Xavier any commands?

10         A.   Give him what?

11         Q.   Any commands?

12         A.   Where?

13         Q.   During the course of his arrest.

14         A.   I don't -- no, I don't think I did.

15         Q.   Do you recall what Xavier was wearing?

16         A.   Not off the top of my head, no.

17         Q.   When you say that Wright was able to stop

18    Xavier, do you recall how that occurred?

19         A.   I believe he ran right into him, ran

20    towards where he was standing or, you know,

21    wherever -- it was a couple doors down so we

22    didn't have a real great view, plus we're on the

23    street, this happened on the sidewalk.

24              I do remember it was pretty chaotic,

1    you heard Stanley yelling, see somebody bolting

2    and then we're getting out 'cause we don't know

3    what he's running for, and then I seen Wright

4    struggling with him on the ground and so I came

5    and helped him cuff him.

6         Q.   Is it fair to say you didn't see how

7    Xavier was taken to the ground?

8         A.   I don't know how that happens, you know,

9    I mean, there is various ways.  I -- he could have

10   hit the ground when he hit Dave for all I know.

11   I -- it is fair to say I don't know.

12        Q.   All right.  Do you recall what actions

13   you took to assist in the -- what specific actions

14   you took to assist in the arrest of Xavier Walker?

15        A.    I believe I helped handcuff him -- well,

16   only one guy can handcuff.  I might have held his

17   arm while he was down and then he got put up and

18   he got put in the back of their car.

19                   And then Dave said he's going to go

20   check the way he ran.  And plus we still didn't

21   see Sanders so I stayed there with Wright while he

22   was sitting in the back of the

23   car (indecipherable) --

24        Q.   And you said --

98

```
 1              THE STENOGRAPHER:  I'm sorry.
 2   BY THE WITNESS:
 3       A.   'Cause that was not my squad car.  My
 4   squad car I jumped out of.
 5   BY MS. SAMUELS:
 6       Q.   And I think just now you testified that
 7   you stayed there with Wright, but I think you
 8   meant Walker?
 9       A.   I stayed there with Wright?
10       Q.   Right.
11       A.   With Maurice, yeah -- I'm sorry, Xavier
12   Walker, that was the guy that was handcuffed.  I
13   stayed with Xavier Walker.  So I misstated before,
14   yeah, you're right.
15       Q.   Okay.  Do you recall having any
16   interactions with Maurice Wright?
17       A.   Are we talking about Wright or are you
18   trying to trick me?
19       Q.   Oh, no, now I'm talking about Wright --
20   well, before we switch it, let me ask.  Do you
21   have any other specific recollections of the
22   arrest of Xavier Walker?
23       A.   I believe -- you know, why it's sticking
24   in my head, I don't know, but I think I read him
```

1   his rights in the back of the car 'cause I might

2   have wanted to talk to him or see what he was

3   going to say.  I might have.

4       Q.   Anything else?

5       A.   That's it.

6       Q.   All right.  Hard stop.  So do you have

7   any independent recollection of your interactions

8   with Maurice Wright?

9       A.   I remember Maurice Wright was up in the

10  Area, but I had no interactions Maurice

11  whatsoever.  I'm -- well, let me take it back.  As

12  far as I know I didn't.  I may have taken him to

13  the bathroom if he knocked on the door and needed

14  to go to the bathroom, that's a possibility.  But

15  I did not talk to Maurice Wright.

16      Q.   Okay.  And I believe you said you also

17  recalled the arrest of Jovanie Long?

18      A.   Yes.

19      Q.   All right.  What do you recall about

20  that?

21      A.   I recall that I had numerous

22  conversations with Regina Long, she eventually

23  told me he was going to surrender himself.

24  Jovanie Long showed up at Area 4 with his mom and

100

1    a minister or reverend or Major Howard (phonetic)

2    I believe his name was to surrender himself.

3         Q.   What else do you recall?

4         A.   I recall walking up to him and telling

5    him that he was under arrest, and I -- I believe

6    John Riordan was with me, and we took him into one

7    of the interview rooms along with the reverend.

8    The reverend asked if he could come along, and I

9    said sure.  So he walked with us until we got him

10   into the interview room and at which time the

11   reverend, I don't know if he was there, I think he

12   was talking to him, saying a prayer or something

13   and then I read him his rights in front of the

14   reverend --

15        Q.   Anything else you recall?

16        A.   -- I did or Riordan.

17        Q.   I am sorry.

18        A.   I don't know, I -- again, I either read

19   him his rights or John Riordan read him his

20   rights, and then we asked -- we told the reverend

21   he has to leave.  I says we're going to talk to

22   him about what happened, and he thanked me and I

23   walked him back to the front, told the reverend

24   and Regina they could stay but he would probably

1   be here for some time and gave them my phone

2   numbers and the number up in the Area.  You can

3   leave and just call if you want, you know,

4   somebody will let you know where we're at with

5   him.

6       Q.   Okay.  Anything else you recall about the

7   arrest of Jovanie Long?

8       A.   No, that was it.  I mean, I unhandcuffed

9   him and put him in the room.  I asked him if he

10  wanted something to drink like I do with everybody

11  or want something to drink, you want a cigarette,

12  I'll get it for you, otherwise I'm going to close

13  the door for a minute and we'll be back.

14      Q.   All right.  Another thing you said you

15  had an independent recollection of was gathering

16  information.  What information did you recall

17  gathering?

18      A.   When did I say that, in relation to what

19  question?

20      Q.   Oh, I think so -- when I started, I just

21  asked you what you have independent recollection

22  of.

23      A.   Oh, okay.  Well, then I'm sure I went

24  back and let everybody -- on this arrest, on

1    Jovanie Long?

2        Q.   Yes.

3        A.   I am sure I told people that needed to

4    know that Jovanie was here, and gathering

5    information would mean getting prepared to

6    interview him, which would include whatever file

7    we had on him, particularly which would be his rap

8    sheet or his criminal history, encounters with the

9    police, things of that nature.

10       Q.   Okay.  Do you recall interviewing Jovanie

11   Long?

12       A.   Yes, somewhat.

13       Q.   What do you recall about interviewing

14   Jovanie Long?

15       A.   He at this point -- at this point when I

16   initially interviewed him, I asked him if he knew

17   why he was under arrest and, of course, I got

18   denial, I got nothing to do with it, this or that

19   and I talked to him for a little bit.

20            I -- whatever might have been -- I --

21   somewhere in that conversation I confronted him

22   with the fact that I have a videotaped statement

23   from Xavier Walker implicating you in the murder.

24   And he asked to see it.

1          So I had to leave, find Xavier, we

2     had a copy of his tape-recorded confession.  I

3     went to -- the only reason I remember this is

4     because Violent Crimes didn't have a TV with a

5     VCR, I had to go to Property Crimes, cue it up,

6     then I took him over there and showed him the

7     portion of the film where Xavier implicates him

8     for the murder, for shooting the white boy.

9          Q.   What else do you recall?

10         A.   I recall him putting his head down and I

11    remember his eyes opened up when I first showed

12    him Xavier on film, and then he nodded, put his

13    head down and said they tricked my ass or tricking

14    on me or something to that effect.

15         Q.   What else do you recall?

16         A.   I believe I took him back into the room

17    at that point and left him there for a little bit

18    of time because I had to make sure the film got

19    back to where it's supposed to be.

20              I don't recall at the time if I gave

21    him cigarettes, I just don't remember.  And then I

22    eventually went back in and talked to him again.

23         Q.   What else do you recall?

24         A.   I recall going back in there and

1  confronting him.  I said well, you seen the film.

2  And he says well, can I tell my end of it.  I said

3  sure.  And then he proceeded to tell me how he

4  and Xa (phonetic) were out hitting a lick on -- or

5  in the area of Erie and Ohio and they eventually

6  seen a van come down.

7              He implicated Xavier in the crime,

8  you know, and told me what happened.  He said that

9  he got in the van.  The white boy pulled over in

10  his van, he got in the van, pointed a gun at the

11  guy.  He started to fight, and he was -- he told

12  me he was getting the better of him, the white

13  guy, and he wound up shooting him.

14             He pulled out hit gun, he showed him

15  the gun, he grabbed the barrel of the gun, there

16  was a struggle over the gun.  He wound up

17  eventually shooting him somewhere in the butt, in

18  the rear end area.  The guy ran across the street

19  or limped across the street, and he confronted him

20  again 'cause he seen the money in his pocket, and

21  said the guy swung at me and then I shot him in

22  the head.

23      Q.   And then what do you recall?

24      A.   Then -- what he said was that Xa came and

1    grabbed his money, grabbed the money and they ran.

2         Q.   And then what do you recall?

3         A.   I think he may somewhere in there have

4    told me about going to the clubs or going to one

5    club, going to another club, picked up Xa, dropped

6    him off or other people -- I believe he said -- I

7    don't recall if I asked him about the gun or not,

8    I just don't recall.

9              But that's about it, that was about

10   the content of it.  At which point after he

11   implicated himself I called the State's Attorney

12   'cause I knew it would be a long night.

13        Q.   Was anybody else in the room when he

14   implicated himself?

15        A.   I don't -- Riordan was in and out, I

16   don't remember if he was in there when he -- I

17   just don't remember, he could have been.

18        Q.   Were you surprised when Jovanie

19   implicated himself?

20        A.   Not after I showed him the film, no.

21        Q.   All right.  And was this in the interview

22   room or was this still in the same room with the

23   video?

24        A.   No, I said -- I originally said that I

```
 1    took him back after that -- after we stopped the
 2    video and he said what he said, I wanted him to
 3    think about what he said so I said we're going
 4    back to the room.  So I took him back to the room,
 5    the interview room.
 6         Q.   Do you know if anybody else went into the
 7    interview room while you left him in there?
 8         A.   I don't know, they could have but I
 9    don't -- I don't think so.
10         Q.   Okay.  And then after Jovanie implicates
11    himself, I think you said you called the State's
12    Attorney?
13         A.   Yes.
14         Q.   Then what else do you recall --
15         A.   'Cause sometimes after -- some time after
16    he implicated himself, I put him back in the room.
17    I -- you know, I don't know the approximate time I
18    called the State's Attorney but it would have been
19    relatively soon.
20         Q.   Then what's the next thing you recall
21    occurring?
22         A.   I know I went, told our sergeants or, you
23    know, let them know that he implicated himself and
24    then we start formulating -- or making photocopies
```

107

1    of everything that we had so far as far as his

2    background and handwritten statements and things

3    of that nature, our GPR's.  We get it all

4    condensed into the file and we wait for the

5    State's Attorney to show up and we talk to them.

6              We got a copy of the case report,

7    original one, we give them a -- anything they ask

8    for, we will give them a copy of.  So until the

9    State's Attorney showed up, I don't think we did

10   anything with him.

11       Q.   Okay.  And then what's the next thing you

12   recall?

13       A.   Ultimately State's Attorney would have

14   talked to him.  After they came in, did

15   everything, they would eventually want to talk to

16   him.  So when that happened, I don't know.

17       Q.   Okay.  What's the next thing you recall?

18       A.   I don't -- I mean, I'm sure -- I'm sure

19   eventually he would have been -- the State's

20   Attorney would probably say okay, let's see if he

21   wants to do a handwritten statement or a video

22   statement.  I'm sure she made that clear to him if

23   he was willing to give a statement, and I

24   believe -- I know John Riordan, it was agreed upon

```
 1    that they would do the interview, now they have to
 2    call for the videographer so we're waiting again,
 3    and eventually they wound up in the video room,
 4    and she along with Riordan sat in on the
 5    statement.
 6         Q.   Where were you when he was giving his
 7    statement?
 8         A.   Probably on the floor, somewhere out on
 9    the floor.  I don't recall where exactly.
10         Q.   Was there a particular room that was used
11    to take video statements?
12         A.   Yes.
13         Q.   Can you describe that room?
14         A.   That room is in the office of -- they
15    call it the Sex Office, it was a separate room but
16    it is probably a -- I want to say -- you want
17    dimensions or something or do you want me to
18    describe it to you?
19         Q.   Well, let me see if I got it.  So is it
20    an enclosed space?
21         A.   Yes.
22         Q.   The door, is there a window on the door?
23         A.   There is no window on the door but there
24    is a window that they -- you can look in, anybody
```

109

```
1    inside can look out, and that's where the camera
2    is positioned when they do a video statement.
3         Q.   Okay.
4         A.   And that is in the Sex Office so.
5         Q.   About how big is the room?
6         A.   The room is approximately 15 feet,
7    20 feet by maybe 8 feet, 10 feet.  There is a
8    table, like a -- what do they call those tables
9    that you can fold and unfold?  I -- there is a
10   table in there with chairs, office chairs are in
11   there.
12              The walls, I believe there is either
13   carpeting on the walls to muffle the sound so it's
14   easier to be picked up on video, on audio.
15        Q.   If you're in the room, would you be able
16   to see the camera?
17        A.   Yes.  Unless you're not facing it I
18   guess.
19        Q.   Okay, fair enough.  Is there anything
20   else you recall about the -- I guess the
21   questioning of Jovanie and the taking of the
22   statement?
23        A.   There is nothing else I can recall.
24        Q.   Do you have --
```

```
 1        A.    There might be something -- there might
 2   be something I overlooked, but right now I can't
 3   think of anything else.  That was generally what
 4   happened.
 5        Q.    Okay.  If you think of anything else, let
 6   me know.  Okay?
 7        A.    All right.
 8        Q.    Do you have an independent recollection
 9   of the questioning of Xavier Walker?
10        A.    Yes.
11              THE WITNESS:  And before we go into that,
12   can I use the bathroom?  Sorry, I take pills.
13              MS. SAMUELS:  No problem.  Ten minutes,
14   is that good?
15              MR. MILLER:  Are we going to break for
16   lunch?
17              MS. SAMUELS:  Did you want to do a lunch
18   break now?
19              MR. MILLER:  I mean, it's probably a good
20   spot, unless, you know, I mean, are we around
21   halfway through?  It is 1:00, I don't know.
22              MS. SAMUELS:  Sure, we can do lunch.  How
23   much time do you want for lunch?
24              THE WITNESS:  You're asking me?
```

```
 1          MS. SAMUELS:  Yeah, you're the most
 2   important man in the room.
 3          MR. MILLER:  Half an hour, 40 something
 4   or something.  I mean, 1:40, so 30 minutes or
 5   more?  So 1:40, be back at 1:40.  Does that work?
 6          MS. SAMUELS:  That's fine with me.
 7          THE WITNESS:  Fine with me.
 8                    (Short break.)
 9                    (Mr. Janski enters
10                    Zoom deposition.)
11          MS. SAMUELS:  Back on the record.  And I
12   believe we've been joined by attorney Ryan Janski
13   for the City.
14          MR. JANSKI:  For the City of Chicago,
15   correct.
16   BY MS. SAMUELS:
17      Q.   So when we left off before our lunch
18   break, we were talking about what you recalled
19   from your interactions with Jovanie Long; is that
20   correct?
21      A.   Yes.
22      Q.   Did you have a chance to consult with
23   your attorney over the lunch break?
24      A.   No.
```

1      Q.   Let me see if I can pull this up.  Okay.

2           I am going to share my screen, and I

3    want to show you some reports.  Okay?

4      A.   If I can see them.

5      Q.   Can you see that?

6           MS. ITCHHAPORIA:  Hey, Jeanette, if you

7    give us a page number, we have a hard copy we can

8    give him, give him the hard copies to look at

9    because the screen is kind of how far away from

10   him.

11          MS. SAMUELS:  I am going to looking at

12   NK146 through 152.

13          MS. ITCHHAPORIA:  Is that Exhibit 1?

14          MS. SAMUELS:  Yes.

15          MS. ITCHHAPORIA:  That's in front of him

16   now.

