# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

XAVIER WALKER,                          )

        Plaintiff,            )

        -vs-                  ) No. 20 CV 7209

CITY OF CHICAGO, et al.,                )

        Defendants.           )

        The videotaped deposition of XAVIER L. WALKER, taken at Borkan & Scahill, Ltd., 20 South Clark Street, 19th Floor, Chicago, Illinois, before Michelle A. Duzan, Certified Shorthand Reporter and Registered Merit Reporter, taken pursuant to the provisions of the Federal Rules of Civil Procedure pertaining to the taking of depositions, commencing at 11:20 a.m. on April 12, 2022.

**CERTIFIED TRANSCRIPT**



(866) 715-7770
advancedONE.com

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 2..5
XAVIER L. WALKER, 04/12/2022

Page 2

```
1   APPEARANCES:
2         SAMUELS & ASSOCIATES, LTD.
          MS. JEANETTE SAMUELS
3         3440 South Cottage Grove Avenue
          Suite 504
4         Chicago, Illinois  60616
          Phone:  872.588.8726
5         E-mail:  sam@chicivilrights.com
6               On behalf of the Plaintiff,
7
          NATHAN & KAMIONSKI, LLP
8         MS. NATALIE ADEEYO
          33 West Monroe Street
9         Suite 1830
          Chicago, Illinois  60603
10        Phone:  312.612.2255
          E-mail:  nadeeyo@nklawllp.com
11
               On behalf of the Defendant,
12             City of Chicago,
13        BORKAN & SCAHILL, LTD.
          MS. MISHA ITCHHAPORIA
14        MR. GRAHAM P. MILLER
          20 South Clark Street
15        Suite 1700
          Chicago, Illinois  60603
16        Phone:  312.680.1030
          E-mails:  mitchhaporia@borkanscahill.com
17             mgraham@borkanscahill.com
18             On behalf of the Defendant Officers.
19   ALSO PRESENT:
20        Mr. Tony Micheletto, videographer.
21
22
23
24
25
```

Page 3

```
1            I N D E X
2
     WITNESS                        EXAMINATION
3
     XAVIER L. WALKER
4
5       By Ms. Itchhaporia              5
        By Ms. Adeeyo                 497
6       By Ms. Itchhaporia           539
7
8
9            E X H I B I T S
     EXHIBIT                  MARKED FOR ID
10
        No. 1                       102
11      No. 2                       179
        No. 3                       183
12      No. 4                       412
        No. 5                       479
13      No. 6                       485
        No. 7  (not tendered)       501
14      No. 8  (not tendered)       510
        No. 9  (not tendered)       515
15      No. 10 (not tendered)       521
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1        THE VIDEOGRAPHER:  We are now on the video
2   record.  This is the video deposition of Xavier
3   Walker taken by the defense in the matter of Xavier
4   Walker versus City of Chicago, et al.,
5   Case No. 20 CV 7209, held at Borkan & Scahill,
6   Limited, 20 South Clark Street, Chicago, Illinois.
7   Today's date is April 12th, 2022.  The time is
8   11:20 a.m. as indicated on the video screen.
9        My name is Anthony Micheletto.  I'm the
10  videographer.  The court reporter is Michelle Duzan.
11  We are from the firm of AdvancedOne Legal.
12       Will counsel please introduce yourselves
13  for the video record?
14       MS. SAMUELS:  Jeanette Samuels on behalf of
15  the plaintiff.
16       MS. ITCHHAPORIA:  Misha Itchhaporia on behalf
17  of the individual Chicago police officer defendants.
18       MR. MILLER:  Graham Miller, also on -- on
19  behalf of those defendants.
20       MS. MURRAY:  Christiane Murray, also on behalf
21  of the individual defendant officers.
22       MS. ADEEYO:  And Natalie Adeeyo on behalf of
23  the City of Chicago.
24       MS. ITCHHAPORIA:  And also present via Zoom
25  are defendant Officers Mike Pietryla and Bryan Holy.
```

Page 5

```
1        THE VIDEOGRAPHER:  Will the reporter please
2   swear in the witness?
3        THE COURT REPORTER:  Will you raise your right
4   hand, please?
5             (Witness duly sworn.)
6             XAVIER L. WALKER,
7   called as a witness herein, having been first duly
8   sworn, was examined and testified as follows:
9             EXAMINATION
10  BY MS. ITCHHAPORIA:
11       Q.   Mr. Walker, can you please state and
12  spell your full name, including your middle name,
13  for the record?
14       A.   Xavier Walker, X A V I E R, Laroy,
15  L A R O Y, Walker, W A L K E R.
16       Q.   Have you ever given a deposition before?
17       A.   No, ma'am.
18       Q.   Okay.  I'll go over some of the ground
19  rules so you know what to expect here today.  Okay?
20  I'm going to be asking you some questions.  It's
21  important that all of your answers to those
22  questions are out loud and verbal so that the court
23  reporter here can take down everything that you're
24  saying.  Do you understand?
25       A.   Yes, ma'am.
```



XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 6..9
XAVIER L. WALKER, 04/12/2022

Page 6

1    Q.   Okay.  That means you can't shrug your
2  shoulders, nod the head because she can't take that
3  down.  Okay?
4    A.   I understand.
5    Q.   If at some point you understand where I'm
6  going with my question, it's important that you let
7  me get my entire question out and that we're not
8  speaking over each other because it makes the court
9  reporter's job much more difficult.  Okay?  So just
10 wait until I'm done with my entire question and then
11 go ahead and answer.  Okay?
12   A.   Yes, ma'am.
13   Q.   And if at any point you want to take a
14 break, that's absolutely fine.  The only thing I ask
15 is that you answer any pending question before we
16 take the break.  Okay?
17   A.   Yep.
18   Q.   And if at any point in time you don't
19 understand a question, just let me know and I'll do
20 my best to rephrase.  Okay?
21   A.   Yes, ma'am.
22   Q.   Otherwise, I'm going to assume that you
23 understood my question.  Fair?
24   A.   Okay.
25   Q.   Okay.  And from time to time, attorneys

Page 7

1  may make objections.  Unless you're instructed from
2  your attorney not to answer, you should go ahead and
3  answer.  Those objections are for the record.  Okay?
4    A.   Yes, ma'am.
5    Q.   All right.  Did you review any materials
6  today to prepare for your deposition?
7    A.   No, ma'am.
8    Q.   So you didn't look at a single document?
9    A.   No, ma'am.
10   Q.   Okay.  When was the last time that you
11 looked at any transcripts from your criminal
12 proceedings?
13   A.   Friday.
14   Q.   Friday.  Last Friday?
15   A.   Last Friday.
16   Q.   Okay.  And why did you look at those
17 transcripts?
18   A.   Because I knew my deposition was coming
19 up and I just wanted to refresh myself and see what
20 was going on, to know what's going on, and be -- be
21 able to answer questions --
22   Q.   Okay.
23   A.   -- appropriate today.
24   Q.   Okay.  I'm going to ask you to speak up,
25 okay, because I'm having a hard time hearing you and

Page 8

1  I'm pretty close to you.
2          So to prepare for your deposition today,
3  you did review transcripts from your criminal
4  proceedings; is that correct?
5    A.   Yes.
6    Q.   Okay.  Which transcripts did you review?
7    A.   My trial transcripts, my post-conviction
8  transcripts.
9    Q.   When you say you reviewed your trial
10 transcripts, did you review the entire transcript
11 from the trial?
12   A.   No.  I just skimmed through it.
13   Q.   You skimmed through it?
14   A.   Yes.
15   Q.   Did you skim through the entire trial
16 proceedings?
17   A.   Yes.
18   Q.   Did you skim through any pretrial
19 criminal proceedings?
20   A.   No, I went past that.
21   Q.   Okay.
22   A.   Until the dates of my trial.
23   Q.   And you said post-conviction transcripts?
24   A.   Yes.
25   Q.   Which transcripts?

Page 9

1    A.   From the beginning of my post-conviction
2  when I filed and got appointed to the second stage,
3  them transcripts.
4    Q.   Are you talking about you reviewed the
5  petition that was filed or you reviewed transcripts
6  from court hearings?
7    A.   I reviewed the transcripts from courts of
8  the petition that was filed.
9    Q.   Okay.  Got it.  And which -- specifically
10 which transcripts did you review from the
11 post-conviction proceedings?
12   A.   The judge's rulings and the State's
13 replies to my allegations.
14   Q.   Okay.  When you reviewed your trial
15 transcript, you said you skimmed it.  Did you review
16 anybody's testimony that testified at your criminal
17 trial or the criminal trial of Jovanie Long?
18   A.   Yes.
19   Q.   Whose -- whose testimony did you review?
20   A.   All of them.
21   Q.   All of them.  Okay.  So other than the
22 trial transcript and the post-conviction transcript,
23 did you review any other documents to be prepared
24 for your deposition today?
25   A.   No, ma'am.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 10..13
XAVIER L. WALKER, 04/12/2022

Page 10

1    Q.  Did you look at any police reports to
2 prepare for your deposition today?
3    A.  No, ma'am.
4    Q.  Did you look at any filings that were
5 prepared by yourself or your attorneys to prepare
6 for your deposition today?
7    A.  My post-conviction.
8    Q.  Okay.  Other than the post-conviction
9 petition, did you look at anything else?
10   A.  No, ma'am.
11   Q.  What was the date of that post-conviction
12 petition that you looked at?
13   A.  June 27th.
14   Q.  Of what year?
15   A.  2007.
16   Q.  Okay.  And who prepared that
17 post-conviction petition?
18   A.  I did.
19   Q.  And that was prepared by yourself?
20   A.  Yes, ma'am.
21   Q.  Okay.  Did you review your videotaped
22 confession to prepare for your deposition today?
23   A.  I seen it in the past.  I ain't -- not
24 today or not Friday, no.
25   Q.  When was the last time that you saw your

Page 11

1 videotaped confession?
2    A.  About a week or two ago.  I can't...
3    Q.  A week or two ago?
4    A.  Yeah.
5    Q.  And why were you looking at your
6 videotaped confession a week or two ago?
7    A.  Because I was going over everything
8 preparing for this because I know it was coming up.
9    Q.  Okay.  Did you also look at a transcript
10 of your videotaped confession to prepare for your
11 deposition?
12   A.  No.
13   Q.  Did you look at any other videos to
14 prepare for your deposition today?
15   A.  No.
16   Q.  Did you look at any photographs?
17   A.  No.
18   Q.  Have we covered everything that you've
19 reviewed to prepare for your deposition today?
20   A.  Yes.
21   Q.  Is it accurate to say that when you were
22 incarcerated from May 2000 to December 2019 that you
23 had access to your transcripts from your criminal
24 case?
25   A.  Yes.

Page 12

1    Q.  Is it accurate to say that you also
2 during that same time frame had access to the police
3 reports from the homicide investigation of Marek
4 Majdak --
5    A.  Yes.
6    Q.  -- M A J D A K?
7    A.  Yes.
8    Q.  Is it -- well, strike that.
9        So while you were incarcerated from
10 May 2000 until December 2019, you reviewed your
11 transcripts from your pretrial hearing and your
12 trial over a thousand times?
13   A.  Possibly.
14   Q.  You also looked at the police reports
15 during your period of incarceration over a thousand
16 times, correct?
17   A.  It's possible.
18   Q.  You said last Friday, you reviewed
19 documents.  When you reviewed those documents, were
20 you meeting with your attorney, Ms. Samuels?
21   A.  No, ma'am.
22   Q.  Did you meet with your attorney to
23 prepare for your deposition?
24   A.  Earlier when we first started talking
25 about it the first time before the -- my father

Page 13

1 passed and all that stuff, yes.
2    Q.  Okay.  And was that an in-person meeting?
3    A.  Yes.
4    Q.  How long was that meeting?
5    A.  I don't recall.
6    Q.  Was it several hours?
7    A.  No.
8    Q.  Less than five hours?
9    A.  Yes.
10   Q.  Since that time when you first prepared
11 for your deposition and you met with your attorney,
12 have you met with your attorney again to prepare for
13 your deposition?
14   A.  No.
15   Q.  Have you spoken to your attorney on the
16 phone to prepare for your deposition?
17   A.  I spoken to her on the phone, yes, but
18 not to prepare.  Just I --
19   Q.  Okay.
20   A.  -- check up to maybe --
21   MS. SAMUELS:  Wait.  I'm going to object to --
22 for the record.  Any communications that we've had
23 are privileged, and so you're not supposed to answer
24 any questions regarding that.  Okay?
25   THE WITNESS:  Okay.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 14..17
XAVIER L. WALKER, 04/12/2022

Page 14

1  BY MS. ITCHHAPORIA:
2      Q.   Have you spoken to any other attorney to
3  prepare for your deposition today?
4      A.   No, ma'am.
5      Q.   Have you spoken to any witnesses in this
6  case to prepare for your deposition today?
7      A.   No, ma'am.
8      Q.   Have you reviewed the deposition
9  transcripts of any witnesses in this case to prepare
10 for your deposition today?
11     A.   No, ma'am.
12     Q.   At any point in time, have you reviewed
13 the deposition transcripts of any witnesses in this
14 case?
15     A.   Yes.
16     Q.   Which -- not your trial transcripts.  I'm
17 talking about depositions --
18     A.   Oh, no, ma'am.
19     Q.   -- from the civil case.
20     A.   No, ma'am.
21     Q.   Okay.  Were you involved in the murder of
22 Marek Majdak on May 13th, 2000?
23     A.   No, ma'am.
24     Q.   Jovanie Long shot Marek Majdak on
25 May 13th, 2000, correct?

Page 15

1      A.   I don't know that.
2      Q.   So you can't say that Jovanie Long was
3  not involved in the murder of Marek Majdak, can you?
4      A.   I can't say that either.
5      Q.   You don't know one way or the other?
6      A.   No, ma'am.
7      Q.   Did you see Jovanie Long shoot Marek
8  Majdak on May 13th, 2000?
9      A.   No, ma'am.
10     Q.   Did you hear from anyone that Jovanie
11 Long had shot Marek Majdak on May 13th, 2000?
12     A.   Yes, ma'am.
13     Q.   Who did you hear that from?
14     A.   The police officers.
15     Q.   Other than the police, did you hear from
16 anyone else that Jovanie Long had shot Marek Majdak?
17     A.   No, ma'am.
18     Q.   When did you learn that Jovanie Long had
19 shot Marek Majdak?
20     A.   When the police told me.
21     Q.   When was that?
22     A.   When I was -- when I was being
23 interrogated up in the interrogation room.
24     Q.   Who were you with on May 13th, 2000,
25 between 1:00 a.m. and 1:10 a.m.?

Page 16

1      A.   My friend Simeon Dorsey and my friend
2  Deon Baylock.
3      Q.   Anybody else?
4      A.   I interacted with different people
5  throughout that day, but that's who I was with.
6      Q.   Okay.  So is it accurate to say that on
7  May 13th, 2000, between 1:00 a.m. and 1:10 a.m., you
8  were with Simeon Dorsey and Deon Baylock?
9      A.   Yes, ma'am.
10     Q.   Where were you physically located on
11 May 13th, 2000, between 1:00 a.m. and 1:10 a.m.?
12     A.   First I was in my house and then we left
13 my house to go to a restaurant and then go to a
14 club.
15     Q.   Okay.  But that doesn't answer my
16 question.  Do you know where you were physically
17 located on May 13th, 2000, between 1:00 a.m. and
18 1:10 a.m.?
19     A.   I was at my house.
20     Q.   Okay.  Who were you at your house with on
21 May 13th, 2000, between 1:00 a.m. and 1:10 a.m.?
22     A.   My friend Deon Baylock, Simeon Dorsey,
23 and upstairs in the house, they was there, my
24 mother, my father, my sisters.
25     Q.   Okay.  So that was your mother Tina

Page 17

1  Walker?
2      A.   Yes, ma'am.
3      Q.   Your father Laroy Walker?
4      A.   Leroy Walker.
5      Q.   Leroy.  And what was the name of your
6  sister that was at home?
7      A.   My sister Shunralyn Walker was at home.
8  My sister Shirmiral Walker was at home.  And my
9  sister Sheleah Walker was at home.
10     Q.   How do you know that your parents and
11 your siblings were at home on May 13th, 2000,
12 between 1:00 a.m. and 1:10 a.m.?
13     A.   Because I was back and forth upstairs
14 talking to them, and my sister was -- was talking --
15 I was talking to my family.  I was in the house.
16     Q.   So you saw them during that time frame?
17     A.   Yes, ma'am.
18     Q.   Now, this -- this is a very specific time
19 frame that we're talking about May 13th between
20 1:00 a.m. and 1:10 a.m.  Is where you're -- you're
21 telling me where you were located and who you were
22 with, is that based on your memory or is that based
23 on documents that you have reviewed?
24     A.   Based on my memory.  I really -- I really
25 can't recall the time, but based on my memory and

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 18..21
XAVIER L. WALKER, 04/12/2022

Page 18

1  them hours and them frame times, that's where -- my
2  memory.
3      Q.    But you -- as you sit here today, though,
4  are you telling us -- it is your testimony that
5  between 1:00 a.m. and 1:10 a.m. on May 13th, 2000,
6  that you were with Simeon Dorsey and Deon Baylock at
7  your house on Potomac Avenue?
8      A.    Yes, ma'am.
9      Q.    Do you agree that your memory about the
10 events of May 13th, 2000, was better closer to that
11 time frame than it is today, almost 22 years later?
12     A.    It's possible.
13     Q.    Well, you're saying it's possible.  Isn't
14 that true?
15     MS. SAMUELS:  Objection, argumentative.
16     THE WITNESS:  It's possible.
17 BY MS. ITCHHAPORIA:
18     Q.    And memory doesn't get better over time,
19 does it?
20     MS. SAMUELS:  Same objection, foundation.
21 BY MS. ITCHHAPORIA:
22     Q.    Go ahead.
23     A.    You want me to answer that?
24     MS. SAMUELS:  Yeah.  Unless I instruct --
25     THE WITNESS:  Okay.

Page 19

1      MS. SAMUELS:  -- you not to answer it, you're
2  supposed to answer it.
3      THE WITNESS:  Memory -- memory probably don't
4  get better, but sometimes it repeat itself so much
5  that it's like it could happen yesterday, a lot of
6  things that you'll think about that repeats itself
7  that you always thinking about.  It seems like
8  yesterday.  So --
9  BY MS. ITCHHAPORIA:
10     Q.    Did --
11     A.    But possible -- yeah, but possibly it was
12 better back then.
13     Q.    Sorry.  I didn't mean to interrupt you.
14           Do the events of May 13th, 2000, seem to
15 you like they occurred yesterday?
16     A.    Yes.
17     Q.    On May 13th, 2000, Jovanie Long told you
18 that he killed someone, correct?
19     A.    No, ma'am.
20     Q.    Would you lie for Jovanie Long?
21     A.    No, ma'am.
22     Q.    In the past you've lied for Jovanie Long,
23 correct?
24     A.    No, ma'am.
25     Q.    Have you ever told anyone that Jovanie

Page 20

1  Long admitted to you that he killed Marek Majdak?
2      A.    The police, because that's what they told
3  me to say.
4      Q.    Other than the police, you've told other
5  people that Jovanie Long admitted to you on
6  May 13th, 2000, that he killed Marek Majdak,
7  correct?
8      A.    No, ma'am.
9      Q.    You told your attorney, Deborah Bedsole
10 and Sulman Qasi, on May 30th, 2000, that Jovanie
11 Long said to you, quote, I just killed this mark,
12 true?
13     A.    True.  Yes.  I forgot --
14     Q.    Okay.
15     A.    -- about that, yeah.
16     Q.    So you have told other people that
17 Jovanie Long admitted to you that he killed Marek
18 Majdak, correct?
19     A.    Yes.
20     Q.    Okay.  You also told your mother Tina
21 Walker that when you went and picked Jovanie Long up
22 on May 13th, 2000, you found out what he had done,
23 correct?
24     A.    No, ma'am.
25     Q.    Isn't it true that you told your mother

Page 21

1  Tina Walker, that you picked up Jovanie Long and you
2  found out that he had killed someone?
3      A.    No, ma'am.
4      Q.    Never happened?
5      A.    Never happened.
6      Q.    Isn't it true that you told your
7  attorney, Gregory Wilson, that when you first picked
8  up Jovanie, Jovanie talked about what he had done?
9      A.    No, ma'am.
10     Q.    You never said that to Greg Wilson?
11     A.    No, ma'am.  I told Greg Wilson that this
12 is what I told --
13     MS. SAMUELS:  Hold on.  There's no question
14 pending.
15     THE WITNESS:  Well, okay, but...
16 BY MS. ITCHHAPORIA:
17     Q.    Go ahead.  Finish what you were saying.
18     A.    I told him, this is what I told Deborah
19 Bedsole and the police and the state's attorney
20 because this is what the police had told me to say.
21 And I was telling him why that had happened.
22     Q.    Okay.  So let me be clear.  So it's your
23 testimony that what you told Gregory Wilson, you
24 were repeating what the police had told you?
25     A.    Yes, ma'am.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 22..25
XAVIER L. WALKER, 04/12/2022

Page 22

1    Q.    Did you tell Gregory Wilson that I'm
2  telling you what the police told me to say?
3    A.    Yes, ma'am.  I told everybody that.
4    Q.    So if Gregory Wilson testified that you
5  told him that when you first picked up Jovanie that
6  you talked about what Jovanie had done, and you
7  never told him that that's what the police had said,
8  are you saying Gregory Wilson is lying?
9    MS. SAMUELS:  Objection, mischaracterizes the
10 record, argumentative.
11   THE WITNESS:  I don't know.  He probably don't
12 recall.
13 BY MS. ITCHHAPORIA:
14   Q.    Have you looked at any of Mr. Wilson's
15 notes to prepare for your deposition today?
16   A.    No, ma'am.
17   Q.    Have you ever looked at any of his notes?
18   A.    No, ma'am.
19   Q.    Are you aware that Mr. Wilson took notes
20 during conversations that -- and interviews that he
21 had with you?
22   A.    Yes, I know he had, yes.  That's...
23   Q.    How do you know that?
24   A.    Because he's an attorney and that's what
25 they do.

Page 23

1    Q.    And you saw him, right, taking notes down
2  when he was interviewing you?
3    A.    I probably -- yeah, I probably paid
4  attention, but I don't know what he writing.  I
5  ain't all over his shoulder trying to see what he
6  write, and make sure it's accurate, what facts.
7    Q.    Do you go by any nicknames?
8    A.    Yes.
9    Q.    What nicknames?
10   A.    Zay.
11   Q.    Z A Y?
12   A.    Yes.
13   Q.    Okay.  Who calls you Zay?
14   A.    Everybody.
15   Q.    All your friends?
16   A.    Yes.
17   Q.    And your family members?
18   A.    Yes.
19   Q.    When you introduce yourself to someone
20 for the first time, do you introduce yourself as
21 Xavier or Zay?
22   A.    Zay.
23   Q.    Zay.  Okay.  You've used other names to
24 refer to yourself as well, though, right?
25   A.    No.

Page 24

1    Q.    Wasn't it true that when you've been
2  arrested, you've given police officers other names
3  for yourself besides Xavier Walker?
4    A.    I don't give that to other people, no.
5  That's different.
6    Q.    Okay.  So you're saying when -- when
7  you've been arrested -- you've been arrested
8  multiple times, correct?
9    A.    Yes.
10   Q.    Every time you've been arrested, did you
11 give the police your actual name of Xavier Walker?
12   A.    No.
13   Q.    Okay.  So you lied to the police, right,
14 on multiple occasions about your identity, who you
15 were?
16   A.    Yes.
17   Q.    You told the police that you were Rashad
18 Orbsy, O R B S Y, correct?
19   A.    I don't know.
20   Q.    Okay.  Is that a name that you've used in
21 the past?
22   A.    I've used whatever popped in my head at
23 the time.
24   Q.    Okay.  Have you used the name James
25 Littleton?

Page 25

1    A.    Yes.
2    Q.    Have you used the name James Littletonak?
3    A.    I don't know.  That don't sound familiar.
4    Q.    Okay.  You've used the name Marvin Mosley
5  when you've been arrested, correct?
6    A.    Yes.
7    Q.    You've used the name Kenneth Preteet,
8  correct?
9    A.    Yes.
10   Q.    You've used the name during an arrest as
11 Laroy Mosley, correct?
12   A.    Yes.
13   Q.    You've also used the name Xavia Peteete,
14 correct?
15   A.    Yes.
16   Q.    You've also used the name Shabazz
17 Preteet?
18   A.    Yes.
19   Q.    You also used the name Shake?
20   A.    No.
21   Q.    No.  You used the name Xavier Treteet?
22   A.    No.  That's...
23   Q.    You ever used the name Velli, V E L L I?
24   A.    No.
25   Q.    You've given at least eight false names

Page 26

1  to a police officer during an arrest to prevent the
2  police officer from learning your real identity,
3  true?
4      A.    Yeah.
5      Q.    Your parents are Laroy and Tina Walker,
6  correct?
7      A.    Yes.
8      Q.    And they're married?
9      A.    They was.
10     Q.    Until he recently passed?
11     A.    Yes.
12     Q.    I'm sorry to hear that.
13     A.    Thank you.
14     Q.    During their marriage, did they always
15  live together?
16     A.    Yes.
17     Q.    What's your date of birth?
18     A.    ███████████████
19     Q.    ████
20     A.    Yes.
21     Q.    Is -- have you ever given the birthday
22  ███████████████
23     A.    Yes.
24     Q.    In May 2000 you were 20 years old,
25  correct?

Page 27

1      A.    No.  I think I was 19.  I can't remember.
2      Q.    19.  Okay.
3      A.    I think I turned 20 in jail, though, but
4  I can't remember.
5      Q.    So you've given police officers different
6  date of births when you've been arrested too, right?
7      A.    Yes.
8      Q.    And you did that so the police officer
9  would not be able to determine your real identity?
10     A.    Yes.
11     Q.    So you've lied to the police on multiple
12  occasions?
13     A.    Yes.
14     Q.    Are you on any social media accounts like
15  Instagram or Facebook, Twitter, Snapchat?
16     A.    Yes.
17     Q.    What are you on?
18     A.    Facebook.
19     Q.    Anything else besides Facebook?
20     A.    I think all of them except Instagram
21  probably.
22     Q.    Okay.  All of them except Instagram?
23     A.    Yes.
24     Q.    What else are you on besides Facebook
25  then?

Page 28

1      A.    I'm thinking Twitter, Snapchat, whatever
2  other stuff.  YouTube, all that stuff.  I don't
3  know.
4      Q.    So you said Facebook, Twitter, Snapchat.
5  You're not on Instagram.  Are you on anything else?
6      A.    I don't know.
7      Q.    Okay.  What's your user name on Facebook?
8      A.    My name.
9      Q.    Xavier Walker?
10     A.    Xavier L. Shabazz Walker, I think.
11     Q.    Okay.  Well, so is your name Xavier Laroy
12  Walker or is it Xavier Laroy Shabazz Walker?
13     A.    Xavier Laroy Shabazz Walker.
14     Q.    That's what's on your birth certificate?
15     A.    That's what's been put on it from -- been
16  put on there.
17     Q.    When did you first join Facebook?
18     A.    I don't know.  My -- my family did it
19  while I was in jail.  They had did all that stuff.
20  My niece and nephews had started all them accounts.
21  That's why I don't know what all I'm on and all that
22  stuff.
23     Q.    Have you ever used Facebook to try to
24  connect with people related to your criminal case?
25     A.    Yes.

Page 29

1      Q.    Have you sent messages on Facebook to
2  other people to -- for your criminal case?
3      A.    Not about my case, but I sent it to
4  different people that I used to associate with or
5  considered friends, like happy birthdays if I see
6  them, all that type of stuff, but nothing about my
7  case or this stuff.
8      Q.    Okay.  Well, I guess the question is,
9  have you ever communicated with anyone on Facebook
10  about your criminal case?
11     A.    No.
12     Q.    Have you ever used Facebook to ask
13  someone to be a witness in your criminal case?
14     A.    No.
15     Q.    Have you ever asked any friends or family
16  members to use your Facebook account to contact
17  witnesses in your case?
18     A.    No.
19     Q.    Have you ever asked someone to be a
20  witness in your case and that person refused?
21     A.    No.
22     Q.    Didn't you ask Betty Edwards to be a
23  witness and she said no?
24     A.    I didn't ask her anything.
25     Q.    Well, didn't you have someone on your

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 30..33
XAVIER L. WALKER, 04/12/2022

Page 30

1   behalf ask her to be a witness and she said no?
2       A.    My attorneys probably did.  I don't know
3   who all they contact.  They contact a lot of people
4   that was in my case file or whatever.
5       Q.    Betty Edwards is the grandmother of
6   Postal; is that right?
7       A.    Poso.
8       Q.    Postal?
9       A.    Poso.
10      Q.    Poso?
11      A.    Yeah.
12      Q.    Okay.  Is that correct?  So --
13      A.    Yes.
14      Q.    -- Betty Edwards is the grandma of Poso?
15      A.    Yes.
16      Q.    And didn't you have someone contact Poso
17  to ask him to ask his grandmother Betty Edwards to
18  be a witness?
19      A.    No.
20      Q.    Betty Edwards said that she wouldn't be a
21  witness for you, correct?
22      A.    I don't know what she talked to them --
23  my lawyers and stuff about.  I didn't never talk to
24  her.
25      Q.    Okay.  Which lawyer of yours contacted

Page 31

1   Betty Edwards?
2       A.    Probably all of them.  I don't know.
3       Q.    You don't know?
4       A.    I assumed all of them.
5       Q.    Okay.  Are you just guessing?
6       A.    Yes, because --
7       Q.    Okay.
8       A.    -- I don't know.
9       Q.    Where do you currently live?
10      A.    I don't even know the address.  I live
11  with my wife.
12      Q.    And what's the name of your wife?
13      A.    Lijona Sturghil.
14      Q.    And where do you and Lijona live?
15      A.    In North Riverside.
16      Q.    North Riverside.  What's the address at
17  North Riverside?
18      A.    I don't know it by heart.
19      Q.    Okay.  Are you and Lijona the only people
20  that live there?
21      A.    No.  Her son.
22      Q.    What's the name of your son?
23      A.    John.
24      Q.    John.  What's John's last name?
25      A.    Johnson.

Page 32

1       Q.    Can you spell that?
2       A.    Johnson?
3       Q.    Johnson.  Oh, okay.
4             John Johnson; is that right?
5       A.    Yes.
6       Q.    Okay.  And how old is John Johnson?
7       A.    I think he just turned 20.
8       Q.    He turned 20?
9       A.    Yes.
10      Q.    Is he your biological son?
11      A.    No.
12      Q.    Is he the biological son of Lijona
13  Sturghil?
14      A.    Yes.
15      Q.    Do you own or rent the place at North
16  Riverside?
17      A.    She rent it.  This is her place.
18      Q.    Okay.
19      A.    But I help her pay her bills, though.
20      Q.    Okay.  Do you have any children?
21      A.    No.
22      Q.    When were you and Lijona married?
23      A.    The month after I got out.
24      Q.    So in 2019?
25      A.    '20.

Page 33

1       Q.    '20.  Was it in January 2020?
2       A.    Yes.
3       Q.    What does Lijona do for a living?
4       A.    She's an esthetician.
5       Q.    When did you first meet Lijona?
6       A.    I don't -- when she was 11 and I was 13.
7   I don't know what year.
8       Q.    Did you go to school with her?
9       A.    No.
10      Q.    Did you grow up in the same neighborhood
11  as her?
12      A.    Yes.
13      Q.    When you were incarcerated from May 2000
14  to December 2019, was she someone that you kept in
15  touch with?
16      A.    Off and on.
17      Q.    Off and on.  Okay.  You're currently
18  employed; is that right?
19      A.    Yes.
20      Q.    Where do you work?
21      A.    UPS.
22      Q.    How long have you worked for UPS for?
23      A.    Since December.
24      Q.    December of 2021?
25      A.    Yes.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 34..37
XAVIER L. WALKER, 04/12/2022

Page 34

1       Q.    And what's your position there?
2       A.    A package handler.
3       Q.    What hours do you work?
4       A.    Sunrise.
5       Q.    Sunrise to?
6       A.    It's from 3:00 to 9:30.
7       Q.    Did you -- you went up to the 10th grade;
8    is that right?
9       A.    I don't know if I made it to the 10th
10   grade or not.  I supposed to, yeah.  I don't think I
11   ever actually entered the 10th grade.  I don't know.
12      Q.    I'm sorry?
13      A.    I say I was supposed to, but I don't
14   think I actually ever entered the 10th grade,
15   though, but I know I finished the 9th grade.  I
16   don't think I -- I don't think I ever went back.
17      Q.    So did you finish the 9th grade?
18      A.    Yeah.  Yes.
19      Q.    Okay.  Where were you when you finished
20   the 9th grade, which school?
21      A.    Orr.
22      Q.    Orr.  Okay.  So in May 2000, you were not
23   in school, right?
24      A.    No.
25      Q.    As of May 2000, you hadn't been in school

Page 35

1    for about three years; is that right?
2       A.    Yes.
3       Q.    Did you have a job during those three
4    years?
5       A.    No.
6       Q.    Did you go to Westside Holistic school on
7    Lehman and Division?
8       A.    Yes.
9       Q.    How long did you attend Westside Holistic
10   school for?
11      A.    Off and on, every chance I got out of
12   jail.
13      Q.    That's an alternative school, right?
14      A.    Yes.
15      Q.    Why were you going to alternative school?
16      A.    Because I was still trying to earn my
17   GED.
18      Q.    Were you expelled from Orr?
19      A.    I don't remember if I was expelled or --
20   I don't remember what happened.  I don't -- I don't
21   think so.
22      Q.    Why didn't you go to 10th grade at Orr?
23      A.    It was bad neighborhood, bad things, gang
24   stuff that was involved, and I -- I didn't want to
25   go there no more.

Page 36

1       Q.    So were you scared of people at your
2    school?
3       A.    I ain't going to say scared, but I was
4    smart enough not to go and getting shot or getting
5    jumped on and get hurt.
6       Q.    Have you been arrested since your release
7    in December 2019?
8       A.    No, ma'am.
9       Q.    Prior to May 28, 2000, how many times
10   were you arrested?
11      A.    I can't recall.
12      Q.    Is it accurate to say that you were
13   arrested 12 times before May 28, 2000?
14      A.    Possible.
15      Q.    Do you know?
16      A.    I don't know.
17      Q.    Have you ever been arrested outside the
18   City of Chicago?
19      A.    No.
20      Q.    Sorry?
21      A.    No, ma'am.
22      Q.    You have seven drug-related arrests; is
23   that right?
24      MS. SAMUELS:  Objection, relevance.
25      THE WITNESS:  I don't know.

Page 37

1    BY MS. ITCHHAPORIA:
2       Q.    You have been arrested for drug
3    possession charges; is that right?
4       A.    Yes, ma'am.
5       MS. SAMUELS:  Objection, relevance.
6    BY MS. ITCHHAPORIA:
7       Q.    On April 21, 2000, so a few months
8    before -- well, less than a month before this
9    incident that we're here to talk about today, you
10   were arrested for soliciting unlawful business,
11   correct?
12      MS. SAMUELS:  Can we have a standing objection
13   to any questions related to prior arrests?
14      MS. ITCHHAPORIA:  Sure.
15      THE WITNESS:  I don't know.
16   BY MS. ITCHHAPORIA:
17      Q.    Do you remember being arrested on
18   April 21, 2000, at 4721 West Superior?
19      A.    I don't -- I don't recall.  I don't know.
20      Q.    Okay.
21      A.    It was a long time ago.  I don't...
22      Q.    4721 West Superior is about six city
23   blocks, right, from Ohio and Cicero?
24      A.    Say the address again.
25      Q.    4721 West Superior.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 38..41
XAVIER L. WALKER, 04/12/2022

Page 38

1    A.   No.  That's like three blocks away.
2    Q.   Three blocks away.  Okay.  On that day,
3  April 21st, 2000, you were on the street trying to
4  sell drugs to pedestrians and motorists when you
5  were arrested, correct?
6    A.   I don't recall.  I don't know.
7    Q.   You would solicit pedestrians and
8  motorists to buy drugs that you were selling by
9  shouting, quote, rocks, blows, park, correct?
10   A.   No, I didn't do that.
11   Q.   Well, you did sell drugs, didn't you?
12   A.   Yes.
13   Q.   And to get people to buy your drugs,
14  wouldn't you solicit them?
15   A.   No.  I ain't had to do that.
16   Q.   Blows -- blow is a term -- a street term
17  for heroin, right?
18   A.   Yes.
19   Q.   And rock is a street term for crack
20  cocaine?
21   A.   Yes.
22   Q.   What does parks mean?
23   A.   I don't know.
24   Q.   Have you ever solicited pedestrians or
25  motorists to buy drugs from you by shouting, rocks,

Page 39

1  blows, park?
2    A.   No.
3    Q.   For the least number of arrests that I
4  could count, you've been to the 11th District at
5  Harrison and Kedzie at least on four occasions prior
6  to May 28th, 2000, correct?
7    A.   Possible.  I don't recall.
8    Q.   Well, it is true that before May 20 --
9  May 28th, 2000, you had been arrested and you've
10  been taken to the 11th District; that's true, right?
11   A.   Yes.  How many times, I can't recall.
12   Q.   Okay.  During the number of times that
13  you were arrested, you were given your Miranda
14  rights, right?
15   A.   No.
16   Q.   No?
17   A.   No.
18   Q.   So if I told you that you were arrested
19  nine times prior to May 28th, 2000, it's your
20  testimony that you were never given your Miranda
21  rights during those nine times?
22   A.   Yep.  They never read you your Miranda --
23  that's some TV stuff.
24   Q.   Well, you knew before May 28, 2000, that
25  you had certain rights, right?

Page 40

1    A.   Not really.  I was a kid in the streets,
2  just out in the streets having fun.
3    Q.   So it's your testimony that before
4  May 28, 2000, that you didn't know that you had the
5  right to remain silent?
6    A.   I told you.  That was some TV stuff.
7    Q.   Okay.  But my question is, before May 28,
8  2000, did you know that you had a right to remain
9  silent?
10   A.   No.
11   Q.   So if all these police officers that
12  arrested you wrote on your arrest report that they
13  Mirandized you, that would be false?
14   A.   They all lying.
15   Q.   Do all police always lie?
16   A.   No.  I don't know.  There's some good
17  polices.  But in my neighborhood, they didn't do
18  that.  In my neighborhood, they beat you up when you
19  talking about you ain't talking and all that stuff.
20  They chase you down when you run.  They beat you.
21  They -- it's not like how TV.  That's some TV stuff.
22  That ain't talking about no Miranda rights.
23   Q.   So is it your testimony then that all the
24  police officers that worked in your neighborhood
25  always lied, always beaten people -- always beating

Page 41

1  people up?
2    A.   Yes.  In my neighborhood, that's why half
3  of them went to jail.
4    Q.   On the number of times that you were
5  arrested prior to May 28, 2000, you told the police
6  that you didn't want to answer any other questions,
7  right?
8    A.   I ain't never told the police that I
9  didn't want to answer their questions, because you
10  can't tell the police you don't want to answer their
11  questions.
12   Q.   Sir, when you've been arrested prior to
13  May 28, 2000, isn't it true that you've invoked your
14  right to silence?
15   A.   I have no idea.  I don't think so because
16  I never told the police no stuff like that because
17  the police would beat you up.
18   Q.   Well, you would refuse to answer the
19  police's questions, right?
20   A.   Yeah.  They'll beat me up too.
21   Q.   How many times --
22   A.   That's why I've been beat up by the
23  police a lot of times.
24   Q.   How many times has the police beat you
25  up?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 42..45
XAVIER L. WALKER, 04/12/2022

Page 42

1    A.    A lot of times.
2    Q.    How many times?
3    A.    I can't recall.
4    Q.    More than five?
5    A.    Yes.
6    Q.    More than ten?
7    A.    I don't know.
8    Q.    So you know it's between five and ten?
9    A.    Possible.
10   Q.    Is it your testimony as you sit here
11 today that every time that you were arrested prior
12 to May 28, 2000, that you were beaten up by the
13 police?
14   A.    Yes, except probably twice.
15   Q.    Except probably twice. Okay. And how
16 many times did you report that to anyone, that the
17 police had beaten you up between those five to ten
18 times prior to May 28, 2000?
19   A.    None, because I didn't know I could
20 report it.
21   Q.    You didn't tell a --
22   A.    I would have reported too.
23   Q.    -- single person, did you?
24   A.    Yes. I told it to family members and
25 friends. They knew what happened -- what goes on,

Page 43

1  and I tell them when I got out what the police done
2  did again to me. They even took money from me
3  before, and I had that -- one time they took my
4  sister's rent money, and I had to tell her and she
5  had to go and get -- complain and get it back.
6    Q.    And did she do that?
7    A.    Yes, she did.
8    Q.    What sister --
9    A.    And she got her money back.
10   Q.    -- was that?
11   A.    Sheleah Walker.
12   Q.    When did she do that?
13   A.    I can't remember what year it was. She
14 probably do, but yeah, one year they beat me up and
15 took my -- took her money, because it wasn't my
16 money. They thought I was out selling drugs and
17 talking about it was drug money.
18   Q.    After you would be arrested on those nine
19 occasions, there would be a criminal case, right?
20   A.    Yes.
21   Q.    And so your case would go from the arrest
22 to charging and through the criminal justice system,
23 right?
24   A.    Yes.
25   Q.    And then you would be -- for your

Page 44

1  criminal case, you would go before a judge, right?
2    A.    Yes.
3    Q.    And you would have a lawyer, right?
4    A.    A public defender.
5    Q.    A public defender. It's a lawyer, right?
6    A.    Public defender.
7    Q.    Okay. And your cases went through the
8  criminal justice system numerous times prior to
9  May 28, 2000, right?
10   A.    Yes.
11   Q.    And so you knew your public defender
12 would be representing you and your interests,
13 correct?
14   A.    I know a public defender was doing what
15 we call in the jail being penitentiary deliverers.
16 So every time I went in, I got the quickest copout
17 that I could and got out of there.
18   Q.    I didn't catch that, sorry, because of
19 the vent. You said it was like being what?
20   A.    I said in jail what we call public
21 defenders are penitentiary deliverers. They doing
22 their job to get you to go down. So I always did
23 what I needed -- what I needed to do to get the
24 lessest time that I could and get out of there.
25 That's why I went to boot camp and stuff like that,

Page 45

1  to get up out of there. I didn't go to no trials.
2  I didn't do none of that stuff. I got out of there
3  because I didn't have the money to be able to pay
4  for a lawyer. So that's what we -- I did, which is
5  what most people do in jail.
6    Q.    Well, were you ever guilty of what you
7  were arrested and charged with --
8    A.    Some- --
9    Q.    -- prior to May 28, 2000?
10   A.    Sometime.
11   MS. SAMUELS: Objection, relevance.
12 BY MS. ITCHHAPORIA:
13   Q.    How many times were you guilty?
14   A.    I don't know. Sometime they put stuff on
15 me. Sometime they actually had me.
16   Q.    How many times did the police put stuff
17 on you?
18   A.    Numerous times. I can't recall.
19   Q.    You said it was every time except twice;
20 is that right?
21   A.    No. I didn't say that they put stuff on
22 me every time except twice. You asked how many
23 times have they beat me, and I told you --
24   Q.    You're right.
25   A.    -- in my recollection, every time except

XAVIER WALKER vs CITY OF CHICAGO, et al.　　　　　　　　Pages 46..49
XAVIER L. WALKER, 04/12/2022

Page 46

1　twice.  I only remember two times of ever having a
2　run-in with the police and them not beating me.
3　　　Q.　　How many times then, total times that
4　you've been arrested have the police put stuff on
5　you?
6　　　A.　　I don't recall.
7　　　Q.　　And when you're saying put stuff on you,
8　what stuff did they put on you?
9　　　A.　　Drugs, guns, all type of stuff.  Police
10　will put anything.
11　　　Q.　　How many times did the police plant a gun
12　on you?
13　　　A.　　Once.
14　　　Q.　　Once.  And how many times did the police
15　plant drugs on you?
16　　　A.　　A few times.  I don't know.
17　　　Q.　　A few times?
18　　　A.　　Yeah.
19　　　Q.　　Less than five?
20　　　A.　　Probably around four or five.
21　　　Q.　　Four or five.  Okay.  When did the police
22　plant a gun on you?
23　　　A.　　You ain't going to find that out.  Don't
24　no --
25　　　Q.　　I'm sorry?

Page 47

1　　　A.　　I said you ain't going to find that out
2　through case records or none of that stuff because I
3　didn't go to jail on it.  But when I was young, when
4　I was like 18, they put a gun on me.
5　　　Q.　　Were you arrested?
6　　　A.　　No.  They did all shady, crooked stuff.
7　　　Q.　　What do you mean they did all the shady,
8　crooked stuff?
9　　　A.　　They put a gun on me, and then told me if
10　I give them another gun, they'll let me go.
11　　　Q.　　And so did you give them another gun?
12　　　A.　　I found somebody to give them a gun for
13　me.
14　　　Q.　　Who gave you a gun?
15　　　A.　　Some old man in the neighborhood.
16　　　Q.　　What was his name?
17　　　A.　　I don't know.
18　　　Q.　　So this old man in the neighborhood just
19　give you a gun?
20　　　A.　　Yes.  Somebody I knew since I was a
21　childhood that I watched grow up in the
22　neighborhood, doing illegal things, and I begged
23　him.  He was -- know I was a good kid and deserve
24　it, so he gave it to them.
25　　　Q.　　So this is someone that you grew up with

Page 48

1　in your neighborhood, but you don't know his name?
2　　　A.　　I don't know his real name.
3　　　Q.　　Okay.  What's his street name?
4　　　A.　　Satan.
5　　　Q.　　Satan?
6　　　A.　　Yeah.
7　　　Q.　　And where did he live?
8　　　A.　　I don't know.
9　　　Q.　　On Potomac?
10　　　A.　　No, not that Satan.  This was an older
11　Satan.
12　　　Q.　　And so you just begged him, hey, can I
13　have a gun, and he gave you a gun?
14　　　A.　　No, I went and told him what was going
15　on, the situation, and that was something that was
16　common and for me in our neighborhood, and he helped
17　me out.
18　　　Q.　　And this was when you were 18 years old?
19　　　A.　　Yes.
20　　　Q.　　So this is in about 1998?
21　　　A.　　'98, '99, somewhere around there.
22　　　Q.　　Okay.  And then what did you do with the
23　gun that Satan gave you?
24　　　A.　　I didn't do nothing with it.  He put it
25　in the thing for them to come and get it, and when

Page 49

1　they got it, they let me go.  That's what they did.
2　　　Q.　　He put it in the where?
3　　　A.　　In the garbage can in the alley somewhere
4　and told them.  And then they went and got it and
5　then they let me -- let me go.
6　　　Q.　　So the old man Satan, he put the gun in
7　the garbage can, and then -- and then Satan told the
8　police that he put the gun in the garbage can?
9　　　A.　　Yeah.
10　　　Q.　　And then the police let you go?
11　　　A.　　Yes.
12　　　Q.　　Where were you this entire time?
13　　　A.　　In the police car.
14　　　Q.　　Oh, so you were in the police car and the
15　police put a gun on you; is that right?
16　　　A.　　No.  I was in my neighborhood.  The
17　police pulled me over, searched me, started
18　searching around the neighborhood, went to their
19　trunk, came back like, yeah, look what we found.
20　I'm like, man, I didn't have that.  Man, I just --
21　just came outside.  Man, I ain't did nothing.  And
22　he put me in the car, talked, rode me around like,
23　yeah, we know who you is and what you doing around
24　here.  You give us a gun.  We'll let you go.  I'm
25　like, man, I ain't got no guns.  They like, you know

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 50..53
XAVIER L. WALKER, 04/12/2022

Page 50

1  people who got guns.  You better -- we going to let
2  you out for a minute.  You go holler at your people
3  and see if you can come up with one or we going to
4  take you down.  And I went and did what I was
5  supposed to did and talked to some people.  And I
6  set it up.  They put me back in the car, covered me
7  back up, and I waited.  And once they got what I
8  guess they got, which I never seen, but I know I
9  asked him.  He said he was going to take care of it
10 for me.  And then, you know.
11     Q.    So this happened all on one day?
12     A.    Yeah.
13     Q.    Okay.  And so you did know people that
14 had guns in the neighborhood, right?
15     A.    Yeah.
16     Q.    Was -- Satan, was he a gang member?
17     A.    Yes.
18     Q.    Was he in the same gang as you were?
19     A.    Yes.
20     Q.    That's how you knew he had a gun, right,
21 because you were in the same gang?
22     A.    No, I just knew him.
23     Q.    You had seen him with a gun before?
24     A.    Yes.
25     Q.    Do you know the name of the police

Page 51

1  officers that allegedly planted the gun on you?
2     A.    No.
3     Q.    Do you know what race they were?
4     A.    One of them was white and one of them was
5  black.
6     Q.    Were they uniformed officers?
7     A.    No.
8     Q.    Do you know what district they worked in?
9     A.    Harrison and Kedzie.
10     Q.    Harrison and Kedzie.  Okay.
11           Have you ever seen those officers
12 before --
13     A.    A lot of times.
14     Q.    -- or again?
15     A.    No, I haven't seen them since I've been
16 out, but I seen them a lot of times before I got
17 locked up.  They was frequently in our neighborhood
18 doing this to a lot of people.
19     Q.    You were charged with UUW, which is
20 unlawful use of a weapon, right?
21     A.    I think in this case.
22     Q.    Do you remember going to court for a UUW
23 charge?
24     A.    I don't know.
25     Q.    You don't -- you don't know?

Page 52

1     A.    I don't recall.
2     Q.    Okay.  After May 28, 2000, you were
3  arrested again in April 21, 2000, for possession of
4  a weapon in a penal institution, correct?
5     A.    Yes.
6     Q.    You were also arrested on September 21,
7  2004, for possession of cannabis in a penal
8  institution?
9     A.    Yes.
10     Q.    You knew it was illegal for you to have a
11 weapon or cannabis when you were in jail, correct?
12     A.    I didn't have those things.
13     Q.    Were those planted on you too?
14     A.    Yes.  Well, the shoes, it was stupid.
15 Crazy.
16     Q.    All right.  We'll get there later.
17     A.    The -- I'm going to tell you about it.
18 The weapon was in some shoes that was by my door,
19 and because the shoes by my door, they put that on
20 me and my cellie and told us it was ours and gave us
21 a case for it.
22     Q.    So that was --
23     A.    And we in the inside of our cell, where
24 they come shake down and tear up the cell and they
25 find some shoes, I think, some Timbers or something,

Page 53

1  and they say there was a knife in there, and they
2  gave us a case for it.
3     Q.    And that was -- was that correctional
4  officers that worked for the Cook County
5  Sheriff's --
6     A.    Yes.
7     Q.    -- Department?
8     A.    Yes.
9     Q.    So they were planting cases on you too?
10     A.    No.  They didn't plant -- they just put
11 it on the person whose cell it was.  They -- well,
12 yeah, it's the same thing.  Yeah.
13     Q.    Okay.
14     A.    But...
15     Q.    So other than CPD officers and Cook
16 County Sheriff's officers, any other law enforcement
17 agencies that plant evidence on you to --
18     A.    No.
19     Q.    -- put a case on you?
20     A.    No.  I --
21     Q.    Just those two agencies?
22     A.    I haven't been involved with no other.
23     Q.    Well, you were in IDOC for a number of
24 years, correct?
25     A.    That's all the same thing.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 54..57
XAVIER L. WALKER, 04/12/2022

Page 54

1    Q.    And IDOC is the Illinois Department of
2  Corrections, correct?
3    A.    Yes.
4    Q.    Okay.
5    A.    But they all the same.
6    Q.    Well, it's a different agency.  So let me
7  just ask my question.  Did any officers or -- did
8  any officers working for the Illinois Department of
9  Corrections ever plant anything on you?
10   A.    I can't recall.
11   Q.    You were convicted of a crime prior to
12  May 28, 2000, right?
13   A.    Yes.
14   Q.    You had two felony convictions before
15  May 28, 2000; isn't that true?
16   A.    Yes.
17   Q.    You had a 1998 conviction of a controlled
18  substance with intent to deliver?
19        MS. SAMUELS:  Still objecting --
20        THE WITNESS:  Yes.
21        MS. SAMUELS:  -- to the questions regarding
22  prior convictions.
23        MS. ITCHHAPORIA:  Okay.
24  BY MS. ITCHHAPORIA:
25   Q.    And then for that conviction, the 1998

Page 55

1  conviction, you received IPS probation, right?
2    A.    Yes.
3    Q.    And you violated that probation, didn't
4  you?
5    A.    Yes.
6    Q.    How did you violate that probation?
7    A.    I don't recall.
8    Q.    And then once you violated your
9  probation, you were resentenced to boot camp,
10  correct?
11   A.    Yes.
12   Q.    And you failed to complete that boot
13  camp, didn't you?
14   A.    No.  Well, after the -- the probation
15  part of it, but I completed the boot camp.
16   Q.    Okay.  In September 1999, you got three
17  years in IDOC custody, right?
18   A.    Yeah.
19   Q.    And you were at Vandalia?
20   A.    Yes.
21   Q.    And when you were at Vandalia, you were
22  given work release, right?
23   A.    Yes.
24   Q.    And then you escaped from that work
25  release, didn't you?

Page 56

1    A.    No.
2    Q.    Didn't you get out of work release?
3    A.    I got sent home on house arrest.
4    Q.    So it's your testimony you did not
5  escape?
6    A.    Not from work release.  I wasn't in work
7  release.
8    Q.    Why did you get the three years in IDOC
9  custody in September 1999?
10   A.    I think it was a controlled substance
11  case, a drug case.  I don't...
12   Q.    Okay.  At the time of your first court
13  appearance on May 31st, 2000, when you -- for this
14  case, for this murder case, you were on parole for
15  possession of a controlled substance, right?
16   A.    Yes.
17   Q.    Okay.  And you had -- you also had two
18  bond forfeitures at that time?
19   A.    I don't know.
20   Q.    You don't remember?
21   A.    Huh-uh.
22   Q.    Is that right?  You don't remember?
23   A.    I don't remember.
24   Q.    Okay.  And at that time --
25   A.    I don't recall.

Page 57

1    Q.    -- on May 31st, 2000, at your first court
2  appearance, you also had an escape warrant for IDOC,
3  right?
4    A.    Yes, but it's from house arrest.
5    Q.    Okay.
6    A.    I wasn't on work release.  I was on house
7  arrest.
8    Q.    And when you were on house arrest, how
9  did you escape then?
10   A.    I just left.
11   Q.    You left.  So you were violating the
12  house arrest by going places where you weren't
13  supposed to be?
14   A.    No.  I just left.
15   Q.    What do you mean you just left?
16   A.    I was tired of being there.  I was tired
17  of the situation.  And I was tired of living at that
18  place, and I tried to get stuff changed and I just
19  was tired of all that and I left.
20   Q.    Where were you on house arrest?
21   A.    At my parents' home.
22   Q.    Okay.  So you were on house arrest at
23  your parents' home?
24   A.    Yeah.
25   Q.    You grew tired of the fact that you were

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 58..61
XAVIER L. WALKER, 04/12/2022

Page 58

1   on house arrest and you just decided to leave your
2   parents' home?
3       A.   Yes.
4       Q.   And you knew that was a violation of the
5   terms and conditions of your house arrest, but you
6   did it anyway, right?
7       A.   Yes.
8       Q.   Who is Jovanie Long?
9       A.   A childhood friend.
10      Q.   Does he go by the nickname Vani?
11      A.   Yes.
12      Q.   Is that what you call him?
13      A.   Yes.
14      Q.   Do you also call him Vonnie, Vonnie?
15      A.   No.  Just Vani.
16      Q.   Just Vani.  Okay.  Have you ever heard
17  him go by the nickname G-Man?
18      A.   No.
19      Q.   Have you ever heard anybody call Jovanie
20  Long G-Man?
21      A.   No.
22      Q.   Do you have any other nicknames for him?
23      A.   No.
24      Q.   Have you ever heard anybody else use any
25  nicknames to call him by?

Page 59

1       A.   No.
2       Q.   Have you ever referred to Jovanie Long as
3   Outlaw?
4       A.   No.
5       Q.   When did you first meet Jovanie Long?
6       A.   I don't know.  When I was probably like 5
7   or something.  I don't know.
8       Q.   So you grew up with Jovanie Long,
9   correct?
10      A.   Yes.
11      Q.   And you were best friends?
12      A.   No.
13      Q.   Well, he's like your godbrother, right?
14      A.   Yes.
15      Q.   You called him your brother, haven't you?
16      A.   Yes, he is.  He's still my godbrother.
17      Q.   He's still your godbrother?
18      A.   Yes.
19      Q.   How is he your godbrother?  Explain the
20  connection there.
21      A.   His mother is friends with my parents and
22  became my godmother, so he's my godbrother.
23      Q.   So Regina Long, Jovanie Long's mother is
24  your godmother?
25      A.   Yes.

Page 60

1       Q.   Has she always been your godmother since
2   you were born?
3       A.   Not since I was born.  I think to when
4   they became friends and that stuff happened.  I
5   don't know.
6       Q.   Okay.  Well, prior to May 2000, was
7   Regina Long your godmother?
8       A.   Yes.
9       Q.   So as far as you can remember during your
10  childhood, Regina Long was your godmother?
11      A.   Yes.
12      Q.   And because she was your godmother,
13  Jovanie Long was your godbrother?
14      A.   Yes.
15      Q.   Did you consider him to be family?
16      A.   Yes.
17      Q.   Jovanie -- Jovanie Long's mother, Regina
18  Long, wasn't she close friends with your sister
19  Sheleah Walker?
20      A.   She was close friends with all my -- all
21  my family.
22      Q.   All your family.  Did you guys spend
23  holidays together?
24      A.   Yes.
25      Q.   Like Christmas and --

Page 61

1       A.   Yes.
2       Q.   -- Easter, that kind of stuff?
3       A.   All that stuff, birthdays, all of it.
4       Q.   Back in 2000, so the spring and summer of
5   2000, how often would you see Jovanie Long?
6       A.   When I'd go around my old neighborhood.
7       Q.   And how often would you go back to your
8   old neighborhood in the spring, summer 2000?
9       A.   A lot.  I can't -- no numbers, but I went
10  often.
11      Q.   Often.  Okay.  Well, you weren't in
12  school, right, in that time frame?
13      A.   No.
14      Q.   And you weren't working anywhere, right?
15      A.   No.
16      Q.   So were you going there like every day or
17  every other day?
18      A.   Just often.  I can't -- not every day.
19  Sometime I might not go over there for a couple
20  days.  I might stay around my momma house for a
21  couple days and then go back over there.
22      Q.   So if you were going to your old
23  neighborhood back in that time frame, spring or
24  summer 2000, where would you and Jovanie hang out?
25      A.   A bunch of places.  All over.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 62..65
XAVIER L. WALKER, 04/12/2022

Page 62

1    Q.    I'm sorry?
2    A.    A bunch of places.  All over.  We hung
3  out a lot of places.
4    Q.    Can you give me the names of any of those
5  places?
6    A.    We went to malls.  We went to shows.  We
7  went to clubs.  We went to parks.  We went to
8  basketball games.
9    Q.    So you knew Jovanie Long from the Erie
10  neighborhood; is that right?
11    A.    Yes.
12    Q.    And how long -- for how many years did
13  you live in the Erie neighborhood for?
14    A.    Until I was probably in 6th or 7th grade.
15    Q.    6th or 7th grade.  So how old were you?
16    A.    I don't recall.
17    Q.    Okay.  So you grew up in the Erie
18  neighborhood?
19    A.    Yes.
20    Q.    And when I say the Erie neighborhood,
21  what -- what does that mean to you?
22    A.    My old neighborhood.
23    Q.    Give me the geographic locations of what
24  you consider to be your old neighborhood.
25    A.    Cicero and Erie.

Page 63

1    Q.    Cicero and Erie.
2          Do you call that by any other name
3  besides like the Cicero and Erie neighborhood?
4    A.    No.
5    Q.    Okay.  So in the 6th or 7th grade, you
6  moved from the Erie neighborhood to the Potomac
7  address; is that right?
8    A.    Potomac.
9    Q.    Potomac.
10    A.    Yes.
11    Q.    And that what -- what was the address
12  there?
13    A.    5431 West Potomac.
14    Q.    And you continued to reside at 5431 West
15  Potomac from 6th or 7th grade until you were
16  arrested in May 2000; is that right?
17    A.    Yes.
18    Q.    And your parents continued to live at
19  5431 West Potomac even during your incarceration; is
20  that right?
21    A.    Yes.
22    Q.    Your mother still lives there?
23    A.    Yes.
24    Q.    When you moved to the Potomac address
25  when you were in 6th or 7th grade, did you make new

Page 64

1  friends in your new neighborhood?
2    A.    Yes.
3    Q.    Did you introduce Jovanie Long to your
4  new friends in your new neighborhood?
5    A.    Yes.
6    Q.    Which friends did you introduce him to?
7    A.    All of them.
8    Q.    So did you introduce Jovanie Long to
9  Simeon Dorsey?
10    A.    Yes.
11    Q.    And did you introduce Jovanie Long to
12  Deon Baylock prior to May 2000?
13    A.    Yes.
14    Q.    In May 2000, was Jovanie Long dating
15  anyone?
16    A.    He had a lot of girlfriends.
17    Q.    Do you know anyone by name?
18    A.    No, I can't recall, but...
19    Q.    You can't recall the names of any of his
20  girlfriends?
21    A.    No, not right now.  I can't recall.
22    Q.    Were you dating anyone in May of 2000?
23    A.    I had a lot of girlfriends, too.  We was
24  kids.  We was young kids, just...
25    Q.    Any names that you remember of girls that

Page 65

1  you were dating?
2    A.    My wife.
3    Q.    So your wife Lijona was someone that you
4  were dating in May of 2000?
5    A.    Yes.
6    Q.    Anybody else besides Lijona?  And you
7  said you were with many girls.
8    A.    I don't -- just a lot of girls.  A lot of
9  names.  I don't...
10          Tara Montgomery, who I was talking to
11  that night.
12    Q.    And she's deceased, right?
13    A.    Yes.
14    Q.    Any girlfriends that you can name that
15  are currently living that you were dating back in
16  May 2000?
17    A.    I can't say we was really dating.  I
18  really wasn't -- I was just -- wasn't dating.  We
19  was just having fun, messing around.
20    Q.    Having fun.  Okay.  Were you having fun
21  or messing around with a girl by the name of Lakesha
22  Smith?
23    A.    Yeah.  I ain't seen her since I've been
24  out either.
25    Q.    Were you having fun with her in May 2000?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 66..69
XAVIER L. WALKER, 04/12/2022

Page 66

1   A.   Yes.
2        Q.   Did Jovanie know that you were having fun
3   with his girlfriend?
4        A.   No.  It was a different Lakesha Smith.
5        Q.   So at some point you and Jovanie Long
6   were both dating Lakesha Smiths?
7        A.   Yeah.  That's crazy.
8        Q.   Did you know any of Jovanie Long's
9   ex-girlfriends?
10       A.   Yeah.  I know a lot -- I know a lot of
11  his girlfriends.
12       Q.   Do you -- can you name any of them?
13       A.   No, I can't recall, but I know a lot of
14  them.
15       Q.   Did you know Jovanie Long's ex-girlfriend
16  Hershula Byrd?
17       A.   Yes.
18       Q.   When did you first meet Hershula Byrd?
19       A.   She grew up in the neighborhood, too.  I
20  knew her basically all my life.
21       Q.   Were you friends with her?
22       A.   We just know each other.
23       Q.   Okay.  You knew each other.
24       A.   I can't really say we friends.
25       Q.   Do you still know her currently?

Page 67

1   A.   Yeah.
2        Q.   Do you -- is Hershula Byrd someone that
3   you stay in touch with from time to time?
4        A.   Not really.
5        Q.   Have you ever spoken to Hershula Byrd
6   about your criminal case?
7        A.   No.
8        Q.   Have you ever spoken to her about your
9   civil lawsuit?
10       A.   No.
11       Q.   Where was Jovanie living in May 2000?
12       A.   At his family house that stayed on Erie.
13       Q.   He stayed on Erie?
14       A.   Yeah.
15       Q.   At his family house?
16       A.   Yes.
17       Q.   Where?  What was the address of his
18  family house on Erie?
19       A.   I don't know the exact address, but he
20  stayed -- they had two houses right there on Erie,
21  his family, but...
22       Q.   Wait.  So this is someone that you grew
23  up with whose mother is your godmother.  You don't
24  know the address of where he lived on Erie?
25       A.   I don't even remember my address on Erie.

Page 68

1        Q.   Okay.  So did -- did Jovanie Long have
2   two family homes on Erie?
3        A.   Yes.
4        Q.   And who lived in those homes?
5        A.   In one side his mother and cousin, auntie
6   and them, and then on the other side, his uncle Earl
7   and his auntie Gail and them.
8        Q.   Uncle Earl and auntie who?
9        A.   Gail.  They married.  It was a couple,
10  and then they had their kids and stuff.
11       Q.   Okay.
12       A.   Which is cousins and stuff.  They stayed
13  on the corner right there on Kilpatrick and Erie,
14  and then you go right down a little bit, it was
15  Jovanie house on the opposite side of the street.
16       Q.   Okay.  So in May 2000 he would either
17  stay with his mother and auntie on Erie or at his
18  uncle Earl's house with Gail; is that right?
19       MS. SAMUELS:  Objection, calls for
20  speculation.
21       THE WITNESS:  He stayed with his mother, but
22  he had access to both.  We all be in all them
23  houses.
24  BY MS. ITCHHAPORIA:
25       Q.   Okay.  And as far as you know, did he

Page 69

1   stay anywhere else?
2        MS. SAMUELS:  Same objection.
3        THE WITNESS:  Not stay, no.
4   BY MS. ITCHHAPORIA:
5        Q.   Okay.  Did Jovanie Long ever like stay
6   with you and your family?
7        A.   Not really stay.  He come over.  He'd
8   spend time, come and go when he wanted to.  Same way
9   we all -- all us was with our family that was --
10  grew up together.
11       Q.   Jovanie Long, when he lived on Erie, he
12  lived a few doors down from Maurice Wright, right?
13       A.   His family and them did, yeah.  He stayed
14  across the street.
15       Q.   Did you ever meet Jovanie Long's father?
16       A.   Yes.
17       Q.   What's his name?
18       A.   John.
19       Q.   When did you meet John?
20       A.   When I was a kid.  I don't know.
21       Q.   Did John also stay around on Erie?
22       A.   No.
23       Q.   Where did he stay?
24       A.   I don't recall.
25       Q.   Did you ever go to his house?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 70..73
XAVIER L. WALKER, 04/12/2022

Page 70

1    A.   One of his houses, yeah.
2    Q.   And where was that located?
3    A.   On Superior.
4    Q.   Do you know any of Jovanie Long's
5  siblings?
6    A.   Yes.
7    Q.   Who do you know?
8    MS. SAMUELS:  Objection, relevance.
9    THE WITNESS:  All the siblings.
10 BY MS. ITCHHAPORIA:
11   Q.   Okay.  Well, how many -- how many
12 siblings does he have?
13   A.   Two.
14   Q.   What are their names?
15   A.   Timothy and Yada.
16   Q.   Timothy and?
17   A.   Yada.
18   Q.   Yada?  Is that what you're saying?
19   A.   Yeah.
20   Q.   Y A D A?
21   A.   That's -- yeah, that's what I call him.
22   Q.   Is Yada a boy or a girl?
23   A.   Girl.
24   Q.   Okay.  So is Timothy -- Timothy is -- his
25 last name is Long, right?

Page 71

1    A.   Yes.
2    Q.   Is Timothy Long a friend of yours?
3    A.   Yes.
4    Q.   Is he still a friend of yours?
5    A.   Yes.
6    Q.   You kept in touch with Timothy Long while
7  you were in prison; is that right?
8    A.   From time to time, yeah.
9    Q.   And you've spoken to Timothy Long about
10 your criminal case, correct?
11   A.   No.
12   Q.   Have you ever talken -- have you ever
13 spoken to him about your civil case?
14   A.   No.
15   Q.   Did you see Timothy Long on May 13th,
16 2000?
17   A.   I can't recall.
18   Q.   So it's possible you saw him and you just
19 don't remember?
20   A.   It's possible, but I can't recall.
21   Q.   Isn't it true that you saw Timothy Long
22 at Mary Curry's house on May 13th, 2000?
23   A.   I can't recall.
24   Q.   So it's possible that you saw him there
25 on May 13th, 2000; you just don't remember?

Page 72

1    A.   I don't recall that, so I can't recall.
2    Q.   And you said Yada was a -- is a sister of
3  Jovanie Long?
4    A.   Yes.
5    Q.   And do you know what Yada's last name is?
6    A.   No.
7    Q.   Is that his like biological sister or
8  stepsister?
9    A.   Biological sister.
10   Q.   Okay.  So Yada, Timothy Long, and Jovanie
11 are all brothers and sisters?
12   A.   No.
13   Q.   Oh.  Explain the connection then.
14   A.   Timothy is Regina's son and Jovanie is
15 Regina's son, and Yada is John's daughter and...
16   Q.   Okay.  Got it.  Okay.  Have you ever
17 spoken to Regina Long about your criminal case?
18   A.   No.
19   Q.   You ever spoken to her about the events
20 of May 13th, 2000?
21   A.   No.
22   Q.   In May 2000 -- well, strike that.
23        Was -- is Jovanie about the same age as
24 you, or he is older?
25   A.   I think he a couple of months or a year

Page 73

1  older.  I can't recall.
2    Q.   Did you ever go to school with Jovanie?
3    A.   Yes.
4    Q.   So he went to Orr when you went to Orr?
5    A.   No.
6    Q.   No?  He went to a different school?
7    A.   Yeah.  Yeah.
8    Q.   Why are you laughing?
9    A.   Cause.
10   Q.   Because?
11   A.   It's just funny thinking about it.
12   Q.   Was Jovanie in the same grade as you
13 were?
14   A.   I think he in the grade above me.
15   Q.   Grade above you.  Okay.  He wasn't in
16 school either in May 2000, right?
17   MS. SAMUELS:  Objection, relevance,
18 speculation.
19   THE WITNESS:  I don't know.
20 BY MS. ITCHHAPORIA:
21   Q.   He had dropped out?
22   A.   I don't know.
23   MS. SAMUELS:  Same objection.
24 BY MS. ITCHHAPORIA:
25   Q.   Jovanie Long wasn't employed in May of

XAVIER WALKER vs CITY OF CHICAGO, et al.                          Pages 74..77
XAVIER L. WALKER, 04/12/2022

Page 74

1   2000, was he?
2        MS. SAMUELS:  Objection, relevance,
3   speculation.
4        THE WITNESS:  I don't know.
5   BY MS. ITCHHAPORIA:
6        Q.    Did you know Jovanie Long to ever be
7   employed when you knew him prior to May 28, 2000?
8        A.    Yes.
9        MS. SAMUELS:  Objection, relevance,
10  speculation.
11  BY MS. ITCHHAPORIA:
12       Q.    Where did you know him to be employed?
13       A.    I don't know.  I just know he had jobs
14  before.
15       Q.    You knew he had a job?
16       A.    Yeah.
17       Q.    What job did he have?
18       MS. SAMUELS:  Objection --
19       THE WITNESS:  I don't know.
20       MS. SAMUELS:  -- to relevance as to Mr. Long's
21  employment history.
22  BY MS. ITCHHAPORIA:
23       Q.    How did you know he had a job then?
24       A.    Because he'd tell us he going to work.
25  He can't come kickin' it.  He got to go to work.

Page 75

1   And he went to work.
2        Q.    But you don't know what he did?
3        A.    No.
4        Q.    And you don't know where he worked?
5        A.    No.
6        Q.    And you don't know how many hours he
7   worked?
8        A.    No.
9        Q.    Was he working in May 2000?
10       A.    I can't recall.
11       Q.    Other than Jovanie Long, who else did you
12  know that you were friends with from your old
13  neighborhood, the Cicero and Erie neighborhood, that
14  you grew up with?
15       A.    Everybody.
16       Q.    Can you give me some names?
17       MS. SAMUELS:  Objection, vague.
18       THE WITNESS:  Anthony.
19  BY MS. ITCHHAPORIA:
20       Q.    Anthony Pettigrew?
21       A.    Yeah.
22       Q.    That's a cousin of yours, right?
23       A.    Yeah.
24       Q.    Anybody else?
25       A.    Junior.  There's a lot of people.

Page 76

1   Everybody that still be around there.
2        Q.    Junior, you said?
3        A.    Yes.
4        Q.    What's Junior's real name?
5        A.    I don't know.
6        Q.    What's Anthony Pettigrew's street name?
7        A.    Anthony.  He ain't got no street name.
8   They just called him his name, Anthony Pettigrew.
9        Q.    Maurice Wright was a friend of yours from
10  the old neighborhood, correct?
11       A.    Yes.
12       Q.    And what was Maurice Wright's nickname?
13       A.    Boo Boo.
14       Q.    Is that his street name?
15       A.    It's his nickname.  Everybody called him
16  that.  Family and everybody.  So it was just a
17  nickname, like Matt probably.
18       Q.    You called Maurice Wright Boo Boo, right?
19       A.    Yes.
20       Q.    And Antwoine Waddy, he was a friend of
21  yours too?
22       A.    Yes.
23       Q.    He's someone from the old neighborhood as
24  well?
25       A.    Yes.

Page 77

1        Q.    And you called Antwoine Waddy Bubble; is
2   that right?
3        A.    Yes.
4        Q.    You're saying other people -- that you
5   knew other people from the neighborhood.  Who else?
6   Do you remember any other names?
7        A.    Cowboy, D'Shaun, James, just a bunch of
8   names, Charles.  There's a lot of people.  I knew
9   the neighborhood.  I grew up with it, and we all
10  hung out and was cool and played basketball and
11  football and softball and all that stuff together,
12  flipped together.
13       Q.    Were you friends with an individual by
14  the name of Robert Byrd?
15       A.    Yes.
16       Q.    What was his street name?
17       A.    Ra Ra.
18       Q.    And Robert Byrd was in the same gang that
19  you were in, right?
20       A.    Yes.
21       Q.    And that was -- you were a member of the
22  Imperial Insane Vice Lords?
23       A.    Yes.
24       Q.    And Bubble, also known as Waddy, he was
25  also a member of the same street gang that you

XAVIER WALKER vs CITY OF CHICAGO, et al.                Pages 78..81
XAVIER L. WALKER, 04/12/2022

Page 78

1  were --
2      A.   Yes.
3      Q.   -- correct?
4           What about Boo Boo?  Was Boo Boo a member
5  of the Imperial Insane Vice Lords?
6      A.   No.
7      Q.   What gang was Boo Boo in?
8      A.   I don't recall.
9      Q.   Boo Boo was a member of the New Breeds,
10 right?
11     A.   I don't recall.
12     Q.   But he was in a street gang as far as you
13 knew?
14     A.   Yes.
15     Q.   But he wasn't in the same gang as you?
16     A.   No.
17     Q.   Do you know an individual by the name
18 of -- street name by the name of Lil Red?
19     A.   Yes.
20     Q.   Who's Lil Red?
21     A.   There's a few of them.
22     Q.   A few of them?
23     A.   Yes.
24     Q.   Do you know a Lil Red off Erie?
25     A.   There's a few of them off of Erie.

Page 79

1      Q.   Oh, there's a few of them off Erie?
2      A.   Yeah.
3      Q.   How many?
4      A.   Like three.
5      Q.   Any of them that you're friends with?
6      A.   Yes.
7      Q.   Are you friends with all three?
8      A.   Yes.
9      Q.   And were you friends with all three when
10 you were incarcerated?
11     A.   Yes.
12     Q.   Do you know any of their names?
13     A.   Cortez is the only one I know the name.
14     Q.   Cortez -- is Cortez and Posto the same
15 person?
16     A.   No.
17     Q.   They're different people?
18     A.   Yes.
19     Q.   Cortez was a member of the Imperial
20 Insane Vice Lords as well?
21     A.   I don't know.
22     Q.   What about Charles Toles?  Was someone
23 that you knew from the old neighborhood?
24     A.   No.
25     Q.   He was someone from the new neighborhood?

Page 80

1      A.   Yes.
2      Q.   Okay.  Did you know an individual by the
3  name of Lil Greg?
4      A.   Yes.
5      Q.   He was from the old neighborhood?
6      A.   Yes.
7      Q.   What was his actual name?
8      A.   I don't know.
9      Q.   Don't know his actual name?
10     A.   No.
11     Q.   Was Lil Greg also a member of the
12 Imperial Insane Vice Lords?
13     A.   Yes.
14     Q.   And what about Sammy?
15     A.   Yes.
16     Q.   Sammy was someone that you grew up with
17 from the old neighborhood, right?
18     A.   Yes.
19     Q.   And Sammy was also a member of the Insane
20 Imperial Vice Lords?
21     A.   Yes.
22     Q.   Still friends with Sammy?
23     A.   He's deceased.
24     Q.   When did he pass?
25     A.   Right before I came home.  I don't know

Page 81

1  the exact date and time.
2      Q.   Okay.  What about Little Lloyd?  Did you
3  know him from the old neighborhood?
4      A.   Little Lloyd?  I think you probably ain't
5  saying it right.  I don't -- no, I don't know no
6  Little Lloyd.
7      Q.   L L O Y D?
8      A.   Probably Little Lord.
9      Q.   Little Lord?
10     A.   Yeah.  There's a lot of those too.
11     Q.   Did you know someone -- I'm sorry?
12     A.   There's a lot of those too.
13     Q.   Okay.  Did you know someone called
14 little -- Little Lloyd or Little Lord that was in
15 the same gang as you?
16     A.   Yes.
17     Q.   What was his actual name?
18     A.   I don't know.
19     Q.   Did you know someone by the name of
20 Jesse?
21     A.   Yes.
22     Q.   Who's Jesse?
23     A.   A lot of -- a childhood friend I grew up
24 with.
25     Q.   From the old neighborhood?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 82..85
XAVIER L. WALKER, 04/12/2022

Page 82

1    A.   Yes.
2    Q.   Is Jesse that person's actual name?
3    A.   Yes.
4    Q.   What's Jesse's last name?
5    A.   I don't know.
6    Q.   Jesse was also a member of the Imperial
7  Insane Vice Lords?
8    A.   Yes.
9    Q.   What about Demont?  Do you know a Demont?
10   A.   Yes.
11   Q.   Was Demont a member of the Vice Lords?
12   A.   I don't know.  He grew up in the
13 neighborhood, but I don't know if he was a part
14 of -- he was playing football.  He was going to
15 school.  I don't know.
16   Q.   You communicated with Jovanie Long when
17 you were incarcerated; is that right?
18   A.   Yes.
19   Q.   And when you were in prison, so when you
20 were in IDOC custody, you would write letters to
21 him, right?
22   A.   Yes.
23   Q.   And he would write letters to you?
24   A.   Yes.
25   Q.   Where are those letters now?

Page 83

1    A.   Trash somewhere.  I don't know.
2    Q.   Did you ever give those letters to your
3  lawyer?
4    A.   I think -- I don't know.  If she asked
5  for them, I probably did.  If not, I threw them
6  away.
7    Q.   You had those letters when you were
8  released, though, in December of 2019, right?
9    A.   I probably had some, not all.
10   Q.   And -- then when did you trash them?
11   A.   It was a lot of years.  So I -- I threw
12 letters away every year.  Every time my stuff got
13 too full in my cell, I threw letters and stuff away.
14 So I had the stuff that was more recent with me when
15 I came home.
16   Q.   When you came home, you did have letters
17 from Jovanie Long, correct?
18   MS. SAMUELS:  Objection, calls for
19 speculation.
20   THE WITNESS:  I don't know.  Probably so.
21 BY MS. ITCHHAPORIA:
22   Q.   You would ask your family members when
23 you were incarcerated and your friends to
24 communicate with Long when you were in prison,
25 right?

Page 84

1    A.   No.
2    Q.   You wouldn't ask your family members and
3  friends to give Long -- Mr. Long some messages?
4    A.   No.  I was able to get in touch with him
5  myself.  Why would I have to go through them?
6    Q.   How were you able to get in touch with
7  him?
8    A.   I write him.
9    Q.   Other than writing, were you able to
10 communicate with him through any other means?
11   A.   When we end up being in the same places
12 and see each other.
13   Q.   Okay.  Other than seeing each other --
14   A.   No.
15   Q.   -- or writing to him, were you able to
16 communicate with him in any other way?
17   A.   No.
18   Q.   Since your release from prison in
19 December 2019, when was the last time you spoke to
20 Jovanie Long?
21   A.   Around the time my father passed.  He
22 called and told me he heard about it.
23   Q.   He's someone that you communicate with on
24 a regular basis since your release, right?
25   A.   Yes.

Page 85

1    Q.   He calls you?
2    A.   Yes, when he can.
3    Q.   And when he calls you from prison, he
4  calls you pretty frequently, correct?
5    A.   No.  He call when he can.
6    Q.   When Jovanie Long calls you from prison
7  since you've been released, you guys talk about your
8  criminal case, right?
9    A.   No.
10   Q.   When was the last time that you saw
11 Jovanie Long?
12   A.   When he came back and went to court.
13   Q.   Sorry?
14   A.   When he came back and went to court.
15   Q.   When was that?  What year?
16   A.   This year -- what year?  Is this year?
17 This year.  No.  Yeah, this year, I think.
18   Q.   Oh, so this year his case was up and you
19 were in court?
20   A.   Yes.
21   Q.   Did you go to court to see him?
22   A.   No.  I went to court for my situation for
23 stuff I had to go to court for, and I seen him.
24   Q.   So was your case and his case was both up
25 at the same time when you went to court this year?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 86..89
XAVIER L. WALKER, 04/12/2022

Page 86

1    A.   No, not my case. I said a case,
2  something I had to go to court for, and his case was
3  done as well. So I went and had to see him.
4       Q.   Why were you going to court this year?
5    MS. SAMUELS:  Objection, relevance.
6  BY MS. ITCHHAPORIA:
7       Q.   Well, that's what I'm trying to find out.
8    A.   Not no case of my own. Not no situation
9  of my own.
10      Q.   Oh, I thought you said it was your case?
11   A.   No, I said the situation that I went to
12  court for. I didn't say case.
13      Q.   Okay. So why were you in court when you
14  saw Jovanie Long?
15   MS. SAMUELS:  Same objection.
16   THE WITNESS:  One of my cousins had a court
17  date, and I took him. I had -- he didn't have a way
18  and I took him, and then I went to court with him.
19  BY MS. ITCHHAPORIA:
20      Q.   And did you see Jovanie Long at that
21  time?
22   A.   Yes, I seen him when they called him out
23  while we was sitting there waiting and stuff for his
24  case.
25      Q.   When you were in court, though, did you

Page 87

1  speak to him?
2    A.   No.
3       Q.   Okay.
4    A.   How am I going to speak to him? He in
5  jail. He behind the thing.
6       Q.   When -- since your release in December
7  2019, have you ever gone to visit Jovanie Long in
8  prison?
9    A.   No.
10      Q.   Have you given him any commissary money?
11   A.   Yes.
12      Q.   How much money have you given Jovanie
13  Long since your release in 2019?
14   A.   I don't know. I don't recall.
15      Q.   You talking thousands?
16   A.   I don't have no thousand. I ain't --
17      Q.   Well, when you got a certificate of
18  innocence, you got money from the State of Illinois,
19  correct?
20   A.   Yes.
21      Q.   And that was more than thousands, right?
22   A.   But that was stuff I used to take care of
23  my family and my household. I ain't...
24      Q.   You haven't given any of that money to
25  Jovanie Long?

Page 88

1    A.   No.
2       Q.   Well, how much money have you given him
3  since your release in December of 2019?
4    MS. SAMUELS:  Asked and answered.
5    THE WITNESS:  I can't recall, but probably --
6  I don't know. No no -- a lot of money. I ain't
7  got a lot of money. I got bills.
8  BY MS. ITCHHAPORIA:
9       Q.   Do you put money on his phone card?
10   A.   No.
11      Q.   How would you describe your relationship
12  with Jovanie Long currently?
13   A.   I don't know. I don't know. I guess we
14  all right.
15      Q.   You still consider him to be a close
16  friend?
17   A.   Yes.
18      Q.   Following your arrest in May of 2000, you
19  found out that Jovanie Long had been arrested as
20  well, right?
21   A.   The police told me he was arrested. They
22  lied to me and first told me he was there when I was
23  there. Then when he got arrested, they told me that
24  too.
25      Q.   Well, isn't it true that you saw Jovanie

Page 89

1  Long in court after you had been arrested in May of
2  2000?
3    A.   No.
4       Q.   Did you ever see Jovanie Long in court
5  when your case was up in court?
6    A.   Yes. After he got arrested, but he
7  didn't get arrested until August or something.
8       Q.   Okay. So did you become aware after
9  August 2000 that Jovanie Long was also arrested for
10  the same murder that you were arrested for?
11   A.   Yes.
12      Q.   And did you find that out because you saw
13  him in court?
14   A.   No, I found out because my lawyer told me
15  so.
16      Q.   Okay. And that was your lawyer Greg
17  Wilson?
18   A.   Yes.
19      Q.   So Greg Wilson told you and -- sometime
20  in August that Jovanie Long had also been arrested?
21   A.   Yes, and I got it reindicted. They
22  reindicted me. And I was like, what -- what you
23  mean they reindicted me? He told me why they was
24  reindicting me. He was finally locked up and
25  brought to jail, and they reindicted and added to

XAVIER WALKER vs CITY OF CHICAGO, et al.                           Pages 90..93
XAVIER L. WALKER, 04/12/2022

Page 90

1  where now it's both us, and they supposed to nully
2  my case and let me out and then recharge me, but
3  because they don't care and they ain't going by the
4  rules, they just going to keep me in here and nully
5  it and reindict me and keep it moving.
6      Q.   So they -- when you say "they," you mean
7  the State reindicted you after Jovanie Long was also
8  arrested for the same murder charge that you were
9  arrested for?
10     A.   Yes.
11     Q.   Okay.  And then you would see Jovanie
12 Long in the bullpen when you were waiting for court
13 and he's waiting for court on the same case, right?
14     A.   Yes.
15     Q.   And you and Jovanie Long were also housed
16 in the same division when you were both at Cook
17 County Jail awaiting trial, right?
18     A.   No.
19     Q.   You were never in the same division as
20 him?
21     A.   No.
22     Q.   Weren't you both in Division 10 for some
23 period of time before your criminal trial?
24     A.   No.
25     Q.   So it's your testimony as you sit here

Page 91

1  today that you were never housed in the same
2  division as Jovanie Long when you were waiting for
3  your criminal trial?
4      A.   Yes.
5      Q.   You communicated with Jovanie Long about
6  your criminal cases, though, when you were waiting
7  for your case to be called when you were in the
8  bullpen with Jovanie Long, right?
9      A.   No.
10     Q.   Well, when you would see him in the
11 bullpen, what would you guys talk about?
12     A.   We was kickin' it and having fun and
13 being young, stupid kids that we was, entertaining
14 the things that was going on in jail.
15     Q.   Well, you knew at that time that you were
16 in court on a very serious murder charge, right?
17 Correct?
18     A.   But I didn't understand the magnitude of
19 it, and we was still stupid like a lot of young
20 people that's in jail right now.
21     Q.   Sir, when you were 19 years old, when you
22 were in court with Jovanie Long, you understood that
23 you were in court for a very serious murder charge,
24 correct?
25     MS. SAMUELS:  Objection, asked and answered.

Page 92

1      THE WITNESS:  And I just told you, I didn't
2  understand the magnitude of it.  And I was a young
3  kid that was stupid, and I was still entertaining
4  the things that was going on in jail and that meant
5  more to me than the case.  So I didn't even do --
6  that really was -- and I knew I ain't have nothing
7  to do with it, so I'm like...
8  BY MS. ITCHHAPORIA:
9      Q.   Well, you were aware that you were in
10 there for murder?
11     A.   Yes.
12     Q.   And you understood at that time that
13 murder carried a very stiff penalty, right?
14     MS. SAMUELS:  Objection, argumentative, asked
15 and answered.
16     THE WITNESS:  I just told you.  I never really
17 thought about that stuff when I was there.  That
18 stuff didn't cross my mind when I was there.  I was
19 young and dumb.  And I was into the street life and
20 street stuff and what was going on in the jail.
21 That's why a lot of people end up being in the
22 penitentiary because they be young and stupid and
23 they don't take their case serious and go and learn
24 the law and fight their own cases or try to help the
25 lawyer do that type of stuff.  So they just sit

Page 93

1  there and wait and think they got a lawyer.  They
2  going -- if they feel they free or they going home,
3  especially if they know they didn't do it, I'm going
4  home.  I got a lawyer.  He going to take care of it.
5  And that was my life.  And I was having fun in jail
6  doing stupid stuff, being young and dumb.
7  BY MS. ITCHHAPORIA:
8      Q.   When you saw Jovanie Long in the bullpen,
9  did you have a conversation with him about the
10 videotaped statement that you gave -- that you gave
11 that implicated him and yourself in the murder of
12 Marek Majdak?
13     A.   No.
14     Q.   Did you ever talk about that with Jovanie
15 Long?
16     A.   No.
17     Q.   So to this day, is it your testimony that
18 you've never spoken to Jovanie Long about the
19 statement that you gave implicating Jovanie Long and
20 implicating yourself in that murder?
21     A.   I never talked to him about that stuff.
22     Q.   So he's your co-defendant on the same
23 murder charge, and you've never spoken to him about
24 the statement that you gave that implicated him?
25 That's what you're saying?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 94..97
XAVIER L. WALKER, 04/12/2022

Page 94

1    A.    Yeah.
2         MS. SAMUELS:  Asked and answered,
3    argumentative.
4    BY MS. ITCHHAPORIA:
5         Q.    Has Jovanie Long ever spoken to you about
6    the statement that he gave that implicated himself
7    and you in the same murder?
8         A.    No.
9         Q.    Why wouldn't you talk to your
10   co-defendant about the statement that he gave that
11   implicated you in this murder that occurred on
12   May 13th, 2000?
13        A.    Because I was young and I was dumb and
14   naive, and that stuff wasn't important to me and I
15   felt I had a lawyer.  I didn't do this stuff.  I
16   ain't got nothing to worry about.  All that stuff
17   was fake and false.  And I was entertaining what was
18   going on in jail, once again.
19        Q.    Well, you're 40 years old now, though,
20   right?
21        A.    Yes.
22        Q.    And you still never asked your
23   co-defendant Jovanie Long, your godbrother, hey, why
24   did you give a statement implicating me in this
25   murder?  You've never asked him that?

Page 95

1         A.    No, because during the course of my time
2    of being in jail, I know why, because they did
3    treat him like they treated me, and you do
4    what the police say when they treat you like they
5    treat us.
6         Q.    Okay.  But to be clear, as you sit here
7    today, you've never asked Jovanie Long why he
8    implicated you, correct?
9         A.    No.
10        MS. SAMUELS:  Asked and answered,
11   argumentative.
12   BY MS. ITCHHAPORIA:
13        Q.    My statement is correct?
14        A.    And -- correct.
15        Q.    Okay.
16        A.    Once again.
17        Q.    Did you ever discuss your trial strategy
18   with Jovanie Long when you would see him in the
19   bullpen?
20        A.    No.
21        Q.    Did he ever discuss his trial strategy
22   with you?
23        A.    No.
24        Q.    Did you ever talk about with Jovanie Long
25   where you were at the time of the murder on

Page 96

1    May 13th, 2000?
2         A.    No.
3         Q.    Did he ever talk about where he was at
4    the time of the murder on May 13th, 2000?
5         A.    No.
6         Q.    As you sit here today, do you have an
7    understanding of where Jovanie Long was supposedly
8    at at the time of the murder on May 13th, 2000?
9         A.    No, I do not.
10        Q.    No idea?
11        A.    No.
12        Q.    And you've never asked him?
13        A.    No.
14        MS. ITCHHAPORIA:  All right.  Let's take a
15   quick break.  Go off the record, please.
16        THE VIDEOGRAPHER:  We are off -- we are off
17   the record at 12:33 p.m.
18             (Whereupon, a break was taken,
19              after which the following
20              proceedings were had:)
21        THE VIDEOGRAPHER:  We are back on the record
22   at 12:43 p.m.
23   BY MS. ITCHHAPORIA:
24        Q.    You were at Cook County Department of
25   Corrections awaiting trial from May 30th, 2000,

Page 97

1    until June 2004; is that right?
2         A.    No.
3         Q.    Okay.  What -- for what period of time
4    were you at the Cook County Department of
5    Corrections?
6         A.    From May 31st to 2005 something.
7         Q.    Okay.  Until your sentencing on
8    January 11th, 2005?
9         A.    Yes.
10        Q.    Okay.  And during that period of time,
11   May 31st, 2000, to January 11th, 2005, did you ever
12   see Jovanie Long when you were at the Cook County
13   Department of Corrections?
14        A.    Yes, I seen him when we go to court.
15        Q.    Right.  But not at court.  I'm saying,
16   would you ever see him when you were in the jail?
17        A.    No.  I was in Division 9 and he was in
18   Division 11.
19        Q.    So you were in 9 -- were you in 9 the
20   whole time?
21        A.    No, I went to 10, but when I went to 10,
22   I came in 2'05 on a writ to come back after I had
23   writed to the penitentiary, to IDOC, and I came
24   back, they only had at the time that was the writ
25   deck in Division 10, but he had -- was already gone.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 98..101
XAVIER L. WALKER, 04/12/2022

Page 98

1    Q.    Would you and Jovanie Long ever go to the
2  law library together when you were at the Cook
3  County Department of Corrections?
4    A.    No.  We was never in the same building.
5    Q.    Okay.
6    A.    Law library is in the buildings of
7  whatever building you in.
8    Q.    Would you ever be in the yard at the same
9  time as Jovanie Long when you were at the Cook
10  County Department of Corrections?
11    A.    No.  The yards was also to whatever
12  division you was in.
13    Q.    Oh, okay.
14    A.    Visiting, sha- -- yards, law library,
15  none of that stuff.  It's all to whatever division.
16    Q.    What about when you would go eat in the
17  mess hall?  Was that also the same division?
18    A.    Everything in the same -- whatever
19  division you in.
20    Q.    Okay.
21    A.    In the county jail.
22    Q.    Did you -- while you were in IDOC, did
23  you ever try to help Jovanie Long with his criminal
24  case?
25    A.    No.

Page 99

1    Q.    Have you ever tried to help Jovanie Long
2  with his criminal case?
3    A.    No.
4    Q.    Well, haven't you given an affidavit to
5  help Jovanie Long with his criminal case?
6    A.    I sign an affidavit, yeah.  That's not me
7  giving him help.  That's me signing an affidavit,
8  doing what I was asked from him and his attorney.
9    Q.    So you were asked by Jovanie Long --
10  Jovanie Long's attorney to sign an affidavit for
11  Jovanie Long to use in his criminal case, right?
12    A.    Yes, but that's not like me going and
13  show him and trying to help dude.  No, that's
14  different.
15    Q.    Which attorney of Jovanie Long asked you
16  to sign an affidavit?
17    A.    I do not recall.
18    Q.    Male or female?
19    A.    Male.
20    Q.    And do you remember when that was?
21    A.    No, I do not recall.
22    Q.    Sorry?
23    A.    I do not recall.
24    Q.    You ever been asked by Jovanie Long's
25  attorney, Jarrett Adams, to provide an affidavit?

Page 100

1    A.    Yes.
2    Q.    And did you?
3    A.    I do not recall.
4    Q.    How many affidavits have you signed for
5  Jovanie Long?
6    A.    I do not recall.
7    Q.    More than one?
8    A.    Yes.
9    Q.    Do you have copies of those affidavits?
10    A.    Probably somewhere.
11    Q.    Have you given those affidavits that
12  you've signed for Jovanie Long to your attorney?
13    A.    I don't -- I don't recall.  I don't think
14  so.  I don't know.
15    Q.    Do you remember when you first signed an
16  affidavit for Jovanie Long?
17    A.    Nope.  I don't recall.
18    Q.    You signed an affidavit for Jovanie
19  Long's case in 2007; is that right?
20    A.    Possible.
21    Q.    Did you also sign one for Jovanie Long in
22  2020?
23    A.    Possible.
24    Q.    Well, you're saying it's possible.  Did
25  you?

Page 101

1    A.    No, I don't remember the dates, so I
2  don't remember the dates or the year, but yes, I
3  know I signed affidavits for him.
4    Q.    Okay.  And you're saying at least two?
5    A.    Yes.
6    Q.    Is there more than two that you -- are
7  there more than two affidavits that you signed for
8  Jovanie Long?
9    A.    It's possible.  I don't recall.
10    Q.    Do you have any idea when the first one
11  was, when you signed the first affidavit for Jovanie
12  Long?
13    A.    No, I do not.  I don't recall.
14    Q.    Okay.  If I tell you that you signed an
15  affidavit for Jovanie Long in 2007, you have no
16  reason to disagree with that, right?
17    A.    No.
18    Q.    Did you prepare that affidavit?
19    A.    I don't recall that either.  I don't
20  think so.  I don't know.
21    Q.    Okay.  Okay.  For the record, we're going
22  to mark as Exhibit 1 to your deposition -- thank
23  you -- what has been Bates marked CCSAO Xavier
24  Walker 000314 through 315.
25    MS. ITCHHAPORIA:  Could you please hand that

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 102..105
XAVIER L. WALKER, 04/12/2022

Page 102

1   to the witness?
2           (Whereupon, Deposition
3           Exhibit No. 1 was marked.)
4       THE WITNESS:  Yeah, I remember I wrote this.
5   Yep, I remember I wrote this.
6   BY MS. ITCHHAPORIA:
7       Q.    And --
8       MS. SAMUELS:  There's no question pending.
9   BY MS. ITCHHAPORIA:
10      Q.    Mr. Walker, is what we're looking at,
11  Exhibit 1, is this an affidavit that you signed for
12  Jovanie Long in -- on May 29th, 2007?
13      A.    Yes.
14      Q.    And is that your signature on page 2 of
15  this affidavit?
16      A.    Yes.
17      Q.    And is page 1 of this affidavit all in
18  your handwriting?
19      A.    Yes.
20      Q.    Did you prepare this affidavit?
21      A.    Yes.
22      Q.    Why did you prepare this affidavit?
23      A.    Because I -- I wanted to write it the way
24  that I remember it.
25      Q.    Did Mr. Long ask you to provide an

Page 103

1   affidavit to him?
2       A.    His attorney did.
3       Q.    Okay.
4       A.    Whatever attorney he was messing with at
5   the time.
6       Q.    It's a male attorney.  You don't remember
7   his name?
8       A.    Right.
9       Q.    How did the male attorney ask you to sign
10  an affidavit for Jovanie Long?
11      A.    I don't recall.
12      Q.    Did he come and meet you in prison?
13      A.    I don't know if it was over the phone or
14  if he came to see me.  I don't -- I don't recall.
15      Q.    Did you write this out and then hand it
16  to the attorney?
17      A.    I wrote it out and sent it to where he
18  told me to send it.
19      Q.    Where did you send it?
20      A.    I don't recall.
21      Q.    When was the last time that you saw
22  Exhibit 1?
23      A.    A long -- I don't recall.  It's been a
24  minute.  I ain't seen this in a while.
25      Q.    Is there anything in Exhibit 1 that's

Page 104

1   inaccurate?
2       A.    Yes.
3       Q.    Now you've had a chance to look at
4   Exhibit 1, right?
5       A.    Yes.
6       Q.    Okay.  And you said there is something in
7   here that's inaccurate?
8       A.    No.  Everything is accurate.
9       Q.    Everything is accurate?
10      A.    Yes.
11      Q.    Okay.  There's a statement in here where
12  you say in Exhibit 1, it says, knowing that they
13  used my statement as a confession to find Mr. Long
14  guilty of first degree murder.  Do you see that?
15      A.    Yes.
16      Q.    And when you say "they used my
17  statement," what are you -- what are you talking
18  about?
19      A.    The State used my statement as my
20  confession as a statement to be able to convict him.
21      Q.    Your -- your statement wasn't used as
22  evidence in Mr. Long's case, was it?
23      MS. SAMUELS:  Objection, foundation.
24      THE WITNESS:  Yes.
25  BY MS. ITCHHAPORIA:

Page 105

1       Q.    It was?
2       A.    Yes.
3       Q.    You were in court for your criminal
4   trial, right?
5       A.    Yes.
6       Q.    And Mr. Long's criminal trial proceeded
7   at the same time as yours, correct?
8       A.    Yes.
9       Q.    They were simultaneous bench trials
10  before Judge Salone --
11      A.    Yes.
12      Q.    -- correct?
13      A.    Yes.
14      Q.    But your trials were severed; isn't that
15  true?
16      A.    Yes.
17      Q.    So evidence that was coming in against
18  you was not coming against Mr. Long, correct?
19      MS. SAMUELS:  Objection, foundation, calls for
20  speculation.
21      THE WITNESS:  I'm -- let me see how to put
22  this.  Okay.  Officially -- officially, it wasn't,
23  but if I tell you something, you can't close your
24  ears to it.  You can't not hear it.  So everything
25  that was said about me was heard.  Everything that

XAVIER WALKER vs CITY OF CHICAGO, et al.                        Pages 106..109
XAVIER L. WALKER, 04/12/2022

Page 106

1  was said about him was heard.  There wasn't no way
2  for it to be unheard for them not to use it or
3  consider it or be imbedded in they mind to use it
4  and think that it corroborates each other.  And
5  somewhere in my trial script, the judge mentioned
6  and said that about the corroborations of the -- of
7  the statements, even though he act like and try to
8  say that that's not why he's finding us guilty.
9  BY MS. ITCHHAPORIA:
10      Q.    Well, you trust that Judge Salone
11  followed the letter of the law, right, in your case?
12      A.    No.
13      Q.    You don't trust that he did?
14      A.    No.
15      Q.    Do you have a basis for saying that?
16      A.    Yes, a lot of basis.
17      Q.    What's your basis?  I'm sorry?
18      A.    I said I have a lot of basis for saying
19  it.
20      Q.    Your -- you have a paralegal degree,
21  right?
22      A.    Yes.
23      Q.    And when did you get that paralegal
24  degree?
25      A.    I think 2012, '13, somewhere around

Page 107

1  there.  I don't recall.
2      Q.    And you had to take courses to get that
3  paralegal degree?
4      A.    Yes.
5      Q.    And those were courses in the law?
6      A.    Yes.
7      Q.    So did you as part of that -- so you got
8  a certification at the end; is that right?
9      A.    Yes.
10      Q.    A paralegal certification?
11      A.    Yes.
12      Q.    And to get that certification, did you
13  have to like take criminal law classes?
14      A.    Yes.
15      Q.    And civil law classes?
16      A.    Yes.
17      Q.    And then did you use that paralegal
18  degree to assist you in your criminal case to get
19  out of prison?
20      A.    Yes.
21      Q.    Is that why you got the criminal degree?
22      A.    Yes.
23      Q.    I mean, not -- the paralegal certificate.
24      A.    Yes.
25      Q.    So you knew when you signed this

Page 108

1  affidavit in 2007 that you were signing it under
2  penalty of perjury, right?
3      A.    No.
4      Q.    You didn't know that?
5      A.    No.
6      Q.    Doesn't it say on the second page,
7  pursuant to 28 USC 1746, 18 USC 1621, or 735 ILCS
8  5/1-109, I declare under penalty of perjury?  Do you
9  see that?
10      A.    Yes, but --
11      Q.    Okay.
12      A.    -- that's -- I never read that before.
13      Q.    I'm sorry?
14      A.    I said, yeah, I never read that before.
15      Q.    Okay.  So when you signed this affidavit
16  in 2007, even though it clearly says here, you were
17  signing under penalty of perjury, your testimony is
18  that you didn't know that that was there?
19      A.    Yes, I never read that before.
20      Q.    Okay.
21      A.    I seen it, but I never read it.
22      Q.    And it's your testimony, to be clear,
23  that Judge Salone, even though he was the sitting
24  judge during your trial, that he considered evidence
25  against you that was only supposed to come in

Page 109

1  against Jovanie Long?
2      A.    Yes.
3      Q.    And you're just basing that on your own
4  say-so, right?
5      A.    Yes.
6      MS. SAMUELS:  Objection, misstates his prior
7  testimony.
8  BY MS. ITCHHAPORIA:
9      Q.    You do remember that Jovanie Long's
10  attorney presented a motion to sever?
11      A.    Yes.
12      Q.    And the motion to sever was granted by
13  the Court?
14      A.    Yes, but we never severed.  Every court
15  date was still together.  Everything was still heard
16  together, so...
17      Q.    Have you ever filed any other pleadings
18  in court where you've claimed that evidence that
19  came in against Jovanie Long also came in against
20  you?
21      A.    Yes.
22      Q.    Where else have you done that?
23      A.    I had filed an arrest of judgment that
24  was stamp filed, copied, and sent out, and then they
25  told me it disappeared.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 110..113
XAVIER L. WALKER, 04/12/2022

Page 110

1    Q.   Are you talking about that pro se
2  post-conviction petition that you filed in 2007?
3    A.   No.  I'm talking about in 2005 when I
4  filed an arrest of judgment, and they talking about
5  it was disappeared.
6    Q.   An arrest of judgment?
7    A.   Yes.  I was still young and stupid,
8  didn't know what I was doing.  I just heard some
9  people in the law library told me to do something,
10 and I filed it.  They fixed it, helped me.  They was
11 a fake jailhouse lawyer, fixed it up.  And I filed
12 it and then it disappeared, and I complained to the
13 courts about it for years.  I still have my filed
14 stamped copy of it somewhere in my stuff, but they
15 talking about they don't have no memory or no -- now
16 I'm like, how when it was stamp filed by Dorothy
17 Brown signature and I talked to you-all and gave it
18 to them in court.
19   Q.   So what false statements did you make in
20 your arrest of judgment that you filed in 2005?
21      MS. SAMUELS:  Objection.
22      THE WITNESS:  I didn't make no false
23 statements.
24      MS. SAMUELS:  Argumentative.
25 BY MS. ITCHHAPORIA:

Page 111

1    Q.   Okay.  Did you say in this arrest of
2  judgment that you drafted that was filed in the
3  court in 2005 that evidence that came in against
4  Jovanie Long also came in against you?
5    A.   Yes.
6    Q.   What did you say specifically in that
7  court filing?
8    A.   That for us to have a severance.  They
9  never separated our court dates.  We always was
10 together.  So everything that was heard -- what I --
11 basically what I told you.  Everything that was
12 heard in his case was heard in mine and used.
13   Q.   Okay.  And you've said that you still
14 have that document; is that right?
15   A.   I -- I believe so.  I probably have it.
16 I got to check.  I don't know.
17   Q.   And you drafted that by yourself?
18   A.   No, I just told you.  Some jailhouse
19 lawyers --
20   Q.   Oh, right.
21   A.   -- that was in jail did it.
22   Q.   What was the name of the jailhouse
23 lawyer?
24   A.   Something Current.  I don't remember the
25 first name.

Page 112

1    Q.   Okay.  And you can put that to the side
2  now.
3         In May of 2000, you were living at 54- --
4  5431 West Potomac Avenue, correct?
5    A.   Yes.
6    Q.   And when you moved there, you said you
7  moved there in about 6th or 7th grade?
8    A.   Yes.
9    Q.   When you moved there in 6th or 7th grade,
10 you were already a member of the Imperial Insane
11 Vice Lords; is that right?
12      MS. SAMUELS:  Objection, relevance.
13      THE WITNESS:  No.
14 BY MS. ITCHHAPORIA:
15   Q.   No?
16   A.   No.
17   Q.   So you joined the Imperial Insane Vice
18 Lords after you moved from the Erie neighborhood?
19   A.   Yes.
20      MS. SAMUELS:  Same objection.
21      THE WITNESS:  How old you be in 6th grade?  I
22 don't know.
23 BY MS. ITCHHAPORIA:
24   Q.   Did you know an individual by the name of
25 Boss Hog from your old neighborhood?

Page 113

1    A.   Yes.
2    Q.   Was Boss Hog in the same gang as you?
3    A.   No.
4    Q.   What gang was he in?
5    A.   I don't know.
6    Q.   And Boss Hog is -- his real name is Paris
7  Williams; is that right?
8    A.   I have no idea.  I never knew his real
9  name.
10   Q.   When was the last time that you spoke to
11 Boss Hog?
12   A.   I haven't.  Probably before I got locked
13 up.  I don't know.
14   Q.   Did you grow up with Boss Hog?
15   A.   A little bit.  He not from our
16 neighborhood.  I think one of his cousins or
17 something stay in our neighborhood.  So he'd come
18 over and see his cousin and kick it and stuff like
19 that.
20   Q.   Who was his cousin that grew up in the
21 neighborhood?
22   A.   James.
23   Q.   James.  What's James's last name?
24   A.   I don't know.
25   Q.   Okay.  Did you know a Ramell Sturdivant

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 114..117
XAVIER L. WALKER, 04/12/2022

Page 114

1   from the old neighborhood?
2       A.    Yes.
3       Q.    And what was his nickname?
4       A.    Shake.
5       Q.    And was Shakey in the same gang as you?
6       A.    Yes.
7       Q.    So he was also a member of the Imperial
8   Insane Vice Lords?
9       A.    Yes.
10      Q.    When was the last time you spoke to
11  Shakey?
12      A.    I don't know.
13      Q.    I'm sorry?
14      A.    I don't know.  Don't -- it's been awhile.
15      Q.    Do you know where Shakey currently is?
16      A.    He in one of these prisons.
17      Q.    I'm sorry?
18      A.    He's in one of these prisons.
19      Q.    How do you know he's in prison?
20      A.    Because he was in -- been in prison.
21      Q.    So you said once you moved from your old
22  neighborhood, you would -- in April and May of 2000,
23  you would go back to your old neighborhood on a
24  frequent basis, fair?
25      A.    Yes.

Page 115

1       Q.    And when you go -- when you would go back
2   to your old neighborhood, would there be any reason
3   to go back there other than to see your friends?
4       A.    Yeah, just hanging out with my friends
5   and family.
6       Q.    Would you go back to your old
7   neighborhood in April and May to sell drugs?
8       A.    No.  I just go to hang out and kick it
9   with my family and friends.
10      Q.    Would you go back to your old
11  neighborhood to see and hang out with other gang
12  members?
13      A.    Yes.  Some.
14      Q.    You did sell drugs in that time frame, in
15  the 1999-2000 time frame in your old neighborhood,
16  right?
17      MS. SAMUELS:  Objection, relevance,
18  foundation.
19      THE WITNESS:  I sold drugs wherever I could.
20  BY MS. ITCHHAPORIA:
21      Q.    You sold drugs wherever you could?
22      A.    Yeah.
23      Q.    Is that correct?
24      A.    Yes.
25      Q.    Okay.

Page 116

1       A.    When I was young and stupid and thought
2   that was the only job I could get.
3       Q.    When you moved to the 5431 West Potomac,
4   you became friends with Charles Green; is that
5   right?
6       A.    Yes.
7       Q.    Did you call him by any other names?
8       A.    Kevin.
9       Q.    Kevin?
10      A.    Yes.
11      Q.    And did he live immediately next door to
12  you?
13      A.    Yes.
14      Q.    So what was his address?
15      A.    I don't know.
16      Q.    Okay.  So if you were at 5431, was he 29
17  or was he 33?
18      A.    I don't know.  They skip, like it's --
19  it's kind of crazy and weird.  I don't know if his
20  is 27 or something.  It's -- it's -- it's kind of
21  weird.
22      Q.    When was the last time that you saw or
23  spoke to Charles Green?
24      A.    A couple days ago.
25      Q.    So he's someone that you're still friends

Page 117

1   with?
2       A.    He still live next door.  So I see when I
3   go over there.
4       Q.    Was Charles Green in the same gang as you
5   were?
6       A.    No.
7       Q.    He was in a different gang?
8       A.    Yes.
9       Q.    What gang was he in?
10      A.    I don't know.
11      Q.    And you said he still lives on Potomac?
12      A.    Yes.
13      Q.    Marvin Mosley, was he someone that you
14  became friends with when you moved to the new
15  neighborhood?
16      A.    Yes.
17      Q.    Did you know him before?
18      A.    No.  I met all them when I moved over
19  there.
20      Q.    Okay.  Was he -- do you also call Marvin
21  Mosley Marv?
22      A.    No.
23      Q.    Do you call him Veno or Veno?
24      A.    Veno.
25      Q.    Veno?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 118..121
XAVIER L. WALKER, 04/12/2022

Page 118

1    A.    Yeah.
2    Q.    Was Marvin Mosley in the same gang as
3  you?
4    A.    No.
5    Q.    Was he in a different gang?
6    A.    No.
7    Q.    Is he still a friend of yours?
8    A.    Yes.
9    Q.    Was he someone that you kept in touch
10 with during your incarceration?
11   A.    Yes.
12   Q.    Would you call him from time to time?
13   A.    Yes.
14   Q.    Did you ever ask Marvin Mosley when you
15 were in prison to find witnesses for you?
16   A.    No.
17   Q.    Did you ever ask Marvin Mosley when you
18 were in prison to have witnesses sign affidavits for
19 you?
20   A.    No.
21   Q.    When you moved to the new neighborhood,
22 did you become friends with Charles Toles?
23   A.    Yes.
24   Q.    And did you call him Chuck?
25   A.    Yes.

Page 119

1    Q.    Did you also call him Chi Chi?
2    A.    Yes.
3    Q.    Was Charles Toles in the same gang as
4  you?
5    A.    No.
6    Q.    He's still a friends of yours, right?
7    A.    Yes.
8    Q.    Did you keep in touch with him when you
9  were incarcerated?
10   A.    From time to time, when I could.
11   Q.    Did you ask Charles Toles to provide an
12 affidavit?
13   A.    I don't think -- I think my attorneys
14 did.
15   Q.    Did you ever see an affidavit from
16 Charles Toles?
17   A.    No.
18   Q.    Do you know why he didn't provide an
19 affidavit?
20   A.    I don't know if he did or not.
21   Q.    Simeon Dorsey is also a friend of yours
22 from the new neighborhood, right?
23   A.    Yes.
24   Q.    Did you know Simeon before you moved to
25 the new neighborhood?

Page 120

1    A.    No.
2    Q.    Was Simeon in the same gang as you?
3    A.    No.
4    Q.    What was his nickname?
5    A.    Moto.
6    Q.    Moto?
7    A.    Yeah.
8    Q.    Is Simeon Dorsey still friends with you?
9    A.    Yes.
10   Q.    Where did he live in April, May 2000?
11   A.    With us.
12   Q.    So he lived -- when you're saying "with
13 us," he lived with you and your family at --
14   A.    Yes.
15   Q.    -- 5431 West Potomac?
16   A.    Yes.
17   Q.    What period of time did he live with you?
18   A.    I don't recall.  His mother had moved
19 away to -- his mother and them moved to Indiana, and
20 he was trying to finish his last year of school and
21 he had a job, so he didn't want to move.  And my
22 mother was okay with letting him staying with us
23 until he found another place to stay.
24   Q.    Which school was he going to?
25   A.    I don't recall.

Page 121

1    Q.    Did he -- when he stayed with you, would
2  he stay with you in the same bedroom as you?
3    A.    It was the basement.  So it was like --
4  it had a big area.  So it was like -- yeah.
5    Q.    Your bedroom in April, May 2000 was in
6  the basement; is that right?
7    A.    Yes.
8    Q.    And your sister Sheleah also had a room
9  in the basement?
10   A.    Yes.
11   Q.    Those were actual bedrooms, right?
12   A.    Yes.
13   Q.    So when Simeon would stay with you, would
14 he stay in the same bedroom as you or would he stay
15 in the open area of the basement?
16   A.    It's like -- that's what I'm saying.
17 It's like multiple rooms in the basement.  So it's
18 more than just that.  It's a big basement.  It's
19 like -- so he stayed in his little area.  We stayed
20 in our area, but we -- then we had a front room
21 part, and it's a bathroom and it's the part where
22 the washing machine and dryer.  So it's a big
23 basement.
24   Q.    Other than you and Sheleah, though, that
25 had bedrooms in the basement, did anybody else?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 122..125
XAVIER L. WALKER, 04/12/2022

Page 122

1    A.   No.  The other bedrooms basically just
2  for guests, I guess, family and friends, people that
3  come over to hang, you know.
4    Q.   And the basement there at 5431 West
5  Potomac, it had its own entrance, right?
6    A.   Yes.
7    Q.   And you would use that -- you would use
8  that door to exit and leave the basement area; is
9  that right?
10   A.   Sometimes.
11   Q.   And your friends would also use that door
12 to come in and out of the basement?
13   A.   Sometimes.
14   Q.   Where does that door lead to?  So when
15 you exit from that basement door, are you in the
16 backyard?
17   A.   Yes, in the backyard.  And then you still
18 got to go out past the front and all that stuff,
19 so...
20   Q.   But you can go out through the -- that
21 door in the basement to the backyard and then go
22 around through the gangway to come to the front?
23   A.   The gangway is right at the door, so --
24   Q.   Oh, okay.
25   A.   -- everything on the side is that, yeah.

Page 123

1    Q.   So your friends would from time to time,
2  though, exit the basement through that door and then
3  go around the gangway to come to the front of the
4  street?
5    A.   No.  The door leads to the side of our
6  house.  So they come out and up the stairs.  You got
7  to go the same way that you'll come in if you was
8  going to the front is the same way you got to go and
9  that.
10   Q.   But you can go through the side of the
11 house, though, right?
12   A.   Everything is on the side of the house.
13 We don't have a front porch and stuff.
14   Q.   Okay.  Deon Baylock was also someone that
15 you met in the new neighborhood; is that right?
16   A.   Yes.
17   Q.   And was Deon in the same gang as you?
18   A.   Yes.
19   Q.   Deon Baylock was a lot younger than you,
20 right?
21   A.   Yes.
22   Q.   He was about four years younger than you?
23   A.   If -- if that.  I thought he was probably
24 younger.
25   Q.   If -- if --

Page 124

1    A.   I don't know.
2    Q.   Probably younger?
3    A.   Yeah.
4    Q.   In May 2000 Deon was about 14 years old,
5  right?
6    A.   If he was that old.  I think -- I thought
7  he was like 12 or 11 or something.
8    Q.   You thought he was 12?
9    A.   I don't know.
10   Q.   And he passed away; is that right?
11   A.   Yes.
12   Q.   Did you keep in touch with Deon Baylock
13 when you were incarcerated?
14   A.   A little bit.  I tried to.
15   Q.   And what happened?
16   A.   He --
17   MS. SAMUELS:  Objection, vague.
18   THE WITNESS:  Well, I'm going to tell them.
19 He had a rough life, so -- and he didn't have
20 nobody.  The reason that he started hanging out and
21 being with me, I had become to him like a little
22 brother and was trying to keep him off the streets
23 and all that and trying to help him go to school and
24 do stuff and get his haircut and stuff like that for
25 him because his parents was dead.  He was staying

Page 125

1  with his elderly grandparents and wasn't nobody
2  looking out for him.  So I -- and one day I seen
3  him.  He wasn't at school.  And I'm like, why you
4  ain't at school?  He's like, because I ain't got
5  no -- no haircut.  Look at my head.  And I ain't got
6  no shoes.  He had holes in his shoes.  So I took him
7  to get his hair cut and got him shoes so he can go
8  to school.  They was -- he started becoming like my
9  little brother.
10 BY MS. ITCHHAPORIA:
11   Q.   So you were looking out for him?
12   A.   Yes.
13   Q.   Did you have him sell drugs with you?
14   A.   No.
15   Q.   But didn't he sell drugs with you?
16   A.   No.
17   Q.   Did you know an individual by the name of
18 Tyrell -- Terell Glass from the new neighborhood?
19   A.   Yes.
20   Q.   What was his nickname?
21   A.   Terrell.
22   Q.   Terrell.  Did you have a nickname for
23 Deon Baylock?
24   A.   No.  Deon.  It was -- just everybody
25 called him Deon, knew him as Deon.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 126..129
XAVIER L. WALKER, 04/12/2022

Page 126

1    Q.    Was Terrell in the same gang as you?
2    A.    No.
3    Q.    Where did he live?
4    A.    Around the corner from my mother's house.
5    Q.    And he was a buddy of yours?
6    A.    Yes.
7    Q.    Did you keep in touch with him when you
8  were incarcerated?
9    A.    A little.
10   Q.    Tyree Patterson was also a friend of
11 yours from the new neighborhood, right?
12   A.    Yes.
13   Q.    Was Tyree in the same gang as you?
14   A.    No.
15   Q.    What gang was he in?
16   A.    I don't know.
17   Q.    When was the last time you spoke to Tyree
18 Patterson?
19   A.    A couple days ago.
20   Q.    Why did you speak to him a couple days
21 ago?
22   A.    Because we friends.
23   Q.    You saw Tyree Patterson on May 12th,
24 2000, correct?
25   A.    May 12th, 2000.  Possible.

Page 127

1    Q.    Do you know?
2    A.    I don't recall.
3    Q.    So it's possible that you saw him on
4  May 12th, 2000; you just don't remember?
5    A.    Yes.
6    Q.    Didn't Tyrell -- didn't Tyree Patterson
7  go to the same club that you went to on May 12th,
8  2000?
9    A.    Yes.
10   Q.    So you saw him at the club, right?
11   A.    Yes.
12   Q.    Did you go to the club with Tyree
13 Patterson?
14   A.    No.
15   Q.    You just saw him there?
16   A.    Yes.  I think he went with a bunch of
17 other friends.  There was a lot of my friends went
18 to the club.
19   Q.    Do you know an individual by the name of
20 Dominic --
21   A.    Yes.
22   Q.    -- from the new neighborhood?
23   A.    Yes.
24   Q.    Who's Dominic?
25   A.    One of the other little homies from off

Page 128

1  the block.
2    Q.    I'm sorry?
3    A.    One of the other little guys off the
4  block.
5    Q.    Was he in the same gang as you?
6    A.    No.
7    Q.    Was he someone that you kept in touch
8  with when you were incarcerated?
9    A.    From time to time, yeah, a little bit.
10   Q.    Did you see Dominic on May 12th, 2000, at
11 the club?
12   A.    I'm pretty sure he probably was there.
13   Q.    Do you have a memory of him being there?
14   A.    I don't -- can't recall who all was
15 there.  I know there was a bunch of us, like we
16 always went.  That's what we did.  We went partying
17 and clubbing.
18   Q.    Do you know an individual from the new
19 neighborhood by the name of Shaun Johnson?
20   A.    Yes.
21   Q.    And what's his nickname?
22   A.    Shakey too.  He's another Shakey.
23   Q.    Oh, okay.  Another Shakey.
24   A.    Yeah.
25   Q.    Was he in the same gang as you?

Page 129

1    A.    No.
2    Q.    Was -- is he someone that you kept in
3  touch with?
4    A.    From time to time.
5    Q.    Was he at the club on May 12th, 2000?
6    A.    I'm pretty sure he was.  Him and Charles
7  was like close -- closer.  So Beverly -- I'm pretty
8  sure he was there.
9    Q.    You said who was close?
10   A.    Him and Charles Toles, and we was going
11 to celebrate him so...
12   Q.    Okay.
13   A.    I'm pretty sure he was there.
14   Q.    Do you -- as you sit here today, do you
15 actually have a memory of seeing Shaun Johnson slash
16 Shakey at the club on May 12th, 2000?
17   A.    I can't recall.
18   Q.    You're also friends with an individual by
19 the name of Quinton Livious; is that right?
20   A.    No.  Quinton Livious.
21   Q.    Livious?
22   A.    Yes.
23   Q.    Okay.  And he goes by the nickname Quack?
24   A.    Yes.
25   Q.    Do you have any other nicknames for him?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 130..133
XAVIER L. WALKER, 04/12/2022

Page 130

1    A.   No, just Quack.
2    Q.   Was he someone that you knew from the old
3  neighborhood --
4    A.   Yes.
5    Q.   -- or new neighborhood?
6    A.   The new neighborhood.
7    Q.   Was he in the same gang as you?
8    A.   No.  A lot of them wasn't never in gangs
9  from my new neighborhood.
10   Q.   When was the last time that you spoke to
11 Quinton?
12   A.   Probably around my father's death too.
13   Q.   Okay.  So he's someone that you keep in
14 touch with?
15   A.   From time to time, yeah.
16   Q.   He calls you; you call him?
17   A.   Yes.
18   Q.   You have his number in your cell phone?
19   A.   Yes.
20   Q.   Same for Tyree Patterson?  You have his
21 phone number too?
22   A.   Yes.
23   Q.   Was Quinton Livi -- Livious -- how do you
24 say it?
25   A.   Livious.

Page 131

1    Q.   Livious.  Was Quinton Livious, was he
2  someone that you saw at the club on May 12th, 2000?
3    A.   I'm pretty sure he was there too.  All us
4  was close.  We was all friends.  It was like 30 of
5  us, and we all kicked it and hung out and went
6  clubbing and partying every weekend.
7    Q.   It was 30 of you?
8    A.   Yeah.
9    Q.   Was Quinton friends with Charles Toles as
10 well?
11   A.   Yes.
12   Q.   Did you stay in touch with Quinton during
13 your incarceration?
14   A.   Often, from time to time.
15   Q.   And where does he reside?
16   A.   Out south somewhere.  He stay out south
17 now somewhere.
18   Q.   Like the south suburbs of Chicago or
19 south side of the city?
20   A.   South side of the city.
21   Q.   Okay.  Did you tell any of these new
22 friends that we just talked about that you were in a
23 gang?
24   A.   No.
25   Q.   No.  Did they know?

Page 132

1    A.   Some did.
2    Q.   How would they know that you were in a
3  gang if you didn't tell them?
4    MS. SAMUELS:  Objection to relevance with
5  regard to all questions regarding gang affiliation.
6    THE WITNESS:  I have no idea, but some knew
7  and some didn't.  I don't know.
8  BY MS. ITCHHAPORIA:
9    Q.   Would all those people that we just
10 talked about, would they hang out sometimes with you
11 and Jovanie Long?
12   A.   The ones that liked him.  The ones that
13 was cool with him.
14   Q.   Were there -- there were some that
15 weren't cool with him?
16   A.   Yeah.  You always got people that's not
17 cool with other people in cliques and stuff, and --
18 but all together, we all together, but then when we
19 separate, you got these groups that they cool with
20 these and these group that they cool with these.
21   Q.   You said you didn't know what gang Boo
22 Boo was in, right, but --
23   A.   No, I can't recall.  I -- I think --
24   Q.   But you knew he was in a gang?
25   A.   Yeah.

Page 133

1    Q.   Was he in a rival gang to the gang that
2  you were in?
3    A.   We ain't really got no rivalries.  We --
4  well, I don't -- this is crazy, but -- I don't know.
5  It's how you-all got it is messed up.  The TV and
6  all this stuff got it messed up.  I don't -- there's
7  a lot of people, especially out west in Chicago that
8  you can be all type of gangs and supposed to be
9  rivals somewhere else, but we over here kickin' it.
10 We all cool and we ain't got that problem, and we --
11 you know, but elsewhere they probably be rivals and
12 into it or TV type stuff, but...
13   Q.   So you never considered Boo Boo to be in
14 a rival gang?
15   A.   No.
16   Q.   Isn't it true that anyone that's not a
17 member of the Imperial Insane Vice Lords back in
18 2000 would be considered to be in a rival gang?
19   A.   That's considered to the police and TV
20 and all that type of stuff, yeah.
21   Q.   But you didn't personally consider
22 anybody that wasn't in the Imperial Insane Vice
23 Lords to be a rival to you?
24   A.   No.  The only person that was a rival to
25 me if a person did something to me.  If he ain't did

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 134..137
XAVIER L. WALKER, 04/12/2022

Page 134

1  nothing to me, then you ain't my rival.  I don't got
2  no beef with you.
3       Q.    Boo Boo told you that he shot a Vice Lord
4  gang member at Springfield and Grenshaw, right?
5       A.    No.
6       Q.    He never told you that?
7       A.    No.
8       Q.    Didn't he act out for you how he killed
9  someone at Springfield and Grenshaw?
10      A.    No.
11      Q.    Didn't he tell you that he got a star for
12 killing another Vice Lord gang member?
13      A.    No.  That's all fabricated.  This stuff
14 crazy.
15      Q.    Did you ever talk with Maurice Wright
16 slash Boo Boo about shooting someone?
17      A.    No.
18      Q.    When did you first meet Boo Boo?
19      A.    I don't recall.  One of the times when I
20 came home from jail.  He had moved in our
21 neighborhood and was cool with all the people in the
22 neighborhood.  So I can't...
23      Q.    Was he someone that you had known for a
24 few years before May 2000?
25      A.    Yes.

Page 135

1       Q.    And Boo Boo -- you knew that Boo Boo was
2  also friends with Jovanie Long, right?
3       A.    Yes.
4       Q.    Prior to May 28, 2000, you knew that
5  Maurice Wright slash Boo Boo also sold drugs, right?
6       A.    I don't know what he do.
7       Q.    You never saw him selling drugs?
8       A.    I had my own life.
9       Q.    Okay.  But did you ever see him selling
10 drugs?
11      A.    No.
12      Q.    Were -- did you ever become aware that he
13 sold drugs?
14      A.    No.
15      Q.    Was -- was he known as a known gang
16 dealer in that old neighborhood where you grew up?
17      A.    No.
18      Q.    No.  Why is that funny?
19      A.    Because he's a nobody --
20      Q.    Because he's a nobody?
21      A.    -- in my neighborhood, not to -- known to
22 be anything.  He's just Boo Boo.
23      Q.    Do you know where Boo Boo currently
24 resides?
25      A.    No.

Page 136

1       Q.    When was the last time that you spoke to
2  Boo Boo?
3       A.    I have no idea.
4       Q.    Was Boo Boo someone that you kept in
5  contact with when you were incarcerated?
6       A.    I tried to, but he was always in jail
7  somewhere else, so couldn't.
8       Q.    You -- you tried to keep in touch with
9  him but you weren't able to?
10      A.    Yes.
11      Q.    Did you ever speak to Boo Boo while you
12 were incarcerated?
13      A.    When I seen him in jail.
14      Q.    When you see him in jail.  When did you
15 see Boo Boo in jail?
16      A.    I don't remember the years or nothing,
17 but he came through like twice when I was in jail.
18      Q.    And just to be clear, when you're saying
19 jail, are you saying Cook County Department of
20 Corrections or --
21      A.    Yes.
22      Q.    -- the Illinois Department of
23 Corrections?
24      A.    Cook County.  Cook County.
25      Q.    Cook County.  Okay.

Page 137

1            So did you see Boo Boo two times at Cook
2  County Jail before your criminal trial started?
3       A.    I can't recall.
4       Q.    Were you -- you were -- after your
5  criminal trial ended and you were sentenced, you
6  were moved to IDOC, right?
7       A.    Yes.
8       Q.    So if you saw him at Cook County
9  Department of Corrections, it would have been before
10 January 11th, 2005?
11      A.    Yes.
12      Q.    Okay.  And you saw him at least twice?
13      A.    At least twice, yeah.  Probably more.
14      Q.    Was he -- I'm sorry?
15      A.    I said at least twice, but probably more
16 because he was back and forth to jail like crazy.
17      Q.    Was he in the same division that you
18 were, 9 or 11?
19      A.    No.
20      Q.    So you were never housed in the same
21 division as Maurice Wright?
22      A.    Yes.
23      Q.    So you were or you weren't?
24      A.    I was.
25      Q.    Okay.  You were?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 138..141
XAVIER L. WALKER, 04/12/2022

Page 138

1    A.    Yes.
2        Q.    Which division were you in -- which
3    division were you in when Maurice Wright was in the
4    same division as you?
5    A.    10.
6        Q.    How long were you both in Division 10
7    for?
8    A.    I have no idea.  Not long, though.
9        Q.    When Maurice Wright was in Division 10,
10   you spoke to Maurice Wright about your criminal
11   case, right?
12   A.    No.
13       Q.    You didn't speak to Maurice Wright when
14   you were in Division 10 about the statement that he
15   gave that implicated you in the murder?
16   A.    No.  You want to know what we talked
17   about?  Girls and him hooking me up with his cousin
18   and stuff.
19       Q.    Have you ever asked Maurice Wright why he
20   implicated you as being involved in the murder of
21   Marek Majdak on May 13th, 2000?
22   A.    No.  I told you.  I just took it as you
23   got to do what the police tell you.  You going to
24   get beat.  And then you still do it and still get
25   beat.

Page 139

1        Q.    So when you were in Division 10 with
2    Maurice Wright, you knew at that time that Maurice
3    Wright had told the police that you were involved in
4    the murder, right?
5    A.    Yes.
6        Q.    And you knew that Maurice Wright had
7    given a handwritten statement to the state's
8    attorney that said that you were involved in the
9    murder, right?
10   A.    Yes.
11       Q.    And you knew that Maurice Wright had
12   testified before the Grand Jury, implicating you in
13   the murder, right?
14   A.    Yes.
15       Q.    And you never asked Maurice Wright why he
16   implicated you in the murder?
17   A.    Once again, young, stupid, and living in
18   the -- in the jail.  We talked about girls, trying
19   to get visits, and eating burritos and stuff and
20   smoking weed and stuff.
21       Q.    Did Maurice Wright tell you why he was in
22   jail when you saw him at Cook County on those two
23   occasions?
24   A.    I'm pretty sure he probably did at the
25   time.

Page 140

1        Q.    Do you remember what he said?
2    A.    No.
3        Q.    So it wasn't just two occasions when you
4    saw him, right, if you were housed in the same
5    division as him?
6    A.    Right.
7        Q.    You're seeing him a lot more, right?
8    A.    No.  I seen him the different times that
9    he came in jail.
10       Q.    Okay.  So there were two times when
11   Maurice Wright was housed in the same division as
12   you?
13   A.    Yeah.
14       Q.    Okay.  And then when he's housed -- so
15   he --
16   A.    No.  One time he -- only one time he was
17   housed in the same division with me.  The other time
18   I seen him, he was somewhere else.
19       Q.    Okay.  But when Maurice Wright is in
20   Division 10 with you, that means that you have the
21   same yard time, you eat at the same time, and you
22   can go to the law library with him at the same time,
23   right?
24   A.    Yeah.
25       Q.    You can freely communicate with him?

Page 141

1    A.    Yes.
2        Q.    When did you find out that Maurice Wright
3    had given a handwritten statement that implicated
4    you in the murder on May 13th, 2000?
5    A.    When my attorney told me about it.
6        Q.    Your attorney, Greg Wilson?
7    A.    Yes.
8        Q.    When -- when did Greg Wilson tell you
9    that?
10   A.    I don't recall.  Whenever he was going
11   over the discovery with me.
12       Q.    And when did you find out that Maurice
13   Wright had testified before the Grand Jury
14   implicating you in that murder?
15   A.    Whenever my attorney told me.
16       Q.    So Greg Wilson told you that too?
17   A.    Whatever was in the discovery and the
18   discovery said, that's what he -- we -- he discussed
19   with me.
20       Q.    Okay.  Greg Wilson would share with you
21   what the discovery was, right?
22   A.    Yes.
23       Q.    So he would tell you who had given
24   handwritten statements?
25   A.    Yes.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 142..145
XAVIER L. WALKER, 04/12/2022

Page 142

1    Q.    And he would tell you what was in those
2  handwritten statements?
3    A.    I don't actually know if he told me what
4  was in them, but I know he told me about whatever
5  was in discovery.  We went over discovery discussing
6  and then him telling me his plans for the case or
7  whatever.  I don't...
8    Q.    Did he show you the documents, too, when
9  you were going over the discovery?
10   A.    No.
11   Q.    He would just tell you?
12   A.    Yeah.
13   Q.    And did he tell you that Maurice Wright
14 testified at the Grand Jury?
15   A.    I'm pretty sure if it was in the
16 discovery and stuff he did.
17   Q.    Do you remember him telling you that?
18   A.    I can't recall.
19   Q.    When was the last time that you saw
20 Maurice Wright?
21   A.    Last time he came through the county.
22   Q.    So sometime prior to January 11, 2005?
23   A.    Yes.
24   Q.    Was that the last time that you spoke to
25 him?

Page 143

1    A.    I don't know.  I don't know if I spoke to
2  him when I -- when he got out because I know I used
3  to be trying to catch him.  I don't know.
4    Q.    Why were you trying to catch him when he
5  was out?
6    A.    Because he was a friend and I was trying
7  to get up with his cousin.
8    Q.    He was a friend and you were trying to
9  what?  Sorry.
10   A.    Get up with his female cousin I just told
11 you about, that we just talk about.
12   Q.    Who was his female cousin that you were
13 trying to get with?
14   A.    He got a few of them but...
15   Q.    Anyone in particular?
16   A.    Yeah.  Mimi.
17   Q.    Mimi?
18   A.    Yeah.
19   Q.    Did you ever write to Maurice Wright when
20 you were in prison?
21   A.    No.
22   Q.    Did you ever try to call him?
23   A.    Yeah.  I just finished telling you that I
24 tried to reach out to him to get in touch with his
25 cousin and stuff.

Page 144

1    Q.    But you're saying you tried to reach out
2  to him.  Did you actually speak to him on the phone
3  when you were incarcerated?
4    A.    I can't recall if I actually talked to
5  him, but I know I tried to reach out to him because
6  I was always trying to get up with his cousin.
7    Q.    You knew in -- in May 2000 that Maurice
8  lived at 4653 West Erie, right?
9    A.    I never knew the address, but yeah, I
10 knew he stayed on Erie.
11   Q.    And when I say Maurice or Boo Boo, you
12 know that we're talking about the same person,
13 right?
14   A.    Yes.  Yes.
15   Q.    Okay.  And prior to your arrest in May
16 2000, did you know Jovanie Long to also stay with
17 Boo Boo at Boo Boo's house on Erie?
18   A.    No.  He used to be over there.  We all
19 used to be over there.  It was just a kickin' house.
20 We kicked it over at his house.  It was like a
21 hangout house.
22   Q.    So it was a kickin' and a hangout house?
23   A.    Yeah.  As far as friends.  Like we all go
24 over there and play the video games, smoke weed,
25 drink, play cards, you know, bring girls, and we all

Page 145

1  kick it.
2    Q.    Did you know prior to your arrest in May
3  2000 that Jovanie Long would stay the night from
4  time to time at Boo Boo's house?
5    MS. SAMUELS:  Objection, calls for
6  speculation.
7    THE WITNESS:  We all stayed nights over there.
8  We all -- it wasn't -- that's what I'm telling you.
9  It was a kick house.  The same thing that they did
10 to my house and how they'll be at my house, the same
11 way we be at Jovanie house, we all did that because
12 we all kicked it with each other.  So we all can go
13 in there.  We can all be...
14 BY MS. ITCHHAPORIA:
15   Q.    So you would go to Boo Boo's house on
16 Erie and play video games and card games.  And did
17 you say smoke up?
18   A.    Smoke weed, drink, mess with girls,
19 hanging out, kickin' it.
20   Q.    And when you would do that at Boo Boo's
21 house, would Jovanie Long also be over?
22   A.    Sometime.
23   Q.    And Boo Boo's mother was Mary Curry,
24 right?
25   A.    Yes.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 146..149
XAVIER L. WALKER, 04/12/2022

Page 146

1    Q.   And did you call her TeeTee?
2    A.   No.
3    Q.   Did you ever hear people call her TeeTee?
4    A.   No.
5    Q.   Did you know her to go by the name
6  TeeTee?
7    A.   No, I didn't know that.  I don't know.
8    Q.   What did you call Mary Curry?
9    A.   Ms. Curry.
10   Q.   Ms. Curry.  Okay.  Did you ever call her
11  Momma or Monna?
12   A.   Ms. Curry.
13   Q.   How many -- when you knew Ms. Curry, how
14  many kids did she have?
15   A.   I don't know.
16   Q.   You knew that Maurice Wright was her son,
17  right?
18   A.   Yes.
19   Q.   Did Maurice have any siblings?
20   A.   I thought it was his siblings, yeah.
21   Q.   Oh, who did you think were his siblings?
22   A.   He had a few of them.  It was a bunch of
23  girls.
24   Q.   What were their names?
25   A.   I don't remember all of them names.  I

Page 147

1  don't -- I don't recall their names, all their
2  names.
3    Q.   You said you thought they were his
4  siblings.  Did you find out at some point they
5  weren't?
6    A.   Yes.
7    Q.   Who did you think were his siblings and
8  later you found out weren't?
9    A.   All of them girls.  I don't know their
10  names.
11   Q.   How many girls are we talking about?
12   A.   It was like six of them.
13   Q.   Six of them.  And did they also kick it
14  at the kickin' house?
15   A.   Yes.
16   Q.   Would one of --
17   A.   You make it sound weird and crazy.
18   Q.   Was one of those girls' names Ashanti
19  Wright?
20   A.   Yes.
21   Q.   Did you call Ashanti Shontae?
22   A.   I call her Ashanti.  Shanti.  Shontae.
23  Well, that is -- that's the same.
24   Q.   Did you ever hear anybody call her
25  Shontae or Shanti?

Page 148

1    A.   Yeah.  That's the same basically.
2    Q.   So did Ashanti Wright stay at Boo Boo's
3  house at 4653 West Erie?
4    A.   Sometimes.
5    Q.   Yeah.  You thought she was Boo Boo's
6  sister, right?
7    A.   Yeah.
8    Q.   Was Ashanti Wright someone that you were
9  kickin' it with?
10   A.   Yeah.  She -- some, yeah.
11   Q.   So you were romantically involved with
12  her?
13   A.   No.
14   Q.   No?
15   A.   No.
16   Q.   Were you ever in a sexual relationship
17  with Ashanti Wright?
18   A.   Yeah.
19   Q.   Did Ashanti Wright have a sister by the
20  name of Jermaica Wright?
21   A.   It's probably one of them girls.
22   Q.   Do you know an individual by the name of
23  Jermaica Wright?
24   A.   Yeah.  I -- I don't know her last -- I
25  don't know her name really, but I -- it's probably

Page 149

1  one of them girls.
2    Q.   Does Jermaica Wright sound familiar?
3    A.   Yeah.
4    Q.   Okay.  And that was the sister of Ashanti
5  Wright as far as you knew?
6    A.   Yeah.  All of them was sisters.
7    Q.   Okay.  How did you find out that Jermaica
8  and Ashanti were not the sisters of Maurice Wright?
9    A.   Fighting this case.
10   Q.   Okay.  Was it like during your trial?
11   A.   No.  Try -- fighting my appeal.
12   Q.   During your appeal of your criminal case,
13  you found out that Ashanti and Jermaica were not
14  sisters of Maurice Wright?
15   A.   Yeah.
16   Q.   How specifically did you find that out?
17   A.   Them -- my lawyers and stuff trying to
18  find them and reach out to them and checking.  All
19  the time I thought they was sisters and brothers and
20  like, yeah, you catch them -- I don't know.  They
21  all family.  And the whole time ain't none of them
22  family.  So I don't know.
23   Q.   Did Ashanti Wright, was she ever kickin'
24  it with Jovanie Long as far as you knew?
25   A.   Yeah, probably was.  Yeah.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 150..153
XAVIER L. WALKER, 04/12/2022

Page 150

1    Q.    So was she like dating him at some point?
2    A.    No.  We wasn't doing all that.
3    Q.    But you believe that they were in some
4  sort of relationship at some point?
5    A.    We was just kickin' it, having fun,
6  having sex, all type of...
7    Q.    When you say kickin' it, do you mean like
8  a sexual relationship?
9    A.    Yeah.
10   Q.    Okay.  Do you know if Jovanie Long had a
11  sexual relationship with Ashanti or you're just
12  assuming?
13   A.    No, I know.
14   Q.    You know.  He told you?
15   A.    No.
16   Q.    You saw?
17   A.    Yeah.
18   Q.    You saw Ashanti and Jermaica Wright on
19  May 13th, 2000, right?
20   A.    Yeah.
21   Q.    And you saw them at Boo Boo's house at
22  4653 West Erie?
23   A.    Yeah.
24   Q.    And you saw both Jermaica and Ashanti
25  Wright on May 13th, 2000, before you went to the

Page 151

1  club?
2    A.    Yeah.
3    Q.    And then you saw Jermaica and Ashanti
4  Wright after you came back from the club and you
5  were on Erie, correct?
6    A.    Not saying they didn't come back there
7  that night.  I went home, but I seen them probably
8  prior to that, because they was always over there.
9  Like I said, I thought they stayed there, thought
10  that was -- they had to be there the majority of the
11  time and...
12   Q.    Did you see Ashanti Wright after you went
13  to the club on May 13th, 2000?
14   A.    No.
15   Q.    You saw Jermaica Wright after you went to
16  the club on May 13th, 2000?
17   A.    No.  No.  I seen them before I went to
18  the club.  I didn't see none of them after I went to
19  the club.  I went home.
20   Q.    Well, you were present on May 13, 2000,
21  when Jovanie Long told Jermaica that he had killed
22  someone, right?
23   A.    No.
24   Q.    You weren't there?
25   A.    No.  I -- that's crazy.  I don't even

Page 152

1  know that happened.
2    Q.    From -- well, as far as you knew, though,
3  before your arrest in May of 2000, you were -- were
4  you friends with Ashanti and Jermaica?
5    A.    That was just people I was trying to
6  sleep with.
7    Q.    Okay.
8    A.    Sleeping with.
9    Q.    But there was no bad blood between you
10  and them?
11   A.    Not that I know of.  I don't know.
12   Q.    Did you know Ashanti Wright to be in a
13  gang?
14   A.    I don't know.
15   Q.    Did you know Jermaica Wright to be in a
16  gang?
17   A.    I don't know.
18   Q.    And there was no bad blood between you or
19  Mary Curry prior to May 28, 2000, was there?
20   A.    I was a bad little kid.  Mary ain't like
21  none of us.
22   Q.    I didn't catch that.  I'm sorry.
23   A.    I said I was a bad little kid.  Mary
24  ain't like none of us.  We -- she at work and we
25  tearing her house up.

Page 153

1    Q.    So did Mary ever tell you that she didn't
2  like you?
3    A.    She tell all of us to get up out of her
4  house and stuff when she be there.
5    Q.    Where did Mary work?
6    A.    I don't know.
7    Q.    But you know that she had a job?
8    A.    Yep.  That's when we come over and kick
9  it, when she at work.
10   Q.    And you said that she had a bunch of
11  other kids.  There were like six of them?
12   A.    Yeah.
13   Q.    Do you know who the other kids were?
14   A.    I don't remember their names.
15   Q.    Were they boys or girls?
16   A.    Girls.
17   Q.    They were all girls?
18   A.    Yes.
19   Q.    And you would see them when you would go
20  over to 4653 West Erie?
21   A.    Yes.
22   Q.    From the end of your trial -- or from the
23  time you were sentenced in January 2005 to December
24  2019, did you ever speak to Mary Curry?
25   A.    No.

XAVIER WALKER vs CITY OF CHICAGO, et al.                                    Pages 154..157
XAVIER L. WALKER, 04/12/2022

Page 154

1    Q.    During that same time frame, January 2005
2  to December 2019, did you ever speak to Ashanti
3  Wright?
4    A.    No.
5    Q.    Since your release, have you ever spoken
6  to Ashanti Wright?
7    A.    No.
8    Q.    You ever spoken to Mary Curry since your
9  release?
10   A.    No.  But I thought she was dead.  She
11 ain't dead?
12   Q.    How do you -- why do you believe she's
13 dead?
14   A.    I don't know.  Somebody said that.
15   Q.    Okay.  Have you ever spoken to Jermaica
16 Wright since your arrest on May 28, 2000?
17   A.    No.  But I had thought that lady Betty
18 was dead, too, and found out she ain't dead.
19   Q.    Do you -- have you ever asked Ashanti or
20 Jermaica to give you an affidavit?
21   A.    No.
22   Q.    You ever asked any of your family members
23 or friends to get in touch with them to give -- to
24 ask them to give an affidavit?
25   A.    No.

Page 155

1    Q.    Maurice Wright testified at your criminal
2  trial, right?
3    A.    Yes.
4    Q.    And you were in court when he testified?
5    A.    Yes.
6    Q.    And you know that when he testified at
7  your criminal trial on February 19, 2004, that he
8  was being called as a witness for the State, right?
9    A.    Yes.
10   Q.    And you were aware that Maurice Wright
11 was going to testify at your criminal trial before
12 he took the stand, right?
13   A.    I knew that he had a statement and stuff.
14 I didn't know he was -- knowing if he was going to
15 do all that stuff or not.  I -- no.  How would I
16 know that?
17   Q.    Well, Gregory Wilson would share the
18 discovery with you, right?
19   A.    Yes.
20   Q.    So he would tell you who the State was
21 going to call as a witness in your criminal case,
22 wouldn't he?
23   A.    Yeah.  He told me that, but --
24   Q.    Okay.  So --
25   A.    -- he said he was potential.  He said a

Page 156

1  bunch -- it's like a bunch of potential witnesses
2  that they had, so -- and then they had supposed to
3  be their silent witnesses.  Silent witnesses never
4  came.  Then the potential, they started looking for
5  him and came, and he was one of the potentials.
6    Q.    Okay.  So you knew, though, before
7  Maurice Wright hit the stand when you were in court
8  that he was a potential witness?
9    A.    Yes.
10   Q.    And did Jovanie Long ever as far as you
11 know talk to Maurice Wright about his testimony
12 before Maurice testified at the criminal trial?
13   A.    No.  We ain't -- how we going to do that?
14   Q.    You told Maurice Wright to recant the
15 statements that he made in his handwritten statement
16 in which he implicated you in the murder, correct?
17   A.    No.
18   Q.    Why did you laugh?
19   A.    Because that's absurd.
20   Q.    Why is that absurd?
21   A.    How?  For one, I ain't had no access to
22 him to tell him to do that.  And then why?  I never
23 did -- done had anything to do with this stuff,
24 so...
25   Q.    Well, you knew that he had implicated you

Page 157

1  in his handwritten statement and to the Grand Jury,
2  and so you wanted him to recant his statements;
3  isn't that true?
4    A.    No.
5    Q.    No?
6    A.    No.
7    Q.    You wanted him to get up there on the
8  stand at your criminal trial and say that you were
9  involved in the murder?  That's what you wanted him
10 to do?
11   MS. SAMUELS:  Objection, argumentative.
12   THE WITNESS:  I wanted him to get up there and
13 tell the truth.
14 BY MS. ITCHHAPORIA:
15   Q.    And isn't it the truth that you were
16 involved in the murder?
17   A.    No.
18   Q.    Isn't it the truth that you told Boo Boo
19 that Jovanie Long had told you that he shot someone?
20   A.    No.  That stuff's -- man, I -- I don't
21 know if you-all even hearing this or hearing
22 you-all.  This stuff sound like TV and a movie.  I
23 don't...
24   Q.    Did Jovanie Long ever tell you that he
25 wanted Maurice Wright to recant statements from his

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 158..161
XAVIER L. WALKER, 04/12/2022

Page 158

1  handwritten statement and his Grand Jury testimony?
2      A.    No.
3      Q.    You were in court when Maurice Wright
4  testified that he saw you on May 13th, 2000, right?
5      A.    Yes.
6      Q.    And that's the truth.  You did see
7  Maurice Wright --
8      A.    Yes.
9      Q.    -- on May 13th, 2000, right?
10     A.    Yes.
11     Q.    You saw him before you went to the club?
12     A.    Yes.
13     Q.    And you saw him after you came from --
14  back from the club?
15     A.    No.  I seen him before I went to the
16  club, and I seen him the next day.  I keep telling
17  you.  I went home after the club.
18     Q.    Okay.  So it's your testimony --
19     A.    Well, we went to the gas station.  Then
20  we went home.
21     Q.    Okay.  So it's your testimony as you sit
22  here today that after you left the club, you went to
23  the gas station and then you went home?
24     A.    Yes.
25     Q.    Okay.  Did you make any stops in between

Page 159

1  going from the gas station and going home?
2      A.    No.
3      Q.    Okay.  So it's your testimony that after
4  you left the club, you never saw Maurice Wright?
5      A.    No.
6      Q.    Is that -- is that -- is what I'm saying
7  correct?  It's your testimony as you sit here today
8  that you never saw Maurice Wright after you left the
9  club?
10     A.    After I left the club, no.
11     Q.    What time did you leave the club?
12     A.    I can't recall.
13     Q.    So how can you be sure that you didn't
14  see Maurice Wright?
15     A.    Because I know I went home and I know
16  that they went home or wherever they was going.  He
17  wasn't in the car with me.
18     Q.    Well, he was at the club, though, right?
19     A.    Yeah.  We all was at the club, but we all
20  left together separate and went our separate ways
21  the same way we came.  The people who came with me
22  left with me.  Whoever he came with, he left with.
23  Whoever the rest of them came with, they left with.
24     Q.    Who did he leave the club with?
25     A.    Whoever he was with.  I don't know.

Page 160

1      Q.    You don't know who he was with?
2      A.    I can't recall.
3      Q.    Who did you leave the club with?
4      A.    With Simeon and Deon.
5      Q.    Anybody else?
6      A.    No.
7      Q.    So is it your testimony that when you
8  left the club, you left with Simeon and Deon because
9  they're the same people that you came with and
10  they're the same people that you left with?
11     A.    Yes.
12     Q.    Was anybody else with you when you left
13  the club besides --
14     A.    No.
15     Q.    -- Simeon and Deon?
16     A.    No.
17     Q.    And you said you don't know what time you
18  left the club; is that right?
19     A.    No, I can't recall.
20     Q.    But you left the club around the time it
21  closed?
22     A.    Yes.
23     Q.    So we're talking about early morning
24  hours of May 13th, 2000?
25     A.    Yes.

Page 161

1      Q.    When Jovanie Long -- well, you were in
2  court when Jovanie Long testified that you and
3  Jovanie Long came to his house after the club,
4  right?
5      MS. SAMUELS:  Objection.  Do you mean Maurice
6  Wright?
7      THE WITNESS:  No.  I didn't --
8      MS. ITCHHAPORIA:  I'm sorry?
9      THE WITNESS:  You said that Jovanie testified
10  to that?
11  BY MS. ITCHHAPORIA:
12     Q.    Well, let me rephrase.  Sorry.  Strike
13  that.
14            You were in court when Maurice Wright
15  testified that you and Jovanie Long came to his home
16  on Erie after you had gone to the club?
17     A.    Yes.
18     Q.    And that was truthful testimony that
19  Maurice Wright provided at your criminal trial,
20  correct?
21     A.    No.
22     Q.    Maurice Wright testified that you and he
23  and Jovanie spoke after the club about girls that
24  you had met at the club; isn't that true?
25     A.    He stated that, yeah.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 162..165
XAVIER L. WALKER, 04/12/2022

Page 162

1    Q.   You're saying that testimony was not
2  true?
3    A.   No.  He was confused or something.  I
4  don't know what was wrong with him.
5    Q.   You knew that Maurice Wright was going to
6  say that the handwritten statement that he provided
7  to the state's attorney was not given voluntarily
8  before he testified at your criminal trial?
9    A.   No, I didn't know what he was going to
10  say.
11    Q.   So when he testified that he didn't make
12  some of the statements that were in his handwritten
13  statement, were you surprised?
14    A.   Yes.
15    Q.   That was the first you ever heard of it?
16    A.   Yes.
17    Q.   But Jovanie Long knew that Maurice Wright
18  was going to say that some of the statements in his
19  handwritten statement were not given voluntarily,
20  right?
21    MS. SAMUELS:  Objection, calls for
22  speculation.
23    THE WITNESS:  How am I supposed to know that?
24  BY MS. ITCHHAPORIA:
25    Q.   You never spoke to Jovanie Long about

Page 163

1  that?
2    A.   No.  That's crazy.
3    Q.   You weren't aware that Jovanie Long had
4  filed a motion before the criminal trial saying that
5  some of the statements in Maurice Wright's
6  handwritten statement were incorrect?
7    A.   No, I didn't know he did that.
8    Q.   When --
9    A.   I guess you learn something new every
10  day.
11    Q.   You said that you joined the Insane
12  Imperial Vice Lords after you moved to the Erie --
13  after you moved from the Erie neighborhood, right?
14    A.   Yes.
15    Q.   And you moved there in 6th or 7th grade?
16    A.   Yes.
17    Q.   So how old were you when you joined the
18  Imperial -- the Insane Imperial Vice Lords?
19    MS. SAMUELS:  Standing objection to any
20  questions related to gang affiliation.
21    MS. ITCHHAPORIA:  Okay.
22    THE WITNESS:  Like 13 or something.  12, 13.
23  BY MS. ITCHHAPORIA:
24    Q.   13.  Is it Insane Imperial or Imperial
25  Insane, or does it --

Page 164

1    A.   Imperial Insane.
2    Q.   Imperial Insane.  Okay.  Is that also
3  known as II Vice Lords?
4    A.   Yeah.
5    Q.   How long were you a member of the
6  Imperial Vice Lords for, Imperial Insane Vice Lords?
7    A.   From that time until I woke up.
8    Q.   And when did you wake up?
9    A.   I told you.  Like right before I started
10  getting in school and stuff after -- when I was in
11  Pontiac and my momma and them came to see me and
12  stuff.
13    Q.   So what year was that?
14    A.   Probably about 2008, '9, somewhere.  I
15  don't...
16    Q.   Okay.  What did you do to say that you
17  were no longer in the gang?  Did you have to do
18  something?
19    A.   No.  I'm a grown man.  I told them I'm --
20  I woke up and I ain't doing that no more.  I
21  changed.  I'm trying to do something different.
22    Q.   But prior to 2008 when you were at Cook
23  County Jail and in IDOC, you would hang out with
24  other members that were in the same gang as you,
25  right?

Page 165

1    A.   I still hung out with them even when I
2  wasn't.  I hung out with the same people I hung out
3  with.  Before then, I hung out with other people
4  that was other gangs and people that I was cool
5  with.  If I got cool with you and connected with you
6  and we vibe, I kicked it with you no matter what
7  gang you was or what race you was.  And it was the
8  same way after I left it alone.
9    Q.   Did you -- what did you have to do to
10  become a member of the Imperial Insane Vice Lords
11  when you were 13 years old?
12    A.   I ain't do nothing.  I just went and
13  joined it.  I told them I'm -- that's what I am.
14    Q.   You just joined it?
15    A.   Yeah.
16    Q.   Didn't you have to get beaten in?
17    A.   Once again, it's some TV stuff.
18    Q.   So no, you never got beaten in?
19    A.   No.
20    Q.   Did you ever get violated --
21    A.   No.
22    Q.   -- to be in the Imperial Insane Vice
23  Lords?
24    A.   No.  No.
25    Q.   You know what it means to be violated,

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 166..169
XAVIER L. WALKER, 04/12/2022

Page 166

1  right?
2       A.   Some TV stuff.
3       Q.   What does it mean?
4       A.   That's some TV stuff.
5       Q.   Well, okay.  But what does it mean to
6  you?
7       A.   They be jumped on by a bunch of people
8  that supposed to be your homies and love you.
9  That's the stupidest stuff ever.
10      Q.   And that never happened?
11      A.   No.
12      Q.   When you were in the Imperial Vice Lords,
13 did you have any tattoos that reflected that you
14 were in a gang?
15      A.   No.
16      Q.   Did you ever have any gang tattoos?
17      A.   Yes.
18      Q.   What gang tattoos did you have?
19      A.   I got -- I got them later when I was in
20 jail.
21      Q.   Okay.  And which ones did you get when
22 you were later in jail?
23      A.   One that say This World Insane and that's
24 it.
25      Q.   And that -- where was that?

Page 167

1       A.   On my arm.
2       Q.   Is it still on your arm?
3       A.   Yes.
4       Q.   What year did you get that?
5       A.   I don't remember.
6       Q.   And what does that mean?
7       A.   Just with the Imperial Insane Vice Lords
8  sign and This World is Insane, saying it's insane.
9       Q.   And did you have any other gang tattoos
10 other than the one on your arm?
11      A.   No.
12      Q.   That was the only one?
13      A.   Yes.
14      Q.   A star gang tattoo signifies that you've
15 shot someone or killed someone, right?
16      A.   No.  That's the stupidest stuff ever too.
17 Some more TV stuff.
18      Q.   But what does a star gang tattoo signify,
19 a five-point star?
20      A.   Not that at all.  I don't know, but I
21 know it does -- that's the stupidest stuff ever.
22      Q.   Well, you've heard of a five-point star
23 tattoo before, right?
24      A.   Yeah.  I see a lot of people with that,
25 but that don't mean -- that's the stupidest stuff

Page 168

1  ever.  And if people are really doing that because
2  of that, then they stupid.
3       Q.   Okay.  And a five-point star is a gang
4  tattoo, right?
5       MS. SAMUELS:  Objection, speculation,
6  foundation.
7       THE WITNESS:  It can be anything because
8  females got five-point stars tattooed on them, so --
9  you know, but...
10 BY MS. ITCHHAPORIA:
11      Q.   Were any of your family members in the
12 Imperial Insane Vice Lords?
13      A.   Not that I know of --
14      Q.   Did you --
15      A.   -- no.
16      Q.   Did you have any rank when you were in
17 the gang?
18      A.   I -- no, not really.  I just did what I
19 wanted to do regardless.
20      Q.   You said not really.  So did you have
21 some sort of rank when you were in the gang?
22      A.   No.
23      Q.   Were you a Shorty?
24      A.   I wasn't that either.  I just was me.
25      Q.   You were just you?

Page 169

1       A.   Yes.
2       Q.   What's a Shorty?
3       A.   I have no idea, but I know I wasn't a
4  Shorty.
5       Q.   Did you sell drugs for your gang?
6       A.   No.
7       Q.   No?
8       A.   No.
9       Q.   Where would you get the drugs from that
10 you were selling?
11      A.   I'd buy them.
12      Q.   You would buy them?
13      A.   Yeah.
14      Q.   And who would you buy them from?
15      A.   People that sold drugs.
16      Q.   Would you buy them from other gang
17 members?
18      A.   Some -- I don't know.  Some of them
19 probably was gang members.
20      Q.   Did you have like a regular supplier
21 prior to May 2000?
22      A.   No.
23      Q.   Where would you go to buy the drugs that
24 you were selling?
25      A.   To places that they sold drugs.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 170..173
XAVIER L. WALKER, 04/12/2022

Page 170

1    Q.    Which places were those?
2    A.    Drug places.
3    Q.    Were they drug places in your old
4  neighborhood?
5    A.    In the whole city.  Drug places.  It's...
6    Q.    Was there a particular person that you
7  would --
8    A.    No, I didn't have no particular --
9    Q.    Wait.  Hold on.  I've got to get my
10  question out.
11   A.    Okay.
12   Q.    Was there a particular person that you
13  would frequently buy drugs from that you were going
14  to then sell?
15   A.    No.
16   Q.    So it would be different people every
17  time?
18   A.    Yes.
19   Q.    And when did you first begin selling
20  drugs?
21   A.    When I was a teenager.
22   Q.    So when you joined the gang?
23   A.    No.
24   Q.    So you were selling drugs even before you
25  joined the gang?

Page 171

1    A.    Yes.
2    Q.    And you continued to sell drugs on a
3  regular basis until your arrest in May of 2000,
4  right?
5    A.    Yes.
6    Q.    And you would sell drugs what, on a
7  weekly basis or everyday basis?
8    A.    Whenever I needed some money.
9    Q.    And how often would you need money?
10   A.    Probably about a weekly basis.  I don't
11  know.
12   Q.    Okay.  And you would sell -- what
13  would -- you would sell heroin and you would sell
14  crack cocaine; is that right?
15   A.    I would sell whatever I can sell to make
16  some money.
17   Q.    Okay.  Did you sell heroin?
18   A.    Yes.
19   Q.    Did you sell crack cocaine?
20   A.    Yes.
21   Q.    Did you sell weed?
22   A.    Yes.
23   Q.    Did you sell PCP?
24   A.    Yes.
25   Q.    What else did you sell besides those

Page 172

1  four?
2    A.    That's the only thing in my neighborhood.
3  I sold the stuff that was in my neighborhood.
4    Q.    Okay.  And those were the four main drugs
5  that you would sell?
6    A.    Yes.
7    Q.    Back in May of 2000, who was the chief of
8  the Insane Imperial Vice Lords?
9    A.    I don't know.
10   Q.    Did you have to give any dues to your
11  gang?
12   A.    That's some TV stuff too.
13   Q.    So you never had to pay any money to your
14  gang?
15   A.    No.
16   Q.    Would you attend gang meetings?
17   A.    Yes.
18   Q.    When were those meetings held?
19   A.    Different times.
20   Q.    What was the purpose of the gang
21  meetings?
22   A.    To have order and structure to our
23  neighborhood.
24   Q.    And what kind of things would be
25  discussed at the gang meetings?

Page 173

1    A.    Just some pimps -- pimping over here.  We
2  don't want that on this block so the little kids can
3  be out there playing in the park.  So we've got to
4  stop them.  Such and such in jail, trying to get
5  together to send some money to them, make sure they
6  family cool and just trying to make sure our
7  neighborhood cool and stuff like that.  Make --
8  seeing if we -- anybody got any problems and then we
9  address the problems and try to leave away with a
10  better understanding.
11   Q.    Would you --
12       MR. MILLER:  Hold on.  The Zoom --
13       MS. ITCHHAPORIA:  Oh, sorry.
14       MR. MILLER:  The Zoom is off.
15       MS. ITCHHAPORIA:  Okay.
16       THE VIDEOGRAPHER:  No.  We're back on.
17       MR. MILLER:  We're back on now?
18       THE VIDEOGRAPHER:  Uh-huh.
19  BY MS. ITCHHAPORIA:
20   Q.    Okay.  Would you send money then to gang
21  members that were in prison?  Would you give money
22  to your gang so they could give it to gang members
23  that were in prison?
24   A.    No.
25   Q.    No?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 174..177
XAVIER L. WALKER, 04/12/2022

Page 174

1   A.   I didn't give it to them.
2   Q.   When you were in prison, did your gang
3   ever give you money?
4   A.   No.
5   Q.   Did your gang operate within a certain
6   geographical area in the city?
7   A.   No.
8   Q.   Your gang did have a presence in your old
9   neighborhood on Erie and Cicero and Ohio, right?
10  A.   Yes.
11  Q.   Was that considered to be Imperial Insane
12  Vice Lord territory?
13  A.   No.
14  Q.   Did Jovanie Long have a rank in the gang?
15  A.   No.
16  Q.   He didn't?
17  A.   Nope.
18  Q.   Is that a no?
19  A.   No.
20  Q.   Would you and Jovanie Long sell drugs
21  together?
22  A.   No.
23  Q.   If you wanted to gangbang, would you go
24  back to your old neighborhood?
25  MS. SAMUELS:  Objection, vague.

Page 175

1   THE WITNESS:  No.
2   BY MS. ITCHHAPORIA:
3   Q.   When you became an Imperial Insane Vice
4   Lord, you took an oath, right?
5   A.   Yes.
6   Q.   And you took that oath seriously?
7   A.   Yes.
8   Q.   And you were loyal to that oath, correct?
9   A.   Yes.
10  Q.   And part of that oath is never to snitch
11  on a fellow gang member, right?
12  A.   That don't say nothing in the oath.
13  Q.   Okay.  What does the oath say?
14  A.   I'm not going to say it and discuss it,
15  but it don't say nothing about none of that.
16  Q.   I'm sorry.  What was that?
17  A.   I say, I'm not going to say it and
18  discuss it, but it don't say none of that.
19  Q.   Why aren't you going to say and discuss
20  your Imperial Insane Vice Lord oath at your
21  deposition today?
22  A.   Because that's not something that you're
23  supposed to do.
24  Q.   It's not something that you're supposed
25  to do?

Page 176

1   A.   Yeah.
2   Q.   But you're not a member of the gang
3   anymore, are you?
4   A.   No, but still.
5   Q.   Okay.  So what's the oath that you said
6   when you became a member of the Imperial Vice Lord?
7   A.   What's his name?  I think his last name
8   Henderson.  Mr. Henderson wrote a book and the oath
9   is in there.  You can check it out.
10  Q.   Okay.  But I want you to tell us on the
11  record what the oath was when you became a gang
12  member.
13  A.   I can't even remember actually.  I can't
14  recall that stuff word for word.
15  Q.   Sir, you're -- it's not that you can't
16  recall it.  You just don't want to say it on the
17  record?
18  A.   No.  It's both.  I can't recall it word
19  for word accurate and I don't want to say it.
20  Q.   You're still loyal to that oath today,
21  aren't you?
22  A.   I have no ties with that, but I'm
23  still -- got rules and principle in life of being a
24  man and being a black man growing up in the
25  neighborhood I grew up in.

Page 177

1   Q.   What were some of the rules that you had
2   to follow when you were a gang member?
3   A.   Be -- trying to become a better member of
4   my community.
5   Q.   This is a street gang that we're talking
6   about, right?
7   A.   That's what you-all say it is and making
8   it as.
9   Q.   Well, it's a street gang that engages in
10  violence, right?
11  A.   That's what you-all say it is and make it
12  as.
13  Q.   Well, you didn't know your street gang --
14  your gang to engage in any sort of acts of violence?
15  A.   If acts of violence was done to them.
16  Q.   And this was a street gang that sold
17  drugs in the community, right?
18  A.   Gangs -- street gangs don't sell drugs in
19  the community.  Individuals sell drugs in
20  communities.  And individuals that sell it probably
21  be tied to a certain street gang or something, but
22  street gangs don't sell drugs in no community.
23  Q.   You're not saying that your street gang
24  is like being in the Boy Scouts, are you, sir?
25  A.   No, I'm not.

XAVIER WALKER vs CITY OF CHICAGO, et al.                      Pages 178..181
XAVIER L. WALKER, 04/12/2022

Page 178

1   Q.   Okay.  Because --
2   A.   What I'm saying --
3   Q.   -- a street gang is an illegal
4  organization, correct?
5   A.   According to you-all, because that's what
6  you-all twist it into and made it to.  The
7  organization that I -- that I became a part of and
8  the reason that I became a part of it was because it
9  was to help better our neighborhoods and then it was
10 turnt and twisted to what it is now by the media and
11 by the police and by the people because people
12 perpetuated all the nonsense that they show on the
13 newses and on all this other different stuff, but
14 our oath was to take care of our neighborhood.
15      We was policing our neighborhoods from
16 enemies and people that's coming in our
17 neighborhoods doing wrong, police included, because
18 police used to come and do wrong in our
19 neighborhood.  Pimps used to come and do wrong in
20 our neighborhood.  We started our neighborhood --
21 our organizations of a movement like the Black
22 Panthers and like all that type of stuff and then it
23 was turnt and twisted into what it is now.  And the
24 young people that don't know the history of it,
25 don't know about that, took that and ran with it,

Page 179

1  and they think that that's what it's about.  But
2  that's not what it was about.
3   Q.   But you committed crimes as a member of
4  that street gang, didn't you?
5   A.   No.  I wasn't told by no street gangs to
6  go and commit no crimes.  Things that people do,
7  they do it individually on their own terms, on their
8  own recognizance, and then probably try to -- either
9  is did by the media or by people to call it a gang
10 or people want to justify with a gang.  But that's
11 not how that stuff was worked -- or what that stuff
12 was about.
13      MS. ITCHHAPORIA:  All right.  Well, we're --
14 we're at a good stopping point, so let's go off the
15 break -- let's go off the record, sorry, so we can
16 take a break.  That's what I meant to say.
17      THE VIDEOGRAPHER:  We're off the record at
18 1:46 p.m.
19           (Whereupon, a break was taken,
20           after which the following
21           proceedings were had:)
22           (Whereupon, Deposition
23           Exhibit No. 2 was marked.)
24      THE VIDEOGRAPHER:  We are back on the record
25 at 2:28 p.m.

Page 180

1      THE WITNESS:  I'm like...
2  BY MS. ITCHHAPORIA:
3   Q.   Okay.  Mr. Walker, I'm going to show you
4  a picture on the Internet.  Do you recognize this to
5  be Ramell Sturdivant that we talked about
6  earlier?
7   A.   Yes.
8   Q.   And you know this individual to be
9  Shakey?
10  A.   Yes.
11  Q.   Okay.  Thank you.  I also want to mark
12 this as Exhibit 2 to your deposition.  I'm not going
13 to mark that.  And for the record this is
14 Bates-marked City NK 1615 through 1621.  I'm going
15 to ask you to look at the first page of that.
16      Okay.  Mr. Walker, do you see there
17 under -- on page 1 of Exhibit 2 where it says,
18 scars, marks, tattoos.  It also indicates that you
19 have a tattoo on your abdomen that says Thug Life;
20 is that correct?
21  A.   Yes.
22  Q.   And that's a gang tattoo as well, right?
23  A.   No.
24  Q.   No?  What does that mean, Thug Life?
25  A.   Tupac.

Page 181

1   Q.   And then you have another tattoo on your
2  back that says Wiley Coyote, right?
3   A.   No.  It was a tattoo that I was getting
4  done when I was in jail, but they end up moving a
5  guy that was doing it, so I never got it finished.
6  It was going to be the Wiley Coyote, but it's not
7  even done.  It's only part of his frame.
8   Q.   Part of his frame.  Is that a gang
9  tattoo?
10  A.   No.
11  Q.   Okay.
12      MS. ITCHHAPORIA:  Sorry?
13      MR. MILLER:  When?
14 BY MS. ITCHHAPORIA:
15  Q.   When did you get that?
16  A.   I don't remember what year, but I was in
17 jail.  I got all my tattoos in jail.
18  Q.   Even the Thug Life, you got in jail?
19  A.   Yes.
20  Q.   Okay.  And then you have something on
21 your left hand that says Zay?
22  A.   Yes.
23  Q.   And did you get that in jail too?
24  A.   Yes.  Every tattoo I have on my body, I
25 got while I was in jail.

Page 182

1   Q.   Okay.
2   A.   On this bit.
3   Q.   And then do you see this has a date of
4   birth of ████████████, on the first page of
5   Exhibit 2?
6   A.   Yes.
7   Q.   That's not your birthday, right?
8   A.   No.
9   Q.   Your birthday is what again?
10  A.   ██████████
11  Q.   Of what year?
12  A.   ████
13  Q.   ████ Is that the birth date that
14  appears on your driver's license?
15  A.   Yes.
16  Q.   Do you have your driver's license with
17  you today?
18  A.   Yes.
19  Q.   We'll mark that as Exhibit 3, and we'll
20  make a copy of it after the dep.
21  A.   It's in my other pants.  I got too much
22  stuff on my body.  I got a grandpa wallet.
23  MS. SAMUELS:  Jesus.  Is there dead see
24  squirrels in there too?
25  THE WITNESS:  Huh?

Page 183

1               (Whereupon, Deposition
2               Exhibit No. 3 was marked.)
3   BY MS. ITCHHAPORIA:
4   Q.   Okay.  For the record, the witness has
5   handed to me his driver's license, which we'll make
6   a copy of after the deposition and mark as Exhibit
7   3.  And on here, his date of birth is noted as
8   ██████████
9   MS. SAMUELS:  We ask that his driver's license
10  be marked confidential.
11  MS. ITCHHAPORIA:  Oh, yeah.  Okay.  I don't
12  have an issue with that.
13  MS. MURRAY:  Be right back.
14  MS. ITCHHAPORIA:  Okay.  Thank you.
15  THE WITNESS:  Huh?
16  MS. SAMUELS:  Huh?
17  THE WITNESS:  What did you say?
18  MS. SAMUELS:  I was keeping your driver's
19  license confidential.
20  BY MS. ITCHHAPORIA:
21  Q.   Mr. Walker, before the break we were
22  talking about your gang affiliation.  I just wanted
23  to know, was there a particular area that you were
24  aware of prior to your arrest in May 2000 where your
25  gang members would store drugs?

Page 184

1   A.   No.
2   MS. SAMUELS:  So I'm going to renew my
3   standing objection to questions related to gang
4   affiliation.
5   BY MS. ITCHHAPORIA:
6   Q.   Okay.  And you said no?
7   A.   Uh-huh.
8   Q.   Okay.  Was there a particular area that
9   you were aware of prior to your arrest in May 2000
10  where your gang members would store their guns?
11  A.   No.
12  Q.   As a member of the Imperial Insane Vice
13  Lords, you had access to guns, right?
14  A.   Only if I pay for them and got them
15  myself, yeah.
16  Q.   You couldn't just ask a fellow gang
17  member if you could borrow a gun?
18  A.   I had to pay for it or give them some
19  money or something back for it like I had to do when
20  I got locked up that time.
21  Q.   From time to time, you did pay people for
22  firearms; isn't that true?
23  A.   Yes.
24  Q.   When you would get firearms, where would
25  you store them?

Page 185

1   A.   On me.  I have them with me.
2   Q.   It would be on your person?
3   A.   Yes.
4   Q.   And then what would you do with the
5   firearm at night?  Let's say when you're sleeping.
6   A.   I had it with me.
7   Q.   You would keep it on your person?
8   A.   Yes.
9   Q.   Like under your pillow or actually like
10  in your pocket when you're sleeping?
11  A.   In my waist or on my side.
12  Q.   Why would you keep your gun on your
13  waist, on your side when you're sleeping?
14  A.   Because I was a stupid person that was
15  caught up with the street life that thought this was
16  what we're supposed to do because this is what they
17  say we supposed to do.  Rap songs and movies and
18  everything.
19  Q.   Would you have a firearm on your person
20  before your arrest in May 2000 because you felt you
21  needed it for protection from other gang members?
22  A.   No.
23  Q.   Would you have a gun on your person
24  because you felt you needed protection from rival
25  gang members?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 186..189
XAVIER L. WALKER, 04/12/2022

Page 186

1    A.    No.
2         Q.    Did you ever sell drugs for your gang?
3    A.    No.
4         Q.    You sold drugs for yourself?
5    A.    Yes.
6         Q.    Did you ever have to give any of the
7    proceeds from your drug sales to your gang?
8    A.    No.
9         Q.    Would you ever have to give any proceeds
10   from the sale of your drugs -- any proceeds from the
11   sale of your drugs to anyone?
12   MS. SAMUELS:  Asked and answered --
13   THE WITNESS:  No.
14   MS. SAMUELS:  -- for these questions as well.
15            (Reporter clarification.)
16   BY MS. ITCHHAPORIA:
17        Q.    You sold drugs for the older guys from
18   your old neighborhood, true?
19   A.    Yes.
20        Q.    Who were those older guys that you were
21   selling drugs for?
22   A.    Different people had sold drugs.  It was
23   different ones.
24        Q.    What were their names?
25   A.    I don't want to answer that.

Page 187

1         Q.    I'm sorry?
2    A.    I said I don't want to answer that.
3         Q.    Why don't you want to answer that?
4    A.    Because I don't want to disclose any of
5    them people names due to might incriminate them or
6    me.
7         Q.    Is that because they're fellow gang
8    members?
9    A.    No.
10        Q.    Okay.  Mr. Walker, I'm going to ask you
11   to speak up --
12   A.    No.
13        Q.    -- a little bit because I'm having a hard
14   time hearing you.
15   A.    No.  I sold drugs for different gang
16   members, all type of gang members and...
17        Q.    In April or May of 2000 when you were
18   selling drugs, you were selling drugs on a daily
19   basis?
20   A.    No.  Like when I needed money.
21        Q.    Okay.  Would you --
22   A.    When I needed extra money.
23        Q.    In April or May, would you be selling
24   drugs on a like every other day basis?
25   A.    No.  I need -- I told you I sold them

Page 188

1    whenever I needed extra money.
2         Q.    You're saying extra money.  So was there
3    another source of money that you had besides selling
4    drug --
5    A.    Yes.
6         Q.    -- drugs?
7              What was that?
8    A.    I got money from my family and I got
9    money from doing different little jobs around the
10   area.
11        Q.    So your parents would give you like,
12   what, an allowance?
13   A.    Yes.
14        Q.    Was that like a regular allowance that
15   you got on a --
16   A.    Yes.
17        Q.    It was?
18   A.    Yes.
19        Q.    Well, how much would they give you?
20   A.    Regular allowance.  They probably give me
21   like 50 to $75, something like that, a week.
22        Q.    A week?
23   A.    Yes.
24        Q.    When you were selling drugs, let's say in
25   April 2000, how much money did you make selling

Page 189

1    drugs?
2    A.    I don't recall.
3         Q.    In May 2000 before your arrest, how much
4    money would you make selling drugs?
5    A.    I don't recall.
6         Q.    Do you -- can you give me any estimate of
7    how much money you made selling drugs in the year
8    2000 before your arrest in May 2000?
9    A.    I don't recall.  I ain't put no number,
10   figure on it.
11        Q.    You sold drugs prior to your arrest in
12   May 2000 near Ohio and Cicero, right?
13   A.    No.
14        Q.    No?  You sold drugs near Ohio and
15   Kilpatrick?
16   A.    No.
17        Q.    You sold drugs near Cicero and Erie?
18   A.    Yes.
19        Q.    You also sold drugs by Kilpatrick and
20   Erie?
21   A.    Yes.
22        Q.    You would sell drugs in the alley that
23   was close to your old house on Erie, correct?
24   A.    Yes.
25        Q.    And the -- the spot that you particularly

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 190..193
XAVIER L. WALKER, 04/12/2022

Page 190

1   liked to sell drugs was east of Cicero?
2       A.    No -- yeah, in Kilpatrick.  I'm -- I'm --
3   from Kilpatrick to Cicero, that whole block.
4       Q.    Okay.
5       A.    That was my old block.  That was the only
6   place I could sell drugs at.
7       Q.    Did you ever sell drugs with Jovanie
8   Long?
9       A.    No.  He did his own thing.  I told you, I
10  don't --
11      Q.    Okay.
12      A.    -- know what he did.
13      Q.    You knew that Jovanie Long would sell
14  drugs?
15      A.    Yes.
16      Q.    Did you see him sell drugs?
17      A.    No.
18      Q.    How do you know he sold drugs?
19      A.    Because that's what we did in our
20  neighborhood.  If you wanted some extra money,
21  that's what you did.
22      Q.    Would he be selling drugs at the same
23  time when you were selling drugs?
24      A.    No.
25      Q.    You would sell drugs at a different time?

Page 191

1       A.    I be by myself when I'm selling my drugs
2   is what I'm doing.
3       Q.    Was there a period of time where Jovanie
4   Long had a hard time getting drugs to sell?
5       A.    Not that I know of.  I don't know.
6       Q.    He never told you that the older guys in
7   the neighborhood wouldn't give him drugs to sell?
8       A.    No.  He didn't tell me.  I don't know.
9       Q.    Did you ever pay people to stand security
10  for you while you sold drugs?
11      A.    No.
12      Q.    When you would sell drugs, would you be
13  armed in case someone tried to steal your drugs?
14      A.    Yes.
15      Q.    So every time you were selling drugs, you
16  would be armed, right?
17      A.    Yes.
18      Q.    And you would have the firearm on -- you
19  said in your waistband, tucked in your waistband?
20      A.    Yes.
21      Q.    Would you tell people that were buying
22  drugs from you that you were armed?
23      A.    No.
24      Q.    Did anyone ever try to rob you while you
25  were selling drugs?

Page 192

1       A.    No.
2       Q.    Why did you feel the need to have a
3   firearm on you, on your person, when you were
4   selling drugs?
5       A.    Because that's the way I was told and
6   taught by the streets.
7       Q.    By other gang members?
8       A.    No.  By the streets.
9       Q.    Did you have -- did you ever have
10  occasion to use the firearm that was on your person
11  when you were selling drugs?
12      A.    Luckily, I didn't.
13      Q.    You said luckily you didn't?
14      A.    Yes.
15      Q.    Did you ever have to show anyone that you
16  were armed while you were selling drugs?
17      A.    No.  Luckily, I didn't have to do that
18  either.
19      Q.    Did you ever threaten anyone with your
20  firearm at any point in time?
21      A.    No.
22      Q.    When you would be arrested for possession
23  of drugs, the police would take the drugs, right?
24      A.    I don't know where the police get the
25  drugs from.

Page 193

1       Q.    Well, they wouldn't let you keep the
2   drugs after you'd been taken into custody, right?
3       A.    Police ain't never get my drugs, so I
4   don't know where they was getting the drugs from.
5       Q.    When you were arrested and the drugs are
6   taken away, are you still responsible for paying for
7   those drugs?
8       A.    I told you, everything I did was mines
9   and on me and the police never got my drugs.  But
10  yes, I would -- whatever loss I took was -- it was
11  for me.  I'm lost.  I took a loss.
12      Q.    And you would take a loss every time that
13  you were arrested for possession and the police
14  would take the drugs, right?
15      A.    Yes.
16      Q.    Did you ever pretend that you were
17  selling drugs?
18      A.    No.
19      Q.    Were the drugs that you were selling,
20  were they actually drugs?
21      A.    Yes.
22      Q.    Would you ever sell like just white
23  powder?
24      A.    No.
25      Q.    Would you ever sell like fake sugar and

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 194..197
XAVIER L. WALKER, 04/12/2022

Page 194

1  try to pass it off as drugs?
2      A.    No.
3      Q.    Have you ever sold anyone fake drugs?
4      A.    No.
5      Q.    Have you heard of people on the street
6  back in -- prior to your arrest selling fake drugs?
7      A.    Not nobody that I hung around with.
8      Q.    Was that a problem in your old
9  neighborhood when you were selling drugs, that some
10 people weren't actually selling real drugs?
11     A.    No.  Now, that cause a problem.  That
12 cause you some -- not a rival gang because gangs
13 don't run other gangs, ain't on the -- but a person
14 whose drug spot it is, they would do something to
15 you and get at you because if you sold some fake
16 drugs on their block.
17     Q.    But that wasn't a problem for you?
18     A.    No, because I didn't have to do that.
19     Q.    Where was your drug spot?
20     A.    I didn't have a drug spot.  I worked on
21 my block by my house.
22     Q.    Okay.  Is -- is selling fake drugs, is
23 that called hitting a lick?
24     A.    That's what the police said it is.
25     Q.    Have you ever -- did you ever use the

Page 195

1  term "hitting a lick" prior to your arrest in May
2  2000?
3      A.    No, not prior to that, no.
4      Q.    Had you ever heard of that phrase,
5  "hitting a lick," prior to your arrest in May 2000?
6      A.    Yes, but I thought it was something else.
7      Q.    What did you think it was?
8      A.    Masturbating.
9      Q.    You didn't think, though -- prior to your
10 arrest, you didn't think hitting a lick had anything
11 to do with drug sales?
12     A.    No.
13     Q.    Have you ever told anyone that you sold
14 fake drugs that you tried to pass off as real drugs?
15     A.    No, besides the police and Deborah
16 Bedsole stuff.
17     Q.    I --
18            (Reporter clarification.)
19     THE WITNESS:  I said no besides the police and
20 Deborah Bedsole with this stuff.
21 BY MS. ITCHHAPORIA:
22     Q.    Oh, so you told your attorney, Deborah
23 Bedsole, that you sold fake drugs?
24     A.    Yes.
25     Q.    Did you tell Greg Wilson that you sold

Page 196

1  fake drugs?
2      A.    No.
3      Q.    You were arrested on March 27th, 2000, at
4  621 North Cicero, correct?
5      A.    I don't recall.
6      Q.    Okay.  Do you have any reason to doubt
7  that?
8      A.    No.
9      Q.    621 North Cicero is right around the
10 corner from 4721 West Ohio, right?
11     A.    Yes.
12     Q.    And when you were arrested on March 27th,
13 2000, you were arrested for possession of heroin,
14 weren't you?
15     A.    I don't recall.
16     Q.    When you were arrested on March 27th,
17 2000, the officers found 13 straws containing heroin
18 in the fuel door of a car; is that correct?
19     A.    It's possible.  I don't know if -- it
20 wasn't mines, but it's possible that they found it
21 and put it -- put it on me.
22     MS. SAMUELS:  For the record, I think I
23 previously stated that I have an objection related
24 to prior arrests and --
25     MS. ITCHHAPORIA:  Okay.

Page 197

1  BY MS. ITCHHAPORIA:
2      Q.    Did you ever sell and hide drugs in the
3  fuel door of a vehicle?
4      A.    No.
5      Q.    When you were arrested in -- on May 27,
6  2000, you told the arresting officers, quote, I only
7  took their money, sir?  Isn't that true?
8      A.    Possible.
9      Q.    And you said that to the police because
10 what you meant by that was that you weren't selling
11 actual drugs; you were selling fake drugs, right?
12     A.    No.
13     Q.    That's why you told the police, I only
14 took their money?
15     A.    No.  If I told the police that I only
16 took their money, that mean I just took their money.
17 That's it; that's all.
18     Q.    Took their money and what, and didn't
19 give them any drugs in return?
20     A.    And told them to get on.
21     Q.    Was that something that you did from time
22 to time?  You just take people's money and not give
23 them the drugs that they were there to buy?
24     A.    When customers used to be stupid and act
25 crazy and out of ordinary or room, yeah, I -- get

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 198..201
XAVIER L. WALKER, 04/12/2022

Page 198

1   on.
2       Q.   Okay.
3       A.   But I --
4       Q.   And so you would rob people?
5       A.   Basically, yeah.  If you -- it's more
6   robbing than what you said, yeah.
7       Q.   It's -- it's robbing, right?
8       A.   No, because --
9       Q.   You take someone's money?
10      A.   If I --
11      Q.   That's robbing.
12      A.   If you give me your money and I take it
13  and then tell you to get on, that's not me robbing
14  you.  That's me robbing you because I tell you --
15  you gave it to me.  And then I tell you to get on.
16  Ain't got nothing for you.  That's -- I robbed you?
17      Q.   How would you trick people to give you
18  their money?
19      A.   I wouldn't have to trick them.  They just
20  be stupid people that be running up and assume that
21  everybody out here because we on this block sells
22  drugs and selling drugs.
23      Q.   They would -- you would take their money
24  because you were pretending that you were selling
25  drugs, right?

Page 199

1       A.   I didn't have to pretend I was selling
2   drugs.  Just standing out there -- just standing
3   outside in my neighborhood, people assume that you
4   sell drugs.
5       Q.   And you wouldn't disabuse them of that
6   notion that you were, in fact, out there selling
7   drugs?
8       A.   I wouldn't make them or force them to
9   believe it, but if they came up to me right and I
10  tell you to go on, get on, I ain't on nothing, I
11  ain't doing nothing, and you just keep on, then I'll
12  take it, yeah.  Get on.
13      Q.   In April and May of 2000, were you using
14  drugs?
15      A.   I smoked weed and I drink and I smoked
16  PCP.
17      Q.   How often would you smoke PCP?
18      A.   Every other day or something.
19      Q.   Do you continue to use illegal drugs to
20  today, like today's date?
21      A.   No.  I drink.
22      Q.   Okay.  You drink alcohol?
23      A.   Yes.
24      Q.   How often would you drink alcohol in
25  April and May of 2000?

Page 200

1       A.   The same as I did the other stuff.  On a
2   regular basis.
3       Q.   Okay.  So every other day, you would
4   smoke PCP, weed, or drink alcohol or a combination
5   of all three?
6       A.   Or a combination of all three.
7       Q.   Okay.  Would you also drink alcohol with
8   Jovanie Long?
9       A.   Yes.
10      Q.   Did you smoke PCP with him?
11      A.   Yes.
12      Q.   Jovanie Long would be your -- would
13  become mean and aggressive when he would get drunk,
14  right?
15      A.   No.
16      Q.   No?
17      A.   No.
18      Q.   Wasn't he a mean drunk?
19      A.   No.
20      Q.   When he was -- you would also smoke PCP
21  with Jovanie, right?
22      A.   Yes.
23      Q.   And when he would smoke PCP, he would
24  become aggressive, right?
25      A.   No.

Page 201

1       Q.   Was he a calm drunk?
2       A.   He was cool.  We all was cool.  We all
3   kicked it.  This is what we did every day all our
4   life.  So we was used to all -- any forms that make
5   you act out or do stupid.  We been past all that
6   stuff.
7       Q.   Would you use -- smoke PCP and weed and
8   drink alcohol with Simeon Dorsey and Deon Baylock
9   and Marvin Mosley?
10      A.   They didn't smoke PCP, but I smoked weed
11  and drunk with them.
12      Q.   Okay.  And would they also smoke weed
13  and --
14      A.   Well, not Deon because he was a Shorty.
15  We didn't let him smoke and drink with us, but the
16  rest of --
17      Q.   Deon was a Shorty?
18      A.   Yeah.
19      Q.   What does that mean?
20      A.   He was younger than us.  He was littler
21  than us.  He was a little kid.
22      Q.   Okay.  But Simeon and Marvin would smoke
23  weed with you and drink alcohol too?
24      A.   Yeah.
25      Q.   And where would you guys do that?

XAVIER WALKER vs CITY OF CHICAGO, et al.                      Pages 202..205
XAVIER L. WALKER, 04/12/2022

Page 202

1   A.   Walking, in his house, my house, car,
2   whoever friend car we was in.
3   Q.   On May 13th, 2000, did you have a gun on
4   your person?
5   A.   May 13th, no.
6   Q.   What about on May 12th, the evening of
7   May 12th?  Did you have a gun?
8   A.   No.
9   Q.   You had access to a firearm, though,
10  right?
11  A.   No.
12  Q.   No, you couldn't go and ask someone in
13  your neighborhood if you wanted to borrow a gun
14  in -- on May 12th or 13th, 2000?
15  A.   People don't let you borrow guns and
16  stuff like that.  Unless you got some money or
17  something to give them to pay for it, then you not
18  getting a gun.  People not letting you just borrow
19  they guns and have they guns for free.
20  Q.   How many times did you pay someone for a
21  gun?
22  A.   I don't -- I really don't recall.
23  Q.   Is it so many that you don't remember?
24  MS. SAMUELS:  Objection, relevance.
25  THE WITNESS:  I don't recall.

Page 203

1   BY MS. ITCHHAPORIA:
2   Q.   Is it more than ten times you've paid
3   someone prior to May 2000 for a gun?
4   MS. SAMUELS:  Same objection.
5   THE WITNESS:  Probably so.
6   BY MS. ITCHHAPORIA:
7   Q.   Around ten times?
8   A.   Probably so.
9   Q.   Have you ever discharged a firearm?
10  A.   Yes.
11  Q.   Have you ever discharged a firearm in the
12  direction of another person?
13  A.   No.
14  Q.   Why have you discharged a firearm?
15  A.   I shot on New Year's before and I shot on
16  a range before.
17  Q.   Is that the only time?
18  A.   Yes.
19  Q.   So when you're saying you shot on New
20  Year's, like was that to celebrate the turning of
21  the new year?
22  A.   Celebrate the -- yeah.
23  Q.   But you've never discharged a weapon in
24  the direction of another person?
25  A.   No.

Page 204

1   Q.   And you've never asked to borrow a
2   firearm?
3   A.   No.  People don't let you -- I don't know
4   why you would think somebody let you borrow their
5   gun.
6   Q.   Have you ever given a firearm to someone
7   so they could use it?
8   A.   No.  I'm not -- just like ain't nobody
9   going to let me see theirs.  I ain't letting nobody
10  see mine.  Now, you can buy it.
11  Q.   Did you ever stole -- have you ever
12  stolen a firearm from someone?
13  A.   No.
14  Q.   And you've never had an Illinois Firearm
15  Owner's Identification Card, right?
16  A.   No.
17  Q.   And you've never had an Illinois conceal
18  and carry card?
19  A.   No.
20  Q.   Have you ever been arrested for unlawful
21  use of a weapon?
22  A.   Besides the one time that I almost was, I
23  never went to jail for none that I can remember that
24  I recall.
25  Q.   So is it your testimony that you were

Page 205

1   arrested one time for a UUW?
2   A.   I told you I was picked up.  They didn't
3   take me in.
4   Q.   Okay.
5   A.   They did the illegal transaction and let
6   me go.
7   Q.   Have you ever been told that there was a
8   warrant out for you for a UUW charge?
9   A.   I don't know.  I don't recall.
10  Q.   Okay.  But your understanding is that
11  besides being picked up, you weren't actually taken
12  into a police station for a UUW charge?
13  A.   I can't recall.  I've been picked up and
14  took to the police station for a lot of different
15  things a lot of times.  So I don't remember.  I
16  don't recall all the...
17  Q.   Did you ever tell Jovanie Long that you
18  had a firearm when you would have those firearms on
19  those ten occasions?
20  A.   If he was around me or with me, then I
21  might probably show him or tell him.  I don't know.
22  But no, that's not something you go and brag and
23  tell people.  I kept that to myself and...
24  Q.   And on these --
25  A.   It was for me.

AdvancedONE LEGAL                    (866) 715-7770
                                     advancedONE.com

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 206..209
XAVIER L. WALKER, 04/12/2022

Page 206

1    Q.    On these ten occasions when you had
2  firearms, like what kind of firearms did you have?
3  Were they revolvers?  Were they automatics?  What
4  kind of firearms did you get?
5    A.    Mostly revolvers, but I have had a few
6  automatics.
7    Q.    And then why is it that you would need to
8  keep purchasing firearms?  Like what would happen to
9  the firearm?  You were just collecting firearms?
10   A.    No.  I either go to jail with it or I'd
11 lose it.  Somebody steal it or something or I sell
12 it.
13   Q.    Okay.  So let's break that down a little
14 bit.  How many times did you sell an illegal firearm
15 to someone else?
16   MS. SAMUELS:  Objection, relevance,
17 foundation.
18   THE WITNESS:  Once.  I sold once.
19 BY MS. ITCHHAPORIA:
20   Q.    Once?
21   A.    Yeah.
22   Q.    Who did you sell it to?
23   A.    A guy on the street.
24   Q.    Do you remember his name?
25   A.    I never -- didn't even know him.

Page 207

1    Q.    Prior to May -- that was prior to your
2  arrest in May 2000?
3    A.    Yes.
4    Q.    How did that person know that you had a
5  firearm?
6    A.    He didn't.  He was coming and asking
7  people.
8    Q.    Okay.  How many times was your firearm
9  stolen from you?
10   A.    A bunch of times.  That's why I stopped
11 putting them down and start only kept with -- on me.
12 I'd get caught with it and go to jail with it
13 instead of putting it down.  That's why I ain't put
14 my guns or drugs down, a person would steal it.
15   Q.    You said a bunch of times.  Can you
16 quantify that?
17   A.    No, I can't.
18   Q.    So the ten times where you've purchased a
19 firearm from someone, one time you said that you
20 sold it.
21   A.    I'm not even actually saying ten.  I'm
22 saying around that.  You numbering it off and making
23 it like it's specific.  I don't know the specific
24 number or amount, so...
25   Q.    Okay.  So around the ten times when you

Page 208

1  purchased a gun from someone, you said one time you
2  sold the gun to someone else and you said a bunch of
3  times your firearms were stolen from you?
4    A.    Yeah.
5    Q.    So was it at least five times that your
6  firearm was stolen from you?
7    A.    It's possible.  I don't recall no certain
8  numbers of stuff.
9    Q.    And then other times, you said you would
10 lose the firearm?
11   A.    Yeah, I lost a few.
12   Q.    Because you would put them down and
13 that's why you started carrying them on your person?
14   A.    Yes.
15   Q.    So when you put them down, where were you
16 putting them down?
17   A.    Different places, wherever I thought I
18 could -- had it, wasn't nobody watching me, nobody
19 seeing it.
20   Q.    Did you have a stash spot?
21   A.    No.  I try to make whatever spot at the
22 time.
23   Q.    Your family knew that you had firearms,
24 right?
25   A.    No.

Page 209

1    Q.    You never told them?
2    A.    No.  Why would I tell them?
3    Q.    Did you --
4    A.    I'd be put out the house and mad at me
5  forever.
6    Q.    Did you ever see Jovanie Long with a
7  firearm?
8    A.    No.
9    Q.    Did he ever tell you that he discharged
10 his firearm?
11   A.    No.
12   Q.    Did he ever tell you that he needed to
13 borrow a firearm?
14   A.    No.  He wouldn't tell me that.  He know I
15 have -- I wouldn't let him borrow -- people don't --
16 I don't know where you get this stuff from.
17   Q.    Did Jovanie Long ever tell you that he
18 stole a firearm?
19   A.    No.
20   Q.    You knew in May 2000 that Jovanie Long
21 had stolen a firearm, didn't you?
22   A.    From who?  From where?  Why am I going to
23 know that, and how am I going to know that?
24   Q.    He didn't tell you that?
25   A.    No, he didn't.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 210..213
XAVIER L. WALKER, 04/12/2022

Page 210

1    Q.    Is that something that you think that
2  Jovanie Long would do, is steal a firearm from
3  someone else?
4    A.    No.
5    Q.    Why don't you think he would do that?
6    A.    Because he's the same way I am and the
7  same way the rest of the people in our neighborhood
8  is.  He know how to go out and get his own, and he
9  would know how to -- he worked, plus he know how to
10  sell drugs and make money on his own if he needed.
11    Q.    So he would know people on the street
12  that he could ask to buy a gun from.  Is that what
13  you're saying?
14    A.    Yes.
15    Q.    But was there a particular person that
16  you would buy your gun from or you bought your gun
17  from a variety of people?
18    A.    A variety of people.  Whoever come around
19  selling one.
20    Q.    And would they be -- would you be buying
21  guns from people in your neighborhood or from all
22  locations in the city?
23    A.    All locations in the city.
24    Q.    On May -- do you remember what day of the
25  week May 12th was?

Page 211

1    A.    No.
2    Q.    2000?  May 12th, 2000?
3    A.    No.
4    Q.    You don't remember.  Okay.  On May 12th,
5  2000, do you remember what time you woke up?
6    A.    No.
7    Q.    You woke up early?
8    A.    I don't -- I can't recall.
9    Q.    When -- when you woke up, who was at your
10  house?
11    A.    My family and my friend Simeon.
12    Q.    Are you saying -- earlier you just said
13  you couldn't recall.  So are you guessing or that's
14  what you actually remember?
15    A.    No.  I'm -- I'm just saying typically
16  that's who -- in that area and time, that's who
17  stayed there and that's who woke up with me when I
18  wake up.
19    Q.    Okay.  Typically in May, Simeon would be
20  at your house and your family would be at your
21  house?
22    A.    Yes.
23    Q.    But as you sit here today, do you have a
24  memory of who --
25    A.    No.

Page 212

1    Q.    -- was at home when you woke up on
2  May 12, 2000?
3    A.    No, I do not.
4    Q.    Okay.  And you don't remember what time
5  you woke up on May 12th, 2000?
6    A.    No, I do not.
7    Q.    Okay.  Did you -- did -- did Simeon stay
8  at your house the entire day on May 12th, 2000?
9    A.    He left whenever I left.  So if -- if I
10  didn't leave, then he didn't leave.
11    Q.    Okay.  Do you remember leaving your house
12  at any point on May 12th, 2000?
13    A.    Yeah.  Going to the club and stuff.
14    Q.    Okay.  Prior to going to the club, did
15  you leave your house on May 12th, 2000?
16    A.    No.  Probably going to stand outside in
17  the front talking to friends and stuff, but no,
18  not -- not the area or vicinity of my home, no.
19    Q.    Okay.  So is it accurate to say that on
20  May 12th, 2000, you did not leave your home, the
21  area of your home, and I'm -- when I'm saying
22  "area," I mean like the front yard or the backyard.
23  So you didn't leave that area?
24    A.    Right.
25    Q.    Is that correct?

Page 213

1    A.    Yes.
2    Q.    Okay.  So you didn't go to the store on
3  May 12, 2000, right?
4    A.    No.
5    Q.    And you were at home, but you might have
6  stepped outside to the front yard or the backyard to
7  talk to friends?
8    A.    Yes.
9    Q.    Okay.  Do you remember as you sit here
10  today which friends you spoke to on May 12th, 2000?
11    A.    I know Marvin -- Marvin, Charles,
12  Quinton, I know all of them came over there to tell
13  us about they want to go out for Charles getting off
14  house arrest and for his -- I don't know if it was
15  his birthday or something else with him.  But he had
16  just got out and got off house arrest, and he came
17  to say -- and he wanted to go out to the clubs and
18  kick it.
19          And in the midst of time they first came
20  to my house but then we all walked out, go in the
21  front, talking and all that and kickin' it, hanging
22  out, seeing the girls and whoever going past and
23  then they left and then we went back in the house.
24    Q.    So did Marvin and Charles and Quinton
25  come over to your house?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 214..217
XAVIER L. WALKER, 04/12/2022

Page 214

1    A.    Yes.
2    Q.    Did they come inside?
3    A.    Yes.
4    Q.    And where -- and where did they come
5    inside, like in the basement?
6    A.    Yes.
7    Q.    What time was it when they came over?
8    A.    I don't recall.
9    Q.    Who else was over when Martin, Charles,
10   and Quinton came over?
11   A.    It'd be different -- I don't recall.
12   Different friends came in and out all day. I don't
13   recall.
14   Q.    Did the three of those guys, Marvin,
15   Charles, and Quinton, did they come together?
16   A.    I think Charles and Marvin came together,
17   and Quinton probably came by his self.
18   Q.    Okay. And then they came to the basement
19   and they asked you if you wanted to go to the club?
20   A.    Yes.
21   Q.    Prior to that, you hadn't made any plans
22   with them to go to the club?
23   A.    Yeah, we had been talking about it but...
24   Q.    You had been talking about it when?
25   A.    Since we knew Charles was getting off

Page 215

1    house arrest. So we had been talking about it. So
2    it was that day and time. So now everybody was
3    making their final plans, trying to get everything
4    ready, they little clothes and they outfits and they
5    money and all that stuff and be ready, so...
6    Q.    You said something about seeing girls.
7    Did you see girls when you were -- on May 12th,
8    2000?
9    A.    Yes.
10   Q.    Who did you see?
11   A.    A few different girls. When I went on
12   my -- outside of my block. It's females that stay
13   on the block.
14   Q.    Oh. So these are girls that were just
15   passing in the neighborhood?
16   A.    Yes.
17   Q.    Did you invite any girls over to your
18   house that day?
19   A.    I was trying to. I was trying -- I was
20   talking to my friend Tara, trying to get them to
21   come over there, but they was trying to get us to
22   come to their house so I go to the club with them.
23   Q.    So Tara didn't come over?
24   A.    No.
25   Q.    You were trying to, but -- and you asked

Page 216

1    her and she said no?
2    A.    No. She was trying to get us to come out
3    there because her and her friends was going to a
4    club. She stayed out south, so...
5    Q.    So no girls came to your house on
6    May 12th, 2000, right?
7    A.    I can't recall.
8    Q.    Okay. Can't recall.
9    A.    But most likely, yeah, but I can't recall
10   though.
11   Q.    Well, do you remember any girls coming to
12   your house on May 12th, 2000?
13   A.    No, I can't remember right now but...
14   Q.    What time was it when you left your house
15   to go to the club?
16   A.    I don't know the exact time, but I know
17   it was after midnight because that's the time my
18   sister let me see her car.
19   Q.    So that would be after midnight. So now
20   we're talking May 13th, right?
21   A.    Yes.
22   Q.    So to be clear, on May 12th, 2000, you
23   never left your home; is that right?
24   A.    Yes.
25   Q.    And on May 13th, you're saying after

Page 217

1    midnight, you left your house on Potomac to go to
2    the club?
3    A.    Went to the restaurant, then to the club.
4    Q.    Restaurant and then the club. Potomac.
5    Okay.
6    Do you remember anything else that you
7    did on May 12th, 2000, other than talking to Marvin
8    and Charles and Quinton and Tara trying to get you
9    to come over to a club by her?
10   A.    Playing cards and smoke weed and drink
11   and watch TV, playing a game.
12   Q.    Who were you playing cards with?
13   A.    A few different people, but we played
14   cards with Charles and Quinton. We won some, you
15   know, won, beat them and got the bragging rights
16   over there, talk crazy to them. Then another
17   friend, I don't know if it was Satan or his brother,
18   one of them. They came over playing cards, and we
19   was talking smack and beating them.
20   Q.    So Satan's brother came over to your
21   house on May 12?
22   A.    I don't know if -- I can't recall if it
23   was him or his godbrother.
24   Q.    Okay.
25   A.    But they came, and there was another

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 218..221
XAVIER L. WALKER, 04/12/2022

Page 218

1   person that they played cards with.
2       Q.    And were you playing cards in the
3   basement?
4       A.    Yes.
5       Q.    And you're saying you got bragging rights
6   over Charles and Quinton.  So you won the game?
7       A.    Yeah.
8       Q.    What were you playing?
9       A.    Spades.
10      Q.    How many people do you need to play
11  spades?
12      A.    Four.
13      Q.    You can't play spades with two or three
14  people?
15      A.    Probably can, but I only play it with
16  four.
17      Q.    You only play it with four.  But you can
18  play it with three people?
19      A.    I don't know.  I never played that way.
20  So I don't know.
21      Q.    Who were you smoking weed with?
22      A.    All the people that we were playing cards
23  and kickin' it with.
24      Q.    Okay.  So when Quinton and Charles came
25  over and you were playing spades with them, you were

Page 219

1   smoking weed and you were drinking?
2       A.    Yes.
3       Q.    Were they also smoking weed and drinking?
4       A.    Yes.
5       Q.    Do you remember what time they came over?
6       A.    No.
7       Q.    Do you remember what time they left?
8       A.    No.
9       Q.    And at some point you said Marvin also
10  came over?
11      A.    Yes.
12      Q.    Do you remember what time he came over?
13      A.    No.
14      Q.    Do you remember what time he left?
15      A.    No.
16      Q.    And when -- when Satan or his brother
17  came over, were Charles, Quinton, and Marvin also at
18  your house?
19      A.    Yes.
20      Q.    Do you remember --
21      A.    And Antwoine and Boo Boo came over too
22  and some other people.
23      Q.    Okay.  So --
24      A.    I think Ra Ra came over and Jovanie came.
25  I think -- I don't know.

Page 220

1       Q.    All right.  Well, let's go over that.  So
2   you're saying Antwoine.  That's Antwoine Waddy came
3   over?
4       A.    Yes.
5       Q.    And did he come over with Boo Boo?
6       A.    Yes.
7       Q.    Okay.  So Antwoine Waddy, also known as
8   Bubble, and Maurice Wright, also known as Boo Boo,
9   they came over to your house on May 12th, 2000?
10      A.    Yes.
11      Q.    Were they there at your house -- was
12  Antwoine Waddy and Boo Boo at your house when
13  Marvin, Charles, and Quinton were at your house?
14      A.    Yes.
15      Q.    And you said Ra Ra also came over?
16      A.    Yes.
17      Q.    And Ra Ra is Timothy Long?
18      A.    No.
19      Q.    Who is Ra Ra?
20      A.    Robert Byrd.
21      Q.    Robert Byrd.  Okay.  So Robert Byrd --
22  did Robert Byrd come with Antwoine Waddy and Boo
23  Boo?
24      A.    No.
25      Q.    He came by himself?

Page 221

1       A.    No.  He came with somebody else.  I just
2   can't remember who it is.  I was just trying to
3   think who came with him.  I can't remember, though.
4       Q.    Okay.  Was Robert Byrd over when Antwoine
5   Waddy and Boo Boo were over?
6       A.    No.
7       Q.    Was Robert --
8       A.    They had left already.
9       Q.    Sorry?
10      A.    They had left already.
11      Q.    Okay.  So tell me -- can you tell me what
12  the sequence of events was?  Who came over first?
13      A.    Charles and Marvin came over first.
14      Q.    Okay.
15      A.    Then Quinton came over a little later
16  because that's Charles' card partner and close
17  friend, so he play with him.  Marvin normally will
18  play with me.  So Quinton can't -- you know, he
19  can't play with them.  So that -- yeah, we was
20  playing and then other people started coming in.
21      Q.    Okay.  So did Satan or Satan's brother
22  come before Waddy and Boo Boo?
23      A.    Yes.
24      Q.    Okay.  So then the next in the order
25  would be Satan and -- or Satan's brother, right?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 222..225
XAVIER L. WALKER, 04/12/2022

Page 222

1   A.   Yes.
2   Q.   And then at some point, you said Waddy
3   and Boo Boo came together?
4   A.   Yes.
5   Q.   And when Waddy and Boo Boo came, was
6   Marvin, Charles, Quinton, and Satan or Satan's
7   brother still there?
8   A.   Marvin and Charles was still there, but
9   Satan and them had left.  They was leaving at the
10  same -- as they was coming, they was leaving.
11  Q.   They left.  Okay.  So you didn't play
12  cards with Satan or Satan's godbrother?
13  A.   Not -- I don't remember which one, but
14  yeah, I played cards with one of them and whatever
15  friend or cousin that they had with them.
16  Q.   Okay.  Do you remember Satan's brother's
17  name?
18  A.   Twin.
19  Q.   Twin?
20  A.   Yeah.
21  Q.   And do you remember Satan's cousin's
22  name?
23  A.   No, I don't remember who he even had with
24  him.  I don't know if it was they cousin, friend,
25  somebody, but they came over with a guy to play

Page 223

1   cards.  That's why they came, because we be talking
2   smack about playing cards and all that stuff.
3   Q.   And to be clear, you can't tell me what
4   time Satan or his brother or his cousin came over?
5   A.   No.
6   Q.   And you can't tell me -- to be clear, you
7   can't tell me what time Antwoine Waddy or Boo Boo
8   came over to your house on May 12th?
9   A.   No.
10  Q.   Do you know if it was the evening hours
11  or daylight when Antwoine Waddy and Boo Boo came
12  over?
13  A.   Probably after normal time probably.  I
14  don't know.
15  Q.   Okay.  And when Antwoine Waddy and Boo
16  Boo came, Charles Toles, Marvin Mosley, and Quinton
17  were still there?
18  A.   Yes.
19  Q.   And then at some point, you said --
20  A.   Simeon was there and Deon was there too.
21  Q.   Oh, Simeon and Deon were there too?
22  A.   Yeah.
23  Q.   Okay.  When did Simeon come over?
24  A.   Simeon stay with us.
25  Q.   Okay.  So he was always there?

Page 224

1   A.   Yeah, he was always there.
2   Q.   Was there any point in time when Simeon
3   left your house on May 12th, 2000?
4   A.   No.  When I -- no, because if he leaves,
5   I left.
6   Q.   Okay.  And you said Deon was also over?
7   A.   Yes.
8   Q.   When did Deon come over?
9   A.   He came over like right around the same
10  time Quinton came.
11  Q.   Okay.  They didn't -- did they come over
12  together?
13  A.   No.  Deon stayed like two doors down.  So
14  he -- while we was out on the front all talking and
15  mingling and messing around, talking smack, like,
16  you know, yeah, come on, all right, we finna go do
17  this; we finna go play and all that, he came -- he
18  heard us, and he came out and came down.
19  Q.   Okay.  And then --
20  A.   We all went in the basement.
21  Q.   -- you testified that Robert Byrd, also
22  known as Ra Ra, he came over sometime after Bubble
23  and Boo Boo came over?
24  A.   Yes.
25  Q.   And when Ra Ra came over, Charles,

Page 225

1   Marvin, and Quinton, Deon, and Simeon were still
2   there?
3   A.   Yes.
4   Q.   Okay.  And what did you-all do when Ra Ra
5   came over?
6   A.   We was still playing cards and kickin'
7   it, and they just came, said, hey, what's up?
8   Kicked it, smoked a few blunts, and then they left,
9   him and whoever was with him.
10  Q.   Who's "they left"?
11  A.   Ra Ra and whoever was with him.
12  Q.   Oh, okay.  So Ra Ra left before Waddy and
13  Boo Boo left?
14  A.   No.  They was -- they left already.  I
15  told you they left before Ra Ra came.
16  Q.   Okay.  They left before Ra Ra came.  Do
17  you know what time they left?
18  A.   No.
19  Q.   Do you know what time Ra Ra came?
20  A.   No.
21  Q.   Do you know what time he left?
22  A.   No.
23  Q.   All right.  You said around -- it was
24  after midnight on May 13th when you left your house,
25  right?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 226..229
XAVIER L. WALKER, 04/12/2022

Page 226

1    A.    Yes.
2    Q.    And do you remember what time it was when
3  you left your house on May 13th?
4    A.    Not exactly.  I don't recall, but I know
5  it was when my sister finally said yes to letting me
6  see her car.
7    Q.    What --
8    A.    I know that was after midnight because
9  when it was 12:00, I was saying she making us late.
10  Man, she trippin'.  She don't even want us to use
11  the car.  That's what I was telling Simeon and Deon.
12  Like, man, I should have asked my daddy before he
13  went to sleep but...
14    Q.    Okay.  So you know -- you know that it
15  was after 12:00 when you asked your sister Shunralyn
16  Walker for her car because --
17    A.    No.  It wasn't after when I asked her.  I
18  said it was after before she gave it to me.  I had
19  been asking her all day, ever since Marvin and them
20  came over and said that they was -- we was going to
21  the club.
22    Q.    Okay.
23    A.    And she was -- at first she had stuff to
24  do, so she was rip and running and doing her --
25  whatever she said she had to do, and she told me she

Page 227

1  going to get back to me.  She ain't never tell me
2  no.  She just kept giving me a string of hope
3  because I had just -- they told me if I get my
4  license and stuff, they'll let me use their cars,
5  so -- and I had got my license.  So my mother and
6  father started letting me use their cars, and now I
7  was trying to use her car because hers was a little
8  newer.  I wanted to go to the club looking like --
9  shining a little bit, you know, so yeah.
10    Q.    But when did she say you could use her
11  car?  When did she finally agree?
12    A.    It was after midnight.
13    Q.    It was after midnight.  And you know it
14  was after midnight when your sister Shunralyn agreed
15  that you could use her car because you said to your
16  friends Simeon and Deon that you should have asked
17  your dad before midnight if you could take her
18  car -- or take his car?
19    A.    No.  I -- I said I should have asked him
20  before he went to sleep.  He had went to sleep.  But
21  I had been asking her, and she kept stringing me
22  along.  So I'm like, she going to give it to me.  So
23  I didn't ask my father because I'm thinking my
24  sister is going to give it to me.
25        But then when it got to getting later and

Page 228

1  later and I'm looking at the clock and it's 12:00
2  and they calling, they paging me, talking about,
3  Man, what up?  Where you-all at type stuff?  I'm
4  like, Man, they making us late.  Everybody gone
5  already.  Everybody going to the club.  She making
6  us late.  Man, she's trying to make us miss it.  But
7  I ain't telling her this because I don't want to
8  make her mad and get her upset so she don't let me
9  use it.  So this is my complaint to the homies.
10    Q.    You said you were looking at the clock.
11  Where was a clock?
12    A.    In the room.  In the bedroom.
13    Q.    In -- in your bedroom in the basement?
14    A.    Yes.
15    Q.    You weren't wearing a wristwatch or any
16  kind of watch, right?
17    A.    Yes.
18    Q.    You were wearing a watch?
19    A.    Yes.
20    Q.    Were you wearing a watch when you left
21  your house that day?
22    A.    Yes.
23    Q.    What kind of watch was it?
24    A.    I don't know.
25    Q.    Like a --

Page 229

1    A.    Just like I got a watch on now.  I never
2  looked at the time.  And I don't even think it's
3  set.  There's a watch on my hat.  It's not set.  And
4  I had that same type of hats back then.
5    Q.    Oh, so you were wearing a watch on
6  May 13th when you left your house but it wasn't
7  working?
8    A.    Yeah, it worked.  I just never set them
9  and I never care about looking at them for the time.
10  That's not what I bought them for.
11    Q.    Okay.  You just got it because it looks
12  nice?
13    A.    Yeah.
14    Q.    Okay.  Was it a digital watch?
15    A.    No.  It was a watch similar like this.
16    Q.    Okay.  Like this -- yours has kind of got
17  like -- it's got hands on it.  Okay.
18    A.    Yeah.
19    Q.    When you were asking Sho--- you asked
20  your sister, Shunralyn Walker, if you could use her
21  car, right?
22    A.    Yes.
23    Q.    Is that a yes?
24    A.    Yes.
25    Q.    Okay.  And she had a green Ford Taurus at

XAVIER WALKER vs CITY OF CHICAGO, et al.                              Pages 230..233
XAVIER L. WALKER, 04/12/2022

Page 230

1    that time?
2         A.    Yes.
3         Q.    And when you were asking her to use her
4    car, would you go upstairs?
5         A.    Yes.
6         Q.    And when you went upstairs, did you see
7    any of your other sisters?
8         A.    Yes.
9         Q.    Who else was at home?
10        A.    My little sister and my big sister.
11        Q.    Okay.  So they were both at home?
12        A.    Yes.
13        Q.    And were they at home the entire time
14   that you were at home on May 12th, 2000?
15        A.    I do not know.
16        Q.    Okay.  When you were in the basement with
17   your friends, was your sister Sheleah also in the
18   basement?
19        A.    Yeah, for a nice while.
20        Q.    For a what?  Sorry?
21        A.    For a nice while.  Then she got to
22   complaining we too loud and smoking and all the weed
23   smoking, all that stuff.  So she complained, tried
24   to put people out, and that's really why Bo and them
25   left because of her complaining and trying to put

Page 231

1    people out.  And then she go upstairs and complain
2    to my momma and daddy, like, get out of here.  They
3    being loud.  I'm trying to do whatever she trying to
4    do in her little room.  And we got the music going.
5    We playing video games.  We playing cards.  We
6    smoking weed and we drinking, and she complaining.
7         Q.    What -- what time was it when you first
8    saw your mother, Tina Walker, on May 12th, 2000?
9         A.    I don't know.
10        Q.    Was it --
11        A.    I have no idea.
12        Q.    -- in the morning?
13        A.    Yeah.  When I first woke up, yeah, I know
14   I go up there and I say hey to them and see if
15   they make -- well, she makes breakfast.  My momma
16   used to make breakfast every morning.  So I go up
17   there and get me something to eat and get Simeon
18   something to eat and say my heys to them and come
19   back downstairs.
20        Q.    So when you woke up on May 12th and went
21   upstairs, your mom -- your mom was there?
22        A.    Yes.
23        Q.    Was your dad there?
24        A.    Yes.
25        Q.    And were your sisters there, all three of

Page 232

1    them?
2         A.    Yes.
3         Q.    And then at some point, did your mom and
4    dad leave?
5         A.    I don't know.
6         Q.    Did -- were your parents working on
7    May 12th, 2000?
8         A.    I don't think so.  I don't know, though.
9         Q.    Do you remember seeing them again on
10   May 12th, 2000?
11        A.    Yes.  And I seen them periodically
12   throughout the day every time I went upstairs or
13   every time one of them came downstairs because
14   sometime they'll come down and be like, hey, now,
15   you-all getting a little too loud.  We know to tone
16   it down a little bit.
17        Q.    Do you remember your mom or your dad
18   actually coming down on May 12th, 2000, and telling
19   you guys to keep it down?
20        A.    I remember my daddy coming when my sister
21   first went complaining.
22        Q.    Okay.  So anybody else that you saw on
23   May 12th, 2000, that we haven't gone over?
24        A.    Not that I can think of.  I don't know.
25        Q.    And when Waddy and -- when Antwoine Waddy

Page 233

1    and Boo Boo were over, did you tell them that you
2    had made plans with Marvin, Charles, and Quinton to
3    go to the club?
4         A.    Yeah.
5         Q.    Because they didn't know Charles, right?
6    They weren't really friends with him?
7         A.    They knew him, but they not really cool.
8    They know -- all of them, I done introduced and they
9    all met each other, but like I said, it's --
10   different people hang out with different people.
11   But when we having events like that, somebody
12   birthday or going to celebrate or us going to the
13   club, everybody will come out.  So when I told them,
14   yeah, we all going to the club, they was like, all
15   right.  We just -- let me know.
16        Q.    So -- but before Waddy and Boo Boo left,
17   did you make plans with them to meet them at the
18   club?
19        A.    Yes.
20        Q.    And did you tell them which club you were
21   going to?
22        A.    Yes.
23        Q.    What club did you tell them you were
24   going to?
25        A.    We going to the club at Wax Factory on

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 234..237
XAVIER L. WALKER, 04/12/2022

Page 234

1   Lake and St. Louis and then the Club Xavier down the
2   street from it on Lake and Homan.
3       Q.    Wait.  So what were the clubs' names?
4   Wax Factory and...
5       A.    The Wax Factory and Club Xavier.
6       Q.    Club Xavier?
7       A.    Yeah.
8       Q.    And so you told them you were going to go
9   to both clubs?
10      A.    Yeah.  They right down the street from
11  each other.  One of them was -- well, none of them
12  there now.  But back then, it was like right down
13  the street, one of them on St. Louis and Lake, and
14  the other one is on Homan and Lake, right on the
15  corner.
16      Q.    Which one was on Lake and St. Louis?
17      A.    The Wax Factory.  That's the one we was
18  going to first because that's the main club.  That's
19  where they was going.
20      Q.    Okay.
21      A.    But a lot of times before that one end,
22  we'll try to go to the other one because, depending
23  on what girls there and stuff, if there's a lot of
24  girls there, we'll stay, but if there's not, we go
25  to the other one because that's where the girls at.

Page 235

1       Q.    The Club Xavier was at Homan and
2   St. Louis?
3       A.    No.
4       Q.    Oh.
5       A.    Lake and Homan.
6       Q.    Lake and Homan.  Okay.
7       A.    Yeah.  The other one on Lake and
8   St. Louis.
9       Q.    Okay.  And did you go to Club Xavier on
10  May 12th, 2000?
11      A.    No.
12      Q.    You never made it there?
13      A.    No.
14      Q.    Okay.  But you had told them anyway the
15  first club that you were going to go to was the Wax
16  Factory?
17      A.    Yeah.
18      Q.    And you expected to see them at the Wax
19  Factory on May 12, 2000?
20      A.    Yes.
21      Q.    And did you see Antwoine Waddy and Boo
22  Boo at the Wax Factory on May 13th, 2000?
23      A.    I don't recall, but I'm pretty sure they
24  probably came.  I know I seen Ra Ra.  So I know the
25  rest of them probably came.

Page 236

1       Q.    Did you tell Ra Ra you were also going to
2   the Wax Factory?
3       A.    Yes.
4       Q.    Did you tell Satan and Satan's brother or
5   his cousin that you were going to the Wax Factory?
6       A.    Not the other person because I don't
7   really remember or know the other person.  But
8   whichever one of them it was, yes, I told him too.
9       Q.    Did you tell Charles and Marvin and
10  Quinton that, you know, after the Wax Factory, that
11  you guys were going to go to Club Xavier?
12      A.    No, I didn't have to tell them that.
13  That was the plan that we all made --
14      Q.    Okay.
15      A.    -- together.  That's what they wanted
16  because that's what we normally do.  If we go --
17  coming from where we from, we get there.  The Wax
18  Factory is first, and we go check that one out.  If
19  it's bussin', a lot of girls and people that we know
20  and homies and it's a good vibe, we stay there.  If
21  it ain't, we go to the other one because we know
22  everybody at that one now.  That's how it was.
23      Q.    Did you see Jovanie Long on May 12th,
24  2000?
25      A.    I don't recall.  I don't know if he came

Page 237

1   with Ra Ra or not.  He probably was the one with
2   Ra Ra.  I can't recall, though.
3       Q.    As you sit here today, you can't tell me
4   if Jovanie Long came over to your house on May 12th,
5   2000; is that right?
6       A.    Yes, I can't recall.
7       Q.    Do you know when the first time was that
8   you saw him either on May 12th or May 13th?  I'm
9   talking about Jovanie Long.
10      A.    I remember seeing him in the club.
11      Q.    Didn't you give him a ride to the club?
12      A.    No.
13      Q.    So have we covered all the people that
14  you spoke to or saw on May 12th, 2000?
15      A.    That I can recall, yes.
16      Q.    Okay.  Anybody else that you spoke or saw
17  on May 12th, 2000?
18      A.    Not that I can recall.
19      Q.    Now, you said you spoke to Tara, and I
20  assume that was on the phone?
21      A.    Yes.
22      Q.    Okay.  Do you remember speaking to
23  anybody else on the phone on May 12th, 2000, besides
24  Tara?
25      A.    Her friends.

XAVIER WALKER vs CITY OF CHICAGO, et al.                          Pages 238..241
XAVIER L. WALKER, 04/12/2022

Page 238

1    Q.    Other friends?
2    A.    Her friends.
3    Q.    Oh, her friends.
4    A.    But yeah, I also talked to other people
5  on the phone.  I can't remember who all, but yeah.
6    Q.    Did you speak to Jovanie Long on the
7  phone --
8    A.    Yeah, I remember --
9    Q.    -- before you went to the club?
10   A.    Yeah, I remember telling him we was going
11 to the club and stuff, yeah.
12   Q.    So you did speak to him on the phone
13 before you left for the club?
14   A.    Yes.
15   Q.    Do you remember what time it was when you
16 spoke to Jovanie Long?
17   A.    No.
18   Q.    Did he call you or you called him?
19   A.    I think -- I think I was talking to Ra Ra
20 and he was with Ra Ra.
21   Q.    Oh.  Like physically at your house or on
22 the phone?
23   A.    On the phone before they came.  That's
24 why they -- how they come and came, you know, then.
25 People just don't pop up and stuff.  They just -- we

Page 239

1  talk, kick it.  What you-all doing?  Where you-all
2  at?  We over here.  We doing this.  What you-all
3  doing tonight?
4    Q.    So when you talked to Jovanie Long, Ra Ra
5  hadn't been over at your house?
6    A.    No.
7    Q.    So Ra Ra and Jovanie Long were together
8  when you spoke to Jovanie Long on the phone?
9    A.    Yes.
10   Q.    And then after that, Ra Ra came over and
11 you believe that Jovanie Long may have come over?
12   A.    Yeah.  But he came later, though.  So I
13 don't -- from when we talked, we talked a little
14 earlier and then they came a little later.  So I
15 don't remember who was with them, but possibly
16 Jovanie.
17   Q.    Did Ra Ra and Jovanie Long come to your
18 house together?
19   A.    I can't recall.
20   Q.    Did they come inside your house?
21   A.    Yes.  Whoever it was that was with Ra Ra,
22 they came together, yeah.
23   Q.    And when Ra Ra and Jovanie Long came over
24 to your house, Simeon and Deon were still there?
25   A.    Yes.

Page 240

1    MS. SAMUELS:  Objection, misstates his prior
2  testimony.
3  BY MS. ITCHHAPORIA:
4    Q.    Was anybody else there?
5    A.    Yes.  I -- it's -- I told you we was
6  playing cards.  I'm playing cards with Charles and
7  them.  So they still there.
8    Q.    Okay.  And did you tell Jovanie Long that
9  you -- when you were talking to Jovanie Long on the
10 phone, did you tell him about going to the Wax
11 Factory?
12   A.    Yes.
13   Q.    What did you tell him?
14   A.    That Charles had just gotten off house
15 arrest.  We all going to the club.  Okay.  We going
16 to go to the Wax Factory.  Then we going to go to
17 Club Xavier, see what's up, see which one is
18 poppin'.
19   Q.    And what did he say?
20   A.    They with it.  They with it.
21   Q.    He said he wanted to come to the club?
22   A.    Yeah.
23   Q.    And prior to speaking to him on May 12th,
24 2000, on the -- on the phone, when had you last seen
25 or spoken to him?

Page 241

1    A.    Probably like a couple of days before
2  then.
3    Q.    You're saying probably.  You don't
4  remember?
5    A.    No.
6    Q.    Do you know if you saw Jovanie Long on
7  May 11th, 2000?
8    A.    I can't recall.
9    Q.    Do you know if you spoke to Jovanie Long
10 on May 11th, 2000?
11   A.    I cannot recall.
12   Q.    Do you remember anything that you did on
13 May 11th, 2000?
14   A.    Yeah.
15   Q.    What did you do on May 11th, 2000?
16   A.    I found out that my cousin had got killed
17 on that date.
18   Q.    And what's the name of your cousin?
19   A.    Darnell.  I don't know if he got killed
20 on that date, but I found out about it on that date.
21 And his funeral was coming up.  His funeral was like
22 that Saturday or something.  Sunday or Saturday.  I
23 can't remember.  I can't recall.
24   Q.    What's Darnell's last name?
25   A.    Wiggins.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 242..245
XAVIER L. WALKER, 04/12/2022

Page 242

1    Q.    So is he a cousin related to you by
2  blood --
3    A.    Yes.
4    Q.    -- from your mom or your dad?
5    A.    My dad.
6    Q.    Your dad.  So is he the son of an uncle
7  or an aunt?
8    A.    He's a son of one of my daddy's first
9  cousins who was also deceased.
10   Q.    And how did you find out that Darnell was
11 dead?
12   A.    One of my other cousins had called me.
13   Q.    Okay.  And did he tell you how Darnell
14 had died?
15   A.    No.  They just told me he was killed.
16   Q.    Do you know how he was killed?
17   A.    He was shot.
18   Q.    And you found that out on May 11th?
19   A.    Yes.
20   Q.    And you found out on May 11th, 2000, that
21 the funeral for Darnell Wiggins was going to be on
22 that Saturday, Sunday?
23   A.    Some -- yes, one of those days.
24   Q.    Sorry?
25   A.    I said yes, one of those days.

Page 243

1    Q.    Do you remember what day Darnell Wiggins'
2  funeral was?
3    A.    I can't recall, but I know it was one of
4  those days.
5    Q.    Did you go to his funeral?
6    A.    Yes.
7    Q.    Did you go to his wake?
8    A.    Yes.
9    Q.    Was his wake and funeral on the same day?
10   A.    Yes.
11   Q.    Where was his wake and funeral?
12   A.    I can't recall.
13   Q.    So you can't recall where it was and you
14 don't recall the day?
15   A.    No.
16   Q.    Is that right?
17   A.    Yep.  But I'm pretty sure I can get an
18 obituary and all that stuff from my sister and them.
19   Q.    Anything else that you recall doing on
20 May 11th, 2000?
21   A.    Besides that, my -- basically just
22 kickin' it, smoking, drinking, playing cards, and
23 chilling.
24   Q.    Well, that's -- that's what you used to
25 do, right?  Those are activities, playing --

Page 244

1    A.    Right.
2    Q.    -- cards, smoking weed, those are things
3  that you typically did in that time frame, right?
4    A.    Yes.
5    Q.    Do you actually have a memory of doing
6  those things on May 11th, 2000?
7    A.    A subpar memory, yeah.
8    Q.    Okay.  And what's your memory?  Tell me
9  what your memory is of what you were doing on
10 May 11th, 2000.
11   A.    I remember being in my basement smoking
12 weed.
13   Q.    With who?
14   A.    Simeon.
15   Q.    Anybody else?
16   A.    I can't remember.  I can't recall.
17   Q.    Do you -- did you leave your house at any
18 point on May 11th, 2000?
19   A.    I can't recall.
20   Q.    Did you go anywhere on May 11th, 2000?
21   A.    I can't recall.
22   Q.    Did you go to a nightclub on May 11th,
23 2000?
24   A.    Depending on what day it was.  What day
25 is it -- was it?

Page 245

1    Q.    You don't remember?
2    A.    No.  What day was it?
3    Q.    If it was a Thursday, does that --
4    A.    Yeah.
5    Q.    -- jog your memory?
6    A.    Yeah, because Thurs- -- Thursday to
7  Sundays was the party nights and the club nights.
8  So it's possible.
9    Q.    Okay.  So let's assume May 11th was a
10 Thursday.  Does that mean that you went out?
11   A.    Possible.
12   Q.    But you don't remember?
13   A.    No.
14   Q.    Okay.  So is it accurate to say that as
15 you sit here today, you have no memory of going to a
16 club on May 11th, 2000?
17   A.    I can't recall --
18   Q.    Okay.
19   A.    -- what I did exactly.
20   Q.    Do you have a memory as you sit here
21 today of seeing anybody besides Simeon on May 11th,
22 2000?
23   A.    No.
24   Q.    And I know you said you spoke to Tara on
25 the phone on May 12th and you spoke to Jovanie Long

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 246..249
XAVIER L. WALKER, 04/12/2022

Page 246

1   and Ra Ra on the phone, right?
2       A.   Yes.
3       Q.   Do you have a memory of speaking to
4   anybody else on the phone?
5       A.   Some of Tara's friends.
6       Q.   Right.  Tara's friends.  Anybody else
7   that you spoke to on the phone?
8       A.   I can't recall.
9       Q.   You can't recall?
10      A.   Huh-uh.
11      Q.   Did you speak to Boss Hog on the phone?
12      A.   Possible.
13      Q.   Possibly?
14      A.   Yeah.
15      Q.   Do you have a memory of speaking to Boss
16  Hog on the phone?
17      A.   I can't recall, but possibly.
18      Q.   Sorry?
19      A.   I said no, I can't recall, but possibly.
20      Q.   Did Boss Hog tell you that Jovanie had
21  done some shit?
22      A.   He always call me and telling me somebody
23  did something.  Boss Hog used to gossip.
24      Q.   He was a gossip queen?
25      A.   Yeah.

Page 247

1       Q.   Do you remember on May 12th, 2000,
2   getting a call from Boss Hog and Boss Hog telling
3   you that Jovanie did some shit?
4       A.   No.
5       Q.   But that is something that he could have
6   said?
7       A.   Yes, but I remember the call that I got
8   on May 12th from him now that you saying it and it
9   jogging my memory and stuff.  But no, he was telling
10  me that the block was poppin' and coming on the
11  block.  They was out there acting -- acting a fool.
12      Q.   So he told you the block was popping?
13      A.   Yeah.
14      Q.   And he was acting a fool?
15      A.   Yeah.
16      Q.   What -- what do you mean by that, he was
17  acting a fool?
18      A.   Meaning that they was out there smoking,
19  drinking, having a good time, and there was a bunch
20  of girls over there and come just slide on the
21  block.  Come kick it.  That's --
22      Q.   Is that --
23      A.   -- one of the reasons that I still
24  through the block before I went.
25      Q.   So is that what it means when the block

Page 248

1   is popping is that people are out there hanging out
2   and having a good time and there's girls there?
3       A.   Yeah.  Yes.  Smoking, drinking, kickin'
4   it, have a good time.  It's bussin'.  It's block.
5       Q.   What time did Boss Hog call you?
6       A.   I don't recall.
7       Q.   When Boss Hog called you, did your sister
8   Sheleah pick up the phone?
9       A.   I don't recall.
10      Q.   Did you tell Boss Hog that you were going
11  to the club --
12      A.   Yes.
13      Q.   -- that night?
14      A.   Yes.
15      Q.   Did he tell you that he was going to come
16  to the club with you?
17      A.   No.  He said he didn't want to go.
18      Q.   He said he didn't want to go.  Okay.
19      A.   He --
20      Q.   Did Boss Hog tell you that it was crazy
21  in the neighborhood?
22      A.   He was talking about kickin' it and all
23  that, and that's why he didn't want to go.  He had a
24  little fat girl that he had gotten and he was trying
25  to creep off with.  That's...

Page 249

1       Q.   Did Sheleah -- Sheleah told you that
2   someone was on the phone for you at some point on
3   May 12th, 2002 [sic], right?
4       A.   It's possible.  She probably answered the
5   phone a bunch of the times and telling people was on
6   the phone.  That's...
7       Q.   Do you have a memory of Sheleah telling
8   you on May 12th, 2000, that someone was on the phone
9   for you?
10      A.   Not accurately, but I know that's
11  something that could have happened because she does
12  that normally.  She answers -- if she answers the
13  phone, she going to tell whoever the phone for that
14  somebody on the phone for them like anybody else in
15  my house would.
16      Q.   On May 12th, 2000, Sheleah told you that
17  someone was on the phone for you and it was about
18  Jovanie, right?
19      MS. SAMUELS:  Objection, misstates the prior
20  testimony.
21      THE WITNESS:  I just told you I don't -- it's
22  possible that she could have told me something --
23  answered the phone and told me that I had a phone
24  call but nothing about -- nothing -- she'll tell me
25  I got a phone call because it's just like anybody

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 250..253
XAVIER L. WALKER, 04/12/2022

Page 250

1  else in my house, if you answer the phone and it
2  wasn't for you, you told the person who it was for,
3  telephone.
4  BY MS. ITCHHAPORIA:
5      Q.    All right.  But did Sheleah ever tell you
6  that there was a phone call for you and it was about
7  Jovanie?
8      A.    No.
9      Q.    Okay.  Did the person on the phone ever
10 tell you that you need to come and get Jovanie
11 because Jovanie had done some shit?
12     A.    No.
13     Q.    Did the person tell you that he couldn't
14 tell you what shit Jovanie had done over the phone?
15     A.    No.
16     Q.    Well, isn't it true that Sheleah gave an
17 affidavit that you attached to one of your court
18 filings that said that someone called her and --
19 someone called you and she picked up and they told
20 her that you needed to come and get Jovanie because
21 Jovanie had done some shit?
22     A.    No.
23     MS. SAMUELS:  Objection, misstates the record.
24 BY MS. ITCHHAPORIA:
25     Q.    You've seen an affidavit from Sheleah

Page 251

1  that says that, right?
2      A.    It doesn't say what you said.
3      Q.    It doesn't say what I said?
4      A.    No.  It's saying that somebody told me
5  that, and she was on the phone supposedly and
6  hearing it or whatever.  But I guess she don't --
7  she heard, like I just told you, how you thought
8  what I said, the block poppin' and all that, I guess
9  she took it as something else.  And I don't know
10 but...
11     Q.    Okay.  So is it your testimony as you sit
12 here today that when you were on the phone and
13 Sheleah overheard that no one told you to come and
14 get Jovanie because he had done some shit?
15     A.    No.
16     Q.    That never occurred?
17     A.    No.  It wasn't said that way.
18     Q.    So if Sheleah swore to that in an
19 affidavit, then are you saying she's lying?
20     A.    I'm saying she took it the way that she
21 took it, assuming that this is what this means, and
22 I'm telling you that when we talking about the block
23 is poppin', the block is bussin' and all that, we
24 talking about a good time.  We not talking about
25 nothing crazy or nothing stupid.  We talking about,

Page 252

1  man, there's girls out here.  Everybody out.  The
2  block bussin'.  The block poppin'.  It's crazy out
3  here.  Need to come kick it.  That's how we talk.
4      Q.    Have you ever spoken to Sheleah about
5  that affidavit and the statement that she made?
6      A.    No.
7      Q.    Did you write that affidavit for Sheleah?
8      A.    No.  I haven't even seen it.  I don't
9  even know what she wrote or what she got or what she
10 did.
11     Q.    But you are aware as you sit here that
12 she made that statement in the affidavit?
13     A.    Yes.
14     Q.    How are you aware of that?
15     A.    Because my lawyers and attorneys and
16 people talk to me about it.
17     Q.    Okay.  So you -- you said you had asked
18 your sister Shunralyn Walker to borrow her car
19 because you had just gotten your driver's license,
20 right?
21     A.    Yes.
22     Q.    Now, hadn't you borrowed her car on prior
23 occasions before May 12th, 2000?
24     A.    I didn't just get my driver's license on
25 May 12th.  So I -- I got my license probably either

Page 253

1  the end of the month before or like the middle
2  sometime of the month before.  So of course up and
3  to then, once I got my license, that was the whole
4  purpose of me getting my license to be able to drive
5  their cars.  So all -- once I got it, all the way up
6  until then, yes, I borrowed their cars; I drove
7  their cars.
8      Q.    You drove cars, though, before you got
9  your driver's license, right?
10     A.    Yes.
11     Q.    You were arrested for driving without a
12 license, weren't you?
13     A.    Yes.
14     Q.    And you drove your family's cars without
15 having a license too, right?
16     A.    Yes, and then they stopped me and --
17 because I got arrested and they told me I can't --
18 to get my license.  That's what made me go and get
19 my license.
20     Q.    And -- and did you tell your sister
21 Shunralyn Walker when you were asking her for her
22 car on May 12th why you needed her car?
23     A.    Yes.
24     Q.    What did you tell her?
25     A.    I told her I wanted to go to the

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 254..257
XAVIER L. WALKER, 04/12/2022

Page 254

1   restaurant and wanted to go to the club.
2       Q.      Okay.
3       A.      And she was trying to make me not go to
4   the club and tell me just go to the restaurant.
5       Q.      Why didn't she want you to go to the club
6   as far as you knew?
7       A.      Because she's a grandma. She's an old
8   lady type person. She be, you don't need to be
9   doing that, like she is now. She's an old grandma
10  type person where she be trying to be
11  overprotective. You don't need to be doing this or
12  doing that type stuff.
13      Q.      Was she worried that you might get into
14  trouble?
15      A.      Just hanging out, normal stuff, I guess.
16  I don't know.
17      Q.      So did you tell her -- as you sit here
18  today, it's your testimony that you told her that
19  you were going to the restaurant and you were going
20  to the club?
21      A.      Yes.
22      Q.      So she knew that you wanted your car to
23  go to the club?
24      A.      Yes. But she kept telling me not to go
25  to the club. So I guess she figured, she told me

Page 255

1   not to, I'm not going. She -- only go to the
2   restaurant. I'm like, yeah, all right. I'm going
3   to go to the restaurant. And I went to the
4   restaurant and went to the club.
5       Q.      And how many times did you ask her that
6   day on May 12th, 2000, if you could have her car to
7   go to the restaurant and the club?
8       A.      I don't recall. But a bunch of times. I
9   don't know how many. But she -- I know she dangling
10  me and stringing me along. Instead of saying no,
11  she kept saying, I'm going to think about it. So I
12  kept on. Did you think about it yet? Come on, man.
13  Let me see it. Man, we just trying to go out. Man,
14  we trying to go to the club. We trying to go -- you
15  don't need to be going to no club anyway. All
16  right. We trying to go to the restaurant, man. I'm
17  hungry. I ain't ate all day. And kept on until she
18  finally said yeah.
19      Q.      When we talked about some of the people
20  that came over to your house on May 12th, 2000, do
21  you remember that Tyree Patterson also came over to
22  your house?
23      A.      Yes.
24      Q.      And what time did he come over?
25      A.      I can't recall.

Page 256

1       Q.      Was he playing cards with you as well?
2       A.      Yes.
3       Q.      And did Tyree Patterson, did you also
4   make plans with him to meet him at the club?
5       A.      Yes.
6       Q.      You told him you were going to the club
7   too?
8       A.      Yes.
9       Q.      Did Tyree come to your house with anyone?
10      A.      I don't recall.
11      Q.      Did you give him a ride to the club?
12      A.      No.
13      Q.      What time was it when you started getting
14  ready to go to the club?
15      A.      About 10 o'clock.
16      Q.      And so you were making -- you were
17  getting ready --
18      A.      No. I take that back. I had been
19  ironing, getting my stuff ready earlier and all day.
20  But by the time I was set in my mind, because this
21  is the time that they was going, about 10:00, 10:30,
22  because the club start about 9:00 and then don't
23  nobody want to go and be the first and early person
24  there. We wait until it start filling out, see if
25  girls and people are going to come in. So I had

Page 257

1   told myself like 10:30, 11 o'clock, we going to go,
2   and then my sister started making me late, trying to
3   steady drag on.
4       Q.      So is that accurate to say that you
5   started getting ready and ironing your clothes for
6   the club before your sister had agreed that you
7   could use her car?
8       A.      Yes.
9       Q.      And you were ironing your clothes?
10      A.      Yes.
11      Q.      What were you wearing that night when you
12  went out?
13      A.      I had a hat -- a Breyer's Buck50 hat like
14  I got now, navy blue, and a navy blue Pelle Pelle
15  outfit and some all white Air Force Ones like I got
16  on now.
17      Q.      And some what? I didn't catch the last
18  part.
19      A.      All white Air Force Ones, Nikes, that I
20  got on -- like I got on now.
21      Q.      Were you wearing jeans?
22      A.      Yes, a Pelle Pelle jeans jacket outfit.
23      Q.      And did you -- did you have like a
24  starter jacket like what you're wearing now?
25      A.      A Pelle jacket.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 258..261
XAVIER L. WALKER, 04/12/2022

Page 258

1    Q.   A Petty jacket?
2    A.   Pelle. Pelle, Pelle Pelle. Marc
3 Buchanan Pelle Pelle brand that was out back then.
4    Q.   Did you have a cell phone on your person
5 in May 2000?
6    A.   I think I had my -- a Chirp.
7    Q.   A what?
8    A.   It was the Motorolas, when the Motorola
9 Nextels came out and they call it a Chirp.
10    Q.   They called them?  I can't --
11 THE COURT REPORTER:  Chirp.
12 THE WITNESS:  Chirp.
13 BY MS. ITCHHAPORIA:
14    Q.   Okay.  So you had a Chirp on you?
15    A.   Yeah.
16    Q.   Which is a mobile phone?
17    A.   Yeah.
18    Q.   What was your number for your mobile
19 phone?
20    A.   I don't know.
21    Q.   Did you ever tell any of your attorneys,
22 like Deborah Bedsole or Gregory Wilson, that you had
23 a Motorola phone with you on May 12th, May 13th,
24 2000?
25    A.   I don't know.

Page 259

1    Q.   What happened to your phone?
2    A.   I don't know.  I don't know if the police
3 ever gave my stuff over when they took it.
4    Q.   And you said you were smoking weed and
5 drinking before you went out that night, right?
6    A.   Yes.
7    Q.   Were you intoxicated when you left your
8 house?
9    A.   I had a little buzz, but I wasn't
10 intoxicated like that, no.
11    Q.   Were you high when you left your house
12 that day?
13    A.   I had a little buzz, but I wasn't
14 intoxicated to where I couldn't function to drive or
15 none of that type of stuff, no.
16    Q.   What were you drinking that day?
17    A.   Bud Light.
18    Q.   How many Bud Lights did you have before
19 you left your house after midnight on May 13th,
20 2000?
21    A.   About two.
22    Q.   Two?  And how much weed had you smoked?
23    A.   I don't know.
24    Q.   When you left your house after midnight
25 on May 13th, 2000, to go to the restaurant first,

Page 260

1 who was with you?
2    A.   Simeon and Deon.
3    Q.   So they were with you?
4    A.   Yes.
5    Q.   And were they with you when your sister
6 gave you her car keys?
7    A.   No.  They was in the basement.
8    Q.   Okay.  So you went upstairs and your
9 sister gave you the car keys?
10    A.   Yes.
11    Q.   And as you sit here today, you believe
12 that that was sometime after midnight when she gave
13 you the keys on May 13th, 2000?
14    A.   Yes.
15    Q.   Did she give you the keys to her car
16 before 1:00 a.m. on May 13th, 2000?
17    A.   I can't recall.
18    Q.   You just know it was sometime after
19 midnight?
20    A.   Yes.
21    Q.   You can't be any more precise than
22 sometime after midnight; is that right?
23    A.   No, because, like I said, I don't even
24 remember that because I was saying she making us
25 late, and I -- that's the time that I seen when she

Page 261

1 was making us late.  It was already 12:00 something.
2 I'm like she trippin'.
3    Q.   And you had made plans to meet your
4 friends there, right?
5    A.   Exactly.
6    Q.   And your plans were to meet your friends
7 before midnight?
8    A.   Exactly.
9    Q.   And so as soon as your sister gave you
10 the keys, you left your house with Simeon and Deon,
11 right?
12    A.   Yes.
13    Q.   You didn't stay at your house after she
14 gave you the keys?
15    A.   I had to go downstairs and tell them,
16 come on.  She finally gave them to us, and then we
17 all getting ready, get our stuff, get our coats and
18 whatever else we taking with us and stuff and then
19 we left out.
20    Q.   Did you leave out from the front door or
21 the back door or the basement door?
22    A.   The front door.
23    Q.   And did Shunralyn see you leave?
24    A.   Yes.
25    Q.   And was anybody else at home when you

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 262..265
XAVIER L. WALKER, 04/12/2022

Page 262

1  left your house with Simeon and Deon?
2      A.   Yes.
3      Q.   Who else was at home?
4      A.   Who else was home?  Well, woke -- my
5  mother and my little sister was both home and woke.
6  And my daddy was in his room asleep.  And my other
7  sister, I don't -- she was pacing -- I don't know if
8  she was back and forth upstairs or downstairs
9  throughout the day.  But I know for a fact my little
10 sister because she was -- she wanted me to try to
11 get her -- bring her something to eat, and I'm like,
12 no, we finna go to the club after this.
13     Q.   Did you tell Shunralyn which club you
14 were going to?
15     A.   No.
16     Q.   Did you tell her which restaurant you
17 were going to?
18     A.   No -- yeah, I told her we was going to
19 Papa Charlie's, but it was closed, so...
20     Q.   Did you tell her that Simeon and Deon
21 were coming with you?
22     A.   No.  She knew that -- well, she should
23 have knew they was with me over there.  Simeon was
24 staying with me.  And it was like, I'm not going to
25 leave him in the house by himself.  He was staying

Page 263

1  there because of me.
2      Q.   Did -- Shunralyn Walker told you that she
3  didn't want Deon going with you because he was too
4  young, right?
5      A.   Yeah.  She always told me that.  They all
6  told me that because they like, why you-all got that
7  little boy hanging with you-all?  But they don't
8  know that we started having him hang with us because
9  he was out there by himself and he had nobody and
10 became our little brother and we trying to make sure
11 he be straight.
12     Q.   But you're saying they always said that.
13 But on May 12, 2000, Shunralyn told you that she
14 didn't want Deon going with you because he was too
15 young?
16     A.   Yeah, she probably did.  But like I said,
17 that was something that was normal.
18     Q.   Well, you're saying probably, but you
19 don't actually remember her saying that?
20     A.   Yeah, I remember her saying it because
21 she always told me that is what I'm telling you.
22     Q.   Okay.
23     A.   It's not the first time, but it was the
24 last.  But it wasn't the first time that she had
25 told me that but...

Page 264

1      Q.   So she gives you the car keys upstairs.
2  You go downstairs.  You tell Simeon and Deon that
3  you got the car keys and then you left out through
4  the front door; is that right?
5      A.   Yes.
6      Q.   And where is --
7      A.   After I got my stuff.
8      Q.   Right.  After you got your coat and
9  stuff?
10     A.   Yeah.
11     Q.   What else did you get?
12     A.   My hat and my coat, my phone, my chain.
13 Got to put -- you know, got to be flashing.
14     Q.   Did you have an ID on you?
15     A.   No.
16     Q.   No.  But how much money did you have on
17 you?
18     A.   I don't know.
19     Q.   And then you -- where was her car parked?
20     A.   Like on my -- on the block, but like a
21 few houses down.
22     Q.   Okay.  And so did the three of you go to
23 her car?
24     A.   Yes.
25     Q.   And you got in the car?

Page 265

1      A.   Yes.
2      Q.   And what time was it when you left your
3  house on May 13th, 2000?
4      A.   I don't know.  I can't recall.  I...
5      Q.   You left your house around 12:10 a.m. to
6  go to the restaurant; isn't that right?
7      A.   No, because it was still 12:00 -- like
8  12:10 or something when I was in the house saying
9  that she making me late.  So I know it was after
10 that.
11     Q.   So it was around 12:10 when you left the
12 house to go to the club --
13     A.   No.
14     Q.   -- or go to the restaurant?  I'm sorry.
15     MS. SAMUELS:  Objection, argumentative, asked
16 and answered.
17     THE WITNESS:  No.  It was around 12:10 when I
18 asked her and I said that she's making us late and I
19 can't go.  I'm like, man, she trippin'.  She making
20 us late.  She on some garbage.  Because it was 12:00
21 something, almost 12:10 then.  So I know I didn't
22 get it then.  It was a nice minute before she gave
23 it to me.
24 BY MS. ITCHHAPORIA:
25     Q.   Well, did you leave your house at

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 266..269
XAVIER L. WALKER, 04/12/2022

Page 266

1  approximately midnight?
2      A.    No.
3      Q.    So if someone said that, that would not
4  be true?
5      A.    No.
6      Q.    Did you leave your house around 1:00 a.m.
7  in the morning to go to the restaurant?
8      A.    That'd be more accurate because like I
9  told you, I know for a fact that it was 12:00
10 something because I'm looking and saying that she
11 making me late.  So it was already after midnight
12 before she gave me the keys and before I can go
13 anywhere.
14     Q.    Didn't you tell your attorney, Greg
15 Wilson, that you left your house around 12:10 a.m.?
16     A.    I don't recall.
17     Q.    So it's possible --
18     A.    I don't think so.
19     Q.    -- you said that to him and you don't
20 remember?
21     A.    I don't recall.  And he probably just
22 mixed it up because I probably was telling him the
23 same thing I'm telling you about 12:00 something was
24 when I seen that she didn't let -- she wasn't
25 letting me use the car, and I was saying she

Page 267

1  trippin'.  So I know I didn't tell him 12:10.  I
2  don't know if he messed up, if he did say that, but
3  I don't know if he even said that.  That just could
4  be something you said.
5      Q.    So he messed up when he -- he messed up
6  if he said that you told him that you left the house
7  around 12:10?
8      A.    Yes.
9      Q.    Okay.  And he also messed up when he said
10 that you told him when Jovanie got in the car that
11 Jovanie told you what he had done?  He -- that's
12 another example of Greg Wilson messing up, right?
13     A.    If he said that, then yeah -- well, he
14 did a lot -- he messed up a lot of stuff as you can
15 see, so...
16     Q.    When you -- when you got in the car,
17 where did Simeon sit?
18     A.    In the passenger seat.
19     Q.    So he was in the front passenger seat?
20     A.    Yes.
21     Q.    And Deon sat in the back?
22     A.    Yes.
23     Q.    And was Deon going to come to the club
24 with you?
25     A.    Yes.  He did go to the club with us.

Page 268

1      Q.    Wasn't he too young to get into the club?
2      A.    We was all too young to get in the club.
3      Q.    But he's like -- you thought he was like
4  12 or 13, right?
5      A.    But these was the ghetto clubs that you
6  can come in at these ages.  We was all -- I was
7  going to clubs since I was 12 but...
8      Q.    So did you go -- so you guys -- the three
9  of you get into the car and then you go over to Papa
10 Charlie's; is that right?
11     A.    Yeah.  We went there first.
12     Q.    And where is Papa Charlie's?
13     A.    It don't exist no more, but it was on
14 Central by Division.
15     Q.    Okay.  Did you go straight from your home
16 straight to Papa Charlie's?
17     A.    Yes.
18     Q.    Did you make any stops?
19     A.    No.
20     Q.    Did you go to the gas station?
21     A.    No.  Even though the gas station and Papa
22 Charlie's was right across the street from each
23 other, but I didn't go to the gas station yet
24 because she already had gas in her car.  I had to
25 put gas in there leaving to be able to put back the

Page 269

1  gas that she had in there.
2      Q.    Okay.  But on the way to the club, you
3  didn't stop at the gas station?
4      A.    No.
5      Q.    So you go to Papa Charlie's, and you said
6  the restaurant was closed?
7      A.    Yes.
8      Q.    What time did Papa Charlie's typically
9  close?
10     A.    At different times.  Sometime it close at
11 2:00 a.m.  Sometime it close at -- I guess early.  I
12 don't know what time it close early because we was
13 used to it closing at 2:00 a.m.  That was someplace
14 we go to when we get out of the club.  That was one
15 of the restaurants we would go.
16     Q.    And you said it was located on Central
17 and what?
18     A.    And Division.
19     Q.    And Division.  Okay.
20     A.    Yeah.
21     Q.    And so did you go in to Papa Charlie's?
22     A.    No, it was closed.
23     Q.    So you didn't even have to open the --
24 try to open the door.  You just knew it was closed?
25     A.    No, I went to the door and tried to open

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 270..273
XAVIER L. WALKER, 04/12/2022

Page 270

1   it.  It was closed.
2       Q.    Okay.  So you didn't get any food from
3   Papa Charlie's?
4       A.    No.
5       Q.    And then -- oh, and how long did it take
6   you from your house, 5431 West Potomac, to get to
7   Papa Charlie's at Central and Division?
8       A.    Not long at all.  I don't have no idea,
9   though, what time, but it's not that far.  So it's
10  only a couple blocks away.
11      Q.    Yeah.  Well, when I Googled it, it was
12  about one to two minutes away.  Does that sound
13  about right?
14      A.    Possibly.  I don't know.
15      Q.    So is it accurate to say that you were at
16  Papa Charlie's around 1:00 a.m. on May 13th?
17      MS. SAMUELS:  Objection, calls for
18  speculation.
19      THE WITNESS:  I don't know.
20  BY MS. ITCHHAPORIA:
21      Q.    Okay.  But it didn't take you longer than
22  like ten minutes to get there, right?
23      A.    No.
24      Q.    And so once you realized that Papa
25  Charlie's is closed, what did you do?

Page 271

1       A.    Then we started proceeding on our way
2   going to the club.
3       Q.    Okay.  And did you ever tell your sister
4   that you were going to go to Taste Buds, a different
5   restaurant called Taste Buds?
6       A.    That's somewhere we went to after Papa
7   Charlie's was closed.
8       Q.    Okay.
9       A.    That was a different restaurant that was
10  also in that area or vicinity of going that way to
11  the club, so...
12      Q.    So did you tell Shunralyn that you were
13  going to Taste Buds?
14      A.    I don't recall if I told her after that
15  or not.  I don't recall.
16      Q.    So are you saying that on May 13th,
17  right -- we're talking about early morning hours on
18  May 13th -- that after you went to Papa Charlie's,
19  you went to Taste Buds?
20      A.    No.
21      Q.    Oh.  You're saying --
22      A.    I saying --
23      Q.    -- on other occasions, you had gone to
24  Taste Buds?
25      A.    Yes.

Page 272

1       Q.    Okay.  But you didn't go to Taste Buds on
2   May 13th?
3       A.    No.
4       Q.    Okay.  So you go to Papa Charlie's.  You
5   op- -- try to open the door.  You realize it's
6   closed.  And then you said you got back in the car?
7       A.    Yes.
8       Q.    And then you --
9       A.    We got back in the car because we all got
10  out.
11      Q.    Okay.  The three of you get back in the
12  car.  And you're heading to the club at this point?
13      A.    Yes.
14      Q.    Did you order any food from anywhere
15  before you got to the club?
16      A.    No.
17      Q.    Did you get any food from Papa Charlie's?
18      A.    No.
19      Q.    Did you eat any food in the car on the
20  way to the club?
21      A.    No.
22      Q.    What time was it when you left Papa
23  Charlie's to go to the club?
24      A.    I have no idea.
25      Q.    After you left Papa Charlie's, where

Page 273

1   exactly did you go?
2       A.    Riding on the way going to the club, just
3   rolled through all our old neighborhoods on the way
4   because they all was on the way.
5       Q.    You went through your old neighborhood?
6       A.    Not just my old neighborhood.  My cousin
7   old neighborhood.  All the neighborhoods that we
8   knew had friends and people that we kicked it with
9   and said, what's up with, associated with, we rolled
10  through that way because it's all on the way going
11  to the club.
12      Q.    Did you want to show your friends Simeon
13  and Deon your old neighborhood?
14      A.    They been seeing my old neighborhood.
15  They been going over there with me for -- since I
16  moved over there.  All my friends -- I took both --
17  friends from there to my mom -- new area, and done
18  took friends from there to the old area.  They been
19  over there.  So why would I have to take them to
20  show them the neighborhood?
21      Q.    Okay.  So did you make any stops from the
22  time that you left Papa Charlie's to the time you
23  got to the Wax Factory?
24      A.    Yes.  I slid through all the
25  neighborhoods.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 274..277
XAVIER L. WALKER, 04/12/2022

Page 274

1      Q.    So you stopped?
2      A.    Yeah, at all of them, I basically -- they
3  all on the way going.  And it wasn't no long stops.
4  Just a -- seeing who was out there.  Like if I slid
5  up and seen that you was out, Hey, how you doing,
6  what's up?  What you-all got going on?  Well, we
7  chillin'.  We hanging out.  And oh, we finna go to
8  the club.  You-all want to go to the club?  We going
9  to pop- -- you know, we going to the Wax Factory.
10 It's poppin' tonight.  We about to go crazy.  And if
11 you wanted to go, you be like, yeah.  You probably
12 have your friends be like, Girl, come on.  We going
13 to go to the club, go kick it with them.  Whatever.
14     Q.    So you were driving your sister's green
15 Ford Taurus at this time, right?
16     A.    Yes.
17     Q.    Did you ever tell anyone that you ate
18 food -- that you stopped at Papa Charlie's and you
19 got food?
20     A.    No.
21     Q.    When you left Papa Charlie's, which --
22 what route did you take to get to this -- the first
23 old neighborhood that you stopped at?
24     A.    Which is my always route and the same
25 route.  I went from Cicero to Chicago Avenue, from

Page 275

1  Chicago Avenue down Leclaire, Leclaire towards Huron
2  because friends and family members stayed up there.
3  Come up Huron on -- well, the alley before Cicero to
4  come up Superior, slide by my cousin and them house,
5  see who all out there, and then come back down
6  Lamon, then go back to Cicero, then Cicero towards
7  Ohio, then Ohio down to Erie, and then from Erie
8  back to Cicero to Lake, then Lake shooting down to
9  the club.
10     Q.    And this was the route that you always
11 took?
12     A.    Yes.
13     Q.    And where was -- you said you made like
14 numerous stops on the way to the club, right?
15     A.    Yeah.
16     Q.    Where was the first stop that you made
17 that night?
18     A.    Right off Chicago Avenue and Leclaire.
19     Q.    And who did --
20           (Reporter clarification.)
21 BY MS. ITCHHAPORIA:
22     Q.    And who did you see there?
23     A.    My cousin Travis.  They was standing
24 outside on the porch.
25     Q.    And did you tell Travis you were going to

Page 276

1  Wax Factory?
2      A.    Yes.
3      Q.    Did you invite him to come along with
4  you?
5      A.    Yes.
6      Q.    He said no?
7      A.    Yes.
8      Q.    Did you get out of the car at Chicago and
9  Leclaire?
10     A.    For a hot second -- no, we just stopped.
11 We didn't get out of the car.  We just stopped.
12 They was on the porch, so we didn't have to get out.
13 And he was out there with some people, I don't know,
14 his friends and people.  What up, Cuzzo?  What you
15 on?  What you on?  Told him.  And he said they was
16 chillin', and I went --
17     Q.    You didn't get out of the car?
18     A.    No.
19     Q.    You didn't park the car?
20     A.    I pulled up in front of their house.
21 Their house --
22     Q.    You pull up.  Okay.
23     A.    You pull up.  They on the porch.  I see
24 my cousin.  I wouldn't have stopped if they wasn't
25 on the porch.  But I see him, pull up.  I see him on

Page 277

1  the porch.  I stopped.  What up, Cuzzo?  We
2  exchanged words.  All right.  And I left.
3      Q.    And Simeon and Deon didn't get out of the
4  car either?
5      A.    No.
6      Q.    Okay.  And was any -- any of your friends
7  with your cousin Travis?
8      A.    Yeah, he had people on the porch with
9  him.
10     Q.    But none of those people are your
11 friends?
12     A.    No.
13     Q.    Okay.  So then after you stopped at
14 Chicago and Leclaire, where was the next pit stop
15 that you made?
16     A.    On Superior and middle of Lamon and
17 Cicero.
18     Q.    Middle of Lamar and Cicero?
19     A.    Lamon.  Lamon and Cicero.
20     Q.    Oh, Lamon and Cicero.  Okay.  And who did
21 you see there?
22     A.    My other cousin.
23     Q.    What was that cousin's name?
24     A.    Pud.
25     Q.    Put?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 278..281
XAVIER L. WALKER, 04/12/2022

Page 278

1    A.    Yeah.
2    Q.    P U T?
3    A.    No.
4    Q.    Oh.
5    A.    P U D.
6    Q.    P U D, Pud.  Does Pud have a real name?
7    A.    Yeah.
8    Q.    What's his real name?
9    A.    Lashunt.
10   Q.    Lashunt Walker?
11   A.    No.  Boyd.
12   Q.    And is that Travis Walker?
13   A.    No.  I don't know Travis last name.
14   Q.    Okay.
15   A.    And that's my real cousin too.  That's
16   crazy.
17   Q.    Was this the same thing like before, like
18   you just pulled over and said, Hey, what's up?
19   A.    Yeah.
20   Q.    I'm going to the club.  You didn't get
21   out of the car?
22   A.    No.
23   Q.    And -- your cousin Pud didn't get in
24   the car with you, right?
25   A.    No.  They was all standing in the street.

Page 279

1    Q.    Okay.  Did you make any other stops
2    besides these two before going to the club?
3    A.    Yeah.  I went on Ohio and went on Erie.
4    Q.    Okay.  You went on Ohio and then Erie.
5    And who did you see there?
6    A.    When I went on Ohio, I seen the ambulance
7    and the police.
8    Q.    You see ambulance and the police.  Okay.
9    A.    And then when I went on Erie, I seen
10   Shavanna, Boss Hog, I think Boo Boo, Jovanie, Ra Ra,
11   a bunch of them, and they was walking and going to
12   Boo Boo house, and I met them at Boo Boo house.
13   Q.    Okay.  I didn't catch all those people.
14   A.    Shavanna.
15   Q.    Okay.
16   A.    Boss Hog, Boo Boo, Ashanti, Ashanti's
17   sister, two of them.  I don't know their names.
18   There was a bunch of them.  They was out there at
19   the -- the block was bussin'.  They was kickin' it.
20   They was out there fire.  There was a bunch of girls
21   and a bunch of dudes and...
22   Q.    So you saw Shavoni [sic], Boss Hog,
23   Boo Boo, Shanti -- that's Ashanti Wright?
24   A.    Yeah.
25   Q.    Ashanti Wright's sister, Jermaica Wright?

Page 280

1    A.    I don't know.  There still was two of
2    them.  There was two girls with them.  Two -- two of
3    her sisters.  I don't know which one Jermaica is,
4    which one is which.
5    Q.    Okay.  And you said Ra Ra.  So you saw
6    Robert Byrd?
7    A.    Yeah.
8    Q.    And they're all outside Boo Boo's house
9    on Erie?
10   A.    Yeah.
11   Q.    Did you see Jovanie Long?
12   A.    Yeah.  I said his name.
13   Q.    Oh, okay.  So he was outside Boo Boo's
14   house too?
15   A.    Yeah.
16   Q.    Okay.  And when you -- when you got to
17   Ohio, you said you saw an ambulance and the police.
18   A.    Yes.
19   Q.    And you didn't stop there, right?
20   A.    No.
21   Q.    How many -- like what else did you see
22   besides the ambulance and the police?
23   A.    I seen people on their porches and people
24   watching and seeing what's going on.  I seen police
25   and people.

Page 281

1    Q.    What time was that?
2    A.    I have no idea.
3    Q.    Did you know why the ambulance and the
4    police were there?
5    A.    No.
6    Q.    Did you talk about that with Simeon and
7    Deon, about the ambulance and the police being on
8    Ohio?
9    A.    Nope.
10   Q.    That was a pretty common occurrence for
11   that neighborhood, right?
12   A.    Yeah.
13   Q.    So you didn't think anything of it?
14   A.    Nope.
15   Q.    And then you said when you got to Erie,
16   you saw Shavanna, Boss Hog, Boo Boo, Shanti,
17   Shanti's sister, Ra Ra, and Jovanie Long outside
18   Boo Boo's house?
19   A.    Yeah.  Well, there was a bunch more
20   people too, though.
21   Q.    Oh.  Who else was there?
22   A.    A lot of people.  A bunch of people.
23   Q.    And what were they doing?
24   A.    Hanging out.  Smoking, drinking, kickin'
25   it.  I don't know who all was smoking and drinking.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 282..285
XAVIER L. WALKER, 04/12/2022

Page 282

1  But you could smell the weed.  They got drinks.
2  They out kickin' it.  They --
3      Q.    Were they -- were they --
4      A.    It was Boss Hog, the little fat girl that
5  he had, and her cousin.  There was...
6      Q.    So it was Boss Hog -- Boss Hog and the
7  fat girl and the girl's cousin?
8      A.    Yeah.
9      Q.    And you don't know who those people are
10 by name?
11     A.    No.
12     Q.    Anybody else that you know by name?
13     A.    I think the fat girl name was Kita or
14 something.  I can't -- Kita or Keisha.  I don't know
15 but...
16     Q.    Kita or Keisha?
17     A.    Yeah.  Some girl that Boss Hog had start
18 messing with.  And there was a few other people out
19 there.
20     Q.    Who is Shavanna?
21     A.    A girl from the neighborhood.
22     Q.    From your old neighborhood?
23     A.    Yes.
24     Q.    So a friend of yours?
25     A.    Yeah.

Page 283

1      Q.    What's Shavanna's last name?
2      A.    I don't know.  And I haven't seen her
3  since I've been out either.  I don't -- a lot of
4  people gone.  I don't...
5      Q.    Was she friends with Boo Boo and Jovanie
6  Long?
7      A.    Yeah.  We all was friends.  We all grew
8  up together.
9      Q.    Have you ever tried to find her?
10     A.    Not really.
11     Q.    Okay.  So to be clear, before you went to
12 the club, you saw Boo Boo and you saw Jovanie Long
13 and Shanti and Shanti's sister and these other
14 people, right?
15     A.    Yeah.
16     Q.    And did you tell them that you were going
17 to the club?
18     A.    Yep.
19     Q.    Did you get out of your car at this point
20 when you were on Erie?
21     A.    Yep.
22     Q.    And did Deon and Simeon get out of the
23 car?
24     A.    Nope.
25     Q.    So you -- so did you park your car in

Page 284

1  front of Boo Boo's house?
2      A.    Yeah.  I parked right there where they
3  was all at and got out and hugged a few people,
4  shook a few people's hands and all that and told
5  them what we was doing and then got back in the car
6  and went to the club.
7      Q.    Why didn't Simeon and -- and Deon get
8  out?
9      A.    I don't know.
10     Q.    Did you tell them when -- once you left
11 Papa Charlie's that you were going to go and make
12 all these stops to see all these people?
13     A.    No.  But they knew.  That's what we
14 always do.  It wasn't like nothing new.
15     Q.    So they stay in the car when you're
16 talking to the people outside Boo Boo's house?
17     A.    Yeah.  They could have got out if they
18 wanted to, but they knew, I guess, I wasn't gonna be
19 long.  We finna get ready to go to the club, so I
20 guess they didn't feel like getting out.
21     Q.    And then when you asked them what was
22 going on, what did they say?
23     A.    They was talking about smoking and
24 drinking, and Boss Hog was showing me the little fat
25 girl cousin.  Like you can get her.  She -- she's

Page 285

1  kind of all right too.  And he, she like you and
2  whatever.  And I'm telling him we finna go to the
3  club.  You-all should come.  Come on.  And he
4  talking about no, because he trying to go have sex
5  with her.  Vani and them like, We going to be up
6  there, and then I left.
7      Q.    Have you ever tried to find Boss Hog?
8      A.    Nope, because I never knew his real name.
9      Q.    Well, Boss Hog was friends with all the
10 people that you were friends with from the old
11 neighborhood, right?
12     A.    Yeah.  But it's a lot of people from the
13 neighborhood I don't know their real names, so I
14 ain't...
15     Q.    Why is he -- why was he called Boss Hog?
16     A.    I have no idea.  That's what his name was
17 when I met him.  So that's what I always called him.
18     Q.    So you told him that you were going to
19 the club, and he said he didn't want to go to the
20 club because he was trying to have sex with the girl
21 that he was with?
22     A.    Yeah, but he didn't say it like that.
23     Q.    Well, along those -- in those --
24     A.    Yeah.
25     Q.    In those words?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 286..289
XAVIER L. WALKER, 04/12/2022

Page 286

1     A.    Yeah.
2     Q.    So he said --
3     A.    Like I want some.  Hey, man, I'm kickin'
4  it with Shorty.  You know, he saying -- making her
5  feel good.  Man, I'm kickin' it with Shorty.  I
6  ain't finna -- no.  We chillin'.
7     Q.    How -- how long do you think it took you
8  from the time you left -- you left Papa Charlie's to
9  the time you got on Erie outside Boo Boo's house?
10    A.    I have no idea.
11    Q.    Are we talking like 30 minutes, 40
12  minutes, 10 minutes?
13    A.    I have no idea.
14    Q.    The other two stops that you made when
15  you saw your two cousins, those were quick stops,
16  right?
17    A.    All of them was quick.  Even that one was
18  quick.  I got out, Hey.  Told them what was going
19  on.  Shook a few hands.  Hugged a few people.  And
20  told them what we on, try to see if they wanted to
21  come.  Vani was like, Yeah, we still coming.  We
22  ain't forgot.  And all right.  I'm going to see
23  you-all up there.  And I left.
24    Q.    But this was a longer stop than the other
25  stops because you had to get out of the car --

Page 287

1     A.    Yeah, it was a little longer than --
2     Q.    -- right?
3     A.    It was about the same as my cousin Pud
4  and them.  Even though I didn't get out of the car,
5  I told you they was all in the middle of the
6  streets.  I don't know if you know about the stuff
7  that goes on with -- now they call it fifis
8  (phonetic), but back then, we was just kickin' it,
9  hanging out.  But when everybody hanging out and
10  they all on the streets or whatever, they smoking
11  and drinking and got the streets packed up, that's
12  how they was on Superior.  It still be that way.
13  That's one thing I seen still be that way since I've
14  been out.  On weekends they still be crowding and
15  packing out in the streets and hanging out.
16    Q.    How long were you in your old
17  neighborhood on Cicery -- on Cicero and Erie on
18  May 13th, 2000?
19    A.    Not long.  I can't recall no accurate
20  time, but not long.
21    Q.    And you don't know what time it was when
22  you got to Cicero and Erie?
23    A.    No.
24    Q.    And to be clear, you were driving your
25  sister's car, her green Ford Taurus, when you were

Page 288

1  at Cicero and Erie in the early morning hours on
2  May 13th?
3     A.    Yes.
4     Q.    And it had to be sometime after 1:00 a.m.
5  Is that --
6     A.    Yes.
7     Q.    -- what you're saying?
8     A.    Yes.
9     Q.    If there's anyone that says you didn't go
10  to your old neighborhood on May 13th, that -- that
11  would be incorrect, right?
12    A.    Yes.
13    Q.    And did you tell Jovanie Long when you
14  saw him outside Boo Boo's house that you were going
15  to the club?
16    A.    I reminded him and asked them, was they
17  still going?  They was saying yeah, they was still
18  going.
19    Q.    And he said he was still going?
20    A.    Yeah.
21    Q.    Did you ask Boo Boo if he was going to
22  the club?
23    A.    Yeah.
24    Q.    And what did he say?
25    A.    He said he was going.

Page 289

1     Q.    Didn't he tell you that he didn't want to
2  go?
3     A.    No.  He said he was going.
4     Q.    Did Boo Boo appear to be drunk when you
5  saw him?
6     A.    No, not -- we all smoke and drink, but we
7  don't be -- you wouldn't know that -- no, you
8  wouldn't know that he drunk like that.
9     Q.    Did he appear to be high, Boo Boo?
10    A.    We all had been smoking and drinking and
11  stuff, so...
12    Q.    So you couldn't tell?
13    A.    No.
14    Q.    Okay.  Did Boo Boo tell you that he
15  wasn't going to come to the club because he was
16  trying to mess with some girl?
17    A.    That's when he -- Boss Hog was on.  I
18  guess he was trying to get with -- I don't know.
19  But he told -- he said he was coming.  Then I guess
20  he must have tried -- since I didn't want the girl,
21  I guess he tried to get her or something.  I don't
22  know.
23    Q.    But he told you he was coming and you saw
24  him at the club?
25    A.    No, I didn't say I saw him at the club.

XAVIER WALKER vs CITY OF CHICAGO, et al.                     Pages 290..293
XAVIER L. WALKER, 04/12/2022

Page 290

1  I said he said he was coming.
2      Q.     Okay.  Didn't you say earlier in your
3  deposition today that you saw Boo Boo at the club?
4      A.     I said he -- I don't know.  I can't
5  recall.  I don't know.  But I don't think so,
6  though.
7      Q.     So you told Jovanie Long that you were
8  going to the club, and he said that he's still
9  coming to the club?
10     A.     Yeah.
11     Q.     And how long was this conversation with
12  Boss Hog and Boo Boo and -- and Jovanie Long?
13     A.     Not long at all.
14     Q.     Did you ask Shanti and Shanti's sister if
15  they wanted to come to the club?
16     A.     I asked all of them that was right there,
17  did they want to come to the club?
18     Q.     And Shavanna too?
19     A.     Yes.
20     Q.     And no one said they wanted to come with
21  you?
22     A.     No.  They said they was kickin' it.  The
23  block was bussin'.  They wasn't trying to leave off
24  the block.  The block was jumping like a club but...
25     Q.     Did you --

Page 291

1      A.     And probably if I wouldn't told Charles
2  and them we was going, then I probably would stay on
3  the block because there was a lot of girls and a lot
4  of people out there and they was kickin' it, having
5  a good time.  It was the weekend, so people were
6  out.
7      Q.     Did you ask anybody that you saw outside
8  Boo Boo's house why the police were in the area?
9      A.     Yeah.
10     Q.     Who did you ask that to?
11     A.     Everybody.  I just -- it was in general.
12  Like what happened?  What went on over there?  Oh,
13  somebody got shot, and that was that.
14     Q.     Who told you someone got shot?
15     A.     I don't remember.  One of them said it
16  that was in the crowd.  I don't remember who.
17     Q.     And did you say anything when -- when
18  they told you someone got shot?
19     A.     No.  What -- what I was going to say?
20  I'm -- it's not my business.  I don't know.
21     Q.     Did you get any more information about
22  the shooting at that point?
23     A.     No.  I left.  I'm not trying to...
24     Q.     So you invited Jovanie to the club,
25  right?

Page 292

1      A.     I invited everybody that was out there to
2  the club, everybody that was in they little area,
3  because there was a lot of other people that was
4  outside as well.  But everybody that was in their
5  little area that was kickin' it with them, I invited
6  to the club.
7      Q.     And then Jovanie said he was coming to
8  the club?
9      A.     Yes.
10     Q.     When -- when you spoke to Jovanie, did he
11  seem buzzed?
12     A.     Yeah, we all was buzzed.  We all...
13     Q.     Did he seem high?
14     A.     Yeah, he all seemed -- we all was --
15  everybody's smoking and drinking all throughout that
16  day, like that was normal, so -- but he wasn't
17  overbearing drunk or nothing of that.  Like Boo Boo
18  wasn't overbearing drunk or overbearing high.
19  They --
20     Q.     You could tell --
21     A.     -- smoking weed and drinking.  We
22  ain't...
23     Q.     You could tell --
24     A.     Beers.
25     Q.     -- Jovanie was vibing, though, right?

Page 293

1      A.     He was kickin' it.  He was kickin' it
2  with girls and kickin' it with them, I guess.  I
3  don't know.
4      Q.     But he was vibing, right?
5      A.     I guess.  He kickin' it with girls and
6  kickin' it with his homies, you know.
7      Q.     What does it mean to vibe?
8      A.     To kick it with your people.  That's what
9  it means in the -- be chilling, kickin' it and
10  having a good time, feeling relaxed, comfortable and
11  good, having a good time.
12     Q.     And doesn't --
13     A.     It's a vibe.
14     Q.     It doesn't mean to be high?
15     A.     No.  I don't -- I don't know.  That's
16  probably some more TV stuff you got.  I don't know.
17     Q.     So when you asked Jovanie to -- if he was
18  going to the club and he said, yeah, did he get in
19  the car with you?
20     A.     No.
21     Q.     Jovanie never got in your sister's green
22  Ford Taurus with you?
23     A.     No.
24     Q.     Isn't it true that Jovanie got into your
25  sister's car uninvited and said he was coming to the

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 294..297
XAVIER L. WALKER, 04/12/2022

Page 294

1  club?
2      A.    No.
3      Q.    You told your attorney, Deborah Bedsole,
4  that Jovanie got in the car with you and -- and he
5  was uninvited?
6      A.    That's cuz that's what the police told me
7  to say.
8      Q.    But you did say that to Deborah Bedsole?
9      A.    Yes.
10     Q.    And you didn't tell her the police told
11 me to say this, right?
12     A.    I didn't even trust her.  I thought she
13 was the police.  I thought she was with them the
14 majority of the time that I talked to her.
15     Q.    So when you told Deborah Bedsole that
16 Jovanie got in the car with you and uninvited, you
17 thought at that point that what, she wasn't your
18 attorney?
19     A.    I thought she was a part of the State.  I
20 didn't know who that lady was.  I never seen her
21 before in my life, and then she come after me being
22 interrogated by the police and then the state's
23 attorney lady and then another person, another lady
24 come talking about some -- what's going on?  I'm
25 thinking they all the same.  And then I never talked

Page 295

1  to my family.  I never talked to nobody.  So I don't
2  know that my family know that I'm in jail to be able
3  to send a lawyer, and I never had a lawyer come to
4  me before from my family because I never had no
5  serious case for me to have to call my family and
6  get a lawyer.  So I didn't know who that lady was.
7      Q.    So did -- did you give Jovanie Long a
8  ride to the club on May 13th, 2000?
9      A.    No.
10     Q.    So he never got in your sister's car and
11 you never drove him to the club?
12     A.    No.
13     Q.    Have you ever told anyone that you gave
14 Jovanie Long a ride to the club on May 13th, 2000?
15     A.    Yeah, I told Deborah Bedsole and the
16 police, because that's the way the police had the
17 story, so I told them what they -- they story.
18     Q.    Did you ever tell anybody else besides
19 Deborah Bedsole and the police that Jovanie got in
20 the car and you gave Jovanie a ride to the Wax
21 Factory?
22     A.    No.
23     Q.    So to be clear, you left your old
24 neighborhood on -- on Cicero and Erie in your
25 sister's car?

Page 296

1      A.    Yes.
2      Q.    And when you left your neighborhood,
3  Jovanie Long was not in your car?
4      A.    No, he was not.
5      Q.    And you drove your sister's car from Erie
6  to the Wax Factory?
7      A.    Yes.
8      Q.    Did you make any other stops from Erie to
9  the Wax Factory?
10     A.    No.
11     Q.    And it takes about ten minutes from Papa
12 Charlie's to get to Cicero and Erie; is that about
13 right?
14     A.    I have no idea.  I never did Google and
15 did the math or none of that stuff.  I never looked
16 it up.
17     Q.    How long does it take to get from your
18 old neighborhood, Boo Boo's house on Erie to the Wax
19 Factory on Lake and St. Louis?
20     A.    I don't know.  Once again, I never did no
21 research to figure it out.  I don't know.
22     Q.    Okay.  But your testimony as you sit here
23 today is that you left Boo Boo's house and you went
24 straight to the Wax Factory?
25     A.    Yes.

Page 297

1      Q.    Okay.  Now, when you were outside Boo
2  Boo's house on May 13th sometime after 1:00 a.m.,
3  did you see Mary Curry?
4      A.    No.
5      Q.    Did you go inside Boo Boo's house when
6  you saw them when you were going to the club on
7  May 13th, 2000?
8      A.    No.
9      Q.    So what do you and Simeon and Deon talk
10 about as you're leaving Erie to go to the Wax
11 Factory on Lake and St. Louis?
12     A.    We was talking about the girls that was
13 outside.  We was talking about how it's bussin'
14 outside and how everybody out.  We should have -- we
15 could have kicked it in one of them blocks,
16 especially my cousin and them block, because there
17 was a lot of girls on they block.  And we was
18 talking about we hoped certain different girls that
19 we was trying to catch at the club be out.  And we
20 know they already late and trippin'.  They going to
21 be talking about us, because they already there.
22     Q.    Isn't it true that when you asked Jovanie
23 Long to come to the club, he got in the car with
24 you?
25     A.    No.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 298..301
XAVIER L. WALKER, 04/12/2022

Page 298

1    Q.    And when he got in the car, didn't he
2 tell you, "I just killed this mark"?
3    A.    No.
4    Q.    He never got in the car and he never said
5 those words?
6    A.    He never got in the car and he never said
7 those words.
8    Q.    Didn't Jovanie tell you when he got in
9 the car that he had been trying to sell drugs to a
10 man in a van, and when the guy didn't want to pay,
11 he shot and killed the man?
12    A.    No.
13    Q.    Okay.  You told your attorney, Deborah
14 Bedsole, that Jovanie told you "I just killed this
15 mark," correct?
16    A.    Yes.
17    Q.    And you also told your attorney, Deborah
18 Bedsole, that when Jovanie got in the car that he
19 told you that he tried to sell drugs to a man in a
20 van, and when the man didn't want to pay, he shot
21 and killed the man?
22    A.    Yes.
23    Q.    You told her that, right?
24    A.    Yes.
25    Q.    And you told her that because you knew

Page 299

1 that she was your attorney and you --
2    A.    No.
3    Q.    -- thought there was attorney-client
4 privilege?
5    A.    No.  I told her that because I thought
6 she was the State still trying to trick me.  And
7 she'll tell you herself that I kept telling her and
8 I kept sensing that -- when she sensed that, she
9 started trying to reassure me that she wasn't and
10 started trying to make me feel comfortable that she
11 wasn't and telling me that my family had sent her
12 there to help me, which I still haven't talked to my
13 family, still don't know how they was able to tell
14 her this, because I didn't know nothing -- I never
15 talked to nobody, but the police.
16    Q.    Well, Simeon Dorsey also provided an
17 affidavit that -- where he swore that Jovanie got in
18 the car and that you took him to the club, and that
19 on the way to the club Jovanie said that a guy had
20 been shot and that he got into an altercation with a
21 guy.  You're aware of that as you sit here today,
22 right?
23    MS. SAMUELS:  Objection --
24    THE WITNESS:  No, I'm not.
25    MS. SAMUELS:  -- misstates the record.

Page 300

1 BY MS. ITCHHAPORIA:
2    Q.    So if -- let's assume that's correct.
3 Let's assume Simeon Dorsey said that in an
4 affidavit.  Are you saying that that's false?
5    A.    Yes.  If he said that, it's false.
6    Q.    Well, why would Simeon Dorsey make that
7 up?
8    A.    The police --
9    MS. SAMUELS:  Objection --
10    THE WITNESS:  -- probably told --
11    MS. SAMUELS:  -- calls for speculation.
12    THE WITNESS:  -- him to say that too.
13 BY MS. ITCHHAPORIA:
14    Q.    Oh, so the police told Simeon Dorsey what
15 to say in an affidavit?
16    A.    I don't know.  You saying why would he
17 say it?  I'm telling you the only thing I can think
18 of.  I don't know.
19    Q.    Okay.
20    A.    I don't know if he talked to the police.
21 I don't know if the police made him do anything.
22    Q.    Have you ever seen the affidavit that
23 Simeon Dorsey executed in November 2013?
24    A.    No.
25    Q.    Okay.  And your understanding is that

Page 301

1 Simeon Dorsey said in that affidavit that he
2 executed in 2013 that Jovanie said a guy had been
3 shot and that he had gotten into an altercation with
4 a guy on the way to the club because the police told
5 Dorsey to say that?
6    MS. SAMUELS:  Objection, misstates --
7    THE WITNESS:  If he said that, then I guess I
8 don't know.  I have no idea.
9 BY MS. ITCHHAPORIA:
10    Q.    You ever ask Simeon Dorsey why he would
11 say that?
12    A.    No, I haven't.  I didn't even know he
13 said that.
14    Q.    Were you aware that Deon Baylock also
15 said in an affidavit that someone got in the car and
16 put a gun -- and had a gun?
17    MS. SAMUELS:  Objection --
18    THE WITNESS:  No.
19    MS. SAMUELS:  -- misstates the record.
20 BY MS. ITCHHAPORIA:
21    Q.    Do you know why Deon Baylock would say
22 that?
23    MS. SAMUELS:  Same objection.
24    THE WITNESS:  No.
25 BY MS. ITCHHAPORIA:

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 302..305
XAVIER L. WALKER, 04/12/2022

Page 302

1     Q.    Have you ever seen an affidavit where
2  Deon Baylock made that statement that someone got in
3  the car with you and Simeon and that person had a
4  gun?
5     A.    No.
6     Q.    So do you know how long it took you from
7  Boo Boo's house to get to the Wax Factory?
8     A.    No.
9     Q.    What time was it when you got to the Wax
10 Factory?
11    A.    I have no idea.
12    Q.    When you got to the Wax Factory, did you
13 immediately go inside or did you wait around in your
14 car?
15    A.    I had to park.  We found a parking.  We
16 immediately went outside.  We know we was already
17 late.  They was already in there.  So we was trying
18 to hurry up and get in there.
19    Q.    Okay.  Who did you know -- like were
20 these just the people that you had seen earlier you
21 thought that they were going to the club and that
22 they would already be there, or did you already know
23 that they were at the club?
24    A.    I know they was there.  They already had
25 called me and told me they was there.

Page 303

1     Q.    Who had called you and told you they were
2  at the club?
3     A.    Marvin and Charles.
4     Q.    Okay.  So when you're parking, you don't
5  see Marvin and Charles?  You don't see them until
6  you go inside?
7     A.    Right.
8     Q.    And when you're going inside the club,
9  who's with you?
10    A.    Simeon and Deon.
11    Q.    Jovanie Long is not with you when you're
12 going into the club?
13    A.    No.
14    Q.    Did you pay cover charge --
15    A.    Yes.
16    Q.    -- to go into the club?
17    A.    Yes.
18    Q.    How much was cover on May 13?
19    A.    I think it was 10 or $20.  I can't
20 recall, but that's what it is normally, 10 or $20.
21    Q.    And you paid for your own charge?
22    A.    Yes.
23    Q.    Cover charge?
24    A.    Yes.
25    Q.    And you paid the cover charge for Simeon?

Page 304

1     A.    For him and Deon.
2     Q.    You paid for both of them?
3     A.    Yes.
4     Q.    Where did you get the money to pay for
5  both of them?
6     A.    I had gotten my allowance, plus I was
7  selling drugs.
8     Q.    And that -- you told your attorney, Greg
9  Wilson, that you paid for the cover for Simeon,
10 right?
11    A.    Probably so.  I don't recall.
12    Q.    And didn't Jovanie also pay cover for
13 Deon to enter the club?
14    A.    No.
15    Q.    Didn't you tell Greg Wilson that Jovanie
16 paid cover -- paid the cover charge for Deon to go
17 to the club?
18    A.    No.
19    Q.    You never said that to Greg Wilson?
20    A.    That's probably another mixup he done
21 did.  That guy is --
22    Q.    Oh, so this is --
23    A.    -- bad --
24    Q.    -- another mixup?
25    A.    It have to be if he's saying that.

Page 305

1  That's a bad lawyer.  Don't hire him.  Don't get him
2  to do your case.
3     Q.    So you paid for the three of you to get
4  into the club, right?
5     A.    Yes.
6     Q.    So Deon came to the club?
7     A.    Yes.
8     Q.    Are you a hundred percent sure that Deon
9  came to the club?
10    A.    Yes.  I took Deon and a bunch of other
11 little homies that was too young in the club to the
12 club a lot of times, the same way I went to the club
13 when I was young and too little.
14    Q.    So if Deon said that he didn't go to the
15 club because he was too young, then Deon is lying,
16 right?
17    A.    Yeah.  But I don't know that he said
18 that.
19    Q.    And you don't know what time it was when
20 you entered the club, right?
21    A.    No.
22    Q.    And when you got to the club, did you see
23 any of your friends?
24    A.    Yes.
25    Q.    Who did you see?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 306..309
XAVIER L. WALKER, 04/12/2022

Page 306

1    A.   A bunch of my friends.  Half the club was
2    people that I knew.
3         Q.   Give me a list of all the people that you
4    knew that you saw at the club on May 13th, 2000, at
5    the Wax Factory sometime after 1:00 a.m.
6         A.   It'd be impossible for me to do that,
7    because there was too many for one and then I don't
8    recall everybody and all that that...
9         Q.   So in these 22 years that you've thought
10   about this case, you've never come up with a list of
11   all the people that you saw at the club on May 13th,
12   2000, that could vouch for your whereabouts?
13        A.   Just the main people that I met there.
14        Q.   Okay.  So tell me the name of those main
15   people.
16        A.   I know I seen Quinton.  I know I seen
17   Charles.  I know I seen Marvin.  I know I seen
18   Ra Ra.  I know I seen Jovanie.  I know Deon and
19   Simeon was with me.  I know I seen Tyree baby momma
20   cousin.  I forgot her name.  What's her name?
21   What's that girl name?  Dominique.  I seen another
22   girl named Chocolate.  I seen a bunch of people.
23        Q.   Okay.
24        A.   I seen a girl named T I used to go with.
25        Q.   T -- T?

Page 307

1    A.   Yeah.
2         Q.   Did you see --
3         A.   A whole bunch of different dudes that I
4    know.  Some I went to school with.  Some I was in
5    and out of jail with.  Some other people from the
6    neighborhood.
7         Q.   Any other names that you remember?
8         A.   No.
9         Q.   Did -- did you see Tyree Patterson at the
10   club?
11        A.   I can't recall seeing him, but I possibly
12   know -- sure that he was there because he from the
13   neighborhood and we all kicked it and hung together,
14   so...
15        Q.   Did you see Kevin or Charles Green at the
16   club?
17        A.   No.  Charles, he ain't never really go to
18   the clubs and stuff with us that much.
19        Q.   So you didn't see him there?
20        A.   No.
21        Q.   And did you see Boo Boo at the club?
22        A.   I can't recall.
23        Q.   Did you see Antwoine Waddy at the club?
24        A.   I can't recall.  I don't think they came.
25   I know --

Page 308

1         Q.   You saw Jovanie, right?
2         A.   -- Ra Ra did.
3              Yeah, I know Ra Ra and Jovanie came.
4         Q.   Did they come together?
5         A.   Yeah, that's who -- they was in the car
6    together.
7         Q.   Were they already -- was Jovanie and
8    Ra Ra already at the club before you got to the
9    club?
10        A.   Yeah, I think so.  I don't know.
11        Q.   You don't know?
12        A.   No, I don't know.  I know we all end up
13   being in the pack together.  We all seen each other
14   and said our what's ups and kicked it and then
15   people venture off to their own areas because you
16   trying to get the girl that you trying to get and
17   dance on the girl, people that you trying to dance
18   on.
19        Q.   Did you see Shavanna or Boss Hog at the
20   club?
21        A.   No, they didn't come.
22        Q.   What about --
23        A.   I told you.  Boss Hog was trying to get
24   the girl.
25        Q.   What about Ashanti Wright and her sister?

Page 309

1    Did you see them at the club?
2         A.   No, they didn't come.
3         Q.   Did you see someone called Kenyetta Park
4    at the club?
5         A.   I don't know because I don't know who
6    that is.
7         Q.   Okay.  Do you know someone called BJ that
8    was at the club?
9         A.   Did BJ -- BJ could have went.  He could
10   have been with Ra Ra and them.  That's Ra Ra cousin.
11   So he could have been.  I don't know.
12        Q.   You don't remember?
13        A.   I don't remember.  I don't recall --
14        Q.   Did you see --
15        A.   But I know that's Ra Ra cousin, though.
16        Q.   Did you see Hershula Byrd at the club --
17        A.   No.
18        Q.   -- that day?
19        A.   I know that she wasn't there.
20        Q.   She wasn't there?  Okay.
21             And so you don't -- you don't know what
22   time Jovanie and Ra Ra got to the club, but you just
23   know they came together?
24        A.   Yes.
25        Q.   So they could have been there before you

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 310..313
XAVIER L. WALKER, 04/12/2022

Page 310

1   or after you --
2       A.   Yes.
3       Q.   -- or got there after you?
4       A.   They could have.
5       Q.   Okay.  Did you-all hang out together at
6   the club?
7       A.   To say our what's ups and packing, let it
8   be known we all together, kick it, and then we all
9   went our separate ways, like I said.  It's -- went
10  to the club to chase a girl.  I'm trying to get the
11  girl I came, that I've been chasing from last
12  Saturday and stuff, so...
13      Q.   Who?  Was that T?
14      A.   No.
15      Q.   Oh, did you -- were you successful --
16      A.   Yeah.
17      Q.   -- in --
18      A.   Yeah.
19      Q.   Which girl were you talking to?
20      A.   A girl named Chocolate.
21      Q.   Oh, the Chocolate.  Okay.  Do you know
22  her actual name?
23      A.   Chocolate was thick as ever, but -- no, I
24  just know she was Chocolate, thick as ever.
25      Q.   When you were at the club that night, so

Page 311

1   early morning hours, I should say, on May 13th, was
2   there a conversation about the shooting that had
3   happened earlier on -- in the area of Ohio and
4   Cicero?
5       A.   No.  Why we going to be talking about
6   that -- we at the club kickin' it.  I'm trying to
7   come up.  I ain't thinking about nothing that ain't
8   got nothing to do with me.  That's stupid.
9       Q.   Well, wasn't Jovanie telling people at
10  the club about this shooting and what had happened
11  earlier that night?
12      A.   I ain't never hear him tell nobody about
13  no shooting or no stuff like that.
14      Q.   So you didn't hear Jovanie saying stuff
15  like that?
16      A.   No, not at all.
17      Q.   You -- you don't -- you didn't hear the
18  word shooting coming out of anyone's mouth when you
19  were at the club; is that right?
20      A.   No.
21      Q.   Did you drink any alcohol at the club?
22      A.   Did I drink?  Probably.  I can't recall.
23      Q.   Did you use any drugs at the club?
24      A.   No, we can't smoke in there, but they
25  used to have drinks in there.

Page 312

1       Q.   Alcohol drink, right?
2       A.   Yeah.  They used to have alcohol, but...
3       Q.   How would you buy alcoholic drinks back
4   then?
5       A.   Like you buy anything else.  You just buy
6   it.
7       Q.   And they don't ask to see an ID?
8       A.   No.
9       Q.   Did you see Jovanie drinking alcohol at
10  the club?
11      A.   No.
12      Q.   Did you see him using any drugs at the
13  club?
14      A.   No.
15      Q.   When you were at the club, was Jovanie
16  kind of acting out of control and crazy?
17      A.   No.  He was kickin' it.
18      Q.   And how long were you at the club for?
19      A.   I don't recall, but until it closed,
20  though.
21      Q.   You had been to the Wax Factory many
22  times before May 13th, right?
23      A.   Yes.
24      Q.   It was one of your frequent clubs that
25  you would go to?

Page 313

1       A.   Yes.
2       Q.   That and Club Xavier?
3       A.   Yes.
4       Q.   But Wax Factory would close before Club
5   Xavier, right, because you would typically go to
6   Club Xavier after Wax Factory?
7       A.   Yes.
8       Q.   So did Wax Factory close around
9   3:00 a.m.?
10      A.   Possibly.  I can't recall.
11      Q.   Did you take pictures at the club?
12      A.   Yes.
13      Q.   You ever see those pictures?
14      A.   Nope.
15      Q.   You ever tried to find those pictures?
16      A.   Yep.
17      Q.   You can't find them?
18      A.   Nope.
19      Q.   Did --
20      A.   A girl took them.
21      Q.   Sorry?
22      A.   Some girl took them.
23      Q.   Did you speak to Marvin Mosley and
24  Quinton and Charles Toles at the club?
25      A.   Yep.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 314..317
XAVIER L. WALKER, 04/12/2022

Page 314

1    Q.    Were they like in the crew that you were
2  hanging out with at the club?
3    A.    Yep.  Before we all went our separate
4  ways trying to chase the girls and stuff.  Yeah, we
5  all -- yeah, we all pal together, celebrating him,
6  yeah, congratulations and all that stuff, whatever,
7  whatever, and then we all did our own thing.  We
8  took a few pictures and all that type of stuff while
9  we was together, and then everybody went to chase
10  the tail that they wanted to chase.
11    Q.    So when you went off, Jovanie didn't come
12  with you?
13    A.    No.
14    Q.    Did Simeon and Deon come with you?
15    A.    Deon came with me.  Simeon was like off
16  in the cut dancing with some girl, kickin' it --
17  kickin' it doing them.
18    Q.    Did you guys take shots, alcoholic shots
19  to celebrate Charles Toles being released from house
20  arrest?
21    A.    It's possible.  I can't recall, but more
22  than likely, we probably did.
23    Q.    Were you drunk when you left the club?
24    A.    No, I was not.
25    Q.    So you don't know what time you closed

Page 315

1  the club, but you're saying it possibly could have
2  closed at around 3:00 a.m.?
3    A.    It's possible.
4    Q.    If you told your attorney, Deborah
5  Bedsole, that the club closed at 3:00 a.m., was that
6  probably accurate?
7    A.    Possible.  And she was never my attorney.
8    Q.    When you left the club, did anyone leave
9  with you?
10    A.    Yeah, Deon and Simeon.
11    Q.    Did Jovanie Long leave the club when you
12  left the club?
13    A.    I don't know when he left.
14    Q.    Did you tell him that you were leaving?
15    A.    No.  Everybody just be leaving the club
16  then and everybody leaving, going to make it to
17  their cars.  You ain't telling like, hey, I'm finna
18  leave.  No.
19    Q.    Well, back in the days when I went to the
20  clubs, when the club would close, the lights would
21  come on, right?  Is that what happened --
22    A.    Exactly.
23    Q.    -- on May 13?
24    A.    Yes.  The light come on, and everybody
25  get scattered about it like roaches, you know.

Page 316

1    Q.    So when the lights came on, did you see
2  Jovanie Long?  Was he still at the club?
3    A.    I wasn't looking for him.  I was -- I was
4  making sure Deon was with me, and I'm trying to get
5  up out of here and still trying to get the girl, see
6  if I can get up with her tomorrow or she going to
7  come with me.
8    Q.    Did she agree to come with you?
9    A.    No.  She get up -- get up with me,
10  though.
11    Q.    Did you get her number?
12    A.    Yep.
13    Q.    This is Chocolate's number, right?
14    A.    Yep.
15    Q.    So then -- did you spend most of that
16  time at the club with Chocolate or with Simeon and
17  Deon?
18    A.    With Chocolate.
19    Q.    Okay.
20    A.    But Deon was close, because he was a --
21  he's my showoff.  He dance.  He knew how to dance
22  and do all the little footwork and stuff.  The girls
23  would like that.  So girls come around while he do
24  his footwork, and I hold his shirt and stuff and let
25  him do his little thing and...

Page 317

1    Q.    So he -- he kind of would dance to get
2  the girls' attention?
3    A.    Yeah.
4    Q.    And so when you left the club, you don't
5  remember seeing Jovanie Long?
6    A.    No.
7    Q.    Do you remember telling anyone when you
8  left the club that you were leaving?
9    A.    No.  We all was leaving.
10    Q.    Okay.  Did you make any plans with anyone
11  as you were leaving the club to go somewhere?
12    A.    Home.
13    Q.    You didn't make any plans to go get food?
14    A.    No.  We was going home.
15    Q.    When was the last time that you ate
16  anything that day before you went to the club?
17    A.    I don't know.
18    Q.    It had been like a long time before you
19  had eaten anything, right?
20    A.    Probably like now.
21    Q.    You didn't have a chance to have lunch
22  today?
23    A.    I came straight from work here.
24    Q.    No.  But when we took the lunch break?
25    A.    Yeah.  Did we eat?  Yeah, I just gonna

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 318..321
XAVIER L. WALKER, 04/12/2022

Page 318

1  eat, but before then, I got -- went to work at 3:00
2  in the morning.  I got up at 2:00 in the morning,
3  went to work at 3:00 in the morning, came here.
4  Well, I made a few stops then, too, so, but...
5      Q.    So when you left the club, did you go
6  back to your car, your sister's car?
7      A.    Yes.
8      Q.    And you got in the car and so did Simeon
9  and Deon?
10     A.    Yes.
11     Q.    And did Simeon get in the front passenger
12 seat and Deon got in the back?
13     A.    Yes.
14     Q.    Jovanie got in the car too, right?
15     A.    No.
16     Q.    Didn't Jovanie get in the driver's seat
17 and start driving your sister's car?
18     A.    No.
19     Q.    You told your attorney, Deborah Bedsole,
20 that Jovanie drove your sister's car that night,
21 didn't you?
22     A.    A story that them people told me to say
23 all type of stupid stuff.
24     Q.    So the police told you to tell your
25 attorney, Deborah Bedsole, that Jovanie --

Page 319

1      A.    You keep saying --
2      Q.    -- got in the car?
3      A.    -- that they told me to tell my attorney.
4  And I keep telling you, I didn't know this lady was
5  my attorney.  I thought this lady was them trying to
6  trick me, trying to come and talk to me and see if
7  I'm going to change and not tell the story the way
8  that they wanted me to tell it, and the way that
9  they just made me tell it, the way that they
10 rehearsed it with me.
11     Q.    Is it your testimony that the police told
12 you to say that Jovanie drove your sister's car that
13 night?
14     A.    They made a whole elaborate story that
15 sound like a movie --
16     Q.    Right.
17     A.    -- and that was a part of it.
18     Q.    But I'm talking about that part of the
19 story.  Is --
20     A.    All of it is part of it.
21     Q.    Right.  But did the police tell you to
22 say that you -- that Jovanie drove your sister's
23 car?
24     A.    If I said it, then it was part of the
25 story that they put together and had me saying.

Page 320

1      Q.    When you left the club, where did your
2  other friends go?
3      A.    To they cars and went home.
4      Q.    Were they following you home?
5      A.    No.  We all went separate ways.  They
6  don't have to stay with me.  So why they going to
7  follow me home?
8      Q.    So you didn't tell Marvin or Charles
9  Toles that, let's go get something to eat after the
10 club closed?
11     A.    No.
12     Q.    They didn't follow you to the restaurant
13 or anything?
14     A.    No.
15     Q.    They didn't drive behind you as you were
16 leaving the club?
17     A.    No.
18     Q.    And so you went straight from the club to
19 your house back on Potomac; is that right?
20     A.    No.
21     Q.    Okay.  Where did you go after the club?
22     A.    I went to the gas station.
23     Q.    Okay.  And then you went to --
24     A.    Then I went home.
25     Q.    Where was the gas station?

Page 321

1      A.    On Division and Central, close to my
2  home.
3      Q.    Okay.
4      A.    Same gas station, close to -- across from
5  Papa Charlie's.
6      Q.    So you didn't -- you drove straight from
7  the club, straight to the gas station at Division
8  and Central?
9      A.    Yes.
10     Q.    And when you went to the gas station at
11 Division and Central, Jovanie was with you, right?
12     A.    No.
13     Q.    Did you drop Jovanie off on the block on
14 Erie?
15     A.    No.
16     Q.    Did you ever tell anyone that you dropped
17 Jovanie off on the block on Erie?
18     A.    Yes.
19     Q.    Who did you tell that to?
20     A.    Deborah Bedsole.
21     Q.    Anybody else besides Bedsole?
22     A.    No.  Well, the police because -- but
23 that's their story.
24     Q.    Okay.  Did you tell anyone else besides
25 Deborah Bedsole and the police that you gave Jovanie

XAVIER WALKER vs CITY OF CHICAGO, et al.                        Pages 322..325
XAVIER L. WALKER, 04/12/2022

Page 322

1  Long a ride after the club?
2       A.    No.
3       Q.    Did you see Boo Boo at any point that
4  night after you left the club?
5       A.    No.
6       Q.    What was the name of the gas station?
7       A.    I think it's a Shell.  I think it always
8  been a Shell too.
9       Q.    Didn't Jovanie Long get into an
10 altercation with the gas attendant at the gas
11 station?
12      A.    I don't know nothing about none of that.
13      Q.    Didn't you tell that to your attorney,
14 Deborah Bedsole?
15      A.    If that's the story that they had me say,
16 then probably so, but...
17      Q.    Is it your testimony that if you said
18 that to Deborah Bedsole, that's something the police
19 told you to say?
20      A.    Yes.  Everything that I told her was
21 basically stuff that the police told, and to -- she
22 assured me that she wasn't with them, and then I
23 started telling her about them beating on me and
24 stuff and showing her what they did to me.  She seen
25 that.  Well, she seen it first and started asking me

Page 323

1  to it.  And that's how she got to me.  It was like,
2  let me see your shirt.  Let me see your body.  Let
3  me see -- and checking on me.  And then I started
4  like, okay, she might not be lying, but I still
5  didn't trust her.  And I still thought she was the
6  police.  And I still thought she was with the State.
7       Q.    So it was only after -- it was only after
8  she asked you to see your shirt, that's when you
9  started trusting her?
10      A.    No.  That's when I started telling her
11 about the police, what they did to me, but I still
12 thought she was the State and the police, the whole
13 time that I talked to her until I found out
14 different.
15      Q.    What time was it when you got home that
16 night --
17      A.    I don't recall.
18      Q.    -- on May 13th?
19      A.    I don't recall.
20      Q.    Did you drop Simeon and Deon at their
21 homes?
22      A.    No.  Simeon stayed with me, and Deon just
23 could go down -- go home.  He stayed two -- well, he
24 stayed two houses down, but...
25      Q.    So you parked the car and then Deon

Page 324

1  walked home and Simeon came into your house?
2       A.    Yes.  Yes.
3       Q.    And did you enter from the basement or
4  the front door?
5       A.    From the front door.
6       Q.    And was anybody awake at your house?
7       A.    No.
8       Q.    Did you see your sister Shunralyn Walker
9  when you got home after the club?
10      A.    Yes.
11      Q.    She was awake?
12      A.    No.
13      Q.    Where did you see her?
14      A.    I went and woke her up and gave her keys.
15      Q.    You woke her up?
16      A.    Yeah.
17      Q.    Why did you wake her up?
18      A.    I wasn't trying to wake her up.  I was
19 trying to put the keys in there, but --
20      Q.    Okay.
21      A.    -- you know, come open somebody door,
22 they get -- what you doing?  I'm giving you your
23 keys.  Gave her keys and then I went downstairs
24 to my -- my room.
25      Q.    What time was it when you gave her keys

Page 325

1  back to her?
2       A.    I don't know.
3       Q.    You didn't look at the clock?
4       A.    No.
5       Q.    You told her at that point that you were
6  around Erie and saw something that you wish you had
7  never seen, right?
8       A.    No.
9       Q.    And after you gave Shunralyn --
10      A.    Where you-all -- where you getting this
11 stuff at?
12      Q.    After you gave --
13      A.    This is crazy.
14      Q.    -- Shunralyn her keys, did you go into
15 your bedroom in the basement?
16      A.    Yes.
17      Q.    And was Deon in your bedroom too?
18      A.    No.  Simeon stayed down there with me.
19 Deon --
20      Q.    Oh.
21      A.    -- went home.
22      Q.    Okay.  Was Simeon in your bedroom?
23      A.    Yes.
24      Q.    Okay.  You came home that day on
25 May 13th, 2000, sometime after 8:00 a.m., right?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 326..329
XAVIER L. WALKER, 04/12/2022

Page 326

1   A.   Yeah.  I don't know what time it was.
2   Q.   Is it possible it was after 8:00 a.m.?
3   A.   No.
4   Q.   Was it light out when you came home?
5   A.   Yeah, but it wasn't no -- it wasn't that
6   late.  No, it was...
7   Q.   So was it dawn when you got home?
8   A.   I have no idea.  We --
9   Q.   You were still wearing the same clothes
10  that you had left to go to the club with when you
11  got home when you gave your sister her car keys
12  back, right?
13  A.   Yes.  But it wasn't no 8:00 a.m., none of
14  that.  I don't think it was that late.  Probably was
15  like 4:00 or 5:00 or something.  I don't know.
16  Q.   The sun wasn't out when you got home?
17  A.   No, I don't think so.  I don't recall,
18  but no, the sun wasn't out.  No.
19  Q.   So you give Shunralyn the keys and you
20  said you woke her up.  Did you have a conversation
21  with her?
22  A.   No.  I gave -- well, semi conversation,
23  but not no -- me telling her -- I opened the door.
24  I guess that startled her, me making noise, opening
25  her door.  And she, what you doing?  Who?  Me, I'm

Page 327

1   giving you your keys.  And that was it.  I gave her
2   her keys, and I went downstairs.
3   Q.   And that was it?
4   A.   Yeah.
5   Q.   Did you guys fuss around a little bit?
6   A.   No.  She was asleep.
7   Q.   So if she testified that you walked in
8   the front door and she saw you walking in the front
9   door sometime after 8:00 a.m. on May 13th, she's
10  wrong then?
11  A.   No.  That's probably something different.
12  I don't know.
13  Q.   She's wrong then if she said that?
14  A.   If she said that, she probably talking
15  about a different time, not when I came from the
16  club and stuff.  I didn't stay out that late.
17  Q.   Haven't you given people over the years
18  different versions about what happened that night on
19  May 13th, 2000?
20  A.   Only people I gave different versions to
21  is Deborah Bedsole and the police because I gave
22  them their version and I gave everybody else the
23  truth, which is what I'm telling you, the truth.
24  Q.   Well, you told your attorney, Greg
25  Wilson, that after the club, you went to Bubble's

Page 328

1   house, right?
2   A.   No.
3   Q.   And you told your attorney, Deborah
4   Bedsole, that after the club, you went to Bubble's
5   house, right?
6   A.   No.  Bubble don't -- never -- Bubble
7   don't even have a house, never had a house.
8   Q.   All right.  So you didn't tell your
9   attorney, Greg Wilson and Deborah Bedsole, that you
10  went to Bubble's house on Division and Central?
11  A.   Where I just said -- where did I just say
12  the gas station was at?
13  Q.   Division and Central.
14  A.   Google Division and Central, see if you
15  see a house.
16  Q.   Is Bubble's house as far as you know
17  located near or on Division and Central?
18  A.   See -- see if you see a house on
19  Google -- on Division and Central.  Google it and
20  see if -- that area.  Ain't no houses on that area.
21  Q.   Okay.
22  A.   I went to the gas station on Division and
23  Central.  If they mixed that up, I don't know.
24  Q.   Okay.  So is it your testimony today that
25  both Deborah Bedsole and Greg Wilson both messed up

Page 329

1   that you told them that you went to Bubble's house?
2   A.   If they said I went to his house, Bubble
3   never had a house.
4   Q.   Okay.
5   A.   Bubble my age, for one.  So how he have a
6   house?  Then --
7   Q.   You told Deborah Bedsole on May 30th,
8   2000, that after the club, you went to Bubble's
9   house, right?
10  A.   I told you.  Everything that I told
11  Deborah Bedsole was still the stuff that the police
12  had told me.
13  Q.   Okay.
14  A.   So whatever they had, I don't really even
15  know and remember or recall what I -- what they had
16  me saying, but...
17  Q.   Do those words come out of your mouth?
18  A.   I don't --
19  Q.   Did you tell Deborah Bedsole on May 30th
20  that after the club, you went to Bubble's house?
21  A.   I don't recall.
22  Q.   Okay.  Did you tell your attorney,
23  Deborah Bedsole, on May 30th, 2000, that you saw Boo
24  Boo after you had gone to the club?
25  A.   I don't recall.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 330..333
XAVIER L. WALKER, 04/12/2022

Page 330

1    Q.    You told your attorney, Greg Wilson, on
2  April 10th, 2001, that after the club, you went to
3  Bubble's house on Division and Central, right?
4    A.    I don't recall.
5    Q.    So if you -- if Greg Wilson says that's
6  what you told him, is he lying?
7    A.    He probably mixing it previous from what
8  I told Deborah Bedsole, and what I told Deborah
9  Bedsole, once again, is the stuff that the police
10  had me saying.  But like I just said, if you Google
11  Division and Central, there's no houses on Division
12  and Central nowhere.  It's all businesses.  It's
13  shops and currency exchange, a restaurant, a gas
14  station.  No houses nowhere.  And Bubble, for one,
15  once again, never had a house.  His mother had been
16  dead.  So he never had a house.  He basically like
17  he is now, got to find him.
18    Q.    So you told -- but you told your
19  attorney, Greg Wilson, that after the club, you went
20  to Bubble's house and you also saw Boo Boo?
21    A.    If that's what she said, then possible,
22  but like I said, it was all of what --
23    Q.    So -- so is it your testimony that both
24  of your attorneys, Deborah Bedsole and Gregory
25  Wilson, what, they're both just getting it wrong?

Page 331

1    A.    No.  Deborah Bedsole, I told her
2  everything that the police said.  Greg just, I
3  guess, messed up -- mixed everything up and can't --
4  I guess couldn't diff- -- differentiate from the
5  stuff that I'm telling I told Deborah Bedsole and
6  why I told Deborah Bedsole to what I'm telling him
7  is facts and what actually happened.  I don't know
8  if he mixed it up to that or what, but like I said,
9  once again, everything I told that lady was stuff
10  that the police told me, because I didn't trust that
11  lady.  And I thought that lady was the police or the
12  State or somebody with them.
13    Q.    At Bubble's house that night, after the
14  club on May 13th, in the early morning hours of
15  May 13th, you did go to Bubble's house and you found
16  Boo Boo outside there, right?
17    A.    Yeah, I went to Bubble's house at
18  Division and Central at the gas station.  Bubble
19  stayed in the gas station then.
20    Q.    Where did Bubble stay?
21    A.    Bub- --
22    MS. SAMUELS:  Can we take a break?
23    MS. ITCHHAPORIA:  Sure.  Let me just get an
24  answer to that.
25  BY MS. ITCHHAPORIA:

Page 332

1    Q.    Where did Bubble stay?
2    A.    I don't know where Bubble stayed.  Bubble
3  never -- his momma and daddy had died.  Bubble
4  basically was staying in cars and staying with
5  friends and family that he could, but Bubble didn't
6  have no house, and he still that way right now to
7  this day.
8    Q.    So prior to May 28, 2000, you had never
9  been to Bubble's house?
10    A.    Bubble didn't have a house.
11    Q.    Okay.  But I know he doesn't have a
12  house.  But where did he like stay?  Where did he
13  sleep?
14    A.    Wherever he could.  He was basically like
15  Simeon, but only difference is Simeon family moved
16  away.  Bubble parents died.
17    Q.    Okay.  So there wasn't a house at
18  Division and Central --
19    MS. SAMUELS:  So we're taking the break.
20    MS. ITCHHAPORIA:  Just one question and then
21  I'm going to move on to a different topic area.
22  BY MS. ITCHHAPORIA:
23    Q.    There wasn't a house at Bubble and --
24  there wasn't a house near Division and Central where
25  Bubble would stay?

Page 333

1    A.    No.
2    MS. ITCHHAPORIA:  Okay.  All right.  Let's
3  take a break.
4    MS. SAMUELS:  Thank you.
5    THE VIDEOGRAPHER:  We're off the record at
6  4:25.
7           (Whereupon, a break was taken,
8           after which the following
9           proceedings were had:)
10    THE VIDEOGRAPHER:  We are back on the record
11  at 4:35 p.m.
12    THE WITNESS:  Time flies.
13  BY MS. ITCHHAPORIA:
14    Q.    So after the club -- I just want to be
15  real clear -- you didn't see Boo Boo, you didn't see
16  Jovanie, and you didn't see Bubble?
17    A.    No.
18    Q.    You told your attorney, Deborah Bedsole,
19  that you told Boo Boo what Jovanie had said about
20  killing someone, and then Jovanie then told Boo Boo
21  it was true?  You said that to her, right?
22    A.    If that's what the police have for me to
23  say, then yeah.  I don't recall.
24    Q.    But those words did come out of your
25  mouth to Deborah Bedsole?

XAVIER WALKER vs CITY OF CHICAGO, et al.                     Pages 334..337
XAVIER L. WALKER, 04/12/2022

Page 334

1   A.   I haven't went over that to study it.  So
2 I don't recall what all was said or not, but...
3      Q.   You told your attorney, Greg Wilson, that
4 after the club, that at some point Jovanie Long was in
5 the car and that Bubble also got -- Boo Boo also got
6 in the car, right?
7   A.   That guy.  I don't know.  That guy must
8 tweak.  He messed up everything.
9      Q.   So you didn't say that to him?
10   A.   No.
11      Q.   You didn't tell him that there was five
12 of you in the car at some point after the club?
13   A.   No.
14      Q.   So if both -- if you -- so if both
15 Deborah Bedsole and Greg Wilson say that after the
16 club, Jovanie drove your sister's car and that you
17 guys went to Boo Boo's house after going to Bubble's
18 house, then both Deborah Bedsole and Greg Wilson got
19 it wrong?
20   A.   Yes.
21      Q.   Deon was scared of Jovanie; isn't that
22 true?
23      MS. SAMUELS:  Objection, calls for
24 speculation.
25      THE WITNESS:  I don't know.  I didn't -- I

Page 335

1 don't know.  I ain't never see that.
2 BY MS. ITCHHAPORIA:
3      Q.   After the club, you did go back to Boo
4 Boo's house, right?
5   A.   No.
6      MS. SAMUELS:  How long has Cruz been on?
7 BY MS. ITCHHAPORIA:
8      Q.   Didn't you -- didn't you go into a side
9 alley near Boo Boo's house and Jovanie tried to
10 convince you to wipe fingerprints off the side and
11 the inside of the van?
12   A.   No.
13      Q.   But you said that to Deborah Bedsole,
14 didn't you?
15   A.   No.
16      Q.   You told Bedsole that you and Jovanie
17 argued about whether or not you should go and wipe
18 fingerprints off the van?
19   A.   No.
20      Q.   So Jovanie never asked you on May 13th,
21 2000, to wipe fingerprints from a van?
22   A.   No.
23      Q.   Isn't it true that when you were outside
24 Boo Boo's house after the club that you and Jovanie
25 tried to get Ashanti Wright to come outside?

Page 336

1   A.   No.  I was never at they house, so no.
2      Q.   You -- didn't you ask Ashanti Wright on
3 May 13th, 2000, after you had been to the club, to
4 wipe fingerprints off the van?
5   A.   No.
6      Q.   Well, Ashanti Wright told the police that
7 you asked her to wipe fingerprints off the van.  So
8 was she lying when she told the police that?
9   A.   If she told them that, then yes, she was
10 lying.
11      Q.   And Ashanti Wright also told the
12 prosecutor, ASA Leafblad, that you asked her to wipe
13 fingerprints off the van.  So was she lying when she
14 said that to ASA Leafblad?
15   A.   If she told them that, yes, she was
16 lying.
17      Q.   Okay.  And she also -- Ashanti Wright
18 also said in a sworn handwritten statement to the
19 prosecutor that you asked her to wipe fingerprints
20 off the van.  So was she lying in that sworn
21 statement too?
22   A.   If she said that, yes, she lying.
23      Q.   And then she testified before the Grand
24 Jury under oath that you asked her to come with you
25 to wipe fingerprints off the van, correct?

Page 337

1   A.   If she said that, she's lying, once
2 again.
3      Q.   So all four times, Ashanti Wright is
4 lying?
5   A.   If she said that all four times, then she
6 lied all four times.
7      Q.   Why would Ashanti make that up?
8   A.   I have no idea.
9      Q.   Why would Ashanti tell the police, the
10 prosecutor, the prosecutor at the Grand Jury, and
11 the people at the Grand Jury that you asked her to
12 go with you to wipe off fingerprints off the van?
13 Why would she make that up?
14   A.   I don't know --
15      MS. SAMUELS:  Objection, calls for
16 speculation.
17      THE WITNESS:  -- if she actually said that.  I
18 don't know if the police made her say that.  I don't
19 know why.  I -- but if she said that, she's lying.
20 But if you use common sense, the police and
21 ambulance and all them people was already there.  So
22 they done already did their investigation.  They
23 done already had their lab peoples out.  So for me
24 to ask her the next day or later on or whatever to
25 go and wipe, that -- for what?  They already got all

XAVIER WALKER vs CITY OF CHICAGO, et al.          Pages 338..341
XAVIER L. WALKER, 04/12/2022

Page 338

1  their -- they done been there and left.
2  BY MS. ITCHHAPORIA:
3      Q.    She --
4      A.    Don't make no sense.
5      Q.    Ashanti Wright -- Ashanti Wright made
6  that statement on at least four different occasions
7  because that's the truth?  That's what happened,
8  right?
9      A.    No.  If that's -- if she made that
10 statement, I don't know if she lied or if the police
11 made her say that statement.  Police was putting
12 their story together like they did with me.
13     Q.    That's -- that's another assumption that
14 you're making?
15     A.    I'm making that same assumption that you
16 making saying that she's telling the truth.
17     Q.    Now, Mary Curry also told the police that
18 she overheard you asking Ashanti Wright to go with
19 you to wipe fingerprints off the van.  So was Mary
20 Curry lying when she said that to the police?
21     A.    If she said that, yes, she was lying.
22     Q.    Okay.  And Mary Curry also told that to
23 the prosecutor in her handwritten statement.  So was
24 she lying when she said that in her handwritten
25 statement, that you -- she overheard you and Ashanti

Page 339

1  talking about going with you to wipe off
2  fingerprints?  Was she lying at that point too?
3      A.    If she said that, yes, she's lying.
4      Q.    And so Mary Curry also swore under oath
5  and at the Grand Jury that she heard you ask Ashanti
6  Wright to go with her to wipe off fingerprints off
7  the van.  So was Mary Curry lying before the Grand
8  Jury?
9      A.    If she told them that, then yes, she's
10 lying.
11     Q.    Is everybody lying but you?
12     A.    I don't know.  But right now, the people
13 that you talking about are lying.
14     Q.    Why would Mary Curry make that up?
15     A.    I have no idea.
16     Q.    You didn't have any beef with Mary Curry,
17 right?
18     A.    Not that I know of besides her thinking
19 that we bad kids and being in her house, messing the
20 house up, and -- when she not there.
21     Q.    Well, you didn't have any beef with
22 Ashanti Wright?  That was someone you had a sexual
23 relationship with, right?
24     A.    I had sex with her, but it wasn't no
25 relationship.  Just that.

Page 340

1      Q.    Right.  But you didn't have any beef with
2  her, right?
3      A.    Not that I know of.  I don't know.
4      Q.    After the club, you went to Boo Boo's
5  house, and Mary Curry told you to go home and be
6  quiet because you guys were making too much noise
7  and she had elderly neighbors, right?
8      A.    No.
9      Q.    Well, why would Mary Curry say that she
10 saw you at her home sometime in the early morning
11 hours of May 13th, 2000?
12     MS. SAMUELS:  Objection, calls for
13 speculation.
14     THE WITNESS:  I have no idea.
15 BY MS. ITCHHAPORIA:
16     Q.    You fell asleep after the club at -- for
17 a few hours at Mary Curry's house, right?
18     A.    No.
19     Q.    And Jovanie fell asleep there too?
20     A.    I don't know where he fell asleep, but I
21 know where I fell asleep.  And I was at my house,
22 getting ready for the -- get up and go to a funeral,
23 which is my family member funeral that I attended
24 and all my family members and people seen me attend.
25 And I had no time -- and the funeral was probably

Page 341

1  like at 9:00, 10:00 in the morning, because it was a
2  weekend or whatever.  I don't know.  I don't know
3  why she said that.
4      Q.    You, Jovanie Long, and Maurice Wright all
5  went back to Boo Boo's house and fell asleep
6  sometime in the morning hours on May 13th, 2000,
7  correct?
8      A.    Incorrect.
9      Q.    And then you and Jovanie woke Maurice
10 Wright up, right?
11     A.    Incorrect.
12     Q.    And you and Jovanie told Maurice about
13 what had happened earlier, about killing the white
14 guy, right?
15     A.    Incorrect.
16     Q.    Why would Maurice Wright make those
17 things up?
18     A.    I have no idea, but why would we wait a
19 whole -- we didn't tell them nothing about this at
20 the club.  We didn't tell them nothing about it
21 coming.  We wait to wake him up the next day to tell
22 him?
23     Q.    You had a conversation with Boo Boo
24 sometime on May 13th when Jovanie was there and you
25 had a conversation about what you guys did with the

XAVIER WALKER vs CITY OF CHICAGO, et al.        Pages 342..345
XAVIER L. WALKER, 04/12/2022

Page 342

1  murder weapon, right?
2     A.    Incorrect.
3     Q.    And in your presence, Jovanie told Boo
4  Boo that you and he had walked down to the train
5  station and that you had thrown the gun toward
6  Chicago Avenue, correct?
7     A.    False.
8     Q.    Well, isn't that true?  That's how you
9  and Jovanie got rid of the murder weapon; you threw
10  it down the train station?
11     A.    False.
12     Q.    Sir, why is that funny?
13     A.    Because you trying to make it like any of
14  this thing is accurate or facts.  And it's like
15  crazy to me that you saying it like it's facts or
16  true when it's not.  None of it is.
17     Q.    Well, you were present when Jovanie told
18  Boo Boo that he and the white person had struggled
19  over the money and that the white person had got out
20  of the driver's side of his car and hit Jovanie?
21     A.    Incorrect.
22     Q.    And you were present when Jovanie told
23  Boo Boo that he had struck the man back and then the
24  men -- the man fell on the ground, and that's when
25  Jovanie pulled out the .45 and shot the man in the

Page 343

1  head?
2     A.    Incorrect.
3     Q.    Were you aware that's what Maurice Wright
4  swore to under oath in front of the Grand Jury?
5     A.    No.
6     Q.    Why would Maurice Wright make that up?
7     MS. SAMUELS:  Objection, calls for
8  speculation.
9     THE WITNESS:  I don't have no idea.
10  BY MS. ITCHHAPORIA:
11     Q.    You didn't have any beef with Maurice
12  Wright, did you?
13     A.    I have no idea.
14     Q.    He was a friend of yours, right?
15     A.    Have -- he was supposed to be a friend,
16  an acquaintance that I met when I came home.  He was
17  staying in my neighborhood and friends with all my
18  friends and family members, so...
19     Q.    Yeah.  This is someone that had come to
20  your home, right?
21     A.    Yeah.
22     Q.    And you had gone to his home?
23     A.    Yeah.
24     Q.    You knew who his family members were,
25  like you had met his mom?

Page 344

1     A.    Yeah.
2     Q.    And he had met your mom?
3     A.    Uh-huh.
4     Q.    And then he gets up in front of the Grand
5  Jury under oath and he says that you were present
6  when Jovanie Long made -- made -- made these
7  statements, and you're saying that what, Maurice
8  Wright was lying?
9     A.    Yes.  If he said that, yes, he was lying.
10     Q.    What would be Maurice Wright's motivation
11  to lie and make up --
12     MS. SAMUELS:  Objection, speculation, asked
13  and answered.
14  BY MS. ITCHHAPORIA:
15     Q.    -- those statements against you?
16     A.    Threats made by the police, force by the
17  police, beaten by the police, scared of the police,
18  police coercing them to make a statement that fit
19  their case like they do a lot in our neighborhoods
20  and our community, which I know you have seen and
21  seen numerous times, but...
22     Q.    Did Maurice Wright ever tell you that he
23  had been threatened or beaten by the police to
24  implicate you in the murder that occurred on
25  May 13th, 2000?

Page 345

1     A.    I haven't talked to Maurice to know that,
2  but I assume that they did it to him because they
3  did it to me.
4     Q.    But he's never told you that?
5     A.    I haven't talked to him.
6     Q.    Isn't it true that approximately between
7  1:00 a.m. and 1:14 a.m. on May 13th, 2000, that you
8  were in the vicinity of 4721 West Ohio?
9     A.    Incorrect.  False.
10     Q.    Prior to 1:00 a.m. on May 13th, 2000, you
11  and Jovanie were drinking alcohol and getting high
12  and then you ran out of alcohol and drugs, right?
13     A.    False.
14     Q.    Isn't it true that on May 13th, 2000, at
15  around 1:00 a.m. that morning, Jovanie told you that
16  he wanted to hit a lick?
17     A.    False.
18     Q.    So you're saying that you went home --
19  after the club, you went directly home after the
20  club -- or you went to the gas station, then you
21  went home?
22     A.    Went to the gas station, then I went
23  home.
24     Q.    Okay.  What time was it when you woke up
25  on Saturday, May 13th?

XAVIER WALKER vs CITY OF CHICAGO, et al.          Pages 346..349
XAVIER L. WALKER, 04/12/2022

Page 346

1   A.   Probably about 8 -- 8 o'clock, 8:30
2   something.
3        MS. ITCHHAPORIA:  Oh, okay.  Real quick, let's
4   go off the record.
5        (Whereupon, a discussion
6             was had off the record.)
7        THE VIDEOGRAPHER:  We're off the record at
8   4:46 p.m.
9        (Whereupon, a discussion
10            was had off the record.)
11       THE VIDEOGRAPHER:  We are back on the record
12  at 4:47 p.m.
13       MS. SAMUELS:  For the record, defendant John
14  Cruz has joined the deposition where -- I'm not
15  aware how long he's been present, but he's here now.
16  BY MS. ITCHHAPORIA:
17       Q.   So what time was it when you woke up on
18  May 13th?
19       A.   I really don't recall, but I know it was
20  earlier that day, possibly about 8:00, 8:30 because
21  I was getting ready for my cousin's funeral.
22       Q.   And you said you went to the funeral, but
23  you don't remember where it was or what time it was,
24  right?
25       A.   No, but I can get -- definitely get you

Page 347

1   the obituary, and it should have all that on there.
2        Q.   Did you go to the funeral with your
3   family?
4        A.   Yes.
5        Q.   You-all rode together?
6        A.   Yes.
7        Q.   And who attended the funeral from your
8   family?  Was it your mom, dad, and your three
9   sisters?
10       A.   Yes.
11       Q.   And you?
12       A.   Yes.
13       Q.   And you-all went in your dad's car to the
14  funeral?
15       A.   No.  We went in my sister's car and my
16  parents' car.  We was two cars.  Simeon also went to
17  the funeral with us.
18       Q.   Did Simeon know your cousin?
19       A.   Yes.
20       Q.   Did Jovanie Long come to the funeral?
21       A.   No.
22       Q.   Did Jovanie know Darnell as well?
23       A.   Yes.
24       Q.   Why didn't he go to the funeral?
25       A.   I don't know.

Page 348

1        MS. SAMUELS:  Objection, calls for
2   speculation.
3   BY MS. ITCHHAPORIA:
4        Q.   Did you have to go to Boo Boo's house to
5   ask for your sweater so you could wear it to the
6   funeral?
7        A.   No.  I wore a suit to the funeral.
8        Q.   Did you ride with your sister or did you
9   ride with your dad?
10       A.   I rode with my father.
11       Q.   And was the funeral first or was the wake
12  first?
13       A.   The viewing the body was first.
14       Q.   Sorry?
15       A.   The viewing of the body was first.  I
16  don't know if they call that the wake or not.
17       Q.   And then was there a service anywhere?
18       A.   Yes.
19       Q.   And did you go to the service?
20       A.   Yes.  It was in the church.
21       Q.   Okay.  And then what did you do that
22  night?
23       A.   Then we went to the repass at their
24  house.
25       Q.   Okay.  Did you go out that night to the

Page 349

1   club?
2        A.   No.
3        Q.   Did you see Jovanie Long that night?
4        A.   No.
5        Q.   You became aware that the police were
6   looking for you between May 13th and your arrest
7   later on in the month in May, right?
8        A.   No.
9        Q.   You were not aware the police was looking
10  for you?
11       A.   No, not until they -- my -- they finally
12  came to my parents' house and was looking for me,
13  and then my parents told me about it, which was way
14  later, like right before I got arrested, a day or
15  two before I got arrested.
16       Q.   Okay.  So at some point after May 13th,
17  but before you were arrested, your parents told you
18  that the police were looking for you?
19       A.   Yeah, like the day before I got arrested.
20       Q.   The day before, they told you that?
21       A.   Yeah, it was like the day before.
22       Q.   And they told you the police were looking
23  for you in connection with a shooting, right?
24       A.   No.  They didn't know why.  They -- they
25  told me they didn't know why the police was looking

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 350..353
XAVIER L. WALKER, 04/12/2022

Page 350

1  for me, but the police came to the house looking for
2  me, and I need to call them and see what's going on.
3      Q.    Well, didn't -- haven't you told people
4  that your parents told you that the police were
5  looking for you in connection with the shooting?
6      A.    No.  I told people that the police --
7  that my parents told me that the police looking for
8  me and they didn't know why.  And I need to get in
9  touch with them and see what's going on.
10     Q.    Well, your mother Tina Walker told you
11 the police wanted to talk to you about a murder case
12 that happened on Cicero and Ohio, right?
13     A.    No, she did not tell me about no murder
14 case.  She told me the police contacted her and was
15 looking for me and wanted to question me.  And she
16 want -- needed me to call them and talk to them.
17     Q.    You were interviewed by a prosecutor when
18 you were at Lawrenceville in 2018, April 2018,
19 correct?
20     A.    Yes.
21     Q.    And that prosecutor's name was Mark
22 Rotert?
23     A.    Yes.
24     Q.    R O T E R T?
25     A.    Yes.

Page 351

1      Q.    And you told Mark Rotert, ASA Mark
2  Rotert, that your mother told you that the police
3  wanted to talk to you about a murder case that
4  happened on Cicero and Ohio, didn't you?
5      A.    No.  I told him that my mother told me
6  that the police was looking for me and they wanted
7  to talk to me.  I never stated and said what they
8  was looking for me for to him.  If he added that
9  because he know that that's what my case was about,
10 then that's him adding that, because that's what he
11 know what the case was about.  I never stipulated
12 out of my mouth saying what exactly they was looking
13 for me for because my parents didn't know.
14     Q.    When your -- when you were interviewed by
15 ASA Rotert at Lawrenceville, you -- your attorney
16 was there?
17     A.    Yes.
18     Q.    You had attorney Harold Winston that
19 represented you, right?
20     A.    Yes.
21     Q.    And the investigator Alicia Stewart was
22 also present, right?
23     A.    Yes.
24     Q.    And ASA Mike -- Mark Rotert was there?
25     A.    Yes.

Page 352

1      Q.    And there was a -- an investigator from
2  the state's attorney's office with Mark that was
3  also there, right?
4      A.    Yes.
5      Q.    And your statement was being
6  videorecorded, right?
7      A.    Yes.
8      Q.    And you had given Mark Rotert consent to
9  videorecord that interview, right?
10     A.    Yes.
11     Q.    You signed a document, right?
12     A.    Yes.
13     Q.    Giving him consent?
14     A.    Yes.
15     Q.    So if on the video you're saying that
16 your mother told you that the police wanted to talk
17 to you about a murder case that happened on Cicero
18 and Ohio, are you aware of that?
19     A.    It's possible.  Could have happened, but
20 what I'm telling you is that my mother didn't know
21 what the State was looking for me for.  She just
22 know that they was looking for me.
23     Q.    Okay.  So --
24     A.    But because I know what they was looking
25 for me for when I found out, it could have come out

Page 353

1  that way.  But my parents never knew what they was
2  looking for me for.  All they knew, that the police
3  was looking for me.  And this ain't the first time
4  that the police came to their house looking for me.
5  They done came to their house looking for me for
6  several things.
7           Once again, I was at their house on house
8  arrest before all this stuff happened, and I had
9  took the house arrest band off and left and was on
10 the run from house arrest.  So the police was
11 already coming to my mother's house looking for me
12 for that.  So they don't know if it was that or
13 murder.  They don't know what it was about.  They
14 just know the police coming to the house looking for
15 me.
16     Q.    After May 13th, but before your arrest in
17 May, your parents asked you if you knew anything
18 about a murder, didn't they?
19     A.    No.
20     Q.    Didn't you tell ASA Mark Rotert that your
21 parents asked you if you knew anything about a
22 murder?
23     A.    No.  My parents only found out and
24 started talking to me about this after this stuff
25 hit the fan and I was locked up and arrested for it

AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 354..357
XAVIER L. WALKER, 04/12/2022

Page 354

1  and knew what was going on, not before. I never
2  said that before this happened, before I got
3  arrested that my parents asked me, did I know about
4  a murder that was going on. I never said that.
5  Check the tape.
6       Q.    Isn't it true before you were arrested in
7  May 2000 that you told your parents that you didn't
8  have anything to do with the murder and your parents
9  asked why the police were looking for you and told
10 you to tell the truth?
11      A.    That was all, once again, after the
12 police came looking for me and my parents start
13 asking me, trying to tell me to get in touch with
14 them and find out what was going on. When she
15 told -- my parents told me to get in touch with them
16 and find out what's going on, what they looking for
17 me for, I investigated and found out what they was
18 looking for me for, and then I told my parents what
19 was going on, what they looking for me for, what
20 they saying I did. But it wasn't before like they
21 knew what was going on. They heard what was going
22 on, and then they came and told me. No. The police
23 came to the house looking for me.
24      Q.    Well, at some point --
25      A.    And all they did was call and told me

Page 355

1  that the police looking for me. What's going on?
2  And then I found out details and told them and
3  talked to my parents about what's going on and why
4  they saying they looking for me, because I did -- my
5  parents asked me, which was call and find out what
6  they -- what they looking for me for, what they
7  had -- they coming to their house for me for.
8       Q.    So you're saying after your arrest, your
9  parents asked you if you had anything to do with the
10 murder? Is that what your testimony is?
11      A.    No. That's not what I just said.
12      Q.    Okay. Did your parents ask you at any
13 point in time if you had anything to do with the
14 murder?
15      A.    After the police came looking for me, and
16 my parents told me that they was looking for me, and
17 told me to contact them and see what they're looking
18 for me about, and then I contacted them and seen
19 what they was looking for me about. Then me and my
20 parents had this conversation.
21      Q.    That was before you were arrested, right?
22      A.    Yes, but it was after, like I keep
23 saying, after the police came to my house looking
24 for me.
25      Q.    Right. And so after the police came to

Page 356

1  your house looking for you, but before your arrest,
2  your mom told you that the police wanted to talk to
3  you about a murder case --
4       A.    No.
5       Q.    -- that occurred on Cicero and Ohio?
6       A.    No.
7       MS. SAMUELS:    Asked and answered.
8  BY MS. ITCHHAPORIA:
9       Q.    Okay. You told your parents -- oh, wait.
10 Strike that.
11      Your mom told you to contact the police,
12 right?
13      A.    Yes.
14      Q.    But you didn't do that?
15      A.    Yes. I just told you I did that.
16      Q.    Well, you said first you investigated it?
17      A.    I invest -- that's my investigating,
18 contacting them, seeing what they looking for me
19 for, what's going on, and asking what's going on.
20 Why you-all come to my parents' house is me
21 investigating, find out what's going on. Isn't that
22 investigating?
23      Q.    Well, before you called the police, you
24 did some other investigation, didn't you?
25      A.    No. I called the police like my mother

Page 357

1  and them asked me to.
2       Q.    Didn't you try to find out on your own
3  what was going on before you talked to the police?
4       A.    No. I talked to them first. Why would I
5  be trying to call and find out -- I don't know
6  what's going on. So why would I be trying to call
7  and find out from anybody else other than the people
8  that looking for me that I -- that know what's going
9  on?
10      Q.    Well, you wanted to go to Cicero to find
11 out what happened before you talked to the police,
12 right?
13      A.    No. I did all that type of stuff. I
14 tried to do all that and thought about all that
15 after my parents told me that, call the police, and
16 I called the police. I went to the gas station and
17 called the police.
18      Q.    Okay. But I'm talking about before you
19 called the police. So after --
20      A.    I'm talking about when my parents told me
21 this, my next thing was going to the gas station and
22 using the pay phone and call the police. I wasn't
23 going to call from their home, and I wasn't going to
24 call them from my cell phone. So I went to the gas
25 station and called the police.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 358..361
XAVIER L. WALKER, 04/12/2022

Page 358

1   Q.   Isn't it true that before you called the
2   police, that you went to Cicero to try to find out
3   what happened?
4   A.   No.
5   Q.   Okay.
6   A.   I did all that after I called the police.
7   Q.   Didn't you try to sell drugs between
8   May 13th and your arrest later on in May, May 29th,
9   to try to get enough money so you could get a
10  lawyer?
11  A.   No.
12  Q.   You weren't selling drugs --
13  A.   I was already selling drugs.
14  Q.   Okay.  But weren't you selling drugs so
15  you could raise money to get a lawyer?
16  A.   No.  That wasn't -- I was selling drugs
17  because I was selling drugs for money.  I needed
18  money, but yeah, if I -- that would help for me to
19  get a lawyer, but no, I had all type of things going
20  on at that time.
21  Q.   Well, didn't you tell ASA Mark Rotert
22  that you were trying to get money to get a lawyer
23  because you learned from the streets that that's
24  what you're supposed to do?
25  A.   Yeah, after I called -- after I called

Page 359

1   and talked to them and they told me what was going
2   on, I just told you.  I start doing all that after I
3   called and the police told them what they looking
4   for me for.
5   Q.   Well, didn't you tell ASA Mark Rotert in
6   2018 that you didn't call the police even though
7   you -- even though you knew they were looking for
8   you because you were trying to get money to get a
9   lawyer?
10  A.   No, I didn't tell them that --
11  Q.   You never said that?
12  A.   -- I didn't call the police.
13  Q.   Okay.
14  A.   I never said I didn't call the police.
15  Q.   Has your cousin --
16  A.   I said I didn't turn myself in or go to
17  the police, because I'm going -- I was raising money
18  to get me a lawyer before I go turn myself in to
19  them.  I wanted to go with a lawyer.
20  Q.   Your cousin told you to get a lawyer
21  during that time --
22  A.   Yes.
23  Q.   -- frame, right?
24       And that's Anthony Pettigrew?
25  A.   Yes.

Page 360

1   Q.   And why did you think you needed a
2   lawyer?
3   A.   I had a lot of different things going on
4   at that time.  I was on the run from house arrest.
5   I was on the run from another case that I had just
6   caught that they had gave me an ad bond from.  So I
7   needed a lawyer.
8   Q.   Did you contact a lawyer between May 13th
9   and May 28th, 2000?
10  A.   No, I was trying to talk to people and
11  find out one.
12  Q.   And were you selling drugs during that
13  time frame?
14  A.   Yes.
15  Q.   And did you get enough money to retain a
16  lawyer?
17  A.   No, I didn't make it.  I got locked up.
18  Q.   From the time that you found out that --
19  when did you -- you said -- when did your parents
20  tell you that the police were looking for you?
21  A.   I don't know the exact dates or none of
22  that stuff, but it was like a couple of days before
23  I got locked up.  Probably a day or two before I got
24  locked up.
25  Q.   And during -- so you had about two days,

Page 361

1   you're saying, from the time your parents told you
2   until you were locked up?
3   A.   Yeah.
4   Q.   And during that time, you had time to
5   think about what you were going to tell the police
6   about where you were at the time of the murder,
7   right?
8   A.   No.  I'm telling them the truth, what
9   you -- I didn't have nothing to do with this case or
10  this situation.  So I didn't have nothing to hide,
11  but I also know, like I said, I was also on the --
12  dealing with the house arrest stuff and with another
13  case.  So I know from me going and talking to them,
14  I'm going to jail for that, but this stuff, I had
15  nothing to do with.  So I wasn't worried about this
16  stuff because I had nothing to do with this.
17       As long as I got a decent lawyer that can
18  prove and do what I need him to do to prove my
19  innocence, then I shouldn't have to worry about
20  this, but I got to worry about this drug case and I
21  had to worry about the house arrest that I was going
22  to deal with.  So I needed a lawyer.
23  Q.   Between May 13th and May 28, 2000, you
24  were trying to figure out where you were at the time
25  of the murder on May 13th, weren't you?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 362..365
XAVIER L. WALKER, 04/12/2022

Page 362

1   A.   No.  I knew where I was.
2        Q.   Did you speak to Simeon and Deon between
3   May 13th and May 28th about what had happened on
4   May 13th?
5        A.   No, because there wasn't nothing --
6   didn't nothing happen on May 13th for me to talk to
7   them about.
8        Q.   After going to the Wax Factory on
9   May 13th and before your arrest later on in May, did
10  you see Jovanie Long?
11       A.   I'm pretty sure I did.  I...
12       Q.   You saw him at Boo Boo's house?
13       A.   I don't know where I seen him at, but I
14  know I -- I seen him.  Pretty sure I seen him.
15       Q.   And you were --
16       A.   Until I got locked up.
17       Q.   And you were seeing him pretty
18  frequently, right, like every couple -- every couple
19  of days?
20       A.   Yeah, like normal.
21       Q.   And you would go over to Boo Boo's house
22  and you would see Boo Boo and Jovanie, right?
23       A.   Sometimes, yeah.
24       Q.   And during that time frame, so after
25  you'd gone to the club on May 13th and before your

Page 363

1   arrest on May 29th, you and Jovanie and Maurice
2   would go shopping and buy gym shoes and outfits,
3   right?
4        A.   We always did that before -- before that
5   date, all the way until I got locked up.  We went --
6   we all -- I had a lot of clothes, a lot of shoes,
7   and a lot of going shoppings.
8        Q.   Well, you would go to the cleaners and
9   get clothes out from the cleaners during that time
10  frame?
11       A.   Yes.
12       Q.   And you would talk to Jovanie Long about
13  where he was on May 13th at the time of the murder,
14  right?
15       A.   No.  I never talked to him about none of
16  that stuff.
17       Q.   Well, before you were taken into custody
18  on May 28, didn't you tell Jovanie that the police
19  were looking for him?
20       A.   No.  He already knew the police was
21  looking for him.
22       Q.   Is that what he told you?
23       A.   No.  I just know if they was looking for
24  us cuz they came to my house looking for me and I
25  heard that they came to his parents' house looking

Page 364

1   for him.
2        Q.   How did you hear that?
3        A.   From his parents calling my parents.
4        Q.   Oh, so Jovanie Long's parents called your
5   parents and said that the police were looking for
6   Jovanie and looking for you?
7        A.   I -- I don't know which one called each
8   other or who or how they told it, but I know all
9   them was talking about it, and after the police came
10  to my parents' house, I don't know if they went to
11  his the same day.  I don't know how that went, but I
12  know somehow in there, they found out and they knew
13  about whatever, and we talked about it.
14       Q.   But when you told Jovanie that the police
15  were looking for him, before you were taken into
16  custody, he acted like he didn't know what was going
17  on, right?
18       A.   I didn't know what was going on.  Ain't
19  none of us know what was going on.
20       Q.   Before you were taken into custody, were
21  you aware that the police had interviewed Boo Boo?
22       A.   No.
23       Q.   Were you aware that the police had
24  interviewed Ashanti Wright?
25       A.   No.

Page 365

1        Q.   Were you aware that the police had
2   interviewed Mary Curry?
3        A.   No.
4        Q.   So you were taken into custody at some
5   point, right, in May?
6        A.   Yes.
7        Q.   And this was about two days after the
8   police -- after your parents told you the police
9   were looking for you?
10       A.   Yes.
11       Q.   And you didn't turn yourself in?
12       A.   No.
13       Q.   You didn't go and talk to the police like
14  your mom told you to, right?
15       A.   I went and talked to them over the phone,
16  the pay phone.
17       Q.   And who did you speak to?
18       A.   I don't remember the officer's name.
19       Q.   Was it an officer or was it a detective?
20       A.   It was an officer.  Then they passed me
21  to somebody else.
22       Q.   And what did they tell you?
23       A.   They was trying to get me to come in,
24  turn myself in and come talk to them at the station.
25  I told them I couldn't do that because I was on the

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 366..369
XAVIER L. WALKER, 04/12/2022

| Page 366 |
| --- |

1  run from house arrest. And I was on the run from
2  another case that I was fighting.
3        Q.    So you told the police that you were on
4  the run?
5        A.    Yes.
6        Q.    That you wouldn't come into the station?
7        A.    Yes.
8        Q.    And do you remember what day it was when
9  you were -- when the police apprehended you?
10       A.    It was either the 27th or the 28th,
11  something. I don't remember exact date.
12       Q.    And it was in the evening hours, right?
13       A.    Yes.
14       Q.    And you were down the street from your
15  house, in front of a friend's house when the police
16  caught you, right?
17       A.    Yes.
18       Q.    You were talking to your neighbor Charles
19  Green?
20       A.    No.
21       Q.    Were you --
22       A.    I was talking to Charles Toles.
23       Q.    You were talking to Charles Toles when
24  the police got to you?
25       A.    Yes.

| Page 367 |
| --- |

1        Q.    Where exactly were you when the police
2  apprehended you?
3        A.    I was coming off my friend porch, and
4  then two guys walked up on me. As I was leaving his
5  porch, looking like stickup men, looking like they
6  trying to rob me. And I start walking fast. They
7  start walking fast. So I start running. They start
8  running. And I thought they was stickup men trying
9  to rob me.
10       Q.    So were you at Charles Toles' porch?
11       A.    No. I was at another friend porch.
12       Q.    Whose porch were you at?
13       A.    A friend named Shareel, but he passed
14  away.
15       Q.    Okay. So you were at Shareel's porch
16  talking to Charles Toles?
17       A.    Yes.
18       Q.    So Charles Toles was over at Shareel's
19  house?
20       A.    Yes.
21       Q.    Isn't it true that you told people that
22  you were at Charles Green's home?
23       A.    No. Somebody probably mixed that up and
24  messed it up. Charles Green live directly next door
25  to me. How can I be down the street at Charles

| Page 368 |
| --- |

1  Green's house? I was --
2        Q.    But you weren't outside --
3        A.    -- talking to Charles Toles down the
4  street at my friend Shareel house.
5        Q.    Okay.
6        A.    I guess people -- Charles, Charles. They
7  mix the name. I guess. I don't know.
8        Q.    So was Charles Toles present when the
9  police apprehended you?
10       A.    Yes. He -- well, he went in my friend
11  house. I was leaving, going back, finna go back to
12  my parents' house, and he was going back in our
13  friend house, Shareel house, which was another house
14  that some of us frequently go down and kick it and,
15  you know, chill at.
16       Q.    Oh, so he didn't see -- Charles Toles
17  didn't see the police apprehending you because he
18  was inside?
19       A.    Yes.
20       Q.    Okay. Have you ever spoken to Charles
21  Toles about that day and the police's apprehension
22  of you?
23       A.    No.
24       Q.    He's never told you that he saw the
25  police apprehend you?

| Page 369 |
| --- |

1        A.    No.
2        Q.    You weren't outside your house at 5 --
3  5431 when you were apprehend by the police, were
4  you?
5        A.    No, but that -- that's where they lied
6  and said they got me from.
7        Q.    Were your -- any of your parents outside
8  the house when you were apprehended by the police?
9        A.    No.
10       Q.    And you said -- you said two people
11  acting like stick men came up to you?
12       A.    I said -- you say stick man.
13       Q.    Men.
14       A.    People acting like robbers.
15       Q.    Robbers. Okay.
16       A.    Act -- looking like and dressed like
17  robbers with plain clothes on, with leather coats
18  and shoes and leather -- and black pants on, walking
19  fast like in the movies with the robbers about to
20  get you, like the movies where -- what's his name?
21  Richard Pryor and them when they was working with
22  the pimps and all that stuff, and they finna go and
23  get you. They was looking like that, coming at me
24  fast. So I ran.
25       Q.    Well, there were police cars in the area,

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 370..373
XAVIER L. WALKER, 04/12/2022

Page 370

1  but you just didn't see them?
2      A.    I didn't see no police -- wasn't no
3  police cars out or around in front when I came out
4  that -- off that porch.
5      Q.    And didn't those two men that you're
6  saying that were dressed in plain clothes, didn't
7  they announce that they were the police?
8      A.    No.
9      Q.    When they announced that they were the
10 police, you ran, right?
11     A.    No.
12     Q.    You ran because you didn't want to get
13 caught?
14     A.    They didn't announce that they was the
15 police and they didn't tell me nothing about being
16 no police.  All they did was chase me and told me
17 come here and called me the B word and told me I
18 know what they looking for me for.  So that made me
19 think that I trying to stick me up and rob me.  I
20 got on another different type of hat like this
21 brand-new.  I don't know if you know about these
22 hats or whatever.  And I got on another brand-new
23 Pelle coat and some brand-new Michael Jordans, and I
24 had money in my pocket and I had my chain on.  I'm
25 not finna let them get me, so I ran.

Page 371

1      Q.    Were you armed?
2      A.    No.
3      Q.    When you went to the club on May 13th,
4  were you armed?
5      A.    No.
6      Q.    When -- you said there were two men.  Do
7  you know -- as you sit here today, do you know what
8  their names are?
9      A.    I just know they two black officers.
10 Which ones, I don't know.  I know when I see them.
11 And I know the names when I hear it.
12     Q.    So your -- it's your testimony that they
13 didn't tell you that they were the police?
14     A.    No.
15     Q.    And then did you start running when you
16 saw them?
17     A.    I start running when they said, come
18 here, you little B.  You know what we looking for
19 you for.
20     Q.    And when you're saying "little B," what
21 was the word they used?
22     A.    The B word.
23     Q.    What's that word?
24     A.    I don't use profanity.
25     Q.    Ever?

Page 372

1      A.    What they call female dog.  No, I stopped
2  for my mother when I started changing and grew up in
3  2008.  I stopped using profanity as well.
4      Q.    So did the police -- did the officers
5  tell you to stop running?
6      A.    No.  They told me, come here you little
7  B.  You know what we looking for you for and chased
8  me down and then tackled me down and rough me up and
9  put their knee in my back and twist my arms and then
10 cuff me up.
11     Q.    They -- did you end up on the ground?
12     A.    Yes.
13     Q.    How did you end up on the ground?
14     A.    Because one of them tackled me to the
15 ground.
16     Q.    And when they tackled you to the ground
17 is where you were cuffed?
18     A.    Yes, eventually.
19     Q.    Do you know how you ended up on the
20 ground?
21     A.    Yeah.  I just told you.  He tackled me.
22     Q.    Who tackled you?
23     A.    The one that had the brown leather coat
24 on.
25     Q.    So the black officer with the brown coat

Page 373

1  tackled you --
2      A.    Yes.
3      Q.    -- to the ground?
4      A.    Yes.
5      Q.    And did he say anything?
6      A.    He told me what I just told you.
7      Q.    Okay.  Other than that, did he say
8  anything else?
9      A.    No.  They started telling me -- the other
10 one started telling me, stop resisting and stop
11 fighting and all that type of stuff, because I'm
12 trying to get up and get away.  I don't know who
13 these people is.
14     Q.    And then they cuffed you when you were
15 down?
16     A.    No.  They tussled with me, and then
17 that's when the police squad cars and other polices
18 and all that get to coming out and whatever and two
19 other officers run over trying to help them to
20 tussle with me and cuff me up.  And one of them
21 twisting my arm one way, one of them pushing my head
22 down, one of them putting his knee in my back and
23 try to twist my other arm.  The other one hitting me
24 and trying to grab me like if he snatch me away from
25 them to pick me, I don't -- they was -- and

XAVIER WALKER vs CITY OF CHICAGO, et al.                                    Pages 374..377
XAVIER L. WALKER, 04/12/2022

Page 374

1  eventually the one that had his knee in my back was
2  able to twist my other arm.  The other guy gave him
3  my other arm once he got the cuff on so he can put
4  the other hand in a cuff, and then snatched me --
5  one of them snatched me up.
6      Q.    Did any of the officers kick you in the
7  stomach causing you to double over?
8      A.    No, he didn't kick me in the stomach
9  causing me to double over.  He just kicked me in the
10 stomach.
11     Q.    Did one of the officers throw you to the
12 ground?
13     A.    Yes.  The one that tackled me.  They
14 threw me to the ground.
15     Q.    And Officer Mike Pietryla was not
16 involved when you were taken into custody on this
17 date, May 28, 2000, right?
18     A.    No, I didn't see him that day.
19     Q.    And so you're saying that you were
20 handcuffed while -- while you were on the ground?
21     A.    Yes.
22     Q.    Were you handcuffed with your arms in
23 front or in back?
24     A.    In back.
25     Q.    And after -- well, while or during when

Page 375

1  you were handcuffed, did the officer say anything to
2  you about why you were being handcuffed?
3      A.    No.
4      Q.    And then you were put in the police car?
5      A.    No.
6      Q.    No?
7      A.    No.
8      Q.    What happened after you were handcuffed?
9      A.    Originally they had put me in the -- what
10 they call them cars?  The transporter car, the
11 transportation car.  And then they took me back out
12 and put -- put me in the detective's car.
13     Q.    Okay.
14     A.    I think they was originally finna take me
15 to Grand and Central because they was there helping
16 them, and they had transporter cars and blue and
17 whites and other stuff and all the different
18 officers that was around.  And that's when I started
19 seeing them when I was yanked up by one of the other
20 officers.  He yanked me up.  And then I seen all the
21 other officers that was around and the ones that was
22 coming and standing around and like blocking off the
23 area and all that type of stuff.
24     Q.    When this is all going on, did you see
25 anybody from your neighborhood outside that you

Page 376

1  knew?
2      A.    There was a lot of people outside from my
3  neighborhood.
4      Q.    Okay.  But did you see anybody in
5  particular?
6      A.    Yeah, I seen my neighbor and I seen my
7  friend Shareel that -- who house we was in front of
8  and his mother and...
9      Q.    Who's your neighbor?
10     A.    Charles Green.
11     Q.    So he was outside at this point?
12     A.    Yeah, he was outside by -- walking down
13 that way.
14     Q.    Have you ever spoken to Charles Green
15 about the police's apprehension of you on that day?
16     A.    No.
17     Q.    Was it the same officers that tackled you
18 to the ground that transported you to the police
19 station?
20     A.    Yes.
21     Q.    And they transported you in the detective
22 car, you said?
23     A.    Yes.  They took me out of the car that
24 they was finna put me in -- well, transporter van
25 and put me in they car.

Page 377

1      Q.    And you were taken from that area to
2  Harrison and Kedzie, right?
3      A.    Yes.
4      Q.    And before they started driving to
5  Harrison and Kedzie, they gave you your Miranda
6  rights in the car, right?
7      A.    No.
8      Q.    They didn't give you your Miranda rights?
9      A.    No.
10     Q.    Once you were at Harrison and Kedzie,
11 where did you go?
12     A.    To the interrogation room in the murder
13 area.
14     Q.    And where was the area, the detective
15 area?
16     A.    I don't know.
17     Q.    Did you have to go upstairs to the area?
18     A.    Yeah.
19     Q.    Did you go immediately from the car to
20 the upstairs area?
21     A.    Yes.
22     Q.    And were you put in an interview room?
23     A.    I was put in an interrogation room.
24     Q.    Where was the room that you were put in
25 in relation to the stairs that you had come up?  Do

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 378..381
XAVIER L. WALKER, 04/12/2022

Page 378

1  you know?
2      A.    I don't know.  I know it was by some
3  desks and it was in the middle of two other rooms.
4      Q.    The middle of two other rooms?
5      A.    Yeah, there was...
6      Q.    So there was a room on each side?
7      A.    Yes.  Then on the outside -- when you --
8  before I came in was the desks, I guess, where they
9  work at.
10     Q.    And there was a bench in the room?
11     A.    Yes.
12     Q.    And you were able to sit on the bench?
13     A.    No.
14     Q.    Was there any windows in the room?
15     A.    I think it's like one little window, like
16  in the top wall or top of the wall thing, yeah.
17     Q.    So there was a bench.  Was there a chair
18  and a table?
19     A.    No.
20     Q.    No chair?
21     A.    No chair, no table.  Just one little
22  bench that look a little bit like that, but all
23  steel, without the vents.
24     Q.    Who put you inside the room?
25     A.    The detectives.

Page 379

1      Q.    Was it the same two detectives that
2  transported you to the area?
3      A.    There was four of them when I first came
4  that was following me behind.  So all four of them
5  walked me down there and they -- two of them took me
6  in there and one of them cuffed my arm to the bench,
7  to the -- to the hook in the wall.
8      Q.    So the two black -- or black officers
9  transported you to the area, right?
10     A.    Yeah, but it was -- when we was walking,
11  the whole time once we got in the station, we was
12  walking.  It was four of them following me up while
13  we -- and talking, and the other officers, I guess,
14  congratulating them and whatever, and they ooh,
15  oohing and -- and took me up there.  And one of them
16  opened the door, and then the other two that had
17  brought me, that I was in the car with, took me in
18  while the other one had to open the door for him.
19     Q.    Do you know the name of the other two
20  officers that joined the two black officers --
21     A.    No.
22     Q.    -- as you sit here today?
23     A.    No.
24     Q.    Who was the officer that you said
25  handcuffed you in the room?

Page 380

1      A.    One of the black officers.
2      Q.    Okay.  And what did he handcuff you to?
3      A.    It's -- it's like a hook in the wall.
4      Q.    Okay.  And he handcuffed you to the hook
5  in the wall?
6      A.    Yeah.
7      Q.    After about 30 minutes and steady
8  calling, a different officer entered the room and
9  removed one of your hands from the handcuffs, right?
10     A.    No.
11     Q.    You were able to sit down after your
12  hands were removed from the handcuffs, right, while
13  still remaining cuffed to the wall?
14     A.    No.  That was -- ain't nobody come and
15  take one handcuff off until later hours, later, the
16  whole nother shift.
17     Q.    Shortly after you got to the area --
18     A.    No.
19     Q.    -- you were taken to the restroom, right?
20     A.    No.
21     Q.    And when you returned from the restroom,
22  you were uncuffed, right?
23     A.    No.
24     Q.    Well, didn't you tell your attorney,
25  Deborah Bedsole, that after about 30 minutes of

Page 381

1  calling for an officer, that someone entered the
2  room -- entered the room where you were in and
3  removed one of your hands from the handcuffs?
4      A.    And once again, everything that I told
5  her was orchestrated by the detectives and officers.
6      Q.    Well, no one told you -- no police
7  officer told you that you had to say that to Deborah
8  Bedsole?
9      A.    Yes, they did, went over the story to me,
10  not to Deborah Bedsole, because it wasn't to them.
11  They went over the story with me of what they wanted
12  me to say and when they want me to say it and to
13  who.  And I thought she was still the State.
14  They -- this is what they wanted me to tell the
15  State that I was treated properly, that I was let go
16  to the bathroom, that I was fed and all that stuff
17  that wasn't true.  And I'm thinking she still the
18  State.  And I'm not going to say nothing against
19  them to get me in trouble if -- they be like, oh, he
20  bagged out on it, because I was under the impression
21  I'm going home once I do what they told me to do.
22  So I didn't think that I'd tell her a different
23  story or whatever, and then they be like, oh, no, he
24  trying to renege on it, saying, no, we ain't letting
25  him go home.  So I told them what they wanted me to

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 382..385
XAVIER L. WALKER, 04/12/2022

Page 382

1  tell them.
2      Q.    You were wearing a sleeveless athletic
3  shirt over a white T-shirt that day, right?
4      A.    No.
5      Q.    Wasn't the athletic shirt, the sleeveless
6  athletic jersey, wasn't it blue in color?
7      A.    Yes, but that was like under another
8  shirt.  I had on a sweater.  Then I had on that
9  shirt, then my T-shirt.
10     Q.    All right.  So you had -- what color was
11 the sweater?
12     A.    It was like blue and grayish, some -- it
13 was similar to the same color as the Cubs -- the
14 jersey.
15     Q.    Okay.  So you had a sweater on and then
16 you had a blue jersey on?
17     A.    Yes, and a T-shirt.
18     Q.    And the blue jersey was sleeveless,
19 right?
20     A.    It wasn't sleeveless.  It was a Cubs
21 jersey.
22     Q.    It was a Cubs jersey?
23     A.    Yeah.
24     Q.    Okay.  And underneath the Cubs jersey,
25 you had a white T-shirt --

Page 383

1      A.    Yes.
2      Q.    -- is that right?
3      Q.    Okay.  And were you wearing all three
4  items of clothing when you got to the area?
5      A.    No.
6      Q.    What were you wearing when you got to the
7  area?
8      A.    I think by then just my T-shirt.
9      Q.    Just the white T-shirt?
10     A.    Yeah.
11     Q.    What happened to your blue Cubs jersey?
12     A.    I don't know.  During -- during the
13 struggle and wrestling with them and then them
14 getting me and taking -- they took stuff.  They took
15 my sweater and took my shirt and then I only had my
16 T-shirt.
17     Q.    When you met with Deborah Bedsole, you
18 were wearing the blue jersey, right?
19     A.    No.
20     Q.    Once you were put into the room, did any
21 officers come in and talk to you?
22     A.    Yes.
23     Q.    Which officer interviewed you?
24     A.    Several officers interviewed me.  It was
25 different ones.

Page 384

1      Q.    The first interview, what did the police
2  officer say to you?
3      A.    They get to coming in, yelling at me and
4  cursing at me, ask me where Jovanie at, and tell me
5  where Jovanie at.  And we killed this such and such
6  guy.  And why we do it and all type of stuff like
7  that.
8      Q.    And who was the officer that was saying
9  that?
10     A.    The -- the two black guys.  Then it was
11 two white guys.  Then it was the sergeant.
12     Q.    Okay.  Well, first I want to talk about
13 the first time that the officers speak to you.
14     A.    The first time, it was my two -- the two
15 that I was in the car with the first time.
16     Q.    The two black officers?
17     A.    Yes.
18     Q.    Okay.  And they're asking you where
19 Jovanie is, right?
20     A.    Yeah.
21     Q.    And did you tell them where Jovanie was?
22     A.    No, because I didn't know where he was.
23     Q.    Well, you knew that sometimes he resided
24 on Erie, right?
25     A.    Yeah.  But I don't know where.  I can't

Page 385

1  tell you something that I don't know.
2      Q.    But did you give them potential addresses
3  of where they could find Jovanie?
4      A.    No.  I told them, you-all know where he
5  at.  You-all...
6      Q.    Did they tell you why they were looking
7  for Jovanie?
8      A.    Yeah.  I told you they told us that what
9  we supposed to did.  They talking about we killed
10 that guy, and why we kill him, and all this stuff.
11     Q.    And that first interview with the two
12 black officers was about 20 to 30 minutes, right?
13     A.    I don't know how long.  I can't recall.
14     Q.    During the first interview with the two
15 black officers, nobody struck you; isn't that right?
16     A.    No.
17     Q.    So you're saying that they did strike
18 you?
19     A.    No, I'm saying nobody struck me the
20 first.
21     Q.    Okay.  Did the officers say any -- did
22 those two black officers say anything else to you?
23     A.    Yeah.  They was questioning along with
24 those same questioning, but...
25     Q.    Okay.  Anything else other than what

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 386..389
XAVIER L. WALKER, 04/12/2022

Page 386

1  you've already testified to?
2      A.    Not that I can recall, no.
3      Q.    Did you say anything to the two black
4  officers other than what you've already said today?
5      A.    I told them, I don't know where Jovanie
6  at.  I wasn't with him.  And I don't know what
7  you-all talking about.
8      Q.    Okay.  Did they tell you why they wanted
9  to talk to Jovanie?
10     A.    I just told you, yeah, they told me that
11  me and him supposedly did what they saying we did.
12     Q.    A murder?
13     A.    Yes.
14     Q.    So they told you that they wanted you and
15  Jovanie because they wanted to talk to you about a
16  murder?
17     A.    Not saying how you -- being nice like you
18  saying it, but yeah, like I told you, they was
19  cursing at me saying that we killed this guy and
20  they going to get us and all that type of stuff.
21     Q.    Did they tell you where the murder
22  happened?
23     A.    Yes.
24     Q.    What did they tell you?
25     A.    They told me that they -- we supposed to

Page 387

1  killed a guy in front of the park on Ohio.
2      Q.    And did they tell you when the murder
3  occurred?
4      A.    Yes.
5      Q.    What did they tell you?
6      A.    I can't recall the exact detail, but they
7  told me a whole story and the whole rundown of what
8  happened.  And even admitted to it in my transcripts
9  that they told me my involvement of the case and
10  what the witnesses said I supposed to did and what
11  my co-defendant said I supposed to did even though
12  they didn't have my co-defendant at the time.  They
13  was lying to me, but, you know, they still said it.
14     Q.    But you already knew before the police
15  spoke to you that the police were looking for you
16  about a murder that occurred on May 13th because
17  your parents had told you that?
18     A.    Yeah -- no, my parents told me to call
19  the police because the police came looking for me.
20  And then the police told me why they was looking for
21  me when I called them.
22     Q.    Okay.  And so when the police told you
23  that, you know, you were involved in a murder that
24  occurred outside the park on Ohio on May 13th, what
25  did you say to that?

Page 388

1      A.    I told them, no, I wasn't.  You-all --
2  you-all got the wrong guy.
3      Q.    Did you tell them where you were?
4      A.    No, I didn't tell them where I was.
5      Q.    You never told them that you were at the
6  club with Simeon and Deon, right?
7      A.    Not at -- when I was on the phone with
8  them and all that stuff, no, I --
9      Q.    No.  I'm talking about when we're at the
10  area now.
11     A.    Yes.
12     Q.    So when you're at the area talking to
13  those two black officers, you didn't tell them that
14  at the time of the murder that you were at home with
15  Simeon and Deon?
16     A.    Yes.
17     Q.    You did tell them that?
18     A.    Yes.
19     Q.    You told that to the two black
20  officers --
21     A.    Yes.
22     Q.    -- during that first interview?
23     A.    Not that first time in that first
24  interview, but I told them during the time me being
25  interrogated and being in that room, that I was at

Page 389

1  home and that I was with my friend Simeon and Deon
2  and that I went to the club and all that stuff, yes,
3  I did.
4      Q.    Okay.  I'm talking about the first
5  interview at the area with the two black officers.
6      A.    No, I did not.
7      Q.    Okay.
8      A.    Not the first interview.
9      Q.    Okay.  And that first interview lasted 20
10  to 30 minutes?  That's what you've previously
11  testified to, right?
12     A.    I don't know.  I don't recall how long.
13     Q.    Okay.  If you -- that's what your
14  testimony was at the motion to suppress, that the
15  first interview lasted 20 to 30 minutes, you have no
16  reason to doubt that testimony that you gave, do
17  you?
18     A.    No.
19     Q.    Okay.  So after that 20 to 30 minutes
20  where you didn't tell them where you were at the
21  time of this murder, what happened after that?
22     A.    Then they came back in and one of the
23  black ones left out, and then another guy came in, a
24  Caucasian guy came in, and then I guess that's when
25  they start trying to turn it up.  So the bad cop,

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 390..393
XAVIER L. WALKER, 04/12/2022

Page 390

1  good cop and bad cop, bad cop, and all that type of
2  stuff, because he came in a little more aggressive
3  and a little more loud and talking about they tired
4  of playing with me and grabbing on me and pushing at
5  my face and stuff and...
6      Q.    Well -- so after the -- didn't the two
7  black officers leave the interview room for a little
8  bit after the first interview?
9      A.    Yes, I said that.
10     Q.    So they left, right?
11     A.    Yes.
12     Q.    Two black -- and then you were in the
13 room by yourself?
14     A.    Yes.
15     Q.    And it's your testimony that you were
16 cuffed after the officers left the interview room?
17     A.    Yes.  I was cuffed majority of the time
18 that they interviewed me.
19     Q.    How long were you left alone in the
20 interview room after the first interview had ended?
21     A.    I don't recall.
22     Q.    What were you doing during that time
23 frame?
24     A.    I was on my knees just waiting and
25 looking and seeing what's going to happen.

Page 391

1      Q.    And then did somebody else at some point
2  come in the interview room again?
3      A.    Yes.
4      Q.    And this was a Caucasian --
5      A.    No.  I told --
6      Q.    -- officer?
7      A.    -- you the same first two officers came
8  in again together, and then one of them left out and
9  then a Caucasian man came in and it was one of the
10 blacks that was already there and a Caucasian man
11 together.
12     Q.    Okay.  Let's break that down.
13           So you're in the interview room.  You've
14 had the first interview that lasts about 20, 30
15 minutes, and some time passes, and then the two same
16 black officers enter again; is that right?
17     A.    Yes.
18     Q.    And you don't know how much time passed
19 between the first time when they entered the room
20 and then they left the room and then they came back
21 in again?  You don't know how much time passed?
22     A.    No.
23     Q.    It could have been five minutes.  It
24 could have been an hour.  You don't know?
25     A.    I don't know.

Page 392

1      Q.    Were you still wearing your watch?
2      A.    No.  They took all that stuff off me.
3      Q.    So they'd already taken your watch.  So
4  you were wearing it at the time when they
5  apprehended you --
6      A.    Yes.
7      Q.    -- and they had taken that from you?
8      A.    Yes.
9      Q.    Did they take anything else from you?
10     A.    They took all my belongings.
11     Q.    But you're in the room wearing your blue
12 Cubs jersey and your white shirt or no?
13     A.    No.  I just had the white shirt on.
14     Q.    Okay.  And was the white shirt kind of
15 dirty from when you --
16     A.    No.
17     Q.    There wasn't any dirt marks on it from
18 when you fell on the floor -- or from when you were
19 taken to the ground earlier?
20     A.    No.  I had on the sweater and the blue
21 shirt then.  So it wasn't -- that didn't get dirty
22 until later.
23     Q.    So you said the two black officers -- and
24 we're talking about the second interview.  Okay.
25 The two same black officers enter the room.  Did

Page 393

1  they say anything when they entered the room for the
2  second time?
3      A.    Yes.  They still talking about the same
4  stuff, still aggressive, still being belligerent.
5      Q.    What did they say?
6      A.    They was telling me that they tired of me
7  playing with them, that I better tell them where
8  Jovanie at, calling me dumb, ignorant Bs, and
9  stupid.  I'm going to try to -- I'm going to --
10 trying to save him and -- and free him, and he's
11 telling on me and all type of stuff.  You know, they
12 was crazy.
13     Q.    Was one of the black officers talking
14 more than the other, or were they both talking to
15 you?
16     A.    It's like they'll take turns.  Like they
17 was -- like it was routine.  Like it was, like I
18 said, good cop, bad cop.
19     Q.    Well, who was the good cop?
20     A.    The one with the black coat was the good
21 cop.  The one with the brown coat was the bad one.
22 Same one that tackled me was the aggressive one.
23     Q.    And as you sit here today, did you ever
24 figure out which one was the black officer wearing
25 the brown coat that was the bad cop?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 394..397
XAVIER L. WALKER, 04/12/2022

Page 394

1    A.    No, but I know when I see him.
2    Q.    Okay.  And then you said one of the black
3  officers was wearing a black coat and he --
4    A.    Yes.
5    Q.    -- was a good cop?
6    A.    In the room.
7    Q.    In the room?
8    A.    Yeah.  He was a little more trying to
9  reason with me, like, Man, come on.  Just tell him
10  what -- just tell him what happened.  Just tell him
11  what they want to hear.  Just tell him, type stuff.
12    Q.    And how long did they talk to you this
13  second time before you said a third officer entered?
14    A.    I don't recall, but it wasn't that long
15  before the third officer came in and the guy with
16  the black coat left and there was the third guy and
17  the guy with the brown coat.
18    Q.    Okay.  So the black officer that was the
19  good cop that was wearing the black coat, he left?
20    A.    Yes.
21    Q.    And then did immediately the white
22  officer come in?
23    A.    About a few seconds after him.
24    Q.    Okay.  And then the black officer with
25  the brown coat is still in the room?

Page 395

1    A.    Yes.
2    Q.    And this -- this white officer that
3  entered the room, this is the first time that he
4  entered the room?
5    A.    Yes.
6    Q.    Was this the first time that you saw this
7  guy, this officer?
8    A.    No.
9    Q.    Was he in -- one of the officers that had
10  walked you in when you were being walked into the
11  area?
12    A.    He's one of the officers that when they
13  tackled me and grabbed me and was tussling me up, he
14  was with them tussling me up and he was one of the
15  ones that walked in with them when they came, yes.
16    Q.    So he was there when you were apprehended
17  by the police?
18    A.    Yes.
19    Q.    And you said he tussled with you?
20    A.    Yes.
21    Q.    What did he do when he tussled with you?
22    A.    When I was trying to get off and get
23  away, he helped grab my arm and twist my arm up.  He
24  pushed my head down.
25    Q.    And what was the name -- did you ever

Page 396

1  come to learn the name of this officer?
2    A.    No, but I know when I see him.
3    Q.    Well, what does he look like?  What did
4  he look like back then?
5    A.    Look like a guy that had been to the
6  Army, crew cut like and had a little weight on him.
7    Q.    Crew cut, weight.  How old did he look?
8    A.    Probably in his 30s or 40s.
9    Q.    How tall was he?
10    A.    He was taller than me back then, so...
11    Q.    And how tall were you back then?
12    A.    I don't know.
13    Q.    How tall are you now?
14    A.    5'9".
15    Q.    Were you about 5'9" back in May of 2000?
16    A.    No.
17    Q.    You were shorter?
18    A.    Yes.  I grew in jail.
19    Q.    Were you about 5'8"?
20    A.    I was probably about 5'5", 5'6",
21  something like that.
22    Q.    Okay.  And you said that he had -- this
23  white officer that had this Army crew cut had some
24  weight on him.  How much did he weigh?
25    A.    Not like no weight weight.  Like -- like

Page 397

1  him, I guess.  About, you know -- like he work out.
2  He could say --
3    Q.    Like my colleague Green -- Graham?
4    A.    Yeah.  You could tell like he probably
5  work out a little bit, got a little muscles and
6  got -- or he used to work out type stuff.
7    Q.    And so then this white officer came in
8  the room.  And did he say anything to you?
9    A.    Yes.
10    Q.    What did he say to you?
11    A.    First the black guy was still talking to
12  me, belligerent and a little aggressive, and I'm
13  still saying, I don't know what you-all talking
14  about.  I didn't have nothing to do with this.  And
15  then he got mad first, slammed his hand on the bench
16  thing.  Like I'm tired of you playing.  You know
17  what's going on.  You know where Jovanie at.  You
18  better tell us and this and that and start
19  threatening me and stuff.  And I'm like, Man, I
20  don't know what you talking about.  So I'm a little
21  aggressive back because I'm -- I don't know what you
22  talking about.  I wasn't with Jovanie.  Then he like
23  muffed my head, telling me I do know where he at and
24  I better stop playing with them.  I'm going to go to
25  jail for the rest of my life and all this other

XAVIER WALKER vs CITY OF CHICAGO, et al.                Pages 398..401
XAVIER L. WALKER, 04/12/2022

Page 398

1  stuff.  And got a little aggressive, telling me
2  basically the same thing that the other officer
3  talking about.  I better tell him where Jovanie at,
4  tell him where the gun at, tell him all this stuff,
5  and I'm like, I don't know nothing about what
6  you-all talking about.
7       Q.    So who -- who was the officer that
8  slammed his hands on the bench?
9       A.    The Caucasian guy that came in.
10      Q.    Okay.
11      A.    He came in and turnt it up a little bit
12 like.
13      Q.    So when the Caucasian officer was talking
14 to you, the black officer with the brown coat wasn't
15 saying anything?
16      A.    He was talking already, and the guy
17 basically like over-talked him and overshadowed him
18 and made a lot of noise and got loud and just -- you
19 know, I guess to turn it up.  Like yeah, he the bad
20 cop, but I'm the badder one type stuff like.
21      Q.    You said he muffed your head.  What do
22 you mean?
23      A.    Like pull it, you know, muff.
24      Q.    So the -- so the -- so the white
25 officer --

Page 399

1       MS. SAMUELS:  Do you mind if we take a quick
2  break?
3       MS. ITCHHAPORIA:  Oh, okay.  Let's just take a
4  quick break.
5       THE VIDEOGRAPHER:  We're off the record at
6  5:28 p.m.
7            (Whereupon, a break was taken,
8             after which the following
9             proceedings were had:)
10      THE VIDEOGRAPHER:  We are back on the record
11 at 5:33 p.m.
12 BY MS. ITCHHAPORIA:
13      Q.    On May 30th, you were taken from the
14 interview room for a meeting with Deborah Bedsole
15 and Sulman Qasi, right?
16      A.    Yes.
17      Q.    And were they already in the room when
18 you got in the room?
19      A.    Yes.
20      MS. ITCHHAPORIA:  Oh, real quick because the
21 camera is -- can you see him?
22      THE WITNESS:  I'm ducked down.  I don't know.
23 It hurt.
24      MS. ITCHHAPORIA:  Let's just go back off the
25 record.

Page 400

1            Off the record, please.
2       THE WITNESS:  I don't know.  It just --
3       THE VIDEOGRAPHER:  We're off the record at
4  5:34 p.m.
5            (Whereupon, a break was taken,
6             after which the following
7             proceedings were had:)
8       THE VIDEOGRAPHER:  We are back on the record
9  at 5:41 p.m.
10 BY MS. ITCHHAPORIA:
11      Q.    Okay.  So, Mr. Walker, you met with
12 Deborah Bedsole and Qasi for about an hour and 25
13 minutes on May 30th at District 11; is that right?
14      A.    I -- I don't know how long it was, but I
15 guess.
16      Q.    Okay.  And it was at -- it was at the --
17 just the 11th District where you met with her,
18 right?
19      A.    Yes.
20      Q.    And nobody else was in the room when she
21 was interviewing you except her and Sulman Qasi,
22 right?
23      A.    Yes.
24      Q.    They were the only two people in the room
25 with you?

Page 401

1       A.    Yes.
2       Q.    And you weren't cuffed at that time, were
3  you?
4       A.    No.
5       Q.    Okay.  And you were wearing the same
6  white T-shirt that you had been wearing when you
7  were in the interview room at the area?
8       A.    Yes.
9       Q.    And Deborah Bedsole, the first thing that
10 she did is she introduced herself to you and she
11 told you that she was an attorney for First Defense
12 Legal Aid, correct?
13      A.    Yes.
14      Q.    And she told you that Sulman Qasi was a
15 law student that was also working for First Defense
16 Legal Aid, correct?
17      A.    No, she didn't tell me -- not -- well, if
18 she did, I don't remember her telling me nothing
19 about him.  I didn't even remember him at first.
20      Q.    Okay.  But she told you she was an
21 attorney?
22      A.    Yes, she told me that --
23      Q.    And she told you that your mother had
24 called First Defense Legal Aid, right?
25      A.    Yes.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 402..405
XAVIER L. WALKER, 04/12/2022

Page 402

1    Q.    And she told you that she was there to
2  represent you?
3    A.    Yes.
4    Q.    And she told you that there was
5  attorney-client privilege, right?
6    A.    No, she didn't go into details of all of
7  that.  She was still trying to -- because I'm steady
8  asking her about, how?  How my momma tell you?  How
9  my momma know?  Is my momma and them downstairs?  Is
10  they here?  Is they finna get me out?  Did they come
11  and get me?  I start going to that stuff.  So she
12  tried to explain to me like no, that's not -- you
13  know, they not here.  They just called me and sent
14  me.  I'm like, man, you for real?  How do you -- do
15  they know?  Who told them?  And we going through
16  that stuff.  And I'm like, all right.  Whatever.  So
17  then that's when I'm like, man, they try to trick
18  me.
19    Q.    But as part of her introduction, she told
20  you that she was an attorney, that she was there to
21  represent you?
22    A.    Yeah.  She told me that part.  I said
23  that.
24    Q.    And she showed you a business card?
25    A.    I can't recall.  I don't remember if she

Page 403

1  showed me a business card.
2    Q.    Or Mr. Qasi showed you a business card?
3    A.    No, I don't remember him saying -- doing
4  nothing until he start --
5    Q.    Well, she never told you that she was
6  with the State, did she?
7    A.    No.
8    Q.    And then after she introduced herself to
9  you, you talked with her about how you came to be in
10  the area for questioning, right?
11    A.    Later, yeah.  That came later.
12    Q.    Oh, no.  After she introduced herself,
13  you started talking about how the police apprehended
14  you, correct?
15    A.    No.
16    Q.    Okay.  So you're saying that she
17  introduced herself.  And then what did you talk
18  about next?
19    A.    I started talking about where my family
20  at.  Is my parents here?  Is they coming to get me?
21  Did they come and get me?  How?  Who told them?
22  Where -- where they at?  How you know?  I don't
23  believe you.  And I'm going to that stuff with her.
24    Q.    Okay.
25    A.    So we went to that for a nice little

Page 404

1  minute and then I guess she seen that what she was
2  doing wasn't working, so she changed her approach.
3    Q.    Well, then she talked to you about how
4  you came to be at the area and how the police
5  apprehended you, right?
6    A.    No.  Then she started talking to me
7  about, what's that on my shirt and stuff?  And what
8  happened to me and that?  And then we started
9  talking a little bit about that and then we went
10  back into all the other stuff.
11    Q.    Okay.  So you're saying the order was you
12  asked her about your family.  Then she asked you
13  about your shirt.  And then you talked about how the
14  police apprehended you?
15    A.    Yes.
16    Q.    Okay.  And then after you talked about
17  that, you talked about what happened in the
18  interview room with her, right?
19    A.    Yes.
20    Q.    And you talked about how you give a
21  videotaped statement to the ASA, right?
22    A.    Yes.
23    Q.    And then you told her about what happened
24  on May 13th, 2000, right?
25    A.    Yes.

Page 405

1    Q.    And you told her about going to the club
2  and everything?
3    A.    Yes.
4    Q.    And when you're telling her about what
5  happened on May 13th, 2000, that's after you've
6  talked about your shirt and after you've told her
7  what's happened at the area?
8    A.    Yes.
9    Q.    You told Deborah Bedsole that the
10  detective kicked you in the stomach and that you
11  were thrown to the ground and handcuffed and put in
12  the car when the police apprehended you, right?
13    A.    Now, she bundled all that up.
14    Q.    Okay.  Sir, I'm asking you what you told
15  her.  You told her --
16    A.    And I'm trying to -- and I'm trying to
17  explain it to you how --
18    Q.    Hold on.  You told her that the detective
19  kicked you in the stomach, you were thrown to the
20  ground, handcuffed, and put in the car?
21    A.    No, not in that order and not in that
22  way.
23    Q.    Okay.  So if Ms. Bedsole testified at her
24  deposition in this case that that's what you told
25  her, are you saying Ms. Bedsole is lying?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 406..409
XAVIER L. WALKER, 04/12/2022

Page 406

1    A.    No.  I'm telling you she bundled
2  everything I told her up into one.
3    Q.    You never told Ms. Bedsole that you had
4  been kicked when you were in the interrogation room
5  at the area?  You never told her that?
6    A.    Yes, I did.
7    Q.    You never told Ms. Bedsole that your
8  wrists were painful?
9    A.    Yes, I did.
10   But one second.  Can I ask you something?
11  Did --
12   Q.    No.  I'm -- I'm asking the questions.
13   A.    Okay.
14   Q.    Sorry, sir.  You told her that -- you
15  told your attorney, Deborah Bedsole, that you were
16  read your Miranda rights at the time of your arrest
17  and during the transport to Area 4, correct?
18   A.    No, I didn't.
19   Q.    When you told Deborah Bedsole that
20  Jovanie told you that he had just killed this mark,
21  you knew that she was representing you?
22   A.    No, I didn't.
23   Q.    Deborah Bedsole told you at the end of
24  the interview that she was going to contact your
25  mother, right?

Page 407

1    A.    Yes, she did.
2    Q.    And then after your interview with
3  Deborah Bedsole, were you then taken to the lockup
4  at District 11?
5    A.    No.
6    Q.    Where did you go after your interview
7  with Deborah Bedsole?
8    A.    I went back to the interrogation room for
9  a second and then they took me downstairs after they
10  had somebody waiting to come transport me and take
11  me downstairs to the lockup.
12   Q.    And before you hit the cell in the
13  lockup, you were processed by the lockup keeper,
14  right?
15   A.    Yes.
16   Q.    And the lockup keeper did like a medical
17  screening?
18   A.    Not that I'm aware of, no.  I don't
19  remember that.
20   Q.    Well, the lockup keeper asked you
21  questions about your medical condition, correct?
22   A.    Yes.
23   Q.    And you told the lockup keeper that you
24  had asthma, right?
25   A.    Yes.  I grew out of it, but yes.

Page 408

1    Q.    But you didn't complain to the lockup
2  keeper that the police had physically abused you,
3  did you?
4    A.    That's another police.  What am I...
5    Q.    Okay.  So my statement is correct?
6    A.    No, it's not -- of course, yeah, I'm
7  not -- tell another police that the other police
8  just beat me up for.
9    Q.    So when the lockup keeper is asking about
10  your medical condition, you didn't complain about
11  any injuries to your wrist and you never complained
12  that you had been kicked in the stomach, true?
13   A.    True.  Not to them, no.
14   Q.    And then after you were at the district
15  lockup, you had a cell, then you were taken to
16  court; is that right?
17   A.    Yes.
18   Q.    And at court you didn't tell the judge
19  that you had been struck by the police, did you?
20   A.    I didn't even get to talk to the judge.
21   Q.    Well, if we have a transcript of a court
22  hearing where you were present with an attorney --
23   A.    Yeah, and the attorney said whatever, and
24  they -- I was in and out.  I went in there.  The
25  attorney said such and such.  And I was right back

Page 409

1  out.
2    Q.    Okay.  So you were presented before a
3  judge on May 31st, 2000, right?
4    A.    Yes.
5    Q.    And you never told the judge that you had
6  been physically abused by the police, did you?
7    A.    I didn't get a chance to.
8    Q.    Okay.  And then on May 31st after you
9  went to court, you were then taken to Cook County?
10   A.    Yes.
11   Q.    And that's the Cook County Jail, right?
12   A.    Yes.
13   Q.    And before you hit the cell at Cook
14  County Jail, photographs were taken of you, right?
15   A.    Yes.
16   Q.    And do you remember the person that took
17  the photographs of you?
18   A.    Not really, because I thought it was the
19  man that was with Deborah Bedsole, but I found out
20  that it was somebody else with her.  So the whole
21  time, I thought it was the man that was with Deborah
22  Bedsole.
23   Q.    Okay.  Do you remember -- sorry.  Before
24  that when you were in the lockup, the lockup keeper
25  took a mug shot of you, right?

Page 410

1    A.    Yes.
2    Q.    And there's nothing in your mug shot that
3  shows any injuries to your face, is there?
4    A.    I have no idea because I haven't seen it.
5    Q.    And when you were in the lockup, you
6  called your parents, right?
7    A.    No.
8    Q.    Isn't your parents' phone number
9  379-2605?
10   A.    Yes.  Well, yes.  Yes.
11   Q.    You spoke to one of your parents that
12  day, right?
13   A.    Yes, but --
14   Q.    When you were in the lockup?
15   A.    No, not when I was in the lockup.
16   Q.    The lockup keeper -- before you hit the
17  cell, the lockup keeper conducted a visual
18  examination of you, right?
19   A.    No.
20   Q.    He asked you if you were taking
21  medication?
22   A.    Yeah.  He asked me questions, but he
23  didn't look me over and come and check me and make
24  sure everything was good on me, no.  He just asked
25  me like such, such, such, this and writing stuff

Page 411

1  down.  He never looked at me and examined me or none
2  of that.
3    Q.    Well, he asked you if you received any
4  treatment for any medical conditions, right?
5    A.    Yes.
6    Q.    And you -- the only thing you told him
7  was that you had asthma --
8    A.    Yes.
9    Q.    -- right?
10        And then photographs, you -- or you're
11  saying were taken of you when you were at the Cook
12  County Jail before you hit the cell?
13   A.    Yes, before I hit the cell or -- and
14  before I went to the judge.
15   Q.    Okay.  Oh.  The photographs were taken
16  before you went to the judge?
17   A.    Yes.
18   Q.    And the photographs were taken by a
19  photographer for the public defenders' office,
20  right?
21   A.    I have no idea.  This whole time, like I
22  said, I thought it was the person that was with
23  Deborah Bedsole.  It looked like the same guy, and I
24  thought it was him.  But I just found out recently
25  that it wasn't.

Page 412

1    Q.    What do you mean you found out recently?
2    A.    During the investigation and research
3  into this to find the pictures and track the
4  pictures down, we found out that that wasn't the guy
5  that was with Deborah Bedsole.  That's why I was
6  having a hard time at first getting them because I
7  always thought it was the guy that was with Deborah
8  Bedsole that took them and found out it wasn't.
9    Q.    Well, the photographer that was with the
10  PD's office, he took Polaroid pictures of you,
11  correct?
12   A.    Yes.
13   Q.    And so they were Pol- -- you know what a
14  Polaroid camera is, right?
15   A.    Yes.
16   Q.    And as he was taking pictures, the
17  pictures were coming out of the camera?
18   A.    Yes.
19   Q.    Have you ever seen those pictures?
20   A.    No.
21   Q.    I'm going to mark as Exhibit 4 to your
22  deposition Plaintiff 2443 through 2447.
23        (Whereupon, Deposition
24         Exhibit No. 4 was marked.)
25   MS. ITCHHAPORIA:  You can flip through those.

Page 413

1        Oh, can I get the extra copy?  Thanks.
2  BY MS. ITCHHAPORIA:
3    Q.    All right.  So you've had a chance to
4  look at Exhibit 4, correct?
5    A.    Yes.
6    Q.    And in Exhibit 4, you're wearing the same
7  white shirt that you were wearing when you were in
8  the interview room at Area 4, right --
9    A.    Yes.
10   Q.    -- on May 30th?
11   A.    Yes.
12   Q.    Okay.  Did you see any boot prints in any
13  of these photographs?
14   A.    No, because it was too far away.
15   Q.    And the photographer was supposedly
16  taking photographs of your injuries, correct?
17   A.    Yes.
18   Q.    There's no injury to your face that you
19  can see on page 2444 of Exhibit H, is there?
20   A.    Yes.
21   Q.    Where is the injury to your face?
22   A.    On my jaw area on both pictures.  You can
23  see the bruise.  You don't see that bruise?  That's
24  not --
25   Q.    Can you circle for me on page 2444 where

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 414..417
XAVIER L. WALKER, 04/12/2022

Page 414

1  an injury was to your face?
2      A.    (Witness marks exhibit.)
3      Q.    Okay.  And is it your testimony that
4  injury was caused by the police officers when you
5  were at Area 4?
6      A.    I believe this came when they tackled me
7  down and was roughing me up on the -- on the
8  concrete because I'm wrestling and tussling, and I
9  scraped my face on the concrete.
10     Q.    Okay.  So that was before you got to
11 Area 4?
12     A.    Yes.
13     Q.    Do you -- when the police are
14 apprehending you?
15     A.    Yes.
16     Q.    Any other injuries on 2444?
17     A.    Not that I can see.
18     Q.    Okay.  And then the first page, 2443, if
19 you look at also 2445, it looks like it's some sort
20 of scar on your back; is that right?
21     A.    Yes.
22     Q.    This wasn't caused by the police, was it?
23     A.    Yes.
24     Q.    It was?
25     A.    Yes.

Page 415

1      Q.    When was this caused by the police?
2      A.    When I was in the interrogation room.
3      Q.    Who caused this?
4      A.    The one that kept kicking me and hitting
5  me.
6      Q.    Which -- which officer?
7      A.    Black guy with the brown jacket.
8      Q.    The black officer with the brown jacket
9  that was the --
10     A.    Yes.
11     Q.    -- bad cop?
12     A.    Yeah.
13     Q.    How did he do that?
14     A.    He was hitting me with something.  I
15 don't know if I told you -- got to that yet with
16 you-all.  But he had hit me with something that was
17 like a stick.  I guess it was the little flip-out
18 things that they have.  I don't know what you call
19 that.
20     Q.    Did you tell Deborah Bedsole that a
21 police officer had struck you with a stick at
22 Area 4?
23     A.    I don't recall.
24     Q.    Did you tell Greg Wilson that a police
25 officer had struck you with a stick?

Page 416

1      A.    Yes.
2      Q.    Okay.  You did tell him that?
3      A.    Yes.
4      Q.    Isn't this an old scar that we're looking
5  at on page 2443?
6      A.    Not at the time when that was.  Not --
7  no, that's not old.  That was fresh.  That's why he
8  took a picture of it.
9      Q.    You don't have that scar anymore, do you?
10     A.    I don't know.  I don't believe so,
11 though.
12     Q.    Were you telling him what to take
13 pictures of?
14     A.    No.  He took pictures of the things that
15 he seen.
16     Q.    Okay.  And then if you look at 2446,
17 that's a picture of you in the white shirt that you
18 were wearing when you were at the area on May 30th,
19 right?
20     A.    Yes.
21     Q.    And these were the pictures that you said
22 were taken of you on May 31st before you went to
23 court?
24     A.    Yes.
25     Q.    By the PD's photographer?

Page 417

1      A.    I don't -- like I said, I don't know who
2  it was.
3      Q.    Okay.  And there's no boot print on this
4  white shirt that we're looking at on 2446, is there?
5      A.    No.  For some reason, you can't see it.
6  I don't know why.
7      Q.    Okay.
8      A.    But you see it.
9      Q.    And he was there to supposedly photograph
10 your injuries?
11     A.    I have no idea, because like I keep
12 telling you, this whole time, I thought this was
13 somebody from Deborah Bedsole's office because she
14 said she was going to have somebody come and take
15 pictures and stuff, and I was always thinking that
16 it was her office.  But --
17     Q.    Would this --
18     A.    -- I guess this was the public defender
19 office.  I don't know.
20     Q.    It was a male photographer, right, who
21 had the Polaroid camera?
22     A.    It was the guy that looked like the same
23 guy that was with Deborah Bedsole.
24     Q.    Oh, it looked like the same guy that was
25 with Deborah Bedsole?  It wasn't a white guy called

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 418..421
XAVIER L. WALKER, 04/12/2022

Page 418

1   Michael Brayton that was taking these photographs?
2       A.    It looked like a guy that was like
3   Deborah Bedsole's guy to me.  I don't see no --
4       Q.    So the guy that was with Deborah Bedsole
5   was --
6       A.    Was a black guy.
7       Q.    -- Sulman Qasi.  He was a black guy?
8       A.    I thought he was.  Some other -- what --
9   he looked black.
10      Q.    And so is it your testimony that he left
11  with Sulman Qa- -- he left with Deborah Bedsole and
12  then he came back and took these photographs?
13      A.    That's what I thought.  He came -- he met
14  me at the County and took the pictures.  I thought
15  she was going to be there too and be waiting to come
16  out in court.  But then when I got in court, it
17  wasn't her and none of my family and nobody was
18  there.
19      Q.    Okay.  If you look at the last picture,
20  2447, does that show any injuries?
21      A.    You can't see it on here, but there was
22  injuries there.  But you can see it a little bit on
23  this side.  My wrist in this area, all this was
24  bruised from the handcuffs.
25      Q.    Okay.  So for the record, you just marked

Page 419

1   on 2447 where there was a bruise on your wrist?
2       A.    Yes.
3       Q.    And what was that bruise caused by?
4       A.    From the handcuffs.
5       Q.    Okay.
6       A.    And me having to be bent down on my
7   knees.
8       Q.    You never complained to Greg Wilson that
9   you -- that your handcuffs were too tight, did you?
10      A.    Yes, I did.
11      Q.    Okay.  Put that back.
12      A.    I told Deborah Bedsole about that and
13  Greg Wilson about that.  And them bruises been on my
14  wrist since forever, the rest of my life from that,
15  and they still there right now.
16      Q.    Before you hit the cell at the Cook
17  County Jail, you underwent a medical screening,
18  right?
19            Thank you.
20      A.    No, not really.
21      Q.    Well, isn't it true that there was a
22  medical screening that was conducted by a medical
23  professional and you removed your shirt during that
24  screening?
25      A.    Yes.  I went through the regular routine

Page 420

1   thing that they have when you go through the County,
2   but they don't check you.  They don't doing nothing.
3   For real.  They just pass you through the same way I
4   was just saying when the guy was asking me stuff,
5   they wasn't looking at me and going over it.  They
6   just, you got it.  This happened?  Yep.  Without
7   even looking at me.
8       Q.    So at the -- at Cook County Jail when you
9   were undergoing this medical processing, was it a
10  man or a woman that was doing the processing?
11      A.    I don't recall.
12      Q.    Okay.  And you did remove your shirt?
13      A.    Yes.  I removed whatever they told me to
14  remove.
15      Q.    Okay.  Were you naked, or you just
16  removed your shirt?
17      A.    I -- at different times, I was naked.
18  Different times, I had to remove my shirt.
19  Different times, they had -- it's a whole process, a
20  whole thing that you got to go through.
21      Q.    Okay.
22      A.    You even had to see a guy that stuck a
23  thing inside your penis and told you he was doing it
24  for -- check gonorrhea and all that that was bogus.
25  And people end up getting lawsuits and stuff for it.

Page 421

1   Stuck a thing longer than this inside your thing.
2   So we had to do whatever they told us to do.
3       Q.    Okay.  But before that happened, you've
4   removed your shirt and the person that's doing the
5   screening is asking you questions, right?
6       A.    Yeah.  They asking questions and writing
7   down without looking at you, without going over
8   nothing with you, without checking --
9       Q.    Well, you don't know what the person was
10  looking at when he was asking you questions, do you?
11      A.    I know if -- I know if I'm looking at you
12  while you talking to me and your head like this, you
13  not looking at me.
14      Q.    So is it your testimony as you sit here
15  today that the person that was doing the medical
16  screening at Cook County Jail never looked at your
17  torso when you removed your shirt?
18      A.    Yes.
19      Q.    Okay.  Never made any physical
20  observations?
21      A.    Yes.
22      Q.    That person asked you questions, right?
23      A.    Yes.
24      Q.    And did you answer those questions
25  truthfully?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 422..425
XAVIER L. WALKER, 04/12/2022

Page 422

1   A.   I answered the questions according to
2   whatever they asked me at the time.
3   **Q.   You told that person that you had asthma,**
4   **right?**
5   A.   Yes.
6   **Q.   You didn't tell that person that you had**
7   **been physically abused by the police, did you?**
8   A.   No.
9   **Q.   You didn't complain to that person that**
10  **you had any injury on your wrist, did you?**
11  A.   No.
12  **Q.   I want to go back to the second interview**
13  **at Area 4 when you're saying that the white guy came**
14  **in for the first time, right, and the good cop**
15  **left --**
16  A.   Yes.
17  **Q.   -- the black officer that was the good**
18  **cop?**
19  A.   He was a fake good -- imposter good cop.
20  **Q.   Well --**
21  A.   He was the better one out of the two
22  because wasn't none of them good.  They was all
23  cursing, using bad language, and being belligerent
24  and trying to force me to say what they wanted me to
25  say but...

Page 423

1   **Q.   During this second interview, though, did**
2   **anybody use any force?**
3   A.   Yes.
4   **Q.   Who used force?**
5   A.   The guy that came in.  I told you he the
6   one that came in and ramped it up.  He got like
7   charged.  Like he was brought in to be charged and
8   be able to do it.  He came in.  The other guy was
9   still talking, and I'm still telling like, no, that
10  ain't happen.  I wasn't with him.  And then all of a
11  sudden, out of nowhere, he hit this -- boom, loud
12  noise with his hands, and I'm tired of you with this
13  stuff.  You better tell us where he at.  You know
14  where he at.  And cursing and stuff.  And I don't
15  know where he at.  He pushed my head.  Yes.  You
16  know where he at.  You going to stop playing.  All
17  that stuff on me and...
18  **Q.   Okay.  Other than pushing your head, did**
19  **he strike you?**
20  A.   Yeah.
21  **Q.   How did he strike you?**
22  A.   He hit me -- I can show you.  It's
23  like -- I can't really explain it, but I can try to
24  show you.
25  **Q.   Where on your body did he stri- -- did he**

Page 424

1   **strike you?**
2   A.   In my chest area and my face.
3   **Q.   Okay.  And did he strike you with his**
4   **knee or with his arms?  How did he do it?**
5   A.   He smacked me and muffed me, which is a
6   smack muff, in my face --
7   **Q.   Okay.**
8   A.   -- several times.
9   **Q.   With his hand?**
10  A.   With his hand.
11  **Q.   Okay.**
12  A.   And like his upper body, like I guess
13  trying to -- because I'm already like this and I'm
14  sideways on the floor with my knees trying to hang
15  onto the thing.  And I guess he trying to push me
16  more into the wall so I can be like submissive and
17  broken, but -- I don't know.  Crazy.
18  **Q.   And did he use a black stick during this**
19  **second interview?**
20  A.   No, he didn't use the black stick.  I
21  didn't say he used the black stick.
22  **Q.   Who used the black stick?**
23  A.   The black guy with the brown coat.
24  **Q.   Oh.  Did the black guy with the brown**
25  **coat use the stick during the second interview?**

Page 425

1   A.   No.
2   **Q.   When did he use the stick?**
3   A.   That came later.  I guess they was a
4   little tired of me.
5   **Q.   Okay.**
6   A.   This was after he came -- he did that
7   like after the sergeant came in, talking about he
8   tired of me playing with his officers.  He tired of
9   me.  I better do this or I'm going to be going to
10  jail for -- I'm going to get 50 years and be locked
11  up for the rest of my life and all this stuff and --
12  **Q.   Who said that?**
13  A.   The sergeant.
14  **Q.   What was the name of the sergeant?**
15  A.   Sergeant Holy.
16  **Q.   So Sergeant Holy came into the room --**
17  **what, was he the third officer that came into the**
18  **room for the --**
19  A.   No.
20  **Q.   Well, strike that.**
21  **Was -- when Sergeant Holy came in the**
22  **room, was anybody else in the room besides you and**
23  **Sergeant Holy?**
24  A.   Yes.  Me and the other two officers.  But
25  he didn't come in the second time.  This was a

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 426..429
XAVIER L. WALKER, 04/12/2022

Page 426

1  little later after they done been playing -- the
2  other four been playing back and forth musical
3  chairs on who going to come in, what two going to
4  come in at the time.
5          And I'm still saying the same thing of me
6  not being with Jovanie. I don't know where he at.
7  And I didn't have nothing to do with this stuff.
8  And I guess he got tired and pissed off, like he
9  said, because that's what he said when he came in.
10 He tired and pissed off with me playing with his
11 officer, me giving the runaround, me lying. I
12 better tell him right now and all this stuff.
13     Q.    How long had you been at the area when
14 Sergeant Holy came in the room?
15     A.    I have no idea.
16     Q.    Sergeant Holy didn't use any force
17 against you in the room, did he?
18     A.    Yes.
19     Q.    What did he do?
20     A.    He grabbed my face like this, telling me
21 I'm lying and he -- I'm tired -- he tired of me
22 lying and stuff and...
23     Q.    Did he do anything else to you?
24     A.    Yanked my head back after when he pushed
25 me back.

Page 427

1      Q.    Okay. Other than grabbing your face and
2  yanking your head back, did he do anything else?
3      A.    Not at that time, no.
4      Q.    Did the officers that were interviewing
5  you, so the black guy with the brown coat, and then
6  the white officer, did they tell you that other
7  people had implicated you in the murder?
8      A.    Yes.
9      Q.    Who did they tell you had implicated you
10 in the murder?
11     A.    They told me that Boss Hog had implicate
12 me in the murder. They told me that Boo Boo had
13 implicated me in the murder, that Mary Curry had
14 implicated me in the murder, that Ashanti had
15 implicated me in the murder, that Jovanie had
16 implicated me in the murder, and somebody else. I
17 can't remember who else they said.
18     Q.    Did they show you their statements?
19     A.    No.
20     Q.    They just told you verbally?
21     A.    They just told me and told me they story.
22     Q.    Okay. They told you a story?
23     A.    Yes.
24     Q.    What information did they feed to you?
25     A.    They fed to me where the murder happened

Page 428

1  at.
2      Q.    Well, didn't you already know where the
3  murder had happened from your parents before you
4  spoke to the police?
5      A.    No. I learned it from the police before
6  I spoke and then I talked to my parents about it,
7  like I told you earlier, but --
8      Q.    Okay. So you already knew, though,
9  before you were at Area 4 --
10     A.    Yes.
11     Q.    -- where the murdered occurred?
12         Okay.
13     A.    But they told me the so-called details of
14 what had supposed to happen about it, what it
15 supposed to have been about, that it supposed to
16 have been a robbery, that I supposed to have played
17 a role for Jovanie and been a lookout, which never
18 happened because I wasn't nobody lookout. But this
19 is what they say. That me and Jovanie supposed to
20 have plotted and planned to do this. We supposed to
21 have been at Boo Boo house and supposed to ran out
22 of money for drugs and -- and -- and alcohol, which
23 is crazy because I in my parents' house has got a
24 whole bar. We still got the bar. And I never ran
25 out of alcohol because I can just go home and get

Page 429

1  some liquor. Still can do that now. Still got it
2  in the house, but anyway.
3          And I can always get money from my family
4  and people. So I never had ran out of money.
5  Believe it or not, even though I'm from the ghetto
6  and I grew up with the stupid way and doing a lot of
7  stupid things, I was a blessed kid and my parents
8  both worked and took care of us to the best of their
9  ability and we never wanted for nothing.
10         But they told me I supposedly ran out of
11 money and plotted to go and hit a lick, which I'm
12 like, a lick? I planned to jack off in -- for some
13 money? But -- because that's what licks was to us.
14 Robbing, what they talking about is a robbery and
15 that's a stickup, and that's what we call it,
16 robbery, and we didn't call it all that other stupid
17 stuff.
18         And they told me about -- that Mary
19 supposed to have said some stuff, that Boo Boo
20 supposed to have said some stuff, that we supposed
21 to have left some shoes or something up in Boo Boo
22 and them house and had our blood on it, so we
23 popped -- they going to test the shoes and it's
24 going to have my blood on it. It's going to have
25 Jovanie blood on it.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 430..433
XAVIER L. WALKER, 04/12/2022

Page 430

1    One of us was supposed to have been
2  stupid enough to bite the person and it was a new
3  bite mark, and they going to get our DNA, and we
4  going to be known.  And I better tell them what I
5  need to tell them and tell them on Jovanie so they
6  can help me get a deal, because if not, we going to
7  both be gone for the rest of our life.  They told me
8  that -- the type of gun that it was supposed to have
9  been.  How many shots it was supposed to have been.
10 The money that the guy was supposed to be robbed
11 for, which is a joke.  It was crazy as ever because
12 I wouldn't even waste my time, but -- I spend more
13 than that on hats.  My hats cost more than that
14 but...
15       Q.    How much money did they say you
16 supposedly robbed?
17       A.    $200.  My hat cost $275.
18       Q.    So you wouldn't have robbed someone for
19 200.  It would have to be more?
20       A.    It got to be worth my while if I'm going
21 to take a risk of going to jail and losing my life
22 or get into trouble.  I'm not finna -- I got about
23 six of these hats, and they cost 275.  I'm not finna
24 rob you for -- my shoes cost more than that hat.
25       Q.    So you're saying the police made up that

Page 431

1  you and Jovanie were looking to sell drugs to
2  someone and that you acted as a lookout for Jovanie?
3  They just made that up out of whole cloth?
4        A.    Yes.  I don't know where they got it from
5  and where they made it up from, but they made it up.
6        Q.    Do you know how you got on the police
7  radar?
8        A.    Yes.
9        Q.    How?
10       A.    Because I was a known troublemaker in my
11 neighborhood that used to be selling drugs that used
12 to run from them, that used to be gangbanging and
13 throwing bottles and stuff at them when I was a kid
14 and all type of stuff and then my cousin and them
15 was known for selling drugs and gangbanging in the
16 neighborhood and stuff, and there was one time that
17 they chased me and -- and I got away, but the police
18 fell.  And they was talking about they was going to
19 kill me and all type of stuff, so, yeah.
20       MS. SAMUELS:  Christiane, you...
21       THE WITNESS:  I don't know why I just start
22 sweating like this, but I'm always sweating too.
23 BY MS. ITCHHAPORIA:
24       Q.    So you said that the sergeant came in the
25 room.  And when the sergeant came in the room, the

Page 432

1  other two -- the one black officer with the brown
2  coat was still there and then the white officer with
3  the Army crew cut was there?
4        A.    Yes.
5        Q.    Okay.  And the sergeant comes in.  And
6  then does the sergeant leave?
7        A.    After he went off and had his little --
8  little tyrant and he grabbed me.
9        Q.    How long was the sergeant in the room
10 with you for?
11       A.    I don't recall.
12       Q.    And then once the sergeant left, was it
13 just the same black guy with the brown coat and then
14 the white officer with the crew cut?
15       A.    And -- no.  Another officer had came in,
16 another -- one of them that had been in there a few
17 times had came in.
18       Q.    Okay.  What does that officer look like?
19       A.    Another Caucasian.  I don't know.
20       Q.    Can you describe what he looked like?
21       A.    No.
22       Q.    Do you know what his name is?
23       A.    No.  I know when I see him, though.
24       Q.    And did this Caucasian officer use force?
25       A.    No, not at that time.  He was one of the

Page 433

1  ones that roughed me up when they brought me in.  He
2  was with the other one, with the crew cut guy.  I
3  guess that was his partner probably.  But they was
4  together.  He came in.  They all talked and said
5  little stuff.  And then when they left out, Michael
6  Pietryla came in.  Now, this is where the good cop
7  came in.  This is where he came in.  He tried to --
8  instead of him being aggressive, he finesse.
9  Just --
10       Q.    So Mike was the good cop, Mike Pietryla?
11       A.    Yes.
12       Q.    Okay.  Let -- let's just back up a little
13 bit.  So this -- the officer that you're saying that
14 was feeding you the information about the robbery
15 and how you plotted and planned and you were at Boo
16 Boo's house and you ran out of money and that you
17 planned to hit a lick and that you were acting for a
18 lookout and then you robbed the man for $200, who
19 was feeding you that information?
20       A.    All -- all three of them officers.
21       Q.    All -- all three of the officers?
22       A.    Yes.
23       Q.    Which officers?
24       A.    The two black officers was saying this
25 stuff, and then the guy with the crew cut, he was

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 434..437
XAVIER L. WALKER, 04/12/2022

Page 434

1   saying this same stuff.  And Sergeant Holy,
2   didn't go through the details like they did, but he
3   was basically like saying some of, I guess, the
4   parts that he knew and was like, I better stop
5   effing playing with them and, you know, beating
6   around the bush.  I'm going to get this much time,
7   and they ain't going to be able to help me and save
8   me if they -- I don't -- you know, all that stuff
9   telling me like...
10       Q.      Between the second and the third
11  interview, did you go to sleep?
12       A.      No.  I couldn't go to sleep.
13       Q.      Did you go to any sleep -- did you go to
14  sleep at any point when you were in the interview
15  room?
16       A.      No, I couldn't go to sleep.
17       Q.      You were given food when you were in the
18  interview room, right?
19       A.      No.
20       Q.      And you were taken to the bathroom?
21       A.      No.
22       Q.      When you were at Area 4, was there ever a
23  period of time when you were in the interview room
24  and you were alone?
25       A.      Yes.

Page 435

1        Q.      And during that time frame, did you fall
2   asleep?
3        A.      No.
4        Q.      Did you talk to anyone you knew?
5        A.      Yes.
6        Q.      Who did you talk to?
7        A.      I talked to Anttwoine Waddy and to Maurice
8   Wright.
9        Q.      You talked to both of them?
10       A.      Yes.
11       Q.      Who did you talk to first?
12       A.      I don't remember.  I don't recall.
13       Q.      You don't recall the order?
14       A.      No.
15       Q.      And when you spoke to Maurice Wright, how
16  did you know it was Maurice Wright?
17       A.      Because he told me.
18       Q.      How did he get your attention or did you
19  get his attention?
20       A.      He -- he got my attention.
21       Q.      What did he say to you?
22       A.      He banged on the wall and told me that he
23  was over there and that they had him; they had his
24  momma and his sister.  See, it was still his sister
25  then.  But they had him and his mom and his sister.

Page 436

1   And to be cool, just tell them what they want to
2   hear and they going to let me go, tell them what
3   they -- you know, tell them they story back and they
4   going to let me go.  They said they looking for
5   Vani.  Have I seen him?  All -- I'm like, No, I
6   ain't seen him.  I ain't been over there yet and...
7        Q.      How long was the conversation with Boo
8   Boo?
9        A.      Not long.  Probably about -- not -- a
10  minute.
11       Q.      So Boo Boo told you to tell them what
12  they wanted you to say?
13       A.      Yeah.
14       Q.      And did -- because Boo Boo told you that,
15  did you agree to do that?
16       A.      No, not at first.
17       Q.      Did you and Boo Boo talk about anything
18  else about what happened on May 13th?
19       A.      No.  The police came in.  He got quiet.
20  And then they was back at me.  They loud and
21  roughing, I guess, you know, so he -- I didn't want
22  them to come in and beat on him no more probably.
23  So he didn't say nothing else.
24       Q.      Was it a one- to two-minute conversation
25  with Boo Boo?

Page 437

1        A.      Like a minute probably.
2        Q.      You didn't hear any beating going on in
3   the room where Boo Boo was, right?
4        A.      No.
5        Q.      You didn't hear him screaming or crying?
6        A.      No, I don't know he was there until,
7   like I said, he -- I guess when he heard it got
8   quiet, he banged on the wall and started talking to
9   me.
10       Q.      Did you ever see Boo Boo at Area 4?
11       A.      I seen him leaving.
12       Q.      You saw him -- when did you see him
13  leaving?
14       A.      Out the window when he left.
15       Q.      Oh, you saw him from the window that --
16  so you saw him from the interview room that you were
17  at by looking through the window?
18       A.      Yeah.
19       Q.      Was that a window that was in the door or
20  on the wall?
21       A.      It's like on the wall.  It was like up a
22  little bit on the wall, and you can -- that's the
23  only piece of light you can see is when it turns --
24  the sun shine a little bit and you can see out
25  there, but it was a window like from, I guess, they

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 438..441
XAVIER L. WALKER, 04/12/2022

Page 438

1  park out in the entrance and come in way.
2      Q.    Did you tell Maurice Wright what had
3  happened to you when the police were talking to you?
4      A.    I didn't get a chance to.
5      Q.    So he just told you, tell the police that
6  the police -- he told you the police were looking
7  for Jovanie and just to tell the police what they
8  wanted to hear?
9      A.    No.  He was like, calm down and be cool
10 because he -- I guess he'd been hearing them beating
11 on me and me steady saying the same stuff and me
12 being aggressive with the police.  Like calm down
13 and be cool.  Just tell them what they want to hear.
14 Just tell them what they saying, man, and you'll be
15 up out of here.  They -- they say you looking for
16 Vani.  You see him?  Like no, I ain't seen him.  I
17 ain't been out there.  I ain't been over there.  He
18 like, Man, just be cool.  Then the police was coming
19 back.
20     Q.    But that wasn't true because you had seen
21 Jovanie, right?
22     A.    Not that day.  No, I hadn't seen him.
23     Q.    But you had seen him after May --
24 May 13th?
25     A.    But I hadn't seen him prior up and until

Page 439

1  that.  So I'm thinking about now.  I wasn't thinking
2  about last week or two weeks ago that I seen him.  I
3  wasn't -- that wasn't my mind frame two, three weeks
4  ago.  I'm thinking about now.  I haven't seen him.
5  So I don't know where he at.
6      Q.    You never told your attorney, Greg
7  Wilson, that you had a conversation through the wall
8  with Maurice Wright, did you?
9      A.    I think I did.  I -- yeah, I told him
10 about both of my conversation with Antwoine Waddy
11 and Maurice.
12     Q.    So after you spoke to Maurice Wright, did
13 you then speak to Antwoine Waddy?
14     A.    After the police left the other time --
15     Q.    Okay.
16     A.    -- because we stopped because the police
17 came back in.  Now they back loud, aggressive.  I'm
18 still saying my same stuff, that I don't know what
19 they talking about.  Coming in and now they arguing
20 with me and hitting on me and stuff again.  I'm
21 crying.  I'm loud, crying, and telling them, I don't
22 know what they talking about.  They loud, telling me
23 I do and stop all this stuff or whatever and cursing
24 at me.
25            And then they left again.  I get another

Page 440

1  wall -- another (demonstrating).  I'm thinking it's
2  Boo Boo.  I'm like, What up?  I'm trying to talk to
3  him.  He, no.  This Bubble.  I'm like, What you in
4  there -- you-all in there together?  You in there
5  with Boo Boo?  He like, No, he just left.  And
6  that's when I looked out and seen he was leaving.
7      Q.    You never had a conversation with Maurice
8  Wright through the wall, did you?
9      A.    Yes.
10     Q.    Bubble is the one that told you that
11 Maurice Wright was in the next room to him, right?
12     A.    No.  I talked to Maurice Wright, and we
13 talked.  Bubble told me that Maurice Wright was
14 leaving, and I looked out the window and seen him
15 leaving.  And then me and Bubble talked.  We talked
16 a little longer than Maurice Wright because it took
17 a little longer for the police to come in.  And he
18 basically started telling me the same thing.  Just
19 be cool.  Tell them what they want to say.  Tell
20 them what they want to hear.  They'll stop hitting
21 on you.
22     Q.    Bubble told you that Maurice Wright was
23 in the next room?
24     A.    No.
25     Q.    He never said that?

Page 441

1      A.    I had just talked to Maurice Wright
2  already.  Bubble told me Maurice just left.  He was
3  like -- I asked him, was in the same room with him?
4  He said no, he was in the other room.  But he just
5  left.  And that's when I looked and I seen him
6  leaving.  He was like, they just let him go.  He
7  just -- he leaving.  He left.
8      Q.    Who left the room first, you or Bubble?
9      A.    Bubble.  All of them left before me.  I
10 seen both of them leave.
11     Q.    You saw Bubble leave too?
12     A.    Yeah.
13     Q.    Through the window?
14     A.    Yeah.
15     Q.    In the same interview room?
16     A.    Yeah.
17     Q.    Were you in that same interview room the
18 entire time that you were at Area 4?
19     A.    No.
20     Q.    You were taken to a different room?
21     A.    A different room to where I did the
22 confession thing.
23     Q.    Oh, right.  But before --
24     A.    That was different.
25     Q.    Before you met with the state's attorney,

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 442..445
XAVIER L. WALKER, 04/12/2022

Page 442

1  though, you were in the same interview room?
2      A.   Yes.
3      Q.   You didn't tell your attorney, Deborah
4  Bedsole, about the conversation that you had with
5  Bubble, did you?
6      A.   Yes.
7      Q.   You did tell her?
8      A.   Yeah.  I told her and Greg Wilson about
9  both conversations with both of them, with Boo Boo
10  and Bubble.
11      Q.   When you were talking to Deborah Bedsole
12  on May 30th, she was taking notes, right?
13      A.   Sometime.  Part of the time.  I told you,
14  at first she was trying to convince me that she was
15  for me.  So she wasn't taking notes when we talking
16  and I'm telling her -- I'm trying to get an
17  understanding with her because I'm not believing
18  that she for me.  She wasn't taking notes when I'm
19  telling her where my mom and them at.  How you
20  knowing all that?  She wasn't taking notes.  And
21  when I first start showing her my stuff about the
22  T-shirt and all that, she wasn't taking notes yet.
23          But then I guess when -- she changed her
24  approach, and I got a little more relaxed to her
25  satisfaction because I still ain't believe her; I

Page 443

1  still thought she was with the State all the way
2  until I got to talk to my parents, because I didn't
3  know how they know that and to send somebody down
4  there when I haven't talked to them and ain't nobody
5  from my family know that I was even locked up.  So I
6  didn't believe this lady.
7          But once she felt a little comfortable,
8  and I was a little more relaxed, I'm like, okay, let
9  me just tell her what the police had told me to say,
10  fix it up a little bit just in case if she is with
11  me, but not -- not go off the boiler what they was
12  saying, because if they trying to trick me --
13  because they told me that day, after I do it, they
14  was going to let me go home.  So I'm like, I don't
15  want them to be trying to trick me, and I'm backing
16  away from what they saying and then they don't let
17  me go home.  So let me, you know, tell her what they
18  want -- what -- I told them what they want to hear.
19  Let me go -- tell her what they want to hear.
20      Q.   How many times did the officer -- the
21  black officer with the brown coat hit you with the
22  stick?
23      A.   Twice.
24      Q.   And it was just twice on the back?
25      A.   Yeah -- no, he -- it was like one up

Page 444

1  there, and the other was like the lower back part,
2  but twice in the back area, though, yeah.
3      Q.   So one was on the upper back.  One was on
4  the lower back?
5      A.   Yes.
6      Q.   And when he hit you with the stick, who
7  else was in the room, if anybody?
8      A.   The other officer, the other crew cut.
9  That's when him and that guy was still together.
10      Q.   Okay.  Was that during the third
11  interview?
12      A.   Probably like the third or fourth.
13      Q.   Okay.  There were like four interviews
14  that day?
15      A.   Probably like five.  They kept coming
16  out.
17      Q.   None of the interviews lasted more than
18  like 40 minutes, right?
19      A.   Yeah.  Ain't none of them -- they was
20  like in and out, like I guess he ain't go.  So we
21  got to go back to the table, go back and re- -- I
22  guess talk about what they going to do and come back
23  and then same thing, because I'm saying the same
24  stuff because it's the truth and facts, and then
25  they'd be like, go back out, try it again.  And it'd

Page 445

1  be like they just kept taking turns, two and two
2  were, and then until it became a three with them and
3  the Sarge.  But it was two and two.
4      Q.   At some point did you agree to give a
5  statement?
6      A.   Yes.
7      Q.   So at some point you agreed that you were
8  going to admit to your involvement in the murder?
9      A.   No.  I -- I agreed to I'm going to tell
10  them what they want to hear so I can go home.
11      Q.   And was that -- who did you say that to?
12      A.   Michael Pietryla and the officer with the
13  black -- with the brown and the officer with the
14  black, I told.
15      Q.   How many times at that point had they
16  gone over the story with you about what had happened
17  on May 13th?
18      A.   About three to four times and then they
19  went over it a few more times before the state's
20  attorney came.
21      Q.   All right.  So tell me in total, how many
22  times did they go over the story with you about what
23  happened on May 13th from the beginning to the end?
24      A.   I can't -- I can't recall how many times,
25  how many times --

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 446..449
XAVIER L. WALKER, 04/12/2022

Page 446

1    Q.    But more than five, you're saying?
2    A.    No, I don't know.  It was about --
3    about -- probably about four or five.  I don't know.
4    About.
5    Q.    And it took you about four to five times
6    and then you memorized the story, right?
7    A.    No, I didn't memorize it fully.  I
8    memorized bits and pieces of it, basically the gist
9    of it.  I didn't -- I couldn't verbately say exactly
10   what they said back to them.
11   Q.    And then at some point, you were
12   interviewed by an ASA, correct?
13   A.    Yes.
14   Q.    And that was in a different room?
15   A.    Yes.
16   Q.    And she asked you when you were in a room
17   with her how you'd been treated by the police,
18   correct?
19   A.    Yes.
20   Q.    And it was just you and her in the room
21   when she asked you that?
22   A.    No.  It was me, her, and Michael
23   Pietryla.
24   Q.    Okay.  So if that prosecutor who's a
25   lawyer says it was just you and her --

Page 447

1    A.    Then she's lying.
2    Q.    She's lying?
3    A.    Yes.
4    Q.    Okay.  So you never had a conversation
5    with her just when it was just you and her?
6    A.    No.  It was always me, her, and Michael
7    Pietryla.
8    Q.    So you -- did she interview you first?
9    A.    She came in with somebody, another -- a
10   gentleman and Michael Pietryla, and she told me who
11   she was and what they was doing and what they wanted
12   me to do and the options of I can do the written
13   paper or the video, but they'd prefer --
14   Q.    Well, before she gave you the options,
15   though, she interviewed you, right?
16   A.    No.  They -- I'm telling you what
17   happened.  She came in and told me what was going on
18   and who she was and what was happening and then she
19   told me that she came to take my statement, and I
20   got the options to do a written or I got the option
21   to do a video.  They preferred me to do a video and
22   they want me to do a video.  So she suggest that I
23   do a video.  And I'm like, okay, I guess I got to do
24   a video.  And then the guy, I guess, went to set up
25   the camera stuff, and she -- her and Michael

Page 448

1    Pietryla sat down and we started talking.
2    Q.    Were you still wearing the same white
3    T-shirt that you had been wearing at the area when
4    you met with this prosecutor?
5    A.    I -- I think I had -- I don't know -- for
6    some reason, I think I had got a longer white shirt
7    for something -- somewhere they gave me and put on
8    me.
9    Q.    So you were wearing a different white
10   shirt when you met with the female prosecutor?
11   A.    I think so for some reason.  I don't know
12   why, but I think -- because my -- they had already
13   took my sweater and my jersey.  And now I got a
14   little cold, and I think when I was saying I was
15   cold, they brought me a bigger white shirt because
16   it was bigger than my shirt.  It didn't even look
17   like --
18   Q.    The white shirt that you were wearing
19   when you came to the area, did you ever see a boot
20   print on it?
21   A.    Yes.
22   Q.    When was that boot print put on your
23   shirt?
24   A.    When they -- the officer was coming back
25   and forth in the room interrogating me and the

Page 449

1    officer kicked me.
2    Q.    So you're saying that happened at the
3    area?
4    A.    Yes.
5    Q.    Isn't it true that happened when the
6    police apprehended you?
7    A.    No.  And that's what I was trying to
8    explain to you earlier.  When you saying I got
9    kicked and tumbled over, I'm trying to explain to
10   you I got tackled when they arrested me.  I got
11   kicked in the police station.
12   Q.    So who kicked you in the stomach at the
13   police station?
14   A.    The officer with the brown jacket.
15   Q.    So the black officer with the brown
16   jacket?
17   A.    Yes.
18   Q.    Did he do that before or after he hit you
19   with the stick?
20   A.    Before.  Before he got the stick.  Before
21   he went -- I think that's why he went and got the
22   stick because...
23   Q.    And did he hit you just the one -- did he
24   just -- did he kick you or hit you in the stomach?
25   A.    He kicked me in the stomach just like...

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 450..453
XAVIER L. WALKER, 04/12/2022

1    Q.    One time?
2    A.    No.  He kicked me more than once in the
3  stomach.
4    Q.    How many times did he kick you in the
5  stomach?
6    A.    Like two or three times, but different
7  times, like when I'm -- because like I -- once
8  again, I told you I'm on my knees like this, so...
9    Q.    Did you see a footprint on your white
10  shirt?
11    A.    Yes, I seen --
12    Q.    How many footprints were there on your
13  white shirt?
14    A.    It was a -- it was tread marks of him
15  kicking me with -- like two or -- two or three
16  times, and it was -- looked like a footprint, and
17  you could see his tread marks from his shoe on my
18  footprint -- of the footprint on my stomach and then
19  you could see like how it had been did again, like
20  it was done multiple times.
21    Q.    So two or three tread marks?
22    A.    Two that you can see.
23    Q.    Two?
24    A.    The third, I don't know why.  It just
25  looked like two.

1    Q.    Did you tell -- did you show those
2  footprints to the female prosecutor?
3    A.    No, I didn't --
4    Q.    Why didn't you show those to her?
5    A.    Because she with them.
6    Q.    Because she was what?
7    A.    She's with them.  She's the State.  She
8  was with them.
9    Q.    Well, she told you that she was a
10  prosecutor for the State, right?
11    A.    That's with the State.  That's with the
12  police.  That's with them.
13    Q.    She advised you of your Miranda rights,
14  right?
15    A.    That's the first time I ever heard my
16  Miranda rights in that whole time frame is when she
17  did it.
18    Q.    Okay.  And she told you that you had a
19  right to remain silent, but you agreed to talk to
20  her, right?
21    A.    Yes, because I was instructed and told to
22  by the police.
23    Q.    And then she asked you questions?
24    A.    Yeah.
25    Q.    And she asked you what happened on

1  May 13th, right?
2    A.    Yes.
3    Q.    And it's your testimony as you sit here
4  today that what you were telling her, the female
5  prosecutor, is what the police had fed to you?
6    A.    Yes.
7    Q.    Did you ever go off script?
8    A.    No.
9    Q.    Did you ever tell her anything that
10  actually -- that was the truth about what occurred
11  on May 13th?
12    A.    No.
13    Q.    So everything you told her was what the
14  police had told you?
15    A.    Yes.
16    Q.    Wasn't it true that you told her about
17  the people that you had seen on May 13th, 2000,
18  before you went to the club?
19    A.    May 13th.  I was at the club.
20    Q.    Right.  But you told --
21    A.    So I told her about everything that was
22  that, yeah.
23    Q.    And that was the truth, right?
24    A.    Yeah.
25    Q.    So you did tell her some things that were

1  truthful?
2    A.    About the club stuff.
3    Q.    Okay.  You told her that before you went
4  to the club, that you went to Boo Boo's house, and
5  outside Boo Boo's house, you saw Jovanie Long,
6  Boo Boo, Boss Hog, Shavanna --
7    A.    Yeah.
8    Q.    -- Ashanti Wright.  And that -- that
9  occurred, right?
10    A.    Yeah.
11    Q.    The police didn't feed you that
12  information, did they?
13    A.    Yes.  They told me that too, but I told
14  her basically everything how they fixed it.  They
15  fixed up the story how they wanted it so it'll sound
16  good and reasonable for the state's attorney.  So
17  they had to put some of the things that was real or
18  truthful in there for it to sound real and truthful
19  to the state's attorney.
20    Q.    So the police fed you truthful
21  information.  That's your testimony?
22    A.    They -- they fed me a story that would
23  be -- sound convincing and believable to a state's
24  attorney and to whoever else would believe it --
25    Q.    What other --

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 454..457
XAVIER L. WALKER, 04/12/2022

Page 454

1    A.    -- that's what I'm thinking.
2    Q.    -- truthful information did the police
3  feed to you?
4    A.    I don't know.
5    Q.    You didn't tell ASA Leafblad that you had
6  been kicked in the stomach by the police at the
7  area, did you?
8    A.    No.  She's with them.  Why would I tell
9  her that?
10   Q.    And you didn't tell her that your
11 wrist -- there were injuries to your wrist from the
12 handcuffs, right?
13   A.    No.  I'm not -- that's like going to tell
14 your boss, you know, or your partner that you just
15 did something wrong.  And they going to ride with
16 you.  They not going to ride with me.  They don't
17 know me.
18   Q.    You told ASA Leafblad that you were an
19 Imperial Insane Vice Lord, right?
20   A.    Yes.
21   Q.    And that was the truth, right?
22   A.    Yes.
23   Q.    And you told her that other people would
24 come in your neighborhood, and they were travelers
25 and foes and BDs and GDs and one -- one way boys

Page 455

1  from out of K town, right?
2    A.    Yes.
3    Q.    And that was the truth?
4    A.    Yes.
5    Q.    You also told ASA Leafblad that one of
6  your friends just got out of jail and they were
7  going to the club to celebrate, right?
8    A.    Yes.
9    Q.    That was a truth, right?
10   A.    Yes.
11   Q.    The police didn't feed you that
12 information, did they?
13   A.    No.  They just fixed it up around a story
14 that they knew was actually the truth and then put
15 lies with it.
16   Q.    You told ASA Leafblad that your sister
17 let you use her green Ford Taurus on May 13th, 2000,
18 right?
19   A.    Yes.  Because it was a part of the story
20 that they put together.  They took my truths and
21 what I was telling them and made their story of what
22 they wanted me to say, so --
23   Q.    Well, that was --
24   A.    -- it could be believable.
25   Q.    -- the truth, right?

Page 456

1    A.    Some -- yeah, some of it.
2    Q.    So the police didn't feed you that you
3  had driven your sister's green Ford Taurus on
4  May 13th?
5    A.    I didn't say they fed me that.
6    Q.    Okay.
7    A.    I said --
8    Q.    And they told you --
9    A.    -- they --
10   Q.    You told ASA Leafblad that after you left
11 your house in your sister's car that you first went
12 to a restaurant and then you went around to Cicero.
13 That's what you told her, right?
14   A.    Yeah.
15   Q.    And that's what occurred, right?  That's
16 what you testified to today at your deposition?
17   A.    Yeah.
18   Q.    Police didn't feed you that either, did
19 they?
20   A.    Yes.  They refed me the stuff that I told
21 them that was facts that they seen was true and put
22 it to they story.  They mixed my story with they
23 story and then told me, this is how they want me to
24 say it.
25   Q.    You told ASA Leafblad that when you were

Page 457

1  at -- outside Boo Boo's house before you went to the
2  club, that Jovanie flagged you down and you got in
3  the car and then you went to the club?
4    A.    Possibly.  I can't recall exactly how I
5  told her it happened but...
6    Q.    The police didn't feed you that
7  information, did they?
8    A.    Yes, they did, because Jovanie never got
9  in the car with me and he didn't flag me down.  I
10 went over there looking for them and seeing them and
11 got out and talked to them.  So why we have to flag
12 me down when I went over there looking for them?
13   Q.    Well, you told Greg Wilson that Jovanie
14 got in your car too, didn't you?
15   A.    I told Greg Wilson that this is the story
16 that the police told me and this is the story that
17 they told me to tell and I told Deborah Bedsole this
18 because that.  I was trying to get him to understand
19 the reason why I told Deborah Bedsole this stuff,
20 which is the same problem that I'm having with every
21 attorney basically that I have, because for some
22 reason, they all got the acting cool code of this is
23 how they work.  So they think that all of them work
24 the same and think that because she wrote it the way
25 that she wrote it, it has to be this way when it

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 458..461
XAVIER L. WALKER, 04/12/2022

Page 458

1  wasn't.  And I'm trying to explain this to her.
2       Q.     So all your attorneys got it wrong?
3       A.     No.  All of them sticking to they rules
4  and they code of how they would do it and how it's
5  supposed to be done.  So they thinking that it's
6  done the same way.
7       Q.     You told ASA Leafblad that you went to
8  the Wax Factory that night on May 13th, right?
9       A.     Yes.
10      Q.     That was true, right?
11      A.     Yeah.
12      Q.     You told her the Wax Factory was on Lake
13  and St. Louis, right?
14      A.     Yeah.
15      Q.     The police didn't feed you that either,
16  did they?
17      A.     I didn't say they fed me that, but
18  they --
19      Q.     You told ASA Leafblad that there was
20  cover charge to get into the club, correct?
21      A.     Yes.
22      Q.     And that's the truth?
23      A.     Yep.
24      Q.     No one fed you that, did they?
25      A.     Once again, the police vamp my story with

Page 459

1  they story, so I can tell her the story.
2       Q.     You told ASA Leafblad that you were in
3  the club for about 20 to 30 minutes before it was
4  almost closing time, right?
5       A.     I can't recall.
6       Q.     Okay.  No one fed that to you, did they?
7       A.     Yes.  The police revamped my story and
8  fed it to me so I could feed it to her.
9       Q.     You told ASA Leafblad that you needed
10  your sweater so you could go to your grandmother's
11  funeral.  Did anybody feed that to you?
12      A.     That's a lie.  I didn't wear no sweaters
13  to -- I don't wear sweaters to funerals.  I wear
14  suits.
15      Q.     Well, did that come from -- did that fact
16  come from you, or did it come from the police?
17      A.     I don't have no -- I don't recall where
18  it come from, but I know that's not something that I
19  do or something I wear.  I wore a suit to both
20  funerals.  And I'm pretty sure there's pictures and
21  stuff with me with the suits in both funerals.  I
22  went to -- my grandma funeral was one week, and my
23  cousin funeral was one week.  And I went to both
24  funerals, and I wore suits to both funerals.
25      Q.     You told ASA Leafblad that you tried to

Page 460

1  trick Ashanti Wright to go and wipe fingerprints off
2  the van after the club, right?
3       A.     Yes, because that's what the police told
4  me to say.
5       Q.     The police fed you that?
6       A.     Yes.
7       Q.     You told ASA Leafblad that after the
8  club, you and Jovanie Long went to Boo Boo's house,
9  right?
10      A.     Yes.
11      Q.     Was that fed to you by the police?
12      A.     Yes.
13      Q.     You told ASA Leafblad that you went to
14  Bubble's house and that's where you saw Boo Boo
15  sleeping in the car, correct?
16      A.     Yes.
17      Q.     Was that fed to you by the police?
18      A.     Yes.
19      Q.     You told ASA Leafblad that you and Vani
20  talked to Boo Boo, correct?
21      A.     Yes.
22      Q.     That was the truth, right?
23      A.     No.
24      Q.     Was that fed to you?
25      A.     Yes.

Page 461

1       Q.     You told ASA Leafblad that when Vani
2  tried to go in Bubble's house, you told Boo Boo that
3  he and all the others were bogus for leaving Vani
4  over there without knowing that -- can't nobody
5  control him when he's drunk and stuff and high with
6  a gun?
7       A.     All lies that the police fed me.
8       Q.     The police fed you that?
9       A.     Yes.
10      Q.     The police fed you that Vani can't be
11  controlled when he's drunk?
12      A.     Yes.  They -- like I told you, it sound
13  like a TV strip in a movie.  That's why I wanted
14  you-all to Google that area so you-all can see
15  wasn't no houses over there.  So it's a lie.  They
16  don't know the neighborhood -- well, they know the
17  locations, but they don't know the diverse of the
18  blocks.  So they can say I went to somebody house on
19  Division and Central and think that's accurate
20  because they know that them streets exist, but don't
21  know that ain't no houses on that block, so...
22      Q.     You told ASA Leafblad that Vani came back
23  from Bubble's house and that Vani got talking to
24  Boo Boo and was telling Boo Boo about it, the
25  murder, right?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 462..465
XAVIER L. WALKER, 04/12/2022

Page 462

1   A.   Yes.
2   Q.   Was that fed to you?
3   A.   Yes.
4   Q.   Who fed that to you?
5   A.   The police officer.
6   Q.   And that was the black officer with the
7 brown coat?
8   A.   I really don't know which one put the
9 story together, but it was told to me by him and the
10 other officers, yes.
11   Q.   You told ASA Leafblad that Jovanie stayed
12 over at your house the following week, correct?
13   A.   The following week?  I don't know.  I --
14   Q.   Okay.
15   A.   -- can't recall.
16   Q.   Was that truthful?
17   A.   I can't recall.
18   Q.   Was that fed to you?
19   A.   I can't recall because I don't actually
20 remember.
21   Q.   Have you seen your videorecorded
22 statement at any point in time?
23   A.   I told you last time I seen it was like
24 Friday.  Before then I hadn't seen it in a while.
25   Q.   Okay.  When you saw your recorded

Page 463

1 statement, there wasn't any marks on your white
2 shirt, was there?
3   A.   No.  That's why I said I think they had
4 me with a shirt when I started saying it was cold,
5 so that mean that they put -- gave me.  I don't --
6 because --
7   Q.   So they gave you a long-sleeved white
8 shirt to wear during the court-reported statement
9 that was videotaped?
10   A.   It looked like it or a big shirt because
11 it don't even look like -- this shirt don't look as
12 big as this shirt when I'm on there sitting down.  I
13 want to see it because this don't -- this look like
14 a regular shirt.
15   Q.   So it's your testimony --
16   A.   And that shirt be big.
17   Q.   -- that when you were giving the
18 videorecorded statement, that you were wearing a
19 white long sleeve white shirt over the other shirt?
20   A.   I can't recall if it was long sleeve, but
21 I know it was bigger than my shirt because it was
22 real big and floppy on me on the -- on the thing
23 when I was just looking at it.  I'm like, this shirt
24 look too big.  It don't even look like my shirt.
25   Q.   Isn't it true that the shirt that you're

Page 464

1 wearing during your videorecorded court-reported
2 statement is the same shirt that you were wearing
3 the entire time when you were at Area 4?
4   A.   No, because I just told you I started off
5 with my sweater and then I had my jersey, and they
6 took that, so...
7   Q.   Who was the first person that you told
8 that the police struck you with a stick?
9   A.   The other fellow officer.
10   Q.   And other than the fellow officer, who
11 was the next person that you told?
12   A.   I can't recall.  I don't know if I told
13 Gregory or Deborah Bedsole, but I don't think I told
14 Deborah Bedsole because I still thought she was the
15 police.  So I think I probably told Gregory Wilson.
16   Q.   And Greg Wilson would share discovery
17 with you, right?
18   A.   Yes.  He went over it.  He didn't like
19 give it to me, let me see it or nothing.  He read
20 off stuff and go over it, yes.
21   Q.   He would discuss strategy with you?
22   A.   He would discuss logistics with me,
23 because the stuff that he discussed that was
24 supposed to have been strategy, he didn't do none of
25 it.  So it wasn't really strategy.  But these things

Page 465

1 that he was supposed to do or promising to do or
2 going to do, yeah, he discussed that.
3   Q.   Did you tell him about where you were and
4 who you were with on May 13th, 2000?
5   A.   Yes.
6   Q.   And did you tell Gregory Wilson about
7 what had happened at Area 4?
8   A.   Yes.
9   Q.   And did you tell Greg Wilson that you had
10 been -- that an officer had struck you twice with a
11 stick?
12   A.   Yes.
13   Q.   Did you tell Greg Wilson that you had
14 been kicked in the stomach on --
15   A.   Yes.
16   Q.   -- two times?
17   A.   Yes.
18   Q.   Greg Wilson filed a motion to suppress on
19 your behalf, right?
20   A.   Yes.
21   Q.   And he shared that with you before he
22 filed it?
23   A.   No.
24   Q.   He didn't -- he didn't show it to you?
25   A.   No.

XAVIER WALKER vs CITY OF CHICAGO, et al.          Pages 466..469
XAVIER L. WALKER, 04/12/2022

Page 466

1   Q.   Did he tell you that he was filing a
2   motion to suppress?
3   A.   Yes.
4   Q.   Did he give you a copy of the motion to
5   suppress?
6   A.   No.
7   Q.   There's nothing in your motion to
8   suppress about being struck with a stick, is there?
9   A.   Gregory Wilson did what he wanted to do.
10  And then he told me to do it the way that he wanted
11  me to do it and only ask questions that was asked to
12  me, and by them not asking me none of them
13  questions, them questions never came up.
14  Q.   So there's no allegation in the motion to
15  suppress that was filed by your attorney, Greg
16  Wilson, that you were hit with a stick?  That's just
17  something --
18  A.   I -- I --
19  Q.   -- that you made up?
20  A.   I have no idea.  No, it's not.
21  Q.   The first time that you told anybody
22  about being hit with a stick was years after you had
23  been found guilty?
24  A.   The first time that I told anybody about
25  it was when I finally found out that there was a

Page 467

1   place that I can write a complaint to the -- about
2   the police because there's somebody that's actually
3   trying to stand up for us and do something about it.
4   So I wrote and told them about it because it was the
5   truth and facts and I wanted to get my story out
6   there, the truth out there, so it can be heard and
7   told.
8   Q.   And that was years after you had been
9   convicted and sentenced for this murder?
10  A.   Yes, it was, because that's when I
11  finally woke up and started working on my case and
12  found out that there was people out there that was
13  actually trying to help me, that might believe in me
14  and might give me a chance to prove my innocence.
15  Q.   Your attorney, Greg Wilson, he met with
16  you at Cook County Jail, right?
17  A.   Yes.
18  Q.   Met with you numerous times?
19  A.   Yes.
20  Q.   And when it was you and Greg Wilson
21  meeting, there was nobody else there, right?  The
22  police weren't there?
23  A.   No.  Police was always around.
24  Q.   But you were able to speak to Greg Wilson
25  in private and maintain attorney-client privilege,

Page 468

1   right?
2   A.   No, not really.  The way that you set up
3   in the County, it was like a room like this or a
4   little bigger, looked like a law library or a
5   classroom, and the police over there at the desk and
6   then you go to the table with your officer -- in
7   Division 9 where I was at, you go to the table with
8   your attorney and then there might be other
9   attorneys and their clients and public defenders and
10  their clients in there as well, and you and your
11  attorney, even though, another people's personal
12  attorneys at the next table, you-all at you-all
13  table talking about you-all situation and the
14  officer still sitting right up there watching and
15  hearing everything that you-all do.
16  Q.   But when you told your attorney about
17  what happened on May 13th, 2000, you were truthful
18  when you told him what had happened, right?
19  A.   Yes.
20  Q.   And you told him everything that you
21  remembered about what occurred on May 13th, 2000?
22  A.   I told him everything that happened, but
23  that don't mean that he documented everything that I
24  told him.
25  Q.   Okay.  But you were truthful when you

Page 469

1   were talking to him?
2   A.   Yes, for the most part, the things I can
3   remember correctly, yes.
4   Q.   When you met with ASA Mark Rotert in
5   April 2018, he told you that he was there to
6   investigate your claim, right?
7   A.   Yes.
8   Q.   And he told you to be honest and
9   truthful?
10  A.   Yes.
11  Q.   And he told you to be straightforward,
12  right?
13  A.   Yes.
14  Q.   Were you honest and truthful during that
15  interview?
16  A.   To the best of my knowledge and my
17  recollection of what I can remember, yes.
18  Q.   Okay.  Was there anything that you said
19  to Mark Rotert during that interview that you now
20  know was not true?
21  A.   I don't even know everything that I told
22  him because I didn't see the -- the tape and I don't
23  have transcripts of what was told.  So I don't know
24  to be able to tell you that hundred percent accurate
25  because I don't know.  So I can't recall.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 470..473
XAVIER L. WALKER, 04/12/2022

1    Q.    Okay.  But I know you haven't seen it.
2  But you were there at the interview, right?
3    A.    Yes.  But that was a couple of years ago
4  and I done forgot most of that.
5    Q.    But based on what you remember about that
6  interview, do you -- is there anything that you told
7  him now that you know was not truthful?
8    A.    I -- I don't know.
9    Q.    You told him that you were successful at
10 selling drugs, right?
11   A.    In my eyes I was.
12   Q.    And you told him that you -- the Vice
13 Lords were the ones that gave you the heroin that
14 you were selling, right?
15   A.    No.
16   Q.    You didn't tell him that?
17   A.    No.
18   Q.    You told ASA Mark --
19 MS. SAMUELS:  For the record, I still have my
20 standing objection to questions about gang
21 affiliation.
22 BY MS. ITCHHAPORIA:
23   Q.    You told Mark Rotert that you would share
24 some of the money that you got from the sale of the
25 drugs with the Vice Lords, correct?

1    A.    No.
2    Q.    You told ASA Mark Rotert during that
3  interview that you -- that Jovanie Long also sold
4  drugs, right?
5    A.    Yes.  I just told you that he sold drugs.
6    Q.    You told ASA Rotert that you do recall a
7  time when your sister Sheleah told you that someone
8  was on the phone for you, right?
9    A.    Yes.
10   Q.    You told ASA Rotert that you left at
11 about 1:00 a.m. to go to Papa Charlie's, right?
12   A.    I don't recall what time, but I know it
13 was after 12:00 something.  Like I told you, I know
14 it was after midnight, which is what I've been
15 saying from day one.
16   Q.    You told ASA Rotert that you went to the
17 club with Jovanie Long --
18   A.    No.
19   Q.    -- true?
20   A.    I told him that Jovanie Long was at the
21 club.  I seen him at the club, not that like we
22 physically went together.  But we all went to the
23 club.  If you and your friends -- you and her say
24 you-all going to the club together and now you-all
25 meet up at the club, you-all went to the club.

1  That's -- don't mean that you-all got in the same
2  car or you got on the same bus or you-all walked
3  there together.  That mean that you-all was at the
4  club together.  Am I right or...
5    Q.    You told ASA Rotert that you gave Jovanie
6  Long a ride to the Wax Factory?
7    A.    No, I did not tell him that I gave him a
8  ride.  I told him that we all went to the club, that
9  we went to the club to celebrate Charles getting out
10 and getting off house arrest.
11   Q.    Okay.  You told ASA Rotert that the club
12 usually let out at 4:30 or 5:00 a.m. and that you
13 left right before the club closed, correct?
14   A.    Yes, that's the time --
15   Q.    Was that the truth?
16   A.    Yes.
17   Q.    You told ASA Rotert that you left the
18 club with Jovanie Long, Deon Baylock, and Simeon
19 Dorsey, didn't you?
20   A.    No.  I told him we all left the club, and
21 the people that was in the car with me was Simeon
22 and Deon.
23   Q.    You sold ASA Rotert during that interview
24 in 2018 that you left the club with Jovanie Long,
25 Deon Baylock, and Simeon Dorsey and that Jovanie

1  Long was in your car?
2    A.    I don't recall that.
3    Q.    So you may have said that?
4    A.    I don't recall that.
5    Q.    You told ASA Rotert that after you left
6  the club, you dropped Jovanie on the block on Erie?
7    A.    I don't recall that.
8    Q.    So it's possible that you may have said
9  that?
10   A.    I don't recall.
11   Q.    Okay.  Well, today you said that you
12 didn't drop Jovanie Long off, right?
13   A.    I didn't.  You just said, did I tell him
14 that?  And I'm telling you I don't recall.  But if
15 you asked me, did I drop Jovanie off?  No, I did
16 not.  I went home.  But did I -- if I told him, I
17 don't recall that.
18   Q.    Why would -- if you told ASA Rotert that
19 you did drop Jovanie off at the club, then you were
20 lying during that interview, weren't you?
21   A.    No.  I said I don't recall that.  So I
22 don't know if I said that or not.  And if I did say
23 it, then I don't know.  I might have been mixed up
24 or confused of his questions.  So I don't know.  But
25 I didn't say that -- to him that I drove Jovanie.  I

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 474..477
XAVIER L. WALKER, 04/12/2022

Page 474

1  don't recall that.  But I know to -- that for facts
2  that I did not drive him because he was not in the
3  car with me.  He was in the car with Ra Ra
4  somewhere.  They was doing them.
5      Q.     Sir, accept my represent- -- I'm going to
6  represent to you that the interview -- during your
7  interview with ASA Mark Rotert in April 2018, you
8  told him that you dropped Jovanie off after the
9  club.  Okay?
10     A.     I don't recall it.
11     Q.     If you -- if my representation is
12 correct, which it is, then you were lying to
13 Mr. Rotert during that interview, weren't you?
14     MS. SAMUELS:  Objection, asked and answered,
15 argumentative.
16     THE WITNESS:  Either he mixed it up or I
17 probably mixed it up.  I don't know.  But I don't
18 recall that.
19 BY MS. ITCHHAPORIA:
20     Q.     What else did you lie to Mr. Rotert
21 about?
22     A.     I --
23     MS. SAMUELS:  Objection, argumentative.
24     THE WITNESS:  -- didn't lie to Mr. Rotert
25 about nothing.

Page 475

1      MS. ITCHHAPORIA:  All right.  Can we take a
2  quick break, please?
3      THE VIDEOGRAPHER:  We are off the record at
4  6:40 p.m.
5          (Whereupon, a break was taken,
6           after which the following
7           proceedings were had:)
8      THE VIDEOGRAPHER:  We are back on the record
9  at 6:50 p.m.
10 BY MS. ITCHHAPORIA:
11     Q.     Okay.  After May 30th, 2000, the next
12 time you saw Deborah Bedsole was when she was in
13 court and she testified?
14     A.     Yes.
15     Q.     Did you ever see her again after that?
16     A.     No.
17     Q.     Did she ever visit you when you were in
18 IDOC?
19     A.     No.
20     Q.     Did you ever talk to her on the phone
21 when you were in IDOC?
22     A.     No.
23     Q.     Did you ever write her any letters?
24     A.     Yes.
25     Q.     How many letters did you write her?

Page 476

1      A.     I have no idea, but I wrote her several
2  times trying to see if she was going to be willing
3  to come to court for me and she's going to still
4  help me pursue chasing my freedom and my -- proving
5  my innocence.
6      Q.     Did Greg Wilson ever tell you why he
7  didn't call any alibi witnesses at your trial?
8      A.     No.
9      Q.     Didn't he tell you that at the time of
10 your trial, that he couldn't find your alibi
11 witnesses?
12     A.     No.
13     Q.     You filed a pro se post-conviction in
14 July 30th, 2007, right?
15     A.     You say July 30th?
16     Q.     Yeah.
17     A.     I guess probably that's when they got it.
18 I actually had sent it in and filed it June 27th,
19 2007, but --
20     Q.     Okay.
21     A.     -- I don't know when they filed it and
22 when they did whatever they did.
23     Q.     And you claimed in the petition that your
24 appellate attorney was ineffective, right?
25     A.     Yes.

Page 477

1      Q.     And you also claimed that your trial
2  attorney, Gregory Wilson, was also ineffective,
3  right?
4      A.     Yes.
5      Q.     You never said anything in that
6  post-conviction petition about being physically
7  abused by the police, did you?
8      A.     Yes.
9      Q.     You did?
10     A.     Yes.
11     Q.     What did you say in the post-conviction
12 petition about being abused by the police?
13     A.     About me being hit, about me being
14 kicked, and all that.  I talked about all that in my
15 post-conviction.
16     Q.     In your pro se post-conviction.  That's
17 the one I'm talking about.
18     A.     Yes.
19     Q.     How many pages was your pro se
20 post-conviction petition?
21     A.     I don't have no idea, but I can get a --
22 get it.  I got it -- still got a copy somewhere.  I
23 can find it.  And yes, I did talk about it.
24     Q.     You attached affidavits from certain
25 witnesses to your pro se post-conviction petition,

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 478..481
XAVIER L. WALKER, 04/12/2022

Page 478

```
 1  right?
 2      A.   Yes.
 3      Q.   And did you ask those witnesses to
 4  provide those affidavits to you?
 5      A.   Yes.
 6      Q.   So you got an affidavit from Marvin
 7  Mosley, Shunralyn Walker, Simeon Dorsey, and Deon
 8  Bolock [sic], and Jovanie Long?
 9      A.   Yes.
10      Q.   But the -- the affidavit for Deon Bolock
11  was not signed, right?
12      A.   I -- I don't know if he had -- what
13  happened to him.  I don't know if he had went to
14  jail or had died or I don't know why I haven't.
15      Q.   Who's --
16      A.   Something happened with him.
17      Q.   Who's Deon Bolock?
18      A.   That was my little friend, the one we
19  talking about, the one that was younger, Deon.
20      Q.   Deon Baylock?
21      A.   Baylock, yeah.  They probably
22  mispronouncing it or miswrote it or something.  But
23  it's Deon Baylock.
24      Q.   And you also asked Jovanie Long to give
25  you an affidavit, right?
```

Page 479

```
 1      A.   Yes.
 2      Q.   How -- in 2007 how did you communicate
 3  with Jovanie Long about asking him for an affidavit?
 4  Did you write him a letter?
 5      A.   No.  The person that he was using as an
 6  attorney contacted me and asked me to write one for
 7  him and I told him I'm going to need him to write
 8  one for me as well because I'm pursuing my
 9  post-conviction and my freedom too.
10      Q.   Okay.  I'm going to show you what I'll
11  mark for the record as Exhibit 5, which is
12  Bates-marked Plaintiff 135 through 136.
13           (Whereupon, Deposition
14            Exhibit No. 5 was marked.)
15  BY MS. ITCHHAPORIA:
16      Q.   Do you recognize Exhibit 5 to be in your
17  handwriting?
18      A.   Yes.
19      Q.   And is that your signature on the second
20  page of this exhibit?
21      A.   Yes.
22      Q.   And so you filed a complaint with the
23  TIRC commission on July 12th, 2011; is that right?
24      A.   Yes.
25      Q.   And in this TIRC -- in this complaint to
```

Page 480

```
 1  the TIRC commission, that's when you complained for
 2  the first time that you had been hit with a black
 3  stick; isn't that true?
 4      A.   No.
 5      Q.   In this -- did anybody help you prepare
 6  this, or did you prepare this on your own?
 7      A.   I prepared it on my own.
 8      Q.   And how did you find out that you could
 9  file a claim with the TIRC?
10      A.   Because I had started going to law
11  library and talking to people that worked in the law
12  library and talking to jailhouse lawyers and stuff
13  in there, and I learned it from one of them.  I
14  don't know which one.  But before these people, they
15  had me writing OPS and all -- and IPRA or whatever
16  that one was, the things that was -- that type of
17  stuff before this.
18      Q.   Before that, you wrote to IPRA?
19      A.   To IPRA and to OPS.  But I guess one of
20  them was changed to another one and then they said
21  that they didn't get my letter or they lost my
22  letter, and then IPRA was like they was doing an
23  investigation on it.  They was going to get back in
24  touch with me.  And then I found these -- about
25  these people, and I wrote these people as well.
```

Page 481

```
 1      Q.   Okay.  And were you truthful when you
 2  wrote this complaint to TIRC?
 3      A.   Yes.
 4      Q.   Okay.  In this -- on -- on 4C on the
 5  first page, it says, Name of the persons committing
 6  alleged torture.  Do you see that?
 7      A.   Yes.
 8      Q.   You didn't include Sergeant Holy's name
 9  in this, did you?
10      A.   I didn't know his name at the time.  I
11  knew it was Sarge.  And I kept telling him Sarge
12  and I've been saying Sarge --
13      Q.   You didn't put sergeant on here, did you?
14      A.   Not in this because I didn't have his
15  name.  I didn't want to put inaccurate -- so I knew
16  the Sarge, and I had to track down and find and do
17  my investigation and find out the serg- -- the name
18  of the sergeant that was in there.
19      Q.   So -- but 2011, you had police -- access
20  to police reports and transcripts.  It's your
21  testimony that you didn't know the name of the
22  sergeant?
23      A.   Yes.  And -- and until like 2008, 2009, I
24  told you I was still young and stupid and I wasn't
25  even really doing nothing on my case.  I felt I had
```

AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 482..485
XAVIER L. WALKER, 04/12/2022

Page 482

1   a lawyer and the lawyer was doing stuff.
2        Q.    But you wrote this in 2011?
3        A.    Yes.  That's what...
4        Q.    And you had police reports with you when
5   you wrote this?
6        A.    Yes, I had my police reports and stuff,
7   but I didn't know, like I said, what serg- -- on my
8   police reports, it's more than just these officers'
9   names.  It's like probably seven, eight to nine or
10  ten officers' names on my actual police reports, and
11  it's multiple sergeants on my police report.
12       Q.    What --
13       A.    So --
14       Q.    What torture did Detective Cruz commit
15  against you?
16       A.    I -- I think that's the one with the crew
17  cut.  I'm not for sure if that's him or not.  I was
18  hoping that his face popped on there like Pietryla,
19  but it never did.
20       Q.    Okay.
21       A.    But I was hoping to see.
22       Q.    What torture did Detective Wolverton use
23  or do?
24       A.    Them the other two that -- the two that I
25  told you was -- I guess they was partners or

Page 483

1   whatever and they had come in when it was -- I told
2   you it was -- it was the four.  They switched up.
3   It was the black -- two black people first and then
4   one of the black persons left, the one with the
5   black coat.  Then the other -- the crew cut guy came
6   in.  And then a little bit later, after them coming
7   in, back and forth, his partner came in.  And I told
8   you when it was the partner and the other black guy
9   and then the sergeant came in close to the end
10  because I guess he was pissed off and tired and said
11  I'm lying to his officers and I'm playing games with
12  his officers and he was fed up about it, all because
13  I kept telling the truth saying I didn't have
14  nothing to do with this stuff.
15       Q.    You had no interaction with Officers
16  Bartik and Officer Riordan, correct?
17       A.    I don't know who this is.
18       Q.    Okay.  And you had no interaction with
19  them at Area 4 on May 30th, 2000, or any time when
20  you were at Area 4; isn't that true?
21       A.    I don't know because I -- I would have to
22  see them.  I don't know all them officers' names.  I
23  didn't even know these officers' names until I start
24  getting the police reports and stuff like that and
25  reading it.  I didn't -- they didn't come and say,

Page 484

1   Hey, my name is this and I'm finna beat you up.  No,
2   man.
3        Q.    Are you aware that you're suing Officers
4   Bartik and Riordan in this case?
5        A.    If -- if I'm suing them, then that mean
6   they played some type of part in my -- in the role
7   of doing stuff to me.
8        Q.    Okay.  So what did Officer Riordan do in
9   the role of doing something to you?
10       A.    He could have been one of the officers
11  that -- remember when I told you when they tackled
12  me on the ground and other police came and helped
13  and was helping them rough me up to twist me and
14  stuff and bend me up and then one of them snatched
15  me up.  Them was officers that I never got names and
16  stuff that I don't know until I see them who they
17  are, so I don't know until I see them.
18       Q.    What did -- what are you saying Officer
19  Bartik did to you?
20       A.    I don't know until I see him.  I can't
21  tell -- like I -- I just said it.  I don't know.
22       Q.    Then -- so after you filed -- or you're
23  saying before you filed this claim with the TIRC,
24  you had already filed something with IPRA and OPS?
25       A.    Yes.  Yes.

Page 485

1        Q.    And OPS told you that they didn't get it?
2        A.    OPS said they lost it because they was
3   switching over and lost a lot of different stuff or
4   whatever and then I think they told me that they was
5   now becoming the IPRA or whatever and to write them
6   and then I wrote them.
7        Q.    Okay.
8        A.    I don't know if you-all ever seen and had
9   letters and stuff from them, but I had a letter that
10  I wrote -- not a letter that I wrote to them, but a
11  response from them telling me that they was doing an
12  investigation and claiming all that stuff that was
13  before this torture -- this here, before this.
14       Q.    I'm going to hand to you what I've
15  been -- marked as Exhibit 6 to your deposition,
16  which for the record, it's Bates-marked CCSAO 2262
17  through 2266.
18             (Whereupon, Deposition
19             Exhibit No. 6 was marked.)
20  BY MS. ITCHHAPORIA:
21       Q.    And if you look at the last page, do you
22  see that this is to IPRA?
23       A.    Yes.
24       Q.    The Independent Police Review Authority.
25  Do you see that?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 486..489
XAVIER L. WALKER, 04/12/2022

Page 486

1    A.   Yes.
2         Q.   Okay.  And if you look at the one, two --
3    third page, is that your signature?
4    A.   Yes.
5         Q.   Okay.  And you signed this complaint to
6    IPRA on September 8th, 2013; is that right?
7    A.   Yes.
8         Q.   Okay.  Is this the complaint that you
9    filed with OPS, or is this a different complaint?
10   A.   This is something I filed later when I
11   told you like -- I told you I guess they had
12   switched over and all that stuff and they lost my
13   stuff and then I had to redo it and all that and --
14        Q.   Uh-huh.
15   A.   -- I started trying to redo it, but I
16   initially had got at the IPRA people before this and
17   then I had to get back in touch with them and send
18   them this -- all this stuff because I don't know if
19   it's because they was switching over or how it
20   happened.  But they was like they -- they don't know
21   what happened to my stuff even though I had a
22   response from them earlier with a letter dated
23   earlier than this saying that they got my stuff and
24   they was going to do an investigation.  And then
25   years go by and I don't hear nothing.  So I'm like,

Page 487

1    oh, what the heck.  And I revisit it, and they was
2    like oh, well, we done changed over.  They done
3    changed over a few times and whatever, whatever.
4         Q.   Oh.  Going back to Exhibit 5, you never
5    claimed that Detective Pietryla used any force
6    against you, right?
7    A.   Pietryla, no.
8         Q.   He never hit you or touched you, right?
9    A.   No.  He just lied to me and tricked me
10   and finessed me.
11        Q.   And what we're looking at, Exhibit 6, the
12   complaint that you drafted to IPRA, which is dated
13   September 2013, you didn't complain in here about
14   anything that Detectives Cruz and Wolverton
15   supposedly did to you, do you?
16   A.   No.  I didn't go into all details.
17        Q.   Well, you did mention Officers Sanders,
18   Wright, and Pietryla, right?
19   A.   Yes.
20        Q.   But you didn't mention Cruz or Wolverton,
21   correct?
22   A.   I just mentioned the other officers that
23   kept in, come in, helping, assisting them.  I didn't
24   know their names specifically or who they was in the
25   vicinity.  So I had to put in general, the other

Page 488

1    officers that was coming in assisting them
2    basically, the other officers that was coming in
3    doing things to me.
4         Like I don't know all you-all names, so I
5    can't just say you-all individually, but I can say
6    it was one, two, three, four, five, six, seven, and
7    I know that they was doing this.  I was talking to
8    such and such, and, you know, I can't say her name,
9    her name.  I don't know their name.
10        Q.   And you waited until 2013 to file a
11   complaint with IPRA, correct?
12   A.   No.  I told you I had originally got at
13   them with OPS and then I originally got at them when
14   they first supposed to change to IPRA, and then
15   because they never responded and got back up with
16   me, I had to revisit and re get back up with them.
17        Q.   When did you file a compl- -- when was --
18   when did you file the complaint with OPS?
19   A.   I don't know.  But it was like, I guess,
20   within months of them supposed to have been going --
21   transferring over or starting the IPRA, whatever,
22   because it was -- when I first got to the County and
23   got to the jail and started trying to work on my
24   case and learned about that I can work on my case
25   and started having to do it, people told me OPS.

Page 489

1    That was the name of it at that time.  And it was
2    still in faction when they first told me.  So when I
3    started, when I wrote to it, they was like they in a
4    position of transferring and changing over whatever.
5         Q.   The statement that you wrote to OPS, was
6    that in your handwriting?
7    A.   Yes.
8         Q.   About how many pages was it?
9    A.   I can't recall.
10        Q.   And that was before this one, right --
11   A.   Yes.
12        Q.   -- the 2013?  Okay.
13        When you and Mr. -- when you were
14   represented by Mr. Wilson before your criminal
15   trial, you had a discussion with Mr. Wilson about
16   whether you should have a jury or a bench trial,
17   right?
18   A.   Yes.
19        Q.   And you decided on your own free will to
20   have a bench trial, right?
21   A.   No.
22        Q.   You and Mr. Wilson discussed whether or
23   not you should testify at your criminal trial,
24   correct?
25   A.   Yes.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 490..493
XAVIER L. WALKER, 04/12/2022

Page 490

1    Q.   And that was your decision to make,
2  whether or not you should take the stand at the
3  trial, right?
4    A.   No.
5    Q.   You chose not to testify at your criminal
6  trial, correct?
7    A.   No.
8    Q.   You did testify at the motion to
9  suppress, correct?
10   A.   Yes.
11   Q.   So are you saying that Greg Wilson told
12 you not to testify?
13   A.   Yes.  Greg Wilson basically --
14   Q.   Wait.  There's no question pending, sir.
15 When Mr. Wilson --
16   A.   Yeah, he told me --
17   Q.   -- didn't call any of your alibi
18 witnesses, did you ask him why he didn't call them?
19   A.   Yes.
20   Q.   What did he tell you?
21   A.   He told me he had a different strategy.
22   Q.   Have you since your release in 2019
23 sought any medical or mental health treatment?
24   A.   Yes.
25   Q.   When did you first seek medical and

Page 491

1  mental health treatment?
2    A.   I first started when I was incarcerated,
3  but since I've been out, I have been going to
4  therapy.
5    Q.   Who --
6    A.   I go to physical therapy, and I go to --
7  got a therapist.
8    Q.   Who's your therapist?
9    A.   Her name is Mrs. Zoe Shanks.
10   Q.   And how many therapy sessions have you
11 had with Ms. Zoe Shanks?
12   A.   I have no idea.
13   Q.   Are those therapy sessions in person?
14   A.   No.  Over Zoom and over the phone.  I
15 think she's based out in Seattle or something or
16 somewhere out that way.
17   Q.   And how -- when did you first start
18 seeing her?
19   A.   I don't recall.
20   Q.   And do you currently see her?
21   A.   Yes.
22   Q.   On Zoom?
23   A.   Yes.
24   Q.   And does anybody attend these sessions,
25 these therapy Zoom sessions with you?

Page 492

1    A.   Not anymore.  At one point in time, it
2  was her and her husband.  And her husband is a
3  pastor and a therapist, and she's a therapist and
4  something else.  And they was my wife therapist --
5  she was my wife therapist and then my wife always
6  telling me I need therapy because I got a lot of
7  issues, whatever.  She say things that's wrong with
8  me.  So then I start messing with her.  Then we
9  start trying to use -- work with both of them in
10 couples' therapy, and then we got past that.  And so
11 now we just continue seeing her for just therapy.
12   Q.   When you have these Zoom therapy sessions
13 with Zoe Shanks, does she take notes?
14   A.   I believe so.
15   Q.   Did you ever have to fill out any
16 documentation to -- when you started the therapy?
17   A.   My wife did.
18   Q.   Did she ever give -- did Zoe Shanks ever
19 give you any sort of like homework that includes you
20 writing your thoughts down or sharing your thoughts
21 in any written or verbal communications?
22   A.   No.
23   Q.   Have you ever done that, where she's
24 asked you to do any homework?
25   A.   Yes, but not as far as writing down my

Page 493

1  thoughts or none of that stuff.  She had me do
2  exercise as far as working with my wife with
3  marriage and exercises on how to calm myself from
4  being stressed or whatever, like homework type
5  stuff.
6    Q.   And are -- is it your testimony that
7  you're seeking therapy from Zoe Shanks because of
8  your arrest and prosecution and conviction for
9  the -- for Marek Majdak?
10   A.   That's a big part of it.  But just for
11 the getting better in general life and have a better
12 understanding, be able to talk to somebody about my
13 problems and issues and stress of life, period.  But
14 that's what it started from, and that's what my wife
15 was saying I got the issues from because she said
16 I -- I'm like I'm still in jail or something.  I
17 don't know.  I got a lot of bad habits that I
18 didn't -- it came up with from being locked up.
19   Q.   Zoe Shanks isn't a medical professional,
20 is she?
21   A.   No, but she's somebody to talk to and try
22 to get things out, though, but...
23   Q.   But she hasn't ever pre- -- she -- and
24 because she can't -- she hasn't prescribed you with
25 any medication, right?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 494..497
XAVIER L. WALKER, 04/12/2022

Page 494

1     A.    No.
2     Q.    And she hasn't diagnosed you with any
3   mental or medical health condition, right?
4     A.    No.  The --
5     Q.    Have you ever --
6     A.    -- county jail did that.
7     Q.    Have you ever --
8     MS. SAMUELS:  Let him finish his answer,
9   please.
10    MS. ITCHHAPORIA:  Sorry.
11  BY MS. ITCHHAPORIA:
12    Q.    Have you ever sought --
13    MS. SAMUELS:  No, you -- you cut him off.
14  BY MS. ITCHHAPORIA:
15    Q.    Oh, go ahead.
16    MS. SAMUELS:  Let him finish his answer.
17    THE WITNESS:  No, I was saying, no, she
18  didn't, but the county jail -- I mean, the
19  penitentiary, IDOC, mental health did that.  And
20  then from that, I told her what they had diagnosed
21  me with and what they said or whatever and stuff and
22  then she went off that and...
23  BY MS. ITCHHAPORIA:
24    Q.    But it's accurate to say that since your
25  release, you have not sought any mental health

Page 495

1   treatment from any medical professional?
2     A.    No.
3     Q.    And you've never been diagnosed as you
4   sit here today by any medical professional with any
5   mental health issues, correct?
6     A.    No.
7     Q.    And you're not taking any medication for
8   any mental health issues, correct?
9     A.    No.
10    Q.    You said you also got physical therapy;
11  is that right?
12    A.    Yes.
13    Q.    What did you get physical therapy for?
14    A.    I was in a car accident.
15    Q.    Okay.  That's -- so that's unrelated to
16  your interactions --
17    A.    Yeah.
18    Q.    -- with the police; is that correct?
19    A.    Yes.
20    MS. ITCHHAPORIA:  All right.  If we can go off
21  the record for a quick second.  Oh, wait.  Let's
22  just stay on the record.  I have a quick question.
23  BY MS. ITCHHAPORIA:
24    Q.    When you were released from Cook County
25  Jail on December 19th, 2019, you had two large

Page 496

1   plastic bags with you, right?
2     A.    I was released December the 12th, 2019,
3   but yes, I had two -- they was brown bags and then
4   large plastic bags around it, yes.
5     Q.    And those -- in those plastic bags, that
6   was -- you had documentation in there from your --
7   that you had collected over the years relating to
8   your criminal trial, right?
9     A.    Yes, I had all -- yeah.  That's some of
10  the stuff that was in there.
11    Q.    And you also had correspondence from
12  various people over the years in those bags?
13    A.    Yes.  That's some of the stuff that was
14  in there as well, yes.
15    Q.    And did you give those documentations
16  that were in those bags to your attorney?
17    A.    No.
18    Q.    Why not?
19    A.    I don't know.
20    Q.    Has your attorney ever asked for them?
21    A.    I think they already -- they had got all
22  the stuff that they needed, and I think if they
23  needed anything, then yes, I did, but I don't think
24  I gave anything.
25    Q.    Do you still have those documentations

Page 497

1   with you?
2     A.    Some of them.
3     Q.    Okay.  I'm going to ask that you --
4     A.    Not with me now here in today but...
5     Q.    Sure.  At your home?
6     A.    Yes, some of them.
7     Q.    I'm going to ask that -- I'll go through
8   your attorney -- that you don't destroy those and
9   that you produce them in this litigation.  Okay?
10    MS. ITCHHAPORIA:  And if we could just go off
11  the record.  I just need a few seconds to make sure
12  I cover what I needed to.
13    THE VIDEOGRAPHER:  We are off the record at
14  7:08 p.m.
15          (Whereupon, a break was taken,
16          after which the following
17          proceedings were had:)
18    THE VIDEOGRAPHER:  We are back on the record
19  at 7:11 p.m.
20    MS. ITCHHAPORIA:  Okay.  I don't have any
21  questions at this time for the witness.
22          EXAMINATION
23  BY MS. ADEEYO:
24    Q.    Okay.  Hello, Mr. Walker.  I'm Natalie
25  Adeeyo.  I mentioned that several hours ago.  I

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 498..501
XAVIER L. WALKER, 04/12/2022

Page 498

1 represent the City of Chicago.  I just have some
2 questions for you.
3       A.   Okay.
4       Q.   I'll be moving a little quickly.  I
5 apologize in advance.
6       A.   Okay.
7       Q.   But I'm also going to be playing some
8 audio.  Okay?
9       A.   Okay.
10      Q.   So first, while you were incarcerated,
11 had you ever spoken to anyone on the phone about
12 your criminal case?
13      A.   I don't recall.  I don't...
14      Q.   So is it possible that you did and you
15 just can't recall who you spoke with?
16      A.   It's possible.
17      Q.   Do you recall speaking to any witnesses
18 on the telephone about your criminal case while you
19 were incarcerated?
20      A.   I don't recall.
21      Q.   Do you recall while you were incarcerated
22 speaking on the telephone about obtaining affidavits
23 in support of your criminal case?
24      A.   I don't recall, but it's possible.
25      Q.   Do you recall specifically who you may

Page 499

1 have spoken to about affidavits?
2       A.   I probably told -- if -- if my attorneys
3 asked me before they get in touch with my sisters
4 and family members, I probably told them my
5 attorneys want you-all to sign affidavits, and if --
6 like close friends that stayed in the neighborhood
7 like Marv and them, I probably told them -- reached
8 out and told him, my attorney is going to call you
9 and ask you, you know, for an affidavit for what
10 happened, stuff like that.  But me going to details
11 or anything else like that, I didn't know enough to
12 be able to ask them that, so...
13      Q.   When you say you didn't go into details
14 because you didn't know enough, what details are you
15 referring to?
16      A.   Like what's going on or what -- what they
17 knew or what they was told the police or what they
18 told the attorneys and all that type stuff.  I
19 didn't know, so I didn't -- you know.
20      Q.   Okay.  So while you were incarcerated
21 when you spoke on the phone, did you ever speak with
22 anyone about the details of what happened May 12th
23 through the 13th of 2000?
24      A.   No.
25      Q.   Okay.  Did you ever speak to anyone on

Page 500

1 the phone while you were incarcerated about your
2 alibi or your -- your whereabouts that you claim are
3 truthful today on May 12th and May 13th of 2000?  Do
4 you recall that?
5       A.   Yes.  I recall like to different family
6 members and friends because they had said first
7 like, Man, we know you want that or whatever.  You
8 know such.  And I be like, Yeah, I know, but, you
9 know, it's -- they saying it, so we got to fight it,
10 whatever, type stuff, yeah.
11      Q.   Did you ever speak to those family
12 members and friends about your whereabouts to tell
13 them to write that down in an affidavit on your
14 behalf?
15      A.   No.
16      Q.   Okay.  First I'm going to play a call --
17 what exhibit did we leave off on?  Were we on 7?
18      A.   Not that I recall rather.  I don't know.
19      Q.   So I'm going to constructively mark this
20 call as Exhibit 7.  It's disc 2, call 64.  It was
21 produced and Bates-stamped City NK 1969 through
22 1999.  It's an August 4th, 2013, call at 5:02 p.m.
23 to the phone number (773) 337-6096.  That phone
24 number I've just read --
25      A.   I don't even know that number.

Page 501

1       Q.   -- do you recall that phone number?
2       A.   I don't recall that number, no.
3            (Whereupon, Deposition
4             Exhibit No. 7 was marked.)
5 BY MS. ADEEYO:
6       Q.   Okay.  So I'm going to play certain
7 portions of a call.  I'm not going to play the
8 entire thing.  So I'm going to pick up at 18
9 seconds.  Okay?
10      A.   Okay.
11      Q.   Let me know if it's not loud enough or if
12 I need to come closer.
13      A.   All right.
14           (Audio recording played.)
15 BY MS. ADEEYO:
16      Q.   Do you recognize the two voices on
17 that -- on that call?
18      A.   It sound like Jovanie and somebody.  I
19 don't know.  That don't even sound like me, though.
20      Q.   Here, I'll play...
21           (Audio recording played.)
22 BY MS. ADEEYO:
23      Q.   Now, Zay is your nickname, correct?
24      A.   Yeah, but...
25      Q.   And you just heard that says it's a

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 502..505
XAVIER L. WALKER, 04/12/2022

Page 502

1  prepaid phone call from Zay, right?
2      A.    Yeah.  That still sound like nobody.
3            (Audio recording played.)
4  BY MS. ADEEYO:
5      Q.    Now, back in 2013, you were an inmate at
6  Menard Correctional Center, correct?
7      A.    Yes.
8      Q.    To your knowledge, Jovanie Long was not
9  housed with you at Menard in 2013, correct?
10     A.    I don't know if he had left or not yet.
11 I don't know.  I can't recall.
12     Q.    So it's your testimony today you were
13 housed at the same time with Jovanie Long at Menard
14 Correctional Center?
15     A.    At different times, yes.
16     Q.    My question was at the same time.  Were
17 you housed together?
18     A.    That's what I'm saying.  We was housed
19 in -- in Menard at different years together.  Well,
20 he would be on one gallery and I'd be on one gallery
21 in the same building and all that stuff, but then he
22 left and went somewhere and then I left.  Then he
23 was back.  Then he left again.  But I don't know
24 what years it was, though.  But I don't know if he
25 was there in 2013.  I don't think so.  I think he

Page 503

1  probably was in Stateville.
2      Q.    Okay.  So I'm going to play the beginning
3  of that call again in which...
4            (Audio recording played.)
5  BY MS. ADEEYO:
6      Q.    Is that you saying Zay on the phone?
7      A.    That don't sound like me to me, but I
8  don't know.  It's possible.
9      Q.    To your knowledge, was someone else
10 claiming to go -- call themself Zay while you were
11 housed at Menard Correctional Center?
12     A.    I don't -- no, I don't think so, no.
13     Q.    I'm going to go back to 18 seconds here.
14            (Audio recording played.)
15     THE WITNESS:  Oh, yeah.  That's me.  Now I
16 hear my sister.  So I know that's me.
17 BY MS. ADEEYO:
18     Q.    So that's you and your sister, correct?
19     A.    Yes.
20     Q.    Okay.  Now I'm going to jump -- your
21 sister Shunralyn?  Is that who --
22     A.    Yes.
23     Q.    Okay.  I'm going to jump now to five
24 minutes and 48 seconds on the call.
25            (Audio recording played.)

Page 504

1  BY MS. ADEEYO:
2      Q.    Okay.  Do you recognize the two voices at
3  that point of the call?
4      A.    Yes.
5      Q.    Okay.  Who is speaking?
6      A.    Me and Marvin Mosley.
7      Q.    Okay.  Now I'm going to just play that
8  back again just so you can hear the statement that I
9  just played.
10           (Audio recording played.)
11 BY MS. ADEEYO:
12     Q.    My lawyer and them they just talked to
13 Simeon.  He said he's still going to do it.  Is that
14 what you --
15     A.    Yes.
16     Q.    -- just said?
17     A.    Yes.
18           (Audio recording played.)
19 BY MS. ADEEYO:
20     Q.    Marvin Mosley replied, That's a good
21 thing?
22     A.    Yes.
23           (Audio recording played.)
24     THE WITNESS:  No.  I said it's a good thing.
25 Marvin just said, That's decent.

Page 505

1  BY MS. ADEEYO:
2      Q.    Okay.  So you -- my apologies.  You just
3  said that's a good thing?
4      A.    Yeah.
5      Q.    Okay.  So let me back up a little just so
6  we can get the full statement that Marvin said.
7            (Audio recording played.)
8  BY MS. ADEEYO:
9      Q.    So Marvin just asked, You still need Chi
10 Chi to do that affidavit, though, right?
11     A.    Yes.
12     Q.    Okay.  And Chi Chi is Charles Toles?
13     A.    Yes.
14     Q.    Okay.  I'm going to keep playing at five
15 minutes, 58 seconds.
16           (Audio recording played.)
17 BY MS. ADEEYO:
18     Q.    You said you need everybody, the more the
19 better.  It's going to help prove your case,
20 correct?
21     A.    Yes.
22     Q.    Okay.  I'm going to jump forward to six
23 minutes, 36 seconds.
24           (Audio recording played.)
25 BY MS. ADEEYO:

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 506..509
XAVIER L. WALKER, 04/12/2022

Page 506

1    Q.   Marvin Mosley just said, Chi Chi, he
2  acting like he don't know what he's supposed to
3  write down, correct?
4    A.   Yes.
5         (Audio recording played.)
6  BY MS. ADEEYO:
7    Q.   And you just asked, You ain't keep --
8  keep no copy of yours?
9    A.   Yeah.
10   Q.   And you're referring to Marvin Mosley's
11 affidavit, correct?
12   A.   Yes.
13        (Audio recording played.)
14 BY MS. ADEEYO:
15   Q.   Marvin just said, Nah, you told me to
16 send it back to you, correct?
17   A.   Yes.
18        (Audio recording played.)
19 BY MS. ADEEYO:
20   Q.   And then you say, I told you to make a
21 copy and then send it back to me, correct?
22   A.   Yes.
23   Q.   Why did you tell Marvin Mosley to make a
24 copy of his affidavit?
25   A.   Because it was something that he wrote

Page 507

1  and he did.  So I told him to make a copy so he can
2  always have it and then give it back to me.  I
3  reached -- like I told you, I never knew details,
4  but I did reach out to them and tell them, like
5  yeah, my lawyer and them going to need you-all to do
6  this and help my lawyer and this and that, like I
7  did then.  And I told them, my lawyer is going to
8  get in touch with you-all, you know.  They going to
9  get up with you-all and then you-all go over there,
10 make sure you keep a copy.  I'm going to need
11 everybody.  Like I did.  I need everybody that help
12 me that was there and that was around that know the
13 truth.  I'm trying to prove my innocence, so...
14   Q.   So you asked Marvin to make a copy just
15 for his own records?
16   A.   Yes.
17   Q.   Is that fair to say?
18   A.   Yes.
19   Q.   Okay.
20   A.   Of what he said and what he did, his
21 affidavit.
22   Q.   Okay.  I'm going to pick back up at six
23 minutes, 58 seconds.
24        (Audio recording played.)
25 BY MS. ADEEYO:

Page 508

1    Q.   Now, you said, The next time I go to the
2  law library, I'll try to make a copy and then I'll
3  send it to you?
4    A.   Yes, because he didn't keep a copy for
5  his self, so I -- he send it back to me.  And I was
6  getting it to my lawyers.  Before I get it to my
7  lawyer, give him a copy so he can have a copy of
8  what he wrote, his affidavit of his truth and his
9  facts and what happened or what he remember.
10   Q.   So you had a personal copy of Marvin
11 Mosley's affidavit in 2013, correct?
12   A.   Everybody that my lawyer and them wanted
13 me to reach out to and told, they end up getting up
14 with me and then I got up with my lawyers and them
15 because where I come from, people, I guess, don't
16 like to get up with lawyers and get up with people
17 and stuff.  So they got up with me.
18   Q.   So if I understand correctly, then you
19 did reach out to witnesses in this case to obtain
20 affidavits --
21   A.   No.
22   Q.   -- correct?
23   A.   My attorneys reached out to witnesses and
24 stuff.  And then instead of them getting in touch
25 with my attorneys, they reach out to me because like

Page 509

1  I just said, where I come from, people don't trust
2  attorneys.  People don't trust lawyers, all that
3  stuff.  So they get up with me and ask, is this
4  accurate?  Who is this, all that type of stuff.  And
5  yeah, that's my lawyer and them.
6         (Audio recording played.)
7  BY MS. ADEEYO:
8    Q.   And then you say, He can basically just
9  put down what you put down?
10   A.   Yes.
11   Q.   And so when you said that, you were
12 telling Marvin that you'd send him a copy of
13 Marvin's affidavit for Chi Chi to put down what
14 Marvin put down?
15   A.   No.  I was saying I'm sending Marvin a
16 case -- a copy so he can have, and I was like he's
17 saying he don't know what to write.  He can
18 basically put down what you put down, but he didn't
19 do that and I didn't -- he didn't do that.  He did
20 his own truth because that was his truth.  He did
21 what he remember, his recollection.
22   Q.   But that's what you directed Marvin to
23 do, correct?
24   A.   No.  We was talking about Chi Chi.
25 Marvin had already did his.  That's why I told

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 510..513
XAVIER L. WALKER, 04/12/2022

Page 510

1   him he -- and you heard me say what you put down
2   because that's what he did of his own recollection.
3   And he was like, Chi Chi, I guess he didn't have a
4   lot of different things, in and out of jail, having
5   his own problems, he didn't remember.  So he like
6   didn't remember what to put down.  I'm like I don't
7   know.  So I just told him basically put down what
8   you put down.  But he still didn't do that.  When he
9   thought about it, set down and had the time and got
10  with different attorneys, he did what he did, which
11  I don't know what he did because I still ain't seen
12  his affidavit.
13      Q.   You still haven't seen Charles Toles'
14  affidavit?
15      A.   No.
16      Q.   Okay.  Now I'm going to move to what I
17  will mark as Exhibit --
18      MS. MURRAY:  8.
19      MS. ADEEYO:  Thank you.
20          (Whereupon, Deposition
21            Exhibit No. 8 was marked.)
22  BY MS. ADEEYO:
23      Q.   Exhibit 8.  Let me write down as I go.
24  Which is disc 2, call 169, dated February 21st,
25  2014, at 8:27 p.m. to phone number (773) 379-2605.

Page 511

1   Was that Shunralyn's number at the time?
2       A.   No.  That's my -- the number to my
3   parents' home, which is still the same number, been
4   my whole life.
5       Q.   Okay.  So it's their house phone?
6       A.   Yes.
7       Q.   Okay.  I'm going to start playing at the
8   top of this recording.
9           (Audio recording played.)
10      THE WITNESS:  Why my voice sound like that?
11  It sound like deep.
12  BY MS. ADEEYO:
13      Q.   And you hear Zay is identified at the top
14  of that call, correct?
15      A.   Yes.
16      Q.   I'm going to move down to 19 seconds.
17          (Audio recording played.)
18  BY MS. ADEEYO:
19      Q.   Do you recognize the voices on that call?
20      A.   Yeah.  That's my mother.
21      Q.   Yourself and your mother, correct?
22      A.   Yes.
23      Q.   Okay.  I'm going to move down to 24
24  minutes and six seconds.
25          (Audio recording played.)

Page 512

1   BY MS. ADEEYO:
2       Q.   That was you just saying, What's up,
3   Marvin, correct?
4       A.   Yes.
5       Q.   And you heard his voice, correct?
6       A.   Yes.
7       Q.   So it was you and Marvin speaking at that
8   time?
9       A.   Yes.
10      Q.   Okay.  I'm going to continue playing.
11          (Audio recording played.)
12  BY MS. ADEEYO:
13      Q.   You asked Marvin, Did Chi Chi give you
14  the affidavit, correct?
15      A.   Yes.
16          (Audio recording played.)
17  BY MS. ADEEYO:
18      Q.   And then Marvin said, Nah, he said we got
19  to sit down and he has to write it out, right?
20      A.   Right.
21          (Audio recording played.)
22  BY MS. ADEEYO:
23      Q.   Is that you saying, He told me he wrote
24  it already?
25      A.   Yeah.

Page 513

1       Q.   So you spoke to Charles Toles about him
2   writing his affidavit while you were incarcerated,
3   correct?
4       A.   I didn't talk to him directly.  I talked
5   to him through my attorneys and through Marvin.
6   That was the only way that I had to be able to get
7   in touch with him because like I said, he was in and
8   out of jail and had a lot of his own stuff going on,
9   so...
10      Q.   So when you stated, He told me he wrote
11  it already, that was false?
12      A.   No.  I talked to him through a third
13  party, and he told -- he told him that he did.  I
14  think one of my attorneys or somebody at the time,
15  he told them that he did and I was waiting on him to
16  send it, and it didn't come to me.  So I called
17  back.
18      Q.   Okay.  I'm going to keep playing.
19          (Audio recording played.)
20  BY MS. ADEEYO:
21      Q.   And you said, When you-all get together
22  to do what you-all supposed to have been doing, just
23  make sure you sit down with him and make sure he
24  does that too?
25      A.   Yes.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 514..517
XAVIER L. WALKER, 04/12/2022

Page 514

1    Q.    That's what you said?
2    A.    Yes.
3    Q.    So you wanted Marvin to sit down with
4  Chi Chi, Charles Toles, as he drafted his affidavit,
5  correct?
6    A.    I just wanted him to make sure he do it.
7    Q.    And you wanted Marvin to oversee that
8  act?
9    A.    No.
10   Q.    Correct?
11   A.    He didn't have to oversee it.  I just
12 wanted him to stand on him to make sure he did it
13 because he was acting like he was taking too long.
14 He was playing games, so...
15   Q.    When you say stand on him, what do you
16 mean?
17   A.    Remind him.  Just remind him that, you
18 know, he's supposed to be doing what he's supposed
19 to be doing.
20   Q.    And you say he was playing games.  What
21 do you mean by that?
22   A.    Taking too long, and he was -- I guess --
23 I can't say he's now been playing games.  He's -- now
24 that I'm out here, I see how life take a toll on you
25 and he got his own life.  He got a lot going on.  So

Page 515

1  he probably was -- had a lot going on and he wasn't
2  getting around to what I was doing because that --
3  you put that on the back burner.  And him being out
4  there free with everything he got going on, not
5  understanding my urgency or the sense of need that I
6  needed.  So I was trying to make sure it got done.
7  That's it.
8    Q.    When you say stand on him, you weren't
9  meaning any verbal or physical threats by Marvin
10 Mosley?
11   A.    No, sir -- no, ma'am.  I -- I don't
12 need -- Marvin -- Marvin not that type of guy.
13   Q.    Okay.  Now I'm going to play another
14 call.  I'll mark as Exhibit 9, disc 2, call 44,
15 dated September 18th, 2018, at 5:46 p.m. to
16 (773) 379-2605, which you just testified is the
17 house phone of your parents.
18   A.    Yes.
19   Q.    Correct?  Okay.
20             (Whereupon, Deposition
21              Exhibit No. 9 was marked.)
22             (Audio recording played.)
23 BY MS. ADEEYO:
24   Q.    Now, you heard it's a prepaid collect
25 call from Xavier Walker, correct?

Page 516

1    A.    Yeah.
2    Q.    And that was your voice?
3    A.    It doesn't sound like me.  It got my
4  voice deep for some reason on that stuff, but I
5  guess that's how the computer did it, the thing.
6    Q.    I'm going to jump to 48 seconds.
7             (Audio recording played.)
8  BY MS. ADEEYO:
9    Q.    That's you and your mother speaking,
10 correct?
11   A.    Yes.
12   Q.    Okay.  Now I'm going to move to 26
13 minutes and eight seconds.
14             (Audio recording played.)
15 BY MS. ADEEYO:
16   Q.    You said, They put this case on me where
17 I'm in -- that I'm in here right now, right?
18   A.    Yes.
19             (Audio recording played.)
20 BY MS. ADEEYO:
21   Q.    And you heard your mother say, You know
22 why that, right?
23   A.    I think my -- that was my father.  I
24 think both of them was on the phone.
25   Q.    Oh.  My apologies.  So that was your

Page 517

1  father who said, You know why that?
2    A.    Yeah.
3             (Audio recording played.)
4  BY MS. ADEEYO:
5    Q.    You say, Yeah, but I still ain't have
6  nothing to do with it, though, right?
7    A.    Right.
8             (Audio recording played.)
9  BY MS. ADEEYO:
10   Q.    And then your father said, You did have
11 something to do with it?
12   A.    Yeah, because my father was listening to
13 the police and the streets.
14   Q.    Did he tell you that?
15   A.    Yeah.  He told me that the police said
16 that I did it and the police ain't lying on me.  The
17 police ain't wrong.  And I'm like, What?  The police
18 always lying on me and wrong.
19   Q.    Okay.  Let's keep listening.
20             (Audio recording played.)
21 BY MS. ADEEYO:
22   Q.    Your father said, Yesterday you went over
23 there and you picked him up, correct?
24   A.    Yes.
25             (Audio recording played.)

AdvancedONE LEGAL        (866) 715-7770
advancedONE.com

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 518..521
XAVIER L. WALKER, 04/12/2022

Page 518

1  BY MS. ADEEYO:
2      Q.    And then he said, and rode around and
3  trying to cover him up, correct?
4      A.    He says sober him up, but yes.
5      Q.    Sober him up?
6      A.    Yes.
7            (Audio recording played.)
8  BY MS. ADEEYO:
9      Q.    And then your father said, That's what
10 you said, correct?
11     A.    Yes.
12           (Audio recording played.)
13 BY MS. ADEEYO:
14     Q.    You said you went over there and picked
15 him up and went to the club, correct?
16     A.    Yes.
17     Q.    You're referring to Jovanie Long,
18 correct?
19     A.    Yes.
20           (Audio recording played.)
21 BY MS. ADEEYO:
22     Q.    You said, After I picked him up, I had
23 learned about all that stuff?
24     A.    Yes.
25     Q.    Correct?

Page 519

1      A.    Yes.
2            (Audio recording played.)
3  BY MS. ADEEYO:
4      Q.    I didn't know nothing about none of that
5  stuff until after I picked him up and we were on our
6  way to the club, right?
7      A.    Yes.
8            (Audio recording played.)
9  BY MS. ADEEYO:
10     Q.    You -- once you found out, you said, What
11 the heck?  You tried to find out what was going on.
12 Then you went to the club, correct?
13     A.    Yes.
14     Q.    That's what you said?
15     A.    Yes.
16           (Audio recording played.)
17 BY MS. ADEEYO:
18     Q.    And then you said, But whatever had
19 happened had already happened, right?
20     A.    Yes.
21     Q.    Okay.  Just for the sake of time, I'm
22 going to move this call just 30 seconds ahead to
23 27:53.
24           (Audio recording played.)
25 BY MS. ADEEYO:

Page 520

1      Q.    Your dad said, After that, you found out,
2  right?
3      A.    Yeah.
4            (Audio recording played.)
5  BY MS. ADEEYO:
6      Q.    And then you said what he had done and
7  you said yeah.  You heard that?
8      A.    Yeah.
9            (Audio recording played.)
10 BY MS. ADEEYO:
11     Q.    Your father said being a good either
12 American or samaritan or good citizen, you should
13 have called the police and reported it?
14     A.    Yes.
15     Q.    He said that, right?
16     A.    Yes.
17           (Audio recording played.)
18 BY MS. ADEEYO:
19     Q.    Then your father said, Hey, my friend
20 just confessed that he killed somebody, correct?
21     A.    Yes.
22           (Audio recording played.)
23 BY MS. ADEEYO:
24     Q.    You said, Nah, I ain't supposed to do
25 that?

Page 521

1      A.    Yeah.
2            (Audio recording played.)
3  BY MS. ADEEYO:
4      Q.    And you said, In the law, it don't say
5  you have to do that, correct?
6      A.    Yeah.  Yeah.
7      Q.    Now, I think you previously testified --
8  correct me if I'm wrong -- that you've never spoken
9  with Jovanie Long in person or written to him about
10 your criminal case or the murder of Marek Majdak,
11 correct?
12     A.    Yeah.
13     Q.    Is that a yes?  I'm sorry.
14     A.    Yes.
15     Q.    Okay.  I'm going to play another call.
16     MS. ADEEYO:  Exhibit 10?  I think so.
17           (Whereupon, Deposition
18           Exhibit No. 10 was marked.)
19     MS. SAMUELS:  Yes.
20 BY MS. ITCHHAPORIA:
21     Q.    Disc 1, call 27, dated November 20th,
22 2012, at 11:50 a.m. to phone number (773) 837-9374.
23 Do you recognize that phone number?
24     A.    No.  I'm trying to see what number that
25 is now.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 522..525
XAVIER L. WALKER, 04/12/2022

Page 522

1          (Audio recording played.)
2  BY MS. ADEEYO:
3      Q.    Oh, hold on.  I'm going to start playing
4  at one minute, five seconds.
5          (Audio recording played.)
6  BY MS. ADEEYO:
7      Q.    Now, you heard the caller identify them
8  self as Xavier, correct?
9      A.    Yeah.
10     Q.    That was you?
11     A.    Yeah.
12     Q.    Okay.  I'm going to jump to a minute and
13  20- --
14     A.    That sounded like me.  The rest of them
15  don't sound like me.
16     Q.    I'm going to jump to a minute, 28
17  seconds.
18          (Audio recording played.)
19  BY MS. ADEEYO:
20     Q.    Do you recognize those voices?
21     A.    No.
22     Q.    Here, I'll play it back.
23          (Audio recording played.)
24  BY MS. ADEEYO:
25     Q.    Is that Lil Red?

Page 523

1      A.    I don't know.
2      Q.    Okay.  I'm going to push -- move it up to
3  two minutes and 42 seconds.
4      A.    I'm trying to catch the voice.
5      Q.    Actually, I'll start at two minutes --
6  well, two minutes and 42 seconds.
7          (Audio recording played.)
8  BY MS. ADEEYO:
9      Q.    Do you recognize the voice of that
10  individual who's speaking?
11     A.    Yes.  Me.
12     Q.    That's you?
13     A.    Yeah.
14     Q.    Okay.  So now I'm just going to go back
15  and confirm what you said.
16          (Audio recording played.)
17  BY MS. ADEEYO:
18     Q.    You said, When is the last time you
19  talked to Vani?
20     A.    Uh-huh.
21     Q.    Is that a yes?
22     A.    Yes.
23          (Audio recording played.)
24  BY MS. ADEEYO:
25     Q.    And then unidentified individual said

Page 524

1  shit, uh, last Sunday or Monday, right?
2      A.    Yes.
3          (Audio recording played.)
4  BY MS. ADEEYO:
5      Q.    And then you said if he calls you again,
6  right?  The unidentified individual said yeah.  Then
7  you said, Tell him that the private or the
8  investigatory lady that's working on my case just
9  came down and seen me, right?  That's what you said?
10     A.    Correct.
11          (Audio recording played.)
12  BY MS. ADEEYO:
13     Q.    Then you said she's supposed to be going
14  to see him.  You hear me?
15     A.    Yeah.  Correct.
16     Q.    You were referring to this investigatory
17  lady going to see Jovanie Long, correct?
18     A.    Correct.
19          (Audio recording played.)
20  BY MS. ADEEYO:
21     Q.    And you said, And I had wrote him, sent
22  him a letter to tell him what to tell her or
23  whatever?
24     A.    Correct.
25          (Audio recording played.)

Page 525

1  BY MS. ADEEYO:
2      Q.    Just stick to the story?
3      A.    Correct.
4      Q.    So you wrote Jovanie Long a letter to
5  tell him what to say to the investigatory lady,
6  correct?
7      A.    No.  That's not about that.  That's some
8  whole other stuff but --
9      Q.    What's that about then?
10     A.    -- correct.
11          That was about something that we had
12  filed in the jail because we was getting treated --
13  mistreated and stuff in jail.
14     Q.    Something you and Jovanie Long filed in
15  the jail together?
16     A.    Not just me and Jovanie Long.  A -- a
17  multitude of us.
18     Q.    Who?
19     A.    A multitude of inmates that was being
20  unfairly mistreated and we had filed a class action,
21  different -- several class actions actually about
22  different things that was going on.
23     Q.    And this happened in 2012 when this call
24  was made?
25     A.    No.  The stuff happened before then, but

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 526..529
XAVIER L. WALKER, 04/12/2022

1  we started working on this stuff then.  We had -- as
2  a matter of fact, I got to check into them because
3  one of them I didn't get nothing about.  But we had
4  lawsuits about the mail being messed up.  We had
5  lawsuits about the living conditions.  We had a lot
6  of different stuff about when he had got into the
7  fight with the police in Menard that ended up
8  getting him sent to Stateville to where he was at,
9  and I was helping him with all that type of stuff.
10  And we was working on these different lawsuits.
11      Q.    And you had an investigator working on
12  these lawsuits with you?
13      A.    Yes.  We had got appointed attorneys and
14  investigators, yes.
15      Q.    What's this investigator's name?
16      A.    I don't recall but...
17      Q.    Do you recall --
18      A.    It's -- it's --
19      Q.    -- the attorneys' names who were working
20  on these class action suits?
21      A.    It's documented.  I'll find the
22  documentation and give it to you.  Try to send it.
23      Q.    So you -- you have the documents in your
24  possession?
25      A.    I can find them.  I should still have

1  them.  And like the mail one, I still should -- it
2  still was open and pending before I left.  I got to
3  check into that because I'm pretty sure we won.  It
4  was --
5      Q.    So if I --
6      A.    -- money.
7      Q.    -- understand your testimony correctly,
8  you were on the phone with an unidentified
9  individual telling him that you wrote Jovanie Long
10  and you sent him a letter to -- telling him to stick
11  to the story about a class action lawsuit?
12      A.    About different lawsuits and stuff that
13  we had going on in the jail, yes.
14      Q.    What mistreatment did Jovanie Long face
15  in jail?
16      A.    We all faced a lot of it.  Jovanie Long
17  was lied on and said he spit on an officer and then
18  beaten by the officers and sent to Pontiac seg for
19  one.  But we all had a lot of different messed up
20  living conditions that we had while we was in jail.
21  We had mail that supposed to come to us and then we
22  won't get it for months at a time.  So we was filing
23  class actions on that.  We did a lot of fighting and
24  politicking in jail about our living conditions and
25  our wellbeing that was did -- that we was mistreated

1  and mishandled for throughout our incarceration.
2      Q.    And you learned about Long's mistreatment
3  through the letters that he sent you, correct?
4      A.    When he got into the stuff with the
5  police and stuff, he was in Menard with me.  Like I
6  said, we was in Menard for a while and got into the
7  police and -- I think one of them said, He spit on
8  me.  And then he jumped him and then sent him to
9  Pontiac seg.  But we was around each other several
10  times while we was in Menard and a lot of different
11  things.  Not just with me and him, but other several
12  inmates.  And we had different class action lawsuits
13  and stuff that was going on.
14      Q.    And you were in Menard with Jovanie Long
15  in 2012 when you made this call?
16      A.    No.  He had already been moved to
17  Stateville.
18      Q.    And when did this mistreatment occur?
19      A.    I --
20      Q.    What time frame?
21      A.    I don't actually know what -- the dates
22  and specifics on different ones.  But it was
23  multiples.  It was, like I said, one of them -- that
24  was just one, the police jumping on him and sending
25  him to Pontiac seg.  But we also, like I said, had

1  the mail issues, us being in thing, cold issues, us
2  being in cells where rats and stuff run in.  We had
3  a lot of different, mis, you know, treatment
4  informa--- things that was going on while being in
5  the penitentiary.  Wake up in bugs, rats and roaches
6  done ate your food, you know.  This is the stuff we
7  was confined to, and we got tired of living in these
8  type of conditions.  So we started trying to do
9  something about it, you know.
10          Same way that one of my cellies, they
11  had -- was tired of being in Tamms and filed
12  lawsuits about it.  So he told us that we should do
13  the same type of stuff, you know.  This is the way
14  you fight it and get this stuff stopped if you want
15  it stopped.  So, you know, we started learning the
16  law and started trying to work on our situations.
17      Q.    Okay.  I'm going to play another call.
18  I'm going to mark it as Exhibit 11, disc 1, call 28,
19  dated November 18th, 2012, at 8:14 p.m. to phone
20  number (773) 379-2605.  That's the house number
21  again, correct?
22      A.    Yes.
23      Q.    I'm going to start --
24      A.    What was the other number that you had
25  said?  I'm still trying to remember who number that

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 530..533
XAVIER L. WALKER, 04/12/2022

Page 530

1  is.
2      Q.    I'm going to start play- --
3      MS. SAMUELS:  I didn't write it down.
4      THE WITNESS:  Oh.
5  BY MS. ADEEYO:
6      Q.    I'm going to start playing it at one
7  minute.
8              (Audio recording played.)
9  BY MS. ADEEYO:
10     Q.    That was your voice, correct?
11     A.    Yes.
12     Q.    Okay.  I'm going to jump to one minute,
13 18 seconds.
14     A.    Sound like I sound in the other ones?
15 That was sounding deep.
16             (Audio recording played.)
17 BY MS. ADEEYO:
18     Q.    That was your mother, correct?
19     A.    Yes.
20     Q.    Okay.  Now I'm going to jump now to 14
21 minutes, ten seconds.
22             (Audio recording played.)
23 BY MS. ADEEYO:
24     Q.    Was that you speaking?
25     A.    Yes.

Page 531

1      Q.    And you said, We going to be decent
2  because it's about to rock 'n roll.  The show about
3  to start?
4      A.    Yes.
5      Q.    That's what you said, right?  And then
6  you said, I wrote him the letter telling him
7  everything.  But I know the letter going to take
8  awhile to get there.  That's what you said, correct?
9      A.    Yes.
10     Q.    Who were you referring to that you wrote
11 a letter to?
12     A.    I have no idea at that time.  I wrote
13 several letters to a bunch of people.  I have a
14 bunch of family members, a bunch of friends, and a
15 bunch of people that I wrote letters to.
16     Q.    I'm going to jump to 15 minutes and 30
17 seconds on this call.
18             (Audio recording played.)
19 BY MS. ADEEYO:
20     Q.    Okay.  So I'm just going to repeat what
21 you said.  And as soon as Bruh call, tell Bruh I
22 say, man, the letter on the way, but the lady
23 probably going to make it down there before the
24 letter.
25             Were you referring to Jovanie Long when

Page 532

1  you said Bro?
2      A.    Probably so.
3      Q.    Okay.  Then you said, just talk to the
4  lady.  Tell the lady that you know the script, how I
5  went to the club, but then he called me while I was
6  at the club.  I came and picked him up and he went
7  to the club.  That's what you said, correct?
8      A.    Yes.
9      Q.    Who's the lady?
10     A.    I don't know.  Whichever old lady
11 probably at that time.
12     Q.    Would that have been Alicia Stewart that
13 Jovanie Long may have been speaking to?
14     A.    It could have been her.  It could have
15 been Karen Flor- -- I had several female attorneys.
16 I had several female investigators.  I had different
17 people at different times on my case and my
18 situation.
19     Q.    So you had a lady attorney or
20 investigator go down to Jovanie Long while he was
21 incarcerated to stick to the script as you said?
22     A.    To -- which is facts, the truth, but
23 yeah.
24     Q.    And then to this individual on the phone,
25 you then started to explain your whereabouts the

Page 533

1  night of May 12th through the 13th, correct?
2      A.    It sounds that way, yes.
3              (Audio recording played.)
4  BY MS. ADEEYO:
5      Q.    You said, He called me a few times off
6  and on during that day, correct?
7      A.    Yes.
8      Q.    Are you referring to Jovanie Long calling
9  you a few times during that day?
10     A.    Probably.  I don't...
11     Q.    Would that have been on your Motorola
12 Nextel Chirp phone?
13     A.    Both.  He called both phones.  He call
14 the house phone sometime.  He call the Chirp phone
15 sometime.
16     Q.    And what did Jovanie Long call you about
17 on May 12th during that day?
18     A.    The usual.  Kickin' it, seeing what we
19 doing, what's going on.  And then I told him -- like
20 I told you, I talked to him that day.  I told him we
21 was going to the club and all that type of stuff
22 before I seen him.  Before I went around there, I
23 had talked to him and he told -- told them that we
24 was going to the club and stuff, so...
25             (Audio recording played.)

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 534..537
XAVIER L. WALKER, 04/12/2022

Page 534

1  BY MS. ADEEYO:
2      Q.    You said you picked him up and you went
3  to the club.  You don't know nothing about the rest
4  of that stuff, right?
5      A.    Correct.
6      Q.    So you lied previously when you said that
7  you did not pick Jovanie up and bring him to the
8  club today, correct?
9      A.    I didn't have to pick him up because he
10 ended up coming with Ra Ra.
11     Q.    Back to my question.  You lied previously
12 today when you said you did not pick Jovanie Long up
13 and bring him to the club, correct?
14     A.    No.  Incorrect.  I didn't have to pick
15 him up because he ended up going with Ra Ra.
16     Q.    You previously testified today that you
17 did not pick Jovanie Long up, correct?
18     A.    And I'm still saying that right now.  I
19 just said I didn't have to pick him up because he
20 end up coming with Ra Ra.
21     Q.    So you were lying on this call?
22     A.    No, I was telling him how -- what he
23 was -- what they was saying.  All right.  We going
24 to go over what they saying.  But the facts is I
25 didn't have to pick him up because he came with

Page 535

1  Ra Ra.
2      Q.    When you say, We're going to go with what
3  they're saying, what are you referring to?
4      A.    They made a story.  Now we going to make
5  they story work for us.
6      Q.    So you were telling this individual to
7  tell Jovanie Long to continue the story that they
8  made.  I'm guessing you're referring to the police?
9      A.    Yes.
10     Q.    So you wanted in 2012 for Jovanie Long to
11 stick to the story that you told police?
12     A.    Not I told police.  Story that the police
13 told us.
14     Q.    And you wanted Jovanie Long to stick to
15 that story in 2012, correct?
16     A.    Yes.
17     Q.    I'm going to pick up at 16 minutes and 12
18 seconds.
19     A.    Well, not the whole story.  Just --
20     Q.    I'm sorry.
21     A.    -- part of the story.
22     Q.    I didn't have a -- I didn't have a
23 question pending.
24     A.    Pardon me.  But I was talking about that.
25          (Audio recording played.)

Page 536

1  BY MS. ADEEYO:
2      Q.    You said, We going to look good.  We're
3  going to get up out of here, correct?
4      A.    Correct.
5      Q.    Who's the person you were talking to on
6  the phone?
7      A.    I have no idea because I can't catch the
8  voice.
9      Q.    But you can identify that that's you
10 speaking, correct?
11     A.    Yes.  Correct.
12     MS. ADEEYO:  Okay.  Can we go off the record?
13 Can I get a time check?
14     THE VIDEOGRAPHER:  We are off the record at
15 7:48 p.m.
16          (Whereupon, a break was taken,
17           after which the following
18           proceedings were had:)
19     THE VIDEOGRAPHER:  We are back on the record
20 at 7:53 p.m.
21 BY MS. ADEEYO:
22     Q.    Mr. Walker, did you tell your father that
23 you picked up Jovanie Long before you went to the
24 club on May 13, 2000?
25     A.    Yes.

Page 537

1      Q.    And when did you tell your father this?
2      A.    While I was incarcerated.
3      Q.    And why did you tell him this?
4      A.    Because they was constantly asking me
5  about it and constantly trying to say that we did it
6  and that I was with him and stuff and I was stuck to
7  what the police story, what the police had said.  So
8  my father and my mother never been to jail, never
9  been in trouble, never been in the streets.  So they
10 good people and good samaritans.  They don't
11 understand -- and anything that the police say, like
12 anything the lawyers say, they take it as a hundred
13 percent facts.
14          Like everything that my lawyers were
15 saying, they believed, and even though the lawyer
16 ain't do none of the stuff they said or they was
17 going to do even though they pay them they money,
18 but they believed him because they was gullible and
19 naive to it.
20          So in order for me to try to put my
21 parents at ease, I was trying to say what I needed
22 to say for them to be at ease and just let them know
23 that I didn't have nothing to do with this because
24 it's truth and facts, but okay.  This is what they
25 saying.  Yeah, okay, I did that, whatever.  I'm

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 538..541
XAVIER L. WALKER, 04/12/2022

Page 538

1  trying to help them understand -- I was trying to
2  bring them closer to knowing me and understand and
3  still be able to help me do what I'm trying to do is
4  prove my innocence.
5      Q.    So are you saying that you lied to your
6  father on the phone while you were incarcerated?
7      A.    I told him the stuff that the police
8  basically said that he had knew that the police told
9  him and that the streets was saying because this is
10 what he was saying he was hearing from the police,
11 from the streets.  So I'm like, okay, yeah, all
12 that's fine and dandy.  All that's what happened.
13 But I'm telling you that I didn't do that.  I didn't
14 have nothing to do with it.  I wasn't around.  And
15 he be like, Well, you said this or they said this.
16 You did.  Okay.  Yeah, I did it, whatever.  But
17 look, I'm telling you that I didn't have nothing to
18 do with this, and that's how I try to keep it.  But
19 they never -- still ain't understanding, still
20 ain't...
21     MS. ADEEYO:  Okay.  That's all I have.
22     THE WITNESS:  All the way up until he died.
23     MS. ITCHHAPORIA:  You doing that one thing or
24 should I do it?
25              FURTHER EXAMINATION

Page 539

1  BY MS. ITCHHAPORIA:
2      Q.    Okay.  I just have a quick follow-up
3  question, Mr. Long.  You said earlier you testified
4  that the police fed you information that you had
5  supposed to be bit the victim, correct?
6      A.    That one of us bit the victim.  I didn't
7  say me.
8      Q.    Okay.  One of you -- you or Jovanie Long
9  had bit the victim, right?
10     A.    Yes.
11     Q.    And that was fed to you by one of the
12 police officers?
13     A.    Yes.
14     Q.    Was that the black officer with the brown
15 coat?
16     A.    I don't remember.  I don't recall which
17 one.
18     Q.    But when you told the story to the female
19 prosecutor, you didn't include that fact that was
20 fed to you by the police.  You didn't tell her that,
21 did you?
22     A.    I don't recall.
23     Q.    Okay.  It says nothing in your videotaped
24 statement that you or Jovanie bit someone, right?
25     A.    I don't recall.

Page 540

1      Q.    Did you just forget to mention that fact,
2  that the police told you to feed -- that the police
3  fed to you?
4      A.    They didn't feed that as a story for me
5  to say or repeat to nobody.  They told me that this
6  is how they going to book me and this is how they
7  going to get me because one of us did this.  So they
8  didn't -- this wasn't a part of their story for me
9  to tell to the state's attorney or nobody else or
10 they story of the coercion.  This is what they told
11 me that they had as far as the shoes and the bite
12 mark and some blood that supposed to have been
13 either me or Jovanie's to book me.
14          So why would I repeat that when that's
15 not the part of the story?  That was just what they
16 told me.  This is how they going to book me if I
17 don't cooperate with them and tell them what they
18 want to know and what they want to hear and if I
19 don't cooperate and do the story how they want it
20 because they got a bite mark.  And I found this out
21 because they told me first and then Greg Wilson told
22 me and then they end up coming and doing the DNA
23 samples on us for these different things.
24          And then once the DNA samples came back
25 that it wasn't none of ours, all that disappeared.

Page 541

1  Now all of a sudden, wasn't no blood on the shoes or
2  it was some Kool-Aid.  Wasn't no bite mark.  It was
3  an old bite mark that had been happened years, but
4  they was just saying it was a fresh and new one when
5  they told me this, and the -- wasn't no -- the blood
6  splatter when they was saying that it had to be one
7  of ours because --
8      Q.    But I didn't ask you about a blood
9  splatter.
10     A.    But -- yeah.  But all that was tied
11 together.  This is one of the things that they told
12 me that they was using to book me and that's how
13 they going to prove it.  So that was that.  That
14 wasn't the part of the story that they wanted me to
15 tell the state's attorney or nobody else.
16     Q.    If you and Jovanie Long were not
17 responsible for the murder of Marek Majdak on
18 May 13th, 2000, do you know who was?
19     A.    No.
20     Q.    Have you ever heard anything on the
21 streets about who was responsible for that murder?
22     A.    I heard several things.  I even heard
23 people say that we did it and that I did it, but I
24 heard...
25     Q.    Any names other than you and Jovanie?

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 542..545
XAVIER L. WALKER, 04/12/2022

Page 542

1    A.    Yes.
2    Q.    What are the names?
3    A.    It was a Red and Darnell.
4    Q.    Who did you hear that from?
5    A.    I heard that from the police and I heard
6  that from peoples in the neighborhood.
7    Q.    Did you ever try to find out who Red or
8  Darnell was?
9    A.    There's a lot of Reds and Darnells in my
10 neighborhood.  So it could have been --
11   Q.    Is that a no?
12   A.    No.
13   Q.    Okay.  You don't know anybody by Red and
14 Darnell that you're able to say today that committed
15 this murder?
16   A.    No.
17        MS. ITCHHAPORIA:  Okay.  All right.  I have no
18 further questions.
19        MS. SAMUELS:  Nothing.  From me.
20        MS. ITCHHAPORIA:  What was that?  Do I have a
21 minute left?  I can still go.  No, I'm just kidding.
22        THE VIDEOGRAPHER:  We are off the record.  At
23 7:58 p.m.  This concludes the video deposition of
24 Xavier Walker.
25        THE COURT REPORTER:  Signature?

Page 543

1        MS. SAMUELS:  Reserved.
2        THE COURT REPORTER:  Are you ordering -- oh,
3  you have an order.
4             Does anybody want a copy?
5        MS. ADEEYO:  Yeah.  We'll take a copy, yeah.
6        THE COURT REPORTER:  Do you want a copy?
7        MS. SAMUELS:  Yes, please.
8        THE COURT REPORTER:  E-trans for all of you?
9        MS. SAMUELS:  Yes.
10       MS. ADEEYO:  Oh, no.  No copy.  Never mind.
11 Because you guys are ordering it.
12            (Witness excused at 7:58 p.m.)

Page 544

1        IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3                 EASTERN DIVISION
4
5  XAVIER WALKER,              )
6           Plaintiff,         )
7           -vs-               )  No. 20 CV 7209
8  CITY OF CHICAGO, et al.,    )
9           Defendants.        )
10      I hereby certify that I have read the
11 foregoing transcript of my deposition given at the
12 time and place aforesaid, consisting of Pages 1 to
13 546, inclusive, and I do again subscribe and make
14 oath that the same is a true, correct and complete
15 transcript of my deposition so given as aforesaid,
16 and includes changes, if any, so made by me.
17
18
19                      XAVIER WALKER
20 SUBSCRIBED AND SWORN TO
21 Before me this        day
22 of               , A.D. 2022.
23      Notary Public
24
25

Page 545

1  STATE OF ILLINOIS    )
2                       )  SS:
3  COUNTY OF MACON      )
4
5
6        I, Michelle A. Duzan, CSR No. 084-004270,
7  a Notary Public within and for the County of Macon,
8  State of Illinois, and a Certified Shorthand
9  Reporter of said state, do hereby certify:
10       That previous to the commencement of the
11 examination of the witness, the witness was duly
12 sworn to testify the whole truth concerning the
13 matters herein;
14       That the foregoing deposition transcript
15 was reported stenographically by me, was thereafter
16 reduced to typewriting under my personal direction
17 and constitutes a true record of the testimony given
18 and the proceedings had;
19       That the said deposition was taken before
20 me at the time and place specified;
21       That I am not a relative or employee or
22 attorney or counsel, nor a relative or employee of
23 such attorney or counsel for any of the parties
24 hereto, nor interested directly or indirectly in the
25 outcome of this action.

XAVIER WALKER vs CITY OF CHICAGO, et al.                    Pages 546..547
XAVIER L. WALKER, 04/12/2022

Page 546

```
 1         IN WITNESS WHEREOF, I do hereunto set my
 2  hand and affix my seal of office at Forsyth,
 3  Illinois, this 20th day of April, 2022.
 4
 5
 6
 7
 8         Notary Public, Macon County, Illinois.
 9         My commission expires 10/23/25.
10         Michelle Duzan
11         Michelle A. Duzan, CSR, RMR
12         CSR No. 084-004270
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 547

```
 1              Errata Sheet
 2  NAME OF CASE:     XAVIER WALKER vs CITY OF CHICAGO, et al.
 3  DATE OF DEPOSITION: 04/12/2022
 4  NAME OF WITNESS:   XAVIER L. WALKER
 5  Reason Codes:  1. To clarify the record.
 6                 2. To conform to the facts.
 7                 3. To correct transcription errors.
 8  Page _____ Line _____ Reason _____
 9  From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24                     _____
25              XAVIER L. WALKER
```



AdvancedONE LEGAL

(866) 715-7770
advancedONE.com