# EXHIBIT 14

```
1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  XAVIER WALKER,                    )
                                     )
4          Plaintiff,                )
                                     )
5     vs.                            )No. 20 Cv 7209
                                     )Judge Guzman
6  CITY OF CHICAGO, STANLEY SANDERS, )
   MICHAEL PIETRYLA, DAVID WRIGHT,   )Magistrate
7  BRIAN HOLY, JOHN CRUZ, DONALD     )Judge Fuentes
   WOLVERTON, JOHN RIORDAN, ROBERT   )
8  BARTIK, ANTHONY BRZENIAK, THOMAS  )
   MAHONEY, and COOK COUNTY,         )
9                                    )
           Defendants.               )
10
```

11

12          The Discovery Deposition via Zoom

13  Electronic Telephone/Video Conferencing of

14              DAVID WRIGHT,

15  taken before ADRIENNE M. LIGHTFOOT, Certified Shorthand

16  Reporter and Notary Public, taken pursuant to the

17  provisions of the Federal Rules of Civil Procedure and

18  the Rules of the Supreme Court thereof, pertaining to

19  the taking of depositions for the purpose of discovery

20  held on the 12th day of May 2022, at the hour of 10:00

21  a.m. pursuant to notice.

22

23  Adrienne M. Lightfoot,

24  Illinois C.S.R # 084-004276

```
 1                    A P P E A R A N C E S

 2
    REPRESENTING THE PLAINTIFF,
 3  XAVIER WALKER:

 4
                    SAMUELS & ASSOCIATES
 5                  Attorneys At Law
                    53 West Jackson Boulevard.
 6                  Suite 831
                    Chicago, Illinois 60604
 7                  (872)588-8726

 8                      By:  Jeanette S. Samuels, Esq.

 9

10  REPRESENTING THE DEFENDANT,
    CITY OF CHICAGO:
11
                    NATHAN & KAMIONSKI
12                  Special Assistant Corporation Counsel
                    33 West Monroe Street
13                  Suite 1830
                    Chicago, Illinois 60603
14                  (312)612-1079

15                      By: Breana Brill, Esq.
                            Shneur Nathan, Esq.
16

17  REPRESENTING THE DEFENDANTS,
    INDIVIDUAL POLICE OFFICERS:
18
                    BORKAN & SCAHILL, LTD.
19                  Attorneys At Law
                    20 South Clark Street
20                  Suite 1700
                    Chicago, Illinois 60603
21                  (312)580-1030

22                      By:  Misha Itchhaporia, Esq.

23

24  ALSO PRESENT:  John A. Cruz
```

1                          **I N D E X**

2

3      **DAVID WRIGHT**                              **PAGE**

4           **Examination by**
            **Ms. Samuels**                          **4**

5

6

7

8

9

10

11                      **E X H I B I T S**

12                   **(No Exhibits Marked)**

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    (Witness Sworn)
 2                    DAVID WRIGHT,
 3  called as a witness herein, after having been first
 4  duly sworn, was examined and testified as follows:
 5                      EXAMINATION
 6  BY MS. SAMUELS:
 7       Q    Can you please state and spell your name for
 8  the record?
 9       A    David Wright, D-a-v-i-d, W-r-i-g-h-t.
10       Q    All right.  This is the deposition of David
11  Wright -- can you hear me?
12       A    Yes.
13       Q    All right.  This is the deposition of David
14  Wright taken in the case of Walker versus City of
15  Chicago, et al.  Case number 20 CV 7209.  This
16  deposition is taken pursuant to notice in agreement of
17  the parties under all applicable rules.
18  BY MS. SAMUELS:
19       Q    Mr. Wright, have you given a deposition
20  before?
21       A    Yes.
22       Q    About how many times?
23       A    I don't recall the exact number.
24       Q    Do you recall, generally, how many
```

1    depositions you've given?

2         A    I don't recall.

3         Q    When was the last time you gave a deposition?

4         A    If I had to guess, I would say maybe 10 years

5    ago.

6         Q    Okay.  Well, since it's been a while ago,

7    I'll go over the real briefly.

8              Essentially, you are testifying today

9    under oath, it's functional equivalent of testifying in

10   court.  All your answers have to be the truth; do you

11   understand what that means?

12        A    Do I understand what truth mean?

13        Q    Yep.

14        A    Yes, I do.

15        Q    You may anticipate where I'm going with the

16   question and want to provide an answer, but I would ask

17   that you wait until I'm fully done asking the question

18   prior to providing your answer just so the record can

19   be clear, okay?

20        A    Yes.

21        Q    Likewise, your answers need to be verbal.

22   Things like uh-huh, uhns-uhn aren't clear for the

23   record.  To the extent you can remember, please say yes

24   or no.  If I prompt you, that's not me being a

1    stickler, that's just me trying to make sure we

2    understand your answer correctly, okay?

3         A    Yes.

4         Q    I'm going to ask you a number of questions.

5    If any of my questions aren't clear, please by all

6    means, ask me to rephrase them, otherwise, I'm going to

7    assume you understood my question and that the answer

8    to the question that's being asked, okay?

9         A    Yes.

10         Q    And then, of course, if at any time you want

11    to take a break, go right on ahead.  The only thing I

12    would ask is that if there's a question pending, you

13    answer that question prior to taking your break, and

14    that's it, okay?

15         A    Thank you.

16         Q    Okay.  Did you prepare for your deposition?

17         A    Yes.

18         Q    How did you prepare?

19         A    With my Counselors.

20         Q    How many times did you meet with them?

21         A    Approximately four times.

22         Q    All right.  When was the --

23              MS. SAMUELS:  Can you guys turn the volume up

24    a little bit?  It's hard for me to hear.  Is that

1    possible?

2              MS. ITCHHAPORIA:  We are going to try.

3              MR. MILLER:  Yeah, just speak louder.

4                    I know we can turn up, like, about how

5    we can hear you, I don't know if we can turn up our

6    audio louder, but he'll speak louder.

7    BY MS. SAMUELS:

8         Q    And so I believe you said you met with your

9    attorneys about four times to prepare for your

10   deposition?

11        A    Yes, ma'am.

12        Q    And when was that?

13        A    Thursday and Friday of last week, and Monday

14   and Tuesday of this week.

15        Q    And Thursday when you met with your

16   attorneys, was anybody else present?

17        A    Yes, ma'am.

18        Q    Who?

19        A    Detective Pietryla.

20        Q    Anybody else?

21        A    Detective Cruz.

22        Q    Anybody else?

23        A    No, ma'am.

24        Q    How long did you meet on Thursday?

1        A     Probably about six hours.

2        Q     And when you met on Friday, who was present?

3        A     The same detectives.

4        Q     And how long did you meet on Thursday --

5   excuse me -- on Friday?

6        A     Approximately the same time.

7        Q     On Monday who was present for these meetings?

8        A     The same detectives as I recall.

9        Q     And how long did you meet?

10       A     Approximately the same time.

11       Q     On Tuesday, who was present for the meetings?

12       A     Same detectives.

13       Q     How long was the meeting?

14       A     Approximately the same time.

15       Q     And yesterday was Wednesday?

16       A     Yesterday was Wednesday?

17       Q     Okay.  And did you sit and listen to

18   Pietryla's deposition?

19       A     Some of it, yes.

20       Q     Okay.  So about how many hours were you

21   present?

22       A     Approximately four or five hours.

23       Q     And during those four or five hours that you

24   were listening, did you hear him testify about anything

1    related to the investigation of the murder of Merek

2    Majdak that was false?

3         A    No, ma'am.

4         Q    Any of those four meetings that you had to

5    prepare for your deposition, did you review any

6    materials?

7         A    Yes, ma'am.

8         Q    What materials did you review?

9         A    Did you ask me how many?

10        Q    No, sir.  I asked:  What materials did you

11   review?

12        A    Case report, supplemental report, morgue

13   report, video.

14        Q    All right.  So for -- besides the

15   investigation into the murder of Merak Majdak, did you

16   review case reports related to any other incident?

17        A    Could you be more specific?

18        Q    Right.  So my understanding is you were a

19   detective investigating the murder of Merek Majdak,

20   correct?

21        A    Yes, ma'am.

22        Q    All right.  And that entire investigation is

23   under one RD number, correct?

24        A    Yes, ma'am.

1    Q    All right.  Did you review nay other RD

2  numbers or any other incidents besides that murder?

3    A    No, ma'am.

4    Q    What video did you review?

5    A    The statement of Walker.

6    Q    Is that all?

7    A    Yes.  That's -- yes.

8    Q    So the only video you reviewed was the

9  statement of Walker.  The morgue report, how long was

10  the morgue report that you reviewed?

11    A    I'm sorry.  I didn't hear you.

12    Q    How many pages was the morgue report that you

13  reviewed?

14    A    I don't recall.

15    Q    Did you review any pictures?

16    A    Yes.

17    Q    What pictures did you review?

18    A    Crime scene and the ME chart.

19    Q    When you say ME chart, you mean where the ME

20  writes down the different injuries in their

21  handwriting?

22    A    Yes.

23    Q    Okay.  But you didn't review the ME's

24  pictures of -- on the decedent?

1      A    Yes.

2      Q    Okay.  You did review the pictures of the

3  decedent?

4      A    No.  Let me clarify.  When I say picture, I'm

5  talking about the chart that describe the wounds.

6      Q    Right.  That's handwritten where the ME talks

7  about different things that he see, correct?

8      A    Yes.

9      Q    Okay.  The ME also takes pictures of

10  decedent, correct?

11      A    Yes.

12      Q    Did you review any of those pictures?

13      A    No, ma'am.  I was speaking in reference to

14  the chart that the ME describes the wounds.

15      Q    Okay.  No problem.

16           Did you review any GPRs?

17      A    Yes.

18      Q    Okay.  Whose GPRs did you review?

19      A    I can't recall exactly all -- everybody's

20  GPR, but some of the ones with the detectives that was

21  working on the case.

22      Q    Anything else you can recall reviewing?

23      A    No, ma'am.

24      Q    Did you review your Interrogatory answers?

```
 1        A      I'm sorry.  You didn't come across clear.
 2        Q      Did you review your Interrogatory answers?
 3        A      I'm still not hearing you clearly.
 4        Q      Did you review your Interrogatory answers?
 5        A      Aritory(Phonetic) answers?
 6               MS. ITCHHAPORIA:  Interrogatory.
 7               THE WITNESS:  Yes.
 8  BY MS. SAMUELS:
 9        Q      All right.  What year did you graduate from
10  high school?
11        A      1974.
12        Q      After high school, what did you do?
13        A      I went to work.
14        Q      Where did you work?
15        A      Cook County Assessors Office.
16        Q      What did you do there?
17        A      Appraisals.
18        Q      Of property?
19        A      Yes, ma'am.
20        Q      All right.  How long did you do that?
21        A      Approximately ten years.
22        Q      Ten years?
23        A      Approximately ten years.
24        Q      So you are familiar with how to look up
```

1    different properties, I guess, in Cook County?

2         A    At that time, I did.

3         Q    So after you left -- well, why did you leave

4    the Cook County Assessors Office?

5         A    I became a Police Officer.

6         Q    Were you ever subject to any discipline while

7    you were at the Assessors office?

8         A    No, ma'am.

9         Q    Ever accused of any misconduct?

10        A    No, ma'am.

11        Q    What is your date of appointment?

12        A    I don't recall at this time.

13        Q    What year did you become a Police Officer?

14        A    1987.

15        Q    All right.  Prior to becoming a Police

16   Officer, sir, had you ever been arrested?

17        A    No, ma'am.

18        Q    After becoming a Police Officer, had you ever

19   been arrested?

20        A    No, ma'am.

21        Q    Since retiring from the Police force, have

22   you been arrested?

23        A    No, ma'am.

24        Q    What made you decide to become a Police

1    Officer?

2         A    I wanted to make a difference in my community

3    and also I wanted to help other people.

4         Q    Do you have any relatives who are Police

5    Officers?

6         A    Yes, ma'am.

7         Q    Who?

8         A    My wife.

9         Q    And what's her name?

10        A    Angela.

11        Q    And does she go by Wright?

12        A    Wynburn(Phonetic) hyphen Wright.

13        Q    And what department is she with?

14        A    She's retired.

15        Q    From what department?

16        A    Chicago Police Department.

17        Q    Did you ever work together?

18        A    No.

19        Q    Was she ever a Detective?

20        A    No.

21        Q    Besides your wife, do you have any other

22   relatives who are Police Officers?

23        A    No, ma'am.

24        Q    After leaving the Police Academy, what was

1    your first area of assignment?

2        A    Twenty-first District.

3        Q    Where is that?

4        A    Excuse me -- I had another job.  I mean, did

5    you want to know about that?

6        Q    Yes.

7        A    Okay.  I was also a Chicago Public

8    Schoolteacher, which I was working simultaneously with

9    the Police Department.

10       Q    When did you begin doing that?

11       A    I would say about '88 -- 1988, '89.

12       Q    All right.  What school did you work out of?

13       A    The school I'm currently working at now is

14   Washington Irving.  But I have worked at numerous

15   different schools.

16       Q    So in '88, '89 where were you working?

17       A    The school I was working at that particular

18   time.  I was subbing, so I was at various schools

19   throughout the city of Chicago.

20       Q    Would you substitute for any subject or any

21   grade?

22       A    Any subject, any grade, yes.

23       Q    Okay.  Were you ever given any complaints or

24   subject to any discipline in your role as a Substitute

1    Teacher?

2        A    No, ma'am.

3        Q    And so I think you said after the Academy you

4    went to the 21st District.

5        A    Yes, ma'am.

6        Q    And where is the 21st District?

7        A    2900 South Prairie.

8        Q    I'm sorry.  2900 South Prairie?

9        A    2900 South Prairie Avenue.

10       Q    And when you are in the 21st District, were

11   you a Patrolman?

12       A    Yes, ma'am.

13       Q    How long were you in the 21st District?

14       A    Probably about two years.

15       Q    During the entire time you were at the 21st

16   District, was your title Patrolman?

17       A    Yes, ma'am.

18       Q    Were you ever assigned to any specialized

19   units or specialized team while you were a part of the

20   21st District?

21       A    Yes, ma'am.

22       Q    All right.  What?

23       A    Tactical.

24       Q    Any others?

1      A      No, ma'am.

2      Q      What's the Tactical Team?

3      A      You say what is the Tactical Team?

4      Q      Yeah.

5      A      Kind of an undercover unit where you go out

6  and make arrests.  You know, whatever the Watch

7  Commander's discretion is.  He may -- his concentration

8  may be on robberies or thefts or whatever his

9  discretion is at that time, narcotics.

10      Q      Okay. did you have to apply to be on the

11  Tactical Team?

12      A      I'm sorry?

13      Q      Did you have to apply to be on the Tactical

14  Team?

15      A      No, I did not.

16      Q      Did you receive any specialized training to

17  join the Tactical Team?

18      A      No.

19      Q      Did you receive any additional training to

20  join the Tactical Team?

21      A      Not that I'm aware of.

22      Q      How is being on the Tactical Team different

23  than being a Patrolman?

24      A      Other than being in civilian clothes, they

1    are about the same.

2         Q    And then I believe you said after about two

3    years, you left the 21st District, correct?

4         A    Yes, ma'am.

5         Q    All right.  Where did you go after the 21st

6    District?

7         A    I worked as an Undercover Officer on CTA.

8         Q    Was there a specific unit that did that?

9         A    It was a Strike Force, so it was a temporary

10   unit.

11        Q    And how long were you part of this Strike

12   Force?

13        A    Approximately two years.

14        Q    Do you have to apply to be part of the Strike

15   Force?

16        A    Yes, ma'am.

17        Q    All right.  And how did you apply?

18        A    Application.

19        Q    It was just an application you filled out?

20        A    Yes, ma'am.

21        Q    Did you have to go through an interview

22   process or anything like that?

23        A    Yes, ma'am.

24        Q    Do you remember who interviewed you?

1      A      I would say the commander over the Strike

2  Force.

3      Q      And who was over the Strike Force at the time

4  you joined?

5      A      I don't remember at this time.

6      Q      What was your role or what did you do?

7      A      An undercover capacity to suppress crime that

8  was on CTA property.

9      Q      What would your day look like as a Police

10 Officer being part of the Strike Force?

11     A      Could you be more specific?

12     Q      Yeah.  Like, when you'd logged in for work,

13 what would you do?

14     A      I would go get on the trains or a bus, and

15 look for violations.

16     Q      Were you in plain clothes at this time?

17     A      Yes, ma'am.

18     Q      And when you say you are looking for

19 violations, are you talking about violations by the bus

20 driver, the public or both?

21     A      City violations.

22     Q      What does that mean?

23     A      Typical -- we are looking for thefts,

24 robberies, drinkers, gambling -- City Ordinance

violations.

Q    Okay.  So you were not necessarily concerned with what the Operator were doing with the mode of transportation, fair?

A    Yes, ma'am.

Q    Okay.  And assuming you saw some violation occurring, would you be responsible for conducting the arrest or would you alert other officers who would come and deal with it?

A    I would make the arrest.

Q    Okay.  Did you work certain -- a specific area doing this?

A    It was a citywide unit.

Q    And were you assigned citywide, or did you work a specific area?

A    I was assigned citywide.

Q    Did you do this individually, or did you have a partner?

A    Partner.

Q    Who was your partner?

A    I had various partners.

Q    Who?

A    Vance Bonnor, Dennis Barns, Leneatte Shannon.

Q    While you were part of a Tact Team, did you

1    have a partner?

2         A    Yes, ma'am.

3         Q    Who was your partner when you were on the

4    Tact Team.

5         A    Various partners.  Again, Michael Shields,

6    Dennis Barns, Leslie Harris.  That's as much as I could

7    recall today.

8         Q    If you think of anymore later on, just let me

9    know, okay?

10        A    I'm sorry.

11        Q    I said if you think of anymore later on just

12   let me know.

13                   And then after two years with the CTA

14   Strike Force, what was your next assignment?

15        A    In an undercover capacity, I worked the

16   school unit, citywide school unit.

17        Q    And how long did you do that?

18        A    To the best of my recollection, probably two,

19   three years.

20        Q    And what was your responsibilities in this

21   unit?

22        A    Responsible for school crimes.

23        Q    So when you say you worked undercover, what

24   does that mean?

1      A      Plain clothes.

2      Q      So would you just be assigned to a school?

3      A      No, ma'am.

4      Q      So how would that work?

5      A      Citywide, anywhere there was a city crime,

6  would respond to it.

7      Q      All right.  So if there was a call for

8  service at a school, you would be responsible for

9  responding to it?

10     A      Yes, ma'am.

11     Q      Did you work out of a particular station or

12  area for the school unit?

13     A      Yes, ma'am.

14     Q      Where?

15     A      Kedzie and Harrison.

16     Q      For the Strike Force, did you work out of a

17  particular area or a station?

18     A      Yes, ma'am.

19     Q      Where is that?

20     A      Kedzie and Harris.

21     Q      That's on the west side, right?

22     A      Yes, ma'am.

23     Q      I'm sorry?

24     A      Yes.

1      Q      Oh.  Were there particular schools that had

2  more calls than others?

3      A      I don't recall at this time.

4      Q      And you said you did that for two to three

5  years, correct?

6      A      Yes, ma'am.

7      Q      Did you have a partner while you were working

8  in a school unit?

9      A      Yes, ma'am.

10     Q      Who was your partner?

11     A      Dennis Barns.

12     Q      Anyone else?

13     A      No one else that I could recall at this time.

14     Q      After the school unit, what was your next

15  area of assignment?

16     A      Gang crimes.

17     Q      What was your job title?

18     A      Patrolman.

19     Q      And what area or station were you working out

20  of?

21     A      Kedzie and Harrison.

22     Q      And how long did you work Gang Crimes at

23  Kedzie and Harrison?

24     A      I'm not sure.  If I had to -- I believe maybe

1   five years.

2       Q    Was this undercover unit as well?

3       A    Uniform.

4       Q    And so how is a Gang Crimes Patrolman

5   different from a regular Patrolman?

6       A    We special -- we were suppressing crimes with

7   gangs, street gangs.

8       Q    Did you say three gangs?

9       A    Street -- street gangs.

10      Q    That makes a lot more sense.  Okay.

11              Did you receive any specialized training

12  or additional training to join the Gang Crimes Unit.

13      A    I'm sure I did, but I don't recall at this

14  time.

15      Q    Did you have a partner at the time you joined

16  Gang Crimes?

17      A    Yes, ma'am.

18      Q    Who was your partner?

19      A    Dennis Barns, Vance Bonnor, probably a lot of

20  other different people that I can't recall at this

21  time.

22      Q    The entire time you were with Gang Crimes did

23  your job title stay Patrolman?

24      A    Yes, ma'am.

```
 1          Q    And who is your supervisor for Gang Crimes?

 2          A    Fred Vosse.

 3          Q    The entire time?

 4          A    Yes, ma'am.

 5          Q    Okay.  And after five years with Gang Crimes,

 6   what was your next assignment?

 7          A    Special Operations.

 8          Q    And where was that?

 9          A    Kedzie and Harrison.

10          Q    What unit was that?

11          A    I don't remember the unit number.

12          Q    Did you have to apply to join Special

13   Operations?

14          A    Yes, ma'am.

15          Q    Do you recall -- well, first, how long were

16   you with the Special Operations Section?

