# EXHIBIT 20

```
 1   STATE OF ILLINOIS )
                       ) SS:
 2   COUNTY OF C O O K )

 3     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
       THE PEOPLE OF THE      )
 5     STATE OF ILLINOIS,     )
                              )
 6              Plaintiff,    )
                              )
 7          vs.               )  No. 00 CR 20601-01
                              )  Charge:
 8                            )
       XAVIER WALKER,         )
 9     JOVANIE LONG,          )
                Defendants.   )
10
                    REPORT OF PROCEEDINGS HAD
11   at the hearing of the above-entitled cause, before the

12   Honorable MARCUS R. SALONE, one of the Judges of said

13   Division, on the 14th day of October, A.D., 2003.

14              PRESENT:
                HON. KIMBERLY M. FOXX,
15              STATE'S ATTORNEY OF COOK COUNTY, by
                UNIDENTIFIED SPEAKER 1 and
16              UNIDENTIFIED SPEAKER 2,
                Assistant State's Attorneys,
17                  Appeared on behalf of the People;

18              MR. GREGORY WILSON,
                    Appeared on behalf of Xavier Walker;
19
                MRS. AMY P. CAMPANELLI,
20              PUBLIC DEFENDER OF COOK COUNTY, by
                MR. JOHN CONNIFF and MR. TOM BRICE,
21              Assistant Public Defenders of Cook County,
                    Appeared on behalf of the Defendant.
22                          * * * * *
     Kim Cypress, CSR
23   Cook County Official Court Reporter
     Criminal Division
24   2650 S. California Avenue - 4C02
     Chicago, Illinois  60608
                          1
```

```
 1                            INDEX

 2    Trial Date: 10-14-2003

 3    People vs. Xavier Walker
                    Jovanie Long
 4
      Bench Trial
 5    Opening Statements
      By Unidentified Speaker ASA 2 - - - - - - Pg. 7
 6    By Mr. Wilson - - - - - - - - - - - - - Pg. 11
      By Mr. Conniff  - - - - - - - - - - - - Pg. 14
 7

 8    WITNESSES

 9    For the State
      DANIEL ROMANSKI
10    By UNIDENTIFIED SPEAKER ASA 1 - DX-17
      By MR. CONNIFF              CX-21
11      * * *
      ALICJA SKIBICKI
12    By UNIDENTIFIED SPEAKER ASA 2 - DX-23  RD-35
      By MR. WILSON              CX-32
13    By MR. CONNIFF            CX-32  RCX-36
        * * *.
14    URSZULA ZARZYCKI.
      By UNIDENTIFIED SPEAKER ASA 2 - DX-37
15

16    For the Defense

17

18

19

20    State Rebuttal

21

22
      Closing Arguments:
23

24                            * * * *

                              2
```

1     THE CLERK:  Xavier Walker, Jovanie Long, sheets 2,

2  6, and 5.

3     MR. CONNIFF:  Good morning, Judge.

4     MR. WILSON:  Good morning, Judge.  How are you?

5     THE COURT:  How is everybody?

6     MR. CONNIFF:  Good.

7     THE COURT:  Good morning, gentlemen.

8     UNIDENTIFIED DEFENDANT:  Good morning.

9     MR. WILSON:  For the record, Judge, Gregory Wilson

10  on behalf of Xavier Walker.

11     MR. CONNIFF:  Good morning, Judge.  John Conniff

12  and Tom Brice, public defenders for Jovanie Walker.

13     THE COURT:  This is set for -- are we going to

14  start.

15     UNIDENTIFIED SPEAKER ASA 2:  For the record I did

16  tender the DNA results formerly I today although.  I

17  did alert both counsel prior to today as to what those

18  results are.  I did tender about a hundred pages of DNA

19  notes to them this morning.  Both counsels have

20  graciously agreed that as long as we did not produce

21  any substantive testimony today, we could put on the

22  civilian witnesses and our life/death witness to

23  commence and continue the bench trial.

24     THE COURT:  Is that correct?

3

1      MR. WILSON:  That's correct, Judge, yes, sir.

2      THE COURT:  All right, let's go off the record for

3  a moment.

4                         (Off the record.)

5                         (WHEREUPON, the following

6                         proceedings were had on the

7                         record:)

8      Okay, let's do the trial.  Mr. Long and --

9  Mr. Long and Walker.

10     Okay, we are here once again.

11     MR. CONNIFF:  Good morning, Judge.  John Conniff

12 for Jovanie Long.

13     MR. WILSON:  And Gregory Wilson for Xavier Walker.

14     Tender to the -- copy of Jury Waiver -- Mr.

15 Walker.

16     MR. CONNIFF:  Likewise as to Jovanie Long.

17     THE COURT:  Mr. Long?

18     DEFENDANT LONG:  Yes, sir.

19     THE COURT:  Tell me your understanding of a jury

20 trial.

21     DEFENDANT LONG:  I know you pick 12 people and they

22 time -- deliberate, leave and come back with a verdict.

23 That's my understanding.

24     THE COURT:  Is that your -- you're Mr. Long, right?

4

1          DEFENDANT LONG:  Yes, sir.

2          THE COURT:  Is that your understanding, Mr. Walker?

3          DEFENDANT WALKER:  Somewhat, your Honor.

4          THE COURT:  You have a different understanding.

5    Tell me your understanding what a jury trial --

6          DEFENDANT WALKER:  Suppose to be 12 people among

7    your peers.

8          THE COURT:  Okay.

9          DEFENDANT WALKER:  As opposed to saying look at the

10   evidence and judge off all the evidence that they hear.

11         THE COURT:  Okay.  As to each defendant, I am in

12   receipt of executed Jury Waivers.  I find those waivers

13   to be given knowingly and voluntarily, shall be

14   accepted.  Okay.

