# EXHIBIT 21

```
 1    STATE OF ILLINOIS)
                       ) SS.
 2    COUNTY OF COOK  )

 3    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                    CRIMINAL DIVISION
 4
      THE PEOPLE OF THE      )
 5    STATE OF ILLINOIS,     )
                             )
 6        Plaintiff,         )
                             ) NO. 00CR20601
 7        VS                 )
                             )
 8                           )
      XAVIER WILSON and      )
 9    JOVONIE LONG,          )
                             )
10        Defendants.        )

11
                REPORT OF PROCEEDINGS of the hearing
12    had before the Honorable MARCUS SALONE, heard
      on the 4th day of November, 2003.
13
                APPEARANCES:
14              HON. RICHARD DEVINE,
                State's Attorney of Cook County, by:
15              MS. JENNIFER RAVIN, and
                MR. DAVID COLEMAN,
16              Assistant State's Attorneys,
                    appeared for the People;
17
                MR. GREGORY WILSON,
18                  appeared for the Defendant Walker.

19
                MR. EDWIN BURNETT,
20              Public Defender of Cook County, by:
                MR. JOHN CONNIFF, and
21              MR. THOMAS BRICE,
                Assistant Public Defenders,
22                  appeared for the Defendant Long.

23    Jacqueline Shenberger,
      Official Court Reporter
24    2650 South California,
      Chicago, Illinois
```

DATE OF HEARING: 11-4-03
PG. NO. 1-PP THROUGH 93-PP


INDEX

PROCEEDINGS

| LIST OF WITNESSES | DX | CX | RDX | RCX | RDX |
|---|---|---|---|---|---|
| DET. CRUZ | 4 | 22 | 32 | 32 | |
| JOANNA LEAFBLAD | 35 | 48 | | | |
| JAMES NAVARRE | 52 | 64 | | | |
| OFF. RIORDAN | 74 | 91 | | | |

1    THE CLERK: Xavier Walker and Jovonie

2  Long.

3    THE COURT:  Xavier Walker and Jovonie

4  Long, each Defendant is represented by

5  respective Counsel.  Gentlemen, please.

6    MR. WILSON:  Gregory Wilson for Mr.

7  Walker.

8    MR. BRICE:  John Conniff and Tom Brice

9  for Jovonie Walker.

10    THE COURT:  When were we together

11  last?

12    MR. WILSON: October 14th.

13    THE COURT:  Are we ready, State?

14    MS. RAVIN:  We're in the middle of our

15  case, correct?

16    THE COURT:  I don't know if we're in

17  the middle of it, we started it.

18    MS. RAVIN:  Correct.

19    THE COURT:  Call your next witness.

20    MS. RAVIN:  We'll call Detective Cruz.

21    MR. COLEMAN:  For the record David

22  Coleman.

23        (WITNESS SWORN.)

24    MR. COLEMAN: May I proceed, Judge?

1    THE COURT: Please.

2         DETECTIVE JOHN CRUZ,

3    called as a witness herein, having been first

4    duly sworn, was examined and testified as

5    follows:

6         DIRECT EXAMINATION

7              BY

8         MR. COLEMAN:

9    Q    Detective, I'm going to ask that you

10   state your full name, spelling your last name,

11   give your star number and unit of assignment?

12   A    Detective John Cruz, C-r-u-z, star

13   number 20887, I'm assigned to Area 4 Detective

14   Division of the Chicago Police Department.

15   Q    Detective, how long have you been

16   assigned to Area 4?

17   A    Almost five years.

18   Q    And how long have you been a police

19   officer?

20   A    A little over thirty years.

21   Q    Are you familiar with the area of 4721

22   West Ohio?

23   A    Yes, I am.

24   Q    And had you worked in that area during

1    the course as a police officer?

2         A    My entire career.

3         Q    Now, I'm going to direct your

4    attention to May 13th of the year 2000, at

5    approximately 1:40 A.M., were you on duty on

6    that date and time?

7         A    Yes, I was.

8         Q    Were you working with a partner?

9         A    Yes, I was working with Detective Don

10   Wolverton.

11        Q    On that date and time did you receive

12   an assignment?

13        A    Yes.

14        Q    What was that assignment?

15        A    To investigate a homicide at 4721 West

16   Ohio.

17        Q    Okay, and as a result of that what did

18   you do, Detective?

19        A    My partner and I proceeded to the

20   scene.

21        Q    When you arrived at the scene could

22   you please describe the scene for the Court?

23        A    Okay, the block itself is a

24   residential block. On the south side of the

1    street there are residences almost all the way

2    to the corner from 4700 West to Cicero, and the

3    north side of the street there are residences

4    about midway up the block from the east end of

5    the block to the middle of the block and

6    there's a play lot up to the alley and there's

7    a building from the alley to Cicero, which is

8    partially residential.  And there's a business

9    in the front on Cicero.

10        Q   Is Ohio as it leads from Cicero is

11   that a one way street?

12        A   One way street going eastbound, yes,

13   and there's a light at the corner at Cicero and

14   Ohio, a traffic light.

15        Q   When you arrived at the scene was the

16   scene secured?

17        A   Yes, it was, it was taped off with

18   yellow police tape and there were police

19   officers just outside of it and just inside the

20   taped lines.

21        Q   And at approximately 2:20 A.M. did

22   anyone from the Forensic Unit arrive at the

23   scene?

24        A   Yes, Officers Tobar, Bob Tobar and

1    Pat, I see him almost every day, I can't think

2    of his name.

3         Q   Moran?

4         A   Pat Moran.

5         Q   And what if anything did you observe

6    those two individuals doing when they arrived

7    at the scene?

8         A   They consulted with us first, we

9    explained what we had seen and then they

10   started processing the scene.  They recovered

11   two shell casings from  -- one from 4725 West

12   Ohio and in front  -- on the pavement, and one

13   from in front of 4723 West Ohio on the

14   pavement. They took photographs where the

15   victim was lying on the sidewalk at 4721 West

16   Ohio with his head to the east and his feet

17   generally to the west, a pool of blood around

18   his head, there was a van across the street,

19   like 4724 West Ohio, a mini van, a green mini

20   van, Dodge Caravan, the passenger window of the

21   vehicle was broken out, there was glass on the

22   passenger seat and some smaller amount of glass

23   on the street, the lights  -- the emergency

24   flashers were on. The passenger door was open,

1    inside the van there were car keys on the

2    floor, near the  -- under the dashboard area,

3    there was blood  -- there was a spot of blood

4    on the passenger seat in the glass.  And all

5    those things were processed by photographs and

6    by taking blood swabs from the  -- blood spot

7    on the seat and blood on the sidewalk where the

8    victim was at. There was an impression, it

9    looked like a depression in the parkway at 4725

10   as though it was-- there was a depression in

11   the parkway, in the grass.

12        Q    Detective  --?

13             THE COURT:  Where is Guy?

14             MS. RAVIN:  I think he went up.

15   BY MR. COLEMAN:

16        Q    Detective, besides the blood swabs

17   that the forensic investigators took from the

18   vehicle, did they take anything else from the

19   van?

20        A    From the van, they fingerprinted the

21   van, they photographed the van, they

22   photographed the scene before they recovered

23   any evidence.

24        Q    Now, Detective, you testified that the

```
1         forensic investigators recovered some
2         cartridges, how many did they recover?
3              A    Two shell casings.
4              Q    Were those shell casings inventoried?
5              A    Yes, they were.
6              Q    Were they inventoried under inventory
7         number 2321182?
8              A    Yes, sir.
9              Q    And regarding the blood swabs, you
10        stated there was an item recovered from the
11        van, is that correct?
12             A    There was, yes.
13             Q    Was that inventoried under inventory
14        number 2321183?
15             A    Yes, sir.
16             Q    And you also testified there was a
17        blood swab taken from the sidewalk, is that
18        correct?
19             A    Yes.
20             Q    And was that inventoried under
21        inventory number 2321182?
22             A    Yes, it was.
23             Q    And regarding the van, did you
24        yourself recover  --?
```

```
 1              MR. COLEMAN:  Can I have one moment,
 2      Judge?
 3              THE COURT:  Sure.
 4      BY MR. COLEMAN:
 5         Q   I'm sorry, previously I had mentioned
 6      regarding the inventory of the cartridges, was
 7      that inventoried under inventory number
 8      2321181?
 9         A   Yes, sir.
10         Q   Now, regarding the van did you recover
11      any items from the van?
12         A   We recovered a pay stub in the
13      victim's name and dated May 12th, 2000.
14         Q   You had a chance to observe the
15      victim, is that correct?
16         A   Yes, sir.
17         Q   What side of the street was he on?
18         A   He was on the south side of the
19      street.
20         Q   What side of the street was the van?
21         A   The north side of the street.
22         Q   Specifically did you notice anything
23      regarding the victim's clothing?
24         A   The victim was laying face up, he was
```

1  wearing a shirt, trousers, the right pocket,

2  the right front trouser pocket was pulled

3  inside out and there were some coins

4  immediately adjacent to that pulled out pocket.

5        Q    Detective, did you eventually perform

6  a canvass of the area?

7        A    Yes, sir.

8        Q    After you did that what did you do?

9        A    The victim was removed to the Medical

10 Examiner's Office and my partner and I

11 proceeded to Medical Examiner's Office.

12       Q    When you got there what happened?

13       A    We took note of his injuries again.

14       Q    Specifically what did you see?

15       A    Well, he had an apparent gunshot wound

16 midway between the left ear and the left eye,

17 corner of his left eye and there was also a

18 gunshot wound that was observed in the upper

19 part of his left buttocks.

