# EXHIBIT 22

```
 1   STATE OF ILLINOIS    )
                          )  SS:
 2   COUNTY OF COOK       )

 3     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
     THE PEOPLE OF THE       )
 5   STATE OF ILLINOIS       )
                             )
 6            Plaintiff,     )
                             )
 7        vs.                )   No. 00-CR-20601-01
                             )       00-CR-20601-02
 8   XAVIER WALKER and       )
     JOVANIE LONG,           )
 9                           )
              Defendants.    )
10
11            REPORT OF PROCEEDINGS of the Continued
     Bench Trial had before the HONORABLE MARCUS R.
12   SALONE on the 19th day of February, 2004.

13        APPEARANCES:

14
          MR. RICHARD A. DEVINE,
15            State's Attorney of Cook County, by:
          MS. JENNIFER RAVIN and MR. DAVID COLEMAN,
16            Assistant State's Attorneys,
              appeared for the Plaintiff;
17
          MR. EDWIN A. BURNETTE,
18            Public Defender of Cook County, by:
          MR. JOHN CONNIFF and MR. THOMAS BRICE,
19            Assistant Public Defenders,
              appeared for the Defendant, Jovanie Long;
20
          MR. GREGORY WILSON,
21            Attorney At Law,
              appeared for the Defendant, Xavier Walker.
22

23   Connie L. James, CSR
     Official Court Reporter
24   License #084-002510
```

SS-1

1

<u>INDEX</u>

2

Date:  2/19/04
3       People vs. Walker & Long
        Reported by Connie L. James, CSR
4       Pages SS-3 thru SS-158

5

6

MAURICE WRIGHT:
7       Direct Exam. by Ms. Ravin ......... Pg. SS-4
        Cross Exam. by Mr. Conniff ........ Pg. SS-90
8

9

Stipulations ......................... Pg. SS-102
10

11

DETECTIVE MICHAEL PIETRYLA:
12      Direct Exam. by Mr. Coleman ....... Pg. SS-133
        Cross Exam. by Mr. Wilson ......... Pg. SS-152
13      Cross Exam. by Mr. Brice .......... Pg. SS-155

14

15

16

17

18

19

20

21

22

23

24

CCSAO XAVIER WALKER 001260

1    THE CLERK:  Xavier Walker.  Jovanie Long.

2    THE COURT:  All right.  This is in the

3  matter of People vs. Jovanie Long and Xavier

4  Walker.  We are still in the State's case.

5       Counsel, if you would kindly identify

6  yourselves?

7    MR. WILSON:  For the record Gregory Wilson

8  appearing on behalf of the Defendant, Xavier

9  Walker, who is present.

10   MR. CONNIFF:  John Conniff and Thomas Brice

11  from the Public Defender's Office for Jovanie

12  Long.

13   MS. RAVIN:  Jennifer Ravin, Assistant

14  State's Attorney.  And my partner is David

15  Coleman, also an Assistant State's Attorney.

16   THE COURT:  Defense, are you ready?

17   MR. WILSON:  Yes, Judge.

18   MR. CONNIFF:  Yes, Judge

19   THE COURT:  Please call your next witness,

20  State.

21   MS. RAVIN:  Judge, we would be calling

22  Maurice Wright.

23         (Whereupon Maurice Wright was

24           first duly sworn.)

CCSAO XAVIER WALKER 001261

1          THE COURT:  I'm going to ask you to keep

2     your voice up, okay?

3          MR. WRIGHT:  Yep.

4                    MAURICE WRIGHT,

5     called as a witness on behalf of the People of the

6     State of Illinois, having been first duly sworn,

7     was examined and testified as follows:

8                    DIRECT EXAMINATION

9                    BY

10                    MS. RAVIN:

11         Q     Could you please state your name, spell

12    both your first and last name for the Court?

13         A     Maurice Wright, M-a-u-r-i-c-e,

14    W-r-i-g-h-t.

15         Q     Maurice, do you know somebody by the

16    name of the Jovanie Long?

17         A     Yes, I do.

18         Q     Do you see him in court today?

19         A     Yes.

20         Q     Can you please point to him and name

21    something he's wearing?

22         A     The brown D.O.C. (indicating).

23         Q     Is he seated on the right side of the

24    table or the left side of the table?

```
 1          A.    On the left side.

 2          MS. RAVIN:  Would the record please reflect

 3    an in-court identification of the Defendant,

 4    Jovanie Long?

 5          THE COURT:  It shall.

 6          MS. RAVIN:

 7          Q    Do you know somebody by the name of

 8    Xavier Walker?

 9          A.    Yes, I do.

10          Q    Do you see him in the courtroom today?

11          A.    Yes.

12          Q    Could you please point to him and name

13    something he's wearing?

14          A.    The brown D.O.C. suit (indicating).

15          Q    Which side of the table is he on?

16          A.    Left side.

17          THE COURT:  I'm sorry.  He's on your left or

18    your right?

19          THE WITNESS:  He's on my right.

20          THE COURT:  Okay.

21          MS. RAVIN:

22          Q    Is he seated next to the attorney

23    wearing the black suit with the red tie?

24          A.    Yes, he is.
```

SS-5

CCSAO XAVIER WALKER 001263

1       MS. RAVIN:  Would the record please reflect

2   the in-court identification of the Defendant,

3   Xavier Walker?

4       THE COURT:  It shall.

5       MS. RAVIN:

6       Q    Does Jovanie Long have a nickname?

7       A.   Nope.

8       Q    Do you know Jovanie Long by any other

9   name other than Jovanie?

10      A.   Nope.

11      Q    Do you call him anything other than

12  Jovanie?

13      A.   Nope.

14      Q    Does Xavier Walker have a name other

15  than Xavier?

16      A.   Nope.

17      Q    Have you ever called him anything other

18  than Xavier?

19      A.   Nope.

20      Q    How long have you known Jovanie Long

21  for?

22      A.   About two years.

23      Q    You have known him for two years?

24      A.   Two years.

CCSAO XAVIER WALKER 001264

1      Q      Two years from today backwards?

2      A.     About three years, three years.

3      Q      So today being February 19, 2004, you

4      are saying you've only known him since February

5      19, 2001?

6      A.     Well --

7      Q      Is that what you're saying?

8      A.     Yep, basically.

9      Q      Back in May of 2000, did you know

10     Jovanie Long?

11     A.     May of who?

12     Q      May of 2000 did you know Jovanie Long?

13     A.     Yes, I did.

14     Q      So you have known him longer than two

15     or three years?

16     A.     Longer than that.  I've been locked up

17     so it might have been.

18     Q      How long did you know him before May of

19     2000?

20     A.     From 2000 to 2004, so that would be

21     what, five years?

22     THE COURT:  Did you know him any time before

23     May of 2000?

24     THE WITNESS:  No.

SS-7

1        MS. RAVIN:

2        Q    You just met him in May of 2000, that

3  was when you first met Jovanie Long?

4        A.   Yeah, we been cool since then.

5        Q    But only since May of 2000?

6        A.   Yeah.

7        Q    Okay.  How about Xavier Walker?

8        A.   Around the same time.

9        Q    You met him right in May of 2000?

10       A.   Yeah.

11       Q    You didn't know him longer than that?

12       A.   No.

13       Q    Where were you living in May of 2000?

14       A.   4653 West Erie.

15       Q    Who did you live there with?

16       A.   My mother.

17       Q    What's your mother's name?

18       A.   Mary Curry.

19       Q    Is that C-u-r-r-y?

20       A.   Yes.

21       Q    Where is your mother now?

22       A.   She's in Georgia.

23       Q    Is she healthy or is she sick?

24       A.   She's sick.

CCSAO XAVIER WALKER 001266

1    Q    What happened to her?

2    A.   She had a couple of strokes.

3    Q    Who does she live in Georgia with?

4    A.   My sister.

5    Q    Did anybody else live with you and your

6    mother, Mary Curry?

7    A.   Just foster kids.

8    Q    Did anybody named Deshontae (phonetic)

9    Wright ever stay there?

10   A.   No. She hung around every now and

11   then.

12   Q    Was she a relative of yours?

13   A.   No, she wasn't.

14   Q    Was she a play relative of yours?

15   A.   No, she wasn't.

16   Q    Did she call your mother anything?

17   A.   Yeah.  She had called her mom.

18   Q    Did you know anybody named Jamaica?

19   A.   Jamaica?

20   Q    Who's Jamaica?

21   A.   Oh, that's her sister.

22   Q    When you were living back on 4653 West

23   Erie in the middle of May, like May 12, May 13,

24   2000, you were living at that address, right?

SS-9

1    A. Yeah.

2    Q May 13th in the morning were you with

3 anybody?

4    A. In the morning?  I was --

5    Q Like after midnight, the morning, like

6 1:00, 2:00 in the morning?

7    A. No.  I had just left with another

8 friend.

9    Q Who was the friend you had left?

10    A. I was with this guy named Bubba.

11    Q And does Bubba have a real name?

12    A. I don't know his real name.

13    Q When you were with Bubba, what were you

14 doing with Bubba?

15    A. We was with another female.

16    Q What did you do with that female?

17    A. Basically we had a three-some.

18    Q And after you had the three-some, what

19 did you do?

20    A. Came to the house, I went to my house.

21    Q How did you get to your house?

22    A. He drove me over there.

23    Q Who is he?

24    A. Bubba.

CCSAO XAVIER WALKER 001268

1      Q      When Bubba drove you to your house, was

2   anybody else there?

3      A.     That's when I seen Jovanie and Zay.

4      Q      And when you saw Jovanie and Zay, did

5   they come over to where you were?

6      A.     Yeah.  They was -- They came from

7   across the street in their house.

8      Q      When they came from across the street,

9   where did they walk to?

10     A.     Across the street to my house.

11     Q      What part of your house were you at?

12     A.     I was in front of the house.

13     Q      When you saw Jovanie and Zay, what did

14  they do?

15     A.     They was just telling me about how the

16  club was that night, you know, that they had just

17  left the club.

18     Q      And when they told you that they had

19  left the club, did you say anything to them?

20     A.     No.  I asked them did they have a nice

21  time, did they meet some females.

22     Q      Did they tell you what they did?

23     A.     They told me they met a couple of girls

24  and they just came to the house after that.

1       Q    What did you all do?

2       A.   I think I had a cup of Tangaray and I

3   drunk it with them.  Then after that we continued

4   talking.  Then both of them went back across the

5   street in the house.

6       Q    Did anybody sleep at your house that

7   night?

8       A.   No, they did not.

9       Q    Did you go anywhere from your house

10  that night?

11      A.   No.  I sat on the front porch.

12      Q    You sat on the front porch for how

13  long?

14      A.   At least about three or four hours.

15      Q    By yourself?

16      A.   Yeah.

17      Q    When you say Zay who are you talking

18  about?

19      A.   Huh?

20      Q    Who are you talking about when you say

21  Zay?

22      A.   Zay?

23      Q    Yes.

24      A.   That's Xavier right there (indicating).

1    THE COURT:  I'm sorry.  Zay is where?

2    MS. RAVIN:  Zay, the witness has indicated,

3  Xavier Walker across the courtroom sitting at the

4  table.

5    Q    After they left and you sat for three

6  or four hours on your front porch, what did you do

7  next?

8    A.    I was on the porch smoking marijuana.

9    Q    While you are smoking that marijuana,

10  where are is Zay and Jovanie?

11    A.    They went in the house and went to

12  sleep then.  They laid down.

13    Q    At some point did they wake up?

14    A.    I ain't seen them no more until like

15  probably like around 10:00 that morning.

16    Q    When you saw them at 10:00 that

17  morning, where did you see them?

18    A.    Coming out the house.

19    Q    What house?

20    A.    Across the street by my house.

21    Q    Who lives across the street from your

22  house?

23    A.    Jovanie do and his family.

24    Q    Well, when -- How long had you lived in

1    your house at 5643 (sic)?

2         A.   I wasn't staying there that long

3    because my mother, she was already staying there

4    and I had just had moved in with her so it was

5    like a couple of months.

6         Q    You had been there a couple of months?

7         A.   Yeah.

8         Q    How long had your mother been there?

9         A.   She was there like about -- about

10   eighteen months, fifteen months, something like

11   that.

12        Q    You would visit her from time to time,

13   though, while she was living there during those

14   eighteen months, right?

15        A.   Yeah.  But eventually I moved in with

16   her.

17        Q    But you did visit her over that period

18   of time, right?

19        A.   Yeah.  Yeah.

20        Q    Well, after Jovanie and Zay woke up and

21   saw you at 10:00 that morning, where were you

22   talking with them?

23        A.   I was talking to them across the street

24   from Jovanie Long's house.

CCSAO XAVIER WALKER 001272

```
 1        Q      So you left the porch?
 2        A.     When I was out -- When I seen them that
 3   morning?
 4        Q      Yes.
 5        A.     Yes, I did.
 6        Q      Where did you go?
 7        A.     I went across the street where they
 8   was.
 9        Q      When you went across the street where
10   they was -- where they were, what did you do?
11        A.     We just started talking, talking about
12   what we going to do today.
13        Q      And did they tell you anything else,
14   or you just talked about what the plans for the
15   day were?
16        A.     We just talked about the plans, what we
17   was going to do today.
18        Q      And then what happened?
19        A.     Then later on that day we went
20   downstairs in my basement and drunk a couple of
21   drinks, smoked a little weed and that was that.
22        Q      What were you doing in the basement?
23        A.     Just kickin' it.
24        Q      Playing any video games?
```

SS-15

1        A.    No.   We were just listening to the
2   radio.
3        Q     Okay.  How long did you kick it?
4        A.    For about -- We kick it like half of
5   the whole day, you know, probably about -- it was
6   about -- until about 3:00 in the afternoon.
7        Q     After you are done kickin' it at 3:00,
8   what did you do?
9        A.    Well, they go back across the street
10  and I be in my basement, you know.
11       Q     They went back across the street at
12  what time?
13       A.    Had to be like 4:00, 3:00, 3:30,
14  something like that.
15       Q     When -- Did they leave together?
16       A.    Yes, they did.
17       Q     What did you do?
18       A.    I just stayed in my basement enjoying
19  myself, drinking.
20       Q     When is the next time you saw Jovanie?
21       A.    I think later on that night.
22       Q     When you saw him later on that night,
23  where did you see him?
24       A.    Sitting on the front porch of his

1   house.

2        Q    Whose front porch?

3        A.   His family house.

4        Q    Across the street?

5        A.   Yeah.

6        Q    What was he doing?

7        A.   Sitting there.  He got nieces and

8   nephews, so he be out there watching them.  That's

9   the only time I see him standing out there.

10       Q    How long was he out there?

11       A.   I can't even tell you.

12       Q    How long were you out there?

13       A.   I stayed out there like about an hour

14  to two hours.  Then I left.  I went to my old

15  neighborhood.

16       Q    Did you ever see Xavier Walker?

17       A.   No.

18       Q    When is the next time you saw Xavier

19  Walker after 10:00 that morning?

20       A.   Next time I had seen him was like

21  yesterday -- the next day that afternoon, and I

22  think we was talking about some gym shoes, or

23  Timberlands that just came out or something like

24  that.

1        Q    So the first time you saw them was

2    May 13th when they told you that they had gone and

3    seen some girls, right?

4        A.   I don't remember the days, I mean the

5    exact day it was, like the 19th, I don't remember

6    that.

7        Q    At some point later on in the month,

8    two weeks later, you ended up talking to the

9    police, right?

10       A.   Right.

11       Q    And when you went down to the police

12    station that was like May 27th, right?

13       A.   I can't even tell you.  I don't

14    remember.

15       Q    But it was towards the end of the

16    month, right?

17       A.   Right.

18       Q    It was two weeks after you had seen

19    Xavier and Jovanie, or had you seen Jovanie during

20    that time?

21       A.   I seen him that time.

22       Q    Where had you seen him?

23       A.   At his house.

24       Q    When?

1    A.    I don't remember.  Like I said I don't

2  remember what day it was.  But I seen him, though.

3    Q    How many times did you see Jovanie

4  between May 13th and May 29th -- May 27th?

5    A.    Basically for about the whole two

6  weeks.

7    Q    How about Xavier Walker, when did you

8  see Xavier Walker?

9    A.    I was seeing him every blue moon.

10    Q    So when you say every blue moon, what

11  do you mean?

12    A.    Like every other day, two days,

13  something like that, every two days, but later on

14  that afternoon.

15    Q    At some point you saw Jovanie and

16  Xavier and Jovanie had money on him, right?

17    A.    Yeah.  The money that he had told me

18  that he had got from his mother.

19    Q    Oh.  And how much money did he tell you

20  that he had got from his mother?

21    A.    I know it was like about a hundred to

22  two-hundred because like basically every other day

23  we go get gym shoes and outfits, you know, to put

24  on that weekend, or we go to the cleaners and get

1    some clothes out the cleaners.

2        Q    So when his mother gave him that $100

3    to $200, was it in large bills?

4        A.    I think I had seen some fives, and tens

5    and twenties.

6        Q    It was all little dollars?

7        A.    Yeah.

8        Q    And he had one-hundred to two-hundred

9    of those little dollars?

10       A.    I don't remember.

11       Q    But it was from his mother, right?

12       A.    Yeah.

13    THE COURT:  Which Defendant is this?

14    MS. RAVIN:

15       Q    Who did you see the money with?

16       A.    Jovanie Long.

17       Q    Well, at some point Jovanie Long told

18    you that he had gotten the money a different way,

19    didn't he?

