# EXHIBIT 23

```
1

2    STATE OF ILLINOIS )
                       )        SS.
3    COUNTY OF C O O K )

4             IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT-CRIMINAL DIVISION
5
     THE PEOPLE OF THE   )
6    STATE OF ILLINOIS   )
                         )    No.  00-CR-20601
7        -vs-            )
                         )    Charge:  MURDER
8    XAVIER WALKER       )

9

10       REPORT OF PROCEEDINGS in the above-entitled cause

11   taken before the Honorable MARCUS R. SALONE, Judge of

12   the said court, on  June 22, 2004.

13       Present:

14            HON. RICHARD DEVINE,
                   State's Attorney of Cook County, by
15            Ms. Jennifer Ravin and Mr. Dave Coleman,
                   Assistant State's Attorneys,
16                 representing the People;

17

18            Mr. Gregory Wilson,
                   representing the Defendant.
19

20

21   Patrick J. Flannery
     Official Shorthand Reporter
22   2650 So. California Ave.
     Chicago, IL 60608
23   Lic. #084-001220

24
```

FILED
CR-526-12
FEB 03 2006
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

XX-1

CCSAO XAVIER WALKER 001514

1

2            I   N   D   E   X;   Pgs.   XX-1   to   XX-56; 6/22/04

3

4         DIRECT    CROSS    REDIRECT    RECROSS

Stipulation;   Pg.   XX-5   to   XX-32

People Rest;   Pg.   XX-32

Motion Directed Finding;   Pg.   XX-38

State Response;   Pg.   XX-40

Judge's Ruling;   Pg.   XX-41

Defense Closing;   Pg.   XX-46

State Rebuttal;   Pg.   XX-48

Judge's Ruling;   Pg.   XX-53

CCSAO XAVIER WALKER 001515

```
 1
 2            THE CLERK:  Jovanie Long and Xavier Walker.
 3            THE COURT:  Good morning, gentlemen.
 4       MR. BRICE:  Good morning, your Honor.
 5       MS. RAVIN:  Good morning.  For the record
 6  Jennifer Ravin, R-a-v-i-n, for the State.
 7            MR. WILSON:  For the record Gregory Wilson
 8  appearing for Xavier Walker.
 9            MR. CONNIFF:  John Conniff and Tom Brice for
10  Jovanie Long.
11            THE COURT:  The testimony was in February,
12  continued to April --
13            MS. RAVIN:  Right.
14            THE COURT:  I just want to make sure I have
15  it, all of the transcripts.  I have three.  I read
16  three.
17            MS. RAVIN:  Yes.
18            THE COURT:  Good morning, gentlemen.
19            THE DEFENDANTS:  Good morning, sir.
20            THE COURT:  All right.  Are we ready to
21  resume?
22            MS. RAVIN:  Yes, Judge.  I have about four
23  stipulations that will take about 30 to 60 minutes to
24  read into the record.
```

XX-2

CCSAO XAVIER WALKER 001516

1        THE COURT:  Good.

2        MS. RAVIN:  Then we will rest.  I think I had

3   anticipated there being some other witnesses, but it

4   looks like we may just have arguments.

5        THE COURT:  Okay.

6        MS. RAVIN:  So, we kind of wanted to approach

7   to see, I know you have other bench trials to do.  And

8   I know there is an another motion.  I don't know if it

9   was commenced and continued.  If we can kind of have a

10  ballpark time.

11       THE COURT:  I have a bench trial?

12       MR. GROTH:  Yes, Fidel Thompson.

13       MR. FLOREY:  I am asking for date on that

14  case, Judge.

15       THE COURT:  I am in the mode of getting rid

16  of this stuff.  I am being choked by everybody wanting

17  a date for years.  I have been acquescing.  I just --

18  if it is ready it goes.  Or if it should be ready, it

19  goes.  State's not ready, run the term.  That is where

20  I am at.

21       Having said that you guys will be first.  And

22  looks like we are in the next ten minutes I think.

23  That is where we are at.

24       THE CLERK:  Yes.

XX-3

CCSAO XAVIER WALKER 001517

1          MS. RAVIN:  Are you going to want to break
2   after I read the stipulations or are you going to want
3   to go to right into argument?  I don't know if you want
4   to.

5          THE COURT:  Well, I think we can go right
6   into arguments.

7          MS. RAVIN:  Are you talking about 12:30,
8   thereabouts?

9          THE COURT:  You would rather break, right?
10  What is you gentlemen's pleasure?

11         MR. WILSON:  We are prepared to go.

12         THE COURT:  You want to break after both
13  sides rest?

14         MR. CONNIFF:  Whatever you you want to do,
15  Judge, that is fine.

16         THE COURT:  Okay.  I think we can argue.  I
17  have got a lot to do.

18         Deputy Shields, would you call Kelly, tell
19  her we want to send her a case.  She is in Judge
20  Lampkin's courtroom.

21         MR. FLOREY: Judge, before we do that can I
22  talk to you about this case?

23         THE COURT:  Gentlemen, you can go in the
24  back.

CCSAO XAVIER WALKER 001518

```
 1              (Case passed.)

 2          THE CLERK:  Xavier Walker and Jovanie Long.

 3          THE COURT:  What is the date of last

 4  testimony?

 5          MS. RAVIN:  February 19th of this year.

 6          THE COURT:  Okay.  Are we ready.  This is the

 7  matter People versus Xavier Walker and Jovanie Long.

 8  Counsel.

 9          MR. WILSON:  For the record Gregory Wilson

10  appearing for Xavier Walker.

11          MR. CONNIFF:  John Conniff and Tom Brice for

12  Jovanie Long, Judge.

13          THE COURT:  Jennifer.

14          MS. RAVIN:  Right now we are in the middle of

15  our case in chief.  We have put on all of our live

16  witnesses.  We would be proceeding by way of

17  stipulation.

18          First stipulation is as to the fingerprint

19  examiner, that it is stipulated between the parties the

20  People of the State of Illinois, Richard A. Devine by

21  and through his assistants Jennifer Ravin and Dave

22  Coleman, and the defendant Jovanie Long through his

23  attornies John Conniff and Tom Brice and defendant

24  Xavier Walker by and through attorney Gregory Wilson,
```

CCSAO XAVIER WALKER 001519

1   that the following is true and accurate.

2          That Forensic Investigator Robert Tovar,

3   12847, was employed by the Chicago police department on

4   May 13th, 2000.  Investigator Tovar found two possible

5   latent prints from the exterior passenger front door of

6   Marek M-a-r-e-k, M-a-d-j-a-k's, Dodge van located at

7   4721 West Ohio.

8          He found these possible prints when he dusted

9   the van with white powder that is commonly used to

10  ascertain whether or not an item has prints that cannot

11  be ordinarily seen.

12         Investigator Tovar lifted possible prints

13  from the van and according with proper procedure sent

14  them to the Illlinois State Police Forensic Science

15  Center at Chicago.

16         These lifts were transported to the Illinois

17  State Police Forensic Science Center in accordance with

18  proper Chicago police department procedures.  Chain of

19  custody was properly preserved at all times.

20         Anastasia, A-n-a-s-t-a-s-i-a, Petruncio,

21  P-e-t-r-u-n-c-i-o, Forensic Scientist and latent print

22  examiner with the Illinois State Police Forensic Crime

23  Center at Chicago, she is expert in the field of latent

24  prints and would be so qualified by the Court as an

CCSAO XAVIER WALKER 001520

1    expert in her field.

2          The Illinois State Police Crime Lab received
3    Chicago police department inventory number 2321181 on
4    May 16th, 2000, received two latent lifts on May 15th,
5    2000, latent lifts designated as Crime Lab Exhibit No.
6    1, would be identified as People's Exhibit No. 21.  The
7    discharged cartridge casings under number 2321181, were
8    designated as Crime Lab Exhibit Nos. 5 and 6 would be
9    identified as People's Exhibit No. 22.

