# EXHIBIT 34



# Transcript of Joanna Liotine-Leafblad

**Date:** July 7, 2022
**Case:** Walker -v- City of Chicago

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4   - - - - - - - - - - - - x
5   XAVIER WALKER,            :
6          Plaintiff,         :
7      v.                     :   No. 20 C 07209
8   CITY OF CHICAGO, et al.,  :
9          Defendants.        :
10  - - - - - - - - - - - - x
11
12
13      REMOTE DEPOSITION of JOANNA LIOTINE-LEAFBLAD
14              Thursday, July 7, 2022
15                10:05 a.m. CST
16
17
18
19
20
21  Job No.: 455341
22  Pages: 1 - 339
23  Reported By:  Michelle M. Yohler, CSR, RMR, CRR
24
```

**Page 2**

```
1      The deposition of JOANNA LIOTINE-LEAFBLAD, held
2   remotely pursuant to notice before Michelle M.
3   Yohler, CSR, RMR, CRR, a certified shorthand
4   reporter, CSR No. 84-4531.
```

**Page 3**

```
1            A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFF:
3      MS. SIERRA REED
4      MS. JEANETTE SAMUELS
5      SAMUELS & ASSOCIATES, LTD.
6      53 West Jackson Boulevard, Suite 831
7      Chicago, Illinois 60616
8      872.588.8726
9
10  ON BEHALF OF THE DEFENDANT CITY OF
11  CHICAGO:
12      MS. NATALIE ADEEYO
13      MR. WARREN FASONE
14      NATHAN & KAMINSKI LLP
15      33 West Monroe, Suite 1830
16      Chicago, Illinois 60603
17      312.612.2255
18
19
20
21
22
23
24            (Continued)
```

**Page 4**

```
1   A P P E A R A N C E S   C O N T I N U E D
2   ON BEHALF OF THE DEFENDANT OFFICERS:
3      MS. MISHA ITCHHAPORIA
4      MR. GRAHAM P. MILLER
5      BORKAN & SCAHILL, LTD.
6      20 South Clark Street, Suite 1700
7      Chicago, Illinois 60603
8      312.580.1030
9
10  ON BEHALF OF THE COOK COUNTY STATE'S ATTORNEY'S
11  OFFICE:
12      MR. PATRICK DWYER
13      COOK COUNTY STATE ATTORNEY'S OFFICE
14      69 West Washington Street
15      Chicago, Illinois 60602
16      312.603.8600
17
18  ON BEHALF OF THE DEPONENT:
19      MR. JOHN C. COYNE
20      LAW OFFICES OF JOHN C. COYNE
21      53 West Jackson Boulevard, Suite 1750
22      Chicago, Illinois 60604
23      312.929.4308
24
```

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

2 (5 to 8)

**5**

E X A M I N A T I O N S

WITNESS                                              PAGE

JOANNA LIOTINE-LEAFBLAD

By Ms. Adeeyo............................    8
By Ms. Itchhaporia...................... 112
By Ms. Reed............................. 319
By Ms. Itchhaporia...................... 332
By Ms. Reed............................. 334
By Ms. Itchhaporia...................... 335


E X H I B I T S

EXHIBITS                                             PAGE

No. 1   Statement of Ashanti Wright.........   23
No. 2   Statement of Mary Curry.............   43
No. 3   Motion to Suppress Testimony
        Excerpt.............................   57
No. 4   Transcript of Video Statement of
        Xavier Walker.......................   73
No. 5   Xavier Walker Arrest Report......... 151
No. 6   Blueback Excerpts................... 238
No. 7   Motion to Quash Transcript.......... 266
            (Continued)

**6**

E X H I B I T S

EXHIBITS                                             PAGE

No. 8   Outline for Video................... 270
No. 9   Consent to Videotape Statement...... 273
No. 10  Opening Remarks for Videotaped
        and Court-Reported Statements....... 278
No. 11  Videotape........................... 292

**7**

P R O C E E D I N G S

MS. REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and have no objections to the witness being sworn in remotely.

Counsels, please indicate your agreement by stating your name, the party you represent, and your agreement on the record, starting with the taking attorney.

MS. ADEEYO:  Natalie Adeeyo on behalf of defendant City of Chicago, and I agree, as well as my co-counsel, Warren Fasone.

MR. COYNE:  On behalf of the witness, John Coyne.  I agree.

MS. REED:  Sierra Reed on behalf of plaintiff.  I agree.

MS. ITCHHAPORIA:  Misha Itchhaporia and Graham Miller on behalf of the individual Chicago Police defendant officers, and we agree.

MR. DWYER:  Patrick Dwyer on behalf of Cook County State's Attorney's Office, and I agree.

**8**

(WHEREUPON, the witness was duly sworn.)
JOANNA LIOTINE-LEAFBLAD, called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. ADEEYO:

Q  Good morning, Ms. Leafblad.  Can you please state and spell your name for the record.

**A  Yes.  My name is Joanna, J-o-a-n-n-a, middle initial M, like Mary, and then I have Liotine, L-i-o-t-i-n-e, and my last name is Leafblad, L-e-a-f-b-l-a-d.**

Q  And, Ms. Leafblad, are you present in the room that you're sitting in with anyone else?

**A  No, there's nobody here.  And my door is closed.**

Q  Perfect.  Thanks.

I'm just going to quickly go over some ground rules with you for a deposition.  First, please just answer questions aloud.  Because we're not sitting in the same room, it makes my life easier, as well as the court reporter, as I'm sure you're aware.

If you do not understand any of my

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

**9**

1  questions, just let me know, and I'll either
2  repeat it or rephrase it.  However, if you answer,
3  I'm going to assume that you understood it.
4       I also ask that you just wait for me to
5  fully ask my question before you begin your
6  response, and I'll try to pay you that same
7  courtesy as well.
8       I'm going to apologize now for speaking
9  over you because the likelihood of that happening
10 is pretty high.
11      Also, if you need to take a break at any
12 time, that's perfectly fine.  I just ask that if I
13 have a question pending, you answer it before you
14 go on a break, okay?
15     A  Okay.
16     Q  Also, there's several attorneys on this
17 Zoom, so in the event there's an objection to one
18 of your questions, unless you're instructed not to
19 answer, you must answer, okay?
20     A  Okay.
21     Q  All right.  So let's get started.
22      First, Ms. Leafblad, how old are you?
23     A  I'm 53.
24     Q  And what is your current occupation?

**10**

1      A  I'm an attorney.  I'm an Assistant State's
2  Attorney with the Cook County State's Attorney's
3  Office.
4      Q  How long have you been an Assistant
5  State's Attorney with the Cook County State's
6  Attorney's Office?
7      A  I returned to the -- I just came back to
8  the office in September of 2021.  Prior to that, I
9  was in the office from March of 1994 to April --
10 I'm sorry, I think it's March of 1996 until April
11 of 2003.
12     Q  And your entire time with the Cook County
13 State's Attorney's Office, were you functioning as
14 an Assistant State's Attorney?
15     A  Yes.
16     Q  Now, while you were working as an ASA --
17 I'll use that abbreviation -- were you always in
18 the same unit or department?
19     A  No.
20     Q  Can you just kind of walk me through your
21 career with the Cook County State's Attorney's
22 Office.
23     A  The first time I was in the office, which
24 would have been -- I think I started in March of

**11**

1  '96.  I have not checked, but I think that's
2  correct.  I started in the Child Support
3  Enforcement unit.  After that, I was in the
4  Domestic Violence Prosecution unit at the
5  misdemeanor level.
6       And then I went to Felony Review, and then
7  I went to one of the branch courts of -- the
8  felony branch courts.  I can't recall which one.
9  And then I went to our Homicide and Sex
10 Preliminary Hearings unit.
11      In between there -- in between there I
12 went back and prosecuted -- or maybe it was -- it
13 could have been prior to Felony Review.  I'm
14 sorry, I don't recall the order, but at one point
15 I was prosecuting misdemeanor domestic violence
16 cases under a grant and I specifically did those.
17 And that was for about two years, I think.
18      And then I was the third chair in the
19 felony trial division, and then I left the office.
20      And when I came back in September, I am an
21 Assistant State's Attorney in the Special
22 Prosecution Human Trafficking unit.
23     Q  So is it fair to say you're currently
24 working as an Assistant State's Attorney in the

**12**

1  Human Trafficking Unit?
2      A  That's what I am doing currently, yes.
3      Q  And for that period of time you left the
4  Cook County State's Attorney's Office before you
5  returned, were you working as an attorney?
6      A  Yes.
7      Q  And who was your employer?
8      A  I was self-employed during that time.  I
9  did work Of Counsel with a few attorneys, and I
10 was an arbitration panelist for Cook County
11 mandatory arbitration.
12      And then I did work for the Illinois State
13 Board of Education for a short period of time and
14 also for -- I was an employee of a law firm for a
15 short -- a little over a year.
16     Q  During the time in which you were
17 self-employed -- and I think you just mentioned
18 you were an employee of a law firm.  What type of
19 law were you practicing?
20     A  Primarily estate planning, which is wills
21 and trusts, probate, guardianship, real estate.
22 Those were the -- that's what I did primarily.
23     Q  Did you perform any work in civil rights
24 litigation?

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

4 (13 to 16)

---

13

1      A  Not that I recall.
2      Q  And during that period of time in which
3  you weren't working for the Cook County State's
4  Attorney's Office, did you do any work in criminal
5  defense?
6      A  Not specifically.  I might have appeared
7  in court for somebody to cover a court date, but I
8  specifically didn't litigate any criminal defense
9  matters that I -- not that I recall.  It wasn't
10  something I looked for.
11      Q  Understood.  So in your current position
12  working in the Human Trafficking Unit, what would
13  you say your duties are?
14      A  Well, we receive cases -- we work under
15  the purview of a grant, so we receive cases that
16  involve victims who are, you know, the victims of
17  involuntary servitude and sexual assault or abuse
18  within that -- within the involuntary servitude
19  and, you know, any victims who are trafficked.
20          And so I prepare cases for -- you know, I
21  do discovery, draft motions if needed, argue
22  motions if necessary, and, you know, ultimately go
23  to trial unless the matter comes to some other
24  resolution.

14

1      Q  Understood.  Ms. Leafblad, I notice that
2  you've been looking down a lot.  Do you have a
3  document in front of you?
4      A  No.  I'm looking down -- when I think
5  about my answer, I look down or look up.  I
6  apologize.
7      Q  No, no need to apologize.  I just want to
8  double-check if you're referring to a résumé or,
9  you know, something of that sort.
10      A  Okay.
11      Q  Okay.  So I know you mentioned that you
12  worked in Felony Review for the Cook County
13  State's Attorney's Office.  Do you recall what
14  period of time that you worked in that unit?
15      A  I think I started in December of 1999, and
16  I think I left in January of 2001.  I'm not
17  exactly sure of those dates -- of any dates, but I
18  think that is the time period.
19      Q  Is it fair to say you worked in the Felony
20  Review Unit in May of 2000?
21      A  It would seem -- that fits into that time
22  period, yes.
23      Q  And while you were working for the Felony
24  Review Unit, what would you say your general

15

1  responsibilities were as an ASA?
2      A  We would be called to a detective area.
3  Sometimes it could be elsewhere, sometimes a
4  police district or a hospital, depending on the
5  case.  And we would review the paperwork -- you
6  know, the reports and any documentation that there
7  was and speak to the police officers and
8  detectives, interview witnesses, victims, and
9  offenders -- or people who are in custody.
10      Q  When you said you would review reports and
11  documents, are you referring to police reports
12  that would be contained in the detective's
13  investigative file?
14      A  Well, I would review police reports.  I
15  don't know what -- I've never been -- I was never
16  handed a file, a detective's investigative file,
17  but I did review police reports.
18      Q  And then you also said you would speak to
19  the officers, the detectives working up that case;
20  is that correct?
21      A  Yes.
22      Q  Okay.  And, just generally, what would you
23  speak to those officers or detectives about?
24          MS. REED:  I'm going to object --

16

1          MR. COYNE:  I'm going to object to
2  foundation.
3          Go ahead.
4          MS. REED:  I'm going to object to
5  foundation.
6  BY MS. ADEEYO:
7      Q  You may proceed.
8      A  Well, whatever they called in.  So, I
9  mean, it could be any number of things.  So I
10  can't -- that's really the best answer I can give,
11  whatever they were calling about, then we would go
12  and talk to them about what they called in.
13      Q  And when you say what they called in, were
14  you speaking to those detectives or officers to
15  discuss the facts surrounding whatever crime that
16  they were calling in?
17      A  Yes, that's fair to say.  That's at least
18  one of the things we would have discussed, yes.
19      Q  And would you discuss with those
20  detectives or officers any potential suspects or
21  potential leads that they had in that case?
22          MS. REED:  I'm going to --
23          MR. COYNE:  Object --
24          MS. REED:  -- object to -- I'm going to

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

5 (17 to 20)

17

1 join the objection. Also object to form, calls
2 for a narrative, and speculation.
3 BY MS. ADEEYO:
4     Q  You can answer.
5     A  I would speak to them about whatever they
6 felt was relevant when I -- at the time. So I
7 don't know -- I can't say what specifically they
8 would have wanted to talk to me about in each
9 case. Each case is different.
10     Q  You also mentioned that you would
11 interview witnesses, victims, and suspects as part
12 of your responsibilities in Felony Review, right?
13     A  Those were the -- yes.
14     Q  Typically, how would you determine which
15 witnesses to interview?
16     MR. COYNE:  Same objection.
17     MS. REED:  Join the objection.
18 BY MS. ADEEYO:
19     Q  You can answer.
20     A  Well, I can speak generally, but I can
21 just say that, you know, again -- I don't remember
22 specifically how we got to that. It would just be
23 based on whatever the facts of the particular case
24 were. If there were witnesses, we would talk to

18

1 them. If there was somebody in custody, we would
2 talk to them.
3     I mean, you know, I'm sorry, that's all
4 that I -- that's the best I can respond.
5     Q  So aside from interviewing witnesses,
6 suspects, victims, and reviewing police reports,
7 was there any other responsibilities that were
8 part of your role in the Felony Review Unit? Was
9 that it?
10     A  That's all.
11     Q  Okay. Now, the case that we're here to
12 talk about today relates to the prosecution of an
13 individual named Xavier Walker for a murder that
14 occurred in 2003 of the victim, Marek Majdak.
15     Are you aware that we're talking about
16 that case today?
17     A  I'm aware that we were -- yes.
18     Q  Okay. Do you have any independent
19 recollection of that case?
20     A  I do not.
21     Q  Prior to today's deposition, did you
22 review any documents to prepare?
23     A  I did review some documents. I
24 reviewed -- yes, I did review some documents.

19

1     Q  And the part of the documents that you
2 reviewed, did you review any trial transcripts or
3 hearing transcripts?
4     A  I did scan two transcripts, yes.
5     Q  When you scanned, do you mean that you
6 just looked through them quickly, or did you
7 actually have the opportunity to read the
8 information contained in those transcripts?
9     A  I looked through them. I mean, I did -- I
10 read a little bit, but I didn't -- I scanned
11 through it. I didn't spend time on it.
12     Q  And in addition to those transcripts, did
13 you also review any witness statements?
14     A  Yes, I did.
15     Q  And do you recall the witness statements
16 you reviewed?
17     A  If I do -- not offhand. I don't know the
18 names of the witnesses offhand.
19     Q  And in preparation for today's deposition,
20 did you also review the statement transcript of
21 Xavier Walker?
22     A  Yes.
23     Q  After reviewing those documents, did it
24 refresh your recollection about any aspect of your

20

1 involvement in this -- in Walker's case?
2     A  No.
3     Q  So I understand you don't recall much of
4 this case, if anything, but I'm just going to try
5 to walk you through it, okay? And I have some
6 questions pertaining to the specific documents I
7 sent to you, okay?
8     A  Okay.
9     Q  So, first, do you recall when you were
10 first assigned to Xavier Walker's case?
11     A  No.
12     I'm sorry, were you asking me the date I
13 was first assigned?
14     Q  Correct.
15     A  No. I do not recall that, no.
16     Q  Do you recall if any other Assistant
17 State's Attorneys were assigned to Walker's case
18 as well as yourself?
19     A  No, I do not.
20     Q  Do you recall any specific police reports
21 that you reviewed when you were assigned to
22 Walker's case?
23     A  No --
24     MS. REED:  I'm going to object to lack of

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

6 (21 to 24)

---

21

1  foundation.
2  BY MS. ADEEYO:
3      Q  I'm sorry, did you answer?  I missed it.
4      A  I said no.
5      Q  Do you recall speaking to any specific
6  detectives or officers when you were first
7  assigned to Xavier Walker's case?
8          MS. REED:  I'm going to object to lack of
9  foundation.
10  BY MS. ADEEYO:
11     Q  You can answer.
12     A  No.
13     Q  Do you recall interviewing any specific
14  witnesses as part of your assignment to Walker's
15  case?
16         MS. REED:  I'm going to object to lack of
17  foundation.
18  BY THE WITNESS:
19     A  No.
20  BY MS. ADEEYO:
21     Q  Do you recall interviewing Xavier Walker
22  as part of your assignment to this case?
23         MS. REED:  I'm going to object to lack of
24  foundation.

---

22

1  BY THE WITNESS:
2      A  No.
3  BY MS. ADEEYO:
4      Q  Do you recall the names of any of the
5  detectives or officers working on Xavier Walker's
6  case?
7          MS. REED:  I'm going to object to asked
8  and answered, lack of foundation, form.
9  BY THE WITNESS:
10     A  No.
11  BY MS. ADEEYO:
12     Q  Okay.  So now I'm going to turn to what
13  I'll mark as Exhibit 1, which is Bates-stamped
14  City NK 93 to 97.  I'm going to share my screen as
15  well.
16         Ms. Leafblad, do you have those documents
17  printed out with you?
18     A  Which document are you referring to?
19     Q  It's Bates-stamped City NK 93 t0 97 at the
20  bottom.
21     A  I don't have -- oh...
22     Q  If you don't, that's fine; I'll be sharing
23  my screen, so you can just take a look at it that
24  way.

---

23

1      A  I was able to print some documents; I just
2  couldn't print all of them.  But I do seem to
3  have -- I do have 93 to 97 printed.
4      Q  Okay.
5          (WHEREUPON, Leafblad Exhibit No. 1 was
6  presented to the witness.)
7  BY MS. ADEEYO:
8      Q  Okay, Ms. Leafblad, do you see a document
9  in front of your screen at the top it says
10  "Statement of Ashanti Wright"?
11     A  Yes, I see it.
12     Q  So taking a look at this document, it
13  starts:  Statement of Ashanti Wright taken
14  28 May 2000 at 6:10 at 4653 West Erie -- I believe
15  that's an abbreviation for Chicago -- CHGO.  And
16  it says:  Present:  ASA Leafblad, J; Detective
17  Cruz, #20887; Detective Wolverton, #20014.
18         Do you see that there?
19     A  Yes, I do.
20     Q  So this appears to be the statement of
21  Ashanti Wright, and you were present for that
22  interview; is that correct?
23         MS. REED:  I'm going to object to lack of
24  foundation.

---

24

1  BY MS. ADEEYO:
2      Q  You can answer.
3      A  Well, you said this appears to be the
4  statement of Ashanti Wright, and I would agree
5  with that.  I do not recall taking this statement.
6      Q  Okay.
7      A  It sounded like a two-part question, so
8  I'm trying to answer both parts of it.
9      Q  Taking a look at the bottom of this first
10  page here marked City NK 93.
11         Is that your signature contained here at
12  the bottom of this page?
13     A  It does look like my signature, yes.
14     Q  Okay.  I'm going to take you to the next
15  page, City NK 94.
16         Does this appear to be your signature at
17  the bottom of this page?
18     A  It does appear to be my signature, yes.
19     Q  Taking you to the next page, City NK 95.
20         Does this appear to be your signature at
21  the bottom of this page?
22     A  It does appear to be my signature, yes.
23     Q  Taking you to the next page, City NK 96.
24         Does this appear to be your signature at

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

7 (25 to 28)

25

1 the bottom of the page?
2    **A   It does appear to be my signature, yes.**
3    Q   And turning your attention to the last
4 page of this exhibit, City NK 97, does that appear
5 to be your signature under this first photograph?
6    **A   It does appear to be my signature, yes.**
7    Q   Okay.  So I understand you don't have any
8 recollection of this interview, but I'm just going
9 to walk you through what it states.
10    First, let me ask you, does this appear to
11 be your handwriting in this --
12    MS. REED:  I'm going to -- never mind.
13 BY MS. ADEEYO:
14    Q   You can answer.
15    **A   Does it appear to be my handwriting --**
16    Q   Correct.
17    **A   -- I'm sorry, was that the question?**
18    Q   Yes, it was.
19    **A   It does appear to be my handwriting.**
20    Q   Okay.  Now, starting here at the top, it
21 states:  This statement taken regarding the
22 robbery and shooting death of Marek Majdak which
23 occurred on 13 May 2000 at 1:00 -- and then
24 there's a slash -- 1:14 at 4721 West Ohio,

26

1 Chicago.
2    It starts:  "After being advised that
3 Assistant State's Attorney Joanna Leafblad is a
4 lawyer and a prosecutor but not Jovanie Long or
5 Maurice Wright's attorney, Ashanti Wright, made
6 the following statement, which is a summary but
7 not word for word."
8    So based on this statement, you informed
9 Ashanti Wright that you were a prosecutor but not
10 Jovanie Long or Maurice Wright's attorney; is that
11 correct?
12    MS. REED:  I'm going to object to lack of
13 foundation, hearsay, calls for speculation, and
14 form.
15 BY MS. ADEEYO:
16    Q   You can answer.
17    **A   That is what the document says.**
18    Q   And you have --
19    **A   Again, I don't have a -- I don't have a**
20 **specific recollection of doing that, but I don't**
21 **dispute that that's what the document says.**
22    Q   Okay.  Do you dispute the accuracy of this
23 document?
24    MS. REED:  I'm going to object to lack --

27

1    MR. COYNE:  Object --
2    MS. REED:  -- of foundation.
3    MR. COYNE:  Sorry.  Join.
4 BY MS. ADEEYO:
5    Q   You can answer.
6    **A   Would you please repeat the question.**
7    Q   Do you dispute the accuracy of this
8 document?
9    MR. COYNE:  Objection --
10    MS. REED:  Objection --
11    MR. COYNE:  -- foundation.
12    MS. REED:  -- to lack of foundation.
13 BY THE WITNESS:
14    **A   I don't dispute its existence.  I don't**
15 **have a specific recollection to that day or to**
16 **creating the document.  But I see it.  I don't**
17 **dispute its existence.**
18 BY MS. ADEEYO:
19    Q   Do you question whether or not you, in
20 fact, created this document?
21    MR. COYNE:  Objection, form, and
22 foundation.
23    MS. REED:  Join objection.
24

28

1 BY THE WITNESS:
2    **A   I don't question it, but I can't -- but I**
3 **don't remember doing it.**
4 BY MS. ADEEYO:
5    Q   Okay.  So I believe I read this sentence,
6 but just in case I didn't, it says:  "Ashanti
7 Wright made the following statement which is a
8 summary but not word for word."
9    Typically in your role as an ASA for
10 Felony Review Unit when you would be documenting
11 the statement given by a witness, would you
12 normally summarize what that person said?
13    MS. REED:  I'm going to object to lack of
14 foundation, calls for speculation, and form.
15 BY MS. ADEEYO:
16    Q   You can answer.
17    **A   In general --**
18    Q   Yes.
19    **A   -- yes, we would summarize.**
20    Q   Okay.
21    **A   I can't confirm -- again, I don't have a**
22 **specific recollection of this date, but I can tell**
23 **you that, in general, we would summarize -- I**
24 **would summarize.**

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

29

1  Q  Okay.  The next section states:  "Ashanti
2 states she is 20 years old.  Ashanti states she
3 went up to 11th grade at Westinghouse High School
4 in Chicago.  Ashanti states she has three
5 children, ages five, four, and three.  Ashanti
6 states they are all boys.  Ashanti states she
7 lived at 4653 West Erie with her godmother,
8 Maurice Wright, and her godmother's children.
9 Ashanti states her godmother's name is Mary
10 Curry."
11      You have no reason to dispute that that's
12 what Ashanti Wright told you that day, correct?
13      MS. REED:  I'm going to object to hearsay,
14 lack of foundation, calls for speculation, and
15 form.
16      MR. COYNE:  Join.
17 BY MS. ADEEYO:
18  Q  You can answer.
19  A  I have no reason to dispute it, no.
20  Q  The next section states:  "Ashanti states
21 on May 13th, 2000, she was home with Mary and
22 Ashanti's sister, Jamaica Wright, and Mary's
23 children.  Ashanti states they were paying" --
24 "playing cards when they heard gunshots.  Ashanti

30

1 states the shot sounded like it was close by, so
2 she went down to the basement to check on Timmy,
3 Jovanie Long's younger brother.
4      "Ashanti states Timmy wasn't down there
5 and neither was anyone else.  Ashanti states they
6 all went back upstairs but heard noises in the
7 basement five to ten minutes later.
8      "Ashanti states they went down again and
9 saw Jovanie, who they also call Vani.  Ashanti
10 states Vani didn't have a shirt on and was in the
11 bathroom.  Ashanti states Vani looked nervous.
12 Ashanti states Vani then went upstairs a short
13 time after they did.
14      "Ashanti states the person in Exhibit 1 is
15 Jovanie "Vani" Long.  Ashanti states Vani said he
16 didn't hear gunshots because he'd been sleeping in
17 the basement.  Ashanti states she know that wasn't
18 true but left it alone."
19      So up until that point, you have no reason
20 to dispute that that's what Ashanti told you that
21 day you took her interview; is that correct?
22      MS. REED:  I'm going to object to lack of
23 foundation, calls for speculation, form, and
24 hearsay.

31

1      MR. COYNE:  Join in foundation.
2 BY MS. ADEEYO:
3  Q  You can answer.
4  A  Again, I have no reason to dispute it, but
5 I don't recall it, I -- the conversation or doing
6 this interview.
7 BY MS. ADEEYO:
8  Q  I'm going to pick up where I left off.
9      "Ashanti states Vani put on another shirt
10 and told Ashanti and Jamaica to go to the sub
11 place with him to buy loose cigarettes.  Ashanti
12 states on their way back home, they saw the police
13 and walked down the street past where the body was
14 and the van with the hazard lights still flashing.
15      "Ashanti states Vani looked like he was
16 crying and the police asked them if they could
17 tell if the body was of someone they knew.
18 Ashanti states she doesn't know a lot of people,
19 so she didn't go look.  But another girl did and
20 said it was a white man not from the neighborhood.
21      "Ashanti states they went back home but
22 before they got home, Vani's friend Xavier, who
23 they call Zay, pulled up in a black car.  Ashanti
24 states Vani got into the black" -- "the back seat

32

1 of the car and they drove away while Ashanti and
2 Jamaica just went on home.  Ashanti states there
3 were two other people in the car but she doesn't
4 know them.
5      "Ashanti states she, Jamaica, and Mary
6 talked about the shooting for a while.  Ashanti
7 states Mary went to bed" -- and then it looks like
8 it's crossed out and says "upstairs, and Vani and
9 Maurice came in.  Ashanti states Maurice went up
10 to tell Mary they were back.  Ashanti states Vani
11 said he killed the white guy."
12      Now, in terms of what I just read to you,
13 you have no reason to dispute that that's what
14 Ashanti told you that day, correct?
15      MR. COYNE:  Objection --
16      MS. REED:  I'm going to object -- join
17 objection as well as hearsay, form, calls for
18 speculation.
19 BY MS. ADEEYO:
20  Q  You can answer.
21  A  I don't dispute that that's what the
22 document says.  I have no recollection outside of
23 that.
24  Q  "Ashanti states Vani said he wanted the

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

9 (33 to 36)

---

33

1 white boy's money but he put up a fight and was
2 getting the best of Vani, so Vani shot him.
3 Ashanti states they played cards, then Zay came.
4 Ashanti states Zay told her to go with him to wipe
5 fingerprints off the van. Ashanti states she
6 would not go because she didn't want to be a part
7 of anything."
8        You have no reason to dispute that that's
9 what Ashanti told you that day, correct?
10       MS. REED: I'm going --
11       MR. COYNE: Objection --
12       MS. REED: -- object -- join objection, as
13 well as hearsay, form, calls for speculation.
14 BY THE WITNESS:
15    A Again, I have no reason to dispute it, but
16 I don't recall it.
17 BY MS. ADEEYO:
18    Q Typically as an ASA in Felony -- in the
19 Felony Review Unit, when you're interviewing
20 witnesses, you're taking down accurately what that
21 witness relates to you, correct?
22       MS. REED: I'm going --
23       MR. COYNE: Object --
24       MS. REED: -- to -- I'm going to object to

---

34

1 form as well.
2 BY THE WITNESS:
3    A In general? Yes --
4 BY MS. ADEEYO:
5    Q Correct.
6    A -- I would -- in general, I would be as
7 accurate as I possibly can based on what
8 information was available.
9    Q And in that role as an ASA working in the
10 Felony Review Unit, when you're interviewing a
11 witness, you would never put down information in a
12 statement that they did not tell you, correct?
13       MR. COYNE: Objection, form.
14       MS. REED: I'm going to object to form.
15 Also calls for speculation and lack of foundation.
16 BY MS. ADEEYO:
17    Q You can answer.
18    A Can you please ask the question again.
19    Q Sure. In your role as an ASA working for
20 the Felony Review Unit, when you would interview a
21 witness, you would never put down in their
22 statement information that they did not tell you;
23 is that correct?
24       MS. REED: Same objections.

---

35

1        MR. COYNE: Same objections.
2 BY THE WITNESS:
3    A No, I would not -- in general, I would not
4 write something down that was not told to me if it
5 was a statement of a witness that I was taking.
6 BY MS. ADEEYO:
7    Q Okay. And I understand you don't recall
8 this specific interview, but, generally speaking,
9 when you'd interview a witness, would you allow
10 them to make corrections to their statement?
11       MS. REED: I'm going to object to lack of
12 foundation, form.
13 BY THE WITNESS:
14    A In general?
15 BY MS. ADEEYO:
16    Q Yes.
17    A They would be allowed to make corrections.
18    Q And, in general, when a witness would be
19 allowed to make those corrections, would you then
20 cross out what that witness originally told you
21 and write down the correction that they're making?
22       MS. REED: I'm going to object to lack of
23 foundation, form, calls for speculation.
24

---

36

1 BY MS. ADEEYO:
2    Q You can answer.
3    A It depends on what the correction was. It
4 depends on what the correction was. I mean, if it
5 required being crossed out and rewritten, that's
6 what I would do. If it required something else, I
7 would do that. Generally speaking, that's how we
8 would do it -- I would do it.
9    Q Okay. So I'm going to pick up where I
10 left off here on City NK 95.
11       It says: "Ashanti states she later told
12 Mary, who they also call Mama, what Vani said
13 about robbing and shooting the white guy. Ashanti
14 states Vani found out Ashanti" -- wait -- "Ashanti
15 states" -- can you read what this says here?
16       MS. REED: I'm going to object to lack of
17 foundation.
18       MR. COYNE: Join.
19 BY MS. ADEEYO:
20    Q You can answer.
21    A Which part are you --
22    Q So I'm on City NK 96, the third line down.
23 Do you see here it starts: "Ashanti states"?
24    A Okay. And then do you want me to read

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

37

1  what was crossed out or what -- what do you want
2  me to read?
3      Q  Actually, yeah, you can read what was
4  crossed out.
5      MS. REED:  I'm going to object to lack of
6  foundation.
7      MR. COYNE:  Join.
8  BY THE WITNESS:
9      A  It looks --
10 BY MS. ADEEYO:
11     Q  You can answer.
12     A  It looks like it says:  "She came back
13 later that my Vani."  That's the crossed-out
14 portion.
15     Q  Okay.  The next line:  "Vani found out
16 Ashanti told and told Ashanti she was bogus for
17 telling Mama.  Ashanti states she left with
18 Jamaica soon after that.
19     "Ashanti states Vani called the house
20 today and told her he heard that Maurice, who they
21 call Boo Boo, trickin' on him, referring to
22 Maurice being at the police station talking to the
23 police."
24     You have no reason to dispute that this is

38

1  what Ashanti Wright told you that day, correct?
2      MS. REED:  I object to lack of foundation,
3  calls for speculation, form, hearsay.
4      MR. COYNE:  Join foundation.
5  BY MS. ADEEYO:
6      Q  You can answer.
7      A  I don't dispute that that's what's on the
8  document, no.
9      Q  The next paragraph states:  "Ashanti
10 states she's been treated well by the police and
11 Assistant State's Attorney Joanna Leafblad."
12     You have no reason to dispute that that's
13 what Ashanti Wright told you that day, correct?
14     MS. REED:  I'm going to object to lack of
15 foundation, form, hearsay, and speculation.
16     MR. COYNE:  Join foundation.
17 BY THE WITNESS:
18     A  I have no reason to dispute that that's
19 what she told me that day, but I don't have a
20 specific recollection of the conversation or
21 anything.
22 BY MS. ADEEYO:
23     Q  Do you have any recollection of not
24 treating Ashanti Wright well during this

39

1  interview?
2      (Simultaneous objections.)
3      (Reporter clarification.)
4      MR. COYNE:  Both to form and foundation.
5      MS. REED:  That's correct.
6  BY MS. ADEEYO:
7      Q  You can answer.
8      A  What was the -- will you please repeat the
9  question?
10     Q  Sure.  You do not have any recollection of
11 not treating Ashanti Wright well that day during
12 that interview, correct?
13     A  I do not --
14     MS. REED:  Same objections.
15 BY MS. ADEEYO:
16     Q  Sorry.  Go ahead.
17     A  I do not have any recollection of any
18 contact I had with her that day.
19     Q  Typically in your role as an ASA for the
20 Felony Review Unit when you would go and interview
21 witnesses, you would typically treat them well; is
22 that correct?
23     MS. REED:  I'm going --
24     MR. COYNE:  Objection --

40

1      MS. REED:  -- object -- I'm going to join
2  the objection for form, as well as lack of
3  foundation, calls for speculation.
4  BY THE WITNESS:
5      A  I would --
6  BY MS. ADEEYO:
7      Q  You can answer.
8      A  I would treat people respectfully.  And I
9  would -- yes, I would treat them well.  I would
10 treat them respectfully.
11     Q  While you were working as an ASA for the
12 Felony Review Unit when you would interview a
13 witness, do you recall an instance in which you
14 ever witnessed a detective or an officer not treat
15 that witness well during an interview?
16     MR. COYNE:  Objection, form.
17     MS. REED:  Same objection, as well as lack
18 of foundation.
19 BY MS. ADEEYO:
20     Q  You can answer.
21     A  I do not have any recollection of that,
22 no.
23     Q  I'm going to jump down to this line kind
24 of in the center of this paragraph on City NK 96.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

11 (41 to 44)

41

1    It starts here.  It says: "Ashanti states
2  no threats or promises were made in exchange for
3  this statement."
4    You have no reason to dispute that that's
5  what Ashanti Wright told you that day, correct?
6    MR. COYNE:  Objection, foundation.
7    MS. REED:  Join objection, as well as
8  form, speculation, and hearsay.
9  BY MS. ADEEYO:
10   Q  You can answer.
11   **A  I have no reason to dispute it.  I have no**
12 **reason to dispute that that's what the document**
13 **says.  So, you know, again, I don't have a**
14 **recollection of my conversation with Ashanti.**
15   Q  In your work as an ASA in the Felony
16 Review Unit, have you ever threatened a witness
17 during an interview or made a promise during an
18 interview?
19   MR. COYNE:  Objection, form.
20   MS. REED:  Objection, form, lack of
21 foundation.
22 BY MS. ADEEYO:
23   Q  You can answer.
24   **A  No, I have not.**

42

1    Q  While working as an ASA in the Felony
2  Review Unit, when you would interview a witness,
3  do you recall ever witnessing an officer or a
4  detective threaten a witness during an interview?
5    MR. COYNE:  Same objection.
6    MS. REED:  Objection, form, also I believe
7  asked and answered.
8  BY THE WITNESS:
9    **A  I do not.**
10 **BY MS. ADEEYO:**
11   Q  And while working as an ASA in the Felony
12 Review Unit, when interviewing a witness, do you
13 recall ever witnessing an officer or detective
14 make a promise to a witness in exchange for their
15 statement?
16   MR. COYNE:  Objection, form.
17   MS. REED:  Join objection, as well as lack
18 of foundation and asked and answered.
19 BY THE WITNESS:
20   **A  I do not.**
21 **BY MS. ADEEYO:**
22   Q  Okay.  Now I'm going to turn to what I'll
23 mark as Exhibit 2, which is Bates-stamped
24 City NK 98 to 101.

43

1    (WHEREUPON, Leafblad Exhibit No. 2 was
2  presented to the witness.)
3  BY MS. ADEEYO:
4    Q  Do you see that document on the screen,
5  Ms. Leafblad?
6    **A  Yes, I do.**
7    Q  Okay.  And at the top of this document, it
8  states: "Statement of Mary Curry taken
9  28 May 2000 at 2:26 at A/4 roll call room;
10 Present:  Detective Cruz #20887, ASA Leafblad, J."
11   Do you see that there?
12   **A  I see that, yes.**
13   Q  Just taking a look at this document, does
14 this appear to be your handwriting?
15   **A  It appears to be my handwriting.**
16   Q  And taking a look at this first page, does
17 that appear to be your signature contained on this
18 page?
19   **A  That does appear to be my signature.**
20   Q  Moving to the second page, does this
21 appear to be your signature at the bottom?
22   **A  It does appear to be my signature.**
23   Q  Taking a look at this third page, is that
24 your signature there?

44

1    **A  It looks like my signature.**
2    Q  And then just this bottom page here, does
3  that appear to be your signature in the bottom
4  left-hand corner?
5    **A  It appears to be, yes.**
6    Q  Do you have any recollection of taking the
7  interview of Mary Curry on May 28, 2000?
8    **A  No, I do not.**
9    Q  As you just testified that this does
10 appear to be your signature, do you know what this
11 A/4 stand for?
12   MS. REED:  I'm going to object to lack of
13 foundation and form.  Also calls for speculation.
14 BY MS. ADEEYO:
15   Q  You can answer.
16   **A  At the time, I think that would have been**
17 **Area 4.**
18   Q  And typically as an ASA working for the
19 Felony Review Unit, when you would interview a
20 witness, you would write down all of the
21 individuals who were present for the interview,
22 correct?
23   MS. REED:  Objection, calls for
24 speculation, lack of foundation, form.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

12 (45 to 48)

45

1 BY THE WITNESS:
2    A  In general, that is what I would do, yes.
3 BY MS. ADEEYO:
4    Q  Okay.  So turning to that first page,
5 City NK 98, at the somewhat top there, it says:
6 "This statement taken regarding the robbery and
7 shooting death of Marek Majdak, which occurred on
8 15 May 2000 at 1:00 a.m. to 1:14 at 4721 West
9 Ohio, Chicago."
10     Do you see that there?
11   A  I do see it.
12   Q  Okay.  So I'm just going to kind of walk
13 through this document.  This first paragraph:
14 "Being advised that Assistant State's Attorney
15 Joanna Leafblad is a lawyer and a prosecutor but
16 not Maurice Wright's or Jovanie Long's lawyer,
17 Mary Curry made the following statement which is a
18 summary and not word for word."
