# EXHIBIT 35

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3  XAVIER WALKER,                    )
                                      )
 4          Plaintiff,               )
                                      )
 5      vs.                          )No. 20 Cv 7209
                                      )Judge guzman
 6  CITY OF CHICAGO, STANLEY SANDERS, )
    MICHAEL PIETRYLA, DAVID WRIGHT,   )Magistrate
 7  BRIAN HOLY, JOHN CRUZ, DONALD     )Judge Fuentes
    WOLVERTON, JOHN RIORDAN, ROBERT   )
 8  BARTIK, ANTHONY BRZENIAK, THOMAS  )
    MAHONEY, and COOK COUNTY,         )
 9                                    )
            Defendant.                )
10

11

12         The Discovery Deposition via Zoom

13  Electronic Telephone/Video Conferencing of

14                 THOMAS MAHONEY,

15  taken before ADRIENNE M. LIGHTFOOT, Certified Shorthand

16  Reporter and Notary Public, taken pursuant to the

17  provisions of the Federal Rules of Civil Procedure and

18  the Rules of the Supreme Court thereof, pertaining to

19  the taking of depositions for the purpose of discovery

20  held on the 16th day of December 2021, at the hour of

21  10:00 a.m. pursuant to notice.

22

23  Adrienne M. Lightfoot, CSR

24  Illinois License # 084-004276
```

**Page 2**

```
 1              A P P E A R A N C E S

 2  REPRESENTING THE PLAINTIFF,
 3  XAVIER WALKER:

 4
               SAMUELS & ASSOCIATES
 5             Attorneys At Law
               53 West Jackson Boulevard.
 6             Suite 831
               Chicago, Illinois 60604
 7             (872)588-8726

 8             By:  Jeanette S. Samuels, Esq.

 9

10  REPRESENTING THE DEFENDANT,
    CITY OF CHICAGO:
11
               NATHAN & KAMIONSKI
12             Special Assistant Corporation Counsel
               33 West Monroe Street
13             Suite 1830
               Chicago, Illinois 60603
14             (312)612-1079

15             By:  Breana Brill, Esq.

16

17  REPRESENTING THE DEFENDANTS,
    INDIVIDUAL POLICE OFFICERS:
18
               BORKAN & SCAHILL, LTD.
19             Attorneys At Law
               20 South Clark Street
20             Suite 1700
               Chicago, Illinois 60603
21             (312)580-1030

22             By:  Misha Itchhaporia, Esq.

23

24
```

**Page 3**

```
 1           A P P E A R A N C E S (CONT'D.)

 2  REPRESENTING THE DEFENDANTS,
 3  BRZENIAK and MAHONEY:

 4             TRIBLER ORPETT & MEYER, P.C.
               Attorneys At Law
 5             225 West Washington Street
               Suite 2550
 6             Chicago, Illinois 60606
               wboberts@tribler.com
 7
               By:  Bob Oberts, Esq.
 8
```

**Page 4**

```
 1                   I N D E X

 2  THOMAS MAHONEY                      PAGE

 3      Examination by
        Ms. Samuels                      5
 4
        Examination by
 5      Ms. Itchhaporia                 53

 6

 7

 8              E X H I B I T S

 9  MAHONEY                       MARKED FOR ID

10  No. 1                             35

11  No. 2                             81

12  No. 3                             84

13

14

15

16

17

18

19  (Said exhibits were retained by Counsel.)

20

21

22

23

24
```

WALKER vs. CITY OF CHICAGO, ET AL.                    THOMAS MAHONEY          May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 3 of 24 PageID #:2982

5

```
 1              (Witness Sworn)
 2              THOMAS MAHONEY,
 3   called as a witness herein, after having been first
 4   duly sworn, was examined and testified as follows:
 5                    EXAMINATION
 6   BY MS. SAMELS:
 7       Q   Can you spell your name for the record, sir?
 8       A   My name is Thomas Mahoney, T-h-o-m-a-s.  Last
 9   name is M-a-h-o-n-e-y.
10              MS. SAMELS:  All right.  This is the
11   deposition of Thomas Mahoney taken in the case of
12   Xavier Walker versus City of Chicago, et al.  Case
13   No. 20 CV 7209.
14              This deposition is taken pursuant to
15   Subpoena and agreement of the parties and all
16   applicable rules.
17   BY MS. SAMELS:
18       Q   Have you ever given a deposition before, sir?
19       A   Yes.
20       Q   About how many times?
21       A   Once.
22       Q   All right.  When was that?
23       A   Seven or eight years ago; maybe longer.
24       Q   Since it's been a while, I'll go over the
```

6

```
 1   rules briefly.  All your answers have to be verbal.
 2   You may anticipate where I'm going with the question
 3   and want to provide your answer.
 4              But just so that the record is this
 5   clear, I would ask that you wait until I am fully done
 6   asking a question prior to providing your answer.  And
 7   I'll try to provide you with that same courtesy, okay?
 8       A   Yes.
 9       Q   If any of my questions are unclear, please,
10   by all means, ask me to rephrase it.  I won't take it
11   personally.  We just want to make sure that the answers
12   you're providing are responsive to the questions being
13   asked, okay?
14       A   Yes.
15       Q   And then, of course, if at any time you want
16   to take a break, just let me know, and we can go off
17   the record for you, all right?
18       A   Thank you.  Yes.
19       Q   What year did you graduate law school?
20       A   1992.
21       Q   Okay.  And did you go straight from undergrad
22   to law school?
23       A   No.
24       Q   All right.  How much time did you take in
```

7

```
 1   between?
 2       A   Probably about nine or ten years.
 3       Q   Okay.  And during those nine or ten years,
 4   did you have a profession?
 5       A   I did.
 6       Q   What was that?
 7       A   I worked for Waist Management Services out of
 8   college.  I worked there until about 1985.  From 1985
 9   'til around 1989, I worked in a — for a business forms
10   company, and then I went to law school.
11       Q   Okay.  And what did you do for Waist
12   Management?
13       A   Well, when I was younger through the end of
14   high school and college, I was a garbage truck driver.
15   And I worked my way through college doing that.  I
16   worked summer.  I worked winter breaks, when I was
17   home.
18              And then from there, once I graduated
19   college, I went to work in — as a dispatcher.  I was a
20   route supervisor.  I was in sales.  When I left, I was
21   in sales.
22       Q   Okay.  And what did you do for the business
23   forms company?
24       A   I was in sales.
```

8

