# EXHIBIT 38

```
 1    STATE OF ILLINOIS    )
                           )   SS:
 2    COUNTY OF C O O K    )

 3         IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 4            COUNTY DEPARTMENT - CRIMINAL DIVISION

 5    THE PEOPLE OF THE     )
      STATE OF ILLINOIS     )
 6                          )
              vs.           )   No. 00 CR 20601
 7                          )
      XAVIER WALKER and     )
 8    JOVANIE LONG          )

 9

10                    REPORT OF PROCEEDINGS at the hearing of

11    the above-entitled cause, had before the HONORABLE

12    MARCUS R. SALONE on the 19th day of February 2003.

13
      A P P E A R A N C E S:
14         HON. RICHARD A. DEVINE
           State's Attorney of Cook County
15         BY:  MS. JENNIFER COLEMAN
                Assistant State's Attorney
16              Appeared on behalf of the People;

17         MR. GREGORY WILSON
                Appeared on behalf of the Defendant,
18              Xavier Walker;

19         MS. RITA FRY
           Cook County Public Defender
20         BY:  MR. JOHN CONNIFF
                Assistant Public Defender
21              Appeared on behalf of the Defendant,
                Jovanie Long.
22

23    JO ANN KROLICKI, CSR
      Official Court Reporter
24    Illinois License No. ███████████
```

EE-1

1               I N D E X

2

3     People vs. Xavier Walker and Jovanie Long

4     Date of Hearing:  2-19-03

5     Page Numbers:  EE-1 through EE-95

6

7             PROCEEDINGS

8                                        PAGE

9     MOTION TO SUPPRESS EVIDENCE (Long)

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| MICHAEL PIETRYLA | 9 | 31 | | |
| JOHN RIORDAN | 51 | 63 | | |
| ROBERT BARTIK | 65 | 72 | | |
| JOHN RIORDAN | 76 | | | |
| ARGUMENT | | | | 85 |
| FINDING | | | | 88 |

14             EXHIBITS

| | ID | REC. |
|---|---|---|
| People's 1 | 18 | |
| People's 2 | 54 | |
| People's 3 | 68 | |
| Defendant's 1 | 72 | |

19

20

21

22

23

24

CCSAO XAVIER WALKER 000700

1    WHEREUPON,

2                    MICHAEL PIETRYLA,

3    called as a witness on behalf of the People of

4    the State of Illinois, having been first duly sworn,

5    under oath was examined and testified as follows:

6                    DIRECT EXAMINATION

7                    BY MS. COLEMAN:

8        Q.    Detective, could you please tell the judge

9    your full name and spell your last name and give us

10   your star number?

11       A.    Michael Pietryla, P-i-e-t-r-y-l-a, Star

12   Number 21209.

13       Q.    And where are you currently assigned?

14       A.    Area 4 Homicide.

15       Q.    What are your duties in Area 4?

16       A.    I'm a homicide detective, ma'am.

17       Q.    Back in April and May of the year 2000,

18   were you assigned to Area 4?

19       A.    Yes, I was.

20       Q.    On May 13th of 2000, were you assigned to

21   investigate the homicide of Marek Majdak which had

22   occurred on April 13th of 2000 at approximately

23   1:00  a.m. at 4721 West Ohio?

24       A.    Yes.

CCSAO XAVIER WALKER 000988

```
 1          Q.    And did you -- were you assigned to
 2    investigate that case until the case was cleared and
 3    closed?
 4          A.    Yes, I was.
 5          Q.    Now, I'm going to direct your attention to
 6    the end of May of the year 2000.  By that point, was
 7    the codefendant on the case, Xavier Walker, already
 8    arrested and charged?
 9          A.    Yes.
10          Q.    And was there a stop order out for a person
11    by the name of Jovanie Long?
12          A.    Yes.
13          Q.    Did you and your partners begin looking for
14    Jovanie Long?
15          A.    Yes.
16          Q.    Did you know an address for his mother of
17    4230 West Crystal?
18          A.    Yes.
19          Q.    Did you begin looking for the defendant at
20    that address?
21          A.    Yes, we did.
22          Q.    I'm going to direct your attention
23    specifically now to June 5th of 2000.  That evening,
24    did you speak to anybody at that address?
```

CCSAO XAVIER WALKER 000989

1        A.    Yes, I did.

2        Q.    Who did you speak to?

3        A.    I spoke to a woman who identified herself

4    as Regina Long, the mother of Jovanie.

5        Q.    Could you keep your voice up louder?

6        A.    Sure.

7        Q.    Did you speak to her in person or over the

8    phone on June 5th?

9        A.    Over the phone.

10       Q.    When you spoke to Regina Long over the

11   phone, what did you tell her?

12       A.    First we asked her if she knew the

13   whereabouts of her son and that he was implicated in

14   a homicide which occurred in May.

15       Q.    Did she tell you whether she knew where her

16   son was?

17       A.    She said she did not know where he was at,

18   but she had spoke with him.

19       Q.    And did she tell you that she would do

20   anything with the information you had given her?

21       A.    Yes.   We had asked her to contact her son

22   as soon as she could and have him call us or come in

23   to talk to us.

24       Q.    At any time on that date, did you speak to

EE-11

CCSAO XAVIER WALKER 000990

1    the defendant, himself?

