# EXHIBIT 39

```
 1    STATE OF ILLINOIS    )
                           ) SS:
 2    COUNTY OF C O O K    )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 4           COUNTY DEPARTMENT - CRIMINAL DIVISION

 5    THE PEOPLE OF THE        )
      STATE OF ILLINOIS        )
 6                             )
              vs.              ) No. 00 CR 20601
 7                             )
      XAVIER WALKER and        )
 8    JOVANIE LONG             )

 9

10              REPORT OF PROCEEDINGS at the hearing of

11    the above-entitled cause, had before the HONORABLE

12    MARCUS R. SALONE on the 19th day of February 2003.

13
      A P P E A R A N C E S:
14             HON. RICHARD A. DEVINE
               State's Attorney of Cook County
15        BY:  MS. JENNIFER COLEMAN
               Assistant State's Attorney
16             Appeared on behalf of the People;

17             MR. GREGORY WILSON
               Appeared on behalf of the Defendant,
18             Xavier Walker;

19             MS. RITA FRY
               Cook County Public Defender
20        BY:  MR. JOHN CONNIFF
               Assistant Public Defender
21             Appeared on behalf of the Defendant,
               Jovanie Long.
22

23    JO ANN KROLICKI, CSR
      Official Court Reporter
24    Illinois License No. ████
```

EE-1

CCSAO XAVIER WALKER 000981

```
 1                       I N D E X

 2

 3    People vs. Xavier Walker and Jovanie Long

 4    Date of Hearing:  2-19-03

 5    Page Numbers:  EE-1 through EE-95

 6

 7                      PROCEEDINGS

 8                                                   PAGE

 9    MOTION TO SUPPRESS EVIDENCE (Long)
      WITNESSES:                  DX    CX    RDX    RCX
10    MICHAEL PIETRYLA             9    31
      JOHN RIORDAN                51    63
11    ROBERT BARTIK               65    72
      JOHN RIORDAN                76
12    ARGUMENT                                       85
      FINDING                                        88
13

14                      EXHIBITS
                                   ID          REC.
15    People's 1                   18

16    People's 2                   54

17    People's 3                   68

18    Defendant's 1                72

19

20

21

22

23

24
```

CCSAO XAVIER WALKER 000700

1     notations on those forms and whether those forms
2     existed on that day.
3            THE COURT: You can call him as your
4     witness.
5            MR. CONNIFF: All right. No further
6     questions.
7            MS. COLEMAN: I have nothing further,
8     Judge, from this witness.
9            THE COURT: Step down, sir.
10                  (Witness excused.)
11           MS. COLEMAN: Judge, I have one other brief
12    witness. It's the polygraph examiner.
13           THE COURT: Okay.
14                  (Brief pause.)
15           THE COURT: Please raise your right hand.
16                  (Witness sworn.)
17           THE COURT: Please be seated.
18    WHEREUPON,
19           ROBERT BARTIK,
20    called as a witness on behalf of the People of
21    the State of Illinois, having been first duly sworn,
22    under oath was examined and testified as follows:
23                  DIRECT EXAMINATION
24                  BY MS. COLEMAN:

CCSAO XAVIER WALKER 001044

1  Q. Officer, could you please tell the judge
2  your name, your star number, and your unit of
3  assignment?
4  A. Police Officer Robert Bartik, B-a-r-t-i-k,
5  Star Number 3078, Chicago Police Department, Forensic
6  Services Division.
7  Q. And what do you do in the Forensic Services
8  Division?
9  A. I'm a polygraph examiner.
10 Q. So do you administer polygraph exams?
11 A. Yes, ma'am.
12 Q. I'm going to direct your attention now to
13 August 5th of the year 2000. Were you called to
14 administer a polygraph exam to a subject by the name
15 of Jovanie Long?
16 A. Yes, ma'am.
17 Q. Was there an arrangement for the detectives
18 to bring Jovanie Long to Homan Square on August 5th
19 of 2000 at approximately 8:00 a.m.
20 A. Yes, ma'am.
21 Q. What time did you arrive at Homan Square
22 that morning?
23 A. About 8:15.
24 Q. When you arrived at Homan Square, did you

CCSAO XAVIER WALKER 001045

1   meet with anybody?
2       A.  When I got there, Detectives Riordan and
3   Pietlak (sic) were already there with Mr. Long.  I
4   escorted them into my office.  I put Mr. Long into
5   the polygraph laboratory and met with Detective
6   Riordan and Pietlak in my office.
7       Q.  When you say, "Pietlak," is that Pietryla?
8       A.  Yes.
9       Q.  The detective that was in the back room?
10      A.  Yes, ma'am.
11      Q.  Do you see the person that you indicated
12  was Jovanie Long in the courtroom today?
13      A.  Um, yeah.  The gentleman in the beige
14  Department of Corrections suit (indicating.)
15          MS. COLEMAN:  Judge, may the record reflect
16  the in-court identification of the defendant?
17          THE COURT:  It shall.
18  BY MS. COLEMAN:
19      Q.  When the defendant -- you said the
20  defendant was put in one room; correct?
21      A.  He was placed in the polygraph laboratory.
22      Q.  Where did you, Detective Riordan, and
23  Detective Pietryla go?
24      A.  They were in my private office.

