# EXHIBIT 41

RE: INVESTIGATION (ROBBERY AND FATAL SHOOTING OF MAREK MAJDAK)

VIDEO STATEMENT

OF

JOVONIE LONG

taken in an interview room, Area 4 Headquarters, Chicago, Illinois, on August 5, 2000, at 4:32 p.m.

PRESENT: Jim Navarre
Assistant State's Attorney

Gang Specialist Riordan
Star No. 60040
Area 4 Violent Crimes

Recorded by: Cordelia B. Wert

---

MR. NAVARRE: Let the record reflect that today is August the 5th, 2000. We are in an interview room at Area 4 Violent Crimes. Present in the room with me, Assistant State's Attorney Jim Navarre, are Gang Specialist Riordan, star 60040, and Jovonie Long.

We are here to take the statement of Jovonie Long concerning the investigation of the robbery and fatal shooting of Marek Majdak, which occurred on May 13th, 2000, at approximately 1:00 o'clock or 1:14 in the morning, at the location of 4721 West Ohio.

Before we spoke, I explained that I am an assistant state's attorney, a lawyer and prosecutor and not your lawyer, is that correct?

A. Yes.

1

Q. Before we spoke, I advised you of your constitutional rights, is that correct?

A. Yes.

Q. Jovonie Long, I talked to you earlier and you told me about the robbery and fatal shooting of Marek Majdak. At that time you told me that on May 13th, 2000, you were with Xavier Walker and looking for licks, which are people to rob. And the victim drove up in a van and you ended up shooting him twice when you were trying to get money from him. And you ended up getting two fifty dollar bills after Xavier took his money and gave you some. Is that correct?

A. Yeah.

Q. I'm now going to read you your rights again. Do you understand that you have the right to remain silent?

A. Yeah.

Q. Do you understand that anything you say can be used against you in a court of law?

A. Yeah.

Q. Do you understand you have the right to talk to a lawyer and have him present with you while you are being questioned?

A. Yeah.

Q. Do you understand if you cannot afford to hire a lawyer and you want one, a lawyer will be appointed by the court to represent you before any questioning?

A. Yeah.

Q. Understanding these rights, do you wish to talk to us

City NK 000074

now?

A. Yeah.

Q. Jovonie Long, I asked you if you would agree to have your statement videotaped, is that correct?

A. Yeah.

Q. And after you indicated that you would agree to have your statement videotaped, I asked you to sign a form which is marked as Exhibit 1, which is a Consent to Videotape Statement, is that correct?

A. Yeah.

Q. And you understand that right now a video camera is in the next room and that it will record everything that I say and do as well as everything that you say and do, is that correct?

A. Yeah.

Q. And understanding this, you consent to the videotaping of your statement, is that correct?

A. Yeah.

Q. But you did not want to sign the Consent to

A. No.

Q. -- Videotape Statement form, is that correct?

A. No.

Q. Okay. But you are agreeing to the videotape statement?

A. Yeah.

Q. What is your date of birth, Jovonie?

A. 

Q. Do you know someone by the name of Xavier Walker?

3

**City NK 000075**

A. Yeah.

Q. Is there a nickname that you call him by?

A. Zay.

Q. I'm now showing you what's been marked as Exhibit Number 2. Is that a photograph of Xavier Walker?

A. Yes.

Q. How long have you known Xavier Walker for?

A. All my life.

Q. And there is -- is there a name that he calls you by?

A. Vani or Jovonie.

Q. Have you and Zay ever done anything before in the past?

A. Probably once, twice.

Q. And what is that you, that you've done with Zay?

A. Hit a lick.

Q. And what does it mean to, hit a lick?

A. It's a (inaudible) or snatch some money.

Q. Take some money from people?

A. Yeah.

Q. All right. Now, I want to talk about May 13th, 2000, or early in the morning sometime around 1:00 o'clock in the morning. Were you with Zay?

A. Yeah.

Q. Okay. And where were you and Zay at?

A. On Erie and Kilpatrick.

Q. What were you doing at the time with Zay?

A. Trying to hit a lick.

4

Q. And once again, a lick is taking money from people?

A. Yeah.

Q. Did you have anything with you?

A. Yeah.

Q. What is it that you had with you?

A. A gun.

Q. What kind of gun?

A. A 45.

Q. Is that an automatic?

A. Yeah.

Q. When is it that you got this 45 caliber?

A. About a week before that.

Q. About a week before May 13th?

A. Yeah.

Q. Okay. Where did you get it from?

A. Off the street.

Q. And did you have to pay any money for it?

A. Yeah.

Q. How much did you pay?

A. $50.

Q. After you were with Zay for about a half hour, did anyone drive up?

A. Yeah.

Q. Okay. And who is it that drove up?

A. A guy in a, a white guy in like a dark bluish mini-van, something like that.

5

City NK 000077

Q. Was this mini-van a newer van or an older van?

A. It was new.

Q. When you saw that it was newer van, what did you think?

A. I thought he probably had some money.

Q. After the white guy drove up in the newer mini-van, what happened?

A. Xavier standing in the street flagging him down like this. (indicating) And he pulled over.

Q. Who pulled over?

A. The white guy.

Q. Okay. And then what happened?

A. Then Xavier went up to the van and I guess he had some money out cause he snatched in that like that, tried to snatch it, snatch the money.

