# EXHIBIT 46

```
                  UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF ILLINOIS

                       EASTERN DIVISION

---------------------------------------------------------

Xavier Walker,


          Plaintiff,


     vs.                          Case Number 1:2020cv07209


City of Chicago et al.,


          Defendants.

---------------------------------------------------------

                Deposition of Gregory Wilson

                        Wednesday

                   February 23rd, 2022


                          -at-


                  Zoom Remote Deposition
```

Exhibit 5, LLC

```
 1                      APPEARANCES

 2

 3              For the Plaintiff:

 4              Jeanette S. Samuels

 5              Samuels & Associates, Ltd.

 6              601 South California Avenue

 7              Chicago, Illinois 60612

 8

 9         For the Defendant City of Chicago:

10              Natalie Adeeyo

11                Breana Brill

12               Robin Shoffner

13             Nathan & Kamionski, LLP

14             33 West Monroe Street

15                 Suite 1830

16             Chicago, Illinois 60603

17

18   For the Individual Chicago Police Officer Defendants:

19             Misha Itchhaporia

20              Graham P. Miller

21             Borkan & Scahill, Ltd.

22              20 South Clark Street

23                 Suite 1700

24             Chicago, Illinois 60603

25
```

```
 1              RECORDER:  Zoom is now recording.  Good
 2  morning.  We are now on the record.  Today is
 3  Wednesday, February 23rd, 2022.  The time is now 10:06
 4  a.m.  We are meeting remotely today for the deposition
 5  of Gregory Wilson in the matter of Xavier Walker v.
 6  City of Chicago et al., case number 1:2020cv07209.  The
 7  venue is Northern District of Illinois, Eastern
 8  Division.  Mr. Wilson, my name is Brenda Portillo.  I'm
 9  a notary public, and I'm recording this deposition on
10  behalf of Exhibit 5, LLC.  This deposition is being
11  recorded remotely via Zoom in accordance with Illinois
12  Public Act 101-0640.  Mr. Wilson, would you please
13  confirm your identity by placing a valid picture ID in
14  front of the camera briefly?
15              MR. WILSON:  I -- one moment, please.  All
16  right.  Do you see it?
17              RECORDER:  A little over to -- yep, a little
18  further over.  Sorry, we're looking at your --
19              MS. SHOFFNER:  We see your --
20              RECORDER:  -- palm right now.
21              MR. WILSON:  We're good?
22              RECORDER:  No, we're looking at your palm
23  still, I'm sorry.
24              MR. WILSON:  Okay.
25              MR. MILLER:  Read your palm -- but --
```

```
 1              RECORDER:  A little bit to your right.
 2              MS. SHOFFNER:  Your future is bright and
 3   sunny.
 4              MR. WILSON:  Miss Court Reporter?
 5              RECORDER:  Yes.
 6              MR. WILSON:  Are you satisfied?
 7              RECORDER:  Can you actually hold it up one
 8   more time a little more to your right, please?
 9              MR. WILSON:  To my right?
10              RECORDER:  Yeah.  Try holding it in front of
11   your nose actually.  Is that better -- is it -- that
12   helps a little bit more.  Thank you.
13              MR. WILSON:  Okay.
14              RECORDER:  Yes.  And Mr. Wilson, are you
15   physically located in the state of Illinois?
16              MR. WILSON:  I am.
17              RECORDER:  Yes?  At this time, would you
18   please raise your right hand for the oath?
19                        (Witness sworn)
20              RECORDER:  Thank you.  Would the attorneys
21   please state their appearances for the record?
22              MS. SHOFFNER:  Good morning, Mr. Wilson.  My
23   name is Robin Shoffner, and I, along with Natalie
24   Adeeyo and Breana Brill represent the City of Chicago.
25              MR. MILLER:  Graham Miller and Misha
```

```
 1  Itchhaporia on behalf of the individual CPD Defendants.
 2           MS. SAMUELS:  Good morning, my name is
 3  Jeanette Samuels, and I represent the Plaintiff, Xavier
 4  Walker.
 5           RECORDER:  Thank you.  That completes the
 6  required information.  We can proceed.
 7                       EXAMINATION
 8  BY MS. SHOFFNER:
 9      Q.  All right.  Mr. Wilson, would you please
10  state your full name including your middle name and --
11  for the record?
12      A.  Gregory Allan Wilson.                    0:02:54
13      Q.  And are you currently alone in a room?
14      A.  Yes, I am.
15      Q.  All right.  Sir, have you given a deposition
16  before?
17      A.  Yes, I have.
18      Q.  All right.  You -- then you know the general
19  ground rules, I'll just go over them briefly.  From
20  time to time, I'll be asking a question, you will know
21  the question before I finish it, but please allow me
22  the opportunity to finish asking the question and I
23  will allow you the opportunity to finish your answer,
24  okay?
25      A.  Certainly.
```

1     Q.   If you don't understand a question, please

2  let me know and I will do my best to clarify it for

3  you.  If you answer a question, I will assume you

4  understood the question and answered it accurately,

5  understood?

6     A.   Yes.

7     Q.   All right.  From time to time, the attorneys

8  may object to a question I ask, and once they get their

9  object -- objection on the record, then you are free to

10 go ahead and answer the question, okay?

11    A.   Okay.                                    0:03:54

12    Q.   If you need a break at any point in time,

13 just let me know.  We can always stop and take a break.

14 I -- I only ask that you answer a pending question

15 before taking a break.  Understood?

16    A.   Yes.

17    Q.   All right.  Before we jump into this, I need

18 to ask, are you under the influence of any drugs or

19 alcohol?

20    A.   No.

21    Q.   All right.  Are you under the influence of

22 any medication that may impact your ability to testify

23 truthfully today?

24    A.   No.

25    Q.   All right.  Do you know of any reason why you

```
 1  cannot testify truthfully and accurately to the best of

 2  your ability?

 3      A.   No.

 4      Q.   All right.  Sir, I contacted you to confirm

 5  your deposition here today.  When we spoke, other than

 6  setting the date for your appearance, did we discuss

 7  anything related to Xavier Walker's civil lawsuit?

 8      A.   No.

 9      Q.   And did we discuss his criminal case?

10      A.   No.

11      Q.   And we didn't discuss anything related to Mr.

12  Walker.  Is that fair to say?

13      A.   That's correct.

14      Q.   Now have you discussed your deposition today

15  with anyone?

16      A.   No.                                         0:05:05

17      Q.   You haven't spoken to Jeanette Samuels, Mr.

18  Walker's attorney?

19      A.   Yeah, I did speak with Attorney Samuels, but

20  it was not regarding my deposition.

21      Q.   All right.  When did you last speak to

22  Attorney Samuels?

23      A.   I spoke to her yesterday, matter of fact.

24      Q.   And what was the nature of your communication

25  yesterday?
```

```
1        A.   It had to do with my recollection of the

2   facts surrounding Xavier's -- my -- my represent --

3   representation of Xavier in his criminal trial.

4        Q.   And -- and you had no discussion about your

5   deposition.  Is that what you're say --

6        A.   That's what I'm saying, that is correct.

7        Q.   Okay.  All right.  Did -- did you all discuss

8   your assertion of the attorney-client privilege during

9   your deposition today?

10       A.   We did not.

11       Q.   Did you discuss any facts that you cannot

12  testify here to today?

13       A.   No, we did not.                        0:06:12

14       Q.   And how long did that conversation last?

15       A.   Maybe five minutes.

16       Q.   And you were able to communicate your

17  recollection of Mr. Walker's criminal case to her

18  within that five-minute time period?

19       A.   As I was able to answer the questions she

20  raised within that five minutes, yes, as best I could.

21       Q.   What questions did she ask?

22       A.   She asked if I had -- if I could recall -- if

23  I recalled whether certain individuals had been

24  presented to me in -- in my defense of Mr. Walker.

25       Q.   When you say, "certain individuals," did she
```

```
 1   give you --

 2        A.   Certain people named as potential witnesses

 3   in -- in his criminal trial.

 4        Q.   Okay.  And which -- which individuals were

 5   you asked about?

 6        A.   Oh, jeez.  I did not take notes, and as I sit

 7   here right now, I can't answer that.

 8        Q.   Okay.  Did she ask you about Simeon Dorsey?

 9        A.   That name came up, yes.                    0:07:15

10        Q.   Did she ask you about Shunralyn Walker?

11        A.   Yes.

12        Q.   Did she ask you about Antwoine Waddy?

13        A.   I believe so.

14        Q.   Did she ask you about Marvin Mosley?

15        A.   That name also may have came up.

16        Q.   Did she ask you about Charles Toles?

17        A.   I don't recall that name.

18        Q.   Did she ask you about Yvette Anderson?

19        A.   I don't recall that name.

20        Q.   How about Marion Tillman (phonetic)?

21        A.   I don't recall that name.

22        Q.   Deon Baylock?                              0:08:00

23        A.   I believe that name came up.

24        Q.   Now when she asked you about Simeon Dorsey,

25   what was your -- what -- what was your response to
```

1   that?  About -- the question I believe she said -- she

2   asked was, "Were these witnesses presented to you,"

3   correct?

4       A.   Yeah, so my -- my response to Ms. Samuels

5   yesterday for that individual and frankly for all of

6   them was that I'd no longer had any recollection of --

7   of my involvement with them whatsoever.

8       Q.   It has been quite a while ago, hasn't it?

9       A.   Yeah, indeed so.

10      Q.   And so with each of these witnesses and when

11  she asked you if they had been presented to you, your

12  response with respect to all of them was that you

13  didn't -- you didn't have independent recollection.  Is

14  that fair to say?

15      A.   I think that is fair to say, yes.          0:08:56

16      Q.   Now in addition to asking you if certain

17  witnesses had been presented to you, did she ask you

18  anything else?

19      A.   No.

20      Q.   Okay.  Other than -- other than talking with

21  Ms. Samuels yesterday, have you spoken to her prior to

22  this?  When was the last time you spoke to her prior to

23  yesterday?

24      A.   Yesterday was the first and only time I've

25  ever spoken to Ms. Samuels regarding Xavier Walker's

```
 1   case.

 2       Q.   Yeah, but you said -- do you know her

 3   personally?

 4       A.   We -- in passing.                        0:09:48

 5       Q.   So you've spoken to her on occasion in

 6   connection with other -- other instances or social or

 7   -- or -- or work related, but with respect to Xavier

 8   Walker, yesterday was the first day that you had a

 9   conversation with Jeanette Samuels about Xavier

10   Walker's civil lawsuit.  Is that fair to say?

11       A.   That is fair to say.

12       Q.   All right.  And have you ever spoken to

13   Jeanette Samuels -- Samuels about Xavier Walker's

14   criminal case when it was pending?

15       A.   No.

16       Q.   Did you ever speak with Ms. Samuels about his

17   efforts to become exonerated and have the charges

18   dismissed against him?

19       A.   No.

20       Q.   And I may have asked this before, but other

21   than Ms. Samuels, have you discussed your deposition

22   with anyone else?

23       A.   No, I have not.                           0:10:53

24       Q.   And have you discussed Xavier Walker's civil

25   lawsuit with anyone else?
```

1    A.    No.

2        Q.    Okay.  But when was the last time you had a

3    discussion about Xavier Walker that you can recall?

4        A.    Oh, jeez, jeez.  It's -- it's been years.

5    Years ago a Harold Winston from the public defender's

6    office was in contact with me regarding I think seeking

7    to have Xavier's conviction overturned, and that --

8    when I say, "years ago," I'm talking more -- probably

9    five-ish years ago.

10       Q.    Okay.

11       A.    And that was the last time I spoke with

12   anyone about Xavier Walker.

13       Q.    I see.  And so you spoke with Mr. Winston

14   when he was seeking to probably get an affidavit from

15   you.  Is that fair to say?

16       A.    That's fair to say.                    0:11:50

17       Q.    And -- and we'll talk about that later, but

18   since that conversation, you haven't had any

19   conversations about Xavier Walker until you received

20   the subpoena and we spoke on the phone.  Is that

21   correct?

22       A.    That is correct.

23       Q.    Okay.  Now sir, have you reviewed any

24   documents in preparation for your deposition today?

25       A.    I looked through my file to see if there was

```
 1  anything there that could refresh my recollection, and

 2  I only really came across the affidavit that I prepared

 3  or was prepared for -- with Mr. Winston.

 4      Q.   Now when you say you looked across your file,

 5  is that the -- the criminal file that you maintained in

 6  connection with Xavier Walker?

 7      A.   Correct.

 8      Q.   And is that the file that you produced to --

 9  to us in response to a subpoena?

10      A.   Correct.                           0:12:48

11      Q.   And you reviewed that file in preparation for

12  your deposition here today?

13      A.   Well, I -- I -- I certainly looked at it,

14  yes.

15      Q.   Now with respect to the document and the file

16  that you produced, were those all the files that you

17  have in connection with this case?

18      A.   Yes.

19      Q.   And does that file -- you have it, but so is

20  that considered your personal file with this case?

21      A.   It is my personal file, yes.

22      Q.   Now does this file represent all the

23  documents that you ever possessed in this case?

24      A.   I would think so, but I can't be -- can't

25  answer that definitively one way or the other.
```

1     Q.   Were all the personal notes that you had

2  taken regarding Mr. Walker included in that file?

3     A.   I believe so.                   0:14:03

4     Q.   And all the notes that you had taken in

5  respect to this case were produced to Counsel.  Is that

6  correct?

7     A.   By "this case," are you talking about this

8  civil case?

9     Q.   No, sir, I'm actually referring to Xavier

10  Walker's criminal case.

11     A.   Okay.  Yes, then answer's yes.

12     Q.   And then would your file also conclude --

13  include notes regarding interviews that you had with

14  potential witnesses?

15     A.   It may -- they may -- it may well have.  I

16  don't recall seeing any such notes when I reviewed the

17  file yesterday, however.

18     Q.   Well, did you create personal notes from

19  having interviewed witnesses?

20     A.   I -- I would believe that I would have done

21  so, yes.

22     Q.   But you said there were no such notes in your

23  file that was tendered to us.  Is that correct?

24     A.   Correct.

25     Q.   Now if you don't have the notes that you

1  generated, where -- where would those notes be?

2      A.    They would have either been lost or -- or --

3  or disposed of.  I mean, again we're talking about a

4  20-ish year-old case.

5      Q.    So is it possible that many of the documents

6  that consisted in your original file in this case may

7  have been destroyed?

8      A.    Yes.                                    0:15:37

9      Q.    And where did you store this -- where did you

10 -- where did you have these documents stored?

11     A.    I have file cabinets in the -- so I have a

12 home office, and I have a -- a -- a dedicated file room

13 then which I store all of my closed files.

14     Q.    Would your file have contained court

15 transcripts from -- transcripts from court proceedings?

16     A.    Actually I don't recall ever having any

17 transcripts from any court proceeding.

18     Q.    How about -- how about photos?  Would your

19 file have contained photos of -- that were generated in

20 connection with this case?

21     A.    Certainly it is possible, but I -- I -- I

22 don't know that -- I know that as I looked at my file

23 yesterday, no photos presented themselves, so once --

24 once again if -- if I had them, I no longer have them.

25     Q.    And is -- over the years, do you sort of pare

1  down the files and sort of keep the -- the important

2  documents and then -- and dispose of other documents

3  and then store them?

4      A.    Well, over the years if I -- if -- once the

5  file becomes, and this is my terminology, stale and a

6  -- a period of time goes by with no action, I -- I

7  literally dispose of everything.

8      Q.    Well, typically you dispose of everything

9  after a period of time, but in this case you seem to

10  have held onto at least several hundred documents.

11  Fair to say?

12      A.    That's fair to say.                    0:17:46

13      Q.    And is there any reason that you held on to

14  documents in this case and didn't dispose of your

15  entire file?

16      A.    The only reason that comes to mind is that as

17  I perhaps was nearing making a decision on it, Mr.

18  Winston presented himself as representing Xavier in his

19  efforts to get exonerated.

20      Q.    And in his effort to do so, did you provide

21  Mr. Winston with any files that you had in your

22  possession?

23      A.    Nothing more than what you guys have.

24      Q.    So I guess the answer to -- I guess my

25  question is -- is did you provide -- and we'll talk

1   more about this later, but did you provide Mr. Winston

2   with original documents that were in your file?

3       A.   Yes.                                    0:18:35

4       Q.   Did -- do you recall what those original

5   documents were?

6       A.   Oh, I do not.

7       Q.   Do you recall how many there were?

8       A.   I do not.  It -- it was a briefcase full of

9   documents, but what they were, I can't tell you.

10      Q.   And so -- and you met with Mr. Winston, you

11  discussed how he was attempting to get Mr. Walker

12  exonerated, and you offered your assistance.  Is that

13  fair to say?

14      A.   No, I did not offer my assistance.  He asked

15  me if I could and would supply him with -- with -- with

16  my file and I -- I agreed to do that.

17      Q.   And you provided him with your file at that

18  time?

19      A.   At -- at some point in time I did, yes.          0:19:34

20      Q.   Did you give him the original documents or

21  did you make a copy of what you gave him?

22      A.   I gave him the -- I gave him my original

23  documents, he Xeroxed and returned my files to me.

24      Q.   Now did you provide a copy of your file to

25  the Cook County public defender's office once you had

1  -- to the Cook County public defender's office once you

2  had completed your representation of Mr. Walker?

3      A.   That -- that's the file that I gave to Mr.

4  Winston, who was with the public defender's office.

5      Q.   Okay.  And that is when you provided the Cook

6  County public defender a copy of your criminal file?

7      A.   Correct.

8      Q.   Relative to your file, how did you receive

9  documents in connection with the Walker case?

10     A.   I'm sorry, would you repeat that?                0:20:47

11     Q.   Relative to your file, how did -- how would

12 you receive documents in connection with this case?

13     A.   Well, as I'm representing Mr. Walker in a

14 criminal matter, much of the material I received was

15 from the State's Attorney's Office in terms of

16 discovery.  My -- my file would have also contained

17 notes that I may have created for -- for my own

18 independent research, and it may have contained notes I

19 created following interviewing certain witnesses or

20 individuals who could or could not have been -- been --

21 been witnesses.

22     Q.   Would you on occasion receive information

23 from the Cook County public defender's office?

24     A.   No.  If -- if I did, I don't -- you see, I

25 have no recollection of having received anything from

```
 1   the Cook County public defender's office.

 2       Q.   Okay.  Other than the documents that you

 3   produced in connection with this case, have you

 4   reviewed any other documents?

 5       A.   No.                                    0:22:05

 6       Q.   All right.  Sir, what is your date of birth?

 7       A.

 8       Q.   And your current address?

 9       A.   4006 South King Drive, Chicago, Illinois

10   60653.

11       Q.   And is -- is this both your business and your

12   home address?

13       A.   Yes.

14       Q.   And where did you graduate from law school?

15       A.   DePaul University College of Law.

16       Q.   And what year was that?

17       A.   1973.                                  0:22:56

18       Q.   How about undergrad?  Where'd you --

19       A.   Roosevelt University, Chicago, Illinois.

20       Q.   And what year was that?

21       A.   1970.

22       Q.   Do you have any other formal education?

23       A.   No.

24       Q.   And what year were you, like, admitted to

25   practice law?
```

```
 1        A.    November 1973 in Illinois.

 2        Q.    And have you been licensed as an attorney

 3   since November of 1973?

 4        A.    Yes.

 5        Q.    Have you ever been disciplined by the ARDC?

 6        A.    Yes.

 7        Q.    And what was the nature of your discipline?

 8        A.    It was a --

 9        Q.    I'm -- I'm sorry, before I -- before you get

10   into the single -- was it just -- was it just one

11   incident?

12        A.    Yes, just one incident.                    0:23:55

13        Q.    Okay.  What -- what did it entail?

14        A.    It entailed my -- my failure to turn over to

15   ARDC in a timely fashion certain file information

16   regarding a client who had lodged a complaint against

17   me.

18        Q.    And what was the complaint that was lodged

19   against you?

20        A.    I think it had to do with a failure to

21   represent, something along those lines.

22        Q.    Was that a -- was it a criminal case or a

23   civil case?

24        A.    I think it was a civil case.

25        Q.    And what was --
```

```
 1      A.    In fact it --
 2      Q.    And what was the out -- outcome of that
 3   investigation?
 4      A.    I was suspended pending turning over the
 5   questioned information, and upon -- which I
 6   subsequently did, and the suspension was lifted.  It
 7   was a matter of months -- a month or two that the
 8   suspension was in effect.
 9      Q.    And when -- when in time did this occur?        0:25:01
10      A.    Oh, jeez.  Late '70s maybe, early '80s.  Late
11   seven -- but I'm pretty sure it was late '70s because I
12   was -- as I recall, I was actually working in the state
13   of Wisconsin at the time this happened.
14      Q.    And have you had any other complaints filed
15   against you through the ARDC?
16      A.    No.
17      Q.    All right.  Are you currently employed?
18      A.    I'm self-employed.
19      Q.    And self-employed in what capacity?
20      A.    As a practicing attorney.                       0:25:56
21      Q.    And what's the nature of your practice?
22      A.    Just a general practice right now, focusing
23   primarily on real estate and family law.
24      Q.    Do you still practice criminal defense?
25      A.    On rare occasions.
```

Exhibit 5, LLC

 1      Q.   And how long have you been self-employed?

 2  No, well, let me ask you this.  Is that your -- is that

 3  the only kind of work that you're doing?

 4      A.   Yes.

 5      Q.   And how long have you been self-employed as a

 6  private practicing attorney?

 7      A.   Oh, jeez.  20, 25 years.                    0:26:49

 8      Q.   You're making me do some math now.  All

 9  right.  So --

10      A.   It was -- it was eight -- early '80s, late

11  '70s.

12      Q.   Well, 25 years would be late '90s.  Like,

13  it's 2022.

14      A.   It was long --

15      Q.   So it's twenty-twenty -- so it's 2022 now, so

16  --

17      A.   It would have -- it would have been I -- I

18  think probably in the mid to late '80s that I be --

19  that I came into private practice.

20      Q.   So then you've been in private practice as a

21  -- are you a sole practitioner?

22      A.   I am.                                        0:27:38

23      Q.   You've been in practice as a sole

24  practitioner since the mid to late 1980s.  Is that

25  correct?

```
 1        A.    That's correct.
 2        Q.    Now prior to -- and can you -- do -- do you
 3  know if it was closer to 1985 or closer to 1990?
 4        A.    Probably closer to '85.
 5        Q.    Now prior -- prior to going into private
 6  practice, where did you work?
 7        A.    Well, okay.  So when I graduated from law
 8  school, I -- my first job was with the National Labor
 9  Relations Board, region 13.  It was --
10        Q.    The NLRB?
11        A.    NLRB.
12        Q.    Okay.                              0:28:28
13        A.    It was just a -- I left there and went to
14  Cook County Hospital in their -- in their personnel
15  labor department.  I left there and went to work in
16  Wisconsin as the staff attorney for the Wisconsin
17  Education Association Council, that's a teacher's
18  union.  I left there and went -- and came back to
19  Illinois and worked as general counsel for the Illinois
20  Education Association, which is the state teacher's
21  union.  And I think after that, I was the staff
22  attorney for the Chicago Sun-Times, their labor
23  department, for a year, and then I went into private
24  practice.
25        Q.    All right.  So when you started working at
```

1   the National Labor Relations Board in 1973, what were

2   your -- what were your responsibilities at that point?

3       A.   Oh, jeez.  To investigate charges of unfair

4   labor practices committed by either labor organizations

5   or employers, to conduct elections for representation

6   as presented to the NLRB but no --

7       Q.   And how -- okay.  And --

8       A.   -- my functions primarily.                0:30:39

9       Q.   And how long did you work in that position,

10  from 1973 until approximately when?

11      A.   From June of 1973 till I believe November of

12  '74.

13      Q.   And then in '74, did you begin working at

14  Cook County Hospital?

15      A.   Yes.

16      Q.   And how long did you work at Cook County

17  Hospital?

18      A.   Only a few months.  It was -- that was the

19  spring of '75 I went to the -- to Wisconsin.

20      Q.   Okay.  When -- when you -- when you were at

21  Cook County Hospital, you said that you did personnel

22  and labor-related matters?

23      A.   Yes, I was their assistant director of labor

24  relations.

25      Q.   So it wasn't a position of practicing law,

```
 1   but it -- it required that you have specific knowledge
 2   of the law.  Is that fair to say?
 3       A.    That's fair to say.                        0:31:45
 4       Q.    And then in the spring of 1975, you went to
 5   Wisconsin?
 6       A.    Correct.
 7       Q.    And -- and you be -- be -- you said you
 8   became a staff attorney for the education union?
 9       A.    Correct.
10       Q.    And -- and how long were you in that
11   position?
12       A.    Oh, jeez.  Sometime in '77 I believe.
13       Q.    So were you in that position for
14   approximately two years?
15       A.    Approximately two years.
16       Q.    And as your role as a staff attorney, what
17   were your responsibilities?
18       A.    Well, to give legal advice to our various
19   local affiliate -- okay, so Wisconsin was the state
20   union, if you follow me, okay?
21       Q.    Yeah.                                       0:32:52
22       A.    And we -- and we had various locals
23   throughout the state, okay, local unions, so for
24   example the city of -- of -- of Madison, Wisconsin, may
25   have had its own chapter, the city of Green Bay,
```

Exhibit 5, LLC

1   Wisconsin, may have had its own chapter, and the like,

2   so my role was to give those varying chapters legal

3   advice for the various labor issues that presented

4   themselves to them.

5       Q.   Understood.  Did you -- but did -- you didn't

6   do any criminal practice in that position --

7       A.   Oh, no, no.

8       Q.   And then after two years, you left that --

9   you left that position and then you became the general

10  counsel of the Illinois Education --

11          RECORDER:  Robin --

12      Q.   -- Association?

13          RECORDER:  Robin --

14      A.   Excuse me?

15          RECORDER:  -- hard to under --

16      Q.   I'm sorry, was -- can you hear me?

17      A.   I hear you now.

18      Q.   Oh, I -- I must have covered my mic, I'm

19  sorry.  Let me turn the volume up just -- can you hear

20  me okay or should I turn the volume up?

21      A.   I hear you fine.                        0:33:55

22      Q.   Okay.  And then -- oh, so let me just

23  rephrase the question so we have a clean record here.

24  After two years in that position, you -- you became the

25  general counsel for the Illinois Education Association?

```
 1        A.    Well, be -- before that, when I left

 2   Wisconsin, I came back to Chicago and I was in private

 3   practice for about a year in which I was -- in which my

 4   practice was primarily labor and personnel work.

 5   Wisconsin -- the Wisconsin labor organization was my

 6   primary client.

 7        Q.    Oh, I see.  That was back in, like, 1977,

 8   correct?

 9        A.    Correct.

10        Q.    And for the year that you were in private

11   practice starting in 1977, did you work on any criminal

12   matters?

13        A.    No.                                      0:34:45

14        Q.    It was solely labor and labor relations?

15        A.    Well, not solely, but it was primarily labor

16   and employment matters.  There may -- there may have

17   been some -- some ancillary civil work involved, but no

18   criminal whatsoever.

19        Q.    Okay.  And then after being in private

20   practice for a year in 1977, what did you do?

21        A.    I think I -- that's when I went to -- think

22   that's when I became the general counsel for the

23   Illinois Education Association located in Springfield,

24   Illinois.

25        Q.    Were you required to move to Springfield?
```

1     A.    Yes.                                        0:35:37

2     Q.    And did -- briefly what were your

3  responsibilities as the general counsel for the

4  Illinois Education Association?

5     A.    Similar to what I did in -- in -- in -- in --

6  in Wisconsin, by that -- by that I mean giving legal

7  advice to our member affiliates throughout the state

8  regarding their labor organization activities or issues

9  arising with our membership.

10     Q.    And how long did you work as general counsel

11  for the Illinois Education Association?

12     A.    Probably two years.  Probably two years, so

13  we're now looking at '79 or '80.

14     Q.    So basically, like, from 1978 to 1980?

15     A.    I think that's correct.                   0:36:36

16     Q.    And then what happened in nine -- in --

17  roughly in 1980, why did you leave that job?

18     A.    Well, I was living in Springfield and my

19  family was here in Chicago, so I came back to be with

20  my family, and I had a job at the Chicago Sun-Times as

21  their labor attorney for a year.

22     Q.    So you came back and you -- did you -- would

23  it be fair to say that you came back to Chicago in 1980

24  and started --

25     A.    I think --

```
 1        Q.    -- work --
 2        A.    Yeah, '80 or '81, some -- one -- one or the
 3   two.
 4        Q.    And then shortly -- did you have a job lined
 5   up when you came back?
 6        A.    Yes.
 7        Q.    And that was the job with the Chicago
 8   Sun-Times?
 9        A.    Correct.
10        Q.    And I believe you said you worked there for
11   one year?
12        A.    That's correct.                        0:37:38
13        Q.    And again it was -- wait, what was your title
14   there?
15        A.    Labor attorney.
16        Q.    And then what happened, why did you leave
17   that job?
18        A.    It -- it was -- we did -- it -- the job did
19   not prove to be what I -- what I found -- what I needed
20   it to be, so -- so I left and went into private
21   practice.
22        Q.    The job didn't meet your expectations, right?
23        A.    Correct.
24        Q.    But you chose to leave, they didn't terminate
25   you.  Is -- is that correct?
```

1      A.    Oh, correct.   Absolutely correct.

2      Q.    And so after you left that job, what did you

3  do?

4      A.    I think that's probably when I began private

5  practice.

6      Q.    And that would have been roughly on or -- and

7  around 1982?

8      A.    Two or three.                                  0:39:00

9      Q.    All right.   When you began your practice in

10  let's just say 1983, what was the nature of your

11  practice?

12      A.    It was -- it was a general practice.

13      Q.    Were you doing criminal cases starting in

14  1983?

15      A.    Probably.

16      Q.    Now what -- in 1983, what percentage of your

17  cases were criminal and what percentage of your cases

18  were civil?

19      A.    I -- I -- I can't answer that, I don't -- I

20  don't know the answer to that.