17          MS. SAMUELS:  So I'm going stop sharing.

18   BY MS. SAMUELS:

19      Q.   Do you recognize -- are you looking at

20   NK146?

21      A.   146.

22      Q.   Okay.  Do you recognize this report?

23      A.   Yes.

24      Q.   Is this one of the GPR's you would have

1   filled out?

2       A.    That is my GPR, yes.

3       Q.    Can you just read what 1 -- what 146

4   says?

5       A.    From the get-go, from the very beginning?

6       Q.    Very beginning with -- so, actually, let

7   me -- so beginning with the date at the top.

8       A.    Okay.  13, May, '00; 23, May, '00; third

9   watch.  Classification, homicide; victim's name,

10  Majdak, Marek; my ID, 5429.

11                  First line Anderson, Yvette, E,

12  female, one means black, 35 years old, born ██,

13  ███████████; 1405 North Mason, First Floor,

14  unknown Social.  Lives with grandmother Nellie

15  Ellis, phone number 773-889-4547.  Unemployed,

16  self-admitted prostitute; her IR Number, ██████.

17                  Sergeant Holy assigned to -- assigned

18  me to interview above.  Sanders and Wright picked

19  up, which means they picked her up.  States she

20  has info on murder, voluntary -- voluntarily came

21  in to talk to us.  Subject -- excuse me.  Subject,

22  I can't make out that, it starts with an F,

23  bathroom and cigarettes.  So I offered her

24  probably during some cigarettes.

```
 1              In Area 4, RD's advised her rights
 2   and understood, agreed to talk to RD's.  States
 3   she has heard two male, one's again are blacks,
 4   from neighborhood shot white boy on Ohio over
 5   drugs, doesn't know shooters.  Police,
 6   raushting (phonetic) hood.  Doesn't know ID of
 7   shooters.  Something H, I -- info on street --
 8   heard the info on the street or -- volunteers to
 9   take box, scheduled for 18:00 hours today.
10              Detective Holy, apparently I talked
11   to him, results -- that was -- 20716, that's his
12   Star number; results, no deception slash
13   knowledge.  Take home at 21:00 hours.  My
14   signature, my Star.
15      Q.   What is third watch?
16      A.   Third watch, there is two shifts for the
17   third watch.  I worked -- I started at 4:00 in the
18   afternoon until 12:00, 12:30.
19      Q.   So is 4:00 a.m. to 12:30 your schedule --
20   would have been your schedule at that time?
21      A.   Yes.
22      Q.   But what was actual third watch?
23           MR. MILLER:  Object to the form of the
24   question.
```

```
 1    BY THE WITNESS:
 2        A.   I don't understand what was the actual
 3    third watch.
 4    BY MS. SAMUELS:
 5        Q.   So when it says date of this report, it
 6    indicates third watch, what does that mean?
 7        A.   It could be anywhere from 3:00 in the
 8    afternoon starting until 4:30 starting -- 4:00
 9    starting until 11:30 finishing, 12:30 finishing.
10    There is two different start times for the third
11    watch.
12        Q.   Okay.  Can you go to 147?
13                      (Ms. Brill exits
14                      Zoom deposition.)
15    BY THE WITNESS:
16        A.   147, I got it.
17    BY MS. SAMUELS:
18        Q.   All right.  And same as before, can you
19    just read it beginning from the top?
20        A.   Sure, sure.  13, May -- original date of
21    the case report, 13, May, 2000; date of this
22    report, 23, May, 2000, third watch.
23    Classification, homicide; victim's name, Majdak,
24    Marek; beat assigned 5429.
```

1          Then it goes to Hill, Yvette, female

2     black, 31 years old; 4638 West Ohio.  Social

3     ████████, unemployed.  Her IR Number is ████████

4     no phone.  Oh, Schnuggles (phonetic) in

5     parenthesis so that's one of her aliases; boy,

6     Domad (phonetic), Marian (phonetic), Marian

7     William, Williams, I can't make out what I wrote

8     there.  She has numerous aliases.  Been arrested

9     for drugs and prostitution.

10          States she heard white boy got shot

11    and killed during robbery on Ohio.  Darnell and

12    Red highlighted, possible shooters, street talk.

13    Says where on Cicero -- something on Cicero, she

14    doesn't know.  Talked to them -- oh, I'm sorry,

15    now I -- now it makes sense.  Says -- you want me

16    to -- says whores on Cicero, no.  Talked to --

17    talked to them.  No further information.

18    Brzeniak, Sanders, Wright on scene.

19       Q.   And when you say on scene, what do you

20    understand that to mean?

21       A.   We were out there canvassing the street

22    whores.

23          It does not say canvass, this could

24    have been at her house.  It was probably at her

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

117

```
 1   house.  I am just indicating who else was there
 2   with me.
 3        Q.   Okay.  So would you have been writing
 4   this down at --
 5        A.   Do you want me to --
 6        Q.   I am sorry, I didn't mean to interrupt
 7   you.  What were you saying?
 8        A.   I was just going to ask you, do you want
 9   me to -- my signature and Star is at the bottom.
10   Sorry, that was all I was going to add.
11        Q.   Sure.  Who's the supervisor it was
12   received by?
13        A.   Who's the supervisor that particular day?
14        Q.   Well, do you recognize this signature
15   next to where it says supervisor received by?
16        A.   Well, that does not necessarily mean it
17   was a supervisor working that day.  He -- he --
18   this supervisor signed off saying that it's
19   complete as far as he could tell.
20        Q.   Okay.
21        A.   His name is Sergeant Mahon, that's
22   Sergeant Mahon, Gary Mahon, M A H O N.  He could
23   have -- he could have been working afternoons, he
24   could have been working days.
```

1    Q.   Okay.  And it looks like he didn't sign

2    it until 18, November, 2000?

3    A.   18, November -- yeah, I -- yeah, that's

4    what it -- or 10, 18 or 10, November, 2000, yes.

5    Q.   Oh.  Let's go ahead and go to NK148 --

6    oh, that was going to be my question.  When it

7    says date of this report, did that indicate the

8    day you're writing it or the day that the -- what

9    you're writing about occurred?

10   A.   The date that I put up there is the date

11   that I am filling out this GPR.

12   Q.   Okay.  And then generally you would do

13   this contemporaneously or in close time frame of

14   when you spoke with the witness?

15   A.   It is the same day.

16   Q.   Okay.  Go ahead and read this one for me,

17   please.

18   A.   Going to the next one, right?

19   Q.   Yes, sir, 148.

20   A.   Date of original case report, 13, May,

21   2000; date of this report, 24, May, 2000, third

22   watch.  Homicide, Majdak, Marek; my beat, 5429.

23   RD's patrol, Brzeniak, Sanders and Wright

24   assigned.  Follow up on homicide.

119

1          Hill, Yvette, stated look for Darnell

2    or Red.  Canvass street whores on Cicero from --

3    what this means is Cicero to Lake and -- on Cicero

4    between Lake and Austin, that's what that means.

5          CI states two male blacks killed

6    white boy on Ohio.  Number one, male, black, 19 to

7    22 years of age, bald.  I am not sure about the

8    second word.  And it says tattoos, five-nine to

9    five-ten.  Girlfriend of number one would be

10   Hershula Berg, possible works street.

11          Number two, male, black, 17 to

12   20 years of age, five-seven -- 5 foot 7 to 5 foot

13   9, short, medium complected, and number two is a

14   friend of number one.

15          Both hang on Ohio and Cicero or

16   Ohio -- or Cicero and Erie.  Identify girlfriend

17   and pick up.  Check history and spelling of --

18   they're referring to Hershula.  Signed by me, my

19   button, it looks like Mahon again -- I am not

20   sure.  It could be Mahon.  I don't know.  It looks

21   like Mahon.  Let's see.  And the date, 16,

22   November, 2000.

23      Q.   Go ahead to NK149.

24      A.   149.  I have one circled at the top, then

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

1    I have date of original case report 13, May, 2000;

2    date of this report, it looks like 29, May, 2000,

3    third watch.  Homicide is the classification,

4    Majdak, Marek victim; my beat, 5429.

5                    This is -- I circled Walker.

6    Sanders, Wright -- Sanders and Wright has

7    information on Walker's location.  CI states he --

8    he's at 5431 West Potomac.

9                    Relocate to Potomac.  Walker leaves

10   house and walks to street.  Sees RD's, runs,

11   arrested or chased or caught -- I am sorry,

12   caught.  Walker advised rights; understands,

13   waives.  Show -- Sanders and Wright -- no, I am

14   sorry.  Oh, shown and read statements.

15                   And then it has Maurice Wright, Mary

16   Curry, Ashonti Wright.  Talks about him and Vanie

17   smoking, drinking and getting high on the street.

18   They -- runs out of weed and liquor, going to hit

19   a lick on Cicero, Ohio.  Vanie shows Xa, that's

20   the way I wrote it, his gun, thinks it's a --

21   thinks it's a .45, rusty, not sure.

22                   12:30 in the morning to 1:00 in the

23   morning, see a van by park lot, pull up, going to

24   rip him.  Vanie gets in, fights with man.  Xa

1    going to hold man and let -- going to hold man,

2    gets out and Vanie capped man.  Xa runs home.

3                    My signature, my button, looks like

4    Mahon again, it was either 10, November, or 16,

5    November, 2000.

6        Q.    Okay.

7        A.    Do you want me to go to the next page?

8        Q.    Yes, please.

9        A.    Number two, circled homicide -- I'm

10   sorry, I skipped 13, May, 2000.  It appears to be

11   28 or 29, May, third watch.  Homicide, Majdak,

12   Marek; 5429, Walker again.

13                   Seen some friends, just got out of

14   prison, gonna party, get sister's car, goes with

15   friend to restaurant, go back on Ohio, police

16   everywhere, streets blocked.  Sees Vanie at

17   Homan -- or, I am sorry, that's Huron and picks

18   him up, go to club.  I put a question mark there,

19   factory, 'cause maybe I didn't understand but I

20   thought it was factory.  Lake and St. Louis.

21                   Vanie has money, pays for Xa, pays

22   for Xa, has drinks.  Leave club and go to Buddha

23   or Bubble, I -- again, I probably didn't

24   understand.  See Booboo, who is Maurice Wright,

122

```
1    sleeping in car.  Again, that word, I can't make
2    out the first one, it's either a T or F Booboo --
3    oh, there we go, tell.
4              Tell Booboo what happened about,
5    parenthesis, shooting, go to Booboo's house, see
6    T.T. (phonetic), who is Curry, Ashonti, that was
7    the way I spelled it.  Ashonti apparently is
8    Wright -- Ashonti Wright, I put that in
9    parenthesis.
10             Vanie wants Xa to wipe prints off
11   man, no way, that's his writing, he emphasizes,
12   that's why I made it bigger.  Xa tells Ashonti to
13   do the same, she says no way.  Doesn't see Vanie
14   for a few days.  Vanie stays at Xa's house two or
15   three days.  Vanie shot man, not him.  Just trying
16   to rip him.
17             My signature, my button, Mahon it
18   looks like again 16, November, 2000.
19        Q.   All right.  151.
20        A.   13, May, 2000, original case report; it
21   looks like 5, June, 2000, third watch.  Homicide,
22   Majdak, Marek; my beat, 5429.
23             Spoke with Jovanie's mother Regina
24   Long on phone.  She is a female black, 38, date of
```

```
 1    birth ███████████████ 4230 West Crystal, Third
 2    Floor.  Social Security number ███████████.  Phone
 3    number 773-278-8657.  Spoke to son -- spoke to
 4    Jovanie -- I am sorry, I misread that.
 5                    Spoke to Sanders and Wright about
 6    Jovanie, remembers talking to me.  Says -- says
 7    she heard Vanie shot man on Ohio, knows -- knows
 8    police looking for him everywhere, hasn't seen him
 9    or talked to him in -- I don't know what the --
10    that -- talked to him, it is, O N, I don't know
11    what that means.  Oh, I know, I got to just keep
12    reading, that's what it is.
13                    Talked to him on phone, told him
14    police looking for him, told him number Jovanie
15    or -- oh, told him number, Jovanie's number on
16    computer -- computers as a wanted person for a
17    named homicide, doesn't know where he's hiding.
18    Will call us, hours -- I think she was asking for
19    our hours and numbers if she can help or she gives
20    me her hours and numbers.
21                    Again, signed by me, 21209, looks
22    like Mahon again, his button, 16, November.
23                    Next one?
24    Q.   Yes, please, 152.
```

1      A.   13, May, 2000; 25, it looks like, June,

2   2000.  I think that's third watch.  Homicide,

3   Majdak, Marek; 5429.  Trying to figure out what

4   the first word is, something, her name Regina Long

5   at 4230 West Crystal.

6            Interviews it says, I am sorry,

7   that's really sloppy handwriting but.  States has

8   seen slash talked to her son Vanie.  He knows

9   police are looking for him about shooting, told

10  him to call us.  I can't make it out at all, to

11  be -- I'm going to skip that one line.  Will call

12  tomorrow or next day about surrender.  My

13  signature, my button, Mahon; 16, November.

14     Q.   And the second to last line of the

15  narrative, you can't make out what that says?

16     A.   No, I can't -- I'm -- I usually can read,

17  decipher my stuff but something to be -- I can

18  read the "to be" but the first word and last word

19  I can't make out and I can't recall off the top of

20  my head.

21     Q.   So thank you first and foremost.  Were

22  you ever trained to indicate where an interview or

23  where a questioning was taking place on your

24  GPR's?

```
1            MR. MILLER:  Object to the form of the

2      question.

3      BY THE WITNESS:

4         A.   I don't exactly understand what you're

5      asking me.

6      BY MS. SAMUELS:

7         Q.   Sure.  So if you're talking -- if you're

8      questioning a witness in their home, were you

9      trained to indicate that?

10        A.   Was I trained?  No, I -- I don't think

11     so.  I think you just put it down sometimes;

12     sometimes you don't.

13        Q.   Do you think it is important to indicate

14     where you're questioning someone?

15        A.   I don't believe -- well, is it important

16     to -- the question is, is it important to document

17     where I am interviewing somebody?  It depends.

18     Sometimes it is; sometimes it isn't.

19        Q.   And when might it be important to

20     indicate where you're questioning someone?

21        A.   Well, if it's someplace unusual.  We

22     interview -- an interview can take place where it

23     takes place.  Sometimes I indicate it; sometimes I

24     don't.  I don't know...
```

1    Q.   All right.  And it was your general

2    practice --

3    A.   (Indecipherable).

4    Q.   I'm sorry, go ahead.

5    A.   Never mind.  I was going to say the same

6    thing, it was coming out of my mouth the wrong

7    way.

8    Q.   If you want to clarify what you're trying

9    to explain, that is fine.

10   A.   No, no, that's about it.  Sometimes I --

11   it depends how fast you do an interview, it

12   depends on the circumstances.  It just depends.

13   Q.   Okay.  I was going to say, was it your

14   general practice when you're interviewing someone

15   on the street to take notes contemporaneously or

16   would you -- well, to take notes on a GPR

17   contemporaneously or is that something you would

18   do either back at the car or back at the station?

19   A.   No, as I was interviewing them, I would

20   generally be writing, and that's why it's in a

21   hurry fashion on a lot of this stuff.

22   Q.   Did you have like a clipboard you kept

23   with you or something?

24   A.   Always carried a clipboard or I --

1    actually a folder that had GPR's in there.

2        Q.   Is it important to indicate the time when

3    you're speaking with somebody?