17          A    I'm not sure how long.  But I know I made

18   Detective in '95, so the last point up to '95.

19          Q    Okay.  And with the Special Operations

20   Section, what was your job responsibilities?

21          A    Suppress Crime again, also respond to civil

22   unrest.  Also it was a part of the SWAT team.  I was

23   part of the SWAT team out of their unit.

24          Q    Who were your partners?
```

1      A    Various partners again, Dennis Barns --

2                That's about all I can think of right

3  now.

4      Q    All right.  And you said you did that,

5  roughly, until '95 when you made Detective?

6      A    Yes, ma'am.

7      Q    Oh, I forgot to ask you this:  When you were

8  with Gang Crimes -- I know that was based out of Kedzie

9  and Harrison, but was that a citywide unit?

10     A    Yes, ma'am.

11     Q    Okay.  And when you were with Special

12 Operations, again, I understand that's based out of

13 Kedzie and Harrison, but was that a citywide unit?

14     A    Yes, ma'am.

15     Q    And then how did you end up becoming a

16 Detective?

17     A    I took the exam.

18     Q    And when you became a Detective, where were

19 you assigned?

20     A    Kedzie and Harrison.

21     Q    And what was your specific job title?

22     A    Detective -- Violent Crime.

23     Q    Oh, there you go.

24                Did you receive any additional or

1    specialized training to become a Detective?

2        A    Yes, ma'am.

3        Q    And what did that consist of?

4        A    I went to the Academy.

5        Q    How long did you have to go to the Academy

6    again?

7        A    I have to guess, probably three or four

8    months.

9        Q    And while you are at the Academy, did you

10   receive training on interviewing witnesses?

11       A    Yes, ma'am.

12       Q    Do you make a differentiation between

13   interviewing someone and interrogating someone?

14       A    It's the same thing.

15       Q    I just wanted to know in case I use -- I

16   generally use both words interchangeably.  I just

17   wanted to make sure if I'm saying one or the other I'm

18   not spotlighting anything different to you?

19       A    No, to the best of my knowledge, they are the

20   same thing.

21       Q    Did you receive training on report writing or

22   documenting statements?

23       A    I'm sure I did.

24       Q    Did you receive training on Brady

1    Obligations.

2        A    I'm sure I did.

3        Q    Did you receive training on Goodwill

4    Obligations?

5        A    I'm sure I did.

6        Q    All right.  And just so you know where I'm

7    going, I'm going to ask you specifically about how you

8    remember being trained.

9            And then after that, I'm going to ask

10   you sort of your policy and practice of how you did

11   things over your time as a Detective, okay?

12           So specific to interviewing witnesses,

13   what do you recall about your training as a Detective?

14       A    From interviewing witnesses?

15       Q    Yes.

16       A    I'm sorry.  Excuse me.  I'm trying to

17   formulate this in my mind, what you are really looking

18   for.

19           I mean, to interview someone, you know,

20   you want to make sure that -- my practice would be

21   making sure that this person want to talk to me.

22           Number two, I would try to -- I guess,

23   my answer would be I would try to establish a

24   relationship with the person, make sure they are giving

```
 1    accurate information.  But I'm sure it's other things.
 2         Q    And how do you determine if they are giving
 3    accurate information?
 4              MS. ITCHHAPORIA:  Objection.  Form.
 5    Incomplete hypothetical.
 6                   Go ahead.
 7              MS. BRILL:  Join.
 8              THE WITNESS:  Obviously, I would try to
 9    cooperate to make sure that they are giving the right
10    information through other sources.
11    BY MS. SAMUELS:
12         Q    Okay.  Do you specifically remember what you
13    were train on when it came to interrogating witnesses
14    in order to become a detective?
15              MS. ITCHHAPORIA:  Objection.  Form.
16                   Go ahead.
17              MS. BRILL:  Join.
18              THE WITNESS:  What do you mean by
19    interrogation?
20    BY MS. SAMUELS:
21         Q    I'm sorry?
22         A    What do you mean by interrogation?
23         Q    Questioning someone who is believed to have
24    information related to a crime or offense?
```

1      A      And you are asking me about the training of

2   interrogation?

3      Q      Right.

4      A      Could you repeat your question again for me?

5      Q      Yeah.  So I understand you did three to four

6   months of Detective training, correct?

7      A      That's correct.

8      Q      And one of the things is that -- you stated

9   that they trained you on was Interviewing slash

10  interrogating the witnesses, which is essentially the

11  same thing, fair?

12     A      Right.

13     Q      All right.  And so my question was:  Do you

14  specifically recall what they trained you on, or you

15  just generally know that was one of the areas that they

16  covered?

17     A      I don't recall.

18     Q      Okay.  And then I'm just going to be asking

19  you the same thing.  So with regard to report writing

20  and documenting statements, do you specifically recall

21  what they trained you on, or do you just generally

22  remember that was one of the areas that they covered?

23           MS. ITCHHAPORIA:  Objection.  Form.

24  Compound.

```
1              Go ahead.
2              MS. BRILL:  Joined.
3              THE WITNESS:  I just remember training.  But
4   I don't recall specifically what the training was.
5   BY MS. SAMUELS:
6        Q     And regarding your Brady and Gigli
7   obligations, do you specifically remember how you were
8   trained or do you just generally remember that that was
9   covered?
10       A     I recall having some training, but
11  specifically, I don't know exactly what was covered.
12       Q     All right.  And how long were you a
13  Detective?
14       A     Approximately about ten years.
15       Q     And so I'm gonna ask you some questions now
16  sort of about your practice and how you would do things
17  during your time as a Detective, okay?
18       A     Okay.
19       Q     And I think you sort of got into this with
20  regard to interviewing witnesses.  You said that you
21  would make sure they want to talk to you, try to
22  establish a sort of relationship, and make sure that
23  they are giving you accurate information by
24  corroborating it to the best that you could with other
```

1    sources, correct?

2         A    Yes.

3         Q    Okay.  I'm sorry.  But my left arm is giving

4    me -- and I don't know why.  So every time I move

5    forward -- it's terrible.

6              And so with regard to interviewing

7    witnesses, do you know whether or not you were trained

8    on whether there was a limit to how long you could

9    interview someone?

10        A    No, ma'am.

11        Q    Okay.

12        A    Discretionary.

13        Q    What about the condition of a person you are

14   interviewing, was there any guidelines that you are

15   aware of that talked about the condition of a person

16   you are interviewing?

17        A    Could you be more specific than that?

18        Q    Right.

19        A    When you say guidelines and condition.

20        Q    Are you aware of any -- well, I guess for

21   Police Officers it would be general orders, or like

22   special orders or anything like that that talks about

23   whether -- if the person is, say, experiencing medical

24   duress, incapacitated or anything like that, or they

1  say that they are, whether or not you are allowed to

2  interview them?

3      A    I would not interview anyone that was

4  distressed or had a medical condition.  I would have

5  him taken to the hospital.

6      Q    And so if somebody alleged injury, was it

7  your general practice to -- well, I'll ask that:  If

8  you were interviewing someone and they alleged injury,

9  what was your general practice?

10     A    Make sure they had medical attention.

11              And that phone number was the actual

12  witness who is sitting in the box with the Lieutenant

13  any box.

14     Q    If you noticed anything do you have a general

15  practice for how you would deal with that?

16          MS. ITCHHAPORIA:  Objection.  Form.

17  Incomplete hypothetical.

18              Go ahead.

19          MS. BRILL:  Join.

20          THE WITNESS:  It all depends.

21  BY MS. SAMUELS:

22     Q    All right.  And what are some of the things

23  that would weigh into that?

24     A    Pain.  Mainly pain, or if they request

```
 1   medical attention.
 2        Q    And so -- so if somebody -- so if somebody
 3   may not say the word like, "I need to go to the
 4   doctor," but if you could see they're, like riding in
 5   pain or something, you are going to call the doctor
 6   anyways, that's sort of how I interpreted what are you
 7   saying.  Is that what you're saying?
 8        A    Well, I'm not saying I'm going to call the
 9   doctor.  But I'm saying I would request an ambulance
10   for this person to be transported to a hospital.  I
11   mean, I don't know any doctors that I could just call.
12        Q    Gotcha.  All right.
13             What about if somebody is under the
14   influence, would that affect whether or not they should
15   be interviewed?
16             MS. ITCHHAPORIA:  Objection.  Form.
17   Incomplete hypothetical.
18                  Go ahead.
19             MS. BRILL:  Join.
20             THE WITNESS:  I would not.  I would not
21   interview the person.
22   BY MS. SAMUELS:
23        Q    Why not?
24        A    Was there another question?
```

1      Q     Yeah.  You said you would not interview them

2   if they were under the influence.  My question was:

3   Why not?

4      A     Because I don't think that person would be

5   able to give a good answer based upon their condition

6   or accurate information based upon their condition.

7      Q     So we went over the length of time -- no, I'm

8   sorry.

9               And for documenting statements, what was

10  your general practice for if you were interviewing

11  somebody out on the street?

12     A     Was that your question?

13     Q     Yes, sir.

14     A     What's my general -- you are kind of cutting

15  in and out a little bit.  So I didn't catch the part.

16  I heard something about interviewing on the street.

17  What was your question, please?

18     Q     I'm sorry.  So I said for documenting

19  statements, what would be your general practice after

20  interviewing someone out in the street?

21             MS. ITCHHAPORIA:  Objection.  Form.

22                Go ahead.

23             MS. BRILL:  Join.

24             THE WITNESS:  Discretionary.

```
1    BY MS. SAMUELS:

2         Q    Can you explain that further?

3         A    Sure.  If I thought that the information was

4    pertinent to the investigation, I probably would

5    document it.

6         Q    And I assume the -- I guess the alternative

7    is true as well, if you didn't believe the information

8    was pertinent, then you wouldn't document it?

9         A    At some point, I probably would.  I could

10   also do that when I get -- you know, when I went back

11   to the station.

12        Q    All right.  So regardless of whether or not

13   you believe the information was pertinent, you would

14   document it somewhere?

15        A    Yes.

16        Q    Okay.  The difference being that if it was

17   pertinent, you would probably be more apt to document

18   it sooner, whereas if you believed it wasn't as

19   pertinent you might wait until you get back to the

20   station to document it?

21             MS. ITCHHAPORIA:  Objection.  Form.

22   Mischaracterizes.

23                  Go ahead.

24             MS. BRILL:  Join.
```

1          THE WITNESS:  Not necessarily -- all the

2     information don't have to be documented.

3     BY MS. SAMUELS:

4          Q    Okay.

5          A    I mean, for example, if they are telling me

6     about the weather or something that's not related to

7     the case, I don't see where that need to be documented.

8          Q    And when you were out on the street

9     interviewing people, what materials would you use to

10    document a statement?

11          MS. ITCHHAPORIA:  Objection.  Incomplete

12    hypothetical.

13               Go ahead.

14          THE WITNESS:  Sometimes, I would carry a

15    clipboard with me.

16    BY MS. SAMUELS:

17          Q    So -- and the times you weren't -- well, I'm

18    trying to get at -- I understand that each situation is

19    different.

20               But was it a general way you just did

21    things over your ten years of being a Detective?

22          A    I'm not --

23          MS. ITCHHAPORIA:  Objection.  Form.

24               Go ahead.

```
 1              MS. BRILL:  Join.
 2              THE WITNESS:  I'm not understanding your
 3   question about the ten years.
 4   BY MS. SAMUELS:
 5       Q    Right.  What I'm trying to get at is as a
 6   Detective, did you form a general practice or a general
 7   habit of how you did things?
 8              MS. BRILL:  Object to vague and form.
 9              MS. ITCHHAPORIA:  Join.
10              THE WITNESS:  I don't understand what you
11   mean by general.
12   BY MS. SAMUELS:
13       Q    Right.  So --
14       A    Because I'm understanding you mean general as
15   this is how I always do things.
16       Q    No.  And so I don't always take the Redline
17   to work, right.  But, generally, that's the way I get
18   to work.  And so if somebody asked me how did I get to
19   work in 2022, I'd probably tell them I took the
20   Redline.
21              Was there a day I might have taken Uber
22   or something?  Probably.  But my general practice would
23   be to take the Redline.  That's sort of what I'm trying
24   to get at.  Do you see what I'm saying?
```

1               THE WITNESS:  Okay.  Am I --

2               MS. ITCHHAPORIA:  Let her ask the question.

3    What's the question?

4    BY MS. SAMUELS:

5         Q    So my question is:  Do you see what I'm

6    trying to get at when I say, like, your general way of

7    doing things?

8               MS. ITCHHAPORIA:  Objection.  Form.

9                    Go ahead.

10              MS. BRILL:  Join.

11              THE WITNESS:  I don't think that I generally

12   do things the same way all the time.

13   BY MS. SAMUELS:

14        Q    Okay.  So depending on the needs of the case,

15   what you did might change drastically from one case to

16   another?

17              MS. BRILL:  Objection.  Call for speculation

18   and vague.

19   BY MS. SAMUELS:

20        Q    And so sometimes you would carry a clipboard

21   to take statements; sometimes you wouldn't, fair?

22        A    I would always have a clipboard handy.  It

23   may be in the car or I may have it in my hand.

24        Q    And would you always keep GPRs with you?

1      A    Generally -- I wouldn't say always.  But
2  generally, to the best of my knowledge, I would always
3  have GPRs.
4      Q    All right.  Was there any documentation that
5  you always kept with your clipboard?
6      A    Like what?  I mean, I'm not understanding the
7  question.  Sorry.
8      Q    Right.  And so we are sort of talking about
9  documenting statements.  You said sometimes -- you said
10  you would always have a clipboard whether it was with
11  you or in the car, it would generally be around you or
12  else accessible, right?
13      A    Yes.
14      Q    All right.  And so I guess what I'm getting
15  at is what's the purpose of the clipboard, or what's on
16  the clipboard, and why was it important?
17          MS. ITCHHAPORIA:  Objection to form.
18              Go ahead.
19          MS. BRILL:  Join.
20          THE WITNESS:  Just if I needed a clipboard.
21  You know, sometimes you want to write a phone number
22  down or something.  Or sometimes I will give someone my
23  information, I'll write my information down and give it
24  to them.

1   BY MS. SAMUELS:

2       Q    Okay.  But there weren't any specific forms

3   or papers that you kept with your clipboard to make it

4   handy to write something?

5           MS. BRILL:  Object to form.

6           THE WITNESS:  No.

7   BY MS. SAMUELS:

8       Q    Okay.  Did you ever document statements by

9   audio recording them?

10      A    Do I what?

11      Q    Audio recording them.

12      A    No.

13      Q    Did you ever document statements by video

14  recording them?

15      A    No, ma'am.

16      Q    Did you ever practice when it came to

17  interviewing witnesses that you never interviewed

18  somebody alone?

19      A    I'm sorry, I didn't catch that.

20      Q    Did you have a practice when it came to

21  interviewing witnesses, that you never interviewed

22  somebody alone?

23          MS. BRILL:  Object to form.

24          THE WITNESS:  I don't recall at this time.  I

1    mean, sometimes I'm interviewing -- I have interviewed
2    people by myself and I have interviewed people with
3    other people, if that's what you're asking me.
4    BY MS. SAMUELS:
5        Q    That's fair enough.
6                 Were you trained to document the time
7    that you spoke to someone?
8        A    I don't recall that being a part of my
9    training.
10       Q    Do you think that's important to note?
11       A    It depends.
12       Q    All right.  Were you trained to document the
13   location where you spoke to someone?
14       A    It all depends on the case.
15       Q    Okay.  But were you trained to document that?
16       A    I don't recall that in my training, but it
17   may have been.
18       Q    Were you trained to document the condition of
19   someone you are speaking to?
20               MS. ITCHHAPORIA:  Objection.  Form.
21                 Go ahead.
22               MS. BRILL:  Join.
23               THE WITNESS:  Would you repeat the question,
24   please?

1    BY MS. SAMUELS:

2         Q    Were you trained to document the condition of

3    someone you're speaking to?

4              MS. ITCHHAPORIA:  Objection.  Form.

5                   Go ahead.

6              MS. BRILL:  Join.

7              THE WITNESS:  I don't recall.  I may have.

8              MS. ITCHHAPORIA:  Jeanette, sorry to

9    interrupt.  Can we just get an agreement that an

10   objection for one Defendant is an objection for all

11   Defendants.

12             MS. SAMUELS:  That's fine.

13             MS. ITCHHAPORIA:  Thank you.

14   BY MS. SAMUELS:

15        Q    If you spoke with an individual on more than

16   one occasion, were you trained to document each time

17   you spoke with an individual?

18        A    If I was trained -- I didn't catch the last

19   part of that.  I'm sorry.  You're not coming across

20   clear to me.

21        Q    No problem.  So if you spoke to an individual

22   on more than one occasion, were you trained to document

23   each time you spoke to the individual?

24        A    It depends on the situation.  That's kind

1   of -- once again, that would be discretionary.  I'm

2   sorry to keep asking you to repeat, but it's kind of a

3   delay.

4        Q    It's no problem.  The wonders of technology.

5             And so as it relates to this case and

6   what I'm more interested in is, say you got somebody in

7   custody for 38 hours, right, ostensively, you're not

8   going to be questioning them for 30 hours straight.

9             And so you might go in one evening to

10  question them; you hold them overnight; you go, you

11  come in the morning and question them.  Right.

12            Those would be two different

13  questionings, but it's the same individual.  And so

14  when it comes to documenting that, would you be trained

15  to document that there were two different sessions, or

16  were you trained -- or was that not part of the

17  training, or how does that work?

18            MS. BRILL:  Object to form.  Foundation.

19            THE WITNESS:  Once again, that's kind of

20  discretionary.  What I may do is write some things down

21  in my notes, and later I will put it in a supplementary

22  report.

23  BY MS. SAMUELS:

24       Q    All right.  And when you say, "write some

1    things down in my notes," is that referring to, like, a

2    note pad or your GPR, or what's that referring to?

3         A    I was given a hypothetical.  It could be GPR.

4         Q    Did you keep notes separate from an GPR?

5         A    No.

6         Q    All right.  So any notes that you would have

7    taken during an interrogation, if you were to take

8    notes, would have been recorded on a GPR?

9         A    Yes.

10        Q    When I say Xavier Walker, do you know who I'm

11   referring to?

12        A    Yes.

13        Q    When I say Jovanie Long, do you know who I'm

14   referring to?

15        A    Yes.

16        Q    When I say Maurice Wright, do you know who

17   I'm referring to?

18        A    Yes.

19        Q    When I say Ashanti Wright, do you know who

20   I'm referring to?

21        A    Yes.

22        Q    When I say Jamaica Wright, do you know who

23   I'm referring to?

24        A    Yes.

1    Q    When I say Mary Curry, do you know who I'm
2    referring to?
3    A    Yes.
4    Q    When I say Antwoine Waddy, do you know who
5    I'm referring to?
6    A    Yes.
7    Q    Do you have an independent recollection of
8    your interactions with Xavier Walker as it relates to
9    the murder of Merek Majdak?
10   A    Yes.
11   Q    Do you have an independent recollection of
12   your interactions with Jovanie Long as it relates to
13   the murder of Merek Majdak?
14        MS. ITCHHAPORIA:  Objection.  Form.
15   Foundation.
16            Go ahead.
17        THE WITNESS:  I would say I have knowledge
18   either by reports or talking to other Detectives.
19   BY MS. SAMUELS:
20   Q    So is it fair to say you don't have an
21   independent recollection of any interaction with
22   Jovanie Long as it relates to Merek Majdak?
23   A    No independent recollection.
24   Q    Do you have an independent recollection of

```
1    Maurice Wright as it relates to the murder of Merek

2    Majdak?

3              MS. ITCHHAPORIA:  Objection.  Form.

4    Foundation.

5                   Go ahead.

6              THE WITNESS:  No independent recollection.

7    BY MS. SAMUELS:

8       Q    Do you have an independent recollection with

9    your interactions with Ashanti Wright as it relates to

10   the murder of Merek Majdak?

11             MS. ITCHHAPORIA:  Same objection.

12                  Go ahead.

13             THE WITNESS:  No independent recollection.

14   BY MS. SAMUELS:

15      Q    Do you have an independent recollection of

16   your interactions with your as it relates to the murder

17   of Merek Majdak?

18             MS. ITCHHAPORIA:  Objection.  Foundation.

19                  Go ahead.

20             THE WITNESS:  No independent recollection --

21   no independent recollection.