15         MR. CONNIFF:  Judge, one additional matter on

16   behalf of Mr. -- it is a bench trial but we move for

17   severance and that we will exact the State will be

18   introducing the statements in case -- for each.

19         THE DEFENDANT:  Any objection?

20         UNIDENTIFIED SPEAKER ASA 2:  No, Judge.  That is

21   correct.  We would also reinform the Court that this is

22   a capital case as with regard to Mr. Long, and that we

23   are seeking the death penalty based upon felony murder.

24         THE COURT:  Okay.

                              5

1       UNIDENTIFIED SPEAKER ASA 2:  Both my partner and I

2   are qualified to proceed, and I have filed the required

3   certificate.

4       THE COURT:  Mr. Conniff?

5       MR. CONNIFF:  Judge, likewise as to Mr. Long I am

6   qualified as is my partner Mr. Brice.

7       THE COURT:  All right.  All right.  Unless there is

8   any other procedure matters --

9       UNIDENTIFIED SPEAKER ASA 2:  We did have, on the

10  last court date, an informal case management conference

11  with counsel.  His co-counsel I don't -- was not

12  present at that informal conference.

13      MR. CONNIFF:  Judge, I understand under new Supreme

14  Court rules we're suppose to have this conference --

15  case management conference.  Counsel is correct, we had

16  an informal case management conference.

17      UNIDENTIFIED SPEAKER ASA 2:  Conniff was present

18  but Mr. Brice was not.  Mr. Coleman was likewise not

19  present.  It was both lead counsel on the case that

20  were present.

21      THE COURT:  Is there anything that we need to

22  revisit?

23      UNIDENTIFIED SPEAKER ASA 2:  I don't believe so,

24  Judge.

6

1     MR. CONNIFF:  I don't believe so.

2     THE COURT:  Okay, let's go.

3     UNIDENTIFIED SPEAKER ASA 2:  I believe there is a

4  joint motion to exclude on both sides.

5     THE COURT:  The motion to severance -- the joint

6  motion to sever is granted.  What --

7        Okay, opening statements, State.

8     UNIDENTIFIED SPEAKER ASA 2:  Judge, on May 13th,

9  2000, after midnight, Marek Madjak, Marek, M-a-r-e-k,

10  pronounced Marek, Madjak, M-a-d-j-a-k, was driving in

11  his van.  He had left a club and was driving and went

12  the wrong way.  And when he went the wrong way, that's

13  when trouble hits.  That's when the defendant waived

14  him over and began a conversation with him.  Then they

15  waived the van around the corner and that's when the

16  victim parked.

17        The victim speaks English very little, mostly

18  Polish.  He was lost in the city of Chicago.  And at

19  that time that's when the defendants -- both defendants

20  executed the plan that they had agreed to earlier which

21  is what they were going to hit a lick.  They were going

22  to take somebody that they thought was a potential

23  buyer and they were going to rob them and they were

24  going to take their money.  And what happened instead

7

1   was robbery and murder.  The Defendant Walker acted as

2   a lookout while the Defendant Long had the gun and went

3   to go take the money from Marek.

4           Initially, Mr. Walker starts the ball rolling.

5   He gets the victim to stop.  After the victim stops,

6   that's when Mr. Walker becomes the lookout and Mr. Long

7   goes into the car and enters the victim's car and a

8   struggle ensues.  Because he wants to take the money,

9   he, meaning the Defendant Long, wants to take the money

10  from Marek.  The victim Marek had had money in his

11  front shirt pocket, money that was visible.  He had

12  just gotten paid.  It was his first paycheck.  He had

13  come over from Poland and Greece because he had family

14  in Greece.  His mother had already been in the United

15  States.

16          He was out celebrating having gotten his first

17  paycheck, and the defendant could see that money.  And

18  when the victim didn't want to give up that money, the

19  Defendant Long has his gun and he points that gun and

20  he's holding that gun.  And the Defendant Long and

21  Marek starts fighting.

22          And as they're having this physical

23  altercation in the car, Defendant Long fires the gun

24  and it strikes Marek Madjak.  As a result, Marek Madjak

8

1   leaves his van because he doesn't want to be killed.

2   When he leaves the van, Defendant Walker who had been

3   walking up to the van because of what had been going on

4   as a result, he stops and he sees Defendant Long going

5   after Marek Madjak.

6          Mark Madjak ends up getting shot again and

7   he's on the ground.  Two shell casings are recovered by

8   his body.  He's shot in the head and he's shot in his

9   butt area.  That shot is a through and through.  He

10  dies and is left to die in his blood on that sidewalk.

11  The money gone.  Some of the change still left in his

12  pocket which is found inside out.

13         Somebody calls 911.  Police are summoned.

14  When they get to the scene they see the car, the van,

15  the victim's van with its flashers on.  They find

16  Mark's body.  They call for an ambulance but it's too

17  late.

18         Through good police investigation, through the

19  rest of May, through June, through July the police go

20  out and they do interviews.  Through those interviews

21  they're led to other people.  Through those other

22  people they're eventually led to two names Xavier

23  Walker and Jovanie Long.

24         Now, Xavier Walker is caught first at the end

1    of May.  They go down to his house and they find him

2    and they bring him back to the station, and they

3    question him and they talk to him.  Xavier Walker gives

4    a videotaped statement about what he saw and what he

5    did and how he participated on May 13th, 2000, after

6    midnight.

7            Other people are interviewed.  The police talk

8    to members of Jovanie Long's family, his mother.  And

9    as a result, in August -- not quite three months later

10   the beginning of August, Jovanie Long turns himself in

11   at the Area 4 headquarters.  Detectives speak to

12   Jovanie Long.  And after speaking with him and his

13   (inaudible), he goes to another location.  And at that

14   location he discloses that he was, in fact, the shooter

15   of Marek Madjak in that robbery back in May on --

16   May 13th, 2000.  Jovanie Long gives a videotaped

17   statement confessing to what his part in that incident

18   was.