20       Q    Did you eventually leave the Medical

21 Examiner's Office?

22       A    Yes, sir.

23       Q    Where did you go?

24       A    We had an identification card in the

1    victim's name or the name of the victim, and we

2    proceeded to an address that was on that

3    identification card in an attempt to find

4    family.

5         Q    Where did you get that identification

6    card?

7         A    It was in his wallet, which I believe

8    was in his left front trouser pocket.

9         Q    When you got to this address what

10   happened?

11        A    We could not reach anybody, nobody

12   would answer the door bell or knocks on the

13   door or windows, so we proceeded then to an

14   address of the business that was on his pay

15   stub.

16        Q    And do you remember the name of that?

17        A    No, it was 2500 North Pulaski, I don't

18   remember.

19        Q    Was it a remodeling supply store?

20        A    Yes.

21        Q    When you got there what did you do?

22        A    It wasn't open immediately, we had to

23   wait around for a half an hour then they opened

24   the doors for business for employees coming.

1   When we found the person from personnel we

2   asked him if he knew this particular -- if he

3   knew the victim, Mr. Marek.

4        Q   Did you eventually have a conversation

5   with the person who worked for that company?

6        A   Yes, I talked to -- I know his last

7   name, Maglovski, the first name is Maglovski,

8   it was a friend that sponsored the victim at

9   the company.

10       Q   This individual that you spoke to did

11  he have a relationship with the victim's

12  sister?

13       A   He was the victim's sister's

14  boyfriend, yes.

15       Q   After you spoke to him did you receive

16  the name of the victim's sister?

17       A   Yes.

18       Q   What did you do then?

19       A   We asked him if he could put us in

20  contact with her, we had to notify her, he

21  accompanied us to Roseland where she lived with

22  him and we told her of her brother being

23  killed.

24       Q   What did you do after that, Detective?

```
1         A    Then we returned to the Area. We

2    notified her how she could contact the Medical

3    Examiner's Office, to notify her mother of what

4    had occurred and then we returned to the Area.

5         Q    Did you eventually turn this

6    investigation over to Detective Pietryla?

7         A    Yes.

8         Q    Now, directing your attention,

9    Detective, to May, 2000, did you pick up this

10   investigation again?

11        A    Yes.

12        Q    And on that date did you learn

13   anything new regarding this investigation?

14        A    Detective Pietryla told us that there

15   was somebody who  --.

16             MR. CONNIFF:  Objection, hearsay.

17             THE COURT: Go ahead, ask the next

18   question.

19                  Your objection is noted.

20   BY MR. COLEMAN:

21        Q    Without getting into what he told you,

22   what did you do based on the information you

23   had received?

24        A    I interviewed somebody.
```

```
1          Q    Specifically, who did you interview?

2          A    I knew his name just a second ago.

3     I'm sorry, I originally knew his name  --.

4          Q    Is your memory exhausted as to the

5     individual who you spoke to on that day?

6          A    Yes, his name is Maurice Wright.

7          Q    When you spoke to Maurice Wright,

8     without getting into what he told you, what

9     happened during that conversation?

10         A    I learned that Jovonie Long and Xavier

11    Walker, he had learned that they had shot  --.

12              MR. CONNIFF:  Objection, Judge.

13              THE COURT:   Sustained.

14              MR. CONNIFF:  Move to strike.

15              THE COURT:   It will be stricken.

16    BY MR. COLEMAN:

17         Q    Did you learn whether or not Maurice

18    Wright was with the Defendants on the night of

19    the murder?

20              MR. CONNIFF:  Objection.

21              THE COURT:  Always a basis?

22              MR. CONNIFF:  Hearsay.

23              THE COURT: Sustained.

24
```

```
1     BY MR. COLEMAN:
2          Q    You had a conversation with Maurice
3     Wright, is that right?
4          A    Yes, sir.
5          Q    And did you ask Maurice Wright to sign
6     a consent to search form?
7          A    Yes, I did.
8          Q    What was that regarding?
9          A    Regarding a pair of shoes, or gym
10    choose.
11         Q    I'll now direct your attention to May
12    28th of the year 2000, did you interview an
13    individual by the name of Mary Curry?
14         A    Yes.
15         Q    Did you interview anyone else on that
16    day?
17         A    Yes, I interviewed Shontay Wright, and
18    a Jamaca Wright.
19         Q    When you spoke to Shontay Wright did
20    she give you anything?
21         A    Yes.
22         Q    What did she give you?
23              MR. WILSON:  Objection, that's hearsay
24    also.
```

```
 1            THE COURT: Very well could be.  I'll
 2    reserve ruling.
 3    BY MR. COLEMAN:
 4        Q   What did she give you?
 5        A   She gave me a pair of gym shoes.
 6        Q   After you spoke with  --?
 7            THE COURT: Are you renewing your
 8    objection?
 9            MR. COLEMAN:  I'll just state it's not
10    being brought for the truth of the matter
11    asserted, what she gave him.
12            THE COURT:  So, the question is did
13    she give you something, the answer is yes.
14        A   Yes.
15    BY MR. COLEMAN:
16        Q   What did she give you?  What's the
17    item she gave?
18            THE COURT:  It is hearsay.
19    BY MR. COLEMAN:
20        Q   Did you receive anything from Shontay
21    Wright?
22        A   Yes, I received  --.
23        Q   What did you receive?
24        A   I received a pair of gym shoes.
```

```
1              MR. CONNIFF:  Objection, hearsay.
2              THE COURT:  It is.
3     BY MR. COLEMAN:
4         Q   After you had a conversation with
5     these three individuals what did you do next?
6         A   I then obtained a stop order for  --.
7              THE COURT:  Who is the third person?
8              MR. COLEMAN:  Mary Curry, Shontay
9     Wright and Jamaca Wright
10    BY MR. COLEMAN:
11        Q   I'm sorry, on the 29th of May, 2000
12    what did you do?
13        A   Obtained a stop order for Jovonie Long
14    and Xavier Walker.
15             MR. COLEMAN:  Can I have just one
16    moment, Judge?
17             THE COURT:  Sure.
18             MR. COLEMAN:  May I approach the
19    witness?
20             THE COURT:  Sure.
21    BY MR. COLEMAN:
22        Q   Detective, I'll show you what's been
23    marked as People's Exhibit 3 for
24    Identification?
```

1          I'll ask that you to look at

2     that item.

3          Do you recognize that.

4     A    Yes, sir.

5     Q    What do you recognize that to be?

6     A    It's the body of the victim laying at

7     4721 West Ohio.

8     Q    Showing you People's Exhibit 4 for

9     identification?

10          Do you recognize what that is.

11     A    It's a closer picture of the victim

12     laying on the sidewalk, with his head lying in

13     a pool of blood.

14     Q    And People's Number 5?

15          Do you recognize that item.

16     A    It's another close-up picture of the

17     victim at the same location and the bullet

18     wound is obvious on the left side of his head.

19     Q    And People's Number 6?

20          Do you recognize that.

21     A    Yes, sir.  It's a picture of the pants

22     that the victim was wearing, with blood

23     emanating from a wound that the victim had on

24     his left buttocks.

1    Q   And People's Number 7?

2            Do you recognize that

3    photograph.

4    A   Yes, sir.

5    Q   What is that a photograph of?

6    A   It's a photograph of a shoe print that

7    was  -- the direction of the shoe that would

8    have been going east on Ohio on the sidewalk

9    near the body.

10    Q   And People's Number 8?

11            Do you recognize that

12    photograph.

13    A   Yes, sir, that's a photograph of a

14    shell casing, that one would have been at 4725

15    West Ohio.

16    Q   And People's Number 9?

17            Do you recognize that

18    photograph.

19    A   Yes, sir, that's a photograph of a

20    shell casing that was at 4723 West Ohio.

21    Q   People's Number 10?

22            Do you recognize that

23    photograph.

24    A   Yes, sir, this is looking west on

CCSAO XAVIER WALKER 001174

1    Ohio, the  -- you can see the victim's vehicle

2    is just barely visible on the right or north

3    side of the street beyond the squad cars.  And

4    on the left side of the street, on the south

5    side of the street it's approximately where the

6    police officers were at, police officers were

7    at processing the scene that the body was at.

8        Q   And Detective, People's number 11?

9            Do you recognize that

10   photograph.

11      A   Yes, sir, it's a picture of the van

12   that had the broken window that belonged to the

13   victim.  It had a temporary registration

14   receipt in the back window. The passenger door

15   is open, the glass is broken out, and the

16   lights are flashing.

17      Q   Is that the same van you recovered the

18   victim's pay stub from?

19      A   Yes.

20      Q   People's Number 12?

21          Do you recognize that

22   photograph.

23      A   Yes, sir, it's another view of the

24   same van, this time the sliding side passenger

1    door is open.  Other than that it's essentially

2    the same way the van was when the police

3    arrived.

4         Q    Okay.  Detective, finally, People's

5    Number 13?

6              Do you recognize that

7    photograph.

8         A    It's the passenger side of that same

9    van with a red fluid on the seat and that's the

10   seat that the blood swab was taken from.

11        Q    Detective, I'll ask you regarding

12   Exhibits 3 through 13, do all those photographs

13   truly and accurately depict the victim and the

14   scene at 4721 West Ohio as it existed on May

15   13th of the year 2000 at 1:40 A.M.