20       A.    No, he did not.

21       Q    He never told you that he had got the

22    money a different way?

23       A.    No, he did not.

24       Q    At some point you had a conversation

1    with both Jovanie and Xavier and Xavier said "That

2    mother fucker just shot a mother fucker," didn't

3    he?

4         A.   No, he did not.  That's the lie that I

5    stated to the officers at Harrison and Kedzie for

6    the --

7         Q    We'll get there.  We'll get to that

8    part, okay?

9              At some point you have this

10   conversation -- You are saying Xavier never said

11   that?

12        A.   No, he did not.

13        Q    And you are saying that Xavier and

14   Jovanie never spent the night at your house?

15        A.   No, they did not.

16        Q    At some point when you had the

17   conversation at 10:00 in the morning with Xavier

18   and Jovanie, both of them were there, right?

19        A.   Oh, outside?

20        Q    Yes.

21        A.   No.  I think I seen -- I seen Jovanie

22   first.  Then like a few minutes later I seen

23   Xavier Walker.

24        Q    When you saw them a few minutes apart

1    they ended up together, didn't they?

2         A.    Yeah, basically.  You know, I seen them

3    across the street stand there, so yeah.

4         Q     You had a conversation with Xavier,

5    didn't you?

6         A.    Yeah.

7         Q     And during that conversation with

8    Xavier, Xavier told you about somebody that had

9    gotten shot the night before, didn't he?

10        A.    No, he did not.  I stated that before

11   again I stated that I lied about this again.

12        Q     We'll, get there.  Remember how I

13   explained I was going to let you say what you

14   wanted to say, but I had to ask you certain

15   questions?  Do you remember when I explained that

16   to you?

17        A.    Yeah.

18        Q     Okay.  I'm just asking you the

19   questions I told you I had to ask.

20              Unless the Court is willing to declare

21   that he is a hostile witness and I can go at this

22   time through the particulars of which I believe

23   the witness has already stated is a lie and he is

24   going to say is a lie.

1       THE COURT:  Counsel for Mr. Walker?

2       MR. WILSON:  Judge, I don't know that I have

3  any objections to her treating this witness as a

4  hostile witness.

5       THE COURT:  Counsel for Mr. Long?

6       MR. CONNIFF:  Judge, I would object.

7  I don't think there's any showing on the record

8  that he is a hostile witness.  He is answering the

9  questions.  I think if the State has a statement

10  which they wanted to impeach him with, they can

11  lay the foundation to do that, but I don't think

12  he is a hostile witness.

13      MS. RAVIN:  Let me clarify my request.  What

14  I'm asking now is that I lay the foundation for

15  the prior inconsistent statements.

16      THE COURT:  Go right ahead.

17      MS. RAVIN:

18      Q    On May --

19      THE COURT:  Neither party, as I understand,

20  has any objection to that, is that correct?

21      MR. WILSON:  We have no such objections to

22  her laying the foundation.

23      THE COURT:  Is that right, Mr. Conniff?

24      MR. CONNIFF:  That's right, Judge.

SS-23

CCSAO XAVIER WALKER 001281

1            THE COURT:  Okay.

2            MS. RAVIN:

3            Q    On May 27th you were at the police

4       station, correct?

5            A.   Yes, I was.

6            Q    I believe you stated that you were at

7       Harrison and Kedzie?

8            A.   Yes, I was.

9            Q    And you were talking to some police

10      detectives, right?

11           A.   Yes, I was.

12           Q    And while you were talking to some

13      police detectives they talked to you about a

14      murder that had happened or something that had

15      happened on Ohio Street, right?

16           A.   Yes, they did.

17           Q    And they asked you if you knew somebody

18      named Jovanie Long?

19           A.   No, they did not.

20           Q    They never asked you if you knew

21      Jovanie Long?

22           A.   No, they did not.

23           Q    Did they ask you if you knew Xavier

24      Walker?

1       A.    No.

2       Q    They never asked if you knew Xavier

3  Walker?

4       A.    No, they did not.

5       Q    They just picked you up and took you

6  down to the police station?

7       A.    When they had came to my house, they

8  was unmarked clothes.  I didn't know they was

9  officers.  So when they came to my door, they did

10  not state they was officers, and when I opened my

11  door they tried to bum rush.  So we had a little

12  tussle at the front door.  So after that two of

13  their partners came from behind their house and

14  put me in handcuffs.  Then they took me down to

15  the police station.

16      Q    And they never told you why they were

17  taking you to the police station?

18      A.    No, they did not.

19      Q    And they never told you that they were

20  the police?

21      A.    No, they did not.  I thought it was for

22  drugs.

23      Q    When they take you down to the police

24  station, where do they put you?

CCSAO XAVIER WALKER 001283

```
 1        A.    They take me downstairs to the holding

 2   cell for like about an hour or two.  Then they had

 3   took me upstairs.

 4        Q    Okay.  Well, when they took you

 5   upstairs, they talked to you right?

 6        A.    Yes, they did.

 7        Q    When they talked to you they asked you

 8   questions, right?

 9        A.    Yes, they did.

10        Q    And you answered their questions,

11   right?

12        A.    Yes, I did.

13        Q    What did you talk to them about?

14        A.    I kept on telling them I did not know

15   who had killed that person on Ohio.  They kept

16   saying, yes, you do, yes, you do.  Then they say

17   you a known drug dealer in the neighborhood, and

18   that's when they had said that, okay, if you don't

19   tell me something we're going to take the kids

20   from your mother.  My mother got foster kids.  So

21   during the time that they had went out the room I

22   had made up a lie on Jovanie Long and Xavier

23   Walker.

24        Q     Well, who was it that told you that
```

1    they were going to go to your mother's house and

2    have her lose her foster kids?

3        A.    It was two black officers.

4        Q    Do you remember their names?

5        A.    No, I do not.

6        Q    There were, I believe, three white

7    detectives that were in the room earlier today

8    that you were in, correct?

9        A.    Yes.

10       Q    Was it any of those three white

11   detectives?

12       A.    Yeah, I seen them.

13       Q    Were any of those three detectives,

14   Detective Pietryla, P-i-e-t-r-y-l-a, Sergeant

15   Bryezniak, B-r-y-e-z-n-i-a-k, and Gang Specialist

16   Riordan, R-i-o-r-d-a-n, were any of those three

17   white detectives any of those people, the ones

18   that threatened you?

19       A.    No, they was not.

20       Q    Well, after these two black detectives

21   threatened you, where did they go?

22       A.    They had stepped out of the room for

23   like an hour to a half an hour.

24       Q    And how long had you been in the room

1    at this time?

2         A.    Like twenty-four hours.

3         Q    You already been there for a day and

4    nobody had talked to you?

5         A.    They was running in and out, kept on

6    threatening me with little things, yeah, we know

7    you a drug dealer, we're going to take your

8    mother's foster kids so you got to come with

9    something.  So that's when I stated a lie on

10    Jovanie Long and Xavier Walker.

11         Q    This is throughout that whole

12    twenty-four hour period, these same two black

13    detectives are the ones that are threatening you

14    with this?

15         A.    Yes, they did.

16         Q    Nobody else, right?

17         A.    No.

18         Q    And nobody else came and talked to you

19    for that twenty-four hours, right?

20         A.    No, they did not.

21         Q    After that twenty-four hours you

22    decided that you were going to make up a lie,

23    right?

24         A.    Yes, I did.

1    Q    Well, when you made up that lie you
2 told that to detectives, right?
3    A.   Yes, I did.
4    Q    Did you tell it to those two black
5 detectives?
6    A.   Yes, I did.  I also told them the same
7 thing.
8    Q    Did you also talk to another detective
9 named Tony Bryezniak?
10   A.   I don't remember their names.
11   Q    Did you talk to a white guy?
12   A.   Yes, I did.
13   Q    Have a little bit of a mustache?
14   A.   I can't even tell you, but if you bring
15 him in I can point him out.
16   Q    Was it one of the guys who was in the
17 room earlier today?
18   A.   I talked -- As a matter of fact, I
19 talked to both of them, the one that had the
20 leather jacket on and the other one that had the
21 mustache.
22   Q    Okay.  When you talked to those
23 detectives, did you tell them something about
24 Jovanie Long and Xavier Walker?

1    A.    Yes, I did.

2    Q    But what you're saying today is what

3 you told them wasn't true, right?

4    A.    Yes, I am.

5    Q    But you did talk to them, correct?

6    A.    Yes, I did.

7    Q    And after you talked to them eventually

8 you talked to an Assistant State's Attorney,

9 right?

10    A.    Yes.  They told me that if I don't go

11 down here they will be coming to my house on a

12 regular basis, just coming up in there, around,

13 checking my house, so they took me to 26th earlier

14 that day or that morning.

15    Q    Okay.  Let me back up a little bit.  I

16 understand at some point you went to 26th and

17 California, this building.  But before you came to

18 this building, did you talk to a prosecutor,

19 somebody like me, but it was a male, his name was

20 Tom Mahoney, M-a-h-o-n-e-y?

21    A.    I don't remember.  I don't remember no

22 names.

23    Q    You talked to a State's Attorney,

24 somebody who was a lawyer, right?

```
 1          A.    I guess.

 2          Q    Well, at some point somebody wrote down

 3   what you told them, right?

 4          A.    Right.

 5          Q    The person that wrote that down, was it

 6   a guy?

 7          A.    Yes, it was.

 8          Q    It was a white guy, right?

 9          A.    Yeah.

10          Q    And he told you he was a State's

11   Attorney, didn't he, he had dark hair, round face?

12          A.    I don't remember.  I don't remember.

13          Q    Well, when you talked to this Assistant

14   State's Attorney and he wrote down your statement

15   you then reviewed that statement with him,

16   correct?

17          A.    Yes, I did.

18          Q    And you signed every page, right?

19          A.    Yes, I did.

20          Q    An he signed every page, right?

21          A.    Yes, he did.

22          Q    Well, when you talked to him you told

23   him what your birthdate was, right?

24          A.    Yes.
```

CCSAO XAVIER WALKER 001289

```
 1          Q     You told him your birthdate was
 2   ███████████████  correct?
 3          A.    Yes.
 4          Q     And you told him that you graduated
 5   from Manley High School, correct?
 6          A.    Yes.
 7          Q     And you told him that you lived at 4653
 8   West Erie, correct?
 9          A.    Yes.
10          Q     And you told him about living with your
11   mother, Mary Curry, right?
12          A.    Uh-huh.
13          Q     And you told him at some point on the
14   weekend of May 11th you were at your house with
15   Jovanie Long, correct?
16          A.    Yes.
17          Q     And you told him at that time Jovanie
18   had a different name, didn't you?
19          A.    No, I don't remember that.
20          Q     Well, you told him that Jovanie Long
21   you sometimes called Vani, correct?
22          A.    I don't remember that.
23          Q     You said that there were two other
24   girls with you and Vani, Boss Hog, and Shakey,
```

1    correct, that's what you told the State's

2    Attorney, right?

3         A.    Yeah.

4         Q    And you were in the basement and it was

5    about 11:30 that night playing a 007 video game?

6         A.    Yeah.

7         Q    The State's Attorney wrote that down,

8    correct?

9         A.    Right.  Right.

10        Q    And then you told the State's Attorney

11   that you had a conversation with Vani and you guys

12   had a whole conversation about shooting people,

13   right, about how you can earn stars, right?

14        A.    I don't remember that.

15        Q    Well, when you had this conversation

16   at some point you stopped playing the video games,

17   right?  Well, you are playing the video games and

18   Jovanie Long is there, right?

19        A.    Okay.

20        Q    And you are talking about gang

21   membership, right?

22        A.    I don't remember that.

23        Q    Well, it says here "Maurice Wright

24   states that he is a New Breed gang member," you

SS-33
CCSAO XAVIER WALKER 001291

1       told the State's Attorney that, didn't you?

2           A.    Yeah.

3           Q     And he wrote it down, didn't he?

4           A.    Yeah.

5           Q     It says "Maurice Wright states that

6       Vani is a member of the Imperial Insane Vicelords

7       and Shakey is a member of the Imperial Insane

8       Vicelords," he wrote that down and you told him

9       that, correct?

10          A.    No.

11          Q     You didn't tell him that?

12          A.    No.

13          Q     He wrote it down, though, didn't he?

14      You don't know?

15          THE COURT:  You have to answer, sir.

16          THE WITNESS:

17          A.    I don't remember him writing that down.

18          MS. RAVIN:

19          Q     Okay.  It says "Maurice Wright states

20      Exhibit A is a photo of Jovanie Long, or Vani, and

21      Exhibit B is a photo of Shakey," you identified

22      those photographs, didn't you?

23          A.    No, I did not.

24          MS. RAVIN:  Showing what I previously

CCSAO XAVIER WALKER 001292

1    tendered to Counsel People's Exhibit 18 and

2    People's Group Exhibit 19.

3         Q    Showing you what's been previously

4    marked as People's Exhibit 18, for identification,

5    do you recognize this?

6         A.   Yep, I do.

7         Q    What is this?

8         A.   That's a paper that I had signed for --

9    I think from the State's Attorney.

10        Q    And this is the one where you signed

11   every page, right, it's seven pages long, correct?

12        A.   Right.

13        Q    And your signature appears on every

14   page, right?

15        A.   Right.

16        Q    Is that correct?

17        A.   Yes.

18        Q    When you signed all of those pages,

19   does this look exactly like it did when you signed

20   them?  Go ahead and look through it.

21        A.   Yeah.

22        Q    All of the pages look exactly the same

23   as when you signed them, right, and have the

24   initials on them for corrections, right?

SS-35

1      A.   No.  It was like two papers I signed,

2  but not that many.

3      Q   You didn't sign all seven of these

4  pages?

5      A.   No.

6      Q   You just said you signed them and now

7  you are saying you didn't?

8      A.   No.  Because I'm counting the papers.

9  Man, I didn't sign all them papers.

10      Q   Here is page seven, is that your

11  signature at the bottom of page seven?

12      A.   Yeah.

13      Q   Is that your signature on the middle of

14  page seven?

15      A.   Yeah, but I don't write like that.

16      Q   Well, it's either your signature and

17  you signed it, or it's not your signature and you

18  didn't sign it.

19      A.   I don't write like that.

20      Q   Okay.  Sir, is it your signature?

21      A.   Yeah, right there, but not up there.

22      Q   That one is not?

23      A.   No.

24      Q   All right.  Page six, is your signature

1    on page six?

2         A.    Yes, it is.

3         Q     Is your signature on page five?

4         A.    Yes.

5         Q     Is that your signature on page four?

6         A.    Yes.

7         Q     Is that your signature on page three?

8         A.    This one don't look like my handwriting

9    right here.

10        Q     So page three, that's not your

11   signature at the bottom?

12        A.    No.

13        Q     On page two is that your signature?

14        A.    Yes, it is.

15        Q     On page one is that your signature?

16        A.    That don't look like my handwriting

17   either.

18        Q     So page one, and page three and the

19   middle of page seven are not your signatures, but

20   two, four, six and the bottom of page seven are?

21        A.    Basically.

22        Q     Okay.  Showing you People's Group

23   Exhibit No. 19, showing you People's 19-A, do you

24   recognize that photograph?

1        A.    Yes, I do.

2        Q     Was that a photograph that you

3    identified as part of this statement?

4        A.    No.

5        Q     You've never seen this photograph

6    before?

7        A.    No.

8        Q     Never?

9        A.    Uh-uh.

10        Q     Okay.  People's Exhibit No. 19-B, do

11    you recognize this photograph?

12        A.    Yeah.

13        Q     Have you identified this photograph?

14        A.    Yeah.

15        Q     Who is this photograph of?

16        A.    That's Shakey.

17        Q     Who's in photograph 19-A, for

18    identification?

19        A.    That's Jovanie Long.

20        Q     Do you recognize People's Exhibit 19-C,

21    for identification?

22        A.    No.  When we was there I ain't -- I

23    ain't say anything about these pictures.

24        Q     You never saw People's Exhibit --

1        A.    No, I didn't say nothing about them

2   pictures when I was down at the police station.

3   They ain't bring no pictures up in there.

4        Q    So People's Exhibit No. 19-C you never

5   seen before?

6        A.    They just showed me that picture and

7   that picture of Bubba.

8        Q    Who is Bubba, is that People's Exhibit

9   No. 19-D, for identification?

10       A.    Yeah.

11       Q    What about People's Exhibit 19-E, for

12   identification, they showed you that?

13       A.    Yeah.

14       Q    Who is that?

15       A.    I forgot his name.

16       Q    But they showed it to you at the time

17   and you identified it, right?

18       A.    Right.

19       Q    Showing you People's Exhibit No. 19-F,

20   for identification, is that a photograph?

21       A.    Yeah.

22       Q    Who is it a picture of?

23       A.    That's me.

24       Q    Is there a signature on that picture?

SS-39
CCSAO XAVIER WALKER 001297

1     A.    Yeah.

2     Q     Whose signature is on that picture?

3     A.    My signature.

4     Q     You signed that picture?

5     A.    No, I did not.  That is not my writing.

6     Q     Okay.  I'm going to give you a copy of

7     that seven-page handwritten statement and we are

8     going to go through it together, okay?

9          THE COURT:  Hold on a minute.

10          All right.  Back on the record.

11     MS. RAVIN:

12     Q     Why don't you go to page two, do you

13     see where the initials are on the left-hand side

14     of that page?