10         All items were received in a properly sealed
11   condition.  Proper chain of custody was maintained at
12   all times.

13         Anastasia Petruncio would identify People's
14   Exhibit No. 22 as the items she examined for latent
15   prints based on the markings she made to the item and
16   envelope.

17         She would identify People's Exhibit No. 22 as
18   being in the same or substantially the same condition
19   as when she finished her examination and sealed the
20   envelopes.

21         Also identify two lifts under People's
22   Exhibit No. 21 as being in the same or substantially
23   the same condition as when she examined them.

24         A latent print is a print made by accident

XX-7

CCSAO XAVIER WALKER 001521

1   when a person touches a surface.  An inked or known

2   print is made on purpose when fingers are rolled in ink

3   and then rolled on a card to record it.

4          Latent prints are not always left behind on

5   every surface.  It depends upon the receiving surface.

6   If a surface if rough or absorbent, the moisture from a

7   touch is absorbed.

8          Moreover is a person's hands are clean and

9   dry, no moisture or contamination would leave prints

10  behind.

11         When Anastasia Petruncio examined the items

12  for prints she used analysis generally accepted in the

13  scientific community.

14         After perfroming this analysis she formed an

15  opinion to a reasonable degree of scientific certainty

16  that in her expert opinion none of the items revealed

17  latent impressions suitable for comparison.

18         So stipulated?

19         MR. WILSON:  So stipulated.

20         MR. CONNIFF:  So stipulated.

21         MS. RAVIN:  With respect to the firearms

22  examiner, Kurt Zielinski, Z-i-e-l-i-n-s-k-i, is a

23  Forensic Scientist employed by the Illinois State

24  Police Forensic Science Center at Chicago.

XX-8

1    That Kurt Zielinski is an expert in the field
2  of firearm identification and would be so qualified by
3  this Honorable Court.
4    On May 16th, 2000, the Forensic Science
5  Center at Chicago received inventory No. 2321181 in a
6  sealed clear plastic bag that contained a sealed
7  envelope what had two cartridge casings recovered by
8  forensic Investigator Tovar, and inventory No. 2320784
9  in a sealed plastic bag that contained a sealed
10  envelope with one fired bullet recovered by Dr. T-a-e,
11  L-o-n-g, A-n, fromt he Office of the Cook County
12  Medical Examiner's Office, under ME case No. 235 May
13  2000.
14    The chain of custody was properly maintained
15  at all times through the inventory process of Chicago
16  police department for the inventoried items.
17    Kurt Zielinski would identify People's
18  Exhibit No. 22 as the two cartridge casings that he
19  received under No. 2321181, which he separated into
20  Crime Lab Exhibits 6 and 7.  Kurt zielinski would
21  identify his markings on these two fired cartridge
22  casings and on the envelope.
23    Kurt Zielinski would identify the fired
24  cartridge casings in People's Exhibit No. 22 as being

XX-9

CCSAO XAVIER WALKER 001523

1   in the same or substantially the same condition as when

2   he placed them back in the bullet envelope and plastic

3   bag, which were sealed and marked with his initials.

4         Kurt Zielinski examined the two fired

5   cartridge casings and identified both casings are

6   Winchester 45 automatic calibre casings.

7         Kurt Zielinski examined the fired bullet

8   under inventory No. 2320784 marked as People's Exhibit

9   No. 23. He determined that this bullet was a 45

10   calibre fired bullet exhibiting 6 lands and grooves

11   with a left hand twist.

12         Kurt Zielinski would identify the bullet, the

13   envelope and plastic bag by his markings on each item

14   and would testify that they are all in the same or

15   substantially the same condition as when he returned

16   them to the original packaging and sealed and initialed

17   the items.

18         Kurt Zielinski formed the opinion to a

19   reasonable degree of scientific certainty that the two

20   cartridge cases were fired from the same firearm.

21         On May 13th, 2000, approximately 0220 hours

22   Forensic Investigator Robert Tovar arrived at 4721 West

23   Ohio to process the scene under Chicago police

24   department record division number F as in Frank

XX-10

CCSAO XAVIER WALKER 001524

1    282753.

2         Forensic Investigator Tovar and his partner

3    Patrick Moran finished processing the scene at

4    approximately 0800 hours.

5         During their processing of the scene evidence

6    was recovered and inventoried according to standard

7    procedures where the chain of custody was properly

8    maintained at all times.

9         Two swabs of blood were taken from the

10   sidewalk at 4721 West Ohio and placed inside a white

11   swab box which was inside a manila coin envelope marked

12   as inventory No. 2321182.  This is now marked as

13   People's Exhibit No. 37.

14        Two swabs of blood were taken from the glass

15   on the front passenger seat of the Dodge Caravan at

16   4826 West Ohio.  These swabs were placed sealed in a

17   white swab box which was inside a manila coin envelope

18   marked as inventory No. 2321183, now marked as People's

19   Exhibit No. 38.

20        These swabs were transported from the

21   Illinois State Police forensic Science Center at

22   Chicago and received on May 16th, 2000.  A proper chain

23   custody was maintained at all times.

24        Inventory No. 2321182 was designated by the

XX-11

CCSAO XAVIER WALKER 001525

1   Illinois State Police Forensic Science as Crime Lab

2   Exhibit No. 3, and is now labeled as People's Exhibit

3   No. 37.

4           Inventory No. 2321183 was designated by the

5   Illinois State Police Forensic Science Center as Crime

6   Lab Exhibit No. 2, and is now labeled as People's

7   Exhibit No. 38.

8           On May 13th, 2000, Dr. Tae Lyong An performed

9   an autopsy on Marek Majdak.  Dr. An followed generally

10  accepted medical procedures and drew a vial of blood

11  from Marek Majdak and sealed that blood standard.

12          Dr. An also swabbed possible bite mark from

13  Mr. Marek Majdak's right arm and placed it in a sealed

14  white box.

15          Dr. An turned over the blood standard and

16  swab to Forensic Investigator Robert Kulak, K-u-l-a-k,

17  on May 13th, 2000.  Forensic Investigator Kulak

18  delivered the blood standard swab to the Chicago Police

19  Department Evidence and Recovered Property Section

20  where they were inventoried according to proper police

21  procedures.

22          Both items were assigned inventory No.

23  2320783.  The chain custody was properly preserved at

24  all time.

XX-12

CCSAO XAVIER WALKER 001526

1       On May 16th, 2000, Illinois State Police
2  Forensic Science Center received inventory No.
3  2320783.  This blood standard was designated as Crime
4  Lab Exhibit No. 4, and is currently marked as People's
5  No. 36 A.

6       The swab from the possible bite mark was
7  designated as Crime Lab Exhibit 5, and is currently
8  marked as People's Exhibit No. 36 B.

9       On November 14th, 2000, Pete Bosco,
10 B-o-s-c-o, was employed as a Forensic Scientist by the
11 Illinois State Police Crime Lab at the Forensic Science
12 Center at Chicago, as an expert in Forensic Biology
13 specifically in the field of blood identification.

14      On November 14th, 2000, Pete Bosco received 4
15 blood swabs under Crime Lab Nos. 2 and 3.  Using tests
16 commonly accepted in the field of forensic biology Pete
17 Bosco tested the red substance on the swabs for the
18 presence of blood.

19      All instruments used during the testing were
20 calibrated before and after the testing and were in
21 good working condition at the time of the test.

22      In Pete Bosco's expert opinion to a
23 reasonable degree of scientific certainty the swabs
24 indicated the presence of blood.