19     Do you have any reason to dispute that you
20 informed Mary Curry during an interview that you
21 were a prosecutor, not Maurice Wright's attorney
22 or Jovanie Long's attorney?
23     MS. REED:  I'm going to object to lack of
24 foundation, form, calls for speculation, and

46

1 compound question.
2     MR. COYNE:  Join on foundation.
3 BY MS. ADEEYO:
4    Q  You can answer.
5    A  I have no reason to dispute it, but I have
6 no specific recollection of this conversation.
7    Q  Just generally speaking, as an ASA in the
8 Felony Review Unit, have you filled out documents
9 like this before, this "Statement of" type
10 document?
11     MS. REED:  I'm going to object to form.
12 BY THE WITNESS:
13   A  In general, I would -- I have filled out
14 forms like that, yes.
15 BY MS. ADEEYO:
16   Q  And when you filled out forms like this
17 before, have you ever crossed out this paragraph
18 similar to -- similar to what's seen here on
19 Exhibit 2?
20     MS. REED:  I'm going to object to lack of
21 foundation, calls for speculation, as well as
22 form.
23 BY MS. ADEEYO:
24   Q  You can answer.

47

1    A  Well, I can see that it's crossed out, but
2 I don't -- I don't recall if I had a practice of
3 that or what that was, so...
4    Q  I understand you don't recall if you had a
5 practice of doing this.  Have you ever -- do you
6 recall ever doing that before, crossing out this
7 paragraph on this type of document?
8     MS. REED:  I'm going to object to asked
9 and answered, lack of foundation, calls for
10 speculation, and form.
11 BY MS. ADEEYO:
12   Q  You can answer.
13   A  I don't have a -- I don't recall crossing
14 it out.
15   Q  Can you think of a reason why you would
16 cross out this paragraph when taking this
17 statement of a witness?
18     MS. REED:  I'm going to --
19     MR. COYNE:  Objection, foundation,
20 speculation.
21     MS. REED:  Join objections for foundation,
22 speculation, as well as misstates the witness's
23 prior testimony.
24

48

1 BY MS. ADEEYO:
2    Q  You can answer.
3    A  I would only be speculating if I gave --
4 if I gave an answer, it wouldn't be specific to
5 this case, my practice as an ASA in the Felony
6 Review, or anything else.  So I don't know how to
7 speculate what the reason would be.
8 BY MS. ADEEYO:
9    Q  Could you have crossed out this paragraph
10 because the witness was not a suspect?
11     MS. REED:  I'm going to --
12     MR. COYNE:  Objection --
13     MS. REED:  -- object to --
14     MR. COYNE:  -- speculation.
15     Go ahead.
16     MS. REED:  Join objection, as well as
17 mischaracterizes the witness's prior testimony.
18 BY MS. ADEEYO:
19   Q  You can answer.
20   A  I don't know.  I'm sorry, again, this is
21 requiring me to guess or speculate as to what I
22 would have done or why I would have done it, and I
23 can't -- I cannot speak to that.  I don't know.
24   Q  Okay.  I'm going to move to this second

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

13 (49 to 52)

49

1  paragraph on this first page here marked
2  City NK 98.
3      It states: "Mary states she is 52 years
4  old.  Mary states she lives at 4653 West Erie with
5  her goddaughter, Ashanti Wright, her son, Maurice
6  Wright, and Mary's other children.  Mary states
7  she's lived there since February 1999.  Mary
8  states she went up to 11th grade at Withrow High
9  School in Cincinnati, Ohio."
10     Do you have any reason to dispute that
11 that's what Mary told you during that interview on
12 that date?
13     MS. REED:  I'm going to --
14     MR. COYNE:  Objection, foundation.
15     MS. REED:  I'm going to join the objection
16 for foundation, as well as speculation, hearsay,
17 and form.
18 BY THE WITNESS:
19     **A  I don't have any reason to dispute that**
20 **it's on the document.  I see it on the document,**
21 **and I don't dispute the document.**
22 **BY MS. ADEEYO:**
23     Q  The next paragraph on the page marked
24 City NK states:  "Mary states on 13 May 2000 in

50

1  the early morning hours, she was home playing
2  cards with Ashanti and her sister, Jamaica.  Mary
3  states about 1:00 to 1:30 a.m. she heard a
4  gunshot, which sounded like it was very close by
5  and they all jumped.
6      "Mary states they went to the basement but
7  no one was down there.  Mary states about five
8  minutes later, they went downstairs again and saw
9  Jovanie, who they also call Vani, down in the
10 basement.  Mary states Vani was coming out of the
11 bathroom taking off his shirt.  Mary states that
12 the person in Exhibit 1 is Jovanie Long, a/k/a
13 Vani.
14     "Mary states she's known Vani for about
15 one year.  Mary states Jovanie, Ashanti, and
16 Jamaica went to the sub place on Cicero near Ohio
17 to buy cigarettes.  Mary states they were gone
18 about one half-hour.  Mary states she went outside
19 and saw Vani go up to Xavier, a/k/a Zay, in a
20 dark-colored car and get in the car with Zay.
21 Mary states she, Ashanti, and Jamaica went back
22 inside.  Mary states a while later, she went
23 upstairs to bed.
24     "Mary states there were two other people

51

1  in the car Zay was driving when Vani got in.  Mary
2  states she heard Vani and Zay talking to Ashanti
3  about going around the corner to wipe fingerprints
4  off the van.  Mary states Zay was knocking on the
5  side door trying to get Ashanti to come out.  Mary
6  states she told Zay to go home and be quiet
7  because he was making too much noise and she had
8  elderly neighbors."
9      You have no reason to dispute that that's
10 what Mary Curry told you that day during the
11 interview, correct?
12     MR. COYNE:  Objection --
13     MS. REED:  I'm going to -- I'm going to
14 join the objection for foundation, form,
15 speculation, hearsay.
16 BY MS. ADEEYO:
17     Q  You can answer.
18     **A  Again, I don't dispute that that's what's**
19 **on this document, but I have no recollection one**
20 **way or another of the day.**
21     Q  On City NK 100 -- I'm going to pick up
22 where I left off -- it states:  "Mary states she
23 went back upstairs and Vani went downstairs.  Mary
24 states Ashanti came upstairs the next morning

52

1  while Vani was in the basement.  Mary states
2  Ashanti told her that Vani told Ashanti that he
3  killed the white guy.  Mary states she went back
4  to sleep until about 11:30 a.m.
5      "Mary states at about 12:30 p.m., she was
6  getting ready for work.  Mary states she told Vani
7  she wanted to talk to him.  Mary states Vani" --
8  I'm not sure what that next word says.  Can you
9  read that there after "Mary states Vani"?
10     MS. REED:  I'm going to object to lack of
11 foundation.
12     MR. COYNE:  Join.
13 BY THE WITNESS:
14     **A  Looks like "came."**
15 **BY MS. ADEEYO:**
16     Q  Okay.  I'm going to pick up there.
17     "Mary states Vani came to her offering a
18 $100 bill.  Mary states she didn't take the money
19 and told him to keep it because he would need it.
20 Mary states she asked Vani why he would want to
21 shoot someone over their own money and that he
22 didn't have to do that.  Mary states Vani started
23 crying and said he was sorry but the man wouldn't
24 let the money go so Vani shot him.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

14 (53 to 56)

53

1     "Mary states Vani said he was sorry he
2 killed the man and then went back downstairs.
3 Mary states she finished getting ready and went to
4 work."
5     Up to where I read, you have no reason to
6 dispute that that's what Mary Curry told you in
7 the interview during that day?
8     MS. REED: Object --
9     MR. COYNE: (Indiscernible.)
10     MS. REED: -- foundation as well as
11 speculation, hearsay, form.
12     (Reporter clarification.)
13     MR. COYNE: I said objection, foundation.
14 BY THE WITNESS:
15     **A I have no reason to dispute it.**
16 **BY MS. ADEEYO:**
17     Q The next section, "Mary" -- it says:
18 "Mary states before Vani went downstairs, he told
19 him he had to go because she didn't want him or
20 any trouble around her children.
21     "Mary states when Vani and Zay were
22 talking and she went downstairs, she had seen
23 Maurice with them, too. Mary states she calls
24 Maurice Boo Boo and that everyone calls her Mama."

54

1     Going to the next page. "Mary states she
2 saw Vani and Zay at her home a couple of more
3 times in the week, but every time she saw them,
4 she would tell them to get out because she didn't
5 want her children involved with their mess."
6     You have no reason to dispute that's what
7 Mary told you during the interview that day?
8     MR. COYNE: Objection, foundation.
9     MS. REED: Join objection, as well as
10 speculation, hearsay, form.
11 BY MS. ADEEYO:
12     Q You can answer.
13     **A I have no reason to dispute it.**
14     Q Now, this next paragraph here on City NK,
15 it states: "Mary states she was treated fine by
16 the police and Assistant State's Attorney
17 Leafblad."
18     You have no reason to dispute that that's
19 what Mary told you that day, correct?
20     MR. COYNE: Objection, foundation.
21     MS. REED: Join objection, as well as
22 hearsay, speculation, and form.
23 BY THE WITNESS:
24     **A I have no reason to dispute it.**

55

1 **BY MS. ADEEYO:**
2     Q And I'm going to read this sentence here.
3 It starts: "Mary states no threats or promises
4 were made in exchange for this statement."
5     You have no reason to dispute that that's
6 what Mary Curry said that day during the
7 interview, correct?
8     MR. COYNE: Objection, foundation.
9     MS. REED: Join objection, as well as
10 speculation, form, and hearsay.
11 BY THE WITNESS:
12     **A It is correct I have no reason to dispute**
13 **it.**
14 **BY MS. ADEEYO:**
15     Q I'm going to read the last sentence of
16 this paragraph here.
17     It says: "Mary states Assistant State's
18 Attorney Leafblad read the statement out loud as
19 she followed along. Mary states she was allowed
20 to make corrections as needed."
21     You have no reason to dispute that that's
22 what Mary Curry said during the interview,
23 correct?
24     MR. COYNE: Objection, foundation.

56

1     MS. REED: Join. As well as speculation,
2 form, and hearsay.
3 BY THE WITNESS:
4     **A Again, I have no reason to dispute it, no.**
5 **BY MS. ADEEYO:**
6     Q Typically in your role as an ASA for
7 Felony Review, when you are taking down the
8 statement of a witness, do you -- have you ever
9 allowed a witness to read along as you write down
10 a statement?
11     MR. COYNE: Objection, form.
12     MS. REED: Join objection. As well as
13 speculation and lack of foundation.
14 BY THE WITNESS:
15     **A I don't recall -- I don't recall doing**
16 **that or not doing that. Sorry.**
17 **BY MS. ADEEYO:**
18     Q Okay. So you're saying you might have,
19 just one way or another, you can't answer whether
20 or not that was typical of your practice?
21     MS. REED: I'm going to --
22     MR. COYNE: Objection, foundation.
23     MS. REED: I'm going to object to
24 foundation as well. As well as misstates

57

1 witness's testimony.
2 BY THE WITNESS:
3     **A I don't remember if I ever allowed**
4 **somebody to read along while I was doing a**
5 **statement.**
6 **BY MS. ADEEYO:**
7     Q Can you recall an instance in which you
8 did not allow a witness to read along as you're
9 taking down their statement?
10     MR. COYNE: Objection, form, foundation.
11     MS. REED: Same objections. As well as
12 misstates witness's prior testimony.
13 BY THE WITNESS:
14     **A I cannot recall any such instance.**
15 **BY MS. ADEEYO:**
16     Q I'm going to turn to my next exhibit that
17 I'll mark as Exhibit 3.
18         (WHEREUPON, Leafblad Exhibit No. 3 was
19 presented to the witness.)
20 BY MS. ADEEYO:
21     Q It is Bates-stamped CCSAO 5869
22 through 5909. I'm going to represent to you that
23 this is a portion of the motion to suppress
24 hearing transcript of Xavier Walker.

58

1         Do you have any independent recollection
2 of being present at the motion to suppress hearing
3 for Xavier Walker?
4     **A No, I do not.**
5     Q I'm going to kind of jump around a bit so
6 that way we don't have to go through the whole 41
7 pages, okay?
8         So at the top of this first page here,
9 Bates stamp CCSAO XAVIER WALKER 5869, it states
10 your name, Joanna -- my apologies if I
11 mispronounce this -- Lioteen-Leafblad? Did I get
12 that correct?
13     **A Liotine. That's okay. It's an odd name.**
14     Q My apologies.
15         It says: "Is called as a witness on
16 behalf of the People of the State of Illinois
17 having been first duly sworn was examined and
18 testified as follows."
19         So, "QUESTION: Introduce yourself to the
20 judge.
21         "ANSWER:" -- you then Joanna -- you spell
22 out your first name, Liotine-Leafblad, spell out
23 those two names -- "and I'm an Assistant State's
24 Attorney.

59

1         "QUESTION: Back on May 29th, Monday, were
2 you working Felony Review?
3         "ANSWER: Yes, on May 29th, 2000, I was.
4         "QUESTION: And you are an Assistant
5 State's Attorney?
6         "ANSWER: Yes.
7         "And you are licensed to practice law in
8 the State of Illinois?
9         "ANSWER: Yes, I am."
10         Does that refresh your recollection at all
11 as to being present at this hearing?
12         MS. REED: I'm going to object to lack of
13 foundation and form.
14 BY THE WITNESS:
15     **A It doesn't, but I don't -- I don't dispute**
16 **or deny that I must have been there. But I don't**
17 **have a recollection of it.**
18 **BY MS. ADEEYO:**
19     Q Okay. So I'm going to pick up kind of
20 where I left off.
21         "QUESTION:" -- Line 24 -- "I want to
22 direct your attention to that evening. Were you
23 working the night shift?
24         "ANSWER: Yes, I was.

60

1         "QUESTION: With Felony Review?
2         "ANSWER: Yes, I was.
3         "QUESTION: Approximately 10:00 that
4 evening, did you have occasion to arrive at Area 4
5 Violent Crimes?
6         "ANSWER: Yes, I did.
7         "QUESTION: And was that for the purpose
8 of being involved in the homicide investigation
9 involving a victim by the name of Marek that
10 occurred on May 13th of the year 2000?
11         "ANSWER: Yes.
12         "QUESTION: After arriving at Area 4
13 Violent Crimes, did you have an opportunity to
14 speak to detectives?
15         "ANSWER: Yes, I did.
16         "QUESTION: Did that include detective
17 Mike Pietryla?
18         "ANSWER: Yes."
19         Based on the testimony that I just read,
20 does that refresh your recollection about speaking
21 to Detective Mike Pietryla regarding Xavier
22 Walker's case?
23         MS. REED: I'm going to object to lack of
24 foundation, form, and speculation.

61

1 BY THE WITNESS:
2    **A I'm sorry, it does not.**
3 **BY MS. ADEEYO:**
4    Q As you sit here today, do you know who
5 detective Mike Pietryla is?
6    **A Yes, I do remember him.**
7    Q Okay. And do you recall working on any
8 specific cases with Mike Pietryla while you were
9 working in the Felony Review Unit?
10    MS. REED: I'm going to object to lack of
11 foundation and form.
12 BY MS. ADEEYO:
13    Q You can answer.
14    **A I don't recall any specific cases**
15 **that I -- I don't recall any specific ones that I**
16 **worked with him.**
17 **BY MS. ADEEYO:**
18    Q Okay. I'm going to pick up here on this
19 page that's Bates-stamped CCSAO XAVIER
20 WALKER 5871, Line 18.
21    "Approximately 10:15 that evening, did you
22 have an opportunity to meet anyone you see in
23 court today?
24    "ANSWER: Yes, I did.

62

1    "QUESTION: Point to that individual and
2 identify an article of clothing he has on.
3    "ANSWER: It's the person wearing the
4 Cook County Department of Corrections uniform
5 sitting at defense counsel's table.
6    "MR. CLANCY: May the record reflect
7 in-court identification of the defendant Xavier
8 Walker.
9    "THE COURT: Sure.
10    "MR. CLANCY: At the time you met him,
11 10:15 in the evening, describe for the judge
12 whether you introduced yourself.
13    "ANSWER: Yes, I did.
14    "QUESTION: How did you do that?
15    "ANSWER: I told him my name is Joanna
16 Leafblad, I'm an Assistant State's Attorney, I'm a
17 lawyer and prosecutor, and I'm not his lawyer. I
18 asked him if he understood that.
19    "QUESTION: After you advised him who you
20 were and what you said, what did he say?
21    "ANSWER: He said he understood.
22    "After that, did you have an opportunity
23 to advise him of anything?
24    "ANSWER: I advised him of his Miranda

63

1 rights by memory."
2    Based on the testimony I just read, does
3 that refresh your recollection of interviewing
4 Xavier Walker?
5    MS. REED: I'm going to object to lack of
6 foundation, form, speculation, and hearsay.
7 BY THE WITNESS:
8    **A It does not.**
9 **BY MS. ADEEYO:**
10    Q Do you have any reason to dispute that you
11 arrived at Area 4 Violent Crimes to speak with
12 Xavier Walker?
13    MR. COYNE: Objection, foundation.
14    MS. REED: Same objection. And
15 speculation.
16 BY MS. ADEEYO:
17    Q You can answer.
18    **A I do not have any reason to dispute that.**
19    Q Do you have any reason to dispute that you
20 introduced yourself to Xavier Walker as a
21 prosecutor, not his attorney?
22    MR. COYNE: Same objection.
23    MS. REED: Same objection.
24

64

1 BY THE WITNESS:
2    **A I have no reason to dispute that.**
3 **BY MS. ADEEYO:**
4    Q Do you have any reason to dispute that you
5 Mirandized Xavier Walker?
6    MR. COYNE: Same objection.
7    MS. REED: Same objection.
8 BY THE WITNESS:
9    **A I have no reason to dispute that.**
10 **BY MS. ADEEYO:**
11    Q I want to jump down here to the page that
12 is marked CCSAO XAVIER WALKER 5875.
13    Line 3, "QUESTION: After advising him of
14 those rights, did the defendant state anything to
15 you?
16    "ANSWER: Yes, he stated he understood
17 them and he wished to speak to me."
18    Do you have any reason to dispute that
19 after you had Mirandized Xavier Walker, that he
20 said to you he understood his Miranda rights and
21 that he wished to speak to you?
22    MR. COYNE: Objection, foundation.
23    MS. REED: Same objection. As well as
24 speculation and form.

65

1  BY THE WITNESS:
2     A  I have no reason to dispute it.
3  BY MS. ADEEYO:
4     Q  I'm going to pick up on Line 7.
5        "QUESTION:  Did you have an opportunity to
6  speak to the defendant?
7        "ANSWER:  Yes, I did.
8        "QUESTION:  Who was present at the time
9  you were speaking with him?
10       "ANSWER:  Detective Pietryla.
11       "QUESTION:  Where were you at the time you
12 were speaking with him in Detective Pietryla's
13 presence?
14       "ANSWER:  In Area 4 interview room.
15       "QUESTION:  Can you describe that room
16 generally?
17       "ANSWER:  It's a small room.  I'm not
18 quite sure of the dimensions.  But there's a bench
19 in the room that's attached to the wall, and then
20 there's a bar behind the bench.
21       "QUESTION:  Were there any chairs in that
22 room?
23       "ANSWER:  No chairs typically in that
24 room, and we brought them in to sit down when we

66

1  talked to Mr. Walker."
2        First, do you have any reason to dispute
3  that Detective Pietryla was present in the
4  interview room when you spoke to Xavier Walker?
5        MR. COYNE:  Objection, foundation.
6        MS. REED:  Join objection.
7  BY THE WITNESS:
8     A  I have no reason to dispute that.
9  BY MS. ADEEYO:
10    Q  Do you have any reason to dispute that
11 your description of the Area 4 interview room in
12 which you interviewed Xavier Walker is incorrect?
13       MR. COYNE:  Objection, foundation.
14       MS. REED:  Join objection.
15       Sorry.  Go ahead, Counsel.
16 BY THE WITNESS:
17    A  I have no reason to think it's incorrect
18 or to dispute it.
19       MS. REED:  Just for the record, I want to
20 make sure that you got that I joined the objection
21 as counsel for foundation and form.
22       MS. REPORTER:  I did.  Thank you.
23 BY MS. ADEEYO:
24    Q  Okay.  I'm going to jump down to the page

67

1  marked CCSAO XAVIER WALKER 5877.  Picking up at
2  Line 1.
3        "QUESTION:  And there's a bench in the
4  room?
5        "ANSWER:  There's a bench attached to the
6  wall.
7        "QUESTION:  Was the defendant handcuffed
8  in any way?
9        "ANSWER:  No."
10       Do you have any reason to dispute that
11 when you interviewed Xavier Walker, he was
12 handcuffed during that interview?
13       MR. COYNE:  Objection, foundation.
14       MS. REED:  Same objection as well as
15 speculation and form.
16 BY MS. ADEEYO:
17    Q  You can answer.
18    A  Well, it says that he was not handcuffed,
19 so I have no reason to dispute that he was not
20 handcuffed.
21    Q  I'm going to pick up there on Line 5, same
22 page.
23       "QUESTION:  Approximately how long did you
24 speak to him for?

68

1        "ANSWER:  Anywhere from 15 minutes to a
2  half-hour.
3        "QUESTION:  After speaking with him, would
4  it be fair to say he admitted participation in
5  this homicide?
6        "ANSWER:  Yes, he did."
7        Do you have any reason to dispute that
8  after speaking with Xavier Walker during the
9  interview, that he admitted to participation in
10 the homicide of Marek Majdak?
11       MR. COYNE:  Objection, foundation.
12       MS. REED:  Same objection as well as form,
13 speculation, hearsay.
14 BY MS. ADEEYO:
15    Q  You can answer.
16    A  I have no reason to dispute that this is
17 what the document says.
18    Q  And when you're testifying before a court
19 as an ASA, you would not lie under oath; is that
20 correct?
21       MS. REED:  I'm going to object to form,
22 speculation, and foundation.
23 BY MS. ADEEYO:
24    Q  You can answer.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

---

69

1    A   Okay.  Well, I want to answer the way you
2 worded the question, so I'm going to -- it is
3 correct that I would not lie.
4    Q   I'm going to pick up here on Line 11.
5    "QUESTION:  After speaking with him and
6 the defendant making an admission, did you advise
7 him of anything regarding the statement?
8    "That there -- I advised him of the
9 different ways it would be possible to record the
10 statement, and he chose to have it recorded in a
11 video statement."
12    Do you have any reason to dispute that
13 when you interviewed Xavier Walker, he chose to
14 record his admission in a video statement?
15    MS. REED:  I'm going to object to
16 foundation, form, speculation, and hearsay.
17 BY THE WITNESS:
18    A   I have no reason to dispute that.
19    MR. COYNE:  Sorry.  Somehow I got muted,
20 so I don't think my prior objections were -- I
21 just want to make a record of that.  Go ahead.
22    MS. REED:  Counsel, I don't believe your
23 objection was actually heard.  I didn't hear
24 anything from you.

70

1    MR. COYNE:  Thank you.  I was objecting,
2 and then I noted that I was somehow muted even
3 though I didn't hit the mute button.
4    MS. REED:  Okay.  So your objection is not
5 on the record.
6    MR. COYNE:  Okay.  Which one?  The last
7 one you mean?
8    MS. REED:  Any of them for that question,
9 the previous question.
10    MR. COYNE:  All right.  I'll join
11 Counsel's objections.  Thank you.
12    MS. REED:  You're welcome.
13 BY MS. ADEEYO:
14    Q   I'm going to jump down a bit in this
15 transcript here.
16    Let me go back up here to CCSAO XAVIER
17 WALKER 5877.  I'm going to take you down to
18 Line 21.
19    "Did a videographer eventually arrive by
20 the name of Sandra Brennan?
21    "ANSWER:  Yes.
22    "QUESTION:  Was a video statement taken
23 approximately 11:43 that evening on May 29th of
24 the 2000?

71

1    "Yes, it was.
2    "QUESTION:  In between the time you were
3 done speaking to him at approximately 10:45 to the
4 time the videotaped statement was begun at
5 approximately 11:43, while you were waiting for
6 the videographer to arrive, did you have an
7 opportunity to speak to the defendant by yourself?
8    "Yes, I did."
9    Ms. Leafblad, do you have any reason to
10 dispute that you spoke with Xavier Walker between
11 the time of 10:45 and 11:43 on May 29, 2000?
12    MR. COYNE:  Objection, foundation.
13    MS. REED:  I'm going to join the objection
14 for foundation, as well as form, speculation, and
15 hearsay.
16 BY MS. ADEEYO:
17    Q   You can answer.
18    A   I have no reason to dispute.
19    Q   Okay.  I'm going to jump down to Line 17
20 on the page marked CCSAO XAVIER WALKER 5879.
21    "QUESTION:  What was the reason for
22 speaking to him by yourself?
23    "ANSWER:  I wanted to know if he had been
24 all right, sir, and treated poorly [sic] and had

72

1 food to eat.
2    "QUESTION:  What did he indicate as far as
3 how he had been treated by the police outside of
4 the police presence?
5    "ANSWER:  He indicated he had been treated
6 fine.  He didn't mention any problems or
7 anything."
8    Do you have any reason to dispute that
9 when you spoke to Xavier Walker during that
10 interview on May 29th, that he told you that he
11 had been treated fine by police?
12    MR. COYNE:  Note an objection.  I think,
13 Counsel, I think there was a misstatement.
14 Line 20 did not say "poorly," it says, "properly."
15    MS. REED:  And I'm also going to object to
16 lack of foundation, form, speculation, hearsay,
17 and join Counsel's objection.
18 BY MS. ADEEYO:
19    Q   Let me reask my question.
20    Do you have any reason to dispute that
21 when you spoke to Xavier Walker on May 29th of
22 2000, that he told you that he had been all right
23 and treated properly and had food to eat?
24    MR. COYNE:  Objection, foundation.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

19 (73 to 76)

73

1     MS. REED:  Same objection -- I'm going to
2 join Counsel's objection for foundation, as well
3 as speculation, hearsay, and form.
4 BY MS. ADEEYO:
5     Q  You can answer.
6     **A  I do not dispute that that's what the**
7 **record says.**
8     Q  Do you have any reason to dispute that
9 when you talked to Xavier Walker during that
10 interview, that he indicated to you that he had
11 been treated fine, that he didn't mention any
12 problems or anything?
13     MR. COYNE:  Objection, foundation.
14     MS. REED:  Join objection, as well as
15 hearsay, speculation, and form.
16 BY THE WITNESS:
17     **A  I have no reason to dispute it.**
18 **BY MS. ADEEYO:**
19     Q  Now I'm going to turn to an exhibit that
20 I'll mark as Exhibit 4.
21     (WHEREUPON, Leafblad Exhibit No. 4 was
22 presented to the witness.)
23 BY MS. ADEEYO:
24     Q  It's Bates-stamped City NK 243 to 258.

74

1     Do you see this document on the screen,
2 Ms. Leafblad?
3     **A  Yes.**
4     Q  At the top here it says:  "Re:
5 Investigation" -- and in parenthesis -- "Robbery
6 and Shooting Death of Marek Majdak; Video
7 Statement of Xavier Walker; taken in an interview
8 room, Area 4 headquarters, Chicago, Illinois on
9 May 29, 2000, at 11:43 p.m.; Present:  Joanna
10 Leafblad, Assistant State's Attorney; Detective
11 Pietryla, Star No. 21209, Area 4 Violent Crimes;
12 Recorded by:  Sandra A. Brennan."
13     So, Ms. Leafblad, do you have any reason
14 to dispute that you were present for the
15 videotaped statement of Xavier Walker at Area 4 on
16 May 29th, 2000?
17     MS. REED:  I'm --
18     MR. COYNE:  Objection --
19     MS. REED:  -- going to -- I'm going to
20 join the objection for foundation as well as
21 speculation and form.
22 BY THE WITNESS:
23     **A  I do not have any reason to dispute it.**
24

75

1 BY MS. ADEEYO:
2     Q  All right.  I'm going to take you through
3 this statement here.  Second paragraph starting on
4 City NK 243.
5     "We're here to take the statement of
6 Xavier Walker concerning the investigation of the
7 robbery and shooting death of Marek Majdak which
8 occurred on May 13th, 2000, at approximately
9 1:00 to 1:14 a.m. at 4721 West Ohio in Chicago,
10 Cook County, Illinois.
11     "Xavier, before we spoke, I explained that
12 I'm Assistant State's Attorney Joanna Leafblad,
13 that I'm a lawyer and a prosecutor, and I'm not
14 your lawyer; is that correct?
15     "ANSWER:  Yes, ma'am.
16     "QUESTION:  Okay.  And before we spoke, I
17 advised you of your Constitutional rights; is that
18 correct?
19     "ANSWER:  Yes, ma'am.
20     "QUESTION:  Xavier Walker, I talked to you
21 earlier, and you told me about the robbery and
22 shooting of Marek Majdak.  And at that time you
23 told me that on the 13th of May 2000, you were out
24 getting high with Jovanie Long who you also call

76

1 Vani.  You were ran out of money and decided to go
2 rob people coming to buy drugs on Ohio.
3     "Vani had a gun.  You were the lookout for
4 Vani, watching his back and watching for police.
5 When a man drove up in a van, Vani got in and held
6 a gun up to that man.  You saw a struggle and
7 started toward the van, maybe to hold the man so
8 that Vani could get his money.  The man ran out of
9 the van and Vani shot him.  Vani took the money
10 out of his pocket and you both ran?
11     "ANSWER:  Yes, ma'am."
12     Do you have any reason to dispute that
13 this is what Xavier Walker told you when you
14 interviewed him on May 29?
15     MR. COYNE:  Objection, foundation.
16     MS. REED:  I'm going to join the objection
17 for foundation, as well as speculation, form, and
18 hearsay.
19 BY THE WITNESS:
20     **A  No, I have no reason to dispute it.**
21 **BY MS. ADEEYO:**
22     Q  I'm going to then jump to City NK 246.
23     Actually, let me go back up to
24 City NK 245.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

20 (77 to 80)

77

1     MR. COYNE: And, Natalie, we've been going
2 over an hour so whenever is convenient for you, if
3 we could just take five minutes. Whenever is
4 convenient for you; I don't want to interrupt your
5 flow.
6     MS. ADEEYO: Actually, I'd rather take it
7 now before we start getting into the substance of
8 what was said during the videotape.
9     MS. REED: Okay. That's cool.
10     MS. ADEEYO: So, yeah, we can come back at
11 11:20.
12     MR. COYNE: Thank you.
13     (WHEREUPON, a recess was had.)
14 BY MS. ADEEYO:
15   Q So, Ms. Leafblad, before we took about a
16 ten-minute break there, we were discussing
17 Exhibit 4, which is Bates-stamped City NK 243 to
18 258. And at the top, it's marked "Video Statement
19 of Xavier Walker."
20     Do you recall our conver- -- your
21 testimony about that document?
22   **A Yes, that we were just -- that's what we**
23 **were just reviewing.**
24   Q Okay. So I'm going to kind of jump back

78

1 in here.
2     On City NK 245 -- let me share my screen.
3     Okay. Ms. Leafblad, do you see
4 City NK 245 on your screen?
5   **A I don't see where the marking is, but I do**
6 **see a page on my screen.**
7     **Yes, that's the one.**
8   Q Okay. Perfect. So I'm going to pick up
9 here where it says: "QUESTION: Okay. Xavier, on
10 May 13th, 2000."
11     Do you see that line there?
12   **A Yes.**
13   Q Okay.
14     "QUESTION: Okay. Xavier, on May 13th,
15 2000, were you out with Vani?
16     "ANSWER: Yes, ma'am.
17     "QUESTION: And what were you doing?
18     "We was walking around trying to wait for
19 a -- a customer or something so we can just give
20 him anything. It's not just money" -- and in
21 parenthesis it says "inaudible."
22     "QUESTION: Okay. But before that, were
23 you doing anything with Jovanie?
24     "ANSWER: We were smoking and drinking.

79

1     QUESTION: Okay. And when you were
2 smoking and drinking -- you stopped smoking and
3 drinking at one point; is that right?
4     "ANSWER: Yes, ma'am.
5     "And why did you stop?
6     "ANSWER: We didn't have no more --
7 nothing else to drink or nothing else to smoke.
8     "QUESTION: Okay. Did you have any money
9 or anything?
10     "ANSWER: No, ma'am.
11     "QUESTION: And when you didn't have any
12 money, did you start talking about doing
13 something?
14     "ANSWER: Yeah, we talked about going
15 outside and snatch some money so we can go -- just
16 have some more money.
17     "QUESTION: And what is that called when
18 you snatch money?
19     "ANSWER: Hitting a lick.
20     "QUESTION: Okay. And when you hit a
21 lick, what exactly do you do?
22     "ANSWER: Well, we -- me and my friends,
23 we'll just give him anything, some grass or
24 something or some fake -- some fake drugs so we

80

1 can snatch they money and run.
2     "QUESTION: And you do that to who?
3     "ANSWER: Customers that come up, Black,
4 white, all types of customers.
5     "QUESTION: People who come to buy drugs?
6     "ANSWER: Customers that come to buy
7 drugs.
8     "QUESTION: And have you -- how many times
9 have you done -- have you hit a lick before with
10 people?
11     "ANSWER: About 30 to -- 30, 40, 50."
12     So the testimony that I just read to you,
13 do you have any reason to dispute that that's what
14 Xavier Walker said during his videotaped
15 statement?
16     MR. COYNE: Objection, foundation.
17     MS. REED: I'm going to join the objection
18 for foundation, as well as speculation, hearsay,
19 and form.
20 BY THE WITNESS:
21   **A I have no -- I have no reason to dispute**
22 **it.**
23 BY MS. ADEEYO:
24   Q I'm going to pick up at that last line

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

81

1 there on City NK 246.
2     "QUESTION: Okay. And how many times have
3 you actually gone to hit a lick with Vani?
4     "ANSWER: About two or three times before.
5     "QUESTION: And when you hit a lick with
6 someone, do you switch off being lookouts?
7     "ANSWER: Sometime.
8     "QUESTION: And when you were out that
9 night, were you being the lookout for Vani?
10     "ANSWER: Yes, ma'am."
11     Do you have any reason to dispute that
12 Xavier Walker said during his videotaped statement
13 that that night he was being a lookout for Vani?
14     MR. COYNE: Objection, foundation.
15     MS. REED: Join objection, as well as
16 hearsay, speculation, and form.
17 BY THE WITNESS:
18     **A I have no reason to dispute that that's**
19 **what the record says that -- so no.**
20 **BY MS. ADEEYO:**
21     Q And I'm going to jump here on City NK 347
22 where it says:
23     "QUESTION: And, before that, about how
24 long were you waiting around for somebody to come

82

1 over so you can hit a lick?
2     "ANSWER: About an hour and a half.
3     "QUESTION: And when you're the lookout
4 for someone what -- what do you do?
5     "ANSWER: Just stand in the way looking
6 for the police or for another customer who comes
7 so you can hit you a lick.
8     "QUESTION: And do you also watch each
9 other's backs?
10     "ANSWER: Yes, ma'am."
11     I'm going to jump down to this last line
12 here.
13     "QUESTION: Okay. And that night, Vani
14 had a gun; is that right?
15     "ANSWER: Yes, ma'am.
16     "QUESTION: And what kind of gun? Do you
17 remember kind of what the gun looked like?
18     "ANSWER: It was rusty and it was
19 automatic. That's all I know.
20     "QUESTION: Okay. Do you know where
21 Vani -- where Vani got that gun?
22     "ANSWER: No, ma'am. From -- I just know
23 from one of the other people -- peoples in the
24 neighborhood."

83

1     Do you have any reason to dispute that
2 during Xavier Walker's videotaped statement, he
3 said that Vani had a gun?
4     MR. COYNE: Objection, foundation.
5     MS. REED: Join objection, as well as
6 speculation, form, and hearsay.
7 BY THE WITNESS:
8     **A I have no reason to dispute this record.**
9 **BY MS. ADEEYO:**
10     Q I'm going to pick up at the next line on
11 City NK 248.
12     "And why did he have the gun?
13     "ANSWER: Because at the time our -- our
14 neighborhood, the gangs into it around there.
15     "QUESTION: What gang is in your
16 neighborhood?
17     "ANSWER: Double IVLs.
18     "QUESTION: And Double IVLs, is that
19 Insane Imperial Vice Lords?
20     "ANSWER: Yes, ma'am."
21     Do you have any reason to dispute that
22 during this videotaped statement, Xavier Walker
23 said that Vani had a gun because of their
24 neighborhood --

84

1     MR. COYNE: Objection --
2 BY MS. ADEEYO:
3     Q -- into it around there?
4     MR. COYNE: Sorry.
5     Objection, foundation.
6     MS. REED: Join objection, as well as
7 speculation, form, and hearsay.
8 BY THE WITNESS:
9     **A I have no reason to dispute that this**
10 **is -- this document says that is what was said.**
11 **BY MS. ADEEYO:**
12     Q Okay. I'm going to pick up here on
13 City NK 248.
14     "QUESTION: So you were waiting for about
15 an hour and a half. And did somebody come up?
16     "ANSWER: Yes, ma'am.
17     "QUESTION: And what was -- was the person
18 driving a car?
19     "ANSWER: A van, ma'am.
20     "QUESTION: Do you remember what color the
21 van was?
22     "ANSWER: No, ma'am. It was dark outside,
23 and I was intoxicated.
24     "QUESTION: Okay. Was there somebody in

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

22 (85 to 88)

---

85

1 the van?
2     "ANSWER: Yes, ma'am.
3     "QUESTION: What did the man look like,
4 could you tell?
5     "ANSWER: I ain't never seen him really.
6     "QUESTION: Could you tell if -- if he was
7 white, Black, Hispanic?
8     "ANSWER: Yeah, he looked like white or
9 Hispanic. That's all, though.
10     "QUESTION: And when you -- when that van
11 pulled up, where was they standing and where were
12 you standing? Or, I'm sorry, where was Vani
13 standing and where were you standing?
14     "ANSWER: First we was both standing
15 together by the entrance of the park, and the van
16 pulled down some, about at the ending of the park,
17 and I walked off going towards the opposite way
18 towards the alley to watch out.
19     "QUESTION: And what street --
20     "ANSWER: And Vani --
21     "QUESTION: I'm sorry --
22     "ANSWER: -- on Ohio and Kil- -- in the
23 middle -- on Ohio in the middle of Kilpatrick and
24 Cicero.

86

1     "QUESTION: That's where you were?
2     "ANSWER: Yeah, both of us was on -- all
3 of us was on Ohio in the middle of Kilpatrick to
4 Cicero. I walked going towards the alley. He
5 went to the van."
6     During this videotaped statement, do you
7 have any reason to dispute that Xavier Walker
8 stated that he and Vani was on Ohio in the middle
9 of Kilpatrick to Cicero, that Walker walked
10 towards the alley, and Vani went to the van?
11     MR. COYNE: Objection, foundation.
12     MS. REED: Join objection, as well as
13 speculation, form, hearsay, and compound.
14 BY THE WITNESS:
15   **A I have no reason to dispute it, no.**
16 **BY MS. ADEEYO:**
17   Q Okay. I'm going to jump down to
18 City NK 250. This first full question here on
19 that page, it states:
20     "Okay. And why were you standing in that
21 area?