```
 1       Q   Oh.
 2       A   Customer Service first, then sales.
 3       Q   What law school did you go to?
 4       A   John Marshall.
 5       Q   What made you decide to go to the law school?
 6       A   I wasn't happy with my career path.
 7       Q   While you are at John Marshall, did you have
 8   any internship or clerkships in a law enforcement
 9   agency?
10       A   Well, I worked at the — I worked a couple
11   days a week at the Cook County State's Attorney's
12   office.
13       Q   After you graduated from law school, what was
14   your first place of employment?
15       A   First place of employment was a law firm out
16   in DuPage County.  It was named O'Reilly, Cunningham,
17   Norton and Mancini.  They were located in Wheaton,
18   Illinois.
19       Q   What type of law did they practice?
20       A   Mostly insurance defense.
21       Q   How long were you with them?
22       A   About six months.
23       Q   And after leaving O'Reilly Cunningham, where
24   did you go?
```

9

1    A    I went to the Cook County States Attorney's
2  office.
3    Q    Were you ever subject to any discipline or
4  censure while you were with O'Reilly Cunningham?
5    A    No.
6    Q    What was your — so that would have been,
7  roughly 1993, when you started at the State's
8  Attorney's office?
9    A    Yeah, about November of 1993, yes.
10    Q    What was your first job title?
11    A    Assistant State's Attorney.
12    Q    And where were you assigned?
13    A    First assignment was the Criminal Appeals
14  Division.
15    Q    How long were you with Criminal Appeals?
16    A    Approximately one month.
17    Q    Then where did you go?
18    A    I went to the Traffic Division.
19    Q    How long were you at the Traffic Division?
20    A    Approximately six months.
21    Q    Where did you go after traffic?
22    A    After Traffic, I went to the Narcotics
23  Prosecutions Bureau.
24    Q    How long were you with the Narcotics

10

1  Prosecutions?
2    A    Well, altogether, I was about there three
3  years.  I was in the Preliminary Hearing Unit.  I was
4  in the Grand Jury Unit.  I was in the night Narcotics
5  Unit.  I came back to the Daytime Felony Trial
6  Narcotics Unit.  So altogether, about three years.
7    Q    Was that out of a specific courthouse?
8    A    Yeah, 26th and California.
9    Q    All different judges, or did you have a
10  particular judge?
11    A    All different judges.
12    Q    After Narcotics Prosecutions, then where were
13  you?
14    A    Then I went to the Felony Review Unit.
15    Q    How long were you with the Felony Review?
16    A    Fourteen to 16 months.
17    Q    And so if I'm doing the math correctly, that
18  would have been — I'm sorry.  What years were those;
19  do you know?
20    A    I think I want to the felony Review Unit in
21  1997, as I recall.  And then from there, I went to the
22  Felony preliminary hearing unit.  I think it was about
23  12 — 12 to 14 months on Felony Review the best I can
24  recall it.

11

1    Q    And when you went to Felony prelims, was that
2  at a specific courthouse or for a specific judge?
3    A    It was at all different courthouses.  It was
4  at Belmont and Western.  It was at Harrison and Kedzie.
5  It was at 111th and — I think it's around Cottage
6  Grove, and 51st and Wentworth.
7         And then back to 26th and California in
8  the Grand Jury Unit.  And it was all different judges.
9    Q    And how long did you do felony prelims?
10    A    I think — I'm not quite sure, but I think it
11  was around a year as well, maybe a little bit longer.
12    Q    After felony prelims, where were you
13  assigned?
14    A    I was assigned tot he Felony Trial Division.
15    Q    And this would have been around '99?
16    A    Right around '99, yeah.
17    Q    How long were you with the Felony Trials
18  Division?
19    A    How long?
20    Q    Yes, sir.
21    A    Around two years, I think.  Maybe not quite
22  that long.  Maybe — I may be a year ahead here, but I
23  had three different assignments in the Felony Trial
24  Division.

12

1         I was the 3rd Chair.  And I was assigned
2  to Judge Turen's (Phonetic) courtroom.  Then I became a
3  2nd Chair.  That was up for about four — four months.
4         And I was assigned to Judge James Egan's
5  courtroom as a 2nd Chair.  And then I went as a 2nd
6  Chair as well to Judge Edward Fialace's (Phonetic)
7  courtroom at — all at 26th and California.
8    Q    Okay.  And so after the Felony Trial
9  Division, where was your next assignment?
10    A    I went to the Gang Crimes Unit.
11    Q    How long were you with Gang Crimes?
12    A    I was with Gang Crimes from 2000.  I did a
13  stint on Felony Review as a Trial Supervisor.  Then I
14  went — I stayed in the Gang Crimes Unit 'til around —
15  I'm going say 2014, 2015 — so 14, 15 years.
16    Q    And so am I to understand, during that
17  timeframe, you were briefly left to do — to be a Trial
18  Supervisor?
19    A    Yes, that's correct.
20    Q    Do you remember when that would have been?
21    A    I think May, '99 — May 2000, something like
22  that.
23    Q    When you were with the Gang Crimes Unit, were
24  you assigned to a particular courthouse or judge?

WALKER vs. CITY OF CHICAGO, ET AL.                                    THOMAS MAHONEY

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 5 of 24 PageID #:2984          May 12, 2022

13

1       A    No.  Well, I was assigned to 26th and
2  California, but no.  The cases were all over the
3  courthouse at 26th and California, and some were out in
4  Markham, some in Bridgeview.
5            I never went to Maywood or Skokie on a
6  case, but the case -- you followed the case wherever it
7  went, whatever judge got assigned to it, that's where I
8  went.
9       Q    All right.  After that Gang Crimes Unit, what
10  was your next area assignment?
11      A    Well, when I was in the Gang Crimes Unit, I
12  became a Deputy Supervisor in about 2005.  And in 2008
13  became the Supervisor of the Gang Crimes Unit.
14           I was then promoted from Supervisor of
15  the Gang Crimes Unit in about 2014, 2015 to Deputy
16  Bureau Chief to the Narcotics Bureau.
17           And then I left the office in August of
18  2016 as Deputy Bureau Chief of Narcotics.
19      Q    And when you left office, where did you go?
20      A    I went to the United States Attorney's Office
21  for the Northern District of Indiana.
22      Q    What was your first area of assignment for
23  the US Attorney's office?
24      A    My first area of assignment was the Narcotics

14

1  and Firearms Unit in the Criminal Division.
2       Q    And what was your job title?
3       A    Assistant United States Attorney.
4       Q    And how long were you with that position?
5       A    Until January of '20 -- I retired at the end
6  of 2021, so December 31, 2021.
7       Q    Okay.  Since retiring from the US Attorney's
8  Office, had you had any other positions?
9       A    I'm in private practice.
10      Q    Do you work for a firm?
11      A    No.  I work for myself.
12      Q    All right.  What area of law do you practice?
13      A    Criminal defense, Federal and State:  And I
14  also do some work for the Fraternal Order of Police.
15      Q    What type of work do you do with Fraternal
16  Order of Police?
17      A    If a Police Officer is called to give a
18  statement before the Bureau of Internal Affairs, before
19  the Citizens Office of Police Accountability, or the --
20  a proceeding before the Police Board, I would be --
21  well, I would represent the Police Officer at that
22  time.
23      Q    And what lodges do you work with?
24      A    Lodge 7.

15

1       Q    Do you work with any other ones?
2       A    No.
3       Q    And my understanding is Lodge 7 is specific
4  to Chicago Police Department; is that correct?
5       A    That's my understanding as well, Counsel;
6  yes.
7       Q    During your time with the Cook County State's
8  Attorney's office, were you ever subject to any
9  discipline or anything like?
10      A    No, I was not.  I was never -- I've never
11  been sanctioned or disciplined by any court.  I did
12  have one investigation with the ARDC, which was closed.
13      Q    What was that about?
14      A    It was about a Batton violation that --
15           MR. OBERTS:  ...
16           THE WITNESS:  Oh, no.  Go ahead.  No.  I'm
17  sorry.
18           MR. OBERTS:  I'm going to object to the issue
19  with regards to the ARDC, as it was a 14-day letter,
20  and no complaint was voted and/or issued.  So,
21  therefore, it would be confidential under ARDC rules.
22           I'm going to object based on that, and
23  ask him not to answer based on that.
24

16

1  BY MS. SAMUELS:
2       Q    Okay.  Have you ever had anybody complain
3  about you violating Batton?
4       A    Once.
5       Q    Do you remember the case that it was in?
6       A    Yes.  It was the People of the State of
7  Illinois versus Jackie Davis.
8       Q    Do you remember, roughly, when that was?
9       A    No.  I think some time in the early 2000s.
10      Q    And that would have been when you were with
11  Gang Crimes?
12      A    That's correct.
13      Q    Okay.  What did you do to prepare for your
14  deposition?
15      A    Pardon me?
16      Q    What did you do to prepare for your
17  deposition?
18      A    I read the statement that I took from Maurice
19  Wright.  I read Maurice Wright's testimony at the
20  trial.  And I read the stipulation that was entered
21  into about me.
22      Q    All right.  Do you have an independent
23  recollection of your interactions with Maurice Wright?
24      A    Not really, no.

**17**

1    Q   Do you recall any actions you took relative
2  to the investigation into the murder of Merak Majdak?
3    A   I was not involved in the investigation. I
4  was merely — I was an Assistant State's Attorney at
5  the time. I was not conducting any investigation.
6          I was reviewing — responding to the
7  police station, reviewing the police investigation, and
8  taking a statement from a witness who had information
9  on a murder.
10    Q   Do you recall the first time you were asked
11  to respond to the police station about this case?
12    A   No.
13    Q   All right. What do you remember about
14  Maurice Wright?
15    A   Hardly any — nothing, really. I don't have
16  any real independent recollection of Mr. Wright. I
17  know that I was there because of the statement that I
18  took. But beyond that, I don't have any specific
19  recollection of him.
20    Q   Do you recall where you were when you took
21  the statement?
22    A   In Area 4 — Area 4, Detective Division.
23    Q   Do you ever recall going to a suspect's or a
24  subject's house to take a handwritten statement?

**18**

1    A   In this case?
2    Q   Ever.
3    A   Going to a suspect's house to take a
4  handwritten statement? No, I don't. And I don't
5  recall ever doing that. I don't think I ever did.
6    Q   What about a witness, going to a witness'
7  house to take their handwritten statement?
8        MR. OBERTS: Objection. Vague. Is that in
9  general, or for this murder investigation?
10        MS. SAMUELS: In general.
11        THE WITNESS: Not that I can recall.
12  BY MS. SAMUELS:
13    Q   How often — or just to rephrase: So you
14  understand you are here because you are the ASA who
15  took Maurice Wright's handwritten statement?
16    A   Yeah, pursuant to a subpoena issued to give a
17  deposition. And the subject of that deposition is
18  Maurice Wright's statement.
19    Q   And so during your time at the Cook County
20  State's Attorney's office, was that — were taking
21  handwritten statements, like the one that was taken of
22  Maurice Wright, was that something that was generally a
23  part of your job duties?
24    A   It would have been part of my job duty during

**19**

1  the time I was assigned to the Felony Review Unit.
2    Q   Okay. Do you recall if you received any
3  training on how to take handwritten statements?
4    A   I recall training when I first — when I was
5  first assigned to the Felony Review Unit, there was a
6  training period. And I believe part of that training
7  was around taking statements, yes. So I do.
8    Q   Right. Do you recall, with specificity,
9  anything you learned in that training regarding how to
10  take handwritten statements?
11    A   Well, I learned that there were certain
12  things that you would ask people about before taking a
13  handwritten statement.
14        You would ensure that the person was
15  there, was not being coerced in any way, was not being
16  threatened in any way, to ensure that any statement
17  that he took was voluntary.
18        So that was one thing that was — I
19  remember was part of the training. The other thing
20  that I can recall was you would — and I pretty much
21  developed this on my own, I would have a conversation
22  with somebody, and it's — we had the conversation.
23        I would wright down what they told me.
24  And after writing down what they told me, we would go

**20**

1  over and review the statement to determine if it's
2  accurate, correct.
3        The person who gave the statement would
4  be able to review it — both would review it, and that
5  would — any changes, nay corrections, anything like
6  that that they wanted to make, they could make at that
7  time, and I would make those changes.
8    Q   Were you ever trained to, like, purposely
9  have an inaccuracy in the statement so that when the
10  witness is reviewing it, you know that they are, like,
11  actually reviewing it and make a correction?
12    A   No. I was never trained to, like
13  deliberately put something in a statement that was
14  inaccurate, no. I record what — I put down what the
15  person told me.
16    Q   Was there any preference when taking a
17  handwritten statement between having an attorney write
18  it and having the witness write it?
19    A   There was — I never had the witness write
20  the statement out. I always wrote it out myself.
21    Q   Why was that?
22    A   That was the policy and procedure at the time
23  at the State's Attorney's office.
24    Q   So how did — was there a policy or procedure

WALKER vs. CITY OF CHICAGO, ET AL.                                    THOMAS MAHONEY                    May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 7 of 24 PageID #:2986

**21**

1 to check for the competency of the individual who you
2 are taking the statement from?
3     A     Will you repeat that?
4     Q     Was there a policy or a procedure that you
5 had to check for the competency of a person you had
6 taken a statement from?
7     A     I don't understand the question when you say
8 competency.  Competency in what way?
9     Q     Right.  They are learning, your educational
10 level, to make sure that they understand what's going
11 on.
12    A     Well, yeah.  And during the review of the
13 statement, I would always ensure — I would ask
14 somebody.  And I would always ensure that they can read
15 and write English, first of all.
16           I would ask for their educational
17 background, if they had — you know, how far they went
18 in school, those sorts of things.  So I would determine
19 that to determine that they understood what was going
20 on.
21    Q     Okay.  And then you also said earlier that
22 there were questions you would ask to make sure that a
23 statement was being given voluntarily, correct?
24    A     Correct.

**22**

1     Q     And what was that?
2     A     I would speak to the witness or the subject
3 alone and ask them, first of all, how they had been
4 treated since they were in the police station.  I would
5 ask them if they were threatened or abused in any way.
6           I would ask them if they had been —
7 while they had been at the police station were they
8 given food to eat, water, pop, coffee, anything to
9 drink, were they allowed to smoke cigarettes, that sort
10 of thing.
11           Just generally, how were they treated
12 while they were at the police station.
13    Q     All right.  In your experience as an
14 Assistant State's Attorney, had you ever had a witness
15 who said, yes, they had been mistreated by the police?
16    A     Once.
17    Q     Okay.  When was that?
18    A     When I was on Felony Review for the first
19 time.
20    Q     All right.  And can you describe what
21 happened there?
22    A     Yes.  The offender was at a district police
23 station, told me that he was punched and kicked by
24 police officers.  So when I determined that to be true,

**23**

1 I refused to take the statement.  I reported it to the
2 Watch Commander, and I advised that the man be taken to
3 the hospital.
4     Q     All right.  And what area was this in?
5     A     It was — I believe it was in the 3rd
6 District.
7     Q     And do you know what happened with those
8 officers?
9     A     I do not.
10    Q     Do you know what happened with that
11 individual?
12    A     I do not.
13    Q     Do you remember his name?
14    A     I don't.
15    Q     Did you ever take any statements from those
16 officers in other cases?
17    A     No.
18    Q     No, you weren't called for that; or no,
19 like —
20    A     No, I never did.  As I recall, I never had
21 any other interaction with either of those police
22 officers.
23    Q     All right.  And who were the officers?
24    A     I don't recall their names.

**24**

1     Q     Did you report the officers' actions to your
2 supervisors?
3     A     Yes.
4     Q     And who was your supervisor at the time?
5     A     I don't recall.
6     Q     I'm sorry.  My screen just went blank.  And I
7 have no idea why.
8     A     Oh, that's okay.
9     Q     Okay.  And that's the only time, in your
10 experience, that that's ever occurred; is that fair to
11 say?
12    A     Yes.
13    Q     Besides when you were on Felony Review, did
14 you ever receive any other training on how to check or
15 to make sure that a statement is being given
16 voluntarily?
17    A     No.
18         MR. OBERTS:  Did you get that, Ms. Court
19 Reporter?
20         MS. SAMUELS:  Did he answer?
21         THE WITNESS:  "No."
22         MR. OBERTS:  I could barely hear it.  I
23 didn't know if you heard it.
24         MS. SAMUELS:  Oh, I definitely didn't hear

WALKER vs. CITY OF CHICAGO, ET AL.          THOMAS MAHONEY          May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 8 of 24 PageID #:2987

25

1    it.  I'm sorry.

2    BY MS. SAMUELS:

3        Q    What was the answer?

4        A    The answer was no.

5        Q    So in or around 2000 — I'm sorry.  What

6    would have been your job title?  Was this when you were

7    with Felony Review or with Gang Crimes?

8        A    What are we talking about, this particular

9    statement I took?

10       Q    Yes.  In May of 2000.

11       A    May of 2000, I was working on Felony Review

12   as a trial supervisor of a team.  So I was assigned to

13   Felony Review Unit at that time.

14       Q    Okay.  So you were a Felony Review Trial

15   Supervisor, correct?

16       A    Correct.

17       Q    Okay.  And who else was on your team?

18       A    I know I'm going to miss somebody, because

19   people would come on or off the team.  But I had JoAnna

20   Leafblad, L-e-a-f-b-l-a-d.  And then Katherine Downey,

21   D-o-w-n-e-y.  I believe Stephanie Kallis, Scott

22   Herbert, H-e-r-b-e-r-t:

23            And I'm trying to think who else was on

24   the team at that time.  I — I just don't remember.

26

1        Q    Do you know a James Nevarri (Phonetic)?

2        A    Oh, yeah.  Yes, I do.

3        Q    Was he on the team?

4        A    No.

5        Q    And when you say "a team," like, how did you

6    guys function as a team?  Can you explain that to me?

7        A    Well, at the time the way the Felony Review

8    Unit was structured, the unit was worked 365 days a

9    year, seven days a week, 24 hours a day.

10            There were four different teams, A, B, C

11   and D.  And there was always one team on duty.  And you

12   typically worked a 12-hour shift.  So either from 6:00

13   a.m. to 6:00 p.m., or 6:00 p.m. to 6:00 a.m.

14            And one of the four teams would work

15   three days on.  And then you would get three days off,

16   then go back and resume — you know, go back to work

17   now.

18       Q    Okay.  And so when you list those

19   individuals, those would have been the members of your

20   team who would have been one of the four teams; is that

21   fair?

22       A    I would have — yeah, they would have been

23   one of the four teams.

24       Q    Okay.

27

1        A    Or on one of the four teams, yes.

2        Q    And as Supervisor, how was your role

3    different than just being a member of the team?

4        A    Well, you would get cases like any other

5    member of the team, but you would be there for advice,

6    because of your level of experience would be higher

7    than the newer members of the team who may have been

8    coming on Felony Review for the first time as part of

9    the rotations.

10            So you would be there just to provide

11   them with advice on how to proceed during cases, advice

12   to, you know, what they should do and what they

13   shouldn't do.

14       Q    Okay.  And so I understand that there's a

15   range of felonies from, like, drugs and guns, to I

16   guess, what I would consider more serious, like a

17   murder or something like that?

18       A    Of course.

19       Q    Would there be a different procedure for how

20   you would handle, I guess, less serious felonies as

21   opposed to, like, a murder or something like that?

22       A    Yes.  First of all, in low-level narcotic

23   cases, there wouldn't even be any Felony Review.

24   Police would just file their complaints and send the

28

1    case into court.  And, typically, the Felony Review

2    Unit wouldn't have anything to do with that.

3            Then there were other cases where the

4    police or the detectives could phone the case in to

5    somebody who was working phones.  And that's somebody

6    would be assigned to the phone room.

7            And they would — so like possession,

8    stolen motor vehicles.  I'm just trying to think of

9    what else, lower-level felonies.  I can't think of —

10            And then certain cases were — would

11   require the State's Attorney — the Assistant State's

12   Attorney to respond, in person, to the police station

13   or the Detective Division where the beat officers were.

14       Q    And did you have to approve any of the work

15   that were done by any of the members of your team or

16   keep track of, I guess, like, statements that were

17   taken or where they were going or anything like that?

18       A    No.  Other than the fact to make sure that

19   the work was getting done.  I would always try to make

20   sure I knew where people were.

21            For instance, if somebody was sent out

22   to an area, and they had two or three cases waiting for

23   them, I might reassign things so people could — you

24   know, so things would get covered in a timely manner.

WALKER vs. CITY OF CHICAGO, ET AL.    THOMAS MAHONEY    May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/15/23 Page 9 of 24 PageID #:2988

**29**

1  But, typically, the Assistant State's
2  Attorneys would do their work.  And they would make the
3  decision whether to take statement, not take a
4  statement, to approve, not approve charges, that sort
5  of thing.
6      Q   Okay.  And then it's my understanding in this
7  case, that both, you and JoAnna Leafblad took
8  statements from witnesses relative to this murder.
9          And so beginning with -- so in the -- in
10  a circumstance like that, right, where you may have
11  multiple handwritten statements that need to be taken,
12  would it be -- was it common to have members of the
13  same team to work on a given case?
14      A   Yes, it would happen sometimes, sure.
15      Q   Okay.
16      A   I don't know about it being common, but it
17  would happen.  It would happen from time to time, on an
18  as-needed basis.
19      Q   Okay.  And when -- how do I ask this?
20          So when you are taking statements, are
21  you doing anything to check for the voracity of a
22  statement, or are you just -- whatever they tell you is
23  what you write down?
24      MR. OBERTS:  Objection.  Vague.  When you say

**30**

1  "You" you are referring to Mr. Mahoney?
2      MS. SAMUELS:  Yes.
3      THE WITNESS:  When you say to check for
4  voracity, I listen to what the person tells me.  And I
5  write down what they tell me regarding the incident --
6  like this murder -- and listen to what Wright told me,
7  what he told me about it.