2         A.    No.

3         Q.    Now I'm going to direct your attention to

4    July 25th of 2000.  Did you go to the home at 4230

5    West Crystal on the third floor?

6         A.    Yes.

7         Q.    Who were you with?

8         A.    Detective Riordan.

9         Q.    And when you and Detective Riordan went to

10   that address, did you speak to somebody who

11   identified herself as Regina Long?

12        A.    Yes, we spoke with Regina Long.

13        Q.    When you spoke to Regina Long at that time,

14   did you ask her about her son, Jovanie Long?

15        A.    Yes, we did.

16        Q.    What did you tell her?

17        A.    We again explained to her why we wanted to

18   talk to him and that he had been implicated and that

19   there was an active stop order in relation to the

20   homicide and we needed to have him come in and talk

21   to us about this.

22        Q.    Now, during that conversation, did you or

23   Detective Riordan ever threaten Regina Long in any

24   way about wanting to kill her son?

EE-12

CCSAO XAVIER WALKER 000991

1      A.   No.

2      Q.   On July 25th, did you or Detective Riordan

3  ever actually speak to Jovanie Long either in person

4  or over the phone?

5      A.   No.

6      Q.   On June 5th on that conversation that you

7  spoke about with the defendant's mother over the

8  phone, did you ever make any threats at all about

9  Jovanie Long?

10     A.   No.

11     Q.   Between June 5th and July 25th, did you or

12  Detective Riordan or anybody else working on this

13  case to your knowledge ever speak directly to the

14  defendant at all?

15     A.   No.

16     Q.   Now, on July 25th of the year 2000, did you

17  receive a phone call from anyone?

18     A.   Excuse me?

19     Q.   Did you receive a phone call from anyone?

20     A.   Yes, from Regina Long.

21     Q.   And did she call you at the area?

22     A.   Yes, she did.

23     Q.   When she called you, did she tell you

24  anything?

CCSAO XAVIER WALKER 000992

1       A.    She told me that she was working on trying

2  to get her son to turn himself in.

3       Q.    Did she give you a time frame about when he

4  may turn himself in?

5       A.    She said approximately a week, that she had

6  to make arrangements with some clergy member and that

7  he needed to get his affairs in order.

8       Q.    And did she tell you that she would contact

9  you again?

10      A.    Yes.

11      Q.    And on August 3rd of 2000 in the evening,

12  approximately 7:00 p.m., were you contacted again by

13  Regina Long?

14      A.    Yes, I was.

15      Q.    Was that again over the phone?

16      A.    Over the phone.

17      Q.    When she talked to you on that time, what

18  did she tell you?

19      A.    She told me that she would be coming in the

20  next day at noon with her son to turn himself in and

21  Reverend Major.  I don't recall his last name.

22      Q.    Is it Reverend Howard?  Major Howard?

23      A.    Yes.

24      Q.    Now, at the conversation on July 28th or

CCSAO XAVIER WALKER 000993

1    August 3rd, did you make any threats at all

2    whatsoever with regard to Jovanie Long?

3         A.   No.

4         Q.   Did you ever actually speak to Jovanie Long

5    at any of those conversations?

6         A.   No.  No, I did not.

7         Q.   And you were the one who was actually

8    speaking to Regina Long; is that correct?

9         A.   Yes, I was.

10        Q.   Now, on August 4th of 2000, were you at

11   the area waiting for the defendant to turn himself

12   in?

13        A.   Yes.

14        Q.   At approximately 11:45 a.m., did anyone

15   show up at the station?

16        A.   Yes.

17        Q.   Who showed up?

18        A.   Jovanie Long, his mother, Regina, and the

19   Reverend.

20        Q.   That's Reverend Major Howard?

21        A.   Yes.

22        Q.   And did you have a conversation with the

23   defendant at any point?

24        A.   At that time?

EE-15

CCSAO XAVIER WALKER 000994

1       Q.    Yes.

2       A.    No.

3       Q.    What happened when they arrived at the

4    area?

5       A.    We took Jovanie into an interview room and

6    the Rev -- I don't -- he asked if the Reverend would

7    come along.  I said that would be fine, and we took

8    both of them into the interview room.

9       Q.    And were you working with Detective Riordan

10   that day?

11      A.    Yes.

12      Q.    Was Investigator Krofel working that

13   morning?

14      A.    No, he was not.

15      Q.    And when you took the defendant to the

16   interview room, it was just you, Riordan, and the

17   Reverend and the defendant; correct?

18      A.    That's correct.

19      Q.    The person you spoke about, Jovanie Long,

20   do you see that person in the courtroom today?

21      A.    Yes, I do.

22      Q.    Could you please point to him and describe

23   something he's wearing today?

24      A.    He's wearing a Cook County outfit and he

CCSAO XAVIER WALKER 000995

1    has a shaved head (indicating.)

2         MS. COLEMAN:  Judge, may the record reflect

3    the in-court identification of the defendant?

4         THE COURT:  It shall.

5    BY MS. COLEMAN:

6         Q.    Now, in the presence of the Reverend, did

7    you or Detective Riordan do anything?

8         A.    Detective Riordan read him his rights.

9         Q.    Read the defendant his rights?

10        A.    Yes, he did.

11        Q.    Did he do that by memory or from a

12   preprinted source?

13        A.    He did it from a preprinted card on the

14   back of our FOP book.

15        Q.    Do you have an FOP book with you?

16        A.    Yes, I do.

17        Q.    Could you please turn that book to the page

18   where the rights are listed?