EE-67

CCSAO XAVIER WALKER 001046

1  Q. What did you do then?

2  A. They apprised me of the situation, of the
3  facts of the case.

4  Q. Where -- was the defendant in the room at
5  that time?

6  A. No, ma'am.

7  Q. After they apprised you of the facts in the
8  case, what did you do?

9  A. After I got all the necessary information,
10 I then entered the polygraph laboratory. I
11 introduced myself to Mr. Long as a police officer,
12 told him that I was here to administer a polygraph
13 examination to him, that the taking of a polygraph
14 examination was a voluntary thing, that he did not
15 have to take it if he did not wish to.

16          I then presented him with a polygraph
17 subject consent form which I read to him verbatim
18 from the form.

19 Q. During this conversation with the
20 defendant, was there anybody else present besides you
21 and the defendant?

22 A. No, ma'am.

23          (WHEREUPON, People's Exhibit
24           Number 3 was marked for

1                    identification.)

2

3   BY MS. COLEMAN:

4       Q.   I'm going to show you what I have marked as

5   People's Exhibit Number 3 for identification.

6            MS. COLEMAN:  May I approach?

7            THE COURT:  Go right ahead.

8   BY MS. COLEMAN:

9       Q.   Officer, I'm going to show you People's

10  Number 3.  Do you recognize that?

11      A.   Yes.

12      Q.   What is that?

13      A.   This is the photocopy of the polygraph

14  subject consent form of Mr. Jovanie Long.

15      Q.   Is there anything that you read to the

16  defendant on that form before he signs it?

17      A.   Yes, ma'am.  I read the entire form

18  verbatim, including the Miranda warnings.

19      Q.   And what else does that form tell him

20  besides Miranda warnings?

21      A.   That he has -- that he is volunteering for

22  the test, that I can give the information to the

23  proper people, a form of release, and that he has a

24  right to have a copy of the results of the polygraph

CCSAO XAVIER WALKER 001048

1    himself.

2        Q.   And after you advised him of that, did he
3    sign that form?

4        A.   Yes, ma'am, on two different spots.

5        Q.   And after that, did you then begin asking
6    him questions?

7        A.   I then went into a pretest interview, yes,
8    ma'am.

9        Q.   What is a pretest interview?

10       A.   Well, the polygraph is actually broken up
11   into two different phases.  The first phase is an
12   interview where we get the subject accustomed to
13   being there talking to us.  We want to make sure that
14   he knows what the issue at hand is, why he's taking a
15   polygraph test.

16            We do a small background health check
17   to make sure that he's suitable to take the test.  We
18   develop questions that we're going to ask him on the
19   test.  We review the questions on the test with him
20   before we actually administer the polygraph
21   examination.

22            The second phase is the actual
23   administration of the test.

24       Q.   And when you begin administering the

EE-70

1    test -- what did you do here?
2    A.   I started talking to him, interviewing him,
3    and explaining to him the process, talking to him
4    about the situation.
5    Q.   Now, at any point in time did you ask him
6    specific questions about this event, about the event
7    that happened on May 13th of 2000?
8    A.   Yes.
9    Q.   What did you ask him?
10   A.   I asked him if he did it.
11   Q.   And what did the defendant tell you?
12   A.   The defendant made a statement.
13   Q.   What did he tell you?
14   A.   He told me that during the robbery, he did
15   shoot the victim.
16   Q.   Now, after the defendant made that
17   statement to you -- first of all, when he made that
18   statement, was he in any way hooked up to any kind of
19   machine?
20   A.   No, ma'am.
21   Q.   So the polygraph had not actually begun
22   yet?
23   A.   No, ma'am.
24   Q.   What did you do after the defendant made

EE-71

CCSAO XAVIER WALKER 001050

1  that statement to you?

2  A.  I immediately opened up the polygraph
3  laboratory door.  I summoned Detective Pietlak and
4  Riordan into the polygraph laboratory.

5  Once they entered the room, I told
6  Mr. Jovanie Long, tell the detectives what you just
7  told me.  At which point, he repeated what he had
8  just told me.