Q. Who snatched it?

A. Xavier.

Q. Okay. And, and what happened when Zay tried to snatch in?

A. He jerked back.

Q. Which guy jerked back?

A. The guy was driving the van, the white guy.

Q. Okay. And where were you at when this happened?

A. About 15 feet away.

Q. Okay. Now, after the, the white guy jerked back and he was in the van, did you do anything at that point?

A. I walked up to the van.

6

Q. Okay. What side of the van did you go on to?

A. The passenger side.

Q. Okay. And what did you do then?

A. I told him to come around the block.

Q. Okay. Did you verbally tell him this or did you make a motion?

A. I made a motion like this. (indicating)

Q. Just like you're doing right now?

A. Yeah.

Q. Okay. And which way were you trying to point him to go to?

A. To Ohio.

Q. Okay. Why is it that you wanted to go over by Ohio?

A. Cause it would be easier and it's dark.

Q. Okay. And why would it be easier?

A. So the police won't be able to see it.

Q. Okay. What happened then?

A. He got on Ohio. I walked up to the van and got in with him.

Q. And which side of the van did you get in on?

A. The passenger side.

Q. Okay. And was the white guy still inside the van?

A. Yeah.

Q. Okay. What did you do after you got in the passenger side?

A. I pulled the gun out.

7

Q. Is that the 45?

A. Yeah.

Q. Okay. What did you do with the gun after you pulled it out?

A. I pointed it at him.

Q. Can you show me right now or --

A. Like this. (indicating)

Q. Okay. And why is it that you pointed the gun at the white guy?

A. So he would give the money up quicker.

Q. Okay. What happened after you pointed the gun at the white guy?

A. He grabbed it. We got to wrestling over the gun.

Q. Okay. What part of the gun were you holding onto?

A. The handle and the trigger part.

Q. Okay. And where were your fingers at?

A. On the handle and the trigger part.

Q. Okay. And what part did the white guy try to grab?

A. He had the -- what you call it -- the barrel part.

Q. Okay. And what did you do then?

A. Well, we wrestled for a while. And then he was beating me up for a minute so I shot --

Q. Okay.

A. -- to get him up off me.

Q. So you fired one shot, you said to get him up off you?

A. Right.

8

Q. Okay. What did the white guy do then?

A. He got out the van.

Q. Okay.

A. And ran across the street.

Q. What's over across the street?

A. Nothing, just a sidewalk.

Q. Okay. And what did you do at that point?

A. I walked up behind him.

Q. Okay. And after you walked up behind him, what did you do?

A. I pulled the gun out again.

Q. Okay. That's the 45?

A. Pointed at him again. Yeah.

Q. You -- show me how you pointed it at him?

A. Like this. (indicating)

Q. Okay. Now, why is it that you pointed the gun at him again?

A. To try to get the money.

Q. Okay. And what happened then?

A. He swung on me again.

Q. And what did you do?

A. I shot.

Q. Okay. So you shot him the second time?

A. Yeah.

Q. Okay. What happened to the victim after you shot him the second time?

9

A. He fell down.

Q. On the sidewalk?

A. Yeah.

Q. Okay. What happened then?

A. Then Xavier ran over there, went in his pocket and took the money.

Q. Okay. Could you see what the money looked like when Xavier took it out?

A. Just like a little knot, like a ball of money, something like that.

Q. And then where did you go?

A. I ran home.

Q. Where was home at?

A. 4653 West Erie.

Q. And who else stays at 4653 West Erie?

A. Mary Curry.

Q. Okay. Is there another name you call Mary by?

A. Yes, momma.

Q. All right, what happened there?

A. Xavier came back and got me.

Q. And where did you go with him then?

A. We went to the, the water spot.

Q. Okay. When you say, water spot, what does that mean?

A. The leaf spot.

Q. Okay.

A. The PCP spot.

10

Q. All right. And what did you do at the water spot with Xavier?

A. Bought some -- he bought -- got out and bought some sacks, some bags of water and we got -- he got back in and we drove around, went down Erie towards Cicero. Went down Cicero to Lake and went to a bar.

Q. Okay. What, what's the name of the place there on Lake?

A. (inaudible)

Q. Okay. Is that a club?

A. Yeah.

Q. Okay. Did Zay give you anything at the club?

A. He gave me two fifties.

Q. Okay. And where the did two fifties come from?

A. From the guy.

Q. From the white guy?

A. Yeah.

Q. All right. Later on that day, did you tell momma what happened?

A. Yeah.

Q. What did you say to her?

A. I told her, we was trying to hit a lick and the guy was fighting me and, and it went bad, I ended up shooting him.

Q. Okay. Did you also tell Ashanti what happened?

A. Yeah.

Q. Okay. And were you there when Zay told Maurice what happened?

11

A. Yeah.

Q. Okay. Who is, who is Ashanti by the way?

A. She like a god daughter to Mary -- to momma.

Q. Okay. And what about Maurice?

A. That's her son.

Q. Okay. Now, did you come here to the police station yesterday?

A. Yes.

Q. Okay. And you came here on your own?

A. Yeah.

Q. Okay. Why is that?

A. Cause I had to. I felt bad about what happened.

Q. How have the police treated you?

A. They've treated me fair.

Q. And how have I treated you?

A. Fair.

Q. Have you been given anything to eat?

A. Yeah.

Q. What have you had to eat?

A. McDonald's and Burger King.

Q. You had anything to drink?

A. Yeah.

Q. What have you had to drink?

A. Some pops, fruit pop and some water.

Q. Okay. Have you had any cigarettes?

A. Yeah.

12

Q. Okay. Have you been allowed to use the bathroom?

A. Yeah.

Q. More than once?

A. Yeah.

Q. Okay. Have you been able to get any sleep?

A. Yeah.

Q. Okay. Are you giving this statement freely and voluntarily?

A. Yeah.

Q. Any threats or promises been made to you in exchange for this statement?

A. No.

Q. Okay. Are you under the influence of alcohol or drugs?

A. No.

Q. This now concludes the statement of Jovonie Long.

-----------------------------------------------------------------

13

City NK 000085