21      Q.    But it's fair to say as of 1983 you had no

22  prior criminal experience, correct?

23      A.    That is safe -- yes.                           0:40:06

24      Q.    Now in advance of starting to have a criminal

25  practice, did you undertake any training or education?

```
 1        A.    No.

 2        Q.    Now as a part -- let me ask you this.  When

 3   did you start doing cases on behalf of the Cook County

 4   public defender?

 5        A.    I'm sorry?

 6        Q.    When did you start doing criminal cases on

 7   behalf of the Cook County public defender?

 8        A.    Never.

 9        Q.    Okay.                                  0:41:00

10        A.    I was never employed by the Cook County

11   public defender's office.

12        Q.    In addition to criminal cases, what other

13   kind of cases -- oh, I'm -- I'm sorry, you -- believe

14   you said you did family law, you did real estate, and

15   -- and in 1983 you started doing criminal work,

16   correct?

17        A.    That's correct.                        0:41:52

18        Q.    Can you describe the nature of your criminal

19   practice from the time period of 1983 until the year

20   2000?

21        A.    It probably would involve representing

22   defendants charged with misdemeanor cases.  It was

23   probably heavily -- well, and -- and -- and drug cases,

24   probably it was heavily involved in drug cases, DUIs,

25   that kind of thing, but no major -- as I can -- as I
```

```
 1   can recall, only -- only rarely did my criminal cases

 2   involve major felony issues.

 3           MS. SHOFFNER:  Okay.  Just got a notice that

 4   my battery was running low because my charger wasn't

 5   plugged in.  Could you read that answer back, please?

 6           RECORDER:  Sure -- it was --                    0:43:48

 7                   (Record replayed)

 8           RECORDER:  Oh, let me go a little further

 9   back.

10           MS. SHOFFNER:  Make sure that's not on the

11   record.

12                   (Record replayed)

13           RECORDER:  Was that good?

14           MS. SHOFFNER:  Yes, thank you.

15      Q.   All right.  So between 1983 and 2000,

16   approximately how many felony cases did you handle?

17      A.   Oh, jeez.  I -- I couldn't answer that.  I

18   don't know.

19      Q.   Did you have any cases that went to trial

20   between 1983 and 2000?

21      A.   I'm sure I did.                                 0:44:46

22      Q.   Approximately how many trials did you have?

23      A.   I don't know that.  I don't -- I don't -- I

24   don't have that in my -- in my mind.

25      Q.   Well, now you -- you testified that you
```

Exhibit 5, LLC

```
 1  rarely had criminal cases involving felonies.  Is that
 2  -- is that -- did I hear that correctly?
 3      A.   You heard -- you heard that correctly.  Major
 4  -- major felonies.
 5      Q.   And when --
 6      A.   I mean I -- I represented a lot of defendants
 7  accused of -- of possession of narcotics, selling of
 8  narcotics.
 9      Q.   So -- so did your felony cases involve
10  selling of narcotics?
11      A.   Some did.                              0:45:47
12      Q.   And what are -- what are some of the other
13  felonies that you handled?
14      A.   I -- I can recall a couple of rape cases that
15  my -- my clients were -- were charged with.  As I said
16  earlier, DUIs, assault -- assault and battery issues.
17      Q.   DUIs were primarily misdemeanors though,
18  correct?
19      A.   Correct.
20      Q.   And the assault and batteries, were those
21  also primarily misdemeanors?
22      A.   Well, they were misdemeanors and -- and --
23  and -- and felonies actually.
24      Q.   Okay.  And the rape cases were certainly
25  felonies.  Did -- did -- did any of those rape -- two
```

1   rape cases go to trial?

2       A.    One in particular that I can recall going to

3   trial.

4       Q.    Do you recall the outcome of that trial?

5       A.    He was found guilty.                        0:46:52

6       Q.    And then with respect to the assault and

7   batteries, do you recall any of those cases going to

8   trial?

9       A.    I -- I cannot -- I do not have that

10  recollection, no.

11      Q.    Did you ever represent anyone -- from 1983

12  until 2000, did you ever represent anyone in connection

13  with a homicide?

14      A.    No.

15      Q.    Did you ever represent anyone in connection

16  with attempted homicide?

17      A.    Not that I recall.

18      Q.    Did you ever represent anyone in connection

19  with a robbery?

20      A.    Maybe, but I can't be any more specific than

21  that.

22      Q.    How about aggravated use of a firearm?  Did

23  you represent anyone in connection with an -- with an

24  agg -- with an agg batt?

25      A.    Yes, I -- yes.  UUW --

```
 1      Q.   And --
 2      A.   -- yes.                                    0:47:57
 3      Q.   And do you recall any of those cases going to
 4  trial?
 5      A.   No, I do not.
 6      Q.   Now in May of 2000, you represented Xavier
 7  Walker in connection with a murder charge, correct?
 8      A.   Correct.                                    0:48:46
 9      Q.   How did you come to represent Mr. Walker?
10      A.   I had previously represented Mr. -- a -- a
11  relative of Mr. Walker's in a criminal matter, and that
12  client referred Xavier to me for my consultation and
13  representation.
14      Q.   And who -- then who was that client?
15      A.   Anthony Pettigrew.                          0:49:28
16      Q.   So when you were -- when you were referred,
17  did you receive a phone call from Mr. Walker or someone
18  from Mr. Walker's family?
19      A.   His relative Pettigrew, my -- my -- my prior
20  -- previous client who was related to Xavier, may have
21  been cousins or something like that.
22      Q.   He called you and what did he say?
23      A.   Oh, God, I can't -- I can't -- I -- now I can
24  only give you what probably was said.  I can't tell you
25  what was said because I certainly have no recollection
```

Exhibit 5, LLC

```
 1  of that conversation.

 2      Q.   All right.  What was your -- with -- what was

 3  your understanding as a result of that conversation?

 4           MS. SAMUELS:  Objection.  Calls for

 5  speculation.                                    0:50:30

 6      A.   That he had a relative who was --

 7      Q.   What was --

 8      A.   That he --

 9      Q.   Okay, hang on.  She just needs to make a

10  recommendation -- her objection for the record, and her

11  objection's noted.  Sir, after that conversation, what

12  was your understanding of what transpired?

13      A.   My client, Anthony Pettigrew, I believe he

14  indicated he had a relative who was -- had a -- a

15  serious case and he needed somebody to represent him.

16      Q.   And -- and did you agree at that time to take

17  it on?

18      A.   Well, I agreed to -- to interview Xavier to

19  see if it was something that I wanted to do.

20      Q.   And did you interview Mr. Walker?

21      A.   I did.                                 0:51:25

22      Q.   How soon after receiving that phone call did

23  you interview Mr. Walker?

24      A.   I would -- I would imagine it was days.  I'm

25  not sure, but I would imagine it was days.
```

1    Q.    Like more than a week?

2    A.    No.

3    Q.    Now at the time that you had agreed to meet

4  with him to interview him, is it fair to say that you

5  had not agreed to accept representation to serve as his

6  counsel?

7    A.    That is correct.

8    Q.    When you spoke with Mr. Pettigrew, did you

9  communicate to him your rate for the work and

10  representing Mr. Walker?

11    A.    No.                                    0:52:09

12    Q.    And at the time that you had agreed to meet

13  with Mr. Walker, had he already been charged?

14    A.    I don't know that, I don't recall that, but I

15  believe the answer is yes because I do not recall go --

16  having -- having to go before any preliminary hearing

17  or anything akin to that, so I believe the answer is

18  yes, he had been.

19    Q.    All right.  So after you talked to Mr.

20  Pettigrew, did you do anything to prepare for your

21  meeting with Mr. Walker?

22    A.    I don't recall that I did.            0:53:20

23    Q.    What did you do?

24    A.    I said I do not recall that I did.

25    Q.    All right.  So then you talked to Mr.

```
 1   Pettigrew, he -- you said you would want to interview

 2   Mr. Walker, and then a few days later, you met -- you

 3   met with Mr. Walker, correct?

 4       A.   Correct.

 5       Q.   And where -- where did you meet with him?

 6       A.   I believe he was in -- he was in custody at

 7   the Cook County Jail.

 8       Q.   And what did you -- what was the nature of

 9   your interview?

10       A.   Well --

11            MS. SAMUELS:  I'm going to object to the

12   extent this calls for attorney-client privileged

13   communications.

14       Q.   What was the nature of your interview?        0:54:26

15       A.   It was to get as much -- to get the facts

16   surrounding his -- the -- surrounding the charge and

17   his arrest.

18            MS. SHOFFNER:  Excuse me just a second.

19       Q.   All right.  And did you also talk about

20   compensation at that interview?

21       A.   We probably did, and he referred me to his

22   parents to discuss the specific -- the specifics of

23   that.

24       Q.   You need to take a break to answer the phone

25   or anything?
```

```
 1      A.   I'm fine.                                    0:55:27

 2      Q.   Okay.  So you have a discussion with Mr.

 3  Walker, and at the time you met with Mr. Walker, did

 4  you -- did you -- did you come to terms with him about

 5  your represent -- representing him?

 6      A.   Well, I think probably -- I'm not clear on

 7  how that went, so I can't -- can't -- I can't be any

 8  more definitive than that.

 9      Q.   When you say you're not clear about how that

10  went, what -- what -- what are you saying there?

11      A.   So I -- okay.  So probably, and I -- and I

12  stress "probably," I told Walker -- would have told

13  Walker that -- that depending upon my ability to reach

14  agreement with his parents regarding my compensation

15  would -- would determine whether I could represent him.

16  He wanted me to represent him.  I was willing to

17  represent him assuming I could reach agreement on

18  compensation, and thus I had to meet with his parents.

19      Q.   And that meeting took place?

20      A.   Yes, it did.                                 0:56:35

21      Q.   How soon after you met with Walker did you

22  meet with his parents?

23      A.   Oh, I would imagine days.

24      Q.   Within a week?

25      A.   No more than that.
```

 1        Q.    And then when you met with the parents, did

 2   you then come to terms?

 3        A.    Yes.

 4        Q.    And sir, what -- what were the terms of your

 5   representation respect -- with respect to how much you

 6   were to be paid?

 7        A.    I believe I charged them $10,000 to represent

 8   their son and his criminal defense through -- up to and

 9   including the trial, if it had to go that far.

10        Q.    So it was a flat fee of $10,000?

11        A.    Correct.                                      0:57:38

12        Q.    And -- and was this the first homicide case

13   that you were representing a criminal defendant in?

14        A.    Yes.

15        Q.    So with the terms of your agreement being

16   $10,000 flat fee, you were going to get paid that

17   amount regardless of the effort that you spent on the

18   case.  Is that fair to say?

19        A.    That's fair to say.                           0:58:18

20        Q.    And did the parents -- was that a payment

21   that was made up front or -- or how did the payment of

22   that $10,000 -- how was it made?

23        A.    They -- I -- as I recall, it was made in

24   installments.  I'm not sure how many installments, but

25   -- but it was made in -- in installments.

1      Q.    Now once you agree and you come to terms to

2   represent Mr. Walker and -- with the parents, what did

3   -- what did you do next?

4      A.    Oh, God.  I don't recall what it -- what my

5   next step was.

6      Q.    Up until the time that you had agreed to

7   represent him, was he being represented by the public

8   defender?

9      A.    I don't know that.  Perhaps, but I don't know

10  that, I don't recall that.

11     Q.    But you didn't know of any other private

12  attorney who was representing him, correct?

13     A.    That's correct, I did not.                    0:59:45

14     Q.    Now when you first met with Mr. Walker, did

15  you have -- did you have -- did you have any

16  documentation with you?

17     A.    I don't recall.

18     Q.    Do you have an independent recollection of

19  meeting with Mr. Walker?

20     A.    Actually I do not.                            1:00:34

21     Q.    Did you -- do you recall if you meeted him --

22  if you met with him just one-on-one?

23     A.    Oh, sure, it -- he -- it would have been he

24  and I in -- in his -- in -- in whatever area of the --

25  that he -- that the -- the guards gave us for me to

```
 1  interview him.

 2      Q.   Did you take notes of that meeting?

 3      A.   I'm sure.

 4      Q.   Do you know where those notes are located?

 5      A.   I do not.

 6      Q.   Did Mr. Walker explain to you why he had been

 7  arrested?

 8      A.   I'm -- I'm sure he did.                    1:01:38

 9      Q.   Did he tell -- did Mr. Walker tell you during

10  this meeting that police officers -- how police

11  officers had treated him during his arrest and his

12  detainment?

13      A.   I have no independent recollection of that.

14      Q.   What did he tell you was the reason he was

15  arrested?

16           MS. SAMUELS:  Objection to the extent it

17  calls for attorney-client communications.

18      Q.   Are you going to -- you can answer the

19  question.

20           MS. SAMUELS:  Can he?

21           MS. SHOFFNER:  Well, I mean you're not -- you

22  haven't -- you haven't asked -- said that he shouldn't.

23           MS. SAMUELS:  He shouldn't.              1:02:39

24           MS. SHOFFNER:  Or that he can't.

25           MS. SAMUELS:  If it's attorney-client
```

1  privileged, he can't answer.

2      Q.   Are -- are you going to answer the question,

3  sir?

4      A.   I'm -- no, I'm not going to answer that

5  question.

6      Q.   Did Mr. Walker tell you that the police had

7  kicked him?

8      A.   I do not recall that.

9      Q.   Did he tell you that the police had slapped

10 him?

11     A.   I do not recall that.

12     Q.   Did Mr. Walker ever tell you that he needed

13 to see a -- a doctor for treatment?

14     A.   I do not recall that.

15     Q.   Did Mr. Walker ever say to you that he had

16 not been given his Miranda rights?

17     A.   I do not recall that.                    1:03:37

18     Q.   Did he tell you that he had given a statement

19 to -- to the police?

20     A.   I don't -- I don't recall that.

21     Q.   You don't recall whether or not Mr. Walker

22 had a --

23     A.   I don't recall whether he told me he gave a

24 statement to the police.

25     Q.   Did you know prior to meeting with Mr. Walker

1   that he had given a statement to the police?

2        A.    I don't believe I did.

3        Q.    Did Mr. Walker ever say to you that police --

4   the detectives made promises to him that he could go

5   home if he -- if he gave a video statement?

6        A.    I don't recall that.

7        Q.    During your meeting with Mr. Walker, did he

8   tell you that he had confessed to the murder of the --

9   of the victim, Marek Majdak?

10       A.    I do not recall that.                          1:04:47

11       Q.    Did Mr. Walker tell you that the detectives

12  had fed him details of what to say in his confession?

13       A.    I do not recall.

14       Q.    Now when you met with Mr. Walker, did he tell

15  you that -- that he had an alibi for this -- for -- for

16  this charge?

17       A.    I don't recall that.

18       Q.    But you came to learn in the course of

19  defending him that he had an alibi, correct?

20       A.    I believe that's correct.

21       Q.    When -- when talking with Mr. Walker, did he

22  provide you with -- with the name of people who would

23  be witnesses in support of his case?  During your --

24  and this is during your initial interview.

25       A.    I don't recall that.                          1:06:03

1     Q.   What was your understanding of the charges

2  against him when you left Cook County Department of

3  Corrections after having met with Mr. Walker?

4     A.   I believe I understood him to be charged --

5  or was going to be charged with first-degree murder.

6     Q.   And did you have any understanding of what

7  evidence existed to support that charge?

8     A.   It's hard for me to answer that because I

9  don't recall the -- the specifics of my meeting -- of

10  my conversation with Mr. Walker, so I can't answer

11  that.

12     Q.   So I did -- I wasn't asking for the

13  specifics, I was just asking for a general -- a general

14  understanding of what sort of -- what your

15  understanding of the nature of the charges against him

16  and the evidence that -- that did or did not exist.

17     A.   I don't -- I don't know that I have any

18  recollection of what I thought the nature of the

19  evidence was -- that he conveyed to me what the nature

20  of the evidence was against him.

21     Q.   During your initial interview -- meeting with

22  Mr. Walker, did he mention Jovanie Long?

23     A.   That name is familiar.  I don't know when it

24  first came up, but that name is familiar.

25     Q.   During your first meeting with Mr. Walker,

1  did he tell you that he thought Jovanie Long committed

2  the murder?

3      A.   I have no -- I don't recall that.            1:08:05

4      Q.   Other than hearing the name Jovanie Long, do

5  you have any memory of what your understanding was

6  relative to Jovanie Long?

7      A.   As I sit here now, I do not.

8      Q.   Now you leave the jail a few days later, you

9  meet with the parents, and you come -- and you come to

10 terms about what the financial commitment is to

11 represent them and they agree to that, and that amount

12 is $10,000.  Did I -- did I state that correctly?

13     A.   I think that's correct.                       1:08:56

14     Q.   What else was discussed at that initial

15 meeting with the family?

16          MS. SAMUELS:  Going to object to the extent

17 this calls for attorney-client communications.

18     A.   And I -- I don't recall what else was

19 discussed.

20     Q.   Had you met with anyone from the First

21 Defense Legal Aid association prior to meeting with the

22 family?

23     A.   I -- I have no recollection of that.          1:09:42

24     Q.   Did you meet with anyone other than his

25 relative, Mr. --

Exhibit 5, LLC

```
 1         A.    I don't recall who all I met with during the

 2    course of my representation of Mr. Walker.

 3         Q.    Okay.  We'll -- we'll go through that in a

 4    little bit more detail, but -- but when you met with

 5    the family, do you recall who was present?

 6         A.    Oh, jeez.  No, I do not.

 7         Q.    Do you recall that his father was present?

 8         A.    I -- I believe that -- I believe that his

 9    father and his mother were both present, but I do not

10    have a specific recollection of that.

11         Q.    All right.  So -- and you don't recall -- or

12    -- or -- any other conversation that took place at that

13    time.  Is that fair to say?

14         A.    That's fair to say.                      1:10:48

15         Q.    Did you talk about your strategy for how you

16    were going to defend the case?

17         A.    I don't recall that.

18         Q.    Did you discuss witnesses who would provide

19    testimony in support of -- of Xavier Walker?

20         A.    I don't recall that.

21         Q.    And what did you do once you agreed to

22    represent Mr. Walker?

23               MS. SAMUELS:  Objection.  Vague.          1:11:49

24         Q.    What was the next step you did in order to

25    represent his interest?
```

Exhibit 5, LLC

```
 1        A.    I don't recall what my next steps were
 2   regarding my representation.
 3        Q.    Well, did you -- did you file an appearance
 4   on his -- on -- on his behalf with the court?
 5        A.    Most certainly, but I don't -- I -- I just
 6   simply don't recall what the next step was.  That's
 7   what your question was, I don't recall what the next
 8   step was.
 9        Q.    Were you provided information from the Cook
10   County State's Attorney relative to Mr. Walker's case?
11        A.    Well, I have to believe that as I filed my
12   appearance, if the public defender's office had been
13   previously representing him, they would have turned
14   over whatever materials they had received from the
15   state, but I have no specific recollection of that.
16        Q.    All right.  Let me show you what I will mark
17   as Exhibit 1.  All right.  Sir, can you see the
18   document in front of you?
19        A.    I do.                                    1:13:20
20        Q.    I'm going to represent to you that this is
21   the document that was contained in your file, and it's
22   dated April 12th, 2001, and it says, "For Attorney Greg
23   Wilson."  You see that there?
24        A.    I do.
25        Q.    And contained in this document is a list of
```

```
 1   -- of different reports and lab biology.  Do you recall
 2   receiving this document?
 3        A.   No, I do not recall receiving it.  I'm not --
 4        Q.   Do you --
 5        A.   I'm not -- I'm not -- I'm not disputing that
 6   I received it, I just don't recall it.
 7        Q.   Right.  And included in this report, a
 8   listing of materials are -- are dates and documents
 9   that were provided to you.  As you sit here today, do
10   you know who provided those documents to you?
11        A.   I do not.                              1:14:30
12        Q.   Once you filed your appearance in this case
13   and you started to represent Mr. Walker, did you have a
14   contact person at the Cook County public defender's
15   office who you worked with in any capacity?
16        A.   I don't recall that I did.
17        Q.   And as you sit here now, can you name one
18   person at the Cook County public defender's office who
19   knew about Xavier Walker's case?
20        A.   I cannot.
21        Q.   And so if I represent to you that these
22   documents were in your file, statements of various
23   witnesses, affidavits, and supp reports, would you have
24   any reason to believe that they -- these documents were
25   not provided to you?
```

1      A.   If that be your representation, I would not

2  -- I have no reason to believe they would have not been

3  provided to me.

4      Q.   But as you look at this file and having

5  reviewed your file, it's fair to say that many of these

6  documents are in your file, correct?

7      A.   No.  It's correct that that may have been

8  what I previously tendered to the public defender's

9  office, but where they currently are, I do not know.

10     Q.   I'm sorry, say that -- say that again?          1:15:59

11     A.   I -- I said that the -- that that -- this

12 statement -- this document -- those documents may be

13 what was previously tendered to me and I may have given

14 them to Mr. Winston's office when I turned over my

15 briefcase with the file information in it, but --

16     Q.   Understood.

17     A.   But I do not today know the whereabouts of

18 that --

19     Q.   I understand.  So in other words, you're

20 saying you don't dispute that these documents were

21 provided to you.  They may -- they may or may not be in

22 your file, but given that you provided a briefcase full

23 of documents to Mr. Winston, they -- they may not be in

24 your file currently, correct?

25     A.   That's what I'm saying, yes.

1      Q.   Now the -- the -- the -- at the top of the

2   document it says, "Tendered on April 12th, 2001."  You

3   see that there?

4      A.   I see it.                               1:17:07

5      Q.   I represent to you that Mr. Walker was

6   arrested on May 28th.  Is there any reason to believe

7   that you would have not been hired to defend him by

8   April 12th, 2001?

9      A.   I do not recall when I was hired to defend

10  Mr. Walker, but I would -- I would presume it was some

11  time prior to April 12, 2001.

12     Q.   All right.  Now I realize that this was your

13  -- your first homicide case, but you -- you did work --

14  you did have a number of felony cases that you had

15  worked on in the past, correct?

16     A.   Correct.                                1:18:08

17     Q.   When you come on as counsel for the

18  defendant, are these the type of documents that you

19  typically get from the public defender or are these the

20  kind of documents that you would receive from the Cook

21  County State's Attorney?

22     A.   Well, depending upon the nature of the case

23  involved, they -- they could or could not be, yes.

24     Q.   They -- they could have come from the Cook

25  County public defender's office, is that what you're

1  saying?

2      A.    Or the State's Attorney's Office, yeah.

3      Q.    Or they could have come from the -- but as

4  you sit here, you don't know where they came from?

5      A.    That's correct.

6      Q.    Okay.  And then I take it that once you

7  receive this file, you had an opportunity to review the

8  contents, correct?

9      A.    Certainly.                                    1:19:13

10      Q.    And so you as early as April 12th -- or give

11  or take a day or two, a few days, you were in

12  possession of the statement from Mary Curry, correct?

13      A.    It would seem.

14      Q.    The statement of Jovanie Long?

15      A.    It -- it would seem.

16      Q.    The statement of -- of Xavier Walker?

17      A.    It would seem.

18      Q.    The statement of Ashanti Wright?

19      A.    Yes.

20      Q.    And the statement of Maurice Wright?

21      A.    Yes.                                         1:20:00

22      Q.    And then it also indicates "Trans."  In your

23  mind, does that -- do you take that to understand it's

24  a transcript?

25      A.    I do not take -- I don't know what that

1  means.

2      Q.   Do you recall receiving transcripts from the

3  grand jury indictment, the hearing?

4      A.   I do not recall, but I would certainly

5  presume I would have received a copy of the grand jury

6  transcripts of varied witnesses.

7      Q.   All right.  And I kind of jumped over -- I'm

8  realizing now that there's two -- there's two rows of

9  documents.  On the left side it says, "60 CRs" -- "60

10  CR" -- looks like "60 CR (2)," and then it says,

11  "Supp."  You see that there?

12     A.   I do.

13     Q.   Are you -- are you --

14          MS. SAMUELS:  Objection that it --

15          MS. SHOFFNER:  I'm sorry?                    1:20:50

16          MS. SAMUELS:  That's "G0" -- it's "GLTR."

17          MS. SHOFFNER:  Oh, general -- okay.  I --

18     Q.   What's your understanding of what that says,

19  sir?

20     A.   Well, it's -- it looks to me as though it is

21  "60 CR (2) Supp S-2000."

22     Q.   But it could also be "GO," as in general

23  order, correct?

24     A.   I -- could it be?  It certainly could be.

25     Q.   Okay.  But then below there, there is a

1  series of dates, and -- and then behind each date, it

2  -- there's parens for the number of pages, correct?

3      A.   I -- well, there's a paren there with a

4  number.  I don't know what that number represents, but

5  yes.

6      Q.   Fair to say.  So it says, "5/13," in paren,

7  "11"?

8      A.   Correct.                          1:21:47

9      Q.   And then it goes straight on down a list of

10  -- of dates and pages that were submitted, and then

11  beneath that it says, "CB Long, CB Walker."  Do you

12  know what that stands for?

13      A.   I do not.

14      Q.   If it stood for -- would you have any reason

15  to dispute that it stands for "criminal background"?

16          MS. SAMUELS:  Objection.  Foundation.

17      A.   I -- I have no -- I -- I don't have any

18  reason to dispute or not dispute it.  I don't know what

19  it means.

20      Q.   Okay.  All right.  And so you are presented

21  with all this information on or around April 12th,

22  2001, and you have no reason to dispute that either,

23  correct?

24      A.   I -- I -- I see the document, I do not

25  dispute what it -- is contained on this sheet.

Exhibit 5, LLC

```
 1            MS. SHOFFNER:  Okay.  Can we take about a
 2  five-minute break just for a comfort break?
 3            RECORDER:  Okay.
 4            WITNESS:  Sure.                          1:22:59
 5            MS. SHOFFNER:  All right.  We --
 6            RECORDER:  -- record, 11:29 a.m.
 7                 (Off the record)
 8            RECORDER:  Back on the record, 11:39 a.m.
 9      Q.   All right.  Mr. Wilson, when you agreed to
10  take on this case defending the homicide charges
11  against Mr. Walker, were you the only person that was
12  working on this case?
13      A.   Yes.
14      Q.   Did you have any -- did you have a support
15  staff or a secretary?
16      A.   No.
17      Q.   No secretary?                             1:23:43
18      A.   No, I was a -- I was a -- a one-man show --
19  shop.
20      Q.   And did you have anyone to sort of bounce off
21  ideas about how to defend the case?
22      A.   Well, I have several friends and -- and
23  acquaintances who are also lawyers, and from time to
24  time I would talk to them about various things about
25  the case that I had questions about.
```

1     Q.   Had you previously hired an investigator to

2  help you with a case?

3     A.   No.

4     Q.   And did you hire an investigator to help you

5  with this case?

6     A.   No.

7     Q.   Did you have help writing any motions or

8  briefs during the course of this case?

9     A.   No.                                 1:24:46

10     Q.   Did you have any assistance in interviewing

11  any witnesses?

12     A.   No.

13     Q.   Did you come to know John Connor in his

14  defense of Jovanie Long?

15     A.   I have a vague recollection of having met him

16  and -- and talked to him about our respective clients,

17  but I -- but that's as far as I can recall.

18     Q.   Did you guys split up the work of trying to

19  find witnesses?

20     A.   We did not.                       1:25:53

21     Q.   And I -- I know that you said you hadn't done

22  any murder trials before, but had you done any appeal

23  work, like work with any --

24     A.   No.

25     Q.   Had you ever filed an appeal with the

```
 1  appellate court?

 2      A.   No.

 3      Q.   Now are you familiar with the First Defense

 4  Legal Aid association -- First Defense Legal Aid?

 5      A.   I'm sorry?

 6      Q.   Are you familiar with First Defense Legal

 7  Aid?

 8      A.   I am not, no.                          1:26:42

 9      Q.   Did you come to know Deborah Bedsole, an

10  employee of First Defense Legal Aid, during your

11  representation of Jovanie Long (sic)?

12      A.   That's -- that's -- I don't recall that I

13  did.  That name is not -- I'm not familiar with that

14  name.

15      Q.   And as you sit here today, you are not

16  familiar with the First Defense Legal Aid?

17      A.   Correct.

18      Q.   Are you aware -- and just to refresh -- does

19  it refresh your recollection if I tell you that First

20  Defense Legal Aid is an organization that deploys

21  lawyers to the courthouse to help represent criminal

22  defendants or people charged in connection with crimes?

23      A.   I -- I accept your representation, but I

24  still have no recollection of them.

25      Q.   And -- and as we sit here today, you have no
```

```
 1   idea what First Defense Legal Aid does.  Is that fair
 2   to say?
 3        A.   Fair to say.                           1:28:02
 4        Q.   Well, do you recall -- do you recall asking
 5   Deborah Bedsole to serve as a witness in the motion to
 6   suppress hearing involving Xavier Walker?
 7        A.   No, I do not.
 8        Q.   Now prior to representing Mr. Walker, had you
 9   previously represented him before?
10        A.   I'm not sure about that to be honest with
11   you.  I don't -- I don't know.  I don't recall that I
12   did or didn't.
13        Q.   And I'm sorry, what did you say was the name
14   of his relative who referred -- referred this case?
15        A.   Andrew (sic) Pettigrew.               1:29:02
16        Q.   And that's P-e-t-t --
17        A.   R-i-g-r-e-w (sic).
18        Q.   D-r -- okay.  Did you know Xavier's -- any --
19   any of Xavier Walker's sisters --
20        A.   No.
21        Q.   -- prior to representing him?  Okay.
22        A.   No.
23        Q.   So when you get a case that's a major felony,
24   after you've -- what do you -- what do you typically do
25   after you file your appearance for a defendant?
```

```
 1        A.    I'm not sure I understand your question.        1:29:52

 2        Q.    Once you file your appearance and you're

 3   presented with statements and videotapes and evidence,

 4   what do you typically do in a case of this magnitude?

 5        A.    I would typically review all of the documents

 6   presented to me and take notes on any of the presented

 7   items that I deemed to be relevant.

 8        Q.    And then -- and then after you review and

 9   take notes, do you meet with your client again?

10        A.    I'm certain -- I'm sure I do, yes.            1:30:30

11        Q.    I'd like to show you what's marked as Exhibit

12   2.  Well, all right, let me just -- hang on, I got to

13   -- I got to get the next exhibit.  All right.  I'm

14   showing you what's been marked as Exhibit 2.  Sir, at

15   the time that you -- during the time that you were

16   representing Mr. Walker, what -- what was your -- do

17   you -- do you recall what your phone number was?

18        A.    Huh, I do not.                                 1:31:37

19        Q.    All right.  What's your current phone number?

20        A.    773-860-4422.

21        Q.    I'm showing you what's been marked as Exhibit

22   2, and it's FDLA Production Group Exhibit 2, Bates

23   stamped BS 10 through 19, which was contained in your

24   file.

25   m      This is Misha.  I don't see that on the screen,
```

Exhibit 5, LLC

```
 1   Robin.

 2           MS. SHOFFNER:  Oh, you don't see the

 3   document?

 4   m    No.

 5           MR. MILLER:  You just have the -- the folders

 6   up there --

 7       A.   I don't --                              1:32:20

 8           MR. MILLER:  -- without opening the document.

 9           MS. SHOFFNER:  Okay.  Huh, it's on my screen.

10   All right.  Let's just -- hang on.  Hang on just a

11   minute here, guys.  Let's see.  These look to all be

12   the same thing -- all right.  I -- hang on a second.

13   Huh.  All right.  Let's go with that.

14       Q.   Can you see it now?                      1:34:26

15       A.   I see a document dated May 30, 2000, entitled

16   "Attorney-Client Privilege," from Deborah Bedsole to

17   file.

18       Q.   Yes, that's the document.  And it's Bates

19   stamped BS 10 through 19.  I represent to you that this

20   document is contained in your file.  Do you have any

21   reason to object -- to dispute that?

22       A.   I do not.                                1:35:03

23       Q.   All right.  So I'd like for you to take a

24   minute to review this document.

25       A.   I can't read anything beyond what's contained
```

Exhibit 5, LLC

1   in the "11:00 a.m." paragraph.