4        A.   Sometimes we did; sometimes we didn't.

5    It doesn't -- I mean, if they were giving me a

6    specific time that they seen something like a

7    murder, I would put it down.  Not the time I'm

8    conducting it.

9        Q.   So why is it not important -- that's a

10   double-negative.  Why is it unimportant to

11   indicate the time you're conducting an interview?

12           MR. MILLER:  Object to the form of the

13   question.

14           MR. JANSKI:  Join.

15   BY THE WITNESS:

16       A.   Why is it important to do -- to document

17   the content; is that your question?

18   BY MS. SAMUELS:

19       Q.   No, I think you indicated that you

20   wouldn't document the time that you were speaking

21   with the individual, correct?

22           MR. MILLER:  Object to mischaracterizes

23   the testimony.

24

```
1    BY THE WITNESS:
2        A.   Sometimes I would; sometimes I wouldn't,
3    it just depends.
4    BY MS. SAMUELS:
5        Q.   Okay.  And under what circumstances
6    wouldn't you document the time that you're
7    speaking with the individual?
8        A.   I am sorry, what was your question again?
9        Q.   Sure.  Under what circumstances would you
10   document the time when you're speaking with the
11   individual?
12       A.   It would again depend on the
13   circumstances.  Some circumstances I would
14   document the time; some I wouldn't.
15   BY MS. SAMUELS:
16       Q.   Right.  And so what are some of those
17   circumstances where you would document the time?
18       A.   If, for example, I had somebody under
19   arrest and I was to read him his rights, I
20   might -- I might think that would be time -- a
21   good time.  But it is generally some time in the
22   period of the third watch that I'm doing this
23   unless it's otherwise indicated.  If I worked over
24   time or something, then perhaps I would do it
```

1    down -- write down the time.  I just generally

2    didn't write down times.

3         Q.   Okay.  Would you consider it important to

4    indicate or to write down somewhere the time that

5    a person is taken into custody?

6         A.   It is generally indicated on the arrest

7    report.

8         Q.   But would you consider it important to

9    indicate someplace that -- the time that the

10   individual was taken into custody?

11        A.   I think I just answered that.  The time I

12   would take somebody into custody, he's under

13   arrest so it would indicate on the arrest slip.

14   It didn't necessarily have to be a GPR.

15        Q.   Right, and I think I'm trying to get at

16   something a little bit different.  So I'm not

17   asking where that would be indicated.  I'm asking

18   about whether or not that's an important fact to

19   document?

20        A.   Is it an important fact, yes, that

21   somebody -- a time somebody is taken into custody.

22        Q.   Okay.  Okay.  And then Exhibit 2 is going

23   to be NK131 --

24        A.   I don't have that.

1     Q.    -- through 145.  Do you have those

2   available to you, sir?

3             MS. ITCHHAPORIA:  Just a second, I'm

4   pulling them up.

5                 Graham, do you have them?  We're just

6   pulling up one for Graham.

7             MR. MILLER:  I'll pull them up.  What are

8   they, GPR's?

9             MS. SAMUELS:  They're more GPR's.  Were

10  you asking what they were?

11            MR. MILLER:  Yeah, just so I can find

12  them on my computer.  But they're the other GPR's,

13  like the Polish interview GPR's; is that what it

14  is?

15            MS. SAMUELS:  Correct.

16            MR. MILLER:  I'll find them as you go

17  through.

18  BY MS. SAMUELS:

19      Q.    Do you have those for, sir, Mr. Pietryla?

20      A.    Yeah, they gave me a stack, yeah.

21      Q.    Okay.

22      A.    Which one do you want to start with?

23      Q.    NK145.

24      A.    They're here somewhere.

```
 1              MS. ITCHHAPORIA:  Well, I think she said
 2     131 to 145.
 3              MS. SAMUELS:  I am sorry, you're right.
 4     I was on the wrong page.
 5     BY MS. SAMUELS:
 6          Q.   Go ahead and start with 131.
 7          A.   All right.
 8          Q.   And so at the bottom left it looks like
 9     there is two signatures for the reporting
10     officers.  Is one of those your signatures?
11          A.   The bottom one is mine.
12          Q.   Okay.  And this looks like it is a GPR
13     corresponding to an interview with Pula, is that
14     how the name would be pronounced?
15          A.   First name.
16          Q.   Okay.  And it looks like the date of the
17     report is 19, May, 2000?
18          A.   No, date of original case report is 13,
19     May; date of this report is 19, May.
20          Q.   Okay.  Thank you for clarifying.  Prior
21     to -- and it looks like you conducted a bunch of
22     interviews beginning on 19, May, with some persons
23     who were -- who were primarily Polish speaking; is
24     that fair to say?
```

132

```
 1        A.   Yes, yes.
 2        Q.   Prior to 19, May, are you aware of any
 3   interactions you took with relation to the
 4   investigation into the murder of Marek Majdak?
 5        A.   No.
 6        Q.   Okay.  Do you know when you were first
 7   assigned to assist on this murder?
 8        A.   I believe it was 19, May.
 9        Q.   Okay.  And then go ahead and review
10   report 131, and when you've had a chance to review
11   it, let me know when you're ready.
12        A.   131, okay.
13                    (Witness viewing document.)
14   BY THE WITNESS:
15        Q.   Okay.
16   BY MS. SAMUELS:
17        Q.   Having reviewed this report, does it
18   refresh your recollection of the interview you had
19   with Pula?
20        A.   Yes.
21        Q.   And what do you recall about your
22   interview with Pula?
23        A.   That every -- I asked the questions, Tony
24   Brzeniak translated the questions, got the answer,
```

```
1    translated it back to me and he wrote down --
2    these are apparently the interview based on the
3    questions I asked, it was translated by Tony
4    Brzeniak.
5         Q.   Okay.  And it looks like you added
6    something towards the end of the report; is that
7    fair?
8         A.   Yes.
9         Q.   Can you just read what that portion says
10   that you wrote?
11        A.   No English, got paid on 12, May, got --
12   we got photos of timecard and check endorsed by
13   Janiszewski, no narcotic use.
14        Q.   And when it says no English, do you know
15   who that's referring to?
16        A.   Pula Czeslaw.
17        Q.   Okay.  And when it says --
18        A.   Or broken.
19        Q.   I am sorry?
20        A.   Go ahead.  Or broken English.
21        Q.   Okay.  But that's referring to the person
22   you're interviewing, not the victim, fair?
23        A.   No, no, the -- at the bottom, no narcotic
24   use, I put in that, that's referring to the
```

1    victim.

2        Q.    Okay.  But no English, that's referring

3    to the person you're interviewing and not the

4    victim?

5        A.    Correct.

6        Q.    Do you just remember that or how do you

7    know to differentiate between those two?

8        A.    Based on the content, we asked everybody

9    about did the victim use narcotics because of the

10   area where we was murdered.

11       Q.    Do you recall asking whether the victim

12   spoke English?

13       A.    The victim?

14       Q.    Yes, sir.

15       A.    The mother -- yeah, I do.  I do remember

16   I asking the mother.

17       Q.    And she indicated that he did speak

18   English?

19       A.    No, it would be very limited English,

20   broken English.

21       Q.    Okay.  Going to -- oh, is Pula the -- no,

22   you said she was a bar -- or door woman or

23   something like that.  Sorry.

24                    Going to NK132, go ahead and review

1    that briefly, and when you're ready, let me know.

2                    (Witness viewing document.)

3    BY THE WITNESS:

4        A.    Okay.

5    BY MS. SAMUELS:

6        Q.    And it looks like this is a GPR

7    corresponding with an interview of a bartender

8    named Barbara?

9        A.    Yes.

10       Q.    And then it --

11       A.    Yes.

12       Q.    It looks like you also added some

13   statements toward the -- I guess the middle of the

14   GPR.  Can you read those for me?

15       A.    No English, thought he worked across

16   street, no problems.

17       Q.    And those statements, are those referring

18   to the victim or to the person you're interviewing

19   or both?

20       A.    That's referring to the bartender, she

21   spoke no English, thought he worked across the

22   street and no problems with him.

23       Q.    Okay.  And it says -- your report seems

24   to indicate that she saw the victim on Friday from

1    12:15 to 12:45.  Would that have been a.m. or

2    p.m.?

3         A.   Where do you see that, I'm -- on this

4    report?

5         Q.   Yes, so --

6         A.   Let me look again.

7         Q.   -- like five lines above your writing.

8         A.   Okay, says seen victim on Friday.  Okay,

9    that would be lunchtime.

10        Q.   Okay.  And then under that I think it

11   says -- I believe it says Polish beer and a

12   tequila; is that your understanding of what it

13   says?

14        A.   Polish beer and tequila, that's

15   apparently what he drank that day the last time

16   she seen him or.

17        Q.   And then under that it says Wednesday,

18   Thursday, Friday, lunch only, not after work.

19   Correct?

20        A.   Correct.

21        Q.   And so is it your understanding that he

22   would have been drinking Polish beer and tequila

23   during his lunch hours?

24        A.   That would be my impression, correct.

1    Q.   Okay.  Did you draw any inferences based

2    upon that information?

3    A.   No.

4    Q.   Do you know whether or not he worked days

5    or nights?

6    A.   I believe he worked days.

7    Q.   Do you recall what he did for a living?

8    A.   I believe it was some type of warehouse

9    work at Remodelers Supply.

10   Q.   Okay.  And then I believe you indicated

11   one of the women was memorable because she was

12   attractive or something like that, correct?

13   A.   Yes.

14   Q.   Is this bartender Barbara, is that the

15   one you're referring to?

16   A.   No, it was at a club.  This is a bar.

17   Q.   Okay.  Continuing to NK133.

18   A.   Do you want me to review it?

19   Q.   Yes, sir.

20              (Witness viewing document.)

21   BY THE WITNESS:

22   A.   Okay.

23   BY MS. SAMUELS:

24   Q.   And that's your signature indicated on

138

1    the bottom left, correct?

2         A.    That's correct.

3         Q.    And it looks like this is an interview of

4    two individuals?

5         A.    No, just one.

6         Q.    Just one, okay.  So the Andrew, it

7    indicates that he's the owner of something,

8    correct?

9         A.    Yes.

10        Q.    And what did you understand him to be the

11   owner of?

12        A.    Michella Terrace.

13        Q.    Okay.  What's that?

14        A.    That's a club.

15        Q.    Okay.  And so is that the nightclub that

16   you understood the victim to have visited?

17        A.    Yes.

18        Q.    And about how far away from where he was

19   killed is the Michella Terrace?

20        A.    The club's on Irving Park and he got

21   killed on Erie, whatever that is, that's a ways.

22        Q.    Okay.

23        A.    Or I don't know what hundred Irving Park

24   is.

1    Q.   But in any event, you would -- it was a
2    considerable distance from the club he had been
3    at?
4    A.   It is a ways, yes, it is a...
5    Q.   Okay.  And then continuing to 134, it
6    looks like there is -- this is an interview of two
7    people, correct, indicated on this sheet?
8    A.   Yes.
9    Q.   And the first seems to be a bouncer at
10   the nightclub Michella Terrace?
11   A.   Correct.
12   Q.   And apparently that individual started
13   work at 10:00 p.m. and didn't see him at any time
14   during his shift, correct?
15   A.   Looking at this, I don't see where
16   10:00 p.m. is at but -- oh, I see.  Yeah, right,
17   right below it.  Didn't see victim, started at
18   10:00 p.m., yep.
19   Q.   Okay.  And below it --
20   A.   -- (indecipherable) he didn't see.
21   THE STENOGRAPHER:  Say it again, I am
22   sorry.
23   BY THE WITNESS:
24   A.   So it indicates this Robert did not see

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

140

```
 1   him.
 2   BY MS. SAMUELS:
 3       Q.   And then below an interview with I
 4   believe who is the uncle of the victim?
 5       A.   Correct.
 6       Q.   And it seems to suggest that they were at
 7   a location together, correct?
 8       A.   Yes.
 9       Q.   And he told his uncle that he was going
10   to Cardinal at about 9:00 or 10:00 p.m.?
11       A.   Yes.
12       Q.   Okay.  And it looks like when it says
13   spoke Greek, not good English.  Is that referring
14   to the uncle or to the victim?
15       A.   The victim.
16       Q.   Going forward to NK135.  That's your
17   signature at the bottom left?
18       A.   Yes, below, below Brzeniak's signature.
19       Q.   Okay.  And it looks like this is an
20   interview with Marta or --
21       A.   Yes.
22       Q.   -- is that Maria?
23       A.   No, it is Marta.
24       Q.   Okay.  And it essentially indicates --
```

1    when it says four times before, do you know what

2    that's referring to?

3         A.   No.  Based on what I'm seeing now, no.

4         Q.   Okay.  And this report seems to indicate

5    that he was at Michella Terrace for a total of

6    15 minutes, correct?

7                    (Witness viewing document.)

8    BY THE WITNESS:

9         A.   Yes.

10   BY MS. SAMUELS:

11        Q.   I think it indicates that at the time

12   that he left Michella Terrace, his condition was

13   he had drunk a little but wasn't -- or but he

14   didn't leave drunk.  Fair?

15        A.   That's correct, fair.

16        Q.   Okay.  Moving on to NK136, all right, and

17   it looks like that is an interview with Wander?

18        A.   That's his first name, yeah, Wander.

19        Q.   Wander, okay.  And it looks like this is

20   an owner?

21        A.   Yes.

22        Q.   Of the Cardinal Club; is that correct?

23        A.   That's correct.

24        Q.   This indicates that he had -- that while

```
1    Mr. Majdak was at the Cardinal Club, he was drunk?
2         A.    That's what it indicates, yes.
3         Q.    And he asked for directions to Michella
4    Terrace?
5         A.    Yes.
6         Q.    And that he was dancing with a girl who
7    the owner did not recognize?
8         A.    Yes.
9         Q.    Did you ever come to find out who that
10   girl was?
11        A.    No.
12        Q.    Did you ever ask for a description of the
13   girl?
14        A.    Not that I recall, no.
15        Q.    Continuing to --
16        A.    Might have but.
17        Q.    Continuing to 137, this is -- oh, this is
18   the door person for the Cardinal Club whose first
19   name is Urszula I believe?
20        A.    Yes, Zarzycki.
21        Q.    And is that the woman you remembered who
22   your partner was chatting up?
23        A.    Yeah, I believe so.  There is a lot of
24   pretty girls there so, I'm pretty sure though this
```

1    is the one that I was referring to.

2        Q.   All right.  What kind of club was

3    Cardinal Club?

4        A.   It is a bar slash dance bar.  They have

5    live entertainment, so like later in the

6    evening -- and by live entertainment, I mean a

7    Polish band.  It is a pretty big club over there.

8    I know it is on the corner of something, but I

9    can't remember where.

10       Q.   Okay.  No strippers or anything like

11   that?

12       A.   No.

13       Q.   Were you aware of the Cardinal Club

14   before this case?

15       A.   I've heard of it.

16       Q.   How had you heard of it?

17       A.   It is a Polish nightclub.

18       Q.   Okay.  It was just popular?

19       A.   Yes, that's the only reason why -- and

20   it's been there a long time.  I've heard it from

21   probably some of my friends.