22   BY MS. SAMUELS:

23      Q    Do you have an independent recollection of

24   your interactions with Mary Curry as it relates to the
```

1    murder of Merak Majdak?

2              MS. ITCHHAPORIA:  Objection.  Foundation.

3                   Go ahead.

4              THE WITNESS:  No independent recollection

5    that I'm aware of at this time.

6    BY MS. SAMUELS:

7        Q    Do you have an independent recollection of

8    your interactions with Antwoine Waddy as it relates to

9    the murder of Merek Majdak?

10             MS. ITCHHAPORIA:  Objection.  Foundation.

11                  Go ahead.

12             THE WITNESS:  No independent recollection at

13   this time.

14   BY MS. SAMUELS:

15       Q    Do you have an independent recollection of

16   your interactions with Yvette Anderson as it relates to

17   the murder of Merek Majdak?

18       A    Would you repeat that?  I'm story.

19       Q    Do you have an independent recollection of

20   your interactions with Yvette Anderson as it relates to

21   the murder of Merek Majdak?

22       A    Yes, I do.

23       Q    Do you have an independent recollection of

24   your interactions with Miriam Tilman as it relates to

1    the murder of Merek Majdak?

2         A    What was the name again?

3         Q    Miriam Tilman?

4         A    No -- no independent recollection.

5         Q    Sometimes she went by Yvette Hill or

6    Smuggles.

7         A    Yes -- yes.

8         Q    Had you known her before this incident?

9         A    No, ma'am.

10        Q    Were you familiar with her, her family?

11        A    Am I familiar with her family?  No, ma'am.

12        Q    Were you familiar with any gang or gang

13   members who were in charge of the Cicero and Ohio area?

14        A    No, ma'am.

15        Q    While you worked Gang Crimes, had you ever

16   become familiar with any gangs that were known to

17   inhabit the Cicero and Ohio area?

18        A    No recollection at this time?

19        Q    All right.  When you worked Gang Crimes,

20   were -- do you become aware of two pimps who are known

21   to run prostitutes along Cicero Avenue?

22        A    Not at this time?

23        Q    All right.  When I say, King Bean, you don't

24   know who that is?

```
 1        A     No, ma'am.
 2              MS. ITCHHAPORIA:  Can you just repeat that or
 3    have that read back, please?
 4    BY MS. SAMUELS:
 5        Q     So I asked, when you say King Bean, you don't
 6    know who that is, and his response was "no, ma'am;" is
 7    that correct?
 8              MS. ITCHHAPORIA:  Are you saying Bean or Pin?
 9              MS. SAMUELS:  Bean.  King, K-i-n-g.  Bean, B-
10    as in boy, e-a-n.
11              MS. ITCHHAPORIA:  Thank you.
12              THE WITNESS:  No, ma'am.
13    BY MS. SAMUELS:
14        Q     All right.  And when I say Cicero Red, you
15    don't know who I'm referring to?
16        A     No, ma'am.
17        Q     No.
18              Is it your understanding that the murder
19    of Merek Majdak was, in any way, gang related?
20        A     To the best of my recollection, no.
21        Q     I believe you said you worked -- you were a
22    Detective in Violate Crime for ten years?
23        A     Yes, ma'am.
24        Q     All right.  After that, what did you do?
```

1      A    Part of that ten years I was -- went to a

2  Cold Case Unit as a Detective as well.

3      Q    And when was that?

4      A    Probably in the last three years as a

5  Detective.

6      Q    All right.  And where was that unit

7  headquartered out of?

8      A    For Police Headquarters.

9      Q    Off of what; what's that, 35th and Michigan?

10     A    Thirty-fifth, yes, ma'am.

11     Q    Did you ever -- did you have a regular

12 partner when you worked for the Cold Case Unit?

13     A    Yes, ma'am.

14     Q    Who was that?

15     A    Stanley Sanders.

16     Q    Anyone else?

17     A    As I recall, it may have been others, but

18 that's what I recall today.

19     Q    And when you were working Violent Crimes as a

20 Detective, did you have a regular partner?

21     A    Not a regular partner, but I worked with two

22 other -- well, I worked with Stanley Sanders and a

23 Cornelius Longstreet.

24     Q    And after Cold Case -- after being a Cold

1    Case Detective for approximately three years, what did

2    you do?

3         A    I was promoted to Sergeant.

4         Q    When was that.

5         A    '95, I believe.

6         Q    2005?

7         A    Yes -- no, I think 1995.  I'm sorry.  I want

8    to say 1995.

9         Q    And where were you assigned as a Sergeant?

10        A    First assignment was back in Patrol at the

11   21st District.

12        Q    So you were a Patrol Sergeant for the 21st

13   District?

14        A    Yes.

15        Q    What does a Patrol Sergeant do?

16        A    Pretty much responsible for a group of

17   Patrolmen, respond to their job, respond to citizen

18   complaints, attend meetings, investigate CR numbers.

19        Q    Anything else?

20        A    I'm not -- it may be more, but that's what I

21   recall right now.

22        Q    So how long were you a Patrol Sergeant for

23   the 21st District?

24        A    Three months.

1          Q     And then where did you go?

2          A     Went back to the Detective Division as area

3    South.

4          Q     Where was that?

5          A     111th and Cottage.

6          Q     What was your job title when you went back to

7    the Detective Division, area South?

8          A     Supervisor of Violent Crimes.

9          Q     What did you have to do in that job?

10         A     Same as Patrol, attend meetings, supervise

11   detectives, investigate CR numbers.

12         Q     How long were you supervisor at Violent Crime

13   scenes, area South?

14         A     Until retirement, 2017.

15         Q     So about how many years was that?

16         A     I don't know.  I'm not sure.

17         Q     After you retired, did you get any other

18   appointment?

19         A     No.  I'm still working with the Chicago Board

20   of Education.

21         Q     And what do you do for the Chicago Board of

22   Education?

23         A     Dean of students.

24         Q     Where?

```
 1        A     Irving Washington.

 2        Q     And what are your job responsibilities as a

 3   Dean of Students?

 4        A     Discipline.

 5        Q     For all grades?

 6        A     Yes.  It's preschool through eighth.

 7        Q     Have you ever had any other jobs other than

 8   the Chicago Board of Education since your retirement?

 9        A     No, ma'am.

10        Q     Did you ever have any part-time jobs other

11   than substitute teacher, which you mentioned while you

12   were employed by the Chicago Police Department?

13        A     No, ma'am, that I could recall.

14        Q     Were you ever subject to any discipline while

15   you were a CP Officer?

16        A     As a what?

17        Q     As -- were you ever subject to any discipline

18   while you were with the Chicago Police Department?

19        A     I believe I was.

20        Q     All right.  And what was that?

21        A     I know one, I took a five-day suspension.  I

22   don't remember all the details.

23        Q     Was there anything else besides the five-day

24   suspension?
```

1          A     I took a ten-day suspension right before I

2    retired.

3          Q     What was that for?

4          A     I don't recall all the details with that.

5    I'm not sure at this time.

6          Q     You don't recall why you were suspended for

7    10 days right before you retired?

8          A     I don't remember all the details.

9          Q     Okay.  What do you remember?

10         A     I remember that a friend of mine's was --

11   that's a schoolteacher was involved in a traffic

12   altercation or an accident, and the guy got out of the

13   car and called her a bunch of racial epithet.

14              And I directed her to go to the nearest

15   police station, and they refused to take a report.  And

16   when they refused to take the report, I instructed her

17   to get a CR number on the Officer that was there.  And

18   somehow, the commander of that Officer got a CR number

19   on me for getting a CR number on his Patrolman.

20              So that part, I remember.

21         Q     Did that play any role in your decision to

22   retire?

23         A     No.

24         Q     When you are responsible for investigating CR

1    numbers, did you ever find anyone -- did you ever

2    sustain any allegations of misconduct?

3        A    Did I sustain -- I'm not -- could you repeat

4    that?  I'm not clear.

5        Q    Right.  When you were responsible for

6    investigating CR numbers, did you ever sustain any

7    allegations of misconduct?

8        A    On the person I was investigating?

9        Q    Yes, sir.

10       A    No.  That was not my role.  That's -- that

11   would be the Emperor or OPS at that time.  They would

12   come back with the sustained, or the Superintendent of

13   Police.

14       Q    What was your role?

15       A    The investigation portion of it.

16       Q    So you would just investigate it and give

17   them the information, and then they would make a

18   determination on whether or not someone did something

19   wrong?

20       A    Yes, ma'am.

21       Q    Have you ever seen another Chicago Police

22   Officer engage in misconduct?

23       A    No, ma'am.

24       Q    Have you ever investigated the Chicago Police

1    Officer who you believe engaged in misconduct?

2         A    Yes, ma'am.

3         Q    What do you recall about your interactions

4    with Miriam?

5         A    I'm sorry?

6         Q    What do you recall about your interactions

7    with Miriam or Snuggles?

8         A    Are you saying Miriam?

9         Q    Yes.  I believe her legal name is Miriam

10   Tilman.

11            MS. ITCHHAPORIA:  Objection.  Form.  Are you

12   going to give him the other name, Jeanette?

13            MS. SAMUELS:  Snuggles.

14            THE WITNESS:  Are you --

15            MS. ITCHHAPORIA:  No, the other one.

16            MS. SAMUELS:  Yvette Hill?

17            THE WITNESS:  Yes.

18   BY MS. SAMUELS:

19        Q    Okay.  So when you knew her, you knew her as

20   Yvette Hill?

21        A    Yes, ma'am.

22        Q    All right.

23        A    I recall.

24        Q    What do you recall about your interactions

1    with her?

2        A    There was an interview conducted by Detective

3    Sanders and myself?

4        Q    All right.  How did you become aware of her?

5        A    As I recall, at that time, I believe it was a

6    CI on the street.

7        Q    And when you say CI, what do you understand

8    that to mean?

9        A    To me, it somebody that don't want to give

10   their name or the information.  They want to stay

11   anonymous.

12       Q    All right.  As you sit here today, do you

13   know who that CI is?

14       A    I'm sorry?

15       Q    As you sit here today, do you know who that

16   CI is?

17       A    No, ma'am.

18       Q    As you sit here today, is there any record

19   you can think of that can be used to determine who that

20   individual is -- excuse me -- who that CI is?

21       A    No, ma'am; not at that -- at this time, no.

22       Q    All right.  At that time, would there have

23   been any record made or created to help you determine

24   at a later date who that CI is?

1          MS. ITCHHAPORIA:  Objection.  Form.

2     Foundation.

3               Go ahead.

4          THE WITNESS:  At this time, I don't recall.

5     BY MS. SAMUELS:

6     Q     Okay.  Would you have documented, or should

7     you have documented somewhere that there was

8     information related to the identity of who the CI is?

9     A     No.

10    Q     And why would you not document somewhere that

11    there was information related -- that there was

12    information somewhere to determine who the CI is?

13    A     If I thought it was -- I thought it was gonna

14    be credible information, I would have.  But the person

15    didn't want his information documented.

16    Q     And when you came across this CI who later

17    appointed you to Yvette Hill, essentially, you guys

18    were canvassing along Cicero, correct?

19    A     At this time, I don't recall.  I may have.

20    Q     All right.  At some point, did you and your

21    partner begin interviewing sex workers who worked along

22    Cicero or in that area?

23    A     I'm sorry.  I didn't hear it.  Somebody was

24    speaking in the background.  Somebody was saying

1    something.

2         Q    So the question was:  At some point, did you

3    and your partner begin questioning sex workers who

4    worked along Cicero or in the Cicero area?

5         A    We may have.  I don't recall at this time if

6    it was on Cicero.

7         Q    Do you remember questioning a number of sex

8    workers?

9         A    I do have some recollection of

10   interviewing -- I don't know --

11                  I'm not sure if they were sex workers,

12   but I do recall interviewing people in that area.

13        Q    Do you know why you were out interviewing

14   people in the area at that time?

15        A    I'm sorry?

16        Q    Do you know why you were out interviewing

17   people in that area at that time?

18        A    Yes.

19             MS. ITCHHAPORIA:  Objection.  Form.

20                  Go ahead.

21             THE WITNESS:  Yes, we were working on a

22   homicide, Merek Majdak.

23   BY MS. SAMUELS:

24        Q    And did you have a reason to believe that

```
 1    those persons would have information related to the
 2    murder of Merek Majdak?
 3         A    Yes.
 4         Q    All right.  And what was the basis for that
 5    belief?
 6         A    Because it was in the area where the homicide
 7    occurred.
 8         Q    Okay.  So it would have just been a general
 9    canvas, because it was in the area, not because you had
10    any specific reason to believe someone had information;
11    is that fair?
12              MS. ITCHHAPORIA:  Objection.  Form.
13              THE WITNESS:  Yes.
14    BY MS. SAMUELS:
15         Q    Okay.  And then what do you recall about the
16    CI?
17         A    I don't understand the question.  Could you
18    be a little bit more specific?
19         Q    So you stated -- you spoke with someone who
20    told you, go talk to Yvette Hill, essentially, correct?
21         A    Yes, ma'am.
22         Q    All right.  What do you recall about the
23    individual who told you to go talk to Yvette Hill?
24         A    As I remember, they told us she may have some
```

```
 1    information in regards to the homicide.

 2         Q    Was it one person, or was it more than one

 3    person?

 4         A    It may have been.  At this time, I don't

 5    recall.

 6         Q    All right.  Man or woman?

 7         A    At this time, I don't recall.

 8         Q    Do you know where you were when you spoke to

 9    them?

10         A    As I sit here today, 22 years later, I don't

11    recall.

12         Q    Do you actually recall the CI telling you to

13    go talk to Yvette Hill, or you just know that's what

14    happened because it's in the report?

15         A    Report.

16         Q    Fair enough.  And so as you sit here today,

17    do you actually recall speaking with Yvette Hill, or

18    you just know you did it because it's in the report?

19         A    I have a vague memory that we did have a

20    conversation with Yvette Hill and the report.

21         Q    Tell me what you remember about your

22    conversation with Yvette Hill.

23         A    I remember that she gave us a couple names,

24    Red and Darnell.  I also recall her saying that she
```

1    wasn't a witness to this homicide.  And it may be more.

2         Q    All right.  Where did you speak with Yvette

3    Hill?

4         A    It was in her residence.

5         Q    All right.  Who else was present?

6         A    It may have been Detective Sanders or

7    Detective Mike Pietryla.

8         Q    Was anybody else from her family present?

9         A    I don't recall at this time.  It may have

10   been.

11        Q    How did you know where to find Yvette Hill?

12        A    At this time, I don't recall, but I'm sure

13   someone -- I'm sorry.

14        Q    Go ahead?

15        A    What I was saying is at this time, I don't

16   recall, but I'm sure it was someone that we talked to

17   on the street.

18        Q    What do you remember about her condition at

19   the time you spoke with her?

20        A    I don't recall at this time.

21        Q    So after you learned that she had identified

22   a Red and Darnell as being involved with this murder,

23   what did you do with that information?

24        A    I'm sure what we did was, we passed it on to

1    the other detectives.

2        Q    Anything else?

3        A    Not that I could recall at this time.

4        Q    Are you aware of any actions that you took to

5    identify Red or Darnell?

6        A    I'm not sure at this time.  You know, I may

7    have or me and my partner, we may have tried to run Red

8    and Darnell in with your data base, computer data base.

9        Q    All right.  Would that be documented

10   somewhere?

11           MS. ITCHHAPORIA:  Objection.  Form.

12   Foundation.

13               Go ahead.

14           THE WITNESS:  In our data base, it's kind of

15   a common name, Red and Darnell.  So probably hundreds

16   of Darnells and Reds would have popped up.  So we could

17   not -- or I'm sure at that time, that it was so many

18   Red and Darnells, we couldn't probably make a

19   determination of a Red and Darnell close to that area.

20   BY MS. SAMUELS:

21       Q    So you didn't know that Darnell Holden lived

22   a block away from this murder?

23           MS. ITCHHAPORIA:  Objection.  Form.

24   Foundation.

```
 1              THE WITNESS:  No.
 2   BY MS. SAMUELS:
 3        Q    And when you ran his name, that didn't come
 4   up?
 5        A    At this time, I don't recall.
 6        Q    Is it your testimony that you were unable to
 7   find any Red or Darnells that were known to associate
 8   with the area of where the murder occurred?
 9              MS. ITCHHAPORIA:  Objection.  Form.
10   Foundation.  Mischaracterizes.
11              Go ahead.
12              THE WITNESS:  I was unable -- I don't -- I
13   don't recall.  May have to, but I don't recall.
14   BY MS. SAMUELS:
15        Q    Had you been able to identify a Darnell that
16   was known to live or associate with the area before the
17   murder occurred, would that have been documented
18   anywhere?
19        A    If it was pertinent to our investigation,
20   yes.
21        Q    Well, why would that not be pertinent to your
22   investigation?
23              MS. ITCHHAPORIA:  Objection.  Form.
24   Argumentative.
```

```
 1                    Go ahead.
 2             THE WITNESS:  Why it wouldn't be pertinent to
 3   our investigation?
 4             MS. SAMUELS:  Yeah.
 5             THE WITNESS:  If -- if we felt -- I mean, if
 6   it was something that we thought was credible, then we
 7   would have probably pursued it further.  But that name
 8   never came up, so there was no need to further that
 9   investigation.
10   BY MS. SAMUELS:
11      Q     When you say the name never came up, what do
12   you mean by that?
13      A     That we never -- as I recall, we never saw
14   Red or Darnell that was close proximity to where this
15   homicide occurred.
16      Q     Okay.  And this homicide occurred on Ohio,
17   right off of Cicero, correct?
18      A     To the best of my recollection.
19      Q     And a known associate of Yvette Hill at that
20   time, and to this day, is Cicero, Red, and that never
21   came up?
22             MS. BRILL:  Object to form.
23             MS. ITCHHAPORIA:  Objection.  Form.
24   Foundation.
```

```
 1              THE WITNESS:  I don't recall.

 2   BY MS. SAMUELS:

 3        Q    Do you recall asking Yvette Hill if she knew

 4   any Reds?

 5        A    I don't recall.

 6        Q    Do you recall asking Yvette Hill if she knew

 7   any Darnells?

 8        A    I don't recall.  I may have.

 9        Q    Generally, that would be a question you ask,

10   right?

11        A    I'm not saying I didn't.  I just don't

12   recall.

13        Q    Right.  If you had asked her those questions,

14   would you have documented her answers?

15        A    I probably would have.

16        Q    Are you aware of any documentation that

17   indicates her knowledge of knowing a Red or Darnell?

18              MS. BRILL:  Object to form.

19              THE WITNESS:  I think on my -- I think on a

20   GPR it was asked, and she indicated that she only knew

21   the nickname.  She didn't know the individuals.

22   BY MS. SAMUELS:

23        Q    And is that what you recall her saying?

24        A    She heard on the street that it was Red and
```

1    Darnell.

2        Q    Did you not believe her when she told you

3    that?

4            MS. BRILL:  Objection to form.

5            MS. ITCHHAPORIA:  Object to form.

6               Go ahead.

7            THE WITNESS:  I didn't have a reason not to

8    believe her.

9    BY MS. SAMUELS:

10       Q    But you are aware of no documentation that

11   indicates a follow-up investigation into the

12   identifying Red or Darnell?

13           MS. BRILL:  Object to form.

14           THE WITNESS:  I'm sorry.

15   BY MS. SAMUELS:

16       Q    I said --

17       A    I'm sorry.  Could you repeat that?

18       Q    I said, you are aware of no documentation

19   that indicates any follow-up investigation into

20   identifying red or Darnell?

21           MS. BRILL:  Same objection.

22           THE WITNESS:  I'm not aware.

23   BY MS. SAMUELS:

24       Q    Did you ever inquire how Yvette Hill knew it

1    was Red and Darnell?

2        A    She -- once again, she said that she heard on

3    the street.

4        Q    Did you ask the person who indicated that

5    Yvette know -- knew about the murder, why she would

6    know about the murder?

7            MS. BRILL:  Object to form.

8            THE WITNESS:  I don't recall at the time.  I

9    may have.

10   BY MS. SAMUELS:

11       Q    Is that something you would generally ask?

12       A    Probably.  But at this time, I don't recall

13   if I did or not.  I have may have or I may not have.

14       Q    Would you generally ask about a person's

15   representation or background when you are trying to

16   learn about a witness?

17           MS. BRILL:  Object to form.  Calls for

18   speculation.

19           THE WITNESS:  I may have.

20   BY MS. SAMUELS:

21       Q    Is that something you wouldn't normally do?

22           MS. BRILL:  Same objections.

23           THE WITNESS:  Once again, what do you mean by

24   normal?

BY MS. SAMUELS:

Q    I mean, you've been a Police Officer for a
number of years.  And when you are trying to find out
information about people, is that something you would
normally ask?

MS. BRILL:  Object to form.

MS. ITCHHAPORIA:  Objection.  Form.

THE WITNESS:  It all depends.

BY MS. SAMUELS:

Q    All right.  In a situation such as this when
someone is scared enough about a situation where they
don't want their information provided, but certain
enough to give you somebody's government name that they
have knowledge about a murder, would you ask for more
information about that person who knows about the
murder?

MS. ITCHHAPORIA:  Objection.  Form.
Foundation.  Incomplete hypothetical.

THE WITNESS:  It all depends.

BY MS. SAMUELS:

Q    Is there any reason you can think of as you
sit here today of why you would not ask for information
about Miriam Tilman's reputation?

MS. BRILL:  Object to form.  Calls for

1    speculation.

2              THE WITNESS:  It's kind of discretionary.

3    BY MS. SAMUELS:

4       Q    Right.  Is there any reason why you would not

5    want to know that into going in to questioning her?

6              MS. BRILL:  Object to form.

7              THE WITNESS:  Once again, it would be

8    discretionary.

9    BY MS. SAMUELS:

10      Q    Right.  And my question is as you sit here

11   today, can you think of any reason why you would not

12   want to know that information?

13             MS. BRILL:  Same objection.

14             MS. ITCHHAPORIA:  Objection.  Form.

15             THE WITNESS:  If I thought it was important,

16   I would have.

17   BY MS. SAMUELS:

18      Q    And so if you didn't ask, it's because you

19   didn't think it was important?

20             MS. ITCHHAPORIA:  Objection.  Form.

21   Mischaracterizes.

22                  Go ahead.

23             THE WITNESS:  My answer still would be if I

24   thought it was important, I would have.