19           You have before you a case that involves a

20   true victim, a victim that was in the wrong place

21   because he got lost.  This is a man who came over from

22   Poland to try to make a better life for his family and

23   was unable to do so because those two men took his

24   money and they took his life, and they left him there

10

1    to die and that is exactly what he did.

2          After you have heard from the witnesses and

3    after you've seen the videotaped statements and after

4    you understand all of the good police work that went on

5    and the thorough investigation, we are confident that

6    you will find both defendants guilty of first-degree

7    murder based on the robbery and the shooting that

8    occurred.  Both individuals are responsible for what

9    occurred when Defendant Long pulled that gun and that

10   gun was fired twice by his hand.  Defendant Walker is

11   equally as responsible as if he had fired that gun.

12        THE COURT:  Thank you.

13        The court's sheet show Mr. Walker first and

14   Mr. Long second.  That's typically the way I proceed

15   just as they appear on the sheet unless there is some

16   arrangements.  I am just going to ask that we be

17   consistent in the order of our conducting the trial.

18   Is there any deviation, Mr. Walker, with --

19        MR. WILSON:  We have none, Judge.

20        THE COURT:  Go right ahead.

21        MR. WILSON:  Judge, the night of May 13, 2000, was

22   a tragic night for Mr. Madjak.  There is no question

23   about that.  He wound up losing his life that night

24   through circumstances that this Court will hear

                              11

1    evidence on.  There was another tragedy that occurred

2    that night also, Judge, and that tragedy involved my

3    client Xavier Walker.

4           Following -- on the evening of May 13th all

5    day that day Mr. Walker had been at home with his

6    family and his friends.  You will hear testimony to

7    that effect.  You will hear testimony that in the

8    evening of May 13th, at some point Mr. Walker asked his

9    sister Shalene (phonetic) Walker could he borrow her

10    car.  And in the neighborhood of midnight that night

11    she finally relented and gave him permission to use her

12    car to go to a restaurant.

13           For the first time around midnight on the

14    night of or the morning of May 13th Xavier Walker left

15    his home, he did not leave his home alone, however.  He

16    -- defendant -- his home with a friend Simeon and a

17    friend Deon who had been, in fact, with him at home all

18    day and all evening, and they drove around.  And they

19    went to a restaurant to get some food to eat, and they

20    drove around and they were going to go to a night club

21    to celebrate the release of another friend who had been

22    recently released from jail.

23           During the course of that -- during the course

24    of that drive around, they came across Jovanie -- the

1   three of them, while in their car, came across Jovanie

2   Long and entered the car.  And they -- and they then

3   went to this club.

4          Now, it is true that Xavier Walker was

5   subsequently picked up by the police and he

6   subsequently gave a videotaped confession.  The Court

7   may recall that we filed a motion to suppress that

8   videotape confession which it denied.

9          You're going to hear testimony again, Judge,

10  about how it is that that confession came to be.  You

11  will hear how Mr. Walker was held in custody for a

12  period of time, that he no longer can recall how long

13  it was.  You will hear how he was taken into custody,

14  taken into a room, shackled to a wall, not allowed any

15  food -- any food or rest, not allowed to use the

16  bathroom.

17         And after a period of time, after the

18  arresting officers came in and repeatedly indicated to

19  him that they wanted him to tell them of his

20  involvement with this murder, with this shooting, how

21  they told him how it was that this shooting took place

22  that night, that night being the night of May 12th,

23  May 13th, year 2000, how they told him that if he would

24  final -- tell them what they wanted to know, they would

13

1  let him go home.  So he told them what they had told

2  him he had done because he thought they were going to

3  let him go home.

4       You may say come on, do you want me to believe

5  that.  Do you want me to believe that a guy who was not

6  involved in the commission of a crime will confess to

7  the commission of a crime?  Yeah.  That's exactly what

8  I want you to believe because that's exactly what

9  happened, Judge.  He made a mistake by doing that.  He

10  made a mistake in believing that the police would let

11  him go home when he told them what they had told him he

12  had done.

13       However, Judge, he did not participate in the

14  commission of a crime against Mr. Madjak.  Mr. Walker

15  did not participate in any way, shape, or form in the

16  killing of Mr. Madjak.  You're going to hear evidence

17  to that effect.  And I believe at the end of the day,

18  Judge, you will find that that there is no way that

19  Mr. Walker could have been -- indeed -- was involved in

20  the commission of that crime, and you will render a

21  verdict of not guilty.

22     THE COURT:  Thank you.

23          Mr. Conniff.

24     MR. CONNIFF:  Judge, the evidence you will hear in

14

1    this case will not establish first-degree murder case.

2    It will not establish a robbery.  Police arrived on the

3    scene and found Marek Madjak's van parked with the

4    flashers on with the passenger door open only on the

5    van with blood on the passenger seat with the passenger

6    window shot out and Mr. Madjak on the sidewalk with two

7    shell casings nearby.

8         The only thing it was going to be able to be

9    proved to you, beyond a reasonable doubt in this case,

10    that there was a struggle of some kind over a weapon

11    and that during that struggle Mr. Madjak himself had

12    possession of a weapon.  The physical evidence is going

13    to support that, and it's not going to support the

14    version of the case which the State has outlined to you

15    this morning.

16         The testimonial evidence which you will hear

17    from the witness stand is not going to be consistent.

18    It's not going to be consistent internally.  The

19    witnesses are not going to be consistent with each

20    other.  It's not going to be consistent with the

21    physical evidence on the scene.  And at the end of the

22    day what you're going to be left with is a tragedy on

23    the West Side of Chicago where -- how Mr. Madjak came

24    to be in that location and what he was there for are

15

1    going to be in dispute.