16        A    Yes, sir.

17             MR. COLEMAN:  One moment, Judge.

18                  Nothing further, Judge.

19             THE COURT:  Okay.

20                  CROSS EXAMINATION

21                       BY

22                  MR. CONNIFF:

23        Q    Detective Cruz, when you arrived at

24   the scene you saw the van parked in the street?

```
 1          A    It was parked against the curb, yes,
 2    sir.
 3          Q    It was parked right adjacent to the
 4    play lot that you describe?
 5          A    Yes, sir.
 6          Q    And the passenger door was open?
 7          A    Yes, sir.
 8          Q    And the window on the passenger door
 9    had been shattered, correct?
10          A    That's correct.
11          Q    And the body was found on the
12    sidewalk, on the south sidewalk, correct?
13          A    Yes.
14          Q    And the van was parked against the
15    north curb?
16          A    Yes, sir, adjacent to the play lot.
17          Q    And there were two shell casings which
18    you observed on the sidewalk, correct?
19          A    That's correct.
20          Q    And one was at 4723 West Ohio?
21          A    Yes, sir.
22          Q    The other was at 4725 West Ohio?
23          A    That's right.
24          Q    Did you observe a shell casing inside
```

1     the van?

2          A    No, I did not.

3          Q    Did you observe a shell casing

4     anywhere around the vicinity of the van?

5          A    No, sir.

6          Q    Did you observe apparent blood on the

7     passenger seat inside the van?

8          A    Yes.

9          Q    You observed that the van had its

10    emergency flashers on?

11         A    Yes, sir.

12         Q    And the keys were on the floor of the

13    van?

14         A    Yes.

15         Q    Now, subsequent to that evening you

16    received information from an individual by the

17    name of Yvette Hill, correct?

18         A    I did not.

19         Q    One of your brother officer's did?

20         A    I believe so, yes.

21         Q    And your brother officer had a

22    conversation with you to further investigate

23    this case?

24         A    Yes.

1    Q    And he gave you information concerning
2    a witness by the name of Yvette Hill?
3    A    I believe so, yes.
4    Q    Also known as Mariam Tillman?
5    A    Yes.
6    Q    Known by the nickname of Snuggles?
7         MR. COLEMAN:  Objection, hearsay.
8         MR. CONNIFF:  It's not offered for the
9    truth, it bears upon the subsequent
10   investigation. This will be a very brief
11   inquiry, it will not be offered for the truth
12   of what's contained in the statement, it will
13   simply be offered that the Detective was given
14   the information and it bears upon the
15   subsequent investigation.
16        THE COURT:  Go on.
17   BY MR. CONNIFF:
18   Q    The information that was given to you
19   is that she had knowledge that two persons
20   known as a Red and Darnell were involved with
21   this murder, correct?
22   A    That's what I was told by the officer.
23   Q    And she had specific knowledge of
24   times and location of the victim immediately

1     prior to his death, correct?

2          A    Again, I was told that.

3          Q    And the investigation--?

4               THE COURT:  Why isn't this hearsay?

5               MR. CONNIFF:  Whether it's true or not

6     is not important.  I think I'll be able to

7     clear it up in two more questions.

8               THE COURT:  All right.

9     BY MR. CONNIFF:

10         Q    You found out that she had a tatoo of

11    Red on her left hand?

12         A    I believe I was told that, yes.

13         Q    After you got this information did you

14    go out and attempt to bring in Red or Darnell?

15         A    No, because I didn't know who Red or

16    Darnell was.

17         Q    Did you make any attempt to find out

18    who Red and Darnell were?

19         A    Yes.

20         Q    And what did you do?

21         A    Checked nickname files.

22         Q    Is that in any of your reports?

23         A    That I checked the nickname files?

24         Q    Is it in any of your reports the

CCSAO XAVIER WALKER 001180

```
 1    investigation you conducted with regard to Red
 2    and a Darnell?
 3         A   Are you talking about if I looked for
 4    their names?
 5         Q   No, if you put it in a report?
 6         A   No, I didn't put it in a report, not
 7    that I know of.
 8              MR. CONNIFF:  Nothing further.
 9              MR. WILSON:  No questions.
10              MR. COLEMAN:  I'm going to renew my
11    objection and I'll ask that that entire line of
12    questioning be stricken as hearsay because it
13    was brought out for the truth, Judge, as to
14    what was said. He named two other people
15    possibly involved in this shooting and no
16    investigation was conducted. I think that bears
17    upon the investigation that was conducted by
18    the police.  Whether it's true or not they're
19    not in a position to say if it was true or not.
20              THE COURT:  The objection is
21    sustained.  You can rephrase the question.
22              MR. COLEMAN:  Will it be stricken from
23    the record, Judge?
24              THE COURT:  It shall be stricken.
```

```
1    BY MR. CONNIFF:
2         Q    If you were given information that two
3    persons known as Red and Darnell were involved
4    in the murder  --?
5              MR. COLEMAN:  Objection.
6              THE COURT:  The objection is
7    sustained.  That's the same question.
8    BY MR. CONNIFF:
9         Q    You talked to Miss Hill during the
10   course of your investigation, is that correct?
11        A    Eventually somebody else did, I
12   didn't.
13        Q    What, if anything, did do you with
14   that information?
15        A    I made out a request that she be
16   stopped, I made out a stop order on her so that
17   she could be interviewed.
18             THE COURT:  I will not consider this.
19             MR. CONNIFF:  The only reason it's
20   being offered  -- let me ask one question.
21   BY MR. CONNIFF:
22        Q    You prepared a supplementary report
23   concerning this information, correct?
24        A    Yes.
```

1      Q  And you put in the supplementary

2    report the information you testified about,

3    correct?

4      A  Yes.

5      Q  What part of it?

6      A  That she had knowledge that two

7    persons known to her as a Red and Darnell were

8    involved with the murder.  That she had a tatoo

9    of Red on her left hand and that she had

10   specific knowledge of times and locations of

11   the victim immediately prior to his death.

12      Q  You put all of that in your report,

13   information you were given?

14      A  I put that in the report why she will

15   be stopped because she might have information.

16      Q  And subsequently there is no report

17   prepared by you which has any follow-up

18   investigation with regard to any individual by

19   the name of Red or Darnell, correct?

20      A  I believe she was subsequently

21   identified, I mean subsequently interviewed,

22   she denied --.

23        THE COURT:  Your objection is

24   sustained.  It will be stricken.

1        MR. CONNIFF:  Again, Judge, it's not

2    offered for the truth, it's offered with regard

3    to the conduct.

4        THE COURT:  Then the line of

5    questioning should go to that. We don't need to

6    mention any other names.

7        MR. CONNIFF:  That's the only reason

8    it's offered to suggest-- all I'm offering it

9    for, Judge, there's an investigation of a

10   murder and a woman by the name of Yvette Hill,

11   gives information to the police that ends up in

12   a supplementary report.

13       THE COURT:  She's corroborated one of

14   them is tattooed on her wrist, there is no

15   investigation, I heard it.

16       MR. CONNIFF:  They're not in a

17   position to say it's not being offered for the

18   truth that Darnell and Red committed the

19   murder, it's being offered for the truth that

20   the police were given information which should

21   have been followed up on to investigate the

22   murder.

23       THE COURT:  That's the question to

24   ask.  To suggest-- to raise these other names

1    was not necessary.

2    BY MR. CONNIFF:

3        Q    Officer, did you talk with some

4    citizens and did they give you the name of

5    Xavier and Jovonie?

6            MR. COLEMAN: Objection.

7            THE COURT:  Sustained.

8            MR. CONNIFF:  Well, consider this,

9    Judge, if information had not given names,

10   arguably no investigation could have been

11   conducted.  Our point is that when the police

12   department was given names of two individuals

13   and there is no investigation of those

14   individuals that bears  -- your Honor should

15   know that in terms of investigation.

16           THE COURT:  The simple solution is I

17   will consider  -- the only thing that I will

18   consider, trust me, is that the officer did not

19   follow-up on the information supplied to him by

20   Miss Hill.

21           MR. CONNIFF:  I'm sorry?

22           THE COURT:  The only thing I will

23   consider is that the officer did not follow-up

24   on the information supplied to him by Miss

```
 1    Hill.
 2              MR. CONNIFF:  All right.
 3              MS. RAVIN:  If I may, I don't believe
 4    this Detective testified he talked to Miss
 5    Hill.  I believe he testified he got a stop
 6    order for Miss Hill, I don't think he testified
 7    that he talked to her.
 8              MR. CONNIFF: Nothing further.
 9              THE COURT:  Redirect.
10                  REDIRECT EXAMINATION
11                         BY
12                  MR. COLEMAN:
13       Q   Did you ever personally speak with
14    Yvette Hill?
15       A   No.
16              MR. COLEMAN: Nothing further.
17              THE COURT: All right.  I will revisit
18    my prior ruling. It will be stricken. The
19    officer's response on Cross is stricken.
20                  RECROSS EXAMINATION
21                         BY
22                  MR. CONNIFF:
23       Q   Did you ever personally talk to Miss
24    Hill?
```

```
1           A    No.
2           Q    But, you were conducting this
3    investigation not by yourself, correct?
4           A    That's correct.
5           Q    You were conducting this investigation
6    in conjunction with other officers of the
7    Chicago Police Department?
8           A    Yes.
9           Q    In order to conduct the investigation
10   properly you have contact with and
11   conversations with other individuals involved
12   in the investigation to carry on and further
13   the investigation?
14          A    Yes.
15          Q    So, you were appraised of all of this
16   knowledge in deciding what you yourself should
17   do in carrying on the investigation, correct?
18          A    Yes.
19          Q    And you never made any attempt to go
20   out and contact, bring in or question either of
21   the individuals that you were given information
22   on, correct?
23          A    I had no idea who they were, no, I
24   didn't.
```

```
1              MR. CONNIFF:  Nothing further.
2              THE COURT:  All right, thank you, sir.
3              MR. COLEMAN:  Nothing further.
4              MR. CONNIFF:  Can I just ask one
5    question?
6              THE COURT:  Sure.
7    BY MR. CONNIFF:
8         Q    And to your knowledge none of the
9    other officers that you were working this
10   investigation with talked to any of those
11   individuals either, as far as you know?
12        A    As far as I know, no.
13             MR. CONNIFF: Nothing further.
14                  (WITNESS EXCUSED)
15                     (WITNESS SWORN.)
16             MS. RAVIN: May I begin?
17             THE COURT: Yes, please.
18
19
20
21
22
23
24
```

1              JOANNA LIOTINE LEAFBLAD,

2      called as a witness herein, having been first

3      duly sworn, was examined and testified as

4      follows:

5                    DIRECT EXAMINATION

6                           BY

7                      MS. RAVIN:

8          Q    If you can please introduce yourself

9      to the ladies and gentlemen in the courtroom?