15     A.    Uh-huh.

16     Q     Do you see where it says "Maurice

17     states that Exhibit A is a photo of Jovanie Long

18     or Vani, and Exhibit B is a photo of Shakey,"

19     that's on page two, correct?

20     A.    Yes.

21     Q     Because that's what the State's

22     Attorney wrote down, correct?

23     A.    Yeah.

24     Q     Because that's what you told the

1    State's Attorney, correct?

2         A.   No.   I told him about Shakey.   I ain't

3    say nothing about Jovanie.

4         Q    Well, then it says "Maurice Wright

5    states that while they were playing video games

6    there was a conversation about how they used to

7    shoot at other groups and get stars," it says

8    that, correct?

9         A.   Yes, it does.

10        Q    Because the State's Attorney wrote this

11   down, correct?

12        A.   Yes.

13        Q    Because you told that to the State's

14   Attorney, correct?

15        A.   Yes, I did.

16        Q    Then it says "Maurice Wright states

17   that Vicelords get stars for killing other

18   people", correct?

19        A.   No, I did not state that.

20        Q    You didn't state that, but the State's

21   Attorney wrote that down, right?

22        A.   Right.

23        Q    Then I go -- Then go to the next page,

24   page three, it states "Maurice Wright states that

1    Shakey said he had all five of his stars,"

2    correct?

3         A.    It says that but I also didn't say that

4    either.

5         Q     But the State's Attorney wrote it,

6    right?

7         A.    Yes, he did.

8         Q     But you didn't say it, it was a lie,

9    right?

10        A.    Yes, it was.

11        Q     "Maurice Wright states that Vani said

12   he didn't have any stars," the State's Attorney

13   wrote that down, right?

14        A.    Yes, he did.

15        Q     You told that to the State's Attorney,

16   right?

17        A.    No, I did not.

18        Q     So that's a lie?

19        A.    Yes, it is.

20        Q     "Maurice Wright states that when Vani

21   said this every one started to laugh at Vani,"

22   that's written down, correct?

23        A.    Yes, it is.

24        Q     Because you told that to the State's

1    Attorney, right?

2         A.    No, I did not.

3         Q    So that's a lie?

4         A.    Yes, it is.

5         Q    Okay.  "Maurice Wright states that this

6    made Vani mad and Vani said 'fuck you all,'"

7    that's what's written on the statement, right?

8         A.    Yes, it is.

9         Q    Because you told that to the State's

10   Attorney?

11        A.    No, I did not.

12        Q    So that's a lie?

13        A.    Yes, it is.

14        Q    "Maurice Wright states that he left the

15   house to go to Melvin's house to look for some

16   weed," correct?

17        A.    Yeah, it says that but I ain't stated

18   that.

19        Q    So the State's Attorney wrote that down

20   and that's also a lie?

21        A.    Yes, it is.

22        Q    "Maurice Wright states that Vani and

23   Trina stayed at his house all night," it says

24   that, right?

CCSAO XAVIER WALKER 001301

1        A.    Yes, it does.

2        Q    The State's Attorney wrote that, right?

3        A.    Yes, it does.

4        Q    Because you told that to the State's

5 Attorney, right?

6        A.    No, I did not.

7        Q    Why don't you look through the

8 statement, and why don't you point to the part

9 that you told the -- Why don't you tell me the

10 part where you actually told it to the State's

11 Attorney, it was a lie but you actually told that

12 to the State's Attorney?

13        A.    No, I ain't tell him all of it, but

14 part of this -- Everything that I stated to the

15 State's Attorney is a lie, but certain things that

16 he put on here I did not say.

17        Q    Okay.  Well, did you tell him about

18 on -- that "Maurice Wright states that he left his

19 house on and off on May 12, 2000, and saw his

20 friend, Bubba, on Superior and Kilpatrick," did

21 you tell the State's Attorney that?

22        A.    Yeah, I told him that.

23        Q    Did you tell the State's Attorney

24 "Maurice Wright states that Bubba was driving a

CCSAO XAVIER WALKER 001302

1    gray Cutlass and there was a girl in the car"?

2         A.    Yes, I did.

3         Q    Did you tell them that they dropped

4    this girl off at Erie and Cicero and picked up

5    another girl at Erie and Cicero by a school?

6         A.    No, I ain't say nothing about we

7    dropped off another girl.

8         Q    So the part about dropping off the one

9    girl you did tell the State's Attorney, right?

10        A.    I ain't say nothing about dropping off

11   no girl.  We picked up a girl.

12        Q    Did you then say that you drove to

13   Bubba's house just off Laramie?

14        A.    Yes.

15        Q    You told that to the State's Attorney,

16   right?

17        A.    Yes, I did.

18        Q    Going to page four, did you tell the

19   State's Attorney that you went into Bubba's house

20   and had sex with the girl?

21        A.    Yes, I did.

22        Q    Did you tell the State's Attorney that

23   after you finished having sex you told Bubba and

24   Bubba told you to wait in the car, did you tell

SS-45
CCSAO XAVIER WALKER 001303

1   that to the State's Attorney?

2        A.   Yes, I did.

3        Q    Did you tell the State's Attorney that

4   you went back to the gray Cutlass?

5        A.   Yes, I did.

6        Q    Did you tell the State's Attorney that

7   when you were in the gray Cutlass it was about

8   1:00 or 2:00 in the morning on May 13, 2000?

9        A.   Yes, I did.

10       Q    Did you tell the State's Attorney that

11  Vani and Zay pulled up in a dark Taurus?

12       A.   Yes, I did.

13       Q    Did you tell the State's Attorney that

14  Zay said "This crazy mother fucker first shot --

15  just shot a mother fucker"?

16       A.   Yeah, that was the statement that I

17  lied about.

18       Q    But you did tell that to the State's

19  Attorney?

20       A.   Yes, I did.

21       Q    Did you tell the State's Attorney that

22  Vani pulled Zay out of the car?

23       A.   Yes, I did.

24       Q    Did you tell the State's Attorney that

CCSAO XAVIER WALKER 001304

```
 1    Vani said, quote, "Guess what I got," unquote, and
 2    Vani showed you a $100 bill and two $50 bills?
 3         A.   No.
 4         Q    You never told that to the State's
 5    Attorney?
 6         A.   No, I did not.
 7         Q    So it's not just a lie, but you never,
 8    ever said that?
 9         A.   No.
10         Q    Did you tell the State's Attorney that
11    Vani asked you if you wanted any money, and you
12    told Vani that he would need the money to get out
13    of town?
14         A.   No, I did not.
15         Q    You never told that to the State's
16    Attorney?
17         A.   No, I did not.
18         Q    But the State's Attorney wrote that
19    down?
20         A.   Yes, he did.
21         Q    Did you tell the State's Attorney that
22    at that time Vani cried and hugged you?
23         A.   No, I did not.
24         Q    You never told that to the State's
```

1     Attorney?

2         A.    No, ma'am.

3         Q     But the State's Attorney wrote it down?

4         A.    Yes, he did.

5         Q     Did you tell the State's Attorney, page

6     five, that you, and Zay and Vani got into the

7     Taurus and drove to your house on Erie?

8         A.    No, I did not.

9         Q     You never told that to the State's

10     Attorney?

11         A.    No, I did not.

12         Q     But he, in fact, wrote that down?

13         A.    Yes, he did.

14         Q     Did you tell the State's Attorney that

15     Vani and Zay stayed at your house and you walked

16     from your house to Cicero and Ohio where you saw

17     the police and saw blood on the sidewalk?

18         A.    No.

19         Q     You never told that to the State's

20     Attorney?

21         A.    No, I did not.

22         Q     But the State's Attorney wrote that

23     down?

24         A.    Yes, he did.

CCSAO XAVIER WALKER 001306

1       Q    Did you tell the State's Attorney that

2  you walked back home and went into the house and

3  walked in the house with Vani and Zay?

4       A.    No.

5       Q    You never told that to the State's

6  Attorney?

7       A.    No, I did not.

8       Q    But he wrote that down?

9       A.    Yes, he did.

10      Q    Did you tell the State's Attorney that

11  you all then went to go to sleep?

12      A.    No, I did not.

13      Q    So the State's Attorney wrote that

14  down, right?

15      A.    Yes, he did.

16      Q    Did you state that Vani and Zay woke

17  you up at about 11:00 in the morning on May 13,

18  2000?

19      A.    Yeah, I told him that.

20      Q    And he wrote it down, right?

21      A.    Yes, he did.

22      Q    Did you tell him that Vani told you

23  that he threw the gun down on the railroad tracks

24  by Chicago Avenue?

1    A.   No, he did not.

2    Q    Vani never told you that?

3    A.   No, he did not.

4    Q    Did you tell the State's Attorney that

5    Vani told you that?

6    A.   Yes, I did.

7    Q    And the State's Attorney wrote that

8    down, right?

9    A.   Yes, he did.

10   Q    Did you tell the State's Attorney that

11   Vani told him Zay was with him when he threw the

12   gun on the tracks?

13   A.   No, I did not.

14   Q    You did not tell the State's Attorney

15   that?

16   A.   No, I did not.

17   Q    Did you tell the State's Attorney that

18   Vani told you about the shooting of the white guy

19   early in the morning of May 13, 2000?

20   A.   No.

21   Q    You never told that to the State's

22   Attorney?

23   A.   No, I did not.

24   Q    But he wrote that down, didn't he?

1    A.    Yes, he did.

2    Q    Maurice Wright, you told the State's

3 Attorney that Vani said that the white guy pulled

4 in a van and asked for blows, correct?

5    A.    No, I did not say that.

6    Q    You did not say that, but the State's

7 Attorney wrote it down?

8    A.    Yes, he did.

9    Q    Going to page six, after where it says

10 "blows," you explained to the State's Attorney

11 that blows is a street term for heroin, right?

12    A.    Yes, I did.

13    Q    And he wrote that down, right?

14    A.    Yes, he did.

15    Q    Then it says "Maurice Wright states

16 that Vani told him that Vani grabbed money out of

17 the white guy's hand," you told that to the

18 State's Attorney?

19    A.    No, I did not.

20    Q    You never told that to the State's

21 Attorney?

22    A.    No, I did not.

23    Q    But he wrote that down?

24    A.    Yes, he did.

CCSAO XAVIER WALKER 001309

1      Q    "Maurice Wright states Vani" -- Strike

2  that.

3         You told the State's Attorney that Vani

4  told you the white guy -- that Vani told the white

5  guy "fuck you, vic," and that's in quotes, that's

6  what you told the State's Attorney?

7      A.   No, I did not.

8      Q    That's what the State's Attorney wrote

9  down, right?

10     A.   Yes, he did.

11     Q    You told the State's Attorney that Vani

12  told you the white guy got out of the van and

13  swung on Vani, correct?

14     A.   No.

15     Q    You never told that to the State's

16  Attorney?

17     A.   No, I did not.

18     Q    But that's what the State's Attorney

19  wrote, correct?

20     A.   Yes.

21     Q    You told the State's Attorney that Vani

22  told you he punched the white guy and knocked him

23  down, right?

24     A.   No, I did not.

CCSAO XAVIER WALKER 001310

1    Q    You never told that to the State's

2 Attorney?

3    A.    No, ma'am.

4    Q    But he wrote that down, didn't he?

5    A.    Yes, he did.

6    Q    You told the State's Attorney that Vani

7 told you that he pulled out a .45 automatic pistol

8 and that the guy -- and shot the guy once in the

9 head, right?

10    A.    No, he did not.

11    Q    Vani never told you that?

12    A.    No, he did not.

13    Q    But you told that to the State's

14 Attorney?

15    A.    No, I did not.

16    Q    So the State's Attorney wrote that

17 down, right?

18    A.    Yes, he did.

19    Q    Okay.  You told the State's Attorney

20 that Zay was present for the this entire

21 conversation that you had with Jovanie Long?

22    A.    No.

23    Q    You never said that to the State's

24 Attorney?

1    A.    No, I did not.

2    Q    But the State's Attorney wrote it down,

3    right?

4    A.    Yes, he did.

5    Q    The State's Attorney then showed you

6    Exhibit C, right, that was one of the pictures I

7    showed you earlier, right?

8    A.    I don't remember.  I don't even

9    remember.

10    Q    People's Exhibit No. 19-C, for

11    identification, that's Exhibit C, isn't it?

12    A.    Oh, yeah.

13    Q    He showed you that, didn't he?

14    A.    No, he did not.

15    Q    He never showed you that?

16    A.    No, he did not.

17    Q    Do you know who is in Exhibit C?

18    A.    Yes.

19    Q    Who?

20    A.    Xavier.

21    Q    He wrote down that Exhibit C is a photo

22    of Zay, correct?

23    A.    Yes.

24    Q    After that he asked you how you had

1    been treated by the police ans by himself,

2    correct?

3         A.   Yeah.

4         Q    And what did you tell him?

5         A.   I ain't tell him nothing.  I was quiet.

6         Q    You didn't say anything?

7         A.   No, I did not.

8         Q    Did he write down that you had been

9    treated well by the police and by Assistant

10   State's Attorney Mahoney?

11        A.   That's what it says.

12        Q    He wrote that down, right?

13        A.   Yes.

14        Q    But you never said that?

15        A.   No, I did not.

16        Q    Did you tell the State's Attorney that

17   you smoked cigarettes?

18        A.   Yes, I did.

19        Q    Did you tell the State's Attorney that

20   you had been given food to eat and pop to drink?

21        A.   No.

22        Q    You never told him that?

23        A.   No.

24        Q    Did he write it down?

1          A.    Yes, he did.

2          Q     Did you talk to the State's Attorney

3     about whether or not anybody had promised you

4     anything in return for the statement?

5          A.    Right.

6          Q     You talked to him about that, right?

7          A.    Yeah.

8          Q     And you told him that nobody had

9     promised you anything for the statement, right?

10         A.    Right.

11         Q     He asked you if you were giving the

12    statement voluntarily, correct?

13         A.    Right.

14         Q     And you told him that you were giving

15    the statement voluntarily, correct?

16         A.    Right.

17         Q     You said that nobody threatened you or

18    abused you in any way, correct?

19         A.    Right.

20         Q     That's what you told the State's

21    Attorney --

22         A.    That was just to get up out of there.

23         Q     That's what you told him, right?

24         A.    That's what I told him.

1    Q    And that's what he wrote down, right?

2    A.   Right.

3    Q    But you didn't have any marks on you?

4    A.   Yes, I did.

5    Q    You had marks on you?

6    A.   Yes.

7    Q    Where were they?

8    A.   On my face.

9    Q    Where were the marks?

10   A.   Below my lip, around my eye.  When I

11   left up out of there, I had a mark around my eye

12   and below my lip.

13   Q    And all of that was before you gave the

14   statement, right?

15   A.   Yes, it was.

16   Q    And you could see these marks on you,

17   right?

18   A.   Yes, you can.

19   Q    Then there is a signature -- Well, then

20   you talk about that you weren't under the

21   influence of any drugs or alcohol, right?  You

22   told the State's Attorney that you weren't under

23   the influence of any drugs or alcohol, right?

24   A.   Right.

CCSAO XAVIER WALKER 001315

1      Q    And he wrote that down, right?

2      A.   Right.

3      Q    After he wrote that down you talked

4  about Exhibits D and E, correct?

5      A.   I don't know what D and E is.

6      Q    Okay.  Showing you People's Exhibit

7  No. 19-D, for identification, that's Exhibit D,

8  isn't it?

9      A.   Okay.

10      Q    And he showed you that, didn't he?

11      A.   Right.

12      Q    And you identified it?

13      A.   Yes.

14      Q    Who did you identify it as?

15      A.   Bubba.

16      Q    Showing you People's Exhibit No. 19-E,

17  for identification, is that marked as Exhibit E?

18      A.   Yeah.

19      Q    And he showed you that, didn't he?

20      A.   Yes, he did.

21      Q    And who did you identify it as?

22      A.   I forgot his name.

23      Q    But you identified who it was, right?

24      A.   Yeah.

1    Q    And after you identified Exhibit E as

2    Boss Hog, you then went through the whole

3    statement with the State's Attorney, right?

4    A.    Right.

5    Q    You went through the first page and you

6    were allowed to make any corrections, correct?

7    A.    Yes.

8    Q    And you went through the second page

9    and you were allowed to make any corrections,

10   right?

11   A.    Well, he read it all to me and he read

12   certain things 'cause I really don't know how to

13   read so good, so I was just signing papers really.

14   Q    You don't know how to read so good?

15   A.    No, I do not.

16   Q    Well, you told the State's Attorney

17   that you had gone to Manley High School, right?

18   A.    Yes.

19   Q    And you told him you graduated from

20   Manley High School?

21   A.    Yes, I did.

22   Q    So you graduated from Manley High

23   School and you don't know how to read?

24   A.    I was just out there smoking a lot of

SS-59

1    PCP so that really had messed me up.

2         Q    So what you are telling the Judge today

3    is you don't know how to read?

4         A.   Not that good.

5         Q    But you graduated from high school,

6    right?

7         A.   Yes, I did.

8         Q    And you signed the bottom of most of

9    these pages, but not all of them, right?

10        A.   Yes, I did.

11        Q    And your initials appear on page two,

12   right?

13        A.   Yes.

14        Q    And your initials appear on page three,

15   right?

16        A.   Yes.

17        Q    And your initials appear on page four,

18   correct?

19        A.   I don't see my initial on here.

20        Q    If you go three-quarters of the way

21   down the page, do you see your initials?