XX-13

CCSAO XAVIER WALKER 001527

1          The markings on Crime Lab Exhibits 2 and 3,

2   People's Exhibit No. 37 and 38, were in fact made by

3   Pete Bosco and are in the same or substantially the

4   same condition as when Pete Bosco tested, repackaged

5   and resealed them.

6          After completing the testing, samples were

7   taken of the swabs and marked as Crime Lab Exhibits 2 A

8   and 3 A, and were maintained in cold storage with the

9   chain of custody properly maintained at all times.

10          The original evidence under People's Exhibit

11   Nos. 37 and 38 was returned to the Chicago Police

12   Department Evidence and Recovered Property Section.

13          Pete Bosco also received the two swabs from

14   the possible bite mark under Crime Lab Exhibit No. 5,

15   People's Exhibit No. 36 B.  Pete Bosco tested those

16   swabs along with two control swabs of positive and

17   negative for the presence of saliva in accordance with

18   generally accepted scientific principles.

19          In Pete Bosco's expert opinion there was no

20   saliva indicated.

21          All tests that were used to ascertain the

22   presence of saliva were tests generally accepted in the

23   scientific community.  And all instruments used were

24   calibrated before and after the tests and were in

XX-14

CCSAO XAVIER WALKER 001528

1    proper working order.

2          On May 27th, 2000, Detective Cruz received

3    one pair of Fila sport shoes, size ten with black shoe

4    laces.  Detective Cruz received those shoes from

5    Ashanti A-s-h-a-n-t-i, Wright W-r-i-g-h-t, at 4230 West

6    Crystal.

7          Detective Cruz inventoried those shoes under

8    inventory No. 2323765 in accordance with proper

9    procedure, and are People's Exhibit No. 39.

10         Kathleen Kozak, K-o-z-a-k, is a Forensic

11   Scientist employed by the Illinois State Police Crime

12   Lab Forensic Science Center at Chicago.  And would be

13   qualified by the Court as expert in forensic biology.

14   Specifically in the field of blood identification.

15         On November 26th, 2002, the Illinois State

16   Police Forensic Science Center received inventory No.

17   2323765.  On February 28th, 2003, Kathleen Kozak began

18   examination and analysis of that inventoried evidence.

19         When Kathleen Kozak received the shoes they

20   were in a brown paper bag sealed with red and white

21   tape that had been marked with the date, initials, case

22   number and exhibit number otherwise known as Dice,

23   D-i-c-e.  There were no markings on the shoes inside of

24   the brown paper bag.

XX-15

1    Kathleen Kozak would describe the shoes as
2 having some wear in otherwise good shape with no damage
3 or obvious staining.
4    Kathleen Kozak took 5 swabs from each shoe,
5 following all procedures generally accepted in the
6 scientific community.
7    She took those swabs along with two control
8 swabs, positive and negative, and performed tests
9 generally accepted in the scientific community in order
10 to determine if there was an indication of blood on any
11 of those swabs.
12    After running those tests Kathleen Kozak
13 reached the opinion to a reasonable degree of
14 scientific certainty that in her expert opinion
15 Kathleen Kozak found there was no blood indicated on
16 the shoes.
17    Kathleen Kozak then placed the shoes back in
18 the original packaging, resealed it using clear and
19 blue evidence tape, and marked the seal with her
20 initials and the date.
21    Kathleen Kozak would identify Exhibit No. 39
22 by her markings, and would testify that People's
23 Exhibit No. 39 is in the same or substantially the same
24 condition as when she tested the gym shoes and

XX-16

CCSAO XAVIER WALKER 001530

1  repackaged them.

2          She would further testify that this item was

3  transported back to the Chicago Police Department

4  Evidence and Recovered Property Section.  And that the

5  proper care and custody was maintained at all time.

6          On November 13th, 2000, pursuant to Court

7  order entered October 25th, 2002, defendants Xavier

8  Walker and Jovanie Long submitted to buccal,

9  b-u-c-c-a-l swabs taken by Investigator Beale,

10 B-e-a-l-e, of the Cook County State's Attorneys

11 Office.

12         A buccal swab is swab taken from the inside

13 cheek of the mouth of an individual.  The inside cheek

14 of a human mouth contains buccal cells which can be

15 used for DNA comparison.

16         Investigator Beale took the swabs per proper

17 scientific procedure, sealed it, labeled it, and

18 inventoried it that same day under RD number F 282753,

19 and under inventory number 10059371 for Xavier Walker

20 and under inventory No. 10059373 for Jovanie Long.

21         The chain of custody was properly preserved

22 at all times.

23         On November 22nd, 2002, the Illinois State

24 Police Forensic Crime Center at Chicago received

XX-17

1  inventory number 10059371, the buccal swab from Xavier

2  Walker designated Crime Lab Exhibit 9 and is now

3  labeled as People's Exhibit No. 40.

4          On November 22nd, 2002, the Illinois State

5  Police Forensic Science Center at Chicago received

6  inventory number 10059373, the buccal swab from Jovanie

7  Long, it was designated as Crime Lab Exhibit 10, and is

8  now labeled People's Exhibit No. 41.

9          On March 4th, 2003, samples for both swabs

10 were taken, kept separate and designated Crime Lab

11 Exhibits 9 A and 10 A respectively by Kathleen Kozak.

12 Both samples we retained in cold storage at the

13 Illinois State Police Forensic Crime Center until

14 further testing was conducted.  The chain of custody

15 was properly preserved at all times.

16          Lisa Nardi, N-a-r-d-i, is employed as a

17 Forensic Scientist by the Illinois State Police Crime

18 Lab Forensic Science Center, and was assigned to the

19 Springfield division August 2003.

20          Lisa Nardi is currently assigned to the

21 Illinois State police Crime Lab Center at Chicago.  At

22 both locations Lisa Nardi had been assigned to the DNA

23 analysis unit.

24          Lisa Nardi would be qualified by this

XX-18

1  Honorable Court to render an expert opinion in the

2  field of DNA analysis.

3          Lisa Nardi would explain that DNA stands for

4  Deoxyribonucleic acid, which is a chemical substance

5  found in all living things, in the nucleur of a cell.

6          DNA is different from person to person and is

7  the same throughout a person's body.  One person's DNA

8  can not be changed into another individual's DNA.

9          Environmental factors such as dirt, rain or

10  heat can degrade a sample and make it unsuitable for

11  testing.

12          DNA is used to do medical research, to

13  identify war dead and to identify victims of airplane

14  crashes or other disasters.

15          DNA is also used in forensic settings and

16  criminal investigations to include or exclude

17  individuals when compared to a sample of DNA.

18          On June 23rd, 2003, the Illinois State Police

19  Forensic Science Center at Springfield received Crime

20  Lab Exhibits 2 A, 3 A, 4 A, 9 A, 10 A, by registered

21  mail.

22          The chain of custody was properly maintained

23  at all times at the Illinois State Police Forensic

24  Science Center at Chicago through receipt in

XX-19

CCSAO XAVIER WALKER 001533

1   Springfield as well as at all times at the Springfield

2   lab.

3           On July 9th, 2003, Lisa Nardi received Crime

4   Lab Exhibits 2 A, blood swabs from the van or seat

5   glass, People's exhibit No. 38.

6           3 A, blood swab from the sidewalk, People's

7   Exhibit No. 37.

8           4 A, which is the blood standard from Marek

9   Madjak, People's Exhibit No. 36 A.

10          And 9 A, which is a blood standard from

11  Xavier Walker, People's Exhibit No. 40.

12          And 10 A, which is the standard from Jovanie

13  Long, People's Exhibit No. 41, for the purpose of

14  comparing the blood found in the car and on the

15  sidewalk with the victim's blood, as well as both

16  defendants' DNA standards.