22     "ANSWER: To watch just in case the police
23 come or if another customer come or just
24 watching -- watching out.

87

1     "QUESTION: Was that a good place to see
2 at all angles where people would be coming from?
3     "ANSWER: Yes, ma'am.
4     "QUESTION: Did you see any police at that
5 time?
6     "ANSWER: No, ma'am.
7     "QUESTION: And what did you see Vani do?
8     "ANSWER: He got in the van. And then I
9 heard a noise, so I looked around. They was -- he
10 was, like, tussling with the man over the money
11 and the gun."
12     During the videotaped statement, do you
13 have any reason to dispute that Walker stated that
14 he saw Vani get in the van, and then Walker heard
15 a noise and looked around? Do you have any reason
16 to dispute that that's what Walker said?
17     MR. COYNE: Objection, foundation.
18     MS. REED: Join objection, as well as
19 speculation, hearsay, form.
20 BY THE WITNESS:
21   **A I have no reason to dispute it.**
22 **BY MS. ADEEYO:**
23   Q And do you have any reason to dispute that
24 Walker said that he saw Vani tussling with the man

88

1 over the money and the gun?
2     MR. COYNE: Objection, foundation.
3     MS. REED: Join objection, as well as
4 speculation, form, and hearsay.
5 BY THE WITNESS:
6   **A I have no reason to dispute that.**
7 **BY MS. ADEEYO:**
8   Q And there's this question here:
9     "And what did you do when you saw Vani
10 tussling with the man?
11     "ANSWER: I started going back towards the
12 van."
13     Do you have any reason to dispute that
14 Walker stated during his videotaped statement that
15 he started walking towards the van?
16     MR. COYNE: Objection, foundation.
17     MS. REED: Join objection, as well as
18 speculation, hearsay, and form.
19 BY THE WITNESS:
20   **A I have no reason to dispute it.**
21 **BY MS. ADEEYO:**
22   Q Okay. So I'm going to pick up on that
23 question at 250 that was next.
24     "QUESTION: And why did you start going

89

1 back toward the van?
2     "ANSWER: Just in case he needed -- cause
3 I thought he was just -- he had the man money
4 already, and the man was trying to grab him and
5 get his money back, so I was gonna just try to
6 help.
7     "QUESTION: And when you said you were
8 going to try to help, what were you going to try
9 to do?
10     "ANSWER: Try to just grab the man and
11 hold him, pull him off him so we both could run."
12     You have no reason to dispute that Walker
13 stated that he was going to try to grab the man,
14 hold him, pull him off of him so we could both
15 run?
16     MR. COYNE: Objection, foundation.
17     MS. REED: Join objection, as well as
18 speculation, hearsay, form.
19 BY THE WITNESS:
20     **A I have no reason to dispute that.**
21 **BY MS. ADEEYO:**
22     Q Now I'm picking up on City NK 251 at the
23 first question here.
24     "QUESTION: And you were going to hold the

90

1 man just in case Vani didn't have the money so he
2 could get it?
3     "ANSWER: Yes, ma'am.
4     "QUESTION: And when you started running
5 towards the van and then you -- did you stop or
6 did you keep going?
7     "ANSWER: I stopped because the door had
8 opened, the man had got out.
9     "QUESTION: What side of the car did the
10 man get out of?
11     "ANSWER: The driver's side.
12     "QUESTION: Driver's side of the van?
13     "ANSWER: Yes, ma'am.
14     "QUESTION: What did the man do when he
15 ran out of the van?
16     "ANSWER: He got a little -- a little bit
17 of ways and he dropped.
18     "QUESTION: Why did he drop?
19     "ANSWER: He had been shot.
20     "Okay. And who shot him?
21     "ANSWER: Jovanie."
22     Do you have any reason to dispute that
23 Walker stated that Jovanie shot the man?
24     MR. COYNE: Objection, foundation.

91

1     MS. REED: Join objection, as well as
2 speculation, form, hearsay.
3 BY THE WITNESS:
4     **A I have no reason to dispute it.**
5 **BY MS. ADEEYO:**
6     Q I'm going to pick up at the next question
7 on that same page, City NK 251.
8     "QUESTION: And what did you do after you
9 saw the man get shot?
10     "ANSWER: I was stalling for a minute
11 because I was stuck and I was scared, and then I
12 ran the opposite way.
13     "Did you see any police at that time?
14     "ANSWER: No, ma'am.
15     "QUESTION: Did -- what did Vani do with
16 the man after he dropped?
17     "ANSWER: I guess he got the money and he
18 ran the opposite way.
19     "QUESTION: And where -- then where did
20 you go?
21     "ANSWER: I went home."
22     Do you have any reason to dispute that
23 Xavier Walker stated he went home after Jovanie
24 shot the man?

92

1     MR. COYNE: Objection, foundation.
2     MS. REED: Join objection, as well as
3 speculation, form, and hearsay.
4 BY THE WITNESS:
5     **A I have no reason to dispute that.**
6 **BY MS. ADEEYO:**
7     Q Okay. I'm going to pick up now on
8 City NK 252, this first question here.
9     "And when you went home, did you -- what
10 did you do when you got home? Did you stay there
11 all night or did you leave?
12     "ANSWER: I seen some of my friends and
13 they -- one of my other friends had just got out
14 of jail, and they was going to the club to
15 celebrate, so I went and talked to my sister. By
16 me just getting my license, she let me use her car
17 so I can go to the club, to the restaurant.
18     "QUESTION: What kind of car was it?
19     "ANSWER: A Ford Taurus.
20     "QUESTION: What color was it?
21     "ANSWER: Green.
22     "QUESTION: And did you go -- where did
23 you go after that when you were in the car with
24 your friends?

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

---

93

1      "ANSWER:  First I went to a restaurant,
2  and then I went back around Cicero."
3      Based on the testimony that I just read,
4  do you have any reason to dispute that this is
5  what Xavier Walker stated during his videotaped
6  statement?
7    A  I don't --
8      MR. COYNE:  Objection, foundation.
9      MS. REED:  Join objection, as well as
10  speculation, hearsay, and form.
11  BY THE WITNESS:
12    A  I have no reason to dispute it.
13  BY MS. ADEEYO:
14    Q  And as we made our way about halfway
15  through Xavier Walker's video statement, does this
16  testimony refresh your recollection at all as to
17  the taking of this statement?
18    A  No, it does not.
19    Q  Okay.  I'm going to pick up there on
20  City NK 252.
21      "QUESTION:  Why did you go back around
22  there?
23      "ANSWER:  Just to see what was going on.
24      "QUESTION:  What was going on back where

---

94

1  the man got shot?
2      "ANSWER:  Through the neighborhood,
3  period.
4      "QUESTION:  And what did you see when you
5  got there?
6      "ANSWER:  I seen police all over Ohio, and
7  when I -- Ohio was blocked off and Erie is a
8  one-way, so I had to go back towards Huron and
9  come down.  And I went towards Huron.
10      "When I got on -- when I got around Erie,
11  I seen Jovanie, Tee Tee, and Shontay and
12  (inaudible) all walking up."
13      Do you have any reason to dispute that
14  Xavier Walker stated that he went back to Ohio the
15  night of the murder?
16      MR. COYNE:  Objection, foundation.
17      MS. REED:  Same -- I'm sorry, join
18  objection, as well as speculation, form, and
19  hearsay.
20  BY MS. ADEEYO:
21    Q  You can answer.
22    A  I have no reason to dispute it.
23    Q  I'm going to now turn to the next page,
24  City NK 253.

---

95

1      First question:  "Okay.  I'm going to show
2  you -- and when you saw them -- you saw Vani with
3  them?
4      "ANSWER:  Yes, ma'am.
5      "QUESTION:  And what happened when you saw
6  Vani?
7      "ANSWER:  He start -- he flagged me down
8  and he got in the car.
9      "QUESTION:  And what happened after he got
10  into the car?
11      "ANSWER:  We went to the club.
12      "QUESTION:  What club do you go to?
13      "ANSWER:  The (inaudible) Factory.
14      "QUESTION:  And where is that club?
15      "ANSWER:  On Lake and St. Louis."
16      Based on the testimony I just read, do you
17  have any reason to dispute that Xavier Walker
18  stated that Jovanie got into the car and then they
19  went to the club on Lake and St. Louis?
20      MR. COYNE:  Objection, foundation.
21      MS. REED:  Join objection, as well as
22  speculation, hearsay, and form.
23  BY THE WITNESS:
24    A  I have no reason to dispute it.

---

96

1  BY MS. ADEEYO:
2    Q  Okay.  I'm going to jump to a question on
3  City NK 253 right here.  It says:
4      "QUESTION:  After you were -- about how
5  long were you in the club?
6      "ANSWER:  About 20, 30 minutes because it
7  was almost closing time.
8      "QUESTION:  And after you left the club,
9  where did you go?
10      "ANSWER:  Went over -- over Bubble house.
11      "QUESTION:  Bubble?
12      "ANSWER:  Yes" -- "yes, ma'am," excuse me.
13      "QUESTION:  Okay.  I'm going to show you
14  what's going to be marked as Statement Exhibit 2
15  for identification.  Is that Bubble?
16      "ANSWER:  Yes, ma'am.
17      "QUESTION:  Do you know Bubble's real
18  name.
19      "ANSWER:  Antwon, ma'am."
20      Do you have any reason to dispute that
21  Xavier Walker stated after he went to the club, he
22  went to Bubble, a/k/a Antwon's, house?
23      MR. COYNE:  Objection, foundation.
24      MS. REED:  Join objection, as well as

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

---

97

1 speculation, form, and hearsay.
2 BY THE WITNESS:
3  **A  I have no reason to dispute it.**
4 **BY MS. ADEEYO:**
5  Q  Okay.  I'm going to jump now to
6 City NK 254.
7  "QUESTION:  Okay.  When you went over to
8 Bubble's house, did you see anybody else you knew?
9  "ANSWER:  Yes, ma'am.  Boo Boo was
10 sleeping in the car behind Bubble car -- house --
11  "QUESTION:  I'm going to show you --
12  "ANSWER:  -- in the driveway?
13  "QUESTION:  I'm going to show you what's
14 marked as Exhibit 3, Statement Exhibit 3.  Who is
15 that in that picture?
16  "ANSWER:  That's Boo Boo, ma'am.
17  "QUESTION:  Do you know Boo Boo's real
18 name?
19  "ANSWER:  No, ma'am.
20  "QUESTION:  So you saw Boo Boo sleeping in
21 the car?
22  "Yes, ma'am.
23  "QUESTION:  Okay.  Did you and Vani talk
24 to Boo Boo?

---

98

1  "ANSWER:  Yes, ma'am.
2  "QUESTION:  And did you tell him what
3 happened?
4  "ANSWER:  Yes, ma'am.
5  "QUESTION:  What did you say to Boo Boo
6 about it?
7  "ANSWER:  I was -- after Vani left going
8 to the window to go try to get in Bubble house, I
9 had told Boo Boo, I was, like:  You all bogus for
10 leaving Vani over there without knowing that can't
11 nobody can control him when he's drunk and stuff
12 and high with a gun."
13  Do you have any reason to dispute that
14 Xavier Walker had this conversation with Maurice
15 Wright on the day of the murder?
16  MR. COYNE:  Objection, foundation.
17  MS. REED:  Join objection, as well as
18 speculation, form, and hearsay.
19 BY THE WITNESS:
20  **A  I have no reason to dispute it.**
21 **BY MS. ADEEYO:**
22  Q  And you have no reason to dispute that
23 this is what Xavier Walker stated during his
24 videotaped statement, correct?

---

99

1  MR. COYNE:  Objection, foundation.
2  MS. REED:  Join objection, as well as
3 speculation, form, and hearsay.
4 BY THE WITNESS:
5  **A  I have no reason to dispute that the
6 record -- this record reflects that.**
7 **BY MS. ADEEYO:**
8  Q  Okay.  Now I'm going to turn to
9 City NK 254, the next page --
10  **A  Excuse me, that this document reflects it.**
11  Q  So on City NK 255 I am on the second full
12 question listed on the page.
13  It says: "QUESTION:  And when you went
14 over to Boo Boo's house, who was there?
15  "ANSWER:  Tee Tee and Shontay and the
16 kids.
17  "QUESTION:  Okay.  Who is Tee Tee?
18  "ANSWER:  Boo Boo mother.
19  "QUESTION:  Who is Shontay?
20  "ANSWER:  A girl.  Just a little
21 neighborhood girl that be over Boo Boo house.  She
22 be living with him.
23  "QUESTION:  Okay.  What's their address?
24  "ANSWER:  I don't -- it's the 4600.  I

---

100

1 don't know the exact address.
2  "QUESTION:  On what street?
3  "ANSWER:  On Erie and Kilpatrick.
4  "QUESTION:  Okay.  And when you got there,
5 did you talk to Shontay?
6  "ANSWER:  Yes, ma'am.
7  "QUESTION:  And what did you talk to
8 Shontay about?
9  "ANSWER:  On our way coming over there,
10 Jovanie was trying to get me to go and wipe the
11 fingerprints off, and I wasn't fitting to go do
12 that.  I was fitting to jack myself off.  So I
13 tried to trick her to go and do it like he was
14 trying to trick me to go do it.
15  "QUESTION:  Wipe the --
16  "ANSWER:  But she ain't want to go do it."
17  Do you have any reason to dispute that
18 Xavier Walker had a conversation with Shontay the
19 night of the murder?
20  MR. COYNE:  Objection, foundation.
21  MS. REED:  Join objection, as well as
22 speculation, form, and hearsay.
23 BY THE WITNESS:
24  **A  I have no reason to dispute that that's**

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

101

1 what this document says.
2 BY MS. ADEEYO:
3    Q  After having just reviewed this statement
4 of Ashanti Wright and this testimony that I just
5 read to you, do you have reason to believe that
6 Shontay is Ashanti Wright?
7        MR. COYNE:  Objection, foundation.
8        MS. REED:  Join objection, as well as
9 speculation.
10 BY THE WITNESS:
11    A  I mean, I would be guessing.  I don't have
12 any -- from this document, I don't have anything
13 that would indicate one way or another.
14 BY MS. ADEEYO:
15    Q  And you have no reason to dispute that
16 Xavier Walker told Ashanti Wright to go and wipe
17 the fingerprints off; is that correct?
18    A  I don't --
19        MR. COYNE:  Objection, foundation.
20        THE WITNESS: Oh, sorry.
21        MS. REED:  Join objection, as well as
22 speculation, form, and hearsay.
23 BY THE WITNESS:
24    A  I don't dispute that what the documents --

102

1    that the documents we have gone through thus far
2    seem to show that, but I have no other -- I have
3    no other recollection outside of that.
4 BY MS. ADEEYO:
5    Q  And you do not dispute the accuracy of
6 this transcript, correct?
7        MR. COYNE:  Objection, foundation.
8        MS. REED:  Join objection, as well as
9 speculation and form.
10 BY THE WITNESS:
11    A  I don't dispute the accuracy of the
12 transcript outside of what would normally be
13 considered, you know, clerical spelling errors or
14 that sort of thing.
15 BY MS. ADEEYO:
16    Q  In terms of the portions of this
17 transcript that we have read, have you pinpointed
18 any clerical records in this transcript?
19    A  No, not really.
20    Q  When you say "not really," that sounds
21 like a qualification.  Is there something you
22 believe to be a clerical error?
23    A  No, I answered the way I did because I
24 don't have anything to compare it to.  So I don't

103

1    recall the -- I don't recall actually taking the
2    statement, I'm just reading this here.  And so,
3    no, I don't see anything in particular that I
4    would find an error, clerical or otherwise.
5    Q  I'm going to draw your attention, on the
6 same Exhibit 4, to City NK 257.  Starting with the
7 fourth question continuing on the page.  It
8 states:
9        "QUESTION:  Okay.  Have you been treated
10 okay by the police and by me?
11        "ANSWER:  Yes, ma'am.
12        "QUESTION:  Have you had anything to eat
13 while you've been here?
14        "ANSWER:  Yes, ma'am.
15        "QUESTION:  What have you had?
16        "ANSWER:  A burger and some fries.
17        "QUESTION:  Okay.  Have you gotten to
18 smoke cigarettes whenever you wanted to?
19        "ANSWER:  Yes, ma'am.
20        "QUESTION:  Have you been able to go to
21 the bathroom whenever you've needed to?
22        "ANSWER:  Yes, ma'am.
23        "QUESTION:  Have any threats or promises
24 been made to you in exchange for this statement?

104

1        "ANSWER:  No, ma'am.
2        "QUESTION:  And are you under the
3 influence of drugs or alcohol at this time?
4        "ANSWER:  No, ma'am."
5    Q  Do you have any reason to dispute that
6 those are the answers that Xavier Walker gave
7 during his videotaped statement to your questions?
8        MR. COYNE:  Objection, foundation.
9        MS. REED:  Join objection, as well as
10 speculation, form, and hearsay.
11 BY THE WITNESS:
12    A  I have no reason to dispute that those
13 were his answers.
14 BY MS. ADEEYO:
15    Q  When you interviewed Xavier Walker back on
16 May of 2000, do you recall seeing any bruises on
17 his face or body?
18        MR. COYNE:  Objection, foundation.
19        MS. REED:  Same objection.
20 BY THE WITNESS:
21    A  I don't recall the interview.  I'm sorry,
22 I don't recall it, so I can't -- I don't remember
23 what he looked like that day.
24

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

105

1 BY MS. ADEEYO:
2     Q  In the event that you had observed a
3 bruise on his face or body when you were speaking
4 to him, would you have asked him about that
5 bruise?
6         MR. COYNE:  Objection, foundation,
7 speculation, incomplete hypothetical.
8         MS. REED:  Join objections.
9 BY MS. ADEEYO:
10    Q  You can answer.
11    **A  I could say, in general, I would have --**
12 **if I noticed something that I thought was of**
13 **concern, I would have inquired about it.  In**
14 **general, again, I don't have a specific**
15 **recollection of this conversation, but -- and I**
16 **don't want to speculate as to how or what I would**
17 **have said or done.**
18        **But if something -- if something stood out**
19 **to me as -- I would have questioned it.**
20 BY MS. ADEEYO:
21    Q  Generally if you're in an interview with a
22 suspect and that person told you that a police
23 officer had abused them, would you have documented
24 that information someplace?

106

1         MS. REED:  Objection, foundation -- lack
2 of foundation, calls for speculation, and
3 incomplete hypothetical.
4 BY THE WITNESS:
5     **A  Well, again, I'm concerned about**
6 **speculating in any way, but I will say if**
7 **something doesn't seem -- if something in any case**
8 **didn't seem right, I would have done whatever my**
9 **oath as a prosecutor would have required me to do.**
10       **I would not -- I don't -- I can't assume**
11 **that I would have sat still for something like**
12 **that if I noticed.**
13 BY MS. ADEEYO:
14    Q  So you mentioned your oath as a
15 prosecutor, what it would have required you to do.
16 So if you had noticed that a suspect had a bruise
17 or some injury to their face or person, what would
18 your oath require you to have done in that
19 situation?
20        MR. COYNE:  Objection, form, foundation,
21 speculation, incomplete hypothetical.
22        MS. REED:  Join.
23 BY THE WITNESS:
24    **A  Again, if there was something that I saw**

107

1     that seemed, I don't know, suspicious or improper
2 **or out of place, then I would have had to call**
3 **attention to it.**
4 BY MS. ADEEYO:
5     Q  And if that occurred, how would you have
6 called attention to it?
7         MR. COYNE:  Same objections.
8         MS. REED:  Same objections.
9 BY THE WITNESS:
10    **A  I don't know.  I can't -- I don't think**
11 **it's right to speculate generally because the**
12 **fact -- any facts -- you know, the facts are**
13 **infinite of what could create a situation like**
14 **that.  So I don't know.**
15 BY MS. ADEEYO:
16    Q  Have you, in your time as an Assistant
17 State's Attorney when interviewing a suspect, have
18 you ever encountered a situation in which the
19 suspect complained to you that a police officer or
20 a detective physically abused them in any way?
21        MS. REED:  I'm going to object to lack of
22 foundation, speculation, incomplete hypothetical,
23 and to the form of the question, as well as calls
24 for a narrative.

108

1 BY THE WITNESS:
2     **A  I do not recall.**
3 BY MS. ADEEYO:
4     Q  When you interviewed Xavier Walker, do you
5 recall seeing any footprints on the front of his
6 shirt?
7         MR. COYNE:  Objection, foundation.
8         MS. REED:  Join objection, as well as
9 speculation and form.
10 BY THE WITNESS:
11    **A  Absolutely not.  I do not recall that.  I**
12 **don't remember anything, but I think something --**
13 **I don't recall anything that would have made an**
14 **impression on me.  I don't recall seeing that.**
15 BY MS. ADEEYO:
16    Q  When you interviewed Xavier Walker, do you
17 recall him ever telling you that he was verbally
18 threatened by any police officers or detective?
19        MR. COYNE:  Objection, foundation.
20        MS. REED:  Same objection, as well as
21 speculation and form.
22 BY THE WITNESS:
23    **A  I do not recall my conversation with him,**
24 **so, no, I don't recall anything like that.**

109

1  BY MS. ADEEYO:
2      Q  Do you recall Walker ever telling you that
3  an officer cuffed him too tightly on his wrist?
4          MR. COYNE:  Objection, foundation.
5          MS. REED:  Same objection, as well as
6  speculation and form.
7  BY THE WITNESS:
8      A  Again, I don't recall my conversation with
9  him, so I don't recall that.  I don't recall
10 him -- anything like that.
11 BY MS. ADEEYO:
12     Q  During your interview with Walker, do you
13 recall him saying that the police officer or
14 detective promised him anything in exchange for
15 his videotaped statement?
16         MR. COYNE:  Objection, form and
17 foundation.
18         MS. REED:  Same objection, as well as
19 speculation.
20 BY THE WITNESS:
21     A  I do not recall.
22 BY MS. ADEEYO:
23     Q  When you interviewed Walker, do you recall
24 if he ever denied his participation in the murder

110

1  of Marek Majdak?
2          MR. COYNE:  Objection, foundation.
3          MS. REED:  Same objection.
4  BY THE WITNESS:
5      A  I don't recall that.
6  BY MS. ADEEYO:
7      Q  During your interview with Walker, do you
8  recall Walker stating that the police told him
9  what to say during his videotaped statement?
10         MR. COYNE:  Objection, foundation.
11         MS. REED:  Same objection.
12 BY THE WITNESS:
13     A  I do not recall -- I don't remember the
14 conversation with him, and I don't recall that.
15 BY MS. ADEEYO:
16     Q  During your interview with Xavier Walker,
17 do you recall Walker telling you that the police
18 did not allow him to sleep while he was in the
19 interview room?
20         MR. COYNE:  Objection, foundation.
21         MS. REED:  Same objection.
22 BY THE WITNESS:
23     A  No, I don't recall that.
24

111

1  BY MS. ADEEYO:
2      Q  Do you remember your interview with
3  Walker, do you recall him telling you that the
4  police did not allow him to use the restroom?
5          MR. COYNE:  Objection, foundation.
6          MS. REED:  Same objection.
7  BY THE WITNESS:
8      A  I don't recall that, but it's contrary to
9  what we just went over, I think.  I'm not sure,
10 but I don't recall any -- I don't recall that
11 night, so I don't recall that.
12 BY MS. ADEEYO:
13     Q  During your interview with Xavier Walker,
14 do you recall Walker ever telling you that the
15 police forced him to stand up in the interview
16 room?
17         MR. COYNE:  Objection, foundation.
18         MS. REED:  Same objection.
19 BY THE WITNESS:
20     A  I don't recall.
21 BY MS. ADEEYO:
22     Q  Okay.
23         MS. ADEEYO:  Can we just take a quick
24 five-minute break?  I believe I'm finished, but I

112

1  want to run through my outline.  Can we come back
2  at 12:00?
3          MR. COYNE:  Of course.
4          MS. REED:  Sure.
5          (WHEREUPON, a recess was had.)
6          MS. ADEEYO:  All right.  Ms. Leafblad,
7  that's all the questions I have for you today.
8  Thank you for your time.  The other attorneys
9  present on the Zoom may have some follow-up.
10         THE WITNESS:  Thank you.
11             EXAMINATION
12 BY MS. ITCHHAPORIA:
13     Q  My name is Misha Itchhaporia.  I represent
14 the individual Chicago police officers, as I
15 mentioned earlier, and I do have some follow-up
16 questions for you.
17         I might be bouncing around a little bit,
18 so if you can just bear with me, okay?
19     A  Okay.
20     Q  Do you have any medical conditions or are
21 you taking any medications that would affect your
22 ability to (inaudible) today?
23     A  You broke up a little bit --
24         MR. COYNE:  Yeah, I didn't hear the whole

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

29 (113 to 116)

113

1  question.
2  BY MS. ITCHHAPORIA:
3     Q  Okay.  Sure.
4        Do you have any medical conditions, or are
5  you on any prescription medication that would
6  affect your ability to testify truthfully today?
7     A  No.
8     Q  Have you ever been diagnosed with any
9  memory issues?
10    A  No.
11    Q  Would you agree that your recollection
12  about your involvement in the Marek Majdak case
13  review was better in May of 2000 than it is today?
14       MS. REED:  I'm going --
15       MR. COYNE:  Objection to --
16       MS. REED:  -- to -- I'm going to join the
17  objection for foundation, as well as speculation
18  and form.
19  BY THE WITNESS:
20    A  Well, to the extent that anybody's memory
21  is better closer to the time of an event, I would
22  say that I imagine it would have been better
23  22 years ago.
24  BY MS. ITCHHAPORIA:

114

1     Q  Would you agree then that your memory was
2  better about your involvement and interactions
3  with Xavier Walker when you testified at the
4  motion to quash hearing in October of 2001?
5        MR. COYNE:  Same objection.
6        MS. REED:  I'm going to object to
7  foundation, form, speculation.
8  BY THE WITNESS:
9     A  I guess I have the same answer.  As it was
10  closer to the event in question, I imagine I would
11  have more specific recollection at that time.
12  BY MS. ITCHHAPORIA:
13    Q  Right.  October 2001 would have been about
14  a year and four or five months after you
15  interacted with Xavier Walker, right?
16    A  Right.
17       MR. COYNE:  Objection, foundation.
18       MS. REED:  Objection --
19  BY MS. ITCHHAPORIA:
20    Q  And would you --
21       MS. REED:  -- foundation.
22  BY MS. ITCHHAPORIA:
23    Q  And would you agree that your memory was
24  better when you testified at the pretrial hearing

115

1  involving Jovanie Long in November of 2003?
2        MR. COYNE:  Objection --
3        MS. REED:  Objection --
4        MR. COYNE:  Sorry.  Objection, foundation.
5        MS. REED:  Objection, foundation,
6  speculation, and form.
7  BY THE WITNESS:
8     A  I believe that my memory would have been
9  better at the time because it was closer to the
10  event.
11  BY MS. ITCHHAPORIA:
12    Q  Okay.  As of May 2000, you had about
13  four-years-plus experience as an Assistant State's
14  Attorney at the Cook County State's Attorney's
15  Office; is that right?
16    A  That's correct, yeah.  Just about that
17  much.
18    Q  And so in May of 2000, you had about five
19  to six months of experience as an ASA in the
20  Felony Review Unit; is that right?
21    A  To the best of my recollection, yes.
22    Q  Okay.  So is it accurate to say that prior
23  to May of 2000 -- at least the end of May of 2000,
24  that you had been told to conduct Felony Review of

116

1  murder charges in other cases?
2     A  You know what --
3        MS. REED:  Object --
4  BY THE WITNESS:
5     A  -- part of your question --
6        MR. COYNE:  That question broke up.
7        MS. ITCHHAPORIA:  Sure.  Let me repeat
8  myself.
9  BY MS. ITCHHAPORIA:
10    Q  Is it fair to say that you had been told
11  to conduct felony review of murder charges in
12  other cases prior to May 29th, 2000?
13       MR. COYNE:  I didn't catch the first part.
14  If she had been what?  Told to, did you say?
15       MS. REED:  You broke out again.
16  BY THE WITNESS:
17    A  Yeah, it does keep breaking up.  I'm
18  sorry.
19  BY MS. ITCHHAPORIA:
20    Q  All right.  Let me try again.  I'm sorry.
21  I'm hardwired in.
22       Is it fair to say that prior to May 29th,
23  2000, that you had conducted felony review in
24  other cases involving murder charges?

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

117

1    MR. COYNE:  Objection, form.
2    MS. REED:  Same objection.
3  BY MS. ITCHHAPORIA:
4    **A  To the best of my recollection.  I don't**
5  **know how many or anything like that as we sit here**
6  **today.**
7  **BY MS. ITCHHAPORIA:**
8    Q  Okay.  But do you know that you had
9  approved felony murder charges in other cases
10 before May 29, 2000?
11    MS. REED:  I'm going to object to form, as
12 well as lack of foundation.
13 BY THE WITNESS:
14    **A  Again, to the best of my recollection, I**
15 **did work on other murder cases prior to that one.**
16 BY MS. ITCHHAPORIA:
17    Q  Okay.  So Xavier Walker's case was not the
18 first murder case that you had worked on?
19    A  I don't believe it was.
20    Q  Okay.  And prior to May 28th, 2000, you
21 had taken handwritten statements from witnesses in
22 other cases, correct?
23    MS. REED:  Objection to form.
24

118

1  BY THE WITNESS:
2    **A  I believe so.**
3  **BY MS. ITCHHAPORIA:**
4    Q  And prior to May 29th, 2000, you had taken
5  videotaped statements from suspects?
6    MS. REED:  I'm going to object to form.
7  BY THE WITNESS:
8    **A  I think so.  Again, it's been -- I don't**
9  **remember how many cases I did prior to that,**
10 **so -- you know, murders or whatever, so I can't**
11 **speak to how many videos I had been involved with**
12 **prior to that, you know, if any.  But I know that**
13 **that wasn't the only one that I would have been**
14 **involved with during the time that I was on Felony**
15 **Review.**
16 **BY MS. ITCHHAPORIA:**
17    Q  Is it fair and accurate to say that Xavier
18 Walker was not the first videotaped confession
19 that you had been involved in?
20    MR. COYNE:  Objection, foundation.
21    MS. REED:  Same objection, as well as
22 form.
23 BY THE WITNESS:
24    **A  I can say it wasn't the only one.  I don't**

119

1  know when my first one was, so I can't -- I just
2  can't remember --
3  BY MS. ITCHHAPORIA:
4    Q  Okay.  If -- sorry.  If Xavier Walker was
5  the first videotaped statement confession that you
6  had been involved in, is that something that you
7  would remember, that it was your first?
8    MS. REED:  I'm going to object to --
9    MR. COYNE:  (Indiscernible.)
10    MS. REED:  I'm going to join Counsel's
11 objection for foundation and speculation, as well
12 as form, as well as asked and answered.
13    (Reporter clarification.)
14    MR. COYNE:  I said objection, foundation,
15 speculation.
16 BY THE WITNESS:
17    **A  Okay.  It's quite possible that that was**
18 **not my first one, but I just don't know -- I just**
19 **don't remember.  So I don't know -- so I can't**
20 **tell you one way or another.  I apologize.**
21 BY MS. ITCHHAPORIA:
22    Q  Is it accurate to say that back in May
23 of 2000, that the Felony Review Unit was divided
24 into four teams that worked seven days a week?

120

1    **A  To the best of my recollection, yes.**
2    Q  And then there were shifts that were three
3  days on and three days off; is that right?
4    **A  Yes, we work three days on, three days**
5  **off.**
6    Q  And the shifts were 12 hours long?
7    **A  Yes.**
8    Q  Do you recall what the start and end time
9  was of the shift that you were working in May
10 of -- let's say May 28, 2000?
11    **A  No.**
12    Q  Who were the other -- we just discussed
13 it.  There were four teams.  Who were the other
14 ASAs that were on your team when you were in
15 Felony Review in May of 2000?
16    **A  I'm sorry, I don't remember that.**
17    Q  Okay.  Do you recall who your supervisor
18 was when you were in Felony Review in May of 2000?
19    **A  No.**
20    Q  Do you know an ASA by the name of
21 (inaudible) Mahoney?
22    **A  Of what?  You broke up again.  What was**
23 **the name?**
24    Q  Thomas Mahoney.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

31 (121 to 124)

---

121

1    A  Did I know an ASA named Thomas Mahoney?
2  Yeah -- yes, I did.
3    Q  In May of 2000, was Thomas Mahoney your
4  supervisor when you were on Felony Review?
5      MS. REED:  I'm going to object to lack of
6  foundation.
7  BY THE WITNESS:
8    A  I don't remember.
9  BY MS. ITCHHAPORIA:
10    Q  Okay --
11    A  I don't remember if he was my trial sup at
12  that time.
13    Q  How many trial supervisors would be
14  assigned as a supervisor on a Felony Review team
15  back in May of 2000?
16    A  I don't remember how it was done at the
17  time.  I know that we had at least one.  There
18  might have been two, but I don't know.  You know,
19  I don't remember how -- if that was for every
20  team.  I just don't remember.
21    Q  In May of 2000, how many ASAs were on your
22  team?
23    A  I don't remember how many ASAs were on my
24  team.

---

122

1    Q  Would the trial supervisor that was on
2  your team also be on the same shift as you?
3    A  The trial supervisor for my team
4  specifically?  I believe, yes, we would be on the
5  shift together.
6    Q  Do you know an ASA by the name of Jim
7  Navarre, N-a-v-a-r-r-e?
8    A  Yes.
9    Q  And was he on the same Felony Review team
10  that you were in -- that you were in in May
11  of 2000?
12    A  I don't --
13      MS. REED:  I'm going to object to lack of
14  foundation.
15  BY THE WITNESS:
16    A  I don't remember --
17  BY MS. ITCHHAPORIA:
18    Q  Did you -- okay.  I'm sorry.
19    A  I don't remember if he was on my team.
20    Q  Did you, at any point in time, have a
21  conversation or communications with ASA Jim
22  Navarre about Xavier Walker's criminal case?
23      MS. REED:  I'm going to object to lack of
24  foundation, calls for speculation.

---

123

1  BY THE WITNESS:
2    A  I just don't remember that case at all, so
3  I don't remember who I talked to at the time.
4  BY MS. ITCHHAPORIA:
5    Q  Okay.  Same question as to ASA Thomas
6  Mahoney.  Did you at any point in time have a
7  conversation with Thomas Mahoney about Xavier
8  Walker's criminal case?
9      MS. REED:  I'm going to object to lack of
10  foundation and calls for speculation.
11  BY THE WITNESS:
12    A  I don't remember if he was -- if they
13  were -- you know, if people were on my team, if
14  they were my trial sups, I may have, but I
15  honestly don't remember who was on my team at the
16  time or who my trial sup was.
17  BY MS. ITCHHAPORIA:
18    Q  Okay.  Going back to Jim Navarre, did you
19  ever have a conversation or any communications
20  with Jim Navarre about Jovanie Long's criminal
21  case?
22      MS. REED:  I'm going to object to lack of
23  foundation and speculation.
24

---

124

1  BY THE WITNESS:
2    A  I don't remember talking to him about the
3  case.
4  BY MS. ITCHHAPORIA:
5    Q  Okay.  Did you become aware at any point
6  in time after you took the videotaped statement of
7  Xavier Walker that Jovanie Long had also
8  confessed?
9      MS. REED:  I'm going to object --
10      MR. COYNE:  Objection --
11      MS. REED:  -- lack of --
12      MR. COYNE:  -- form.
13      MS. REED:  I'm going to object to lack of
14  foundation, speculation, and form.
15  BY THE WITNESS:
16    A  I'm sorry, I don't even -- I don't
17  understand the question.
18  BY MS. ITCHHAPORIA:
19    Q  Sure.  Did you learn at any point in time
20  after you took Xavier Walker's videotaped
21  statement that his co-defendant, Jovanie Long, had
22  also given a videotaped statement confessing to
23  his (inaudible) same murder as Xavier Walker?
24      (Simultaneous objections.)

---

125

1      MR. COYNE:  There was a cutout there.  Two
2  of the words I didn't hear.
3      (Reporter admonition.)
4      MR. COYNE:  For the record, my objection
5  is based on foundation.
6      MS. REED:  And I also objected to
7  foundation, form, and speculation.
8      MS. ITCHHAPORIA:  Maybe this might help:
9  Ms. Reed and John, I'm happy to agree that one
10  objection lodged by one party is an objection for
11  all.  That may cut down some of the back and
12  forth.
13      MR. COYNE:  Fair enough.  That works.
14      MS. ITCHHAPORIA:  Okay.  And I'll try to
15  slow down, Michelle, and I am going to try to
16  rephrase that question or repeat it to the best of
17  my ability to recall.
18      MR. COYNE:  Misha, let me just chime in
19  there.
20      Sierra, since you're typically objecting
21  on more grounds than I am and Counsel has accepted
22  an objection from one of us is an objection from
23  all, it would probably be most productive if I
24  just let you object.

126

1      MS. REED:  If you would like.  But feel
2  free to step in if you think there's an objection
3  I missed.
4      MR. COYNE:  Fair enough.  All right.
5  Thanks.
6  BY MS. ITCHHAPORIA:
7      Q  The question was, at any point in time
8  after you were involved in the videotaped
9  confession of Xavier Walker, did you learn that
10  Xavier Walker's criminal co-defendant, Jovanie
11  Long, had also given a videotaped statement
12  confessing to his involvement in the same murder
13  as Xavier Walker?
14      MS. REED:  I'm going to object to
15  foundation, speculation, and form.
16  BY THE WITNESS:
17      A  I'm sorry, I just don't remember, so I
18  don't remember if I -- if I would have known.  I
19  mean, I can make assumptions, but I can't tell you
20  for certain at this point.
21  BY MS. ITCHHAPORIA:
22      Q  When you were on Felony Review, would you
23  consult with your trial supervisor?
24      MS. REED:  I'm going to object to lack of

127

1  foundation and speculation and form.
2  BY THE WITNESS:
3      A  On occasion I would.  Not with every case.
4  BY MS. ITCHHAPORIA:
5      Q  And what would be the occasions when you
6  would consult with your trial supervisor when you
7  were on Felony Review?
8      A  When I had a -- if I had some kind of a
9  question or, you know, it would be if I had a
10  question about something.  Or if for some reason I
11  was supposed to check in about something.  So I
12  don't have any -- I don't remember specifically
13  what kind of conversations or when I would have
14  called my trial super.
15      Q  Back in May of 2000, would you need your
16  trial supervisor's approval if you were going to
17  approve felony murder charges against a suspect?
18      A  I don't remember.  I don't remember those
19  protocols.
20      Q  Okay.  Did you, in the case of Xavier
21  Walker, consult or speak to your trial supervisor
22  before you approved felony murder charges?
23      MS. REED:  I'm going to object to lack of
24  foundation.

128

1  BY THE WITNESS:
2      A  I don't remember.
3  BY MS. ITCHHAPORIA:
4      Q  You mentioned protocols.  Were there
5  protocols that you were trained on prior to you
6  going out and doing your own Felony Review back in
7  2000?