8          And that's what I put in his statement.
9  It's his statement.
10  BY MS. SAMUELS:
11      Q   Okay.  So hypothetical speaking, if I give a
12  statement, right, and I say I killed so and so on March
13  17th, right; but he died on the 10th, right.
14          And so -- well, let me ask it this way.
15  Before you go in to take a statement, would you know
16  anything about the case that you are asking questions
17  about?
18      A   In this particular case, well in any case,
19  Counsel, I would always talk to the detectives
20  beforehand.  I would meet with them.  If they had any
21  reports available to me, I would review any reports
22  that they had available.  And from there, then I would
23  proceed.  And if it was the thing -- the next thing to
24  do was to go in and interview a witness, and take a

**31**

1  statement from them, I would do that.
2      Q   Okay.
3      A   So I wouldn't walk into a police station, and
4  then just walk right in, sit down, and take a
5  statement.
6      Q   So you would have some general idea of what
7  the witness is expected to be telling you about; is
8  that fair?
9      A   Yeah.  And typically, the person would have
10  been interviewed by the police prior to my arrival.
11      Q   So -- okay.  So knowing that.  So say you,
12  like -- because you've reviewed the reports, you know
13  some basic information about the stop.
14          And so if a witness is telling you sort
15  of demonstratively inaccurate facts, would you still
16  just write -- write that down, and that's their
17  statement or --
18      A   I -- I would --
19      Q   Go ahead.
20      A   No, I would ask them is that -- is that what
21  happened.  I would ask them was that what happened.  So
22  I would want a truthful, accurate statement.  So would
23  I ask follow-up questions during the course of my
24  conversation, during the course of my taking a

**32**

1  statement, sure I would.
2      Q   Okay.  What if they get stuck by something
3  else, just demonstratively false?
4      MR. OBERTS:  Objection.  Calls for
5  speculation and incomplete hypothetical.  Also, object
6  to the form.
7      Mr. Mahoney, go ahead, answer the
8  question if you understand it.
9      THE WITNESS:  If there was something that I
10  knew was demonstratively false that a witness told me,
11  I would ask them about it.
12      I would try to clarify more, and I would
13  also -- I doubt -- I don't -- I would not put something
14  in a statement that I knew to be demonstratively false.
15  BY MS. SAMUELS:
16      Q   Okay.  Besides Maurice, do you remember
17  speaking with -- well, you don't remember speaking with
18  Maurice at all; is that correct?
19      A   I don't have a specific recollection,
20  Counsel, I really don't.
21      Q   All right.  You just know that you did,
22  because you see him on the paper?
23      A   That's right.
24      Q   Okay.  Do you remember talking with ASA

**33**

1  Leafblad at all about your experiences on this case?
2      A    No.
3      Q    Do you remember her talking to you, at all,
4  about her experiences on the case?
5      A    No.
6      Q    If an ASA, you are supervising had gone to a
7  suspect's home -- a witness' home to take a statement,
8  would you expect them to inform you of that?
9      A    I would expect them to tell me that, yes.
10     Q    Okay.  Do you remember being informed about
11 that by ASA Leafblad?
12     A    No.
13     Q    Was there any training or guidelines that you
14 had on locations to take a statement, like to make sure
15 that it wasn't a course of environment, if you get what
16 I'm getting at?
17     A    No, I don't quite understand your question.
18     Q    Sure.  So like if police have somebody in a
19 holding cell, would you take a statement there from
20 them?
21     A    Typically, I would have them in a -- if it's
22 an interview room that they were -- if they are in the
23 lock-up with a bunch of other people, no, I would not
24 take a statement there.

**34**

1      I would take a statement in an interview
2  room.  Quite often I would take statements just in the
3  Detective Division at a Detective's desk with the
4  person sitting out with me, actually at the desk.  So I
5  took statements under both those circumstances.
6      Q    And so what if they were just in a holding
7  cell by themself?
8      A    What do you mean a holding cell; you mean
9  like in a lock-up?
10     Q    Yeah.
11     A    No.  No.
12     Q    Okay.  Why not?
13     A    First of all, I would want to be able to sit
14 somewhere, where I could write.  So preferably at a
15 desk or somewhere in an interview room that has a bench
16 or somewhere where I could sit down and write a
17 statement out and have a conversation with somebody
18 while they were giving their statement, and I was
19 memorializing it.
20          So I don't think a holding cell would
21 be -- and I don't ever recall taking a statement in a
22 holding cell, so -- I typically would not do that.
23     Q    Okay.  But that -- is it fair to say that's
24 just -- there was no rule or anything or no training or

**35**

1  guidelines that you are aware of to make sure the
2  environment where you were taking a statement wasn't
3  coercive?
4          MR. OBERTS:  Objection.  Form.
5          MS. BRILL:  Objection.  Form and foundation.
6          MR. OBERTS:  Do you understand the question?
7          THE WITNESS:  I don't think I -- if you are
8  asking was there training -- whether or not, how to
9  determine whether there was a coercive environment or
10 not, I don't think I ever received any training to say
11 this is or this isn't a coercive environment.
12 BY MS. SAMUELS:
13     Q    Okay.  And then -- I'm just going to review
14 this real quick.  But I think you've already told me
15 what I needed to know.  So I'm showing you what I'm
16 going to mark as Exhibit 1.
17              (WHEREUPON, Deposition Exhibit
18               No. 1, was marked for
19               identification.)
20 BY MS. SAMUELS:
21     Q    Can you see this?
22     A    Yes.
23     Q    It's been Bates marked, City NK, I think it's
24 86 through 92.  Sorry at the bottom, right?

**36**

1      A    No, I see it now.  I got it -- yeah, I see
2  it.
3      Q    And it looks like this is the statement of
4  Maurice, right?
5      A    That's it, yes.
6      Q    It says it was taken May 29th of 2000, at
7  10:30 p.m.?
8      A    That's correct.
9      Q    All right.  Now, would that have been the
10 time you began the statement or the time you completed
11 the statement?
12     A    That would have been when I began the
13 statement.
14     Q    Okay.  Do you know if there's anything
15 indicating at what time you completed the statement?
16     A    I don't think there is.
17     Q    Okay.  And would that just be normal?
18     A    I would typically -- if I was taking a
19 handwritten statement such as this, I would indicate
20 the time, the date, and time when I began the
21 statement.
22     Q    Okay.  And it was just normal practice, not
23 just for you, but as far as you're aware, not to
24 indicate a time that a statement was completed?

37

1    MR. OBERTS:  Objection, form and speculation.
2    But go ahead.
3    THE WITNESS:  On a handwritten statement, I
4 don't recall ever putting the time it was completed.
5 On other types of statements, like court reported
6 statement, or a video statement, the time would be
7 noted.
8 BY MS. SAMUELS:
9    Q    Okay.  And it says, if I'm not — this is
10 Area 4, Violent Crimes, 3151 West Harrison?
11   A    Yes.
12   Q    Present, it says ASA Thomas Mahoney, which is
13 yourself, correct?
14   A    That's right.
15   Q    And this is Detective Toni Brzeniak, his star
16 number and Sheriff's police?
17   A    That's correct.
18   Q    Do you remember having any interactions with
19 Detective Brzeniak.
20   A    I do not.
21   Q    How do you determine — so — okay.  Well, my
22 first question is:  When you're taking a handwritten
23 statement, is there always a Police Officer present?
24   A    Yes.

38

1    Q    Okay.  Why is that?
2    A    Not — not the whole time.  When I would take
3 a handwritten statement as I would always — after
4 speaking to police officers, I would make it a point to
5 speak to a witness or a suspect alone, and deter — ask
6 them certain questions about their treatment, we talked
7 about a little bit earlier, to determine that there
8 were no threats made, that there was no coercion, that
9 they had been treated, you know, fairly and humanely at
10 the police department while they were there.
11   So that portion, I would do it alone
12 with just me and the witness or the Defendant, or
13 suspect, I should say.
14   But after that, I would have a detective
15 sit in as a witness to the statement.
16   Q    And why was that?
17   A    Well, it's the Chicago Police Department's
18 investigation.  And the detectives or Police Officers
19 involved should be present when a witness is giving a
20 statement.  They may have to testify to that.  It's
21 something that they are going to have to incorporate
22 into any reports that they make.  So there's a number
23 of reasons for it.
24   Q    Okay.  And who determined an officer would

39

1 sit in on the statement?
2    A    In this case, I don't recall how it was
3 determined that Brzeniak was going to sit in on it.  I
4 just don't remember.
5    Q    Was there, like, a general way it was
6 determined, just — or is it just a case by case basis?
7    A    I think it's just a case by case basis.  I
8 don't remember.  I don't think there was any general
9 way that you would determine what police officer or
10 detective would sit in on a statement.
11   Q    All right.  And then under that, it says:
12 "The statement taken regarding" — and you wrote in
13 "the robbery and fatal shooting of Merak Majdak," which
14 occurred May 13, 2000 at 1:00 a.m. at 4721 West Ohio,
15 Chicago, Illinois?
16   A    That's correct.  That's what I wrote it.
17   Q    Okay.  And then under that is — it looks
18 like it's a — your Miranda.  And it looks like it's
19 crossed out.
20   A    Yeah.  There is a preprinted portion on that
21 first page that has the Miranda warning, someone's
22 constitutional rights, which I did cross those out.
23   Q    Why did you cross that out?
24   A    Maurice Wright was not a suspect in this

40

1 investigation.
2    Q    Okay.
3    A    And it was not a custodial interrogation.
4    Q    And when you say "custodial interrogation,"
5 what do you mean?
6    A    Meaning somebody who was in custody, somebody
7 that was not free to leave, somebody who is a suspect
8 in the investigation but give incriminating statements.
9    Q    Okay.  And so at the time that you took the
10 statement, it was your understanding that Maurice
11 Wright was free to leave?
12   A    As far as I knew, yeah.
13   Q    Okay.  And it was your understanding that he
14 had gone to the police voluntarily to give the
15 statement?
16   A    I believe so.
17   Q    All right.  And I think there's like a
18 precursor.  This says, "After being advised that
19 Assistant State's Attorney Thomas Mahoney is a lawyer
20 and a prosecutor and" — I think that says and — "is
21 not his lawyer or Jovanie Long's lawyer.  Maurice
22 Wright agreed to give the following statement, which is
23 a summary and not word for word."
24   A    You've read that correctly.

WALKER vs. CITY OF CHICAGO ET AL.                    THOMAS MAHONEY                    May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 12 of 24 PageID #:2991

**41**

1    Q    Okay.  Do you know why you advised him that
2  you are not Jovanie Long's lawyer?
3    A    Because I wasn't.  Because I was an Assistant
4  State's Attorney working on the case.  And I wanted
5  Mr. Wright as I would any other witness that I took a
6  statement from, to know who I am and what I did.
7    Q    Was it common practice to advise somebody
8  that you weren't the suspect's attorney?
9    A    I would advise any witness or any suspect on
10  any statement that I took who I was and what I did.
11    Q    Right.  But — okay.  So — and I'm just
12  going to be frank.  So I'm used to seeing that they
13  were like, "I'm a State's attorney; I'm not your
14  attorney," right.
15    A    But I told them that, yeah.
16    Q    Right.  What strikes me in my understanding
17  is Jovanie Long was a primary suspect in this murder.
18    A    Okay.
19    Q    Okay.  And so my question is:  Was it common
20  practice for you to say that I am not the attorney of
21  the primary suspect in a given case?
22    A    I would have to do that on a case by case
23  basis.  It's based on what I knew at the time I took
24  the statement.  At the time I took the statement, I

**42**

1  believe — because I put it in there — that Jovanie
2  Long was a suspect in the case.
3         Therefore, I put in — So Mr. Wright
4  would know who I was — that I was not a lawyer for
5  him, and I was not a lawyer for Jovanie Long.
6    Q    All right. and so my understanding is that,
7  in any case where you knew who the primary suspect was
8  at the time, if you are taking a witness' statement,
9  you would let them know that you weren't the primary
10  suspect's attorney?
11    A    And I wasn't their attorney as well, yes.
12    Q    Do you know why you didn't inform him that he
13  wasn't Xavier Walker's attorney?
14    A    I don't recall anything about Xavier Walker
15  at the time.
16    Q    All right.  Do you recall when you first
17  learned about Xavier Walker?
18    A    No.
19    Q    All right.  If Xavier Walker was a primary
20  suspect at that time, should you have advised him that
21  you weren't Xavier's attorney?
22         MS. ITCHHAFORIA:  I'm sorry.  This is Misha.
23  Objection.  Incomplete hypothetical.  Form.
24         MR. OBERTS:  I join.

**43**

1         THE WITNESS:  Counsel, can you — do you want
2  me to answer that question.
3         MS. SAMUELS:  Are you asking me, or are you
4  asking your attorney?
5         THE WITNESS:  I'm asking you, if you want me
6  to answer, could you please repeat the question for me.
7         MS. SAMUELS:  Oh, yeah.  I'm sorry.
8  BY MS. SAMUELS:
9    Q    So if Xavier Walker was a primary suspect at
10  the time, should you have advise Maurice Wright that
11  you were not Xavier Walker's attorney?
12         MR. OBERTS:  Objection.  Form, and incomplete
13  hypothetical.  I think that's what Counsel objected to,
14  and I join, and I insert those objections.
15         But go ahead, Mr. Mahoney, if you can, answer
16  the question.
17         THE WITNESS:  If I had known Xavier Walker
18  was a primary suspect by Jovanie Long, I would have
19  included that in the statement, and I would have
20  advised Maurice Wright that not only was I not his
21  lawyer, I wasn't Jovanie Long's lawyer and I was not
22  Xavier Walker's lawyer.  I would put that in there.
23  BY MS. SAMUELS:
24    Q    Okay.  And then — I'm not going to go

**44**

1  through the statement line by line.  So on each page
2  towards the bottom, there's three signatures that are
3  generally indicated, yours, Detective Brzeniak and
4  Maurice Wright?
5    A    That's correct, Counsel.
6    Q    All right.  And are those placed when you are
7  reviewing the statement with him — or with Mr. Wright
8  to make sure that he's confirming that he's read it
9  and/or understand what's in the statement?
10    A    No signatures are done during the review
11  process.  And that's — you're right — that's to
12  understand it, what's in his statement is accurate.
13    Q    Okay.  And then — I'm going to flip towards
14  the end, because on Page 7 — so — and it looks like
15  he had stopped speaking at some point — and so there's
16  three signatures that would seem to indicate the end of
17  the statement, and then he talked some more?
18         MR. OBERTS:  Objection.  Form, incomplete
19  hypothetical.
20         But go ahead, Mr. Mahoney.
21         THE WITNESS:  All right.  What happened is
22  once his statement was complete — and I believe at the
23  end of the statement, I memorialized that he looked at
24  and identified some people through photos — once that

45

1   was complete, we would sign that.
2            And then during the review process, I
3   would go back through the statement, and I would ensure
4   that, first of all, that while I was reviewing it, that
5   Mr. Wright could read and write English, and that he
6   understood what was in his.
7            But I would have him read the —
8   typically I would have the person read the
9   first paragraph out loud, which is what I would do.
10           And then have — and then I would read
11  the rest the statement to him.  He would follow along.
12  He'd sign each page, make any changes, make any
13  corrections.
14           I think there's some grammatical
15  corrections in there.  And after — during the review
16  process, myself, Mr. Wright and the detective would
17  initial those changes or corrections, and also sign
18  each page as we went through it.
19  BY MS. SAMUELS:
20     Q    Okay.  And so the secondary part is basically
21  him saying, "I've had a chance to review this"?
22     A    Essentially, yeah.  And he could read, write
23  which he understood it.  He could read my statement
24  and, you know, it was just something that I wanted to

46

1   ensure, that he — that he knew what was going on.
2      Q    What was I going to say?
3            Okay.  After you are done taking the
4   statement, what do you do with it?
5      A    I take it back to the Felony Review Unit.
6   First of all, I'll make a copy of it, and I'll give it
7   to the Police Officers or the detectives for their
8   file.
9            I will take the statement, put it in
10  what is known as a Felony Review Folder.  I would take
11  the folder back to the Felony Review Office at the end
12  of my shift.  Or if I was going back to the office, I
13  would drop it off then.
14           But I would return that — that
15  statement would end up going back to the State's
16  Attorney's Office, Felony Review Unit Office.
17  BY MS. SAMUELS:
18     Q    Okay.  And then — okay.  And so on Page — I
19  believe — yeah, this is Page 2 of his statement.  It's
20  at NK087.  And it looks like towards the left hand, I
21  see some initials, A.B —
22     A    Yeah, that's —
23     Q    TRM?
24     A    TRM, that's me, MW.

47

1      Q    This — and so this — would this be one of
2   those situations where you are saying he indicated that
3   he made a change?
4      A    He did.
5      Q    Okay.  So is there anything at all that you
6   recall independently of paperwork in this case, or that
7   you remember?
8      A    I'm not sure I understand your question.
9      Q    Right.  So I understand that you've reviewed
10  the stipulation related to what was given at trial,
11  correct?
12     A    I did.
13     Q    Okay.  Did you have any knowledge of that
14  stipulation before you read it, or any recollection of
15  preparing to testify?
16     A    No, until my attorney gave me that transcript
17  reviewing his testimony and the stipulation that was
18  entered into about what I would testify to.  I had
19  never seen that before, and I had no recollection of
20  that.
21     Q    All right.  Can you physically — do you, at
22  all, remember what Maurice Wright looked like, sounded
23  like, anything like that?
24     A    No, I don't.

48

1      Q    Is it fair to say the entirety of your
2   interaction, of what you know about your interaction
3   with Maurice Wright is contained in the handwritten
4   statement?
5      A    That's correct.
6      Q    Have you — prior to — have you spoken or
7   talked about your interactions with Maurice Wright with
8   anyone?
9      A    My attorney.
10     Q    Anyone other than your attorney.
11     A    No.
12     Q    Do you know who Brian Holly(SIC) is?
13     A    Yes.
14     Q    All right.  How do you know him?
15     A    I think it was Brian Holy.
16     Q    Okay.  I'm sorry.  Okay.  How do you know
17  Brian Holey?
18     A    I know that he was a Chicago Police Officer.
19  He was a Detective.  He may have been a sergeant.  But
20  that's what I know about him.
21     Q    All right.  How often did you work with him?
22     A    I never worked with him.
23     Q    Okay.  How are you aware of who he is?
24     A    I know that he is a Chicago Police — he was

WALKER vs. CITY OF CHICAGO, ET AL    THOMAS MAHONEY    May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 14 of 24 PageID #:2993

49

1    a Chicago Police Officer.
2        Q    Yeah, my question is:  How do you know that?
3        A    Because I had seen him in a police
4    department, in a police uniform or in a -- with a
5    police badge on.  And I knew that, you know, he was a
6    police officer through other police officers.
7        Q    How would you describe your relationship with
8    him?
9        A    I didn't have a relationship with him.  If I
10   had any interaction with him, it would have been on a
11   professional level in my role as a State's Attorney.
12       Q    All right.  Do you know --
13           MS. SAMUELS:  Hold on.  I'm sorry.  Somebody
14   keeps calling my phone repeatedly, which would tend to
15   me to say it's important.
16           THE WITNESS:  My phone just beeped too.  I'm
17   trying to ignore it.
18           MR. OBERTS:  Take a five-minute break,
19   Jeanette?
20           MS. SAMUELS:  Yes, please.
21           MR. OBERTS:  Okay.
22           MS. SAMUELS:  Thanks.
23               (WHEREUPON, off the record.)
24           MS. SAMUELS:  Ready to go back on the record?

50

1           THE WITNESS:  Yes.
2    BY MS. SAMUELS:
3        Q    All right.  And so when we left off, I was
4    asking you about some of the officers in this case and
5    how you know them.  And so are you aware of, or do you
6    know a Stanley Sanders?
7        A    Yes.
8        Q    All right.  How do you know him?
9        A    He was a Chicago Police Officer and a Chicago
10   Police Detective.
11       Q    Okay.  Did you work on cases with him?
12       A    I don't recall working specifically with him
13   on cases.  I remember when I was in Narcotics, he would
14   come into some of the narcotics preliminary rooms I
15   worked in.  But that's about it.
16       Q    Do you know -- do you know who Anthony
17   Brzeniak is?
18       A    No, I don't.
19       Q    What about Robert Bartik?
20       A    The name rings a bell, but I don't -- I don't
21   recall who he is or what he looks like.
22       Q    John Cruz.
23       A    No.
24       Q    Donald Wolverton?

51

1        A    Maybe if I saw him, I would know him, but I
2    don't have a specific recollection of him right now.
3           Wolverton, I remember him as a Police
4    Officer, would come into Court Division while I was
5    there, bringing in new cases.  Then I learned that --
6    later on, I knew he was a Detective, but that's about
7    it.
8        Q    All right.  How would you describe your
9    relationship with him?
10       A    I didn't have a relationship with him.  It
11   would have been a professional relationship, if I
12   worked on a case with him, or he had a case that I was
13   prosecuting, that would be the extent of the
14   relationship.
15       Q    All right.  David Wright.
16       A    I remember David Wright.
17       Q    All right.  What do you remember about him?
18       A    He was a Police Officer, Detective, assigned
19   to Area 4.
20       Q    How would you describe your relationship with
21   him?
22       A    Other than a professional relationship, I
23   didn't have a relationship with him.
24       Q    All right.  Do you remember John Riordan?

52

1        A    No.
2        Q    Doesn't he -- I can't pronounce his last
3    name.
4        A    Pardon me?
5        Q    Nothing.  I'm sorry.  Do you recall
6    interacting with Stanley Sanders, David Wright, John
7    Cruise, Donald Wolverton, John Riordan or Robert Bartik
8    in relation to taking Maurice Wright's statement?
9        A    No.
10       Q    Okay.  For the FOP, is that a contract gig,
11   or hourly or --
12       A    It's an hourly.
13       Q    All right.  How much do you get paid an hour?
14       A    That would go into the terms of
15   representation of my clients that I represented there.
16   And I -- that's privilege information.
17           MR. OBERTS:  I'm going to object.  It's not
18   relevant.
19           MS. SAMUELS:  I think it goes to bias, but --
20   okay.
21   BY MS. SAMUELS:
22       Q    Okay.  In a case where multiple statements
23   have been taken from multiple witnesses, would you
24   review what other witnesses had said prior to taking a

WALKER vs. CITY OF CHICAGO, ET AL.                    THOMAS MAHONEY                    May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 15 of 24 PageID #:2994

53