19        MS. COLEMAN:  Judge, I'm asking that the

20   detective's FOP book be marked as People's Exhibit

21   Number 1.

22        THE COURT:  It shall.

23

24

CCSAO XAVIER WALKER 000996

```
 1                        (WHEREUPON, People's Exhibit

 2                         Number 1 was marked for

 3                          identification.)

 4            MS. COLEMAN:   I would ask that the

 5    detective be allowed to read the rights out of the

 6    FOP book.

 7            MR. CONNIFF:   No objection.

 8    BY MS. COLEMAN:

 9        Q.    The rights in that book, are those the same

10    rights read to the defendant?

11        A.    Yes, they were.

12        Q.    Would you begin reading them?

13        A.    "Before we ask you any questions, it

14             is our duty to advise you of your rights.

15                  "Number one:  Do you understand

16             that you have the right to remain silent?

17                  "Number two:  Do you understand

18             that anything you say can and may be used

19             against you in a court or other

20             proceedings?

21                  "Number three:  Do you

22             understand that you have the right to talk

23             to a lawyer before we ask you any

24             questions and to have him with you during
```

EE-18

CCSAO XAVIER WALKER 000997

```
 1          questioning?

 2                    "Number four:  If you cannot

 3          afford or otherwise obtain a lawyer and

 4          you want one, a lawyer will be appointed

 5          for you, and we will not ask you any

 6          questions until he has been appointed.

 7                    "Number five:  If you decide to

 8          answer now with or without a lawyer, you

 9          still have the right to stop the

10          questioning at any time or to stop the

11          questioning for the purpose of consulting

12          a lawyer.

13                    "Number six:  You may waive the

14          right to advice of counsel and your right

15          to remain silent, and you may answer

16          questions or make a statement without

17          consulting a lawyer if you so desire.

18                    "Number seven:  Do you

19          understand each of these rights?

20                    "Number eight:  Do you wish to

21          answer questions at this time?"

22      Q.   After each of those rights were read to the

23      defendant, did he indicate whether he understood each

24      of those rights?
```

CCSAO XAVIER WALKER 000998

```
 1        A.   Yes, he did.

 2        Q.   And this was in the presence of Reverend

 3   Howard?

 4        A.   Yes, it was.

 5        Q.   And did Detective Riordan read the rights

 6   just as you have read them today?

 7        A.   Yes, he did.

 8        Q.   Did the defendant agree to speak to you

 9   about the murder of Marek Majdak?

10        A.   Yes, he did.

11        Q.   What did the Reverend do at that time?

12        A.   The Reverend left the room.

13        Q.   And when the Reverend left, what did you

14   and Detective Riordan do?

15        A.   We escorted the Reverend back to where

16   Regina Long was at, and we told him that Jovanie

17   would be with us for awhile and we were going to

18   conduct some interviews with him, and that if they

19   chose to stay, that was okay.  If they chose to call

20   us, that would be okay, too.

21        Q.   What did you and Detective Riordan do

22   then?

23        A.   Then we went back in the room and talked to

24   Jovanie Long.
```

CCSAO XAVIER WALKER 000999

1       Q.      When you went back into the room, did the

2   defendant speak to you about what had happened on the

3   early morning hours of May 13th of 2000?

4       A.      Yes.

5       Q.      Would you characterize the statement that

6   he gave you as a denial?

7       A.      Yes.

8       Q.      Did he also give you a partial alibi?

9       A.      Yes, he did.

10      Q.      Did he name anybody in that alibi?

11      A.      Yes, he did.

12      Q.      Who did he name?

13      A.      Hersula Byrd.

14      Q.      Did he indicate who Hersula Byrd was to

15  him?

16      A.      He told us it was his girlfriend.

17      Q.      Did you tell the defendant anything about

18  other witnesses?

19      A.      Yes, we did.

20      Q.      What did you tell him?

21      A.      We told him that we had third party

22  admissions from him to other people and that they

23  have already given statements.

24      Q.      Did you tell him anything about the

EE-21

CCSAO XAVIER WALKER 001000

1    codefendant, Xavier Walker?

2        A.   Yes, we did.

3        Q.   What did you tell him?

4        A.   We told him that Xavier Walker had been

5    arrested and charged for his participation in that

6    murder and that he had given a videotape recorded

7    statement implicating him as the shooter and the

8    person who robbed the victim.

9        Q.   When you say, "him," you're referring to

10   Jovanie Long?

11       A.   I'm referrig to Jovanie Long.

12       Q.   Did the defendant, Jovanie Long, ask

13   anything at that time?

14       A.   He wanted to see the videotaped statement.

15       Q.   And what did you and Detective Riordan do

16   then?

17       A.   We left the room, got the tape, and we

18   showed him the portion of the tape which -- in which

19   Xavier Long (sic) said that Jovanie shot him and

20   robbed him.

21       Q.   When you say, "him," you're referring to

22   the victim?

23       A.   To the victim, yes.

24       Q.   Did you ever show him the entire tape at

CCSAO XAVIER WALKER 001001

1    all?

2         A.    No, we did not.

3         Q.    Did you ever actually show him any of the

4    statements of the people who the defendant had given

5    third party admissions to?

6         A.    No, we did not.

7         Q.    Now, after the defendant viewed the portion

8    of the statement where Xavier Walker implicated him,

9    what did the defendant say?