9  Q.  Again, he made another admission?

10 A.  Yes, ma'am.

11 Q.  What did you do then?

12 A.  I left the room.

13 Q.  And was there ever a polygraph examination
14 given of the defendant that day?

15 A.  No, ma'am.

16 Q.  Why not?

17 A.  He had made an admission.

18 MS. COLEMAN:  I have no further questions,
19 Judge.

20             (WHEREUPON, Defendant's Exhibit
21             Number 1 was marked for
22             identification.)

23        CROSS EXAMINATION

24        BY MR. CONNIFF:

```
 1        Q.   Is it Officer Bartik?
 2        A.   Yes.
 3        Q.   Let me show you what I have marked as
 4   Defendant's Exhibit 1 for identification.
 5             MR. CONNIFF:  May I approach, Judge?
 6             THE COURT:  Sure.  Do you want to show that
 7   to counsel?
 8             MS. COLEMAN:  I think I see it.
 9             MR. CONNIFF:  Sorry.
10             MS. COLEMAN:  That's okay.  I see it.
11   BY MR. CONNIFF:
12        Q.   Officer, let me ask you, are those notes
13   that you, yourself, made?
14        A.   Yes, sir.
15        Q.   And do you see at the top of those notes
16   what appears to be a fax transmission date?
17        A.   Yes.
18        Q.   And what is the date of that fax
19   transmission date?
20        A.   February 16, 2003.
21        Q.   So just a couple of days ago?
22        A.   Yes, sir.
23        Q.   So these notes were made by you on or about
24   August the 5th of the year 2000?
```

CCSAO XAVIER WALKER 001052

1    A.   Yes, sir.

2    Q.   And they were just transmitted by fax
3 to the State's Attorney on February the 16th of
4 2003?

5         MS. COLEMAN:  Objection to the relevance,
6 Judge.

7         THE COURT:  I'll allow it.  I'm hard-
8 pressed to see the relevance.

9 BY MR. CONNIFF:

10   Q.   When did you make these notes?

11   A.   Immediately prior and after talking to
12 Mr. Long.

13   Q.   And in this particular note, Defendant's
14 Exhibit 1, this contains your report of the alleged
15 statement which Mr. Long made to you?

16   A.   A paraphrase, yes, sir.

17   Q.   And the first time you made known to the
18 State's Attorney that you had notes which referenced
19 that statement was when?

20        MS. COLEMAN:  Objection to the relevance.

21        THE COURT:  Sustained.

22 BY MR. CONNIFF:

23   Q.   What -- where were these notes kept from
24 August the 5th, 2000, until you produced them?

EE-74

```
 1                MS. COLEMAN:  Objection to the relevance.
 2                THE COURT:  Sustained.
 3   BY MR. CONNIFF:
 4         Q.   Did anyone tell you to make this
 5   notation of this alleged statement that Mr. Long made
 6   to you?
 7         A.   No.
 8         Q.   You have done this in other cases?
 9                MS. COLEMAN:  Objection to the relevance.
10                THE COURT:  Sustained.
11   BY MR. CONNIFF:
12         Q.   If you have made notes of statements which
13   defendants make to you in other cases, what have you
14   been instructed to do with regard to the notes of
15   those statements?
16                MS. COLEMAN:  Objection, relevance.
17                THE COURT:  Sustained.
18   BY MR. CONNIFF:
19         Q.   Did you cause this note of the alleged
20   statement which is Defendant's Exhibit 1 to be
21   transmitted to any supervisor or anyone above
22   you or State's Attorney following your making this
23   note?
24                MS. COLEMAN:  Objection, relevance.
```

CCSAO XAVIER WALKER 001054

```
 1                THE COURT:  Sustained.
 2                MR. CONNIFF:  I have nothing further,
 3   Judge.
 4                MS. COLEMAN:  I have nothing further,
 5   Judge.
 6                THE COURT:  Thank you, sir.
 7                THE WITNESS:  Thank you.
 8                     (Witness excused.)
 9                MS. COLEMAN:  Judge, at this time, the
10   People rest in our case-in-chief.
11                MR. CONNIFF:  Judge, we call Detective
12   Riordan.
13                THE COURT:  Okay.
14                      (Brief pause.)
15                THE COURT:  Sir, you remain under oath to
16   tell the truth.
17                THE WITNESS:  Yes, sir.
18   WHEREUPON,
19                JOHN RIORDAN,
20   called as a witness on behalf of the Defendant,
21   having been first duly sworn, under oath was examined
22   and testified as follows:
23                    DIRECT EXAMINATION
24                    BY MR. CONNIFF:
```

CCSAO XAVIER WALKER 001055