2       Q.   Okay.  Whoops, sorry.  Now when you finish

3   that page, I'd like to just take you down to page 4 and

4   ask you about on the left side, you see that

5   handwriting right there?

6       A.   I do.                                    1:37:33

7       Q.   Is that your handwriting?

8       A.   I believe so.

9       Q.   Okay.  Does -- does seeing at least the first

10  page of this document refresh your recollection that

11  you -- that there was a -- there was a person from the

12  First Defense Legal Aid who had actually interviewed or

13  met with Mr. Walker when he was placed in -- under

14  arrest?

15      A.   Actually it does not, but it would -- but

16  based on the statement, the document, it would seem so,

17  but it does not refresh my recollection.

18      Q.   And on the first page of this document -- and

19  we'll go through it in more detail, but on the first

20  page of this document on the right-hand margin, it has

21  a little star by a paragraph.  Do you see that?

22      A.   I do.                                    1:38:34

23      Q.   Is that a -- is that a -- a notation that you

24  made when you read the paragraph?

25      A.   I can't answer that, I don't know, but I do

```
 1  know that the -- to the left of that, where it -- it --

 2  the -- where "trademark" is crossed out and "tread

 3  mark" is written in, that is not my writing, so I don't

 4  know if I -- I don't know anything about the -- what's

 5  on -- contained on the -- in the right-hand margin.

 6       Q.   Okay.  Did you meet with Xavier to discuss

 7  this document?

 8       A.   I don't recall.  I -- I got to believe I did,

 9  but I don't recall.

10       Q.   After reviewing this document and reviewing

11  the documents that had been provided to you by either

12  the Cook County public defender's office, did you then

13  meet with Xavier to discuss this case?

14       A.   I do not recall.                     1:40:00

15       Q.   Would it make sense to you to have met with

16  him after you had discussed -- after you had reviewed

17  this document and after you had reviewed the documents

18  that were provided to you by the -- the State's

19  Attorney's Office?

20       A.   That would have made sense, yes.

21       Q.   Starting in June of 2000, about how often

22  would you meet with Xavier Walker?

23       A.   I can't -- I have no recollection of how

24  often I met with -- with Xavier.

25       Q.   But would you go to the Department of
```

Exhibit 5, LLC

Page 63

1  Corrections, like, once a week?

2      A.    Well, certainly whenever I met with him, it

3  was at the Department of Corrections, because that's

4  where he was housed, but I don't know how often it was.

5      Q.    But generally was it once a month, once a

6  week, once every two months, how often would you go to

7  the --

8      A.    I -- I've --

9      Q.    -- department --                          1:41:07

10     A.    -- I've got to believe it would have been at

11 least a couple of times a month, but I'm not for sure.

12     Q.    So now that you're representing him and you

13 have this material -- the -- the materials, reports,

14 did Mr. Walker tell you that he had an alibi?

15     A.    I -- I don't -- I don't know -- don't recall

16 that he offered up an alibi based upon this material

17 that's -- based upon this material.

18     Q.    Mr. Walker tell you that he had gone to a

19 club called the Wax Factory?

20     A.    I don't recall that.                       1:42:08

21     Q.    Do you recall that he told you that he

22 borrowed his sister's car and went to the Wax Factory

23 with some friends?

24     A.    I -- I have a vague recollection of him

25 having told me he had his sister's car and he went

```
 1   somewhere, but where I don't recall.
 2       Q.   Did he tell you that he went -- that he was
 3   with friends during the course of the evening and that
 4   those friends would provide an alibi?
 5       A.   I don't recall that.
 6       Q.   Did he provide you with the name of Deon
 7   Baylock?
 8       A.   That name is not familiar.              1:42:57
 9       Q.   Did he provide you with the name of Simeon
10   Dorsey?
11       A.   That name is familiar, but I don't know when
12   or -- it was provided or by whom, but the name is
13   familiar.
14       Q.   Now reading further into this document --
15   well, let's just start up here.  Did Xavier tell you
16   that when police came to arrest him that he tried to
17   run?
18       A.   I don't recall that.                    1:43:58
19       Q.   In this paragraph, it says, "They chased him
20   until they caught him."  Do you see that -- did he tell
21   you that the police officers chased him -- in that
22   paragraph, it says, "The same detective kicked Xavier
23   in the stomach, causing him to double over."  Do you
24   see that there?
25       A.   I see it.
```

1      Q.   Did he tell you that the officers kicked him

2  in the stomach when he was --

3      A.   I don't --

4      Q.   -- being placed into custody?

5      A.   I don't recall that.

6      Q.   And then he says, "He was then thrown to the

7  ground, handcuffed, and put in the car."  You see that

8  there?

9      A.   I do.

10     Q.   Did Xavier tell you that that's what happened

11  to him when he was placed into custody?

12     A.   I don't recall that.

13     Q.   Do you have any reason to dispute that?

14     A.   I don't recall that.  I -- I don't know -- I

15  have no basis to dispute or accept it.  I don't have

16  any recollection.

17     Q.   Okay.  I just wanted to know if you had any

18  reason that -- to -- to disbelieve that or to not

19  believe it happened.

20     A.   No, I do not.               1:45:04

21     Q.   And then further down, and -- and it's

22  underlined, it says, "Xavier was not read his Miranda

23  rights at the time of his arrest or during his

24  transport to area four."  Do you recall Xavier telling

25  you that?

1    A.    I do not recall.

2    Q.    Now after you met -- after you had a chance

3  to review Xavier's statement and -- and his confession

4  and the statements of the other individuals that --

5  that made statements and have testified and you met

6  with Xavier, did he tell you that the reason he gave

7  the statement to the detectives is that they would let

8  him go if he just made a statement?

9    A.    I don't recall that.

10    Q.    Do you recall him saying that he would not be

11  charged if he made a statement?

12    A.    I do not recall that.                    1:46:13

13    Q.    Did he tell you that once he was at area

14  four, he was -- he was locked in a room with no

15  windows?

16    A.    I have no recollection of that.

17    Q.    Do you have any notes that reflected your

18  meeting with him after you -- after you met with him?

19    A.    I don't know if I currently have any such

20  notes or if I ever had any such notes.

21    Q.    If you had those notes, would you make them

22  available?

23    A.    If I had those notes, I would certainly make

24  them available.

25    Q.    And if those notes exist, are you permitting

```
 1  everyone to take a look at them?
 2          MS. SAMUELS:  Well, we're going to object to
 3  the extent that he's agreeing to produce
 4  attorney-client privileged information.
 5      Q.   Sir, are you agreeing to -- to allow us to
 6  look at those documents?
 7          MS. SAMUELS:  He can't waive attorney-client
 8  privilege.  It's on the client.
 9      A.   I don't think I'm going to agree to that,
10  Counsel.                                          1:47:33
11          MS. SHOFFNER:  Jeanette, let's just --
12  Jeanette, I do take issue with your characterization
13  that he cannot waive his attorney-client privilege,
14  that is absolutely not true.  In fact the attorney
15  -client privilege has already been waived by virtue of
16  the production of his notes in this case.
17      Q.   And so, sir, there -- your -- I mean, you can
18  assert the privilege to the extent you think it's --
19  it's -- that you can assert the privilege to the extent
20  you haven't already waived it by having produced the
21  notes, but we maintain that the privilege no longer
22  exists.  If there are any other notes, will you agree
23  to produce them, sir?
24      A.   I -- I think that if I have not -- I -- I've
25  -- I've produced what I produced and -- and I have no
```

Exhibit 5, LLC

```
 1   reason to believe that I have anything further to

 2   produce.

 3       Q.   But you also stated that many of your notes

 4   were taken by a -- by a public defender and that you

 5   don't know if they were all returned to you.  You've

 6   produced all the notes that you have in your

 7   possession.  Is that fair to say?

 8       A.   That is fair to say.                    1:48:46

 9       Q.   And to the extent that there are other notes

10   out there, do you agree to produce those as well?

11       A.   I cannot make any representation on there

12   being other notes out there because I have no

13   recollection of that.  I don't know if there are other

14   notes out there.

15       Q.   But if there are other notes out there, you

16   haven't withheld anything thus far, correct?

17       A.   I have not withheld --

18            MS. SAMUELS:  Objection.  Asked and answered.

19       Q.   I'm sorry?

20            MS. SAMUELS:  Asked and answered.

21       Q.   Oh, no, sir, go ahead.

22       A.   I have not withheld anything, but I have no

23   way of knowing whether there are notes out there, and

24   if they are out there, how would I have them?

25       Q.   Not whether you would have them, it's whether
```

Exhibit 5, LLC

1  you would agree for them to be produced.

2      MS. SAMUELS:  Same objection as before.      1:49:37

3      Q.   All right.  Continuing to look at this page,

4  and we're just going to go through this to see if it

5  refreshes your recollection.  Let me know when you

6  finish.

7      A.   I'm at the paragraph now with "Boo Boo, real

8  name unknown."  Okay, I finished that paragraph.

9      Q.   All right.  And the third paragraph, the last

10  line, it says, "The detectives came back and told

11  Xavier they had spoken to them but they" -- hang on.

12      A.   Sorry, where are you reading from, Counselor?  1:50:47

13      Q.   I -- I'm sorry, I'm looking at the last --

14  third paragraph that starts off with, "Xavier kept

15  trying to tell the detectives that he was not

16  involved."

17      A.   Okay.  Okay.

18      Q.   And then if you read further along starting

19  right here, do you see my arrow?

20      A.   Yes.

21      Q.   "Xavier gave the detectives the names of his

22  friends who had -- who he had been with, Simeon and

23  Deon, last name" -- I suspect that means "last name

24  unknown."  "Simeon and Deon."  You see that there?

25      A.   I do.

```
 1      Q.   Does that refresh your recollection that --
 2  that Xavier told you he had been with Simeon and Deon?
 3      A.   It does not.
 4      Q.   And then the next paragraph, the name "Boo
 5  Boo," you see that there?
 6      A.   Yes.
 7      Q.   Did you ever come to know who Boo Boo was?
 8      A.   I did not.                          1:51:48
 9      Q.   Did you ever come to know the name Antwoine
10  Waddy?
11      A.   Not that I can recall.
12      Q.   All right.  Let's go to the next page.  After
13  the first paragraph, you can stop.
14      A.   Okay.                              1:52:45
15      Q.   Did Xavier ever tell you that they forced a
16  confession out of him?
17      A.   I do not recall that.
18      Q.   Do you -- do you recall that Xavier even gave
19  a confession in this case?
20      A.   I do not recall that.
21      Q.   You don't -- you don't recall that Xavier
22  Walker gave a videotaped confession in this case?
23      A.   No, I do not recall that.
24      Q.   Do you recall that Xavier said that they
25  would not allow him to eat or -- or let him use the
```

1  bathroom?

2      A.    No, I do not.                              1:53:39

3      Q.    You don't remember any of the circumstances

4  associated with Xavier Walker giving a videotaped

5  confession?

6      A.    That is correct.

7      Q.    And you have no memory of any conversations

8  with Xavier Walker about having given a videotaped --

9      A.    That is correct.                           1:54:24

10     Q.    Once you got the file in this case and you

11 saw that he had given a confession and that there were

12 witness statements that he had committed the crime,

13 what was your strategy to defend his case?

14     A.    As -- as I sit here today, I cannot tell you

15 what my strategy was 20 years ago.  I -- I don't

16 recall.

17         MS. SHOFFNER:  All right.  I need to take a

18 break for about five minutes.

19         WITNESS:  Okay.                              1:55:44

20         RECORDER:  Okay.  Off the record, 12:12 p.m.

21              (Off the record)

22         RECORDER:  Back on the record, 12:21 p.m.

23     Q.    All right.  Mr. Wilson, I still have the

24 document, and I'm on BS 10 -- sorry, BS page 13, and

25 the paragraph that I am focused on --

Page 72

```
1        A.   I don't see it.  I -- there's no document
2   before me.
3        Q.   Oh.  Okay.  Let's see if I need to share
4   this.  Okay.  Hang on.  It's -- can you see it now?
5        A.   I see it.                          1:56:44
6        Q.   All right.  Great.  So scrolling down to page
7   4, you indicated earlier that that's your handwriting,
8   correct?
9        A.   Correct.
10       Q.   Now I can't quite read what that says.  Can
11  you tell me what that says in the first line?
12       A.   The --
13       Q.   "Once in" -- it says, "Once in Cicero, they
14  saw Boo Boo, Jovanie, a boy named Boss Hog, and two
15  girls, Shontae and Chavanna."
16       A.   Yes.
17       Q.   And then you have -- and then what does that
18  say?
19       A.   I circled it and I said, "Who are they?
20  Where are they?"
21       Q.   All right.  And then -- and then near the end
22  of that paragraph, it says, "After Jovanie got in the
23  car, he told Xavier, 'I just killed this mark.'
24  Jovanie told Xavier how he had been selling some drugs
25  to a man in a van and the guy didn't want to pay, so he
```

Exhibit 5, LLC

1  shot and killed him.  Xavier was shocked and did not

2  know what to do.  He continued driving to the Wax

3  Factory."  You see that there?

4      A.   I do.                                    1:57:57

5      Q.   Does that refresh your recollection as to

6  what Jovanie -- I mean as to what Xavier Walker

7  believed or told you?

8      A.   It does not actually.

9      Q.   Okay.  And to the left of that, your -- what

10 do your comments say?

11     A.   So at -- it seems that -- I said, "Did Simeon

12 and Deon hear this?"

13     Q.   And when you asked that question, to your --

14 I'm sure it's your -- your -- as you're reading this,

15 you're wondering this, but did you ever ask that

16 question to Xavier, whether or not Simeon and Deon hear

17 Jovanie say that he just killed the mark?

18     A.   I don't know that I did.  I -- I would think

19 that I did, but I don't -- I can't say that I did.

20     Q.   You don't know one way or another whether or

21 not you discussed with Walker, Xavier Walker, whether

22 or not Simeon and Deon heard Jovanie say that he just

23 killed the mark?

24     A.   Correct.                                 1:59:02

25     Q.   Did Walker ever tell you that Jovanie told

```
 1  him that he just killed the mark?

 2      A.   I don't recall that.

 3      Q.   All right.  And then -- and the -- and the --

 4  sorry to jump around here, but in the paragraph right

 5  before that -- could you take a look at that paragraph?

 6      A.   "Once in Cicero"?

 7      Q.   No, it's right under "Alibi."

 8      A.   Okay.                                    1:59:57

 9      Q.   Now in the course of investigating or

10  representing Walker, did you attempt to help develop an

11  alibi for Xavier Walker?

12      A.   I don't recall whether I did or didn't, to be

13  honest with you.

14      Q.   All right.  But it -- it says that Xavier

15  provided information about what actually happened that

16  night.  "Xavier was" --

17      A.   I see --

18      Q.   Okay.  It says, "Xavier was with friends in

19  his basement and that he -- that he shares with his

20  sister Sheleah.  These friends were Charles, Quinton,

21  Marvin Mosley, Simeon, Deon."  You see that there?

22      A.   I do.                                    2:00:52

23      Q.   Do you recall that Xavier ever shared this

24  information with you?

25      A.   I do not recall that.
```

```
 1      Q.   So he could have shared it with you but he
 2   may not have, correct?
 3      A.   That is correct.
 4      Q.   As you sit here today, is there any reason
 5   why he would not want to share this information with
 6   you?
 7      A.   I have no way of -- of answering it.  I -- I
 8   have no -- no idea.
 9      Q.   But as you sit here today, is there any
10   reason why he would not want to share this information
11   with you as his defense attorney?
12           MS. SAMUELS:  Objection.
13      A.   None that I can think of.
14           MS. SAMUELS:  Asked and answered.
15      Q.   All right.  "Everyone was in the apartment
16   from 9:00 p.m. to 12:00 p.m."  You see that there?
17      A.   Yes.
18      Q.   And is there any reason -- well, first of all
19   did -- did Xavier tell you that everyone was in the
20   apartment from 9:00 to 12:00?
21      A.   I don't recall that Xavier -- what Xavier
22   told me about that.
23      Q.   All right.  It says here, "Martin (sic),
24   Quinton left in a separate car to go to the club called
25   the Wax Factory," and then -- and then the next
```

```
 1   sentence, "Xavier had just gotten his license and asked
 2   his other sister, Sharon (phonetic) Walker, if he could
 3   borrow her green Ford Taurus to go a restaurant."  You
 4   see that?
 5        A.   I do.                                    2:02:12
 6        Q.   Does that refresh your recollection that
 7   Xavier had borrowed his sister's car to go to -- out to
 8   eat?
 9        A.   It does not.
10        Q.   If that was relevant to this case, would you
11   have confirmed that information with his sister?
12        A.   I got to believe I would have.
13        Q.   And is there anything in your notes that
14   reflect that Xavier was driving that green Ford Taurus
15   that night?
16        A.   I no longer know what's in my notes.
17        Q.   All right.  And then the next sentence, it
18   says, "Xavier didn't tell Sharon that he was going to
19   the club or that 13-year-old Deon was going with Xavier
20   and Simeon because she would have never let him borrow
21   the car.  Sharon let him -- lent him the car and he and
22   Simeon left to pick up Deon down the street."  You see
23   that there?
24        A.   I do.                                    2:03:13
25        Q.   And that still doesn't refresh your
```

```
 1   recollection that Deon and Simeon were -- were with --
 2   were with Walker that night?
 3        A.   It does not.
 4        Q.   It says here, "Xavier is a former member of
 5   the Imperial Insane gang."  You see that there?
 6        A.   I do.
 7        Q.   Did you ever come to learn from Walker that
 8   he was a member of the Imperial Insane gang?
 9        A.   I don't recall that.
10        Q.   Did you come to learn from any other source
11   that he was a member of the Imperial Insane gang?
12        A.   I do not have any recollection of that.       2:03:55
13        Q.   Okay.  All right.  I'm going to scroll down,
14   and it says here next, "The club was open till 3:00
15   a.m.  They met Xavier's friends there.  After the club
16   closed, they rode around some more until Jovanie said
17   he wanted to go to Bubbles' house on Division and
18   Central."  You see that there?
19        A.   I do.
20        Q.   Did -- did Xavier ever tell you that that is
21   in fact what happened?
22        A.   I do not recall.
23        Q.   Well, it may have happened, it may not, you
24   just don't know?
25        A.   Correct.                                      2:04:53
```

Exhibit 5, LLC

1    Q.   And you have no knowledge of anyone ever

2  telling you that as you sit here today?

3    A.   Correct.

4    Q.   All right.  And the last sentence on that

5  page carried over to the next page, it says, "Xavier

6  described Jovanie as 'acting real crazy, aggressive,

7  flaring up at everyone, trying to pick -- trying to

8  pick'" -- to the next page, "'fights with everyone.'

9  Xavier was afraid of him and didn't know how to get him

10  out of the car."  You see that there?

11    A.   I do see that.

12    Q.   Did -- did Xavier ever tell you that during

13  the course of the night that he was -- that he had

14  encountered Jovanie and that he was afraid of him?

15    A.   I do not recall.

16    Q.   Do you recall Xavier Walker saying to you

17  that he saw something that he wish he had not seen?

18    A.   I do not recall that.                    2:05:57

19    Q.   All right.  Reading that paragraph, "When

20  they got to Bubbles' house, they found Boo Boo was

21  asleep in -- in a gray two-door Regal parked outside.

22  Jovanie woke Boo Boo up and made him get in the car

23  with them.  Xavier told Boo Boo that Jovanie had said

24  -- what Jovanie had said about killing someone.  Xavier

25  told Boo Boo that they should not -- they shouldn't

```
 1  have let Jovanie drink that much because he always gets

 2  crazy when he drinks."  Do you recall Walker telling

 3  you that about Jovanie Long?

 4      A.   I do not.                                    2:06:54

 5      Q.   If he had told you that, would that have been

 6  something that you would put in your notes?

 7      A.   I would think I would have.

 8      Q.   All right.  Next, "Boo Boo acted surprised at

 9  what Xavier was telling him and at first said, 'Quit

10  playing, y'all playing with me.'  Jovanie then told Boo

11  Boo that it was true.  Jovanie got in the driver's seat

12  of the car.  Xavier wanted him out of the car and knew

13  he was too drunk to drive.  He convinced Jovanie to

14  stop at a Shell station at Division and Central.

15  Jovanie got into a heated argument with the gas station

16  attendant.  Jovanie continued to drive the car as they

17  left the station.  Boo Boo and Deon were acting scared

18  of Jovanie."  Does that refresh your recollection about

19  what transpired -- transpired after they left the club?

20      A.   It does not.                                 2:07:55

21      Q.   And as you sit here today, you don't recall

22  having talked to Simeon, correct?

23      A.   Correct.

24      Q.   You don't recall talking to Deon?

25      A.   Correct.
```

1      Q.    You don't recall talking to Boo Boo?

2      A.    Correct.

3      Q.    All right.  So then it says, "Back -- Jovanie

4  drove back to Cicero and Boo Boo's house.  Jovanie

5  pulled into a side alley.  Jovanie tried to convince

6  Xavier to go over to the van and wipe Jovanie's

7  fingerprints off the side of the van."  You see that

8  there?

9      A.    I do see that.

10     Q.    Did Walker tell you that Jovanie tried to

11 convince him to go to the van and wipe off the

12 fingerprints?

13     A.    I do not recall that.

14     Q.    You don't recall it, so it may have happened,

15 he may have told you, he may not have told you.  Fair

16 to say?

17     A.    That's fair to say.  Counselor --

18     Q.    And -- hmm?

19     A.    -- let -- let me just be clear about this.  I

20 don't really recall as I sit here today anything that I

21 said or did for Xavier Walker back 20 years ago.

22     Q.    I understand.

23     A.    Okay.

24     Q.    Hard to recall 20 days ago at some point,

25 isn't it?

1       A.    Sometimes.

2       Q.    All right.  But the next line, "Xavier could

3   see police in the area and saw a van with its blinker

4   lights still on.  Xavier refused Jovanie's request.

5   The two argued, but Jovanie -- Jovanie finally said,

6   'Forget it,' and got out of the car with Boo Boo."  You

7   see that there?

8       A.    Yes.

9       Q.    All right.  That doesn't refresh your

10  recollection about him wiping the prints off the car or

11  being asked --

12      A.    It does not.                          2:09:46

13      Q.    -- to wipe the prints off the car?  Okay.

14  And then the next line -- the next paragraph -- let me

15  just scroll down, "Xavier returned home.  Xavier

16  believes that his friends Deon and Simeon will verify

17  his whereabouts that evening.  He does not think that

18  the detectives ever bothered to speak with them.  He

19  also believes that 17-year-old Chavanna will testify in

20  his behalf."  Do you see that there?

21      A.    I do see it.

22      Q.    Does that refresh your recollection that

23  maybe you would attempt to contact Deon and Simeon to

24  get -- to get Xavier Walker's story that night?

25      A.    It does not.

1    Q.   And with respect to 17-year old-Chavanna, did

2  you ever -- do you know -- did you make any effort to

3  contact her?

4    A.   I have no recollection of that.                    2:10:52

5    Q.   Okay.  Now I want to scroll down to this next

6  page, and it says, "First Defense Legal Aid."  See that

7  there?

8    A.   I do.

9    Q.   Does that -- seeing that logo and that name,

10 does that refresh your recollection about the nature of

11 this organization?

12   A.   It does not.

13   Q.   You see where it says to the left, "Client

14 information"?

15   A.   Yes.

16   Q.   And then it says, "Client's full name"?

17   A.   Yes.

18   Q.   And then it says, "Xavier Walker"?

19   A.   Yes.

20   Q.   Now to the left of that, is that your

21 handwriting?

22   A.   To the right of that or to the left -- to --

23   Q.   I'm sorry, to -- to the right, I'm sorry.

24   A.   Where it says, "Dark skinned black male"?

25   Q.   Yes.                                                2:11:49

1       A.    No, that is not my handwriting.

2       Q.    Okay.  And then scrolling down the page in

3   the paragraph seven, there is writing right above it.

4   Can you -- can you -- is -- is that your handwriting,

5   this -- this --

6       A.    That is not.

7       Q.    -- this right here, the -- where it says --

8   looks like, "Can see fist," or something?

9       A.    Yeah, I see what you're referring --

10      Q.    But that's not your writing?

11      A.    Yeah, that's not my handwriting.

12      Q.    Okay.  And then in the next line down it

13  says, "XW described being slapped in the face at least

14  four times by detectives.  Also be -- described being

15  kicked in the stomach by arresting officer."  Did I

16  read that correctly?

17      A.    Yes.

18      Q.    But I can't quite make out the -- the rest of

19  it, but you didn't write that, did you?

20      A.    Correct, I did not.                      2:13:06

21      Q.    Okay.  Now at the time I -- at the time you

22  were receiving this information, did you come to

23  understand that Deborah Bedsole was representing Xavier

24  Walker?

25      A.    Well, based upon her name being at the bottom

```
 1   of the last page of this document, I -- I -- I presume

 2   that I did come to understand that she represented --

 3   was -- had been representing Xavier Walker.

 4       Q.   And -- and you understood that she -- she

 5   authored this document after having met with Xavier and

 6   interviewed him, correct?

 7       A.   I -- I -- I don't know what I understood

 8   about that, but I presume that to be true.

 9       Q.   Okay.  Now you understood at some point that

10   Xavier was -- was -- that there was a grand jury

11   convened for an indictment in this case.  Is that fair

12   to say?

13       A.   I -- that's fair to say.                2:14:50

14       Q.   Were you -- were you able to attend any of

15   the grand jury hearing?

16       A.   I did not.

17       Q.   And is that in part because you hadn't been

18   hired yet?

19       A.   I can only presume that to be the case.

20       Q.   Do you recall how soon after the grand jury

21   hearing was held that you got involved in the case?

22       A.   I do not.

23       Q.   Do you -- did you come to learn who testified

24   at the grand jury?

25       A.   I don't recall that I ever came to learn who
```

1  testified before the grand jury.

2      Q.   And do you recall that there were certain --

3  certain witnesses who gave statements?

4      A.   I have no recollection of that.                    2:15:44

5      Q.   Okay.  Let's -- I don't mean to share this

6  one, hang on.  Can you see the case supp report that's

7  up in front of the screen?

8      A.   The case supplement report?  Yes, I see that.

9      Q.   Okay.  All right.  Are you familiar with the

10  CPD case supp reports?

11      A.   I am familiar with it, yes.

12      Q.   And -- and -- and typically when you

13  represent criminal defendants and you receive

14  information from the State's Attorney or the public

15  defender or even -- you recall getting the -- the case

16  supp reports that are completed by Chicago police

17  officers?

18      A.   I do recall getting -- receiving such

19  information.                                               2:17:10

20      Q.   All right.  And I'm going to represent to you

21  these are all case supp reports that come from your

22  file, the Bates stamp numbers are BS 543 through 551,

23  554 through 557, and 568 through 570.  Now in this

24  case, there were -- because of the nature of the -- the

25  crime, homicide, there were a number of supp reports

1  done, and I'll represent to you that these documents

2  are part of supp reports but not all the pages of every

3  supp report.  Showing you what's marked as BS 543,

4  there is a page that says, "Notifications," and then

5  there is a page here that says, "Witnesses."  Do you

6  see that there?

7      A.    I do.                                    2:18:34

8      Q.    And then right underneath it, it says,

9  "Antwoine Waddy," correct?

10     A.    Yes.

11     Q.    And then it has his age, his date of birth,

12 his address, his phone number, correct?

13     A.    It has that information there, yes.

14     Q.    And -- and the same information is there for

15 Maurice Wright and Ashanti Wright and Mary Curry.  You

16 see that there?

17     A.    I do.

18     Q.    And then also below is, "To be

19 re-interviewed, Hershurla Byrd."  Do you see that

20 there?

21     A.    Yes.

22     Q.    It has her date of birth, Social Security

23 number, it says that she has no phone but it does have

24 an address, correct?