22       Q.   It looks like Urszula indicated that she

23   had known the victim from seeing him before,

24   correct?

```
 1        A.   Yes.

 2        Q.   And it looked like essentially he was

 3   hitting on her but she said she had a boyfriend?

 4        A.   Yes.

 5        Q.   It looks like instead they were dancing?

 6        A.   I don't see that.

 7        Q.   Well, after the phone number, can you

 8   just read everything on the report following the

 9   phone number?

10        A.   9:45 arrived, victim already here.  Next

11   line, saw him before, victim talked about

12   boyfriend.  Victim talked about boyfriend by front

13   door.  I don't know what that means.  Would like

14   to be -- I can't read that, it is in something.

15   Oh, apparently -- I don't know.  Would like to be

16   in something.  Oh, in love with you but I'm --

17   can't make it out.

18             Wanted to dance, has girlfriend here,

19   more drunk when left.  Victim drive -- drinking

20   Cognac, asked directions to Michella Terrace, left

21   alone, worried -- worried victim was drunk.

22   Victim stated didn't know...

23        Q.   Is that Chicago?

24        A.   I can't -- yes, you're right, it is,
```

 1    Chicago.  Victim stated didn't know Chicago well.

 2                   First paycheck, went for -- went to a

 3    bar after work with friends from work, talked in

 4    Polish; girlfriend, Marzena, female, white, 37,

 5    38, blonde five-ten, called to ask about victim at

 6    club Monday.

 7                   And Thursday, I think that's

 8    abbreviation for Thursday, maybe again on

 9    Thursday, I don't know, Ornacki -- oh, that's

10    Marzena Ornacki, that's what the arrow indicated

11    with the second with her phone number.  Left after

12    midnight.

13                   Brzeniak's signature, my signature,

14    Mahon, 16, November.

15        Q.   All right.  Do you know if the victim was

16    married?

17        A.   The victim, yes, I was told he was

18    married.

19        Q.   And so your understanding was he was

20    married but he also had a girlfriend in America?

21        A.   Yes.

22        Q.   And that he had been to at least the

23    Cardinal Club multiple times the week of his

24    death?

1    A.    It says that he's been there multiple
2    times, yes.
3    Q.    Okay.  Is the Cardinal Club known for any
4    drug use?
5    A.    No.
6    Q.    Is the Cardinal Club known for any gang
7    activity?
8    A.    Not that I'm aware of, no.
9    Q.    Did you ever inquire into the victim's
10   affiliation with any gangs?
11   A.    Gangs?
12   Q.    Yes.
13   A.    No, I -- I did not ask.
14   Q.    How far is the Cardinal Club from where
15   he was found?
16   A.    I believe it's a little bit away.  I
17   think it is even further than the other club.
18   Q.    Michella Terrace or Michella Terrace,
19   whatever that is?
20   A.    Yes, I -- I don't know the address.  I
21   just know it was further west for sure.
22   Q.    Continuing to 138, it looks like this is
23   an interview with a bartender at the Cardinal
24   Club, correct?

```
 1        A.    Yes.

 2        Q.    How do you pronounce the first name?

 3        A.    This is one Polish name I can't say.  I

 4   would say it is Bogumila, that's what I would say

 5   but that may be wrong.

 6        Q.    Okay.  Did -- okay.  And it looks like

 7   this person saw Majdak for the first time that

 8   night; is that your understanding based upon

 9   reading this report?

10        A.    Yes.  Saw victim first time, yes.

11        Q.    And when it says bought one drink, is

12   that referring to the victim?

13        A.    Yes.

14        Q.    It says didn't see how much money.  What

15   do you understand that to mean?

16        A.    Didn't see him put out any money, you

17   know, maybe he didn't put it on the bar, I don't

18   know.

19        Q.    Okay.  Then the next line it says talked

20   about being in Greece and I believe that says

21   first check?

22        A.    Yes.

23        Q.    Then when it says went to dance, that's

24   referring to the victim again?
```

```
 1        A.    Yes.

 2        Q.    A little drunk, referring to the victim?

 3        A.    Yes.

 4        Q.    Left late after midnight, correct?

 5        A.    Yes.

 6        Q.    Came in by himself?

 7        A.    Correct.

 8        Q.    Was here a long time, couple hours?

 9        A.    Yes.

10        Q.    All right.  So was it your understanding

11   that he came from the Terrace to the Cardinal

12   Club?

13        A.    I would think so.

14        Q.    And then under that it looks like you

15   wrote something, can you -- what does that say?

16        A.    Spoke only Polish, no English.

17        Q.    That's referring to the person you

18   interviewed or to the victim?

19        A.    Person we interviewed, that's why -- yes.

20        Q.    Okay.  Continuing to CK139 -- or NK139, I

21   apologize.  It looks like this is your interview

22   with Alicja who is a singer?

23        A.    Yes.

24        Q.    Do you know where she was a singer?
```

1    A.    At one of the clubs, I don't remember

2  which club it was.

3    Q.    And it looks like at or around 10:00 she

4  saw him at the bar?

5    A.    Yes.

6    Q.    It looks like at the time she interacted

7  with him he was drunk?

8    A.    Yes.

9    Q.    They talked, he asked her to dance and

10  she indicated that she doesn't dance with drunks?

11    A.    Yes.

12    Q.    She asked about a brother in Poland, drug

13  problem, heroin?

14    A.    That's correct.

15    Q.    All right.  And when it says drug

16  problem, heroin, what do you understand that to be

17  referring to?

18    A.    His brother.

19    Q.    Okay.  When it says -- looks like it says

20  directions to Michella Terrace?

21    A.    Yes.

22    Q.    Told him to stop drinking?

23    A.    That's correct.

24    Q.    Left after midnight?

1    A.    Yes.

2    Q.    Oh, I'm sorry, he was there about three

3  hours, correct?

4    A.    Yes, that's what this says, yes.

5    Q.    So if she first saw him at or around

6  10:00, then three hours would place it right

7  around 1:00 a.m., correct?

8    A.    It doesn't specifically say what time he

9  left.

10   Q.    Right.  I guess I'm just making an

11  inference based upon it says, she sees him at

12  10:00 at the bar and he was there about three

13  hours.

14   A.    Yes, that's what it says.

15   Q.    Okay.  So that would have meant that he

16  would have left right around 1:00?

17   A.    Yes, that's what she said, yes.

18   Q.    And it says saw him here drunk before?

19   A.    Yes.

20   Q.    All right.  And then it indicated that

21  she didn't know the victim to use drugs?

22   A.    That's correct.

23   Q.    The victim's brother, do you know whether

24  or not he was in America?

151

```
1        A.    At the time of the murder?

2        Q.    Yes.

3        A.    No, I don't know for sure.  He -- but I

4   don't believe so.

5        Q.    And then at the bottom something is

6   written, I know that says no English, but what's

7   that word after English?

8        A.    No English, hated drugs, brother.

9        Q.    Okay.  So when it says --

10        A.    -- (indecipherable) in reference to.

11        Q.    So when it says hated drugs, that means

12   the brother hated drugs?

13        A.    He hated drugs.

14        Q.    Oh, he hated drugs.  So you understand

15   that to mean that the victim hated drugs because

16   of his brother's addiction?

17        A.    That's correct.

18        Q.    Okay.  Continuing to 140, it indicates

19   that this is an interview with Jacek or Jacek?

20        A.    Jacek.

21        Q.    Jacek, okay.  It looks like this was an

22   acquaintance of the victim who he had seen about

23   five times?

24        A.    Yes.
```

1    Q.   At the time that Jacek arrived at or

2  around 10:00 p.m., Majdak was already at the bar?

3    A.   Yes.

4    Q.   At the time that he saw Majdak, he was

5  already drinking and intoxicated?

6    A.   Yes.

7    Q.   Talked with victim, returned about one

8  month for good.  What do you understand that to

9  mean?

10    A.   I don't know.  I don't...

11    Q.   Okay.  And then it generally sort of

12  indicates that he was drinking and dancing?

13    A.   Yes.

14    Q.   And this person didn't know the victim to

15  use drugs or prostitutes, correct?

16    A.   That's correct.

17    Q.   And that he was still at this club after

18  midnight?

19    A.   Still -- yes, at -- well, I think it says

20  at midnight.  Victim still here at midnight.

21    Q.   And then the part that you wrote at the

22  bottom, can you read that to me?

23    A.   No English, no drugs, no prostitutes per

24  the conversation that Tony -- that Brzeniak was

 1    having with him, good shape and good looking,

 2    referring to the victim.

 3         Q.    This looks like it is an interview -- I

 4    am sorry, going to 141.  This looks like it is an

 5    interview with somebody who was a patron of the

 6    Cardinal Club?

 7         A.    Yes.

 8         Q.    Is this a female or a male?  Can you...

 9         A.    A female, Donuta.

10         Q.    Donuta, thank you.  This indicates this

11    is the first time she had seen him but she danced

12    with him twice?

13         A.    Correct.

14         Q.    He didn't talk much, and to her she said

15    he didn't appear drunk?

16         A.    Correct.

17         Q.    And she indicated that she didn't know

18    about his money?

19         A.    Correct.

20         Q.    And she didn't know what time he left?

21         A.    Correct, that's what it says, yep.

22         Q.    Did you believe her?

23         A.    This girl, yes.

24         Q.    Did you look up her background?

```
 1        A.    No.

 2        Q.    Okay.  Continuing to 142, it looks like

 3   this is an interview with Stephan?

 4        A.    Yes.

 5        Q.    Can you just read what's written at the

 6   bottom?

 7        A.    My handwriting or Brzeniak's?

 8        Q.    Yours, sir.

 9        A.    Victim wanted to -- I can't make out

10   this -- that word.  First check and -- oh, I got

11   it.  Victim wanted to celebrate first check and

12   buy sell beers.  Asked Stephan to cash check.  No

13   English, didn't know Chicago, no narcotic use,

14   good, strong kid, victim to bring family here.

15        Q.    Okay.  Continuing to 143, this looks like

16   it is an interview with another of the victim's

17   coworkers.  Is that your understanding?

18        A.    Yes.

19        Q.    Did you draw any inferences from your

20   interview with Damian?

21        A.    Just that they went to the bank and

22   cashed a check and it appears they wanted to

23   party.

24        Q.    Continuing to 144.
```

```
1        A.    Okay.

2        Q.    All right.  This looks like it is --

3        A.    Do you want me to read it?

4        Q.    Sure.  Can you read the part that you

5   wrote at the bottom?

6        A.    Seek residency, no drugs, hard worker,

7   bring check home, open account, home, must save

8   money; hated drugs, that's cause of what happened

9   to his brother; took good care of himself, Joanna

10  Romanska (phonetic) sister.  I can't make out what

11  I wrote there.  Notified -- oh, notified, yeah, by

12  detectives.  Daniel Romanska brother, military,

13  month -- oh, he's on a month leave, don't use

14  drugs.

15       Q.    And it indicated --

16       A.    Brzeniak -- Brzeniak...

17             THE STENOGRAPHER:  I'm sorry, Brzeniak,

18  what?

19  BY THE WITNESS:

20       A.    Brzeniak's signature, my signature,

21  sergeant's signature.

22  BY MS. SAMUELS:

23       Q.    All right.  And it indicates at the top

24  that he was married with four kids who lived out
```

1    of the country?

2        A.    That's what we were told, yes.

3        Q.    And your understanding from the family is

4    that he was saving his money to bring his family

5    here?

6        A.    That he was told to bring that check

7    home.  They opened an account so he could save his

8    money to bring his family here, yes.

9        Q.    So that's not necessarily what he wanted

10   to do, but that's what his family told him to do?

11       A.    That's not what I -- that's not how I

12   read it, that's not my feeling.

13       Q.    So your understanding from reading sort

14   of the portion you wrote is that that was his

15   family's understanding; is that fair?

16       A.    No, I don't even believe it is his

17   family's understanding.  That he didn't want

18   his -- I don't know what you're asking.  Let's

19   start there.

20       Q.    So when it says must save money, what is

21   that referring to?

22       A.    Our conversations with the mother, she

23   knew this was his first paycheck.  Polish people

24   customarily on their first paycheck will -- would

1  like to celebrate it, and she gave him $50 to do

2  the celebrating with, make sure you don't cash

3  your check, we're going to open a bank account so

4  you can save up money to bring your family.

5       Q.   Okay.  It indicates at the top that she

6  had given him $50 that morning, correct?

7       A.   That's correct.

8       Q.   It also indicates that the victim had

9  three scratch marks on his face opposite wound.

10  Do you see that?

11       A.   No, where do you -- oh, 6 -- no.

12       Q.   So right above where your writing begins.

13       A.   Victim had three scratch marks on face

14  opposite wound, yes.

15       Q.   Okay.  Were you --

16       A.   That's what it says, that's what it says.

17       Q.   Were you ever able to determine where

18  those scratch marks came from?

19       A.   No.

20       Q.   Did they seem to be fresh scratch marks?

21            MR. MILLER:  Object to foundation.

22  BY THE WITNESS:

23       A.   The only scratch marks or injuries I seen

24  was -- on the victim was from morgue photos, and I

1    do not recall the scratch marks.

2    BY MS. SAMUELS:

3        Q.   Okay.  So is it fair to say as you sit

4    here today you don't know whether or not those

5    were fresh scratch marks?

6        A.   No, I do not know.

7        Q.   Okay.  And then it looks like there was a

8    final interview -- well, I won't say final.  It

9    looks like on 1:45 you conducted an interview with

10   Marzena?

11       A.   Yes.

12       Q.   And it was your understanding that this

13   was the girlfriend of the victim?

14       A.   Yes, that would be something she said.

15       Q.   All right.  It also looks like the family

16   indicated in the previous interview that Marzena

17   was his girlfriend as well, correct?

18       A.    I believe reading that somewhere, but

19   I -- I think it -- yeah, they may have indicated

20   that, yes.

21       Q.   And it looks like she indicates that the

22   last time she had seen the victim was on Monday,

23   May 8th, correct?

24       A.   Yes.

159

```
1     Q.   And at the bottom it looks like you wrote
2   something as well?
3     A.   Yes, it says good -- you want me to read
4   it?
5     Q.   Yes, please.
6     A.   Good person, no English, didn't know
7   city, hated drugs or any use or any -- I don't
8   know.  Or anybody who uses them.
9     Q.   Okay.  So based upon your interviews with
10   his family and the persons who had seen him at the
11   two clubs, did you come to any conclusions
12   regarding Mr. Majdak's sobriety at the time he was
13   last seen?
14     A.   He has been drinking.
15     Q.   Do you have the ME report or do you need
16   me to share screen for that?
17          MS. ITCHHAPORIA:  Do you have a Bates for
18   that?
19          MS. SAMUELS:  Yeah, BS13157 is what it
20   begins.
21          MS. ITCHHAPORIA:  Oh, we don't have that.
22          MS. SAMUELS:  Okay.  So I will share --
23   BY THE WITNESS:
24     A.   I can walk up to your --
```

```
 1    BY MS. SAMUELS:
 2        Q.    I can share screen.
 3        A.    I can walk up to your --
 4              MS. ITCHHAPORIA:  He's not going to be
 5      able to see it that from far away.
 6              MR. MILLER:  Unless it's really zoomed in
 7      I guess.
 8              MS. ITCHHAPORIA:  It is also city NK40.
 9      Do you mind if we use the City NK version, we have
10      that printed out.
11              MS. SAMUELS:  Go for it, and then if we
12      have any issues, we'll take care of them.
13              MR. MILLER:  Is that the ME report?
14              MS. ITCHHAPORIA:  You're talking about
15      the autopsy report, right?
16              MS. SAMUELS:  Yes, the postmortem
17      examination.
18              MS. ITCHHAPORIA:  City NK40 through 45
19      for the record.
20              MR. MILLER:  Let's take a quick break.
21      Just like -- how long do you need?
22              THE WITNESS:  Just going to the bathroom.
23              MR. MILLER:  Five minutes?
24              THE WITNESS:  Yeah, five minutes.
```

```
 1              MS. SAMUELS:  That's okay.
 2                      (Short break.)
 3              MS. SAMUELS:  Back on the record.
 4     BY MS. SAMUELS:
 5         Q.   Did you have a chance to consult with
 6     your attorney over the break?
 7         A.   No.
 8         Q.   Okay.  So when we left off, we were about
 9     to go into the ME's report.  But before I do that,
10     what's your understanding of how Marek Majdak was
11     killed?
12         A.   By gunshot wound.
13         Q.   Okay.  Where was he the first time he was
14     shot?
15         A.   I believe -- my belief is -- I don't know
16     for sure.  But my belief is he got -- the first
17     shot was inside the car or close proximity to the
18     car -- the van.  His van, not car.
19         Q.   Did you notice any markings or wounds on
20     Majdak that would indicate a physical struggle?
21         A.   From what I know?
22         Q.   Yes, sir.
23         A.   From what I -- I am not understanding
24     what you're asking.
```

1    Q.   Right.  So I believe you said that

2    Jovanie said there was some sort of physical

3    struggle with him and that Majdak was getting the

4    better of him, correct?