```
 1    BY MS. SAMUELS:
 2        Q    Right.  And so my point is the end verse is
 3    also true, right, which means if you did not ask, then
 4    that means you did not believe it was important?
 5              MS. ITCHHAPORIA:  Same objection.
 6                   Go ahead.
 7              THE WITNESS:  No.
 8    BY MS. SAMUELS:
 9        Q    All right.  So if you did not ask, it could
10    have still been important; you just didn't ask?
11        A    I don't recall at this time if I asked or
12    not.
13        Q    All right.  If you had learned information
14    about Miriam's representation, would you have
15    documented that some place?
16              MS. BRILL:  Object to form.  Calls for
17    speculation.
18              MS. ITCHHAPORIA:  Join.  And foundation.
19                   Go ahead.
20              THE WITNESS:  What you mean by her
21    representation?
22    BY MS. SAMUELS:
23        Q    I meant that she was known in that area for
24    setting up men and robbing them.
```

1          MS. BRILL:  Same objection.

2          THE WITNESS:  I'm sorry?

3  BY MS. SAMUELS:

4      Q    She was known in that area for setting up men

5  and robbing them.

6          MS. ITCCHHAPORIA:  Objection.  Form.

7  Foundation.  Incomplete hypothetical.  Close to

8  Speculation.

9              Go ahead.

10         THE WITNESS:  I would not have judged her

11  based on her representation.  She still would have been

12  treated as a witness.

13  BY MS. SAMUELS:

14     Q    Absolutely, positively.  But my question is:

15  Would you have asked about that information so you

16  would have some baseline for asking her questions.

17         MS. ITCHHAPORIA:  Same objection.

18         THE WITNESS:  I don't think that would have

19  mattered in this investigation.

20  BY MS. SAMUELS:

21     Q    So would it matter that somebody said this

22  person knows about the murder, and that that person was

23  known for robbing people and setting up men and

24  stealing their money, and that the victim in this case

1   was ostensibly robbed and killed for his money?

2          MS. BRILL:  Object to form.

3          MS. ITCHHAPORIA:  Objection.  Form.

4   Foundation.  Incomplete hypothetical.  Close to

5   speculation.

6               Go ahead.

7          THE WITNESS:  In that case, if that was the

8   case, I would have.  But there's nothing that indicated

9   or no one I spoke with told her -- gave us information

10  that she was involved.

11  BY MS. SAMUELS:

12     Q    Did you ever look at...as a suspect?

13     A    I'm sorry.  I didn't hear you.

14     Q    Did you ever look at Miriam Tilman as a

15  suspect?

16     A    You mean Yvette Hill?

17     Q    Yes.

18     A    Okay.  No.

19     Q    Do you recall asking her where she was the

20  night of the murder?

21     A    I don't recall at this time.  I may have.

22     Q    Do you recall attempting to corroborate her

23  whereabouts?

24     A    I don't -- I may have.  But at this time, I

1    don't recall.

2        Q    Would that have been documented somewhere?

3        A    I don't know at this time.

4        Q    Should it have been documented somewhere?

5        A    I'm sorry?

6        Q    Should it have been documented somewhere?

7             MS. ITCHHAPORIA:  Object to form.

8             MS. BRILL:  Calls for speculation.

9             THE WITNESS:  I don't know.  Once again, that

10   would have been discretionary on the Detective.

11   BY MS. SAMUELS:

12       Q    And in this case, you would have been that

13   Detective, correct?

14            MS. ITCHHAPORIA:  Objection.  Form.

15            THE WITNESS:  There were other Detectives

16   working on the case as well?

17   BY MS. SAMUELS:

18       Q    You were the one who interviewed her, right?

19       A    Yes.

20       Q    And are you saying that it would have been

21   part of your normal practice to hand the information

22   off to someone else for them to follow-up; is that what

23   you are trying to get at?

24            MS. BRILL:  Object to form.  Speculation.

```
 1              MS. ITCHHAPORIA:  Object to form.

 2              THE WITNESS:  No -- no that's not what I'm

 3   saying.

 4   BY MS. SAMUELS:

 5       Q    Is there anything else you recall about your

 6   interactions with Yvette Hill?

 7       A    No.

 8       Q    What do you recall about your interactions

 9   with Yvette Anderson?

10       A    I'm sorry?

11       Q    What do you recall about your interactions

12   with Yvette Anderson?

13       A    I remember she was interviewed and taken to

14   Area 4.

15       Q    All right.  How did you come to be looking

16   for Yvette Anderson?

17       A    As I recall, her name came up through a CI.

18       Q    Is that documented anywhere?

19       A    I'm not sure at this time.  It may -- it

20   may -- it may be.

21       Q    And where did you find her?

22       A    To the best of my recollection, I think it

23   was on the street.

24       Q    Were you alone at this time, or you were with
```

```
1   your partner?

2        A    I believe I was with my partner.

3        Q    And when you found her, then what happened?

4        A    She was transported to Area 4, to the best of

5   my recollection.

6        Q    Transported to Erie?

7        A    Area 4.

8        Q    Oh, Area 4.  I apologize.

9                  And then what?

10       A    I believe we had conversation, the best of my

11  recollection -- and I'm just trying to think exactly --

12  exactly what happened.  I know we took her to Area 4.

13  I think we had a brief conversation with her.

14                 And then I want to say we went back out

15  looking for Defendants(SIC).  And I know at some point

16  she was taken for a polygraph exam.

17       Q    When you say, "went back out looking for

18  Defendants," what do you mean?

19       A    That may have been input -- tied into the

20  case of this homicide.

21                 Looking for offenders that may be tied

22  into this homicide.

23       Q    You said offenders, correct?

24       A    Offenders.
```

1    Q    Okay.  I'm sorry.  When I heard you the first
2  time, I thought you said Defendants.  And so that's why
3  I was confused.
4    A    No, I never said Defendants.
5    Q    Okay.  And then what else do you recall?
6    A    That's it, that I recall.  I know at some
7  point, I think I told you that she was taken for a
8  polygraph exam.
9    Q    Then what?
10    A    That's all I recall at this time.
11    Q    Did you take her back to where you found her?
12    A    I don't recall if I did or somebody else did.
13    Q    Okay.  When someone is brought in for
14  questioning, is it your general practice to just let
15  them leave the station or to take them back from
16  wherever they were?
17        MS. ITCHHAPORIA:  Objection.  Form.
18  Incomplete hypothetical.
19            Go ahead.
20        THE WITNESS:  Once again, I don't understand
21  what you mean by "general."  Because every situation is
22  different.
23  BY MS. SAMUELS:
24    Q    Do you recall what type of vehicle you used

1    at that time?

2        A    No, ma'am.  It would have been unmarked, but

3    I don't know the make and the model of the vehicle.

4        Q    Do you recall what color?

5        A    No, ma'am; not at this time.

6        Q    Isn't it true you picked up Yvette Anderson

7    because you thought she was Yvette Hill?

8            MS. ITCHHAPORIA:  Objection.  Form.

9    Foundation.  Assumes facts.

10               Go ahead.

11           THE WITNESS:  I'm sorry.  Could you repeat

12   that question, please?

13   BY MS. SAMUELS:

14       Q    Isn't it true you picked up Yvette Anderson

15   because you thought she was Yvette Hill?

16           MS. ITCHHAPORIA:  Same objections.

17               Go ahead.

18           THE WITNESS:  No.

19   BY MS. SAMUELS:

20       Q    So you remember that you were specifically

21   looking for Yvette Anderson?

22       A    To the best of my recollection, yeah.

23       Q    And you were looking specifically for Yvette

24   Anderson because a CI told you to look for Yvette

1    Anderson?

2        A    Yes.

3        Q    Okay.  And when did that CI tell you that --

4    why did that CI tell you to look for Yvette Anderson?

5        A    That she may have knowledge about the

6    homicide.

7        Q    Okay.  And is it your testimony that Yvette

8    Anderson came with you voluntarily to the police

9    station?

10       A    Yes, she did.

11       Q    Okay.  And is it your testimony that she

12   would have been free to leave at any time from the

13   police station?

14       A    Yes.

15       Q    Okay.  Isn't it true you knew where Yvette

16   Hill lived because Yvette Anderson told you?

17       A    I don't recall that at this time.

18       Q    Because you were looking for Yvette, and she

19   responded to Yvette, but once you got to the police

20   station, she informed you that she wasn't Snuggles;

21   isn't that true?

22            MS. BRILL:  Object to form.

23            THE WITNESS:  I don't recall that.

24   BY MS. SAMUELS:

1   Q All right. Was it the same CI who told you

2 to talk to Yvette Anderson and Yvette Hill?

3   A I don't recall that at this time. It may

4 have been.

5   Q Do you remember anything at all about the CI

6 who told you to talk to Yvette Anderson?

7   A No, ma'am.

8   Q Isn't it true that you and your partner took

9 Yvette Anderson back to the neighborhood so that she

10 could tell you where to find Yvette Hill?

11   A No, ma'am.

12   Q You specifically recall that that did not

13 occur, correct?

14     MS. ITCHHAPORIA: Objection. Form.

15      Go ahead.

16     THE WITNESS: Yes, ma'am.

17 BY MS. SAMUELS:

18   Q What do you recall about Yvette Anderson's

19 condition at the time you were questioning her?

20     MS. BRILL: Object to form.

21     THE WITNESS: That she was cooperative.

22 BY MS. SAMUELS:

23   Q Did she seem to be in any type of distress?

24   A No, ma'am, to the best of my recollection,

```
 1   no.

 2        Q    Do you think you would recognize if somebody

 3   was dope sick?

 4             MS. BRILL:  Object to form.  Vague.

 5             THE WITNESS:  Yes, ma'am.

 6   BY MS. SAMUELS:

 7        Q    And to the best of your recollection, did

 8   Yvette Anderson exhibit signs of being dope sick while

 9   you were questioning her?

10             MS. ITCHHAPORIA:  Same objection.

11             MS. BRILL:  Objection.  Form.  Foundation.

12             THE WITNESS:  To the best of my recollection,

13   no.

14   BY MS. SAMUELS:

15        Q    If someone was dope sick, would you feel like

16   they were in the condition to be questioned?

17             MS. ITCHHAPORIA:  Objection.  Form.

18   Incomplete hypothetical.  Close to speculation.

19                  Go ahead.

20             THE WITNESS:  No, ma'am.

21   BY MS. SAMUELS:

22        Q    What do you recall about your interactions

23   with Xavier Walker?

24        A    Received some information about his
```

1    whereabouts, I believe that was on the 28th of May.

2    And they gave us a Potomac address.

3                I recall him running out of the house, a

4    brief chase, caught up with him, struggled with him a

5    little bit, and put handcuffs on him with assistance of

6    other Detectives.

7                And he was transported back to Area 4.

8        Q     Who give you information about where he

9    lives?

10       A     I don't recall that at this time.

11       Q     Would you consider that to be important

12   information to know?

13             MS. ITCHHAPORIA:  Objection.  Form.

14             THE WITNESS:  Not necessarily.

15   BY MS. SAMUELS:

16       Q     Why not?

17       A     I'm sure they probably wanted to stay

18   confidential.

19       Q     But that aside, the question is:  Do you

20   think it's important to know the source of the

21   information?

22       A     I didn't -- if someone told me where someone

23   live, I didn't think it was pertinent to this case.

24   They were not making themself a witness or anything.

```
 1        Q    How did they know you were looking for him?

 2        A    I'm sorry?

 3        Q    How did they know you were looking for him?

 4        A    I don't recall, but -- I don't recall.

 5        Q    How did they know to get in contact with you?

 6             MS. ITCHHAPORIA:  Objection.  Form.  Assume

 7   facts.

 8                  Go ahead.

 9             THE WITNESS:  I'm sure we had -- I had passed

10   out a lot of business cards in the area.

11   BY MS. SAMUELS:

12        Q    So you passed out business cards?

13        A    Yes, ma'am.

14        Q    When was this?

15        A    When was what?

16        Q    When did you go passing out business cards?

17        A    I don't recall.  Probably some time after the

18   homicide, doing canvasses.

19        Q    All right.  During canvasses.

20                  All right.  Do you recall doing

21   canvasses?

22        A    I recall talking to people in the area.

23        Q    All right.  And is that something you would

24   have documented?
```

1      A     If I -- if I thought it was important, I

2   would have.

3      Q     And when you were doing these canvasses, did

4   you ask people if they knew where Red or Darnell lived?

5      A     I'm sure I did.

6      Q     Okay.

7      A     Or if they knew a Red or Darnell.

8      Q     To your recollection, no one knew a Red or

9   Darnell?

10          MS. ITCHHAPORIA:  Objection.  Form.

11   Foundation.

12              Go ahead.

13          THE WITNESS:  To the best of my recollection.

14   BY MS. SAMUELS:

15      Q     And so I understand that you don't have a

16   specific recollection of how this person got into

17   contact with you, but based upon your knowledge and

18   your action in this case, it was probably because you

19   were known to be looking for this individual in the

20   area, because you were handing out business cards and

21   asking people about this; is that fair?

22      A     To the best of my recollection.

23      Q     Okay.  And why were you looking for Xavier?

24      A     Why was I looking for Xavier?

1      Q    Yes, sir.

2      A    Because he was implicated in this homicide.

3      Q    Who implicated him?

4      A    Witnesses.

5      Q    Who?

6      A    I'm sorry?

7      Q    Who?

8      A    We had Mary Curry.  We had Hershula Berg, and

9 there was Ashanti, and also I want to say Maurice

10 Wright.  And it may -- it may be others.  But those are

11 the ones that stick out, the top of my mind today.

12      Q    Fair enough.  And I believe earlier you said

13 you didn't have any interactions with any of those

14 individuals that you just named, correct?

15      A    There may have been some interaction with

16 Mary Curry, I want to say.  And it was just

17 through just looking for her son.

18            That was just basic interaction with

19 Mary Curry.  I just told her we were looking for -- you

20 know, have a conversation with her son.

21      Q    So this would have been before you were able

22 to find Maurice Wright you believe you may have had

23 some...interactions with Mary Curry to let her know you

24 were looking for Maurice?

```
 1        A     Yes.

 2        Q     Why were you looking for Maurice?

 3        A     Why was I looking for Maurice?

 4        Q     I didn't --

 5        A     Because he was implicated -- I mean, no.

 6              Why was I looking for Maurice?

 7        Q     Yes.

 8        A     As a possible witness.  I mean, I wasn't

 9   looking for him, but fellow Detectives was looking for

10   him.

11        Q     Okay.  What made you believe that he was a

12   witness to a murder?

13        A     Well --

14              MS. ITCHHAPORIA:  Objection.  Form.

15   Foundation.  Mischaracterizes.

16              Go ahead.

17              THE WITNESS:  When you say he, who are we

18   talking about?  Are we talking about Xavier?

19   BY MS. SAMUELS:

20        Q     No.  Maurice Wright.

21              MS. ITCHHAPORIA:  Same objections.

22              Go ahead.

23              THE WITNESS:  I don't believe Maurice Wright

24   was implicated as the person that was involved in the
```

1    homicide -- as doing the homicide.

2    BY MS. SAMUELS:

3        Q    Right.  But you told Mary that you guys were

4    looking for him, because you wanted to talk to him,

5    right?

6        A    Yes.

7        Q    Right.

8        A    We wanted to talk to Xavier.  We wanted to

9    talk to Xavier.  And -- you know, the best of my

10   recollection, we were just -- I recall having a brief

11   conversation with her about interviewing people.

12       Q    Okay.  Right, because you went to talk to

13   Mary Curry, because you said you wanted to talk to

14   Maurice believing he might have been a witness that

15   night, correct?

16       A    To the best of my knowledge, that may -- that

17   may what have happened.

18       Q    Okay.  And so as you sit here today, do you

19   know why you believe that Maurice Wright would have

20   been a witness to the murder?

21       A    As I recall reports and talking to fellow

22   Detective.

23       Q    Okay.  Sorry.  I know we took a detour.

24   Okay.  Back to Xavier.

1          So somebody call -- well, somebody gets
2    in touch with you, most likely probably a call to say
3    they know where Xavier is, and they give you this
4    address, fair?
5          A    Yes.
6          Q    And so when you get this information, what do
7    you do?
8          A    Me and my partner and fellow detectives, we
9    went to his address.
10          Q    All right.  Did you do anything to try to
11    verify the information that you received before
12    leaving?
13          A    I don't recall at this time.
14          Q    Is that something you would normally do, or
15    that you would have expect to have been done?
16          MS. BRILL:  Object to form.  Foundation.
17          THE WITNESS:  Not necessarily.
18    BY MS. SAMUELS:
19          Q    When you say you go to his address -- which
20    is essentially that area around Patomac?
21          A    Yes.
22          Q    Okay.  Do you go -- like, do you actually go
23    to his house and knock on the door and talk to people?
24          A    Are you asking is that what I did?

```
 1          Q     Yes, sir.
 2          A     No, I did not go to his house and knock on
 3   the door.
 4          Q     Are you aware of anyone who did?
 5          A     No.
 6          Q     All right.  So what do you do once you get to
 7   Potomac?
 8          A     My partner went to the rear of the location.
 9   I was in the front of that location.  And my partner
10   scream out, "he is running down the stairs or out the
11   back -- out the front."
12                And then I actually see him running,
13   catch up with him, a brief struggle, we fall to the
14   ground, and he's handcuffed.
15   BY MS. SAMUELS:
16          Q     What would you have been wearing at that
17   time?
18          A     Plain clothes, a shirt, suit and tie.
19          Q     What time was Xavier arrested?
20          A     I would say somewhere maybe 9:15, 9:30.
21          Q     P.m.?
22          A     P.m.
23          Q     Okay.  And I think Pietryla described it as
24   like, the sun was perhaps setting, but it wasn't dark
```

1  out; is that how you recall it?

2      A    I don't --

3           MS. ITCHHAPORIA:  Objection.  Form.

4  Foundation.

5               Go ahead.

6           THE WITNESS:  I can't answer how he gave his

7  answer.

8  BY MS. SAMUELS:

9      Q    My question was:  Do you recall it being --

10             So how about this, how do you describe

11 the lighting at that time?

12     A    I don't recall.  It might have been

13 artificial lighting out there.  I don't recall.

14     Q    Do you know whether or not the sun had

15 already set?

16     A    Generally, at 9:00 -- between 9:00 and

17 10:00 o'clock, I would say yes.  I mean, I'm not -- I

18 don't recall.

19             I'll just leave my answer, I don't

20 recall at this time.

21     Q    Do you recall what Xavier was wearing at that

22 time?

23     A    No, I do not.

24     Q    Was Xavier running towards you or away from

1    you?

2        A    Away from me.

3        Q    All right.  How were you able to get him on

4    the ground?

5        A    We both fell to the ground.

6        Q    How did you fall?

7        A    As I recall, I fell on top of him.

8        Q    Did you tackle him to the ground?

9        A    I don't recall it being a tackle.  We both

10   just fell.  It was a brief struggle.

11       Q    Did he stop running before you caught up with

12   him?

13       A    No.

14            THE COURT REPORTER:  I didn't get the answer.

15            MS. ITCHHAPORIA:  No.  The answer was no.

16   BY MS. SAMUELS:

17       Q    And so did you grab him from behind?

18       A    I don't recall how I grabbed him.

19       Q    Is it fair to say that Xavier didn't just,

20   like, trip and fall?

21       A    No.  We struggled.

22       Q    Okay.  When you saw Xavier, did you give him

23   any command?

24       A    I told him, "Stop.  Police."

1      Q      And so when you first see Xavier, you yell,

2    "Stop.  Police"?

3      A      As he was running, yes.

4      Q      And then when he is on the ground, then what

5    happens?

6      A      Still struggling.  And I'm trying to get

7    handcuffs on him.  And fellow Detectives assisted me

8    getting the handcuffs on him.

9      Q      Who else assisted?

10     A      I want to say Mike Pietryla was there.  Maybe

11   Brzeniak.  I'm not sure who all was there.

12     Q      Did Sanders come and assist?

13     A      He may have.  I don't know at this time.

14     Q      All right.  Did you ever strike Mr. Walker in

15   order to gain his compliance?

16     A      No, ma'am.

17     Q      Do you ever place your knee on Mr. Walker to

18   gain his compliance?

19     A      No, ma'am.

20     Q      All right.  Did you ever kick or -- yeah, did

21   you ever kick Mr. Walker in order to gain his

22   compliance?

23     A      No, ma'am.  No.

24     Q      All right.  And so how were you able to gain

```
1    his compliance?

2         A    Handcuffed him.

3         Q    All right.  And so did you just like -- he

4    fell -- he would have fallen, stomach first, correct?

5         A    I don't know.  As I remember, we were both on

6    the ground.  I was on top of him.  I don't recall how

7    he fell.

8         Q    And then you just know you were able to get

9    the handcuffs on him?