2         What Mr. Madjak's conduct was while at that

3    location is going to be in dispute.  The identity of

4    the persons who were at the location with Mr. Madjak is

5    going to be in dispute.  And the only thing that you're

6    going to be left with is Mr. Madjak meeting a tragic

7    end on the night of May 13th.  And physical evidence in

8    the case raising all kinds of questions over why he

9    died and how he died and the witnesses who you will

10   hear testify are not going to be able to establish who,

11   in fact, committed this crime.

12        And the evidence will show that Jovanie Long

13   did not commit first-degree murder.  He did not commit

14   a robbery.  And at the end of this case we will be

15   asking you for an appropriate verdict.

16   THE COURT:  Thank you both.

17        All right, call your first witness.

18   UNIDENTIFIED SPEAKER ASA 2:  Thank you, Judge.

19   UNIDENTIFIED SPEAKER ASA 1:  The People would call

20   Daniel Romanski.

21   THE COURT:  You want to come around and stand

22   behind the court reporter.  Please raise your right

23   hand.

24                              (WHEREUPON, the witness was

16

 1                          first duly sworn.)

 2        UNIDENTIFIED SPEAKER ASA 1:  May I proceed, Judge?

 3        THE COURT:  Yes, please.

 4        UNIDENTIFIED SPEAKER ASA 1:  Thank you.

 5                        DANIEL ROMANSKI,

 6   called as a witness on behalf of the People of the

 7   State of Illinois, having been first previously duly

 8   sworn, was examined and testified as follows:

 9                      DIRECT EXAMINATION

10                      BY UNIDENTIFIED SPEAKER ASA 1:

11        **Q**    Sir, I'm going to ask that you keep your voice

12   up.  Would you please state your full name, spelling

13   your last for the court reporter, please?

14        **A**    Daniel Romanski.  It's R-o-m-a-n-s-k-i.

15        **Q**    And, sir, how old are you?

16        **A**    23.

17        **Q**    And you're currently in the United States

18   Marine Corp?

19        **A**    Correct.

20        **Q**    And what is your rank within the Marine Corp?

21        **A**    Sergeant.

22        **Q**    Where are you currently based at this time?

23        **A**    I'm part of the inspector instructor staff

24   here in Chicago.

                              17

1      **Q**    And as part of that, what is your duties?

2    Please explain to the court.

3      **A**    My duties are basically train the reservist

4    and --

5         MR. CONNIFF:  Judge, I'd object.

6         THE COURT:  Yeah.

7            Okay, next question.

8         BY UNIDENTIFIED SPEAKER ASA 1:

9      **Q**    And how long have you been with the Marine

10   Corp?

11     **A**    A little over four years.

12     **Q**    Now, sir, what was your relationship to the

13   victim in this case Marek Madjak?

14     **A**    He was my brother.

15     **Q**    And do you have any other brothers and

16   sisters?

17     **A**    Yes.

18     **Q**    And how many?

19     **A**    I have one brother and one sister.

20     **Q**    And where do they leave?

21     **A**    My sister she's here in Chicago and my other

22   brother is in Poland.

23     **Q**    Okay.  And your brother Marek, while he was in

24   Chicago, where did he live?

1    **A**    He lived with us.

2    **Q**    And when you say "us" who is that?

3    **A**    With my mom.

4    **Q**    And was he employed?

5    **A**    Yes.

6    **Q**    Where was he working at?

7    **A**    He worked in a factory from Modern Supply

8    Center which is here in Chicago.

9    **Q**    Now, did Marek -- your brother Marek have a

10   family of his own?

11   **A**    Yes, he did.

12   **Q**    And where were they?

13   **A**    They're back in Poland.

14   **Q**    And he has a wife?

15   **A**    A wife and four kids.

16   **Q**    Now, in the time you knew your brother, did

17   you ever know him to ever use drugs or narcotics?

18   **A**    No.

19   **Q**    Now, sir, I'm going to direct your attention

20   to early May of the year 2000.  Did you have an

21   opportunity to see your brother Marek at that time?

22   **A**    Yes, I seen him when I was on leave here.  I

23   was here for about five days.  I saw him when he --

24   when I picked him up from the airport.

19

1    **Q**    And how did your brother appear to you at that

2    time?

3    **A**    He looked good, healthy, built.

4        UNIDENTIFIED SPEAKER ASA 1:  May I approach the

5    witness, Judge?

6        THE COURT:  Sure.

7        BY UNIDENTIFIED SPEAKER ASA 1:

8    **Q**    Sir, I am going to show you what's been marked

9    as People's Exhibit No. 1 for identification.  I'm

10   going to ask you that you look at that and tell me

11   whether you recognize who is depicted in that photo?

12                              (WHEREUPON, People's Exhibit

13                              No. 1 was marked for

14                              identification and tendered

15                              to the witness.)

16   **A**    Yes.  My brother.

17   **Q**    And is that your brother Marek?

18   **A**    Yes.

19   **Q**    Okay.  And I'm going to ask you does this

20   picture truly and accurately depict your brother as you

21   saw him in the early part of May 2000?

22   **A**    Yes.

23   **Q**    Now, sir, did you have an opportunity to see

24   your brother after May 13th of the year 2000?

20

1      **A**    Yes.

2      **Q**    Okay.  And where did you see him at?

3      **A**    At his wake when he was deceased.

4      UNIDENTIFIED SPEAKER ASA 1:  Your Honor, at this

5  time it would be a stipulation by and between the

6  parties that if the witness were shown People's Exhibit

7  No. 2 that he would identify that as a photograph of

8  his brother Marek Madjak after May 13th, 2000, and that

9  it truly and accurately depicts his brother as it exist

10  -- as he existed at that time and that he was deceased.