10         A    My name is Joanna Liotine Leafblad,

11     J-o-a-n-n-a, L-i-        , L-e-a-f-b-l-a-d.

12         Q    Miss          u an attorney?

13         A    Ye

14         Q                        ctice in

15     the

16         A

17         Q

18         A    I'm

19         Q    As an a

20         A    Yes.

21         Q    How long have

22     attorney?

23         A    Since 1993, so, nine        sorry,

24     1994, I'm sorry.

1    Q   Were you ever employed by the Cook
2    County State's Attorneys Office?
3        A   Yes.
4        Q   How long have you been employed by
5    them?
6        A   From 1996 to this year, 2003.
7        Q   And in May of 2000 were you then an
8    Assistant State's Attorney?
9        A   Yes, I was.
10       Q   What unit were you assigned to in May
11   of 2000?
12       A   Felony Review Unit.
13       Q   Briefly explain to the Court what the
14   Felony Review Unit consists of?
15       A   The unit consists of approximately
16   fifty attorneys divided into four teams, that
17   work seven days a week. There are shifts of
18   three days on and three days off.  The shifts
19   are then divided into two twelve hour shifts,
20   and that generally is the description of the
21   Felony Review Unit.
22       Q   For the purposes of the record are you
23   then dispatched to certain areas to interview
24   Defendants and witnesses if they wish to talk

1    to you?

2        A    Yes.

3        Q    Do you work with the police in those

4    investigations?

5        A    Yes.

6        Q    On May 29th of 2000 did you receive a

7    particular assignment?

8        A    Yes.

9        Q    Did that assignment take you to Area 4

10   Violent Crimes?

11       A    Yes.

12       Q    Is that located at Harrison and Kedzie

13   in Chicago?

14       A    Yes.

15       Q    Were you familiar with the case you

16   were being called out on?

17       A    Yes.

18       Q    Why were you familiar with the case?

19       A    Because the day before on May 28th I

20   had interviewed two witnesses related to that

21   case.

22       Q    At about 2200 hours or 10:00 o'clock

23   at night did you arrive at Area 4 Violent

24   Crimes?

1        A    Yes.

2        Q    When you got there what did you do?

3        A    I spoke to Detective Pietryla and I

4     reviewed the available reports.

5        Q    P-i-e-t-r-y-l-a?

6                    After you spoke with Detective

7     Pietryla what did you do.

8        A    Went into an interview room and I

9     spoke to Xavier Walker.

10       Q    The person you spoke to named Xavier

11    Walker, do you see him in the courtroom today?

12       A    Yes, I do.

13       Q    Point to him and name an article of

14    clothing he's wearing?

15       A    The young man in the Cook County

16    Department of Corrections uniform next to

17    Defense Counsel.  He has hair, there's one that

18    has a shaved head and one with a very short

19    haircut, he's the one with the short haircut.

20            MS. RAVIN: May the record please

21    reflect the in-Court identification of the

22    Defendant, Xavier Walker?

23            THE COURT:  Yes.

24

BY MS. RAVIN:

    Q   Where did you first see Xavier Walker?

    A   Area 4 Violent Crimes in the interview room.

    Q   When you went into the interview room was anyone else present?

    A   Detective Pietryla came in with me.

    Q   What is the first thing you did when you saw the Defendant Walker?

    A   I told him who I was, I explained my name is Joanna Leafblad, I'm an Assistant State's Attorney, a lawyer and prosecutor, not his lawyer.

    Q   What did you say then?

    A   And I asked him if he understood that, he said he did.

    Q   Did you advise him of anything at that time?

    A   I advised him of his Miranda Rights from memory.

    Q   After you advised him of his Miranda Rights from memory did he indicate to you whether or not he understood his rights?

    A   Yes, he indicated he understood.

```
 1          Q    At that time did you ask him anything
 2     further?
 3          A    I asked him what happened on May 13th
 4     of the year 2000.
 5          Q    Had he indicated to you whether or not
 6     he wished to talk to you?
 7          A    He indicated he did wish to talk to
 8     me.
 9          Q    At that point what happened?
10          A    Then we went on to talk about what
11     happened, I asked him what happened and he told
12     me.
13          Q    After he told you what happened did
14     that conversation continue?
15          A    Yes, it did.
16          Q    How did that conversation continue?
17          A    When he was through telling me what
18     happened that night I asked him if  -- I
19     described to him different ways that I could
20     memorialize what he was telling me. I told him
21     that I could just simply write it down and that
22     would be it, or I could write down what's
23     called a handwritten statement that he would
24     review it and sign it if he thought it was
```

1    correct and what it is was he had told me. Or

2    that we could call a Court Reporter to come and

3    type out our conversation that would take place

4    in a question and answer format, where he could

5    then review the transcript or we could

6    videotape the conversation, again, a question

7    and answer sort of conversation.

8        Q    Did he make a choice?

9        A    Yes, he did.

10       Q    What did he chose?

11       A    He chose the video tape.

12       Q    After choosing the video taped

13   statement what did you do?

14       A    I left the room and I called the

15   videographer who is a court reporter.

16       Q    After you called the videographer did

17   the videographer arrive?

18       A    Yes.

19       Q    About what time did the videographer

20   arrive?

21       A    I would say between  -- sometime

22   between 11:15 and 11:30.

23       Q    Before the videographer arrived and

24   after you called for  -- after you called the

```
1    videographer and before she arrived, did you

2    ever have another conversation with the

3    Defendant?

4         A    I did.

5         Q    Was anyone else present for that

6    conversation?

7         A    No.

8         Q    What did that conversation consist of?

9         A    I asked him if he had been treated

10   well by the police and if he needed anything or

11   if he had anything to tell me.

12        Q    What did he say to you?

13        A    Nothing, he said he was fine.

14        Q    Did he have any requests?

15        A    No.

16        Q    The videographer arrived, at that

17   point had you gone through anything with the

18   Defendant?

19        A    I did.  I also went through the

20   questions I would ask him when the video tape

21   was rolling.

22        Q    Why did you tell the Defendant what

23   questions you were going to ask?

24        A    Because I didn't want him to be caught
```

1    by surprise, I wanted him to kind of see what

2    it would be like when we were doing the video.

3         Q    After you went through that with him

4    did anybody sign anything?

5         A    Yes, Detective Pietryla, Mr. Walker

6    and myself signed a consent to video tape.

7         Q    After that consent had been signed

8    what is the next thing that occurred?

9         A    When the videographer was ready for us

10   we went into the room and sat down and

11   proceeded with the video when she told us it

12   was okay to start talking.

13        Q    Are there any exhibits that were used

14   during the taping of the statement?

15        A    Yes.

16        Q    What exhibits were used?

17        A    Three photographs.

18        Q    Was the video tape statement also

19   marked as an exhibit?

20        A    Yes, it was.

21        Q    After the video taped statement is

22   then taken what occurred?

23        A    After the videotape statement was

24   taken I was able to review the video taped

1    statement.

2        Q    After you viewed it did it contain

3    substantially the same statement as he had

4    given when it was video taped?

5        A    Yes.

6        Q    Was that statement essentially

7    substantially the same as the earlier oral

8    statement the Defendant had given you?

9        A    Yes.

10       Q    The video that you viewed after it was

11   taken on May 29th of 2000 have you reviewed

12   that since May 29th of 2000?

13       A    Yes.

14       Q    When have you reviewed it?

15       A    Previous Court proceedings, last

16   October I believe and then also today.

17       Q    And is that video the same or

18   substantially the same as when you viewed it

19   back on May 29th of 2000?

20       A    Yes.

21           MS. RAVIN:  Your Honor, if I may

22   approach.

23   BY MS. RAVIN:

24       Q    I'm showing you what's been marked as

1    People's Group Exhibit 14, there's A, B, C and

2    D for Identification?

3                    Showing you what's been marked

4    as People's Exhibit 14A for Identification.

5                    Do you recognize that document.

6    A    I do.

7    Q    What is that?

8    A    It's the original consent to video

9    tape statement that was signed by me, Detective

10   Pietryla and Xavier Walker.

11   Q    Showing you what's been marked as

12   Exhibit 14B for identification.

13                    Do you recognize that.

14   A    Yes, that is one of the photo

15   exhibits, this is the photograph of Jovonie

16   Long.

17   Q    Showing you what's been marked as

18   People's Exhibit 14C for identification.

19                    Do you recognize that.

20   A    Yes, this was a photo exhibit, exhibit

21   2, his first name is Antwon and Mr. Walker

22   didn't know his last name, I believe he also

23   goes by Bubble.

24   Q    Showing you People's Exhibit 14D for

1    identification.

2              Do you recognize that.

3         A    Yes.   This was Exhibit 3 in the

4    statement and it's another photograph of

5    somebody who Mr. Walker referred to as Boo Boo,

6    but didn't know his first name.