22        A.   Yeah, I see Maurice Wright -- Okay, now

23   I see them.

24        Q    Okay.  Going to page five do you see

SS-60
CCSAO XAVIER WALKER 001318

1    your initials on page five?

2           A.    Yes, I do.

3           Q    Do you see any initials on page six?

4           A.    No, I don't see them.

5           Q    Because there weren't any, right?

6           A.    Right.

7           Q    On the bottom of page seven there is

8    another paragraph and that paragraph talks about

9    how you read through the statement with the

10   State's Attorney, correct?

11          A.    Yes, it does.

12          Q    Because when the State's Attorney went

13   through the statement with you, you read part of

14   it out loud to him, didn't you?

15          A.    Certain things that I could read.

16          Q    So you read parts of it to him, but not

17   all of it?

18          A.    Right.

19          Q    But you signed after the part where it

20   says that you reviewed this statement and that you

21   signed each page with A.S.A. Mahoney and Detective

22   Bryezniak, it says that, correct?

23          A.    Like I said I didn't sign all these

24   pages, but I know my handwriting.

CCSAO XAVIER WALKER 001319

1      Q     But you did sign that bottom paragraph,
2  right?
3      A.    Yes, I did.
4      Q     You also testified earlier that you
5  came down to this building at 26th and
6  California --
7            May I just have one moment, Judge?
8            THE COURT:  Sure.
9            MS. RAVIN:
10     Q     That was on May 30th, the police
11 brought you down to this building, right?
12     A.    Yes.
13     Q     Okay.  And when you came down to this
14 building you talked to a prosecutor, right?
15     A.    Yes.
16     Q     It was a male prosecutor, right?  It
17 wasn't a female?  I mean you know the difference
18 between a boy and a girl, right?
19     A.    Right, but I'm saying I don't remember
20 that day.
21     Q     Well, earlier today you testified that
22 they brought you down to the building, didn't you?
23     A.    Yeah, they brought me down to the
24 building.  It was a male.  It was a male.

1    Q    I didn't ask you that, you volunteered

2    that, didn't you?

3    A.   It was a male.

4    Q    When you talked to that male he told

5    you he was a State's Attorney, didn't he?

6    A.   Yes.

7    Q    And he asked you questions, right, yes

8    or no?

9    A.   Yes, he did.

10   Q    And you gave answers, right?

11   A.   Yes.

12   Q    And when you gave those answers you

13   were in front of a lot of people, correct?

14   A.   Like about seven people, something like

15   that.

16   Q    In a room very similar to this -- You

17   were in a room somewhat similar to the room you

18   were in now, correct?

19   A.   Yes.

20   Q    And there were a bunch of people in

21   front of you looking at you, correct?

22   A.   Right.

23   Q    And in that room there was a flag just

24   like there is a flag here today right?

SS-63

1       A.   Right.

2       Q   And you raised your right hand just

3  like you did today, correct?

4       A.   Right.

5       Q   And you swore to take an oath, right?

6       A.   Yeah.

7       Q   And when you took that oath you then

8  answered questions, correct?

9       A.   Yes.

10      Q   You did give those answers, right?

11      A.   Yes.

12      Q   Well, when you talked to Luke Sheridan

13  you told him -- he asked you what your name was,

14  right?

15      A.   Yes.

16      Q   And you told him your name was Maurice

17  Wright, correct?

18      A.   Right.

19      Q   He asked you how old are you and you

20  answered "I am twenty.", correct?

21      A.   Yes.

22      Q   He asked you what your date of birth

23  was and you said &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

24      A.   Yes.

1      Q    He asked you "Where do you live?", and

2   you answered "4653 West Erie.", correct?

3      A.   Yes.

4      Q    He asked you "Who do you live there

5   with?, and you answered "My mother and my -- My

6   mother and sister.", correct?

7      A.   Yes.

8      Q    He asked you what your mother's name

9   was and you answered "Mary Curry.", correct?

10      A.   Yes.

11      Q    And he said "And, Maurice, did you

12   graduate high school?", and you said "Yes."?

13      A.   Yes.

14      Q    He asked you "What high school was

15   that?", and you said "Manley.", correct?

16      A.   Yes.

17      Q    He then asked you "I'm going to direct

18   your attention to the early morning hours of May

19   13, the year 2000, and I am going to ask you

20   specifically sometime between 1:30 and 2:00, were

21   you sitting in a car outside of a friend of yours,

22   Bubba's house?", and your answer was "Yes.", were

23   you asked that question and did you give that

24   answer?

CCSAO XAVIER WALKER 001323

1      A.     Yes.

2      Q      Were you asked this question, "And as

3 you were sitting in that car, did anybody drive up

4 to you?", and did you give the answer "Yes.", were

5 you asked that question --

6      A.     I don't remember that question.

7 I don't think so.

8      Q      Okay.  Were you asked the question "And

9 at that time that the vehicle drove up, did you

10 know who was in the car?", and did you answer

11 "No."?

12      A.     I did not answer that question asked.

13      Q      Were you asked this question, "Did

14 anyone get out of the car and approach you?", and

15 you said "Yes."?

16      A.     No.

17      Q      You were not asked that question and

18 you did not give that answer?

19      A.     No.

20      Q      Were you asked the question "Did you

21 see who that was?", and did you give the answer

22 "Yes."?

23      A.     No.

24      Q      When you were sitting in this room and

1    you were being asked some questions, there was a

2    woman taking down or a man taking down everything

3    that you said, right?

4         A.    Right.

5         Q     Much like the lady is here in front of

6    you (indicating), right?

7         A.    Right.

8         Q     And she was typing down the questions

9    and the answers, correct?

10        A.    Yes.

11        Q     Were you asked this question, "Who was

12   it?", and did you give this answer, "Zay.", Z-a-y,

13   were you asked that question and did you give that

14   answer?

15        A.    Yes, I did give that answer.

16        Q     Were you asked this question:  "Are you

17   referring to Xavier?", and did you give this

18   answer, "Yes."?

19        A.    Yes.

20        Q     Were you asked this question, "Do you

21   know Xavier's last name?", and did you give this

22   answer, "No."?

23        A.    I don't remember.

24        Q     Were you asked this question, "Do you

1    know his last name to be Walker?", and did you

2    give this answer, "I am not sure."?

3         A.    I also don't remember that one either.

4         Q     Were you asked this question, "You are

5    not sure?", and did you give this answer,

6    "Right."?

7         A.    I don't remember.  I do not remember.

8         Q     You don't remember giving that answer

9    to that question?

10        A.    No.

11        Q     Were you asked this question, "When Zay

12   approached you was he alone or was anyone with

13   him?", and your answer was "He was with Jovanie."?

14        A.    Yes.

15        Q     Were you asked this question and did

16   you give this answer, "And, Jovanie, do you know

17   Jovanie's last name?", and the answer "No."?

18        A.    Yes.

19        Q     Were you asked this question, "And does

20   Jovanie go by any other nicknames?", and did you

21   give this answer, "G-Man."?

22        A.    I don't remember that.

23        Q     Were you asked this question, "Do you

24   ever call him Vani?", and did you give this

CCSAO XAVIER WALKER 001326

1   answer, "Yes."?

2      A.   Yeah, yeah.

3      Q   Were you asked this question, "So Vani

4   would be a nickname of his?", and did you give

5   this answer, "Yes."?

6      A.   I don't remember.

7      Q   Were you asked this question, "When Zay

8   came up to your car, did he open the car or how

9   did he talk to you?", and did you give this

10  answer, "He opened the car and woke me up and said

11  'This crazy mother fucker just shot a mother

12  fucker.'"?

13      A.   I don't remember saying that.

14      Q   Were you asked that question?

15      A.   I don't remember.

16      Q   Were you asked this question, "Was he

17  pointing to anybody when he said that?", and did

18  you give this answer, "Yes."?

19      A.   I also don't remember.

20      Q   Were you asked this question, "Do you

21  know who he was referring to when he said that?",

22  did you give this answer, "That's when Vani had

23  pulled him up and said 'Let me holler at my

24  man.'"?

CCSAO XAVIER WALKER 001327

1    A.    No, I don't remember that.

2    Q    Were you asked this question, "So Zay

3    came up to you and started talking to you?", and

4    did you give this answer, "Yes.", were you asked

5    that question and did you give that answer?

6    A.    I do not remember that.

7    Q    Were you asked this question, "When Zay

8    said 'This crazy mother fucker just shot a mother

9    fucker,' what did Vani do?", and did you give this

10   answer, "Pulled him up out of the car.", were you

11   asked that question and did you give that answer?

12   A.    I don't remember that.

13   Q    Were you asked this question, "Out of

14   what?", and did you give this answer, "The car."?

15   A.    Say that again.

16   Q    Were you asked this question, "Out of

17   what?", and did you give this answer, "The car."?

18   A.    I don't remember that one either.

19   Q    Were you asked this question, "Out of

20   the car that you were in?", and did you give this

21   answer, "Yes."?

22   A.    Out of the car that we was in?

23   Q    Yes.

24   A.    No, I don't remember that.

CCSAO XAVIER WALKER 001328

1        Q    Were you asked this question, "What did
2   Vani do after he did that?", and did you give this
3   answer, "He said he showed me the money and showed
4   me a hundred and two fifties."?
5        A.   No, I don't remember that.
6        Q    I'm sorry.  You do you have speak up,
7   sir.
8        A.   No, I don't remember that.
9        Q    Were you asked this question, "Vani did
10  that?", and did you give this answer, "Yes."?
11       A.   No.
12       Q    No, you weren't asked that question and
13  you didn't give that answer?
14       A.   I don't think I was asked that
15  question.
16       Q    Were you asked this question, "Did Vani
17  say anything when he showed you that?", and did
18  you give this answer, "He said 'Do you want some
19  money?  I said, no, you need that shit to get out
20  of town.'", were you asked that question and did
21  you give that answer?
22       A.   I did not give that answer.
23       Q    Were you asked that question?
24       A.   I don't remember.

1      Q      Were you asked this question, "Why did

2   you say that?", and did you give this answer,

3   "Because Zay had told me he had already shot a

4   person."?

5      A.     No, they didn't ask me that question.

6      Q      And you didn't give that answer either?

7      A.     No, I did not.

8      Q      Were you asked this question, "After

9   Vani and Zay came up to you while you were in the

10  Cutlass, did you eventually leave with Vani and

11  Zay?", and did you give the answer "Yes."?

12     A.     No, I don't remember that.

13  THE COURT:  Keep your voice up, sir.

14  THE WITNESS:

15     A.     I do not remember that one.

16  MS. RAVIN:

17     Q      Were you asked this, "And where did you

18  and Vani and Zay go to?", and did you give this

19  answer, "To my house."?

20     A.     No, I don't remember that one.

21     Q      Were you asked this question, "After

22  getting to your house, did you walk around the

23  area?", did you give this answer, "Yes."?

24     A.     No.

CCSAO XAVIER WALKER 001330

1    Q    Were you asked this question, "And did

2    you walk around the area?", and did you give this

3    answer, "Yes, I walked from Erie to Central to

4    Ohio."?

5    A.    No, I did not.

6    Q    Were you asked this question, "Did you

7    see anything unusual when you were walking around

8    the area?", and did you give this answer, "I seen

9    the police out there and I seen some blood on the

10    ground."?

11    A.    No, I did not go around that corner.

12    Q    I understand that.  The Court

13    understands that.  Everybody at the table

14    understands that.  Did you get asked that question

15    and did you give that answer?

16    A.    No.

17    Q    Were you asked this question, "Where

18    did you see the police?", and did you give this

19    answer, "On the right-hand side."?

20    A.    No, I do not remember that one either.

21    Q    Were you asked this question, "Of what

22    street?", and did you give this answer, "Ohio."?

23    A.    No.

24    Q    Were you asked this question, "What

1    were you thinking when you saw the police and the

2    blood there?", did you give this answer, "That is

3    when I believed that Jovanie was telling the

4    truth."?

5         A.   No, ma'am.

6         Q    Were you asked this question, "Now,

7    when you walked around the area, did you then go

8    back to your house?", and did you give this

9    answer, "Yes."?

10        A.   No, ma'am.

11        Q    Were you asked this question, "And did

12   you fall asleep then?", and did you give this

13   answer, "Yes."?

14        A.   No, ma'am.

15        Q    Were you asked this question, "The next

16   morning or later on that morning, did you have an

17   opportunity to wake up?", and you answered "They

18   woke me up."?

19        A.   No.

20        Q    Were you asked this question, "Who woke

21   you up when you say 'they'?", and did you give

22   this answer, "Vani woke me up."?

23        A.   No.

24        Q    Were you asked this question, "Was

1    anyone with Vani when he woke you up?", and did

2    you give this answer, "Zay."?

3         A.   No, ma'am.

4         Q    Were you asked this question, "Where do

5    you sleep at your house?", and did you give this

6    answer, "In the back room and they slept in the

7    front that night."?

8         A.   No, ma'am.

9         Q    Were you asked this question, "Was

10   anyone else in your room when Vani and Zay woke

11   you up?", did you give this answer, "No, there

12   wasn't."?

13        A.   I ain't say nothing.

14        Q    Were you asked this question, "When

15   Vani and Zay woke you up, did you have a

16   conversation with both of those guys?", and did

17   you give this answer, "Just Vani had told me that

18   we had to walk down the train station and we threw

19   the gun towards Chicago Avenue.'"?

20        A.   No.

21        Q    Were you asked this question, "When

22   Vani was telling you, was Zay present, as well?",

23   and did you give this answer, "Yes."?

24        A.   No.

CCSAO XAVIER WALKER 001333

1          Q     Were you asked this question, "Was he
2     saying anything?", and did you give this answer,
3     "No."?
4          A.    I don't remember that.  I don't
5     remember that one.
6          Q     Were you asked this question, "What was
7     he doing?", and did you give the answer "Like he
8     was stuck."?
9          A.    No, I don't remember that one either,
10    ma'am.
11         Q     Were you asked this question, "What was
12    he doing" -- Let me back up.
13              Were you asked this question, "Was he
14    saying anything?", and did you give the answer,
15    "No," meaning was Zay saying anything when he was
16    present when you were talking to Jovanie?
17         A.    I don't remember that day.
18         Q     Were you asked this question, "What was
19    he doing?", and did you give this answer, "Like he
20    was stuck."?
21         A.    Like I said I don't remember that day.
22    I don't remember that.
23         Q     Were you then asked the question,
24    "Stuck?", and did you give the answer, "Like he

1    was just still, like he couldn't say nothing out

2    of his mouth."?

3         A.    I don't remember saying that.

4         Q    Were you asked this question, "When

5    Vani said that they had walked down the railroad

6    tracks, he said something about walking down the

7    railroad tracks?", did you give this answer,

8    "Yes."?

9         A.    No.

10        Q    Were you asked this question, "What did

11   he say?", and did you give this answer, "He said

12   he threw the gun towards Chicago Avenue."?

13        A.    No.

14        Q    Were you asked this question "And did

15   Vani say who he was with when he did this?", and

16   did you give this answer, "He said him and Zay was

17   together."?

18        A.    No, ma'am.

19        Q    Were you asked this question, "Did Vani

20   tell you anything more as he related about the

21   incident the night before, the shooting?", and did

22   you give this answer, "Yes."?

23        A.    No, ma'am.

24        Q    Were you asked this question, "What did

1  Vani tell you?", and did you give this answer, "He

2  told me that him and the white person, they was

3  struggling over the money and the white person had

4  got out the driver's side of his car and hit

5  Vani.", did you answer that question?

6       A.    No, ma'am.

7       Q     Were you asked this question, "Did Vani

8  say anything about what he did after the white guy

9  hit him?", and did you give this answer, "He

10  struck him back."?

11       A.    No, ma'am.

12       Q     Were you asked this question, "And what

13  did Vani tell you next?", did you give this

14  answer, "Then he said the person had fell on the

15  ground and that's when he pulled out the .45."?

16       A.    No, ma'am.

17       Q     Were you asked this question, "That is

18  when who did that?", did you give this answer,

19  "Vani pulled out the .45 and shot him in the

20  head."?

21       A.    No, ma'am.

22       Q     Were you asked this question, "Did he

23  say why he shot the white guy in the head?", and

24  did you give this answer, "No."?

1      A.    No, I don't remember that.

2      Q     Were you asked this question, "Did he

3  say what he was doing in the first place with the

4  white guy, why he was with the white guy in the

5  first place?", and did you give this answer, "The

6  white person wanted some blows and heroin."?

7      A.    No, ma'am.

8      Q     Were you asked this question, "What was

9  Vani going to do when the white guy asked for the

10  blows?", and the answer was "Take the money."?

11      A.    No, ma'am.

12      Q     Were you asked this question, "Did Vani

13  tell you anything about that?", and did you give

14  this answer, "No."?

15      A.    No, I don't remember that.

16      Q     Were you asked this question, "He just

17  told you what happened afterwards?", and you gave

18  the answer "Yes.", did you give that answer in

19  response to that question?

20      A.    No, ma'am.

21      Q     Were you asked this question, "After

22  you had this conversation with Vani, at which

23  point Zay was also present, did those guys leave

24  your house?", and did you give this answer, "Zay

CCSAO XAVIER WALKER 001337

1   went one way and Vani went the other way.  They

2   had went to go get a pack of some heroin."?

3        A.   No, ma'am.

4        Q    Were you asked this question, "Have you

5   seen Vani or Zay since you talked to them after

6   they woke you up that morning?", and did you give

7   the answer, "No."?