17          Lisa Nardi received Crime Lab Exhibits 2A and

18  3A in a manila coin envelope sealed with blue evidence

19  tape and marked with prior analyst's initials and date,

20  as well as Illinois State Police label.

21          Lisa Nardi opened the sealed package, Crime

22  Lab Exhibit 2 A, and marked that ziplock bag with the

23  date and her initials.  She took those two swabs and

24  consumed them for analsys.

CCSAO XAVIER WALKER 001534

1    Lisa Nardi took Crime Lab Exhibit 3 A and

2 marked that ziplock bag with the date and her

3 initials. She took one of the two swabs and consumed

4 it for analysys.

5    On July 9th, 2003, Lisa Nardi extracted DNA

6 from Crime Lab Exhibit 4 A, 9 A and 10 A, in that she

7 performed commonly accepted polymerase chain reaction,

8 p-o-l-y-m-e-r-a-s-e, chain reaction PCR DNA analysis.

9    She performed this analysis properly and

10 correctly. All instruments used during the PCR testing

11 were calibrated before and after the tests were

12 performed and were in proper working order.

13    On August 18th, 2003, Lisa Nardi extracted

14 DNA from Crime Lab Exhibit 2 A and 3 A in that she

15 performed the commonly accepted PCR and DNA analysis.

16    She performed this analysis properly and

17 correctly. All instruments were calibrated before and

18 after the tests were performed and were in proper

19 working order.

20    Lisa Nardi would explain that PCR is an

21 enzymatic, e-n-z-y-m-a-t-i-c, process in which a

22 specific region of DNA is replicated over and over

23 again to yield many copies of a particular sequence.

24    This molecular xeroxing process involves

XX-21

1  heating and cooling samples in a precise thermal

2  cycling pattern.

3       During each cycle a copy of the target DNA

4  sequence is generated for every molecule containing the

5  target sequence.

6       After all tests were performed Lisa Nardi

7  returned all crime lab exhibits to their original

8  packaging, sealed them with blue evidence tape and

9  marked them with the date and her initials.

10      She would identify People's Exhibit No. 36 A,

11 37, 38, 40 and 41, as being in the same or

12 substantially the same condition as when she marked,

13 sealed and returned them.

14      Lisa Nardi compared the DNA from the blood

15 found in the van with the blood on the sidewalk.  She

16 also compared these DNA profiles to the DNA profiles of

17 the victim Marek Madjak and the defendant Xavier Walker

18 and Jovanie Ioaning.

19      Lisa Nardi found in her expert opinion that

20 the PCR analysis showed, A, a human DNA profile was

21 identified in Crime Lab Exhibit 2 A and 3 A.

22      B, that this DNA profile matched the DNA

23 profile of the victim, Marek Madjak.

24      And, C, that this profile does not match the

CCSAO XAVIER WALKER 001536

1   DNA profile of either Xavier Walker or Jovanie Long.

2        Lastly, in Lisa Nardi's expert opinion the

3   blood indicated in Crime Lab Exhibit 2 A, 3 A is

4   consistent with having originated from Marek Majdak and

5   could not have originated from either Xavier Walker or

6   Jovanie Long.

7        All of Lisa Nardi's opinions are to a

8   reasonable degree of scientific certainty.

9        The last stipulation I am tendering to the

10  Court is what will be marked as People's No, 24, that

11  is certified copy of the protocol.

12       Dr. Tae Lyong An, is a physician licensed to

13  practice medicine in the State of Illinois.  And was so

14  licensed on May 13th, 2000.

15       Dr. An is expert in the field of forensic

16  pathology and would be qualified by this Honorable

17  Court as an expert in his field.

18       That Dr. An is a Deputy Medical Examiner for

19  Cook County Medical Examiner's Office, and was acting

20  in that capacity when he performed the autopsy on Marek

21  Madjak on May 13th, 2000.

22       The autopsy that Dr. An performed on Marek

23  Madjak was assigned case number 235 May 2000.  This

24  number appears on the report of postmortem protocol and

XX-23

CCSAO XAVIER WALKER 001537

1  all photographs associated with that report.  A

2  certified copy of the report of postmortem is People's

3  Exhibit No. 24.

4          People's Exhibit No. 2 is an identification

5  photo of the deceased, Marek Madjak, who was subject of

6  autopsy 365, I am sorry, under 235 May 2000.

7          Dr. An noted that Marek Madjak's body was

8  received clothed, including a gray shirt, gray sport

9  shirt, gray pants, the lower clothes showing apparent

10  bullet defects in the corresponding areas.

11          Dr. An performed an external and an internal

12  examination and noted the following injuries.

13          There are three bullet wounds composed of two

14  entries and one exit.

15          The No. 1 bullet wound of entry is located on

16  the left lateral face at 4 centimeters from the left

17  tragus, t-r-a-g-u-s, toward 9:00 o'clock measuring 5

18  milimeters in diameter with pinkish marginal abration

19  in the entire circumference measuring one milimeter in

20  width in the lower aspect up to 5 milimeters in width

21  in the superior aspect.

22          There are many tiny black apparent stipplings

23  in the surrounding skin, most measuring less than half

24  milimeter by half milimeter.  This area measuring 7 by

XX-24

CCSAO XAVIER WALKER 001538

1    7 centimeters.

2         No apparent soot deposit observed around this

3    area.  This bullet wound tract is seen to be directed

4    rightward, backward and down.

5         This bullet fractured the left temporal bone

6    in the lateral portion of the left middle cranial

7    fossa, extensively fractured the left petrous bone,

8    lacerating the brain in the left temporal lobe in the

9    interior aspect.

10        Also fractured the foramen magnum in the left

11   anterior portion.  Also fractured C one on the left

12   side extensively lacerated the spinal cord at this

13   level.

14        Also fractured the right side of C one.  Also

15   fractured the C two, on right posterior aspect.  And

16   then lacerated the muscle tissue on the right posterior

17   aspect of the neck.  And then deposited underneath the

18   skin on the right posterior aspect of the neck at mid

19   level.

20        This bullet is a large copper jacket bullet

21   with round base and oblique flattening at one side of

22   the head.  The bullet wound of entry is shown in

23   People's Exhibit No. 25, which is a photograph.

24        The number two bullet wound of entry is

XX-25

1  located on the left hip area on the lateral aspect of

2  left buttock, at the mid vertical place at ten

3  centimeters above the level of the crotch measuring 7

4  milimeters in diameter with gray red marginal abrasion

5  in the most circumference measuring one milimeter in

6  width in the posterior aspect and up to 7 milimeters in

7  width in the upper anteriod portion.

8      No apparent stippling observed around this

9  wound.  The bullet wound tract is seen to be directed

10  rightward, backward and slightly downward.

11      The bullet lacerated the underlying

12  subcutaneous tissue and muscle tissue of the left

13  buttock and exited No. 3 bullet wound on the left

14  buttock in the posterolateral aspect.  The bullet wound

15  of entry is shown in photograph People's Exhibit No.

16  27.

17      No. 3 bullet wound of exit is located on the

18  left buttock in the posterolateral aspect 8 centimeters

19  above the level of the crotch.  Measuring 10 by 8

20  milimeters with pinkish marginal abrasion in the lower

21  medial aspect, measuring around 5 milimters in width.

22      The lateral margin is slightly irregular

23  without any marginal abrasion.  The medial margin is

24  slightly angulated.  No apparent soot deposit or

XX-26

1   stipling    served around this wo 1.

2          The bullet wound of exit is shown in People's

3   Exhibit No. 28, which is a photograph.

4          Multiple abrasions are seen on the face. One

5   small abrasion is seen on the left forehead. One

6   abrasion is seen in the right forehead. A few pinkish

7   very fine transverse linear abrasions are seen on the

8   right and anterior face in the lower portion.