8      A  No.
9      Q  Back in, you said -- I think you joined
10  the Felony Review Unit in December of 1999.  Was
11  there training that you received as a Felony
12  Review ASA?
13      A  Not that I recall.  Again, it was a long
14  time -- I apologize.  It was a long time ago, and
15  I don't really -- I don't remember.
16      Q  Before you -- when you joined the unit
17  in -- the Felony Review Unit in December of 1999,
18  was there any on-the-job training where you would
19  have to go with other Felony Review ASAs and
20  observe what they're doing?
21      A  I believe so.
22      Q  Do you know how many times you observed
23  another Felony Review ASA review a case before you
24  went on your own?

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

129

1    A  I don't remember, no.
2    Q  Back in May of 2000, how would you get an
3  assignment when you were on Felony Review?
4    A  Typically we'd get a call from our Felony
5  Review dispatcher telling us that there was a case
6  we needed to go to.
7    Q  And so the dispatcher would call where
8  back in May of 2000?
9    A  Well, sometimes we were all in the
10  building together, so they would just say to us to
11  go somewhere.  But other times, if we went there,
12  they would call; you'd have a pager, we'd get
13  paged.
14    Q  And where -- back in May of 2000, where
15  would you have to report to as a Felony Review
16  ASA?
17    A  I believe it was to 26th Street, to our
18  office where the Felony Review Unit is located --
19    Q  And so --
20    A  -- in Chicago.
21    Q  So typically if a dispatcher would call
22  the Felony Review office located at 26th Street to
23  let you know that you were needed to go to a
24  detective area or another location to review?

130

1    A  Well, no, the -- the dispatcher was at
2  26th Street.  We had pagers, so we'd get paged.
3  You know, we'd get a beep, you know, when we had
4  to call.
5    Q  Let me --
6    A  We'd call the office back and find out
7  what was going on if we were not in the office
8  already.
9    Q  Got it.  Okay.  So when you're on Felony
10  Review back in May of 2000, were you actually
11  required to be in the office, or could you be at
12  home and then get paged in when you were on shift?
13    A  We could not be home, I remember that.
14  But, I mean, I don't know, we could have been
15  finishing another case when we get called.  I
16  mean, there's a -- you know, so I have no other --
17  I don't know, you know -- that's it.  I don't know
18  how else to comment on that.  Sorry.
19    Q  And then if you were either paged or if
20  you were in the office when the dispatcher calls,
21  typically what kind of information would the
22  dispatcher provide you?
23    A  I don't remember specifically, but I think
24  that, you know, maybe -- I don't remember.  I

131

1  don't remember.
2    Q  Would the dispatcher tell you which
3  location that you had to go if it was a detective
4  area?
5    MS. REED:  I'm going to object to lack of
6  foundation and speculation.
7  BY THE WITNESS:
8    A  Well, sometimes we went to police
9  districts, sometimes we went to hospitals.  So if
10  we were supposed to go somewhere, we would be told
11  where to go.
12  BY MS. ITCHHAPORIA:
13    Q  So you're told where to go.  Would you
14  also be told what type of charges were being
15  sought?
16    MS. REED:  I'm going to object to lack of
17  foundation.
18  BY THE WITNESS:
19    A  I think so, but I don't really remember.
20  I think so.  You know, if there was a dead body,
21  we would be certainly told that there was a dead
22  body, you know.
23  BY MS. ITCHHAPORIA:
24    Q  And would you be told who the detectives

132

1  were that were working on the case?
2    A  I don't recall.  Again, I feel like I'm
3  going to be guessing because I just really don't
4  remember.  It makes sense that we would be told
5  who to talk to, but I can't tell you that I --
6  that specifically that's how it was every time.
7  BY MS. ITCHHAPORIA:
8    Q  Let me see if I can ask that in another
9  way.  When you got to the area because you'd been
10  called there to do a review, how would you know
11  which detective to talk to?
12    MS. REED:  I'm going to object to lack of
13  foundation.
14  BY THE WITNESS:
15    A  I don't remember.  I mean, it would be
16  different each time.  You know, it depends on what
17  the circumstances were and what else was going on
18  at that particular location at any given time.
19    So I don't really remember specifically.
20  BY MS. ITCHHAPORIA:
21    Q  Back in May of 2000, did you have a
22  practice as to what type of equipment that you
23  brought with you when you were going to do a
24  review of murder charges at a detective division?

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

34 (133 to 136)

133

1      MS. REED:  I'm going to object to form.
2  BY THE WITNESS:
3      **A  Well, I could tell you, we didn't really**
4  **carry any equipment.  I mean, I had -- I made sure**
5  **I had my pager and a pen.  I mean, I really**
6  **didn't -- you know, maybe some paper.  I don't**
7  **think we had -- I don't recall having any kind of**
8  **specific equipment.**
9  **BY MS. ITCHHAPORIA:**
10     Q  Would you bring blank handwritten forms
11 with you so that you could write down a witness's
12 statement?
13     MS. REED:  I'm going to object to
14 speculation and lack of foundation.
15 BY THE WITNESS:
16     **A  I don't think that's something that was**
17 **done every single time.  I don't recall -- I don't**
18 **recall how we did that.**
19     Q  Was it your practice when you were in
20 Felony Review back in May of 2000 to bring the
21 Felony Review blueback with you?
22     MS. REED:  I'm going to object to form as
23 well as lack of foundation and speculation.
24

134

1  BY THE WITNESS:
2      **A  I would say that there's a Felony Review**
3  **folder, and I would say we had to bring that.**
4  **But, again, I don't -- I guess to me personally, I**
5  **tend to like to be more prepared than not, so I**
6  **probably had some folders with me so that I would**
7  **not have to -- not run out of them.**
8      **But I don't know that there was any**
9  **specific requirement or I don't recall any kind of**
10 **established practice.**
11 **BY MS. ITCHHAPORIA:**
12     Q  Was it your practice back in May of 2000
13 to bring consent to have a videotaped statement, a
14 blank -- blank consent forms with you when you
15 were going to do Felony Review?
16     MS. REED:  I'm going to object to form,
17 speculation, and hearsay -- sorry, not hearsay --
18 lack of foundation.
19 BY THE WITNESS:
20     **A  I don't remember if I made that my**
21 **practice.  I don't remember.**
22 **BY MS. ITCHHAPORIA:**
23     Q  Okay.  And you mentioned a Felony Review
24 folder.  What is a Felony Review folder?

135

1      **A  It's just a -- it was a way to write down**
2  **just, you know, the names of the parties or the**
3  **detectives, just to make sure we knew -- just so**
4  **that we had -- it was kind of a -- I don't know.**
5  **It contained general information about, you know,**
6  **the case we were working on.**
7      Q  And when you're saying Felony Review
8  folder, can you describe what the folder looked
9  like?
10     **A  At the time?  It was just kind of a card**
11 **stock folded in half.  And it had -- I don't know.**
12 **I mean, I can't really describe it.  I'm sorry.**
13     MR. COYNE:  Did you say card stock?
14     THE WITNESS:  Card stock paper, like it
15 was a heavier paper on the outside, and then there
16 was, like, thinner paper on the inside that we
17 wrote on.  But I don't -- I'm sorry, that's all I
18 have.
19     MR. COYNE:  I was just wondering what word
20 you used.
21 BY MS. ITCHHAPORIA:
22     Q  Would you fill out the card stock portion
23 of the Felony Review folder before you went to the
24 detective area to conduct a review?

136

1      MS. REED:  I'm going to object to lack of
2  foundation and form.
3  BY THE WITNESS:
4      **A  I don't recall that.  I don't remember.**
5  **Because, again, every case -- each scenario and**
6  **each set of facts and each circumstance, you know,**
7  **they weren't all the same.  So I don't recall.**
8  **BY MS. ADEEYO:**
9      Q  Was it your practice to always, when
10 you're conducting a review, to fill out some
11 portion of the Felony Review folder?
12     MS. REED:  I'm going to object to
13 foundation -- lack of foundation and form.
14 BY THE WITNESS:
15     **A  Could you repeat the question, please.**
16 **BY MS. ITCHHAPORIA:**
17     Q  Was it your practice when you were a
18 Felony Review ASA to fill out some portion of the
19 Felony Review folder?
20     MS. REED:  Same objections.
21 BY THE WITNESS:
22     **A  Well, I would -- I think it's fair to say**
23 **that, you know, I would fill out a portion of it**
24 **depending upon what the information available was.**

137

BY MS. ITCHHAPORIA:

1 BY MS. ITCHHAPORIA:
2    Q  And --
3    A  It wasn't -- you know, we had the police
4  reports to work with, so, you know, those were
5  what we relied on -- or what we would refer to to
6  see first.
7    Q  You said there was some paper -- thin
8  paper inside the Felony Review folder that you
9  would write things down on; is that right?
10    A  Yes.
11    Q  What would you write on the thin paper?
12       MS. REED: I'm going to object to lack of
13  foundation, form, speculation, and incomplete
14  hypothetical.
15 BY THE WITNESS:
16    A  Again, if there was something -- if there
17  was a piece of information that was applicable in
18  one way or another to write down, then we would
19  write it.
20       But, you know, again, in general -- it's
21  very hard to speak generally.  I mean, you know,
22  these aren't cookie cutter cases.  They're all
23  different.  There's different facts, different
24  people, different circumstances.

138

1 BY MS. ITCHHAPORIA:
2    Q  Before you became a Felony Review ASA or
3  right when you started, were you trained on how to
4  fill out a Felony Review folder?
5    A  No, I don't recall being trained.
6    Q  So it's possible that you were and you
7  just don't remember?
8    A  Yeah, I don't remember.
9    Q  Okay.
10    A  So I don't want to speculate to whether it
11  was possible or not.  I don't remember.
12    Q  Would you -- when you're interviewing a
13  witness or a suspect, would you sometimes take
14  notes during your interview on the -- either on
15  the Felony Review folder or in the -- or on the
16  thin paper that was inside the folder?
17    A  I don't remember.
18    Q  Okay.  Back in May of 2000 when you were
19  Felony Review ASA, did you have a practice as far
20  as taking notes when you were conducting Felony
21  Review?
22       MS. REED: I'm going to object to form as
23  well as lack of foundation, speculation.
24

139

1 BY THE WITNESS:
2    A  I mean, I am concerned about speculating
3  here, but I can say that, in general, if I was
4  sitting and talking to somebody who was a witness
5  or whoever I was talking to, I would not take
6  notes during the conversation.
7 BY MS. ITCHHAPORIA:
8    Q  Okay.
9    A  That, I recall.
10    Q  So if you did take notes, it would be
11  after the interview was over?
12       MS. REED: Same objections.
13 BY THE WITNESS:
14    A  I don't remember, and -- I don't remember.
15  That's an extremely general question, so it's just
16  too speculative for me to answer.
17 BY MS. ITCHHAPORIA:
18    Q  Okay.  So is it accurate then to say, as
19  far as your notetaking practice when you were a
20  Felony Review ASA, sort of, you didn't really have
21  a practice, it was on a case-by-case basis?
22    A  I guess that's reasonable to assume, but I
23  don't -- again, I don't have a specific
24  recollection of making a choice of how I was going

140

1  to do things, you know, one situation to another.
2 BY MS. ITCHHAPORIA:
3    Q  Okay.  If you did back in May of 2000 fill
4  out portions of the Felony Review folder or the
5  thin papers, would you do that for witnesses and
6  suspects or just witnesses or just suspects?
7       MS. REED: I'm going to object to form and
8  lack of foundation, as well as speculation.
9 BY THE WITNESS:
10    A  Again, I don't have a specific
11  recollection of my time there.  And there were --
12  I was there -- I can't answer the question without
13  guessing.
14 BY MS. ITCHHAPORIA:
15    Q  Okay.  Back in May of 2000 when you were a
16  Felony Review ASA, is it accurate to say that as
17  the ASA that was assigned to conduct a review, you
18  would be making a decision whether or not to
19  prosecute a person for murder charges?
20       MR. COYNE: Objection, foundation.
21 BY THE WITNESS:
22    A  I don't recall making that decision.
23 BY MS. ITCHHAPORIA:
24    Q  When you were a Felony Review ASA, you

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

141

1  did, in fact, approve murder charges against
2  people; is that right?
3      **A  I would not say I was the final word.  I**
4  **don't recall specifically.  I can say I wasn't the**
5  **final word.  I don't think that I was the final**
6  **word.  That's my -- I don't recall anything more**
7  **specific than that.**
8  **BY MS. ITCHHAPORIA:**
9      Q  When you're saying you're not the final
10 word, what do you mean?
11     **A  I just -- I really don't recall, so I'm**
12 **trying to answer you, but I don't have a specific**
13 **recollection.  And I don't know how to answer you**
14 **without guessing or speculating.  I don't want to**
15 **guess or speculate.  So I don't recall.**
16     Q  Well, let me ask you this:  Was one of
17 your functions as a Felony Review ASA back in 2000
18 to decide whether or not to approve or reject
19 charges against a person?
20     MS. REED:  I'm going to object -- I'm
21 going to join the objection for foundation as well
22 as asked and answered.
23 BY THE WITNESS:
24     **A  Just as I said before, I don't know how to**

142

1  **answer that question without guessing or**
2  **speculating, and so I don't recall that I was in**
3  **any way the person to make that decision one way**
4  **or another.**
5  **BY MS. ITCHHAPORIA:**
6      Q  Okay.  Then what was the function of a
7  Felony Review ASA as far as you understood back in
8  May of 2000?
9      MR. COYNE:  Let me just --
10 BY THE WITNESS:
11     **A  I don't remember.**
12     MR. COYNE:  Hang on one second.
13     In order so that I don't interrupt the
14 record, let me just make a continuing line of
15 objections as to foundation and speculation as to
16 any questions pertaining to this witness in 2000.
17 That way I won't have to keep interrupting.
18     Thank you.
19     MS. ITCHHAPORIA:  Sure.
20 BY MS. ITCHHAPORIA:
21     Q  As you sit here today -- I know you're
22 currently an ASA -- do you have any idea of what
23 the function is of a Felony Review ASA?
24     **A  I have an idea, but that's, again,**

143

1  speculative because I haven't been on Felony
2  Review in 22 years.  So I'm not going to make any
3  guesses or anything as to exactly what their job
4  is.
5      Q  Understanding that it's speculation on
6  your part, what is your speculation about what a
7  Felony Review ASA's function is today at the Cook
8  County State's Attorney's Office?
9      **A  Well, their job is to -- they go out and**
10 **review matters with police.  They'll read the**
11 **reports, they'll talk to witnesses, and they will,**
12 **you know -- ultimately they end up acting as**
13 **witnesses in cases if they go to trial.  So just**
14 **like the police do.**
15     MS. REED:  I just want to say for the
16 record, I'm going to join John in his standing
17 objections.
18     MS. ITCHHAPORIA:  Sure.
19 BY MS. ITCHHAPORIA:
20     Q  Back in 2000 when you were a Felony Review
21 ASA, there was an Illinois statute that required
22 the police to have a case where there were felony
23 charges being sought, to have that case reviewed
24 by prosecutors; is that right?

144

1      **A  I'm sorry, I don't remember that.  If I**
2  **could review the statute and I can talk to you**
3  **about it, but, I apologize, I don't remember that**
4  **right off the top of my head.**
5  **BY MS. ITCHHAPORIA:**
6      Q  Okay.  Back in May of 2000 when you were a
7  Felony Review ASA and you were called when the
8  police were seeking charges, murder charges, you
9  had the option to approve charges; is that right?
10     MS. REED:  I'm going to also object to
11 asked and answered.
12 BY THE WITNESS:
13     **A  Well, I did answer the question, and I'm**
14 **going to -- my answer hasn't changed from when you**
15 **asked me before.  I don't have a -- I don't recall**
16 **being the only one who could make that choice.  So**
17 **I don't recall -- again, I just don't recall being**
18 **the only one who could make that decision.**
19 **BY MS. ITCHHAPORIA:**
20     Q  And I get that you're saying that -- is
21 what you're saying that the Felony Review would be
22 one person within the chain of command who would
23 decide whether or not to approve murder charges?
24     MS. REED:  I'm going to object to form as

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

37 (145 to 148)

---

145

1  well as mischaracterizes prior testimony.
2  BY THE WITNESS:
3      **A  I'm going to say that I don't remember --**
4  **I don't remember.  I mean, again, I don't want to**
5  **guess or speculate and give you an answer based on**
6  **an assumption that I'm making today.  I just don't**
7  **remember.**
8  BY MS. ITCHHAPORIA:
9      Q  Were you aware back in May of 2000 that
10 murder charges that were being sought by the
11 police had to be approved by the Cook County
12 State's Attorney's Office?
13     **A  I don't remember what I was aware of back**
14 **in May of 2000.**
15     Q  Back in May of 2000, you had the option
16 also to reject murder charges when you were doing
17 a Felony Review, correct?
18         MS. REED:  I'm going to also object to
19 asked and answered.
20 BY THE WITNESS:
21     **A  I don't recall what I knew back in May**
22 **of 2000.**
23 BY MS. ITCHHAPORIA:
24     Q  Okay.  Back in May of 2000 when you were

---

146

1  in the Felony Review Unit, you could reject murder
2  charges if you thought the information didn't
3  present the -- did not satisfy the statutory
4  requirements for a murder charge; is that right?
5         MS. REED:  I'm going to object to asked
6  and answered.
7  BY THE WITNESS:
8      **A  I don't recall what I knew back in May**
9  **of 2000.**
10 BY MS. ITCHHAPORIA:
11     Q  Back in May of 2000 when you were a Felony
12 Review ASA, you could reject murder charges if you
13 thought there was an evidentiary problem that
14 would make proceeding and prosecuting the case
15 impossible, correct?
16         MS. REED:  Same objection.
17 BY THE WITNESS:
18     **A  I don't recall what I knew in May of 2000.**
19 **And, again, I don't want to assume.  I don't want**
20 **to speculate.  I just don't recall what I**
21 **remember -- I don't recall what I knew in May**
22 **of 2000.**
23 BY MS. ITCHHAPORIA:
24     Q  Were you aware back in May of 2000 that

---

147

1  police officers don't prosecute cases?
2      **A  Well, I think we know that police --**
3  **police don't prosecute cases, that's correct.**
4      Q  Back in May of 2000, you also had the
5  option to continue a case for further
6  investigation if it appeared that there was a
7  basis for felony charges but additional
8  information or evidence needed to be collected,
9  correct?
10        MS. REED:  I'm going to object to the form
11 of the question as well as compound and asked and
12 answered, and then of course the continuing
13 objections.
14 BY MS. ITCHHAPORIA:
15     Q  To address the form objection, let me
16 break that up.  So strike the first question.
17        You could, back in May of 2000, when you
18 were in Felony Review, you could continue a case
19 for further investigation if it appeared that
20 there was a basis for felony charges if additional
21 information needed to be collected?
22        MS. REED:  Same objections.
23 BY THE WITNESS:
24     **A  I don't recall what I knew back in May**

---

148

1  **of 2000.**
2  **BY MS. ITCHHAPORIA:**
3      Q  Back in May of 2000 when you were in
4  Felony Review Unit and you are a Felony Review
5  ASA, you could continue a case for further
6  investigation if it appeared to you that further
7  evidence needed to be collected?
8         MS. REED:  Same objections.
9  BY THE WITNESS:
10     **A  I think you just asked me -- I think I**
11 **just answered that question.  I don't recall what**
12 **I knew back in May of 2000.**
13 BY MS. ITCHHAPORIA:
14     Q  As it relates to Xavier Walker, you
15 approved murder charges against him in May 29th,
16 2000; is that right?
17     **A  I don't have -- I've been saying today I**
18 **don't have a specific recollection of that day.**
19 **It's clear from these records that we're talking**
20 **about that murder charges were filed against him.**
21 **I don't have a specific recollection of how things**
22 **were done or what was done.**
23     Q  Do you have any reason to dispute that you
24 were the Felony Review ASA that approved murder

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

149

1  charges against Xavier Walker back in May of 2000?
2  **A  I don't have anything that would support**
3  **it or not support it right now.**
4      Q  Okay.  Well, I guess my question was a
5  little different, though.
6      Do you have any reason to dispute that you
7  were the ASA in the Felony Review Unit that
8  approved murder charges against Xavier Walker back
9  in May of 2000?
10     MS. REED:  I'm going to object to asked
11 and answered.
12 BY THE WITNESS:
13 **A  I have no reason to dispute that I worked**
14 **on that case.**
15 **BY MS. ITCHHAPORIA:**
16     Q  Okay.  My question is a little bit
17 different, and you're not answering it.  It's not
18 about working on the case.  I'm asking about if
19 you were the Felony Review ASA that approved
20 murder charges against Xavier Walker back in May
21 of 2000.
22     MR. COYNE:  Objection, asked and answered
23 more than once.
24     MS. ITCHHAPORIA:  Respectfully, I don't

150

1  think it's been answered.
2      MR. COYNE:  It has, and the record will
3  speak for itself.
4  BY THE WITNESS:
5  **A  I know that I worked on the case.  I don't**
6  **remember anything specific about it, so I can't --**
7  **the only record I have seen recently are the ones**
8  **we have discussed today.  So I don't remember, to**
9  **answer your question.  I just...**
10 **BY MS. ITCHHAPORIA:**
11     Q  Back in May 2000, would there be any
12 record or documentation that you would complete
13 that would indicate if you approved murder charges
14 against a suspect?
15 **A  I don't think there would be anything**
16 **outside of the record.**
17     Q  When you're saying the record, what do you
18 mean?
19 **A  Whatever court record exists.**
20     Q  Okay.  So it's not something that you
21 would document, let's say, on the Felony Review
22 folder?
23 **A  I don't remember what I did back in 2000.**
24     Q  I'll show you what we'll mark as -- just a

151

1  second exhibit (indiscernible).
2      (Reporter clarification.)
3      MS. ITCHHAPORIA:  It will be 5.
4      (WHEREUPON, Leafblad Exhibit No. 5 was
5  presented to the witness.)
6  BY MS. ITCHHAPORIA:
7      Q  I'm going to show you what we'll mark as 5
8  to your deposition, which, for the record, is
9  Bates-marked BS000431 through 432.
10     And do you see at the top that this is the
11 arrest report of Xavier Walker?
12 **A  Yes.**
13     Q  And the arrest date is May 29th, 2000; do
14 you see that right here where the cursor is?
15 **A  I do see that, yes.**
16     Q  And then it says "Name of Felony Review"
17 right here in Box -- I think this is Box 38, it
18 says "ASA Leafblad."
19     Do you see that?
20 **A  Yes.**
21     Q  And it says "Charges Approved," and then
22 there's two Xs in the "Yes" box; do you see that?
23 **A  I do see that.**
24     Q  Three Xs actually in the "Yes" box.

152

1      And then it says "Time," and it's got
2  15 hours here, which is 12:15 regular time, right?
3  Do you see that?
4  **A  I do, yes.**
5      Q  Does this -- looking at this document,
6  does this refresh your recollection that you were
7  the Felony Review ASA that reviewed and approved
8  charges of murder against Xavier Walker back in
9  May of 2000?
10 **A  As I said, this is an arrest report.  It**
11 **says I worked on the case, and I have no -- I have**
12 **no dispute that I worked on the case.  The arrest**
13 **report says that the charges were approved by ASA**
14 **Leafblad, and I don't dispute that either.**
15     Q  Okay.  Back in May of 2000 when you were
16 in Felony Review, the Cook County State's
17 Attorney's Office employed investigators; is that
18 right?
19 **A  Back in 2000 investigators I believe -- I**
20 **believe the office employed investigators.  I**
21 **certainly didn't have anything to do with that,**
22 **with the hiring or creating of an investigative**
23 **division.**
24     Q  In May of 2000 when you were on Felony

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

39 (153 to 156)

153

1  Review review if you thought a case
2  (indiscernible), you could have asked an
3  investigator that was employed by the Cook County
4  State's Attorney's Office to do further
5  investigation; is that right?
6      MR. COYNE:  Sorry, but you broke there.  I
7  didn't hear the third or fourth word.
8      MS. ITCHHAPORIA:  Okay.  Sure.  I'll
9  repeat that.
10 BY MS. ITCHHAPORIA:
11     Q  I said back in May of 2000 when you were a
12 Felony Review ASA, if you thought that a case that
13 you were reviewing needed further investigation,
14 then you could have asked an investigator that was
15 employed by the Cook County State's Attorney's
16 Office to conduct further investigation.
17     MS. REED:  I'm going to object to
18 incomplete hypothetical, as well as form and the
19 continuing objections.
20 BY THE WITNESS:
21     **A  I'm sorry, I don't remember how the**
22 **practices or processes were back in 2000.**
23 BY MS. ITCHHAPORIA:
24     Q  Okay.  In May of 2000 when you were in

154

1  Felony Review, if you thought a case that you were
2  reviewing needed further investigation, you could
3  have also asked the Chicago police (indiscernible)
4  further investigation, right?
5      MS. REED:  Same objections.
6      (Reporter clarification.)
7      (Technological issues were resolved off
8  the record.)
9  BY MS. ITCHHAPORIA:
10     Q  In May 2000 when you were a Felony Review
11 ASA if you thought a case that you were reviewing
12 needed further investigation, then you also had
13 the option of asking the Chicago police officers
14 to conduct further investigation, correct?
15     MS. REED:  I'm going to object to
16 speculation, lack of foundation, form, incomplete
17 hypothetical.
18 BY THE WITNESS:
19     **A  Again, I don't remember exactly what I**
20 **could do -- what I knew in 2000.  It makes sense**
21 **that if additional investigation was required,**
22 **that we would have asked that of police, but I**
23 **don't have a -- I don't remember what I knew back**
24 **in 2000.**

155

1  BY MS. ITCHHAPORIA:
2      Q  We looked earlier at the statement of Mary
3  Curry; do you remember that?
4      A  I do.
5      Q  And it looks like you took a handwritten
6  statement from Mary Curry May 28, 2000, at
7  2:26 a.m.; do you remember that?
8      MS. REED:  I'm going to object to lack of
9  foundation.
10 BY THE WITNESS:
11     **A  No, I don't remember taking the statement.**
12 **I know that I was questioned on it earlier and**
13 **that I saw it, but I don't remember being there**
14 **and taking it.**
15 BY MS. ITCHHAPORIA:
16     Q  Do you recall how you got the assignment
17 on May 28th, 2000, to take a statement from Mary
18 Curry?
19     MS. REED:  I'm going to object to lack of
20 foundation.
21 BY THE WITNESS:
22     **A  I do not remember.**
23 BY MS. ITCHHAPORIA:
24     Q  When you -- strike that.

156

1      When you went to take a statement from
2  Mary Curry on May 28, 2000, did you go to Area 4
3  Detective Division?
4      MS. REED:  I'm going to object to lack of
5  foundation.
6  BY THE WITNESS:
7      **A  I think so.  I think that's the -- today**
8  **we were talking about two of them.  One was at a**
9  **person's house, and one was at Area 4.**
10 BY MS. ITCHHAPORIA:
11     Q  I'll just show you to see if I can -- see
12 if it refreshes your recollection.  The first
13 statement that you took was -- is this on the
14 screen yet?
15     **A  No.**
16     (Exhibit shared.)
17 BY MS. ITCHHAPORIA:
18     Q  The first statement that you took -- do
19 you see this now?
20     **A  I do see it, yes.**
21     MS. ITCHHAPORIA:  Showing the witness what
22 we previously marked as Exhibit 2 to the
23 deposition, which is the handwritten statement of
24 Mary Curry.

157

1  BY MS. ITCHHAPORIA:
2      Q  You see it was taken on May 28th, 2000, at
3  2:26 a.m. at Area 4?
4          MS. REED: I'm going to object to lack of
5  foundation and hearsay, as well as calls for
6  speculation.
7  BY THE WITNESS:
8      A  The document you're showing me says that
9  it's the statement of Mary Curry, and I can see
10 that it says Area 4 roll call room on it.
11 BY MS. ITCHHAPORIA:
12     Q  Okay.  Do you know what time you got to
13 Area 4 on May 28th, 2000?
14     A  I don't.
15     Q  Did you speak to any of the detectives
16 involved in the case before you took the statement
17 from Mary Curry on May 28, 2000?
18         MS. REED: Objection, lack of foundation.
19 BY THE WITNESS:
20     A  I don't specifically remember what I did.
21 It's likely that I talked to police before I
22 talked to the witness, but I don't recall
23 specifically that I did that or how I did it.
24

158

1  BY MS. ITCHHAPORIA:
2      Q  And I think you may have testified about
3  this earlier, but it was your practice to review
4  reports.  So is it accurate to say that before you
5  took the statement of Mary Curry on May 28, 2000,
6  that you would have reviewed all available police
7  reports?
8          MS. REED: I'm going to object to
9  mischaracterizes prior testimony, lack of
10 foundation, calls for speculation, and form.
11 BY THE WITNESS:
12     A  In general, I would read the reports
13 before talking to people.  I don't remember
14 what -- I don't remember what I did in particular
15 on these cases or on this day in this case.
16 BY MS. ITCHHAPORIA:
17     Q  Were you aware when you were taking the
18 statement from Mary Curry back on May 28, 2000,
19 that she was a witness?
20         MS. REED: I'm going to object to lack of
21 foundation.
22 BY THE WITNESS:
23     A  I don't recall what I knew or remember --
24 I don't recall what I knew back in May of 2000.

159

1      It's evident from the handwritten statement that
2  we've been looking at that she was a witness, but
3  I don't have a -- I don't recall what I knew back
4  in May of 2000.
5  BY MS. ITCHHAPORIA:
6      Q  When you were at the Area on May 28, 2000,
7  Area 4, taking the handwritten statement of Mary
8  Curry, were you aware of any other witnesses on
9  the Marek Majdak homicide investigation that were
10 also present at Area 4?
11         MS. REED: I'm going to object to form,
12 compound, lack of foundation, calls for
13 speculation, hearsay.
14 BY THE WITNESS:
15     A  I don't remember who would have been there
16 and who wasn't there.  I don't remember that --
17 the time.  I don't remember it.
18 BY MS. ITCHHAPORIA:
19     Q  When you went to Area 4 on May 28, 2000,
20 were you there in your -- you were there in your
21 capacity as a Felony Review ASA to see whether
22 there was enough evidence to bring murder charges
23 against Xavier Walker; is that right?
24         MS. REED: I'm going to object to

160

1  compound, form, lack of foundation.
2  BY THE WITNESS:
3      A  Again, I can see from the documents we've
4  been discussing that we're talking about a murder
5  case.  I don't remember -- I don't remember what I
6  did or what I knew in May of 2000.
7  BY MS. ITCHHAPORIA:
8      Q  Is it accurate, though, back in May
9  of 2000, before you were taking the statement,
10 that you would have known who the suspects were
11 that murder charges were being sought against?
12         MS. REED: I'm going to object to asked
13 and answered, as well as calls for speculation,
14 lack of foundation.
15 BY THE WITNESS:
16     A  I just don't remember what I knew back in
17 May of 2000.  I don't remember what I knew, what I
18 was aware of, who was there, I don't remember
19 that.  So by looking at these documents, I can --
20 I don't dispute what's on the documents we've
21 discussed today.
22 BY MS. ITCHHAPORIA:
23     Q  Would it have been your practice back in
24 May of 2000 to make yourself familiar and aware of

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

41 (161 to 164)

---

161

1  who the person -- who the suspect was that murder
2  charges were being sought against?  Is that
3  something that you would want to know in your
4  capacity as a Felony Review ASA back in May
5  of 2000?
6      MS. REED:  I'm going to object to form,
7  compound, confusing, lack of foundation, calls for
8  speculation.
9  BY THE WITNESS:
10     **A  Again, I don't remember what I knew or**
11  **what I was -- what I did back in 2000.  And I**
12  **could guess or I could speculate.  I could assume**
13  **I did things or didn't do things, but I can't -- I**
14  **don't know in relation to this case what I did or**
15  **what I didn't do.  I don't know.  I don't**
16  **remember.**
17  **BY MS. ITCHHAPORIA:**
18     Q  I understand that you have no recollection
19  of what you did on this case.  I'm asking you,
20  though, now specifically about your practice back
21  in May of 2000.
22      Would you want to know as a Felony Review
23  ASA back in May of 2000 who the suspect was that
24  charges were being sought against?

162

1      MS. REED:  Same objections.
2  BY MS. ITCHHAPORIA:
3      Q  Yeah, as far as your practice.
4      MS. REED:  I'm also going to object to
5  relevance at this point.
6  BY THE WITNESS:
7      **A  In general, I would want to know -- in**
8  **general, I would want to read the reports, talk to**
9  **the detectives, talk to the witnesses, see who was**
10  **being charged.  In general, I would want to do**
11  **those things.  That's all I can speak to.**
12  **BY MS. ITCHHAPORIA:**
13     Q  After you were -- after you took the
14  handwritten statement from Mary Curry, is it
15  accurate to say that you would have known for sure
16  at that time that the suspects that were being
17  sought for charges against were Jovanie Long and
18  Xavier Walker?
19      MS. REED:  I'm going to object to calls
20  for speculation, lack of foundation.
21  BY THE WITNESS:
22     **A  Again, you're asking me if it's reasonable**
23  **that I knew that?  I suppose it is reasonable to**
24  **think that I would know that.**

---

163

1      **I don't have a recollection of what I knew**
2  **or didn't know in May of 2000, so asking me if**
3  **it's reasonable requires me to speculate, and I**
4  **hesitate to do that because I don't find that**
5  **reliable.  I don't remember what I knew or didn't**
6  **know back in May of 2000.**
7  **BY MS. ITCHHAPORIA:**
8      Q  Why did you take a handwritten statement
9  from Mary Curry back in May of 2000?
10      MS. REED:  I'm going to object to
11  mischaracterize prior testimony, lack of
12  foundation, form, and calls for speculation.
13  BY THE WITNESS:
14     **A  I don't remember why.**
15  **BY MS. ITCHHAPORIA:**
16     Q  Is it accurate that in May of 2000,
17  handwritten statements could be used as evidence
18  when the State's Attorney is prosecuting a person
19  for murder?
20      MS. REED:  Objection, calls for
21  speculation.
22  BY THE WITNESS:
23     **A  I don't understand the question.**
24

164

1  BY MS. ITCHHAPORIA:
2      Q  Is one of the purposes of taking a
3  handwritten statement back in May of 2000 to use
4  it as evidence later on in the prosecution?
5      MS. REED:  Same objection.
6  BY THE WITNESS:
7      **A  Again, I think it's reasonable to assume**
8  **that, but I don't recall why I took that**
9  **statement.**
10  **BY MS. ITCHHAPORIA:**
11     Q  And I know we looked at the statement
12  again, but I'm just going to show you real quick
13  the statement of Ms. Curry that we marked as
14  Exhibit 2.  And previously Counsel went through it
15  with you, portions of it.
16      From your review of the statement of Mary
17  Curry, are you able to tell us today what she
18  looked like?
19     **A  No --**
20      MS. REED:  I'm going to object to lack of
21  foundation.
22  BY MS. ITCHHAPORIA:
23     Q  Did you form any impressions of Mary Curry
24  back when you took this handwritten statement?

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

165

1     MR. COYNE: Object to --
2     MS. REED: I'm going to object to --
3 sorry, Counsel.
4     I'm going to join Counsel's objection for
5 form, as well as lack of foundation.
6 BY THE WITNESS:
7     **A I don't remember. I don't recall**
8 **specifically.**
9 BY MS. ITCHHAPORIA:
10    Q Okay. Looking at Exhibit 2, Mary Curry's
11 statement, it says present for the statement was
12 Detective Cruz.
13    Do you see that?
14    **A I do see that, yes.**
15    Q Did you have any conversations or
16 interactions with Detective Cruz on May 28, 2000,
17 about the murder investigation of Marek Majdak?
18    MS. REED: I'm going to object to lack of
19 foundation.
20 BY THE WITNESS:
21    **A It's quite possible, but I just don't**
22 **recall --**
23 BY MS. ITCHHAPORIA:
24    Q Okay. So --

166

1    **A -- I don't recall.**
2    Q It's accurate to say you don't recall the
3 substance of any communication you had, if you had
4 them, with any police officer on May 28, 2000,
5 about the Marek Majdak investigation?
6     MS. REED: I'm going to object as to the
7 extent it calls for her to admit she had
8 conversations for a lack of foundation.
9 BY THE WITNESS:
10    **A I just don't remember -- I just don't**
11 **remember that far back specifically who I talked**
12 **to or what I did. I just don't remember.**
13 BY MS. ITCHHAPORIA:
14    Q I want to talk to you a little bit more
15 about your practice back in May of 2000 when you
16 were in Felony Review and you would be going to
17 the Detective Area to interview a witness. You
18 would first ask the witness questions before you
19 write anything down; is that right?
20    MS. REED: I'm going to object to calls
21 for speculation, lack of foundation, and form.
22 BY THE WITNESS:
23    **A To the best of my recollection, that would**
24 **have been the general practice.**

167

1     MS. ITCHHAPORIA:
2    Q It's accurate to say that first you
3 interview the person, and then after the
4 interview, then that's when you would write the
5 statement; is that correct?
6     MS. REED: Same objections.
7 BY THE WITNESS:
8    **A Again, in general, if a handwritten**
9 **statement was going to be taken, I would have had**
10 **to talk to the person first.**
11 BY MS. ITCHHAPORIA:
12    Q And because you -- you would have to talk
13 to the person first so you know what to put in the
14 statement, right?
15    MS. REED: Same objections.
16 BY THE WITNESS:
17    **A In general, I would have to talk to the**
18 **person first before I would know what to put in**
19 **the statement.**
20 BY MS. ITCHHAPORIA:
21    Q Okay. As far as -- so it's accurate to
22 say then that you interviewed Mary Curry on
23 May 28, 2000, before you drafted her handwritten
24 statement?

168

1     MS. REED: I'm going to object to lack of
2 foundation, calls for speculation, and form.
3 BY THE WITNESS:
4    **A That is an assumption I suppose somebody**
5 **can make. I don't have a specific recollection of**
6 **that conversation.**
7 BY MS. ITCHHAPORIA:
8    Q Okay.
9     MS. ITCHHAPORIA: I'm sorry, I need to
10 take a quick second and mute the phone.
11    (WHEREUPON, discussion was had off the
12 record.)
13    MR. COYNE: Misha, we've been going for
14 about an hour. Whenever it's convenient, I need
15 to take five minutes. Whenever's convenient.
16    MS. ITCHHAPORIA: Let's do that now.
17    MR. COYNE: Great. Thank you.
18    MS. ITCHHAPORIA: Thank you. Let's come
19 back at 1:05?
20    MR. COYNE: That's perfect.
21    MS. ITCHHAPORIA: Okay. Thank you.
22    (WHEREUPON, a recess was had.)
23 BY MS. ITCHHAPORIA:
24    Q Ms. Leafblad, before the break, we were

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

---

169

1  talking about interviewing a witness and then
2  taking the statement.
3      Do you recall that?
4    **A  Yes.**
5      Q  Okay.  So is it accurate to say, as far as
6  Mary Curry, that you would have interviewed her
7  before you took the handwritten statement?
8      MS. REED:  I'm going to object to lack of
9  foundation.
10 BY THE WITNESS:
11   **A  Again, as I said, I think it's reasonable**
12 **to assume that, but I can't confirm it because I**
13 **just don't have a recollection of that time.**
14 **BY MS. ITCHHAPORIA:**
15   Q  How long was your interview of Mary Curry
16 before you took the statement?
17     MS. REED:  I'm going to object to lack of
18 foundation, calls for speculation.