```
 1   statement?
 2          MR. OBERTS:  Objection.  Speculation and
 3   incomplete hypothetical.
 4          But go ahead.
 5          THE WITNESS:  If the statements were
 6   available to me, yes.  If I knew what somebody else
 7   said; would I review it?  Yeah.  Sure.
 8          MS. SAMUELS:  All right.  Those or all the
 9   questions that I have.  Thank you.
10          THE WITNESS:  Thank you.
11                    EXAMINATION
12   BY MS. ITCHHAPORIA:
13      Q   I have some questions, Mr. Mahoney.  As I
14   said earlier, my name is Misha Itchhaporia.  I
15   represent the individual Chicago Police Officers.  I
16   don't know if I said that earlier, but —
17      A   You didn't say that earlier.  But — thank
18   you.
19      Q   I do have a couple of follow-up questions for
20   you.
21          Do you know Officer — was it Detective
22   Mike Pietryla.  That's P-i-e-t-r-y-l-a?
23      A   Yes.
24      Q   And did you — did you have any interactions
```

54

```
 1   with Officer Mike Pietryla as it relates to your job
 2   duties when you took the statement of Maurice Wright?
 3      A   I don't recall.
 4      Q   You testified earlier that it would have been
 5   your practice to talk to the Detectives and review any
 6   available police reports; do you remember that
 7   testimony?
 8      A   I do.
 9      Q   Okay.  Did you, and as far as it relates to
10   your work in this case, review any available police
11   reports?
12      A   I may have.  I don't have a specific
13   recollection about reviewing any reports.  If reports
14   were available to me, I would have reviewed them.  But
15   I don't have a specific recollection of doing that in
16   this case.
17      Q   Can you tell me how many reports you
18   reviewed?
19      A   I can't.
20          MR. OBERTS:  Objection.  Foundation, and
21   misstates testimony — inconsistent with his testimony.
22   BY MS. ITCHHAPORIA:
23      Q   Did you review the handwritten statement of
24   Ashanti Wright before you took the statement of Maurice
```

55