10        A.    I believe he said, Xay's tricking on me.

11        Q.    And then what did he say?

12        A.    He asked if he could take a polygraph

13    exam.

14        Q.    And did you tell him that he could?

15        A.    Yes, we did.

16        Q.    Did you schedule a polygraph exam?

17        A.    Yes, we did.

18        Q.    What time were you able to schedule the

19    polygraph exam for?

20        A.    It would have been the following morning at

21    about 8:00 o'clock.

22        Q.    Now, how long were your conversations with

23    the defendant on August 4th?

24        A.    No longer than 40 minutes at a time.

CCSAO XAVIER WALKER 001002

1       Q.   And how many -- approximately how many

2   times did you speak to him for 40 minutes?

3       A.   Two or three times.

4       Q.   Now, did you tell him that the polygraph

5   would not be until the next morning?

6       A.   Yes.

7       Q.   Now, that evening, where was the defendant?

8       A.   He was in the interview room that we

9   brought him to originally.

10      Q.   And what did you and Detective Riordan

11  begin doing that evening?

12      A.   We began looking for Hersula Byrd.

13      Q.   Did you spend that evening looking for

14  Hersula Byrd?

15      A.   Yes.

16      Q.   Were there points in time when you came

17  back to the area?

18      A.   Yes.

19      Q.   Was there anybody else in the area that

20  night who was working on this case aside from you and

21  Detective Riordan?

22      A.   No, there was not.

23      Q.   Was there any time during the evening

24  when you went to check on the defendant, Jovanie

CCSAO XAVIER WALKER 001003

1     Long?

2         A.   Several times.

3         Q.   Was there any time during that evening when

4     you went in and threatened Jovanie Long?

5         A.   No.

6         Q.   Did you ever tell him that if he did not

7     talk, that he would be held for an indefinite period

8     of time?

9         A.   No.

10        Q.   Also, Detective, was there ever a point in

11    time when the defendant told you that he would not

12    speak to you?

13        A.   No, there was not.

14        Q.   Now, was the defendant left alone that

15    evening until the next morning for the polygraph?

16        A.   Yes.

17        Q.   That evening was he fed at all?

18        A.   Yes.

19        Q.   And who fed him?

20        A.   I think we both fed him, Detective Riordan

21    and myself.

22        Q.   Do you recall what you fed him?

23        A.   Probably hamburgers.

24        Q.   Now, the next morning, on August 5, 2000,

CCSAO XAVIER WALKER 001004

1    you said the polygraph was scheduled for

2    8:00 o'clock; is that correct?

3         A.    That's correct.

4         Q.    Where did you have to take the defendant

5    for the polygraph exam?

6         A.    To Homan Square.

7         Q.    How far is Homan Square from Area 4?

8         A.    About five minutes by car.

9         Q.    Now, when you -- did you leave Area 4 with

10   the defendant to go to the polygraph?

11        A.    Yes, we did.

12        Q.    Who else was with you in the car?

13        A.    Just Detective Riordan and myself and

14   Jovanie Long.

15        Q.    Now, on the way to the polygraph exam --

16   you said it was about a five minute drive?

17        A.    About that.

18        Q.    At any point on the way to the polygraph

19   exam did you tell the defendant that if he passed the

20   exam that you would kill him and make it look like he

21   was killed attempting to escape?

22        A.    No, I did not.

23        Q.    Did Detective Riordan ever make those

24   claims to the defendant?

EE-26

CCSAO XAVIER WALKER 001005

1     A.   No, he did not.

2     Q.   Did you or Detective Riordan make any

3  threats at all to the defendant on the way to the

4  polygraph exam?

5     A.   No, we did not.

6     Q.   Was there anybody else in the car besides

7  you, Detective Riordan, and the defendant?

8     A.   No.

9     Q.   When you got to the polygraph exam, did you

10 meet with a polygraph investigator?

11    A.   Yes.

12    Q.   Who was that?

13    A.   Bartik.

14    Q.   When you met with Bartik, was that first at

15 approximately 8:15 in the morning?

16    A.   Yeah, about 8:15.

17    Q.   When you met with Bartik, where was the

18 defendant?

19    A.   When we met with Bartik, we put Jovanie

20 Long in the polygraph room.

21    Q.   And where did you and Detective Riordan and

22 Detective Bartik go?

23    A.   In his office.

24    Q.   Bartik's office?

EE-27

CCSAO XAVIER WALKER 001006

1    A.    Yes.

2    Q.    And what did you do there?

3    A.    We explained the facts of the case, gave

4    him a copy of the case record, and briefly told him

5    that we were -- want him questioned in regards to his

6    implication as the shooter.

7    Q.    And did Investigator Bartik then leave you

8    and Detective Riordan alone?

9    A.    Yes, he did.

10   Q.    How long was Investigator Bartik gone

11   before he returned to his office?

12   A.    Five or ten minutes.

13   Q.    And when he returned to his office, what

14   did he say?

15   A.    He said, you better come back in here, he

16   made an admission.

17   Q.    Did you go into the room where the

18   defendant was sitting for the polygraph?

19   A.    Yes.

20   Q.    And did you say anything to the defendant?

21   A.    I asked him what he wanted to say,

22   and he told me that he shot -- he robbed him and

23   shot him.

24   Q.    And --

EE-28

CCSAO XAVIER WALKER 001007

1        A.    And I asked him who, and he said, the white

2   boy.