25     A.    Correct.                                  2:19:20

```
 1        Q.    And then as we scroll down, it has -- it has

 2   summaries of what these witnesses said and summaries of

 3   their reports, including the interview with Xavier

 4   Walker.  You see that there?

 5        A.    I do.

 6        Q.    And these were -- these reports were right

 7   out of your file, and I'm asking if you know, if you

 8   recall whether the notations or the lines that are

 9   being drawn under each one is your handwriting?

10        A.    I do not recall that.

11        Q.    So, like for example, this line along -- you

12   don't -- you don't -- you can't say as you sit here

13   today that that's -- that's your notation?

14        A.    Correct.                              2:20:42

15        Q.    Hang on, I just want to go a little bit

16   further down because these are a little out of order,

17   so I apologize for that.  All right.  And then I am

18   taking your attention down in this batch of documents

19   -- or this group exhibit -- page is that?  Okay, on

20   page 6 of 9, Bates stamp 554 -- whoops, I meant to go

21   to 6.  Oh, that's page 8, hang on.  All right.  So then

22   on the top of page 6 it -- or it indicates Ashanti

23   Wright, Jamaica (phonetic) Wright, Antwoine Waddy, and

24   looks like page 5 might have been left off, but the

25   interview starts with Maurice Wright.  You see that
```

1  there?

2      A.   I do.                                    2:22:45

3      Q.   And did you -- did you -- do you recall that

4  he gave a written statement and that he testified --

5  that Maurice Wright testified at the grand jury?

6      A.   I do not recall.

7      Q.   Do you recall that he testified that on May

8  13th between 1:30 and 2:00 a.m., he was sitting in his

9  car and Walker and along -- along with Jovanie Long

10 approached him?

11     A.   I do not recall.

12     Q.   Do you recall that he testified that he told

13 Wright that "This crazy motherfucker Long just shot a

14 motherfucker," unquote?

15     A.   I do not --

16     Q.   Do you recall --

17     A.   No.

18     Q.   You don't recall that testimony?

19     A.   I do not.

20     Q.   Do you recall that he pulled him out of a car

21 and that -- that -- that Walker showed Long $100 and

22 $50 bills?

23     A.   No, I do not.                            2:23:45

24     Q.   Do you recall that Wright testified that Long

25 threw the gun towards Chicago Avenue?

1      A.   No, I do not.

2      Q.   If you had received a statement or testimony

3  that Maurice Wright had in fact said those things as

4  represented by the -- by the -- by the grand jury

5  transcript and by his interview, would you have

6  attempted to follow up with Wright to discuss that with

7  him?

8      A.   I would think I would have, yes.

9      Q.   Do you recall that you actually talked to

10  Maurice Wright about his statement?

11      A.   I do not.

12      Q.   As you read the statement, did you notice

13  anything suspicious about that statement?

14      A.   No, not -- not as I read it now, no, I do

15  not, and I can't recall what I thought about it back

16  then, so.

17      Q.   Did you -- do you recall at some point

18  Maurice Wright saying that the statement was not true?

19      A.   I do not recall that.           2:24:52

20      Q.   Do you recall Maurice Wright telling you that

21  the detectives had threatened him into making a

22  statement?

23      A.   I do not recall that.

24      Q.   Do -- do you have any recollection of the

25  trial in this case?

1      A.    No, I don't.

2      Q.    Do you recall Maurice Wright being called

3   upon to testify at the trial in this case?

4      A.    I do not recall that.

5      Q.    And in fact you -- do you recall Maurice

6   Wright being called to testify by the state in their

7   case in chief to prosecute Xavier Walker?

8      A.    I do not.

9      Q.    Do you recall Xavier -- Maurice Wright

10  testifying at the trial and then at trial recanting all

11  of this testimony, recanting that he had agreed -- oh,

12  hello, sir?

13     A.    I'm here.                              2:25:58

14          MS. SHOFFNER:  Okay.  I just lost you.

15          WITNESS:  Ah.  I need to recharge -- I need

16  to recharge my -- my iPad.  Are you there?

17          MS. SHOFFNER:  Oh, can -- can -- yeah, yes.

18  Can you -- can you plug it in and charge it --

19          WITNESS:  Yeah, I'll tell you what.  I'm

20  going to -- if we -- if you will give me five minutes,

21  I'm going to go onto my computer and -- and tie back

22  into you guys.  Is that okay?

23          MS. SHOFFNER:  Okay.  All right, that's fine.

24          WITNESS:  All right.  Give me five minutes

25  and I'll be right back with you.

```
 1          MS. SHOFFNER:  Okay.

 2          RECORDER:  Okay.  Off the record, 12:52 p.m.

 3                  (Off the record)

 4          RECORDER:  Back on the record, 1:01 p.m.

 5     Q.   All right.  Sir, I was asking you about the

 6  statements made by Maurice Wright, and I -- I had

 7  jumped to the trial in this case.  Do you have any

 8  memory of the -- of the trial that took place in this

 9  case?

10     A.   Unfortunately not.                        2:26:51

11     Q.   It was your -- it was your first and biggest

12  murder trial ever and you have no memory of it?

13     A.   And -- and it was 20 years ago, and I do not.

14     Q.   All right.  But it was one of those moments

15  where the state calls a witness to testify in support

16  of their case and their lead fact witness recants his

17  -- his -- his prior testimony and his prior statement

18  and he -- he indicates that he was coerced into giving

19  the statement against Xavier Walker.  You don't -- you

20  don't recall any of that happening at the trial?

21     A.   I do not.

22     Q.   All right.  Do you recall ever having met

23  with Maurice Wright to discuss his testimony?

24     A.   No, I do not.

25     Q.   How about -- but -- but you -- certainly with
```

1  the information that was provided to you, you had his

2  contact information.  Is that fair to say?

3      A.    That's fair to say.                          2:27:54

4      Q.    And then also Ashanti Wright, you see on the

5  screen right there, "#3 Ashanti Wright"?

6      A.    I do.

7      Q.    And you came to learn that she testified at

8  the grand jury?

9      A.    I don't know that, I don't know if I came to

10 learn that or not.

11     Q.    All right.  Did you come to learn that she

12 did give a statement though?

13     A.    I believe I probably did.

14     Q.    And she was living at 4653 West Erie with

15 Mary Curry and Maurice Wright and her mother, Jamaica

16 Wright, right?

17     A.    I believe that's correct.

18     Q.    And she testified that she was at home at

19 1:00 playing cards when she heard the gunshots, that

20 her mother got up, went to check in the basement and no

21 one was there, they saw Jovanie Long nervous, and --

22 and then they walked down to Ohio and saw a man lying

23 in the street.  Ashanti Wright then testifies that

24 Jovanie Long told her, "I killed the mark," that he

25 killed a white man who was around the corner.

```
 1              MS. SAMUELS:  Back for the record.          2:29:12

 2              MS. SHOFFNER:  Huh?

 3              MS. SAMUELS:  I just returned.

 4       Q.    Okay.  And then Xavier told Ashanti that

 5   Jovanie wanted to return to wipe fingerprints off the

 6   van.  Now do you remember reading that testimony in the

 7   transcripts?

 8       A.    I do not remember any of that.

 9       Q.    Okay.  And had you known in advance of the

10   trial in this case that Ashanti Wright gave that

11   testimony, would you have attempted to -- to contact

12   her to -- to confirm that testimony?

13       A.    I got to believe I would have.              2:30:03

14       Q.    But do you have any record that you attempted

15   to contact Ashanti?

16       A.    I -- I have no such recollection, nor do I

17   have any recollection of having known that that's what

18   Ashanti Wright said.

19       Q.    Looking at her statement below Curry, right

20   there.  Now I understand that you don't -- you don't

21   contend to understand the -- the claim that these

22   underlined statements are yours.  Is that right?

23       A.    That's correct.                             2:30:45

24       Q.    But in the statement Bates stamp page BS 556,

25   the statement that police officers took -- let's see,
```

```
 1   I'll start with the -- near the end where it says, "She

 2   said that Mary went upstairs and Vani -- Vani and

 3   Maurice came in.  Maurice went upstairs to tell Mary

 4   that he was back.  Vani told her that he killed the

 5   white guy.  He told her that he wanted the white guy's

 6   money but that he put up a fight and was getting the

 7   best of Vani, so Vani shot him.  He said, 'He wouldn't

 8   let the money go.  I killed the white guy.'  She said

 9   they started to play cards when Zay came in."  You --

10   you see -- you -- you see that statement there?

11       A.   I do.                                    2:31:43

12       Q.   And that statement's contained in your file.

13   Is that something that you would have followed up on

14   and talked to Ashanti Wright about -- about with

15   respect to -- in your defense of -- of Xavier Walker?

16       A.   I would think so.

17       Q.   Now are you -- are you contending that --

18   well, did you know the relationship between Jovanie

19   Long and Xavier Walker?

20       A.   I don't recall -- I don't recall whether I

21   knew that or not.

22       Q.   That they had been childhood friends?

23       A.   It's -- the -- the -- the -- the statements,

24   the information that you have certainly indicates that

25   there is a -- a -- a kinship of sorts between the two
```

```
 1   of them, but I just don't recall what I knew.
 2        Q.   Okay.  And as you sit here, there's no reason
 3   for you to believe or not believe the statement that
 4   Ashanti Wright gave, is there?
 5        A.   Correct, there --
 6        Q.   You have no --
 7        A.   There is not.                              2:32:49
 8        Q.   Similarly Mary Curry testified at the grand
 9   jury and she also gave a statement, but the gist of her
10   testimony -- or -- is -- is -- is contained in this
11   document and -- hang on, let me just get there.  In the
12   last paragraph -- well, in the paragraph that's in
13   front of you right here, do you see my arrow?
14        A.   Yes.                                       2:33:51
15        Q.   But after the events unfolded, "Jovanie went
16   past her room.  She told them that she wanted to talk
17   with him.  When he came out of the bathroom, he went to
18   her room with $100 bill in his hand."  See that there?
19        A.   That's what I see.
20             MS. SHOFFNER:  I'm sorry, you're -- you're
21   making me dizzy.  What are you doing there?
22             WITNESS:  I'm -- I'm moving my iPad.
23             MS. SHOFFNER:  Okay.
24             WITNESS:  Okay, we're stable.
25        Q.   All right.  "Jovanie replied that he didn't
```

Exhibit 5, LLC

```
 1  have any money and was tired of being broke.  She told

 2  him that the man probably had a wife and children.  He

 3  said, 'Ma'am, I'm sorry.  I didn't mean to kill the

 4  man, but he wouldn't let the money go.'  She said that

 5  he started crying and hugged her for a long time.

 6  Jovanie told her that nobody saw him do it, but she

 7  told him in a Black neighborhood, somebody saw him do

 8  it.  She told him he would have to stay away from her

 9  house because she didn't want any trouble and there was

10  young children.  She gave Boo Boo $60 for pizza and the

11  kids went to work."  You see that there?

12      A.   I see that.                          2:35:18

13      Q.   Does that refresh your recollection that

14  witnesses had continued to maintain that -- that --

15  that Jovanie Long had killed the suspect -- or killed

16  the victim?

17      A.   It does not.

18      Q.   Do you recall ever interviewing Mary Curry?

19      A.   I do not recall.

20      Q.   If you had interviewed her, would you have

21  taken notes of that meeting?

22      A.   I would presume I did -- I would have.

23      Q.   And so as you sit here today, you don't know

24  if when she gave this statement she was telling the

25  truth or not?
```

1       A.    Correct, I do not.

2       Q.    And you have no recollection with any

3   conversation with Mary Curry?

4       A.    None whatsoever.                           2:36:29

5       Q.    Now there was -- all right.  I think that

6   concludes that -- this exhibit.  Let me just make sure

7   there were no other witnesses identified.  Okay.  Now

8   in the course of reviewing the file in this case and

9   reviewing statements, is it your testimony that you

10  could not develop a strategy for how to defend -- or

11  you can't recall a strategy for how to defend Xavier

12  Walker?

13      A.    I do not recall developing a strategy for how

14  to defend Xavier Walker.

15      Q.    Do you recall having discussions about

16  getting a plea agreement?

17      A.    No, I do not.                               2:38:01

18      Q.    Is that something that you would have put in

19  your notes?

20      A.    I would think.

21      Q.    In the course of defending Xavier Walker, did

22  you have the opportunity to speak to his sister,

23  Shunralyn Walker?

24      A.    I don't recall today whether I did or did

25  not.  I would have -- I would assume that I did, but I

```
 1   don't recall.

 2        Q.   So you don't recall if you met with her one

 3   time, if you never met with her, or if you met with her

 4   five or six times.  Is that fair to say?

 5        A.   That's fair to say.

 6        Q.   All right.  I'd like to show you an exhibit

 7   that I have marked Exhibit 4.  Whoops.  All right.  You

 8   have in front of you the "Amended Affidavit of

 9   Shunralyn Walker"?

10        A.   I see it.                              2:39:33

11        Q.   All right.  I'd like you to take a look at

12   that.  Let me know when you're finished.

13        A.   I'm finished.                          2:40:20

14        Q.   All right.  In paragraph ten, she says, "As

15   far as I know, Xavier -- Xavier's trial attorney, Greg

16   Wilson, had not previously done murder trials,"

17   correct?

18        A.   I see that, yes.

19        Q.   And that --

20        A.   And that -- that's a correct statement.

21        Q.   That statement is true?  Okay.  Oh, I didn't

22   ask you.  After you did this murder trial, did you ever

23   do any more -- additional murder trials?

24        A.   Yes, two.  One -- one for sure.  Yes, one.

25        Q.   So you had another murder trial?
```

```
 1      A.   Yes.

 2      Q.   And what was the -- what was your client's

 3  name in that case?

 4      A.   I'm sorry?

 5      Q.   What was your client's name in that case?

 6      A.   I'm embarrassed because I don't recall his

 7  name.

 8      Q.   How long ago was your -- was your next murder

 9  trial?

10      A.   That murder trial was -- oh, I don't know,

11  around 2015.

12      Q.   Okay.  So in the course of your entire

13  criminal career, you've done two murder trials?

14      A.   I've done three murder trials.  The -- the --

15      Q.   Oh, okay.                           2:41:36

16      A.   Yeah, another murder trial was -- involved a

17  -- one second, I'll tell you his name.  Jamarcus

18  Robinson (phonetic).

19      Q.   Can you spell that first name?

20      A.   J-a-m-a-r-c-u-s Robinson.

21      Q.   And when -- and when was that murder trial?

22      A.   Oh, 2016, '17, '18.

23      Q.   Oh, and what was the outcome?

24      A.   He was found guilty of -- of murder.

25      Q.   And then you said you had one in 2015, right?
```

```
 1      A.   Yeah, one -- yeah, the -- the dates are

 2  confusing, but that -- there was one other, so I've had

 3  three murder trials all total.

 4      Q.   And who was your other client?

 5      A.   That's the name that I can't recall right

 6  now.

 7      Q.   But that one was about in 2015?

 8      A.   Yeah.                                    2:42:45

 9      Q.   Okay.  All right.  So we're turning back to

10  the exhibit here.  It says in paragraph 11, "Greg

11  Wilson interviewed me and I told him I wanted to

12  testify for Xavier.  I told him I was watching the

13  clock and that Xavier did not leave the house until

14  1:45 a.m."  You see that there?

15      A.   I do see that.

16      Q.   And does that refresh your recollection about

17  what Shunralyn told you?

18      A.   It does not.

19      Q.   Do you have any reason to dispute that what

20  she said is -- she believed to be true?

21      A.   I can only tell you that I have no

22  recollection of that conversation with her.

23      Q.   And then the next paragraph, it says,

24  "Attorney Wilson told me that he would put me on the

25  witness stand and also talked about Simeon and Deon
```

```
 1  taking the stand.  Attorney Wilson said" -- oh, no,

 2  "Attorney Wilson also knew that Antwoine Waddy,

 3  'Bubbles,' might be a witness."  Do you see that there?

 4       A.   I see it.

 5       Q.   Does that refresh your recollection that

 6  Simeon and -- that you had spoken to both Simeon and

 7  Deon?

 8       A.   It does not.                        2:43:52

 9       Q.   And then skipping down to paragraph 15, it

10  says, "Greg Wilson interviewed me several times at my

11  house in person."  You see that?

12       A.   I see that.

13       Q.   And -- and as you sit here today despite the

14  fact that she said that you were there several times,

15  you have no memory of -- of meeting with her?

16       A.   That's true, yes.

17       Q.   Following the trial in this matter, did you

18  feel it was necessary to explain to people why you

19  didn't call them as witnesses in this case?

20       A.   I don't know what I thought following the

21  trial in this matter regarding explaining to anyone my

22  reasoning for doing or not doing something.

23       Q.   Did you meet with Xavier after the trial?

24       A.   I'm sure I did.                      2:45:08

25       Q.   All right.  I would like to turn your
```

1   attention to Deon Baylock, and it's your testimony that

2   you didn't meet -- you -- you don't recall having met

3   with him?

4       A.   That is correct.

5       Q.   So you may have met with him, you may not

6   have, correct?

7       A.   I do not recall.

8           MS. SHOFFNER:  Okay.  All right.  Madame

9   Court Reporter, did I -- did you -- did you get that as

10  Exhibit Number 4 that I just presented to you, the

11  "Amended Affidavit of Shunralyn Walker"?

12          RECORDER:  Yes, that's correct.

13          MS. SHOFFNER:  All right.  And do you have

14  her first name spelling?

15          RECORDER:  Actually I can take that down now.

16          MS. SHOFFNER:  All right.  It's

17  S-h-u-n-r-a-l-y-n.

18          RECORDER:  Perfect.

19          MS. SHOFFNER:  And that's Number 4.

20          RECORDER:  Okay, thank you.              2:46:20

21      Q.   All right.  Let's go to -- here.  All right.

22  I'm now showing you what's been marked -- we'll mark as

23  Exhibit Number 5, and it's the "Affidavit of Simeon

24  Dorsey," and I'll ask that you take a look at this

25  affidavit.  It's two pages, so let me know when you

1  need me to scroll down.

2      A.   Okay.  I'm at paragraph seven.  Okay.  You

3  can go to the next page.  Okay.  Okay.

4      Q.   All right.  You see there at paragraph 12 he

5  says, "We returned to Xavier's house and stayed there

6  until after 10:00."  And then 13 he said, "Xavier drove

7  to Cicero and Ohio and picked up Jovanie, who was

8  Xavier's play brother."  And then 14, "Police were in

9  the area and Deon and I were nervous because the police

10 were present."  Moving forward, "Deon, Xavier, and I

11 were having a conversation about girls" -- oops, not

12 that one, we're -- we're almost there.  "Once we

13 finished our conversation," at paragraph seven (sic),

14 "we asked Jovanie what had happened, why the police

15 were there."  Paragraph 18, "Jovanie said that a guy

16 got shot."  19, "We did not know at the time that the

17 person -- we did not know at the time that the person

18 who had been shot was dead."  20, paragraph 20,

19 "Jovanie also said that he had gotten into an

20 altercation with a guy."  Hang on just a second.  "This

21 conversation took place as Xavier was driving where we

22 were going to celebrate Charles Toles getting out of

23 jail.  We met up with Marvin Mosley, Quinton, and

24 Charles Toles at the club.  We were there for a few

25 hours."  At paragraph 24 he says, "Jovanie stayed with

1  us at the club and was telling people about what had

2  happened around his house and he was asked." And then

3  further down, "After we left the club, Jovanie was

4  dropped off at Ohio and Cicero. We went out to get a

5  hoagie." And then he says here at 28, "I was never

6  contacted by Xavier's lawyer or any investigator

7  working for Xavier's lawyer regarding the trial." And

8  then he says, "I would have testified," essentially.

9  Do you see that there?

10     A.   I do.                                    2:51:00

11     Q.   Do you believe as you read this that you did

12  not contact Simeon Dorsey?

13     A.   I don't recall if I contacted Simeon Dorsey

14  or not. I understand that that's what he said in his

15  statement, but I don't recall whether I did or did not.

16     Q.   So you may have contacted him or you may not

17  have, you just don't -- you don't have independent

18  knowledge?

19     A.   That is correct.

20     Q.   And you have no knowledge about -- about --

21  about Xavier giving Jovanie a ride to a club?

22     A.   Correct.

23     Q.   Or that Jovanie had said that he was involved

24  in an altercation with a -- with a -- with a guy who

25  was -- who was -- had been shot dead?

```
 1        A.    I have no such recollection.              2:51:49
 2        Q.    Okay.  But if Jovanie -- but if Xavier Walker
 3   told you that he was with Simeon Dorsey and that Simeon
 4   Dorsey would be an alibi witness, would Simeon Dorsey
 5   have been someone that you would have wanted to
 6   interview?
 7        A.    I would think.
 8        Q.    Okay.  All right.  Do you recall meeting with
 9   the -- a witness named Marvin Mosley?
10        A.    I do not.                                  2:52:54
11              MS. SHOFFNER:  All right.  This is -- I'm
12   getting there, guys.  I'm a little slow with the
13   exhibits.
14        Q.    All right.  Do you see where it says,
15   "Affidavit of Alicia Stewart"?
16        A.    I do.                                      2:53:54
17              MS. SHOFFNER:  And I believe we're going to
18   mark this one as Number 6?
19              RECORDER:  Correct.
20        Q.    Now this affidavit, although it was signed by
21   Alicia Stewart, it was an interview of Marvin Mosley
22   and that -- it states that on the -- on -- at -- at
23   paragraph -- starting at paragraph C --
24        A.    I don't have that on my screen.
25        Q.    Oh.
```

```
 1              MR. MILLER:  It's just showing the folders

 2   again with the list of exhibits.

 3              MS. SHOFFNER:  Oh, okay.  How's that?

 4              MR. MILLER:  Yep.                          2:54:43

 5        A.    Got it.

 6        Q.    Just take a minute and go ahead and read it.

 7        A.    I'm down to paragraph number four.

 8        Q.    Oh.                                        2:55:52

 9        A.    Okay.

10        Q.    All right.  He states that on the night of

11   May 12th, 2000, he was at -- in paragraph B and C and

12   D, that he was at the Wax Factory because their friend

13   Charles Toles just got off house arrest and that

14   Xavier, Simeon, and -- strike that.  Xavier -- on

15   paragraph D, Xavier Walker, Simeon Dorsey, Deon

16   Baylock, and Jovanie Long arrived about 20 minutes or

17   so after Marvin arrived.  Do you see that there?

18        A.    I do.

19        Q.    And then after -- and then Marvin was

20   expecting Xavier, Simeon, and Deon, but not Jovanie,

21   right?

22        A.    I see that.                                2:56:56

23        Q.    At -- and then paragraph F it said, "At the

24   club, someone boasted about getting money from shooting

25   -- from a shooting that evening."  And then at
```

1  paragraph G, "The person bragged about having money but

2  did not say anyone helped him get the money."  And then

3  paragraph H, "Xavier, Simeon, and Deon all looked

4  scared and jittery when they heard the person boasting.

5  Marvin is certain that Xavier had nothing to do with a

6  shooting that night."  And then -- and then it says in

7  paragraph I -- or paragraph J that -- that you spoke

8  with Marvin on the telephone.  You see that there?

9      A.    I do.

10     Q.    If you had called him, how would you have

11 gotten his contact information?

12     A.    I have no recollection.  I don't know.        2:57:53

13     Q.    You -- you don't recall who you worked with

14 to get information about potential witnesses?

15     A.    Correct.  I would assume that had I called

16 him I likely would have gotten the -- the phone number

17 from Xavier, but I don't know that.

18     Q.    Okay.  And -- and it says that you called but

19 you didn't ask about that conversation, that incident

20 with them being at the club.  As you sit here today, is

21 there -- is there any other reason you would have

22 called him?

23     A.    I -- I have no recollection as to why I

24 called him or what was said outside of --

25     Q.    And if you had -- yeah.  And if you had

```
 1  called him, would you have made any notes of that call?
 2      A.   I would have thought so, but I -- I don't
 3  know.                                               2:58:40
 4      Q.   Okay.  And it says here that they were there
 5  to celebrate Charles Toles getting off house arrest.
 6  As you sit here today, do you have any recollection
 7  about having called Charles Toles?
 8      A.   I do not.
 9      Q.   And if you had spoken to Mr. Toles, would
10  that have been reflected in some notes?
11      A.   I would think so.
12      Q.   All right.  I want to just ask you about a
13  few more potential witnesses, and then we'll see where
14  we stand.  On the -- and if you don't recognize these
15  names or can't recall whether or not you spoke to them,
16  just let me know.  Do you recognize the name Yvette
17  Taylor (phonetic)?
18      A.   No.                                         2:59:52
19      Q.   And do you have any recollection of -- of
20  attempting to contact Yvette Taylor?
21      A.   I don't recognize the name.  I have no
22  recollection.
23      Q.   All right.  How about Yvette Hill (phonetic)?
24  Did you -- as a witness in this case, did you make any
25  -- do you recall that name?
```

```
 1        A.    I do not recall that name.
 2        Q.    And do you have any independent recollection
 3   of attempting to contact her?
 4        A.    No.
 5        Q.    What about Marion Tillman?  Have you -- does
 6   that name sound familiar to you?
 7        A.    It is -- does not.
 8        Q.    And you have no recollection of making an
 9   attempt to contact Marion Tillman?
10        A.    Correct, I do not.
11        Q.    How about Betty Edwards?  Did you -- does
12   that name sound familiar to you?
13        A.    No, it does not.
14        Q.    And you have no recollection of contacting
15   Betty Edwards?
16        A.    Correct, I do not.
17        Q.    Do you have -- does the name Hershurla Byrd
18   sound familiar to you?
19        A.    No.
20        Q.    And connection with this case, do you have
21   any recollection of having attempted to contact
22   Hershurla Byrd?
23        A.    No.
24        Q.    How about Yvette Anderson?  Does the name
25   Yvette Anderson sound familiar to you?
```

```
 1      A.   No.                                        3:01:08

 2      Q.   And do you have any recollection of

 3 attempting to contact Yvette Anderson?

 4      A.   No.

 5      Q.   All right.  How about Red (phonetic), a guy

 6 named Red?  Did you know anything about trying to

 7 contact a guy named Red?

 8      A.   I do not recall.

 9      Q.   Does the name -- does the name Darnell

10 (phonetic) sound familiar to you?

11      A.   No, it does not.

12      Q.   Do you have any memory about attempting to

13 contact a person named Darnell?

14      A.   No, I do not.

15           MS. SHOFFNER:  All right.  I think now is a

16 good time for us to take a break.  I still have a bit

17 more to go over here.

18           RECORDER:  Okay.  Off the record, 1:36 p.m.    3:02:10

19                 (Off the record)

20           RECORDER:  Back on the record, 2:32 p.m.

21      Q.   All right.  Mr. Wilson, I am showing you a

22 copy of the motion to suppress that was filed by you.

23 It's marked 2293, but it was filed by you.  Is that

24 your signature there?

25      A.   Yes, it is.
```

1    Q.   All right.  And according to the top of the

2  document, it says it was filed on January 24th, 2001.

3  Do you have any reason to doubt that that was the date

4  that you filed this?

5    A.   I do not.                                3:02:54

6    Q.   Okay.  All right.  It's not the copy that I

7  wanted to use because there was a copy of that document

8  in your file, but that's -- that's fine.  All right.

9  Sir, I want to just go through this motion to suppress.

10  Typically at the time that you filed this, was it your

11  practice to talk to anyone about filing -- about filing

12  this type of motion?

13    A.   What do you mean by, "talked to anyone"?  You

14  mean with my client?

15    Q.   With your client for starters.

16    A.   Certainly.

17    Q.   Okay.  And -- and did you tell your codefense

18  counsel, John Connor?

19    A.   I'm not sure if I did or did not, to be

20  honest.

21    Q.   And is it fair to say that you discussed the

22  strategy behind filing this motion to suppress at the

23  time you filed it?

24    A.   I certainly would have discussed it with my

25  client.

1     Q.   Would you discuss the substance of the motion

2  before you filed it?

3     A.   Yes.                                        3:04:11

4     Q.   Would you discuss the -- would you show it to

5  him before you filed it?

6     A.   I don't know that I would have shown it to

7  him.

8     Q.   But you would certainly discuss the substance

9  of it, is that fair to say?

10    A.   That's fair to say.

11    Q.   All right.  So -- hang on a second.  All

12 right.  So then -- and the first paragraph, it states

13 that, "At 5:00 p.m., the defendant herein was arrested

14 by officers and charged with the offense of first

15 degree murder."  And then in the second paragraph, it

16 states, "Immediately following his arrest, defendant

17 was handcuffed and made to stand upright" --

18 v    Hey, Jessica tested positive.  Let's do two tests.

19 c    Okay.

20         RECORDER:  I'm sorry?  Do we have some

21 interference?