5    A.   That's correct.

6    Q.   All right.  When you reviewed -- well,

7    let me it this way.  During the course of your

8    investigation, did you review the autopsy -- or

9    review the postmortem examination of Marek Majdak?

10   A.   Yes, but not until much later.  I don't

11   know exactly when, but I think this was much later

12   that we got the report.

13   Q.   Okay.  When you reviewed the report, did

14   you notice any indications of -- that he had been

15   in a physical struggle?

16   A.   I don't recall right now what I read.  I

17   mean, I possibly did read that.  I know I reviewed

18   it but I -- at this time I just don't recall.

19   Q.   Okay.  So one of the reports seemed to

20   indicate that he had three scratch marks on his

21   face, correct?

22   A.   That's -- the GPR said that, Tony

23   Brzeniak's GPR.  Do you want me to -- never mind.

24   Sorry.  Sorry.

```
 1        Q.   What are some things you would expect to
 2   see if somebody had gotten into a physical
 3   altercation?
 4            MR. MILLER:  Object to the form of the
 5   question, calls for speculation, incomplete nature
 6   of the hypothetical.
 7            MR. JANSKI:  Join.
 8   BY THE WITNESS:
 9        A.   Depends on the circumstances of the
10   altercation.
11   BY MS. SAMUELS:
12        Q.   Would you expect to see bruising?
13            MR. MILLER:  Same objections.
14   BY THE WITNESS:
15        A.   In some cases you may or may not see
16   them.
17   BY MS. SAMUELS:
18        Q.   All right.  If somebody's been in a
19   physical altercation, would you expect there to be
20   some sort of like markings on their knuckles or
21   something like that to indicate that they had been
22   punching?
23            MR. MILLER:  Object to foundation,
24   speculation, incomplete nature of the
```

1    hypothetical.

2          MR. JANSKI:  Join the objection.

3    BY THE WITNESS:

4       A.   Depends on what kind of altercation it

5    was.

6    BY MS. SAMUELS:

7       Q.   Sure.  Let's assume it was a fistfight.

8          MR. MILLER:  Same objections.

9          MR. JANSKI:  Join.

10   BY THE WITNESS:

11      A.   I didn't hear.

12         MR. MILLER:  Can you repeat the question?

13   BY MS. SAMUELS:

14      Q.   I said let's assume it is a fistfight.

15      A.   Assuming it was a fistfight, you might

16   have knuckles or bruises.

17      Q.   What was your understanding of the

18   physical altercation that Jovanie allegedly got

19   into with the victim?

20         MR. MILLER:  Object to form.

21   BY THE WITNESS:

22      A.   My understanding of it is what -- from

23   what I can recall anyway, is from what Jovanie had

24   said happened, and I don't -- didn't take much

1  from what Walker said because he was outside and

2  didn't actually see it, he just seen a commotion.

3  BY MS. SAMUELS:

4      Q.   And how was the physical altercation

5  described to you?

6      A.   That the victim had the better of

7  Jovanie.

8      Q.   All right.  And nothing more specific

9  than that?

10      A.   There was nothing more specific that we

11  know.

12      Q.   Okay.  Were you able to get a copy of the

13  ME's report or do I need to share it?

14      A.   Yes, I have it right here.

15      Q.   Okay.  I don't know what I just did.

16  Okay.  So beginning -- can you turn to page 7 of

17  the report which I believe is the toxicology

18  results.

19      A.   That would be the last one.

20          MS. ITCHHAPORIA:  For the record, I think

21  that's City NK46 which I hadn't given him.

22               But here you go.

23  BY THE WITNESS:

24      A.   Okay, I have it.

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

```
 1   BY MS. SAMUELS:

 2        Q.   Okay.  It indicates that there was

 3   ethanol in Majdak's blood and urine, correct?

 4        A.   That's correct.

 5        Q.   And the amounts of ethanol indicated, did

 6   you make any inferences based upon that?

 7        A.   No, I don't know what those numbers mean.

 8        Q.   Did you -- you or any of the detectives

 9   that you worked on in this case ever evaluate what

10   those numbers would have meant or indicated?

11             MR. MILLER:  Object to foundation.

12   BY THE WITNESS:

13        A.   I don't know.  I know -- I do not know

14   what these numbers mean other than he had it in

15   his system.  And I'm not aware of what any other

16   detectives did as far as if these two things are

17   concerned.

18   BY MS. SAMUELS:

19        Q.   Okay.  Do you recall ever discussing how

20   the sobriety of the victim may have played a

21   factor into his death?

22        A.   Did I discuss it?

23        Q.   Right.

24        A.   With whom?
```

1     Q.   With any of the other detectives.

2     A.   Other than the fact that -- I may or may

3  not have, but I am not really sure; but if I had,

4  it would -- just that he was out drinking.

5     Q.   Okay.  Did you ever come to the

6  conclusion that he was significantly intoxicated?

7          MR. JANSKI:  Object to form.

8          MR. MILLER:  Object to form.

9  BY THE WITNESS:

10    A.   I believe he drank quite a bit.  I don't

11  know what his tolerance is though, I have no idea.

12  BY MS. SAMUELS:

13    Q.   Okay.  And so my question was, did you

14  ever come to the conclusion during your

15  investigation that the victim was significantly

16  intoxicated?

17          MR. JANSKI:  Same objection, asked and

18  answered.

19  BY THE WITNESS:

20    A.   Significantly intoxicated, no.

21  BY MS. SAMUELS:

22    Q.   Okay.  What evidence did you have that

23  Mr. Majdak drove himself to the location where he

24  was ultimately found?

1    A.    I don't have any evidence he drove other

2    than what people told us when he left.

3    Q.    And I believe it is only one person who

4    indicated that they saw him leave, correct?

5    A.    I don't recall specifically, but I know

6    at least one person had told him -- had thought

7    that he did.

8    Q.    Okay.  And -- so the copy of the report,

9    do you have the letter from Dr. An?

10    A.    I have the whole report.  I -- it does --

11    it is not a letter.  It is a report, report of

12    postmortem examination.  Is that what you're

13    referring to?

14    Q.    No.  So I'm going share screen so you can

15    see what I'm referring to, and it looks like --

16    can you see my screen?

17    A.    Yeah, I've got to get up.

18            MS. ITCHHAPORIA:  You've to get up.

19            THE WITNESS:  Yeah, even though it's

20    blown up, I won't be able to read it that far.

21            MR. MILLER:  He's going to get up and

22    look at it and then come back.  Is that okay?

23    BY MS. SAMUELS:

24    Q.    And this looks like it is a letter

1    written to the Assistant Medical Examiner on

2    May 20th, 2000, correct?

3              MR. MILLER:  Jeanette, he has to get up

4    and go look at it and come back down so that's why

5    he's going to step out of the screen for a second.

6              MS. SAMUELS:  That's fine.

7                        (Witness viewing document.)

8              MR. MILLE:  We can print this out if

9    we're going to go through it in detail.  But he

10   did look at it, it looks like it's to Dr. An.

11   BY THE WITNESS:

12       A.   It is to Dr. An is what my impression of

13   that is.

14   BY MS. SAMUELS:

15       Q.   That's fine.  Do you recall receiving or

16   reviewing this letter?

17       A.   This is the first time I ever seen it.

18       Q.   It looks like a bite mark examination was

19   conducted on Marek Majdak, correct?

20             MR. JANSKI:  Object to foundation.

21   BY THE WITNESS:

22       A.   This is the first time I have heard of

23   this I believe.

24

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

BY MS. SAMUELS:

Q.    Okay.  Is it fair to say that you didn't
take this into consideration when conducting your
investigation?

A.    I certainly didn't have it or was aware
of it.  I certainly wasn't aware of it.

Q.    Who -- so I think you said there was a
detective who was specifically responsible for I
guess working with the Medical Examiner's Office,
correct?

A.    Yes, he's assigned at the Medical
Examiner's Office.

Q.    And when they receive a copy of the
medical examiner's report, they would create a
supplemental report indicating that, correct?

MR. MILLER:  Object to foundation.

BY THE WITNESS:

A.    I don't know their procedure, but I would
assume they would.

BY MS. SAMUELS:

Q.    So how do you become aware that the
medical examiner's report is ready?

A.    Are we talking about the postmortem
report?

171

1      Q.   Yes, sir.

2      A.   That's just sent.  Whenever it is done

3  and completed, it just inter-company mail or

4  somehow it gets to us.

5      Q.   Okay.  Do you have any reason to believe

6  that this letter wasn't sent with the postmortem

7  examination?

8           MR. MILLER:  Object, calls for

9  speculation.

10          MR. JANSKI:  Join and foundation.

11  BY THE WITNESS:

12     A.   I don't know.

13  BY MS. SAMUELS:

14     Q.   This is something you would expect to

15  accompany the postmortem examination, correct?

16          MR. JANSKI:  Same objections.

17          MR. MILLER:  Object to the form of the

18  question.

19  BY THE WITNESS:

20     A.   I don't know the morgue's procedure, how

21  they provide information.  But the only thing I

22  know we received would have been the postmortem,

23  and I don't know when that would have came.

24

1    BY MS. SAMUELS:

2        Q.    All right.  And was it your understanding

3    that Marek Majdak was shot and killed pursuant to

4    a robbery?

5        A.    I think it was part of the robbery, yes.

6        Q.    So going to what's been Bates marked, I

7    think this is BS13171.  It looks like an inventory

8    sheet from the Medical Examiner's Office.

9                    Can you see that all right?

10       A.    Can I get up and look at it?

11       Q.    Yes, sir.

12            MR. JANSKI:  Jeanette, what Exhibit

13   number is this?  I am sorry, I didn't hear.

14            MS. SAMUELS:  The ME's documents are

15   Exhibit 3.

16            MR. JANSKI:  Got it, okay.

17                    (Witness viewing document.)

18   BY THE WITNESS:

19       A.    Yes, that was property taken from the --

20   at the Medical Examiner's Office.

21   BY MS. SAMUELS:

22       Q.    And so did you ever -- did it seem weird

23   to you that this was an alleged robbery but they

24   didn't take the victim's metal chain or necklace?

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

173

```
 1              MR. MILLER:  Object to the form of the

 2    question.

 3              MR. JANSKI:  Join in that objection.

 4    BY THE WITNESS:

 5       A.   No.

 6    BY MS. SAMUELS:

 7       Q.   Did it seem weird to you that this was an

 8    alleged robbery but they didn't take the victim's

 9    earring?

10              MR. MILLER:  Object to the form of the

11    question.

12              MR. JANSKI:  Same objection.

13    BY THE WITNESS:

14       A.   I don't believe so.

15    BY MS. SAMUELS:

16       Q.   Did this seem weird to you it was an

17    alleged robbery but they didn't take the victim's

18    wallet?

19              MR. MILLER:  Object to the form of the

20    question.

21              MR. JANSKI:  Same.

22    BY THE WITNESS:

23       A.   I don't believe so.

24
```

174

```
 1    BY MS. SAMUELS:
 2        Q.   Did it seem weird to you this was an
 3    alleged robbery but they didn't take the victim's
 4    money?
 5            MR. MILLER:  Object to the form of the
 6    question.
 7            MR. JANSKI:  Same.
 8    BY THE WITNESS:
 9        A.   I don't believe so.
10    BY MS. SAMUELS:
11        Q.   Why not?
12            MR. JANSKI:  Form.
13    BY THE WITNESS:
14        A.   I believe other -- I believe he had the
15    bulk of his money stuffed in the pocket up on top,
16    and I believe none of that stuff would have been
17    taken after he's been shot and killed.  It might
18    have, but that's my belief.
19    BY MS. SAMUELS:
20        Q.   So it was your understanding that his
21    money was taken before he was shot?
22        A.   Yes.
23        Q.   Who took his money?
24        A.   Xavier Walker says that Jovanie did;
```

1   Jovanie did says that Xavier Walker did.

2       Q.   So is it fair to say based upon your

3   investigation, after the victim was shot and

4   fell -- well, after he was shot and fell to the

5   pavement, his body wasn't disturbed?

6           MR. MILLER:  Object to the form of the

7   question.

8           MR. JANSKI:  Join.

9   BY THE WITNESS:

10      A.   I believe -- I believe so until the

11  paramedics showed up or -- but it is also possible

12  his -- his front pocket, one of his pockets went

13  through.  I would assume they left his wallet

14  alone.

15  BY MS. SAMUELS:

16      Q.   So it was your understanding that they

17  took his money before he was shot, and then after

18  he was shot, they went through his front pocket?

19      A.   My belief is that it was taken either in

20  the car, in the van, then shot or shot in the car,

21  ran across the street, got shot again and then the

22  money was taken.  I am not sure which.

23      Q.   Was there any evidence you recall

24  recovering from the scene that indicated the body

176

```
1    had been turned or moved at all?
2         A.    I don't believe that at all, I just
3    don't.
4         Q.    Would that be indicated anywhere?
5         A.    If the paramedics came, it would be
6    indicated on -- that they attempted to revive him.
7         Q.    Okay.  But separate and apart from the
8    paramedics, was there anything -- any evidence at
9    the scene that suggested he had been turned over
10   or flipped by any assailant?
11        A.    Not to my knowledge.
12        Q.    So that would indicate that after he was
13   shot, most -- well, let me ask it this way.  The
14   money that you believe was taken from him was
15   taken from his front shirt pocket; is that fair?
16        A.    Yes.
17        Q.    And so if his body wasn't moved, that
18   would suggest when he fell, he fell on his back,
19   correct?
20        A.    You could make that assumption, yes.
21        Q.    Well, did you make that assumption during
22   the course of your investigation?
23        A.    Yes, I did.
24        Q.    And because nothing indicated that his
```

1    body had been moved and he would have to fall on

2    his back in that case in order to retrieve the

3    money from his front shirt pocket, correct?

4        A.   Yes.

5        Q.   And then I'm going to show you just one

6    autopsy photo, I don't believe it's graphic but I

7    did just want to prepare you.  This is Bates

8    marked -- what is this, BS1319.

9              And it looks like this is a picture

10   of the victim's ankle, correct?

11       A.   Yes, that's his foot and ankle.

12       Q.   Did you ever come to understand what the

13   meaning of this tattoo was?

14       A.   This is the first time I'm seeing that.

15       Q.   During the general course of a homicide

16   investigation, would you expect yourself to review

17   autopsy photos?

18       A.   Generally we do, yes.

19       Q.   Do you have an independent -- I am going

20   to take that off.  That's sort of all I have for

21   the MP -- or, excuse me, for the ME.