10        A    With assistance by other Detectives.

11        Q    Okay.  And then --

12             MS. ITCHHAPORIA:  Hey, Jeanette, whenever you

13   are at a good stopping point, can we take a break?  We

14   have been going about two -- two point something hours,

15   maybe a lunch break even actually.

16             MS. SAMUELS:  Let's get through the arrest,

17   and then we'll break for lunch, fair?

18             MS. ITCHHAPORIA:  Yep.

19   BY MS. SAMUELS:

20        Q    Okay.  And then after you were able to get

21   the handcuffs on him, then what happened?

22        A    He was placed in the police car and driven

23   back to the Area 4.

24        Q    Was he placed in your car or someone else's?
```

1      A     I believe it was my police car.

2      Q     Okay.  Do you know whether or not he was read

3    his rights at that time?

4      A     Yes, he was.

5      Q     All right.  Was it your practice to always

6    read somebody their rights as soon as they are

7    handcuffed?

8            MS. ITCHHAPORIA:  Objection.  Form.

9    Foundation.

10           Go ahead.

11           THE WITNESS:  If they are asking questions,

12   yes.

13   BY MS. SAMUELS:

14     Q     Okay.  Did you ask some questions at that

15   time?

16     A     He was asking questions, and I recall my

17   partner answering his questions.

18     Q     All right.  What was he asking?

19     A     What was this all about?

20     Q     And what did your partner say?

21     A     I recall him reading his rights, and he told

22   him he had been implicated for murder.

23     Q     What else was Xavier asking?

24     A     I don't -- I don't recall at this time.

1      Q      Do you recall anything else that your partner

2   was saying at that time?

3      A      No.

4      Q      Did you ever hear your partner curse at

5   Xavier?

6      A      No, ma'am.

7      Q      Did you ever curse at Xavier?

8      A      No, ma'am.  That's not my practice.

9      Q      While you've been a Chicago Police Department

10  Officer, have you ever cursed at the citizen you were

11  dealing with?

12     A      I don't recall that -- that I did.  That's

13  generally not my practice.

14     Q      All right.  Had you ever heard -- do you

15  understand when I'm asking about your partner, I'm

16  talking about Sanders?

17     A      I'm clear now.

18     Q      Okay.  So earlier when I was asking if you

19  ever heard your partner, I was talking about Sanders,

20  and so -- let me just ask it again.

21             Had you ever heard Sanders curse at

22  Xavier?

23     A      No, ma'am.  I never heard him.

24     Q      All right.  Had you ever seen Sanders curse

1    at a civilian you were dealing with while you guys were

2    Police Officers?

3        A    Not to my knowledge.  He may have.

4        Q    All right.  Do you recall searching the scene

5    of the location after Xavier's arrest?

6        A    Yes, ma'am.

7        Q    Why did you search the scene?

8        A    Just practice and habit to see was anything

9    discarded.

10        Q    All right.  Did you see him make any motions

11    that would indicate he was trying to discard something?

12        A    No, ma'am.

13            MS. SAMUELS:  Okay.  All right.  How long do

14    you want for break?

15            MS. ITCHHAPORIA:  Thirty minutes.  Maybe we

16    can come back at like 1:05.  That will be 35 minutes.

17    Will 1:05 work?

18            MS. SAMUELS:  All right.

19                    WHEREUPON, off the record.)

20            MS. SAMUELS:  Back on the record.

21    BY MS. SAMUELS:

22        Q    Did you have a chance to confer with your

23    attorney over the break?

24        A    No, ma'am.

```
 1        Q    Did you review anything related to this case?
 2        A    No, ma'am.
 3        Q    How were you trained to satisfy your Brady
 4   obligations?
 5        A    I'm sorry?
 6        Q    How were you trained to satisfy your Brady
 7   obligations?
 8        A    To make sure that all files are turned over
 9   at the completion of the investigation.
10        Q    Anything else?
11        A    That's all that I can recall at this time.
12        Q    When I say Brady obligations, what do you
13   understand that to mean?
14        A    That all paperwork should be tendered over in
15   relationship to a case.  So where Defendant's attorney
16   will have access to the same information.
17        Q    And when I say -- how -- actually, how were
18   you trained to satisfy your Gigli obligations?
19        A    I'm sorry.
20        Q    How were you trained to satisfy your Gigli
21   obligations?
22        A    Could you explain what you mean, because I'm
23   not understanding you.  Could you be a little bit more
24   specific?
```

1      Q    When I say Gigli obligations, do you know
2  what I'm referring to or what I mean?
3      A    No, ma'am.
4      Q    Okay.  Do you ever recall anybody talking to
5  you or telling you that you had a duty or
6  responsibility under Gigli?
7           MS. BRILL:  Object to form.  Vague.
8           THE WITNESS:  No.
9  BY MS. SAMUELS:
10     Q    Well, then we'll skip it.
11          What do you know about the area of where
12 the murder happened at the time that it occurred?
13     A    What I know about the area.  Could you be a
14 little bit more specific?  Are you asking me the
15 geographic?
16     Q    Yeah, the geographic area, what do you know
17 about it?
18     A    As I recall, you have Ohio, Cicero, and I
19 think, Kilpatrick, partial -- partially residential.
20 There's a park over there.  That's as much as I
21 remember.
22     Q    Were you familiar with that area prior to
23 being assigned to work the Majdak murder?
24     A    When you say familiar, I've been in that

```
 1   area.  I have worked past that area.  But it's about as
 2   much as I know about it.
 3        Q    Did you have any knowledge of the gangs that
 4   were in that area?
 5        A    To the best of my knowledge, at one time, I
 6   probably did when I was in Gang Crime.
 7        Q    To your knowledge, had you ever interacted
 8   with Xavier Walker prior to his arrest on --
 9             Had you ever interacted with Xavier
10   Walker prior to his arrest in this matter?
11        A    To the best of my recollection, no.
12        Q    What about Jovanie Long?
13        A    To the best of my recollection, no.
14        Q    Maurice Wright?
15        A    To the best of my recollection, no.
16        Q    Ashanti Wright?
17        A    To the best of my recollection, no.
18        Q    Jamaica Wright?
19        A    To the best of my recollection, no.
20        Q    Mary Curry.
21        A    To the best of my recollection, no.
22        Q    Antoine Waddy.
23        A    To the best of my recollection, no.
24        Q    Yvette Anderson?
```

1      A     To the best of my recollection, no.

2      Q     Yvette Hill?

3      A     To the best of my recollection, no.

4      Q     What do you recall about your interactions

5   with Antoine Waddy?

6            MS. ITCHHAPORIA:  Objection.  Form.

7   Foundation.

8                  Go ahead.

9            THE WITNESS:  None.

10   BY MS. SAMUELS:

11      Q     Do you know how he became -- why he was

12   brought in in this case?

13            MS. ITCHHAPORIA:  Objection.  Foundation.

14                  Go ahead.

15            THE WITNESS:  To the best of my recollection,

16   no.

17   BY MS. SAMUELS:

18      Q     Having reviewed the reports from this -- from

19   this murder investigation, do you know why he was

20   brought in on this case?

21      A     I believe he was a -- the Detective thought

22   he was a potential witness.

23      Q     Are you including yourself when you say

24   "Detectives"?

1      A     I'm speaking of other Detectives.

2      Q     Did you form an opinion about whether or not

3   he was a witness -- or a potential witness in this

4   matter?

5      A     I'm sorry?

6      Q     Did you form an opinion about whether he was

7   a potential witness in this matter?

8      A     Are we still talking about Waddy?

9      Q     Yes, sir.

10     A     No.

11     Q     Is there a reason why you don't recall

12   interacting with Antoine Waddy?

13     A     I don't recall -- no, I don't.  No, I don't

14   have a reason.

15     Q     To your recollection, who were the Detectives

16   that were working on trying to figure out who killed

17   Merek Majdak?

18     A     To the best of my recollection, Don Cruz,

19   Donald Wellington, Mike Pietryla, Stanley Sanders.  And

20   it may be more, I don't know at this time.

21     Q     Those five individuals and yourself, would

22   you consider yourself the main Detectives?

23           MS. ITCHHAPORIA:  Object to form.

24           MS. BRILL:  Objection.  Form.

```
1              THE WITNESS:  No.
2    BY MS. SAMUELS:
3        Q    Why not?
4        A    I don't know if there was a main Detective.
5    I mean, you know, sometimes supervisors just ask guys
6    to work on a case.
7              So we may have been just sharing equal
8    responsibility.
9        Q    Okay.  So you would describe it as there not
10   being really one main person who was working on the
11   case.  But you all were equally responsible for trying
12   to determine who killed Merek Majdak?
13             MS. ITCHHAPORIA:  Objection.  Form.
14   Mischaracterizes.
15             Go ahead.
16             THE WITNESS:  Yes.
17   BY MS. SAMUELS:
18       Q    Do you recall interacting with any States'
19   attorneys related to this murder investigation?
20       A    Not that I recall.
21       Q    All right.  Do you recall interacting with
22   Hershula Berg.
23       A    Yes.
24       Q    All right.  What do you recall about that?
```

1      A    She stated that she was the ex-girlfriend of

2  Long and that she saw him on the street and asked him

3  about this homicide.

4              And he told her to shut her mouth or he

5  was going to pop her ass.  Then she walked away.

6      Q    And where were you speaking with Hershula?

7      A    As I recall, it was on the street.

8      Q    And when you say "on the street," do you

9  mean, literally, like on a street, or do you just mean

10 outside of the station?

11     A    At this time, I recall on the street.

12     Q    Do you recall which street?

13     A    No, ma'am.

14     Q    Do you know how you came to be looking for

15 Hershula Berg?

16     A    Not at this time, no.

17     Q    Do you remember talking to a CI, told you to

18 go talk to Hershula Berg?

19     A    To the best of my recollection, not at this

20 time.

21     Q    Do you recall figuring out how to find

22 Hershula Berg?

23     A    Not at this time; I don't know.

24     Q    So Hershula Berg gave a deposition in this

```
1    matter, and she recalls being taken back to the police
2    station and questioned.
3                    Do you have a reason to believe that she
4    wasn't telling the truth when she says that's what
5    occurred?
6              MS. BRILL:  Object to form.
7              THE WITNESS:  If that's what she said, it's
8    probably true.
9    BY MS. SAMUELS:
10       Q    And then -- I'll just ask it.
11                   So some witnesses gave handwritten
12   statements in this investigation, correct?
13       A    Yes.
14       Q    When would you expect to get a handwritten
15   statement from a witness?
16             MS. ITCHHAPORIA:  Objection.  Form.
17   Incomplete hypothetical.
18                   Go ahead.
19             THE WITNESS:  That wouldn't be up to me.
20   That would be up to a State's attorney.
21   BY MS. SAMUELS:
22       Q    Okay.  When would you contact a State's
23   attorney -- so -- well, let me ask it this way:
24                   Is there any special procedure that you
```

1    have to go to -- go through, excuse me, in order to

2    contact a State's attorney to get a handwritten

3    statement?

4              MS. ITCHHAPORIA:  Object to form.

5    Foundation.

6              THE WITNESS:  No.  Detectives don't decide

7    who's going to take a handwritten statement.  It's

8    strictly up to the State's attorney.

9    BY MS. SAMUELS:

10       Q    So how do you determine when a State's

11   attorney should talk with a witness?

12             MS. BRILL:  Same objections.

13             THE WITNESS:  We call it in to felony review.

14   And just as the name says, "Review," they reviewed the

15   case.

16   BY MS. SAMUELS:

17       Q    And then after you call it in, does the --

18             After you call it in, then the State's

19   attorney would come speak with the witness, and then

20   it's their decision whether or not someone gives a

21   written statement?

22             MS. BRILL:  Object to form.  Foundation.

23   Speculation.

24             THE WITNESS:  To the best of my

1    recollection -- to the best of my recollection, yes.

2    BY MS. SAMUELS:

3        Q    Do you know whether you had called in a

4    State's attorney to talk about the information you

5    received from Yvette Hill?

6        A    If it -- once again, that would be

7    discretionary.  If they thought it was -- if the

8    Detective -- or if I thought it was enough information,

9    I probably would.

10       Q    Okay.  And I appreciate that.  I guess I'm

11   just wondering, do you remember whether or not you did

12   that in this case with Yvette Hill?

13       A    I have no recollection of it at this time.

14       Q    Honestly, I'm just going to run through some

15   people...

16            Do you remember if you called in a

17   State's attorney to -- regarding the information you

18   learned from Yvette Anderson?

19       A    No, I did not.

20       Q    Okay.  Do you remember whether you called in

21   a State's attorney to -- where is my list of people?

22   Sorry.  Give me one second.  Here it is -- whether you

23   called in a State's attorney to discuss the information

24   that was given by Antoine Waddy?

1      A     No, I did not.

2      Q     All right.  And then do you know whether or

3  not a State's attorney was called in to determine -- or

4  to talk about the information that was provided by

5  Jamaica Wright?

6      A     At this time, I don't recall, but may have.

7      Q     And then I believe, Ashanti, Maurice and Mary

8  Curry, they all gave handwritten statements, correct?

9      A     I think they did, yes.

10     Q     Okay.  And so that would seem to indicate

11 that a State's attorney was not involved in that

12 process of taking the statement?

13         MS. BRILL:  Object to foundation.

14 Speculation.

15         THE WITNESS:  Yes.

16 BY MS. SAMUELS:

17     Q     So we got that.  Oh, Hershula.

18             Do you know whether a State's attorney

19 was called in to discuss the information that was

20 provided by Hershula?

21     A     At this time, I don't recall.  May have.

22     Q     All right.  Are there times when you call and

23 request for a State's attorney, but the State's

24 attorney's office says no.

1      A      Yeah, there has been times.

2      Q      Okay.  And so they just won't come out,

3  altogether.

4      A      No.  What they do is make a file for it.

5      Q      I'm sorry.  They do what?

6      A      Make a file.  You know, there's other things

7  to do.  They may want more witnesses or -- you know, it

8  varies.

9      Q      Okay.  So say you called for a State's

10  attorney, and they say we are not coming down.  We need

11  you to do X, Y and Z; would that be documented

12  somewhere?

13         MS. BRILL:  Object to form.  Foundation.

14  Vague.

15         THE WITNESS:  It's kind of discretion --

16  discretionary again.

17  BY MS. SAMUELS:

18      Q      Do you think that information should be

19  documented somewhere?

20         MS. BRILL:  Object to form.  Foundation.

21         THE WITNESS:  It depends on the situation.

22  BY MS. SAMUELS:

23      Q      All right.  So under what situation should it

24  be documented?

1          MS. BRILL:  Object to foundation.

2          MS. ITCHHAPORIA:  Objection.  Form.

3          THE WITNESS:  Once again, it's kind of

4    discretionary.

5    BY MS. SAMUELS:

6      Q    Right.  So can you give me an example of a

7    situation where it should be documented?

8          MS. BRILL:  Same objection.

9          MS. ITCHHAPORIA:  Objection.  Form.

10         THE WITNESS:  If it's something that's going

11   to be pertinent to the case, such as a confession or

12   something.

13   BY MS. SAMUELS:

14     Q    So if a witness says, so and so told me they

15   committed murder, would you expect that to be

16   documented?

17         MS. BRILL:  Object to form.

18         THE WITNESS:  I would put that in, yes.  Yes.

19   BY MS. SAMUELS:

20     Q    I mean, would you expect that -- would you

21   expect that witness to document it, like, with a

22   handwritten statement or a video statement or something

23   like that?

24         MS. BRILL:  Object to form.

1          MS. ITCHHAPORIA:  Objection.  Form.

2          THE WITNESS:  I don't know.

3     BY MS. SAMUELS:

4     Q    So as a Detective, do you think that that's

5     something that the witness should document, either

6     through a handwritten -- well, through some sort of

7     memorialized statement?

8          MS. BRILL:  Object to form.  Foundation.

9          THE WITNESS:  Do I think a witness?

10    BY MS. SAMUELS:

11    Q    Right.

12    A    Are you asking if -- the witness should

13    document something or the police should document?

14    Q    So -- and let me back up to make sure that we

15    are on the same page.

16              So I understand sometimes you talk to

17    witnesses and you just take down notes of what they

18    tell you, right?

19    A    Yes.

20    Q    And then sometimes you talk to witnesses or

21    subjects and the information they are providing sort of

22    has a greater value, and so you either get a

23    handwritten statement, or a video statement, or an

24    audio recorded statement, something like that, right?

```
 1        A    Yes.
 2             MS. ITCHHAPORIA:  Objection.
 3   BY MS. SAMUELS:
 4        Q    And so what I'm getting at is, if someone
 5   says so and so told me they committed murder; would you
 6   expect that to be recorded in one of those -- I guess
 7   more formal ways -- either through an audio, video or
 8   like a handwritten statement?
 9             MS. ITCHHAPORIA:  Objection.  Form.
10             THE WITNESS:  That would be up to the State's
11   attorney, not the Detectives.
12   BY MS. SAMUELS:
13        Q    Right.  My question is about your
14   expectation.
15             MS. ITCHHAPORIA:  Same objection.
16             THE WITNESS:  I don't know if I'm an expert
17   on saying what the State's attorney should do.  So I
18   don't know what my expectations would weigh in their
19   decision.
20   BY MS. SAMUELS:
21        Q    Right.  I'm not talking about -- I got to go
22   to the doctor -- I'm not talking about --
23             You've reviewed a number of case files
24   over your years as a Detective, correct?
```

1       A    Yes.

2       Q    And when someone gives -- provides

3  information such as so and so admitted to murder, in

4  your experience, is that usually recorded using video,

5  audio or a handwritten statement?

6            MS. ITCHHAPORIA:  Objection.  Form.

7  Incomplete hypothetical.

8                 Go ahead.

9            THE WITNESS:  Through my experience as a

10  Detective, it's up to the witness or the offender to

11  decide if he wants a video statement or not.

12  BY MS. SAMUELS:

13      Q    All right.  And assuming they are willing --

14  well, no, not even assuming the witness is willing to

15  provide one.

16                 As a detective, would you try to get

17  that reported memorialized in some -- in one of those

18  fashions?

19            MS. BRILL:  Object to form.  Foundation.

20            THE WITNESS:  Generally, at least it will be

21  the handwritten statement.

22  BY MS. SAMUELS:

23      Q    Okay.  Do you recall -- were you with the

24  officers that went to the Wright's house when they were

1    taking the statements of Ashanti and Mary Curry?

2        A    To the best of my recollection, no.  But I

3    may have been.

4        Q    In any event, you don't independently recall

5    that separate from whatever would be reported on some

6    documentations; is that fair?

7        A    That's correct, Counselor.

8        Q    Okay.  Did I ask you -- I don't remember.  I

9    apologize if I've already asked you this.

10            But before I jump off from Hershula

11   Berg; do you recall what condition she was in when you

12   were questioning her?

13       A    Yes, you did ask me that question.  And I

14   told you she was cooperative, and she didn't appear to

15   be distressed.

16       Q    Okay.  Well, thank you for answering it

17   again.  I promise I'm not trying to trick you.  I

18   just take bad notes.

19       A    Okay.

20       Q    And then Xavier, I think before we went to

21   break we had just finished discussing his arrest,

22   correct?

23       A    I believe so.

24       Q    Okay.  And then you said he was asking

1    questions, so you read him his rights and then he was

2    transported back to Area 4, essentially?

3        A    Essentially, yes.

4        Q    Okay.  And then once he got back to Area --

5    well, once you returned to Area 4, then what happened?

6        A    He was placed inside of an interview room.

7        Q    Do you recall which one?

8        A    E.

9        Q    D?

10       A    E as in Eddie.

11       Q    Okay.  And can you describe Interview Room E

12    for me?

13       A    Sure.  Dimensions is approximately ten by 12.

14    And you have a chair, a bench.  There's a door with a

15    lock on the outside of it.

16       Q    What's on either side of Interview Room E.

17           MS. ITCHHAPORIA:  Objection.  Foundation.

18              Go ahead.

19           THE WITNESS:  At this time, I don't recall.

20    BY MS. SAMUELS:

21       Q    I'm assuming because there's Interview Room

22    D, that there's an A, B and C?

23       A    To the best of my recollection, yes.

24       Q    Okay.  Do you know where Interview Room C

1     would have been in -- relative to Interview Room D?

2          A    Not at this time, no.

3               MS. ITCHHAPORIA:  Jeanette, just so you know,

4     he said Interview Room E -- E for Eddie.

5               MS. SAMUELS:  Oh, I'm sorry.  I thought you

6     said D as in dog.

7                    Okay.  Thank you.

8     BY MS. SAMUELS:

9          Q    Was there more than one area in the station

10    where interview rooms were located?

11         A    The lock-up.  There's interview rooms in the

12    lock-up for attorneys.

13         Q    Anyplace else?

14         A    Yeah, the Juvenile section.  They have a

15    Juvenile section; they have an interview room as well,

16    but they wouldn't take adults down there.

17         Q    Okay.  And Interview Room E, where is that

18    located?

19         A    Second floor, Detective Division.

20         Q    Were the interview rooms -- were they in

21    separate locations on the floor of the Detective

22    Division, or were they all generally clustered in one

23    area?

24               MS. ITCHHAPORIA:  Object to the form.