11  So stipulated?

12      MR. CONNIFF:  So stipulated.

13      MR. WILSON:  So stipulated.

14      UNIDENTIFIED SPEAKER ASA 1:  Just one moment,

15  Judge.

16      **Q**    Do you know how long your brother was working

17  at the factory?

18      **A**    Not exactly.

19      **Q**    Okay.

20      UNIDENTIFIED SPEAKER ASA 1:  I have nothing

21  further.

22                    CROSS-EXAMINATION

23                    BY MR. CONNIFF:

24      **Q**    Mr. Romanski is it?

21

1      A      Yes.

2      Q      I notice you're wearing your Marine Corp

3    uniform today?

4      A      Yes.

5      Q      This is not marine business that you're here

6    on today, though, is it?

7      A      Sorry, sir.

8      Q      You're not here on Marine Corp business today

9    even though you have your marine uniform on in court,

10    correct?

11      A      No.  But I'm still on duty.

12      Q      I'm sorry.

13      A      I'm still on duty.

14      Q      I understand.

15          Your brother came to Chicago in April of 2000?

16      A      Correct.

17      Q      And he was deceased on the night of May the

18    12th and May 13th of 2000?

19      A      Correct.

20      Q      And you weren't with him at any time on the

21    night of May the 12th, were you?

22      A      No.

23          MR. WILSON:  No questions.

24          UNIDENTIFIED SPEAKER ASA 1:  Nothing based on that.

```
 1        THE COURT:  All right.
 2        UNIDENTIFIED SPEAKER ASA 1:  Judge, at this time --
 3   well, we are just asking State's witness be allowed to
 4   stay in the courtroom.
 5        THE COURT:  Is there a motion to exclude?  He can.
 6        UNIDENTIFIED SPEAKER ASA 1:  I understand that.
 7        THE COURT:  Fine.  Any objection?
 8        MR. CONNIFF:  No.
 9        MR. WILSON:  No.
10        MR. CONNIFF:  No objection.
11        UNIDENTIFIED SPEAKER ASA 1:  Thank you, Judge.
12        THE COURT:  Thank you.
13        THE WITNESS:  Thank you.
14        THE COURT:  Please raise your right hand.
15                            (WHEREUPON, the witness was
16                             first duly sworn.)
17        Please be seated.
18                        ALICJA SKIBICKI,
19   called as a witness on behalf of the People of the
20   State of Illinois, having been first previously duly
21   sworn, was examined and testified as follows:
22                    DIRECT EXAMINATION
23                    BY UNIDENTIFIED SPEAKER ASA 2:
24     Q    Ma'am, if you could please state your full
```

23

1    name, spelling both your first and last name for the

2    benefit of the court?

3        **A**    Alicja Skibicki.  The first name is

4    A-l-i-c-j-a.  The last name S-k-i-b-i-c-k-i.

5        **Q**    Back in May of 2000 where were you working?

6        **A**    I was working as a singer in Cardinal Club.

7        **Q**    Where was the Cardinal Club located?

8        **A**    Exactly the corner of Laramie and Belmont.

9        **Q**    Is the Cardinal Club still in existence today?

10       **A**    No, no, it is not.  It was torn down.

11       **Q**    Are you working somewhere else?

12       **A**    I work as real estate professional.  I've been

13   in real estate for 12 years.  And I work from time to

14   time as a musician.  I have a master's degree in music,

15   so it's part of my life.

16       **Q**    How long had you been working at the Cardinal

17   Club in May of 2000?

18       **A**    Seven years.  Seven.

19       **Q**    Do you know somebody named Ursula?

20       **A**    It's the girl.  She was a ticket in the front

21   of the -- working as ticket person.

22       **Q**    Do you know what Urszula's last name?  Is it

23   Zarzycki?

24       **A**    Yes.

1    **Q**    And would that be U-r-s-z-u-l-a for Urszula

2    and Z-a-r-z-y-c-k-i?

3    **A**    Z-a-r-z-y-c-k-i.

4    **Q**    And you say she worked taking tickets from the

5    front door?

6    **A**    Yes.

7    **Q**    Back on May 13th of 2000 did you know someone

8    named Marek Madjak?

9    **A**    Yes.  I met him before a few times.

10   **Q**    Who introduced you to Marek?

11   **A**    His mother.

12   **Q**    His mother would be Teresa Romanski?

13   **A**    Yes.

14   **Q**    How many times had you seen him prior to May

15   13th of 2000?

16   **A**    Maybe five times -- five, six times.

17   **Q**    How would you describe his English?

18   **A**    Poor.  I mean, he's been here maybe a month,

19   maybe more.  Maybe two months prior to being killed.

20   **Q**    What was his native tongue or any language?

21   **A**    Polish, of course.  He came from Greece but he

22   was born in Poland and he spoke Polish.

23   **Q**    Did you see him on May 13th of 2000?

24   **A**    Yes.

1      **Q**   When you saw him on May 13th that was at the

2   Cardinal Club?

3      **A**   Yes.

4      **Q**   Did you have a conversation with him?

5      **A**   Yes.

6      **Q**   If you could please describe his demeanor when

7   you spoke with him?

8      **A**   He came being very happy because that was his

9   first paycheck that he had made in this country and he

10  said that he celebrated --

11     MR. WILSON:  Objection, Judge.

12     THE COURT:  As to --

13     MR. CONNIFF:  Objection, Judge.

14     THE COURT:  As to what he said?

15     MR. CONNIFF:  Uh-huh.  Excuse me.

16     THE COURT:  Okay, next question.

17         Sustained.

18     BY UNIDENTIFIED SPEAKER ASA 2:

19     **Q**   When you had the conversation with him, did

20  you notice anything about his appearance?