7         Q    I'm showing you-- well, do all of

8    these exhibits in People's Group Exhibit 14,

9    are all of these exhibits in the same or

10   substantially the same condition as when you

11   filled them out and signed them and used them

12   in the video taped statement on May 29th, 2000?

13        A    Yes.

14        Q    Showing you what's marked as People's

15   Group Exhibit 15 for identification. People's

16   Exhibit 15A, what is that?

17        A    It's a videotape.

18        Q    Is that the video tape that you viewed

19   today before testifying and that you viewed

20   back when it was taken on May 29th, 2000?

21        A    Yes.

22        Q    I'm showing you People's Exhibit 14B

23   for identification   --?

24             THE COURT:   15B?

1          MS. RAVIN: 15B, excuse me.

2     BY MS. RAVIN:

3          Q    Do you recognize that?

4          A    Yes, I do.

5          Q    What is that?

6          A    That's the transcript of the video

7     taped statement.

8          Q    And does it contain 16 court reported

9     typed pages?

10         A    Yes, it does.

11         Q    Have you reviewed that transcript?

12         A    Yes, I have.

13         Q    Does it truly and accurately depict

14    what is portrayed on the video tape?

15         A    Yes, it does.

16         MS. RAVIN:  May I have one moment,

17    Judge?

18         THE COURT:  Yes.

19         MS. RAVIN:  At this time I have no

20    further questions of Miss Leafblad. I'll ask to

21    publish the video taped statement.

22         MR. CONNIFF:  As to Jovonie Long we

23    will object as to Jovonie Long.

24         THE COURT:  I believe this is the

CCSAO XAVIER WALKER 001201

1    statement of Mr. Walker?

2            MS. RAVIN:  Yes.

3            THE COURT:  Your objection is noted.

4                Mr. Wilson, any objection?

5            MR. WILSON:  No objection, Judge.

6                (VIDEO TAPE PLAYED).

7            MS. RAVIN:  I have no further

8    questions, your Honor.

9            THE COURT:  Cross?

10                   CROSS EXAMINATION

11                        BY

12                   MR. WILSON:

13       Q    When you arrived at the station at

14    5-29 2000, what time was that?

15       A    Approximately 10:00 P.M.

16       Q    When you arrived there at 10:00 P.M.

17    did you immediately go to the area where Xavier

18    Walker was located, to the interview room?

19       A    I arrived at the area at 10:00 P.M.

20    and I went to speak to Mr. Walker approximately

21    fifteen minutes later.

22       Q    When you went to speak to him he was

23    in an interview room?

24       A    That's correct.

1      Q   Was he handcuffed in this interview

2   room?

3      A   No, he wasn't.

4      Q   Were there devices that allowed for

5   handcuffing in this interview room on the wall?

6          MS. RAVIN:  Objection, relevance.

7          THE COURT:  I'll give him some

8   latitude.

9      A   Well, there was  -- in the room there

10  was a bench and there was a metal bench

11  attached to the wall above that, much closer to

12  the wall was a bar where I suppose you could

13  attach a handcuff like do one arm and then a

14  handcuff on that bar.

15  BY MR. WILSON:

16     Q   Miss Leafblad, to your knowledge how

17  long had Walker been at Area 4 prior to your

18  arrival?

19     A   I'm not certain of the exact time.

20         THE COURT:  You're not certain.

21     A   No.

22  BY MR. WILSON:

23     Q   And prior to you going to the video

24  room with Mr. Walker you don't know if he had

1    -- in your presence he had not been given

2    anything to eat or drink, had he?

3        A    I don't think it was in my presence,

4    no, but, he told me he had eaten.

5        Q    In your presence he did not have the

6    opportunity to go and use the washroom

7    facilities, had he?

8        A    I don't recall if he got up to go to

9    the bathroom when I was with him.  I might have

10   been privy to that conversation, I certainly

11   could not have been involved in that.

12       Q    And prior to his video session taking

13   place how long did this interview that you had

14   with Mr. Walker last?

15       A    I would say approximately fifteen

16   minutes, a half an hour.

17       Q    And the video session occurred in a

18   video room?

19       A    Yes.

20       Q    That is separate and apart from the

21   interview room?

22       A    That is correct.

23       Q    Once you came into the presence of Mr.

24   Walker in the interview room were you with him

1    continuously up to and including the video

2    session?

3         A    You mean did I escort him from the

4    video room to the interview room?

5         Q    No, I mean were you and he together

6    continuously during that period of time?  Did

7    there ever occur a time when you left his

8    presence or he left your's?

9         A    Well, I did leave to go call the

10   videographer.

11        Q    When you went to leave to go call the

12   videographer did you leave Mr. Walker alone?

13        A    I don't remember if the Detective

14   stayed in there with him or not.

15        Q    By Detective, who are you referring?

16        A    Detective Pietryla.

17        Q    That's the Detective who you met with

18   when you first came to Area 4?

19        A    That's correct.

20        Q    That's the Detective you met with when

21   you first went into the interview room with Mr.

22   Walker?

23        A    Yes, that's the Detective that was

24   with me.

```
1              MR. WILSON:  I have nothing further.
2              MR. CONNIFF:  We have no questions.
3              THE COURT:  Thank you.
4              MR. COLEMAN:  No redirect, Judge.
5                    (WITNESS EXCUSED)
6              MR. COLEMAN:  At this time the People
7      call Jim Navarre.
8                    (WITNESS SWORN.)
9              MR. COLEMAN: May I proceed, Judge?
10             THE COURT: You may.
11                    JIM NAVARRE,
12     called as a witness herein, having been first
13     duly sworn, was examined and testified as
14     follows:
15                 DIRECT EXAMINATION
16                         BY
17                  MR. COLEMAN:
18        Q   I'll ask you that you state your full
19     name, spell your last name for the court
20     reporter?
21        A   Sure. Jim Navarre, N-a-v-a-r-r-e.
22        Q   And Mr. Navarre, are you an attorney?
23        A   Yes, I am.
24        Q   And are you licensed in Illinois?
```

```
 1          A    I am.
 2          Q    Are you licensed in any other state?
 3          A    I have a license in Kentucky, which is
 4     not currently active.
 5          Q    And how many years have you been an
 6     attorney?
 7          A    Since 1993.
 8          Q    Are you currently employed?
 9          A    Yes, I am.
10          Q    Where are you employed?
11          A    I work at the law firm of Hinshaw and
12     Culbertson, that's
13     H-i-n-s-h-a-w-C-u-l-b-e-r-t-s-o-n.
14          Q    I'll direct your attention to August
15     of the year 2000, were you employed at that
16     time?
17          A    I was.
18          Q    By whom were you employed?
19          A    I was employed by the Cook County
20     State's Attorneys Office as an Assistant
21     State's Attorney.
22          Q    In August of 2000 how many years had
23     you been employed by the Cook County State's
24     Attorneys Office?
```

1          A    Roughly seven years.

2          Q    What was your assignment during August

3     of 2000?

4          A    I was assigned to the Felony Review

5     Unit.

6          Q    Specifically, Mr. Navarre, August 5th

7     of 2000, were you assigned to the Felony Review

8     Unit?

9          A    Yes, on that day I was assigned to

10    Area 4 in connection with my duties with the

11    Felony Review Unit.

12         Q    At approximately 10:00 A.M., on August

13    5th, 2000 did you receive an assignment?

14         A    Yes, I did.

15         Q    What was that?

16         A    It was an assignment regarding the

17    fatal shooting of Marek Majdak.

18         Q    As a result of that assignment what

19    did you do?

20         A    I went to Area 4 where I met Gang

21    Specialist Riordan and Detective Pietryla.

22         Q    When you spoke to them did you speak

23    to them about the case?

24         A    I did.

1    Q    And what else did you do when you
2    spoke to the Detectives?
3    A    They gave me reports which they had on
4    hand regarding the case, and I also viewed a
5    video taped statement that had previously been
6    taken of Mr. Walker.
7    Q    After you reviewed the report and
8    viewed the statement what did you do next?
9    A    I then went to speak with Jovonie
10   Long.
11   Q    Okay, and do you see Jovonie Long in
12   Court today?
13   A    I do, he is the gentleman as I face
14   him on the left in the D.O.C. outfit.
15   MR. COLEMAN:  Your Honor, may the
16   record reflect the in-Court identification of
17   the Defendant Jovonie Long?
18   THE COURT:  Yes.
19   BY MR. COLEMAN:
20   Q    Where did you first see the Defendant
21   Jovonie Long?
22   A    I first saw him in an interview room
23   at Area 4.
24   Q    And who was present at that time?

1      A    Myself, Jovonie Long and Gang

2    Specialist Riordan.

3      Q    And when you first met with the

4    Defendant Long what did you do?

5      A    I introduced myself, I told him my

6    name is Jim Navarre, I'm an Assistant State's

7    Attorney, a lawyer, a prosecutor, but not his

8    lawyer.

9      Q    What did you do then?

10     A    I then asked him if he understood

11   that.

12     Q    What did you do after that?

13     A    I then advised him of what are

14   commonly referred to as Miranda Warnings.

15     Q    You did that by memory?

16     A    Yes.

17     Q    And after you did that did you ask the

18   Defendant if he understood those rights?

19     A    I did.

20     Q    And what did he reply?

21     A    He said he did.

22     Q    Did you ask the Defendant if he agreed

23   to speak to you at that time?

24     A    I did.

1      Q   What did he say?

2      A   He said he would.

3      Q   And what happened after that?

4      A   I proceeded to have a conversation

5  with him.

6      Q   Did he give you an oral statement

7  regarding the incident that occurred on May

8  13th, 2000?

9      A   He did.

10     Q   After you spoke with the Defendant

11  regarding the incident on May 13th, 2000 what

12  did you do next?