8        A.   I don't remember that.

9        Q    Were you asked the question about

10  whether or not "you had the chance to speak with

11  an Assistant State's Attorney previously before

12  coming down and talking to me," meaning the male

13  State's Attorney, "is that correct?", and did you

14  give the answer, "Yes."?

15       A.   Yes.

16       Q    Were you asked the question "While you

17  were at the police station?", and did you give the

18  answer "Yes."?

19       A.   Yes.

20       Q    And were you asked the question, "And

21  that statement was written down in writing, is

22  that correct?", and you gave the answer "Yes."?

23       A.   Yes.

24       Q    Were you asked the question, "And you

1    could read and write English, is that correct?",

2    and you gave the answer "Yes.", true?

3        A.    True.

4        Q    You were asked the question "I am going

5    to show you what's been marked as People's Exhibit

6    No. 1, for identification, do you recognize this

7    document?", and you answered "Yes.", is that true?

8        A.    I don't remember that.

9        Q    Were you asked the question, "And what

10   do you recognize it to be?", and you answered, "To

11   be when I was at the police station around 11:30

12   and they was writing it down.", were you asked

13   that question and did you give that answer?

14       A.    No, I did not give that answer.

15       Q    Were you asked this question, "This is

16   the statement that they wrote down?", did you give

17   this answer, "Yes."?

18       A.    No, I don't remember that either.

19       Q    Were you asked this question, "Does the

20   statement appear to be in the same condition as it

21   was when it was written down?", and did you give

22   the answer, "Yes."?

23       A.    No, I don't remember that, ma'am.

24       Q    Were you asked the question, "Does your

SS-81
CCSAO XAVIER WALKER 001339

1    signature appear at the bottom of each page?", and

2    did you answer "Yes."?

3        A.    The ones that I seen at the time and I

4    was like yes.

5        Q    That was the question you were asked

6    and was that the answer you gave?

7        A.    Yes.  To certain papers I seen.

8        Q    Sir, my question is very specific.

9    Were you asked this question, "On each page does

10   your signature appear?", and did you give the

11   answer, "Yes."?

12       A.    Yes.

13       Q    Were you asked the question, "While you

14   were at the police station, did anyone threaten

15   you or promise you anything in return for this

16   statement that was given?", and did you give the

17   answer "No."?

18       A.    I ain't say nothing.  I did not say

19   nothing.

20       Q    You never answered that question?

21       A.    No, I did not.

22       Q    But that question was asked of you?

23       A.    No.

24       Q    The question was never asked?

SS-82
CCSAO XAVIER WALKER 001340

1          A.    No.

2          Q     Were you asked this question, "And how

3     did the police and State's Attorneys treat you

4     while you were at the police station?", did you

5     give this answer, "They fed me good.   I kept

6     cigarettes."?

7          A.    No.

8          Q     You weren't asked that question and you

9     did you give that answer?

10         A.    No, I did not.

11         Q     Were you asked this question, "Now, you

12    came down here this morning, is that correct?",

13    and you gave the answer, "Right.", were you asked

14    that question and did you give that answer?

15         A.    Say that again.

16         Q     "Now, you came down here this morning,

17    is that correct?," and the answer, "Right."?

18         A.    Yeah.

19         Q     "Question.   And you had an opportunity

20    to meet with me before you came here and testified

21    before the Grand Jury, is that correct?   Answer.

22    Yes.", were you asked that question and did you

23    give that answer?

24         A.    Yes.

CCSAO XAVIER WALKER 001341

1    Q    "Did I introduce myself to you as a

2    lawyer and State's Attorney but not your lawyer?

3    Answer.  Yes.", were you asked that question and

4    did you give that answer?

5    A.    I don't recall that one.

6    Q    "Question.  And did I explain to you

7    what a State's Attorney did?  Answer.  Yes.", were

8    you asked that question and did you give that

9    answer?

10    A.    I also don't recall that one either.

11    Q    "Question.  Since you have been down

12    here today, how have you been treated?  Answer.

13    Fairly.", were you asked that question and did you

14    give that answer?

15    A.    I did not give that answer.

16    Q    Were you asked that question?

17    A.    No, I did not.  No, I wasn't.

18    Q    "Question.  Has anyone threatened you

19    or promised you anything in return for your

20    testimony before the ladies and gentlemen of the

21    Grand Jury?  Answer.  No.", were you asked that

22    question and did you give that answer?

23    A.    Yes, I had gave that answer.

24    Q    "Question.  Are you under the influence

1    of any drugs or alcohol?  Answer.  No.", were you

2    asked that question and did you give that answer?

3        A.   No, I don't remember that question.

4    No, no, ma'am.

5        Q   "Question, were you under the influence

6    of any drugs or alcohol at the time that you gave

7    your statement at the police station?  Answer.

8    No.", were you asked that question and did you

9    give that answer?

10       A.   No, ma'am.

11       Q   Maurice, you said that you have been

12    incarcerated, what are you incarcerated for?

13       A.   Aggravated battery.

14       Q   Aggravated battery to who?

15       A.   Police officer.

16       Q   And you are serving time in the

17    Illinois Department of Corrections for that,

18    right?

19       A.   Yes.

20       Q   You said earlier that you got

21    threatened by these black detectives so you made

22    up a lie on Jovanie Long and Xavier Walker, right?

23       A.   Yes.

24       Q   What was the lie you made up on them?

1      A.   Basically half of this statement that's

2  on this paper right here (indicating).

3      Q   Okay.  Well, tell me what it was that

4  you lied about.

5      A.   Well, it was about the -- I told the

6  officers that that day that Jovanie Long and

7  Xavier Walker had a gun and they had shot

8  somebody.  That's what I told them.

9      Q   Okay.  Well, all the stuff that you

10 just said you never told the State's Attorneys in

11 the handwritten statement?

12     A.   No, I told the police that.

13     Q   You told the police that, but you never

14 told the State's Attorney that?

15     A.   No.

16     Q   Okay.  So you lied to the police but

17 you didn't lie to either of the State's Attorneys,

18 right, that's what you are telling the Judge,

19 correct?

20     A.   I only remember saying half of the

21 things that they had told me.

22     Q   Because all the things that are typed

23 in the Grand Jury testimony are the stuff that you

24 said isn't true, right, and you don't remember,

CCSAO XAVIER WALKER 001344

1    right?

2         A.    Right.

3         Q    So you don't remember saying anything

4    about Jovanie Long and Xavier Walker to any of the

5    State's Attorneys, right?

6         A.    Some semblance of that.

7         Q    "Semblance," is that the word you're

8    saying?

9         A.    Yeah.

10        Q    You saw this earlier, I believe it was

11   People's Exhibit 19-F, for identification, and you

12   said that was a picture of you, right?

13        A.    Yeah.

14        Q    And that's not your signature you said,

15   right?

16        A.    I do not write like that.

17        Q    Who took that picture of you?

18        A.    I don't even know when that occurred.

19        Q    You have no idea when they took that

20   picture?

21        A.    No, I do not.

22        Q    Well, you were there for the picture,

23   right?

24        A.    Yeah, I was there but I don't remember

1    the day, the time or nothing.

2         Q    That's a Polaroid photograph, right?

3         A.   Yeah.

4         Q    You know what a Polaroid photograph is,

5    right?

6         A.   Yeah.

7         Q    What is it?

8         A.   It's when a picture come out of the

9    camera.

10        Q    They take the picture and the picture

11   comes out instantaneously, right?

12        A.   Yeah.  Yeah.

13        Q    They don't have to go and get it

14   developed, right?

15        A.   No.

16        Q    By the way, there's no marks on you on

17   that picture, right?

18        A.   This picture -- Oh, I know that

19   picture.

20        Q    So you do know when it was taken.

21        A.   I know that picture is old.

22        Q    Why is it old?

23        A.   Because when I had a permanent in my

24   hair it was like around '98.

1    Q    So this picture is from 1998?

2    A.   Yeah.

3    Q    Do you know when in 1998?

4    A.   No, I do not.

5    MS. RAVIN:  I have no further questions,

6    Judge.

7    THE COURT:  Okay.  We're going to break for

8    lunch.  We'll be down for an hour.

9                (Whereupon a lunch recess was

10               taken in the proceedings.)

11        * * * * * * * * * * * * * *

12               (Whereupon the lunch recess

13               having concluded, the following

14               proceedings were held, to-wit:)

15   THE COURT:  Back on Long and Walker.

16        Mr. Wright, you remain under oath to

17   tell the truth, okay?

18   THE WITNESS:  Okay.

19   THE COURT:  Cross?

20   MR. CONNIFF:  Thank you, Judge.

21

22               CROSS EXAMINATION

23               BY

24               MR. CONNIFF:

SS-89
CCSAO XAVIER WALKER 001347

1      Q     Mr. Wright, you were home when you got

2  arrested?

3      A.    Yes, I was.

4      Q     And about what time of day was it?

5      A.    I think it was like 11:00 in the

6  morning.

7      THE COURT:  Keep your voice up.

8      THE WITNESS:

9      A.    11:00 in the morning.

10     MR. CONNIFF:

11     Q     And that was on May 27th of 2000?

12     A.    I don't remember what date it was.

13     Q     But it was -- Whatever day it was it

14  was about 11:00 in the morning?

15     A.    Yeah.

16     Q     And when you were arrested did the

17  police ask you if you wanted to go to Area #4 with

18  them?

19     A.    No, they did not.

20     Q     Did they give you any choice about

21  going to Area #4?

22     A.    I did not know that they was police

23  officers.

24     Q     But they physically put you into a car

1    and took you to Area #4?

2          A.    Yes, they did.

3          Q    And when you got to Area #4 they put

4    you in an interview room?

5          A.    They put me downstairs in the holding

6    cell first, then they took me -- like later on

7    that day they took me upstairs to the other area.

8          Q    All right.  And at the time that you

9    were at Area #4, did you believe that you were

10   free to leave Area #4 and go home if you wanted

11   to?

12         A.    Yes, I was.

13         Q    You believed that you could walk out of

14   Area #4 at any time and the police wouldn't stop

15   you?

16         A.    I thought I was 'cause I thought they

17   had just bumrushed my house for some drugs or

18   something.

19         Q    When you say you thought you was, what

20   are you referring to, what did you think?

21         A.    Well, they ain't find no drugs and I

22   was just going to leave a few hours from now.

23         Q    But you were in a holding cell?

24         A.    Yes.

CCSAO XAVIER WALKER 001349

1        Q    All right.  And you couldn't leave
2   then?

3        A.   Right.

4        Q    After they took you out of the holding
5   cell, did you go to an interview room?

6        A.   Yes, I did.

7        Q    And did you spend the night at Area #4
8   that night?

9        A.   Yes, I did.

10       Q    And was that in a holding cell or was
11  it in an interview room?

12       A.   It was an interview room.

13       Q    Inside the interview room could you
14  describe -- How did you spend the night there,
15  were you on a chair, a bench?

16       A.   On three chairs.

17       Q    Was there anyone in there with you?

18       A.   No, it wasn't.

19       Q    When you spent that night there, you
20  didn't go home that night?

21       A.   No, I did not.

22       Q    And did they tell you that night that
23  you could go home?

24       A.   No, they did not.

CCSAO XAVIER WALKER 001350

1       Q    And all of that day after they arrested

2   you at 11:00 and kept you at Area #4, detectives

3   were coming in and out of the room?

4       A.   Yes, they was.

5       Q    Talking to you?

6       A.   Yes, they was.

7       Q    And indicating to you that they thought

8   that you had knowledge about this murder?

9       A.   Yes, they did.

10      Q    And that you weren't telling them the

11  truth?

12     A.   I kept on telling them that I ain't

13  know who done it.

14     THE COURT:  Rephrase your question.

15     THE WITNESS:

16     A.   I kept on telling the officers that --

17  They kept on asking me --

18     MS. RAVIN:  I ask this be stricken.  There's

19  no question pending.

20     THE COURT:  All right.

21

22     MR. CONNIFF:

23     Q    Mr. Wright, when you went into Area #4

24  after you were taken to Area #4 by the detectives,

1    did you tell them the same thing you told the

2    Judge today about what you had been doing on May

3    the 12th and May the 13th of the year 2000?

4         A.   No.  They did not come right out with

5    that.

6         Q    All right.  But did you ever tell the

7    detectives that you were -- that you were home on

8    May the 13th, the night of May the 13th and that

9    Jovanie Long and Xavier Walker had come over, but

10   did not spend the night there?

11        A.   No, I did not.

12        Q    All right.  Now, the next day did you

13   spend that day at Area #4?

14        A.   Yes, I did.

15        Q    And were you in an interview room or in

16   a holding cell?

17        A.   Interview room.

18        Q    And did you spend all of the next day

19   at Area #4?

20        A.   Yes, I did.

21        Q    Now, backtracking to the previous day,

22   the day that you were brought down to Area #4, you

23   didn't sign that handwritten statement on that

24   day, did you?

CCSAO XAVIER WALKER 001352

1      A.   No, I did not.

2      Q    And you didn't sign a handwritten

3  statement on the next day, did you?

4      A.   No.

5      Q    So you were held the second day all day

6  at Area #4?

7      A.   Yes, I was.

8      MS. RAVIN:  Objection as to the form of the

9  question.

10      THE COURT:  I think -- Go ahead.

11      MR. CONNIFF:

12      Q    You were taken into custody one day at

13  about 11:00, right?

14      A.   Yes.

15      Q    And you spent all of that day and you

16  spent the night there, right?

17      A.   Yes.

18      MS. RAVIN:  Objection to the form of the

19  question.  I know Counsel keeps asking about

20  arrested and in custody, but the witness testified

21  that he thought he was free to go.

22      THE COURT:  Read back the question.

23                  (Whereupon the record was read

24                   back as follows:

1                      "Question.  You were taken into

2                      custody one day at about 11:00,

3                      right?

4                      Answer.  Yes.

5                      Question.  And you spent all of

6                      that day and you spent the

7                      night there, right?

8                      Answer.  Yes.")

9        THE COURT:  Rephrase your question.

10       MR. CONNIFF:

11       Q    You don't remember what date that was

12  you were taken into custody, right?

13       THE COURT:  That's the objection.

14       MS. RAVIN:  Objection, Judge.

15       MR. CONNIFF:

16       Q    Well, you indicated -- Eventually you

17  found out that the people who physically took you

18  from your home were police officers, correct?

19       A.   Yes, I did.

20       Q    And you didn't leave your home and go

21  to Area #4 with your consent, did you?

22       A.   No, I did not.

23       Q    All right.  So -- And the day that the

24  police officers took you without your consent to

CCSAO XAVIER WALKER 001354

1    Area #4 at about 11:00 a.m. you spent all of that

2    day at Area #4, correct?

3         A.    Yes, I did.

4         Q    And you spent that night at Area #4,

5    correct?

6         A.    Yes, I did.

7         Q    You did not sign any statement which

8    had been prepared by a State's Attorney on that

9    day, did you?

10        A.    No, I did not.

11        Q    The next day, the second day at Area

12   #4, you were in custody at Area #4 all day long,

13   weren't you?

14        A.    Yes.

15        Q    All right.  Did you make any attempt to

16   leave to go home on that day?

17        A.    I don't think so.  I don't remember.

18        Q    Well, let me ask you a question.  When

19   you were in the police station at Area #4, did you

20   think that you could walk out of police station

21   and go home?

22        A.    Yeah.  After a few hours, yes.

23        MS. RAVIN:  Objection.  Asked and answered.

24        THE COURT:  Asked and answered.  It is about

SS-97
CCSAO XAVIER WALKER 001355

1    the -- He said it again for the fourth time, "See,

2    because I'm a drug dealer and they didn't have any

3    drugs so I could leave."

4         MR. CONNIFF:  I understand, Judge.

5         Q    All right.  So you were there all day

6    the second day, right?

7         A.   Yes, I was.

8         Q    And you were all -- And at the end of

9    the second day you didn't sign any statement

10   prepared by a State's Attorney that night, did

11   you, you didn't, did you?

12        A.   No, I did not.

13        Q    And you spent that night at Area #4

14   also, didn't you?

15        A.   I think I stayed there seventy-two

16   hours, yes, I did.

17        Q    And the day after that you woke up that

18   day at Area #4 also, didn't you, you did, didn't

19   you, the next day?

20        A.   I don't remember.

21        Q    All right.  You didn't sign anything

22   that the State's Attorney handed you on the first

23   night, correct?

24        A.   No, I did not.

CCSAO XAVIER WALKER 001356

1    Q    You didn't sign anything the State's

2    Attorney handed you on the second night, correct?

3    A.    No.

4    Q    And, finally, at 10:30 at night on the

5    third night you signed this Petitioner's --

6    People's Exhibit 18, right?

7    A.    I did not sign all the papers.

8    Q    Parts of it?

9    A.    Yes.

10   Q    But it was on the third night at about

11   10:30 at night that this document or the pages of

12   this document were handed for to you sign,

13   correct?

14   A.    Yes, sir.

15   Q    At any time during the three days that

16   you were at Area #4 before People's Exhibit 18 was

17   presented to you, did any of the detectives

18   indicate to you that you might be charged with

19   this murder?

20   A.    Yes, they did.

21   Q    At any time while you were at Area #4,

22   did the detectives indicate to you that they were

23   going to talk to your mother?

24   A.    No, sir.

1       Q    Did they ever indicate to you that they

2  were going to talk to the other family members

3  that you indicated lived with you at that address?