9          Three abrasions are seen on the left knee.

10   Two on the lateral aspect, one on the medial aspect.

11   Two transversely disposed dark pinkish linear abrasions

12   are seen on the left leg in the anterior aspect.

13          Two small pinkish abrasions are seen on the

14   right hand posterior aspect lateral portion. Many

15   isolated abrasions are seen on the right arm in the

16   anterior mid portions, arranged in circular fashion

17   with irregular purplish bruise in the center.

18          This entire area measuring about 7 by 5

19   centimeters. These injuries will be examined by the

20   dentist for possible bite marks. This mark is depicted

21   in People's Exhibit No. 29.

22          Stippling found on bullet wound No. 1 means

23   that there is evidence of close range firing. In other

24   words, that the firearm was within 22 inches from the

XX-27

CCSAO XAVIER WALKER 001541

1    entry wound, but is not a contact wound since there is

2    no soot deposit or rim abrasion.

3         The scalp undersurface shows a small

4    hemorrhage infiltration in the right parietal area mid

5    portion.  There are extensive cerebral contusions

6    involving most inferior aspect of the left temporal

7    lobe and the left occipital lobe also involving the

8    inferior aspect of the left verebellar hemisphere.

9         The spinal cord reveals extensive hemorrhage

10   infiltration due to bullet lacerations on multiple

11   sectioning.  The posterior neck muscle reveals

12   extensive hemorrhage infiltration in the muscle tissue

13   of the most posterior aspect of the neck, being more

14   prominent on right side.

15        A large copper jacket bullet was located

16   through fluoroscopy.  This bullet was removed and

17   placed in a sealed evidence envelope.  People's Exhibit

18   No. 30 is a photograph of that bullet.

19        Blood and urine were saved for toxicological

20   analysis.  Blood was also drained and preserved as a

21   blood standard.

22        Dr. An took a swab of the possible bite mark

23   located on the right arm.

24        Nancy B. Wu Chen, C-h-e-n, PhD., is a

CCSAO XAVIER WALKER 001542

1 toxicologist employed by the Cook County Medical

2 Examiner's Office. Dr. Chen wrote a report detailing

3 the results of Marek Madjak' toxicology.

4      In this report her analysis was that Marek

5 Madjak' blood tested positive for ethanol in the amount

6 of 231 miligrams per decileter. That his urine tested

7 for ethanol in the amount of 343 milileters per

8 decileters.

9      The bullet recovered from the deceased body

10 during the examination and the blood card were

11 transported in sealed envelopes and inventoried in the

12 Chicago Police Department's Evidence and Recovered

13 Property Section.

14      The bullet was given inventory No. 2320784,

15 and would be identified as People's Exhibit No. 23.

16 The blood standard and possible bite mark swab were

17 given inventory No. 2320783, and would be identified as

18 People's Exhibit No. 36 A and 36 B. A proper chain of

19 custody was maintained at all times.

20      Dr. An would identify the photographs marked

21 in People's Exhibits 2, and 25 through 35 as truly and

22 accurately depicting the bullet, the clothes, the

23 wounds and the victim Marek Majdak as they were on May

24 13th, 2000, the date Dr. An performed the postmortem

CCSAO XAVIER WALKER 001543

```
 1   examination.

 2            Dr. An formed an opinion to reasonable degree

 3   of medical certainty as to the manner and cause of

 4   death for Marek Madjak.

 5            That Dr. An's opinion as to the cause of

 6   death to a reasonable degree of medical certainty is

 7   that Marek Majdak died of multiple gunshot wounds.  Dr.

 8   An's opinion is based on his education, training and

 9   experience, as well as the autopsy he performed in this

10   case.

11            Dr. An's opinion would be that the gunshot

12   wound to the face lacerated the brain and spinal cord.

13   Dr. An's opinion as to the manner of death is homicide.

14            So stipulated?

15            MR. CONNIFF:  So stipulated.

16            MR. BRICE: So stipulated.

17            MR. WISON:  So stipulated.

18            THE COURT:  With that, State?

19            MS. RAVIN:  Judge, at this time I would ask

20   that People's Exhibits 1 through 41 be admitted into

21   evidence.

22            I have also marked the stipulation to the

23   firearms as People's Exhibit No. 42, the stipulation to

24   the fingerprints as People's Exhibit No. 43, the
```

CCSAO XAVIER WALKER 001544

```
1   medical examination stipulation being Exhibit No. 44,
2   and the DNA exhibit as People's Exhibit No. 45.
3           Ask that all of those, the identification
4   marks be stricken and that they be moved into
5   evidence.  The ME, medical examiner photographs I can
6   go through one by one for the Court, if you would like
7   me to.
8           THE COURT:  Okay.
9           MS. RAVIN:  This is medical examiner --
10          THE COURT:  No.  Let me, do you have them
11  available?
12          MS. RAVIN:  Yes, I do.
13          THE COURT:  Well, let me ask this, any
14  objection to any of the State's proposed Exhibitd 1
15  through 45?
16          MR. WILSON:  No objection on behalf of of
17  Xavier Walker.
18          MR. CONNIFF:  Judge, just as far as the
19  statements, the exhibits concerning Xavier Walker's
20  statement, we would object to their admission as to
21  Jovanie Long.  Maurice Wright I believe they are
22  offering the handwritten and grand jury.
23          MS. RAVIN:  Correct.
24          MR. CONNIFF:  We do also object to those.
```

XX-31

CCSAO XAVIER WALKER 001545

```
 1              THE COURT:  That will be received over the
 2   defendant's objection, defendant Long's objection.
 3   People's 1 through 45 will be received into evidence.
 4   Identification marks will be stricken.
 5              MS. RAVIN:  Judge, just for clarification
 6   that is the exhibits for defendant Walker exhibits 14
 7   A, B, C, D, and 15 A, B we are only seeking to admit to
 8   the defendant Walker.  And Exhibit 16 A and B, 17 A and
 9   B we are only seeking to admit against the defendant
10   Long.
11              THE COURT:  It is noted.
12              MS. RAVIN:  Thank you, Judge.
13              With that as all the evidence has been
14   received by the Court, with that the People would
15   rest.
16                   (People rest.)
17              THE COURT:  Can I see the lawyers, please,
18   for a moment?
19                   (Short recess.)
20              THE COURT:  State rested.  For Mr. Long.
21              MR. CONNIFF:  Judge, we would move for
22   directed finding at this stage of the case.  Your Honor
23   has heard a lot of evidence as to Maurice Wright.  Your
24   Honor heard him come in to testify that he was held in
```

XX-32

CCSAO XAVIER WALKER 001546

1  the police station for several days before Jovanie Long

2  was arrested. He denied from the stand making the

3  statements that were attribute to him.

4  We ask your Honor to consider his motive at

5  this point. When he was in the police station he

6  testified that he was threatened and that he was

7  threatened with being charged with a crime himself.

8  He had a motive clearly at that point when he

9  was in custody to implicate Jovanie Long. Jovanie

10  Long's videotape statement, Judge, is the other item of

11  evidence.

12  Your Honor will note that as to the videotape

13  statement he refused to so sign a consent form. If

14  your Honor looks at the substance of that statement and

15  what he purportedly stated in the statement, how this

16  crime occurred, I think you could reach the conclusion

17  that that statement is not a true statement. That he

18  was not present at the time that this crime took

19  place.

20  He has in that videotape statement and

21  account in which Mr. Madjak presumably having traveled

22  southbound on Cicero Avenue, some period of time makes

23  a left off of Cicero Avenue to travel eastbound not in

24  the vicinity of the Eisenhower Expressway, but in a

CCSAO XAVIER WALKER 001547

1    neighborhood at approximately Ohio.