19 BY THE WITNESS:
20   **A  I do not recall.  I don't remember how**
21 **long the interview was.  If -- I don't even**
22 **remember the interview with her.**
23 **BY MS. ITCHHAPORIA:**
24   Q  And we looked at the statement that was

---

170

1  marked as Exhibit 2, and I'll just share it again
2  just to show you.
3      The time here at the top is 2:26 a.m. on
4  May 28th, 2000.
5      Do you see that?
6    **A  Yes.**
7      MS. ITCHHAPORIA:  For the record, we're
8  looking at Exhibit 2.
9  BY MS. ITCHHAPORIA:
10   Q  Does that time, 2:26 a.m., does that
11 indicate the time that you started handwriting
12 Mary Curry's statement?
13     MS. REED:  I'm going to object to lack of
14 foundation, as well as calls for speculation.
15 BY THE WITNESS:
16   **A  Again, I don't remember that time period,**
17 **but my assumption would be that it is -- my**
18 **assumption would be that that is supposed to be**
19 **the time we started doing the handwritten**
20 **statement.  I do not recall if that's the case or**
21 **not.**
22 **BY MS. ITCHHAPORIA:**
23   Q  Was it your practice back in May of 2000
24 when you were in Felony Review that when you noted

---

171

1  the time on the handwritten statement, that that
2  would be the time that the statement began -- that
3  you began writing the statement?
4      MS. REED:  I'm going to object to form,
5  calls for speculation, lack of foundation.
6  BY THE WITNESS:
7    **A  In general, I would say that I would write**
8  **the time down when I started the handwritten**
9  **statement.**
10 **BY MS. ITCHHAPORIA:**
11   Q  Do you know how long it took you to write
12 the statement of Mary Curry?
13   **A  I do not.**
14     MS. REED:  Same objections.
15 BY MS. ITCHHAPORIA:
16   Q  Do you know when you were done completely
17 with the statement of Mary Curry?
18     MS. REED:  Same objections.
19 BY THE WITNESS:
20   **A  I do not recall.  I don't know.**
21 **BY MS. ITCHHAPORIA:**
22   Q  We touched on this earlier a little bit,
23 but there's sometimes when you ask suspects how
24 they were treated by the police.

---

172

1      Do you remember that line of questioning
2  earlier?
3    **A  I do recall that line of questioning**
4  **earlier.**
5      Q  Was it your practice when you were in
6  Felony Review back in May of 2000 to also ask
7  witnesses during your interview of them how they
8  had been treated by the police?
9      MS. REED:  I'm going to object to lack of
10 foundation, calls for speculation, form.
11 BY THE WITNESS:
12   **A  Again, I can respond generally, but I**
13 **can't say specific to this case or really any**
14 **other that I did on Felony Review because I just**
15 **don't remember.  But I would say it was my**
16 **practice to check in and make sure that they were**
17 **treated well.**
18 **BY MS. ITCHHAPORIA:**
19   Q  Okay.  And would you typically check in
20 with them as far as your practice after you had
21 done the interview?
22     MS. REED:  I'm going to object to calls
23 for speculation, lack of foundation.
24

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

173

BY THE WITNESS:

A  I cannot speak to that in general or specifically.  In general, it's because the circumstances could be different each time.  I don't know when I would have had the -- I took the opportunity when I had it if I had it.

And, again, specifically to this case, I really just don't have -- I don't have a specific recollection of this -- of my conversation with Ms. Curry.

BY MS. ITCHHAPORIA:

Q  Okay.  Do you know if Detective Cruz was present when you interviewed Mary Curry before you took her statement?

MS. REED:  I'm going to object to lack of foundation.

BY THE WITNESS:

A  I don't remember one way or another if he was.

BY MS. ITCHHAPORIA:

Q  Okay.  And do you know if Detective Cruz was present the entire time when you were taking and drafting the handwritten statement of Mary Curry?

174

MS. REED:  I'm going to object to lack of foundation.

BY THE WITNESS:

A  I don't remember.

BY MS. ITCHHAPORIA:

Q  Was it your practice back in May of 2000 when you were in Felony Review when you were asking a witness how they had been treated by the police, that you would typically do that outside of the presence of the police?

MS. REED:  I'm going to object to lack of foundation, calls for speculation, form.

BY THE WITNESS:

A  In general, I would try to do that.

BY MS. ITCHHAPORIA:

Q  Okay.  So the statement that we looked at, you did ask Mary Curry how she had been treated by the police.  Do you remember seeing that in the statement?

A  I saw --

MS. REED:  I'm going to object on lack of foundation.

BY MS. ITCHHAPORIA:

Q  Okay.  And so --

175

THE WITNESS:  I'm sorry, Ms. Reed, I keep talking when you are.

MS. REED:  That's okay.  You're doing good.

BY MS. ITCHHAPORIA:

Q  Okay.  And --

MS. REPORTER:  I didn't hear an answer.

BY THE WITNESS:

A  I don't remember what I answered.  What was the question, please?

BY MS. ITCHHAPORIA:

Q  I don't remember either.  Let me ask you again.

When we looked at the statement of Mary Curry that was Exhibit 2, there was a portion where you asked her how she had been treated by the police.

Do you remember seeing that in the statement?

MS. REED:  I'm going to object to lack of foundation.

BY THE WITNESS:

A  I remember seeing that in the statement today, yes.

176

BY MS. ITCHHAPORIA:

Q  And based on your practice as a Felony Review ASA, is it accurate to say that you would have asked Mary Curry how she had been treated by the police outside the presence of any police officers?

MS. REED:  I'm going to object to asked and answered, lack of foundation, calls for speculation, form.

BY THE WITNESS:

A  I will say that it was my general practice to try and speak to -- ask the witness outside of the officer's presence, but I can't say that I was specifically able to do that in this case.

BY MS. ITCHHAPORIA:

Q  We're just looking -- I'm going to show you Page 4 of Mary Curry's statement that we marked as Exhibit 2, and I'm just going to read you this paragraph.

It says:  "Mary states she was treated fine by the police and Assistant State's Attorney Leafblad.  Mary states she was given 7UP to drink and allowed to smoke cigarettes when she wanted.  Mary states no threats or promises were made in

177

1  exchange for the statement.  Mary states she is
2  not under the influence of drugs or alcohol and
3  makes this statement freely and voluntarily."
4      Do you see that?
5    **A  I do see that.**
6    Q  And that is what Mary Curry told you when
7  you asked her those questions, correct?
8      MS. REED:  I'm going to object to lack of
9  foundation, calls for speculation, form, and
10 hearsay.
11 BY THE WITNESS:
12   **A  Again, that is what is in the statement,**
13 **so I can -- I would assume that that is what she**
14 **told me as well.  I don't have a specific**
15 **recollection of it, but it's in the statement, so**
16 **I must -- so I don't dispute that it's in the**
17 **statement.**
18 **BY MS. ITCHHAPORIA:**
19   Q  And can you tell me back in May of 2000
20 when you were in Felony Review, is one of the
21 reasons to ask a witness how they were treated and
22 if they were given food and something to drink is
23 to determine if the statement is given voluntarily
24 and freely?

178

1      MS. REED:  I'm going to object to it calls
2  for speculation.
3  BY THE WITNESS:
4    **A  Again, I would ask them generally to make**
5  **sure that, in fact, yes, they were there -- that**
6  **they were making the statement freely and**
7  **voluntarily.  I can't speak specifically to this**
8  **case because I don't have a recollection of what I**
9  **did on Felony Review.**
10     **But, again, this is -- I'm assuming that I**
11 **would have asked her because it's in the**
12 **statement.  So I don't have a specific**
13 **recollection.**
14 **BY MS. ITCHHAPORIA:**
15   Q  Why -- when you were in Felony Review as
16 an ASA, why would you want to know if a witness
17 was giving a statement freely and voluntarily?
18     MR. COYNE:  And, just so you know, Joanna,
19 just let me interpose an objection.
20     For purposes of Federal Rule 26, the Work
21 Product Doctrine, if you can answer that question
22 generally without divulging your mental processes
23 regarding decisions you made as a prosecutor on an
24 individual case, you can go ahead and answer.

179

1      But if you can't answer that question
2  without divulging your mental processes as to why
3  you took a particular position or made a
4  particular decision as a prosecutor, then I would
5  instruct you not to answer.
6      So if you can answer in those terms, go
7  ahead.
8      MS. REED:  I'm also going to object to
9  incomplete hypothetical.
10 BY THE WITNESS:
11   **A  Can you repeat the question, please.**
12 **BY MS. ITCHHAPORIA:**
13   Q  Sure.  The question was, why, as a Felony
14 Review ASA back in May of 2000, would you want to
15 know if a witness is giving a statement freely and
16 voluntarily?
17   **A  Okay.  Again, I just don't recall what my**
18 **thought processes were or what I knew or didn't**
19 **know back in May of 2000.**
20   Q  Okay.  And I'm not asking you specifically
21 about this case.  I'm just saying, in general,
22 when you were a Felony Review ASA, why would you
23 want to know if a witness is giving a statement
24 voluntarily and freely?

180

1      MS. REED:  I'm also going to add an
2  objection for relevance.
3  BY THE WITNESS:
4    **A  Again, I don't remember.**
5  **BY MS. ITCHHAPORIA:**
6    Q  Would one of the reasons why you would
7  want to determine if a statement is given
8  voluntarily and freely is to rebut any future
9  allegations that the statement was given under
10 duress or coercion?
11     MS. REED:  I'm going to object to form,
12 also leading.  And Counsel is testifying or
13 inputting testimony, as well as calls for
14 speculation and lack of foundation.
15 BY THE WITNESS:
16   **A  These may be reasonable conclusions, but I**
17 **cannot testify that that was my mindset at any**
18 **time because I don't recall May of 2000.  I don't**
19 **recall, like, the specific case, you know, so I**
20 **can't dispute that this document exists and that,**
21 **you know, these are -- this is what it says.**
22     **I cannot speculate as to what my thought**
23 **process was at that time.**
24

181

1  BY MS. ITCHHAPORIA:
2      Q  I think you testified earlier that when
3  you were in Felony Review in May of 2000, you knew
4  that there was a possibility that later, after
5  you've reviewed a case, that you could become a
6  witness.
7      Do you remember that testimony?
8      **A  I never testified that I specifically**
9  **could become a witness.  I testified that -- I**
10 **believe the question was what did I think that**
11 **Assistant State's Attorneys on Felony Review at**
12 **this time do, and I said that they could be**
13 **witnesses in cases.**
14     Q  Okay.  Were you aware, when you were a
15 Felony Review ASA for that almost-year time frame,
16 that in the future there was a possibility that
17 you could become a witness?
18     MS. REED:  I'm going to object to lack of
19 foundation.
20 BY THE WITNESS:
21     **A  In general, I was aware that that was a**
22 **possibility.**
23 BY MS. ITCHHAPORIA:
24     Q  And you testified in your capacity as a

182

1  Felony Review -- well, strike that.
2      You testified as an employee of the Cook
3  County State's Attorney about your role as a
4  Felony Review ASA in several cases; is that right?
5      MS. REED:  I'm going to object to
6  relevance as well as lack of foundation, calls for
7  speculation.
8  BY THE WITNESS:
9      **A  I have.  I have testified to that in the**
10 **past, yes.**
11 BY MS. ITCHHAPORIA:
12     Q  Okay.  And before you testified in the
13 Xavier Walker pretrial hearing, had you testified
14 in court about your role as a Felony Review ASA in
15 other cases?
16     MS. REED:  I'm going to object to
17 relevance.
18 BY THE WITNESS:
19     **A  I don't remember the -- I don't remember.**
20 **I know that I have testified, but I don't know the**
21 **order or, like, the time period.  I don't know if**
22 **it was a case prior to Xavier Walker, if there was**
23 **a case after.  I just don't know the answer to**
24 **that question.  I don't remember.**

183

1  BY MS. ITCHHAPORIA:
2      Q  So then would -- another reason to put in
3  a statement that a statement is given freely and
4  voluntarily by a witness would also be to refresh
5  your recollection when you had to testify as a
6  witness?
7      MR. COYNE:  And, again, you can
8  actually -- let me just interject.
9      Joanna, same instruction as previously.
10 If you can answer that question generally, you may
11 do so.  If you can only answer that question with
12 respect to a particular case and your
13 decision-making with respect to that case as a
14 prosecutor, then I would instruct you not to
15 answer based on work product privilege.
16     MS. REED:  I'm also going to object to
17 speculation, form, lack of foundation, incomplete
18 hypothetical.
19 BY THE WITNESS:
20     **A  I will say, I didn't understand the**
21 **question.**
22 BY MS. ITCHHAPORIA:
23     Q  Okay.  The question would be, in the
24 statement that we looked at from Mary Curry, as an

184

1  example, but I'm speaking generally, when you
2  would indicate that a witness's statement is it
3  voluntarily given and freely given, is one of the
4  reasons you would do that so that when you're
5  asked to testify, it would refresh your
6  recollection that the statement was, in fact,
7  given freely and voluntarily?
8      MS. REED:  I'm going to --
9      MR. COYNE:  Same --
10     MS. REED:  Same objections.
11     MR. COYNE:  Same instruction as
12 previously.
13 BY THE WITNESS:
14     **A  Yeah, I'm not -- I'm going to respectfully**
15 **not answer that question.**
16 BY MS. ITCHHAPORIA:
17     Q  Okay.  Based on work product privilege?
18     **A  Yeah.**
19     Q  Okay.  When you joined the Felony Review
20 team back in December of 1999, were you given any
21 sort of training about what needed to be included
22 in a statement of a witness?
23     **A  I don't recall any specific training.**
24     Q  Were you trained when you were in Felony

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

---

185

1  Review about what needed to be included in a
2  suspect statement?
3  **A  I really don't recall any specific**
4  **training.**
5     Q  Were you trained as part of being a Felony
6  Review ASA that you needed to make a determination
7  that the statements that you were taking, whether
8  it was from a witness or a suspect, was given
9  voluntarily and freely?
10  **A  I don't recall any specific training.**
11  Q  Showing you again Exhibit 2.
12     Right here, do you see where my cursor is?
13  **A  Yes.**
14  Q  It says: "Mary states that the person in
15  Exhibit 1 is Jovanie Long, a/k/a Vani."
16     Do you see that?
17  **A  I do.**
18  Q  So at the time when you were taking the
19  statement from Mary Curry, you had a picture of
20  Jovanie Long; is that right?
21     MS. REED:  I'm going to object to lack of
22  foundation, calls for speculation.
23  BY THE WITNESS:
24  **A  That is what this statement indicates.**

186

1  BY MS. ITCHHAPORIA:
2     Q  And you have no reason to dispute that you
3  had a picture of Jovanie Long?
4  **A  That is correct.**
5     MS. REED:  Same objections.
6  BY MS. ITCHHAPORIA:
7     Q  How did you get the picture of Jovanie
8  Long back in May of 2000?
9     MS. REED:  Same objections.
10  BY THE WITNESS:
11  **A  I don't remember how I got the picture.**
12  **BY MS. ITCHHAPORIA:**
13  Q  Why did you ask Mary to identify if the
14  person in Exhibit 1 was Jovanie Long?
15     MS. REED:  Same objections.
16  BY THE WITNESS:
17  **A  I really don't -- I don't remember why I**
18  **did any -- I don't remember.**
19  **BY MS. ITCHHAPORIA:**
20  Q  Okay.  And I think you told me this
21  earlier but you don't remember when you were
22  done -- what time it was when you were done with
23  Mary Curry; is that right?
24  **A  That's correct, I don't remember.**

187

1     Q  When you were done with the handwritten
2  statement of Mary Curry, what was your
3  practice -- well, strike that.
4     What was your practice back in May of 2000
5  when you were Felony Review as far as what would
6  you -- what you would do with the statement of a
7  witness once you were done?
8     MS. REED:  Objection, lack of foundation,
9  calls for speculation.
10  BY THE WITNESS:
11  **A  I really don't remember what I would have**
12  **done at that time.**
13  **BY MS. ITCHHAPORIA:**
14     Q  Is it accurate to say that back in May
15  of 2000 that you would have taken possession of
16  the original handwritten statement?
17     MS. REED:  Same objections.
18  BY THE WITNESS:
19  **A  I really don't remember what I would have**
20  **done at that time.**
21  **BY MS. ITCHHAPORIA:**
22     Q  If there were any photographs that were
23  attached to -- or shown to a witness during a
24  handwritten statement, would the photograph be

188

1  attached to the statement?  Was that part of your
2  practice?
3     MS. REED:  Same objections.
4  BY THE WITNESS:
5  **A  If there is a picture attached to the**
6  **statement, then I don't dispute that the picture**
7  **would be attached to it.  I don't remember**
8  **anything outside of that.**
9  **BY MS. ITCHHAPORIA:**
10     Q  Do you know what you did with the
11  handwritten statement of Mary Curry after you were
12  done drafting it and reviewing it and it was all
13  signed?
14     MS. REED:  Same objections.
15  BY THE WITNESS:
16  **A  I do not remember.**
17  **BY MS. ITCHHAPORIA:**
18     Q  And I think on the statement you signed it
19  along with Mary Curry and Detective Cruz; is that
20  right?
21     MS. REED:  Same objection.
22  BY THE WITNESS:
23  **A  My signature is on there.  It looks like**
24  **my signature that's on there, yes.**

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

189

BY MS. ITCHHAPORIA:

1

2    Q   And then do you see also on each page
3  there's a signature of Mary Curry?
4        MS. REED:  I'm going to object as it calls
5  for a conclusion.
6  BY THE WITNESS:
7    A  Are you -- do you mean to share the screen
8  with me?  Because I don't --
9  BY MS. ITCHHAPORIA:
10   Q  Oh, I'm not sharing it?  Sorry.  Hold on.
11       Showing the witness Exhibit 2.
12       Do you see on each page -- and I can show
13  you -- that there also appears to be what appears
14  to be the signature of Mary Curry?
15       MS. REED:  I'm going to object to lack of
16  foundation, calls for speculation, calls for a
17  conclusion.
18  BY THE WITNESS:
19   A  I see that there is a signature on there
20  that looks like -- that says "Mary Curry."
21  BY MS. ITCHHAPORIA:
22   Q  Why would you have the witness sign each
23  page of the handwritten statement back in May of
24  2000?

190

1        MR. COYNE:  Same --
2        MS. REED:  I'm going to --
3        MR. COYNE:  Well, let me ask, before you
4  answer that question, Joanna, before we assess
5  potential work product privilege, do you know the
6  answer to that question?
7        THE WITNESS:  Of -- do I know the answer
8  to the question of why we would have the witness
9  sign?
10       MR. COYNE:  Yeah, I just want to know if
11  you know the answer to the question she just asked
12  you before we go further to assess potential
13  privilege.
14       I'm not asking you to answer it; I'm just
15  asking you if you know the answer.
16       THE WITNESS:  I don't remember what I
17  would -- I don't know the answer.
18       MR. COYNE:  Okay.  Fair enough.  You can
19  go ahead.
20       MS. REED:  I'm going to make an objection
21  for lack of foundation, calls for speculation.
22  BY MS. ITCHHAPORIA:
23   Q  What was the answer?
24   A  The answer is I don't know the answer.

191

1    Q   Okay.  And then the detective also would
2  sign each page of the handwritten statement?  Do
3  you see Detective Cruz's signature -- or what
4  purports to be Detective Cruz's signature on each
5  page?
6        MS. REED:  I'm going to object to lack of
7  foundation, calls for speculation, calls for a
8  conclusion.
9  BY THE WITNESS:
10   A  I see a signature.  It's hard to read, but
11  I see a third signature on it.
12  BY MS. ITCHHAPORIA:
13   Q  Do you know why the detective would sign
14  each page of a witness's handwritten statement?
15       MS. REED:  Same objection.
16  BY THE WITNESS:
17   A  No.  I don't remember why, no.
18  BY MS. ITCHHAPORIA:
19   Q  Okay.  Back in May of -- well, strike
20  that.
21       Why would you also, in May of 2000, sign
22  each page of the handwritten statement?
23       MS. REED:  Same objections.
24       MR. COYNE:  Same instruction, Joanna.

192

1  Same instruction.  You can answer the question if
2  you can answer generally without disclosing your
3  mental impressions and your decisions that you
4  made as a prosecutor with regard to an individual
5  case, which would be work product.
6        If you can answer that question without
7  disclosing that information, then you can go ahead
8  and answer.
9  BY THE WITNESS:
10   A  I can't answer the question without
11  disclosing that information.
12  BY MS. ITCHHAPORIA:
13   Q  Okay.  So on the basis of work product
14  you're not answering that question; is that
15  correct?
16   A  Yes.
17   Q  Okay.  After you -- generally in your
18  practice as a Felony Review ASA, after you were
19  done interviewing a witness, would you discuss
20  with the witness how to memorialize the witness's
21  statement?
22       MS. REED:  Same objections.
23  BY THE WITNESS:
24   A  In general, if I -- I think that I would

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

49 (193 to 196)

193

1  have had that discussion with a witness, but I
2  don't have a specific recollection of that time
3  period, so I can't say if I did or not.
4  BY MS. ITCHHAPORIA:
5     Q  Do you know back in May of 2000 what
6  options a witness would have had to memorialize
7  his or her statement?
8        MS. REED:  I'm going to object to lack of
9  foundation.
10 BY THE WITNESS:
11    A  I don't remember what they would have had
12 at that time.
13 BY MS. ITCHHAPORIA:
14    Q  Back in May of 2000, would the Cook County
15 State's Attorney's Office memorialize a witness's
16 statement by video recording the statement, or
17 was that --
18       MS. REED:  I'm going to --
19 BY MS. ITCHHAPORIA:
20    Q  -- for suspects?
21       MR. COYNE:  Sorry.  Objection, form.
22       MS. REED:  I'm going to join the
23 objection, as well as lack of foundation.
24

194

1  BY THE WITNESS:
2     A  I don't remember if there were video
3  statement options for witnesses as well as people
4  in custody.
5  BY MS. ITCHHAPORIA:
6     Q  Is it accurate to say, though, that your
7  practice as a Felony Review ASA is to give the
8  witness the option of how the witness wants to
9  memorialize the statement?
10       MS. REED:  I'm going to object to lack of
11 foundation, calls for speculation, and form.
12 BY THE WITNESS:
13    A  I will say that, in general, a witness is
14 given the opportunity to decide whether and how
15 their statement is memorialized, but I don't have
16 any specific recollection about this one.
17    Q  And so with respect to Mary Curry --
18 because we're looking at her handwritten statement
19 here in Exhibit 2 -- is it accurate to say that
20 she chose to memorialize her statement by giving
21 it handwritten?
22       MR. COYNE:  Objection, speculation.
23       MS. REED:  I'm going to join in
24 speculation, as well as lack of foundation, and as

195

1  well as it calls for the conclusion that this is
2  actually Mary's statement.
3  BY THE WITNESS:
4     A  Again, I don't remember my conversation
5  with Mary, and I don't remember, you know,
6  specifically.  I see that there is a handwritten
7  statement that we are discussing today, and I
8  don't dispute its existence.
9  BY MS. ITCHHAPORIA:
10    Q  And if Mary Curry had said "I don't want
11 to give a handwritten statement," then this
12 document wouldn't exist in Exhibit 2; is that
13 fair?
14       MR. COYNE:  Objection, speculation.
15       MS. REED:  I'll join the objection to
16 speculation, as well as incomplete hypothetical.
17 BY THE WITNESS:
18    A  I can't answer that.  I don't know.  I
19 don't remember --
20 BY MS. ITCHHAPORIA:
21    Q  Do you have any --
22    A  I don't remember that conversation with
23 her.
24    Q  Understanding that you have no

196

1  recollection, do you have any reason to dispute
2  that Mary Curry chose to give a handwritten
3  statement?
4        MR. COYNE:  Same objection.
5        MS. REED:  I'm going to join the
6  objection, as well as lack of foundation.
7  BY THE WITNESS:
8     A  I don't dispute that there is a
9  handwritten statement purported to be by Mary
10 Curry.  I don't dispute that this -- we're looking
11 at a statement here that says "Mary Curry" on it.
12 BY MS. ITCHHAPORIA:
13    Q  Okay.  But I -- do you dispute then that
14 she chose to give a handwritten statement?
15       MR. COYNE:  Objection --
16       MS. REED:  Join objection, as well as lack
17 of foundation and asked and answered.
18 BY THE WITNESS:
19    A  I don't recall that conversation, so I
20 can't -- this would be -- would require me to make
21 a statement as to what her mindset was at a time
22 in a -- you know, in a time that I don't recall in
23 a conversation that I don't recall.
24

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

50 (197 to 200)

197

1  BY MS. ITCHHAPORIA:
2     Q  Back in May of 2000 when you were in
3  Felony Review, when you would draft the
4  handwritten statement, would the officer be
5  present, or would that be on a case-by-case basis?
6        MS. REED:  I'm going to object to lack of
7  foundation.
8  BY THE WITNESS:
9     A  Again, you know, in general, they could be
10 present, but that doesn't mean that any -- that
11 there was a requirement or a common practice.
12 BY MS. ITCHHAPORIA:
13    Q  When you were interviewing Mary Curry back
14 on May 28, 2000, were you the one that was asking
15 her questions?
16       MS. REED:  I'm going to object to calls
17 for speculation, lack of foundation, and form.
18 BY THE WITNESS:
19    A  I just don't remember the conversation
20 with her specifically, so I don't know how to
21 answer that question.
22 BY MS. ITCHHAPORIA:
23    Q  Do you remember any questions that you
24 asked her specifically?

198

1        MS. REED:  Same objections.
2  BY THE WITNESS:
3     A  I do not.
4  BY MS. ITCHHAPORIA:
5     Q  Back in May of 2000, was it the Cook
6  County State's attorney's policy or practice or
7  procedure to not allow witnesses to handwrite
8  their own statements?
9        MS. REED:  I'm going to object to lack of
10 foundation, calls for speculation, and form.
11 BY THE WITNESS:
12    A  I don't know.  I can't answer.  I don't
13 know the answer to that question.
14 BY MS. ITCHHAPORIA:
15    Q  Okay.  Have you ever in your career as a
16 Felony Review ASA ever had a witness handwrite his
17 or her statement?
18       MS. REED:  I'm going to object to the
19 question being broad as to scope and time, as well
20 as calls for speculation, lack of foundation, and
21 form.
22 BY THE WITNESS:
23    A  Not in my recollection.
24

199

1  BY MS. ITCHHAPORIA:
2     Q  So is it accurate to say that any
3  handwritten statements that you were involved in,
4  it was your practice to be the person to draft the
5  handwritten statements?
6        MS. REED:  I'm going to object it calls
7  for speculation and lack of foundation.
8  BY THE WITNESS:
9     A  In general, it is likely I would have
10 written it, but, again, I can't speak specifically
11 to this case or any other specific case.
12 BY MS. ITCHHAPORIA:
13    Q  Did you have any conversation with Mary
14 Curry on May 28, 2000, about her testifying before
15 the grand jury?
16       MS. REED:  I'm going to object to lack of
17 foundation.
18 BY THE WITNESS:
19    A  I do not recall my conversation with Mary
20 Curry, so I don't know.
21 BY MS. ITCHHAPORIA:
22    Q  If a witness was going to testify before
23 the grand jury, would it be the Felony Review ASA
24 that would be having the conversation with the

200

1  witness before the witness was actually going to
2  the grand jury?
3        MS. REED:  I'm going --
4        MR. COYNE:  Objection, form.
5        MS. REED:  I'm going to join the objection
6  for form, as well as speculation, lack of
7  foundation.
8  BY THE WITNESS:
9     A  I don't recall how things were done at
10 that time with regard to the grand jury.
11 BY MS. ITCHHAPORIA:
12    Q  Back in May 2000 when you were a Felony
13 Review ASA, who would decide on a murder case who
14 would be testifying before the grand jury?
15       MS. REED:  I'm going to object to form and
16 calls for speculation, lack of foundation.
17 BY THE WITNESS:
18    A  I don't know the answer to that, and I
19 don't recall what the process was, and I just
20 don't know the answer.
21 BY MS. ITCHHAPORIA:
22    Q  Okay.  I'm going to represent to you that
23 ASA Luke Sheridan was the grand jury ASA back in
24 May of 2000.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

51 (201 to 204)

201

1    Knowing that information, did you ever
2  have a conversation with ASA Luke Sheridan about
3  Mary Curry's grand jury testimony?
4      MS. REED:  I'm going to object to lack of
5  foundation and form.
6      MR. COYNE:  Yeah, and under the Grand Jury
7  Secrecy Act, Joanna, you need to know that it is
8  contemptible to disclose information regarding
9  witness testimony and other matters presented to
10 the grand jury.
11     So I understood Counsel's question to be
12 something that preceded the actual grand jury
13 proceedings themselves, but you ought to know
14 that, that the Grand Jury Secrecy Act precludes
15 revealing witnesses, testimony, and other
16 witnesses that is, in fact, presented to the grand
17 jury.
18     So that's just an admonition to protect
19 your interest in answering grand jury questions.
20     MS. ITCHHAPORIA:  Sure.  My question was
21 about preceding, but just so you know, John, that
22 that's been waived in this case because the grand
23 jury transcripts have been produced to all the
24 parties.

202

1      MR. COYNE:  Oh, it has.  Okay.  Fair
2  enough.
3  BY THE WITNESS:
4    A  I don't remember if I talked to Luke about
5  this case or not.
6  BY MS. ITCHHAPORIA:
7    Q  But you do know Luke Sheridan; is that
8  right?
9    A  I do know him, yeah.
10   Q  Did you ever become aware that Mary Curry
11 testified before the grand jury?
12   A  I don't remember if I knew it at the time
13 or not.
14   Q  Did you ever become aware that Ashanti
15 Wright testified before the grand jury?
16     MS. REED:  I'm going to object to lack of
17 foundation.
18 BY THE WITNESS:
19   A  I don't remember if I knew it at that
20 time.  I don't remember any -- I don't remember.
21 BY MS. ITCHHAPORIA:
22   Q  And after your conversation with Ashanti
23 Wright, also on May 28, 2000, did you have a
24 conversation with her about testifying before the

203

1  grand jury?
2      MS. REED:  I'm going to object to lack of
3  foundation, calls for speculation, and form.
4  BY THE WITNESS:
5    A  Not that I recall.
6  BY MS. ITCHHAPORIA:
7    Q  Okay.  So Ashanti Wright's statement that
8  we looked at before that was marked as Exhibit 1
9  was taken on May 28, 2000, but a few hours later.
10 Do you recall that?  Based on what we looked at
11 today.
12     MS. REED:  I'm going to object to lack of
13 foundation, calls for speculation.
14 BY THE WITNESS:
15   A  I'm sorry, I don't understand what your
16 question was.  Can you please ask it again.
17 BY MS. ITCHHAPORIA:
18   Q  I'm just going to show it to you.  Hold on
19 a second.
20   A  Okay.
21     MS. ITCHHAPORIA:  I'm going to show the
22 witness what was previously marked as Exhibit 1,
23 which was the handwritten statement of Ashanti
24 Wright.

204

1  BY MS. ITCHHAPORIA:
2    Q  Do you see Exhibit 1 on the screen?
3    A  I do.
4    Q  And do you see that it was taken on
5  May 28, 2000, at 6:10 a.m.?
6    A  Yes.
7      MS. REED:  I'm going to object to lack of
8  foundation and calls for speculation.
9  BY MS. ITCHHAPORIA:
10   Q  Okay.  And based on the statement that we
11 looked at of Mary Curry, Ashanti Wright's
12 statement was taken after the handwritten
13 statement of Mary Curry was taken, correct?
14     MS. REED:  Same objections.
15 BY THE WITNESS:
16   A  If we go by what these documents state,
17 then that is -- that would be correct.
18 BY MS. ITCHHAPORIA:
19   Q  And you have no reason to doubt that the
20 dates and times on these documents is anything
21 other than what it says?
22     MS. REED:  Objection, lack of foundation,
23 calls for speculation, and form, as well as
24 hearsay.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

52 (205 to 208)

---

205

1  BY THE WITNESS:
2  **A  I don't dispute the documents.**
3  BY MS. ITCHHAPORIA:
4  Q  Okay.  Do you know what you did in between
5  taking Mary Curry's statement and taking Ashanti
6  Wright's statement?
7  MS. REED:  I'm going to object to lack of
8  foundation.
9  BY THE WITNESS:
10  **A  I don't know.  I don't remember.**
11  BY MS. ITCHHAPORIA:
12  Q  Do you know if you stayed at the area or
13  if you went back to the Felony Review office at
14  26th and California?
15  MS. REED:  I'm going to object to lack of
16  foundation and asked and answered.
17  BY THE WITNESS:
18  **A  I really don't remember.**
19  BY MS. ITCHHAPORIA:
20  Q  Did you know at the time when you were
21  taking the handwritten statement of Mary Curry
22  that there was another witness that -- whose
23  handwritten statement also needed to be taken?
24  MS. REED:  I'm going to object to lack of

---

206

1  foundation, as well as mischaracterizes prior
2  testimony, calls for speculation, form.
3  BY THE WITNESS:
4  **A  I don't remember.**
5  BY MS. ITCHHAPORIA:
6  Q  Okay.
7  MR. COYNE:  I'm sorry, Misha, let me just
8  interject real quick.
9  Joanna, we've been going for more than
10  three and a half hours.  Do you need to take a
11  lunch break or another break of a significant
12  period of time longer than five minutes?
13  THE WITNESS:  No.
14  MS. ITCHHAPORIA:  Okay.  Does anybody else
15  need to?  I'm happy to proceed if the witness is
16  happy and everybody else is.
17  MR. COYNE:  Yeah, Misha, approximately how
18  much more do you have, just in general?
19  MS. ITCHHAPORIA:  Maybe an hour.
20  MR. COYNE:  Okay.
21  MS. REED:  If it's going to be an hour,
22  can we take about a 15-minute break?  I haven't
23  been able to use the restroom and I'm on crutches
24  so it's going to take some time to get there.

---

207

1  MS. ITCHHAPORIA:  Sure.
2  (WHEREUPON, a recess was had.)
3  BY MS. ITCHHAPORIA:
4  Q  Ms. Leafblad, before the break, we were
5  talking about the timing of Ashanti Wright's
6  statement, just to acquaint you where we are.
7  And we saw that her statement was taken
8  after the statement of Mary Curry based on the
9  documents that you reviewed today, correct?
10  MS. REED:  I'm going to object to calls
11  for speculation, lack of foundation.
12  BY THE WITNESS:
13  **A  That's what the documents reflect.**
14  BY MS. ITCHHAPORIA:
15  Q  And I may have asked you this, and I don't
16  recall, but are you able to tell me if you left
17  the Area in between those two statements?
18  MS. REED:  I'm going to object to asked
19  and answered, lack of foundation.
20  BY THE WITNESS:
21  **A  I don't remember what I did between the**
22  **statements.**
23  BY MS. ITCHHAPORIA:
24  Q  When we looked at the statement of Ashanti

---

208

1  Wright, you saw that it was taken at a different
2  location than Area 4; is that right?
3  MS. REED:  I'm going to object to calls
4  for speculation, lack of foundation.
5  BY THE WITNESS:
6  **A  That's what the document would suggest.**
7  BY MS. ITCHHAPORIA:
8  Q  I'll just show that to you what we marked
9  as Exhibit 1.
10  Do you see that on your screen?
11  **A  I do.**
12  Q  And it says that the statement was taken
13  at 4653 West Erie, Chicago.  Do you see that?
14  **A  I see that.**
15  Q  And you have no reason to dispute that was
16  the location where you took the statement of
17  Ashanti Wright on May 28, 2000, correct?
18  MS. REED:  I'm going to object to lack of
19  foundation, calls for speculation.
20  BY THE WITNESS:
21  **A  I will not -- I cannot -- I do not dispute**
22  **that a statement of Ashanti Wright was taken at**
23  **that address.**
24

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

53 (209 to 212)

209

1  BY MS. ITCHHAPORIA:
2     Q  Do you know why you ended up taking the
3  statement of Ashanti Wright at 4653 West Erie
4  rather than a detective area?
5        MS. REED: I'm going to object to lack of
6  foundation.
7  BY THE WITNESS:
8     A  I have no recollection of the -- of taking
9  the statement, so I don't -- I don't know why.
10 BY MS. ITCHHAPORIA:
11    Q  Prior to -- or strike that.
12       During your career as an ASA, had you had
13 occasion to interview and take a statement from a
14 witness at any location other than the detective
15 area?
16       MS. REED: I'm going to object to it being
17 overly broad.
18 BY THE WITNESS:
19    A  I believe so.
20 BY MS. ITCHHAPORIA:
21    Q  Was it unusual in this case to take a
22 statement from a witness at a location other than
23 the Area?
24       MR. COYNE: Objection, form.

210

1  BY THE WITNESS:
2     A  I don't recall why this was taken -- the
3  statement was taken at this address.  I don't
4  recall having taken the statement, so I can't
5  speak to any kind of thought process in terms of
6  why this document shows 4653 West Erie address.
7  You know, presumably that the statement was taken
8  at that address.
9  BY MS. ITCHHAPORIA:
10    Q  Was there any sort of requirement back in
11 May of 2000 when you were in Felony Review to
12 inform your trial supervisor of the fact that you
13 were taking a statement at a witness's home?
14 BY THE WITNESS:
15    A  I don't recall -- I don't recall what kind
16 of procedures there would have been at that time.
17 BY MS. ITCHHAPORIA:
18    Q  Do you recall when you were Felony Review
19 ASA ever reporting to your trial supervisor that
20 you took a statement of a witness at the witness's
21 home?
22    A  No, I don't recall specifically talking to
23 a trial supervisor about that.
24    Q  Would it be your decision as the Felony

211

1  Review ASA about the location of where to take a
2  statement from a witness?
3     A  I don't know why a statement would be
4  taken elsewhere.  And I think that I would -- you
5  know, I could guess or assume, but I don't have a
6  specific answer to why the choice would be made.
7     Q  As you sit here today, can you picture
8  what the home looked like at 4653 West Erie?
9     A  No, I cannot.
10    Q  I'll represent to you it's a home also
11 where Mary Curry lived, which was 4653 West Erie.
12 Knowing that information, does that refresh your
13 recollection of what the home looked like?
14    A  No --
15       MS. REED: I'm going to object to lack of
16 foundation.
17 BY THE WITNESS:
18    A  No, unfortunately it does not.
19 BY MS. ITCHHAPORIA:
20    Q  Was anyone else at the home when you were
21 speaking to Ashanti Wright on May 28, 2000?
22       MS. REED: I'm going to object to lack of
23 foundation, calls for speculation.
24

212

1  BY THE WITNESS:
2     A  I don't remember.
3  BY MS. ITCHHAPORIA:
4     Q  Do you remember little children or young
5  children being in the home when you took the
6  statement from Ashanti Wright on May 28, 2000?
7        MS. REED: I'm going to object to lack of
8  foundation, calls for speculation.
9  BY THE WITNESS:
10    A  I don't remember taking the statement, and
11 I don't remember who was present.  I don't even --
12 I didn't even remember where I took it so...
13 BY MS. ITCHHAPORIA:
14    Q  Do you know how you got from Area 4 to
15 4653 West Erie on May 28, 2000?