```
 1   Wright?
 2      A   Not that I recall.
 3      Q   Did you review the handwritten statement of
 4   Mary Curry before you took the handwritten statement of
 5   Maurice Wright?
 6      A   Not that I can recall.
 7      Q   I'm going to show you what was marked as
 8   Exhibit 1 to your deposition.
 9          Bear with me for a second.
10          MS. ITCHHAPORIA:  Hey, Jeanette, it says I
11   can't screen share.  Host disabled participant screen
12   share.
13          MS. SAMUELS:  Okay.  Hold on.
14          MS. ITCHHAPORIA:  Thank you.
15   BY MS. ITCHHAPORIA:
16      Q   All right.  Do you see the statement of
17   Maurice Wright on the screen?
18      A   I see a portion of it.
19      Q   Okay.  All right.  This is what we've marked
20   as Exhibit 1, to your deposition, and I am going to go
21   through some of it with you.
22          Starting on Page 2 of the statement,
23   which is City NK000087; do you see some of the
24   highlight on this page?
```

56

```
 1      A   Yes, I do.
 2      Q   Okay.  I'm going to read it to you.  It says
 3   here, the first highlight, "Maurice Wright states that
 4   Bonnie is a member of the Imperial Insane Vice Lloyds,
 5   and Shakey is a member of the Imperial Insane Vice
 6   Lloyds;" do you see that?
 7      A   Yes.
 8      Q   Is that something that Maurice Wright told
 9   you when you took this handwritten statement in May of
10   2000?
11      A   Yes.
12          MS. SAMUELS:  Objection.  Foundation.
13   BY MS. ITCHHAPORIA:
14      Q   Okay.  Then it goes on to state, "Maurice
15   Wrights states that Exhibit A is a photo of Jovanie
16   Long — or Vanie.  And Exhibit B is a photo of Shakey;"
17   do you see that?
18      A   Yes, I see that.
19      Q   Okay.  So did you show Exhibit A, a photo of
20   Jovanie Long or Vanie 2, Maurice Wright?
21      A   If that — yes, if it's in that statement —
22   if it's in Maurice Wright's statement, and I reference
23   an exhibit, I would have shown him that Exhibit A, and
24   I would have shown him Exhibit B.
```

WALKER vs. CITY OF CHICAGO ET AL.          THOMAS MAHONEY          May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 16 of 24 PageID #:2995

**57**

```
 1      Q    And so is it accurate for him to say that
 2 Maurice identified Exhibit A as a photograph of Jovanie
 3 Long or Vanie?
 4      A    That's what he said.
 5      Q    Okay.  And is it also accurate to say that
 6 Maurice Wright identified Exhibit B as a photograph of
 7 Shakey?
 8      A    That's what he said.
 9           MS. SAMUELS:  Objection.  Foundation.
10 BY MS. ITCHHAPORIA:
11      Q    If Maurice Wright testified at trial that he
12 did not identify the photograph of Jovanie Long, or the
13 photograph of Shakey, that would be false, correct?
14           MS. SAMUELS:  Objection.  Form.
15           THE WITNESS:  It would contradict what he
16 told me during the time I memorialized his statement.
17 BY MS. ITCHHAPORIA:
18      Q    Okay.  But if he — assuming that's what he
19 said at the trial, that I never told ASA Mahoney that
20 Exhibit A is a photograph with Jovanie Long or Vanie;
21 that would be incorrect?
22           MS. SAMUELS:  Objection.  Form.
23           THE WITNESS:  It would contradict what he
24 told me during the time I memorialized his statement.
```

**58**

```
 1 BY MS. ITCHHAPORIA:
 2      Q    Understanding that you weren't at trial, did
 3 you ever come to learn that Maurice Wright recanted
 4 portions of his statements that we are looking at in
 5 Exhibit 1.
 6      A    I read his — I read his trial testimony, and
 7 his trial testimony is inconsistent.  There are
 8 inconsistencies in the handwritten statement he gave
 9 and his trial testimony.
10      Q    Okay.  Moving on.  And it says here at the
11 bottom of City N87, "Maurice Wright stated" — oh,
12 sorry — "Maurice Wright states that Vice Lloyds get
13 stars for killing other people;" do you see that?
14      A    Yes.
15      Q    And is that something that Maurice Wright
16 told you when you took this handwritten statement of
17 him in May of 2000?
18           MS. SAMUELS:  Objection.  Foundation.
19           THE WITNESS:  That's what he said.
20 BY MS. ITCHHAPORIA:
21      Q    Okay.  Going on to Page 3 of the statement,
22 which is City N88 at the top here, it says, "Maurice
23 Wright states that Shakey and he — no.  "Maurice
24 Wright states that Shakey said he had all five of his
```

**59**