3        Q.    What did you do then?

4        A.    We explained to him that -- you know, what

5   was going to be done now, that we would take him

6   back.  He wasn't going to take the polygraph exam,

7   and we were going to take him back to the area.

8        Q.    Did you and Detective Riordan then take him

9   back to the area?

10        A.    Yes.

11        Q.    When you took him back to the area, did you

12   or Detective Riordan advise him of anything?

13        A.    Detective Riordan advised him of his rights

14   again.

15        Q.    Was that in your presence?

16        A.    Yes.

17        Q.    Were those the same rights that you have

18   just read to us?

19        A.    Yes.

20        Q.    Did he begin reading them out of the FOP

21   book?

22        A.    Yes.

23        Q.    Did the defendant acknowledge he understood

24   each of those rights?

CCSAO XAVIER WALKER 001008

1    A.    Yes.

2    Q.    Did the defendant make a statement to you

3    about the murder of Marek Majdak?

4    A.    Yes, he did.

5    Q.    After that statement, what did you do?

6    A.    We contacted felony review and told him the

7    facts of the case, and they told us that they would

8    send out a State's Attorney.

9    Q.    And did a State's Attorney arrive at the

10   area at approximately 10:00 a.m.

11   A.    Yes.

12   Q.    Detective, was there ever a time when the

13   defendant was shown various statements from witnesses

14   until he was coached into giving a statement about

15   the murder of Marek Majdak?

16   A.    No.

17   Q.    In fact, the only statement that you showed

18   the defendant was whose statement?

19   A.    Xavier Walker's.

20   Q.    Was there ever a time when you even

21   showed the defendant the entire statement of Xavier

22   Walker?

23   A.    No, we did not.

24   Q.    Was there ever a time when the defendant

EE-30

CCSAO XAVIER WALKER 001009

1      was in custody where you or anyone in your presence

2      threatened the defendant in any way that if he

3      refused to talk he'd be held for an indefinite period

4      of time?

5              A.    No.

6              Q.    And was there ever a time before the

7      defendant turned himself in where you or any other

8      detectives threatened to kill the defendant if they

9      found him?

10             A.    No.

11             Q.    Was the defendant ever in custody on August

12     2nd of the year 2000?

13             A.    No, he wasn't.

14             MS. COLEMAN:   I have no further questions

15     of this witness, Judge.

16                  CROSS EXAMINATION

17                  BY MR. CONNIFF:

18             Q.    Detective, how long have you been a Chicago

19     Police Officer?

20             A.    17 years.

21             Q.    How long have you been a detective?

22             A.    Eight years.

23             Q.    Your testimony was that the defendant

24     turned himself in; correct?

EE-31

```
 1        A.    That's correct.
 2        Q.    Now, when a defendant turns himself in or
 3   if anyone comes into the station to talk to you, what
 4   records are kept of the individual being in the
 5   station?
 6              MS. COLEMAN:   I'm going to object to
 7   generally what records are kept as to relevance.
 8              THE COURT:  Sustained.
 9              MR. CONNIFF:  I can rephrase it, Judge.
10   BY MR. CONNIFF:
11        Q.    With respect to Mr. Long, what records
12   would be kept indicating that he was in the station
13   on August the 4th?
14        A.    Our General Progress Reports.
15        Q.    All right, sir.  If he comes into the
16   station, he has to appear at the desk first;
17   correct?
18        A.    Yes.
19        Q.    And you would be notified of his presence
20   in the station?
21        A.    Yes.
22        Q.    Does the desk sergeant make a notation of
23   who approaches him in the station and asks to talk
24   to the detective?  Is there any record kept at the
```

CCSAO XAVIER WALKER 001011

1    desk?

2         A.   I don't know.

3         Q.   In your experience as a police officer, you

4    don't know whether those records are kept?

5         A.   I don't believe so.

6         Q.   So if Mr. Long came in on a day other than

7    August the 4th, there would be no other record

8    maintained by the Chicago Police Department other

9    than your General Progress Reports as to when he was

10   in the station?

11             MS. COLEMAN:   Objection, calls for

12   speculation.

13             THE COURT:   He can tell us his

14   understanding.

15   BY THE WITNESS:

16        A.   Repeat the question again.

17   BY MR. CONNIFF:

18        Q.   If Mr. Long came into the station on a day

19   other than August the 4th --

20        A.   Mm-hmm.

21        Q.   -- would there be any other record

22   of the Chicago Police Department of his presence

23   in the station other than your General Progress

24   Reports?

CCSAO XAVIER WALKER 001012

1       A.      Depending upon what he came in for.

2       Q.      All right.  Let's assume he came in to turn

3    himself in.

4       A.      Then there would be General Progress

5    Reports by a detective.

6       Q.      So your answer, as I understand it, is the

7    only record of when a man is in the station when he

8    reports to turn himself in is the General Progress

9    Report which you prepared?

10      A.      Yes.

11      Q.      There's nothing -- no notation is made at

12   the desk?

13      A.      No.

14              MS. COLEMAN:  Objection, asked and

15   answered.

16              THE COURT:  Sustained.

17   BY MR. CONNIFF:

18      Q.      There's no notation made up in the Area 4

19   Violent Crimes Office, an official log of who was

20   present in the station?

21              MS. COLEMAN:  Objection, asked and

22   answered.