22    Q.   All right.  So the second paragraph,

23 "Immediately following his arrest, defendant was

24 handcuffed and made to stand upright in a cell for

25 unknown number of hours, but on information and belief,

```
 1  believes he was so restrained for a period of time in
 2  excess of 24 hours."  You see that there?
 3      A.   I do.                                    3:05:30
 4      Q.   Did you discuss in this -- is there a reason
 5  that you did not discuss the nature of his arrest in
 6  filing this motion?
 7      A.   Is -- that I did not discuss the nature of
 8  his arrest with --
 9      Q.   Yes.
10      A.   -- whom?
11      Q.   That -- that you don't mention the nature of
12  his arrest when -- when you filed this motion.
13      A.    I -- and I don't know that there was any
14  particular reason why that was not included.
15      Q.   Like for example, you -- you had previously
16  been told, by way of documents and otherwise, that Mr.
17  Walker had been kicked and had been slapped, correct?
18      A.    I've -- I saw documents that made reference
19  to that, yes.
20      Q.   And -- and you didn't -- you didn't consider
21  that information germane to this motion, because it's
22  not included, is that fair to say?
23      A.    Well, it's -- it's fair to say that it is not
24  included.  Now I don't know that I considered it
25  germane or not, but it is not included in the motion.
```

```
 1      Q.    All right.  "During the course of this

 2   incarceration -- during this period of incarceration,

 3   the defendant was denied any food or drink.  He was not

 4   allowed to sleep.  He was not allowed to sit.  He was

 5   not allowed to use any washroom facilities."  You see

 6   that there?

 7      A.    I do.

 8      Q.    And is this based on your communication with

 9   Mr. Walker about his experience while in custody at the

10   police department?

11      A.    It would have been.                        3:07:03

12      Q.    "And during this period of incarceration, the

13   handcuffs on his wrists -- on defendant's wrists were

14   so tight that they began to cut off blood circulation.

15   They left distinct marks on his wrist.  The defendant

16   asked on several occasions to have handcuffs loosened,

17   said requests were ignored or denied."  You see that

18   there?

19      A.    I do.

20      Q.    And is that -- is that based on any

21   conversation -- is that based on your conversation with

22   Mr. Walker?

23      A.    Yes, it would have been.

24      Q.    All right.  In paragraph five, "During this

25   period of incarceration, the defendant was subjected to
```

```
 1  several instances of physical abuse at the hands of

 2  representatives of the Chicago Police Department

 3  including but not limited to being kicked and stepped

 4  on in the chest area."  You see that there?

 5      A.    I do see that.                              3:08:01

 6      Q.    Now and -- and is this statement based on

 7  your communication with Mr. Walker?

 8      A.    It would have been.

 9      Q.    Did Mr. Walker at any time tell you that --

10  that pictures were taken of him while he was at the

11  police station?

12      A.    I do not recall that.

13      Q.    Did he tell you that police officers kicked

14  him and stepped on his chest area in the process of

15  placing him under arrest?

16      A.    Well, inasmuch as it's in -- that reference

17  is in my motion, I would have gotten that information

18  from Xavier Walker, so I -- I -- yes, he must have.

19      Q.    Well, this particular paragraph, paragraph

20  five, says that "during his period of incarceration" --

21  did you -- did you clarify with Mr. Walker that during

22  his arrest he may have been kicked and stepped on in

23  the chest area, or was he kicked and stepped on in the

24  chest area while he was at the station?

25      A.    I don't recall making that distinction with
```

```
 1  him.                                                   3:09:09
 2      Q.   "During this period of incarceration, the
 3  defendant was repeatedly told by officers of the police
 4  department that the aforementioned treatment would end
 5  immediately and that he would be released and allowed
 6  to go home if he would simply admit his involvement in
 7  the death of one Marek Majdak on May 13th, 2000, at
 8  approximately 1:00 a.m."  And is this, the substance of
 9  this paragraph, based on your communication with Mr.
10  Walker?
11      A.   It would have been, yes.
12      Q.   And -- and did you verify any of these facts
13  with any of the other evidence that had been presented
14  to you at the time you made these representations in
15  this one document?
16      A.   I do not have a recollection of that.
17      Q.   Is that something that you would typically
18  do?
19      A.   I would think so, yes.                        3:10:03
20      Q.   Like for example, if you have reports that
21  said that he was kicked in the stomach while being
22  apprehended during a -- while being apprehended, and
23  then your client were to come to you and say, "Yeah,
24  they kicked me in the stomach when I was -- when I was
25  at the station," would you have said something to your
```

```
 1  client like, "Hey, listen, Mr. Walker.  The documents
 2  say that you were kicked in your stomach or you were --
 3  you were kicked in the abdomen while they were -- while
 4  you were being apprehended, not when you were on the
 5  station."  Would you draw those type of distinctions
 6  with your client?
 7      A.    Probably so --
 8            MS. SAMUELS:  Objection.  Form, compound, and
 9  incomplete hypothetical.
10      Q.    Do you understand my question, sir?
11      A.    I understood your question, and probably I
12  would have drawn the distinctions.
13      Q.    In this case, those type of distinctions --
14  you -- is it your testimony, sir, that in this case,
15  those type of distinction -- you simply cannot remember
16  what you knew at the time you prepared this motion,
17  correct?
18      A.    That is correct.                      3:11:09
19      Q.    Now, the -- the date this document was filed
20  was January 24th, and sir, by that time, you had been
21  representing Mr. Walker for, well, basically since the
22  -- since the beginning of April 2001?
23      A.    Since the beginning of April 2000, not 2001.
24      Q.    Oh, correct.  So you had been representing
25  him for almost a year or about that -- about eight or
```

```
 1  nine months?
 2          MS. SAMUELS:  Objection --
 3      A.   So it would seem.
 4      Q.   Okay.  Hang on.  Now as you read this motion,
 5  does this refresh your recollection about Xavier Walker
 6  having given a confession in this case?
 7      A.   It does not.                              3:12:22
 8      Q.   So even as you sit here today, you have no
 9  recollection of Mr. Walker giving a -- a confession?
10      A.   Correct.
11      Q.   And other than the facts that are represented
12  here, do you have any information or a memory related
13  to what led up to his getting a confession?
14      A.   I do not.
15      Q.   So is it fair to say that all you know about
16  what happened to Mr. Walker before he gave his
17  confession is what is contained in this document,
18  correct?
19      A.   I'm not sure that is accurate, but I don't
20  know that I know -- that I know anything other than
21  what's contained in this document.
22      Q.   So if more information is presented to you,
23  it may -- you may be able to refresh your recollection?
24      A.   That's possible.                         3:13:10
25      Q.   Like, for example, as you sit here, you can't
```

```
 1  recall anyone else you spoke to about filing this
 2  motion?
 3       A.   Correct.
 4       Q.   Do you recall speaking to Ms. Bedsole and
 5  having her come as a witness to testify about the
 6  nature of -- of the apprehension and -- and -- and the
 7  abuse that he suffered while at the station?
 8       A.   I do not have that recollection.
 9       Q.   And in paragraph seven, it states that "As a
10  result of the treatment referred to above, the
11  defendant on May 29th, 2000, at approximately 11:43
12  gave a video statement, also referred to as a
13  confession, concerning the death of Marek Majdak.  The
14  video statement given by the defendant was neither
15  voluntarily nor freely given."  And then in the last
16  paragraph, nine, "The State's Attorney's Office now
17  intends to use this video in its prosecution of the
18  defendant herein."  And then the relief that you seek,
19  "Xavier Walker respectfully prays that this honorable
20  court enter an order suppressing from being introduced
21  into evidence any and all parts of the video statement,
22  also known as a confession, given by the defendant on
23  May 30th and for such further relief as this court deem
24  just and appropriate."  Do you have any independent
25  recollection of what you did to prepare to present this
```

```
 1  motion to the court for hearing?

 2      A.   I do not.                                        3:14:55

 3      Q.   Hang on just a minute.  Now, you argued this

 4  motion to the court and -- strike that.  Let me show

 5  you what has been marked as -- we really haven't marked

 6  a lot of these, but -- but we will mark these pictures

 7  as Exhibit 8.

 8           RECORDER:  Mr. Wilson, is it possible to get

 9  you centered in the screen a little better?

10           WITNESS:  Sure.  Let me work on it.            3:16:39

11           RECORDER:  Thank you.

12           WITNESS:  Okay.  Just a sec.

13           RECORDER:  Much better.  Thank you.

14           WITNESS:  Okay.

15      Q.   All right.  These -- these photos are Bates

16  stamped Plaintiff -- no.  Hang on.  Photos, where are

17  the -- oh, Cook County State's S -- Cook County State's

18  Attorney's Office 22 through 26.  Sir, I'm showing you

19  what has been marked as photos that were taken of

20  Xavier Walker while he was in custody at the Cook

21  County Department of Corrections, and as I show you

22  these pictures, do you have independent recollection of

23  having seen them?

24      A.   I do not.                                        3:17:37

25      Q.   Do you remember -- do -- do you recall seeing
```

```
 1  -- well, never mind.  All right.  So those are the

 2  pictures that were taken of Mr. Walker while at the

 3  police department.  They -- and -- and in your -- in

 4  the course of representing Mr. Walker, did you have the

 5  opportunity or -- or -- did you have the opportunity to

 6  go to ERPS, the inventory -- where they lodge the

 7  inventory from the case, and review evidence?

 8       A.    I mean, I don't understand the question.

 9       Q.    Where the police officers take inventory from

10  -- or evidence from a -- the scene of a crime, whether

11  its -- its -- whether its ballistics -- bullets or

12  clothes or sneakers or -- once they get evidence, or

13  even pictures for that matter depending on who takes

14  them, those things are registered within a division of

15  the police department, and defense counsel is permitted

16  to go view the evidence.  Have you ever been to the

17  police department to view evidence in a criminal case?

18       A.    Not that I recall.                        3:18:48

19       Q.    Okay.  And at the time that you were

20  representing Mr. Walker, you do not -- you do not

21  recall viewing these pictures?

22       A.    Correct.

23       Q.    Let's see.  Do you recall what the -- what

24  the judge ruled -- how the judge ruled on the motion to

25  suppress?
```

```
 1        A.    I do not recall, and I can only presume that

 2   he denied my -- my motion.

 3        Q.    But you don't -- you don't have any

 4   independent recollection as to what he said about

 5   denying -- when he denied the motion?

 6        A.    Correct.                                      3:19:47

 7        Q.    And you made numerous attempts to -- to --

 8   your -- your record reflects that you made -- or your

 9   file reflects that you made numerous attempts to keep

10   in contact with Ms. Bedsole and call her as a witness,

11   and she in fact testified.  Hold on.  But you did not

12   argue that his statement should be suppressed because

13   he was kicked or because he was struck across the neck,

14   correct?

15        A.    I don't recall.                               3:21:04

16        Q.    And you in fact called Mr. Walker to testify

17   at the motion to suppress hearing too, correct?

18        A.    I believe that's correct.

19        Q.    And consistent with the motion, Mr. Walker

20   said that he had nothing to eat or drink, right?

21        A.    I don't recall what his testimony was.

22        Q.    All right.  Do you recall -- do you recall

23   that he said that they were -- they were cursing and

24   yelling at him?

25        A.    I do not.
```

```
 1      Q.    Do you recall that he said his cuffs were too

 2  tight?

 3      A.    I do not.

 4      Q.    Sir, do you recall that you stipulated that

 5  Detective Sanders, if called, would testify that he

 6  never hit Mr. Walker across the neck?

 7      A.    I do not -- I do not recall that.          3:22:04

 8      Q.    And you stipulated that Xavier Walker never

 9  asked to make a phone call?

10      A.    I do not recall that.

11      Q.    And you also stipulated, sir, that Walker

12  never told him that his wrists were hurting?

13      A.    I do not recall that.

14      Q.    You don't recall giving any of those

15  stipulations?

16      A.    Correct.

17      Q.    All right.  All right.  I'd now like to show

18  you another exhibit.  All right.  Can you see this

19  where it says, "Amended Answer to People's Motion for

20  Pretrial Discovery"?

21      A.    I do.

22      Q.    And this is a document that was filed by you.

23  It's not signed by you, but we did get it out of your

24  file, and it's dated September 9th, two thousand -- I

25  can't tell what date that is -- oh, September 9th,
```

Exhibit 5, LLC

```
 1   2002.  Do you see that right there?
 2       A.    I do see that.                           3:24:09
 3       Q.    And would you on occasion file a document
 4   with the court that didn't necessarily contain your
 5   signature?
 6       A.    I -- that's highly unusual, but it could
 7   happen, I suppose.
 8       Q.    But -- okay.  You don't dispute that you
 9   prepared this document, do you?
10       A.    No, I do not.
11       Q.    Okay.  Let's take a look at it.  If you
12   would, take a look at it.  Now is this the type of
13   document that you would typically file when preparing
14   for trial?
15       A.    Indeed so.                               3:25:00
16       Q.    And what's the purpose of this document?
17       A.    To clarify what the defendant's position
18   would be relative to his -- the presentation of his
19   case in chief.
20       Q.    And is it -- and is this the document where
21   you sort of identify who it is you intend to call at
22   trial to testify?
23       A.    Yes.
24       Q.    And -- and looking at this document,
25   paragraph two, it -- I believe it's the third full
```

1   sentence, it says, "Further, the defendants may call to

2   testify Deon Baylock," date of birth, and also it says

3   that -- Simeon Dorsey.  You see that there?

4        A.   I do.

5        Q.   And when you filed this document with the

6   court in September of 2002, was it your intent to call

7   Deon Baylock and Simeon Dorsey to testify at trial?

8        A.   Well, I believe it was my intent to at least

9   list them as a potential witness who may or may not be

10  called.

11       Q.   I understand.  And then further down the

12  document, it says, "The defendant may also call to

13  testify Shunralyn Walker, date of birth

14       You see that there?

15       A.   I do.                                    3:26:22

16       Q.   And at this point, was it your intention to

17  call Ms. Walker as a witness in the trial?

18       A.   I don't know whether that was my intentions

19  or not, but certainly to list her in the event I

20  decided to call her, but I don't know that -- that's

21  all I can tell you.

22       Q.   If you had any other witnesses who you felt

23  would be credible witnesses and who would create an

24  alibi for Mr. Walker, would you have listed them in

25  this paragraph to testify at trial?

```
 1      A.   I would --

 2           MS. SAMUELS:  Objection.

 3      A.   -- think so.

 4           MS. SAMUELS:  Speculation.

 5      Q.   I'm -- I'm sorry.  What was your answer, sir?

 6      A.   I said, "I would think so."              3:27:03

 7      Q.   Is there any reason, as you sit here today,

 8  other than a person not being credible or not offering

 9  evidence that would exonerate your client, is there any

10  other reason why you would not list a witness in this

11  particular document?

12           MS. SAMUELS:  Same objection.

13      A.   Nothing comes to mind.

14      Q.   Now in your course -- in the course of

15  conducting an investigation on any kind of case but

16  particularly a murder case, you -- you need to assess

17  the credibility of every witness that you interview, is

18  that fair to say?

19      A.   That's fair to say.

20      Q.   And you also need to determine whether or not

21  a witness can provide the kind of testimony that would

22  actually help your defense, is that fair to say?

23      A.   Yes.                                     3:27:53

24      Q.   And you -- you had -- you -- you have to

25  figure both of these things and you have to make a
```

Exhibit 5, LLC

1    decision about whether or not a witness is beneficial

2    to your case, correct?

3        A.    Correct.

4        Q.    And if they're not beneficial, then you --

5    then you typically won't call them, right?

6        A.    That's correct.

7        Q.    All right.  All right.  Now, do you have an

8    independent recollection about this trial at all?

9        A.    No.                                        3:29:04

10       Q.    Do you recall that at the close of the

11   state's case in this trial of -- of Xavier Walker, you

12   moved for a directed verdict?

13       A.    I do not recall that, but it's certainly

14   something that I would think I would have done as a

15   matter of course.

16       Q.    And in this case, you moved for a directed

17   verdict, one, because there was no independent evidence

18   establishing Xavier Walker's guilt, and two, because

19   his statement should have been -- his statement was

20   coerced.  And your -- your motion to -- for a directed

21   verdict was denied, and the court in this case

22   essentially says to you the strength of this video is

23   -- is enough.  Like, the strength of this video to me

24   shows his guilt.  Do you recall that happening?

25       A.    I do -- I do not.                          3:30:20

Page 128

```
 1        Q.    And then after the judge denies your motion
 2   for a directed verdict, you rested your case, and you
 3   did not present any additional witnesses in this case.
 4   Any -- and you didn't call any witnesses in defense of
 5   Xavier Walker.  Do you recall that?
 6        A.    I do not recall that.                          3:30:59
 7        Q.    But your decision -- well, we can talk more.
 8   Your decision to not call a witness -- let me just say
 9   -- strike that.  If you felt that calling a witness
10   would have helped your case, would you have called that
11   witness?
12             MS. SAMUELS:  Objection.  Calls for
13   speculation.  Incomplete hypothetical.
14        A.    So 20 years later, I'm not going to engage in
15   hindsight, because you know, I -- I -- I can't say 20
16   years later why I did or did not do something 20 years
17   ago.
18        Q.    You were at trial, and your motion -- today,
19   if you're at trial and your motion for a directed
20   verdict is denied, and based on the judge's ruling on
21   -- and this -- make hypothetical -- based on the
22   judge's ruling, you don't think your witnesses are
23   going to make a difference in this case, would you call
24   them to testify?
25             MS. SAMUELS:  Same objection.  Incomplete
```

Exhibit 5, LLC

1  hypothetical.  And argumentative.  Foundation.

2      A.    Hypothetically, I have -- I have been

3  involved in having a motion for a directed verdict

4  denied and chose to rest my case thereafter, and on

5  some occasions the court then rules in my favor, and

6  then some occasions it rules not in my favor.  So it's

7  -- it's just an assessment that I make.

8      Q.    Yes, it's an assessment that you make based

9  on the credibility of your witnesses, correct?

10     A.    Well, based on my -- my total review in my

11  own mind of the strength of the case that I would be

12  presenting.

13     Q.    And if you feel that a witness's testimony

14  does not strengthen your case, is it fair to say that

15  you would choose not to call them?

16         MS. SAMUELS:  Objection.  Incomplete

17  hypothetical.  Foundation.  Speculation.

18     A.    That's probably fair.                    3:33:25

19     Q.    All right.  And if a witness has testimony

20  that doesn't advance your defense, it's fair to say

21  that you're not going to call them either, is that --

22  is that fair to say?

23     A.    Yes, that's fair to say.

24         MS. SAMUELS:  Same objections on that.

25     Q.    And that's a -- that's a decision that you

Page 130

```
 1  make at the time -- like you may have been planning to

 2  call them, but based on how things shake out after you

 3  argue your motion for directed verdict, that's a --

 4  that's a game-time decision that you have to make, is

 5  that fair to say?

 6      A.   Yes.                                      3:34:01

 7      Q.   All right.  Now the -- the trial ends in a

 8  guilty verdict, and there -- a period of time goes by

 9  before there's actually a sentencing.  Do you -- do you

10  recall that?

11      A.   I don't recall it, but that tends to be the

12  case normally.

13      Q.   Now, while this case is, like, between the

14  trial and the sentencing, you continued to represent

15  Mr. Walker in this case, correct?

16      A.   Correct.

17      Q.   In fact, you were still representing him in

18  2004 while the sentencing was pending, correct?

19      A.   I believe that's correct.                 3:35:03

20      Q.   And as a result of representing him, are you

21  -- do you -- did you receive disciplinary reports from

22  the Cook County Department of Corrections?

23      A.   I don't recall that.

24      Q.   You don't recall ever receiving disciplinary

25  reports from the Cook County Department of Corrections
```

```
 1  -- Corrections?

 2      A.    I don't -- I don't recall.

 3      Q.    I mean -- okay.  Let me ask you this.  Have

 4  you received disciplinary reports from the Department

 5  of Corrections with respect to other clients that

 6  you've represented?

 7      A.    No.                                        3:35:44

 8      Q.    Okay.  All right.  All right.  I'm going to

 9  represent to you that this document was produced in

10  connection with your file as Bates stamp BS386, and I'm

11  going to ask that you take a close look at this.  Did

12  you come to learn that Mr. Walker was being charged

13  with possession of contraband while he was at the Cook

14  County Department of Corrections?

15      A.    The -- that's what this document reflects.

16      Q.    Do you have an independent recollection that

17  he was charged?

18      A.    Correct.  I have no independent recollection.  3:37:00

19      Q.    Did you have the opportunity to talk with him

20  about this charge?

21      A.    I don't recall.

22      Q.    Now, as his defense counsel in the underlying

23  murder case, did you represent him in connection with

24  this case?

25      A.    I don't recall that I --
```

```
 1        Q.   I'm sorry, did I -- did we break up?

 2        A.   No, I'm here.  Do you hear me?

 3        Q.   Oh, yes.  No, I didn't.

 4        A.    I said I did not -- do not recall if I

 5   represented him in this matter or not.

 6        Q.   Okay.  The description of the incident states

 7   that "On the above date," which I took to mean -- the

 8   above date is -- is here somewhere.  Oh, date of

 9   infraction, looks like April 20th, 2004.  But certainly

10   it was at some point in 2004 that "while RO was

11   searching detainee Walker, Xavier, found one sharpened

12   metal object approximately six inches long inside the

13   right foot that Detainee Walker was wearing.  RO asked

14   Detainee Walker if these boots were his, and Detainee

15   Walker replied, 'Yes.'  Sergeant Walker (sic) was

16   notified, identified sharpened metal object with tape

17   and badge number 7971 written on it."  Did I read that

18   correctly, sir?

19        A.   You did.                              3:38:46

20        Q.   All right.  Now, if I scroll down, April the

21   grand jury convened with -- with respect to the offense

22   of possession contra in a penal institution.  And I

23   will also represent that this document was in your

24   file, and so given that these documents were in your

25   file, did you represent Mr. Walker in connection with
```

1  these charges?

2      A.   I have no recollection of that.

3      Q.   Did you -- do you have any recollection of

4  having spoken to Mr. Walker about this charge?

5      A.   I do not.

6      Q.   Now, this was one of several disciplinary

7  reports that were -- that were in your file, and I know

8  I've asked you once but I want to ask you again, you

9  have no recollection of having received disciplinary

10 reports for Mr. Walker at all?

11     A.   Correct.                                    3:40:03

12     Q.   Do you believe these reports could have come

13 from somewhere else?

14     A.   I make no -- I have no idea how I came into

15 possession of these documents.

16     Q.   Okay.  Now, as a part of Mr. Walker's

17 sentencing, he had to submit to an evaluation by the

18 Cook County Adult Probation Department.  Do you recall

19 attending a meeting with him on that?

20     A.   Attending a meeting with Cook County

21 department of probation?

22     Q.   Yes.

23     A.   I do not recall that.                       3:40:59

24     Q.   All right.  I'm showing you what's been --

25          MS. SHOFFNER:  Madam Court Reporter, can you

```
 1   help me out here, what number are we on in terms of
 2   exhibits?
 3            RECORDER:  So the last one would have been
 4   10, making this one 11.
 5       Q.   All right.  I'm showing you what's been
 6   marked as Exhibit Number 11, BS 0415 consecutive
 7   through 0422, and it is entitled "Circuit Court of Cook
 8   County Adult Probation Department Investigative
 9   Report."  And I will represent to you, sir, that this
10   was contained in your file that was produced in this
11   case.  Now, I'm looking at the bottom of page 1, and is
12   this your handwriting right here?
13       A.   Yes, it is.                              3:42:36
14       Q.   And could you please state what it says?
15       A.   Well, it says two different things.  It says,
16   "Long," and then it says, "45 years IDOC."  Then it
17   says, "1/5/05 sentencing, 35 years IDOC, 30 days to
18   appeal."
19       Q.   And do you recall writing that document?
20       A.   I do not recall writing it, but it is
21   certainly my handwriting.
22       Q.   Okay.  Now, do you recall meeting with the
23   probation officer to conduct this interview?
24       A.   No.                                      3:43:16
25       Q.   Generally, do you know what the purpose of
```

1  this interview is?

2      A.   Well, these interviews -- I believe this was

3  considered a presentence investigation report conducted

4  by the probation department.  And that being said, I'm

5  not aware of any incidence in which I've been involved

6  in that process by the probation department.

7      Q.   Okay.  I just want to take you to a couple

8  pages where they do reference you to -- to confirm that

9  you -- and is -- is -- this is your -- this is your

10 handwriting here?

11     A.   Yes.                                    3:43:58

12     Q.   And on page 4, and what does that say?

13     A.   It says, "No violation of work release."

14     Q.   Okay.  Now, on page 5 of the report, this is

15 the "Official Version of the Offense."  And then it

16 says, "The defendant provided all the information in

17 this investigation unless otherwise indicated.

18 Verified information will be indicated in the

19 investigation, and verification materials may be

20 included in a separate envelope attached to this

21 investigation."  And then underneath, where it says,

22 "Defendant's Version of -- of the Offense," it says,

23 "Based on the advice of his attorney, the defendant did

24 not wish to provide his version of the offense."  Were

25 you -- were you present when Mr. Walker asserted that

```
 1   he was resting on your representation not to discuss

 2   the incident?

 3       A.   Well, this report would certainly seem to

 4   indicate that, although I have no recollection of being

 5   present.

 6       Q.   Okay.  And then -- so you're saying that you

 7   very well may have been there and in your capacity as

 8   his attorney?

 9       A.   Yes.                                        3:45:21

10       Q.   But you have no independent recollection?

11       A.   That is correct.

12       Q.   So if someone from the Adult Probation

13   Department comes and says, "No, the attorney wasn't

14   there, that's just what Mr. Walker said," then you

15   would not dispute that?

16       A.   I have no recollection of being present or

17   not being present, so no --

18       Q.   Okay.

19       A.   -- I would not.

20       Q.   All right.  All right.  Let's just -- and

21   then there's a narrative that follows, and on page 6,

22   Mr. Walker or "The defendant stated he was expelled

23   during his sophomore year due to absenteeism --

24   absenteeism."  Excuse me.  "The defendant stated that

25   he lacked an interest in school and wanted to run the
```

 1  streets."  Do you recall him saying that during the

 2  interview?

 3      A.    I don't recall being present in the

 4  interview.

 5      Q.    All right.  Do you have any reason to dispute

 6  the -- the truth of that assertion?

 7      A.    No.

 8      Q.    And then under "Employment," it states that

 9  "The defendant stated that he has never been employed

10  and that he has always been supported by his family.

11  The defendant does not have any future employment plans

12  at this time."  Do you have any reason to dispute the

13  truth of that assertion?

14      A.    No.                                    3:47:06

15      Q.    And then going on, "Defendant reported that

16  when he was 16 years old, he first tried marijuana.

17  The defendant indicated that he used marijuana with his

18  friends approximately every other day.  The defendant

19  last used marijuana before he was arrested on this

20  case."  Do you have any basis to dispute the assertions

21  in this paragraph?

22      A.    I have no basis to dispute or -- or accept.

23  I don't -- I have no knowledge.

24      Q.    Now, in the next paragraph, it states, "The

25  defendant admitted to a membership with the Insane Vice

1  Lords street gang of the Chicago's West Side.  He

2  reported that he joined the gang at age 15 or 16."  Do

3  you have any basis to dispute the assertion of

4  paragraph -- in that paragraph related to his gang

5  affiliation?

6      A.   I -- I can neither dispute or -- nor accept

7  it.  I have no knowledge.

8      Q.   All right.  And did -- did -- do you have any

9  memory of whether or not Xavier Walker expressly told

10 you that he was or was not a member of the Insane Vice

11 Lords street gang?

12     A.   I have no memory.

13     Q.   Then I think if we go further on in that, it

14 says, "The defendant stated that most of his friends

15 are strength -- are -- are gang members.  The defendant

16 stated that the codefendant in this case was a gang

17 member.  He advised that most of his friends have a

18 criminal background."  Did I read that correctly?

19     A.   Yes.                                    3:49:22

20     Q.   And do you have any basis to dispute the

21 assertions that are made in that paragraph?

22     A.   I can't dispute it nor admit to it.  I have

23 no knowledge.

24     Q.   All right.  Oh, there's one other thing.  Oh,

25 under "Economic Status," it states, "The defendant

1  stated that prior -- prior to incarceration, he was

2  supported by his family.  The defendant denied having

3  any income, assets, monthly expenses, or outstanding

4  financial obligations.  He has never declared

5  bankruptcy."  Did I read that correctly?

6      A.   Yes, you did.                          3:50:21

7      Q.   And do you have any basis to dispute the

8  assertions in that paragraph?

9      A.   I have no knowledge about his correctness or

10  -- or lack of correctness.

11      Q.   All right.  All right.  We're getting there.

12  I now want to talk to you about the affidavit that

13  we've referenced today, the affidavit that you signed,

14  sir.  You indicated earlier that you spoke to Mr.

15  Harold Winston?

16      A.   Yes.                                   3:51:11

17      Q.   And when was that?

18      A.   Oh, jeez.  I -- I can't tell you.  I don't

19  have no recollection of the dates.

20      Q.   Was it on or around the time that you signed

21  the affidavit?

22      A.   It certainly would have been.

23      Q.   So that would have been roughly in about

24  2014?

25      A.   That seems like -- like it's possible, yes.

1      Q.   And how did your affidavit come -- come to be

2  created?

3      A.   I -- if memory serves me right, I may have

4  had a face-to-face meeting with Mr. Winston, and

5  following that meeting, he prepared an affidavit based

6  upon my speaking with him and sent it to me for my

7  review.

8      Q.   Now, was the first time that you spoke to him

9  about Xavier Walker in a face-to-face meeting with him?

10     A.   I don't recall that.                    3:52:19

11     Q.   Well, you indicated that you had a

12  face-to-face meeting with him, correct?

13     A.   I did have a face-to-face meeting with him,

14  but the first time I spoke to him may have been by

15  telephone.  I don't -- I don't recall.

16     Q.   Okay.  With -- with respect to the substance

17  of -- of this case, like, during the face-to-face

18  meeting, what did you discuss?

19     A.   Oh, jeez.  I don't recall that at all.

20     Q.   All right.  Now, did you -- at the time you

21  had had your face-to-face meeting, had you already

22  given him your file in this case?

23     A.   I don't recall that.                    3:53:01

24     Q.   Would it be fair to say that you gave him the

25  file on or -- or near the time that you had a

Exhibit 5, LLC

Page 141

1  face-to-face meeting?

2      A.    That would seem so, but I don't know if it

3  was before the face-to-face or subsequent to the

4  face-to-face.

5      Q.    Your file was quite voluminous, is it fair to

6  say?  It was well over 700 pages worth of documents?

7      A.    I think that's fair to say.

8      Q.    And would you have mailed those documents, or

9  would you have handed them off to him?

10      A.    I would have handed them off to him, I

11  wouldn't -- delivered them to his office for them to be

12  xeroxed and returned to me.

13      Q.    Is that what you did in this case?

14      A.    Yes, I do -- I believe that I did.  I don't

15  have any -- a specific recollection, but I'm sure I did

16  not mail or have mailed a 700-ish page document.

17      Q.    Correct.  I understand.  And when -- do -- so

18  did you meet with him -- do you recall if he had

19  already had an opportunity to review your documents or

20  not?

21      A.    I do not recall that.                    3:54:08

22      Q.    And I believe you said that he had a

23  briefcase full of documents, at some point today.