22              Do you have an independent

23   recollection of your interactions with Xavier

24   Walker?

```
 1       A.    Yes, I have a recollection.
 2       Q.    All right.  What do you recall?  So you
 3  already sort of discussed the arrest and what you
 4  remember about that, correct?
 5       A.    Yes, up to bringing him to Area 4,
 6  correct.
 7       Q.    Okay.  So once he was -- well, did you go
 8  with him when he was transported to Area 4 or did
 9  somebody else transport him?
10       A.    I believe Sanders and Wright transported
11  him.
12       Q.    And then do you have any independent
13  recollection of your interactions with Xavier
14  while he was at Area 4?
15       A.    Yes.
16       Q.    What do you recall?
17       A.    I recall he was put into an interview
18  room, and Detective Sanders and myself went in
19  there and confronted him with the facts of what
20  the case -- the reason he was here 'cause -- you
21  know, circumstances of the murder of Majdak.  And
22  he denied knowing anything about it, denied --
23  said he knew nothing about it, didn't even hear
24  about it.
```

```
 1      Q.    What else do you recall?

 2      A.    Excuse me?

 3      Q.    What else do you recall?

 4      A.    And then I believe we stopped talking to

 5  him at that time, and I -- I do remember going

 6  back in there asking him if he wanted something to

 7  eat or drink, and I believe I got him a hamburger

 8  and french fries and a drink, possibly a cigarette

 9  if he asked for it, I gave it to him.

10             Left the Area and went and got his

11  food, came back roughly a half-hour, 45 minutes

12  and let him eat.

13      Q.    Did you stay with him while he ate?

14      A.    No.

15      Q.    After that what's the next thing you

16  recall?

17      A.    I believe we left for the day, told the

18  sergeant we were leaving.

19      Q.    And when you left for the day, where did

20  you leave him?

21      A.    Where did I go?

22      Q.    No, where did you leave Xavier?

23      A.    In the same interview room we placed him

24  in.  I don't recall if it was -- what letter it
```

1   was.

2       Q.   Okay.  Then what's the next thing you

3   recall?

4       A.   Coming in the next day, I don't recall

5   exactly what time I got there, and going in to

6   check on him, see if he needed anything; if he did

7   ask for something, I would have went and got it,

8   that would be indicated somewhere I would believe

9   in a report.  And after that I may have left, may

10  have stayed.

11           But at some point in time I asked him

12  to talk about this -- the murder again.  I brought

13  his attention to the murder again, and I believe I

14  got a denial again from him, and then I confronted

15  him with the fact that we had statements to --

16  that dispute his side of the events that occurred

17  that night.

18      Q.   Then what happened?

19      A.   I don't -- I don't recall if he didn't

20  believe me or that was the impression I got.  I

21  probably went, left the room, probably got the

22  statements and anything relative to showing him

23  people were up here and talking to the police and

24  gave him up stating that he was part of the

1    murder.  He got implicated by these people.

2         Q.   Okay.  Then what?

3         A.   I don't recall if there was any time

4    between that, going back in, but I think I

5    probably would have gotten him cigarettes or

6    something at the time.

7              In any event, I went -- I might have

8    came back in, I might have stayed there at the

9    same time and then he wanted to tell me what

10   really happened.

11        Q.   Okay.  And about how long had Xavier been

12   in custody at that point?

13        A.   At least -- I don't exactly remember the

14   time, but based on what I just told you, it had to

15   be at least 24 hours minimum to 30 hours,

16   somewhere in that neck of woods.  I don't recall

17   exactly.

18        Q.   All right.  And he would have spent the

19   bulk of that time in the interview room, correct?

20        A.   That's correct.

21        Q.   Is there a difference between an

22   interview room and an interrogation room?

23        A.   We interview everybody -- we -- what do

24   you mean by interview and interrogation, the

1   difference?  I suppose it depends.

2       Q.   Well, I guess are there -- do you use

3   one -- are there separate rooms where you question

4   people?

5           MR. JANSKI:  Object to form.

6   BY THE WITNESS:

7       A.   We have -- we use them either way.

8   BY MS. SAMUELS:

9       Q.   Can you describe what an interview room

10  looks like?

11      A.   Interview room would be an enclosed area,

12  a room all in and of itself.  It generally has a

13  bench, a metal bench with either rings on the

14  wall, affixed to the wall or a bar attached to the

15  bench that has been welded on.

16           No -- well, mostly -- most of the

17  rooms in Area 4 did not have windows that they

18  could look out of.  That's a general description

19  of it.  I don't -- unless you're asking something

20  specific.

21      Q.   And so once you're in an interview room,

22  there is no place you could see out of the

23  interview room; is that fair?

24      A.   You -- I don't recall 'cause it's been a

1   long time since I was in Area 4.  The walls at
2   least to the ceilings would be concrete, you had
3   kind of a drop ceiling there, yeah, a couple of
4   the rooms have windows in them that I am aware of
5   but not -- one is -- you can't see outside, but
6   the other ones you -- there is one room that
7   does -- you can actually see a street view.
8       Q.   Are there windows in the doors at all?
9       A.   When I was there, no.
10      Q.   And so the room that you just described,
11  that would have been similar to the room where
12  Xavier Walker was left?
13      A.   I don't recall which room he was in, but
14  he could have been in one like that or he could
15  have been in the one that had a street view.  I
16  don't recall.
17      Q.   Up to this point, did Xavier ever
18  indicate that he had been somewhere else at the
19  time of the murder?
20      A.   He never told me that.
21      Q.   He just said he wasn't involved?
22      A.   His denials were I don't know nothing
23  about it.
24      Q.   And besides saying I don't know anything

```
 1    about it, he didn't provide you with any other
 2    information?
 3        A.   No, and I asked him I'm sure.  I normally
 4    would ask him, well, where were you, tell me where
 5    you're at.
 6        Q.   All right.  So you would generally ask
 7    somebody to tell you where they were at or who
 8    they were with?
 9        A.   Yeah, given denials or even given
10    something that I know not to be true, yes.
11        Q.   When you say something that you know not
12    to be true, what do you mean?
13        A.    If I have a picture of you sitting there
14    and tomorrow I ask you if you were sitting there
15    and you tell me no, then I'm going to ask you,
16    that's an example.
17        Q.   When Xavier denied being involved with
18    the murder, did you believe he was being
19    dishonest?
20        A.   Yes.
21        Q.   Why?
22        A.    'Cause we already had two handwritten
23    statements implicating him.
24        Q.   And those -- that was from Mary Curry and
```

```
 1    Maurice Wright?
 2         A.   Mary Curry and Ashonti Wright.
 3         Q.   Oh.  And so -- oh.  And so I think you
 4    said at some point when he had been there for 24
 5    to 30 hours, he said he wanted to tell you what
 6    really happened or words to that effect?
 7         A.   Yes.
 8         Q.   Okay.  Who else was present when he said
 9    this?
10         A.   I believe it was just me, but I can't say
11    for sure.
12         Q.   When he told you this, then what
13    happened?
14         A.   Then I listened to his story.
15         Q.   What did he say?
16         A.   He implicated himself, and he also
17    implicated Jovanie in partaking in the robbery,
18    homicide of Marek.
19         Q.   Do you remember with specificity anything
20    he said during this time?
21         A.   Best that I can recall anyway sitting
22    here 22 years later, he gave me a story about
23    where he and Jovanie were on the street, trying to
24    hit a lick.  They were drinking earlier and
```

186

1    smoking up I believe, they ran out of intoxicants

2    so they decided to go out and hit a lick, which

3    means a robbery, or sell fake dope.

4              He told me that they did that for

5    some time, I don't recall, maybe -- I don't

6    exactly recall what -- if he said half-hour to an

7    hour.  I -- somewhere in that did vicinity.

8              And eventually the van that Marek

9    Majdak drove up on came down and Jovanie -- I

10   don't think he said Jovanie seen it, but that's

11   the one they decided to hit a lick on.  Then he

12   told me that the van pulled over somewhere close

13   to the park, Jovanie approached the van, got in

14   the van, a struggle ensued.

15             He was about 15 feet away from the

16   rear of the van and he was -- why he was there,

17   'cause he was looking for the police if they

18   showed.  Seen Jovanie struggle, started to go up

19   to the van, then he seen Jovanie shoot him.  Seen

20   the man -- well, no, I don't recall -- I believe

21   he said, and after he shot him, he left, he ran

22   home, first shot.

23        Q.   Okay.

24        A.   That's basically what I remember.

187

1      Q.   And then after that what happened?

2           MR. MILLER:   Object to the form of the

3   question.

4   BY THE WITNESS:

5      A.   After he told me all of this?

6   BY MS. SAMUELS:

7      Q.   Yes, sir.

8      A.   Then I would have went and contacted the

9   State's Attorney's Office.  I believe they were in

10  the office but you have to call it in because one

11  person's probably not going to be enough to do all

12  these handwrittens.

13     Q.   When you say they were in the office,

14  what does that mean?

15     A.   I believe somebody was up there taking a

16  handwritten statement relative to our case but I

17  don't know which -- whose statement it was at the

18  time or was at least investigating from the Felony

19  Review Unit's aspect, and then if they agreed with

20  the police or they believed there was probable

21  cause to charge them, they would have went in and

22  did a handwritten.

23     Q.   Okay.  Hold on.

24     A.   Excuse me?

1      Q.   So when you say they would have went and

2  did a handwritten, I'm confused, I am sorry, say

3  that again.

4           MR. JANSKI:   Object to form.

5           MR. MILLER:   Hold on, are you asking

6  him -- do you want that read back, the answer, or

7  are you asking a different question?

8  BY MS. SAMUELS:

9      Q.   No, can you just explain what you had

10  explained to me before, I don't think I got it.

11     A.   What was the original question that you

12  asked me?  I'll start again, okay, 'cause I just

13  lost my train of thought.

14     Q.   Okay.  So what we were talking about is

15  you said that somebody was already in the station

16  from the ASA's Office but you think they had to

17  send somebody else, correct, or something like

18  that?

19     A.   Something -- yeah, I believe somebody was

20  in there already taking handwritten statements.  I

21  don't know if it was relative to our case but it

22  could have been.  But you're still going to

23  notify -- you have to give them an official

24  notification.  So I notified them and then waited

 1    for whoever was going to show up.

 2        Q.    Okay.  And then what?

 3        A.    He would be just left in the room.  We

 4    would take him to the bathroom and everything.

 5    I -- I don't -- we would wait for the State's

 6    Attorney to arrive, we would tell them what he

 7    said and then they would probably go and talk to

 8    him.

 9        Q.    Then what?

10        A.    At some point in time, and I don't know

11    exactly when, he decided to give a handwritten

12    statement videotaped.

13        Q.    Do you remember that?

14        A.    Do I remember sitting in on the

15    videotape?

16        Q.    Yes, sir.

17        A.    Yes.

18        Q.    And what do you recall about that

19    process?

20        A.    When the -- once the process would be --

21    once the -- they made a determination to take the

22    video, a videographer would be ordered, we would

23    wait for them to come set up their stuff.  I would

24    wait for the State's Attorney to say she's ready

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

190

1    to proceed to take the video statement.

2                    And I would go in, and I would escort

3    Xavier from whichever room he was in to the

4    videotape office.

5        Q.    Would that have been the same or

6    substantially the same room that you previously

7    described?

8            MR. JANSKI:  Object to --

9    BY THE WITNESS:

10       A.    That's a completely different room.

11           MR. JANSKI:  Object to form.

12   BY MS. SAMUELS:

13       Q.    Just to make sure I am on the same page,

14   I think you mentioned there was like a room in or

15   near Sex Crimes or something that had --

16       A.    That's the room.

17       Q.    Okay.

18       A.    Okay.  That's the room I would have took

19   him into.

20       Q.    Then what?

21       A.    Then I would sit there with him and

22   observe the State's Attorney take control of the

23   entire interview.

24       Q.    Would the State's Attorney talk to them

191

```
 1    without you present?
 2         A.   Generally in most cases they do.
 3         Q.   Do you recall that happening here?
 4         A.   It probably happened, but I don't recall
 5    it sitting here today.
 6         Q.   Did you ever notice any injuries on
 7    Xavier Walker?
 8         A.   No.
 9         Q.   At the time of his arrest, did you notice
10    any injuries on Xavier Walker?
11         A.   No, I did not.
12         Q.   At the time of his arrest, what was it
13    your understanding you were arresting him for?
14         A.   Murder.
15         Q.   Have you seen the Polaroids that were
16    taken of Xavier Walker?
17         A.   I have not.
18         Q.   Do you know what it means to be dope
19    sick?
20         A.   Yes.
21         Q.   Would you be able to recognize if an
22    individual was dope sick?
23         A.   Yes, I think I would.  It is mostly
24    addicts that are dope sick.
```

```
 1      Q.   All right.  What are some of the
 2  indications that somebody is dope sick?
 3      A.   What I have observed them do is throw up,
 4  barely can put two words together, sleep a
 5  tremendous amount, grab their guts, nodding.
 6      Q.   All right.
 7      A.   That's about it.
 8      Q.   When someone is dope sick, would you
 9  still conduct an interrogation of them?
10      A.   No.
11      Q.   Why not?
12      A.   I would -- I wouldn't interrogate anybody
13  that was on narcotics.  I wouldn't -- if he was --
14  I'll wait for you to ask a question.
15      Q.   I guess, no, my question is just why
16  wouldn't you interrogate somebody who is dope
17  sick?
18      A.   Why wouldn't I?  One of the reasons, with
19  anybody who needs medical attention, and he
20  certainly, does should be seen by a doctor and
21  relatively sober when I am talking to him so he
22  can understand his constitutional rights most
23  importantly.
24      Q.   Okay.  Did you play any role in the
```

```
 1     interrogation or questioning of Maurice Wright?
 2         A.   Of who?
 3         Q.   Maurice Wright.
 4         A.   No.
 5         Q.   Did you play any role in the questioning
 6     or interrogation of Ashonti Wright?
 7         A.   No.
 8         Q.   Did you play any role in the
 9     interrogation or questioning of Jamaica Wright?
10         A.   No.
11         Q.   Did you play any role in the
12     investigation or questioning of Mary Curry?
13         A.   No.
14         Q.   Do you know why Maurice Wright was
15     brought in for questioning?
16         A.   I believe the reason he was brought in is
17     because -- I believe Hershula Berg had said that
18     he -- Jovanie Long and possibly Xavier stay at
19     Maurice Wright's house.
20         Q.   Did you play any role in the questioning
21     or interrogation of Antwoine Waddy?
22         A.   No.
23         Q.   What was your understanding of why
24     Antwoine Waddy was brought in for questioning?
```

1    A.    I don't recall at this time.  I just

2    don't.

3    Q.    What was your understanding of why

4    Hershula Berg was brought in for questioning?

5    A.    Because she was named as the boyfriend --

6    I am sorry, excuse me, girlfriend of Jovanie.

7    Q.    Is there a reason why Hershula Berg was

8    not asked to give a written statement?

9        MR. MILLER:  Objection, calls for

10   speculation, foundation.

11       MR. JANSKI:  Join.

12   BY THE WITNESS:

13   A.    That wouldn't have been our call anyway.

14   If the State's Attorney would have asked us to

15   pick her up to give a statement, we would have.

16   BY MS. SAMUELS:

17   Q.    Is it your understanding that Hershula

18   Berg was not brought into the station for

19   questioning?

20   A.    No, Hershula Berg did come to the

21   station -- not station, Area 4.

22   Q.    I am sorry, okay, Area 4.  And the

23   handwritten statements would have been a decision

24   made by the State's Attorney or like Felony

1    Review; is that fair?

2       A.   Yes, after that they -- yes, it would

3    have been by a state's attorney, somebody from the

4    State's Attorney's Office.

5       Q.   Okay.  Do you remember speaking with a

6    Paris Williams in relation to this incident?

7       A.   Me?

8       Q.   Yes, sir.

9       A.   No, ma'am.  No, ma'am.  I -- I don't

10    recall.