```
 1              Go ahead.
 2              THE WITNESS:  They are spread out.  You may
 3    have A through C or D, on one side of the room, and
 4    then D through F on the other side.  That's the way I
 5    recall.
 6    BY MS. SAMUELS:
 7         Q    And the chair that you said was in Interview
 8    Room E when that -- was that, like, bolted down, or was
 9    it a chair that could be brought in and out?
10         A    The chair is not bolted.
11         Q    All right.  So it can be brought in and out?
12         A    Yes, ma'am.
13         Q    Okay.  The bench that was in Interview Room
14    E, was that affixed to something?
15         A    Yes, ma'am, the wall.
16         Q    Okay.  And about how long is the bench?
17         A    I'd say about five -- five feet, six feet.
18         Q    And about how wide is the bench?
19         A    I'm not sure exactly the width of it.  It's
20    wide enough for someone to lay down on it if they
21    wanted to lay down.
22              We have prisoners all the time that come
23    in there and lay down and go to sleep.
24         Q    All right.  And so I'm thinking like -- like,
```

1    a twin bed, like, roughly that size?

2        A    No, ma'am.  It's not that wide.

3        Q    Okay.  Is a twin bed -- which one is smaller,

4    a twin or a full?  I'm sorry.  I'm bad at this.

5        A    A twin is smaller.

6        Q    Okay.

7        A    I sleep on a twin.

8        Q    Okay.  And then you said the door with the

9    lock on the outside.

10               Was there a window in the door that you

11   are aware of?

12       A    I don't believe so, ma'am.  But I could be

13   wrong.

14       Q    Okay.  To your knowledge, was there any way

15   to see in and out of the room once the door is closed,

16   I guess I should say?

17       A    I'm not sure.  It's been 20 something years

18   since I've been up there, so my recollection is real

19   short when it comes to that.

20       Q    Okay.  How do you remember that it was

21   Interview Room E?

22       A    Because I have a vague memory where we placed

23   him that day as I recall the case.

24       Q    And, like, on the -- how would -- how did

1    you -- is there like -- I'm picturing like a room
2    number, but it would be like a letter on the outside
3    doors.
4                 You know how like apartments have the
5    number on the outside door, is that sort of like how it
6    was for differentiating between the interview rooms?
7        A    I'm almost -- as I recall, yes.  And the
8    reason why is because when attorneys come, they will
9    say, he's in interview, or she's in Interview Room E.
10   So the attorney knows -- you know, that he doesn't have
11   to go through various different rooms.  He go straight
12   to E.
13       Q    Okay.  Okay.  And then you said these
14   interview rooms were in the Detective Division,
15   correct?
16       A    Yes, ma'am.
17       Q    All right.  So besides the Detective -- well,
18   besides the interview rooms, what else is located in
19   that area?
20       A    You have Property Crime Detectives, Violent
21   Crime Detectives, and Sex Detectives all on that same
22   floor.
23       Q    Okay.  Were there, like -- was there like a
24   processing area?  Were there desks?  Were there files?

1       A       Yes, Detectives sit behind the desk.

2       Q       Okay.  And so what I'm picturing in my head,

3   and let me know if I'm visualizing this right.

4                   It's sort of like an area where you

5   would work, or where Detectives would be able to work.

6   And then interview room sort of along the perimeter?

7       A       That's correct, ma'am.

8       Q       Oh, okay.  And so you place Mr. Walker in

9   Interview Room E.  At that time, do you know whether or

10  not there are any other suspects or any other persons

11  related to the Majdak murder investigation in custody?

12      A       To the best of my recollection, I don't know

13  at this time.  It may have been.

14      Q       All right.  What do you -- okay.  So after

15  you place him in the interview room, then what happens?

16      A       Placed in the interview room.  He's

17  unhandcuffed.  Sanders reads him his rights again.  And

18  I'm sure, to the best of my recollection, we asked him

19  some things in regards to the homicide.

20                  And I recall him denying it.  And it was

21  a very brief conversation.  We left out, wanted to give

22  him time to stew about it.

23      Q       Then what?

24      A       I think I start work on something else.

```
1        Q     What's the next thing you recall?

2        A     At some point I go home, come back the next

3   day.

4        Q     Do you recall what shift you were working at

5   that time?

6        A     Sure, Third Watch.

7        Q     And I believe that would have been from,

8   like, 3:00 to midnight?

9        A     Close.  It could be 3:00 or 4:00 to midnight.

10       Q     Okay.  And so to the best of your

11  recollection you and your partner, Sanders, went to

12  speak with Mr. Walker briefly after he was brought to

13  the interview room.

14              And then you sort of left to let him

15  stew, and you didn't have any other interactions with

16  him that night; is that fair?

17            MS. ITCHHAPORIA:  Objection.  Form.

18  Mischaracterizes.

19              Go ahead.

20            THE WITNESS:  To the best of my recollection.

21  BY MS. SAMUELS:

22       Q     I'm sorry.  Was that yes?

23       A     To the best of my recollection, yes.

24       Q     Okay.  And then I think you said you left for
```

1    the night.  Did Sanders work the same shift as you?

2        A    I'm sorry?

3        Q    Did Sanders work the same shift as you?

4        A    Yes, ma'am.

5        Q    Okay.  And so when you left for the night,

6    where did you leave Xavier?

7        A    Interview Room E.

8        Q    Okay.  Then what?

9        A    I went home.

10        Q    Okay.  And what's the next thing you recall?

11        A    The next day I arrive back at work around

12    noon, I believe.

13        Q    And what do you recall?

14        A    I don't think -- I don't think I had any

15    other interactions with Mr. Walker after that.

16        Q    So after putting him in the interview room

17    briefly that night, you don't recall having any further

18    interactions with him?

19        A    No, ma'am.

20        Q    At some point, do you recall seeing your

21    partner go into the interview room with Xavier Walker

22    without you?

23        A    I have no recollection of that, but I'm sure

24    he did.

1      Q     Why are you sure?

2      A     Because there's further interviews with

3   Xavier Walker, I believe.

4      Q     All right.  So you just know somebody

5   interviewed him later, but you are just not sure who?

6      A     I didn't go back in.  I can't tell you

7   exactly who went in.

8      Q     Okay.  At any point in time did you learn

9   that Xavier Walker had made inculpatory statements?

10     A     Yes.

11     Q     All right.  Who did you learn that from?

12     A     I don't recall, fellow Detectives.

13     Q     And how did you learn it?

14     A     Verbal.

15     Q     Was this before or after he gave the video?

16     A     I don't recall that.

17     Q     Was there like a protocol for how to deal

18   with interviewees or persons who are detained for

19   questioning after you leave your shift?

20     A     Anything specific?

21     Q     So is there somebody you tell them, like,

22   there's somebody in this room, like, you got to check

23   on them or something like that?

24     A     Yes.

1      Q     Okay.  How does that process work?

2      A     Protocol usually is we instruct the arrestee

3   if he need anything, whereas toilet facilities, knock

4   on the door.

5      Q     Okay.  Anything else?

6      A     That's pretty much it.  I mean, that's the

7   communication, he has to knock on the door.

8      Q     Okay.  Oh, is there any sort of log you

9   filled out to indicate when somebody is brought into an

10  interview room?

11     A     Twenty-two years ago, it may have been.  But

12  today, I don't have any recollection of that.

13     Q     Do you recall searching Xavier before placing

14  him in the room?

15     A     I have no recollection.  I'm sure he was.

16  I'm not sure if myself or someone else did.

17     Q     Okay.  Is it fair to say that it's standard

18  practice to search an individual before placing them in

19  an interview room?

20          MS. BRILL:  Object to form.  Foundation.

21          THE WITNESS:  Yes, ma'am.

22  BY MS. SAMUELS:

23     Q     And would this be a custodial search?

24          MS. BRILL:  Same objections.

1          THE WITNESS:  What you mean by custodial?

2    BY MS. SAMUELS:

3        Q    Great question.  So my understanding is like,

4    there's two, like, levels of searches where there's

5    like -- you pat people down or whatever to see if they

6    have weapons.

7              And then there's, like, a more thorough

8    search where, like, you go in pockets and, like, make

9    them take off their shoes and stuff like that.

10             Have you heard of anything like that, or

11   am I just watching too much TV?

12             MS. BRILL:  Object to form.  Foundation.

13             THE WITNESS:  We would search his pockets,

14   make sure he doesn't have any weapons or anything to

15   hurt himself or hurt somebody else.

16   BY MS. SAMUELS:

17       Q    Okay.  And, like, shoes, would you take his

18   shoelaces?

19       A    Yes.

20       Q     do you recall anything else about your

21   interactions with Xavier Walker?

22       A    At this time other than the State's attorney,

23   I have no recollection of anybody else.

24       Q    Tell me what you remember about the State's

1  attorney.

2       A    That she arrived to the area.

3       Q    When was this?

4       A    I'm sorry?

5       Q    When was this?

6       A    I'm not sure an exact date and time.

7       Q    What do you remember about her arriving?

8       A    At this time, nothing.

9       Q    Okay.  You just know there was a State's

10 attorney, because he gave a videotaped statement?

11      A    I think I learned that, yes.

12      Q    Okay.  Do you recall whether or not you had

13 ever worked with her before?

14      A    I don't recall that.

15      Q    What's your understanding of Merek Majdak was

16 murdered?

17      A    It was a robbery homicide.

18      Q    All right.  And can you just explain to me

19 how that was accomplished, based on your understanding

20 of the facts and evidence in this case?

21           MS. ITCHHAPORIA:  Objection.  Form.

22           THE WITNESS:  From my understanding, that

23 Long got in his car.  There was some type of struggle

24 going on.  Xavier Walker, as I recall, that he was like

1   15 feet away by a park.

2              He was the lookout.  And at some point

3   he was running towards the van doing -- while his

4   partner -- while Long was struggling with this guy.

5   And he hears some type of noise, and he decide to run

6   the other way.

7              From my understanding, the victim had

8   some money in his shirt pocket, and at that point, Long

9   gets out of the vehicle chasing after the victim.

10             Somehow the victim gets out of the

11  vehicle and Long goes after the victim, and from my

12  understanding, he shot on the sidewalk a second time.

13  BY MS. SAMUELS:

14       Q    Did you have -- during the course of your

15  investigation, were you ever aware of any physical

16  evidence that connected Xavier Walker to the murder of

17  Merek Majdak?

18       A    I'm sorry.  You have to repeat that.  I

19  didn't catch half of it.

20       Q    During the course of your investigation, were

21  you ever aware of any physical evidence that connected

22  Xavier Walker to the murder of Merek Majdak?

23       A    Other than Defendant statements.

24       Q    I'm sorry.  So I interpreted your answer to

1    be that the only information that you had connecting

2    him to the murder of Merek Majdak were the Defendant

3    statements?

4          A    That I recall at this time, and witness

5    statements, I should say as well.

6          Q    Okay.  Do you contend that Xavier Walker

7    resisted arrest?

8          A    Yes, I do.

9          Q    You understand that Xavier Walker is alleging

10   that he was physically abused during the course of him

11   being in custody, correct?

12         A    I'm aware of that now, yes.

13         Q    You weren't aware of that before today?

14         A    Through the -- through the course of talking

15   to my Counselors.

16         Q    You weren't aware that he also allege that

17   soon after his arrest?

18         A    No.

19         Q    And you also understand that Xavier Walker is

20   alleging that he was coerced into providing a knowingly

21   false statement that implicated himself in the murder

22   of Merek Majdak?

23         A    I know that now.

24         Q    Do you deny physically abusing Xavier Walker?

1      A    No.  I deny.

2      Q    Did you ever see any injuries on Xavier

3 Walker at the time that you are dealing with him?

4      A    No, ma'am.

5      Q    Okay.  And so from the time you first

6 encountered him on the scene when he's existing the

7 house until you leave him in the Interview Room E after

8 a brief interrogation to go home, you never viewed

9 any -- you never saw any injuries on Xavier Walker; is

10 that fair?

11            MS. ITCHHAPORIA:  Objection.  Form.  Assumes

12 facts.

13                Go ahead.

14            THE WITNESS:  No, ma'am.

15 BY MS. SAMUELS:

16      Q    No, that's not fair, or no you didn't see any

17 injuries?

18      A    No, ma'am, I never saw any injuries.

19      Q    You understand that Antwoine Waddy, in this

20 case, is also alleging -- well, he's not a party, but

21 he has given statements where he alleges that he was

22 also subjected to physical abuse while he was in

23 custody and being questioned about the murder of Merek

24 Majdak; did you know that?

1        A    As I sit here, I don't have any recollection

2   of that.  It may have came up.

3        Q    Do you deny that you abused -- that you

4   physically abused, either through participation or

5   through witnessing, and failing to stop Antwoine Waddy,

6   in relation to Antwoine Waddy?

7        A    I never abused anyone.

8        Q    You understand that Maurice Wright, at the

9   time, he provided testimony in relation -- at Xavier

10  Walker's trial, testified that he was physically abused

11  and coerced into providing a false statement

12  implicating Xavier Walker and Jovanie Long; do you

13  understand that?

14           MS. ITCHHAPORIA:  Objection.  Form.

15  Foundation.  Mischaracterizes.

16                Go ahead.

17           THE WITNESS:  I never abused anyone or

18  coerced anyone.

19  BY MS. SAMUELS:

20       Q    I promise I'm going to ask that question

21  next.

22                But do you understand that he had made

23  those allegations at that time?

24           MS. ITCHHAPORIA:  Same objection.

1          THE WITNESS:  Maybe at some point in this

2     deposition.

3     BY MS. SAMUELS:

4          Q    Okay.  And again, you deny either

5     participating in or witnessing any abuse?

6          A    That's correct.

7          Q    Okay.  Did you ever make any effort to

8     determine who had bitten Majdak?

9          A    I'm not --

10          Q    The question was:  Did you ever make any

11     effort to determine who had bitten Merek Majdak?

12          MS. ITCHHAPORIA:  Objection.  Foundation.

13               Go ahead.

14          THE WITNESS:  To the best of my recollection,

15     I'm not even sure if I knew that there was a bite mark

16     on the victim.

17     BY MS. SAMUELS:

18          Q    Do you think that's important information?

19          MS. ITCHHAPORIA:  Objection.  Form.

20          THE WITNESS:  It could be.

21     BY MS. SAMUELS:

22          Q    Would you have had -- well, if you were

23     working on a murder investigation, would you generally

24     check what -- what's being filed in that case?

1              So will you look at, like, case reports

2    that's been filed or supplementary reports to see what

3    else is happening in the investigation?

4              MS. BRILL:  Objection.  Form.  Foundation.

5              THE WITNESS:  I may have.

6    BY MS. SAMUELS:

7       Q    Is that something you would normally do?

8              MS. BRILL:  Same objections.

9              THE WITNESS:  Not necessarily.

10   BY MS. SAMUELS:

11      Q    All right.  Why not?

12             MS. BRILL:  Same objections.

13             THE WITNESS:  It depends on what role I'm

14   playing in the investigation.  If it's something that

15   I'm working on, I might pull something to see if this

16   person has been interviewed or not.

17   BY MS. SAMUELS:

18      Q    How would you describe your role in the

19   investigation into the murder of Merek Majdak?

20      A    Just one of the assisting Detectives.

21      Q    And when you first join a murder

22   investigation, are you -- how do you catch yourself up

23   on what's been occurring?

24             MS. BRILL:  Object to form.

```
 1            THE WITNESS:  Usually role call, or
 2   Detectives.
 3   BY MS. SAMUELS:
 4       Q    And when you say "other Detectives," am I to
 5   expect the people who had been working the case, to
 6   sort of give you a briefing on what's been occurring
 7   and keep you up-to-date on the important facts; is that
 8   fair?
 9       A    Yes.  Yes.
10            MS. ITCHHAPORIA:  Objection to form.
11   BY MS. SAMUELS:
12       Q    Do you recall ever reviewing the autopsy
13   report of Merek Majdak?
14       A    No, ma'am; not to my knowledge.  Other than
15   earlier I told you I saw the chart.  But not --
16       Q    I'm sorry.  I keep cutting you off because of
17   the delay.
18            Go ahead.
19       A    No, I was saying I reviewed -- I looked -- I
20   saw the chart.
21       Q    Okay.  And let me know if you recall at the
22   time that you were working on the murder of Merek
23   Majdak; do you recall whether or not you reviewed any
24   material from a medical examiner's office?
```

1      A    To the best of my recollection, I don't

2  recall at this time.

3      Q    Okay.  So I'm going to show you a couple

4  pictures if I can find them.

5               They do show some blood, but they are

6  not too graphic.  It's just from the clothing.  Okay.

7           MS. SAMUELS:  Could we take a 5-minute break

8  while I try to find these files?  I apologize.

9               Thank you.

10                  (WHEREUPON, off the record.)

11           MS. SAMUELS:  All right.  Back on the record.

12  BY MS. SAMUELS:

13      Q    Mr. Wright, did you have a chance to confer

14  with the Counsel during the break?

15      A    No, ma'am.

16      Q    And so I'm showing you what's been Bates

17  marked -- if I can find it -- BS13204.

18               Have you -- do you recall seeing this

19  before?

20      A    No, ma'am.

21      Q    Would you have reviewed, either through

22  pictures or through personally handling the clothing of

23  the victim, in order to assist with the murder

24  investigation?

1      A    No, ma'am.

2      Q    And is this the garment that you -- that you

3  allege was -- contain the money that was stolen from

4  the victim?

5           MS. ITCHHAPORIA:  Objection.  Form.

6           THE WITNESS:  I don't know what clothes he

7  had on, ma'am.

8  BY MS. SAMUELS:

9      Q    Okay.  It would -- my understanding is your

10 investigation led you to believe that Mr. Majdak was

11 essentially murdered for money that was hanging out of

12 his pocket, correct?

13     A    Yes, ma'am.

14     Q    Okay.  And did you ever do anything to

15 confirm that he had pockets where money could hang out

16 of?

17          MS. ITCHHAPORIA:  Objection.  Form.

18 Foundation.

19               Go ahead.

20          THE WITNESS:  No, ma'am.

21          MS. SAMUELS:  Take that off the screen.  Stop

22 looking at that.

23 BY MS. SAMUELS:

24     Q    Okay.  Do you recall ever reviewing, either a

1    crime scene diagram or going to the crime scene on the

2    night of the murder?

3         A    No, ma'am.

4         Q    Is that --

5         A    I never went to the -- I never went to the

6    scene of the crime the night of the murder.

7         Q    Okay.  Do you recall reviewing the crime

8    scene diagram?

9         A    At this time, I don't recall.  I may have.

10        Q    When I say "crime scene diagram," do you know

11   what I'm referring to?

12        A    I guess you're -- I'm thinking you are

13   talking about the diagram of the scene that the

14   Detectives do.

15        Q    Correct.  And they usually -- they will,

16   like, indicate where important things are located and

17   finding things, like that?

18        A    Yeah.  And my answer is still the same.  I

19   may have.  I have no recollection today.

20        Q    Did your investigation ever turn up evidence

21   or elucidate why Merek Majdak was in the 4700 block of

22   West Ohio that night?

23        A    To the best of my recollection, I don't

24   recall.

1    Q    Do you recall ever attempting to ascertain or

2  determine why Merek Majdak was in the 4700 block of

3  West Ohio that night?

4    A    I don't recall at this time if I did or not.

5    Q    Would that normally be an area of inquiry --

6         MS. SAMUELS:  Am I still showing?  My bad.

7         THE WITNESS:  Yes.

8  BY MS. SAMUELS:

9    Q    Okay.

10   A    I say yes.

11   Q    I'm going to show you some more pictures.

12  It's the vehicle that Majdak was in that night.  Here

13  we go.  I'm showing you what's been Bates marked NK348.

14         Do you recall ever reviewing pictures of

15  the crime scene?

16   A    Yes.

17   Q    Okay.  Let me ask a better question.  At the

18  time that you were investigating the murder, do you

19  recall reviewing pictures of the crime scene?

20   A    Would you repeat that again?  I'm sorry.

21   Q    At the time that you were investigating this

22  murder, do you recall reviewing pictures of the crime

23  scene?

24   A    Yes.

1      Q     And do you recognize the vehicle in this

2   picture to be the vehicle that contained Merek Majdak

3   on the night of his murder?

4           MS. ITCHHAPORIA:  Objection.  Form.

5   Foundation.

6              Go ahead.

7           THE WITNESS:  I believe that that is the

8   vehicle.

9   BY MS. SAMUELS:

10     Q     All right.  And you see where the passenger

11  seat is leaning back?

12     A     Yes, it appears to be leaning back, yes.

13     Q     Do you draw any inferences from that?

14          MS. ITCHHAPORIA:  Objection.  Form.

15          THE WITNESS:  No, ma'am.

16  BY MS. SAMUELS:

17     Q     Would that picture indicate to you that at

18  some point someone had been -- a person had been

19  traveling in the passenger seat?

20          MS. ITCHHAPORIA:  Objection.  Form.

21  Foundation.  Close to speculation.

22              Go ahead.

23          THE WITNESS:  No, ma'am.  The front seat of

24  my car is leaned back.  The passenger seat is leaned

1   back also, because usually I put partials -- boxes or

2   something in that seat.

3   BY MS. SAMUELS:

4       Q    Did you have any reason to believe that Merek

5   Majdak was dropping off anything at the 4700 block,

6   West Ohio that night?

7           MS. ITCHHAPORIA:  Objection.  Form.

8   Argumentative.

9               Go ahead.

10          THE WITNESS:  I have no recollection of that,

11  ma'am.

12  BY MS. SAMUELS:

13      Q    Do you have any reason to believe that he was

14  picking up anything that night?

15          MS. ITCHHAPORIA:  Same observations.

16          THE WITNESS:  No recollection of that, ma'am.

17  BY MS. SAMUELS:

18      Q    Do you ever recall reviewing any information

19  or any evidence that suggested the vehicle having been

20  in any sort of accident?

21          MS. ITCHHAPORIA:  Objection.  Form.

22  Foundation.

23              Go ahead.

24          THE WITNESS:  I don't -- I don't recall.

1    BY MS. SAMUELS:

2        Q    What was your understanding of how the front

3    passenger window was broken?

4            MS. ITCHHAPORIA:  Objection.  Form.

5    Foundation.  Close to speculation.

6                Go ahead.

7            THE WITNESS:  I have no recollection on that,

8    ma'am.

9    BY MS. SAMUELS:

10       Q    Okay.  And did it seem odd to you that Merek

11   Majdak had parallel parked his vehicle?

12           MS. ITCHHAPORIA:  Objection.  Form.

13           THE WITNESS:  I have no recollection of why.

14   BY MS. SAMUELS:

15       Q    I'm showing you NK350, and it shows you that

16   his vehicle had been parallel parked on the north side

17   of the street, correct?

18           MS. ITCHHAPORIA:  Objection.  Form.

19   Mischaracterizes.

20                Go ahead.

21           THE WITNESS:  The way it appears on this

22   picture, yes.

23   BY MS. SAMUELS:

24       Q    Showing you NK351, which is another view, and

1    it shows that the vehicle had been parallel parked on

2    the street, correct?

3              MS. ITCHHAPORIA:  Same objection.

4              THE WITNESS:  Yes.

5    BY MS. SAMUELS:

6         Q    Did that seem weird to you?

7              MS. ITCHHAPORIA:  Objection.  Form.

8              THE WITNESS:  I don't know all the

9    circumstances why it would be parked on the other side

10   of the street.

11   BY MS. SAMUELS:

12        Q    Right.  I mean, did it seem weird to you that

13   it would be perfectly parallel parked at all?

14             MS. ITCHHAPORIA:  Same objection.

15             THE WITNESS:  I have no recollection of why

16   he would park on that side of the street.

17   BY MS. SAMUELS:

18        Q    All right.  And you can see in the background

19   that the driver side is closest to the park, correct?

20        A    Yes, ma'am.

21        Q    All right.  Was the vehicle found with the

22   passenger door open?

23             MS. ITCHHAPORIA:  Objection.  Form.

24   Foundation.

1          THE WITNESS:  I wasn't out there.  But

2     viewing his photo, that's the way the crime lab took

3     that picture, so I assume that that's the way -- I

4     think the picture depicts the way the crime scene was

5     at that time.

6     BY MS. SAMUELS:

7          Q     I'm gonna stop sharing this.

8               And so my understanding is that Merek

9     Majdak's body was found on the southern sidewalk of

10    4700 West Ohio; is that your understanding as well?

11         A     To the best of my recollection, yes.

12         Q     Did it seem weird to you that he would get

13    out of his driver side door and then instead of running

14    east or west, he would cross in front of his car again,

15    which would ostensively bring him closer to the person

16    who was attacking him in the passenger seat?

17              MS. ITCHHAPORIA:  Object to form.

18    Foundation.  Close to speculation.

19              Go ahead.

20              THE WITNESS:  I don't know what the victim

21    was thinking that day, ma'am.  So I can't answer that.

22    BY MS. SAMUELS:

23         Q     I understand that.  But does that seem weird

24    to you?

1          MS. ITCHHAPORIA:  Objection.  Form.  And

2    close to speculation.

3               Go ahead.

4          THE WITNESS:  I have no -- still, I have no

5    idea.

6    BY MS. SAMUELS:

7     Q     Do you have any reason to believe that Merek

8    Majdak was in the driver side seat of his vehicle at

9    the time that this altercation occurred?

10         MS. ITCHHAPORIA:  Objection.  Form.

11    Foundation.  Close to speculation.

12              Go ahead.

13         THE WITNESS:  I have no recollection where he

14    was in his vehicle.

15    BY MS. SAMUELS:

16     Q     All right.  Would it be more consistent with

17    somebody fleeing from the passenger seat of that

18    vehicle to end up on the southern sidewalk?

19         MS. ITCHHAPORIA:  Objection.  Form.

20    Foundation.  Close to speculation.

21              Go ahead.

22         THE WITNESS:  I have no recollection of that

23    scenario you just gave.

24