21     **A**   He looked like he had maybe one or two drinks

22  and he had lots of money in his pocket.  It was sort of

23  like flowing outside of his pocket.  So I noticed that

24  right away and --

26

1      **Q**     How would you describe the money?  Was it

2   paper currency?

3      **A**     It was paper, yes.  Paper currency.

4      **Q**     When you had that conversation with Marek, did

5   he ask you specifically how to get anywhere?

6      **A**     He asked me -- that was one of the --

7      MR. CONNIFF:  Objection.

8      THE COURT:  About what he asked?

9      MR. CONNIFF:  Any conversation between the witness

10  and the deceased.

11     THE COURT:  Yeah.  Always a basis for your

12  objection.  And it's really --

13     MR. CONNIFF:  Hearsay.

14     THE COURT:  -- more so for your protection than

15  mine.  Go ahead.

16     BY THE WITNESS:

17     **A**     Do you want me to describe what he --

18     THE COURT:  Go ahead.  She can answer the question.

19     BY THE WITNESS:

20     **A**     He asked me for directions how to get to

21  another club nearby.

22     **Q**     Did you give him an answer?

23     **A**     Yes, I gave him the answer.  I told him how to

24  get there.  I told him it's not too far.  It's like

27

1    three blocks or four blocks away.

2    **Q**   How would you characterize how well Marek knew

3    the city?

4    **A**   I'm sure that he didn't know at all.  I mean,

5    just not --

6    MR. CONNIFF:  Objection, Judge.

7    THE COURT:  Sustained.

8    BY UNIDENTIFIED SPEAKER ASA 2:

9    **Q**   Did you say anything specific to Marek after

10   you --

11   THE COURT:  Always a basis.

12   MR. CONNIFF:  Judge, I think they're going into

13   hearsay every time they ask a question about the

14   conversation.

15   THE COURT:  Well, this was not hearsay.  She was

16   sure that he didn't know.

17   BY THE WITNESS:

18   **A**   I knew that.

19   THE COURT:  Proceed.

20   MR. CONNIFF:  Which could have only been based on

21   conversation between the witness and the deceased.

22   Maybe it's her assumption.

23   THE WITNESS:  Because I met --

24   UNIDENTIFIED SPEAKER ASA 2:  Ma'am, you can't

28

1    answer unless there is a question pending, okay.

2       Q    Did you say anything to him after giving him

3    the directions to that club?

4       THE COURT:  Even more reason why we need a basis,

5    you know.

6       MR. CONNIFF:  All right.

7       THE COURT:  Okay.

8       BY THE WITNESS:

9       A    I just told him the directions.  That's all.

10   And I told him also "I mean, Marek, you should go

11   home."  That's all I remember saying besides that.

12      Q    Did you see where he went after he had the

13   conversation with you?

14      A    He went to the front of the bar and stayed

15   there probably -- I don't know what happened but --

16      Q    Did you see if he had a conversation with

17   anybody towards the front of the bar?

18      A    From the distance I saw that he talking to

19   Urszula.

20      Q    And that was the Urszula we talked about

21   earlier?

22      A    Yes.

23      Q    Do you know what time Marek left the Cardinal

24   Club?

29

1     **A**    It was probably around midnight.

2     UNIDENTIFIED SPEAKER ASA 2:  May I approach, your

3   Honor?

4     THE COURT:  Sure.

5     UNIDENTIFIED SPEAKER ASA 2:  Showing counsel what's

6   already been marked as People's Exhibit No. 1 for

7   identification.

8                                   (WHEREUPON, People's Exhibit

9                                   No. 1 was shown to opposing

10                                  counsel.)

11    **Q**    Ma'am, I'm showing you what's been marked as

12  People's Exhibit No. 1 for identification.  Do you

13  recognize that photograph?

14                                  (WHEREUPON, People's Exhibit

15                                  No. 1 was tendered to the

16                                  witness.)

17    **A**    Yes.

18    **Q**    Who is it a photograph of?

19    **A**    It's Marek.

20    **Q**    And does that photograph truly and accurately

21  depict the Marek Madjak that you knew back in May of

22  2000?

23    **A**    Absolutely.

24    UNIDENTIFIED SPEAKER ASA 2:  May I have one moment,

30

1    Judge?

2         THE COURT:  Sure.

3         BY UNIDENTIFIED SPEAKER ASA 2:

4         **Q**    Earlier you stated you could see the paper

5    currency in Marek's pocket.  Where was that pocket

6    located?

7         **A**    I think it was on his left side.  You just --

8    you know, it's hard for me to recall but --

9         **Q**    You're indicating like his left breast --

10        **A**    Yes.

11        **Q**    -- area?

12        **A**    Yes.

13        **Q**    Is that the pocket that you're describing?

14        **A**    Yes.  It was on the upper side of his jacket

15   or whatever it was (indicating).

16        UNIDENTIFIED SPEAKER ASA 2:  Indicating for the

17   record that the witness has placed her right hand over

18   like where your heart would be on the left breast side

19   of the chest.

20        THE COURT:  Noted.

21        UNIDENTIFIED SPEAKER ASA 2:  No further questions,

22   Judge.

23        THE COURT:  Cross?

24        MR. WILSON:  Just a couple.

                              31

1                    CROSS-EXAMINATION

2                    BY MR. WILSON:

3       Q    Ms. Skibicki, how long was Marek in the club?

4       A    Maybe 40 minutes.

5       Q    Maybe 40 minutes?

6       A    (Nodding head.)

7       Q    And to your knowledge how many drinks did he

8    have?

9       A    In the club, I don't know how many.  But he

10   came being a little bit tipsy.

11      Q    Did you see him with any drinks in the club?

12      A    No, I don't recall him holding the hand -- I

13   mean, the bar was empty at that moment.  It was not

14   busy, so I felt he may be looking for some friends.