13     A   After we got done with his oral

14  statement about the incident, I told him there

15  were different ways in which the statement can

16  be memorialized. I then told him the different

17  options.

18     Q   What options did you explain to him?

19     A   I told him that we could keep it as an

20  oral statement, handwritten statement, a court

21  reported statement or a video taped statement.

22     Q   And did the Defendant Long eventually

23  make a choice from those options?

24     A   He did.

1    Q    What did he decide?

2    A    He chose a video taped statement.

3    Q    As a result of that what did you do?

4    A    After we went through his oral

5    statement and went through the different ways

6    in which it could be memorialized, I then had

7    Detective Riordan leave the room, so, it was

8    myself and Mr. Long.

9    Q    And when it was just yourself and the

10   Defendant Long what occurred?

11   A    I asked him essentially how he had

12   been treated by the police while he was in Area

13   4, what he had been provided to eat and drink,

14   was he allowed to use the bathroom.

15   Q    What did he reply to those questions?

16   A    That he had been treated fine, he had

17   been given both McDonald's and Burger King to

18   eat, he had been given stuff to drink including

19   pop, water, I think maybe fruit punch or

20   something to that effect.  He had been allowed

21   to use the washroom, smoked cigarettes and he

22   had been allowed to sleep.

23   Q    Did you leave the room after that

24   conversation?

1       A    I did.

2       Q    And what did you do then?

3       A    Started doing some paper work, made a

4   few notifications and called for the

5   videographer.

6       Q    Did the videographer arrive at

7   approximately 4:32 P.M. on that date?

8       A    She arrived before that, maybe roughly

9   half an hour, 45 minutes before that so she

10  could get set up before the actual statement.

11      Q    Did begin taking the video taped

12  statement at 4:32 P.M.?

13      A    I did.

14      Q    After the video was over was the

15  statement that was given on the video taped

16  statement the same or substantially the same

17  statement that he gave you earlier as his oral

18  statement?

19      A    It was substantially the same.

20      Q    Now, prior to taking the video taped

21  statement did you ask the Defendant to sign any

22  form?

23      A    I did.

24      Q    Okay.  What was that?

1          A    There is a written consent form for

2     video taped statements which I asked him to

3     sign.

4          Q    Okay.  Did the Defendant agree to sign

5     that form?

6          A    Although he consented to the video

7     taped statement he told me he would not

8     actually sign the actual consent form.

9          Q    Did you view the video taped statement

10    after it was taken?

11         A    I viewed it for the first time today.

12              MR. COLEMAN:  May I approach the

13    witness, Judge?

14              THE COURT:  You may.

15    BY MR. COLEMAN:

16         Q    Mr. Navarre, I'm going to be showing

17    you what has been marked as People's Group

18    Exhibit 16, specifically ask that you look at

19    People's Exhibit Number 16A, do you recognize

20    that document?

21         A    I do.

22         Q    What do you recognize that to be?

23         A    This is the consent to video tape

24    statement.

1        Q   All right, and are there signatures on

2    there?

3        A   There are.

4        Q   Whose signatures are on that document?

5        A   My signature as well as Gang

6    Specialist Riordan's signature.

7        Q   I'll be showing you what is marked as

8    People's 16B, do you recognize that document?

9        A   I do.

10       Q   And what is that?

11       A   This is a photograph of Mr. Walker,

12    it's an Exhibit that was used during the course

13    of Jovonie Long's video taped statement.

14       Q   Regarding People's Group Exhibit 16A

15    and 16B, are these documents in the same or

16    substantially the same condition as they

17    existed on August 5th of 2000?

18       A   They are.

19       Q   Now, sir, I'm going to  be showing

20    you what has been previously marked as People's

21    Group Exhibit 17, specifically the first item,

22    17A, do you recognize that?

23       A   Yes, this is identified as the video

24    taped statement of Jovonie Long.

1    Q   Now, when you viewed that today the

2    contents of that video taped statement does it

3    truly and accurately depict what was said and

4    done during the video taped statement that you

5    did on August 5th of 2000?

6    A   Yes.

7    Q   Finally, People's Exhibit Number 17B,

8    do you recognize that document?

9    A   This is the transcription of the video

10   taped statement taken that day.

11   Q   Okay, and how many pages is that?

12   A   A total of thirteen pages.

13   Q   Did you read that transcript before

14   you testified today?

15   A   I looked at it this morning.

16   Q   And does that transcript truly and

17   accurately depict what was said on the video

18   taped statement that you took of the Defendant

19   Long on August 5th of 2000?

20   A   Yes.

21   MR. COLEMAN:  At this time I'm asking

22   that the People be allowed to publish People's

23   Exhibit 17A, the video taped statement of the

24   Defendant Long.

```
 1              THE COURT:  Mr. Conniff?
 2              MR. CONNIFF:  No objection.
 3              THE COURT:  Mr. Wilson?
 4              MR. WILSON:  As it relates to Mr.
 5      Walker, I have an objection based on hearsay,
 6      Judge.
 7              THE COURT:  That will be allowed.
 8                   (VIDEO TAPED PLAYED)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1        MR. COLEMAN:  Judge, I have nothing

 2    further.

 3            THE COURT:  Mr. Conniff, Cross.

 4            MR. BRICE:  If I may, Judge.

 5                    CROSS EXAMINATION

 6                          BY

 7                    MR. BRICE:

 8        Q   Good afternoon, Mr. Navarre?

 9        A   Good afternoon.

10        Q   Hinshaw-Culbertson?

11        A   Yes.

12        Q   Mr. Navarre, your testimony was that

13    you were contacted at 10:00 A.M. on the date

14    you got the video tape?

15        A   Correct.

16        Q   When you arrived at Area 4 did you

17    know how long the Defendant had been in

18    custody?

19        A   Not upon my initial arrival,

20    obviously, I found out during the course of

21    speaking with him that he had gotten there the

22    day before, I did not  --.

23        Q   You learned his family turned him in,

24    correct?
```

1     A     I believe that's correct.

2     Q     Do you know if prior to your arrival

3     any other State's Attorney interviewed the

4     Defendant?

5     A     I do not believe so.

6     Q     You said that you talked to the

7     Defendant and you made some reports and you

8     took this video tape about 4:00 P.M.?

9     A     4:30 when it actually started.

10    Q     For six hours you were doing other

11    things, reviewing reports, in addition to

12    speaking with the Defendant?

13    A     Correct.

14    Q     Not everything that the Defendant had

15    told you went into the video tape, correct?

16    A     As a far as being word for word no,

17    but definitely the substance of his statement

18    was pretty similar.

19    Q     His statement was that he shot at this

20    man twice after the man swung at him inside the

21    van and outside on the street?

22    A     Yes, the statement about inside the

23    van that the two of them were fighting over the

24    gun, after the White man had grabbed for the

1    gun and the second shot was after the White guy

2    had swung at him.

3        Q    Prior to starting the video tape were

4    you made aware Mr. Walker had made a video

5    tape?

6        A    Yes.

7        Q    Had you had an opportunity to see the

8    tape or review the transcript?

9        A    I believe I saw the tape at some point

10   after my arrival at Area 4.

11       Q    So, while you were taking this video

12   tape of Mr. Long you were aware there was some

13   significant differences in the two versions?

14       A    I believe there are some differences,

15   I don't know if I would classify them as being

16   significant.

17       Q    You said that you spoke to the

18   Detective and you went over the reports that

19   they had made up until that point, correct?

20       A    Yes.

21       Q    Do you recall if you reviewed the

22   canvass reports?

23       A    As I said here today I can not recall

24   any specific reports by name, but I know that I

1     in fact did review reports that day.

2          Q    As you sit here today do you remember

3     if in your review of the reports you were made

4     aware of or had in mind a number of shots that

5     were fired during this incident?

6          A    According to what Jovonie told me he

7     fired two shots.

8          Q    Were you aware that the police had

9     interviewed civilian witnesses during the

10    canvass who came up with a higher number of

11    shots?

12         A    I do not have that specific

13    recollection right now.  It's possible, but I

14    can't recall.

15         Q    Did you have an opportunity to examine

16    the Medical Examiner's report or speak with the

17    Detectives regarding the M.E.'s report?

18         A    I believe I knew the location of the

19    gunshot wound.  As far as reviewing the Medical

20    Examiner's report no, I don't have a specific

21    recollection of what report I viewed, I know I

22    --.

23         Q    Were you made aware of any other

24    injuries to the victim other than the gunshot?

CCSAO XAVIER WALKER 001221

1      A    I believe he may have had some

2    abrasions also on his body.

3      Q    Do you recall or were you told by the

4    Detectives they suspected a human bite mark on

5    the victim's right arm, as you sit here today

6    do you remember that?

7      A    As I sit here today in looking at some

8    of the documents just today I saw reference to

9    a human bite mark, but recalling back to the

10   time when I was at Area 4 I don't know right

11   now if I knew at that time that there was an

12   indication of a possible bite mark.

13     Q    You don't know if the Detective told

14   you that or not?

15     A    I can't say one way or the other.

16     Q    You indicated when you first met with

17   the Defendant you introduced yourself as a

18   State's Attorney?

19     A    Yes.

20     Q    You explained to him what a State's

21   Attorney was?

22     A    A State's Attorney, a lawyer and

23   prosecutor, but not his lawyer.