4       A.   No, they did not.

5       MR. CONNIFF:  Judge, may I have a moment?

6       THE COURT:  Sure.

7       MR. CONNIFF:

8       Q    Now, after you signed the document that

9  the State's Attorney presented to you on the third

10  night at 10:30 at night, were you released to

11  leave then?

12       A.   No, I wasn't.

13       Q    And did you spend that night at Area

14  #4?

15       A.   Yes, I did.

16       Q    And it was the following morning that

17  you went to the Grand Jury, correct?

18       A.   Yes, sir.

19       Q    And you got to the Grand Jury because

20  of a ride that was given you by the detective,

21  right?

22       A.   Yes, sir.

23       Q    And before you went to the Grand Jury

24  that morning you talked to the detectives?

1    A.    Yes, sir.

2    Q    And the detectives went over that

3    document with you before you went in the Grand

4    Jury?

5    A.    No, they said something else.

6    Q    I'm sorry?

7    A.    They said something else.  They ain't

8    say nothing about the document.  They stated

9    that -- if I wouldn't go that my drug selling and

10   all that stuff they be locking my mother's foster

11   kids and stuff like that so I went ahead and left.

12   Q    Okay.

13   MR. CONNIFF:  I don't have anything else,

14   Judge.

15   THE COURT:  Greg?

16   MR. WILSON:  No questions.

17   THE COURT:  Redirect?

18   MS. RAVIN:  No questions.

19   THE COURT:  Thank you, sir.  You can step

20   down.

21        Who's next, State?

22   MS. RAVIN:  I can present two stipulations.

23   THE COURT:  Okay.

24   MS. RAVIN:  If called to testify Assistant

1    State's Attorney Thomas Mahoney, T-h-o-m-a-s,

2    M-a-h-o-n-e-y, would testify that he was an

3    Assistant State's Attorney assigned to the Felony

4    Review Unit on May 29, 2000; that at 10:30 p.m. he

5    memorialized in a handwritten format a seven-page

6    statement memorializing an oral conversation that

7    he had had with Maurice Wright, who he would

8    identify from the photograph in People's Exhibit

9    No. 19-F as that photograph truly and accurately

10   depicting Maurice Wright when he talked to him on

11   that date and time; that that photograph was taken

12   at the -- contemporaneous to the handwritten

13   statement and that Maurice Wright did, in fact,

14   sign that photograph, People's Exhibit No. 19-F,

15   for identification.

16         He would be shown People's Exhibit

17   No. 18, for identification, and he would identify

18   that as truly and accurately and being in the same

19   or substantially the same condition as when he

20   memorialized that handwritten statement; that his

21   signature, Detective Tony Bryezniak, star number

22   224 of the Sheriff's Police Department also signed

23   all of the pages of that seven-page handwritten

24   statement, as did Maurice Wright, that each

1  signature of Maurice Wright on each and every one

2  of those seven pages, including the two on the

3  last page, page seven, were, in fact, Maurice

4  Wright's signatures, and that they were done in

5  front of him and Detective Bryezniak; that the

6  handwritten statement contains some changes that

7  were made by the witness and some changes that

8  were made by Tom Mahoney as they were reviewing

9  the statement; that after he memorialized the

10 handwritten statement they went back and reviewed

11 each and every page of that statement, him, the

12 detective and the witness, Maurice Wright; that

13 Maurice Wright read that first handwritten

14 paragraph of that handwritten statement out loud

15 and showed that he did, in fact, and could, in

16 fact, read and write English; that Assistant

17 State's Attorney Mahoney had a conversation with

18 Maurice Wright where no police officers were

19 present, and during that conversation Maurice

20 Wright never told him that anybody had threatened

21 him, or threatened his mother or anybody else, and

22 that nobody had promised him anything with respect

23 to that handwritten statement, and that everything

24 in that handwritten statement is based on the

1     conversation he had with Maurice Wright; that

2     everything was written in the presence of Maurice

3     Wright and that nothing was written down that

4     Maurice Wright hadn't said.

5          THE COURT:  Does that conclude it?

6          MS. RAVIN:  Yes -- That People's Exhibit

7     19-A, B, C, D and E, for identification, were all

8     shown -- they were all shown to Maurice Wright and

9     they were all identified in and part of that

10    handwritten statement, which is People's Exhibit

11    No. 18, for identification.

12               So stipulated?

13         MR. CONNIFF:  Judge, we would stipulate that

14    if that witness were called to testify he would so

15    testify.

16         MR. WILSON:  So stipulated, Judge.

17         THE COURT:  Okay.  Thank you.

18               Next stipulation.

19         MS. RAVIN:  That if called to testify Luke

20    Sheridan, L-u-k-e, S-h-e-r-i-d-a-n, would testify

21    that on May 30, 2000, he was an Assistant State's

22    Attorney assigned to the Grand Jury Unit; that he

23    presented a witness by the name of Maurice Wright

24    to the Grand Jury and that he asked the questions

SS-104
CCSAO XAVIER WALKER 001362

1   and that Maurice Wright gave the answers that are

2   contained within People's Exhibit No. 20, for

3   identification, which is a Grand Jury transcript

4   of the John Doe investigation relating to the

5   facts involved in this case.

6          He would identify all of the pages of

7   the Grand Jury transcript.  It is thirteen pages

8   of questions and answers and one page of Annette,

9   Falkis, F-a-l-k-i-s, her certified accuracy as

10  part of that transcript.

11         He would identify the photograph in

12  People's Exhibit No. 19-F, for identification, as

13  the photograph of Maurice Wright who was the

14  witness he put on in front of the Grand Jury.

15         He would further identify People's

16  Exhibit No. 18, for identification, and People's

17  Exhibits 19-A through E, for identification as the

18  handwritten statement and the photographs that are

19  attached to that handwritten statement as -- in

20  the same or substantially the same condition as

21  when he showed them to the witness, Maurice

22  Wright, as he presented him to the Grand Jury on

23  May 30, 2000; that People's Exhibit No. 20, for

24  identification, that would be identified as truly

1   and accurately representing all of the questions

2   he asked and all of the answers that Maurice

3   Wright gave before the Grand Jury on that 30th day

4   of May, 2000.

5          So stipulated?

6      MR. CONNIFF: Judge, we would stipulate that

7   if that witness were called he would so testify.

8      MR. WILSON: So stipulated.

9      MS. RAVIN: We would ask that People's

10   Exhibits 18 and 20, that their identification

11   marks be stricken and they be made part of the

12   record and published to the Court.

13      THE COURT: Any objection, Mr. Conniff?

14      MR. CONNIFF: Judge, we would object to

15   their substantive admissibility. We have no

16   objection to it being used as impeachment. We

17   would object to it being admitted substantively.

18      THE COURT: Mr. Wilson?

19      MR. WILSON: We will join in that objection,

20   Judge.

21      THE COURT: State?

22      MS. RAVIN: Pursuant to the --

23      THE COURT: It's 115-10.

24      MS. RAVIN: That they be admitted because

1    while it is not -- it was not viewed by the

2    witness, he did testify under oath at the Grand

3    Jury of the third party admissions by Jovanie Long

4    and the admission by Xavier Walker, who was

5    present when Jovanie Long made those statements,

6    and Xavier Walker did not deny any of those facts,

7    that they be admitted pursuant to 115-10.1 as

8    substantive evidence.

9         THE COURT:  Any response, Mr. Conniff?

10        MR. CONNIFF:  No, Judge.  We stand on the

11   objection.

12        MR. WILSON:  We have nothing further, Judge.

13        MS. RAVIN:  I believe if the witness

14   testifies under oath in court as to either the

15   making of this statement at that time it would be

16   admissible.

17        Judge, I believe that even though the

18   witness admits to some of the statements and

19   denies most of them, he does admit to signing the

20   handwritten statement and he does admit to

21   testifying in front of the Grand Jury.  And the

22   stipulations that were just entered into were Luke

23   Sheridan's testimony and A.S.A. Mahoney's

24   testimony would then beget the publishing as

1    substantive evidence.

2         THE COURT:  I have no question that 115-10

3    permits introduction of the statement, as well as

4    the Grand Jury testimony as substantive evidence,

5    but there is something -- You alluded to third

6    party admissions and one of the Defendants being

7    present?

8         MS. RAVIN:  Correct.

9         THE COURT:  And not responding?

10        MS. RAVIN:  Correct.

11        THE COURT:  What is it that you said?

12        MS. RAVIN:  It's an admission by his not

13   denying the facts that were said in front of him

14   as him being a part of that -- of what happened,

15   that that is, in fact, an admission.

16        THE COURT:  That's Mr. Walker?

17        MS. RAVIN:  Correct.  If you want me to

18   further elaborate I can.

19        THE COURT:  No, no, no, no, no.  I'm trying

20   to recall the testimony.

21        MR. CONNIFF:  Judge, in addition to that I

22   believe there's reference in the handwritten

23   statement to a statement allegedly made by

24   Mr. Walker, which I don't think would be

1    admissible against Mr. Long.

2        THE COURT:  State, I take it you are making

3    reference to the alleged conversation between

4    Mr. Long and Mr. Wright when they pull up in a

5    car?

6        MS. RAVIN:  Correct.  The -- Well, all of

7    it, but, yes, there is an initial conversation

8    where Xavier Walker says "That mother fucker just

9    shot another mother fucker."  And then there is

10   another conversation later on where Jovanie Long

11   details everything that happened in front of

12   Xavier Walker, and it is an admission because at

13   that point in time were those facts not to be true

14   a reasonable person would deny that to have taken

15   place, which Mr. Walker did not do to Maurice

16   Wright.  That is why it would be considered an

17   admission for both of those reasons.

18       THE COURT:  All right.  The Defendant's

19   objection is overruled.  There is still -- Well,

20   that's all I'll say.  The objection is overruled.

21       MS. RAVIN:  All right.  Thank you.  We will

22   just ask that prior to the Court making any ruling

23   that the Court read through the handwritten

24   statement and the Grand Jury testimony, unless you

1    wish me to publish them right now.

2            THE COURT:  Go right ahead, publish them.

3            MR. COLEMAN:  "In regarding the John Doe

4    investigation, Grand Jury number 852, before the

5    Grand Jury of Cook County, May 2000.

6            Transcript of testimony taken in the

7    above-entitled matter on the 30th day of May, year

8    2000.

9            Present:  Mr. Luke Sheridan, Assistant

10   State's Attorney.

11           Reported by Annette Falkis, certified

12   shorthand reporter.

13           List of witnesses:  Maurice Wright.

14           The Foreperson:  Would you raise your

15   right hand, please?

16           Witness duly sworn.

17           Mr. Sheridan:  I am Assistant State's

18   Attorney Luke Sheridan of the Homicide Sex Unit.

19   I am appearing on Grand Jury number 852, which is

20   a John Doe investigation relating to the murder of

21   Marek Majdak, which occurred on May 13, the year

22   2000.

23           We are not seeking an Indictment at

24   this time.

SS-110

1          At this time I ask leave to call

2   Maurice Wright.

3          The Grand Jury does have the right to

4   subpoena and question any person against whom the

5   State's Attorney is seeking a Bill of Indictment,

6   or any other person, and to obtain and examine any

7   documents or transcripts relevant to the matter

8   being prosecuted by the State's Attorney.

9          Maurice Wright, having been first duly

10  sworn was examined and testified as follows:

11         Examination by Mr. Sheridan:

12         Please state your name for the record.

13  That was the question.

14         Answer.  Maurice Wright, last name

15  W-r-i-g-h-t.

16         Question.  And how old are you?

17         Answer.  I am twenty.

18         Question.  And what is your date of

19  birth?

20         Answer.  ████████████████

21         Question.  Where do you live?

22         Answer.  4653 West Erie.

23         Question.  Who do you live with

24  there -- or who do you live there with?

1                    I'm sorry.

2                    Answer.  My mother and sister.

3                    Question.  What's your mother's name?

4                    Answer.  Mary Curry.

5                    Question.  And, Maurice, did you

6       graduate high school?

7                    Answer.  Yes.

8                    Question.  What high school was that?

9                    Answer.  Manley.

10                   Question.  I am going to direct your

11      attention to the early morning hours of May 13,

12      the year 2000, and I am going to ask you

13      specifically sometime between 1:30 and 2:00, were

14      you sitting in a car outside of a friend of yours,

15      Bubba's house?

16                   Answer.  Yes.

17                   Question.  And as you were sitting in

18      that car, did anybody drive up to you?

19                   Answer.  Yes.

20                   Question.  And at that time that the

21      vehicle drove up, did you know who was in the car?

22                   Answer.  No.

23                   Question.  Did anyone get out of the

24      car and approach you?

```
 1                   Answer.  Yes.

 2                   Question.  Did you see who that was?

 3                   Answer.  Yes.

 4                   Question.  Who was it?

 5                   Answer.  Zay.

 6                   Question.  Are you referring to Xavier?

 7                   Answer.  Yes.

 8                   Question.  Do you know Xavier's last

 9     name?

10                   Answer.  No.

11                   Question.  Do you know his last name to

12     be Walker?

13                   Answer.  I am not sure.

14                   Question.  You are not sure?

15                   Answer.  Right.

16                   Question.  When Zay approached you was

17     he alone or was he -- or was anyone with him?

18                   Answer.  He was with Jovanie.

19                   Question.  And Jovanie, do you know

20     Jovanie's last name?

21                   Answer.  No.

22                   Question.  And does Jovanie go by any

23     other nicknames?

24                   Answer.  G-Man.
```

CCSAO XAVIER WALKER 001371

1        Question.  Do you ever call him Vani?

2        Answer.  Yes.

3        Question.  So Vani would be a nickname

4   of his?

5        Answer.  Yes.

6        Question.  When Zay came up to your

7   car, did he open the car or how did he talk to

8   you?

9        Answer.  He opened the car and woke me

10  up and said 'This crazy mother fucker just shot a

11  mother fucker'

12       Question.  Was he pointing to anybody

13  when he said that?

14       Answer.  Yes.

15       Question.  Do you know who he was

16  referring to when he said that?

17       Answer.  That's when Vani had pulled

18  him up and said 'Let me holler at my man.'

19       Question.  So Zay came up to you and

20  started talking to you?

21       Answer.  Yes.

22       Question.  When Zay said 'This crazy

23  mother fucker just shot a mother fucker,' what did

24  Vani do?

1          Answer.  Pulled him up out of the car.

2          Question.  Out of what?

3          Answer.  The car.

4          Question.  Out of the car that you were

5     in?

6          Answer.  Yes.

7          Question.  What did Vani do after he

8     did that?

9          Answer.  He showed --

10          I'm sorry.  Strike that.

11          He said -- He showed me the money and

12     showed me a hundred and two fifties.

13          Question.  Vani did that?

14          Answer.  Yes.

15          Question.  Did Vani say anything when

16     he showed you that?

17          Answer.  He said 'Do you want some

18     money?'

19          Again an answer.  I said 'No, you need

20     that shit to get out of town.'

21          Question.  Why did you say that?

22          Answer.  Because Zay had told me he had

23     already shot a person.

24          Question.  After Vani and Zay came up

SS-115
CCSAO XAVIER WALKER 001373

1    to you while you were in the Cutlass, did you

2    eventually leave with Vani and Zay?

3                 Answer.  Yes.

4                 Question.  And where did you and Vani

5    and Zay go to?

6                 Answer.  To my house.

7                 Question.  After getting to your house,

8    did you walk around the area?

9                 Answer.  Yes.

10                Question.  And did you walk around the

11   area?

12                Answer.  Yes.  I walked from Erie to

13   Central to Ohio.

14                Question.  Did you see anything unusual

15   when you were walking around the area?

16                Answer.  I seen the police out there

17   and I seen some blood on the ground.

18                Question.  Where did you see the

19   police?

20                Answer.  On the right-hand side.

21                Question.  Of what street?

22                Answer.  Ohio.

23                Question.  What were you thinking when

24   you saw the police and the blood there?

SS-116
CCSAO XAVIER WALKER 001374

1        Answer.   That is when I believed that

2    Jovanie was telling the truth.

3        Question.   Now, when you walked around

4    the area, did you then go back to your house?

5        Answer.   Yes.

6        Question.   And did you fall asleep

7    then?

8        Answer.   Yes.

9        Question.   The next morning or later on

10    that morning, did you have an opportunity to wake

11    up?

12        Answer.   They woke me up.

13        Question.   Who woke you up when you say

14    'they'?

15        Answer.   Vani woke me up.

16        Question.   Was anyone with Vani when he

17    woke you up?

18        Answer.   Zay.

19        Question.   Where did you sleep at your

20    house?

21        Answer.   In the back room and they

22    slept in the front that night.

23        Question.   Was anyone else in your room

24    when Vani and Zay woke you up?

1          Answer.  No, there wasn't.

2          Question.  When Vani and Zay woke you

3     up, did you have a conversation with both of those

4     guys?

5          Answer.  Just Vani had told me that we

6     had to walk down the train station, and we threw

7     the gun towards Chicago Avenue.

8          Question.  When Vani was telling you,

9     was Zay present, as well?

10         Answer.  Yes.

11         Question.  Was he saying anything?

12         Answer.  No.

13         Question.  What was he doing?

14         Answer.  Like he was stuck.

15         Question.  Stuck?

16         Answer.  Like he was just still, like

17    he couldn't say nothing out of his mouth.

18         Question.  When Vani said that they had

19    walked down the railroad tracks, he said something

20    about walking down the railroad tracks?