2         He makes a left turnoff Cicero Avenue, Cicero

3    Avenue being as the evidence indicates that area of

4    Cicero Avenue being heavy trafficed by prostitutes and

5    hookers in that area of the sitity.  He takes a left

6    presumably is traveling eastbound.  And according to

7    the videotape statement attributed to Mr. Long Mr.

8    Walker is in the street that is while the van travels

9    eastbound.

10        Mr. Walker approaches the van and Mr. Madjak

11   has cash in his hand, which Mr. Walker according to the

12   statement then tries to take, swipe from Mr. Madjak's

13   hand.  Mr. Madjak pulls the cash back.  Now, if that is

14   true, there is an attempt at that point by someone to

15   rob Mr. Madjak.

16        One would think that at that point having

17   been put on notice of what is transpiring, that if that

18   statement is true, that Mr. Madjak would leave the

19   area.

20        But we know the statement can't possibly be

21   true because according to the statement attributed to

22   the Jovanie Long he waits there with an individual

23   having tried to take cash from him.  And Jovanie Long

24   then motions him according to this statement around the

XX-34

CCSAO XAVIER WALKER 001548

1   block to some other location.

2       I ask the Court why would Madjak if that

3   situation, that statement was true if you are supposed

4   to believe that he is traveling eastbound in an

5   unfamiliar area off Cicero Avenue down off Cicero in

6   the vicinity of Erie, someone is just trying to take

7   cash from him and he waits in the area while someone

8   motions him around the block.

9       Interestingly enough he is already facing

10  eastbound, the van when it is found is facing

11  eastbound.  So, this can't be true either that he was

12  motioned around the block because he is already

13  traveling eastbound to go around the block and ends up

14  going eastbound.

15      You have to make a complete circle to end up

16  going in the same direction that you are already

17  going.  Why would he have traveled to some other

18  location and both locations facing eastbound?  So that

19  can't be true either.

20      The State indicates in the theory of the case

21  that they can't understand why he is down in that

22  area.  Perhaps he took a wrong turn.  Your Honor, can

23  note the distance from where he started out to where he

24  ended up.

CCSAO XAVIER WALKER 001549

1          Investigation here began with the prostitutes

2     on Cicero Avenue.  Whatever happened here, this was

3     not, did not involve Jovanie Long.

4          What happened your Honor can recall that in

5     the testimony that there was a prostitute who had

6     information as to the victim's actions and locations at

7     or about the time of this.

8          MS. RAVIN:  Objection.

9          THE COURT:  No.  Go ahead.

10         MR. CONNIFF:  There was a witness, a

11    prostitute who had information about this victim.  That

12    this individual, this prostitute mentioned the names

13    Red and Darnell.  This is only going to the

14    investigation and the reliability of the statement.

15         THE COURT:  All of which we struck.  Is that

16    right, Miss Ravin?

17         MS. RAVIN:  Yes.  It wasn't anything to do

18    with the victim.

19         MR. CONNIFF:  I am sorry, Judge.  I thought

20    you were going to consider it only for that purpose.

21         THE COURT:  No.  Go ahead.  I think that is

22    why Miss Ravins objected.

23         MR. RAVIN:  It was struck.

24         MR. CONNIFF:  I am not arguing the

XX-36

CCSAO XAVIER WALKER 001550

1    substance.  I am just arguing there wasn't any

2    investigation that Red and Darnell were never

3    investigated.  I think the officer --

4           THE COURT:  I struck it because it was double

5    hearsay basically.

6           MR. CONNIFF:  I was only going to the

7    investigation, Judge.  There was no investigation of

8    this information.

9           THE COURT:  All right.

10          MR. CONNIFF:  And that the prostitute in

11   question, reason it wasn't given why there was no

12   investigation of this was because they had no way of

13   finding out who Red and Darnell were.  She had stated

14    --

15          THE COURT:  She said Red.

16          MR. CONNIFF:  They never followed up.  There

17   is no physical evidence here.  There is no fingerprints

18   in the van.  There is no gun recovered.  There is no,

19   they took gym shoes.  No blood on the gym shoes.  No

20   physical evidence tying Mr. Long to this incident.  We

21   would ask your Honor to grant the motion.

22          THE COURT:  In his video recorded statement

23   your client said that the weapon used was a 45, is that

24   correct?

XX-37

CCSAO XAVIER WALKER 001551

```
 1          MR. CONNIFF:  Yes.

 2          THE COURT:  Okay.  All right.  Let's hear

 3   from Mr. Walker.

 4          MR. WILSON:  Judge, we are also asking for a

 5   directed finding of not guilty.  We believe the State

 6   has failed to prove beyond a reasonable doubt that my

 7   client, Xavier Walker, was any way, shape or form

 8   involved in the commission of this crime.

 9          I think, Judge, that when the evidence is

10   viewed in a light most favorable to the State --

11          THE COURT:  As the law requires.

12          MR. WILSON:  As the law requires what you are

13   left with is this.  Mr. Madjak was in the area and he

14   wound up dead.  There is no disputing that.

15          How he come to be killed and at whose hands

16   it was that he was the victim is debateable.  There is

17   nothing, there is absolutely no evidence whatsoever

18   tying Xavier Walker to this crime.  Put aside for the

19   moment, if you would, Judge, his taped video statement

20   as you recall we previously sought to have it

21   suppressed, which the Judge, whichever the Court

22   overruled.

23          But just put that aside for the moment, there

24   is nothing that indicates that Xavier Walker on the
```

CCSAO XAVIER WALKER 001552

1    morning or evening of May 13th, 2000, was anywhere near

2    this scene.

3            There is nothing.  No physical evidence.

4    There is nothing.  There is no evidence, Judge, that

5    ties Xavier Walker into any scheme, if you will,

6    involving himself and Mr. Long for the robbery and or

7    murder of Mr. Madjak.

8            The State has not shown any accountability

9    which it must show I believe in order to have my client

10    found guilty between himself and Mr. Long.  Do they

11    know each other?  Yes, Judge.  They have known each

12    other since --

13            THE COURT:  Childhood.

14            MR. WILSON:  Since childhood.  No dispute.

15    That is all there is.  There is no credible evidence

16    whatsoever implicating Xavier Walker in the commissioin

17    of this crime, but for, but for the video statement

18    that he gave.

19            We reiterate, Judge, we think the statement

20    was improper.  We think it is highly suspect.  I don't

21    think, I think that because that is the only evidence

22    involving Xavier Walker in the commissioin of this

23    crime, the State has failed to prove, carry the burden

24    of proof, Judge.  We are asking for a directed finding,

XX-39

CCSAO XAVIER WALKER 001553

1    Judge.

2           THE COURT:  If we put aside the statement, I

3    would, the videotaped statement, I would agree with

4    you, Greg.  But we are also overlooking a piece of

5    evidence that I think is properly before the Court for

6    consideration.

7           In that statement Mr. Walker implicates

8    himself.  I am sure you all will recall the content of

9    the recording, but he talks about planning to commit a

10   lick, directing the victim out of, hopefully out of the

11   sight of police.  Becoming aware of a struggle between

12   the victim and Mr. Long and going, starting to the

13   vehicle with the intent to help Mr. Long during the

14   struggle and on and on.

15          State, brief response, please.

16          MS. RAVIN:  Judge, I believe that taking the

17   evidence in the light most favorable to the nonmoving

18   party, we have not only met our burden, but met it

19   beyond a reasonable doubt.

20          With respect to this there is corroboration

21   to the defendant with the statement through Maurice

22   Wright, there is corrobation through shell casings that

23   are found.  They are both fired from the same gun

24   correspond to the two shots that land in the victim,

CCSAO XAVIER WALKER 001554

1 Marek Madjak, that corroboration is what backs up the

2 defendant's confession. And that is why he is guilty.