16       MS. REED: Same objections.
17 BY THE WITNESS:
18    A  No, I don't remember.
19 BY MS. ITCHHAPORIA:
20    Q  And would your practice have been the same
21 when you were taking -- when you went to 4653 that
22 you would have interviewed Ashanti Wright before
23 you started drafting the handwritten statement?
24       MS. REED: I'm going to object to

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

54 (213 to 216)

213

1  mischaracterizes prior testimony, as well as lack
2  of foundation, calls for speculation.
3  BY THE WITNESS:
4    **A  I don't know why we went to the house.  I**
5  **don't know why the statement was taken there.  I**
6  **don't have any -- I can't comment in terms of**
7  **anything specific with regard to this specific.**
8  **BY MS. ITCHHAPORIA:**
9    Q  Right.  Understanding that you have no
10 recollection of this specific statement, was it
11 still your practice in May of 2000, even if you
12 weren't taking a statement at the detective area
13 that you would still go ahead and interview the
14 witness before you took the handwritten statement?
15     MS. REED:  Same objections.
16 BY THE WITNESS:
17   **A  Well, I can say in general, and, as I said**
18 **already, that my practice would have been to speak**
19 **to the witness first before taking any kind of**
20 **handwritten statement.  That's all I can say is**
21 **that in general, that's what I would have done.**
22 **BY MS. ITCHHAPORIA:**
23   Q  And with respect to Ashanti Wright, do you
24 have any reason to believe that you diverted from

214

1  that practice when you interviewed her and took
2  her handwritten statement on May 28, 2000?
3      MS. REED:  I'm going to object to it calls
4  for speculation, lack of foundation.
5  BY THE WITNESS:
6    **A  I don't have any recollection that would**
7  **give me any kind of reason to believe one way or**
8  **the other.**
9  **BY MS. ITCHHAPORIA:**
10   Q  Do you know how long the interview was of
11 Ashanti Wright?
12     MS. REED:  I'm going to object to lack of
13 foundation, calls for speculation.
14 BY THE WITNESS:
15   **A  I do not remember how long that interview**
16 **was.**
17 **BY MS. ITCHHAPORIA:**
18   Q  Did you ask questions during the interview
19 of Ashanti Wright?
20     MS. REED:  Same objection.
21 BY THE WITNESS:
22   **A  I don't remember if I -- I don't remember.**
23 **BY MS. ITCHHAPORIA:**
24   Q  Do you know if any police officers were

215

1  present when you interviewed Ashanti Wright?
2      MS. REED:  Same objection.
3  BY THE WITNESS:
4    **A  Outside of what we see on the document, I**
5  **don't have any recollection of who would have been**
6  **there.**
7  **BY MS. ITCHHAPORIA:**
8    Q  And the document indicated that Detective
9  Cruz and Detective Wolverton were present for the
10 handwritten for Ashanti Wright.  Do you remember
11 seeing that?
12   **A  I remember seeing that, and so I don't**
13 **dispute what that says.  Outside of that, I have**
14 **no recollection of who was there.**
15   Q  Do you -- did you have any communications
16 with Detective Wolverton about the Marek Majdak
17 homicide investigation?
18     MS. REED:  I'm going to object to lack of
19 foundation calls for speculation.
20 BY THE WITNESS:
21   **A  I don't recall having any conversation**
22 **with Wolverton about it.**
23 **BY MS. ITCHHAPORIA:**
24   Q  Do you know if Detective Cruz or Detective

216

1  Wolverton asked any questions of Ashanti Wright
2  during the interview?
3      MS. REED:  I'm going to object to lack of
4  foundation, calls for speculation.
5  BY THE WITNESS:
6    **A  I don't remember if they asked her**
7  **questions or not.**
8  **BY MS. ITCHHAPORIA:**
9    Q  Are you able to describe what Ashanti
10 Wright looked like?
11   **A  No, I'm not --**
12     MS. REED:  I'm going to object to lack of
13 foundation, calls for speculation.
14 BY MS. ITCHHAPORIA:
15   Q  Did you form any impressions of Ashanti
16 Wright?
17     MS. REED:  Same objection and form.
18 BY THE WITNESS:
19   **A  I have -- I don't remember.**
20 **BY MS. ITCHHAPORIA:**
21   Q  Did Ashanti Wright appear to you to be
22 scared to provide incriminating statements against
23 Xavier Walker and Jovanie Long?
24     MS. REED:  I'm going to object to the form

Transcript of Joanna Liotine-Leafblad

55 (217 to 220)

Conducted on July 7, 2022

---

217

1 of the question, as well as foundation and calls
2 for speculation.
3 BY THE WITNESS:
4 **A  I don't remember my conversation with her,**
5 **and I certainly can't speak to what her mindset**
6 **was.**
7 **BY MS. ITCHHAPORIA:**
8    Q  We talked about this earlier, but your
9 practice would have been to ask the witness how
10 they wanted their statement memorialized, correct?
11      MS. REED:  I'm going to object to lack of
12 foundation, calls for speculation,
13 mischaracterizes prior testimony.
14 BY THE WITNESS:
15 **A  That was a general practice.  I can't say**
16 **that I was -- that I did it exactly the same way**
17 **in this circumstance.  I don't remember.  I just**
18 **have no recollection of this.**
19 **BY MS. ITCHHAPORIA:**
20    Q  Do you have any reason to believe that you
21 diverted from that practice when it came to asking
22 Ashanti Wright how she wanted to memorialize her
23 statement?
24      MS. REED:  Same objections, as well as

---

218

1 asked and answered I believe.
2 BY THE WITNESS:
3 **A  I don't have reason to believe I would**
4 **have, but I don't recall the conversation.**
5 **BY MS. ITCHHAPORIA:**
6    Q  Okay.  I just wanted to show you
7 something.  Just bear with me.  I'm just trying to
8 find it in the statement.
9      I'm showing you what we marked as
10 Exhibit 1 to your deposition, the handwritten
11 statement of Ashanti Wright.
12      And do you see right here where my cursor
13 is where it says "Ashanti"?
14 **A  Yes.**
15    Q  She was, quote, bogus, end quote for
16 telling Mama.  Do you see that?
17 **A  I do see that.**
18    Q  Why is the word quote -- why is the word
19 "bogus" in quotation works?
20      MS. REED:  I'm going to object to calls
21 for speculation, lack of foundation.
22 BY THE WITNESS:
23 **A  I don't know.**
24

---

219

1 BY MS. ITCHHAPORIA:
2    Q  Was it your practice when you were in
3 Felony Review to put in quotation marks the exact
4 language that the witness was using?
5      MS. REED:  Same objections, as well as
6 relevance.
7 BY THE WITNESS:
8 **A  I don't recall why I would have done that.**
9 **BY MS. ITCHHAPORIA:**
10    Q  Okay.  What about -- what about your
11 practice; was it your practice to put things that
12 witnesses said in quotes in the statement?
13      MS. REED:  I'm going to object to asked
14 and answered, as well as foundation and
15 speculation.
16 BY THE WITNESS:
17 **A  You know what, I can't speak to a general**
18 **practice in terms of those -- in terms of why I**
19 **would put one thing in quotes or not put another**
20 **thing in quotes.  I can't speak to that.**
21 **BY MS. ITCHHAPORIA:**
22    Q  Just going down further down in that
23 paragraph, it says:  Who they call, quote,
24 Boo Boo, end quote, and was, quote, trickin', end

---

220

1 quote?
2      Do you see that?
3 **A  I do see that.**
4    Q  Okay.  Was the word "trickin'" was that
5 the word that Ashanti Wright used?
6      MS. REED:  I'm going to object to lack of
7 foundation, calls for speculation.
8 BY THE WITNESS:
9 **A  I don't remember the conversation.  I see**
10 **that the word is in the document, and I can't**
11 **dispute that it's there.  We can make assumptions**
12 **that it was used.  I don't have a specific**
13 **recollection.**
14 **BY MS. ITCHHAPORIA:**
15    Q  Did you use the word "trickin'" the way
16 it's spelled there in the statement back in May of
17 2000?
18      MS. REED:  I'm going to object to lack of
19 foundation, calls for speculation, and also
20 mischaracterizes prior testimony as it assumes
21 that she wrote this document or admitted to
22 writing this document.
23 BY THE WITNESS:
24 **A  Are you asking me if I used the word --**

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

56 (221 to 224)

221

1  **BY MS. ITCHHAPORIA:**
2     Q  Yes.
3     **A  -- in my life?**
4     Q  Well, did you use the word "trickin'," was
5  that part of your regular vernacular back in May
6  of 2000?
7        MS. REED:  I'm going to object to
8  relevance.
9  BY THE WITNESS:
10    **A  I doubt it.**
11 **BY MS. ITCHHAPORIA:**
12    Q  Okay.  To be clear, this is a statement
13 that you drafted, right?  The statement of Ashanti
14 Wright.
15       MS. REED:  I'm going to object to
16 mischaracterizes prior testimony, as well as lack
17 of foundation, calls for speculation.
18 BY THE WITNESS:
19    **A  I don't recall drafting it.**
20 **BY MS. ITCHHAPORIA:**
21    Q  Okay.  But this is --
22    **A  I don't recall the meeting, and I don't**
23 **recall drafting it.**
24    Q  But this is your handwriting?

222

1        MS. REED:  I'm going to object to it calls
2  for speculation, lack of foundation.
3        MR. COYNE:  And asked and answered.
4  BY THE WITNESS:
5     **A  It looks like my handwriting.**
6  **BY MS. ITCHHAPORIA:**
7     Q  And you recognize what your handwriting
8  looks like, right?
9        MS. REED:  Same objections, and form.
10 BY THE WITNESS:
11    **A  I recognize it looks like my handwriting.**
12 **BY MS. ITCHHAPORIA:**
13    Q  Has your handwriting changed in 20 years?
14       MS. REED:  I'm going to object to lack of
15 foundation and relevance.
16       MR. COYNE:  And form.
17 BY THE WITNESS:
18    **A  I don't know if it's changed.  I mean, I**
19 **don't know, in minor ways maybe.**
20 **BY MS. ITCHHAPORIA:**
21    Q  Was it your practice when you were taking
22 handwritten statements in Felony Review to use
23 capital letters throughout the statement?
24       MS. REED:  I'm going to object to lack of

223

1  foundation, calls for speculation, also
2  mischaracterizes prior testimony as if -- as if it
3  is to assume that she had wrote this document or
4  admitted to writing this document.
5  BY THE WITNESS:
6     **A  I'm saying -- well, I recognize this**
7  **as -- that it looks like my handwriting.  I have**
8  **written things in all caps --**
9  **BY MS. ITCHHAPORIA:**
10    Q  Okay.
11    **A  -- and I still don't have a recollection**
12 **of doing this document.**
13    Q  Is it still your practice as an ASA, when
14 you're doing work or taking notes or drafting
15 things in your writing, to write things in capital
16 letters?
17       MS. REED:  I'm going to object to lack of
18 foundation, calls for speculation, as well as
19 mischaracterizes prior testimony.
20 BY THE WITNESS:
21    **A  It's not a general practice.**
22 **BY MS. ITCHHAPORIA:**
23    Q  Back in May of 2000, did you know how to
24 write in cursive?

224

1        MS. REED:  I'm going to object to
2  relevance, as well as lack of foundation, calls
3  for speculation, form.
4  BY THE WITNESS:
5     **A  Are you asking me if I knew how to write**
6  **in cursive back in May 2000?**
7  **BY MS. ITCHHAPORIA:**
8     Q  Mm-hm.
9     **A  Yes, I did.**
10    Q  Okay.
11       MS. REED:  Same objections.
12 BY MS. ITCHHAPORIA:
13    Q  Were you trained as a Felony Review ASA
14 that one should write clearly and in capital
15 letters rather than cursive writing because
16 cursive writing can sometimes be hard to read?
17       MS. REED:  I'm going to object to lack of
18 foundation, calls for speculation, and form.
19 BY THE WITNESS:
20    **A  I'm sorry.  I really don't remember**
21 **what -- you know, that -- I don't remember that**
22 **time.  It was just a long time ago, and I don't**
23 **remember -- you know, I just don't remember it.**
24

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

225

1 BY MS. ITCHHAPORIA:
2   Q I want to take your attention down to this
3 paragraph where it says: "Ashanti states she has
4 been allowed to smoke when she wanted and that she
5 was interviewed at home in her own dining room."
6   Do you see that?
7 **A I do see that.**
8   Q Seeing it says she was interviewed at home
9 in her own dining room, does that refresh your
10 recollection about the location of where this
11 statement took place?
12   MS. REED: I'm going to object to lack of
13 foundation, calls for speculation.
14 BY THE WITNESS:
15 **A It indicates to me that the interview**
16 **happened in her dining room. I don't have a**
17 **recollection of her dining room.**
18 **BY MS. ITCHHAPORIA:**
19   Q And then it goes on to say that: Drugs or
20 alcohol and gives this statement freely and
21 voluntarily.
22   Do you see that?
23 **A I do.**
24   Q And so that's what Ashanti Wright told you

226

1 when you asked her if the statement was given
2 freely and voluntarily?
3   MS. REED: I'm going to object to lack of
4 foundation, calls for speculation, form, and
5 hearsay.
6 BY THE WITNESS:
7 **A I see that it's in the document. I don't**
8 **have a specific recollection of the conversation**
9 **or her dining room or anything else.**
10 **BY MS. ITCHHAPORIA:**
11   Q You have no reason to dispute that that's
12 what she said?
13   MS. REED: Same objections.
14 BY THE WITNESS:
15 **A I have no reason to dispute what's in this**
16 **document.**
17 **BY MS. ITCHHAPORIA:**
18   Q Okay. And I may have asked you this, I
19 apologize, but you don't know how long the
20 interview was of Ashanti Wright, correct?
21   MS. REED: I'm going to object to asked
22 and answered, lack of foundation, calls for
23 speculation.
24

227

1 BY THE WITNESS:
2 **A That is correct; I don't know how long it**
3 **took.**
4 **BY MS. ITCHHAPORIA:**
5   Q And do you know how long it took you to
6 draft the statement?
7   MS. REED: I'm going to object to form,
8 lack of foundation, calls for speculation, also
9 calls for conclusion as far as it insinuates that
10 she admitted to writing this document.
11 BY THE WITNESS:
12 **A I don't know how long it took to draft**
13 **this document. I don't have any recollection of**
14 **it.**
15 **BY MS. ITCHHAPORIA:**
16   Q Do you know when you were done with
17 drafting and reviewing this statement with Ashanti
18 Wright, do you know what time it was?
19   MS. REED: Same objection, also asked and
20 answered.
21 BY THE WITNESS:
22 **A I don't know what time it was because I**
23 **just don't have any recollection of this.**
24

228

1 BY MS. ITCHHAPORIA:
2   Q Do you see the -- looking at Ashanti
3 Wright's statement, there's this fax message at
4 the top here -- or this, like, typewritten it says
5 5-28-2000, 10:51 p.m., and it says "From."
6 **A Yes.**
7   Q Do you know where that came from?
8 **A I do not.**
9   MS. REED: Object to lack of foundation.
10 BY MS. ITCHHAPORIA:
11   Q At the end of the statement, would you
12 have taken Ashanti Wright's statement with you,
13 the original?
14   MS. REED: I'm going to object to lack of
15 foundation, calls for speculation, incomplete
16 hypothetical, and form.
17 BY THE WITNESS:
18 **A I don't recall what I did. I don't recall**
19 **taking the statement. I don't recall what I --**
20 **what would have been done with the statement. I**
21 **just don't remember.**
22 **BY MS. ITCHHAPORIA:**
23   Q Was it your practice back in May of 2000
24 that when you go back to the Felony Review office,

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

58 (229 to 232)

229

1  that you would fax the statement anywhere?
2      MS. REED:  I'm going to -- same
3  objections, lack of foundation, speculation, form,
4  as well as relevance.
5  BY THE WITNESS:
6      A  I don't recall that there was a practice
7  to fax anything anywhere.
8  BY MS. ITCHHAPORIA:
9      Q  And so that was on May 28th.  Was
10 that -- taking the statement and interviewing Mary
11 Curry and interviewing and taking the statement of
12 Ashanti Wright, was that your only involvement in
13 this case on May 28th, 2000?
14     MS. REED:  I'm going to object to lack of
15 foundation, calls for speculation, form.
16 BY THE WITNESS:
17     A  I really don't remember doing the case,
18 and I don't remember the extent of my involvement
19 in it.
20 BY MS. ITCHHAPORIA:
21     Q  And we looked at some testimony, and it
22 appears the next day on May 29th, 2000, that you
23 went to the area to take the statement of Xavier
24 Walker, correct?

230

1      MS. REED:  I'm going to object to lack of
2  foundation, calls for speculation.
3  BY THE WITNESS:
4      A  If that's what -- if that's what the
5  document you're looking at shows, then I can't
6  dispute that.  I don't see what you're looking at.
7  And I don't have a recollection of this case and
8  any work I did, if anything.
9  BY MS. ITCHHAPORIA:
10     Q  Okay.  Let me just show you what was
11 previously marked as Exhibit 4, which is the
12 transcribed statement -- videotaped statement
13 confession of Xavier Walker.
14     Do you see Exhibit 4 on your screen?
15     A  I do.
16     Q  Okay.  And it's got a date -- it says:
17 Video statement of Xavier Walker taken in an
18 interview room, Area 4 headquarters, Chicago,
19 Illinois, on May 29, 2000, at 11:43 p.m.
20     Do you see that?
21     A  I do see that.
22     Q  Okay.  And we looked at some testimony
23 earlier where you testified that you got to the
24 area at 10:00 p.m. on May 29th, 2000.

231

1      Do you remember looking at that testimony?
2      MS. REED:  I'm going to object to lack of
3  foundation, calls for speculation, and hearsay.
4  BY THE WITNESS:
5      A  You know what, if that's -- I don't recall
6  which document it was that said that, but I know
7  that I was asked about it earlier today.
8  BY MS. ITCHHAPORIA:
9      Q  Okay.  I'm going to show you what was
10 previously marked as Exhibit 3 to your deposition,
11 which, if you look at the -- which is the
12 transcript.  And if you can look at the date here,
13 it's the 2nd day of October 2001.
14     Do you see that?
15     A  I do see that.  I hadn't seen that page
16 before.
17     Q  Okay.  And do you see the second page is
18 the index, and it shows that you testified here on
19 Page 56 on October --
20     A  I see that now, yes.
21     Q  And then just looking at what I'll call
22 CCSAO WALKER 000843 of the transcript, which is
23 also 057, you were asked the question at Line 5:
24     "QUESTION:  Approximately 10:00 that

232

1  evening, did you have occasion to arrive at Area 4
2  Violent Crimes?
3      "ANSWER:  Yes, I did."
4      Do you see that?
5      A  I do see that.
6      Q  You don't have a reason to dispute that
7  time, do you?
8      A  I don't --
9      MS. REED:  I'm going to object to lack of
10 foundation, calls for speculation, hearsay.
11 BY THE WITNESS:
12     A  I do not have a reason to dispute that.
13 BY MS. ITCHHAPORIA:
14     Q  You testified truthfully when you said
15 that you got to the area at 10:00 that night,
16 correct?
17     MS. REED:  I'm going to object to lack of
18 foundation, calls for speculation.  She said she
19 did not remember giving this testimony.
20     MS. ITCHHAPORIA:  I think she can testify
21 about whether or not she was truthful when she
22 testified.
23     MS. REED:  If she can't remember it, my
24 objection stands.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

59 (233 to 236)

233

1 BY MS. ITCHHAPORIA:
2    Q I can repeat the question, Ms. Leafblad,
3 if necessary.
4    **A I don't remember testifying. I will say**
5 **that in my life, when I testify, I testify**
6 **truthfully.**
7    Q And then it says, also looking at that
8 same page that:
9    "Approximately 10:15 that evening, did you
10 have an opportunity to meet anyone you see in
11 court today?
12    "ANSWER: Yes, I did."
13    Do you see that?
14    **A I do see that.**
15    Q So according to your testimony, you saw
16 Xavier Walker at 10:15 on May 29, 2000, correct?
17    MS. REED: I'm going to object to lack of
18 foundation, calls for speculation, and hearsay.
19 BY THE WITNESS:
20    **A That is what this transcript suggests.**
21 BY MS. ITCHHAPORIA:
22    Q Before you spoke to Xavier Walker on
23 May 28th -- May 29th, 2000, sorry, did you know
24 what time the police had apprehended him?

234

1    MS. REED: I'm going to object to lack of
2 foundation and speculation.
3 BY THE WITNESS:
4    **A No.**
5 BY MS. ITCHHAPORIA:
6    Q Did you know how long he had been in
7 custody before you spoke to him?
8    MS. REED: Same objections.
9 BY THE WITNESS:
10    **A I don't remember if I would have known**
11 **that or not.**
12 BY MS. ITCHHAPORIA:
13    Q Was that -- was it part of your practice
14 to make yourself aware of how long a suspect was
15 in custody before you spoke to them back in May
16 of 2000?
17    MS. REED: Same objections as well as
18 relevance.
19 BY THE WITNESS:
20    **A In general, I would inquire about it if I**
21 **didn't already know the answer, I suppose.**
22 BY MS. ITCHHAPORIA:
23    Q And, as you sit here today, you don't know
24 how long he was in custody before you spoke to

235

1 him?
2    **A I don't know -- yeah, I don't know how**
3 **long he was in custody. I don't remember whether**
4 **I knew already or whether I had to ask. I don't**
5 **remember it at all.**
6    Q Do you know how -- in May 2000, how long
7 the police could keep someone in custody before
8 they have to charge them or present -- or before
9 they had to have charges approved or present them
10 to a judge?
11    **A I don't remember offhand.**
12    Q On May 29th, 2000, when you got the
13 assignment, do you recall how you got the
14 assignment?
15    MS. REED: I'm going to object to asked
16 and answered, as well as relevance and -- not
17 relevance, I'm sorry, lack of foundation and
18 speculation.
19 BY THE WITNESS:
20    **A I don't remember how I got it.**
21 BY MS. ITCHHAPORIA:
22    Q Because you had worked on the case the day
23 before, on May 28th, was it the practice back in
24 May of 2000 at Felony Review to assign the same

236

1 Assistant State's Attorney to the case if there
2 was any work that needed to be done on it the next
3 day?
4    MS. REED: I'm going to object to lack of
5 foundation and speculation.
6 BY THE WITNESS:
7    **A I don't know if it was a practice, so I**
8 **can't say -- I can't speak to that because I**
9 **wouldn't have been responsible for setting the**
10 **practices of the entire unit.**
11    **And, again, I -- that's the extent of any**
12 **kind of recollection I have.**
13 BY MS. ITCHHAPORIA:
14    Q Do you know back in May of 2000 cases
15 assigned to the Felony Review ASA sort of on a
16 whoever's-next type of rotation, or you don't
17 know?
18    MS. REED: I'm going to object to lack of
19 foundation, calls for speculation.
20 BY THE WITNESS:
21    **A I don't remember.**
22 BY MS. ITCHHAPORIA:
23    Q Okay. If you had known that Xavier Walker
24 had been in police custody for 24 hours, approximately,

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

60 (237 to 240)

237

1  give or take, before he spoke to you -- before you
2  spoke to him, would that have concerned you?
3      MS. REED:  I'm going to object to lack of
4  foundation, calls for speculation, incomplete
5  hypothetical, and form.
6  BY THE WITNESS:
7      A  It does require me to guess or assume.  I
8  don't remember exactly how long someone could be
9  in custody at that time.  I don't think that -- I
10 know that it was more -- I know it was more than
11 24 hours, so I don't know -- I can't speak to what
12 I would have thought at that time.
13 BY MS. ITCHHAPORIA:
14     Q  Were you -- when you would work as a
15 Felony Review ASA back in May of 2000, would you
16 wear a watch?
17     A  I don't -- oh, God, I don't remember if I
18 wore a watch or not.
19     Q  Did you have a cell phone back in May
20 of 2000 that you had with you when you were a
21 Felony Review ASA?
22     MS. REED:  I'm going to object to
23 relevance.
24

238

1  BY THE WITNESS:
2      A  Everybody didn't have cell phones at that
3  time, so I'm not sure if I had one or not.  I
4  could have had one, but I, you know --
5  BY MS. ITCHHAPORIA:
6      Q  You don't remember?
7      A  -- we didn't carry them everywhere like we
8  do now.
9      So I don't -- I can say they weren't
10 prevalent.  You know, the cars had clocks in them.
11 I just -- I don't know.
12     Q  I'm going to show you what we will mark as
13 Exhibit 6 to your deposition.
14     (WHEREUPON, Leafblad Exhibit No. 6 was
15 presented to the witness.)
16     MS. ITCHHAPORIA:  And, for the record,
17 it's Bates-marked BS 828 through BS 330.  I'm
18 looking at the first page of Exhibit 6.
19 BY MS. ITCHHAPORIA:
20     Q  Do you recognize the handwriting on this
21 document that we're looking at, Exhibit 6?
22     A  I do.
23     Q  Is that your handwriting?
24     A  It looks like my handwriting.

239

1      Q  And would this -- what we're looking at in
2  Exhibit 6, is this part of the Felony Review
3  folder?
4      MS. REED:  I'm going to object to lack of
5  foundation, calls for speculation.
6  BY THE WITNESS:
7      A  Well, it looks like it's been cut out, so
8  that's not what the folder looks like, but those
9  look like they could have been cut out of a Felony
10 Review folder.
11 BY MS. ITCHHAPORIA:
12     Q  Okay.  This is how it was produced, so
13 that's what I'm showing you.
14     And do you see where it says here:  Video
15 29th May 2000, 2350.  It says court reporter
16 Sandra Brennan.
17     Do you see that?
18     A  I do.
19     Q  Is that time when the video statement
20 would have started?
21     MS. REED:  I'm going to object to lack of
22 foundation, calls for speculation.
23 BY THE WITNESS:
24     A  I don't know.  I don't remember what that

240

1  would mean.
2  BY MS. ITCHHAPORIA:
3      Q  Okay.  I'm just going to read this to you
4  and then ask you a couple questions.
5      It says:  Statement Witness Detective
6  Pietryla and ASA Leafblad, J., statement witness.
7  Defendant Area 4 waived -- oh, no, I don't know
8  what that says.
9      It says "Defendant," and then do you know
10 what this says right after that?
11     MS. REED:  I'm going to object to it calls
12 for speculation, lack of foundation.
13 BY THE WITNESS:
14     A  I can answer that typically during that
15 time, "AOR" might have indicated advised of
16 rights.
17 BY MS. ITCHHAPORIA:
18     Q  Okay.  And I should actually ask you, but
19 this delta sign or the triangle that we're looking
20 at, does that -- does that stand for defendant?
21     MS. REED:  Same objections.
22 BY THE WITNESS:
23     A  That could be -- it could represent
24 defendant.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

61 (241 to 244)

241

1 BY MS. ITCHHAPORIA:
2    Q  Okay.
3    A  Like I said, I don't remember.
4    Q  So:  Defendant advised of rights and
5 waived on 13th May 2000.  Defendant was out
6 getting high with Jovanie Long who he claims --
7 who he calls Vani.
8       Do you see that?
9    A  I see it.
10    Q  Okay.  Did I read that correctly?
11    A  It looks like you did, yes.
12    Q  And it says:  "Defendant said they ran out
13 of money and decided to go rob people coming to
14 buy drugs on Ohio."
15       Do you see that?
16    A  Yes.
17    Q  Did I read that correctly?
18       MS. REED:  I'm going to object it calls
19 for speculation.
20 BY THE WITNESS:
21    A  It looks to me like you read it correctly.
22 BY MS. ITCHHAPORIA:
23    Q  And then it says:  "Defendant said Vani
24 had a gun.  Defendant said he was lookout for

242

1 Vani, watching his back and watching for police."
2       Do you see that?
3    A  I see it.
4    Q  Okay.  Did I read that correctly?
5       MS. REED:  Same --
6 BY THE WITNESS:
7    A  I think so.
8       MS. REED:  -- objection.
9 BY MS. ITCHHAPORIA:
10    Q  Okay.  And then it says "V" here.  Does
11 "V" stand for victim?
12       MS. REED:  Same objection, calls for
13 speculation, lack of foundation.
14 BY THE WITNESS:
15    A  It could.
16 BY MS. ITCHHAPORIA:
17    Q  Is that how you used "V" back in May
18 of 2000 when you were on Felony Review?
19       MS. REED:  Same objection, as well as
20 mischaracterizes prior testimony.
21 BY THE WITNESS:
22    A  I could have but, again, I mean it's --
23       MS. ITCHHAPORIA:  Ms. Leafblad froze for
24 me.  Did she freeze for anybody else?

243

1       MS. REED:  Yes.
2       MS. ITCHHAPORIA:  Let's just see if she's
3 going to unfreeze.
4       MR. COYNE:  There she is.  Can you hear
5 us, Joanna?
6       THE WITNESS:  I can hear you now.
7 Everything froze --
8 BY MS. ITCHHAPORIA:
9    Q  Yeah --
10       THE WITNESS:  -- so I didn't hear
11 anything --
12 BY MS. ITCHHAPORIA:
13    Q  It froze for us, too, and I think you were
14 mid answer when it froze, so I'll -- I think I
15 asked you if I'm correct if you used "V" to stand
16 for victim when you were in Felony Review?
17       MS. REED:  I'm going to object to lack of
18 foundation, calls for speculation, calls for a
19 conclusion.
20 BY THE WITNESS:
21    A  Okay.  I will say that the screen froze up
22 on me a little bit.  It sounds like you asked me
23 if it was a general practice for me to use the
24 word "V" to represent victim when I was on Felony

244

1 Review; is that correct?
2 BY MS. ITCHHAPORIA:
3    Q  That's correct.
4    A  In my general practice, I would sometimes
5 do that.
6    Q  So I think this says:  "Victim drove up in
7 his van and said" -- sorry.  Let me start that
8 again.
9       "Victim drove up in his van.  Defendant
10 said Vani got in van and held gun up to victim."
11       Do you see that?
12    A  I see it.
13    Q  Did I read that correctly?
14       MS. REED:  Object to calls for
15 speculation.
16 BY THE WITNESS:
17    A  As best I can tell, I think you did.
18 BY MS. ITCHHAPORIA:
19    Q  Okay.  "Defendant said he saw Vani
20 struggle with victim, and so defendant" -- "and so
21 defendant started towards van to hold victim so
22 Vani could get money."
23       Did I read that correctly?
24       MS. REED:  I'm going to object to

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

62 (245 to 248)

245

1 speculation.
2 BY THE WITNESS:
3    **A From what I can see, it looks like you**
4 **read it correctly.**
5 BY MS. ITCHHAPORIA:
6    Q Okay. And then it says: "Victim ran out
7 of van and Vani shot him. Defendant said Vani
8 took money out of victim's pocket and they both
9 ran."
10    Do you see that?
11    **A I see it.**
12    Q Did I read that correctly?
13    MS. REED: Objection, speculation.
14 BY THE WITNESS:
15    **A I'm losing -- I lost your question again.**
16 BY MS. ITCHHAPORIA:
17    Q I said did I read that correctly?
18    MS. REED: Same objection.
19    THE WITNESS: The screen's freezing.
20    MS. ITCHHAPORIA: Oh, she's frozen for me,
21 too.
22 BY MS. ITCHHAPORIA:
23    Q Oh, there -- you're back.
24    The last question I said was did I read

246

1 that correctly?
2    MS. REED: Same objection.
3 BY THE WITNESS:
4    **A It looks like you did.**
5 BY MS. ITCHHAPORIA:
6    Q Okay. Looking at Exhibit 6, is this
7 something that you would have drafted after the
8 videotaped statement had been completed of Xavier
9 Walker?
10    MS. REED: I'm going to object to lack of
11 foundation, calls for speculation,
12 mischaracterizes prior testimony.
13 BY THE WITNESS:
14    **A The screen is freezing up on me again, so**
15 **as I understood the question, you're asking me if**
16 **this is something that I would have drafted if I**
17 **interviewed this person and put it into the Felony**
18 **Review folder; is that correct?**
19 BY MS. ITCHHAPORIA:
20    Q That was not quite my question, so let me
21 ask you again.
22    I said would you have drafted this that
23 we're looking at, Exhibit 6, after the
24 statement -- the videotaped statement of Xavier

247

1 Walker was completed?
2    MS. REED: Same objections.
3 BY THE WITNESS:
4    **A I don't know. The order in which the --**
5 **something like this would be written really just**
6 **depends on the time available. And I don't**
7 **remember that -- I don't remember what was going**
8 **on at that time, and I don't remember doing this**
9 **case.**
10 BY MS. ITCHHAPORIA:
11    Q The, sort of, form that we're looking at,
12 the form, you know, where it's got this
13 typed-writing statement, defendant number, is that
14 information that would appear on the card stock
15 Felony Review folder or on the white paper -- or
16 on the thin paper that would be inside the Felony
17 Review review folder?
18    MS. REED: I'm going to object -- same
19 objections, but I'm going to also add compound.
20 BY THE WITNESS:
21    **A I don't remember. It could be either or**
22 **both. I just don't recall.**
23 BY MS. ITCHHAPORIA:
24    Q Do you know if you completed any portions

248

1 of the Felony Review folder or the thin paper
2 inside for either Ashanti Wright or Mary Curry?
3    MS. REED: I'm going to object to lack of
4 foundation, calls for speculation, compound.
5 BY THE WITNESS:
6    **A I don't remember.**
7 BY MS. ITCHHAPORIA:
8    Q Okay. So you got to -- we looked at your
9 testimony. You said you got to the area around
10 10:00. You started interviewing Xavier Walker at
11 10:15, and then I think you testified at the
12 motion -- pretrial motion that the interview
13 lasted about 15 to 30 -- 15 to half-hour.
14    Do you remember that testimony in the
15 motion to suppress?
16    **A I don't --**
17    MS. REED: I'm going to object to lack of
18 foundation, calls for speculation, and hearsay.
19 BY THE WITNESS:
20    **A I don't remember testifying on the motion**
21 **to suppress. I did see the transcript, and I**
22 **don't dispute what the transcript says.**
23 BY MS. ITCHHAPORIA:
24    Q All right. Let me show it to you.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

63 (249 to 252)

249

1    I'm showing you what was previously marked
2    as Exhibit 3 to your deposition, and the question
3    here on 060 page of the transcript says:
4        "Approximately how long did you speak to
5    him for?
6        "ANSWER: Anywhere from 15 minutes to
7    half" -- "a half-hour."
8        Do you see that?
9        MS. REED: Same objections, as well as
10   asked and answered.
11   BY THE WITNESS:
12   **A  I do see it.**
13   BY MS. ITCHHAPORIA:
14   Q  And that was truthful testimony, correct?
15       MS. REED: Same objections, asked and
16   answered, lack of foundation, calls for
17   speculation, hearsay.
18   BY THE WITNESS:
19   **A  I would have testified truthfully.**
20   BY MS. ITCHHAPORIA:
21   Q  Okay.  And so after you --
22   **A  Everybody is freezing up on me again.**
23   Q  Oh, okay.  Are we back?
24   **A  I'm sorry, everybody froze up on me again,**

250

1    **so I know that I missed some of what you said.**
2        MR. COYNE: Can you see the screen?  Can
3    you see the screen?
4        THE WITNESS: I think -- I see the screen,
5    yes.
6    BY MS. ITCHHAPORIA:
7    Q  Okay.  When you interviewed Xavier
8    Walker -- and I believe we looked at the motion to
9    suppress testimony -- you read him his rights; is
10   that right?
11       MS. REED: I'm going to object to lack of
12   foundation, calls for speculation, and hearsay.
13   BY THE WITNESS:
14   **A  Again, I don't have a specific**
15   **recollection of that day, but I don't dispute this**
16   **transcript.  And I can say that I would have**
17   **testified truthfully, whether or not I recall it**
18   **today.  So I don't dispute what the transcript**
19   **says.**
20   BY MS. ITCHHAPORIA:
21   Q  Did Xavier Walker ever complain to you
22   that you were the first person that read him his
23   rights?
24       MS. REED: I'm going to object to lack of

251

1    foundation, calls for speculation.
2    BY THE WITNESS:
3    **A  I don't recall -- I don't recall that.  I**
4    **don't recall my conversations -- any of my**
5    **conversations with Xavier Walker or anybody in**
6    **this case.**
7    BY MS. ITCHHAPORIA:
8    Q  We looked at this page earlier, but it was
9    on Page 61 of Exhibit 3, and you were asked here
10   at Line 3 -- sorry, actually Line 6:
11       "Did you have an opportunity to speak to
12   the defendant by yourself?"
13       And you answered: "Yes, I did."
14       Do you see that?
15   **A  I do.**
16   Q  So when you said you spoke to him by
17   yourself, that means you spoke to him outside the
18   presence of any police officer; is that right?
19       MS. REED: I'm going to object to lack of
20   foundation, calls for speculation, and hearsay.
21   BY THE WITNESS:
22   **A  Well, I mean, to that end, if that's what**
23   **the -- if that's what the questioner meant when**
24   **the question was asked at that time, then I**

252

1    **suppose the answer would be -- that would be the**
2    **answer.**
3        **I don't recall specifically.**
4    BY MS. ITCHHAPORIA:
5    Q  Okay.  Just looking at Line 21, it says:
6        "What did he indicate as far as" -- let me
7    start that again.
8        "What did he indicate as far as how he had
9    been treated by the police outside of the police
10   presence?"
11       Do you see that?
12   **A  I do.**
13   Q  And then you answered: "He indicated that
14   he had been treated fine.  He didn't mention any
15   problems or anything."
16       Do you see that?
17   **A  I do.**
18   Q  And so that -- your testimony in response
19   to that question meant that you spoke to Xavier
20   Walker about how he had been treated outside the
21   presence of any police officers; is that correct?
22   **A  That's --**
23       MS. REED: I'm going to object to lack of
24   foundation, calls for speculation, and hearsay.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

64 (253 to 256)

253

1  BY THE WITNESS:
2    **A  That is what the transcript would**
3  **indicate.**
4  **BY MS. ITCHHAPORIA:**
5    Q  And that was consistent with your practice
6  as a Felony Review ASA, to talk to the suspect
7  alone to determine how he'd been treated by the
8  police, correct?
9       MS. REED:  Same objections, as well as
10 mischaracterizes prior testimony.
11 BY THE WITNESS:
12   **A  I would try to do that if it was possible.**
13 BY MS. ITCHHAPORIA:
14   Q  And why would you try to (inaudible)
15 suspect about treatment by the police without a
16 police officer being present?
17      MR. COYNE:  Renew the --
18      MS. REED:  Same objection.
19      MR. COYNE:  Yeah, and to the witness,
20 renew the earlier instruction as to Federal
21 Rule 26 Work Product Doctrine.
22      If you can answer that question without
23 divulging your mental processes as they related to
24 your work as a prosecutor and your decisions as a

254

1  prosecutor in a particular case -- i.e. such as
2  this one -- then you can go ahead and answer the
3  question.
4       Otherwise I'd instruct you not to answer
5  the question pursuant to Federal Rule 26 and the
6  Federal Work Product Doctrine.
7  BY THE WITNESS:
8    **A  I'm going to choose not to answer the**
9  **question.**
10 BY MS. ITCHHAPORIA:
11   Q  Okay.  Based on work product?
12   **A  Yes.**
13   Q  Let me ask you this to see if you can
14 answer it:  Would one of the reasons be to ask a
15 witness how he was treated when there's no police
16 officer present so the witness would feel
17 comfortable if he, in fact, did have a complaint
18 about the police and --
19      MR. COYNE:  Same --
20      MS. REED:  Same objections.
21      MR. COYNE:  Sorry to interrupt, Misha, but
22 same instruction.