```
 1 stars;" do you see that?
 2      A    Yes.
 3      Q    Okay.  Is that something that Maurice Wright
 4 told you?
 5           MS. SAMUELS:  Objection.  Foundation.
 6           THE WITNESS:  Yes, if he — if that's — if
 7 that's in the statement, that's what he said.
 8 BY MS. ITCHHAPORIA:
 9      Q    Okay.  And that is — it is, in fact, in the
10 statement, right?
11      A    It is.
12      Q    Okay.  And then going on, it says, "Maurice
13 Wright states that Vanie said he didn't have any
14 stars"; do you see that?
15      A    Yes.
16      Q    And that's something that Maurice Wright also
17 told you?
18           MS. SAMUELS:  Objection.  Foundation.
19           THE WITNESS:  If it's in the statement,
20 that's what he said.
21 BY MS. ITCHHAPORIA:
22      Q    And it's in the statement, right?
23      A    Yes.
24      Q    Okay.  And he goes on to say, "Maurice Wright
```

**60**

```
 1 states that when Vanie said that everyone" — let me
 2 strike that.  Let me start again —
 3           "Maurice Wright states that when Vanie
 4 said this everyone started to laugh at Vanie;" do you
 5 see that?
 6      A    Yes.
 7      Q    And that's something that Maurice Wright told
 8 you when he took his handwritten statement?
 9           MS. SAMUELS:  Objection.  Foundation.
10           THE WITNESS:  Yes.
11 BY MS. ITCHHAPORIA:
12      Q    Okay.  Then it goes on to say, "Maurice
13 wright states that this made Vanie mad, and Vanie said,
14 "Fuck y'all;" do you see that?
15      A    Yes, I do.
16      Q    And that's something that Maurice Wright also
17 told you?
18      A    That's correct.
19           MS. SAMUELS:  Objection.  Foundation.
20 BY MS. ITCHHAPORIA:
21      Q    And do you see here where it says, "fuck
22 y'all" that's in quotes?
23      A    Yes.
24      Q    Why is that in quotes?
```

WALKER vs. CITY OF CHICAGO ET AL.                    THOMAS MAHONEY                                    May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 17 of 24 PageID #:2996

61

```
 1         MS. SAMUELS:  Objection.  Foundation.
 2         THE WITNESS:  That's the way the handwritten
 3    statement was memorialized.  And if he was --
 4    Mr. Wright was telling me what someone else said, I put
 5    it in quotations.
 6    BY MS. TICHHAPORIA:
 7         Q    Okay.  So the statement here, "Fuck y'all,"
 8    that's Maurice Wright telling you that those are the
 9    words that Vanie used; is that correct?
10         A    That's why I put them in quotes; that's
11    right.
12         Q    Okay.  Then he goes on to say, "Maurice
13    Wright states that he left the house to go to Melvin's
14    house to look for some weed;" do you see that?
15         A    Yes, I do.
16         Q    And that's also something that Maurice Wright
17    told you?
18         MS. SAMUELS:  Objection.  Foundation.
19         THE WITNESS:  If it's in his statement,
20    that's what he said.
21    BY MS. TICHHAPORIA:
22         Q    That's in the statement, correct?
23         A    It is in the statement, yes.
24         Q    And the statement goes on to say, "Maurice
```

62

```
 1    Wright states that Vanie and Trina stayed at his house
 2    all night;" is that something also that Maurice Wright
 3    told you?
 4         A    Yes.
 5         MS. SAMUELS:  Objection.  Foundation.
 6    BY MS. TICHHAPORIA:
 7         Q    Okay.  And then we go on here a little bit
 8    further down.  It says, "Maurice Wright states that
 9    they dropped this girl off Erie and Cicero and pick up
10    another girl at Erie and Cicero by a school;" do you
11    see that?
12         A    Yes, I do.
13         Q    And that's also something that Maurice Wright
14    told you, correct?
15         A    If it's in his statement, that's what he told
16    me.
17         Q    That's in his statement, correct?
18         A    Yes, it is.
19         Q    You didn't just make that up, did you?
20         A    No, I did not.
21         Q    Okay.  And then it goes on -- we're looking
22    at now, City N#89, it says, Page 4 of Maurice Wright's
23    statement.  It goes on to say here towards the bottom,
24    "Maurice Wright states that Vanie said, "Guess what I
```

63

```
 1    got."  And Vanie showed him a hundred dollar and two
 2    $50 bills; do you see that?
 3         A    Yes.
 4         Q    And that's something that Maurice Wright told
 5    you when you took his handwritten statement in May of
 6    2000?
 7         MS. SAMUELS:  Objection.  Foundation.
 8         THE WITNESS:  Yes, it is.
 9    BY MS. TICHHAPORIA:
10         Q    It goes on to say, "Maurice Wright states
11    Vanie asking him if he wants any money, and Maurice
12    told Vanie --
13         A    He needed --
14         Q    Oh, okay -- "he needed that money to get out
15    of town;" do you see that?
16         A    Yes.
17         Q    Okay.  So, again, that's something Maurice
18    Wright told you when you took his handwritten
19    statement?
20         MS. SAMUELS:  Objection.  Foundation.
21         THE WITNESS:  Yes, he did.
22    BY MS. TICHHAPORIA:
23         Q    Wright goes on to say Maurice Wright states
24    Vanie cried and hugged him; do you see that?
```

64

```
 1         A    Yes, I do.
 2         Q    Is that something that Maurice Wright told
 3    you?
 4         A    That's what he told me.
 5         MS. SAMUELS:  Objection.  Foundation.
 6    BY MS. TICHHAPORIA:
 7         Q    Okay.  And knowing that you don't have a
 8    memory -- an independent recollection of your
 9    interactions with Maurice Wright when you took the
10    statement, how are you able to tell us today that that
11    is something that Maurice Wright told you?
12         A    Because it's something that I wrote down
13    during the time I spoke with him.  And it's what he
14    told me.  I would have no other idea about what
15    happened or who said what or who did what.
16         It was his statement.  And it's the
17    statement -- this seven-page statement is clearly
18    written out by me, in my handwriting, reviewed by
19    Maurice Wright, Detective, and signed off on.
20         Q    Okay.  So it's accurate to say that even
21    without having an independent recollection of your
22    interactions with Maurice Wright from May of 2000, you
23    can say that these are the things that Maurice Wright
24    told you because they are in his statement and you
```

WALKER vs. CITY OF CHICAGO, ET AL.                    THOMAS MAHONEY

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 18 of 24 PageID #:2997    May 12, 2022

65

1  wouldn't just fabricate or make up and attribute
2  statements to Maurice Wright?
3          MS. SAMUELS:  Objection.  Form.
4          THE WITNESS:  I would be as accurate as
5  possible in memorializing what Maurice Wright told me
6  as I would in any other case and any other statement.
7  And I'm sure that's what I did here.
8  BY MS. ITCHHAPORIA:
9      Q   Okay.  Then it goes on to say, City NK89,
10 going on to 90, "Maurice Wright states that him and Zay
11 and Vanie got into the Taurus and drove to Maurice
12 Wright's house on Erie," do you see that?
13     A   Yes, I do.
14     Q   Is that also something that Maurice Wright
15 told you?
16     A   Yes.
17     Q   And it goes on to say, "Maurice Wright states
18 that Vanie and Zay stayed at his house.  Maurice walked
19 from his house to Cicero and Ohio where he saw police
20 and saw blood on the sidewalk;" do you see that?
21     A   Yes, I do.
22     Q   Is that something also that Maurice Wright
23 told you?
24         MS. SAMUELS:  Objection.  Foundation.

66

1          THE WITNESS:  Yes.
2  BY MS. ITCHHAPORIA:
3      Q   And it goes on to say, "Maurice Wright states
4  that he walked back him and went in the house and
5  walked in the house with Vanie and Zay;" do you see
6  that?
7      A   Yes, I do.
8      Q   Is that also something that Maurice Wright
9  told you?
10         MS. SAMUELS:  Objection.  Foundation.
11         THE WITNESS:  Yes.
12 BY MS. ITCHHAPORIA:
13     Q   Was that a yes?  I'm sorry.  I didn't catch
14 that.
15         THE WITNESS:  I also would object.  I'm
16 sorry, Ms. Samuels, to answer before your objection is
17 stated.  I apologize for that.  But, yes, that's
18 something he told me.
19 BY MS. ITCHHAPORIA:
20     Q   Okay.  Then it goes on to say that, "Maurice
21 Wright states that Vanie told him when he was with him when
22 he threw the gun on the tracks;" do you see that?
23     A   I do.
24     Q   And is that something, also, that Maurice

67

1  Wright told you?
2          MS. SAMUELS:  Objection.  Foundation.
3          THE WITNESS:  It is.
4  BY MS. ITCHHAPORIA:
5      Q   And was it your understanding that Zay
6  referred to Xavier Walker.
7          MS. SAMUELS:  Same objection.
8          THE WITNESS:  I don't recall.
9          MR. OBERTS:  Just note that that last
10 sentence said "railroad tracks," not "trucks."  I don't
11 know if you said "trucks".
12         MS. ITCHHAPORIA:  Oh, okay.  I mean tracks.
13 Let me just do it again to be clear.
14 BY MS. ITCHHAPORIA:
15     Q   It goes on to say Maurice Wright states that
16 Vanie told him Zay was with him when he threw the gun
17 on the tracks; is that what Maurice Wright told you?
18     A   Yes, it is.
19     Q   And it goes on to say, "Maurice Wright states
20 that Vanie told him about the shooting of the White guy
21 early in the morning of May 13, 2000;" do you see that?
22     A   I do.
23     Q   And is that something that Maurice Wright
24 told you when you took his handwritten statement?

68

1          MS. SAMUELS:  Objection.  Foundation.
2          THE WITNESS:  Yes, it is.
3  BY MS. ITCHHAPORIA:
4      Q   Then it goes on to say Maurice Wright states
5  Vanie said that the White guy pulled in the van and
6  asked for blows; do you see that?
7      A   I do.
8      Q   And is that something that Maurice Wright
9  told you?
10         MS. SAMUELS:  Objection.  Foundation.
11         THE WITNESS:  Yes, it is.
12 BY MS. ITCHHAPORIA:
13     Q   And, again, the word "blows" is in quotes; do
14 you see that?
15     A   Yes.
16     Q   Is that — because the word "blows" is in
17 quotes, does that mean that's the exact language that
18 Maurice Wright used when he was talking to you on May
19 27, 2000?
20         MS. SAMUELS:  Same objection.
21         THE WITNESS:  Yes, that's what he told me.
22 BY MS. ITCHHAPORIA:
23     Q   Where he goes on to say Maurice Wright states
24 that Vanie told him that Vanie grabbed money out of the

69