23              THE COURT:  I'll let him answer that.

24   BY THE WITNESS:

EE-34

CCSAO XAVIER WALKER 001013

```
 1          A.    Yes.
 2    BY MR. CONNIFF:
 3          Q.    Yes, there is such a log?
 4          A.    There is a log.
 5          Q.    And is that log kept on a daily basis?
 6          A.    Yes.
 7          Q.    All right.  And what does that log --
 8    describe the entries that are made in that log.
 9          A.    Date on which the -- whoever is coming
10    in -- what date that would be, his name and the
11    detective's name and what case.
12          Q.    All right.  And is that a book?
13          A.    No, it's not.  It's just a piece of paper
14    that they have just so that when people call to see
15    if somebody is there, they can say, yeah, he's here
16    or he's not here.
17          Q.    All right.  So I take it this happens every
18    day; right?
19                MS. COLEMAN:  Objection.
20    BY MR. CONNIFF:
21          Q.    These sheets are kept up there?
22                THE COURT:  Go ahead.
23    BY MR. CONNIFF:
24          Q.    Sheets are kept on a daily basis?
```

CCSAO XAVIER WALKER 001014

1       A.   I assume so, yes.

2       Q.   And kept on every shift?

3       A.   Yes.

4       Q.   And they indicate those persons who are

5 present in Area 4 Violent Crimes on that date at a

6 specific time?

7       A.   Yes.

8       Q.   Now, after Mr. Long turned himself in, you

9 prepared General Progress Reports?

10      A.   Yes.

11      Q.   And do those General Progress Reports

12 document what you did with respect to Mr. Long?

13      A.   Yes.

14      Q.   And do you document -- generally speaking,

15 do you document in the General Progress Report, for

16 example, the time that you began an interview with

17 the defendant?

18      A.   Generally, I do.

19      Q.   All right.  Do you know whether you did in

20 this case?

21      A.   I don't recall.

22      Q.   Do you document the time that you conclude

23 an interview of a defendant?

24      A.   Yes, sometimes I do.

CCSAO XAVIER WALKER 001015

1       Q.    Did you do it in this case?

2       A.    I don't recall.

3       Q.    You say sometimes you do.  Is there any

4   policy which the Chicago Police Department requires

5   that you do so?

6             MS. COLEMAN:  Objection to the relevance.

7             THE COURT:  No, go ahead.  I'll let him

8   answer.

9   BY THE WITNESS:

10      A.    I -- I'm -- I don't know.

11  BY MR. CONNIFF:

12      Q.    Okay.  So with regard to a defendant giving

13  you a statement, sometimes you put down the time you

14  start and end and sometimes you don't?

15      A.    Yes.

16      Q.    And what guides you in making the

17  determination as to whether you document it?

18      A.    It just depends upon how busy I am and what

19  I'm doing.

20      Q.    All right.  So if it -- strike that.

21            Do you document each and every

22  separate conversation that you have with the

23  defendant?

24      A.    No.

CCSAO XAVIER WALKER 001016

```
 1        Q.   So you could have more than one
 2   conversation with the defendant and you would
 3   summarize it as though you were having one
 4   conversation; is that correct?
 5             MS. COLEMAN:  Judge, I'm going to object to
 6   what the detective generally does.
 7             THE COURT:  Sustained.
 8   BY MR. CONNIFF:
 9        Q.   All right.  But with respect to whether or
10   not you document each separate conversation, your
11   answer was no?
12        A.   That's correct.
13        Q.   Do you document in the General Progress
14   Report times when defendants ask to go to the
15   bathroom?
16             MS. COLEMAN:  Again, objection to the
17   relevance of what the detective generally does.
18             THE COURT:  Sustained.
19   BY MR. CONNIFF:
20        Q.   Did the defendant ask to go to the bathroom
21   in this case?
22        A.   Oh, yes.
23        Q.   He did.  Did you note that in your General
24   Progress Report?
```

CCSAO XAVIER WALKER 001017

1          A.    I would have to review my report.

2          Q.    What is the instruction that you have

3     been given by the Chicago Police Department as a

4     detective with regard to documenting that particular

5     subject?

6               MS. COLEMAN:   Objection to relevance.

7     BY MR. CONNIFF:

8          Q.    What is the policy, the general policy?

9               THE COURT:   He can answer.

10    BY THE WITNESS:

11         A.    Of going to the bathroom?

12    BY MR. CONNIFF:

13         Q.    Of noting in your General Progress Reports

14    your treatment of the defendant.  For example, his

15    request to go to the bathroom, what time it occurred,

16    and the fact that you let him go to the bathroom.

17    What's the general policy regarding General Progress

18    Reports?

19         A.    The general policy would be that we took

20    him to the bathroom, fed him, gave him cigarettes,

21    Coke, with no specific time or date.

22         Q.    So the general policy is to simply mention

23    it in the General Progress Reports?

24         A.    Yes.

CCSAO XAVIER WALKER 001018

```
 1          Q.     And there's no instruction to you to
 2     keep a chronological log of -- by time and subject
 3     exactly what you did with regard to the defendant
 4     and conversations that were had and actions
 5     that were taken concerning him in a chronological
 6     fashion?
 7          A.     That's correct.
 8          Q.     You indicated that you began your
 9     investigation on or about May the 13th, which is the
10     date of the homicide; correct?
11          A.     Yes.
12          Q.     And the first conversation that you had
13     with Regina Long was on June the 5th?
14          A.     That's correct.
15          Q.     Were there any prior conversations with
16     Regina Long by other detectives that you were aware
17     of?
18          A.     Not that I'm aware of.
19          Q.     Would Detective -- was Detective Sanders
20     involved in this investigation?
21          A.     Yes, he was.
22          Q.     Was Detective Wright?
23          A.     Yes, he was.
24          Q.     Did you have conversations with them
```

CCSAO XAVIER WALKER 001019

1    concerning the conduct of the investigation?