24      A.    I -- my -- my -- I would have delivered to

25  him my file in a briefcase, yes.

```
 1       Q.   I -- okay.  So you delivered your file.  And
 2  -- and you -- did you deliver the whole thing?
 3       A.   I don't understand that question.  I -- I
 4  delivered the file that I had in a briefcase to Mr.
 5  Winston's office.
 6       Q.   All right.  Well, I -- I guess my question is
 7  -- is, when you say you delivered the file, is that all
 8  the documents that you had pertaining to Xavier
 9  Walker's criminal case?
10       A.   I believe so.
11       Q.   And at the time that you all had your
12  face-to-face meeting, had he -- to your knowledge, had
13  he already reviewed your file?
14       A.   I have no knowledge.                        3:55:10
15       Q.   Where did you meet?
16       A.   Oh, jeez.  It was in a downtown office.  It
17  may have been at 69 West Washington.  I'm not sure.
18       Q.   And did he tell you why he wanted to meet
19  with you?
20       A.   I don't recall that.
21       Q.   But certainly he told you that it was about
22  Xavier Walker, is that --
23       A.   Certainly.
24       Q.   -- fair to say?  Okay.
25       A.   Certainly.
```

```
 1      Q.   And how many times did you meet with Mr.
 2  Winston?
 3      A.   Oh, jeez.  I -- once, maybe twice, but -- but
 4  once for sure.
 5      Q.   Okay.  And during this meeting, did Mr.
 6  Winston ask you to -- to sign an affidavit?
 7      A.   He was -- asked me to review an affidavit
 8  that he was preparing for my signature, make whatever
 9  corrections I deemed appropriate, if any, and then
10  return it to his office.
11      Q.   Did he tell you why he wanted an affidavit?
12      A.   I don't know that he did, but I believe I
13  understood that he was representing Mr. Walker in an --
14  in an appeal of his conviction.
15      Q.   And did you understand that at that point in
16  time, they -- that at -- at some point in time, an
17  argument that ineffective assistance of counsel was
18  being argued as a basis for Mr. Walker's release from
19  jail?
20      A.   I believe I understood that.          3:57:20
21      Q.   And how did -- what did you -- if you can
22  recall, what did you think about that?
23      A.   I don't -- I have no recollection of how I
24  thought about that.  You know, I -- I know that most
25  appeals of -- of criminal convictions involve at the
```

Exhibit 5, LLC

```
 1  very least an argument of ineffectiveness of counsel,
 2  so.
 3      Q.   You -- because many appeals include an
 4  argument of ineffective assistance of counsel, is it
 5  fair to say that it -- it didn't bother you personally
 6  that they were -- were going to assert ineffective
 7  assistance of counsel in this case?
 8      A.   Did it bother me personally?  No, it did not
 9  bother me personally.  I -- you know, no, it did not.
10      Q.   Did you feel that your representation of Mr.
11  Walker was ineffective?
12      A.   No, I did not.                        3:58:16
13      Q.   Did you feel that you did the best you could
14  with the facts that you had presented to you?
15      A.   I felt that at the time.
16      Q.   Now, when you -- when you met with Mr.
17  Winston, did he tell you in advance what the affidavit
18  would say?
19      A.   I don't recall that.
20      Q.   So did they give you an affidavit when you
21  met with him and then you took it with you?
22      A.   I don't recall if they gave me an affidavit
23  when I met with him or if they prepared one subsequent
24  to the meeting and sent it to me for my review.
25      Q.   Do you recall if you made any changes to the
```

```
 1  affidavit that was first presented to you?

 2      A.    I don't recall.                              3:59:25

 3      Q.    All right.  I'd like to take a look at the

 4  affidavit.  Just one second here.  All right.  Showing

 5  you what is being marked as number --

 6           MS. SHOFFNER:  Is this number 9?

 7           RECORDER:  Exhibit?  I would have for 12.     4:00:32

 8           MS. SHOFFNER:  Oh -- oh, this is 12?

 9           RECORDER:  Yeah.

10           MS. SHOFFNER:  Oh.

11           RECORDER:  The last one, you didn't mention

12  but it would have been 11.  Oh, no, we did.  We

13  discussed it.  It was 11, and then 10 before that,

14  yeah.

15           MS. SHOFFNER:  All right.  Okay.  12.  So

16  which one is this?

17           RECORDER:  This would be 12.

18           MS. SHOFFNER:  Oh, this is 12.

19      Q.    All right.  Let's just go through this

20  briefly.  In paragraph three, it states, "When I

21  represented Xavier Walker, I did not have an

22  investigator, and I had to do all my own

23  investigation."  You see that there?

24      A.    I do.                                        4:01:34

25      Q.    And you've indicated that you've had two
```

Exhibit 5, LLC

```
 1  other murder trials since -- since this case, but that
 2  you're also a solo practitioner.  Do you currently have
 3  -- have an investigator that does your investigations?
 4       A.   No, I do not.
 5       Q.   Have you always done your own investigations?
 6  Do --
 7       A.   I have.
 8       Q.   Did you think that you needed an investigator
 9  in the Xavier Walker case?
10       A.   At the time, I did not think that.          4:02:11
11       Q.   Do you think that -- looking back on it
12  today, do you think that you needed to have an
13  investigator assist you?
14       A.    Well, looking back on it today, there's
15  several things that I did that I would have do -- that
16  I would do differently, that -- that -- that would --
17  that being one of them.
18       Q.   All right.  Looking back -- okay.  That being
19  one of them.  What else would you have done
20  differently?
21       A.   I probably would have made sure that I
22  clearly understood Xavier's physical injuries prior to
23  being arrested and subsequent to being arrested, and
24  made a -- and made an argument in my motion to suppress
25  on both -- on both counts.
```

```
 1      Q.   All right.  Other than having an investigator
 2  and understanding his injuries, what else would you
 3  have done differently in the defense of Xavier Walker?
 4      A.   It's -- it's -- you know, the -- there -- you
 5  could always second-guess yourself about doing this or
 6  not doing that, and then, you know, there -- there
 7  probably are several things as I -- just can't itemize
 8  them right now, that I would have done differently or
 9  not done at all.
10      Q.   Is there anything that you did that you would
11  not have done at all?
12      A.   No, nothing that I can think of as I sit
13  here.                                              4:03:45
14      Q.   All right.  In paragraph four, it says,
15  "Xavier gave me the names and contact information of
16  some witnesses, including Simeon Dorsey, Deon Baylock,
17  and Marvin Mosley.  I also knew Xavier's sister,
18  Shunralyn Walker, could be a witness."  So did -- was
19  it -- was it Xavier who gave you Mr. -- was it Xavier
20  Walker who gave you these names and -- and contact
21  information?
22      A.   I -- it must have been.  That's what the --
23  that's what the affidavit says.
24      Q.   And -- and you identified three out of four
25  of these folks in your -- in your pretrial discovery,
```

```
 1  correct?
 2       A.    Yeah, I do recall that.                    4:04:35
 3       Q.    And so -- so why is this paragraph in here?
 4       A.    I don't recall that.  I -- I -- I don't have
 5  the recollection as to why that -- why the affidavit is
 6  constructed as it is.
 7       Q.    All right.  But it states that Xavier gave
 8  you these names.  These were the same names that you
 9  used in your -- in your pretrial motion, all except for
10  Marvin Mosely, right?
11       A.    Yes.                                        4:05:11
12       Q.    And you had the -- the Chicago Police
13  Department supp reports with -- with the names and
14  telephone numbers and addresses of all these
15  individuals, is that fair to say?
16       A.    Yes.
17       Q.    All right.  So they could have been
18  contacted, correct?
19       A.    Clearly.
20       Q.    Okay.  And it -- and -- and they may have
21  been contacted, you just don't have independent
22  recollection, is that what you're -- is that what -- is
23  that -- do I understand that correctly?
24       A.    Correct.  Yes, you are.
25       Q.    And then, "Xavier told me Bubbles was at the
```

```
 1  police station and heard Xavier crying after being
 2  beaten.  I do not know why I did not call Bubbles as a
 3  witness at the motion to suppress statements."  Now,
 4  you put the name Bubbles in here, but you -- you
 5  certainly had the information from -- and contact
 6  information from Antwoine Waddy in the police reports,
 7  correct?
 8      A.   I had contact information in the police
 9  reports, yes.
10      Q.   And -- and -- and you also had the statement
11  from Antwoine Waddy contained in those reports wherein
12  he -- he states that he was at the police station,
13  correct?
14      A.   I recall seeing that, yes.               4:06:25
15      Q.   So Xavier wasn't your only source of
16  information relative to where -- that Bubbles was there
17  or that these other individuals were witnesses in this
18  case, correct?
19      A.   That seems to be just -- that seems to be the
20  case.
21      Q.   All right.  And then, "At the trial, in my
22  opening statement, I repeatedly said the court would
23  hear evidence about who was with Xavier that night and
24  about the police coercing Xavier to obtain a statement
25  from him."  Now, I will say that your opening statement
```

```
 1  does indicate that you intend to call both Simeon
 2  Dorsey and Deon Baylock to testify.  Did you plan on
 3  calling them to testify at the time you gave your
 4  opening statement?
 5      A.   At the time I gave my opening statements, I
 6  certainly entertained the possibility of calling them.
 7      Q.   Had you spoken to them about the substance of
 8  their testimony?
 9      A.   I got to -- as I stand here now, I don't
10  recall.  But I would -- I've got to believe that I must
11  have.
12      Q.   Right.  Because you would not have
13  represented to the court that you're going to call a
14  witness when you haven't already determined what the
15  nature of their testimony is going to be, is that fair
16  to say?
17      A.   Fair to say.                          4:07:48
18      Q.   And then eight, "I do not know why I did not
19  put on any witnesses at trial."  Have you ever tried a
20  case, a criminal case, where you did not move for a
21  directed verdict?
22      A.   No.
23      Q.   You always move for a directed verdict, is
24  that fair to say?
25      A.   That's fair to say.
```

Page 151

1    Q.    And in some instances, that's the endgame,

2  correct?

3    A.    Sometimes.

4    Q.    Like, you know that you move for a directed

5  verdict, and if you don't get it the game -- game is

6  over, the case is closed -- over?

7    A.    Well, you then have a decision to make if

8  you're -- if you don't get the directed verdict.  Do

9  you put on any evidence, or do you rest?

10    Q.    And if you have a very steep hill to climb in

11  terms of overcoming the state's evidence and you don't

12  have very much evidence to support those arguments, is

13  it fair to say that you would rest your case and not

14  put on just a couple of witnesses who -- who -- who you

15  know can't get the job done?

16    A.    Well, I think it's safe to say that you're

17  constantly evaluating your case and looking at it in

18  its totality, and so the decisions that are made are

19  not made in an isolated fashion.  You could -- you view

20  everything in your pouch, so to speak, and then make

21  your decision, and that's what I did.

22    Q.    Yes.  And then in paragraph nine, it says, "I

23  do not recall if I lost contact with any witnesses."

24  That's kind of like saying you don't recall if they

25  were waiting out in the hall, isn't that true?

 1    A.    I do not recall is what I said, and I do not

 2  recall.

 3    Q.    You don't recall -- do you recall if the

 4  witnesses were waiting in the hall waiting to testify?

 5    A.    I do not -- I do not recall if I had

 6  witnesses in the hall or not.

 7    Q.    You don't recall anything about what the

 8  status of your witnesses were when you gave -- when you

 9  filed your motion for a directed verdict?

10    A.    No, I said to you earlier today that I did

11  not recall anything surrounding the trial, and that

12  remains true even now.

13    Q.    And it was true when you spoke with Mr.

14  Winston and you told him that you didn't recall whether

15  or not you had the witness's phone numbers, correct?

16    A.    I don't recall my conversation with Mr.

17  Winston.                                        4:10:37

18    Q.    But it's fair to say that you at least told

19  him that you didn't recall whether or not you had lost

20  contact with witnesses?

21    A.    Well, that is contained in the affidavit, so

22  presumably I told him that, but I don't recall what I

23  told Mr. Winston.

24    Q.    All right.  And then -- and then in the next

25  paragraph, "I do not know why, after the judge denied

 1  my motion for a directed finding, I did not request a

 2  continuance to obtain testimony of witnesses."  In your

 3  mind, does this sentence assume that you made a

 4  decision to call witnesses?

 5      A.   This sentence says that I don't know why I

 6  didn't request a continuance to call witnesses, so I

 7  don't know if it -- if it means that or if it means I

 8  simply decided not to call witnesses.

 9      Q.   So statement ten -- are you saying that

10  statement -- that this contained in statement ten is

11  the assumption that you made a decision not to call

12  witnesses?

13      A.   Statement ten states -- says -- you know, it

14  says what it says.

15      Q.   Right.  But I'm asking you about whether or

16  not you were reserving your right to not call

17  witnesses?

18      A.   I was not -- I made no -- no such

19  reservation.  I mean, having decided to rest, that case

20  was -- the case was now closed, left -- it was left for

21  a judge to decide.

22      Q.   And when you didn't --

23      A.   There was nothing that -- that -- at no time

24  did I tell the judge I want to reserve the right to

25  call witnesses but you can go ahead and decide the case

1  in the interim.

2      Q.   That's correct, but also, sir, when you

3  rested your case, you had made a decision not to call

4  witnesses, is that fair to say?

5      A.   I think that's fair to say.

6      Q.   All right.  Now -- now, at one point the --

7  the -- your -- your representation of Mr. Walker ended,

8  and the public defender assumed the appeal in this

9  case.  Do you recall that?

10     A.   Vaguely.                              4:13:35

11     Q.   And you were asked to review the -- the

12  appeal to reverse the conviction.  Do you recall that?

13     A.   I -- I don't recall that.  I assume -- I

14  presume that to be true, but I don't recall it.

15     Q.   Well, the motion -- the brief on appeal, it

16  didn't argue ineffective assistance of counsel, is that

17  fair to say?

18     A.   I can't answer it.  I don't know that I've

19  read the brief on appeal.

20     Q.   Okay.  Do you know the outcome of the brief

21  on appeal?

22     A.   I do not.                             4:14:25

23          MS. SHOFFNER:  Okay.  All right.  I just have

24  one more group of exhibits for us to go over, and I

25  will cede my time.

```
 1              MR. MILLER:  Can we have a five-minute break?

 2              MS. SHOFFNER:  Oh, let's take a -- yeah.

 3  Let's just take a ten-minute break.

 4              WITNESS:  Okay.

 5              RECORDER:  Off the record --

 6              MS. SHOFFNER:  And then --

 7              RECORDER:  -- 3:45 p.m.

 8                   (Off the record)

 9              RECORDER:  Back on the record, 3:55 p.m.      4:14:59

10     Q.   All right.  Mr. Wilson, the Plaintiff had

11  produced a few of your notes -- Plaintiff's Counsel,

12  and I would just like to take some time and go through

13  those notes that we believe are your notes, just to

14  confirm that and see what the documents say.

15     A.   Okay.

16     Q.   All right.  This first document I have is

17  dated, it looks like 7/1/02, is that -- do I have that

18  correct?

19     A.   Yes.

20     Q.   All right.  Can we just read through what --

21  what this page says to us?

22     A.    It says -- first sentence says, "Client

23  visit, trial preparation."  Then it says, "Hershurla

24  Byrd, female, Jovanie's girlfriend."  Then it says,

25  "Contact Bedsole to get pictures."  It says, "Subpoena
```

Exhibit 5, LLC

1  phone records for" -- I don't know what "DOI" --

2  department of -- I don't know what that -- who D -- who

3  or what -- "For DOI."  I don't know what that is.  If

4  you -- scroll it up, please.

5      Q.    Oh.                                    4:16:24

6      A.    Then it has -- come down -- I'm sorry.  That

7  -- that was good.

8      Q.    Sorry about that.

9      A.    Come down to -- stop.  Just go up slowly.

10     Q.    Right there.

11     A.    "Tari Montgomery," and lists two different

12 phone numbers.  First one says, "Current," and the

13 second one says -- it appears to say, "On DOI."  I

14 don't know what that means.

15     Q.    All right.

16     A.    "Client was taking -- taken to" -- maybe "to

17 jail, off and on all day."  And then it's "7/5/02," and

18 it lists the name "Simeon" and a cell number for Simeon

19 and an address for Simeon with another phone number

20 underneath that, which I think my notes reflect is his

21 sister's cell phone.  Then we have "7/7/02."  Scroll

22 up, please.

23         MS. SHOFFNER:  I'm in here.              4:17:32

24     A.    It seems to say, "Have mom get Deon's phone

25 number from Shamiral (phonetic)."

1    Q.   Okay.  All right.  Let's just go back to the

2    top quite briefly.  All right, so on July 1st, "Contact

3    Bedsole."  Does that refresh your recollection that you

4    attempted to reach out to Deborah Bedsole?

5    A.   It's -- it -- it does not reflect my

6    recollection, but those -- that's certainly is what my

7    notes seem to -- to indicate.

8    Q.   And then -- and did you say after that it

9    says, "to get pictures"?

10   A.   Let's see.  It says, "Subpoena phone records

11   for" -- it says, "get pictures."  Yes, it does say

12   that.  It says, "Contact Bedsole to get pictures."

13   Q.   Okay.  And -- okay.  And then just up a

14   little bit, "Hershurla Byrd, female, Jovanie's

15   girlfriend."  Do you know why you were trying to get a

16   -- do you know why she was relevant or why you wanted

17   to -- to -- to -- get her.

18   A.   I do not, no.

19   Q.   And you're -- you're seeing these notes, but

20   it doesn't refresh your recollection that you actually

21   attempted to contact Hershurla Byrd or talked to her?

22   A.   Correct.                                    4:18:58

23   Q.   And then similarly with respect to Bedsole,

24   it was to get pictures, but it doesn't indicate that

25   you made an effort to get those pictures but that you

1  just wanted to get them, correct?

2       A.    Correct.

3       Q.    And then it says, "Subpoena phone records for

4  department of investigations," do you know -- do you

5  know what that was about?

6       A.    I do not recall.

7       Q.    All right.  And then Tari -- does that say,

8  "Montgomery"?

9       A.    Tari Montgomery.

10      Q.    And -- and who is Tari Montgomery?

11      A.    I -- it says -- the arrow says that -- that,

12  "Client was talking to Tari off and on all day."  I --

13  I don't know who Tari Montgomery is."

14      Q.    Okay -- called her?

15      A.    I do not.  There are two phone numbers there

16  and I don't know that I ever called Tari Montgomery.

17      Q.    Okay.                                    4:19:55

18            RECORDER:  -- interrupt.  That last question

19  cut out right before the answer.  Would you be able to

20  repeat that one more time?

21            WITNESS:  The question or the answer?

22            RECORDER:  The question and the answer,

23  honestly.

24      Q.    All right.  And the question was, did you

25  call Tari Montgomery?  Do you know if you called --

```
 1        A.    And I don't recall.   There -- there are two

 2   phone numbers for Tari Montgomery, and I don't recall

 3   that I ever called her at either number.

 4        Q.    All right.  And then under "7/5/02," it says

 5   -- it has Simeon's cell, address, phone number, and it

 6   says that's his sister's cell.  Off to the left of

 7   that, there's some scribble there.  Do you see that?

 8        A.    Yeah, I do.                            4:20:44

 9        Q.    Can you tell me what that says?

10        A.    It says -- it says -- I believe it says,

11   "Call Saturday, 5/13."

12        Q.    Okay.  And did you -- do you know as you sit

13   here whether you made that call?

14        A.    I do not.                              4:21:08

15        Q.    All right.  And then under "7/7" --

16        A.    Go ahead.

17        Q.    Is -- it's -- when it says here, "Have mom

18   get Deon's phone number," is this Shunralyn Walker,

19   Xavier's sister?

20        A.    I don't know, but I would -- that -- that --

21   maybe it's a different person altogether, but it could

22   be Shunralyn.  If it's Shunralyn, it would certainly be

23   Xavier's sister.

24        Q.    Okay.  All right.  And then let's just go on

25   to the next page.
```

Exhibit 5, LLC

Page 160

```
 1        A.    "7/16, Xavier visit."

 2        Q.    All right.  And -- and what is -- what does

 3   that next line say starting with the scribble to the

 4   left of the margin?

 5        A.    Actually, I can't make out what that scribble

 6   says.

 7        Q.    Okay.

 8        A.    Then it says, "Have Anthony contact

 9   Cranberry, old state's trooper who is retired.  Call

10   parents for Devon's (sic) number.  Call Tara regarding

11   phone calls with -- with client, on day -- on day, guy

12   client."  I don't know what any of that means now.

13        Q.    Okay.  But when it says, "Have Anthony

14   contact Cranberry, old state trooper, retired," were

15   you looking to hire an investigator to assist you?

16        A.    I don't know that.  I don't know that.  I --

17   I don't know who -- Anthony was -- was Anthony

18   Pettigrew who referred Xavier to me, but I don't know

19   what that reference regarding Cranberry pertains to.

20        Q.    And then, "Contact Cranberry, old state

21   trooper," do you know a Cranberry who is an old state

22   trooper?

23        A.    I do not.                              4:23:17

24        Q.    So as you sit here today, you don't know what

25   this is in relation to?
```

Exhibit 5, LLC

1     A.    Correct.

2     Q.    All right.  And then -- and then under the

3  line -- let's just scroll down here.  Starting with

4  officer -- does that say officer -- Officer Prine?

5     A.    Yes.

6     Q.    Okay.  And who is Officer Prine?

7     A.    Apparently, he was an officer who was

8  assigned to division nine, section 1G, and apparently

9  his shift was 7:00 to 3:00.

10     Q.    And why did you need to -- why -- why -- why

11  is he referenced here?

12     A.    I don't know.  It had to have something to do

13  with what Xavier told me, but as I sit here today, I do

14  not recall what that was.

15     Q.    Okay.  And then the next line, there's a line

16  here, there's no date, but what -- what does this say

17  here?

18     A.    It says -- starts with, "Simeon spent Friday

19  night at my house hanging out."  This must have been

20  what Xavier told me.  Then he said, "Deon came to my

21  house between 11:00 and 12:00 on Saturday.  The three

22  of us stayed together all day, played cards, stayed

23  outside talking to guys, went inside and talked on the

24  phone, planned the rest of the day to go to the club."

25     Q.    Okay.  Now, "you planned the rest of the day

```
 1   to go to the club."  Now, in the -- in the -- in the
 2   margins, before you read the next line, there's
 3   something in the margins there?
 4       A.   Yeah.  It's -- it's sort of cut off, but the
 5   first one says, "Xavier," then it says, "Charles,
 6   Marvin, Deon, Simeon," it lists -- lists some names.
 7   "Simeon" --
 8       Q.   So --
 9       A.   I don't know what's under "Simeon," but the
10   last thing says, "Friends."
11       Q.   Okay.
12       A.   I don't know.
13       Q.   So it looks like it provided a list of -- of
14   -- of -- of friends of his, including Charles, Deon,
15   Simeon.  Can you see what that is right there, right
16   above "Friends," what word that is?
17       A.   I can -- I can only hazard a guess.  I don't
18   know what that says.
19       Q.   Okay.  And so, "Planned the rest of the day
20   to go to the club," and then it says, "My friend," is
21   that right?
22       A.   "My friend -- my friend Charles just got off
23   house arrest.  Came home from boot camp.  First time on
24   -- first time for all guys to hang out and kick it
25   again."  And then I have the "Wax Factory on Lake and
```

1   St. Louis."  "Marvin has the car."  Scroll up, please.

2   "Marvin has the car.  I was going in my sister's car.

3   Shawni (phonetic)" -- maybe "had a Grand Ford Taurus.

4   I was licensed.  Had just gotten my driver's license a

5   couple of days before this."

6       Q.   All right.  And this is -- this is what

7   Xavier told you, and you're writing the notes down?

8       A.   Correct.                                    4:27:06

9       Q.   And was this on -- on July 16th, 2002?

10      A.   If you scroll back down, I can tell you what

11  date I took this down.  It would have been July 16,

12  yes.

13      Q.   Okay.

14      A.   2002.

15      Q.   All right.  So then we go to the next page.

16      A.   It says, "Shawn (phonetic) let me use her car

17  to go to restaurant.  She knew I was going to the Wax

18  Factory.  Left house at approximately 12:10 to go to

19  restaurant.  Drew and Simeon still with me.  Drew left

20  out before me and Simeon.  Me and Simeon left out

21  together."

22      Q.   Hang on.  Hang on.  I just want to -- where

23  it says, "Approximately 12:10 to go to restaurant."

24      A.   Yes.

25      Q.   And then the next line says --

1      A.    "Drew and Simeon still with me."

2      Q.    Okay.

3      A.    Then it says, "Drew left out before me and

4  Simeon."  Then it says, "Me and Simeon left out

5  together.  Walked to the car.  Got in, started the car

6  up, and picked Drew up in front of his house two to

7  three doors down at approximately 12:15."  Scroll up,

8  please.

9      Q.    Hang on just a second.  "Picked Drew up in

10 front of his house two to" -- what does that say?  "Two

11 to three" --

12     A.    "Two to three" --

13     Q.    -- doors"?

14     A.    -- "doors down."

15     Q.    "Doors down."  Okay.  "Approximately 12:15."

16     A.    "Approximately 12:15."  Then it says, "Went

17 to the gas station on Central and Division.  Parked and

18 went to the restaurant.  I had at this point" -- I

19 said, "no drinking or getting high."  Meaning, I guess,

20 he -- at this point, he had not been drinking or

21 getting high.

22     Q.    Okay.                                    4:29:10

23     A.    "We rode around looking for Marvin, then we

24 went to Cicero near my old house, old block near Cicero

25 and Erie.  Took Cicero southbound to Ohio, eastbound on

```
 1   Ohio.  Ohio was blocked off with police cars.

 2   Detoured, went through alley to Kilpatrick, saw

 3   Jovanie, Shontae, Boo Boo," and I think that says,

 4   "Bugs."

 5        Q.   "Bug"?

 6        A.   I think -- I think that's what that says.

 7        Q.   B-u-g-s?

 8        A.   Yeah.  That's what I read -- that's what I

 9   read it to say.

10        Q.   Okay.  So they detoured through that alley to

11   Kilpatrick and saw Jovanie, Shontae --

12        A.   Shontae --

13        Q.   -- Boo --

14        A.   -- Boo Boo.

15        Q.   And Bugs?                            4:30:07

16        A.   And Bugs.

17        Q.   All right.  Now that says that it was 7/16,

18   and that was the only page that we had.  The next two

19   pages were apparently at a different point in time.

20        A.   Okay.

21        Q.   Let's just scroll down there.  But -- oh,

22   wait a minute.  Before I -- before I do, it says right

23   here, "Drew and Simeon left with me" --

24        A.   No, it's says, "Drew and Simeon still with

25   me."
```

```
 1      Q.    "With me."                                    4:31:04

 2      A.    Then it says, "Drew left out before me and

 3  Simeon."  Then it said, "Me and Simeon left out

 4  together, walked to the car, got in, started car up,

 5  picked Drew up in front of his house two to three doors

 6  down at approximately 12:15."

 7      Q.    I see.  Okay.  And then -- and what is the

 8  date on the next page?

 9      A.    The date on the next page seems to be April

10  10, 2001.  And it says -- it starts by listing the date

11  of "5/13/2000," and again, this appears to be notes I

12  took from a meeting with Xavier.  And it says that he

13  was "at home practically all day."

14      Q.    Hang on.  It says, "Home" -- let's just start

15  from the beginning.  "5/13/2000" --

16      A.    Yes.                                           4:32:15

17      Q.    Oh, on "5/13/2000, at home" --

18      A.    Pardon me?

19      Q.    Go ahead.

20      A.    "At home practically all day."

21      Q.    Oh, "practically."  "Approximately 1:00 a.m."

22  --

23      A.    "Approximately 1:00 a.m."  Then it says,

24  "Mother, two sisters.  Father came home from work.  His

25  friends Deon and Simeon.  He left the home -- left home
```

1  with Simeon and Drew.  They were driving.  He was

2  driving his sister's car" --

3      Q.   Hang on.  "Were driving because" -- what does

4  that say?  "Were driving, client not" --

5      A.   "Client was driving -- was driving."

6      Q.   Oh, "was driving"?  Or -- or could that say

7  --

8      A.   "Was driving."

9      Q.   "Was."  Okay.

10     A.   Then it says, "Was driving sister's car,

11 which was a four-door green Taurus."  It -- it says

12 that -- I guess it was -- I have down it's "Shawn

13 (phonetic) Walker."

14     Q.   Okay.

15     A.   I guess it was the sister's name.

16     Q.   Okay.                                    4:33:17

17     A.   Okay.  Scroll up a little.  Okay.  I guess

18 her birthday was 3/14.  I don't know that.  But it

19 says, "She's" --

20     Q.   It says --

21     A.   -- "she's older than me."

22     Q.   It does say, "D.O.B. -- DOB," and then it's

23 crossed out, but it does say, "3/14."

24     A.   Yes.

25     Q.   Okay.

```
 1        A.    "She's -- she's older than me."  Then the
 2   next line says, "Client's DOB is 10/18/79.  He was 20
 3   at the time."  It says, "He did not graduate from high
 4   school, only went to the tenth grade when this
 5   happened.  He was attending Altwater School called --
 6   alternative school called Westside Holistic, which he
 7   attended for approximately one year."
 8        Q.    Okay.                               4:34:19
 9        A.    Okay.  Then the arrow comes down, said that,
10   "He was on his way to go to the club to meet a couple
11   of friends.  The club was the Wax Factory on Lake and
12   St. Louis.  Both friends were going with -- were going
13   with me.  Simeon, who was 20 to 21, and Deon, who was
14   14.  He stopped off around the old neighborhood of
15   Cicero and Erie.  Showed the friends where I used to
16   live.  He saw Jovanie and Boss Hog.  Chavanna," I guess
17   that is.  "Chavanna, Shontae, and Boo Boo -- Boo Boo
18   Mama?  Boo Boo Mama.  They -- they were walking.
19   Jovanie got in the car and asked where" -- scroll it
20   up, please.
21        Q.    Okay.  Just a second.  Okay.  Go ahead,
22   "Where" --
23        A.    "Where we were going.  He went -- he went
24   with us to the club, four of us.  Stayed at the club
25   until it closed at 3:00 a.m.  We drove around, back to
```

1  Cicero and Erie, then went to Bubbles' on Division and

2  Central.  Jovanie got out of car, went to Bubbles'

3  house, returned with another friend, Boo Boo.  Now it's

4  five in the car.  Went to the gas station, Jovanie got

5  in driver's seat and drove around.  Drew got scared and

6  jumped out of car.  I told him to go back to my house.