11       Q.   So Jovanie was arrested in or around

12    early August, correct?

13       A.   He surrendered, yes.  The exact date I am

14    not sure, but early August, yes.

15       Q.   Okay.  Xavier was arrested late May?

16       A.   I believe it was -- yeah, some -- yes,

17    late May, yes.

18       Q.   Okay.  So after the arrest of Xavier

19    Walker and before Jovanie turned himself in, were

20    any other individuals brought to the police --

21    were any other individuals brought in for

22    questioning in relation to this case?

23          MR. MILLER:  Object to foundation.

24          MR. JANSKI:  Join.

196

```
 1    BY THE WITNESS:
 2        A.   Not that I'm aware, not that I'm aware
 3    of.  But I could be wrong but I don't -- I don't
 4    believe I brought anybody in in between those
 5    times.
 6    BY MS. SAMUELS:
 7        Q.   All right.  If someone was brought in in
 8    relation to this case, would you expect there to
 9    be some sort of report that would indicate that?
10            MR. MILLER:  Object to form.
11            MR. JANSKI:  Join.
12    BY THE WITNESS:
13        A.   If somebody came in relative to this
14    case, there would be something indicated, if they
15    came to Area 4 anyway, up to 640, somebody would
16    document it somewhere.
17    BY MS. SAMUELS:
18        Q.   And it would be under the same RD number,
19    correct, or it should be?
20        A.   Yes.
21        Q.   Okay.  If a --
22        A.   Yes.
23        Q.   -- search of someone's residence was
24    conducted while looking for Jovanie, should there
```

1    be a corresponding report?

2              MR. MILLER:  Object to the form of the

3    question.

4              MR. JANSKI:  Join.

5    BY THE WITNESS:

6        A.   If a search was done of a residence other

7    than -- well, it doesn't matter.  Yeah, I would

8    say.

9    BY MS. SAMUELS:

10       Q.   Okay.  Have you ever seen any Chicago

11   police officer engage in misconduct?

12       A.   In misconduct?

13       Q.   Yes, sir.

14             MR. JANSKI:  Object to form.

15   BY THE WITNESS:

16       A.   No, ma'am.  No, ma'am.

17   BY MS. SAMUELS:

18       Q.   If a person was shot inside of a vehicle,

19   would you expect the shell casing from the bullet

20   to be inside the vehicle -- to be found inside the

21   vehicle?

22             MR. MILLER:  Object to the incomplete

23   nature of the hypothetical, calls for speculation,

24   foundation.

```
 1              Go ahead.
 2         MR. JANSKI:  Join in the objection.
 3   BY THE WITNESS:
 4      A.   Not necessarily.
 5   BY MS. SAMUELS:
 6      Q.   All right.  When would you expect that
 7   shell casing to be found outside of a vehicle?
 8         MR. MILLER:  Same objections.
 9   BY THE WITNESS:
10      A.   It could be found outside the vehicle at
11   any time, in or out.
12   BY MS. SAMUELS:
13      Q.   And to the best of your knowledge --
14   well, do you know what type of gun was used to
15   shoot and kill Marek Majdak?
16      A.   Based on the crime scene report, they
17   recovered .45-caliber casings.
18      Q.   And do you know what type of gun that can
19   come from?
20      A.   .45-caliber casing can only come from a
21   .45.
22      Q.   Okay.  Does a .45 when it is shot, does
23   it eject to the left or to the right?
24      A.   Depends on the make of the gun and some
```

1   gun...

2       Q.   Were you aware that there was a bite mark

3   found on Marek Majdak?

4       A.   Not until I was told well after the

5   medical examiner's report came in.

6       Q.   So that would have been during the course

7   of your investigation back in 2000, correct?

8       A.   At some point, yes.

9       Q.   Did you ever inquire into any bite mark

10  analysis?

11      A.   No, ma'am.

12      Q.   Why not?

13      A.   As I said, I wasn't even aware that there

14  is -- was a bite mark anywhere until after the --

15  well into the investigation.

16      Q.   So the officer who would have gone to the

17  autopsy, he didn't report that to you?

18      A.   No, ma'am.

19      Q.   Do you think that's a material fact in

20  trying to determine how Marek Majdak was killed?

21          MR. MILLER:  Object to the form of the

22  question.

23          MR. JANSKI:  Join, foundation.

24

1    BY THE WITNESS:

2        A.    Do I think it is a material fact?  It is

3    something we should have known for sure.

4    BY MS. SAMUELS:

5        Q.    How familiar are you with the area around

6    Cicero and Erie?

7        A.    Not familiar at all.

8        Q.    What was I going to say?  Did you have

9    any reason to believe that the murder of Marek

10   Majdak was gang related?

11       A.    There is no indication of that as far as

12   I could tell.

13       Q.    Was there a log that was kept to identify

14   when a person was placed into an interview room?

15       A.    Back on that time I am not sure, but I

16   know there was a log that we use, but I am just

17   unclear as to if that log was in effect in 2000 or

18   was it later.  I'm aware of a log that they do

19   keep.

20       Q.    Okay.  Do you know whether or not shell

21   casings were recovered from the shooting of Marek

22   Majdak?

23       A.    Yes.

24       Q.    And were those sent for forensic testing?

1      A.   They may have been, but I'm not aware of

2   it.

3      Q.   Is it your general practice to send shell

4   casings in for testing to see whether or not there

5   were fingerprints on them?

6      A.   I did that for years, yes.  I would

7   personally on my murder, if I was handling it,

8   would send in shell casings; and then I tended not

9   to do that later at the end of my career.

10      Q.   So around 2000 would that still have been

11   your practice?

12      A.   Yes, if I was working that portion of the

13   investigation, I probably would have sent them in.

14      Q.   Was there a lead detective in this murder

15   that you're aware of?

16          MR. MILLER:  Object to the form of the

17   question.

18          MR. JANSKI:  Join.

19   BY THE WITNESS:

20      A.   I don't know what you really mean by lead

21   detective because we do not use terms like that.

22   We -- we work as partners or sometimes individuals

23   as a group, all do working towards the same end of

24   arresting somebody for a crime, but we all do

```
 1   different things.
 2   BY MS. SAMUELS:
 3        Q.    Okay.
 4        A.    Sometimes we duplicate them.
 5        Q.    Is it fair to say that there were a team
 6   of detectives that worked to determine -- or to
 7   investigate the murder of Marek Majdak?
 8        A.    There were numerous detectives assigned
 9   to do this, to work on this murder and we
10   basically worked together.
11        Q.    Okay.  Did you ever meet to share
12   information or to brainstorm where to go with the
13   case?
14             MR. JANSKI:  Object to form.
15   BY THE WITNESS:
16        A.    No.
17   BY MS. SAMUELS:
18        Q.    In 2000 would that have been your general
19   practice?
20        A.    To do what?
21        Q.    To meet to discuss what's going on with
22   the case or to brainstorm areas of inquiry?
23        A.    You meant -- I am sorry, you meant at the
24   time of the investigation do we talk to each other
```

```
 1    and talk about the case and what we're going to do

 2    and where we're going; is that what you mean by

 3    brainstorming?

 4        Q.   Yes.

 5        A.   Yes, we did do that.

 6        Q.   Was that a regular practice like

 7    something you would expect to do every day or

 8    every other day or just as important developments

 9    would occur?

10        A.   Whichever detectives were working on the

11    case, we would keep each other informed on a

12    regular basis until it's solved.

13        Q.   Okay.  Are you aware of any action that

14    took place on this case between May 13th and

15    May 19th when you went out to speak with the

16    people on those GPR's?

17             MR. JANSKI:  Form, foundation.

18             MR. MILLER:  Object to form.

19    BY THE WITNESS:

20        A.   Was I -- was I aware of what?  Because

21    you're again failing off on some words.

22    BY MS. SAMUELS:

23        Q.   I apologize, let me ask a different

24    question.  So in a murder investigation, what
```

1    would you expect the first steps to be?

2         MR. MILLER:  Object to form.

3         MR. JANSKI:  I'll join.

4    BY THE WITNESS:

5    A.   First steps would be a marked police car

6    would go to the scene, verify -- not verify,

7    create and generate a RD number to be attached to

8    the call.  They would notify Detective Division

9    who would send out a crime scene unit.  Detectives

10   would be assigned to do a crime scene.  That's my

11   answer.

12   BY MS. SAMUELS:

13   Q.   And then once you're assigned to a crime

14   scene, what would you expect some -- I guess the

15   initial steps for the investigation to be?

16        MR. MILLER:  Object to form.

17   BY THE WITNESS:

18   A.   We would gather evidence -- we would

19   first make sure the scene is secured, we would

20   identify evidence, we would order a crime lab, we

21   would notify the ME's Office, we would conduct a

22   canvass.

23             We would stay until the crime scene

24   has -- all that had been done, any interviews, any

205

1    witnesses that needed to be interviewed, if they

2    were willing to come into the Area, we would talk

3    to them there.  That's about it.  Wait for the

4    body to be removed.

5    BY MS. SAMUELS:

6        Q.   Do you recall whether or not you were

7    called to the scene in this case?

8        A.   I know I wasn't.

9        Q.   How do you know?

10       A.   'Cause I don't work midnights at that

11   time.

12       Q.   Do you know what prompted you to begin

13   questioning those individuals on the 19th?

14         MR. MILLER:  Object to the form of the

15   question.

16   BY THE WITNESS:

17       A.   I believe that day they assigned me to do

18   that.

19   BY MS. SAMUELS:

20       Q.   Do you know how you knew who to go talk

21   to?

22       A.   I believe I was instructed -- I believe,

23   it was the date I'm thinking of, I was instructed

24   that a witness was in the Area and to go in and

206

1    talk to her, see what she had to say.

2        Q.   When you reviewed the reports in

3    preparation for your deposition, do you recall

4    seeing individuals referred to as CI?

5        A.   Do I see it written?

6        Q.   Right.  Do you recall seeing that?

7        A.   Yes.

8        Q.   Do you know who those -- who that's

9    referring to?

10       A.   The CI?

11       Q.   Right.

12       A.   It's an unknown person.

13       Q.   As you sit here today, do you know of any

14   way to identify who the alleged CI is?

15       A.   No.

16       Q.   As you sit here today, do you know

17   whether or not CI was more than one person?

18       A.   As I sit here today, I believe -- I am

19   not sure.  It could be one person, it could be

20   more than one person.

21           MS. SAMUELS:  Do you want to take a

22   five-minute break?  I just need to pull up some

23   other stuff and then we can -- is that okay?

24           MR. JANSKI:  Certainly.

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

207

```
 1              THE WITNESS:  Can we make it ten?
 2              MS. SAMUELS:  Go for it.
 3                   (Short break.)
 4              MS. SAMUELS:  So back on the record.
 5      BY MS. SAMUELS:
 6         Q.   I am going to show you what's been Bates
 7      marked as NK50.  Go ahead and stand up if you need
 8      to see that a little bit closer.  But it looks --
 9         A.   I recognize it.
10         Q.   This is a Chicago Police Department
11      supplementary report?
12         A.   Yes.
13         Q.   All right.  And then at the top, do you
14      see it case created by Michael Pietryla?
15         A.   That's correct.
16         Q.   So that would have made you the reporting
17      officer, correct?
18         A.   For that particular detective sup, yes.
19         Q.   And it says date RO arrived, it says 13,
20      May, 2000, at 1:20.  Do you see that?
21         A.   Yes.
22         Q.   What do you understand that to mean?
23         A.   That is the initial -- well, that's my
24      name, number one, but the date and time is the
```

208

```
 1    initial time that was recorded for the homicide.
 2        Q.   Okay.  So that's not when you would have
 3    arrived at the scene?
 4        A.   No, no.
 5        Q.   Okay.  I am going to stop sharing.  Is
 6    there anything else you recall about your role
 7    into the investigation of the murder of Marek
 8    Majdak?
 9             MR. MILLER:  Object to the form of the
10    question.
11             MR. JANSKI:  I'll join.
12    BY THE WITNESS:
13        A.   Nothing in specific that I recall at this
14    time.
15    BY MS. SAMUELS:
16        Q.   Have you ever been disciplined during
17    your time as a Chicago police officer?
18             MR. JANSKI:  Object to form.
19    BY THE WITNESS:
20        A.   What do you mean by discipline?
21    BY MS. SAMUELS:
22        Q.   What do you understand that to mean?
23        A.   Action taken -- that the City has taken
24    some kind of disciplinary action against me that
```

1    would mean in terms of me being suspended for a

2    certain amount of days, something along that line.

3        Q.    Do you ever recall that happening to you

4    during your time as a Chicago police officer?

5             MR. JANSKI:  Object to form.

6    BY THE WITNESS:

7        A.    I believe when -- I believe when I was a

8    patrolman I had to -- as best I can recollect

9    anyway, I was suspended for a day, and they

10   allowed me to use my comp -- comp time to wipe it

11   out.

12   BY MS. SAMUELS:

13       Q.    And what were you suspended for?

14       A.    That's such a long time ago, I have no

15   idea.

16       Q.    Do you remember the name Stanley Budz,

17   B, as in boy, U D Z, coming up during the course

18   of your investigation into the murder of Marek

19   Majdak?

20       A.    Stanley Budz, no, I don't recall that

21   name at all.

22       Q.    All right.  The last name B U D Z is

23   generally a short or English-ized form of

24   Budzinski, correct?

210

```
 1              MR. JANSKI:  Form, foundation.
 2     BY THE WITNESS:
 3         A.   It could be.
 4     BY MS. SAMUELS:
 5         Q.   And you understand Budzinski to be a
 6     Polish last name?
 7              MR. JANSKI:  Object to form, foundation.
 8     BY THE WITNESS:
 9         A.   Certainly sounds like a Polish name.
10     BY MS. SAMUELS:
11         Q.   Okay.  During the course of your
12     investigation, you understood the victim to be
13     Polish?
14         A.   Yes.
15         Q.   Do you recall getting into trouble for
16     falsifying affidavits in or around 1988?
17         A.   No.
18         Q.   I am going to pull up -- I'm going to
19     share NK3378 through NK383 if I can find it.  All
20     right.
21              Do you recall having an arbitration
22     hearing before the Department of Housing for the
23     City of Chicago?
24         A.   Now that I see the name Freeman & Sons,
```

1    yes.

2        Q.   Okay.  Essentially there was a dispute

3    with Freeman & Sons over some contracting?

4        A.   That's correct.

5        Q.   And then flipping to the next page, it

6    looks like at paragraph 7 that it was the

7    unanimous conclusion by the panel that the owner

8    who is considered by the panel to be the main

9    culprit, that together with the contractor

10   perpetrated a fraud.  The fraud was manifested in

11   such actions among others as.

12            Do you see that?

13       A.   Yes.

14       Q.   And in paragraph A it says, submitting to

15   the Department of Housing a fraudulently prepared

16   sworn statement of affidavit.

17            Do you see that?

18       A.   Yes.

19       Q.   Subparagraph C it says, not listing the

20   owner as a subcontractor on submitted affidavits.

21            Do you see that?

22       A.   Yes.

23       Q.   So is it your understanding that there

24   was a unanimous finding by this panel that you had

212

1    committed fraud by submitting fraudulent

2    affidavits?

3         A.   No.

4         Q.   So are you disputing the findings or are

5    you saying that's not what they found?

6         A.   I was never made aware of this to begin

7    with, but I would dispute that finding if it was

8    presented to me.

9         Q.   And paragraph 8 it says, the owner was

10   always aware of all the provisions of the contract

11   documents.  The owner is a part-time contractor

12   and a full-time police officer for the City of

13   Chicago and was a full-time contractor prior to

14   becoming a police officer.