```
 1    BY MS. SAMUELS:

 2        Q    Right.  I'm not asking about your

 3    recollection.  I'm asking about actions and human

 4    nature, and whether in your opinion, right, having been

 5    a Police Officer for any number of years whether that

 6    would be more consistent?

 7            MS. ITCHHAPORIA:  Objection.  Form.

 8    Foundation.  Close to speculation.

 9                Go ahead.

10            THE WITNESS:  As a Police Officer, I try not

11    to speculate.  So I have no idea.

12    BY MS. SAMUELS:

13        Q    Do you know what a -- do you guys have

14    Tactical Response Reports at that time?

15        A    Any what?

16        Q    Did you have Tactical Response Reports in

17    2000?

18        A    I don't think we did.  I'm not sure, ma'am.

19    I could be wrong.  I think it came out later.

20        Q    That's fair.

21                If you needed to use force to subdue a

22    subject, was there anyplace that was supposed to be

23    documented, to your knowledge, in May of 2000?

24        A    At this time, I have no recollection.
```

1      Q     All right.  Would you generally expect that

2 information to be reported, or to be recorded

3 somewhere?

4           MS. BRILL:  Object to form.  Foundation.

5           THE WITNESS:  Yes.

6 BY MS. SAMUELS:

7      Q     All right.  And where would that be recorded?

8 Where would you expect that to be recorded?

9           MS. BRILL:  Same objections.

10          THE WITNESS:  It could be on -- probably a

11 supplemental report.

12 BY MS. SAMUELS:

13     Q     I'm showing you what's been Bates marked

14 NK -- whatever number this is -- 441.  And this looks

15 to be the arrest report of Xavier Walker?

16     A     Yes.

17     Q     Correct?

18     A     Yes.

19     Q     Okay.  And it looks like this was signed by

20 your partner, Sanders.  And it lists you, Wright,

21 Pietryla and Brzeniak as assisting arresting officers;

22 is that fair?

23     A     Yes.

24     Q     And also, it says that Cruz and Sergeant

1    Oliver were additional arresting officer; is that

2    correct -- oh, and Wolverton, I'm sorry; is that

3    correct?

4         A    Yes.

5         Q    Do you recall reviewing this report in

6    preparation for your deposition?

7         A    I may have; not specifically that report.

8         Q    Do you want to take a moment to review it

9    now?

10        A    Sure.

11        Q    Let me know when you need me to scroll down.

12        A    Okay.  I'm finished.

13        Q    All right.  Having reviewed the report, do

14   you see anything that's inaccurate or needs to be

15   changed?

16        A    As I'm looking at it today, no.

17        Q    All right.  Do you recall interacting with

18   any other persons relative to your investigation into

19   the murder of Merek Majdak who we haven't already

20   talked about?

21        A    No.

22        Q    No.

23             Do you recall -- so after Xavier was

24   charged, do you recall attending any court dates?

1      A      I'm sorry.  Taking any what, ma'am?

2      Q      Do you recall attending any court dates?

3      A      No, ma'am.

4      Q      All right.  Do you recall meeting with any

5  State's attorneys to discuss the case?

6      A      No, ma'am.

7      Q      Do you recall being prepared to testify at a

8  trial or any hearing?

9      A      No, ma'am.

10     Q      And so after learning that Xavier had gave

11 the videotaped statement, do you recall taking any

12 further actions in relation to this case?

13     A      No, ma'am.

14     Q      All right.  Do you deny -- was there a hook

15 on the wall to handcuff people to an interrogation

16 room, E -- or Interview Room E?

17     A      Yes, ma'am.

18     Q      Do you deny that Mr. Walker was forced to

19 stay on his knees cuffed to the wall, because he was

20 handcuffed to the hook when you put him in -- the ring

21 when you put him in the interview room?

22     A      No, he was not handcuffed to the wall.

23     Q      Do you deny that he was handcuffed at all?

24     A      In the room, I deny he was handcuffed.

1   Q  Was it always your practice to take handcuffs

2 off people when you placed them in the interview room?

3     MS. BRILL: Object to form. Foundation.

4     THE WITNESS: Not all witnesses.

5 BY MS. SAMUELS:

6   Q  When would you leave somebody handcuffed?

7     MS. BRILL: Same objections.

8     THE WITNESS: Our policy --

9 BY MS. SAMUELS:

10   Q  I'm sorry.

11   A  If someone was going to injury themself or

12 injure a Police Officer.

13   Q  So if you thought someone posed a risk or

14 might be dangerous, then you would leave them

15 handcuffed?

16   A  Yes.

17   Q  Okay. And my understanding is you believe

18 that Xavier was at least a flight risk because he

19 attempted to run from you, correct?

20   A  Yes. A flight risk?

21   Q  Yes.

22   A  Would you be a little bit more specific when

23 you say flight risk? I'm thinking you are talking

24 about leave the state, country.

1      Q     Well, he tried to get away from you, that's

2  all I'm getting at, right?

3      A     Yeah, I wouldn't call that a flight risk.  He

4  was just trying to run away, escape arrest.

5      Q     And you believe that even after you caught

6  him and he knew that he was under arrest, he continued

7  to fight with you, correct?

8           MS. ITCHHAPORIA:  Objection.  Form.

9  Mischaracterizes.

10               Go ahead.

11           THE WITNESS:  He struggled until he was

12  handcuffed.

13  BY MS. SAMUELS:

14      Q     And so she continued to fight with you?

15      A     Yes.

16      Q     But you wouldn't put him into that class of

17  persons who you would have left handcuffed?

18      A     No.

19      Q     Why not?

20      A     I'm sorry?  Did you ask another question?

21      Q     Yes, sir.  I asked:  Why not?

22      A     Because at that point, he didn't seem to be

23  a -- he wasn't fighting anymore.  He actually had

24  calmed down after he was handcuffed.

```
 1        Q     All right.  Did Xavier Walker ever attempt to

 2   strike you?

 3        A     When we were struggling, there was some

 4   pushing, grabbing going on.

 5        Q     By Mr. Walker?

 6        A     Yes.

 7        Q     Was it ever your understanding that he

 8   intended to cause you physical or bodily harm?

 9        A     Yes.

10        Q     Okay.  Did you ever kick Mr. Walker?

11        A     No, ma'am.

12        Q     Did you ever hit him?

13        A     No, ma'am.

14        Q     At that time, did you keep a black stick?

15        A     Detective don't carry sticks, ma'am.

16        Q     So is that no?

17        A     That's correct.  No.

18        Q     And so I understand that there's, like --

19   there's batons, which are, like, thicker.  And then

20   there's expandable batons that are, like, thinner, and

21   then you, like, whip them out, and it gets longer; do

22   you know what I'm talking about?

23        A     Yes.  When I was a Detective, I don't think

24   they had even authorized that with the Chicago Police
```

1   Department.  That came later.

2        Q    Did you carry a flashlight?

3        A    No, ma'am.

4        Q    Did you have access to a flashlight?

5        A    At this particular time, I don't recall.  I'm

6   sure I may have.

7        Q    Do you know what else he could be referring

8   to when he says, like, black stick?

9             MS. ITCHHAPORIA:  Objection.  Form.

10  Speculation.

11               Go ahead.

12            THE WITNESS:  I have no idea what he's

13  talking about, ma'am.

14  BY MS. SAMUELS:

15       Q    Okay.  Do you recall ever telling Xavier

16  Walker words to the effect of:  You are lying?

17       A    No, ma'am.

18       Q    All right.  Do you ever recall telling Xavier

19  Walker words to the effect of:  You are not telling the

20  truth?

21       A    No, ma'am.

22       Q    Do you ever recall telling Xavier Walker

23  words to the effect of:  You are going to be here.  You

24  are going to stay here until you tell us the truth?

```
 1        A     No, ma'am.

 2        Q     Do you ever recall telling Xavier Walker

 3   words to the effect of:  You are going to be here.  You

 4   are going to stay here until you tell us what we want

 5   to hear?

 6        A     No, ma'am.

 7        Q     Okay.  So my understanding is when you first

 8   put Xavier in the room, you questioned him, correct?

 9        A     I did what?

10        Q     You questioned him about the crime?

11        A     I never questioned him; my partner did.

12        Q     Okay.  But you were present when your partner

13   questioned him, correct?

14        A     For the first 15 minutes, yes.

15        Q     And are you saying after 15 minutes, you left

16   out, and then your partner was in there with him by

17   himself?

18              MS. ITCHHAPORIA:  Objection.  Form.

19              THE WITNESS:  I never -- I never said that.

20   BY MS. SAMUELS:

21        Q     Okay.  Well, when you put a 15-minute

22   timeframe on it; that's what I'm trying to understand.

23                    And so are you saying, the time we

24   talked to him 15 minutes, both me and Sanders; or after
```

1  you saying after 15-minutes, I left?

2     A    I say approximately 15 minutes, he was read

3  his rights.  And my partner asked him some questions in

4  regards to the investigation, and he denied it, and we

5  left out.

6  BY MS. SAMUELS:

7     Q    Okay.  Why didn't you let him go after he

8  gave his statement that he wasn't involved?

9     A    Because there was other corroborating

10  evidence that he was involved?

11    Q    Was it because you didn't believe him?

12         MS. ITCHHAPORIA:  Objection.  Form.

13  Mischaracterize.

14             Goes ahead.

15         THE WITNESS:  I didn't believe him.

16  BY MS. SAMUELS:

17    Q    Was there anything that Xavier Walker could

18  have said or told you at that time to convince you he

19  was not involved in the murder of Merek Majdak?

20         MS. ITCHHAPORIA:  Objection.  Form.

21  Foundation.  Incomplete hypothetical.  Close to

22  speculation.

23             Go ahead.

24         THE WITNESS:  I don't think so.

BY MS. SAMUELS:

    Q   Do you recall seeing any footprints on his shirt at the time that you were dealing with Xavier Walker?

    A   No, ma'am.

    Q   Do you recall seeing any bruises on his wrist?

    A   No, ma'am.

    Q   Do you recall seeing any marks on his face?

    A   No, ma'am.

    Q   Do you recall seeing any marks on his back?

    A   No, ma'am.

    Q   Why wasn't an arrest warrant issued for Xavier?

        MS. ITCHHAPORIA:  Objection.  Form. Foundation.  Close to speculation.

            Go ahead.

        THE WITNESS:  I -- usually, arrest warrants are very difficult to get unless there's some evidence that this person is going to flee the state, not going to be able to get caught.

BY MS. SAMUELS:

    Q   All right.  Was -- were they called "Investigative alerts" at that time, or "stop orders";

1    do you know?

2        A    Either one, same thing.

3        Q    Okay.  To your knowledge, was an

4    investigative alert or stop order issued for Xavier

5    Walker prior to the time he was brought in?

6        A    As I said here, 22 years later, I have no

7    recollection.

8        Q    Okay.  So this is the unpleasant part.  I'm

9    going to go through your complaint history.  I'm going

10   to be asking you some questions about that, okay?

11               Do you recall an allegation against you

12   made in November of 1990 by Kevin Smith?

13       A    You could refresh my memory.

14       Q    He alleged that you struck him about the head

15   and the body with the palm of your fist.

16       A    No, I did not do that.

17       Q    Did you know you were under investigation for

18   taking money from a known drug dealer?

19       A    I never was aware of that, never received an

20   allegation of that.

21       Q    Have you ever taken money from drug dealers

22   in exchange for not arresting him?

23       A    I will never do that.

24       Q    This would have been in or around April of

1     1992, just for the record.

2                   Do you recall going into a place of

3     business, asking the owner if he had a gun, but then

4     taking it?

5          A    I'm sorry, Counsel.  I didn't hear your last

6     remarks in regards to 1992.

7          Q    Oh, yeah.  So you said you were unaware that

8     that had been an allegation against you related to

9     taking money from a known drug dealer, right?

10         A    Yes, ma'am.

11         Q    Okay.  And I was saying that allegation was

12    made against you in or around 1992?

13         A    Okay.  I was never informed of that.

14         Q    Okay.  In '92, what unit were you working

15    with?

16         A    It might have been Gang Crimes.  It might

17    have been the Strike Force, CTA.  I'm not sure at this

18    time.

19         Q    Was that when you were with the Special

20    Operations section?

21         A    It may have been.

22         Q    Did you ever learn or come to find out that

23    members of the Special Operations section were robbing

24    drug dealers?

1          MS. ITCHHAPORIA:  Objection.  Form.

2     Foundation.

3          THE WITNESS:  Yes.

4     BY MS. SAMUELS:

5          Q    Were you surprised to learn that?

6          A    Yes.

7          Q    Why?

8          A    Because the majority of the people that

9     worked in that unit were upstanding officers.  It's

10    just unfortunate you get a few bad apples that ruin the

11    whole unit.

12         Q    And then the one I think you didn't hear me

13    was, were you aware of an allegation from January of

14    1994 that you entered this gentleman's business, asked

15    if he had a gun and then took his gun?

16         A    I don't recall that.  First, I don't think I

17    was ever disciplined for it.  I don't think I was ever

18    made aware of it.

19         Q    And did you know that despite him making the

20    allegation in January, you did, in fact, inventory his

21    weapon approximately three months later?

22         A    At this time, I have no recollection of that?

23         Q    Can you think of any --

24         A    Or whatever -- or I never got a disposition.

1      Q    Can you think of any reason why you would

2  take property from an individual and not inventory it

3  within a timely fashion?

4           MS. ITCHHAPORIA:  Objection.  Form.

5  Foundation.

6           THE WITNESS:  I don't think I would do that.

7  That's not my practice.

8  BY MS. SAMUELS:

9      Q    Okay.  Were you aware that an allegation was

10  made against you in 1996 by Mark Smith of being

11  physically abused during the course of an arrest?

12           MS. ITCHHAPORIA:  Objection.  Asked and

13  answered.

14           THE WITNESS:  Yes.

15  BY MS. SAMUELS:

16      Q    Okay.  What do you recall about that

17  interaction --

18      A    I think that's the one I took the ten days

19  suspension for that we talked about earlier.

20  BY MS. SAMUELS:

21      Q    In this one, you ended up breaking

22  Mr. Smith's nose and forcing him to the ground; does

23  that sound familiar?

24      A    Yes.

1              MS. ITCHHAPORIA:  Objection.  Form.

2     Foundation.

3              Go ahead.

4              THE WITNESS:  Yes.

5     BY MS. SAMUELS:

6         Q    Okay.  We are still talking about the same

7     one?

8         A    We were not talking about the same incident.

9         Q    Okay.  Having heard more of the facts

10    regarding the allegations made by Mr. Smith, do you

11    recall this incident?

12        A    Yes.

13        Q    All right.  What do you recall about this

14    incident?

15        A    I recall, I think I was working CTA Strike

16    Force at that time.  And there was some type of

17    disturbance, a riot protest going on on CTA property.

18    The police were called.

19              There was -- I want to say a couple

20    arrests.  Mr. Smith and someone else, some CTA

21    employees was going to sign a complaint.  When

22    Mr. Smith goes to get handcuffed, he gets combative.

23    We both fall to the ground.

24              And I think he sustained an injury to

1    his nose.  He was transported to the hospital.

2        Q   And so, to the best of your recollection, he

3    did suffer injuries, but it was accidental?

4        A   It was accidental.  And I don't think I

5    received any disciplinary action in regards to it.

6        Q   Do you recall an allegation made by Tavarus

7    Calhoun in or around 1997 against yourself and

8    Detective Sanders?

9        A   No.

10        Q   All right.  Do you recall interviewing

11    Tavarus Calhoun in relation to a homicide

12    investigation?

13        A   No, ma'am.

14        Q   All right.  Do you deny that you verbally

15    abused him, including telling him, "Fuck you," shoved

16    him, and kept him in severe cold during the course of

17    this investigation?

18        A   No, ma'am.  I would never do that.

19        Q   Do you recall some interactions with Dawn

20    O'Metty, which would have been in or around April of

21    1987?

22        A   Yes, ma'am.

23        Q   All right.  What do you recall about that?

24        A   He was a Defendant that was arrested by

1   myself and several other Detectives in regards to

2   robbing and killing his schoolteacher.

3              And subsequently, he was arrested,

4   charged with robbery murder.  And eventually he was

5   released based upon a lot of -- a lot of eyewitnesses

6   recanted their stories.

7       Q    And when the witnesses recanted their

8   stories, did they allege that they had been coerced

9   into making these false statements?

10      A    I have no recollection.

11      Q    All right.  Did Mr. O'Metty allege -- do you

12  recall Mr. O'Metty alleging that you and Detective

13  Sanders beat him and forced him to sign a false

14  confession?

15      A    No, ma'am.

16      Q    No, ma'am, that didn't occur, or no, ma'am

17  you don't remember him saying that?

18      A    No, ma'am, it did not occur.  And I didn't

19  receive any type of disciplinary action in regards to

20  this.  I think it was just an allegation unfounded.

21      Q    Do you recall -- apparently, a day later, an

22  allegation made by Dorothy Willis that you pointed your

23  gun at her and threatened to shoot her?

24      A    No, ma'am.

1          Q     Do you recall getting into a car accident in
2    or around April of 1997?
3          A     No, ma'am.
4          Q     All right.  Do you deny that you reached into
5    her vehicle, struck her, pointed your gun at her, and
6    threatened to shoot her after she accidentally hit your
7    car?
8          A     No, ma'am.  Once again, I don't recall that.
9    I never did that.  I never received any disciplinary
10   action in regards to this incident.
11         Q     Do you think the city of Chicago does a good
12   job of disciplining officers who commit misconduct?
13              MS. ITCHHAPORIA:  Object to form.
14   Foundation.
15              MS. BRILL:  Object to form.  Foundation.
16              THE WITNESS:  Yes.
17   BY MS. SAMUELS:
18         Q     Do you think the city of Chicago does a good
19   job of investigating officers who are alleged to have
20   committed misconduct?
21              MS. BRILL:  Same objections.
22              MS. ITCHHAPORIA:  Form.  Foundation.
23              THE WITNESS:  Yes.
24

```
 1    BY MS. SAMUELS:
 2         Q    Do you recall an allegation made by Timothy
 3    Stevens in and around '98, that he was physically
 4    abused by you while at Area 4, Violent Crimes?
 5         A    No, I'm not aware, ma'am.
 6         Q    Do you recall interviewing Timothy Stevens in
 7    relation to a violent crime, holding him at Area 4?
 8         A    No, ma'am.
 9         Q    Do you deny that you slapped him repeatedly
10    about the face?
11         A    Yes.
12         Q    Do you deny that you stepped on his neck?
13         A    Yes.
14         Q    Do you deny that you punched him repeatedly
15    about the chest and stomach?
16         A    Yes, ma'am.
17         Q    Do you deny that you struck him repeatedly
18    with a blackjack about the torso?
19         A    Yes, ma'am.
20         Q    When I say, "blackjack," do you know what
21    that means?
22              MS. ITCHHAPORIA:  Objection.  Foundation.
23              THE WITNESS:  I have no idea what you mean.
24    Once again, Detectives do not carry any type of sticks,
```

1  blackjacks or batons.

2  BY MS. SAMUELS:

3      Q    But when I say the term, "blackjack," you

4  generally understand that to be some sort of, like,

5  long object that's like a stick or something like that?

6          MS. ITCCHHAPORIA:  Objection.  Close to

7  speculation.  Foundation.

8              Go ahead.

9          THE WITNESS:  I understand what you're

10  saying.

11  BY MS. SAMUELS:

12      Q    Okay.  Do you deny that you stopped and

13  kicked Mr. Stevens in the groin?

14      A    Yes, I deny that, equivalently deny that.

15      Q    Do you deny that you failed to provide

16  Mr. Stevens with food and water?

17      A    I'm sorry?

18      Q    Do you deny that you failed to provide

19  Mr. Stevens with food and water?

20      A    Yes, ma'am.

21      Q    Do you recall interactions with Mr. Stevens

22  at all?

23      A    No, ma'am.

24      Q    I'm sorry.  Go ahead.