15      Q    And the 4 or 5 times you had seen Marek

16   previously, were those times always at the club?

17      A    Except once.

18      Q    Except once?

19      A    (Nodding head.)

20      MR. WILSON:  All right, I have nothing further.

21      THE COURT:  Counsel for Mr. Long.

22                    CROSS-EXAMINATION

23                    BY MR. CONNIFF:

24      Q    Ms. Skibicki, you work as a singer at the

1    club?

2    **A**    Yes.

3    **Q**    And you said that he had cash in his pocket?

4    **A**    Lots of cash.

5    **Q**    And the reason you noticed that was because he

6    tried to buy you a drink?

7    **A**    No.  He was buying -- I don't think --

8    **Q**    All right.  But he was at the club.  There are

9    girls at that club?

10    **A**    Yes, there were.

11    UNIDENTIFIED SPEAKER ASA 2:  Objection to the form

12    of the question.

13    THE COURT:  No.  I take it just as it was

14    literally.

15    BY MR. CONNIFF:

16    **Q**    You saw him there drinking, right?

17    **A**    Not at this moment.  Not that on that

18    particular night.

19    **Q**    You didn't see him dripping that night?

20    **A**    (Inaudible.)

21    **Q**    Did you see him trying to pick up any girls at

22    the bar?

23    **A**    No.  He was acting friendly but there were no

24    girls around me -- talking to me.

33

1      Q    But at the time you saw him you thought that

2    he had too much to drink and should go home?

3      A    Yes.  Yes.

4      Q    And he left, right?

5      A    Yes.

6      Q    You didn't go outside with him?

7      A    No.  I wish I would have.

8      Q    You didn't go outside?

9      A    I didn't go outside.

10     Q    And you don't know where he was going when he

11   left your club?

12     A    He was going definitely, to my knowledge, to

13   another place that he asked the name for.  Michelle

14   Terrace was the name he asked for.

15     Q    And you don't know that he went there, though?

16     A    No, I don't.

17     Q    And do you know the other place -- what the

18   name of the other place was?

19     THE COURT:  Michek Terrace?

20     THE WITNESS:  Michelle Terrance.  It's on the

21   corner Irving Park and Laramie.

22     BY MR. CONNIFF:

23     Q    And how far is away -- from that Maypole?

24     A    I mean, maybe four blocks.  I have no --

34

1  exactly the idea how in blocks but it's very -- it's

2  five minutes away by car.

3      MR. CONNIFF:  Nothing further.

4      THE COURT:  Redirect?

5      UNIDENTIFIED SPEAKER ASA 2:  Very briefly, Judge.

6      THE COURT:  Sure.

7                  REDIRECT EXAMINATION

8                  BY UNIDENTIFIED SPEAKER ASA 2:

9   Q    You say that you saw Marek on one other

10  occasion not at the club.  Was anybody else present for

11  that?

12  A    Yes.

13  Q    Who else was there?

14  A    His mother invited me to her boyfriend's place

15  in Highland Park.  One of my (inaudible) came from

16  Toronto and I came to visit him there.

17  Q    And --

18  A    And Marek was actually the one who opened the

19  door for me when I arrived.

20  Q    When you -- if you were to leave the Cardinal

21  Club and go towards --

22  A    Michelle Terrance.

23  Q    -- Michelle Terrance would that be on the way

24  towards the Edens or 94 North to the suburbs?

1       **A**     It's going north toward the suburbs.

2       **Q**     Okay.  If you were to go the wrong way, would

3   that be the opposite way of Michelle Club?  Would that

4   be the opposites way of the Edens which would take you

5   to the northern suburbs?

6       **A**     You would be going opposite way from the club.

7   You will be going east toward the --

8       **Q**     To the part of the city?

9       **A**     Yes.

10          Actually, you would be going closer to the

11  highway.

12      **Q**     Would you have to pass the highway on your way

13  away from the club?

14      **A**     Yes.

15      **Q**     How far is the entrance to the highway from

16  the club?

17      **A**     Oh, it's a distance.  It's 20 minute distance

18  from the club.

19          UNIDENTIFIED SPEAKER ASA 2:  I have nothing else.

20                  RECROSS EXAMINATION

21                  BY MR. CONNIFF:

22      **Q**     The highway you're referring to, ma'am, is the

23  Edens?

24      **A**     At this point it's 90 and 94.  It's Wilson

36

1    exit, for instance.  That's the way I usually take.

2        **Q**    The expressway that runs north and south?

3        **A**    Yes, north and south.

4    MR. CONNIFF:  Nothing further.

5    MR. WILSON:  Nothing further.

6    THE COURT:  Thank you, madam.  You can step down.

7                        (Witness excused.)

8        Who is next?

9        Please stand and raise your right hand,

10   please.

11                       (WHEREUPON, the witness was

12                       first duly sworn.)

13                   URSZULA ZARZYCKI,

14   called as a witness on behalf of the People of the

15   State of Illinois, having been first previously duly

16   sworn, was examined and testified as follows:

17                   DIRECT EXAMINATION

18                   BY UNIDENTIFIED SPEAKER ASA 2:

19       **Q**    Keep your voice up nice and loud.  You can sit

20   down.

21       If you could please state your first and last

22   name, spelling both for the benefit of the court.

23       **A**    Urszula, U-r-s-z-u-l-a, Zarzycki,

24   Z-a-r-z-y-c-k-i.

                        37

1      THE COURT:  Spell the last name S --

2      THE WITNESS:  Z-a-r-z-y-c-k-i.

3      THE COURT:  Okay.

4      BY UNIDENTIFIED SPEAKER ASA 2:

5      **Q**    Back in May of 2000 were you working anywhere?

6      **A**    Yes.  I work in Cardinal Club.

7      **Q**    Where is the Cardinal Club located?