24     Q    Later you told him you wanted to

```
 1    memorialize his statement?
 2         A   I told him his statement could be
 3    recorded in different ways.
 4         Q   One of the options was the video tape?
 5         A   Yes.
 6         Q   Was that his option or was that
 7    something that you and the officers suggested?
 8         A   That's an option I offered to him
 9    alone, I gave him the different options, I said
10    your statement could be recorded different
11    ways.  One is a video tape.
12         Q   You gave the Defendant the option of
13    picking A, B, C and he picked the video tape?
14         A   Yes.
15         Q   In your training on Felony Review you
16    were told in order to take a video taped
17    statement you had to have that person's consent
18    to be video tape?
19              MR. COLEMAN: Objection.
20              THE COURT:  Read that back.
21                     (RECORD READ)
22              THE COURT: Foundation.
23    BY MR. BRICE:
24         Q   When you arrived at the Area you bring
```

1    a certain packet of forms?

2         A    Yes.

3         Q    Within that packet are there forms you

4    use to obtain a video taped statement?

5         A    Yes.

6         Q    Within that packet of forms you use to

7    get a statement you have one form entitled

8    consent?

9              MR. COLEMAN:  Objection.

10             THE COURT:  No, go on.

11   BY MR. BRICE:

12        Q    You have that consent form with you,

13   right?

14        A    Yes.

15        Q    You had that with you for a purpose,

16   correct?

17        A    Yes.

18        Q    Other instances where you'll take a

19   handwritten statement from a person you would

20   write out that statement and have that person

21   sign each and every page?

22        A    Yes.

23        Q    On a handwritten statement you have a

24   person sign a line indicating they understand

1    the Miranda rights, correct?

2        A   Yes.

3        Q   In this particular case you testified

4    on Direct you gave the Defendant his Miranda

5    Warnings, correct?

6        A   Correct.

7        Q   As you sit here in Court today do you

8    know if you have any signed papers signed by

9    the Defendant indicating he was either read or

10   understood those rights?

11       A   As far as an actual signed document,

12   no, but it's in the video taped statement.

13       Q   The question is do you have anything

14   signed by the Defendant?

15       A   I do not.

16       Q   Do you have anything signed by the

17   Defendant saying he would consent to the video

18   tape?

19       A   He gave his oral consent when I asked

20   him to sign the written form, although he did

21   consent, but he could not sign it.

22       Q   Okay, that was a conversation you had

23   with him before you took the video tape?

24       A   Yes.

1     Q    You knew before the video tape he

2   wasn't going to sign the consent?

3     A    Right.

4     Q    Because he told you that?

5     A    Yes.

6     Q    Did he tell you why, if you recall?

7     A    I think I remember asking him, because

8   it seemed kind of odd he was going to consent

9   to give the video, he knew the video was going

10  to record everything that was said, but, he

11  would not sign the form.  I don't know if he

12  ever really gave a response.

13    Q    But, you did have a conversation with

14  him regarding his reason for not signing the

15  consent, correct?

16    A    I think I asked him why wasn't he

17  signing it since he was in fact consenting, he

18  just responded I just want don't want to sign

19  it.

20    Q    The video taped version of the

21  statement you didn't ask him why he didn't

22  sign, correct?

23    A    No, I don't think I did.  I don't

24  think I got a reason quite honestly, he said he

1    wouldn't sign it.

2         MR. BRICE:  Nothing further.  Thank

3    you, sir.

4         MR. COLEMAN:  Nothing based on that,

5    Judge.

6         THE COURT:  Thank you.

7         MR. NAVARRE:  Thank you, Judge.

8              (WITNESS EXCUSED)

9         MR. COLEMAN:  We'll ask that this

10   witness be excused.

11        THE COURT:  Any objection, Counsel,

12   Counsel for Long? .

13        MR. BRICE:  No, Judge.

14        MR. WILSON: No objection.

15        MS. RAVIN:  One final witness for

16   today.

17              (WITNESS SWORN.)

18        THE COURT:  Go right ahead.

19

20

21

22

23

24

1    GANG SPECIALIST JOHN RIORDAN,

2    called as a witness herein, having been first

3    duly sworn, was examined and testified as

4    follows:

5    DIRECT EXAMINATION

6    BY

7    MS. RAVIN:

8    Q    If you can please introduce yourself

9    to the ladies and gentlemen of the Court.

10   Spelling your first and last name and give your

11   star number?

12   A    Gang Specialist John Riordan,

13   R-i-o-r-d-a-n, star number 60040. I'm assigned

14   to Area 4 Violent Crimes.

15   Q    Is a Gang Specialist a similar rank or

16   different to a Detective?

17   A    It's similar.

18   Q    How long have you been with the

19   Chicago Police Department?

20   A    Seventeen years.

21   Q    How long have you been a Gang

22   Specialist?

23   A    Four years.

24   Q    Have you always been assigned to Area

CCSAO XAVIER WALKER 001228

1       4 as a Gang Specialist?

2           A   No.

3           Q   Where else were you assigned to with

4       Area 4?

5           A   Organized Crime, then I was assigned

6       to Area 4 Violent Crimes.

7           Q   How long were you with the Organized

8       Crime Division?

9           A   For about a year and a half.

10          Q   What do your duties involve as a Gang

11      Specialist?

12          A   To follow-up on criminal incidents, to

13      conduct follow-up investigations on crimes.

14          Q   Who do you work closely with?

15          A   Violent Crime Detectives.

16          Q   Back in June of 2000 were you so

17      assigned as a Gang Specialist?

18          A   Yes.

19          Q   In June of 2000 did you become

20      involved in an investigation with a Detective

21      Pietryla?

22          A   Yes.

23          Q   Were there other Detectives involved

24      in that named Wolverton, W-o-l-v-e-r-t-o-n and

1    Cruz, C-r-u-z?

2        A   Yes.

3        Q   Were there Detectives Sanders and

4    Wright involved in that investigation?

5        A   Yes.

6        Q   When you joined the investigation in

7    June of 2000 had that investigation been

8    started back in May?

9        A   Yes.

10        Q   Was it involving a shooting and a

11    robbery that occurred on May 13th, May 12th to

12    the 13th of May of 2000?

13        A   Yes.

14        Q   Specifically on June 5th were you

15    working with Detective Pietryla?

16        A   Yes.

17        Q   What was your involvement in the

18    investigation with regards to the fatal

19    shooting of Marek Majdak involve?

20        A   Pietryla had spoke with one of the

21    offender's mother's, Miss Regina Long on the

22    telephone.

23        Q   When you had that conversation with

24    Regina Long did -- were you and Detective

1    Pietryla able to locate Jovonie Long at that

2    point?

3         A    No.

4         Q    When you were unable to locate him at

5    that point did you do anything?

6         A    Yes.

7         Q    Was any information left with Jovonie

8    Long's mother Regina Long?

9         A    Yes.

10        Q    What information?

11        A    To have her get in contact with her

12   son and have him call us or come in.

13        Q    Was this investigation picked up again

14   the next month in July of 2000?

15        A    Yes.

16        Q    Specifically on July 25th of 2000 were

17   you again working with Detective Pietryla?

18        A    Yes, I was.

19        Q    What did you and Detective Pietryla

20   do?

21        A    We went to Regina Long's residence.

22        Q    Do you recall what that address was?

23        A    No, I don't.

24        Q    When you went to his mother's house

1    did you speak with her?

2        A    Yes.

3        Q    She identified herself?

4        A    Yes.

5        Q    When you spoke with her were you able

6    to locate Jovonie Long?

7        A    No.

8        Q    When you were unable to locate Jovonie

9    Long did you leave any information with Regina

10   Long?

11       A    Yes.

12       Q    What information did you leave behind?

13       A    Again our names, phone number for our

14   office, Miss Long told us that she had talked

15   to Jovanie, but she had not seen him in quite a

16   while.

17            MR. BRICE:  Objection.

18            THE COURT:  Sustained.

19   BY MS. RAVIN:

20       Q    Without getting into any contents of

21   any conversation.  On July 28th of 2000 did

22   your investigation continue?

23       A    Yes.

24       Q    Without getting into the contents of

1    anything specifically, what occurred?

2        A   After speaking with Miss Long, she

3    related  --.

4        Q   Without getting into the contents of

5    any conversation, did something occur?

6        A   We left Miss Long's residence after

7    giving our names and phone numbers  --.

8            THE COURT:  Hold it. I think I heard

9    -- I'm sorry  --.

10           MS. RAVIN:  Judge, it was

11   non-responsive to my question.

12           THE COURT:  All right.

13   BY MS. RAVIN:

14       Q   On July 28th of 2000 did your

15   investigation continue?

16       A   Yes.

17       Q   When your investigation continued what

18   happened?

19       A   Detective Pietryla had been called by

20   Miss Regina Long.

21       Q   After he had that conversation with

22   Regina Long did you expect anything to occur?

23       A   Pietryla told me that--.

24       Q   Without getting into the contents of

CCSAO XAVIER WALKER 001233

1  any conversation, did you expect anything to

2  happen as a result of that conversation?

3              MR. CONNIFF:  Objection to the form of

4  the question, did you expect anything to

5  happen.

6              THE COURT:  You can answer.

7      A   Yes, we expected Jovonie to turn

8  himself in within a week.

9  BY MS. RAVIN:

10     Q   On August 3rd of 2000 did your

11 investigation continue?

12     A   Yes.

13     Q   How did that investigation continue?

14     A   Pietryla was contacted by Regina Long

15 once again.

16     Q   Was that at 7:00 o'clock P.M. or 1900

17 hours?