21         Answer.  Yes.

22         Question.  What did he say?

23         Answer.  He said he threw the gun

24    towards Chicago Avenue.

CCSAO XAVIER WALKER 001376

1    Question.  And did Vani say who he was
2  with when he did this?
3    Answer.  He said him and Zay was
4  together.
5    Question.  Did Vani tell you anything
6  more as he related about the incident the night
7  before, the shooting?
8    Answer.  Yes.
9    Question.  What did Vani tell you?
10    Answer.  He told me that him and the
11  white person, they was struggling over the money
12  and the white person had got out the driver's side
13  of his car and hit Vani.
14    Question.  Did Vani say anything about
15  what he did after the white guy hit him?
16    Answer.  He struck him back.
17    Question.  And what did Vani tell you
18  next?
19    Answer.  Then he said the person had
20  fell on the ground and that's when he had pulled
21  out the .45.
22    Question.  That is when who did that?
23    Answer.  Vani pulled out the .45 and
24  shot him in the head.

1          Question.  Did he say why he shot the
2     white guy in the head?
3          Answer.  No.
4          Question.  Did he say what he was doing
5     in the first place with the white guy, why he was
6     with the white guy in the first place?
7          Answer.  The white person wanted some
8     blows and heroin.
9          Question.  What was Vani going to do
10    when the white guy asked for the blows?
11         Answer.  Take the money.
12         Question.  Did Vani tell you anything
13    about that?
14         Answer.  No.
15         Question.  He just told you what
16    happened afterwards?
17         Answer.  Yes.
18         Question.  After you had this
19    conversation with Vani at which point Zay was also
20    present, did those guys leave your house?
21         Answer.  Zay went one way and Vani went
22    the other way.  They had went to go get a pack of
23    some heroin.
24         Question.  Have you seen Vani or Zay

CCSAO XAVIER WALKER 001378

1   since you talked to them after they woke you up

2   that morning?

3               Answer.  No.

4               Question.  Now, Maurice, you had a

5   chance to speak with an Assistant State's Attorney

6   previously before coming down and talking to me,

7   is that correct?

8               Answer.  Yes.

9               Question.  While you were at the police

10  station?

11              Answer.  Yes.

12              Question.  And that statement was

13  written down in writing, is that correct?

14              Answer.  Yes.

15              Question.  And you can read and write

16  English, is that correct?

17              Answer.  Yes.

18              Question.  I am going to show you

19  what's been marked as People's Exhibit No. 1, for

20  identification, do you recognize this document?

21              Answer.  Yes.

22              Question.  And what do you recognize it

23  to be?

24              Answer.  To be when I was at the police

1    station around 11:30 and they was writing it down.

2         Question.  There is the statement that

3    you -- I'm sorry.  Strike that question.

4         There is the statement that they wrote

5    down?

6         Answer.  Yes.

7         Question.  Does this statement appear

8    to be in the statement condition as it was when it

9    was written down?

10        Answer.  Yes.

11        Question.  Does your signature appear

12   at the bottom of each page?

13        Answer.  Yes.

14        Question.  On each page does your

15   signature appear?

16        Answer.  Yes.

17        Question.  While you were at the police

18   station, did anyone threaten you or promise you

19   anything in return for this statement that was

20   given?

21        Answer.  No.

22        Question.  And how did the police and

23   State's Attorneys treat you while you were at the

24   police station?

1      Answer.   They fed me good.   I kept

2  cigarettes.

3      Question.   Now, you came down here this

4  morning, is that correct?

5      Answer.   Right.

6      Question.   And you had an opportunity

7  to meet with me before you came here and testified

8  before the Grand Jury, is that correct?

9      Answer.   Yes.

10      Question.   Did I introduce myself to

11  you as a lawyer an State's Attorney but not your

12  lawyer?

13      Answer.   Yes.

14      Question.   And did I explain to you

15  what a State's Attorney did?

16      Answer.   Yes.

17      Question.   Since you have been down

18  here today, how have you been treated?

19      Answer.   Fairly.

20      Question.   Has anyone threatened you or

21  promised you anything in return for your testimony

22  before the ladies and gentlemen of the Grand Jury?

23      Answer.   No.

24      Question.   Are you under the influence

1    of any drugs or alcohol?

2            Answer.  No.

3            Question.  Were you under the influence

4    of any drugs or alcohol at the time that you gave

5    your statement at the police station?

6            Answer.  No.

7            Witness excused."

8       MS. RAVIN:  Publication of the handwritten

9    statement:

10            "Statement of Maurice Wright:

11            Taken May 29, 2000, at 10:30 p.m., at

12    Area 4, Violent Crimes, 3151 West Harrison.

13            Present, A.S.A. Thomas Mahoney,

14    Detective Tony Bryezniak, #224, Sheriff's Police.

15            This statement taken regarding the

16    robbery and fatal shooting of Marek Majdak,

17    M-a-j-d-a-k, which occurred on May 13, 2000, at

18    1:00 a.m. at 4721 West Ohio, Chicago, Illinois.

19            Page one of seven" is written in the

20    side and a pre-printed typed statement is crossed

21    out, which would be commonly called the Miranda

22    Warnings.

23            The handwritten statement begins:

24            "After being advised that Assistant

SS-124

1    State's Attorney Thomas Mahoney is a lawyer and a

2    prosecutor and not his lawyer or Jovanie Long's

3    lawyer, Maurice Wright agreed to give the

4    following statement, which is a summary and not

5    word for word.

6           Maurice Wright states that he is twenty

7    years old and his birthday is July 15, 1979.

8           Maurice Wright states that he graduated

9    from Manley High School in Chicago.

10          Maurice Wright states that he can read

11   and write English.

12          Maurice Wright states that he lives at

13   4653 West Erie in Chicago with his mother, Mary

14   Curry, with his three brothers and three sisters.

15          Maurice Wright states that on May 11,

16   2000, he was at his house in the basement playing

17   007 video game with Jovanie Long, who he calls

18   Vani, Boss Hog, Shakey and two girls named Trina

19   and one girl whose name he doesn't know.

20          Maurice Wright states that they were in

21   his basement around 11:30 p.m. playing 007 video

22   game.

23          Maurice Wright states that he is a New

24   Breed gang member.

1       Maurice Wright states that Vani is a

2   member of the Imperial Insane Vicelords and Shakey

3   is a member of the Insane Imperial Vicelords or

4   Imperial Insane Vicelords.

5       Maurice Wright states that Exhibit A is

6   a photo of Jovanie Long or Vani and Exhibit B is a

7   photo of Shakey.

8       Maurice Wright states that while they

9   were playing video games there was a conversation

10  about how they used to shoot at other gangs and

11  get stars.

12      Maurice Wright states that Vicelords

13  get stars for killing other people.

14      Page three of seven:

15      Maurice Wright states that Shakey said

16  he had all five of his stars.

17      Maurice Wright states that Vani said he

18  didn't have any stars.

19      Maurice Wright states that when Vani

20  said this, everyone started to laugh at Vani.

21      Maurice Wright states that this made

22  Vani mad and Vani said 'Fuck y'all.'

23      Maurice Wright states that he left the

24  house to go to Melvin's house to look for some

SS-126

1    weed.

2              Maurice Wright states that Vani and

3    Trina stayed at his house all night.

4              Maurice Wright states that he left his

5    house on and off on May 12, 2000, and saw his

6    friend, Bubba, on Superior and Kilpatrick.

7              Maurice Wright states that Bubba was

8    driving a gray Cutlass and there was a girl in the

9    car.

10             Maurice Wright states that they dropped

11   this girl off at Erie and Cicero and picked up

12   another girl at Erie and Cicero by a school.

13             Maurice Wright states that they drove

14   to Bubba's house just off Laramie.

15             Maurice Wright states --

16             page four of seven --

17             that he went into Bubba's house and had

18   sex with the girl.

19             Maurice Wright states that after he

20   finished having sex he told Bubba and Bubba told

21   him to wait in the car.

22             Maurice Wright states that he went back

23   to the gray Cutlass.

24             Maurice Wright states that he was in

CCSAO XAVIER WALKER 001385

1    the gray Cutlass at about 1:00 or 2:00 a.m. on May

2    13, 2000.

3                    Maurice Wright states that Vani and Zay

4    pulled up in a dark Taurus.

5                    Maurice Wright states that Zay said,

6    quote, 'This crazy mother fucker just shot a

7    mother fucker,' unquote.

8                    Maurice Wright states that Vani pulled

9    Zay out of the car.

10                   Maurice Wright states that Vani said,

11   quote, 'Guess what I got,' unquote, and Vani

12   showed him a $100 and two $50 bills.

13                   Maurice Wright states Vani asked him if

14   he wanted any money, and Maurice told Vani he

15   needed that money to get out of town.

16                   Maurice Wright states that Vani cried

17   and hugged him.

18                   Maurice Wright states that him, Zay and

19   Vani --

20                   page five of seven --

21                   him, Zay and Vani got into the Taurus

22   and drove to Maurice Wright's house on Erie.

23                   Maurice Wright states that Vani and Zay

24   stayed at his house and Maurice walked from his

SS-128
CCSAO XAVIER WALKER 001386

1     house to Cicero and Ohio, where he saw police and

2     saw blood on the sidewalk.

3             Maurice Wright states that he walked

4     back home and went in the house and walked in the

5     house were Vani and Zay.

6             Maurice Wright states they all went to

7     sleep.

8             Maurice Wright states that Vani and Zay

9     woke him up around 11:00 a.m. on May 13, 2000.

10             Maurice Wright states that Vani told

11     him that he threw the gun down on railroad tracks

12     by Chicago Avenue.

13             Maurice Wright states that Vani told

14     him Zay was with him when he threw the gun on the

15     tracks.

16             Maurice Wright states that Vani told

17     him about the shooting of the white guy early in

18     the morning of May 13, 2000.

19             Maurice Wright states Vani said that

20     the white guy pulled in a van and asked for --

21             page six of seven --

22             'blows,' in quotes.

23             Maurice Wright states that 'blows,' in

24     quotes, is a street term for heroin.

CCSAO XAVIER WALKER 001387

1          Maurice Wright states that Vani told
2     him that Vani grabbed money out of the white guy's
3     hand.
4          Maurice Wright states Vani said he told
5     the white guy, quote, 'Fuck you, vic,' unquote.
6          Maurice Wright states that Vani told
7     him the white guy got out of the van and swung on
8     Vani.
9          Maurice Wright states that Vani told
10    him he punched the white guy and knocked him down.
11         Maurice Wright states that Vani told
12    him he pulled out a .45 automatic pistol and shot
13    the guy once in the head.
14         Maurice Wright states that Zay was
15    present for this entire conversation.
16         Maurice Wright states that Exhibit C is
17    a photo of Zay.
18         Maurice Wright states that he has been
19    treated well by the police and by Assistant
20    State's Attorney Mahoney.
21         Maurice Wright states that he smoked
22    cigarettes and used the washroom when he needed
23    to.
24

CCSAO XAVIER WALKER 001388

1        Maurice Wright states that he slept
2   whenever he wanted to while he has been at the
3   police station.
4        Maurice Wright states that he has been
5   given food to eat and pop to drink at the police
6   station.
7        Maurice Wright states that nobody
8   promised --
9        page seven of seven --
10       him anything in exchange for this
11  statement and he is giving this statement
12  voluntarily.
13       Maurice Wright states that nobody
14  threatened him or abused him in any way.
15       Maurice Wright states that he is free
16  from the effects of drugs and alcohol.
17       Maurice Wright states Exhibit D is a
18  photo of Shakey and Exhibit E is a photo of Boss
19  Hog.
20       Maurice Wright states that he read --
21  he can read and write English and demonstrated
22  this by reading the first paragraph of page one
23  aloud to A.S.A. Mahoney.
24

1          Maurice Wright states that A.S.A.

2     Mahoney then read the rest of this seven-page

3     statement aloud to him.

4          Maurice Wright states that he signed

5     each page and A.S.A. Mahoney and Detective

6     Bryezniak signed each page.

7          Maurice Wright states that he made any

8     changes and corrections that he wanted to make."

9          That would conclude the publishing of

10    the handwritten statement.

11         Judge, before I put on my last witness

12    for the day, can I have a few-minute break?

13         THE COURT:  Sure.

14              (Whereupon a brief recess was

15               held, after which the following

16               proceedings were had, to-wit:)

17         MR. COLEMAN:  Your Honor, the People will

18    call Detective Pietryla.

19              (Whereupon Detective Michael

20               Pietryla was first duly sworn.)

21         THE COURT:  Go ahead.

22         MR. COLEMAN:  Thank you.

23

24

CCSAO XAVIER WALKER 001390

1          DETECTIVE MICHAEL PIETRYLA,

2     called as a witness on behalf of the People of the

3     State of Illinois, having been first duly sworn,

4     was examined and testified as follows:

5               DIRECT EXAMINATION

6               BY

7               MR. COLEMAN:

8          Q     Detective, I would ask you state your

9     full name spelling your last name, star number and

10    unit of assignment.

11         A     Detective Michael Pietryla,

12    P-i-e-t-r-y-l-a, #21209.

13         Q     And where are you assigned at this

14    time, Detective?

15         A     Area #4, Homicide.

16         Q     I'm going to direct your attention to

17    May 19th of the year 2000, where were you assigned

18    on that day?

19         A     Area #4, Homicide.

20         Q     Did you receive an assignment regarding

21    a homicide?

22         A     Yes, I did.

23         Q     What was that assignment?

24         A     Follow-up investigation of the homicide

1    of Marek Majdak.

2         Q    As a result of that, what did you do,

3    if anything, on May 19th of 2000?

4         A.   We traced the victim's movements for

5    the day from the time he left his home, conducted

6    interviews with co-workers and we found out that

7    he left work and went to several bars. And we

8    conducted interviews of waitresses and bartenders

9    there.

10        Q    Detective, on May 22nd and May 23rd of

11   the year 2000, did you continue your investigation

12   of the homicide of Marek Majdak?

13        A.   Yes, I did.

14        Q    And what steps did you take regarding

15   that on those dates?

16        A.   I believe we went back and we

17   interviewed the family of the victim to verify

18   what time he left from work, what time he usually

19   came home.

20        Q    And during your investigation you were

21   working with other detectives that were assigned

22   to Area #4, Violent Crimes, is that correct?

23        A.   That's correct.

24        Q    And during the course of your

1    investigation, did the name of Yvette Hill come

2    up?

3          A.   Yes, it did.

4          Q    Were there any other names that came

5    up?

6          A.   Yes.  Yvette Anderson.

7          Q    And as a result of those names coming

8    up, what, if anything, did you do, Detective?

9          A.   We had information that they are known

10   prostitutes from the area of Cicero --

11         MR. CONNIFF:  Judge, there would be an

12   objection on hearsay.

13         THE COURT:  Sustained.

14         MR. COLEMAN:

15         Q    Based on the information you received,

16   what did you do, Detective?

17         A.   We contacted Yvette Hill and Yvette

18   Anderson.

19         Q    And did you speak to both of those

20   individuals?

21         A.   Yes, we did.

22         Q    And as a result of that, what did you

23   do next?

24         A.   We were given the name of --

1        MR. CONNIFF:   Objection.   Hearsay.

2        THE COURT:   I'll reserve ruling.   It may

3    qualify as course of police conduct.

4        MR. COLEMAN:

5        Q    What did you do after you spoke to

6    Yvette Anderson an Yvette Hill?

7        A    We were given the name of Red and

8    Darnell as possible offenders in this homicide.

9        Q    And as a result of that, did you

10    investigate those names?

11        A    Yes.   We ran the names through our

12    nickname files and came up with about a thousand

13    hits on each name.

14        Q    And with that thousand did you continue

15    to investigate those?

16        A    Yes, we did.

17        Q    What did you do?

18        A    We tried to narrow down the scope for

19    the location of where the murder occurred for

20    possible persons named Red and Darnell.

21        Q    And what was the result?

22        A    We continued to do that, and we went

23    back to the location of Cicero to talk to some

24    more street whores to see if they knew who Red and

CCSAO XAVIER WALKER 001394

1    Darnell was.

2         Q    Did that turn up anything?

3         A.   One of the street whores on Cicero had

4    told Detective Sanders that she knew -- had some

5    information --

6         MR. WILSON:  Objection.

7         MR. CONNIFF:  Judge, objection.  Hearsay.

8         MR. WILSON:  Hearsay.

9         THE COURT:  Sustained.

10        MR. COLEMAN:

11        Q    After you talked to these prostitutes

12   on Cicero, what did you do after that, Detective?

13        A.   We were -- We continued the

14   investigation and we were given information that a

15   possible girlfriend of one of the offenders, her

16   name and her address.

17        Q    Okay.  And was that on approximately

18   May 25th of 2000?

19        A.   Yes.

20        Q    And what was the name of the

21   individual?