3 When you look at his confession, he

4 specifically says in it that at a certain point he

5 hears the struggle. When he hears the struggle he goes

6 to go help his friend. It is all about helping, all

7 about aiding and abetting. That is why he is

8 accountable.

9 With respect to the defendant Long, briefly,

10 Judge. Clearly what the defendant is doing is he is

11 trying to minimize the shooter. And he is the

12 protagonist of the situation. He he is trying to put

13 more on the guy who he was partners with. That is what

14 that is.

15 The victim was lost. You know the victim was

16 lost. When he gets waived around the corner it is

17 because he needs directions. Not because he is going

18 to by drugs or anything like that. He didn't know

19 where he was. He didn't speak a lot of English.

20 We ask that you deny their motion for

21 directed finding.

22 THE COURT: The motion as with respect to the

23 defendants is respectfully denied.

24 Counsel for Mr. Long.

CCSAO XAVIER WALKER 001555

 1              MR. CONNIFF:  Judge, we have no additional
 2    evidence to present.  We rest.
 3              THE COURT:  Counsel for Mr. Walker.
 4              MR. WILSON:  Walker rests, Judge.
 5              THE COURT:  John, have you conferred with
 6    your client regarding resting at this juncture?
 7              MR. CONNIFF:  Yes, I have, Judge.
 8              THE COURT:  Greg, the same way?
 9              MR. WILSON:  Yes, Judge.
10              THE COURT:  Pat, you want to go through?  All
11    right.  Half hour break.
12                        (Lunch recess.)
13              THE CLERK:  Walker and Long.
14              THE COURT:  Bring out the defendants,
15    please.
16              State going to waive argument, reserve
17    rebuttal?
18              MS. RAVIN:  Sure, Judge.
19              THE COURT:  Who wants to go first?
20              MR. CONNIFF:  Judge, I will go first, unless
21    Mr. Wilson wants to.
22              MR. WILSON:  No.
23              MR. CONNIFF:  Judge, you had asked about the
24    45 and Mr. Long's statement that is contained in his

                          XX-42

CCSAO XAVIER WALKER 001556

1   statement, but the physical evidence in the case also
2   indicates that there was blood of the victim found
3   inside the van on the passenger seat.

4          There were no shell casings found in or
5   around the van, which suggested there was a struggle
6   which went on inside the van.  Your Honor will recall
7   the medical examiner found evidence consistent with a
8   bite mark on the victim's arm.

9          There was a struggle which went on inside the
10  van, and that a shot must have been fired at that
11  location for the blood of the victim to have ended up
12  on the passenger seat inside the van.

13         Your Honor will recall the medical examiner
14  also found gunshot wounds to the buttock, but there are
15  no shell casings found except across the street on the
16  other side of the street in the vicinity of the body
17  which was where the 45 shell casings are found.

18         Which raises a question as to the
19  circumstances under which the victim in the case
20  suffered a gunshot wound while inside the van.  Which I
21  think is established by the blood on the passenger
22  seat.

23         That raises questions about the weapon here
24  whether it was a a weapon or whether there was more

CCSAO XAVIER WALKER 001557

1   than one weapon involved.   Which goes to the

2   credibility of Mr. Long's statement, in addition to the

3   way he describes the circumstances under which this

4   came to be.   This motion, it was a robbery, there is

5   absolutely no evidence to suggest there was any felony

6   which was being committed inside that van at that

7   time.

8           There is substantial evidence indicating

9   there was a struggle over a gun, apparently not the 45

10  as to which the shell casings were found on the other

11  side of the street.   Where is that gun and who had

12  possession of that gun?

13          So, this statement, this videotape statement

14  that was taken from my client is not an accurate

15  statement as to what happened out at this location

16  resulting in the death of Mr. Madjak.

17          Is the amount of weight that you put on that

18  statement as being an accurate transcription of what

19  occurred sufficient to convict my client beyond a

20  reasonable doubt?

21          I suggest to the Court that the weight of

22  that is minimal.   Because of the problems with the

23  physical evidence, the problems with the motive.   For

24  example, if this individual was down there, this had

XX-44

CCSAO XAVIER WALKER 001558

1    something to do with prostitution, that would suggest

2    the pockets which was pulled out from the victim's

3    pants.

4         That doesn't necessarily indicate that the

5    motive for this was a robbery of some kind.  So, I

6    think there are questions, Judge, based upon the way

7    the police found the scene here and what the subsequent

8    testing of the blood and the other evidence in the case

9    indicates, where the shell casings were found as well

10   as this issue of this van supposedly being signalled

11   already traveled east to go to another location and

12   ending up a block away facing east.  That that is the

13   important trail in the video statement.  That there is

14   a lot of this that doesn't make sense.

15        The evidence technicians and detectives that

16   arrived at the scene when they picked up those shell

17   casings before Mr. Long ever came in to give a

18   statement it was known there was a 45 involved in the

19   case because of those shell casings.

20        So, what is unknown is what happened inside

21   that van.  And what weapon was involved in the gunshot

22   to the buttock as to which the blood ends up up on the

23   passenger seat.

24        So, coupled with Maurice Wright who was held

XX-45

1   at the police station for a couple of days before he

2   gives an account of this which I would suggest if your

3   Honor looks at that closely, that also does not square

4   with the evidence in the case. That he has supposedly

5   Mr. Long according to the statement indicating the

6   location where the gun was taken. There was no gun

7   ever recovered at that location.

8         So, what you have is Maurice Wright giving a,

9   signing a statement after a couple of days as to a

10   state of affairs which I think there is reasonable

11   cause to believe that this statement is not, was also

12   not an accurate statement and should not be given

13   weight sufficient to convict Mr. Long beyond a

14   reasonable doubt.

15         We'd ask your Honor to so find.

16         THE COURT: Mr. Wilson.

17         MR. WILSON: Thank you, Judge.

18         THE COURT: Mr. Wilson.

19         MR. WILSON: Judge, I won't take up anymore

20   of the Court's time. I think that there does not exist

21   in the record credible evidence to support the State's

22   contention that my client committed the crime as

23   charged.

24         But for the videotaped confession there would

CCSAO XAVIER WALKER 001560

1  literally be no evidence whatsoever implicating Xavier

2  Walker in this came.

3       Clearly there is absolutely no physical

4  evidence whatsoever at the scene of the crime that

5  points toward Xavier Walker.  There are no

6  fingerprints.  There is nothing bearing his signature

7  at the scene of the crime that points toward Xavier

8  Walker.

9       The videotape that exists the Court will

10 recall Mr. Walker sought to explain away how he's been

11 in custody the period of time, how he's been badgered

12 by the arresting officers and then ultimately --

13       MS. RAVIN:  Objection.

14       THE COURT:  All right.  Go ahead.

15       MR. WILSON:  Ultimately how he had been, the

16 Court recalls the circumstances under which Mr. Walker

17 ultimately gave this taped confession.

18       I believe if the Court were to look at the

19 record, at the notes, at the tape itself it could

20 easily conclude that perhaps indeed the statement was

21 not given freely as the State would have you believe.

22       The question is this, Judge, is there in fact

23 in the record sufficient credible evidence to support

24 the contention that Xavier Walker is guilty beyond a

XX-47

1   reasonable doubt?

2           I submit, Judge, the answer is no, it is

3   not.  I ask for to you find my client not guilty.

4           THE COURT:  Miss Ravin.  Thank you, sir.

5           MS. RAVIN:  Judge, I think it is very

6   important when you look at the photographs and you see

7   the blood inside the victim's nose and when you look at

8   the gunshot wounds of entry to the head that was

9   lodged, the gunshot wound of entry on the right, on the

10  left hip that came out and his buttock, you can see the

11  stippling.