23      MS. REED:  And same objections.
24      MR. DWYER:  Join.

255

1  BY MS. ITCHHAPORIA:
2    Q  Go ahead.  I think that kind of got out.
3  BY THE WITNESS:
4    **A  Again, I would -- I would prefer not to**
5  **answer that.**
6    Q  Is that based on work product?
7    **A  Work product.**
8    Q  Were you trained to talk to witnesses
9  about treatment outside of the police presence
10 when you were in Felony Review?
11      MS. REED:  I'm going to object to lack of
12 foundation, calls for speculation.
13 BY THE WITNESS:
14   **A  I don't remember our training if we had**
15 **any at that time, so I don't recall if I would**
16 **have been trained to do that or not.**
17 BY MS. ADEEYO:
18   Q  Okay.  Looking at 059 of this exhibit,
19 Exhibit 4.  You were asked:  "Who was present at
20 the time you were speaking with him?"
21      And you answered:  "Detective Pietryla."
22      Do you see that?
23   **A  I do.**
24   Q  Okay.  And that was truthful testimony,

256

1  correct?
2       MS. REED:  I'm going to object to lack of
3  foundation, calls for speculation, and hearsay.
4  BY THE WITNESS:
5    **A  I will say that I will testify truthfully,**
6  **whether I recall that day or not.**
7  **BY MS. ITCHHAPORIA:**
8    Q  So that's truthful testimony that we just
9  looked at, that question and answer?
10      MS. REED:  Same objection and asked and
11 answered.
12 BY THE WITNESS:
13   **A  Whatever the -- again, I'm not disputing**
14 **the transcript.  And in terms of myself, I**
15 **don't -- I would testify truthfully, so I can --**
16 **I'm not disputing the transcript.**
17 BY MS. ITCHHAPORIA:
18   Q  And if another detective, for example,
19 Detective Sanders or Detective Wright, had been in
20 the interview room when you were interviewing
21 Xavier Walker, you would have testified truthfully
22 to that if that was, in fact, what happened?
23      MS. REED:  Same objection, calls for
24 speculation, hearsay, lack of foundation, also

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

65 (257 to 260)

257

1  incomplete hypothetical and form.
2  BY THE WITNESS:
3      A  Yeah, I don't know how to answer that
4  question.  I mean, if I was asked who was in the
5  room, I suppose I would have answered with who was
6  in the room.
7  BY MS. ITCHHAPORIA:
8      Q  Okay.  Well, if you look at -- just going
9  down to 13 it says: "Where were you at the time
10 you were speaking with him in Detective Pietryla's
11 presence?"
12     And you say: "Area 4 interview room."
13     Do you see that?
14     A  Yes.
15     Q  So if there was anybody else in the room
16 besides you and Detective Pietryla, you would have
17 answered truthfully as to who else was there,
18 correct?
19     MS. REED:  Objection, asked and answered
20 and lack of foundation, calls for speculation,
21 incomplete hypothetical, and form.
22 BY THE WITNESS:
23     A  I suppose I would have.
24

258

1  BY MS. ITCHHAPORIA:
2      Q  If Xavier Walker testified that multiple
3  officers were in the room when you were in the
4  room interviewing him, that would be inconsistent
5  with what you testified to here in court on
6  October 2001, agree?
7      MS. REED:  Same objections.
8      MR. COYNE:  And form.
9  BY THE WITNESS:
10     A  Well, I suppose it would be, but I'm not
11 responsible for Xavier Walker's testimony.  So I'm
12 telling -- you know, so if I testified to this,
13 this is my testimony.
14 BY MS. ITCHHAPORIA:
15     Q  So after your interview with Xavier Walker
16 was over, you discussed with him about how to
17 memorialize the statement, correct?
18     A  Again, I don't have a specific
19 recollection of any conversations I had with him.
20     Q  If Xavier Walker said that you were the
21 one that chose that he give a videotaped
22 statement, that would be incorrect?
23     MS. REED:  I'm going to object to lack of
24 foundation, calls for speculation, form.

259

1  BY THE WITNESS:
2      A  I can say that my general practice would
3  have been to offer the different forms of
4  memorializing testimony.  At that point, it would
5  have been up to the individual what form, if any,
6  of testimony was going to be done.  I can tell you
7  that in general.  I don't have a specific
8  recollection in terms of Mr. Walker.
9  BY MS. ITCHHAPORIA:
10     Q  You have no reason to believe that you
11 diverted from that practice as it relates to
12 Mr. Walker?
13     MS. REED:  I'm going to object to it calls
14 for speculation, incomplete hypothetical, lack of
15 foundation, and form.
16 BY THE WITNESS:
17     A  That is correct.  I don't have reason to
18 believe I would have varied from that.  But,
19 again, I -- I don't have reason to believe I would
20 vary from that, no.
21 BY MS. ITCHHAPORIA:
22     Q  Okay.  And then after Mr. Walker chose to
23 give a videotaped statement, you would have then
24 gone out of the room and called the videographer;

260

1  is that right?
2      MS. REED:  I'm going to object to lack of
3  foundation, calls for speculation, and
4  mischaracterizes prior testimony.
5  BY THE WITNESS:
6      A  The testimony in that transcript I believe
7  says that I would have -- that I walked -- that I
8  left the room and called the court reporter.
9  BY MS. ITCHHAPORIA:
10     Q  And while you were waiting for the court
11 reporter/videographer to come to the area, that's
12 when you went back in and spoke to Xavier Walker
13 alone based on the testimony that we looked at
14 earlier?
15     MS. REED:  I'm going to object to lack of
16 foundation, speculation, and hearsay.
17 BY THE WITNESS:
18     A  I would have to -- again, I don't have an
19 independent recollection of that, so if that's my
20 testimony on that day back in -- when was it,
21 2003, if that's --
22 BY MS. ITCHHAPORIA:
23     Q  2001.
24     A  2001, then that was -- then that's the

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

66 (261 to 264)

261

1  testimony.
2     Q  Okay.  I'll just show it to you so we'll
3  get a clean record.  Exhibit 3.
4        Do you see it?
5     A  Not yet.
6     Q  Okay.  Just read Line 3 through 9 on
7  Page 061 of Exhibit 3.
8        Okay.  So somewhere -- so between the time
9  of 10:45 when you were done interviewing Xavier
10 Walker and 11:43 when the videotaped statement
11 began, you spoke to him alone according to your
12 testimony back in 2001; is that correct?
13    A  That is what the testimony indicates.
14       MS. REED:  I'm going to --
15 BY MS. ITCHHAPORIA:
16    Q  Okay.  And you --
17       MS. REED:  I'm sorry, can I get my
18 objection in for the record?
19       I'm going to object to lack of foundation,
20 speculation, and hearsay.
21 BY MS. ITCHHAPORIA:
22    Q  And if you look at Lines 14 through 16 it
23 says:  "Would that be somewhere around 11:00 or
24 thereabouts?"

263

1        MS. REED:  I'm going to object to lack of
2  foundation, calls for speculation, and form.
3  BY THE WITNESS:
4     A  I don't remember if I did -- I don't
5  remember if that was a common practice.
6  BY MS. ITCHHAPORIA:
7     Q  Okay.
8     A  I think it may have been a general
9  practice to give them an idea of what the video
10 was going to be like in terms of question and
11 answer, but I can't say specifically whether I
12 went through with him questioning and answering --
13    Q  Okay.
14    A  -- prior to the video statement.  I can't
15 even -- I don't remember it, so, you know.
16    Q  Was it your practice to write an outline
17 of the questions that you were going to ask the
18 suspect during the videotaped statement before the
19 statement occurred?
20       MS. REED:  I'm going to object to lack of
21 foundation, calls for speculation, and form.
22 BY THE WITNESS:
23    A  I do not remember if I -- if I would write
24 an outline.  I don't remember that.

262

1        And then you say:
2        "ANSWER:  Sometime around there."
3        Do you see that?
4     A  I do see that.
5     Q  Okay.  After you were done asking Xavier
6  Walker how he was treated, was it -- strike that.
7        After you were done asking Xavier Walker
8  how he had been treated by the police, would you
9  have done a trial run of the videotaped
10 confession?
11       MS. REED:  I'm going to object to lack of
12 foundation, calls for speculation, confusing
13 question, as well as incomplete hypothetical and
14 form.
15 BY THE WITNESS:
16    A  I don't remember what I would have done.
17 I don't remember what I would have done at that
18 time.
19 BY MS. ITCHHAPORIA:
20    Q  Was it your practice in May of 2000 when a
21 suspect was going to give a videotaped statement
22 to have a trial run where you ask the questions so
23 the suspect knows what to expect during the actual
24 videotaping of the statement?

264

1  BY MS. ITCHHAPORIA:
2     Q  Okay.  Let me show you -- we're still
3  looking at Exhibit 3.  I'm going to show you
4  Page 75 of Exhibit 3, Line 9.
5        "QUESTION:  Now, prior to actually having
6  Mr. Walker's statement videotaped, you have what
7  amounts to as a trial run with him as to what he
8  was going to say?
9        "ANSWER:  Yes.
10       "QUESTION:  You went over the questions
11 you were going to ask him, and he gave you the
12 answers he was going to give you?
13       "ANSWER:  That's correct.
14       "QUESTION:  And then you videotaped the
15 statement; is that correct, the session?
16       "ANSWER:  Right."
17       Do you see that?
18    A  I do.
19    Q  Does that refresh your recollection as to
20 the trial run that you had with Xavier Walker?
21       MS. REED:  I'm going to object to lack of
22 foundation, speculation, and hearsay.
23 BY THE WITNESS:
24    A  I don't dispute that that is what that

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

67 (265 to 268)

---

265

1  transcript says.  I don't have a specific memory
2  of that.
3  BY MS. ITCHHAPORIA:
4    Q  Okay.  When you did do trial run as a
5  matter of practice with the witness -- with a
6  suspect, was that -- were you asking questions
7  based on what you had learned earlier during the
8  interview?
9      MS. REED:  I'm going to object to lack of
10 foundation, calls for speculation, as well as
11 mischaracterizes prior testimony.
12 BY THE WITNESS:
13   A  Again, I don't have a specific
14 recollection of this.  I mean, looking at the
15 transcript, it gives me an -- you know, like, I
16 could see what I testified to, but I don't have an
17 active recollection of what I did, you know, each
18 time.
19     So I guess if that's what I -- if that's
20 what the transcript says, it was possible, but I
21 don't know for sure because I just can't remember.
22 BY MS. ITCHHAPORIA:
23   Q  If it was your practice to do trial runs,
24 why would you do trial runs?

---

266

1      MS. REED:  I'm going to object to --
2      MR. COYNE:  And that's --
3      MS. REED:  -- lack of foundation.
4      MR. COYNE:  Joanna, same instruction as
5  before.  Again, if you can answer that question
6  without divulging your decision-making and mental
7  processes with respect to your decisions in this
8  case, or any specific case for that matter, you
9  can answer.
10     If you can't answer the question without
11 divulging your mental processes with respect to
12 your decisions as a prosecutor, then I would
13 instruct you not to answer the question pursuant
14 to Federal Rule 26 Work Product Doctrine.
15     MS. REED:  I'm also going to object to
16 lack of foundation, speculation, incomplete
17 hypothetical, and form.
18 BY THE WITNESS:
19   A  I just don't -- I don't remember.
20 BY MS. ITCHHAPORIA:
21   Q  Okay.  Let me just show you what I'll mark
22 as Exhibit 7 your deposition.
23     (WHEREUPON, Leafblad Exhibit No. 7 was
24 presented to the witness.)

---

267

1      MS. ITCHHAPORIA:  And, for the record,
2  this is Bates-marked Plaintiff Xavier Walker
3  005773 through Plaintiff Xavier Walker 005824.
4  BY MS. ITCHHAPORIA:
5    Q  Looking at the first page of Exhibit 7, do
6  you see it's a report of proceedings dated
7  November 4th, 2003?
8    A  I see that, yes.
9    Q  In the case of People versus Xavier Wilson
10 and Jovanie Long; do you see that?
11   A  Yes.
12   Q  Okay.  And then if you look at the second
13 page, it has you listed as a witness testifying
14 beginning on Page 35.
15   A  Yes, I can see that.
16   Q  I'll take your attention to Page -- what
17 was the page?
18     I'll take you to Page 42, transcript
19 PP 42.  You were asked here at Line 16:
20     "QUESTION:  The videographer arrived.  At
21 that point, had you gone through anything with the
22 defendant?
23     "ANSWER:  I did.  I also went through the
24 questions I would ask him when the videotape was

---

268

1  rolling.
2      "QUESTION:  Why did you tell the defendant
3  what questions you were going to ask?
4      "ANSWER:  Because I didn't want him to be
5  caught by surprise.  I wanted him to kind of see
6  what it would be like when we were doing the
7  video."
8      Do you see that?
9    A  I do.
10   Q  And that was truthful testimony when you
11 testified in court in November 2003?
12   A  Yes.
13     MS. REED:  I'm going to object to lack of
14 foundation, calls for speculation, and hearsay.
15 BY THE WITNESS:
16   A  Yes.
17 BY MS. ITCHHAPORIA:
18   Q  Is this one of the transcripts that you
19 scanned before your deposition today?
20   A  I think so.  I didn't get full
21 transcripts; I got portions of them, so -- but I
22 think so.
23   Q  And the trial run is -- the purpose is to
24 ask him questions -- ask the defendant questions

---

269

1  so he's not caught by surprise; it's not to feed
2  him information; is that right?
3      MR. COYNE:  Same --
4      MS. REED:  I'm going to --
5      MR. COYNE:  Same instruction as before to
6  the witness.  If you need me to repeat the entire
7  instruction, I will; otherwise, the same
8  admonition applies to your answer to that
9  question.
10     MS. REED:  I'm also going to object to
11 lack of foundation, speculation, and form.
12 BY THE WITNESS:
13    **A  I don't have an answer outside of that**
14 **transcript.  You know, I don't have a specific**
15 **recollection of it, and if that's what I testified**
16 **to, then that's what -- you know, if that's what**
17 **the testimony is, that's what it is.**
18 **BY MS. ITCHHAPORIA:**
19    Q  You wouldn't, as a Felony Review ASA, feed
20 information to a suspect for purposes of getting a
21 statement from them, would you?
22     MS. REED:  I'm going to object to form,
23 incomplete hypothetical, as well as overly broad.
24

270

1  BY THE WITNESS:
2     **A  I wouldn't feed anything to anybody.  I**
3  **would want honest statements from people in**
4  **general.  So I don't see how I would have done**
5  **that in Felony Review.**
6  **BY MS. ITCHHAPORIA:**
7     Q  I'll show you what we'll mark as Exhibit 8
8  to your deposition.
9       (WHEREUPON, Leafblad Exhibit No. 8 was
10 presented to the witness.)
11     MR. COYNE:  And, for the record, this is
12 Bates-marked Plaintiff Xavier Walker 2542
13 through 2543.
14 BY MS. ITCHHAPORIA:
15    Q  And looking at the first page of the
16 document, and I'll give you a chance to read it,
17 can you tell me if this is in your handwriting.
18     MS. REED:  I'm going to object to lack of
19 foundation, calls for speculation.
20 BY THE WITNESS:
21    **A  It looks like it could be my handwriting.**
22 **BY MS. ITCHHAPORIA:**
23    Q  And I'll just show the second page.
24     Same question as to the second page:  Does

271

1  that also look like it's in your handwriting?
2      MS. REED:  Same objection.
3  BY THE WITNESS:
4     **A  It looks like it could be my handwriting.**
5  **BY MS. ITCHHAPORIA:**
6     Q  And at the top of this Exhibit 7 -- or
7  Exhibit 8, sorry, that we're looking at, it says
8  "Outline For Video."
9       Do you see that?
10    **A  I do.**
11    Q  So was it your practice, if you recall,
12 back in May of 2000 when you were in Felony Review
13 to write down an outline of the questions that you
14 were going to ask the defendant during the
15 videotaped statement?
16     MS. REED:  I'm going to object to lack of
17 foundation, speculation, as well as asked and
18 answered.
19 BY THE WITNESS:
20    **A  I don't remember what my practice was in**
21 **the year 2000 about how I did things, and any time**
22 **during the year 2000 in terms of these videos.**
23    **I'm looking at what is entitled "Outline**
24 **For Video," and it's written out in writing that**

272

1  **is similar to mine.  I don't have a recollection**
2  **of it.**
3  **BY MS. ITCHHAPORIA:**
4     Q  Are the questions that we're looking at in
5  this outline for video in Exhibit 8, were they
6  based on what Xavier Walker had told you
7  previously during his interview?
8      MS. REED:  I'm going to object to lack of
9  foundation, speculation, hearsay.
10 BY THE WITNESS:
11    **A  I don't know because I have no**
12 **recollection of it.**
13 **BY MS. ITCHHAPORIA:**
14    Q  Okay.  Do you know how long the trial run
15 lasted with Xavier Walker?
16     MS. REED:  I'm going to object to lack of
17 foundation, speculation, and hearsay as well as
18 mischaracterizes prior testimony.
19 BY THE WITNESS:
20    **A  I don't remember.**
21 **BY MS. ITCHHAPORIA:**
22    Q  I'm going to show you what we'll mark as
23 Exhibit 9 to your deposition.
24

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

69 (273 to 276)

273

1    (WHEREUPON, Leafblad Exhibit No. 9 was
2  presented to the witness.)
3  BY MS. ITCHHAPORIA:
4    Q  For the record, it's Bates-marked
5  Plaintiff Xavier Walker 2541.
6      And do you recognize this document?
7    **A  I don't recognize it, but I can see what**
8  **it is.**
9    Q  Okay.  And what is it?
10   **A  It's entitled "Consent to Videotape**
11 **Statement."**
12   Q  Is this a form that you used for
13 videotaped statements when you were in Felony
14 Review?
15     MS. REED:  I'm going to object to lack of
16 foundation, speculation.
17 BY THE WITNESS:
18   **A  I don't remember what I did in -- I don't**
19 **remember what I did in 2000.**
20 BY MS. ITCHHAPORIA:
21   Q  Do you see where it says "Assistant
22 State's Attorney" where it's typed up and then
23 above there, there's a signature?
24   **A  I do see that.**

274

1    Q  Is that your signature where it says
2  "Joanna Leafblad" -- I think "MI Leafblad" or
3  "ML" --
4      MS. REED:  I'm going to --
5  BY MS. ITCHHAPORIA:
6    Q  -- "Leafblad"?
7      MS. REED:  I'm going to object it calls
8  for speculation.
9  BY THE WITNESS:
10   **A  It looks like my signature.**
11 BY MS. ITCHHAPORIA:
12   Q  Okay.  And it's dated May 29, 2000; do you
13 see that?
14   **A  I do see that.**
15   Q  And it's a consent [as read]: "The
16 following statement is about the robbery and
17 shooting death of Marek Majdak that occurred on
18 13th May 2000 at 1:00 a.m./1:14 a.m. at the
19 location of 4721 West Ohio, Chicago, Cook County,
20 Illinois.  I understand that a video camera is in
21 the next room and that it will record everything I
22 say and do.  Knowledge of all of this, I consent
23 to the videotaping of my statement."
24     Do you see that?

275

1    A  I do.
2    Q  Did you ask Xavier Walker to sign this
3  consent to videotape his statement before the
4  statement began?
5      MS. REED:  I'm going to object to lack of
6  foundation, calls for speculation, and hearsay.
7  BY THE WITNESS:
8    **A  I don't remember.  I just don't remember**
9  **any conversations I had with him.**
10 BY MS. ITCHHAPORIA:
11   Q  Would it be your practice back in May
12 of 2000 in Felony Review to get the defendant to
13 sign the consent before the videotaped statement
14 began?
15     MS. REED:  I'm going to object to lack of
16 foundation, speculation, as well as relevance,
17 incomplete hypothetical, and form.
18 BY THE WITNESS:
19   **A  I don't remember what the practice was**
20 **specifically with regard to video statements back**
21 **in 2000.**
22 BY MS. ITCHHAPORIA:
23   Q  Is this -- consent form, is that something
24 you would have come to the Area with back in May

276

1  of 2000?
2      MS. REED:  I'm going to object to asked
3  and answered, lack of foundation, calls for
4  speculation.
5  BY THE WITNESS:
6    **A  I don't remember.  I don't dispute the**
7  **document exists; I just don't remember the process**
8  **or -- you know, or what we -- the process in terms**
9  **of video statements.  And I don't remember my**
10 **conversations with Mr. Walker or anyone else.**
11 BY MS. ITCHHAPORIA:
12   Q  You have here in the consent form where it
13 says 13th May 2000 and the time, that's your
14 handwriting; is that correct?
15     MS. REED:  I'm going to object to calls
16 for speculation, lack of foundation.
17 BY THE WITNESS:
18   **A  It looks like my handwriting.**
19 BY MS. ITCHHAPORIA:
20   Q  And then where it says "Robbery and
21 shooting death of Marek Majdak," that's also your
22 handwriting?
23   **A  It looks like --**
24     MS. REED:  Same objections.

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

70 (277 to 280)

277

1 BY THE WITNESS:
2    A  It looks like my handwriting.
3  BY MS. ITCHHAPORIA:
4    Q  Okay.  And then --
5       MS. REED:  Same objection.
6  BY MS. ITCCHHAPORIA:
7    Q  Okay.  Ms. Leafblad, just give a pause so
8  Counsel can object.
9       And the location of 4721 West Ohio,
10 Chicago, Cook County, Illinois, that was also in
11 your handwriting?
12      MS. REED:  Same objections.
13 BY THE WITNESS:
14   A  It looks like my handwriting.
15 BY MS. ITCHHAPORIA:
16   Q  Where did you get this information from
17 about the date, time, and location of the murder
18 of Marek Majdak?
19   A  I don't --
20      MS. REED:  I'm going to object to lack of
21 foundation, calls for speculation.
22      THE WITNESS:  Sorry I keep answering
23 before the objection.
24

278

1  BY THE WITNESS:
2    A  I don't know.
3  BY MS. ITCHHAPORIA:
4    Q  Is it reasonable to say that you got that
5  information either from speaking to a detective or
6  from looking at police reports?
7       MS. REED:  Same objection and form.
8  BY THE WITNESS:
9    A  That's possible, but I don't have a
10 specific recollection of that.
11 BY MS. ITCHHAPORIA:
12   Q  Show you what we'll mark as Exhibit 10 to
13 your deposition.
14      (WHEREUPON, Leafblad Exhibit No. 10 was
15 presented to the witness.)
16      MS. ITCHHAPORIA:  For the record,
17 Exhibit 10 is Bates-marked Plaintiff Xavier Walker
18 2544 through 2547.
19 BY MS. ITCHHAPORIA:
20   Q  Looking at the first page of this
21 document, do you recognize it?
22   A  I don't recognize it.
23   Q  Is the handwriting on Page 1 of Exhibit 10
24 your handwriting?

279

1       MS. REED:  Objection, calls for
2  speculation.
3  BY THE WITNESS:
4    A  It looks like my handwriting.
5  BY MS. ITCHHAPORIA:
6    Q  And this document, what is it entitled?
7    A  "Openings Remarks For Videotaped and
8  Court-Reported Statements."
9    Q  Okay.  Was this a form that you used as a
10 matter of course when you were taking videotaped
11 statements from defendants or suspects?
12      MS. REED:  I'm going to object to lack of
13 foundation, calls for speculation.
14 BY THE WITNESS:
15   A  I really don't remember.
16 BY MS. ITCHHAPORIA:
17   Q  Okay.  Do you know if, as a matter of
18 course when you were in felony review, was it your
19 practice to bring a blank document like this when
20 you came to the detective area?
21      MS. REED:  Same objections.
22 BY THE WITNESS:
23   A  I don't think it was a practice.
24

280

1  BY MS. ITCHHAPORIA:
2    Q  Was this document provided to you by the
3  police, or was this a Cook County State's Attorney
4  document?
5       MS. REED:  Same objections.
6  BY THE WITNESS:
7    A  I don't remember who generated it.
8  BY MS. ITCHHAPORIA:
9    Q  Did you use a document like this in any
10 other videotaped statements?
11      MS. REED:  Same objections, as well as
12 relevance.
13 BY THE WITNESS:
14   A  I would not remember that unless I could
15 see all the documentation related to every other
16 video statement I ever took.
17 BY MS. ITCHHAPORIA:
18   Q  Did you fill this out, this opening
19 remarks for videotaped and court-reported
20 statements that we're looking at as Exhibit 10,
21 for the actual recording of Xavier Walker's
22 statement started?
23      MS. REED:  I'm going to object to lack of
24 foundation, speculation.

281

1 BY THE WITNESS:
2    A  I don't remember doing it.
3 BY MS. ITCHHAPORIA:
4    Q  Okay.  So we kind of have here:  "We are
5 here to take the statement" all typed up.  And
6 then there's handwriting.  And then it says:
7 "Concerning the investigation" -- so there's,
8 like, typewrite -- typewritten stuff, and then
9 there's handwritten stuff.
10     Do you see that?
11   A  I do.
12    Q  And do you agree that this is also the
13 format in which the actual video-recorded
14 statement of Xavier Walker, it follows the same
15 format?
16   A  I have --
17     MS. REED:  I'm going to object -- sorry.
18 I'm going to object to lack of foundation, calls
19 for speculation, and confusing.
20 BY THE WITNESS:
21   A  I have not viewed the video, so I don't
22 know.
23 BY MS. ITCHHAPORIA:
24    Q  Counsel showed you earlier that we marked

282

1 as Exhibit 4 the transcribed -- the transcript of
2 his statement.
3     Do you remember seeing that?
4    A  I remember seeing it, yes.
5    Q  And from what you remember from earlier in
6 your deposition, can you tell me if that
7 transcribed transcript of Xavier Walker's
8 statement -- videotaped statement followed the
9 same format that we're looking at here in this
10 document entitled "Opening Remarks"?
11     MS. REED:  I'm going to object to lack of
12 foundation, calls for speculation, and hearsay.
13 BY THE WITNESS:
14   A  I'm not sure.  I would have to see them
15 side by side to compare them.
16 BY MS. ITCHHAPORIA:
17    Q  Okay.  I'll show you that in a second.
18     All right.  So just going through this, it
19 says, like, here typewritten:  "Before we spoke, I
20 explained that I am an Assistant State's Attorney,
21 a lawyer, and prosecutor and not your lawyer; is
22 that correct?"
23     Do you see that?
24   A  I do.

283

1    Q  And that was typed up, right?
2    A  Yes, it's typed up -- it looks typed up.
3    Q  You didn't type up this document when you
4 were at the Area, did you, on May 29th, 2000?
5     MS. REED:  I'm going to object to lack of
6 foundation, speculation.
7 BY THE WITNESS:
8    A  I don't remember this document, so I don't
9 remember what I would have done and what I would
10 have not done.
11 BY MS. ITCHHAPORIA:
12    Q  Was this document provided to you by the
13 Cook County State's Attorney's Office because this
14 is the format they wanted you to follow when you
15 took a videotaped statement?
16     MS. REED:  I'm going to object to lack of
17 foundation, speculation, asked and answered.
18 BY THE WITNESS:
19   A  I don't remember who generated the
20 document.
21 BY MS. ITCHHAPORIA:
22    Q  Okay.  And then it says:  "And before we
23 spoke I advised you of your constitutional rights;
24 is that correct" question.

284

1     Do you see that?  That's also typed up?
2    A  I do see that.
3    Q  Okay.  And there's some handwriting on the
4 second page of Exhibit 10.  Does that also look
5 like it's your handwriting?
6     MS. REED:  Objection, calls for
7 speculation.
8 BY THE WITNESS:
9    A  It looks like my handwriting.
10 BY MS. ITCHHAPORIA:
11    Q  Okay.  It says:  "You told me about the
12 robbery and shooting death of Marek Majdak.  At
13 that time you told me on 13th May 2000, you were
14 out getting high with Jovanie "Vani" Long.  You
15 ran out of money and decided to" -- do you know
16 what that says after "to"?
17     MS. REED:  I'm going to object to lack of
18 foundation and speculation.
19 BY THE WITNESS:
20   A  No, I don't know what it says.
21 BY MS. ITCHHAPORIA:
22    Q  "And decided to" -- something -- "rob
23 people coming to buy drugs on Ohio."
24     And then it says:  "Vani had a gun."

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

72 (285 to 288)

---

285

1     Do you see that?
2     A  I see that.
3     Q  Okay.  And then it says: "You were
4  lookout for Vani, watching his back and watching
5  for police."
6     Do you see that?
7     A  Yes.
8     Q  And then it says: "V" -- which I think we
9  established before probably stands for victim --
10  "drove up in his van.  Vani got in and held gun up
11  to victim."
12     Do you see that?
13     A  I do.
14     Q  "You saw a struggle and started towards
15  van to help" -- "to hold victim so Vani could get
16  money."
17     Do you see that?
18     A  Yes.
19     Q  "Victim ran out of van and Vani shot him."
20     Do you see that?
21     A  Yes.
22     Q  "And Vani took the money out of his pocket
23  and both" -- "and you both ran."
24     Do you see that?

---

286

1     A  Yes.
2     Q  Okay.  And it's -- this is kind of like
3  you're telling Xavier Walker what he told you
4  before; is that right?  Because you're using --
5     MS. REED:  I'm going to object to lack of
6  foundation, form, calls for speculation, and
7  hearsay.
8  BY THE WITNESS:
9     A  Again, I don't recall the conversation or
10  this document, so I really can't speak to why
11  this -- this is written there for -- or for what
12  purpose.
13  BY MS. ITCHHAPORIA:
14     Q  When it says here: "At that time you told
15  me," this is based on what Xavier Walker told you,
16  correct?
17     MS. REED:  Same objections.
18  BY THE WITNESS:
19     A  Again, I don't recall the conversation or
20  this document, so whatever the words are on the
21  document are what they are.  I don't dispute their
22  existence --
23  BY MS. ITCHHAPORIA:
24     Q  All right --

---

287

1     A  -- I just --
2     Q  Sorry.  I didn't mean to cut you off.  I
3  apologize.
4     A  That's okay.  But I just don't -- I can't
5  tell you -- I don't remember, you know, what my
6  thought process was or whatever because I just
7  don't remember the document.
8     Q  Sure.  And I understand you don't have a
9  recollection, but is it reasonable to say that
10  this is based on what Xavier Walker said to you?
11  Because you didn't just make this up out of whole
12  cloth, did you?
13     MS. REED:  I'm going to object to the form
14  of the question as well as leading, hearsay,
15  speculation, lack of foundation.
16  BY THE WITNESS:
17     A  I don't recall the document.  I see what
18  is written on the document is consistent with
19  other -- with Xavier Walker's statements on other
20  documents that I have been questioned on today.
21  BY MS. ITCHHAPORIA:
22     Q  And, to be clear, you wouldn't, as an ASA
23  in Felony Review, just make things up and
24  attribute them to defendants?

---

288

1     MS. REED:  I'm going to object to calls
2  for speculation as well as incomplete hypothetical
3  and form.
4  BY THE WITNESS:
5     A  No, I would not make things up.
6  BY MS. ITCHHAPORIA:
7     Q  And then Page 3, does that also appear to
8  have your handwriting?
9     MS. REED:  I'm going to object to
10  speculation.
11  BY THE WITNESS:
12     A  I see the words on "Xavier Walker" on the
13  page.  It looks like it could be my handwriting.
14  BY MS. ITCHHAPORIA:
15     Q  Okay.  Well, sorry, going just back to 2,
16  we have, like, the typed-out rights.
17     Do you see that?
18     A  I do.
19     Q  And then Page 3, it says: "Xavier Walker,
20  I asked you if you would agree to have your
21  statement videotaped; is that correct?"
22     And then it says in parentheses: "A
23  refusal of the videotaped statement must be
24  recorded in the court-reported or handwritten

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

289

1 statement."
2    Do you see that?
3    **A I do.**
4    Q Does that refresh your recollection as to
5 who generated or where this document came from?
6    MS. REED: I'm going to object to lack of
7 foundation, calls for speculation, and hearsay.
8 BY THE WITNESS:
9    **A It does not.**
10 **BY MS. ITCHHAPORIA:**
11    Q Okay. And then the last page says:
12 "Closing remarks for videotaped statement."
13    And then it says: "This now concludes the
14 statement of Xavier Walker."
15    Is that -- "Xavier Walker," is that in
16 your handwriting?
17    MS. REED: Calls for speculation.
18 BY THE WITNESS:
19    **A It looks like it could be my handwriting.**
20 **BY MS. ITCHHAPORIA:**
21    Q Okay. The statement that we looked at,
22 the transcribed statement of Xavier Walker began
23 at 11:43 p.m. on May 29th, 2000. Do you know what
24 time it ended?

290

1    MS. REED: I'm going to object to lack of
2 foundation, calls for speculation.
3 BY THE WITNESS:
4    **A I do not.**
5 **BY MS. ITCHHAPORIA:**
6    Q At some point before you testified in
7 court, either in 2001 or 2003, you did have the
8 opportunity to review the videotaped statement of
9 Xavier Walker; is that correct?
10    MS. REED: I'm going to object to lack of
11 foundation, calls for speculation.
12 BY THE WITNESS:
13    **A I can only assume. I don't remember.**
14 **BY MS. ITCHHAPORIA:**
15    Q Okay. Let me just show you your
16 testimony.
17    Just a second. Sorry.
18    All right. I'm showing you what we
19 previously marked as Exhibit 7 to your deposition
20 and it's your testimony from November of 2003.
21 And on PP 43, you were asked: "After the
22 videotaped statement is then taken, what occurred?
23    "ANSWER: After the videotaped statement
24 was taken, I was able to review the videotaped

291

1 statement.
2    "QUESTION: After you viewed it, did it
3 contain substantially the same statement as he had
4 given when he was videotaped?
5    "ANSWER: Yes.
6    "QUESTION: Was that statement essentially
7 substantially the same as the earlier oral
8 statement the defendant had given you?
9    "ANSWER: Yes."
10    And then: "QUESTION: The video that you
11 viewed after it was taken on May 29 of 2000, have
12 you reviewed that since May of 2000?
13    "Yes.
14    "QUESTION: When have you reviewed it?
15    "ANSWER: Previous court proceedings, last
16 October, I believe, and then also today.
17    "QUESTION: And is that video the same or
18 substantially the same as when you viewed it back
19 on May 29th of 2000?
20    "ANSWER: Yes."
21    Do you see that?
22    **A I do see it.**
23    Q So that was truthful testimony that you
24 did, in fact, review the videotaped statement

292

1 confession of Xavier Walker before you testified
2 in court in November of 2003 and in October
3 of 2001?
4    MS. REED: I'm going to object to form,
5 lack of foundation, calls for speculation, and
6 hearsay.
7 BY THE WITNESS:
8    **A I see that that's what the transcript**
9 **says. I don't have a specific recollection of**
10 **testifying, but I can tell you it was honest**
11 **testimony.**
12 **BY MS. ITCHHAPORIA:**
13    Q Okay. And I'm going to show you what
14 we'll mark as Exhibit 11 to your deposition -- or
15 I should say I'm going to try to show you.
16    Do you see anything on your screen yet,
17 ma'am?
18    **A I don't.**
19    Q Do you see anything on your screen now?
20    **A Yeah, I see your files.**
21    Q Oh, you see my files. Okay. Stop share.
22 All right. Let's try again.
23    (WHEREUPON, Leafblad Exhibit No. 11 was
24 presented to the witness.)

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

74 (293 to 296)

293

1 BY MS. ITCHHAPORIA:
2  Q Do you see anything now on the video
3 screen?
4  A Yes.
5  Q Do you see a video?
6  A I do.
7  Q Okay. So this is Exhibit 11, which is the
8 videotaped statement confession of Xavier Walker
9 (inaudible) as Exhibit 11 that was provided in
10 response to subpoena from the Cook County State's
11 Attorney's Office.
12     I'm just going to play a little bit for
13 you, and then I'll ask you some questions.
14    (Video played.)
15    MS. ITCHHAPORIA: Stopping the video at
16 45 seconds in.
17 BY MS. ITCHHAPORIA:
18  Q Ms. Leafblad, was that you in the video we
19 just looked at in Exhibit 11?
20  A Yes.
21  Q And did you see that there was some
22 document that you were reading from?
23  A Yes.
24  Q Do you know what document you were reading

294

1 from?
2    MS. REED: I'm going to object to lack of
3 foundation, calls for speculation.
4 BY THE WITNESS:
5  A No, I don't know what I was reading from.
6 BY MS. ITCHHAPORIA:
7  Q Were you reading from that opening remarks
8 document that we looked at, Exhibit 10?
9    MS. REED: Same objections, as well as
10 leading.
11 BY THE WITNESS:
12  A I don't know what documents I was reading
13 from.
14 BY MS. ITCHHAPORIA:
15  Q Okay. And looking at that video and
16 seeing -- you saw Xavier Walker in that video?
17  A I did --
18    MS. REED: I'm going to object to lack of
19 foundation.
20 BY MS. ITCHHAPORIA:
21  Q And did you also see Detective Pietryla in
22 the videotape that we just looked at marked as
23 Exhibit 11?
24    MR. COYNE: Objection, foundation.

295

1    MS. REED: Join objection.
2 BY THE WITNESS:
3  A Yes, I saw the detective in the video.
4 BY MS. ITCHHAPORIA:
5  Q Did reviewing that portion of the video --
6 and I know I showed you 43 seconds or something
7 like that, 45 seconds -- does that refresh your
8 recollection about any aspect of the videotaped
9 statement confession of Xavier Walker or his
10 interview?
11  A No, I don't dispute -- no, I mean, I don't
12 dispute that the video was true, that I was there,
13 but I just don't -- no, I don't remember
14 anything -- I mean, I don't remember what
15 documents I had in front of me.
16 BY MS. ITCHHAPORIA:
17  Q Okay. And just showing you again
18 Exhibit 10, do you see Xavier Walker here in the
19 video?
20    MS. REED: I'm going to object to lack of
21 foundation.
22 BY THE WITNESS:
23  A Well, if -- I'm assuming it's him if this
24 is the -- if we're talking about his videotaped

296

1 statement. And in the 45 seconds I watched, it
2 looks like I introduce him as Xavier Walker.
3 BY MS. ITCHHAPORIA:
4  Q And do you see that he's wearing a white
5 T-shirt?
6  A He was wearing a white -- yes.
7  Q Was he wearing that T-shirt when you also
8 interviewed him before the videotaped statement
9 confession started?
10    MS. REED: I'm going to object to lack of
11 foundation, calls for speculation.
12 BY THE WITNESS:
13  A I don't remember what he was wearing.
14 BY MS. ITCHHAPORIA:
15  Q Okay. Do you know if he was wearing that
16 same white T-shirt throughout your interactions
17 with him?
18    MS. REED: Same --
19 BY THE WITNESS:
20  A I don't remember.
21    MS. REED: -- objections.
22    THE WITNESS: Sorry.
23 BY MS. ITCHHAPORIA:
24  Q When you interviewed Xavier Walker, he

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

75 (297 to 300)

297

1 wasn't wearing, like, a Cook County inmate
2 uniform, was he?