```
 1   White guy's hand; do you see that?
 2        A    Yes.
 3        Q    Is that something that Maurice Wright told
 4   you?
 5             MS. SAMUELS:  Objection.  Foundation.
 6             THE WITNESS:  Yes.
 7   BY MS. ITCHKAPORIA:
 8        Q    And then it goes on to say, "Maurice Wright
 9   states Vanie said he told the White guy," quote, "Fuck
10   you, Vick," end quote; do you see that?
11        A    I do.
12        Q    Is that also something that Maurice Wright
13   told you?
14             MS. SAMUELS:  Objection.  Foundation.
15             THE WITNESS:  Yes, it is.
16   BY MS. ITCHKAPORIA:
17        Q    And then the language that's in quotes, Fuck
18   you, Vick," that's the exact language that Maurice
19   Wright used when he — when you took his statement from
20   him; is that right?
21             MS. SAMUELS:  Same objection.
22             THE WITNESS:  It is what Maurice Wright told
23   me Vanie said, yes.
24
```

70

```
 1   BY MS. ITCHKAPORIA:
 2        Q    Then it goes on to say that Maurice Wright
 3   states that Vanie told him the White guy got out of the
 4   van and swung on one.  Swung on one?
 5        A    I think that's Vanie.
 6        Q    Oh, so —
 7        A    So I think that's Vanie.
 8        Q    Okay.  So it says, "Maurice Wright says that
 9   Vanie told him the White guy got out of the van and
10   swung on Vanie;" do you see that?
11        A    Yes, I do.
12        Q    And is that something that Maurice Wright
13   told you when you took his handwritten statement?
14             MS. SAMUELS:  Objection.  Foundation.
15             THE WITNESS:  Yes, it is.
16   BY MS. ITCHKAPORIA:
17        Q    Okay.  Then it says, "Maurice Wright states
18   that Vanie told him he punched the White guy and
19   knocked him down;" do you see that?
20        A    I do.
21        Q    Is that something, also, Maurice Wright told
22   you?
23             MS. SAMUELS:  Same objection.
24             THE WITNESS:  Yes.
```

71

```
 1   BY MS. ITCHKAPORIA:
 2        Q    And it goes on to say, "Maurice Wright state
 3   that Vanie told him he pulled out a point 45 automatic
 4   pistol and shot the guy once in the head;" do you see
 5   that?
 6        A    I do.
 7        Q    Is that something that Maurice Wright told
 8   you when you took his handwritten statement?
 9             MS. SAMUELS:  Objection.  Foundation.
10             THE WITNESS:  Yes, it is.
11   BY MS. ITCHKAPORIA:
12        Q    And it says, "Maurice Wright states that Zay
13   was present for this entire conversation;" do you see
14   that?
15        A    I do.
16        Q    And is that something that Maurice Wright
17   told you when you took his handwritten statement?
18             MS. SAMUELS:  Same objection.
19             THE WITNESS:  Yes.
20   BY MS. ITCHKAPORIA:
21        Q    And then it goes on to say, "Maurice Wright
22   states that Exhibit C is a photo of Zay;" do you see
23   that?
24        A    I do.
```

72

```
 1        Q    And is that what — strike that.
 2             Did you show a photograph of Zay to
 3   Maurice Wright when you took his handwritten statement?
 4             MS. SAMUELS:  Objection...
 5             THE WITNESS:  ...that I referenced as Exhibit
 6   C in Maurice Wright's statement.  And that's a
 7   photograph of Zay who he identified.
 8   BY MS. ITCHKAPORIA:
 9        Q    Okay.  So Maurice Wright identified Exhibit C
10   as a photo of Zay when you took his handwritten
11   statement?
12        A    Yes.
13        Q    Okay.  And I want to go on to read this part
14   here:  It says, "Maurice Wright states that he has been
15   treated well by the police and by Assistant State's
16   Attorney, Mahoney."
17             "Maurice Wright states that he smoked
18   cigarettes and used the washroom when he needed to;" do
19   you see that?
20        A    I do.
21        Q    So this conversation that you had with
22   Maurice Wright about how he was treated, would that
23   have just been when — who was present for that
24   conversation?
```

WALKER vs. CITY OF CHICAGO, ET AL.    THOMAS MAHONEY    May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 20 of 24 PageID #:2999

73

```
 1          MS. SAMUELS:  Objection.  Foundation.
 2          MR. OBERTS:  Objection to -- objection.
 3    Vague.  But with respect to the conversation as it
 4    relates to here, or just in general?  The here being
 5    that statement -- that sentence of the statement you
 6    read "or in general."
 7          MS. ITCHHAPORIA:  Oh, okay.  I see.  Let
 8    me -- let me clarify.
 9    BY MS. ITCHHAPORIA:
10      Q    When you had a conversation with Maurice
11    Wright about how he was treated by the police, when
12    Maurice Wright was at the police station who would have
13    been present for that conversation?
14      A    Just me and Maurice Wright.
15          MS. SAMUELS:  Objection.
16    BY MS. ITCHHAPORIA:
17      Q    When you were writing, actually handwriting,
18    the statement, who was present for that?
19      A    Maurice Wright, me and Detective Brzeniak.
20      Q    Okay.  So you initially -- or not initially.
21    Strike that.
22               Before you started handwriting the
23    statement, you would have interviewed Maurice Wright.
24    And you would have separately interviewed him about how
```

74

```
 1    he was treated by the police; is that correct?
 2      A    I spoke to him alone, asked him how he had
 3    been treated by the police, which he told me he was
 4    treated well, that he smoked cigarettes, used the
 5    bathroom when he needed to, he slept when he wanted to.
 6               He was given food to eat, pop to drink
 7    at the police station.  And he said that nobody
 8    promised him anything in exchange for this statement,
 9    and he was giving it voluntarily.
10               Those are things he told me, initially,
11    when I spoke with him over the phone, because I would
12    have made those inquiries of him.
13               So then once we started to write the
14    statement, I incorporated that earlier conversation
15    into Mr. Wright's statement.
16      Q    Okay.  It just goes on to say on Page 7 of
17    his statement, "Maurice Wright states that nobody has
18    threatened him or abused him in any way;" do you see
19    that?
20      A    I do.
21      Q    And that's something that Maurice Wright told
22    you?
23      A    Yes, he did.
24          MS. SAMUELS:  Objection.  Foundation.
```

75

```
 1    BY MS. ITCHHAPORIA:
 2      Q    Maurice Wright says he is free from the
 3    effects of drugs and alcohol; do you see that?
 4      A    I do.
 5      Q    Is that something Maurice Wright also told
 6    you?
 7      A    Yes.
 8          MS. SAMUELS:  ...
 9    BY MS. ITCHHAPORIA:
10      Q    I wanted to show you -- there's a signature
11    on Page 1 of the statement where it says "Maurice
12    Wright."  You see where it's highlighted right there?
13    (Indicating.)
14      A    I do.
15      Q    Did Maurice Wright put that signature on Page
16    1?
17      A    Yes, he signed it.
18      Q    And then I think it was Page 3, there's
19    another signature of Maurice Wright; do you see that?
20      A    Yes, there's also one on Page 2, Counsel.
21      Q    But looking at the one on Page 3, was that
22    something that Maurice Wright signed on Page 3?
23      A    He signed each page, yeah, including Page 3.
24      Q    Okay.  And I'm looking at Page 7; do you see
```

76