2        A.   Yes, I did.

3        Q.   Did they ever tell you that they had talked

4    with Regina Long?

5            MS. COLEMAN:  Objection to the relevance,

6    Judge.  This detective is not named in the motion.

7            THE COURT:  Go ahead.  I'll allow it.

8    BY THE WITNESS:

9        A.   Not that I recall.

10   BY MR. CONNIFF:

11       Q.   Did you ever review any notes or General

12   Progress Reports that they had made concerning a

13   conversation with Regina Long before you talked to

14   her on June the 5th?

15       A.   No.

16       Q.   You indicated that you had a telephone

17   conversation with Regina Long on June the 5th;

18   correct?

19       A.   That's correct.

20       Q.   And she told you that she hadn't seen her

21   son?

22       A.   Yes.

23       Q.   And that she had talked to him on the

24   phone?

CCSAO XAVIER WALKER 001020

1      A.    That's correct.

2      Q.    And that she told him that the police were

3  looking for him?

4      A.    I don't know what she said to her son.

5      Q.    You don't know what she said?

6      A.    All I know is what she told me.

7      Q.    And what did she tell you?  Did she tell

8  you that she had told her son that the police were

9  looking for him?

10     A.    No, she did not.

11     Q.    She did not say that in that conversation?

12     A.    Not to me she did not.

13     Q.    Did she tell you whether she knew where he

14  was?

15     A.    She said she did not know.

16     Q.    You then had a conversation with Regina

17  Long on July the 25th?

18     A.    That's correct.

19     Q.    Now, between May the 13th and June the 5th,

20  what shift were you working during that period of

21  time?

22     A.    Third watch.

23     Q.    Third watch?

24     A.    Yes.

1          Q.   Were the other detectives on first and
2     second watch also working this case?
3          A.   As far as Jovanie Long was concerned?
4          Q.   As far as May the 13th through June the
5     5th, the first contact with Regina Long?
6          A.   Yes.
7          Q.   And they were out on the street in the
8     neighborhood looking for people to talk to?
9          A.   Yes.
10              MS. COLEMAN:   Objection to the relevance.
11              THE COURT:   Sustained.
12    BY MR. CONNIFF:
13         Q.   Do you know -- you, yourself, were out on
14    the street looking for Jovanie Long during this
15    period?
16         A.   That's correct.
17         Q.   And from -- the same would be true of June
18    the 5th through July the 25th?
19         A.   That's correct.
20         Q.   And approximately how many people would you
21    say that you talked to in the neighborhood during
22    that period of time from May the 13th through July
23    25th?
24         A.   In whose neighborhood?

CCSAO XAVIER WALKER 001022

1      Q.    In the neighborhood where you were looking

2   for Jovanie Long?

3      A.    Approximately?

4      Q.    Yes.

5      A.    10, 15.

6      Q.    10 or 15 people?

7            Were any of those people brought into

8   the station and questioned?

9      A.    Yes.

10           MS. COLEMAN:  Objection to the relevance,

11   Judge.

12           THE COURT:  I'll reserve ruling.  I'm

13   giving you some latitude, but we're going to try to

14   stick to the written petition.

15   BY MR. CONNIFF:

16      Q.    Did you talk to neighbors?

17      A.    Whose neighbors?

18      Q.    Jovanie Long's neighbors?

19      A.    No, I did not.

20      Q.    You did not.

21           Did you talk to relatives?

22      A.    I did not.

23      Q.    You say you did not.  Are you aware of

24   someone else who did?

CCSAO XAVIER WALKER 001023

1        A.    No, I'm not.

2        Q.    So as far as you know, no one did?

3              MS. COLEMAN:  Objection.

4              THE COURT:  Sustained.

5    BY MR. CONNIFF:

6        Q.    You never talked to any cousins, nieces,

7    uncles, aunts, anyone like that who purported to be a

8    relative of Jovanie Long during that period of time?

9    No one?

10       A.    Not that I recall.

11       Q.    And your testimony is that no one else did

12   as far as you know?

13       A.    As far as I know, yes.

14       Q.    So you, yourself, nor no one in your

15   presence ever threatened anyone in the neighborhood

16   with regard to Jovanie Long's presence or your

17   looking for him?

18       A.    No.

19       Q.    And you never nor did anyone else as far as

20   you know take anyone into custody with the objective

21   of trying to find out where Jovanie Long was?

22       A.    No.

23       Q.    And your testimony is that you never

24   threatened Regina Long's mother?

EE-45

CCSAO XAVIER WALKER 001024

1           A.    No, I did not.

2                 THE COURT:  I'm sorry.  Never threatened

3      who?

4                 MR. CONNIFF:  I'm sorry.  I misspoke,

5      Judge.  Jovanie Long's mother, Regina.

6      BY THE WITNESS:

7           A.    No, I never threatened her.

8      BY MR. CONNIFF:

9           Q.    All right.  You never suggested to her

10     that if Jovanie Long didn't turn himself in that he

11     might be shot on the street because this was a murder

12     case?