7  Jovanie drove back to Boo Boo."  Scroll up, please.

8  "Drove back to Boo Boo's.  Me, Jovanie, and Boo Boo got

9  out.  Jovanie and Boo Boo went to the house.  I

10  returned to the car and drove off.  Bubbles followed

11  me.  Been planning to go to the club all day, friend

12  had just got released -- had just been released."  In

13  the margin on the left, it says that, "Tara, somebody's

14  girlfriend," and lists a phone number.

15      Q.  Yes.  That's the number for Tara.  And it

16  says, "Spoke to her about two, three hours"?

17      A.  Yes.  Yes.  Okay.  Coming back down, it said,

18  "When I picked Jovanie up, he talked about what he had

19  done.  At the club, I paid for Simeon, Jovanie.

20  Jovanie paid for Drew -- Deon," rather.  Okay.

21      Q.  What did Jovanie say he had done?            4:37:37

22      A.  I didn't -- there's nothing in here that

23  indicates what Jovanie said he had done.

24      Q.  All right.  Let's go through and just finish

25  the record.  And then the next page?

Page 170

```
 1        A.    Scroll it up, please.

 2        Q.    Oh.

 3        A.    Okay.  Next page starts with the name

 4   "Quinton," and says, "After 5:00," and there's a phone

 5   number listed for Quinton.  And then there's an arrow

 6   that says, "Xavier's friend, can contact Simeon and

 7   have him available for me."  So apparently Quinton can

 8   contact Simeon and have Simeon available for me.

 9        Q.    Okay.  And so apparently these notes are

10   conversations that you had with Xavier Walker.  Is that

11   fair to say?

12        A.    That's fair to say.

13        Q.    And this is where he is telling you what he

14   did on the night of the -- the night of May 13th, or

15   the night of the -- the -- the shooting?

16        A.    That's what it seems to be, yes.          4:38:35

17        Q.    And if this is what you wrote down, it's

18   because he told it to you, correct?

19        A.    Correct.

20        Q.    And this -- would it be fair to say that this

21   was where he was identifying his alibi and the

22   witnesses who would verify that he was not at the scene

23   of the shooting?

24        A.    I -- I -- I -- I guess you can draw that --

25   that interpretation, yes.
```

Exhibit 5, LLC

```
 1        Q.   And was this -- well -- and did you -- did
 2   you take notes like this throughout the course of your
 3   representation of -- of Mr. Walker?
 4        A.   Well, I don't -- I don't know if they -- if
 5   they were like this, but I would certainly take notes
 6   as I met with him.
 7        Q.   And would you take notes as you met with
 8   other people as well --
 9        A.   Yes.
10        Q.   -- to the extent you did?  Okay.
11             MS. SHOFFNER:  All right.  I'm just about
12   done.  I just need about five minutes just to go
13   through my notes to see if there's anything else I want
14   to ask.
15             RECORDER:  Okay.  Off the record, 4:20 p.m.      4:39:55
16                  (Off the record)
17             RECORDER:  Back on the record, 4:24 p.m.
18                  EXAMINATION
19   BY MR. MILLER:
20        Q.   Okay.  Mr. Wilson, again, my name is Graham
21   Miller.  I represent the individual Chicago Police
22   Officer Defendants in this civil suit.  I understand
23   we've been going for a while now, so you know, I'll --
24   I'll try to be as efficient as possible and respect
25   everybody's time.  I'm going to just ask you -- I'm
```

Exhibit 5, LLC

```
 1  going to follow up on some of the areas that Ms.
 2  Shoffner was questioning you about.  There may be a
 3  couple other extra new things, but we'll try to keep it
 4  brief.  Just to kind of pick up where Ms. Shoffner left
 5  off, just to be clear, this Exhibit Number 13 -- those
 6  things that are in Number 13, those are, in fact, your
 7  notes, correct?
 8      A.   Correct.                                  4:40:56
 9      Q.   Okay.  And they're your notes that you took
10  relative to your defense of Xavier Walker in his
11  criminal case, right?
12      A.   Correct.
13      Q.   And is it -- was it a practice of yours back
14  in 2000 to take notes when you're handling a case?
15      A.   Yes.
16      Q.   And so what sorts of things would you take
17  notes for on a case?
18      A.   Well, you know, I -- I take notes to -- to
19  reflect my conversations with -- with my clients
20  because I want to make sure that if there's something
21  they're saying that's pertinent to their case, that I
22  have it so that I -- I don't forget it.
23      Q.   Okay.  So when you're interviewing your
24  clients, obviously you're taking notes because you
25  don't want to forget exactly what they told you, right?
```

```
 1        A.    Correct.

 2        Q.    And so for that reason, you're trying to be

 3   as accurate as possible when you're writing down what,

 4   in fact, they said to you.  Is that fair?

 5        A.    I try.                                    4:41:52

 6        Q.    And that would apply as well when you're

 7   interviewing other witnesses?  You would take notes,

 8   right?

 9        A.    Sometimes, yes.

10        Q.    And --

11        A.    Most times.

12        Q.    -- if you did take notes -- and when you did

13   take notes for witness interviews, you would also try

14   to take down what they said as accurately as possible,

15   correct?

16        A.    Correct.

17        Q.    Okay.  Without having gone through or -- or

18   going through a lot of the notes that -- that we just

19   went through, the notes we did just go through

20   reflected conversations that you had with Mr. Walker,

21   correct?

22        A.    Yes.

23        Q.    And they were conversations that you had with

24   him on the dates that were indicated on the notes?

25        A.    Yes.
```

1    Q.    And where you took down information in those

2  notes, that was information that was coming directly

3  from Mr. Walker, correct?

4    A.    Yes.

5    Q.    And you were taking down that information, as

6  we just discussed, as accurately as possible, so that's

7  as close to what he said as possible.  Is that fair?

8    A.    Well, it was -- that certainly is not

9  verbatim, but yes, it's pretty close to what he said.

10   Q.    Okay.  So for example, on April 10th of 2001,

11 Mr. Walker told you that Jovanie Long got into his car,

12 right?

13   A.    Correct.                          4:43:16

14   Q.    And on April 10th of 2001, Mr. Walker told

15 you that Jovanie Long, in fact, went with him to the

16 club.  Is that correct?

17   A.    Correct.

18   Q.    And on April 10th of 2001, Xavier Walker told

19 you that he went to Bubbles' house on Division and

20 Central that -- on May 13th, 2000, right?

21   A.    Yes.

22   Q.    And Mr. Walker told you on April 10th of 2001

23 that on May 13th of 2000, Boo Boo was at Bubbles'

24 house, right, when he was there?

25   A.    If that's what the notes say, yes.

```
 1      Q.    And we just went over those notes, correct?
 2   That's what they said?
 3      A.    Correct.
 4      Q.    And Xavier Walker told you on April 10th of
 5   2001 that Jovanie Long was in the driver's seat of his
 6   sister's car at some point, correct?
 7      A.    Correct.
 8      Q.    And that Jovanie Long was driving around his
 9   sister's car on May 13th of 2000, right?
10      A.    Correct.                              4:44:16
11      Q.    He told you that -- well, let me -- let me
12   ask you this.  We were -- we were talking about Drew a
13   few times in those notes.  Do you recall that?
14      A.    I do.
15      Q.    Well, is it possible that the -- that Drew is
16   actually Deon?
17      A.    That is possible.
18      Q.    Okay.  Does -- do we need to look at -- if we
19   looked back at some of those notes, would that be --
20   would that help you out in terms of looking to see
21   whether that, in fact, could have been Deon?
22      A.    I -- I don't -- I don't know that it would,
23   to be honest with you.
24      Q.    Okay.  So I'm going to pull it up anyway.  So
25   this is -- I don't know if I'm going to be able to
```

```
 1   share the screen.  I might need permission.  Hold on.
 2              MS. SHOFFNER:  What -- what do you -- do --
 3   is it an exhibit that I -- that I --
 4              MR. MILLER:  It is, but I won't be able to
 5   control it if you pull it up.  So what I'm going to do
 6   is pull it up, and it'll have been part of exhibit --
 7   and I'll identify it, but I'm going to pull it up from
 8   --
 9              MS. SHOFFNER:  Okay.
10              MR. MILLER:  -- my connection, so I --
11              MS. SHOFFNER:  All right.
12              MR. MILLER:  -- just can control it, if that
13   works.  Let's see.  Give me a second.
14        Q.   Is that working?  Can I -- can you see the --
15   the exhibit on there?
16        A.   It's coming up.  It's -- it says you've
17   started screen sharing.
18        Q.   Okay.  Can you actually see it, though?
19        A.   No.                                  4:46:04
20        Q.   Okay.  Are you still there?  I think it's
21   going -- freezing my computer.
22        A.   I'm here.
23              MS. SHOFFNER:  Be happy to pull it up and
24   just do what you ask me to do with it.
25              MR. MILLER:  Yeah, you know what?  It's
```

```
 1 │ freezing my whole computer, like so that I can't see
 2 │ anybody doing anything.  Now the whole thing's frozen,
 3 │ of course.  But you know what?  Why don't we take a
 4 │ break while I restart my computer --
 5 │           MS. SHOFFNER:  Okay.
 6 │           MR. MILLER:  And in the interim, if everybody
 7 │ else's is working, perhaps you could show it -- show
 8 │ him the April 10th, 2001 --
 9 │           MS. SHOFFNER:  Okay.
10 │           MR. MILLER:  -- while we're off the record
11 │ and -- and see whether he can tell if that's Deon and
12 │ not Drew.
13 │           MS. SHOFFNER:  I --
14 │           MR. MILLER:  That would be --
15 │           MS. SHOFFNER:  I can't -- I -- I can't -- I
16 │ will say, I can't do it while you are attempting to
17 │ share screen.  So it says, "You can't start share
18 │ screen while the -- the other participant is sharing."
19 │           RECORDER:  There we go.              4:47:09
20 │           MS. SHOFFNER:  So you want the April --
21 │           MR. MILLER:  Yeah, sorry, I've got to
22 │ restart.  The whole thing -- I can't even hear anybody,
23 │ so I'm restarting.
24 │           RECORDER:  So we should --
25 │           MS. SHOFFNER:  I think we --
```

Exhibit 5, LLC

```
 1              RECORDER:  -- go off the record for now,
 2    correct?
 3              MS. SHOFFNER:  Yes, we are.  And --
 4              RECORDER:  Off the record, 4:31 p.m.
 5                      (Off the record)
 6              RECORDER:  Back on the record, 4:35 p.m.
 7         Q.   Okay.  So what I was trying to do, Mr.
 8    Wilson, is -- we -- we have been talking a lot about a
 9    Deon today and not so much about a Drew, except when it
10    came to these notes.  So I was going to see if you
11    could tell from that 4/10/01 note, looking at, you
12    know, particularly that first page, whether you could
13    tell, looking at it, whether that would be Deon or
14    Drew, or you just can't tell still?
15         A.   Okay.
16         Q.   Now I'm going to --
17              MS. SHOFFNER:  I have it -- I have it up.      4:48:07
18              MR. MILLER:  Okay.  Can you -- can you share
19    it, then?  And we'll -- we'll see if we can look at it
20    that way without --
21              MS. SHOFFNER:  Can you see it?
22              WITNESS:  I don't see anything.
23              MR. MILLER:  Yeah, it's not --
24              MS. SHOFFNER:  Oh.
25              MR. MILLER:  -- shared.  It's not --
```

```
 1            MS. SHOFFNER:  Okay.  Hang on.  Hang on.  All
 2   right.  Can you see it now?
 3            WITNESS:  I see it now.
 4            MS. SHOFFNER:  Okay.  And you wanted this day
 5   right here, and I think they were looking at the --
 6   this word right here, "friends" --
 7            WITNESS:  That --
 8            MS. SHOFFNER:  -- if this --
 9            WITNESS:  -- that word -- if that's the word
10   we're talking about, that word is "Deon."
11       Q.   Okay.  And so when -- when we were -- when we
12   were referencing "Drew" earlier, would it be fair to
13   say that that's probably actually "Deon" in these
14   notes, right?
15       A.   Yeah, probably so.                    4:49:20
16       Q.   Okay --
17            MS. SHOFFNER:  And -- and -- and for the
18   record, I just want to make this clear for the record,
19   this is page Bates stamp 2694, Plaintiff Xavier Walker
20   2694, and it is the one, two, three, fourth line that
21   states, "From work, friends Deon and Simeon."  Did I
22   read that correctly, Mr. Wilson?
23            WITNESS:  You did.
24            MS. SHOFFNER:  All right.  Go ahead.  You can
25   go ahead, Graham.
```

```
 1              MR. MILLER:  Okay.  Thank you.  Yeah, I just
 2   want to figure out exactly where -- where we were.
 3        Q.   Okay.  So one of the things, then, Mr. Walker
 4   told you back on April 10th of 2001, then, was that
 5   Deon got scared and got out of the car and went back
 6   into the house, correct?
 7        A.   Yes.                                          4:50:23
 8        Q.   Okay.  All right.  Then we looked at notes
 9   from July 16th, 2002, which then reflected your
10   conversations with Mr. Walker back on that date, right?
11        A.   Yes.
12        Q.   And one of the things, then, we can be sure
13   that Mr. Walker told you back on July 16th of 2002 was
14   that he left the house around 12:10 a.m. on May 13th of
15   2000 -- 2000, correct?
16        A.   Correct.
17        Q.   And that Mr. Walker told you, back in July of
18   2002, that on May 13th of 2000, he picked up Deon at
19   about 12:15 that night, correct?
20        A.   Correct.
21        Q.   And this is all when he was driving around in
22   his sister's green Ford Taurus, correct?
23        A.   Correct.
24        Q.   And Mr. Walker told you that on that night,
25   after he picked up Deon, that he went to his old
```

 1  neighborhood around Cicero and Erie, correct?

 2      A.   Correct.                                    4:51:26

 3      Q.   And that when Mr. Walker, after he picked up

 4  Deon and went to his old neighborhood around Cicero and

 5  Erie, he saw Jovanie Long among some other people,

 6  correct?

 7      A.   Correct.

 8      Q.   All right.  So according to Xavier Walker, he

 9  left his house that night at 12:10 in the morning,

10  correct?

11      A.   Correct.

12      Q.   And shortly thereafter, Mr. Walker told you

13  that he was then in the presence of Jovanie Long,

14  correct?

15      A.   At some point, yes.

16      Q.   All right.  I wanted to pull up -- so I don't

17  think we went over this set of notes.  I don't know

18  whether it's in that exhibit, so I'm just going to make

19  it a separate exhibit, which would be Wilson 14, I

20  believe.  And it -- mine are in a little bit different

21  order, so correct me if we've seen this already, but --

22          MR. MILLER:  Could you -- Robin, if you could

23  take that off and let me see if I can share this one?

24      Q.   Okay.  Do you see what's written there?       4:53:00

25      A.   I do.

1      Q.    Have we looked at this one -- have you looked

2  at this one yet today?

3      A.    I don't recall.

4      Q.    Okay.  So if we could go through this one, at

5  the top, what's written up there?

6      A.    The name "Simeon" with, presumably, a work

7  telephone number, the date of "July 23, 2000."

8      Q.    Okay --

9      A.    Underneath --

10     Q.    Let -- and let me just -- let me just

11 interrupt you there.  Are these your notes?

12     A.    Yes, they are.

13     Q.    Again, taken in the context of Mr. Walker's

14 criminal case, right?

15     A.    Correct.

16     Q.    And the first date written up there of July

17 23rd, 2000, does that lead you to believe that these

18 notes were taken on July 23rd of 2000?

19     A.    Yes.

20     Q.    All right.  And was it your general practice

21 when taking notes of interviews with your client or

22 witnesses to take them contemporaneously with the

23 interview?

24     A.    Yes.                                    4:53:57

25     Q.    Okay.  So then what does it say below the --

Exhibit 5, LLC

1  the work number?

2      A.   Then there's the name "Deon Baylock" with his

3  date of birth being ███████████████    It lists his

4  address, a phone number, and it says, "He stays with

5  his grandmother."

6      Q.   Okay.  And then there's sort of a line

7  demarking everything that we just read and then what's

8  written below.  Do you know -- do you see that there?

9      A.   I do.

10     Q.   What -- does that mean anything to you in

11 particular?

12     A.   Well, it -- I don't know if it's in the

13 context of Deon Baylock or not, but it says, "No

14 record, and he's never been locked up.  He attends

15 school."  And it indicates that it was Flagg School,

16 and he was currently in the eighth grade.  So I believe

17 that must be Deon.

18     Q.   Okay.  So what the -- those notes are

19 referring to -- to Deon, correct?

20     A.   Deon Baylock, yes.                      4:54:53

21     Q.   And do you know whether this is a

22 conversation you were having with Deon, or is this

23 information coming from somewhere else?

24     A.   I don't know whether I got this information

25 from Deon or elsewhere.

1    Q.   Okay.  If you could keep going?

2    A.   Says, "He was in the seventh grade when this

3  happened."  I guess "this -- this" being the incident.

4  Then it said, "The night of May 13th" -- let's see,

5  "May 13th, the sun had just gone down, was approaching"

6  -- it says, "Zay pulled me up in the car outside 5431."

7    Q.   Okay.  Can we stop right there?  It says,

8  "Night" -- you read that, "Night was approaching.  Zay

9  picked me up in the car outside 5431."  Is that what --

10    A.   Yeah.

11    Q.   -- it says?

12    A.   Which indicates to me that that's taken from

13  Deon himself.

14    Q.   Okay.  The -- that's what I was going to ask

15  you.  The fact that it's in first person and referring

16  to "me" would suggest to you that this was a

17  conversation that you were having with Deon himself,

18  correct?

19    A.   Indeed.                              4:56:02

20    Q.   And so the -- Deon was giving you this

21  information, and you were writing it down

22  contemporaneously, correct?

23    A.   Correct.

24    Q.   All right.  And when it says, "Zay," there,

25  who do you -- who do you know that to be?

1    A.   Zay is Xavier Walker.

2    Q.   Okay.  And "outside 5431," do you know what

3  that number means?

4    A.   I think that was Xavier's address, but I'm

5  not sure now.

6    Q.   Okay.  And then what does it go on to say

7  after that?

8    A.   Then it says, "Simeon came around the corner

9  and got in the car, went to Zay's cousin's house to

10  look at a car."  Then it says, "Lloyd got in the car.

11  Zay then drove me off -- dropped me off at my house on

12  5424.  They dropped me off and went to the club.  I

13  went into the house and went to sleep."

14    Q.   Okay.  So according to the notes that you

15  took on July 23rd of 2000, from your interview with

16  Deon Baylock, Deon Baylock was dropped off before he

17  even went to the club, correct?

18    A.   At -- according to this note, Deon Baylock

19  never went to the club.

20    Q.   Okay.  So Deon never went with Xavier and

21  Simeon Dorsey to the club, according to what Deon told

22  you, right?

23    A.   Correct.                              4:57:23

24    Q.   All right.  He went home and went to sleep,

25  right?

```
1        A.    That's what -- that's what my notes say.

2        Q.    When Xavier and Simeon left the neighborhood

3    to go to the club, correct?

4        A.    Yes.

5        Q.    All right.  And then if we go to the next

6    page, can you read for what us -- us what's written

7    there?

8        A.    Yeah.  That's "Shunralyn Jacinta Walker, 5431

9    West Potomac."  That's his -- Xavier's sister.

10       Q.    Okay --

11       A.    Her date of birth was          Apparently,

12   she got laid off just before 7/4/2000.  Her employer

13   was the lab support at Safety-Kleen.  She was a data

14   entry in the chemistry department.  She had been

15   employed for seven months.  She has a bachelor's degree

16   majoring in biology and minoring in chemistry from

17   Lewis University in Romeoville.  She received that in

18   May of 1997.  She's in the army reserves for eight

19   years.  Then it says, "On May 13, approximately 12:00

20   midnight, she gave Zay, my brother, my car to go to the

21   restaurant.  It was a '95 Ford Taurus."

22       Q.    All right.  Can --

23       A.    "He was" --

24       Q.    Let me stop you there.  Let me stop you

25   there.  So based on the fact that the way you took
```

1  these notes, we're talking in -- in the first person

2  again, "my car" and "my brother," what does that

3  suggest to you?

4      A.   That we're talking about Xavier's sister,

5  Shunralyn -- well, if that be what her name was,

6  Shunralyn Walker.

7      Q.   Shunralyn.  And -- but the fact that you

8  wrote it in the first person, does that suggest to you

9  that you were getting this information directly from

10  Shunralyn herself?

11     A.   It would -- it suggests that to me, yes.        4:59:25

12     Q.   Okay.  Now going back to the -- to the

13  interview above with Deon, do you recall whether that

14  would have been on the phone or -- or in person?

15     A.   I do not have that recollection, no.

16     Q.   Okay.  And what about with Shunralyn Walker?

17  Do you recall whether you interviewed her on the phone

18  or in person?

19     A.   I do not recall that, either.

20     Q.   But in any event, at least with regard to

21  Shunralyn, you had had contact with her a number of

22  times, correct?  Because she -- she lived in the house

23  with Xavier's parents?

24     A.   I think that's safe to say.

25     Q.   And do you recall that she would also attend

1  the court appearances along with -- with Xavier's

2  parents?

3      A.   I don't recall that, but I wouldn't be

4  surprised if that were true.

5      Q.   Okay.  And in any event, both this interview

6  with Deon -- with Shunralyn Walker and the one with

7  Deon Baylock, whether it was on the phone or in person,

8  that interview occurred between you and them on July

9  23rd of 2000, correct?

10     A.   Correct.

11     Q.   Okay.  So Shunralyn is telling you a little

12  bit about her background, and then she's telling you

13  that approximately midnight Zay took her car to go to

14  the restaurant, correct?

15     A.   Correct.                              5:00:29

16     Q.   And that's what she told you back on July

17  23rd of 2000, correct?

18     A.   Correct.

19     Q.   Okay.  What else does she say to you here?

20     A.   She said that Zay was to come right back.

21  She said, "Only Zay and Simeon were to have gone.

22  Simeon had been here," meaning at the house, "all day.

23  Deon had been here, but I told them I did not want Deon

24  going, he was too young.  They were gone approximately

25  one and a half hours.  Zay came and gave me my car.  He

```
 1  said he went around Erie and saw somebody -- something

 2  he wished he'd never seen."

 3      Q.   Okay.  So on July 23rd of 2000, Shunralyn

 4  Walker told you that she lent Xavier Walker her car,

 5  and Xavier Walker left around midnight on May 13th of

 6  2000.  Is that true?

 7      A.   That's -- seems to be the truth, yeah.      5:01:31

 8      Q.   Based on the notes that you took with your

 9  interview with Shunralyn Walker, correct?

10      A.   Correct.

11      Q.   And then she told you that they were gone --

12  Xavier Walker was gone about an hour and a half after

13  he left at midnight on May 13th of 2000, right?

14      A.   That's what -- yes.

15      Q.   And then when he came back, he -- he told

16  Shunralyn Walker that he had been in his old

17  neighborhood, correct?

18      A.   That's -- yes.  That's what the notes say.

19      Q.   The -- the neighborhood around Erie, right?

20      A.   Yes.

21      Q.   And Shunralyn Walker told you that Xavier

22  Walker told her that he had seen something over there

23  that he wished he had never seen, correct?

24      A.   Correct.

25      Q.   And then you -- in your notes here, you have
```

1   -- what is that after "never seen"?  There's some

2   markings there.

3        A.   Dot, dot, dot, dot.

4        Q.   Okay.  So ellipses, correct?

5        A.   Yes.

6        Q.   And do you know why you would have put

7   ellipses there?

8        A.   I do not.

9        Q.   Is that -- was that a common practice for you

10  in your notes, to put ellipses somewhere?

11       A.   Sometimes, yeah.

12       Q.   All right.  And what is it generally when you

13  would put ellipses?  What were you generally trying to

14  indicate?

15       A.   That there was more being said, but it was

16  not adding to the -- the gist of the conversation.

17       Q.   All right.  And do you have any recollection

18  of what it was that she -- she said after that?

19       A.   I do not.                              5:02:49

20       Q.   Is it possible that she said something that

21  was inculpatory about Xavier Walker there that you

22  didn't want to write down in your notes?

23       A.   I do not have any recollection of what else

24  she had said.

25       Q.   All right.  But that's a possibility?

1      A.    Certainly.

2      Q.    All right.  And what's written on the next

3  page?

4      A.    She -- "I know that Zay and Jovanie are

5  friends, long time, having" -- having something --

6  "running together friends.  They grew up together."

7  Okay.

8      Q.    Is it -- is it possible that's "hanging out"?

9      A.    Yes, could be that.  "Hanging out, running

10  together," yeah, "friends.  Hanging out, running

11  together friends."

12      Q.    Okay.  And just for the record -- that's

13  because it's covered up here, these notes starting with

14  -- with these July 23rd of 2000 notes that we've marked

15  as Exhibit 14, as Plaintiff Xavier Walker 002745, 46,

16  and then we're on 47.  All right.  After that, there's

17  some more written here.  Are these your notes as well?

18      A.    They are my notes.  And it says --

19      Q.    And what does it say?

20      A.    "Boo Boo (Maurice) was picked up for the

21  murder but was let go after Xavier was picked up."

22  Then it says, "Ashanti is Jovanie's girlfriend."

23      Q.    Do you know if this is still the -- the

24  interview with Shunralyn Walker, or is this something

25  else that you picked up from --

```
 1       A.    I -- I don't -- I don't know that.              5:04:39

 2       Q.    Okay.  In any event, where it says, "Boo Boo

 3  (Maurice)," are -- we're talking about Maurice Wright?

 4       A.    I believe so.

 5       Q.    And his -- his nickname would be "Boo Boo,"

 6  correct?

 7       A.    I believe so.

 8       Q.    So whenever we're talking in these notes or

 9  these documents about Boo Boo or Maurice, those are

10  interchangeable, correct?

11       A.    Yes.

12       Q.    Okay.  I want to share another note.  And we

13  may have gone over this, but I want to ask you about a

14  specific part.  So I'm just going to make it a separate

15  exhibit just in -- just in case we haven't gone over

16  it.  Well, first of all, can -- can you see this here?

17       A.    I have a blank screen.  Okay.  I got one now.

18       Q.    Okay.  You see that?                            5:05:40

19       A.    Yes.

20       Q.    And it says -- it -- what does it say at the

21  top?

22       A.    It says, "Xavier Walker, 7/18/2000."

23       Q.    Okay.  Are these your notes as well?

24       A.    Yes, they are.

25       Q.    Did we go through these before?
```

1      A.    No.

2      Q.    Okay.  Can you go through these for us

3  briefly?

4      A.    Right under "Xavier Walker" is the name "Mary

5  Curry," and underneath her name is "Maurice."  And then

6  it says, "Re: Maurice, page 9, not current -- not

7  correct that Zay and Vani were going down railroad

8  tracks and threw gun away."

9      Q.    Okay.  And that's what I want to ask you

10  about.  Do you know what you're referring to here?

11      A.    I do not.                                    5:06:28

12      Q.    Do you know whether this was -- these notes

13  were taken in the context of an interview with Xavier

14  Walker or anybody else, or whether they were from file

15  review, or --

16      A.    I don't know who was giving me this

17  information.

18      Q.    Okay.  So going back to, I think, what Ms.

19  Shoffner was asking a little bit about before, in a

20  murder trial, if a witness is going to help your

21  client's case, you're going to put that witness on,

22  right?

23      A.    I would certainly think so.                  5:07:25

24      Q.    Okay.  And if -- you understand what an alibi

25  is, right?

1     A.   Of course.

2     Q.   And -- and alibis aren't unique to murder

3 cases, right?  I mean, you can have an alibi in any

4 sort of criminal case, right?

5     A.   Correct.

6     Q.   I mean, if -- if -- if there's witnesses that

7 say, "This person wasn't there when this crime was

8 committed," that's somebody that you want to put on in

9 your criminal case, correct?

10    A.   Normally, yes.

11    Q.   Now sometimes the state can ask you -- ask

12 the court to direct you to actually disclose your alibi

13 witnesses and your alibi theory, correct?

14    A.   Yes.

15    Q.   And did that happen, do you recall, in -- in

16 this case?

17    A.   I don't recall that happening.

18    Q.   Okay.

19    A.   You -- by the way, Counsel, your exhibit has

20 gone off my screen.