15              Do you see that?

16        A.   Yes.

17        Q.   And so at the time that the board found

18   that you had committed fraud, you were a full-time

19   Chicago police officer, correct?

20              MR. JANSKI:  Object to form.

21              MR. MILLER:  Object insofar as the

22   document (indecipherable).

23              THE STENOGRAPHER:  Insofar as the

24   document?

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

```
 1            MR. MILLER:  That it misstates the
 2    document.
 3            MR. JANSKI:  I'll join that objection.
 4            MR. MILLER:  You can answer.
 5    BY THE WITNESS:
 6        A.   What was the question again?  Is that
 7    what it says?  That's what it -- that's what it
 8    does say.
 9    BY MS. SAMUELS:
10        Q.   Okay.  And then do you recall later being
11    sued by Freeman & Sons?
12        A.   No, I do not.
13        Q.   Do you dispute that in Case No.
14    19911183051 you were sued by Freeman & Sons for
15    breach of contract?
16        A.   I don't recall a suit.
17        Q.   Have you ever been sued before?
18        A.   Apparently, if this is correct I was, but
19    I am not aware of being sued.
20        Q.   I am going to share screen, if I can find
21    it, and this is just a docket report that I pulled
22    up from that case.
23                  Does this refresh your recollection
24    at all?
```

1    A.   I remember this going to arbitration and

2  it being resolved, that's all I remember.

3  I -- he may have filed a lawsuit, I don't believe

4  it went anywhere, but I just don't recall any of

5  this.

6    Q.   Do you recall filing a satisfaction of

7  release of judgment in 1995?

8    A.   No, I don't recall it right now.  No, I

9  don't.

10    Q.   Do you recall being sued in any other

11  instances?

12    A.   As part of -- I don't understand what you

13  mean by sue, let's start there.

14    Q.   Do you recall any other cases where you

15  were a defendant in a lawsuit?

16    A.   I believe I was sued in a -- person we

17  arrested, Jose Lopez, that's the only one that

18  comes to my recollection.

19    Q.   And that would have been Jose Lopez

20  alleged that in or around 2002 he was falsely

21  arrested, correct?

22    A.   That is correct.

23    Q.   He alleges that you along with other

24  Chicago police officers withheld evidence from the

215

1    State's Attorney's Office that would have

2    exonerated him?

3         A.    That was the allegation.

4         Q.    He also alleged that you and other

5    Chicago police officers physically abused and

6    coerced witnesses into falsely implicating him?

7         A.    Yes, that's an -- yes, yes, he did say

8    that.

9         Q.    And you understand that Xavier Walker who

10   was arrested approximately two years prior to Jose

11   Lopez is making similar allegations in this suit?

12              MR. JANSKI:  Object to form.

13   BY THE WITNESS:

14        A.    I am aware that -- I am aware that he is

15   suing us along with a whole bunch of people.

16   BY MS. SAMUELS:

17        Q.    Do you remember being sued in 1998 by

18   General Finance Corporation?

19        A.    No, I don't recall it.

20        Q.    Do you have a relation to anybody by the

21   name of Sophie Pietryla?

22        A.    That's my wife.

23        Q.    Okay.  So I'm going to go ahead and share

24   screen, and this is a Case No. 19881108121, and it

1    looks like it is General Finance Corporation

2    versus yourself, Sophie Pietryla and City of

3    Chicago, correct?

4          A.    That's what the document says, yes.

5          Q.    All right.  It looks like you were sued

6    for a breach of contract in Small Claims Court?

7                MR. MILLER:  Object to foundation.

8    BY THE WITNESS:

9          A.    I believe that's what it says, yes.

10   BY MS. SAMUELS:

11         Q.    Okay.  And it looks like in order to

12   satisfy the claim, you were -- it was just taken

13   from your wages with the City of Chicago?

14               MR. JANSKI:  Object to foundation, form.

15   I am not sure that this document actually says

16   that.

17               MR. MILLER:  Join.

18   BY THE WITNESS:

19         A.    I believe you're correct.

20   BY MS. SAMUELS:

21         Q.    Do you remember having your wages

22   garnished in or around this time?

23         A.    I have no direct recollection of that,

24   no.

1    Q.   Do you remember being sued in 1996?

2    A.   No.  No, ma'am, I don't have a

3    recollection of it.

4    Q.   I'm going to go ahead and share screen so

5    you have a chance to look at this, it looks like

6    similar defendants.

7             Do you know who Thomas Karva is?

8    A.   No, I don't.

9    Q.   All right.  You have no recollection of

10   being sued by him?

11   A.   No, ma'am.

12   Q.   Do you have a recollection of your wages

13   being garnished in or around 1996 in relation to

14   this suit?

15   A.   I have no recollection of it.

16   Q.   Do you recall being accused -- how many

17   times has your wages been garnished by the City of

18   Chicago?

19             MR. JANSKI:  Object to form.

20   BY MS. SAMUELS:

21   Q.   I am sorry, was there an answer?

22             THE STENOGRAPHER:  I didn't hear one if

23   there was.

24

218

```
 1    BY MS. SAMUELS:
 2        Q.   Do you need me to repeat the question,
 3    sir?  Hello?  Can anybody hear me?
 4                    (Zoom disconnection.)
 5            MR. JANSKI:  I can hear you.  I am not
 6    sure, perhaps maybe they can't hear us.
 7                    (Short break.)
 8                    (Record read as requested.)
 9            THE WITNESS:  So answer that question?
10            MR. MILLER:  Yes, sir, answer.
11    BY THE WITNESS:
12        A.   I don't recall.
13    BY MS. SAMUELS:
14        Q.   Okay.  While you were a patrol officer,
15    were any of your officers black police officers?
16        A.   I worked with -- none of my partners
17    were, but I did work with a couple black guys
18    every now and then.
19        Q.   While you were a patrol officer, were any
20    of your partners any race or ethnicity besides
21    white?
22        A.   Other than what?
23        Q.   White.
24            MR. MILLER:  Object to foundation.
```

```
 1              MR. JANSKI:  Join.
 2    BY THE WITNESS:
 3         A.   While I was a police officer or -- I
 4    mean, the whole time I was or just as a patrolman?
 5    BY MS. SAMUELS:
 6         Q.   Just a patrolman.
 7         A.   I don't believe so.
 8         Q.   When you were a youth officer, did you
 9    have a regularly assigned partner?
10         A.   Most -- no, there were no partners in
11    youth, none.  We all worked independently.
12         Q.   When you were a detective at Area 4,
13    Violent Crimes, did you have a regularly assigned
14    partner?
15         A.   Several.
16         Q.   Who were they?
17         A.   To the best of my recollection would be
18    John Climack, C L I M A C K; Michael Hammond,
19    H A M M O N D; Ray Schnoor, S C H N O O R;
20    Salvador Esparza, E S P A R Z A.  Those are
21    generally all my partners in Area 4.
22         Q.   Do you recall being accused of making
23    racist statements by Kennedy Jones in or around
24    May 28th, 1992?
```

220

```
 1        A.    I don't recall, and that name I don't
 2   recall at all.
 3        Q.    Do you deny making racist statements?
 4        A.    I have never made a racist statement
 5   while I was a police officer.
 6        Q.    All right.  If you heard somebody making
 7   racist statements, would you say something or do
 8   something to prevent it or stop it?
 9             MR. JANSKI:  Objection, form, foundation,
10   improper hypothetical.  Are you asking about his
11   time while he's a police officer?
12             MS. SAMUELS:  Yep.
13             MR. JANSKI:  On duty only?
14             MS. SAMUELS:  Yep.
15             MR. JANSKI:  Okay.  I would
16   ask (indecipherable) --
17             MR. MILLER:  I'll --
18             MR. JANSKI:  -- parts of the question.
19             MR. MILLER:  And I'll join in the
20   objection.
21   BY THE WITNESS:
22        A.    And the question again was did I?
23   BY MS. SAMUELS:
24        Q.    If you heard somebody making racist
```

221

```
 1    statements, would you do something to stop them
 2    and/or report it?
 3         A.   Yes.
 4         Q.   Have you ever reported another police
 5    officer for engaging in misconduct?
 6              MR. MILLER:  Object to asked and
 7    answered.
 8              MR. JANSKI:  Form.
 9              MS. SAMUELS:  I am sorry?
10              MR. JANSKI:  I objected to form.
11    BY THE WITNESS:
12         A.   Have I ever?
13    BY MS. SAMUELS:
14         Q.   Reported another officer for engaging in
15    misconduct.
16         A.   Have I?  No, I have not.
17         Q.   All right.  It looks like you have been
18    accused two or three times for failing to file a
19    statement of financial interest while you're a
20    Chicago police officer.
21              Do you know why you didn't file those
22    statements?
23              MR. JANSKI:  Object to form.
24              MR. MILLER:  Object to form.
```

1  BY THE WITNESS:

2      A.   I remember them telling me that.  I have

3  always sent them in.  They didn't get them, that

4  is not my fault.  But upon knowing that I was

5  given, I would send them another one.

6  BY MS. SAMUELS:

7      Q.   Okay.  Do you recall being accused by

8  Francisco Ayala of kicking and punching him in or

9  around November, 2004?

10     A.   No.

11     Q.   Do you recall your interactions with

12 Francisco Ayala at all?

13     A.   I don't even recall Francis -- the

14 gentleman you're talking about.

15     Q.   All right.  Do you recall being accused

16 by Austin Lathin (phonetic) in or around 2006 of

17 questioning him for 72 hours without food?

18     A.   No, ma'am.

19     Q.   Do you recall Austin Lathin?

20     A.   Not at all.

21     Q.   All right.  Do you deny that you

22 handcuffed Austin Lathin to a pole and forced him

23 to stand for hours while being questioned?

24     A.   Yes, I do deny it.  I don't even know who

1    he is.

2         Q.   Do you deny you questioned him without an

3    attorney?

4         A.   Yes.

5         Q.   Do you understand that Xavier Walker is

6    making similar allegations that he was handcuffed

7    to a pole and forced to be in a position for hours

8    while being questioned, that he was questioned

9    without an attorney, and that he was held without

10   food?

11        MR. MILLER:  Object to the form of the

12   question.

13        MR. JANSKI:  I'll join in the objection.

14   BY THE WITNESS:

15        A.   I am aware of it now.

16   BY MS. SAMUELS:

17        Q.   Okay.  During the course of your

18   investigation, did you ever come upon any

19   information that suggested Xavier Walker was not

20   involved in the murder of Marek Majdak?

21        A.   I never did.

22        Q.   Were you ever trained on your duty to

23   disclose exculpatory evidence?

24        A.   What was the question; can you ask it

1    again?  I was thinking of something else.

2       Q.   No problem.  Were you ever trained on

3    your duty to disclose exculpatory evidence?

4       A.   I am sure I was in some manner, shape or

5    form but right now I couldn't tell you when and

6    where.

7       Q.   And how do you -- as a police officer,

8    how would you go about disclosing exculpatory

9    evidence?

10       MR. MILLER:  Object to the form of the

11    question, incomplete nature of the hypothetical.

12       MR. JANSKI:  Join in those objections.

13    BY THE WITNESS:

14       A.   How would I disclose it?  I -- I

15    wouldn't -- evidence is evidence and it would all

16    get submitted.  I don't determine what's

17    exculpatory or not.

18    BY MS. SAMUELS:

19       Q.   Do you determine what's credible or not?

20       A.   Can I tell you what's credible or not?

21       Q.   Do you determine what's credible or not?

22       A.   Yes.

23       Q.   So if somebody gave you exculpatory

24    information but you determined it wasn't credible,

225

```
1    would you still turn it over?
2            MR. JANSKI:  Object to form.
3            MR. MILLER:  Object to the incomplete
4    nature of the hypothetical, form.
5            MR. JANSKI:  Join in the objection.
6    BY THE WITNESS:
7        A.   I probably -- I probably would.  I am not
8    sure, it depends on the circumstance.
9            MS. SAMUELS:  No further questions.
10           MR. MILLER:  I have no questions.
11           MR. JANSKI:  I have no questions on
12   behalf of the City.
13           MR. MILLER:  Okay.  We'll reserve
14   signature.
15           MS. SAMUELS:  Thanks for your time, sir.
16            AND FURTHER DEPONENT SAITH NOT
17
18
19
20
21
22
23
24
```

```
 1

 2                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 3                         EASTERN DIVISION

 4
        XAVIER WALKER,                )
 5                                    )
                     Plaintiff,       )
 6                                    )
           vs.                        )  No. 20 CV 7209
 7                                    )
        CITY OF CHICAGO, et al.,      )  Judge Guzman
 8                                    )
                     Defendants.      )
 9

10              I, MICHAEL PIETRYLA, hereby certify that

11      I have read the foregoing transcript of my

12      deposition taken on Wednesday, May 11, 2022,

13      consisting of pages 1 through 225, and that to the

14      best of my knowledge it is a true and correct

15      transcript of said deposition, except as I have

16      changed it on the attached sheets in accordance

17      with the rules provided by the said Court.

18                      _____

19                            MICHAEL PIETRYLA
        No errata sheets submitted (Please initial)_____
20      Number of errata sheets submitted_____(pages)

21      SUBSCRIBED AND SWORN TO
        before me this _____ day
22      of _____, 2022

23      _____
                   Notary Public
24
```

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

ERRATA SHEET FOR THE TRANSCRIPT OF:

CASE NAME:     WALKER v. CITY OF CHICAGO, et al.
CASE NUMBER:   20 CV 7209
DEP. DATE:     11th day of May, 2022
DEPONENT:      Michael Pietryla

CORRECTIONS

Pg.  Ln.   Now Reads   Should Read  Reasons Therefore

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

_____

MICHAEL PIETRYLA

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

ERRATA SHEET FOR THE TRANSCRIPT OF:

CASE NAME:      WALKER v. CITY OF CHICAGO, et al.
CASE NUMBER:  20 CV 7209
DEP. DATE:    11th day of May, 2022
DEPONENT:     Michael Pietryla

CORRECTIONS

Pg.  Ln.   Now Reads   Should Read  Reasons Therefore

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

___  ___   _____   _____   _____

_____

MICHAEL PIETRYLA

LIGHTFOOT COURT REPORTING, P.C.  (312) 701-1090

```
 1   STATE OF ILLINOIS   )
                         )  SS.
 2   COUNTY OF C O O K   )

 3

 4          I, TRACI ELICE BOURBEAU, Certified

 5   Shorthand Reporter, do hereby certify that on the

 6   11th day of May, A.D., 2022, the deposition of the

 7   witness, MICHAEL PIETRYLA, called by the Plaintiff

 8   was taken before me, reported stenographically and

 9   was thereafter reduced to typewriting under my

10   direction.

11          The said deposition was taken remotely

12   via Zoom, and there were present counsel as

13   previously set forth.

14          The said witness, MICHAEL PIETRYLA, was

15   first duly sworn to tell the truth, the whole

16   truth and nothing but the truth, and was then

17   examined upon oral interrogatories.

18          I further certify that the foregoing is a

19   true, accurate and complete record of the

20   questions asked of and answers made by the said

21   witness, MICHAEL PIETRYLA, at the time and place

22   hereinabove referred to.

23          The signature of the witness, MICHAEL

24   PIETRYLA, was reserved by agreement of counsel.
```

230

1            The undersigned is not interested in the

2    within case, nor of kin or counsel to any of the

3    parties.

4            Witness my official signature on this

5    26th day of May, 2022.

6

7

8

9

                                    *TraciEliceBourbeau*
10    _____
                                    TRACI ELICE BOURBEAU, CSR
11                                  C.S.R. No. 084-004281

12

13

14

15

16

17

18

19

20

21

22

23

24