```
 1        A     I'm sorry.  Once again, this is something
 2   else I'm unaware of.  I was never disciplined for this.
 3        Q     In 1998, it still would have been OPS, right?
 4        A     Yes, ma'am.
 5        Q     Do you know what happened with OPS?
 6        A     I believe they got phased out, and IMPRA was
 7   the new misconduct unit.
 8        Q     Do you know why OPS was phased out?
 9        A     I'm not sure, ma'am.
10        Q     Do you recall an interaction with Allen Jones
11   in or around May of 2000?
12        A     No, ma'am.
13        Q     That would have been about -- so it says May
14   6th of 2000, so that would have been about three weeks
15   before your interactions with Xavier Walker in this
16   case, correct?
17             MS. ITCHHAPORIA:  Objection.  Form.
18   Foundation.
19                  Go ahead.
20             THE WITNESS:  If those are the dates, yes.
21   BY MS. SAMUELS:
22        Q     Do you recall interviewing Allen Jones back
23   at Area 4, Violent Crime?
24        A     No, ma'am.
```

1  Q Do you recall driving Mr. Jones around in the
2 neighborhood while threatening him?

3  A No, ma'am.

4  Q Do you recall punching Mr. Jones in the head?

5  A No, ma'am, I never did that.

6  Q Do you recall verbally abusing him and
7 telling him you will shoot his ass and to shut the fuck
8 up?

9  A No, ma'am.

10  Q Do you recall arresting Mr. Jones after you
11 learned that he had filed a complaint against you?

12  A No, ma'am.

13  Q Is there a reason why you can recall the
14 facts of Xavier Walker's case, but you don't recall any
15 interaction with Mr. Jones at all?

16   MS. ITCHHAPORIA:  Objection.  Form.
17 Foundation.  Argumentative.

18   THE WITNESS:  If I -- if you give me a little
19 bit more specifics -- keep in mind these cases that you
20 mention is 20 something years ago.  And I think there's
21 a big difference in these cases.

22   It seem like Mr. Jones is more of a
23 verbal beef opposed to a homicide.  Homicide seem to
24 stick in my mind little bit more than someone saying

1  they were verbal abused.

2  BY MS. SAMUELS:

3      Q    Typically, he alleges that you punched him in

4  the head.

5      A    I deny that.

6      Q    Okay.  Do you recall stopping anybody or

7  questioning anybody about shooting an BB gun rifle in

8  or around May of 2000?

9      A    Yes, I remember that.  Mr. Jones?

10     Q    That's Mr. Jones.

11     A    That's why I say, you give me a little bit

12  more information and I'll be able to elaborate on it.

13  I recall observing Mr. Jones point a gun at somebody

14  else.

15          I was driving through looking for a

16  witness on one of my cases, and I thought it was a real

17  gun.  It was a replica gun.  And he was pointing at

18  somebody else.  I thought it was a street robbery.

19          So at that point, I get out, struggle

20  with this guy, Jones.  He gets away.  There were

21  probably about six or seven other guys that was with

22  him.  These were -- they were all gang bangers.

23          What happened was -- as I'm touring the

24  area looking for him, I get some information that

1    somebody had called the police, and they were at this

2    location.  So I'm thinking it's my victim coming back.

3    And actually, when I get over there, it's Mr. Jones.

4                    So Mr. Jones was re-arrested -- he was

5    arrested at that time and taken to the station.  And I

6    charged him.

7                    So through IMPRA or OPS, whatever it was

8    at that time, I get a five-day suspension based upon I

9    did not get on the radio and ask for assist.

10                    I took the five days.  I didn't try to

11   fight it.  I realized I violated a Department policy of

12   not calling it in.

13        Q    How did you know he was a gang banger?

14        A    From criminal history and I also learned that

15   the people that OPS interviewed was his gang banger

16   friends.

17        Q    So in this case, would you say they did a bad

18   investigation?

19                    MS. ITCHHAPORIA:  Objection.  Form.

20   Foundation.

21                    THE WITNESS:  Yes.  I don't have too much

22   confidence in them.

23   BY MS. SAMUELS:

24        Q    Do you recall the interaction with Maxine

1   Terrell where she allege that you called her and told

2   her that she is going to end up in jail on some

3   bullshit?

4        A    No.  No, ma'am.

5        Q    That would have been from December 2000, I

6   think.  You are investigating a harassment complaint

7   that she made; is that ringing any bells?

8        A    No, ma'am.

9        Q    All right.  Do you recall an allegation from

10  September of 2001 that you grabbed Calvin Williams by

11  the neck and choked him?

12       A    No, ma'am.

13       Q    Do you recall an allegation from December of

14  2001 that you entered a business, took their guns and

15  didn't report it?

16       A    No, ma'am.  I would never do that.  And once

17  again, this is an allegation I never received.  And I

18  was never disciplinary -- there was no disciplinary

19  findings of this that I'm aware of.

20       Q    Do you recall an interaction with a Tracy

21  Bradley in and around March of 2002 where it's alleged

22  that you, your partner, Detective Sanders, stopped and

23  grabbed Tracy without justification?

24       A    No, ma'am, I'm not aware of that.

1    Q    All right.  Do you recall that she alleged

2    that she -- you grabbed her coat and pushed her against

3    the fence, used profanity against her and handcuffed

4    her too tightly?

5    A    I remember the incident now.

6    Q    All right.  Go ahead tell me about that one.

7    A    This is the case of the missing Bradley

8    girls, I don't know if you remember this case or not,

9    Tracey Bradley was the mother of these girls that came

10   up missing.  We had surveillance on Tracy, and we

11   approached her for questioning and she got combative

12   and we handcuffed her, put her in the car.

13   Q    And at that time, was she a suspect?

14   A    Yes, she was.

15   Q    Was she later arrested for the missing

16   Bradley girls?

17   A    No, she has never been arrested yet.

18   Q    Was it your opinion that she was responsible

19   for them being missing?

20   A    I believe she had something to do with it.

21   Q    And it looks like one of the reasons you got

22   in trouble is because -- it says, "You failed to

23   complete an arrest report and then failed to follow

24   provisions of the general order for releasing somebody

1 without charges;" does that make sense?  Does that ring

2 any bells?

3     A    No, I was never disciplined on that

4 allegation.

5     Q    Okay.  So to the best of your knowledge, you

6 were never disciplined for this incident.

7     A    I was not disciplined for that allegation.  I

8 think they found that unfounded or -- it definitely

9 wasn't sustained.

10     Q    Okay.  Do you recall an allegation from June

11 of 2008 by Gregory Hill, that he was falsely arrested

12 by yourself?

13     A    No, ma'am.

14     Q    I think this was a lawsuit, too, as well.

15 Does that ring any bells?

16     A    No, ma'am.  You can refresh any memory.

17     Q    I didn't write down all the details of this

18 one.

19          How many times have you been sued?

20     A    I don't -- I don't recall, ma'am.

21     Q    More than five?

22     A    Less.  I'm thinking the number two.

23     Q    Okay.  So this one and one other one?

24     A    I believe.

1        Q     Okay.  And you just don't recall what that

2   other one is?

3        A     No, ma'am.

4        Q     And then you think -- so there's an

5   allegation.

6              I don't know why that position hurt so

7   much.

8              There's an allegation from July of 2010,

9   that you used your position as a Police Officer to run

10  background checks on some people at a school; does that

11  ring any bells?

12       A     Yes.  That was not true.  Never did that.

13  Never -- I don't think I even was notified of that.

14  And it's definitely no disciplinary action in regards

15  to that.

16       Q     And then -- I think we talked about this one

17  already.  This was Colin Ryan; is that the one who --

18  that hate Crime issue?

19       A     Yes, ma'am.

20       Q     Okay.  And I think you said that one you got

21  a ten-day suspension?

22       A     Yes, ma'am.

23       Q     And then there's an allegation from January

24  of 2013 that you are running unauthorized background

1    checks in regard -- who -- do you know an Ischyaa

2    Hannah, I-s-c-h-y-a-a?

3          A    No, ma'am.  No, ma'am.  What's the allegation

4    again?

5          Q    Is that you're running unauthorized

6    background check on individuals to embarrass them and

7    violate their privacy rights in regards to an attack on

8    Ischyaa Hannah to her teachers.

9          A    No, ma'am, I never did that.  And once again,

10   I never received an allegation.  I was never

11   disciplined on this.

12         Q    And when I say Ischyaa Hannah, that's not

13   ringing any bells on, you have no idea what I'm talking

14   about?

15         A    No, ma'am.

16         Q    So Don O'Metty, the case where a bunch of

17   witnesses recanted, do you stand by the statement that

18   you took from Mr. O'Metty?

19              MS. ITCHHAPORIA:  Objection.  Form.

20   Foundation.

21                   Go ahead.

22              THE WITNESS:  Yes, ma'am.

23   BY MS. SAMUELS:

24         Q    All right.  Do you still think he's guilty?

1        A     Yes, ma'am.

2        Q     All right.  Is there anything you could see

3   or any evidence that would get you to change your

4   opinion?

5              MS. ITCHHAPORIA:  Objection.  Form.

6   Foundation.  Close to speculation.  Incomplete

7   hypothetical.

8              THE WITNESS:  Stand by my reports.

9   BY MS. SAMUELS:

10       Q     All right.  When you want to take somebody in

11  for a polygraph examination, how does that work?

12             MS. ITCHHAPORIA:  Objection.  Form.  Vague as

13  to timeframe.

14                  Go ahead.

15             THE WITNESS:  To the best of my recollection,

16  you call and make an appointment with the polygrapher.

17  BY MS. SAMUELS:

18       Q     And then they just tell you when they are

19  ready?

20       A     Yes, they give you a time.

21  BY MS. SAMUELS:

22       Q     Are you able to request a specific person to

23  handle a case?

24       A     No.  To the best of my recollection, I never

```
 1    heard of that.
 2         Q    Do you still trust the reliability of
 3    polygraphs?
 4              MS. BRILL:  Object to foundation.
 5              MS. ITCHHAPORIA:  Objection.  Form.
 6    Foundation.
 7              THE WITNESS:  Polygraphs are just a tool --
 8    admissible in court.
 9    BY MS. SAMUELS:
10         Q    So do you still -- you still think they are a
11    reliable tool?
12              MS. ITCHHAPORIA:  Objection.  Form.
13    Foundation.
14                  Go ahead.
15              THE WITNESS:  I think they are just a tool.
16    So I don't know if they are credible or uncredible.
17    Just a tool.  Just -- another tool we have to use to
18    get to the truth.
19                  Did you say that was it?
20    BY MS. SAMUELS:
21         Q    One more, and then I swear I'm almost done.
22         A    I'm sorry.  I thought you said that was it.
23         Q    I'm almost took that personal, you are trying
24    to run out on me, sir.
```

```
 1        A    No, ma'am.  I would never do that.

 2        Q    Okay.  Is this the right one?  Here we go.

 3   So I'm going to show you what's been Bates marked

 4   NK211.

 5                   Can you see this all right?  Can you see

 6   this all right?

 7        A    I can't see the top of the left side.

 8        Q    You see where it says, "Crime Scene

 9   Processing Report"?

10        A    I see "Processing Report."  So the other word

11   would be "Crime Scene"?

12        Q    Yeah.  Let me -- would it be better if I

13   zoomed out for you to be able to see it better?

14        A    We're good now.

15        Q    Okay?

16        A    If you can Zoom in some, please?

17        Q    Yeah, let me take it to, like, 50 percent.

18   Well, that did nothing.

19                   Can you still see the whole thing?

20            THE WITNESS:  Okay.  We're good.

21            MS. ITCHHAPORIA:  Can't see the whole thing.

22            MS. SAMUELS:  All right.  And it looks like

23   this is a Crime Scene Processing Report?  Did I just

24   turn the page again?  Correct.
```

```
 1              THE WITNESS:  Okay.
 2    BY MS. SAMUELS:
 3         Q    And so this looks like it's a Crime Scene
 4    Processing Report, correct?
 5         A    Yes.
 6         Q    Okay.  And when it says, "Assignment type,"
 7    do you know what that means, when it says PUM?
 8         A    Where are you at?
 9         Q    Right here.  Can you see the little cursor?
10    I don't know if you can see it.
11         A    I'm not sure if that's not one of the reports
12    that we use as Detectives.  That's the forensic lab
13    people.  That just may be some abbreviation they use.
14         Q    Okay.  And so it looks like in the details of
15    the case report, it says that the shirt contains bite
16    mark impressions and possible saliva.  Request a DNA
17    exam; do you see that?
18         A    Yes, ma'am.
19         Q    All right.  Do you know whether or not that
20    was ever requested in this case?
21         A    I have no recollection if it was or was not.
22         Q    As you sit here today, are you aware of any
23    reason of why it would not be set for testing?
24              MS. ITCHHAPORIA:  Objection.  Form.
```

1    Foundation.  Mischaracterizes this -- evidence in this

2    case.

3              Go ahead.

4              THE WITNESS:  I don't think I have enough to

5    answer that question.

6    BY MS. SAMUELS:

7         Q    Okay.  Okay based upon what you know about

8    this case so far -- well, so far.  You are the

9    Detective.  Based upon what you know about the case,

10   would you consider the person who bit Merek Majdak to

11   be a person of interest?

12             MS. ITCHHAPORIA:  Objection.  Form.

13   Foundation.  Calls for speculation.  Incomplete

14   hypothetical.

15             THE WITNESS:  Once again, I don't have enough

16   information in regards to know if that's even related

17   to this case or not.

18             MS. SAMUELS:  Okay.  I think I'm done.  Give

19   me like five minutes to look over my notes, and we'll

20   reconvene.

21             THE WITNESS:  Thank you.

22             MS. SAMUELS:  Yeah.

23                  (WHEREUPON, off the record.)

24             MS. SAMUELS:  Back on the record.

```
 1   BY MS. SAMUELS:

 2        Q    Mr. Wright, are you aware of any GPRs you

 3   created during the course of your investigation to the

 4   murder of Majdak?

 5        A    No, ma'am.

 6             MS. SAMUELS:  No further questions.

 7             MS. ITCHHAPORIA:  Signature reserved,

 8   assuming --

 9                  Attorney Brill, do you have no

10   questions?

11             MS. BRILL:  City has no questions.

12                     (WHEREUPON, the deposition

13                      adjourned.)

14

15

16

17

18

19

20

21

22

23

24
```

```
1   XAVIER WALKER,                        )
                                          )
2          Plaintiff,                     )
                                          )
3      vs.                                )No. 20 Cv 7209
                                          )Judge Guzman
4   CITY OF CHICAGO, STANLEY SANDERS,     )
    MICHAEL PIETRYLA, DAVID WRIGHT,       )Magistrate
5   BRIAN HOLY, JOHN CRUZ, DONALD         )Judge Fuentes
    WOLVERTON, JOHN RIORDAN, ROBERT       )
6   BARTIK, ANTHONY BRZENIAK, THOMAS      )
    MAHONEY, and COOK COUNTY,             )
7                                         )
           Defendants.                    )
8
```

9              C E R T I F I C A T E

10        I, DAVID WRIGHT, do hereby certify that I

11   have read the foregoing transcript in the

12   above-entitled cause and do assert that this is my

13   testimony except as I have so indicated on the errata

14   sheets provided herein.

15

16        _____

17                   DAVID WRIGHT

18   No corrections (Please initial)_____

19   Number of errata sheets submitted_____(pages)

20   SUBSCRIBED AND SWORN TO

21   BEFORE ME THIS_____DAY

22   OF_____, 2022.

23   _____

24      NOTARY PUBLIC

```
1              E R R A T A

2    DEPOSITION OF:  David Wright

3    DATE TAKEN:  May 12, 2022

4

5    PAGE LINE

6    ___  ___    CHANGE: _____

7         REASON: _____

8    ___  ___    CHANGE: _____

9         REASON: _____

10   ___  ___    CHANGE: _____

11        REASON: _____

12   ___  ___    CHANGE: _____

13        REASON: _____

14   ___  ___    CHANGE: _____

15        REASON: _____

16   ___  ___    CHANGE: _____

17        REASON: _____

18   ___  ___    CHANGE: _____

19        REASON: _____

20   ___  ___    CHANGE: _____

21        REASON: _____

22

23   DEPONENT'S SIGNATURE_____

24        DATE:_____
```

1     **E R R A T A**

2     **DEPOSITION OF:  David Wright**

3     **DATE TAKEN:  May 12, 2022**

4

5     **PAGE LINE**

6     \_\_\_ \_\_\_    **CHANGE:** _____

7         **REASON:**  _____

8     \_\_\_ \_\_\_    **CHANGE:** _____

9         **REASON:**  _____

10    \_\_\_ \_\_\_    **CHANGE:** _____

11        **REASON:**  _____

12    \_\_\_ \_\_\_    **CHANGE:** _____

13        **REASON:**  _____

14    \_\_\_ \_\_\_    **CHANGE:** _____

15        **REASON:**  _____

16    \_\_\_ \_\_\_    **CHANGE:** _____

17        **REASON:**  _____

18    \_\_\_ \_\_\_    **CHANGE:** _____

19        **REASON:**  _____

20    \_\_\_ \_\_\_    **CHANGE:** _____

21        **REASON:**  _____

22

23    **DEPONENT'S SIGNATURE**_____

24            **DATE:**_____

LIGHTFOOT COURT REPORTING, P.C.
(312)701-1090
lightfootpc@sbcglobal.net

```
 1   STATE OF ILLINOIS    )
                          )SS
 2   COUNTY OF C O O K    )

 3

 4                 C E R T I F I C A T E

 5

 6             The within and deposition was taken

 7   before ADRIENNE M. LIGHTFOOT, Certified Shorthand

 8   Reporter in the City of Chicago, County of Cook and

 9   State of Illinois; and there were present at the

10   deposition Counsel as previously set forth?

11             The witness reserved signature.

12             The undersigned is not interested in the

13   within case nor of kin or counsel to any of the

14   parties.

15             IN TESTIMONY WHEREOF, I have hereunto

16   set my hand this 15th day of June 2022.

17

18             _____

19             ADRIENNE M. LIGHTFOOT

20             No. 084-004276

21

22

23

24
```