8      **A**    In Chicago, Belmont and Laramie.

9      **Q**    What were you doing or what was your

10     employment at the Cardinal Club?

11     **A**    I was working by the door like cashier.

12     **Q**    Did you take tickets and people would come in?

13     **A**    Yes.

14     **Q**    Back on May 13th of 2000 were you working that

15     evening?

16     **A**    Yes.

17     **Q**    Did you know someone by the name of Marek

18     Madjak?

19     **A**    Yes.

20     **Q**    How did you know him?

21     **A**    This night I saw him second -- not the second

22     time but I spoke with him second time and actually we

23     met each other the last night when I saw him.

24     **Q**    Had you met him prior to May 13th of 2000?

38

1    **A**    I saw him before but I never spoke with him.

2    **Q**    May 13th of 2000 was the first time he spoke

3    to you?

4    **A**    Yes.

5    **Q**    When you saw him, did you have a conversation

6    with him?

7    **A**    Yes.

8    **Q**    After you had that conversation with him, did

9    you say anything to him?

10    **A**    He asked me --

11    MR. CONNIFF: Objection: Hearsay.

12    BY UNIDENTIFIED SPEAKER ASA 2:

13    **Q**    Without getting into the contents of what he

14    asked you, what did you say to him?

15    MR. CONNIFF: Objection: Hearsay.

16    BY THE WITNESS:

17    **A**    I don't understand this question.

18    THE COURT: Okay. Rephrase your question.

19    BY UNIDENTIFIED SPEAKER ASA 2:

20    **Q**    Without saying what anybody said to you, you

21    can explain to the court what you said to Marek.

22    **A**    To Marek?

23    **Q**    Correct.

24    **A**    He was talking with --

1        MR. CONNIFF:  Objection.

2        BY UNIDENTIFIED SPEAKER ASA 2:

3     **Q**    Without getting to what he said to you, you

4   can say what you said to him.

5        THE COURT:  Did you say anything to Marek on that

6   day?

7        THE WITNESS:  Yes.

8        THE COURT:  What did you say?

9        THE WITNESS:  How he can -- direction -- get

10  Michelle Terrance Club.

11       THE COURT:  Okay.

12       BY UNIDENTIFIED SPEAKER ASA 2:

13    **Q**    Did you give him directions on how to get

14  there?

15    **A**    Yes.

16    **Q**    After you told him how to get there, did he do

17  anything?  Did he stay in the club or did he leave?

18    **A**    He was talking to me, and after this he leave

19  the club.

20    **Q**    What time about did he leave the club?

21    **A**    About midnight.

22    **Q**    Did you see where he went when he left the

23  club?

24    **A**    No.

1     **Q**    Did you say anything to him about him going to

2     that other club?

3     **A**    I asked him if he's okay to go by himself and

4     he told me, "Yes, I am."

5         UNIDENTIFIED SPEAKER ASA 2:  May I approach, Judge?

6         THE COURT:  Sure.

7         BY UNIDENTIFIED SPEAKER ASA 2:

8     **Q**    I'm showing you what's been previously marked

9     as People's Exhibit No. 1 for identification.  Do you

10    recognize that photograph?

11                                (WHEREUPON, People's Exhibit

12                                No. 1 was tendered to the

13                                witness.)

14    **A**    Not the photograph but I recognize him.

15    **Q**    Do you recognize the person in the photograph?

16    **A**    Yes.

17    **Q**    Okay.  Who is the person in the photograph?

18    **A**    This is Marek.

19    **Q**    And that's the same individual that we are

20    talking about that you talked to on May 13th of 2000?

21    **A**    Yes.

22    **Q**    Does this picture truly and accurately depict

23    how he looked back in May of 2000?

24    **A**    He looked like --

1    **Q**    Did he look exactly like this?

2    **A**    Yes.  Yes.

3    UNIDENTIFIED SPEAKER ASA 2:  I have no further

4    questions, Judge.

5    MR. WILSON:  I have no questions.

6    MR. CONNIFF:  I have no questions.

7    THE COURT:  Okay, thank you, Madam.  You can step

8    down.

9                              (Witness excused.)

10    UNIDENTIFIED SPEAKER ASA 2:  Judge, we would ask if

11    it would be okay if we can commence and continue this

12    bench trial until November 4th and 5th.  I believe

13    everybody is available those two days.  The jury that I

14    had scheduled in another courtroom is not going to go.

15    The defendant's ill.

16    THE COURT:  The defendant is ill?

17    UNIDENTIFIED SPEAKER ASA 2:  The defendant is ill.

18    THE COURT:  Okay.  I take it you've already

19    discussed these dates?

20    MR. CONNIFF:  Yes.

21    THE COURT:  Okay.  This matter is continued until

22    November 4th.

23                              (Commenced and continued

24                              till 11-4-2003.)

                              42

1                                    (Which were all the
2                                    proceedings had in the
3                                    above-entitled cause.)
4                    *  *  *  *  *  *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1    STATE OF ILLINOIS   )
                          ) SS:
2    COUNTY OF C O O K    )

3
          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
4
              COUNTY DEPARTMENT-CRIMINAL DIVISION
5

6

7                   I, KIM CYPRESS, an Official Court

8    Reporter in the Circuit Court of Cook County, County

9    Department, Criminal Division, do hereby certify that I

10   reported in shorthand the proceedings had at the

11   hearing of the aforementioned cause; that I thereafter

12   caused the foregoing to be transcribed, which I hereby

13   certify to be a true and accurate transcript taken to

14   the best of my ability of the proceedings had before

15   the Honorable MARCUS R. SALONE, Judge of said Court.

16

17

18

19
                        _Kim Cypress_____
20                       Official Court Reporter

21

22   Dated this __21st__ day

23

24   of ___March____ , 2021.    CSR# 084-002917

                              44