18     A   Yes.

19     Q   After he had that conversation with

20 Regina Long did you expect anything to occur?

21     A   Yes.

22     Q   What did you expect to occur?

23     A   For Mr. Long to turn himself in the

24 following day.

```
 1          Q   Did you expect him to arrive with
 2     anyone?
 3          A   Yes.
 4          Q   Who did you expect him to arrive with?
 5          A   With his mother and a reverend.
 6          Q   Did your investigation then continue
 7     into August 4th, 2000?
 8          A   Yes.
 9          Q   At about 1145 hours or about 11:45
10     A.M. did anything happen?
11          A   Yes.
12          Q   What happened?
13          A   Jovonie Long, Miss Regina Long and
14     Major Reverend Howard arrived at Area 4 Violent
15     Crimes.
16          Q   The person you came to learn as
17     Jovonie Long, do you see that individual in
18     Court today?
19          A   Yes.
20          Q   Point to him and name an article of
21     clothing he's wearing?
22          A   The gentleman with the shaved head and
23     brown top and the brown bottom.
24              MS. RAVIN:  Will the record reflect an
```

1    in-Court identification of the Defendant

2    Jovonie Long?

3            THE COURT:  Yes.

4    BY MS. RAVIN:

5        Q   When they came to the station what

6    happened?

7        A   I brought Jovonie to an interview

8    room, the Reverend Mr. Major Howard came with

9    and I advised Jovonie of his Miranda warnings.

10       Q   How did you advise him of his rights?

11       A   F.O.P. book.

12       Q   After you advised him of those rights

13   from the F.O.P. book what happened?

14       A   The Reverend left the room, we

15   directed him back over to where Mrs. Long was

16   and we told them that they could stay, that we

17   had to talk to Jovanie, that they could stay,

18   if they wanted to call or check back later,

19   whatever they decided to do.

20       Q   What happened at that time?

21       A   They chose to leave.

22       Q   After they left where did you go?

23       A   I went back in and spoke with Jovonie.

24       Q   Was anybody else present for that

1    interview?

2         A    No.

3         Q    When you spoke to him had he indicated

4    earlier when you advised him of his rights that

5    he wanted to talk to you?

6         A    Yes.

7         Q    When he spoke to you what did he say?

8         A    I asked him about the shooting that

9    occurred on the 13th of May, he stated that at

10   that time he was with his girlfriend Hershula

11   Byrd.

12        Q    Is that H-e-r-s-h-u-l-a B-y-r-d?

13        A    Yes.

14        Q    Did he say how long he had been with

15   her?

16        A    He stated that he met up with her

17   around 7:00 o'clock, they had sex, he had

18   fallen asleep, at some time in the early

19   morning hours he met up with his friend Xavier,

20   he and Xavier went to a bar on Lake street

21   called the Wax Factory, they stayed there for

22   about an hour and eventually Xavier drove him

23   back to an address on Erie.

24        Q    An address, I'm sorry?

1       A   An address on Erie, I believe it's

2   4653 West Erie.  And that Jovonie went to sleep

3   and he didn't wake up to noon that day.

4       Q   At that point did you say anything to

5   the Defendant?

6       A   Yes.

7       Q   What did you say to him?

8       A   I stated that Xavier had given a video

9   taped statement implicating Jovonie and him in

10   the shooting death of the victim.

11       Q   Did the Defendant say anything to you

12   at that time?

13       A   Yes.

14       Q   What did he say?

15       A   He wanted to see the video tape.

16       Q   What did you do at that time?

17       A   We made arrangements to show a portion

18   of the video taped statement.

19       Q   Did he then view that video taped

20   statement?

21       A   Yes.

22       Q   When you viewed that video taped

23   statement where was that?

24       A   It was in the, I believe the Violent

1    Crimes Office.

2        Q    And who was present for that viewing?

3        A    Myself, Jovonie, Detective Pietryla.

4        Q    After he watched that video taped

5    statement did he say anything?

6        A    Yes.

7        Q    What did he say?

8        A    Sammie (Phonetic) tricken me out.

9        Q    At that time did the Defendant make

10   any requests?

11       A    Yes.

12       Q    When he made that request were other

13   arrangements then made?

14       A    Yes.

15       Q    The arrangements were made and was the

16   Defendant then taken anywhere?

17       A    He was put back in an interview room.

18       Q    Eventually was he taken anywhere?

19       A    Yes.

20       Q    Where was he taken?

21       A    The following morning at approximately

22   8:00 A.M. he was taken to 1111 South Homan.

23       Q    When he was taken over to Homan was he

24   introduced to a Chicago Police Officer by the

```
 1      name of Robert Bartec?

 2           A    Yes.

 3           Q    Did you then leave him with Officer

 4      Bartec?

 5           A    Yes.

 6           Q    Did you go some where else?

 7           A    No.

 8           Q    Were you in another part of the

 9      building?

10           A    We were in a separate room.

11           Q    When you were in the separate room did

12      anybody inform you of anything?

13           A    Yes.

14           Q    Without getting into what you were

15      informed of, what was the next thing that

16      happened?

17           A    Officer Bartec called myself and

18      Pietryla into the next room, Jovonie stated

19      that he shot and robbed the man on Ohio.

20           Q    And did he say that in front of you?

21           A    Yes.

22           Q    At the time when he said that to you

23      did you do anything?

24           A    Yes.
```

1        Q   What did you do?

2        A   Returned to Area 4.

3        Q   When you returned to Area 4 where did

4  you put the Defendant?

5        A   Back in an interview room.

6        Q   What was the first thing that you did?

7        A   I advised him of his Miranda warnings.

8        Q   The same way as you did before?

9        A   Yes, from an F.O.P. book.

10       Q   After you re-advised him of his

11  Miranda warnings, did the Defendant still agree

12  to speak with you?

13       A   Yes.

14       Q   And what did he say?

15       A   He stated that he and Xavier were

16  drinking and smoking on the night of May 12th,

17  and that they finished smoking and they drank

18  all their alcohol and they needed money, they

19  didn't have any money, they decided to hit a

20  lick, which is a slang term for either a

21  robbery or a dope rip off.

22       Q   Did he then give more details about

23  what had occurred that evening?

24       A   Yes.

1    Q    Eventually was that statement taken
2    -- after he gave you that statement did you do
3    anything?
4    A    Yes.
5    Q    What did you do?
6    A    We notified Felony Review.
7    Q    And did an attorney then arrive at the
8    Area?
9    A    Yes.
10   Q    Who was that?
11   A    Jim Navarre.
12   Q    Jim Navarre. When Jim Navarre arrived
13   did he have a conversation with the Defendant?
14   A    Yes.
15   Q    And was that conversation essentially
16   the same that he had given you just prior to
17   that, but after he had gone to Homan Square?
18   A    Yes.
19   Q    At that time did the Defendant  -- was
20   he given any choices?
21   A    Yes.
22   Q    When he was given those choices did he
23   in fact make a choice to have his statement
24   video taped?

1           A   Yes.

2           Q   Eventually was that statement taken in

3      a video taped format?

4           A   Yes.

5           Q   When that video tape was taken at 4:32

6      P.M. were you present in that room?

7           A   Yes.

8           Q   The video taped statement that was

9      taken was that essentially the same statement

10     that he gave to you and ASA Jim Navarre

11     earlier?

12          A   Yes.

13          Q   In an oral form?

14          A   Yes.

15          Q   After that video taped statement was

16     concluded did you have a chance to review the

17     statement?

18          A   Yes.

19          Q   Have you seen the tape that the

20     Defendant gave of the video taped statement?

21          A   Yes.

22          Q   In fact, you reviewed it earlier

23     today, is that correct?

24          A   Yes.

1        Q   When you reviewed that earlier today

2    was it the same or substantially the same

3    condition as when that video tape had been

4    taken back on August 5th of 2000?

5        A   Yes.

6        MS. RAVIN:  If I may approach, Judge,

7    with what's been previously marked as People's

8    Exhibit 17A for Identification and previously

9    published to the Court.

10   BY MS. RAVIN:

11       Q   Do you recognize this video tape?

12       A   Yes.

13       Q   Is this the video tape that you

14   reviewed earlier prior to testifying?

15       A   Yes.

16       Q   And that was the video tape that you

17   just testified that was in the same or

18   substantially the same condition as when it was

19   originally taken back in August of 2000?

20       A   Yes.

21       MS. RAVIN:  I have no further

22   questions, your Honor.

23       THE COURT: Counsel for Long.

24

CROSS EXAMINATION

BY

MR. CONNIFF:

Q    Gang Specialist Riordan, as of August
-- August the 5th, 2000 had you been to the
scene?

A    No, sir.

Q    Had you reviewed the pictures of the
scene?

A    Not since August 5th.

Q    As of August 5th you hadn't seen any
of the pictures?

A    No.

Q    You hadn't reviewed any reports from
the evidence technician, the physical evidence
at the scene?

A    Since August 5th?

Q    Did you review any reports of the
evidence technician that had been at the scene
concerning recovery of physical evidence on
August 5th of 2000?

A    No.

MR. CONNIFF:  Nothing else, Judge.

THE COURT:  Okay. Thank you.

1          GANG SPECIALIST RIORDAN:   Thank you,

2     your Honor.

3          MS. RAVIN:   That's it for today,

4     Judge.

5          THE COURT:   December 1st.

6          MS. RAVIN:   December 1st.

7        (FURTHER PROCEEDINGS CONTINUED TO 12-1-03)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1     STATE OF ILLINOIS )
2                      )SS:
3     COUNTY OF COOK    )
4
5
6
7          I, Jacqueline Shenberger, an Official Court
8     Reporter of the Circuit Court of Cook County,
9     Illinois, hereby certify that I reported in
10    stenographic notes the proceedings had in the
11    above-entitled matter; that I thereafter caused
12    the foregoing to be transcribed into
13    typewriting, and further certify that the
14    foregoing is a true and accurate transcript of
15    the proceedings had on this date.
16
17
18                      _____
19    OFFICIAL COURT REPORTER
20
21
22
      JACQUELINE SHENBERGER,
23    OFFICIAL COURT REPORTER
      License No. 084-001524
24
```