22        A.   Hershula Byrd.

23        Q    And did she have any relationship to

24   either of these Defendants?

```
 1          A.    Yes, she did.

 2          Q    What was the relationship?

 3          A.    She was the girlfriend of Jovanie Long.

 4          MR. CONNIFF:  Judge, again, I object and

 5   move to strike all of the substantive.  This is

 6   all hearsay.

 7          THE COURT:  Sustained.  It will be stricken.

 8          MR. COLEMAN:

 9          Q    As a result of your conversation with

10   Hershula, H-e-r-s-h-u-l-a, Byrd, B-y-r-d, did you

11   receive some information from her, without telling

12   what you received?

13          A.    Yes, we did.

14          Q    As a result of that, did you learn any

15   names, without saying the names?

16          A.    Yes, we did.

17          Q    As a result of that information on

18   May 28th of the year 2000, what was done as part

19   of the investigation?

20          A.    We had received information that one of

21   the --

22          MR. CONNIFF:  Objection.  Hearsay.

23          MR. COLEMAN:

24          Q    Without saying what the information
```

1    was, what did you do as a result of the
2    information?
3        A.    We proceeded to an address on West
4    Potomac.
5        Q    And was that 5431 West Potomac?
6        A.    Yes, it was.
7        Q    And when you went there, who were you
8    looking for?
9        A.    We were looking for Xavier Walker.
10       Q    Who did you go to that address with?
11       A.    Detective Bryezniak, Detective Sanders
12   and Detective Wright.
13       Q    When you arrived at that address please
14   tell the Court what happened.
15       A.    When we arrived at the address we had
16   seen Xavier Wright walking down the stairs of that
17   address --
18       Q    Xavier Walker?
19       A.    Yes.
20       Q    Do you see the person in court here
21   today that you refer to as Xavier Walker?
22       A.    Yes, I do.
23       Q    Can you please point to him and
24   describe an article of clothing?

1      A.    He is wearing the Cook County outfit

2   with the white gym shoes sitting right next to the

3   black gentlemen (indicating).

4      MR. COLEMAN:  May the record reflect the

5   in-court identification of the Defendant, Walker?

6      THE COURT:  It shall.

7      MR. COLEMAN:

8      Q    Once you saw Defendant, Walker, what

9   did you see him doing?

10     A.    He was walking down the stairs of the

11   residence.  We announced that we were the police.

12   He started to run.

13     Q    What did he do?

14     A.    He ran.

15     Q    And which direction did he run?

16     A.    I think he ran northbound.

17     Q    And what happened then?

18     A.    Detective Wright was at the end of the

19   block, and as Walker got close Wright grabbed him

20   and handcuffed him.

21     Q    After he was handcuffed what did you do

22   next, Detective?

23     A.    We took him and placed him in the back

24   of our unmarked car, and I advised him of his

CCSAO XAVIER WALKER 001398

1    rights.

2        Q    You stated that you advised the

3    Defendant, Walker, of his rights?

4        A.    Correct.

5        Q    And how did you do that?

6        A.    From my F.O.P. handbook.

7        Q    That's the Fraternal Order of Police

8    handbook?

9        A.    Yes, it is.

10       Q    And on the last page of that book there

11   are pre-printed Miranda Rights, is that correct?

12       A.    That's correct.

13       Q    And that's what you read to the

14   Defendant?

15       A.    That's correct.

16       Q    And could you just demonstrate briefly

17   to the Court how you read those rights to the

18   Defendant?

19       A.    Individually, one at a time.

20       Q    And after you read each right to the

21   Defendant, did you ask the Defendant if he

22   understood that right?

23       A.    Yes, I did.

24       Q    And what did he reply?

1    A.    Yes.

2    Q    And did he reply that to each and every

3  right that you read to him?

4    A.    That's correct.

5    Q    After you read the Defendant his

6  Miranda Rights, was he then transported to

7  Area #4?

8    A.    Yes, he was.

9    Q    Once you got to Area #4, where was the

10  Defendant brought?

11    A.    He was placed in an interview room.

12    Q    And when he was placed in the interview

13  room, was he continued to be handcuffed?

14    A.    No, he was not.

15    Q    Once you got in that room tell the

16  Court what happened.

17    A.    We again advised him of his rights from

18  the Fraternal Order of Police handbook --

19    Q    Is that similar to the way that you

20  testified to previously how you did it?

21    A.    Yes.

22    Q    And after you did so did you ask him if

23  he wished to waive his rights?

24    A.    Yes, we did.

CCSAO XAVIER WALKER 001400

1    Q    What did the Defendant state?

2    A.    He said he would.

3    Q    After the Defendant, Walker, agreed to

4    waive his rights, what occurred, Detective?

5    A.    I explained to him that he was

6    implicated along with Jovanie Long in the murder.

7    Q    And specifically did you tell him some

8    information that you had received during the

9    course of your investigation?

10    A.    Yes, I did.

11    Q    And what did you say to the Defendant?

12    A.    I told him that we had handwritten

13    statements by witnesses implicating him and

14    Jovanie, and then I read portions of it to him.

15    Q    And after you showed to the Defendant

16    these handwritten statements and read portions to

17    him, what, if anything, happened then?

18    A.    I asked him if he had a response.

19    Q    What did he reply?

20    A.    He said "Yes."

21    Q    What did he say?

22    A.    He said he wanted to tell us his story

23    of it.

24    MR. CONNIFF:  Objection.  Hearsay as to

1    Jovanie Long.  I believe there is a severance.

2         THE COURT:  State?

3         MS. RAVIN:  Judge, we are not asking to

4    admit the Co-Defendant's statement against the

5    Co-Defendant.  It's --

6         THE COURT:  As to Mr. Walker?

7         MR. COLEMAN:  Correct, Judge.

8         MS. RAVIN:  Yes.

9         THE COURT:  Go right ahead.

10        MR. COLEMAN:

11        Q    What, if anything, did the Defendant,

12   Walker, say to you at that time?

13        A.   He said he would like to tell us his

14   side of the story.

15        Q    And did he, in fact, give you a

16   statement at that time?

17        A.   Yes, he did.

18        Q    And could you please tell the Court

19   what, if anything, he told you?

20        A.   He basically implicated himself in the

21   murder.

22        Q    And could you tell us how so?

23        A.   Sure.  He had told us that he and

24   Jovanie were out drinking and smoking, and they

CCSAO XAVIER WALKER 001402

1    ran out of smoke and alcohol and they decided to

2    go hit a lick, which means they are going to sell

3    some fake dope and try to snatch the money from

4    the people and run.

5        Q    And did they say that they came upon an

6    individual?

7        A.    Yes.

8        Q    And what did they tell you?

9        A.    They told me that -- He told me that a

10    dark bluish van came down Ohio between Cicero and

11    Kilpatrick and Jovanie approached the van.

12        Q    And what did he tell you next?

13        A.    He said he seen Jovanie enter from the

14    passenger side of the van, get in the vehicle, and

15    he approached about fifteen, twenty feet away by

16    the alleyway there and was watching for the

17    police.

18        Q    And what did he tell you then?

19        A.    He said he heard some noise coming from

20    the van, and he looked at the van and he seen

21    Jovanie struggling with the victim, and he was

22    going to run over there to give him some help.

23        Q    And what did he tell you after that?

24        A.    He said he stopped because the driver's

SS-145

1    door opened and he seen Jovanie point the gun at

2    the victim and shoot him.

3        Q    Now, after Defendant, Walker, gave you

4    this statement, what did you do next, Detective?

5        A.    Contacted the State's Attorney's Office

6    for Felony Review.

7        Q    And at approximately 10:00 that

8    evening, did someone from the Felony Review Unit

9    of the State's Attorney's Office arrive?

10       A.    Yes.   I believe it was A.S.A. Leafblad.

11       Q    And was a videotaped statement

12   eventually taken regarding Defendant, Walker's

13   statement that he gave to you?

14       A.    Yes, it was.

15       Q    Now, Detective, I'm going to direct

16   your attention to June 5th of the year 2000, were

17   you still investigating the homicide of Marek

18   Majdak?

19       A.    Yes, I was.

20       Q    And specifically was this regarding

21   Defendant, Jovanie Long?

22       A.    Yes.

23       Q    And on that date did you have an

24   opportunity to speak to anyone?

1      A.   Yes, I did.

2      Q    And who did you speak to?

3      A.   His mother.

4      Q    Now, I'm going to direct your attention

5    to July 25th of the year 2000, did you have an

6    opportunity to go to the address of 4230 West

7    Crystal?

8      A.   Yes, I did.

9      Q    And why did you go there?

10     A.   We went there to meet with Regina Long,

11   and we asked her for identification just to make

12   sure that it was his mom --

13     THE COURT:  I'm sorry?

14     THE WITNESS:  Just to make sure it was his

15   mother we asked for identification from her.

16     MR. COLEMAN:

17     Q    When you say "his mother," who are you

18   referring to?

19     A.   Jovanie Long.  Because previous to that

20   we were just talking to her on the phone.  We told

21   her why we were there --

22     MR. CONNIFF:  Objection to hearsay as to the

23   conversation, substance of the conversation,

24   Judge.

SS-147

1     THE COURT:  We haven't heard it.

2     MR. CONNIFF:  Just based on what's gone

3  previously, I suspect that's what's coming next.

4     MR. COLEMAN:  Judge, he hasn't testified to

5  what she has stated.

6     THE COURT:  I haven't heard it.  The

7  objection is noted.

8          Go on.

9     MR. COLEMAN:

10     Q     Continue, Detective.

11     A     We had informed her why we were there,

12  and that we needed to contact Jovanie and that a

13  stop order had been issued by us, Chicago Police

14  Department, for him in questioning for this

15  murder.

16     Q     Now, Detective, I'm going to direct

17  your attention to July 28, 2000, did you receive a

18  phone call at Area #4, Violent Crimes?

19     A     Yes, I did.

20     Q     Did that person identify themselves?

21     A     Yes.

22     Q     Who did that person identify themselves

23  as?

24     A     Regina Long.

1          Q     Now, Detective, on August 3, 2000,

2     approximately 7:00 p.m., did you receive another

3     phone call?

4          A.    Yes, I did.

5          Q     Who was that phone call from?

6          A.    From Regina Long.

7          Q     And, again, she identified herself, is

8     that correct?

9          A.    That's correct.

10         Q     Now, finally, Detective, on August 4,

11    2000, at approximately 11:45 a.m. were you at

12    Area #4, Violent Crimes?

13         A.    Yes, I was.

14         Q     And while you were there, did the

15    Defendant, Long, come to Area #4, Violent Crimes?

16         A.    Yes, he did.

17         Q     Was he in the company of anyone?

18         A.    He was in the company of his mother,

19    Regina Long, and Reverend -- I don't recall his

20    last name.

21         Q     But it was a reverend?

22         A.    A clergyman, yes.

23         Q     And after he arrived there, were you

24    present when the Defendant was advised of his

1    Miranda Rights?

2          A.    Yes, I was.

3          Q    And was that in front of anyone?

4          A.    Yes, it was.

5          Q    Who was it in front of?

6          A.    In front of the clergyman, the

7    reverend.

8          Q    And did the Defendant, Long, at that

9    time waive his Miranda Rights?

10          A.    Yes, he did.

11          Q    After he waived them was he told

12    anything, Detective?

13          A.    Yes.

14          Q    What was Defendant, Long, told?

15          A.    He was told that he was implicated in

16    the murder of Marek Majdak.

17          Q    Now, Detective, I'm he going to ask

18    you, those other detectives that you were working

19    with and you traded the investigation back and

20    forth, who were those two detectives?

21          A.    Detective Sanders and Detective Wright.

22          Q    Were there other detectives involved in

23    the case?

24          A.    Yes.

1      Q      And what were their names?

2      A.     Detective Cruz, Detective Wolverton,

3    Detective Bryezniak, Detective Riordan.

4      Q      Did Detectives Wright and Sanders, did

5    they handle any part of the investigation that

6    dealt with Maurice Wright?

7      A.     No.

8      MR. COLEMAN:  Could I just have one moment,

9    Judge?

10     THE COURT:  Sure.

11     MR. COLEMAN:

12     Q      Now, Cruz and Wolverton, are those two

13   detectives African American?

14     A.     No, they are not.

15     Q      But Wright and Sanders are African

16   American?

17     A.     Yes, they are.

18     Q      And those two individuals never had any

19   contact with Mr. Wright, is that correct?

20     A.     That's correct.

21     THE COURT:  With who?

22     MR. COLEMAN:  Maurice Wright, Judge.

23     THE COURT:  Okay.

24

CCSAO XAVIER WALKER 001409

1    MR. COLEMAN:

2    Q  Wolverton and Cruz were the two

3 individuals that traded the investigation

4 regarding Maurice Wright with you, is that

5 correct?

6    A.  That's correct.

7    MR. COLEMAN: Nothing further, Judge.

8    THE COURT: You want to start?

9    MR. WILSON: Yeah, I'll start, Judge.

10   THE COURT: Go right ahead.

11         CROSS EXAMINATION

12         BY

13         MR. WILSON:

14    Q  Good afternoon, Detective.

15    A.  Good afternoon.

16    Q  Now, Detective, as I understand things

17 based on information that you had received you

18 went to 5431 West Potomac on May 28, 2000, looking

19 for Xavier Walker, is that correct?

20    A.  That's correct.

21    Q  And I believe you said that you saw him

22 coming down the front stairs of the building at

23 5431 West Potomac?

24    A.  That's correct.

1    Q    Are there any gates surrounding this

2  property -- any fences surrounding this property,

3  Detective?

4    A.    I don't recall.

5    Q    And the stairs were in the front

6  portion of the building?

7    A.    Yes.

8    Q    Is Potomac a one-way or two-way street,

9  to your knowledge?

10    A.    I don't know.

11    Q    Now, you stated that Walker told you

12  that he and Jovanie had decided that they were

13  going to hit a lick because they had ran out of

14  money for weed and alcohol, correct?

15    A.    Correct.

16    Q    And so they then went to this location

17  to hit this lick and a van pulled up; did Walker

18  tell you whether or not he directed this van in

19  any direction at all?

20    A.    No, he did not.

21    Q    In fact, he said nothing about having

22  any contact with the van, is that correct?

23    A.    No, he did not.

24    Q    And I believe you indicated that he was

1      some fifteen feet away from the van when he saw

2      the passenger door fly open, is that correct?

3           A.    Driver's.

4           Q     The driver's door fly open?

5           A.    Correct.

6           Q     And he proceeded to approach the

7      vehicle from that distance but stopped because of

8      what he then saw?

9           A.    That's correct.

10          Q     Now, on May 28th, once Walker was

11     apprehended, he was taken into custody by yourself

12     and your fellow officers, is that correct?

13          A.    That's correct.

14          Q     And he was then removed to Area #4?

15          A.    Yes.

16          Q     And at some point he gave a statement

17     to yourself, is that correct?

18          A.    To myself and Detective Sanders, yes.

19          Q     How long had he been at Area #4 before

20     he gave this statement to yourself and Detective

21     Sanders?

22          A.    Oh, I would say approximately an hour.

23          Q     Only an hour?

24          A.    Uh-huh.

1    Q    And he subsequently gave a videotaped

2    statement also, is that correct?

3    A.   That's correct.

4    Q    And when was that videotaped statement

5    given?

6    A.   I don't recall.

7    Q    Were you assisting in that videotape?

8    A.   Yes, I was.

9    MR. WILSON:  I have nothing further.

10   MR. BRICE:  If I may, Judge?

11   THE COURT:  Yes, go right ahead.

12                   CROSS EXAMINATION

13                   BY

14                   MR. BRICE:

15   Q    Good afternoon, Detective.

16   A.   Good afternoon.

17   Q    How are you, sir?

18   A.   I'm fine.  How are you?

19   Q    Good.  I believe you testified on

20   direct that early in your investigation you were

21   looking for nicknames, right, Red and Darnell?

22   A.   That's correct.

23   Q    And one of the people that you --

24   Strike that.

1          You had occasion to be interested in a

2     Yvette Hill?

3          A.    Yes.

4          Q     Okay.  And it was your understanding

5     she was employed as a prostitute?

6          A.    Yes.

7          Q     Did you ever, in the course of your

8     investigation, have a chance to physically meet

9     her?

10         A.    Yes.

11         Q     And you learned -- Prior to that

12    meeting you had taken steps to get photographs of

13    her?

14         A.    Yes.

15         Q     And you noticed that she had a tattoo

16    on her person that said "Red"?

17         A.    Yes.

18         Q     Did you ever learn who that person was?

19         A.    No, I did not.

20         MR. BRICE:  Nothing further.  Thank you,

21    sir.

22         THE COURT:  Redirect?

23         MR. COLEMAN:  Nothing further, Judge.

24         THE COURT:  You may step down.

1    MS. RAVIN:  That concludes our witnesses for

2    today.  We would just ask this be commenced and

3    continued to April 8th.

4            If I do not have an assurance that I

5    can get Deshontae Wright here, when I come into

6    court on April 8th we will put on our stipulations

7    and we will rest on April 8th.

8            If I can get her here on April 8th, we

9    will put her on.  And if there is some way that I

10   know she will be here, but for some reason can't

11   come on April 8th I will make those

12   representations to the Court at that time.

13   THE COURT:  Okay.  Good enough.  This matter

14   is commenced and continued to 4/8.

15                   (Whereupon the above-entitled

16                    matter was continued to 4/8/04.)

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS )
                       )  SS:
2    COUNTY OF COOK    )

3

4

5                    I, CONNIE L. JAMES, Certified

6    Court Reporter in and for the State of Illinois

7    and the County of Cook, County Department,

8    Criminal Division, do hereby certify that I

9    reported in shorthand the proceedings had in the

10   above-entitled cause, and that the foregoing is a

11   true and correct transcript of all the proceedings

12   requested to be transcribed.

13

14

15

16

17                              Official Court Reporter

18                              Circuit Court of Cook County
                                License No. 084-002510
19

20   Date:    2/7/05

21

22

23

24

CCSAO XAVIER WALKER 001416