12          This is not a bite mark, it is a possible

13  bite mark.  No saliva ever found.  I think it is

14  important to look at the bloody clothes and the

15  bullet.  I think that when you look at the scene

16  photographs and you see the car with the shattered out

17  passenger window and you see how the car was found and

18  you see the glass that is over the blood, I think that

19  what you have is corroboration of the fact that

20  defendant Long was struggling with the victim Marek

21  Madjak.

22          While they are struggling I think that the

23  reasonable inference is that the victim moves from the

24  driver's seat of the car as he is fighting with

CCSAO XAVIER WALKER 001562

1  defendant Long.  When they are fighting he ends up in
2  the passenger seat of the car.
3        When you look at the stippling on that bullet
4  wound in his hip, that is where the gun goes off.  I
5  think that with respect to the cartridge casings the
6  reasonable inference to be made is because the gun is
7  left in close proximity during the struggle and
8  defendant Long tells you that the victim had ahold of
9  the muzzle at a certain point during the fight, that
10  the victim was besting him in that physical
11  altercation.
12        What happened is when the semiautomatic
13  ejects that cartridge casing it gets caught in the
14  defendant's clothes.  When the defendant chases after
15  the victim --
16        MR. CONNIFF:  Objection, Judge.
17        THE COURT:  It is just rebuttal argument.
18  Objection noted.
19        MS. RAVIN:  Reasonable inference is when he
20  is chasing after Marek Madjak who is collapsing on the
21  ground beaten, it scrapes as he is falling.  As he
22  chases after the victim that cartridge casings becomes
23  dislodged from the clothes where it went during the
24  struggle.

XX-49

```
 1              Obviously if he is shot down during that
 2    struggle, the gun is being held low.  It is not being
 3    held up high for cartriges casings to be ejected out
 4    out the window or across the street.  It makes sense
 5    because it is in close proximity to the body which what
 6    you see in the picture are the cartridge casings,
 7    Judge.  Clearly from when the victim falls on the
 8    ground and the defendant comes up point blank range
 9    shoots him in the head to finish him off.
10              The robbery can occur at any time whether it
11    is in the car or when he is on the street within the
12    money is taken.  And you heard the woman who talked to
13    you about that, saw him in the bar.  And he was, he had
14    the money.  It was in his pocket.  It was loose.
15    Anybody could see it.  The money is gone by the time
16    the police are there.  And the defendant told you who
17    took it.
18              Clearly defendant Walker was the lookout.  If
19    you look to his videotape statement, Judge, he
20    specifically says that he sees, he hears the sounds
21    which is the struggle of the victim and defendant
22    Long.  And he is going to make a motion and he goes to
23    help.  He hears the shot.  He sees the victim run
24    across the street.  And he sees Long chase after the
```

CCSAO XAVIER WALKER 001564

1   victim.

2          They meet up together. They go back to the

3   scene. They are surveying the damage they caused. You

4   also have Maurice Wright. Whatever you think about

5   Maurice Wright, Maurice Wright was told by the

6   defendant Walker what defendant Long just did.

7          And then when defendant Long continues to

8   tell the story, Walker doesn't deny it. He doesn't

9   change it. He doesn't add to it. Because he knows

10  that what Long is saying is true. It is as if he said

11  the himself. It is what you call a tacit admission.

12  Because a reasonable person, if those facts were not

13  true, would deny them.

14          Maurice Wright hears that third party

15  admission. And that third party admission comes in as

16  substantive evidence what he testifies to in the grand

17  jury.

18          It is all impeachment from the handwritten

19  statement, but it comes in and it corroborates what

20  defendant Walker says happened.

21          He says they talked to him. It says what

22  defendant Long told you happened in the videotape

23  statement.

24          Clearly in defendant Long's statement he is

CCSAO XAVIER WALKER 001565

1  minimizing, he is trying to place more blame on his

2  co-defendant.  That is normal.  That is natural.  That

3  is what he did.

4         With respect to more than one weapon, there

5  isn't more than one weapon, Judge.  You heard the

6  firearm examiner stipulation.  Both cartridge cases

7  were fired from the same gun.  Lo and behold both 45

8  calibre cartridge casings, the bullet recovered from

9  the victim is is 45 calibre bullet.  You can't match

10  the casings to the gun.  The reasonable inference is

11  because there is no gun found.  Your common sense tells

12  you that.

13         If you listen to the defendants, if you

14  listen to Maurice Wright, he tells you in the grand

15  jury that defendant Long told him that they went and

16  they took the gun and threw the gun away by Chicago

17  Avenue.  He says that in front of defendant Walker.

18         Defendant Walker doesn't say a word.  He

19  doesn't say, that is not true.  It is as if he spoke it

20  himself.

21         Both defendants give videotape confession.

22  You saw them.  You saw them on videotape.  You heard

23  what they had to say.  You heard Maurice Wright back it

24  up.

XX-52

1      And you heard through the stipulations and
2  specifically in the medical examiner stipulation with
3  respect to the entry and exit wound and the other
4  gunshot wound to the head.  It backs up what the
5  defendant says about the struggle that he had with the
6  victim in the van.  And it backs up what defendant
7  Walker saw and tells you he saw in his videotape
8  statement.

9      We ask that you find both defendants guilty.
10     THE COURT:  Thank you, Miss Ravin.  I'd like
11 to thank you all.  Let me say at the outset I will not
12 consider as tacit admission or otherwise the suggestion
13 that at one point Mr. Long stood silent as Mr. Walker
14 attributed the shooting to him for a number of
15 reasons.

16     Having said that, I think it is textbook that
17 a conviction will not lie based upon confession alone.
18 That there necessarily must be more.  There is in my
19 opinion sufficient corroboration in this case.

20     Accordingly, the Court finds both defendants,
21 Mr. Walker and Mr. Long, guilty of murder.  And as to
22 Mr. Walker not guilty of armed robbery.

23     The matter will be set down for post-trial
24 motions and sentencing.

XX-53

CCSAO XAVIER WALKER 001567

```
 1              MS. RAVIN:  Judge, I would just make a motion
 2    to revoke all bonds.
 3              THE COURT:  Bond is revoked.  Pre-sentence
 4    ordered.  What date would you like to come back?
 5              MR. CONNIFF:  Judge.
 6              THE COURT:  Greg, pick a date.
 7              MR. WILSON:  How about July 29th, Judge?
 8              THE COURT:  John, is that okay?
 9              MR. CONNIFF:  I think I will be on vacation.
10    How is July 19th, Judge?
11              THE COURT:  Greg.
12              MR. WILSON:  I am fine with that, Judge.
13              THE COURT:  7/19 by agreement as to each
14    defendant.  Pre-sentence ordered.  Counsel, you will
15    need to complete that form.  Bond revoked each
16    defendant.
17                    (End proceedings.)
18
19
20
21
22
23
24
```

XX-54

CCSAO XAVIER WALKER 001568

1

2　STATE OF ILLINOIS )
　　　　　　　　　　　 )　SS.
3　COUNTY OF C O O K )

4

5

6　　　　　　 I, PATRICK J. FLANNERY, CSR, Official Court

7　Reporter for the Circuit Court of Cook County,

8　Illinois, Criminal Division, do hereby certify that I

9　reported in machine shorthand the proceedings had on

10　the motion in the above-entitled cause; that I

11　thereafter caused the foregoing to be transcribed,

12　which I hereby certify to be a true and accurate report

13　of proceedings had before the Honorable MARCUS R.

14　SALONE, Judge of the said court.

15

16

17　　　　　　　　　　Official Court Reporter

18

19

20　Subscribed and sworn to

before me this 2rd day
21
of Feb., 2006.
22

23

24

XX-55