3     MS. REED:  Same objections.
4 BY THE WITNESS:
5     **A  I don't remember what he was wearing.**
6 **BY MS. ITCHHAPORIA:**
7     Q  Okay.  The white T-shirt that he was
8 wearing in the video had sleeves on it, is that --
9 short sleeves; is that correct?
10     **A  I don't remember -- I mean, I think so.  I**
11 **wasn't -- I wasn't paying much attention to what**
12 **he was wearing.  And I -- you know, whatever he**
13 **had on in the video is what he had on.**
14         **So I can watch it again and, you know,**
15 **verify his clothing.**
16     Q  I can show you a still shot of it.  Do you
17 see that he was wearing a white T-shirt?
18     **A  I see that he's wearing a white shirt.  I**
19 **can't tell if it's short-sleeved or not because**
20 **his sleeves go beyond the table.**
21     Q  Okay.  I think there's a point where you
22 can see his elbows, but I'll just show you your
23 testimony.
24         When you were interacting with Xavier

298

1 Walker, did you ever see any footprints on that
2 white T-shirt that we just looked at?
3     MS. REED:  I'm going to object to lack of
4 foundation, calls for speculation.
5 BY THE WITNESS:
6     **A  I don't remember the interview.**
7 **BY MS. ITCHHAPORIA:**
8     Q  Okay.  Had you been to Area 4 prior to
9 May 29th, 2000 -- or May 28th, 2000, I should say?
10     **A  For what purpose?**
11     Q  For Felony Review purposes.
12     **A  It's likely that I would -- it's likely**
13 **that I was.  I know that I was there more than**
14 **once during the time I was on Felony Review.**
15     Q  The interview of Xavier Walker would have
16 taken place in an interview room; is that right?
17     MS. REED:  Objection, lack of foundation,
18 calls for speculation.
19 BY THE WITNESS:
20     **A  What I've seen today indicates that it was**
21 **in an interview room.**
22 **BY MS. ITCHHAPORIA:**
23     Q  And then is the videotaped-statement-taken
24 place somewhere besides the interview room?

299

1     MS. REED:  Same objections.
2 BY THE WITNESS:
3     **A  The videotaped statement took place in**
4 **whatever room that was.  I don't know what they**
5 **called it.  I can't remember what they called --**
6 **if it was an interview room or a video room or**
7 **conference room.  I don't know what they called**
8 **it.**
9 **BY MS. ITCHHAPORIA:**
10     Q  Was it a different room than the room
11 where you had interviewed Xavier Walker?
12     MS. REED:  Same objections.
13 BY THE WITNESS:
14     **A  I don't have an independent recollection,**
15 **but according to what I have seen today, the**
16 **interview room we were in had bars -- had a rail**
17 **on the wall and a bench, and we had to bring in**
18 **chairs.**
19         **The table -- the room in the video had a**
20 **table.  I didn't see that there were bars on the**
21 **wall or a bench that was attached to the wall.**
22 **From that, I can only assume that it was a**
23 **different room.**
24

300

1 BY MS. ITCHHAPORIA:
2     Q  Okay.  And based on what your recollection
3 is or your practice, do you know where the
4 videographer would have been when this statement
5 was being recorded?
6     MS. REED:  Same objections.
7 BY THE WITNESS:
8     **A  I don't remember, but from what I've been**
9 **shown today in terms of exhibits, the videographer**
10 **was outside of the room.**
11 **BY MS. ITCHHAPORIA:**
12     Q  So there was -- is there, like, a
13 partition between the room where the videographer
14 was and where you all were during the actual
15 taping of the statement?
16     MS. REED:  Same objections.
17 BY THE WITNESS:
18     **A  I don't remember.  I can -- you know, I**
19 **vaguely remember it was probably different in**
20 **every place we were because each place is built**
21 **differently, but I can't say what it was like in**
22 **Area 4.**
23 **BY MS. ITCHHAPORIA:**
24     Q  Could you see the court reporter or the

301

1  slash videographer Sandra Brennan during the
2  actual taping?
3      MS. REED:  Same objections, as well as
4  mischaracterizes prior testimony.
5  BY THE WITNESS:
6  **A  I don't remember.**
7  **BY MS. ITCHHAPORIA:**
8      Q  Okay.  How would you have communicated
9  with the videographer Sandra Brennan either before
10 or after the statement?
11     MS. REED:  Same objections.
12 BY MS. ITCHHAPORIA:
13     Q  If she wasn't in the same room, I should
14 say.
15     MS. REED:  Same objections and form.
16 BY THE WITNESS:
17 **A  I don't remember, but I can assume based**
18 **on the documents you have shown me that the**
19 **statements said at the end would indicate that it**
20 **was the -- that the testimony would be over or**
21 **that the statement would be over.  So that could**
22 **be a way.  But I don't know.  I don't have a**
23 **recollection of what we did specifically.**
24

302

1  BY MS. ITCHHAPORIA:
2      Q  Do you remember if the rooms were set up
3  so that -- during the videotaped statement so that
4  the three of you were on one side and then there
5  was a glass window and then the court reporter was
6  on the other side?
7      MS. REED:  I'm going to object to form,
8  compound, lack of foundation, calls for
9  speculation.
10 BY THE WITNESS:
11 **A  I don't remember specifically.**
12 **BY MS. ITCHHAPORIA:**
13     Q  Okay.  Were there any other detectives
14 that were in the room with the videographer when
15 the statement was being recorded?
16     MS. REED:  I'm going to object to lack of
17 foundation, calls for speculation.
18 BY THE WITNESS:
19 **A  I don't remember if there was.**
20 **BY MS. ITCHHAPORIA:**
21     Q  At any point during the videotaped
22 statement of Xavier Walker, did you see any other
23 detectives other than Detective Pietryla?
24     MS. REED:  I'm going to object to lack of

303

1  foundation, speculation, and asked and answered.
2  BY THE WITNESS:
3  **A  I'm sorry, I don't understand what the**
4  **question was.**
5  **BY MS. ITCHHAPORIA:**
6      Q  Did you see any other detectives during
7  the actual recording of the videotaped statement
8  of Xavier Walker other than Detective Pietryla?
9      MS. REED:  Same --
10 BY THE WITNESS:
11 **A  In the 45 seconds --**
12     MS. REED:  -- objections.
13     THE WITNESS:  Sorry.
14 BY THE WITNESS:
15 **A  In the 45 seconds that we watched, I did**
16 **not see any other detectives in there.**
17 **BY MS. ITCHHAPORIA:**
18     Q  Okay.  And what about based on what you
19 recall?  Which I think I know your answer, but I'm
20 going to go ahead and ask you anyway.
21 **A  Yeah, I --**
22     MS. REED:  Objection, lack of foundation,
23 calls for speculation.
24

304

1  BY THE WITNESS:
2  **A  I don't remember.**
3  **BY MS. ITCHHAPORIA:**
4      Q  If there were any other detectives, would
5  you -- that were present for the recording of the
6  statement, would you have documented it somewhere,
7  whether it was on the videotape or in the
8  documents that we previously looked at that were
9  marked Exhibit 10 or 9 or 8?
10     MS. REED:  I'm going to object to lack of
11 foundation, calls for speculation, incomplete
12 hypothetical, and form.
13 BY THE WITNESS:
14 **A  If there were other detectives present for**
15 **the video, it would have been apparent from the**
16 **video.**
17 **BY MS. ITCHHAPORIA:**
18     Q  Okay.  I'm going to show you...
19     Do you see a transcript in front of you?
20 **A  I do.**
21     Q  This is what we marked previously as
22 Exhibit 3.  And I'm just going to show you Page 68
23 of the transcript marked Exhibit 3, Line 22.
24     "QUESTION:  The shirt that the defendant

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

77 (305 to 308)

305

1  is wearing in your interview has sleeves to it; is
2  that correct?
3      "ANSWER:  Yes, it does.
4      "QUESTION:  White shirt; is that correct?
5      "ANSWER:  Yes, it is.
6      QUESTION:  At any time did you see any
7  markings or in the videotape any markings of
8  footprints or shoe prints or a boot print?
9      "ANSWER:  No, I did not."
10     Do you see that?
11     **A  I do.**
12     Q  And that's truthful testimony, correct?
13     MS. REED:  I'm going to object it calls
14 for speculation, hearsay, lack of foundation, and
15 form.
16 BY THE WITNESS:
17     **A  If it is my testimony, it is truthful.**
18 **BY MS. ITCHHAPORIA:**
19     Q  Okay.  And this is your testimony,
20 correct?
21     MS. REED:  Same objections.
22 BY THE WITNESS:
23     **A  I see Q and A, so I'm assuming that this**
24 **is the same transcripts that we've been looking**

306

1  **at.  And, in that case, if it's my testimony, it's**
2  **truthful.**
3  **BY MS. ITCHHAPORIA:**
4      Q  Okay.  So we have a clear record, I'm
5  going to show you the first page of Exhibit 3,
6  which says the 2nd day of October 2001.
7      And then the second page shows you in the
8  index starting on Page 56.
9      And then Page 56 shows that you were sworn
10 in.
11     Do you see that?
12     **A  I do.**
13     Q  Okay.  And so this is your testimony that
14 we're looking at that we just looked at on Page 68
15 of Exhibit 3, correct?
16     MS. REED:  Same objections.
17 BY MS. ITCHHAPORIA:
18     Q  Did we get an answer?
19     **A  You're asking me if it's correct that**
20 **you're showing me the transcript of my testimony?**
21     Q  Yes, because you qualified it before, so I
22 just wanted you to see that it was your
23 transcript.
24     **A  From -- from what you've shown me, yes,**

307

1  **this looks like this is the transcript of my**
2  **testimony.**
3      Q  Okay.  And then you were asked on Page 69
4  of Exhibit 3:
5      "QUESTION:  You indicated you never
6  observed any injury to his right wrist; is that
7  correct?
8      "ANSWER:  Yes."
9      And then you were asked: "QUESTION:  When
10 he coughs, do you see any injuries at his right
11 wrist at approximately 227 here right now?
12     "ANSWER:  No, I don't see any marks on his
13 wrist."
14     Do you see that?
15     **A  Yes.**
16     Q  And that was also truthful testimony,
17 correct?
18     MS. REED:  Objection, calls for
19 speculation, lack of foundation, and hearsay as
20 well as form.
21 BY THE WITNESS:
22     **A  Yes, it would have been truthful.**
23 **BY MS. ITCHHAPORIA:**
24     Q  So it looks like you're testifying here

308

1  that when you were interacting with him, that you
2  never observed any injury to his right wrist; is
3  that correct?
4      MS. REED:  Objection, lack of foundation,
5  calls for speculation, hearsay and form.
6  BY THE WITNESS:
7      **A  Yes, it appears to be the case.**
8  **BY MS. ITCHHAPORIA:**
9      Q  And then it looks like you were shown,
10 when you were testifying in court, some portion of
11 the videotaped statement that we just looked at
12 that was Bates-marked -- I'm sorry, that was
13 marked as Exhibit 11, and you were asked on the
14 videotape if you could see any injuries on Xavier
15 Walker's right wrist, and you said you couldn't;
16 is that correct?
17     MS. REED:  Same objections.
18 BY THE WITNESS:
19     **A  That is what the transcript says, yes.**
20 **BY MS. ITCHHAPORIA:**
21     Q  Okay.  Do you recall that when you were in
22 court in 2001 that you were shown portions of the
23 videotaped statement confession of Xavier Walker
24 while you were testifying?

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

78 (309 to 312)

309

1      MS. REED:  I'm going to --
2 BY THE WITNESS:
3    **A  I do not --**
4      MS. REED:  I'm going to object to lack of
5 foundation and calls for speculation.
6 BY THE WITNESS:
7    **A  I do not recall that.**
8 **BY MS. ITCHHAPORIA:**
9    Q  Okay.  Do you -- do you see here on
10 Page 69 of Exhibit 3 you were also asked:
11 "Approximately five minutes into your conversation
12 with Xavier Walker, when they do a close-up of his
13 face, do you observe anything during the interview
14 or at any time that indicates he was tired or
15 needed sleep?
16      "ANSWER:  No, I did not."
17      Do you see that?
18    **A  Yes.**
19    Q  That's also truthful testimony, correct?
20      MS. REED:  I'm going to object to lack of
21 foundation, calls for speculation, form, and
22 hearsay.
23 BY THE WITNESS:
24    **A  I testified truthfully.**

310

1 **BY MS. ITCHHAPORIA:**
2    Q  And do you agree that you were shown about
3 five minutes of the videotaped statement and you
4 were shown the close-up of Xavier Walker's face
5 during the testimony when you testified in court
6 in October 2001?
7      MS. REED:  Same objections.
8 BY THE WITNESS:
9    **A  I have to rely on what's in the**
10 **transcript.  I don't remember specifically on my**
11 **own.**
12 **BY MS. ITCHHAPORIA:**
13    Q  Sure.  And that is what the transcript
14 says, right?  That you were shown about five
15 minutes of a close-up of Xavier Walker?
16      MS. REED:  Same objections.
17 BY THE WITNESS:
18    **A  That's what the transcript says.**
19 **BY MS. ITCHHAPORIA:**
20    Q  Okay.  Looking at Page 70 of the
21 transcript, Line 1.
22      "QUESTION:  At approximately six minutes
23 and 41 seconds into the videotaped interview, do
24 you see the defendant's right wrist again and do

311

1 you see any injury at the right wrist at the time
2 it's exposed 6 minutes and 41 seconds into the
3 interview?
4      "ANSWER:  No, I didn't see anything on his
5 wrist.
6      "QUESTION:  About 7:16, do you see
7 anything on his left wrist, motions of his left
8 hand?
9      "ANSWER:  No, I don't see anything on his
10 left hand."
11      Do you see that?
12    **A  Yes.**
13    Q  Okay.  And that was also truthful
14 testimony?
15      MS. REED:  I'm going to object to lack of
16 foundation, calls for speculation, hearsay, and
17 form.
18 BY THE WITNESS:
19    **A  It was truthful testimony.**
20 **BY MS. ITCHHAPORIA:**
21    Q  So it looks like, according to your
22 testimony in court in October 2001, that you were
23 shown a videotaped statement of Xavier Walker at
24 6 minutes and 41 seconds, and you were asked to

312

1 make an observation of his right wrist, and you
2 didn't see any injury to his right wrist, agree?
3      MS. REED:  Same objections.
4 BY THE WITNESS:
5    **A  That is what the transcript says.**
6 **BY MS. ITCHHAPORIA:**
7    Q  Okay.  And then also when you were in
8 court, you were shown about 7 minutes and
9 16 seconds into the videotaped statement
10 confession of Xavier Walker, and you were asked to
11 look at his left wrist, and asked if you saw
12 anything on his left hand, and you said you didn't
13 see anything; is that right?
14      MS. REED:  Same objections.
15 BY THE WITNESS:
16    **A  That's what the transcript says.**
17 **BY MS. ITCHHAPORIA:**
18    Q  Okay.  When you were in the area on
19 May 29th, 2000, either interviewing Xavier Walker
20 or doing the trial run or taking his videotaped
21 statement, did you become aware that ASA Thomas
22 Mahoney was also at the area on the same case that
23 you were on?
24      MS. REED:  Objection, lack of foundation,

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

313

1 assumes facts not in evidence, calls for
2 speculation, and form.
3 BY THE WITNESS:
4    **A I just -- I don't remember the -- I don't**
5 **remember being there. I don't remember the case**
6 **specifically, so I don't remember who else was**
7 **there.**
8 **BY MS. ITCHHAPORIA:**
9    Q Okay. Do you -- do you -- I think I know
10 the answer to this, but do you recall seeing ASA
11 Thomas Mahoney at any point in time at the Area on
12 May 29th or May 30th, 2000?
13      MS. REED: I'm going to object to lack of
14 foundation, calls for speculation.
15 BY THE WITNESS:
16    **A I don't remember.**
17 **BY MS. ITCHHAPORIA:**
18    Q Did you become aware when you were in the
19 Area on May 29th that ASA Thomas Mahoney was
20 taking a handwritten statement from a witness by
21 the name of Maurice Wright also known as Boo Boo?
22      MS. REED: Same objections.
23 BY THE WITNESS:
24    **A I just don't remember.**

314

1 **BY MS. ITCHHAPORIA:**
2    Q Okay. I'll represent to you that the
3 handwritten statement for Maurice Wright was taken
4 on May 29th, 2000, at 10:30 p.m. So almost an
5 hour and 15 minutes before the videotaped
6 statement of Xavier Walker was taken, okay?
7      With that representation, are you able to
8 tell me if you would have either seen or discussed
9 with Thomas Mahoney what the contents or substance
10 was of the handwritten statement of Maurice Wright
11 before the videotaped statement confession began
12 of Xavier Walker?
13      MS. REED: I'm going to object to -- go
14 ahead, John.
15      MR. COYNE: Objection, form.
16      Go ahead.
17      MS. REED: Join objection, as well as
18 speculation and lack of foundation.
19 BY THE WITNESS:
20    **A I just don't remember.**
21 **BY MS. ITCHHAPORIA:**
22    Q Did you talk to ASA Thomas Mahoney about
23 approving murder charges against Xavier Walker
24 when you were at the area on May 29, 2000?

315

1      MS. REED: Same objections.
2 BY THE WITNESS:
3    **A I don't remember if we talked about it**
4 **there or somewhere else or whether we talked about**
5 **it at all.**
6 **BY MS. ITCHHAPORIA:**
7    Q Do you know if ASA Thomas Mahoney was
8 still at the Area when you were done with the
9 videotaped statement of Xavier Walker?
10      MS. REED: Same objections, as well as
11 assumes facts not in evidence and mischaracterizes
12 prior testimony.
13 BY THE WITNESS:
14    **A I don't remember.**
15 **BY MS. ITCHHAPORIA:**
16    Q Other than talking to Xavier Walker about
17 how he had been treated by the police, based on
18 your testimony that we looked at earlier, do you
19 know what else you did from the time his interview
20 ended at around 10:45 p.m. and until his
21 videotaped statement began at 11:43 p.m.?
22      MS. REED: I'm going to object to lack of
23 foundation, calls for speculation, assumes facts
24 not in evidence, mischaracterize prior testimony,

316

1 and form.
2 BY THE WITNESS:
3    **A I do not remember.**
4 **BY MS. ITCHHAPORIA:**
5    Q During the --
6      MR. COYNE: Misha, let me ask you real
7 quick, we've been going over an hour and a half.
8 I need to take a five-minute break here to make
9 sure I'm not interrupted in this office. Whenever
10 that's good for you, we can do it now or within
11 the next five to six minutes should work.
12      MS. ITCHHAPORIA: Yeah, I think I'm
13 wrapping up in five to six minutes, John.
14      MR. COYNE: Okay. Go right ahead.
15      MS. ITCHHAPORIA: Okay.
16 BY MS. ITCHHAPORIA:
17    Q In that hour time frame we're talking
18 about, 10:43 to 11:43, did you remain at the Area?
19      MS. REED: Objection, asked and answered,
20 as well as lack of foundation, calls for
21 speculation.
22 BY THE WITNESS:
23    **A I don't remember. I mean, I can assume I**
24 **did, but I don't really remember if I stayed**

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

80 (317 to 320)

---

317

1  there, if I left and came back.  I don't remember.
2  BY MS. ITCHHAPORIA:
3      Q  When you were in Felony Review in May
4  of 2000, were you given a car from the CCSAO?  How
5  did that work?
6      MS. REED:  I'm going to object to
7  relevance.
8  BY THE WITNESS:
9      A  There were cars that we could use while we
10  were working.
11  BY MS. ITCHHAPORIA:
12      Q  Okay.  And so you would use those cars to
13  go, like, back and forth between the Area and the
14  office at 26th and Cal?
15      A  Most of the time, yes.
16      Q  Okay.  Is there anything that you recall
17  about your interactions with Xavier Walker that we
18  haven't discussed today?
19      MS. REED:  I'm going to object to lack of
20  foundation, calls for speculation, and hearsay.
21  BY THE WITNESS:
22      A  No.  Outside of what I've seen in the
23  transcripts and the video and everything else, I
24  don't -- I can't think of anything else.

---

318

1  BY MS. ITCHHAPORIA:
2      Q  And seeing all those exhibits today, has
3  any of that refreshed your recollection about any
4  interaction that you had with Xavier Walker?
5      A  No.
6      Q  Same question as to Mary Curry.
7      A  No.
8      Q  Same question as to Ashanti Wright.
9      A  No.
10      Q  Are there any other documents that you are
11  aware of that would have been generated or that
12  you just are aware of that would refresh your
13  recollection about your interactions with Xavier
14  Walker, Mary Curry, or Ashanti Wright that you --
15      MS. REED:  I'm going to --
16  BY MS. ITCHHAPORIA:
17      Q  -- today?
18      MS. REED:  I'm going to object to lack of
19  foundation, calls for speculation, and form.
20  BY THE WITNESS:
21      A  No, I can't think of any.
22  BY MS. ITCHHAPORIA:
23      Q  Okay.
24      MS. ITCHHAPORIA:  I have nothing further.

---

319

1      MR. COYNE:  Anyone else?
2      MS. REED:  I just have a few questions.
3      MR. COYNE:  Sierra, about how much do you
4  have?  Because I do need to take a five-minute
5  break, but if it's --
6      MS. REED:  About five questions but,
7  John, I am totally okay with you taking a break.
8      MR. COYNE:  Go ahead.  No one's
9  interrupted me yet.  We're good, Sierra.
10          EXAMINATION
11  BY MS. REED:
12      Q  Okay.  I want to reintroduce myself.  My
13  name is Sierra Reed.  I am appearing on behalf of
14  Attorney Jeanette Samuels, who is the attorney for
15  plaintiff in this case.  I just have about maybe
16  four or five questions to ask you.
17      I understand that your recollection of
18  this case is very scarce.  Do you recall going to
19  the house to do any interview -- witness
20  interviews in this case?
21      MS. ADEEYO:  Object to form.
22  BY THE WITNESS:
23      A  I don't recall going to the witness's
24  houses.  I don't -- I just don't remember it.

---

320

1  BY MS. REED:
2      Q  During your term or your time as a felony
3  review attorney or -- sorry, Felony Review ASA, do
4  you or did you happen to go to witness's houses to
5  take witness statements?
6      MS. ADEEYO:  Object to form.
7  BY THE WITNESS:
8      A  There were times when I did.  I will say
9  that.  I just don't have specific recollections of
10  who the witnesses were or which case they were
11  associated with.
12  BY MS. REED:
13      Q  Do you have any recollection of why you
14  would have to go to the house to take a witness
15  statement?
16      MS. ADEEYO:  Object to form, foundation.
17  BY THE WITNESS:
18      A  I don't know.  There could -- I could make
19  an assumption, but I don't really know
20  specifically what the reason would be.
21  BY MS. REED:
22      Q  Do you know what circumstances you would
23  have, what circumstances there would be to make
24  you go to a suspect's home for a statement?

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

81 (321 to 324)

321

1    MS. ADEEYO:  Same objection.
2  BY THE WITNESS:
3    A  No.
4  BY MS. REED:
5    Q  Can you recall any circumstances off the
6  top of your head that you could think of that
7  would require you to go to a witness's house for a
8  statement?
9    MS. ADEEYO:  Same objections.
10  BY THE WITNESS:
11    A  No, I don't know why -- I mean, there
12  could be a -- I would -- I don't know why without
13  assuming, so I don't know -- each case would have
14  a different purpose, so I don't know why.
15  BY MS. REED:
16    Q  Is that a normal practice to be able to go
17  to a witness or suspect's house to collect a
18  statement?
19    MS. ADEEYO:  Objection, form, foundation.
20  BY THE WITNESS:
21    A  At the time -- at that time, I wouldn't
22  call it a practice, but there were times where it
23  was warranted.
24

322

1  BY MS. REED:
2    Q  What times would that have been when it
3  was warranted?
4    A  I don't have a specific recollection as to
5  when -- as to exactly why it would be warranted,
6  but I know that it's not something that was done
7  all the time.
8    MS. ITCHHAPORIA:  I'll object to form on
9  that and incomplete hypothetical.
10  BY MS. REED:
11    Q  Do you know why it was warranted in this
12  case, to go to a witness's house to collect a
13  statement?
14    MS. ADEEYO:  Objection, form.
15    MS. ITCHHAPORIA:  Asked and answered,
16  lacks foundation, and form.
17    MS. ADEEYO:  Join.
18  BY THE WITNESS:
19    A  I do not.
20  BY MS. REED:
21    Q  Do you know if you would have had to
22  document that anywhere?
23    MS. ADEEYO:  Objection, form.
24

323

1  BY MS. REED:
2    Q  Scratch the question.
3    Do you know if you would have to get
4  approval to go to a witness or suspect's house to
5  collect a statement?
6    MS. ADEEYO:  Object to form, foundation.
7    MS. ITCHHAPORIA:  Join.
8  BY THE WITNESS:
9    A  I don't recall if I would have had to get
10  approval or not.
11  BY MS. REED:
12    Q  Do you have to document anywhere that you
13  requested or got approval to get -- sorry, to go
14  to a witness's house or suspect's house to get a
15  statement?
16    MS. ADEEYO:  Same objections.
17    MS. ITCHHAPORIA:  Join.  Assumes facts.
18  BY THE WITNESS:
19    A  I don't recall -- I don't recall that we
20  had to get permission, and I don't recall how we
21  would have asked to do it.  I just don't have any
22  recollection of that.
23  BY MS. REED:
24    Q  Sure.  Do you recall whether or not you

324

1  had to tell anyone you were actually going out to
2  a suspect's or a witness's house to collect a
3  statement?
4    MS. ADEEYO:  Object to form.
5  BY THE WITNESS:
6    A  Well, I will say that I wouldn't go by
7  myself, so it's likely that I would have gone in
8  the company of a detective.  And so I imagine that
9  I would have -- I don't know if I had a practice
10  specifically of who I would have told.
11    I think, just for myself, I would have
12  told people because I would have wanted people to
13  know where I was.  But in terms of a specific
14  practice, I don't have -- I don't recall if there
15  was one or what that was.
16  BY MS. REED:
17    Q  Okay.  Is it -- would it be normal for you
18  to go to a suspect's or a witness's house to
19  collect a statement during the evening to
20  nighttime?  And when I say evening to nighttime, I
21  mean 5:00 p.m. to 12:00 a.m.
22    Would that be something that is normal for
23  you to do during your time at the Felony Review
24  Unit?

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

---

325

1        MS. ADEEYO:  Object to form, foundation.
2  BY THE WITNESS:
3        **A  I'm not sure I understand the question.**
4  **Are you asking if the hours were -- like, are**
5  **there normal hours as opposed to different hours**
6  **of the day or night?**
7  **BY MS. REED:**
8     Q  So not normal hours.  What I'm asking you
9  is that any time after 5:00 p.m. to, let's just
10  say, something 1:00 or 2:00 in the morning, is it
11  normal for you to still be able to go to a suspect
12  or witness's house during those late hours to
13  collect a statement?
14        MS. ADEEYO:  Object to form, foundation,
15  incomplete hypothetical.
16  BY THE WITNESS:
17     **A  I can't speak to whether it's, like, a**
18  **common form or normal.  I think that if --**
19  **frankly, I'm assuming that it would be when we --**
20  **that we would have gone when the witness said they**
21  **were available.  So that's my -- that would -- I**
22  **don't recall any other reasons or practices in**
23  **terms of time.**
24

---

326

1  BY MS. REED:
2     Q  So do you only go to a house -- or a --
3  let me -- do you only go to a suspect or witness's
4  house to collect a statement when they tell you
5  they're available to take or give that statement?
6        MS. ADEEYO:  Object to form, misstates the
7  witness's prior testimony.
8  BY THE WITNESS:
9     **A  Again, I can't state specifically whether**
10  **there is a -- whether there was a common practice**
11  **at the time or what it was, but I say that -- I**
12  **say that only because we -- if we're going to go**
13  **to somebody's house, we'd want to be sure that**
14  **they were there.**
15        **So, to that end, it would require some**
16  **previous discussion with the witness, okay, but I**
17  **don't -- again, this is me -- this is -- I suppose**
18  **it's a common-sense application.  I don't have a**
19  **specific -- I don't have reference to a specific**
20  **application in the office, nor do I have any**
21  **memory of having any kind of specific practice in**
22  **terms of that.**
23  **BY MS. REED:**
24     Q  Do you recall whether or not you had a

---

327

1  conversation with Ashanti Wright about what time
2  was appropriate to go to her house to take a
3  statement?
4        MS. ADEEYO:  Object to form.
5  BY THE WITNESS:
6     **A  I do not recall.**
7  **BY MS. REED:**
8     Q  Do you recall her giving you permission to
9  come to her house to collect a statement?
10        MS. ADEEYO:  Object to form.
11  BY THE WITNESS:
12     **A  I do not recall.**
13  **BY MS. REED:**
14     Q  Do you recall having a conversation with
15  any of the witnesses in this case about
16  appropriate times they were available to come to
17  their house to collect a statement?
18        MS. ADEEYO:  Object to form, foundation.
19        MS. ITCHHAPORIA:  Join.
20  BY THE WITNESS:
21     **A  I do not recall.**
22  **BY MS. REED:**
23     Q  Okay.
24        MS. REED:  We can take a five-minute

---

328

1  break.  I think that's all I have, but I want to
2  make sure.
3        MS. ITCHHAPORIA:  And, John, just so you
4  know, I probably have two minutes' worth of
5  questioning once Ms. Reed's done.
6        MR. COYNE:  Okay.  That's fine.
7        (WHEREUPON, a recess was had.)
8  BY MS. REED:
9     Q  There wasn't a question pending before we
10  left, so I want to pick up where we left off.
11        Do you recall during the robbery and
12  shooting death of Mark Maddock [sic] during an
13  investigation, whether or not Ashanti Wright gave
14  you permission to come to her house at 6:10 in the
15  morning for a statement interview?
16        MS. ADEEYO:  Object to form and
17  foundation.
18        MR. COYNE:  Join.
19  BY THE WITNESS:
20     **A  Do I recall whether she gave me**
21  **permission?**
22  **BY MS. REED:**
23     Q  To come to her house at 6:10 in the
24  morning to collect a statement from her and

---

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

83 (329 to 332)

329

1  conduct an interview.
2      MS. ADEEYO:  Same objection.
3  BY THE WITNESS:
4      **A  I don't recall.  I'm not sure if I'm the**
5  **one who made the meeting appointment with her, but**
6  **I don't recall who did it if it wasn't me.**
7  **BY MS. REED:**
8      Q  Do you recall whether or not you received
9  permission from Maurice Wright to come to his home
10 at 10:30 at night to conduct an interview and get
11 a statement from him?
12     MS. ADEEYO:  Object to the form and
13 foundation.
14     MR. COYNE:  Join.
15 BY THE WITNESS:
16     **A  I don't remember doing Maurice Wright's**
17 **statement, so I'm -- I don't remember getting**
18 **permission -- I don't remember if I'm even the one**
19 **who made the appointment.**
20 **BY MS. REED:**
21     Q  During your time as an ASA, which I
22 believe you stated was March of 1996 until April
23 of 2003 and then from September of 2021 to
24 present, during that time period as ASA, have you

330

1  ever questioned or taken a statement and
2  confession from someone who was later exonerated?
3      MS. ADEEYO:  Object to foundation.
4  BY THE WITNESS:
5      **A  I'm not sure of that answer because I**
6  **have -- well, this is the only case I've ever been**
7  **called as a witness in this manner, so I'm not**
8  **sure if somebody else was later exonerated.**
9  **BY MS. REED:**
10     Q  Is that something you should know, if
11 someone you've taken a statement confession from
12 was later exonerated?
13     MR. COYNE:  Objection, form.
14     MS. ADEEYO:  Objection, form,
15 argumentative.
16 BY THE WITNESS:
17     **A  Is that something I should know?**
18 **BY MS. REED:**
19     Q  Yes.
20     **A  Like, are you asking if I should continue**
21 **following the cases of these individuals to see**
22 **what happens?**
23     Q  No, I'm asking if you should know whether
24 or not someone you gave -- took a statement for

331

1  confession was later exonerated.  Is that
2  something you should know?
3      MS. ADEEYO:  Same objections.
4      MR. COYNE:  Join.
5  BY THE WITNESS:
6      **A  I don't know how I would know without**
7  **following their cases, and so I don't follow**
8  **everybody's cases.**
9  **BY MS. REED:**
10     Q  If there was someone you took a statement
11 or confession from that was later exonerated,
12 would you care that they were exonerated or that
13 they were falsely convicted?
14     MS. ADEEYO:  Object to form.
15     MR. COYNE:  Join.
16     MS. ITCHHAPORIA:  Join.
17 BY THE WITNESS:
18     **A  Would I care?**
19 **BY MS. REED:**
20     Q  Do you care?
21     MS. ADEEYO:  Same objection.
22     MR. COYNE:  Join.
23 BY THE WITNESS:
24     **A  Yeah, of course I care.  I mean, I'm not**

332

1  **sure how that is material to this particular case,**
2  **but, in general, yes, of course I would care.**
3      MS. REED:  That's all the questions I
4  have.
5      MS. ADEEYO:  I have nothing based on that.
6      Misha?
7      MS. ITCHHAPORIA:  Yeah, a few follow-up
8  questions.
9          FURTHER EXAMINATION
10 BY MS. ITCHHAPORIA:
11     Q  Ms. Leafblad, did you become aware at any
12 point in time that Xavier Walker's conviction had
13 been vacated?
14     **A  Well --**
15     MS. REED:  I'm just going to object to
16 lack of foundation.
17 BY THE WITNESS:
18     **A  Well, I kind of assumed it because of this**
19 **proceeding.**
20 **BY MS. ITCHHAPORIA:**
21     Q  Prior to receiving a subpoena to testify
22 at your deposition today, did you become aware
23 that his conviction had been vacated, Xavier
24 Walker's conviction?

Transcript of Joanna Liotine-Leafblad
Conducted on July 7, 2022

84 (333 to 336)

333

1    A  Not that I can recall, no.
2    Q  Did anybody from the Cook County State's
3  Attorney's Office consult with you prior to
4  agreeing to vacate his conviction?
5    A  Not that I recall, no.
6    Q  Were you ever interviewed or did you ever
7  interact or communicate with CIU ASA Mark
8  Rotert -- that's R-o-t-e-r-t -- about Xavier
9  Walker's case?
10    A  No, I don't think so.
11    Q  As you sit here today, are you aware that
12  Xavier Walker received a certificate of innocence?
13    A  Am I aware of it?  Again, I think I
14  assumed it because of this case.
15    Q  Were you given any sort of notice by the
16  Cook County State's Attorney's Office that Xavier
17  Walker had filed a petition for a certificate of
18  innocence?
19    A  I don't even know when he filed it, so I
20  don't think so.
21    Q  Did you testify in any post-conviction
22  proceeding involving Xavier Walker?
23    A  I don't think I did, no.  There would be a
24  transcript of that.  I don't think I did.

334

1    Q  Did you testify at any proceeding
2  involving a certificate or petition for a
3  certificate of innocence with Xavier Walker?
4    A  No.
5    Q  Did anyone from the Cook County State's
6  Attorney's Office consult with you before the
7  State's Attorney's Office decided to take no
8  position on Xavier Walker's petition for a
9  certificate of innocence?
10    A  No, I don't think so.  I don't even know
11  when that occurred.
12    MS. ITCHHAPORIA:  No questions -- no
13  further questions.  Thank you.
14    MR. COYNE:  Anyone else?
15    MS. REED:  Based on that, just one
16  question.
17        FURTHER EXAMINATION
18  BY MS. REED:
19    Q  Now that you are aware that Xavier
20  Walker's conviction was vacated and he received a
21  certificate of innocence, my question -- my
22  previous question to you stands:  Do you care that
23  he was convicted and then exonerated -- wrongfully
24  convicted and then exonerated?

335

1    MR. COYNE:  Objection, form, foundation.
2    MS. ADEEYO:  Join.
3    MS. ITCHHAPORIA:  Join.
4  BY THE WITNESS:
5    A  Do I care that he was wrongfully convicted
6  and exonerated?  Like, it's -- I mean, do I care
7  that he was wrongfully convicted?  Of course I do.
8  Do I care that he was exonerated, if it has been
9  established that he was -- that something was --
10  that he should not have been found guilty, then I
11  guess him being exonerated is the right thing.
12    I don't -- that's kind of personal, so as
13  a human being, nobody likes to see people falsely
14  accused.
15    MS. REED:  I don't have any other
16  questions.
17    MS. ITCHHAPORIA:  I have a follow-up based
18  on that.  Sorry.  A couple questions,
19  Ms. Leafblad.
20        FURTHER EXAMINATION
21  BY MS. ITCHHAPORIA:
22    Q  Do you know if the -- do you know why the
23  State's Attorney's Office decided to vacate Xavier
24  Walker's conviction?

336

1    A  No.
2    Q  Do you know if the State's Attorney's
3  Office made any determination as to Xavier
4  Walker's innocence or guilt before they decided to
5  over -- agreed to vacate his conviction?
6    A  No.  I was not a party to any of that, so
7  I have no idea.
8    MS. ITCHHAPORIA:  Okay.  No questions
9  further.
10    MR. COYNE:  Okay.  Anyone else?
11    MS. REED:  No.
12    MR. COYNE:  All right.  Joanna, you have
13  the right to review your transcript.  You can't
14  make any substantive changes to your testimony,
15  but you have the right to review the transcript
16  before it's finalized.
17    You can reserve that right and provide
18  signature or you can waive signature.  Which do
19  you so choose?
20    THE WITNESS:  I would like to review it.
21    MR. COYNE:  Signature reserved.  Thank
22  you, everyone.
23    (WHEREUPON, the deposition was concluded
24  at 3:52 p.m.)

337

ACKNOWLEDGMENT OF DEPONENT

1    I, JOANNA LIOTINE-LEAFBLAD, do hereby
2 acknowledge that I have read and examined the
3 foregoing testimony and the same is a true,
4 correct, and complete transcription of the
5 testimony given by me and any corrections appear
6 on the attached errata sheet signed by me.
7
8 _____
9    (SIGNATURE)              (DATE)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

338

1    C E R T I F I C A T E   O F   R E P O R T E R
2
3    I, MICHELLE M. YOHLER, a Certified
4 Shorthand Reporter within and for the County of
5 Will, State of Illinois, do hereby certify:
6    That previous to the commencement of the
7 examination of the witness, the witness was duly
8 sworn to testify the whole truth concerning the
9 matters herein;
10    That the foregoing deposition transcript
11 was reported stenographically by me, was
12 thereafter reduced to typewriting under my
13 personal direction and constitutes a true record
14 of the testimony given and the proceedings had;
15    That the said deposition was taken
16 remotely before me at the time and place
17 specified;
18    That I am not a relative or employee or
19 attorney or counsel, nor a relative or employee of
20 such attorney or counsel for any of the parties
21 hereto, nor interested directly or indirectly in
22 the outcome of this action.
23
24

339

1    IN WITNESS WHEREOF, I do hereunto set my
2 hand and affix my seal of office at Chicago,
3 Illinois, this 18th day of July, 2022.
4
5
6
7
8 _____
9    Michelle M. Yohler, CSR, RMR, CRR
10    Certified Shorthand Reporter
11    CSR No.: 84-4531
12
13
14
15
16
17
18
19
20
21
22
23
24