```
 1    in the middle there, there's a signature there, where
 2    it says "Maurice Wright."  Is that something he also
 3    signed in your presence?
 4      A    That's correct.
 5      Q    So if Maurice Wright says that on Pages 1, 3,
 6    and the middle of 7, "I didn't sign those," that would
 7    be incorrect?
 8          MS. SAMUELS:  Objection...
 9          THE WITNESS:  That would be incorrect.
10    BY MS. ITCHHAPORIA:
11      Q    You didn't sign Mr. Wright's name on this
12    statement that we're looking at on Exhibit 1, did you?
13          MS. SAMUELS:  Objection...
14          THE WITNESS:  I signed my own name.  And
15    everybody else, Mr. Wright and the Detective, each, had
16    to sign their own name.
17               So Maurice Wright signed each page of
18    the statement.  Nobody signed it for him.
19    BY MS. ITCHHAPORIA:
20      Q    Okay.  When you reviewed the statement with
21    Maurice Wright, did you read it out aloud to him, or
22    did he read it out aloud to you?
23      A    I read a portion of the statement out loud to
24    him, I believe, the first paragraph out loud.  And then
```

WALKER vs. CITY OF CHICAGO, ET AL.                THOMAS MAHONEY                                    May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/26/23 Page 21 of 24 PageID #:3000

**77**

1    I read — after I — after I — excuse me.
2            I had him read the first paragraph out
3    loud to me so that I knew, first of all, he could read
4    my writing and that he could read, and — to determine
5    that.
6            And then after that, we had reviewed the
7    statement, I — I read the rest of the statement out
8    loud to him, and he followed along with me.
9    Q.   Okay.  Did — let me just show you — just a
10   second.  Sorry.
11   A.   That's all right.
12   Q.   I'm going to show you City NK89.  It's Page 4
13   of Maurice Wright's statement.  It says here, "Maurice
14   Wright states this Zay said:  This crazy Mother Fucker
15   just shot a Mother Fucker;" do you see that?
16   A.   Yes.
17   Q.   Okay.  And then the language here is quoted,
18   "This crazy Mother Fucker shot a Mother Fucker," end
19   quote; do you see that?
20   A.   I do.
21   Q.   And that's something that Maurice Wright told
22   you when you interviewed him, that that's what Zay said
23   to him; is that right?
24   A.   That's what he said.

**78**

1    Q.   Did you get any indication when Maurice
2    Wright told you that Zay said, quote, "This Crazy
3    Mother Fucker just shot a Mother Fucker;" that Maurice
4    Wright was making up a lie?
5        MS. SAMUELS:  Objection.  Foundation.
6        THE WITNESS:  I memorialized what he told,
7    yes.
8    BY MS. ITCHHAPORIA:
9    Q.   Okay.  And so is it accurate to say that
10   Maurice Wright gave you no reason to believe he was
11   lying when he said that?
12       MS. SAMUELS:  Same objection.
13       THE WITNESS:  I just put down what he told —
14       MR. OBERTS:  Objection.  Speculation.
15           Go ahead.
16   BY MS. ITCHHAPORIA:
17   Q.   If Maurice Wright had not been forthcoming
18   with you, or was not cooperating, would have documented
19   that anywhere?
20   A.   I probably would have documented it in my
21   Felony Review folder.  But that would be it.
22   Q.   Okay.  Did you complete a Felony Review
23   folder for Maurice Wright in your interactions with him
24   in May of 2000?

**79**

1    A.   I don't recall, but I most likely would have
2    put in a — filled out a Felony Review Folder, and I
3    would have indicated in that folder that I was taking a
4    witness statement of Maurice Wright.
5    Q.   After you reviewed the statement with Maurice
6    Wright and he made the corrections — strike that.  He
7    did, in fact, make some corrections to the statement;
8    is that correct?
9    A.   That's correct.
10   Q.   And after you signed off and he signed off on
11   those corrections, and Mr. Brzeniak signed off on those
12   corrections, would you have talked to Maurice Wright
13   about what the next steps were?
14   A.   What do you mean?
15   Q.   Like, would you have told Maurice Wright
16   about possibly having to testify before the grand jury?
17   A.   I don't recall.  I may have.
18   Q.   Would you have explained to him why it was
19   necessary for him to testify before the grand jury?
20   A.   I don't recall telling him that he was going
21   to testify or needed to testify before the grand jury.
22   Q.   Do you recall speaking to the grand jury,
23   ASA, Luke Sheridan, about Maurice Wright at any point
24   in time?

**80**

1    A.   No.
2    Q.   Do you recall speaking to the trial
3    prosecutor, in this case, Jennifer Ravin, R-a-v-i-n, at
4    any point in time about your interactions with Maurice
5    Wright?
6    A.   It's Jennifer Ravin.  And I don't recall
7    speaking to her about this case.
8    Q.   For the — when Mr. Walker filed a
9    post-conviction petition, were you made aware that he
10   filed a post-conviction petition?
11   A.   No.
12   Q.   And when Mr. Wright filed a — strike that.
13       When Xavier Walker filed a Petition for
14   a Certificate of Innocence, were you ever given notice
15   of that?
16   A.   I was not given notice about the filing of
17   the Petition for the Certificate of Innocence, but I
18   learned that that was given after speaking to my prior
19   attorney on the case.
20   Q.   Okay.  I want to —
21   A.   I learned after the fact.
22   Q.   You learned it after the fact.  So you
23   weren't given notice before the COI, the Certificate of
24   Innocence, was handed?

WALKER vs. CITY OF CHICAGO, ET AL.    THOMAS MAHONEY    May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 22 of 24 PageID #:3001

81

1    A    No, I wasn't a State's Attorney then.  I was
2    an Assistance US Attorney when all of that took place,
3    so no.
4    Q    And an Assistance State's Attorney — AUSA in
5    Northern District of Indiana, right?
6    A    That's correct.
7    MS. ITCHHAPORIA:  I want to show you what
8    we'll mark as Exhibit 2 to your deposition.
9    Hold on.  Okay.  Just a second.  Okay.
10   We'll mark this as Exhibit 2.  For the record, it's
11   Bates marked CCSAO, Xavier Walker, 1259 through 1632.
12   (WHEREUPON, Deposition Exhibit
13   No. 2, was marked for
14   identification.)
15   BY MS. ITCHHAPORIA:
16   Q    I'm looking at the first page of Exhibit 2.
17   Do you see it's a transcript in the case of People
18   versus Xavier Walker and Jovanie Long, dated
19   February 19, 2004; true?
20   A    I see that, yes.
21   Q    Okay.  I want to take your attention to the
22   stipulation here.  This is the stipulation that you
23   said, earlier, that you reviewed in preparation for
24   your deposition?

82

1    A    Correct.
2    Q    Okay.  When you reviewed — and if you want
3    to review it now, that's fine — actually, I'll ask you
4    to review it.  If you want to look at Line 24 on
5    Page 1359 through 1362, Line 4.  And let me know when
6    you are —
7    A    Okay.  Bring it up to Line 24, and I'll read
8    and then I'll tell you when to move it.
9    Q    Okay.  Can you see it?
10   A    Yes.
11   Q    All right.  Let me know when you need me to
12   scroll down.
13   A    You can scroll down.  You can scroll down.
14   Scroll down, please.  You can scroll down, Counsel.
15   You can scroll down.
16   That's — I reviewed it all now.
17   Q    Okay.  This is the stipulation that was
18   entered at the trial, what you would have testified to
19   if you had been called to testify; is that right?
20   MR. OBERTS:  Objection.  Foundation.
21   Go ahead.
22   BY MS. ITCHHAPORIA:
23   Q    Is there anything in the stipulation that you
24   just reviewed that is inaccurate?

83

1    A    No.
2    Q    Do you know why you weren't called as a
3    witness and why a stipulation was entered instead?
4    MS. SAMUELS:  Objection.  Foundation.
5    THE WITNESS:  It was a matter — I would
6    assume it was a matter of trial strategy, of the trial
7    assistance.  But I don't know why they didn't call me,
8    no.
9    MS. ITCHHAPORIA:  Okay.  If we can have,
10   like, a five-minute break, take a look over my notes, I
11   think I might be done.
12   MS. SAMUELS:  Okay.
13   MS. ITCHHAPORIA:  Come back at 11:51?
14   THE WITNESS:  Sure.
15   MS. ITCHHAPORIA:  Thank you.
16   (WHEREUPON, off the record.)
17   BY MS. ITCHHAPORIA:
18   Q    Mr. Mahoney, I'm almost done.
19   So if you could just bear with me for a
20   few more minutes, I did want to show you one more
21   exhibit.
22   A    Sure.
23   Q    I'm having trouble pulling it up.  All right.
24   Sorry.  Just a second.  Here it is.

84

1    MS. ITCHHAPORIA:  I'm going to show you what
2    we'll mark as Exhibit 3 to your deposition.  CCSAO
3    Xavier Walker, 1259 through 1359.
4    (WHEREUPON, Deposition Exhibit
5    No. 3, was marked for
6    identification.)
7    BY MS. ITCHHAPORIA:
8    Q    I'm looking at the first page of Exhibit 3.
9    Do you see that it is a transcript in the case of
10   People versus Xavier Walker and Jovanie Long, dated
11   February 19, 2004; do you see that?
12   A    Yes.
13   Q    Okay.  And it is the — Page 4 of this
14   exhibit, it is the testimony of Maurice Wright; do you
15   see that?
16   A    Yes.
17   Q    Okay.  I want to take your attention to
18   Page 57 of this transcript.  Mr. Wright was asked when
19   he testified at trial, looking at CCSAO1315, Line 3.
20   Question:  But you didn't have any marks
21   on you?  Answer:  Yes, I did.  Question:  You had marks
22   here?  Answer:  Yes.  Question:  Where were they?
23   Answer:  On my face.
24   Question:  Where were the marks?

WALKER vs. CITY OF CHICAGO, ET AL.    THOMAS MAHONEY    May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 23 of 24 PageID #:3002

**85**

1   Answer:  Around my lip, around my eye.  When I left up
2   out of there, I had a mark around my eye and below my
3   lip.  Question:  And all of that was before you give
4   the statement, right?  Answer:  Yes, it was.
5          Do you see that?
6      A   Yes.
7      Q   Okay.  When you met with Maurice Wright back
8   in May 2000, did he have a mark around his eye and
9   below his lip?
10         MS. SAMUELS:  Objection.  Foundation.
11         THE WITNESS:  He never — I don't recall
12  whether he had a mark on him or not.  I don't recall
13  what he looked like.
14         But I do know what he told me, that he
15  had not been threatened or abused in any way.
16  BY MS. ITCHHAPORIA:
17     Q   And if Mr. Wright had any physical injuries
18  below his lip or around his eye, what would you have
19  done, if anything?
20     A   I would have —
21         MS. SAMUELS:  Objection to incomplete
22  hypothetical.
23         MR. OBERTS:  Join.  But go ahead.
24         THE WITNESS:  If I had noticed that he had a

**86**

1   mark around his eye or his lip, on his face, I would
2   have asked him about that.  I would have asked him how
3   he got it.
4          I would have asked him if he got it
5   while he was in the police station.  I would have
6   definitely addressed it.
7   BY MS. ITCHHAPORIA:
8      Q   And is it accurate to say that Maurice Wright
9   never said to you that the police threatened to take
10  away his mother's children if he didn't give a
11  statement?
12         MS. SAMUELS:  Objection.  Foundation.
13         THE WITNESS:  He never told me that.  It's
14  not in his statement.  It would have been.
15  BY MS. ITCHHAPORIA:
16     Q   And if he had told you that, you would have
17  documented it; is that right?
18         MS. SAMUELS:  Objection.
19         THE WITNESS:  I would have documented it.
20         MS. ITCHHAPORIA:  No further questions.
21         THE WITNESS:  Thank you.
22         MS. BRILL:  The City has no further questions
23  either.
24         MS. SAMUELS:  Nothing for me.  Do you want to

**87**

1   explain waive or reserve?
2          MR. OBERTS:  We'll reserve.
3          MS. SAMUELS:  All right.  Thank you very much
4   for your time.
5          MR. OBERTS:  Have a good day.
6          THE WITNESS:  Thank you.
7              (WHEREUPON, the deposition
8               adjourned.)

**88**

1   XAVIER WALKER,                           )
2          Plaintiff,                        )
3      vs.                                   )No. 20 Cv 7209
                                             )Judge guzman
4   CITY OF CHICAGO, STANLEY SANDERS,        )
    MICHAEL PIETRYLA, DAVID WRIGHT,          )Magistrate
5   BRIAN HOLY, JOHN CRUZ, DONALD            )Judge Fuentes
    WOLVERTON, JOHN RIORDAN, ROBERT          )
6   BARTIK, ANTHONY BRZENIAK, THOMAS         )
    MAHONEY, and COOK COUNTY,                )
7          Defendants.                       )
8
9              C E R T I F I C A T E
10         I, THOMAS MAHONEY, do hereby certify that I
11  have read the foregoing transcript in the
12  above-entitled cause and do assert that this is my
13  testimony except as I have so indicated on the errata
14  sheets provided herein.
15
16         _____
17                   THOMAS MAHONEY
18  No corrections (Please initial)_____
19  Number of errata sheets submitted_____(pages)
20  SUBSCRIBED AND SWORN TO
21  BEFORE ME THIS_____DAY
22  OF_____, 2023.
23  _____
24     NOTARY PUBLIC

WALKER vs. CITY OF CHICAGO, et al.   THOMAS MAHONEY   May 12, 2022

Case: 1:20-cv-07209 Document #: 160-35 Filed: 05/16/23 Page 24 of 24 PageID #:3003

89

```
 1          E R R A T A
 2  DEPOSITION OF:  Thomas Mahoney
 3  DATE TAKEN:  June 30, 2022
 4
 5  PAGE LINE
 6  ___ ___   CHANGE: _____
 7      REASON: _____
 8  ___ ___   CHANGE: _____
 9      REASON: _____
10  ___ ___   CHANGE: _____
11      REASON: _____
12  ___ ___   CHANGE: _____
13      REASON: _____
14  ___ ___   CHANGE: _____
15      REASON: _____
16  ___ ___   CHANGE: _____
17      REASON: _____
18  ___ ___   CHANGE: _____
19      REASON: _____
20  ___ ___   CHANGE: _____
21      REASON: _____
22
23  DEPONENT'S SIGNATURE_____
24      DATE:_____
```

90

```
 1          E R R A T A
 2  DEPOSITION OF:  Thomas Mahoney
 3  DATE TAKEN:  June 30, 2022
 4
 5  PAGE LINE
 6  ___ ___   CHANGE: _____
 7      REASON: _____
 8  ___ ___   CHANGE: _____
 9      REASON: _____
10  ___ ___   CHANGE: _____
11      REASON: _____
12  ___ ___   CHANGE: _____
13      REASON: _____
14  ___ ___   CHANGE: _____
15      REASON: _____
16  ___ ___   CHANGE: _____
17      REASON: _____
18  ___ ___   CHANGE: _____
19      REASON: _____
20  ___ ___   CHANGE: _____
21      REASON: _____
22
23  DEPONENT'S SIGNATURE_____
24      DATE:_____
```

91

```
 1  STATE OF ILLINOIS   )
 2  COUNTY OF C O O K   )SS
 3                      )
 4          C E R T I F I C A T E
 5
 6          The within and deposition was taken
 7  before ADRIENNE M. LIGHTFOOT, Certified Shorthand
 8  Reporter in the City of Chicago, County of Cook and
 9  State of Illinois; and there were present at the
10  deposition Counsel as previously set forth?
11          The witness reserved signature.
12          The undersigned is not interested in the
13  within case nor of kin or counsel to any of the
14  parties.
15          IN TESTIMONY WHEREOF, I have hereunto
16  set my hand this 8th day of March 2023.
17
18          _____
19          ADRIENNE M. LIGHTFOOT
20          No. 084-004276
21
22
23
24
```