13          A.    No, I did not.

14          Q.    Did anyone else make that statement to her

15     in your presence?

16          A.    No.

17          Q.    And you never -- just so we're clear, you

18     never threatened any member of his family?

19          A.    No, I did not.

20          Q.    Nor did anyone else that you know about?

21          A.    No.

22          Q.    Now, you worked on the case from May the

23     13th until Jovanie Long turned himself in?

24          A.    That's correct.

EE-46

CCSAO XAVIER WALKER 001025

1      Q.   And did you work the same shift during that

2  period of time?

3      A.   I was assigned to the same shift.  I worked

4  various hours.

5      Q.   Did you work on this case every day?

6      A.   No.

7      Q.   About how many days out of every seven did

8  you work on this case would you estimate?

9      A.   Probably three to four.

10     Q.   Three to four.

11           And did you generate for those three

12  to four days each week General Progress Reports for

13  the shifts that that period of time would cover as to

14  what you were doing on the case during that period of

15  time?

16         MS. COLEMAN:  Objection to the relevance.

17         THE COURT:  Sustained.

18  BY MR. CONNIFF:

19      Q.   You transported Jovanie Long to the

20  polygraph examination?

21      A.   Yes, Detective Riordan and myself.

22      Q.   And were there conversations in the car

23  between yourself and the -- and Officer Riordan and

24  Jovanie Long?

EE-47

CCSAO XAVIER WALKER 001026

1     A.   No.

2     Q.   Did you ever suggest to him on the way to

3 the polygraph examination that the results of the

4 examination would not matter?

5     A.   No, I did not.

6     Q.   Or words to that effect?

7     A.   No, I did not.

8     Q.   Did you ever suggest to him on the way to

9 the examination that Jovanie Long could be killed and

10 that you could make it appear as if he were trying to

11 escape?

12     A.   No, I did not.

13     Q.   You mentioned a couple of times in your

14 testimony that there was a stop order for Jovanie

15 Long?

16     A.   That's correct.

17     Q.   That is not a warrant for his arrest;

18 correct?

19     A.   No, it's not.

20     Q.   What is the meaning of a stop order in the

21 Chicago Police Department?

22     A.   It means that if he is stopped by another

23 police agency or Chicago, his name will appear that

24 we want him in questioning for -- and it will relate

EE-48

CCSAO XAVIER WALKER 001027

1    to the RD number which we're asking about.

2        Q.   All right.  So if he's at another

3    station, you'll be notified, and you'll go pick him

4    up there?

5        A.   If -- yes.

6        Q.   And finally, Detective, you pulled out the

7    book of Miranda warnings, and you testified -- you

8    read those rights from the book; correct?

9        A.   That's correct.

10       Q.   And you said that the way you read the

11   rights today is the way you saw Officer Riordan read

12   them to the defendant?

13       A.   Yes.

14       Q.   He actually pulled out his book and read

15   them to the defendant?

16       A.   Yes, he did.

17       Q.   Do you know how long Officer Riordan has

18   been a police officer?

19       A.   I believe he's been a police officer for 12

20   or 14 years, somewhere around there.

21       Q.   Not -- strike that.

22              Not with respect to Officer Riordan,

23   but with respect to yourself, in all of your years as

24   a Chicago Police Officer, do you still pull out the

CCSAO XAVIER WALKER 001028

```
 1    book and read from the book to each and every person

 2    that you give the rights to?

 3         A.   I always do.

 4         Q.   You never give them from memory?

 5         A.   Never.

 6         Q.   And why is that?

 7         A.   Because my --

 8              MS. COLEMAN:  Objection to the relevance.

 9              THE COURT:  He can answer.

10    BY THE WITNESS:

11         A.   Because I don't want to miss anything.

12    BY MR. CONNIFF:

13         Q.   You don't want to miss any?

14         A.   A word of the rights.  I do not want to

15    miss not one word.

16              MR. CONNIFF:  I have nothing further.

17              MS. COLEMAN:  I have nothing based on that,

18    Judge.

19              THE COURT:  Thank you, sir.

20                   (Witness excused.)

21              MS. COLEMAN:  We'd ask leave to call

22    Detective Riordan.  The testimony will be very brief,

23    but I'd ask the foundation be laid for the videotaped

24    statement, so I'd ask to set up the video.  It's all
```

EE-50

CCSAO XAVIER WALKER 001029

```
 1    ready to go.

 2              THE COURT:  Okay.

 3                   (Brief pause.)

 4              MS. COLEMAN:  I don't believe the detective

 5    has been sworn.

 6              THE COURT:  Would you stand and raise your

 7    right hand.

 8                   (Witness sworn.)

 9              THE COURT:  Please be seated.

10    WHEREUPON,

11                   JOHN RIORDAN,

12    called as a witness on behalf of the People of

13    the State of Illinois, having been first duly sworn,

14    under oath was examined and testified as follows:

15                   DIRECT EXAMINATION

16                   BY MS. COLEMAN:

17         Q.    Detective, could you please tell the judge

18    your name, star number, and unit of assignment?

19         A.    Gang specialist John Riordan,

20    R-i-o-r-d-a-n, Star Number 60040.  I'm assigned to

21    Area 4 Violent Crimes.

22         Q.    Now, on August 5th of the year -- August

23    4th and 5th of the year 2000, were you assigned to

24    Area 4?
```

EE-51

CCSAO XAVIER WALKER 001030