21    Q.   Yeah.  We're -- we're done with that exhibit.

22    A.   Okay, okay.

23    Q.   Okay.  I'm going to pull up a different

24 exhibit.  And we'll mark it as 16.  And let us know if

25 you need to take a -- I know it's getting late, but let

```
 1  us know if you need to take a break.

 2      A.   I'm good so far.                          5:08:46

 3      Q.   Okay.  All right.  Do you see what's on the

 4  screen now?

 5      A.   Yes.

 6      Q.   And do -- do you recognize that document?

 7      A.   Well, it -- it appears -- it's a typical

 8  motion for pretrial discovery that the state normally

 9  presents to defendant and defendant's counsel.

10      Q.   Okay.  And this is one that was filed in, in

11  fact, Xavier Walker's case that you represented him,

12  correct?

13      A.   So it seems.

14      Q.   Okay.

15      A.   Yes.

16      Q.   And this directs you to disclose witnesses

17  that you may put on in your case, correct?

18      A.   Correct.

19      Q.   And -- and particularly if you're going to

20  put on alibi witnesses, correct?

21      A.   Correct.

22      Q.   And this is something that -- you're going to

23  have to do that prior to trial, right?

24      A.   Yes.

25      Q.   Or you -- or the risk is that you may not be
```

```
 1   able to call those witnesses at trial, right?
 2       A.    That is true.                              5:09:46
 3       Q.    So if you're doing your investigation and
 4   there is a possibility of alibi witnesses and you have
 5   one of these motions, you -- you're going to need to
 6   answer that in discovery, right?  You're going to need
 7   to disclose those witnesses?
 8       A.    Indeed.
 9       Q.    But you need to do that before you even
10   decide whether you're going to call those witnesses,
11   right?
12       A.    Correct.
13       Q.    Because if the alibi witnesses are not real
14   alibi witnesses, you may end up not calling them,
15   correct?
16       A.    That happens, yes.
17       Q.    And in fact, that happened in this case,
18   didn't it?
19       A.    Well, there were witnesses that I'd indicated
20   in my answer to pretrial discovery that I subsequently
21   did not call.
22       Q.    And do you know -- certainly, during your
23   review of this case and your preparation for the trial,
24   you determined when, in fact, at least the estimate of
25   when this murder took place, correct?
```

```
 1      A.   Yes.

 2      Q.   And where would you usually get information

 3 like that?

 4      A.   Well, I would get it from -- initially, it

 5 would come from my client, the defendant.

 6      Q.   Well, if the defendant says --

 7      A.   I would --

 8      Q.   -- he wasn't there --

 9      A.   -- I would look at --

10      Q.   -- you've got to get it from somewhere,

11 right?

12      A.   -- discovery materials.  I would look at the

13 discovery materials that the state has furnished

14 initially, also.

15      Q.   Right.  Including, for example, police

16 reports and whatnot, correct?

17      A.   Correct.                          5:11:05

18      Q.   Because they're going to have the date that

19 they -- the police generally discover the body, and

20 they put together when they think the murder occurred,

21 right?  Is that your general experience?

22      A.   That's my experience.

23      Q.   Okay.  And in this case, you certainly looked

24 over the police reports, right?

25      A.   Yes.
```

```
 1      Q.   All of the case supps and the various

 2  documents that they put together when investigating

 3  this before you -- you tried the case?

 4      A.   Yes.

 5      Q.   Okay.  And I'm going to show you what I guess

 6  we'll mark as 17.  Do you see that document there?

 7      A.   I do.

 8      Q.   And this was -- at the beginning -- at the

 9  top, it says, "Chicago Police Department."  It's one of

10  the case supplementary reports, correct?

11      A.   Correct.                              5:12:03

12      Q.   For identification purposes, this is

13  Plaintiff Xavier Walker 002589.  And I will represent

14  to you that this is something that we pulled from your

15  file, in fact, that was produced to us through

16  Plaintiff, okay?

17      A.   Okay.

18      Q.   You see here that there's a date and time of

19  May 13th, 2000?

20      A.   Yes.

21      Q.   And the address of the occurrence is 4721

22  West Ohio Street, Chicago, Illinois?

23      A.   I don't see the address on the sheet that you

24  have -- yes, I do see that.  Yes.

25      Q.   It's right -- it's right above that --
```

```
 1        A.    I see it.

 2        Q.    -- correct?

 3        A.    Yes.  Yes.

 4        Q.    Okay.  And does that suggest to you that this

 5   is the supp -- supplementary report from the murder of

 6   Marek Majdak back on May 13th, 2000?

 7        A.    Yes.

 8        Q.    And as -- a Chicago Police Department case

 9   supplementary report is certainly one of the many

10   documents you would have reviewed over the course of

11   this case, correct?

12        A.    Correct.                                5:13:03

13        Q.    And as you see there at the beginning, it

14   says their estimate of the date and time of the murder

15   is 0100 to 0110 hours on May 13th of 2000, correct?

16        A.    Correct.

17        Q.    Your understanding is that's first thing in

18   the morning, right?  An hour to an hour and ten minutes

19   after midnight on May 13th, right?

20        A.    That's my understanding.

21        Q.    Okay.  And you've got -- there's a little

22   star next to that that's -- looks to be written --

23   handwritten asterisk, right?

24        A.    Yes.

25        Q.    Okay.  Do you know whether or not that's your
```

```
 1   asterisk?

 2        A.   I don't know that.

 3        Q.   Okay.  But in any event, presumably, as you

 4   investigated this case, you -- you saw this document,

 5   and probably from the other documents, you were able to

 6   ascertain that this murder was allegedly occurred

 7   between 1:00 a.m. and 1:10 a.m., correct?

 8        A.   Correct.

 9        Q.   Okay.  So based on that, when we're talking

10   about Simeon Dorsey and Shunralyn Walker, who said that

11   -- who -- who -- and according to Xavier Walker, who

12   all left the house at midnight, would they be good

13   alibi witnesses in this case?

14             MS. SAMUELS:  Objection.  Calls for

15   speculation.                                    5:14:16

16        A.   Not for purposes of establishing whether or

17   not Xavier was involved in this shooting.

18        Q.   Okay.  So for example, we just -- we just

19   heard that Shunralyn Walker told you that she -- Xavier

20   Walker left in her car at midnight on May 3rd -- 13th

21   of 2000, right?

22        A.   Correct.

23        Q.   And he didn't return for an hour and a half,

24   right?

25        A.   Correct.
```

1    Q.   And in between then, he's -- he had gone over

2  to his old neighborhood around Erie and Ohio, right?

3    A.   Yes.

4    Q.   All right.  And he said that he had seen --

5  he -- he had seen something he wished he never saw,

6  right?

7    A.   Yes.

8    Q.   Well, with Shunralyn -- if you called

9  Shunralyn Walker to trial, would -- would she have been

10  a good alibi witness for Xavier Walker?

11       MS. SAMUELS:  Same objection.

12    A.   It -- she certainly would not have been the

13  strongest alibi witness for Xavier.

14    Q.   And -- and is that why you didn't call her at

15  trial?

16    A.   I -- I -- as I sit here now, that's certainly

17  -- I can't answer that question because I don't know

18  what was going through my head.  But I know, as I'm

19  looking at the -- what we've gone through today, that

20  those things would have concerned me.

21    Q.   Okay.  And as we -- if you were trying this

22  case today knowing those things, would you call

23  Shunralyn Walker for trial to testify on behalf of

24  Xavier Walker?

25    A.   Probably not.                          5:15:40

1     Q.   Now the state might call her, right?

2     A.   Yeah.

3     Q.   And with respect to Deon Baylock, according

4 to -- to -- to Deon himself, he got out of the car

5 before any of this even occurred, right?

6     A.   Correct.

7     Q.   So you're not going to call him at trial, are

8 you?

9     A.   Not if I were trying it today.

10     Q.   Okay.  I just want to go over a little bit

11 about the chain of custody with respect to the file.

12 Once this trial -- the criminal trial ended, you filed

13 a motion -- a posttrial motion, correct?

14     A.   Correct.                     5:16:49

15     Q.   Okay.  And you would have had your file at

16 that point, right?

17     A.   Correct.

18     Q.   Okay.  And we discussed a little bit about

19 that motion was denied and then the -- the case was

20 appealed, right?

21     A.   Correct.

22     Q.   But you did not handle the appeal, correct?

23     A.   Correct.

24     Q.   So would you have given the original file to

25 whoever was handling the appeal, or would you have

1  copied it?  Do you recall what you did in this

2  instance?

3      A.   I -- I would not have copied it because it

4  was so voluminous.  I would have given my original file

5  to Mr. Winston and to -- for purposes of him xeroxing

6  and returning -- and returning it to me.

7      Q.   Okay.  But it -- well, so first of all, what

8  we know about Mr. Winston is you had contact with him

9  in 2014, right?  So --

10     A.   Yes.

11     Q.   -- years and years after this.  Mr. Winston

12  didn't necessarily handle the appeal back when that

13  would have occurred, correct?

14     A.   I think that's correct.                    5:17:41

15     Q.   Okay.  So who -- but so who -- what you're

16  saying is, whoever did handle the appeal, you would

17  have given your file so that they could make a copy,

18  correct?

19     A.   That's what I'm saying, yes.

20     Q.   But at some point you got that file back,

21  right?

22     A.   Yes.

23     Q.   All right.  And it -- as you sit here today,

24  I guess you don't know whether the entire file was

25  returned to you, or do you?

1    A.   I do not.

2    Q.   All right.

3    A.   I have no reason to think that it was not,

4  but I do not.

5    Q.   Okay.  Now in 2005 or -- or shortly before

6  that, do you recall that Xavier Walker's parents filed

7  an ARDC complaint against you?  Or at least they --

8    A.   I do recall that.  I recall that.

9    Q.   And you, in fact, actually wrote a letter in

10  your defense.  Do you recall that?

11    A.   I recall that.

12    Q.   Okay.  But in any event, you gave ARDC your

13  file to review as well.  Is that true?

14    A.   I believe that's true, yes.              5:18:40

15    Q.   And would that have been the same process?

16  Would you have sent them the original to -- to make

17  copies and then send it back?

18    A.   I would have taken them the original and --

19  and then picked it up at a later date.

20    Q.   Okay.  And is that what happened in this

21  case?  Do you recall?

22    A.   Yes, it was.

23    Q.   And do you recall -- I think you testified

24  earlier that you kept this file in some sort of

25  briefcase, right?

```
 1        A.    Yes.
 2        Q.    And when you dropped it off, you would leave
 3    the whole briefcase with whoever you were giving the
 4    file to, correct?
 5        A.    Correct.
 6        Q.    How did you organize your file?
 7        A.    Oh, jeez.  I don't know how to answer that.
 8    As -- as it is an active file, I had parts set aside
 9    for discovery materials, parts set aside for motions,
10    parts set aside for notes, parts set aside for trial
11    preparation with the statements, and the -- and the
12    like.  Now as -- subsequent to the end of the trial,
13    everything probably was sort of commingled.
14        Q.    Okay.  So and -- and, you know, let me break
15    it down, then.  So first of all, your -- your whole
16    file would be in the briefcase, right?
17        A.    Correct.                              5:20:00
18        Q.    Okay.  You wouldn't leave anything behind, at
19    least with regard to giving it to the appellate court
20    or the appellate defender or the ARDC, right?
21        A.    Correct.
22        Q.    And I -- I guess, just as a matter of course,
23    do you have a regular way that you organize your files,
24    or did you back in 2000?
25        A.    I -- no particular format.
```

1      Q.   Okay.

2      A.   First -- first things first, you know.  It --

3  it would begin with the -- with the charge, it would

4  begin with my -- their motion for discovery, my answer

5  to discovery, and the, you know -- that -- the -- those

6  are the initial preliminary documents.

7      Q.   Are you -- do you -- do you have folders,

8  like, orders or subpoenas or, you know, the -- the --

9      A.   Well, yeah I have -- all of that goes in its

10 own separate folder.

11     Q.   Okay.  All right.  And at some point then,

12 you would have picked up the file from the ARDC, you

13 got it back, right?

14     A.   Correct.                               5:20:59

15     Q.   Okay.  And do you recall whether you had the

16 whole thing -- do you -- do you -- when -- presumably,

17 you picked up the whole briefcase, right?

18     A.   Correct.

19     Q.   And did you -- was -- did you check to see

20 whether the file was complete at that point?

21     A.   I did not.

22     Q.   All right.  When you gave the file to the

23 appellate defender and the ARDC, would it have included

24 the notes that we just went over?

25     A.   If they were -- yes, it would have.

 1      Q.    It would have included any notes that you

 2  would -- had in your possession at the time, right?

 3      A.    Correct.

 4      Q.    All right.  And we know that then, at some

 5  point later on, that you gave your file to the public

 6  defender that was handling the posttrial proceedings,

 7  Harold Winston and his affiliates, correct?

 8      A.    Correct.

 9      Q.    Okay.  And was it the same sort of thing?

10  Did you give him a whole briefcase and then at some

11  point came back and picked it up?

12      A.    Exactly.                              5:21:58

13      Q.    All right.  And again, to ask you, you know,

14  was it -- do you know whether it was complete when you

15  picked it back up?

16      A.    I do not.

17      Q.    All right.  At least probably the last time

18  that you produced this file was pursuant to a subpoena

19  from my firm in this civil case.  Do you recall that?

20      A.    I do not recall that, actually --

21      Q.    Okay.  All right.  Did you ever produce it to

22  anybody regarding the civil case?

23      A.    Not to my recollection.

24      Q.    All right.  In any of your productions to

25  anybody in this case, did you create a privilege log

```
 1  for things that you thought might have been withheld

 2  pursuant to -- or should have been held pursuant to

 3  privilege?

 4       A.   No, I did not.

 5       Q.   Okay.  Why not?                          5:22:46

 6       A.   I -- I frankly never -- it never occurred to

 7  me.

 8       Q.   Okay.  Looking back at I think what we had

 9  marked as Wilson Exhibit 7, which was the motion to

10  suppress that you filed -- let me make it more

11  reasonable.  Okay.  You recall looking at this document

12  previously?

13       A.   Yes.                                     5:23:58

14       Q.   All right.  I just had a couple questions

15  about this.  Well, first of all, you're filing a motion

16  to oppress -- to suppress a -- a sworn videotaped

17  statement of your client Xavier Walker, correct?

18       A.   Correct.

19       Q.   And you know, you know, whether or not this

20  is your first murder case or not, any sort of admission

21  or confession is going to be paramount in the state's

22  case, right?

23       A.   Yes.

24       Q.   And you need to do whatever you can as the

25  defense attorney to try to make it so that the
```

```
 1  statement admitting guilt is not introduced into

 2  evidence at trial, correct?

 3      A.    Correct.

 4      Q.    So there's no reason to hold back anything

 5  when you are filing a motion to suppress a videotaped

 6  statement admitting guilt, right?

 7      A.    Correct.                              5:25:00

 8      Q.    So it would be fair to say that anything that

 9  Xavier Walker told you about why his -- his -- how his

10  confession was coerced, you would have put into this

11  motion, right?

12          MS. SAMUELS:  Objection --

13      A.    If I thought it germane, yes.

14      Q.    Okay.  But there's no -- any fact about not

15  -- well, for example, if -- you would put all the facts

16  about physical coercion of a -- of a confession into a

17  motion to suppress, correct?  You wouldn't leave

18  anything out, would you?

19      A.    Correct.  That's correct.

20      Q.    Okay.  And in this case, looking at paragraph

21  five, you put that during this period of incarceration,

22  the defendant was subjected to several instances of

23  physical abuse at the hands of representatives of the

24  Chicago Police Department, including but not limited to

25  being kicked, stepped on in the chest area, correct?
```

```
 1       A.    Correct.

 2       Q.    Would this lead you to believe -- well, based

 3  on that, the only thing that Xavier Walker would have

 4  told you about physical abuse would have been being

 5  kicked and stepped on in the chest area, right?

 6             MS. SAMUELS:  Objection.

 7       A.    I think that's true.

 8             MS. SAMUELS:  Calls for speculation.

 9       Q.    You can answer.                              5:26:04

10       A.    I believe so, yes.

11       Q.    Otherwise, you would have put it in here,

12  right?

13       A.    Yes.

14       Q.    Okay.  And so, for example, if Xavier Walker

15  said that he was hit with a black stick -- if he told

16  you that, you would have put it in here, right?

17       A.    Yes.

18       Q.    Okay.  Any other sort of physical abuse,

19  punching, hitting, anything like that, you would have

20  put it in this motion, correct?

21       A.    Yes.

22       Q.    What does it mean, "during this period of

23  incarceration"?  You say that several times.  The --

24  what period are we talking about here?

25       A.    I'm talking about when he's in custody at the
```

1   police station.

2       Q.   Okay.  So at any point at the police station

3   is what we're talking about, right?

4       A.   Yes.

5       Q.   Was that a yes?  Sorry, I didn't hear.

6       A.   Yes.                                          5:26:55

7       Q.   Okay.  Okay.  Just -- if -- if Xavier Walker

8   had told you that he was not given his Miranda rights,

9   that would have gone in here, correct?

10      A.   I would think so.

11           MS. SAMUELS:  Objection.  Calls for

12  speculation.

13      Q.   You would have put that in there as one of

14  the bases to suppress this confession if, in fact,

15  Xavier Walker had told you that, correct?

16      A.   I --

17           MS. SAMUELS:  Same objection.

18      A.   -- believe I would have, yes.

19           MR. MILLER:  All right.  All right.  Just

20  give me -- I -- I think I'm done.  Let me just look

21  real quick.  Let -- let me just take a five-minute

22  break and make sure, or if -- I don't know if you have

23  any questions, Jeanette.

24           MS. SAMUELS:  I do, but I'll wait till you're

25  done.                                                 5:28:47

```
 1              MR. MILLER:  All right.  Let's take a

 2    five-minute break.

 3              RECORDER:  Okay.  Off the record, 5:16 p.m.

 4                        (Off the record)

 5              RECORDER:  Back on the record, 5:22 p.m.

 6        Q.   Okay.  Just two more things I want to ask you

 7    about.  I'm going to share with you I guess what will

 8    be, I think, 18, Wilson 18.  Do you see this document

 9    here?

10        A.   I do.

11        Q.   And it's "Report of Proceedings" before the

12    Honorable Marcus Salone on November 14 of 2003.  Do you

13    see that?

14        A.   I do.

15        Q.   And I represent this to you to be basically a

16    -- part of -- a partial transcript of the trial, the

17    criminal trial of Xavier Walker, okay?

18        A.   Okay.                                      5:29:50

19        Q.   And this part is -- is essentially your

20    opening statement.  As you can see here, you start out

21    with, "Judge, the night of May 13, 2000, was a tragic

22    night for Mr. Majdak.  There's no question about that.

23    He wound up losing his life," etcetera.  Do you

24    recognize that to be your opening statement in this

25    case?
```

1      A.    I do.

2      Q.    Okay.  And when we look at this paragraph,

3  you say, "For the first time, around midnight on the

4  night of -- the morning of May 13th, Xavier Walker left

5  his home."  You see that right there?

6      A.    I did.  I do.

7      Q.    And is that -- is that statement consistent

8  with what Xavier Walker and Shunralyn Walker told you

9  about when Xavier Walker left his house on May 13th of

10  2000?

11     A.    I believe it is.                          5:30:48

12     Q.    Okay.  And then I just wanted to show you

13  again what we had previously marked as Exhibit 12,

14  which is your affidavit.  And I just -- I -- you know,

15  obviously we went through a lot of this deposition --

16  is that showing up on your screen, by the way?

17     A.    It is not.

18     Q.    Okay.  Let me try it again.  See it now?

19     A.    Yes.

20     Q.    And this is the affidavit that -- that you

21  ultimately signed, correct?

22     A.    Correct.

23     Q.    Now I -- I think we established that you

24  didn't actually write this affidavit, correct?

25     A.    That is correct.                          5:31:47

Exhibit 5, LLC

1        Q.    This was written by Harold Winston?

2        A.    Or someone in his -- in his office.

3        Q.    Okay.  Purportedly based on information that

4  you gave him, correct?

5        A.    Correct.

6        Q.    All right.  And obviously we've been talking

7  about how it has been difficult to remember all the

8  details of this case back going 20 years ago, right?

9        A.    Yes.

10       Q.    But we have since then gone over some of your

11  notes, which may or may not refresh your recollection

12  to some degree.  But I wanted to give you another

13  chance, kind of, to answer some of these questions

14  after having seen those notes.  It says, for example,

15  "I do not" -- in paragraph eight, "I do not know why I

16  did not put on any witnesses at trial."  After having

17  gone over your notes, can you give us more of an answer

18  about -- about that?

19       A.    I -- actually, no.  Because I -- I -- I still

20  don't know why I did not.  I -- I perhaps had a concern

21  about how viable a witness they may have presented

22  themselves.

23       Q.    Okay.  And with regard to, for example, the

24  names that he gave you, Simeon Dorsey, Deon Baylock,

25  Marvin Mosley, and his sister Shunralyn Walker, those

```
 1  are the names that Xavier Walker gave you, correct?

 2      A.   Correct.                                    5:33:09

 3      Q.   And it says they "could be a witness," right?

 4      A.   Correct.

 5      Q.   Okay.  But we know that -- we know that at --

 6  at least with regard to Deon Baylock and Shunralyn

 7  Walker, they wouldn't have made very good witnesses for

 8  Mr. Walker, right?

 9           MS. SAMUELS:  Objection.  Calls for

10  speculation.

11      A.   I -- the only thing I can say is that I had

12  -- at some point, I had concerns about how viable a

13  witness they would prove to be.

14      Q.   Okay.  And -- and again, number nine, looking

15  at number nine?

16      A.   I see it.

17      Q.   Okay.  At this point, you had -- you recall

18  that you did not lose -- that you -- you didn't know

19  whether or not you lost contact with any witnesses?

20      A.   I --

21      Q.   You, in fact, did have contact with, at

22  minimum, Shunralyn Walker, correct?

23      A.   Absolutely.                                 5:34:16

24           MR. MILLER:  Okay.  All right.  All right.

25  That's -- that's all I have.  Thank you.
```

```
 1                      EXAMINATION
 2   BY MS. SAMUELS:
 3       Q.   Okay.  So I have some questions for you.
 4   This is Jeanette Samuels.  Let me turn on my video, I
 5   apologize.  So when you're taking notes, are you doing
 6   a word-for-word transcription, or are you summarizing
 7   what you're hearing?
 8       A.   I'm summarizing what I'm hearing.
 9       Q.   Okay.  And when you summarize what you're
10   hearing, you sometimes have to make sense of what the
11   person is telling you to put it into your own words so
12   that you can understand it later?
13       A.   Indeed so.
14       Q.   Okay.  And so your notes reflect your
15   understanding of what somebody is telling you, but they
16   may not necessarily be word-for-word what that
17   individual is trying to convey?
18       A.   That is correct.
19       Q.   So your notes seem to indicate, at the time,
20   that Deon Baylock was a minor.  Do you recall that?
21       A.   Yes.                              5:35:17
22       Q.   And that he was living with his grandmother?
23       A.   I believe I recall that, yes.
24       Q.   Okay.  If you were presented with evidence
25   that, at the time, he was actually living with his
```

1   uncle, would you have any reason to dispute that?

2       A.    I do not.

3       Q.    All right.  So at the time of -- that you

4   spoke with Deon Baylock, do you recall whether you

5   spoke with him in private or whether you spoke with him

6   in the presence of his guardian?

7       A.    I have no -- no current recollection of that.

8       Q.    Okay.  In your experience as an attorney, is

9   it sometimes the case that minors especially don't want

10  to admit to being out late at night or to breaking

11  their guardian's rules?

12      A.    That is my --

13            MS. SHOFFNER:  Objection.

14      A.    -- experience.

15            MS. SHOFFNER:  Hang on, I'm going to just

16  make an objection as to the form, foundation, and

17  speculative nature of -- of -- of the question.

18      A.    That is my experience.

19      Q.    All right.  I believe earlier you were shown

20  an affidavit of Alicia Stewart regarding her

21  conversation with Deon Baylock.  Do you recall seeing

22  that?

23      A.    Not really.                          5:36:23

24            MS. SAMUELS:  Okay.  Am I -- do I have

25  authority to screen share?

```
 1            MS. SHOFFNER:  Yes.

 2       Q.   All right.  Real quickly, can you see my

 3  screen, Mr. Wilson?

 4       A.   I see it.

 5       Q.   All right.  And you see this is the affidavit

 6  of Alicia Stewart, who was a --

 7       A.   I --

 8       Q.   -- Cook County investigator?

 9       A.   Yes.

10       Q.   All right.  And it looks like it was attested

11  to on December 4th -- 15th, 2014?

12       A.   Yes.

13       Q.   All right.  And it's her conversation with

14  Deon Baylock regarding his recollection of the night of

15  May 12th into May 13th.  Do you see that?

16       A.   I do.

17       Q.   Do you see that he remembered that night,

18  that he had been with Xavier, that Xavier could not

19  have been involved in the shooting?

20       A.   Yes.

21       Q.   As you sit here today, do you have any

22  independent recollection and any independent reason to

23  believe that this affidavit is inaccurate?

24       A.   I do not.                          5:37:29

25       Q.   Okay.  I'm going to go ahead and stop sharing
```

1   my screen.  Do you recall seeing notes regarding

2   subpoenaing for phone records in this case?

3       A.   I recall seeing notes for phone records, yes.

4       Q.   Do you know whether you ever issued that

5   subpoena?

6       A.   I don't recall whether it was issued or not.

7       Q.   Okay.  And do you recall being asked about

8   information that you had put in a motion to suppress?

9       A.   Yes.

10      Q.   Okay.  Are you -- are you familiar with the

11  doctrine of "fruit of the poisonous tree"?

12      A.   Yes.

13      Q.   All right.  And as a general rule, in a

14  motion to suppress, is your intention as an attorney

15  not only to suppress the statement but also any

16  additional evidence that the police may have been able

17  to obtain as a result of their unconstitutional

18  conduct?

19          MS. SHOFFNER:  Objection as to form,

20  incomplete hypothetical.

21      A.   That would be my understanding.          5:38:33

22      Q.   Okay.  I'm going to share my screen again.

23  And I'm showing you the motion to suppress and just

24  scrolling to the bottom where you see the -- can you

25  see the prayer for relief?

1      A.   Yes.

2      Q.   All right.  And it looks that it -- you are

3  looking for an order to suppress from being introduced

4  into evidence any and all parts of the video statement

5  of the confession, correct?

6      A.   Correct.

7      Q.   All right.  Do you see anywhere in that

8  statement where you specifically request any fruits of

9  the poisonous tree that the police may have obtained as

10 a result of that statement?

11     A.   Not that statement, but at the end of the

12 prayer for relief, I say, "for the suppression of --

13 for such further relief as the court deems just and

14 appropriate."

15     Q.   Right.

16     A.   That was a catchall.

17     Q.   Right.  And that's a catchall that you put in

18 every prayer for relief, whether it's a criminal or a

19 civil case, correct?

20     A.   Correct.                              5:39:30

21     Q.   All right.  And specifically for -- in this

22 case, DNA evidence was obtained from Xavier Walker,

23 correct?

24     A.   I believe that's correct.

25     Q.   All right.  And his statement was used in

1   part to help obtain the arrest warrant for -- obtain

2   the arrest for Jovanie Long as well, correct?

3           MS. SHOFFNER:  Objection as to form,

4   foundation, and -- you know, for lack of foundation.

5           MR. MILLER:  I'll join that.

6       A.   I'm -- I'm -- I'm not sure if that's -- was

7   -- is true or not.

8       Q.   All right.  But in any event, you never

9   specifically requested that relief in this motion.  Is

10  that fair to say?

11      A.   That's fair to say.

12      Q.   And the question you -- you remember

13  receiving questions about why the nature of his arrest

14  wasn't a part of the motion to suppress.  Do you

15  remember those questions?

16      A.   I do.                                    5:40:28

17      Q.   Okay.  And do you remember reviewing that

18  FDLA paperwork where it seemed to indicate that some

19  sort of force was used in order to arrest Mr. Walker?

20      A.   I do.

21      Q.   All right.  And so as you sit here today, you

22  have no recollection one way or another whether you

23  specifically reviewed that with Mr. Walker.  Is that

24  fair to say?

25      A.   That is fair to say, yes.

1    Q.   All right.  But it is also fair to say that

2  you had in your file at that time evidence that seemed

3  to suggest some sort of force was used during the

4  course of Mr. Walker's arrest.  Is that correct?

5    A.   I believe that's --

6         MS. SHOFFNER:  Objection as to form,

7  foundation, incomplete hypothetical.

8    A.   Yes, that's correct.

9    Q.   All right.  And that would have been in your

10 file at the time that you filed this motion to

11 suppress?

12   A.   Yes.

13   Q.   Okay.  Do you recall speaking -- actually,

14 we'll leave that alone.  Go ahead and stop sharing my

15 screen.  Is the reason you might not call a witness

16 because they've moved out of state?

17   A.   That is a reason.                        5:41:45

18   Q.   Is the reason you might not call a witness

19 because you weren't able to serve them with a subpoena?

20   A.   Yes.

21        MR. MILLER:  Object to the leading -- the

22 nature -- leading nature of the question.  Go ahead.

23        MS. SHOFFNER:  And also -- I also object

24 based on the incomplete hypothetical and the

25 speculative nature of the question.  So that would be a

```
 1  form, a foundation objection.
 2      Q.    Is the reason you might not call a witness
 3  because you haven't been able to get into contact with
 4  them?
 5          MR. MILLER:  Object to leading.
 6      Q.    Sorry, go ahead.  Sorry, sir, did you hear
 7  the question?
 8      A.    You're asking me?
 9      Q.    Yes, sir.
10      A.    I have no questions.
11      Q.    No, I was saying, is the reason you might not
12  call the witness because you just can't get in contact
13  with them?
14      A.    Yes.                                    5:42:45
15      Q.    All right.  There's any number of reasons
16  under the sun why you might not call a witness,
17  correct?
18      A.    Correct.
19      Q.    Okay.  As you sit here today, do you know why
20  you did not call any witnesses in this case?
21      A.    I do not.
22      Q.    All right.  Fair to say you don't -- you
23  don't remember your motivations one way or the other in
24  regard to any specific action that you took in this
25  case?
```

```
 1       A.    That is correct.

 2             MS. SAMUELS:  Okay.  I have no further

 3   questions.

 4             MS. SHOFFNER:  I have no further questions.

 5   Thank you again, Mr. Wilson.

 6             WITNESS:  Okay.

 7             MR. MILLER:  Thank you.

 8             RECORDER:  Okay.  Signature?

 9             MS. SHOFFNER:  All right, sir.  You have the

10   right to review this testimony today for any

11   typographical errors or -- or scrivener errors, as they

12   often refer to, or you can trust that the court

13   reporter got it right and waive your signature on your

14   deposition transcript testimony.  Would you like to

15   review the testimony, or do you want to waive

16   signature?

17             WITNESS:  I'll waive signature.          5:43:59

18             MS. SHOFFNER:  All righty.

19             RECORDER:  Off the record, 5:37 p.m.

20

21

22

23

24

25
```

```
 1                        CERTIFICATION

 2   I certify that the deponent was duly sworn by me and

 3            that the foregoing is a true and correct

 4            transcript from the record of proceedings

 5                 in the above-entitled matter.

 6

 7

 8                     Brenda L. Portillo

 9                       March 10, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 5, LLC