# EXHIBIT 50

**1**

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   XAVIER WALKER,                )
                                   )
 4         Plaintiff,              )
                                   )
 5      vs.                        )No. 20 Cv 7209
                                   )Judge guzman
 6   CITY OF CHICAGO, STANLEY SANDERS,)
     MICHAEL PIETRYLA, DAVID WRIGHT,)Magistrate
 7   BRIAN HOLY, JOHN CRUZ, DONALD )Judge Fuentes
     WOLVERTON, JOHN RIORDAN, ROBERT)
 8   BARTIK, ANTHONY BRZENIAK, THOMAS)
     MAHONEY, and COOK COUNTY,      )
 9                                  )
           Defendant.              )
10
11
12       The Discovery Deposition via Zoom

13   Electronic Telephone/Video Conferencing of

14                   JOHN RIORDAN,

15   taken before ADRIENNE M. LIGHTFOOT, Certified Shorthand

16   Reporter and Notary Public, taken pursuant to the

17   provisions of the Federal Rules of Civil Procedure and

18   the Rules of the Supreme Court thereof, pertaining to

19   the taking of depositions for the purpose of discovery

20   held on the 16th day of December 2021, at the hour of

21   10:00 a.m. pursuant to notice.

22

23   Adrienne M. Lightfoot, CSR

24   Illinois License ████████
```

**2**

```
 1              A P P E A R A N C E S

 2

 3   REPRESENTING THE PLAINTIFF,
     XAVIER WALKER:

 4

 5               SAMUELS & ASSOCIATES
                 Attorneys At Law
 6               53 West Jackson Boulevard.
                 Suite 831
 7               Chicago, Illinois 60604
                 (872)588-8726
 8
                   By:  Jeanette S. Samuels, Esq.
 9

10   REPRESENTING THE DEFENDANT,
     CITY OF CHICAGO:

11

12               NATHAN & KAMIONSKI
                 Special Assistant Corporation Counsel
13               33 West Monroe Street
                 Suite 1830
14               Chicago, Illinois 60603
                 (312)612-1079
15
                   By:  Breana Brill, Esq.
16                      Natalie Adeeyo, Esq.

17   REPRESENTING THE DEFENDANTS,
     INDIVIDUAL POLICE OFFICERS:

18

19               BORKAN & SCAHILL, LTD.
                 Attorneys At Law
20               20 South Clark Street
                 Suite 1700
21               Chicago, Illinois 60603
                 (312)580-1030
22
                   By:  Graham P. Miller, Esq.
23                      Krista Stalf, Esq.

24
```

**3**

```
 1           A P P E A R A N C E S(CONT'D.)

 2

 3   REPRESENTING THE DEFENDANTS,
     BRZENIAK and MAHONEY:

 4               TRIBLER ORPETT & MEYER, P.C.
                 Attorneys At Law
 5               225 West Washington Street
                 Suite 2550
 6               Chicago, Illinois 60606
                 wboberts@tribler.com
 7
                   By:  Bob Oberts, Esq.
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                   I N D E X
```

**4**

```
 1

 2   JOHN RIORDAN                         PAGE

 3        Examination by
          Ms. Samuels                      5

 4

 5

 6

 7

 8

 9

10                E X H I B I T S

11            (No Exhibits Marked)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

WALKER vs. CITY OF CHICAGO, ET AL.                                    JOHN RIORDAN

Case: 1:20-cv-07209 Document #: 160-50 Filed: 05/16/23 Page 3 of 34 PageID #:3524

December 16, 2021

5

1                        (Witness Sworn)
2                      JOHN RIORDAN,
3    called as a witness herein, after having been first
4    duly sworn, was examined and testified as follows:
5                      EXAMINATION
6    BY MS. SAMUELS:
7        Q     Can you hear me all right, sir?
8        A     I can hear you.  I can't see you, but it's
9    fine.
10       Q     Okay.  Can you please state and spell your
11   name for the record?
12       A     Sure.  It's John, J-o-h-n, Riordan,
13   R-i-o-r-d-a-n.
14            MS. SAMUELS:    This is the deposition of John
15   Riordan taken in the case of Walker versus City of
16   Chicago, et al, Case No. 20 CV 7209.
17            This deposition is taken pursuant to
18   notice, by agreement of the parties and all applicable
19   rules.
20   BY MS. SAMUELS:
21       Q     Have you ever given a deposition before, sir?
22       A     I believe once.
23            MS. STALF:    Can I just interject for one
24   second?  Jeanette, could you please keep your camera

6

1    feed on during the deposition.  We are kind of at a
2    disadvantage for Mr. Riordan to be able to interpret
3    what you're saying, when relying only upon the audio.
4            It would be helpful if he could see you
5    as well when you're speaking.
6    BY MS. SAMUELS:
7        Q     Mr. Riordan, are you unable to understand
8    what I'm saying when I speak.
9        A     It would help to see your face.
10       Q     Sure.  All right.
11       A     Thank you.
12       Q     When was the last time you gave a deposition?
13       A     I don't recall specifically.  A number of
14   years ago.
15       Q     All right.  So, essentially, it's the same
16   thing as testifying under oath.  All your answers have
17   to be verbal, swearing to tell the truth.
18            If at any point you want to take a
19   break, you can.  And if any of my questions are
20   unclear, ask me to rephrase them, otherwise, I'm going
21   to assume you understood what I was talking about,
22   okay?
23       A     I understand.  Thank you.
24       Q     Okay.  Did you prepare at all for your

7

1    deposition today?
2        A     Somewhat, yes.
3        Q     Okay.  And what did you do to prepare for
4    your deposition?
5            MS. STALF:    I'm going to object to the
6    question just to the extent that this question may
7    elicit any attorney/client communication.
8            That being said, to the extent that you
9    can answer the question without eliciting such
10   communications, you can answer, Mr. Riordan.
11            THE WITNESS:    I reviewed some reports and
12   some prior testimony.
13   BY MS. SAMUELS:
14       Q     Whose prior testimony did you review?
15       A     My prior testimony.
16       Q     And whose reports did you review?
17            MS. STALF:    Object to the form.  Foundation.
18            You can answer.
19            THE WITNESS:    The reports that involved
20   myself.
21   BY MS. SAMUELS:
22       Q     Did these reports have a title?
23       A     Yes, ma'am.  Supplementary reports from the
24   Chicago Police Department.

8

1            MS. ADEEYO:    My apologies.  I don't mean to
2    interrupt, but another attorney, Breana Brill is
3    attempting to join this deposition.  It's my
4    understanding she's in the waiting room.
5            So can she please be let in?  Thank you.
6    BY MS. SAMUELS:
7        Q     Did you review any general progress reports?
8        A     I believe some, yes.
9                   (WHEREUPON, Ms. Breana Brill enters
10                   the conference room.)
11   BY MS. SAMUELS:
12       Q     Are there any other records you recall
13   reviewing?
14       A     I'm sorry, I didn't understand.
15       Q     Are there any other records you recall
16   reviewing?
17       A     No.
18       Q     Did you review any videos?
19       A     No.
20       Q     Besides with your attorneys, when is the last
21   time you discussed this case?
22       A     I can't recall.  It's years ago.
23       Q     So in the last two or three years, besides
24   with your attorneys, have you discussed this case with

9

```
 1    anyone?
 2         A    No, ma'am.
 3         Q    Did you ever learn that Xavier Walker had
 4    filed a post-conviction and/or was challenging his
 5    conviction?
 6              MS. STALF:   Object to the question, to the
 7    extent it may seek information protected by the
 8    attorney/client privilege.
 9              With that being said, you can answer
10    this question to the extent that you can without
11    divulging such communication, Mr. Riordan.
12              THE WITNESS:   I was not aware.
13    BY MS. SAMUELS:
14         Q    And is it fair to say that --
15              Is it fair to say that since this case
16    concluded in the early 2000s with the conviction of
17    Mr. Walker that the next time it came up for you was
18    this litigation?
19         A    I wasn't -- okay -- it would be fair to say
20    maybe even a little before the conviction.  I don't --
21    I don't recall specifically the time that Mr. Walker --
22    the timeframe Mr. Walker was convicted.
23         Q    When I say Xavier Walker, do you know who I'm
24    referring to?
```

10

```
 1         A    Yes.
 2         Q    Okay.  And when I say Jovanie Long, do you
 3    know who I'm referring to?
 4         A    Yes.
 5         Q    What about Maurice Wright?
 6              MS. STALF:   Object to form.
 7              THE WITNESS:   I don't recall specifically,
 8    but his -- I believe his name is in the reports.
 9    BY MS. SAMUELS:
10         Q    But besides reading his name in the reports,
11    you don't have any knowledge of Maurice Wright; is that
12    fair to say?
13              MS. STALF:   Objection. Form. Foundation.
14              You can answer the question.
15              THE WITNESS:   Yes.
16              MS. STALF:   Just so you know, you can answer
17    the question even if I object unless I instruct you not
18    to, okay?
19              THE WITNESS:   Okay.
20    BY MS. SAMUELS:
21         Q    If I say Antwoine Waddy, do you know who I'm
22    referring to?
23         A    I'm sorry.  Antwoine; I didn't catch the last
24    name.
```

11

```
 1         Q    Waddy?
 2         A    I have no recollection of Antwoine Waddy.
 3         Q    Prior to the -- your investigation into this
 4    murder -- when I say Merak Majdak, do you know who I'm
 5    talking about?
 6         A    Yes.
 7         Q    And you said you know who I'm talking about
 8    when I said that?
 9         A    Yes.
10         Q    Okay.  So prior to your investigation -- your
11    role in helping to investigate the murder of Merak
12    Majdak, had you had any interactions with Xavier
13    Walker?
14              MS. STALF:   Objection. Form. Foundation.
15              MS. ADEEYO:   Join.
16              THE WITNESS:   No, Counsel.
17    BY MS. SAMUELS:
18         Q    Okay.  Prior to your role in helping to
19    investigation the murder of Merak Majdak, had you had
20    any interactions with Jovanie Long?
21              MS. STALF:   Objection. Form. Foundation.
22              MS. ADEEYO:   Join.
23              THE WITNESS:   No.
24
```

12

```
 1    BY MS. SAMUELS:
 2         Q    So is it fair to say the first time you came
 3    to learn anything about Xavier Long -- excuse me.
 4              The first time you came to learn
 5    anything about Xavier Walker or Jovanie Long was during
 6    the course of your investigation into the murder of
 7    Merak Majdak?
 8              MS. STALF:   Objection. Form. Foundation.
 9              MS. ADEEYO:   Join.
10              THE WITNESS:   Yes.
11    BY MS. SAMUELS:
12         Q    What was your date of appointment?
13              MS. STALF:   Objection. Form.
14              THE WITNESS:   Eight, September, 1986.
15    BY MS. SAMUELS:
16         Q    Where were you originally assigned?
17         A    My very first assignment?
18         Q    Yes, sir.
19         A    The 23rd District.
20         Q    And, roughly, what area does that cover or
21    did that cover at the time?
22         A    At the time, I believe it -- boundaries were
23    Clark to Fullerton to Lawrence to the lake.
24         Q    And how long did you remain at the 23rd
```

13

```
1    District?
2        A    I would estimate for training and maybe a
3    month or two afterwards, so less than six months.
4        Q    And where was your next assignment after
5    that?
6        A    The 24th District.
7        Q    And where does -- at that time, where was the
8    24th District, approximately?
9        A    You want the boundaries?
10       Q    Yes, sir.
11       A    Okay.  Basically, 6000 North to the City
12   limits North, the border of the Evanston, from the
13   Chicago River to the Lake Front.
14       Q    All right.  And how long do you stay with the
15   24th District?
16       A    You have to give me a second.
17            To the best I can recall, late 1994 to
18   late 1995.
19       Q    All right.  So approximately '87 to '95?
20       A    Something close to that, yes.
21       Q    And during that time, were you a Patrol
22   Officer?
23       A    Yes.
24       Q    All right.  Did you ever have any other
```

14

```
1    assignments -- or did you have any other assignments
2    other than Patrol Officer while you were with the 24th
3    District?
4        A    No.  My rank was Patrolman.
5        Q    Were you ever assigned to any specialized
6    units?
7        A    I was on the Tack Team for a short time.
8        Q    What's the Tack Team do?
9            MS. STALF:  Objection.  Form.  Foundation.
10           MS. ADEEYO:  Join.
11           THE WITNESS:  Basically, work on chronic
12   crime problems in the district.  At that time, we got
13   detailed out a lot across the city for events, such as
14   like Taste of Chicago and things like that.
15   BY MS. SAMUELS:
16       Q    Did you receive any specialized training to
17   join the Tack Unit?
18       A    No.
19       Q    Do you remember who your Sergeant was?
20           MS. STALF:  Objection.  Form.  Foundation.
21           THE WITNESS:  I don't recall.  I -- give me
22   a -- I -- I have -- one of them was being Daniel
23   Betlof, and I had another one but I don't recall his
24   name.
```

15

```
1    BY MS. SAMUELS:
2        Q    Besides the Tack Unit, were there any
3    specialized teams you worked on while you are in the
4    24th District?
5        A    I worked on a burglary car.
6        Q    Can you explain what that is, briefly?
7        A    Basically we investigated residential
8    burglaries and thefts in the 24th District.
9        Q    Did you receive any specialized training to
10   work the burglary car?
11       A    No.
12           MS. STALF:  Objection.  Form.
13   BY MS. SAMUELS:
14       Q    And so around '94, '95, you leave the 24th
15   District, correct?
16       A    Correct.
17       Q    Where is your next area of assignment?
18       A    Special Operations.
19       Q    What does a Special Operations Unit do?
20           MS. STALF:  Objection.  Form.  Foundation.
21           THE WITNESS:  We are deployed citywide to
22   deal with spikes in crime.  I would guess that's what
23   you would call it.  We had deployment.
24   BY MS. SAMUELS:
```

16

```
1        Q    And how -- how many units were in Special
2    Operations?
3            MS. STALF:  Objection.  Form.  Foundation.
4            MS. ADEEYO:  Join.
5            THE WITNESS:  I'm not sure what you are
6    asking.
7    BY MS. SAMUELS:
8        Q    Sure.  Was it just like one big division?
9            MS. STALF:  Objection.
10           MS. ADEEYO:  Join.
11           THE WITNESS:  It was one unit inside Special
12   Operations at the time was what they called HBT, which
13   is now the SWAT team.
14   BY MS. SAMUELS:
15       Q    Is that what you were on?
16       A    No.  I never went on SWAT.
17       Q    Okay.  So my understanding is that Tack Teams
18   generally have, like, six to eight members; is that
19   like -- does that sound about right?
20           MS. STALF:  Objection.  Form.  Foundation.
21           MS. ADEEYO:  Join.
22           THE WITNESS:  It varies.  I would say it
23   would be fair to say -- it's supposed to have eight to
24   ten members.  I don't know.  Currently, or -- I should
```

WALKER vs. CITY OF CHICAGO, ET AL. JOHN RIORDAN December 16, 2021

Case: 1:20-cv-07209 Document #: 160-50 Filed: 03/16/23 Page 6 of 34 PageID #:3527

**17**

1 say just previous to my retirement, some teams ran with
2 six. But I believe it's eight.
3           And then a number of Tack Teams in the
4 district also fluctuate, so it's any -- I mean, it's --
5 is that good enough, or --
6 BY MS. SAMUELS:
7     Q     Yeah. So was Special Operations separated
8 into teams?
9     A     Yeah, it was a team environment.
10     Q     Do you recall how many teams there were?
11           MS. STALF:   Objection. Form. Foundation.
12           MS. ADEEYO:   Join.
13           THE WITNESS:   No, I don't.
14 BY MS. SAMUELS:
15     Q     What team were you on?
16     A     I was on a rotating team. I worked days and
17 nights. And then for a while I was on a straight day
18 team.
19     Q     When you say you were on a rotating team,
20 does that mean the members changed, or does that mean
21 the time that you would have changed?
22           MS. STALF:   Objection. Form. Foundation.
23           THE WITNESS:   Maybe -- well, hours definitely
24 changed. It's what rotation refers to. I believe some

**18**

1 of the teams work straight shifts, so the members would
2 change also.
3           So I -- that's probably the best I can
4 answer it. I don't --
5 BY MS. SAMUELS:
6     Q     Who were the other members of your team?
7     A     At which times? They changed. I don't
8 recall specifically all of the members that I worked
9 with while I was there.
10     Q     Who can you recall?
11     A     Pat O'Malley, Anna Gall, Rodney Omochy, Mike
12 Cunas, Sal Perez, Eddy Mirras. I can't -- I mean --
13 and then -- that would change all the time.
14     Q     Gotcha. Did you have a Sergeant who you
15 generally reported to while you worked in special
16 operations?
17     A     I had several.
18     Q     Who can you recall?
19     A     Well, one just passed away, Pat Gordon.
20     Q     I'm sorry for your loss.
21     A     And John Locknene. I mean, there were a
22 couple others. I'm trying to think -- Wagner. I can't
23 remember his first name. I think it might be Bill.
24     Q     And you said when you are on Special Ops, you

**19**

1 work throughout the city.
2     A     We would be deployed to different areas of
3 the City, correct.
4     Q     Did you have to receive any special training
5 to joint Special Ops?
6     A     No.
7     Q     How long were you with Special Ops?
8     A     So I could say in general, I believe like,
9 '95 to '98.
10     Q     And then why did you leave Special Ops?
11     A     I was promoted.
12     Q     To what?
13     A     Gang Specialist.
14     Q     All right. And was that with a specific
15 area?
16     A     I'm sorry, could you repeat that?
17     Q     I said was that with a specific area.
18           MS. STALF:   Objection. Form. Foundation.
19           THE WITNESS:   I'm sorry. I don't understand
20 what you are asking me. Was -- Gang Specialist is a
21 rank.
22 BY MS. SAMUELS:
23     Q     And what -- I guess, so -- let me try to
24 preface where I'm coming from and see if you can pick

**20**

1 up where I'm coming from.
2           And so we were sort of going through
3 your areas of assignment, right. And so you started
4 at, I believe, 23rd and went to 24th, then you went to
5 Special Ops.
6           And so I understand that you've been
7 promoted to Gang Specialist. And so is that City wide,
8 or is that, like, Gang Specialist for the 15th District
9 or -- do you get what I'm trying to say?
10     A     It's actually -- Counsel, it's a rank. It's
11 equivalent -- at the time it was equivalent to
12 Detective and Youth Officer. And it was a City wide
13 unit, also.
14     Q     Oh.
15     A     I took a test and was promoted to Gang
16 Specialist. It was called the D2A test at the time.
17     Q     And what were your responsibilities as a Gang
18 Specialist?
19     A     Basically, to investigate gang-related
20 narcotic sales, the hierarchy of the structure, do some
21 narcotic conspiracy cases at the street level.
22           And I wasn't fortunate, but some members
23 of Gangs would work with Federal agencies.
24     Q     And was there a particular -- excuse me --

21

1 was there a particular building that you worked out of
2 as a Gang Specialist?
3     A    Yes, Counsel.  Homan Square.
4     Q    What district is Homan Square in?
5     A    The 11th District.  It's on the south end of
6 the 11th District.
7     Q    Okay.  And how long did you work as a Gang
8 Specialist?
9     A    Well, how long did I work in Gang
10 Investigations, or how long was I Gang Specialists
11 total?
12     Q    Which one is shorter?
13     A    I was a Gang Specialist for about, roughly,
14 five years.
15     Q    Okay.  And how long did you work Gang
16 Investigation?
17     A    As best I can remember, probably a year and a
18 couple of months -- a little more than a year,
19 somewhere in that timeframe.
20     Q    All right.  So, roughly, from '95 to '96ish,
21 '97?
22     A    No, ma'am.  Like '99 to some time in 2000,
23 like, May or something like that.
24     Q    Okay.  That's when you were in Gang

22

1 Investigations, correct?
2     A    Correct.
3     Q    And when you were in Gang Investigations, was
4 that still out of Homan Square?
5     A    Yes.
6     Q    Okay.  Then after Gang Investigations, then
7 where did you go?
8     A    I was assigned to Area 4.
9     Q    And is this still as a Gang Specialists, or
10 did you have a different title?
11     A    It's still as a Gang Specialist, but
12 basically, I -- I can't tell you exactly how many
13 members, but several ones were sent to the area,
14 Detective Division, to work with Detectives.
15         So they kind of -- they didn't disband
16 Gangs, but they combined it with Narcotics.  And I can
17 even -- I can maybe guess at a percentage.
18         But, like, the majority of us were sent
19 to area Detective Division units across the City.
20     Q    Okay.  And what geography does Area 4 cover,
21 roughly?
22     A    So it covered the 11th District -- it's
23 located above the 11th District -- tenth District, the
24 13th District, which I don't think it exist anymore --

23

1 I know it doesn't exist anymore, the 12th District.
2         And I can't recall specifically, but I
3 know at one time it covered the 1st District.  I don't
4 know.  And then we -- so I don't know exactly when the
5 1st District was -- so let me go over it again.
6         Ten, 11, 12 and 13.  And at one point,
7 the 1st District, which is downtown, also.
8     Q    I gotcha.  And so my understanding is,
9 essentially, you are doing the same role as Gang
10 Investigation, but you are just partnered up with
11 Detectives?
12     MS. STALF:   Objection.  Form.  Foundation.
13     THE WITNESS:   No.  Actually, we were doing
14 the role of Detectives, and we were Gang Specialists.
15 BY MS. SAMUELS:
16     Q    Okay.
17     A    So flip-flop, they put us into the areas to,
18 basically, do the duties that a Detective would do.
19     Q    And is that what you were doing at the
20 time of this case?
21     A    Yes.
22     Q    Okay.  And how were you working Area 4 for,
23 sort of, as a Detective?
24     MS. STALF:   Objection.  Form.  Foundation.

24

1     THE WITNESS:   I don't recall specifically.
2 Basically, I'm not sure if I got there in early --
3 obviously, early June.  But we were sent for additional
4 training before we were assigned to the areas.
5         And I believe that was, maybe in May or
6 late April of, oh, what year is it, 2000?
7     MS. SAMUELS:  Yes, sir.
8     THE WITNESS:   So I would -- I can't recall
9 specific dates, and I'm unable to figure out exactly.
10 But, basically, we were assigned to the areas.  They
11 sent us for additional training, and then they put us
12 in Detective Division.
13 BY MS. SAMUELS:
14     Q    And how long did you remain in the Detective
15 Division?
16     A    So from -- like, around mid 2000 to December
17 of 2003.
18     Q    And you said you -- you received additional
19 training?
20     A    Yes.
21     Q    And do you recall what that training was
22 about, generally?
23     A    Basically, I recall -- what I do recall is
24 some of it was evidence recovery, theft investigations,

25

1  interviews.
2              General -- like, the same training that
3  Detectives had had that Gang Specialists didn't, is the
4  best way I could probably describe it.
5      Q    And then from -- after 2003 -- I think you
6  said you were there until approximately December 2003,
7  correct?
8      A    Correct.
9      Q    All right. Where do you go after that?
10     A    I was promoted.
11     Q    To?
12     A    To Sergeant.
13     Q    Congratulations. What area?
14     A    Thank you.
15              Well, first, the Academy and then to the
16  19th District.
17     Q    Generally speaking, what's the geography of
18  the 19th District?
19     A    Give me a second. I know it. I believe it's
20  Fullerton. So 2400 North, to 4800 north, from Clark
21  Street west, to Chicago River.
22     Q    And what were your responsibilities as a
23  Sergeant?
24     A    I was on midnights and Patrol.

26

1      Q    Okay. And so were you responsible for, like,
2  overlooking paperwork to make sure it's accurate,
3  making sure everybody -- just make sure the shift goes
4  okay, I guess?
5              MS. STALF:   Objection. Form. Foundation.
6              THE WITNESS:   Do you kind of want me to
7  define, like, what a Patrol Sergeant does?
8              You know, you're a front-line
9  supervisor. So, yes, I would review and approve
10  reports. I would respond to calls. There are some
11  calls that you know -- that you are required to respond
12  to, by you know, rules, like domestics, if you are
13  available. And I'm responsible for -- bless you.
14  BY MS. SAMUELS:
15     Q    I'm sorry. Go ahead.
16     A    And I'm responsible for check off, make sure
17  everybody would come in at the end of the tour, that
18  the reports were finished. And another duty was to
19  make sure there were response to calls.
20              So, basically, I mean -- for the most
21  part, I was a Patrol Sergeant. I didn't work in the
22  inside -- in the administrative Sergeant spot.
23     Q    Okay. And you did that -- I don't know.
24  How long were you a Sergeant?

27

1      A    To -- so, basically, 2004 to October, 2010 --
2  a little more than six years I'm guessing. I can
3  figure out the math. In 2010, I was -- in October of
4  2010 I was promoted to Lieutenant.
5      Q    In those six years, were they all with the
6  19th District?
7      A    No. No, Counsel.
8      Q    Okay. How long were you with the 19th
9  District as a Sergeant?
10     A    I went to the Targeted Response Unit. I
11  can't -- maybe less than a year. You know, I can't
12  give you specific -- I can tell you I was in 19 for
13  maybe less than a year. And then I went to the
14  Targeted Response Unit.
15     Q    And how long were you with the Targeted
16  Response Unit?
17     A    So more like, give you -- 2004 -- give me a
18  second, I'm sorry, Counsel.
19     Q    No problem.
20     A    I'm trying to give you the most accurate,
21  so --
22              MS. STALF:   Just so you know, don't think out
23  loud, because the court reporter will struggle to try
24  to take that down, so --

28

1              THE WITNESS:   I believe I left there in 2008.
2  So that make -- December -- 2003 --
3              MS. STALF:   You are doing it again.
4              THE WITNESS:   Under five years -- close to.
5  Somewhere, four and a half years, somewhere close
6  there.
7  BY MS. SAMUELS:
8      Q    So, roughly, until 2008 some time?
9      A    Correct.
10     Q    Okay. And then after the Targeted Response
11  Unit, where did you go?
12     A    To the 20th District.
13     Q    And how long were you with the 20th District?
14     A    From, I believe, summer of 2008 until October
15  of 2010.
16     Q    And what is a Targeted Response Unit?
17     A    It was -- basically, we were sent to areas
18  where there were spikes in crimes to backup the Patrol
19  Division, just give them extra support.
20     Q    And then I believe in 2000 --
21     A    I'm sorry. We were sent to specific
22  locations to help out districts.
23     Q    Okay. Was that in -- was that sort of like
24  what you were doing for Special Ops?

29

1    A    It's similar in that aspect and different in
2  others.
3    Q    Okay.  Can you explain how it was different?
4    A    Well, I don't believe we rotated.  And we --
5  our deployments were a little more confined.  So I
6  believe it was straight nights.  That's like one of the
7  differences.
8         And then -- for them, you know, a lot of
9  the same functions.  It was more data driven where they
10  would deploy us.
11    Q    Okay.  And then in 2010 you're promoted to
12  Lieutenant.
13    A    Correct.
14    Q    And where -- what area were you the
15  Lieutenant over?
16         MS. STALF:   Objection. Form. Foundation.
17         THE WITNESS:   The 19th District.  I went back
18  to the 19th District.
19  BY MS. SAMUELS:
20    Q    Okay.  And how long were you a Lieutenant in
21  the 19th District?
22    A    It's kind of a complicated question.
23    Q    All right.
24    A    If you want me to -- I was in the 19th

30

1  District.  I'd have to estimate for -- oh, several
2  months -- maybe close to a year.  And then they started
3  merging districts.
4         So the 23rd District, which parallels
5  northern and southern borders of the 19th District,
6  they combined those two districts.  And when they did
7  that, I was sent to the 8th District.  That's where I
8  was -- I was sent there.
9         And I was in the 8th District for close
10  to a year.  And then I was able to go back to the 19th
11  District after somebody had retired or something.  I
12  don't recall specifically, but I was able to go back
13  there.
14         And I ended up staying in 19th until --
15  I guessing around 2014.
16         Does that help?
17    Q    Yes, that was perfect.
18         Sorry.  I'm trying my best not to cough
19  in everybody's ears.  I apologize.
20         What -- sort of like how you explained
21  what a Sergeant does, can you explain what a Lieutenant
22  does?
23    A    Well, basically -- if -- I mean, just in
24  general, you are responsible for all the stuff a

31

1  Sergeant does, because you are a Supervisor now for
2  Sergeants.
3         And you are what they would call a -- at
4  the time, I don't think they use the phrase anymore --
5  a Watch Commander.
6         So you would be, like -- the next line
7  in supervision after a Sergeant.  So you would actually
8  go to role call and disseminate information.  And you
9  wouldn't be in charge of the Watch.
10         At the time I was a Lieutenant, they had
11  Captains on the Watch.  So, basically, it would be a
12  Captain.  And you would be -- you would fill in for him
13  on his days off, basically.  You would assume his role.
14         But you would go to role call.  You
15  would, you know, speak with the Commander.  You
16  would -- you know, analyze crime problems with the
17  Command Staff at a district level.
18         You would approve arrest reports, things
19  such as you were in charge of, you would have to go
20  into the lockup during your tour.
21         And as a Watch Commander, you were
22  responsible for the physical location of the police
23  station also.
24    Q    Okay.

32

1    A    It's very general, pretty much what...
2    Q    Oh, and you did -- so your experience with
3  the 19th District was essentially from 2010 to 2014
4  with a break when you went to that 8th District,
5  correct?
6    A    Correct.
7    Q    Then from 2014, where was your next
8  assignment?
9    A    I -- I went to Gang Enforcement.
10    Q    And so were you the Lieutenant in charge of
11  Gang Enforcement?
12    A    For Area North, correct.
13    Q    And what districts comprised of Area North at
14  that time?
15    A    Yeah, because they just changed them
16  recently.  Fifteen -- every -- it's -- it's a bunch of
17  districts.  So it was basically a third of the City,
18  15, 25, 16, 17, 19, 20, 24.  I think I got all of them.
19    Q    And earlier you sort of described what your
20  responsibilities were as Lieutenant sort of in -- for
21  the 19th District.  Was it generally the same for the
22  Lieutenant for Area North Gang Enforcement?
23    A    Yes, much of it -- very much the same.
24    Q    I'm sorry.  Was there anything particular

WALKER vs. CITY OF CHICAGO ET AL                                    JOHN RIORDAN

Case: 1:20-cv-07209 Document #: 160-50 Filed: 05/16/23 Page 10 of 34 PageID #:3531

                                                                    December 16, 2021

33

1   that stands out that was distinctly different as
2   Lieutenant in charge of Area North Gang Enforcement?
3        A      That we occasionally would get deployed,
4   which wouldn't happen in the district, not normally.
5   You had an emergency, maybe a District would get
6   deployed, but we would get deployed on occasion.
7        Q      And when you say deployed, I understand that
8   to mean sort of provide backups to other areas?
9        A      Correct. And I mean -- to give an example,
10  we would go to Puerto Rican Fest for the duration and
11  do traffic control and crowd control and stuff like
12  that. I mean --
13              Yes, so we were supplementing the
14  district when they had that festival. It's just -- you
15  know, when you say example, we were out there.
16       Q      And how long were you with Area North Gang
17  Enforcement?
18       A      Estimate, a little more than -- maybe two
19  years -- two and a half years.
20       Q      So some time around 2016; would you say?
21  2016, --
22       A      Yeah.
23       Q      2017?
24       A      2016.

34

1        Q      And what was your next assignment after that?
2        A      Oh, I was promoted to Captain. Or I should
3   say appointed to Captain. And I was at the 20th
4   District.
5        Q      What were your responsibilities as a Captain?
6        A      Basically, to support the Commander, so --
7   and -- I worked the opposite hours of a District
8   Commander. So, basically, to ensure that his policies
9   were in effect -- to give more supervisions to the
10  Watches.
11       Q      All right. When you are that high up, do you
12  still have to look over paperwork?
13              MS. STALF:  Objection. Form. Foundation.
14              MS. ADEEYO:  Join.
15              THE WITNESS:  Could you repeat that? I'm
16  sorry. Counsel, I caught some of it, not all of it.
17  BY MS. SAMUELS:
18       Q      No, I said when you are that high of a rank,
19  do you still have to look over paperwork?
20       A      In what aspect? I mean, there's reports I
21  have to do.
22       Q      So I guess, like, the reports that patrolmen
23  or, like -- I think you said, like, as Sergeant, you
24  have to look over their reports, make sure they

35

1   completed it.
2              And as Lieutenant, made sure that the
3   Sergeant was -- like their stuff was correct, I guess.
4   Are you still doing that as a Captain, or is it more
5   like --
6        A      It's a little bit --
7              MS. STALF:  Wait. Hold on. Objection.
8              I don't think that Counsel is done
9   asking her question, first of all.
10             Were you finished, Jeanette?
11             MS. SAMUELS:  My vague hand gesture over here
12  was like, was it more like higher level stuff.
13  (Indication.)
14             MS. STALF:  My objection is form, foundation
15  assumes facts not in evidence.
16             Go ahead.
17             MS. ADEEYO:  Join.
18             THE WITNESS:  So I see, basically, every
19  time -- kind of a rule of thumb -- every time you get
20  promoted you have the duties you had before plus
21  the -- plus new responsibility.
22             So I would do reports. I wouldn't
23  review individual reports, like a Sergeant. A Sergeant
24  would review individual reports and approve them.

36

1   BY MS. SAMUELS:
2        Q      Uh-huh.
3        A      I did not do that, no.
4        Q      And then how long were you with the 20th
5   District as a Captain?
6        A      About four years -- four or more.
7        Q      Did you retire from the 20th District as a
8   Captain?
9        A      Yes.
10       Q      Do you have an independent recollection of
11  your role in the investigation into the murder of Merak
12  Majdak?
13       A      Do I have a -- can you repeat that one more
14  time? I'm sorry.
15       Q      Yes. Do you have an independent recollection
16  of your role into the murder of Merak Majdak -- of your
17  role in the investigation into the murder of Merak
18  Majdak?
19       A      I don't know what you're asking me. I mean,
20  could you be more specific? I --
21       Q      Sure. So you understand that, essentially,
22  Merak Majdak was murdered on May 13, 2000, correct?
23       A      Correct.
24       Q      Do you remember helping with that

37

```
1    investigation at all?
2         A    I mean, I recall some of it, yes.
3         Q    What do you recall doing to help with that
4    investigation?
5         A    I was involved in the arrest of Jovanie Long.
6         Q    And what do you recall doing?
7              MS. STALF:   Objection. Form.
8              THE WITNESS:   I mean, could you be more
9    specific?
10   BY MS. SAMUELS:
11        Q    So just to sort of show -- tell you where my
12   point of view is coming from as I'm asking these
13   questions: I understand that there is, like, reams of
14   paperwork about this, that may have helped you recall
15   some things or that may tell you certain things
16   happened on certain dates. Right.
17             All I want to know is, are there some
18   things that you are, like, I literally remember doing
19   this, as opposed to seeing it on a piece of paper?
20   Does that make sense?
21        A    Yes and no, because it's difficult --
22             You know, as I sit here today it was 20
23   something years ago. And I have reviewed some of my
24   reports, so -- I mean, I was there when Jovanie came
```

38

```
1    in. I mean, I interviewed him with another Detective.
2    And he was charged with murder. I mean --
3         Q    And I guess -- so when you say, "I
4    interviewed him with another Detective," do you
5    remember, like, sitting in the room with him and
6    interviewing him?
7         A    Vaguely, yes.
8         Q    Okay. All right. So granted, this is 20
9    years ago, but there's some parts of that interview
10   that you remember occurring; is that fair to say?
11        A    You know, it's just a vague general memory,
12   yes.
13        Q    Okay. And is that sort of the same when you
14   say you remember the arrest of Jovanie Long?
15             MS. STALF:   Object to the form.
16             MS. ADEEYO:   Join.
17             THE WITNESS:   I mean, I remember he turned
18   himself in, I believe, with his mother and a reverend.
19   But I mean, I don't recall freely the specifics, you
20   know.
21   BY MS. SAMUELS:
22        Q    So besides the fact that Jovanie turned
23   himself in with his reverend and his mother, do you
24   recall anything else about that process?
```

39

```
1         A    What process? I mean, mane could you be more
2    specific?
3         Q    Sure. So how about this: Do you recall
4    where Jovanie turned himself in?
5         A    Yes.
6         Q    All right. Where?
7         A    At Area 4.
8         Q    All right. And do you recall where you were
9    at the time that you learned Jovanie was at Area 4?
10        A    I was at Area 4.
11        Q    Do you recall how you were notified that
12   Jovanie was at Area 4?
13        A    I don't recall the specifics. I know it's in
14   a report.
15        Q    You just know somewhere you were informed
16   that Jovanie was at Area 4; is that fair to say?
17        A    That's fair to say.
18        Q    Okay. And do you recall what you did after
19   learning that Jovanie was at Area 4?
20        A    Some of it. Not a lot of it. Not the -- you
21   know, line by line; just a general memory. But
22   there's -- again, some of that's documented in the
23   reports I reviewed.
24        Q    And so what do you recall doing after
```

40

```
1    learning that Jovanie was at Area 4?
2              MS. ADEEYO:   Objection. Asked and answered.
3              THE WITNESS:   I'd like to view my report to
4    refresh my memory if that's possible.
5    BY MS. SAMUELS:
6         Q    Right. So we're going to go through all the
7    reports. And I'm sure by the time we are done with
8    them you are going to be a little bit mad at me because
9    there's so many of them.
10             But at this point, I just want to get
11   what you remember. And so if you don't recall, that's
12   fine, just say, "I don't recall." All I'm trying to
13   get at is what you actually do remember.
14        A    I understand. And I mean, I would feel more
15   comfortable reviewing my report.
16        Q    So -- right.
17        A    If you want to ask me something specific,
18   I'll try to answer it, so --
19        Q    Right. So my question is: After you learned
20   that Jovanie had turned himself in, what's the next
21   thing you recall doing?
22             MS. STALF:   Objection. Form. Foundation.
23             THE WITNESS:   Bringing him to an interview
24   room.
```

41

1    BY MS. SAMUELS:
2         Q    Were you alone with Jovanie at this time?
3              MS. ADEEYO:   Objection. Form.
4              THE WITNESS:   I -- I can't specifically
5    recall.
6    BY MS. SAMUELS:
7         Q    Do you recall where the interview room was?
8         A    It was in Area 4.  I -- I'm...
9         Q    Do you recall any more specifically where
10   that interview room was located in Area 4?
11        A    No.  Sorry.
12        Q    Okay.  When Jovanie was brought to the
13   interview room, was he handcuffed?
14        A    I don't -- I don't recall something that
15   specific.
16        Q    At the time that he is brought to the
17   interview room, is he under arrest?
18             MS. STALF:   Objection. Form. Foundation.
19             MS. ADEEYO:   Join.
20             THE WITNESS:   I specifically don't recall.  I
21   believe it was probable cause to arrest him, but I
22   don't know if he was placed immediately under arrest.
23   I can't recall that.
24   BY MS. SAMUELS:

42

1         Q    Do you recall what furniture was in the
2    interview room?
3         A    No, Counsel.  I'm sorry.
4         Q    Okay.  So after Jovanie is placed in the
5    interview room, what's the next thing you recall?
6              MS. STALF:   Objection. Form. Foundation.
7              THE WITNESS:   Again, when I was notified -- I
8    mean -- I didn't specifically recall this, but it is
9    indicated in my reports that I reviewed.
10   BY MS. SAMUELS:
11        Q    Go ahead.
12             MS. STALF:   Were you done with your answer?
13             THE WITNESS:   Pardon me?
14             MS. STALF:   Were you done with your answer?
15             THE WITNESS:   Yes.  Is that -- do you have
16   another question?  I'm sorry, Counsel.
17   BY MS. SAMUELS:
18        Q    So when you said, I didn't specifically
19   recall this, but it's in my reports, what were you
20   referring to?
21        A    You are asking me questions about things that
22   I documented or testified to.  But you are asking me
23   about my general recollection, which I don't want to
24   make any mistakes.  I want to be accurate.

43

1              There's things I don't recall, that I
2    don't want to make a statement that I may be later, you
3    know, misstating something; you understand?  I'm sorry.
4         Q    Right.  No, I completely get all that.  And
5    so when you say you brought Jovanie to the interview
6    room, is that something you read in a report, or
7    something you remember?
8         A    Perhaps a little of both.
9         Q    Okay.  After you brought Jovanie to the
10   interview room, what is the next thing you recall about
11   your interactions with him?
12        A    I believe we Mirandized him.  I believe I
13   did.
14        Q    Was somebody with you at the time; do you
15   recall?
16        A    I don't recall, specifically, something like
17   that that's, you know.  I would have a better idea if I
18   could, you know, refresh my memory.
19        Q    And then after mirandizing him, what's the
20   next thing you recall occurring?
21             MS. STALF:   Objection. Form. Foundation.
22             THE WITNESS:   Are you asking me, in general,
23   or -- we spoke with him?
24   BY MS. SAMUELS:

44

1         Q    Okay.  When you say "we," who are you
2    referring to?
3         A    Detective Pietryla.
4         Q    Do you recall where you were when you spoke
5    with him?
6         A    With -- with -- with who?  Pietryla or -- I'm
7    sorry.  I'm confused.
8         Q    Right.  You said "we spoke with him," which
9    I'm inferring to mean you and Detective Pietryla are
10   speaking with Jovanie long, correct?
11        A    Right.
12        Q    Do you recall where these conversations took
13   -- where this conversation took place?
14             MS. STALF:   Objection. Form. Foundation.
15             THE WITNESS:   I believe in an interview room.
16   BY MS. SAMUELS:
17        Q    Do you recall, with specificity, anything
18   Jovanie Long said?
19        A    At this point -- I mean, at this day and age,
20   no.  I know that's indicated in the reports.
21        Q    Do you recall, generally, anything that
22   Jovanie Long said?
23        A    Are you talking about throughout the whole
24   interview process, or just -- I mean, could you please

WALKER vs. CITY OF CHICAGO, ET AL.                JOHN RIORDAN                                    December 16, 2021

Case: 1:20-cv-07209 Document #: 160-50 Filed: 05/16/23 Page 13 of 34 PageID #:3534

45

1 be more specific or --
2     Q    Right.  So -- from my recollection, you
3 testified that the next thing you remember doing after
4 mirandizing him, is you and Detective Pietryla are
5 speaking to him.  And so that's what I'm referring to.
6         And so during this time, when you and
7 Detective Pietryla are speaking with Jovanie Long, do
8 you generally recall anything that he's telling you?
9     A    Not -- generally, no.  At that time, no.  I
10 mean, are you talking about when we first interviewed
11 him?  I mean, that's -- I'm sorry.
12     Q    Right.  Yes, sir.
13     A    I'm mean, I'm kind of confused.  I mean,
14 that's --
15     Q    So do you recall interviewing Jovanie Long
16 more than once?
17     A    I would have to say yes.
18     Q    How many times do you recall interviewing
19 Jovanie Long?
20     A    I don't recall a specific number.
21     Q    But whatever --
22     A    Can I clarify?
23     Q    Yes.
24     A    I mean, what I'm calling interviewed more

46

1 than once is if -- and this is general -- if I spoke to
2 him and left the room, or we spoke to him together and
3 left the room, or whatever scenario.
4         I mean, that is -- is what you are
5 getting at, that each time I spoke with him, or myself
6 and Detective Pietryla spoke with him and left?  That
7 would conclude -- that's why I would prefer to look at
8 my reports, because if I would give you --
9         I need better understanding, so --
10     Q    Sure.  So -- thank you for clarifying.
11         When you -- would you consider an
12 interview concluded at the time that you leave the room
13 after you are done talking with a suspect?
14         MS. STALF:   Objection.  Form.  Foundation.
15         MS. ADEEYO:   Join.
16         THE WITNESS:   It depends.  It depends.
17 BY MS. SAMUELS:
18     Q    And what are some factors that would help
19 determine that?
20     A    Probably my reports.  I can't recall, you
21 know, the minutia of things like that.  I mean, my
22 help -- my reports would help me, but --
23     Q    Right.  So right now, I'm talking about
24 your -- sort of your general practice as a Detective,

47

1 right.  So say you're questioning somebody over a
2 period of 10 hours.  Right.
3         Would you consider the 10 hours, in and
4 of itself to just be one long interview, or would you
5 say I questioned him for an hour and then we took a
6 break and then we came back a couple hours later, so
7 that's two interviews?
8         MS. STALF:   Objection.  Form.  Foundation.
9 Incomplete hypothetical.
10         THE WITNESS:   So you are asking me what my --
11 I believe a general policy is, not specific to this
12 case, but just a general --
13 BY MS. SAMUELS:
14     Q    Right.
15     A    I wouldn't say, necessarily, every time you'd
16 leave the room, or if you took them for a bathroom
17 break or something, that you would consider an
18 interview concluded.
19         I mean, it's -- you know, it would be
20 easier just to say that it's every time you are out the
21 room.  I mean, I don't recall specifically.  General
22 practice, it would be when your left the room, or your
23 conversation is concluded about a topic.
24     Q    Okay.

48

1     A    Plus, also, if you had to -- if I had to go
2 to another location, or if I had other
3 responsibilities, if I spoke with, you know, a
4 Defendant in general.
5         And maybe I had to go do some other duty
6 and not be there or whatever, I would -- I would
7 consider that, you know, the interview was concluded
8 while I did another task, yes, something in general
9 like that.
10     Q    Okay.  And while we are on the topic, what --
11 you said prior to -- prior to become to sort of joining
12 the Detective -- joining them, you received additional
13 training on some topics, correct?
14         MS. ADEEYO:   Objection.  Form.
15         THE WITNESS:   Correct.
16         MS. STALF:   Join.
17 BY MS. SAMUELS:
18     Q    One of them was interrogations?
19     A    Interviews.  Is what it was called, I
20 believe.  I'm not 100 percent certain.  But, yes, I
21 believe.
22     Q    All right.  Just so I know, is there -- is an
23 interview synonymous with interrogation, or are those
24 two different things?

49

1          MS. STALF:   Objection. Form. Foundation.
2          MS. ADEEYO:   Join.
3          THE WITNESS:   An interview was more general,
4   casual. An interrogation is more specific. So if
5   somebody is in custody, that would be an interrogation.
6   BY MS. SAMUELS:
7      Q    Is the training on how to conduct an
8   interrogation different from how you would conduct an
9   interview?
10         MS. STALF:   Objection. Form. Foundation.
11         MS. ADEEYO:   Join.
12         THE WITNESS:   I can't answer to specific
13  training or -- general -- I mean, I understand there's
14  a difference. I don't recall what I was trained in,
15  you know, 20 something years ago, specifically.
16  BY MS. SAMUELS:
17     Q    When you are conducting an -- when you are
18  conducting -- I'm sorry.
19         When you are conducting an interview,
20  was it your general practice to take notes during the
21  interview?
22         MS. STALF:   Objection. Form. Foundation.
23  Vague as to timeframe.
24         MS. ADEEYO:   Join.

50

1          THE WITNESS:   It depends on the circumstance.
2   BY MS. SAMUELS:
3      Q    And what circumstances might factor into
4   whether or not you take notes?
5          MS. STALF:   Same objection.
6          THE WITNESS:   Well, I mean, there is -- it's
7   a pretty broad -- you want a few examples, or something
8   like that? I mean, mane if it's something pretty clear
9   cut and you were going to document it on the case
10  report, and it's a short timeframe, maybe you wouldn't
11  take notes. Depending on what you are doing. You
12  know, if you are speaking, your partner may take notes.
13  And those or general practices, not something specific
14  to the Walker or Long case. But, I mean -- so, I mean,
15  there's a variety of -- I could sit here and try to
16  recall -- those are just a couple simple ones right off
17  the top of my head.
18         MS. STALF:   Jeanette, sorry to interrupt, but
19  when it's a good time to take a quick comfort break,
20  can you let us know?
21         MS. SAMUELS:   We can take one now.
22         MS. STALF:   We can go off for five minutes.
23            (WHEREUPON, off the record.)
24         MS. SAMUELS:   Mr. Graham and Ms. Brill, are

51

1   you guys here? Not -- Mr. Miller, excuse me.
2          MR. MILLER:   Yeah, I'm here.
3          MS. SAMUELS:   Ms. Brill?
4          MR. OBERT:   We can start.
5          MS. SAMUELS:   Back on the record.
6          MS. STALF:   Sorry. Before we get started,
7   Madam Court Reporter, can we get a meeting password?
8   We have another individual who is trying to join the
9   deposition.
10         MS. SAMUELS:   Just send them the link.
11            Off the record.
12            (WHEREUPON, off the record.)
13         MS. SAMUELS:   So back on the record.
14  BY MS. SAMUELS:
15     Q    Captain Riordan, did you have a chance to
16  consult with your attorney over that break?
17         MS. STALF:   I'm just going to object to the
18  form of the question to the extent it calls for
19  attorney/client communication.
20            But you can answer -- if you can answer
21  the question without revealing attorney/client
22  communication, you can answer it.
23         THE WITNESS:   Will you please repeat it? I'm
24  sorry.

52

1   BY MS. SAMUELS:
2      Q    Yes.
3          Did you have a chance to consult with
4   your attorney over the break?
5      A    Yes.
6      Q    Okay. When we left off, we were sort of
7   talking your general practice with regards to
8   interviews slash interrogatories; do you recall that?
9      A    Yes.
10     Q    Okay. And if I'm -- if my notes are close to
11  accurate, you said it sort of depends on whether or not
12  you would take notes during an interview or
13  interrogation.
14         And one of your examples were if you had
15  a partner, and you were speaking, then maybe your
16  partner would take notes, and not personally you.
17         Or also if it was a short timeframe from
18  the interview until the drafting of the case report
19  that you might not need to take notes; is that fairly
20  accurate?
21     A    Among other things, yes.
22     Q    Okay. When you are taking notes during an
23  interview, are there certain things you are supposed to
24  always record?

53

1          MS. STALF:   Objection. Form. Foundation.
2          MS. ADEEYO:   Join.
3          THE WITNESS:   Specifically, like I said, it
4    would depend on the individual.
5    BY MS. SAMUELS:
6       Q    Okay. So I'm going to list some things. You
7    tell me if that's generally something that's supposed
8    to be in a note you take for an interview slash
9    interrogation, okay?
10         MS. STALF:   Objection. Form. Foundation.
11   Incomplete hypothetical.
12         MS. ADEEYO:   Join.
13         THE WITNESS:   Am I -- could you repeat that?
14   I don't -- I'm sorry.
15   BY MS. SAMUELS:
16      Q    I'm justing going to start naming some
17   things, and I wanted you to tell me if that's something
18   that's supposed to be noted -- if something that you
19   are supposed to take note of when recording about an
20   interview or interrogation. Did that make sense?
21      A    What I would do or -- no, it kind of don't.
22      Q    We'll see if it makes more sense. So if
23   you're taking notes for an interview, would you always
24   put down the interviewee's name?

54

1          MS. STALF:   Objection. Form. Foundation.
2          THE WITNESS:   No.
3    BY MS. SAMUELS:
4       Q    Why wouldn't you note an interviewee's name?
5          MS. STALF:   Same objection.
6          MS. ADEEYO:   Join.
7          THE WITNESS:   It would depend on the subject
8    matter.
9    BY MS. SAMUELS:
10      Q    All right. So can you give me an example of
11   when you would interview someone but not record their
12   name?
13         MS. STALF:   Same objection.
14         THE WITNESS:   Answer?
15         You want example. I get a license
16   plate, and I want to record -- note the specific
17   numbers of it, but it --
18         I mean, notes are to assist your memory.
19   BY MS. SAMUELS:
20      Q    Right. So I'm specifically talking about
21   when you are interviewing --
22         So for these questions, I'm talking
23   about when you're interviewing or interrogating
24   someone. Right.

55

1       A    Correct.
2       Q    And you've made a decision so that this
3    interview interrogation, for whatever reason, requires
4    you to take notes. Okay.
5          And so is there a time when you are
6    taking notes about an interview or an interrogation of
7    a person when you would not note that person's name?
8          MS. STALF:   Objection. Form. Foundation.
9          THE WITNESS:   Is there -- yes.
10   BY MS. SAMUELS:
11      Q    And what's an example of a time when you are
12   interviewing or interrogating somebody, and you would
13   not memorialize that person's name?
14         MS. STALF:   Objection.
15         MS. ADEEYO:   Join --
16         I'll just put it on the record for ease
17   for the court reporter, I will, as attorney for
18   Defendant, City of Chicago, join all objections made by
19   Counsel for Defendant officers.
20         MS. SAMUELS:   And then while we are pending,
21   I just let in, I believe it's one of the Defendants.
22   But who is this for the record?
23         MS. STALF:   Whomever just joined via phone,
24   could you please identify yourself for the record? You

56

1    will have to unmute yourself to do so.
2          MR. PIETRYLA:   Mike Pietryla.
3          MS. SAMUELS:   Okay.
4          MS. STALF:   Thank you, Mike. You can go
5    ahead and mute yourself again.
6          MR. PIETRYLA:   Okay.
7    BY MS. SAMUELS:
8       Q    I think where we left off, if you were given
9    an example of when, you would not memorialize an
10   interviewee or, I guess, interrogationee's name -- I
11   don't think that's a word, but I tried it.
12      A    Could you be more specific? Memorialize is?
13      Q    To write down a report, somewhere their name.
14      A    I'm sorry. I'm kind of lost in your
15   question. Could you repeat the question again?
16      Q    Sure. When you are taking notes over an
17   interview or an interrogation that's occurring, I asked
18   whether you would always record somebody's name. And
19   your response was no.
20         And so I asked for an example of a time
21   when you would interview or interrogate someone, but
22   you wouldn't write down that person's name.
23         MS. STALF:   Objection just to the extent that
24   the question changed. But if it's a new question,

57

1  sustained to the question as it was stated.
2         THE WITNESS:   I may not spell out their name.
3  I may put an abbreviation, so I would remember who
4  said --
5         If I'm speaking to one individual, is an
6  example.
7  BY MS. SAMUELS:
8     Q     Okay.  So instead of writing out a full name,
9  you might use an initial or some other descriptor to
10  indicate who you are speaking to?
11    A     On some occasions, yes.
12    Q     Okay.  Is there ever an occasion when you are
13  taking notes regarding an interview or an interrogation
14  where you would not indicate anywhere who are
15  speaking to?
16         MS. STALF:   Objection.  Form.  Foundation.
17         THE WITNESS:   I'm sure there's times, yes.
18  BY MS. SAMUELS:
19    Q     Okay.  And can you give me an example of when
20  it would be appropriate to take notes regarding an
21  interview or an interrogation and not memorialize who
22  is providing you with that information?
23         MS. STALF:   Objection.  Form.  Foundation.
24         THE WITNESS:   Any time.  It's -- the notes

58

1  are to assist.  So -- I mean, any time.  If it's a
2  simple subject matter...
3  BY MS. SAMUELS:
4     Q     So would it be fair to train -- would it be
5  fair to state that pursuant to your training, as a
6  Detective, whether or not to indicate the subject -- a
7  subject's name was left to the discretion of the
8  interviewer?
9         MS. STALF:   Objection.  Form.  Foundation.
10         THE WITNESS:   Can you repeat that?  I'm
11  sorry.
12  BY MS. SAMUELS:
13    Q     Basically, what I'm trying to get at is:  You
14  were trained as a Detective on how to interview
15  suspects and take notes and write reports and all that
16  stuff, right?
17    A     Correct.
18    Q     And you're saying, sometimes we don't write
19  down a person's name or we don't indicate it anywhere
20  in our notes, correct?
21         MS. STALF:   Objection.  Form.  Foundation.
22  Mischaracterizes the witness' prior testimony.
23         THE WITNESS:   On a note, you may not put
24  somebody's name; that's correct.

59

1  BY MS. SAMUELS:
2     Q     Right.  And what I'm getting at is, pursuant
3  to your training, that's okay because that's how you
4  were trained to do it, correct?
5         MS. STALF:   Objection.  Form.  Foundation.
6         THE WITNESS:   I don't remember any specific
7  training regarding notes.
8  BY MS. SAMUELS:
9     Q     Okay.  Were you trained on how to memorialize
10  a witness' statement?
11         MS. STALF:   Objection.  Form.  Foundation.
12         THE WITNESS:   I don't recall.
13  BY MS. SAMUELS:
14    Q     And when you take notes from talking with a
15  witness, you -- I believe you said earlier, but I just
16  want to make sure I'm not making this up.
17         When you take notes from talking with a
18  witness, those go on general progress reports, correct?
19    A     That's what a general progress report is, is
20  for notes.  But that's not the only form you could
21  document information on.
22    Q     Okay.  What are other forms you would use to
23  document a statement a witness is giving to you?
24         MS. STALF:   Objection to form --

60

1         MS. ADEEYO:   Objection.  Form.  Foundation.
2  Sorry.  My apologies, Krista.
3         Go ahead.
4         THE WITNESS:   For notes, I generally used
5  GPRs.
6  BY MS. SAMUELS:
7     Q     Okay.  Are there other forms that you
8  would use to document the statement?
9         MS. STALF:   Objection.  Form.  Foundation.
10         THE WITNESS:   It depends on the
11  circumstances.
12  BY MS. SAMUELS:
13    Q     Can you identify the form?  And then we'll go
14  through and we'll talk about what circumstances we'll
15  use those for.
16    A     It's a very broad topic.  It could be
17  anything I could write on that's relevant to the case,
18  or it would have -- you know, basically, anything I
19  could write on, Counsel.
20    Q     Sure.  Are there any specific forms that
21  you're supposed to use to document the statement that's
22  given by a witness?
23    A     There's -- there's a few forms, yes.
24    Q     What are they?

61

1     A    Well, normally, a general progress report and
2  your case report and supplemental case reports.
3     Q    And case reports and supplemental case
4  reports are typed, correct?
5         MS. STALF:   Objection. Form. Foundation.
6         THE WITNESS:   For the most part, yes. They
7  can be handwritten also, but not in this -- what do I
8  want to say.
9              There are versions of the supplemental
10  and case report that could be handwritten.
11  BY MS. SAMUELS:
12     Q    Right.  Besides a GPR case report and a
13  supplemental case report, are there any other specific
14  forms that you are aware of that would be used to
15  document a statement given by a witness?
16         MS. STALF:   Objection. Form. Foundation.
17         THE WITNESS:   No.
18  BY MS. SAMUELS:
19     Q    Okay.  When you are talking with a witness,
20  are there times when you're not -- are you always
21  supposed to put that witness' address?
22         MS. STALF:   Objection. Form. Foundation.
23         THE WITNESS:   When you -- if they will give
24  it to you.

62

1  BY MS. SAMUELS:
2     Q    What about when you're speaking with a
3  witness, are you supposed to document that witness'
4  phone number?
5         MS. STALF:   Objection. Form. Foundation.
6         THE WITNESS:   Yes.
7  BY MS. SAMUELS:
8     Q    When you are talking with a witness, are you
9  supposed to take down a date of birth?
10         MS. STALF:   Objection. Form. Foundation.
11         THE WITNESS:   Again, if they will provide it,
12  yes.
13  BY MS. SAMUELS:
14     Q    When you are spoking with the witness, are
15  you supposed to take down any employment history?
16         MS. STALF:   Objection. Form. Foundation.
17         THE WITNESS:   Again, if they will provide it,
18  yes.
19  BY MS. SAMUELS:
20     Q    When you are talking with the witness, are
21  you supposed to document where this discussion is
22  taking place?
23         MS. STALF:   Same objection.
24         THE WITNESS:   I would say that's fair, yes.

63

1  BY MS. SAMUELS:
2     Q    When you're talking with a witness, are you
3  supposed to document when the discussion is taking
4  place?
5         MS. STALF:   Same objection.
6         THE WITNESS:   Yes.
7  BY MS. SAMUELS:
8     Q    Okay.  And then -- again, I believe we
9  touched on this briefly.  But I just want to make sure
10  I didn't miss it.
11            Were you ever trained, specifically, on
12  how to conduct an interview or an interrogation?
13     A    Yes, but I don't recall when.
14     Q    Okay.  Were you ever trained on how to make
15  sure an interview or interrogation doesn't become
16  coercive?
17         MS. STALF:   Objection. Form. Foundation.
18         THE WITNESS:   I don't remember specifically.
19  BY MS. SAMUELS:
20     Q    All right.  Do you get what I'm referring to
21  when I say "a course in interrogation"?
22     A    A course of interrogation?
23     Q    Yeah.
24     A    Could you repeat that?  I'm sorry.  One more

64

1  time.
2     Q    I just wanted to make sure you knew what I
3  meant when I said "course of interrogation."
4     A    Could you explain?  I'm sorry.
5     Q    So were you ever trained that there were
6  certain techniques or tactics that shouldn't be used
7  because it might lead to a witness just saying
8  something because they were in fear and not necessarily
9  because they wanted to freely give that information?
10         MS. STALF:   Objection. Form. Foundation.
11         THE WITNESS:   I don't recall.  I know I had
12  training.  I don't recall specifics of that training.
13  BY MS. SAMUELS:
14     Q    All right.  Were you ever trained on
15  polygraph examinations?
16         MS. STALF:   Objection. Form. Foundation.
17         THE WITNESS:   No.
18  BY MS. SAMUELS:
19     Q    All right.  Were you ever given any
20  instruction on when it's appropriate to request a
21  polygraph examination?
22         MS. ADEEYO:   Objection. Form. Foundation.
23         MS. STALF:   Join.
24         THE WITNESS:   No.

65

1  BY MS. SAMUELS:
2      Q     In your experience, as a Police Officer, did
3  you ever develop a general practice with regard to when
4  to request a polygraph examination?
5          MS. STALF:   Objection. Form. Foundation.
6          THE WITNESS:   I'm sorry. Could you
7  repeat that one? I missed like one or two words there.
8  BY MS. SAMUELS:
9      Q     I gotcha.
10          In your experience as a Police Officer,
11  did you ever develop a general practice with regard to
12  requesting a polygraph examination?
13      A     No.
14      Q     So if somebody requested a polygraph
15  examination, would you always request one?
16          MS. STALF:   Objection. Form. Foundation.
17          THE WITNESS:   Probably yes.
18  BY MS. SAMUELS:
19      Q     Okay. Were there ever times where you
20  independently believed that a polygraph
21  investigation -- excuse me -- that a polygraph test
22  would further an investigation?
23          MS. STALF:   Objection. Form. Foundation.
24          THE WITNESS:   Yes.

66

1  BY MS. SAMUELS:
2      Q     What were some factors that would lead you to
3  believe that a polygraph would help further an
4  investigation?
5          MS. ADEEYO:   Objection. Form. Foundation.
6          THE WITNESS:   Could you repeat that one
7  more --
8  BY MS. SAMUELS:
9      Q     Sure. So what were some factors you might
10  look to that would lead you to believe that a polygraph
11  would help further an investigation?
12      A     When there's an impasse and the subject would
13  request to prove his innocence or to prove himself
14  being trustworthy.
15      Q     Did you have a general practice that you
16  developed over your years as a Police Officer to help
17  identify when an interview or interrogation might be
18  coming coercive?
19          MS. STALF:   Objection. Form. Foundation.
20  Incomplete hypothetical.
21          THE WITNESS:   I'm sorry -- I'm really sorry.
22  Can you repeat that?
23  BY MS. SAMUELS:
24      Q     Sure. Did you have a general practice you

67

1  developed over the years as a Police Officer to help
2  you identify when an interview or an interrogation
3  might be coming coercive?
4      A     Not that I recall.
5      Q     Have you ever worked with confidential
6  informants during your time as a Police Officer?
7      A     I can't recall specifically.
8      Q     Did you ever receive any training or guidance
9  on how to work with confidential informants?
10          MS. STALF:   Objection. Form. Foundation.
11          THE WITNESS:   I believe so, yes.
12  BY MS. SAMUELS:
13      Q     Okay. Was there a procedure for -- I
14  don't -- was there a procedure for maintaining a
15  confidential informant?
16          MS. STALF:   Objection. Form. Foundation.
17          THE WITNESS:    There are some general
18  procedures, but I don't recall them offhand.
19  BY MS. SAMUELS:
20      Q     Can you relay the ones that you do recall?
21          MS. STALF:   Objection. Form. Foundation.
22          THE WITNESS:   Not really, no.
23  BY MS. SAMUELS:
24      Q     So as you sit here today, you don't recall

68

1  any procedures that would have to do with a
2  confidential informant?
3          MS. STALF:   Objection. Form. Foundation.
4          THE WITNESS:   I know it depends -- I mean --
5          For, like, search warrants, things like
6  that, there are some guidelines. I recall those.
7  BY MS. SAMUELS:
8      Q     Can you re -- I was doing so good.
9      A     But I wouldn't call that all-encompassing.
10      Q     Okay. Can you describe what you recall for
11  how to deal with confidential informants?
12          MS. STALF:   Objection. Form. Foundation.
13  Asked and answered.
14          THE WITNESS:   For search warrants, there
15  was -- I recall a specific guideline for confidential
16  informants.
17  BY MS. SAMUELS:
18      Q     Can you describe what you recall about that
19  guideline?
20      A     Basically, that you had to have at least
21  three prior dealings with the subject and that he had
22  to provide credible evidence prior to you using him as
23  an affiant on a search warrant.
24      Q     If you wanted to make somebody a confidential

WALKER vs. CITY OF CHICAGO, ET AL.    JOHN RIORDAN    December 16, 2021

Case: 1:20-cv-07209 Document #: 160-50 Filed: 05/16/23 Page 19 of 34 PageID #:3546

69

```
 1    informant, do you have to give any approval?
 2          MS. STALF:   Objection. Form. Foundation.
 3          THE WITNESS:   I don't believe so.
 4    BY MS. SAMUELS:
 5       Q    If you wanted to make somebody a confidential
 6    informant, is there any way you have to record that
 7    informant's personal information?
 8          MS. STALF:   Objection. Form. Foundation.
 9          THE WITNESS:   Not that I recall.
10    BY MS. SAMUELS:
11       Q    So if, for instance, I'm reading a report and
12    it says, "Confidential Informant," naming X, Y and Z,
13    is there a mechanism, that you are aware of, to go
14    back and check who -- the identity of that confidential
15    informant?
16          MS. STALF:   Objection. Form. Foundation.
17          THE WITNESS:   I don't believe so.
18    BY MS. SAMUELS:
19       Q    And I believe the -- one of the other things
20    you mentioned you were trained on to become a Detective
21    was preserving evidence; is that correct?
22       A    Correct.
23       Q    Okay. When you say 'preserving evidence," do
24    you mean, like, crime scene stuff, or am I barking up
```

70

```
 1    the wrong tree?
 2          MS. STALF:   Object to form.
 3          THE WITNESS:   You are correct.
 4    BY MS. SAMUELS:
 5       Q    Okay. And so, essentially, you are not
 6    trained, perhaps, as specifically as an evidence
 7    technician, but you are taught the basics of preserving
 8    a scene and evidence and things like that?
 9       A    Correct.
10          MS. ADEEYO:   Objection.
11          THE WITNESS:   Sorry.
12    BY MS. SAMUELS:
13       Q    Okay. As you sit here today, do you have an
14    independent recollection of anything Jovanie told you
15    during the course of your time questioning him?
16          MS. STALF:   Objection. Form. Foundation.
17          THE WITNESS:   Specific, no.
18    BY MS. SAMUELS:
19       Q    Okay. Do you recall, generally, anything he
20    said?
21          MS. STALF:   Same objection.
22          THE WITNESS:   Generally? That he shot the
23    guy.
24    BY MS. SAMUELS:
```

71

```
 1       Q    Okay. Do you recall how long you had been
 2    talking with Jovanie before he said that?
 3       A    No, I don't.
 4       Q    Okay. Is there an -- so I know -- well, I
 5    think I know. Let me ask you: When a person is taken
 6    into lock-up, is there a log that records the time that
 7    they are brought in?
 8       A    Yes.
 9       Q    Okay. When a person is brought in for an
10    interview, is there some sort of similar log that
11    indicates the time they are brought in?
12          MS. STALF:   Objection. Form. Foundation.
13          THE WITNESS:   Can you repeat that? I'm
14    sorry.
15    BY MS. SAMUELS:
16       Q    Yeah. When a person is brought in for an
17    interview, is there a similar sort of log that
18    indicates the time that they are brought in?
19          MS. STALF:   Objection. Form. Foundation.
20          THE WITNESS:   Not that I recall.
21    BY MS. SAMUELS:
22       Q    Okay. When a person has been brought in for
23    questioning for a while sometimes you will buy them
24    food; is that correct?
```

72

```
 1          MS. STALF:   Objection. Form. Foundation.
 2          THE WITNESS:   Yes.
 3    BY MS. SAMUELS:
 4       Q    All right. Where does the money come to
 5    buy -- to purchase their food?
 6          MS. STALF:   Same objection.
 7          THE WITNESS:   Some of it is in the area.
 8    Some of it, we buy ourselves.
 9    BY MS. SAMUELS:
10       Q    When you say yourself, you mean out of your
11    own pocket?
12       A    Correct. Correct, Counsel.
13       Q    All right. Is it always out of your own
14    pocket, or is there some other mechanism or method for
15    obtaining them food?
16          MS. STALF:   Objection. Form. Foundation.
17          THE WITNESS:   Probably primarily out of your
18    pocket.
19    BY MS. SAMUELS:
20       Q    Is there a mechanism or method to obtain
21    reimbursement for purchasing an interviewee or a
22    detainee food?
23          MS. STALF:   Objection. Form. Foundation.
24          THE WITNESS:   Not that I'm aware of.
```

73

1    BY MS. SAMUELS:
2        Q    Do you recall, specifically, anything that
3    you told Jovanie during the course of your interview
4    with him?
5            MS. ADEEYO:   Object to asked and answered.
6            THE WITNESS:   No, I'm sorry. I don't -- I
7    don't recall.
8    BY MS. SAMUELS:
9        Q    Do you recall, generally, anything you told
10    Jovanie during the course of your interview with him?
11           MS. ADEEYO:   Same objection.
12           THE WITNESS:   No, I don't.
13    BY MS. SAMUELS:
14        Q    Do you recall, with any specificity
15    anything -- I don't want to pronounce it wrong,
16    especially, if he -- is it Pietryla?
17           MS. STALF:   Pietryla.
18           THE WITNESS:   Pietryla.
19           MS. SAMUELS:   I'm sorry. Say that again.
20           THE WITNESS:   Pietryla.
21    BY MS. SAMUELS:
22        Q    Do you recall specifically anything Detective
23    Pietryla said during the course of the interview with
24    Jovanie?

74

1            MS. STALF:   Objection. Form. Foundation.
2            THE WITNESS:   No, I don't recall.
3    BY MS. SAMUELS:
4        Q    Do you recall specifically anything Detective
5    Pietryla said during the course of the interrogation?
6            MS. STALF:   Same objection.
7            THE WITNESS:   No, I don't. Sorry, Counsel.
8    BY MS. SAMUELS:
9        Q    Do you recall Jovanie's demeanor during the
10    course of the interrogation?
11           MS. STALF:   Same objection.
12           THE WITNESS:   I can't. I don't recall
13    anything unusual about it.
14    BY MS. SAMUELS:
15        Q    Do you recall anything about Jovanie's
16    physical condition?
17           MS. STALF:   Objection. Form. Foundation.
18           THE WITNESS:   Basically, again, nothing that
19    was unusual.
20    BY MS. SAMUELS:
21        Q    Do you recall what he was wearing?
22        A    No. Sorry.
23        Q    Do you recall whether you had to remove any
24    personal property from him before putting him in the

75

1    interview room?
2            MS. STALF:   Objection. Form. Foundation.
3            THE WITNESS:   No, I don't recall that.
4    BY MS. SAMUELS:
5        Q    Besides what you've already testified to, is
6    there anything else you specifically recall about any
7    of your interactions with Jovanie long?
8        A    Yes.
9        Q    All right. What is that?
10        A    He gave a videotaped statement.
11        Q    All right. And were you present for the
12    statement?
13        A    Yes.
14        Q    When is the last time you saw that video?
15           MS. STALF:   Objection. Form. Foundation.
16    Facts not in evidence.
17           THE WITNESS:   A long time -- I mean, I may
18    have viewed it in some court proceedings years ago.
19    I'm not 100 percent sure.
20    BY MS. SAMUELS:
21        Q    It's fair to say you haven't seen it within
22    the last decade?
23        A    Or more, correct.
24        Q    All right. Besides -- is there anything else

76

1    you specifically recall about your interactions with
2    Jovanie Long?
3        A    Is that his -- just that his mother an
4    reverend turned him in. And I mean, we spoke with
5    them, and that's basically what I recall.
6        Q    Do you recall speaking with his mother at any
7    date prior to him being turned in?
8            MS. STALF:   I'm sorry. Can you restate that
9    question, Counsel? I didn't hear that.
10    BY MS. SAMUELS:
11        Q    Do you recall speaking with his mother at any
12    date prior to him being turned in?
13           MS. STALF:   Thank you.
14           THE WITNESS:   I don't recall specifically
15    speaking to her, but one way or another, I was present
16    when -- I think we spoke to her one time.
17    BY MS. SAMUELS:
18        Q    All right. Do you recall that, or you just
19    read that in a report?
20        A    I vaguely recall speaking with her one time.
21        Q    All right. Was that over the phone or in
22    person?
23        A    I believe in person.
24        Q    Do you recall who else was with you?

WALKER vs. CITY OF CHICAGO, ET AL     JOHN RIORDAN                    December 16, 2021

Case: 1:20-cv-07209 Document #: 160-50 Filed: 05/16/23 Page 21 of 34 PageID #:3542

77

1     A     I believe Pietryla, but I don't recall if
2  there were other people or not.
3     Q     Do you recall where this meeting took place?
4     A     I -- somewhere else outside.
5     Q     Do you mean, like --
6     A     Maybe -- like on her block, or -- I mean.
7     Q     So to the best of your recollection -- how
8  can I say this without sounding abstruse?
9           You didn't meet with her -- so to the
10  best of your recollection, you did not meet with
11  Jovanie Long's mother inside of any building; is that
12  fair to say?
13    A     No, I may have spoken to her at her
14  residence, but I -- it's -- it should be documented in
15  a report.
16    Q     As you sit here today, do you recall meeting
17  with Jovanie Long's mother at her residence?
18    A     Specifically, her residence, I don't recall.
19  But I know that there's a report that has information.
20          So I recall meeting with her, but I
21  didn't remember, specifically, what address or what --
22  so --
23    Q     So let me just make sure I'm -- so prior to
24  meeting her at the police station when Jovanie turns

78

1  himself in, you have a specific recollection of meeting
2  her one other time and at least Detective Pietryla was
3  there with you; is that fair?
4     A     That's fair.
5     Q     Okay.  You are not sure where that location
6  is, but from the reports, the most likely location is
7  her residence; is that fair?
8     A     That's fair.
9     Q     Okay.  Do you have any specific recollections
10  with regard to your role in this -- in the
11  investigation into the murder of Merak Majdak?
12    A     I'm sorry.  I lost like a couple words.
13  Would you please repeat?
14    Q     Yes, sir.  Do you have -- do you have any
15  other specific recollection of your role -- or -- of
16  what you did to investigate the murder of Merak Majdak?
17    A     Not that I recall, no.
18    Q     Okay.  Do you recall the location of where
19  the body was found?
20          MS. ADEEYO:   Object to form.
21          THE WITNESS:   I recall an address.
22  BY MS. SAMUELS:
23    Q     Were you -- was this investigation -- was
24  this a gang investigation?

79

1           MS. STALF:   Objection. Form. Foundation.
2           THE WITNESS:   No.
3  BY MS. SAMUELS:
4     Q     Okay.  Do you know what gang was, I guess, in
5  charge of that location where the body was found?
6           MS. STALF:   Objection. Form. Foundation.
7           THE WITNESS:   I may have at the time.  I
8  don't recall now.
9  BY MS. SAMUELS:
10    Q     Gotcha.  All right.
11          MS. SAMUELS:   I'm about to just run through
12  about five GPRs and basically every case incident
13  report.  And so I don't know if you guys wanted to take
14  a break, or just power through that.
15          MS. STALF:   Do you want to take a lunch break
16  or do you want to keep going?
17          THE WITNESS:   I'll take a lunch break; is
18  that all right?
19          MS. SAMUELS:   Yes, that's fine.
20          MS. STALF:   Like 35 minutes; is that okay?
21          MS. SAMUELS:   Yeah, so come back at what?
22          MS. STALF:   12:50.
23          MS. SAMUELS:   12:50. Okay.
24          MS. STALF:   Yeah, that work.

80

1           MS. SAMUELS:   All right.
2           MS. STALF:   Can we go off the record?
3           MS. SAMUELS:   Yep.
4               (WHEREUPON, off the record.)
5           MS. SAMUELS:   Okay.  So back on the record.
6  BY MS. SAMUELS:
7     Q     When we left off, I was asking you about your
8  independent recollections regarding what you did during
9  the course of the investigation into Merak Majdak; do
10  you recall that?
11    A     Yes.
12    Q     Okay.  And, essentially, there were -- let's
13  call it three main areas that you remembered -- you
14  remember speaking with his mother at some point before
15  he turned himself in; is that correct?
16    A     Correct.
17    Q     You remembered him turning himself in along
18  with his mother and his pastor, correct?
19    A     Correct.
20    Q     And then the third thing you remembered
21  was -- well, let's call it four things you remembered.
22          The third thing, you remembered was the
23  interrogation with Officer Pietryla, correct?
24    A     Detective Pietryla, yes.

81

1    Q    Oh, I'm sorry.  Detective Pietryla.

2          And then you also remembered that he

3    gave a videotaped statement?

4    A    Correct.

5    Q    Is there anything else regarding your role

6    into the investigation of Merak Majdak that you recall?

7          MS. STALF:   Objection.  Asked and answered.

8          THE WITNESS:   Testifying in court.

9    BY MS. SAMUELS:

10   Q    All right.  But nothing during the course of

11   the investigation, correct?

12   A    Correct.

13   Q    Okay.  Now, when you joined, I guess, the

14   investigation, it was already ongoing; is that fair to

15   say?

16   A    Yes.

17   Q    Okay.  Do you recall what actions you took to

18   get up to speed with the investigation?

19         MS. STALF:   Objection.  Form.  Foundation.

20         THE WITNESS:   Probably read some reports and

21   spoke with the Detective assigned to it.

22   BY MS. SAMUELS:

23   Q    And then -- I'm sharing my screen.  And I

24   don't know if -- can you see?  It looks like a General

82

1    Progress Report?

2          MS. STALF:   Yeah, we'll need that enlarged

3    significantly, Jeanette.  It's pretty tiny.

4          MS. SAMUELS:   Is this better?

5          MS. STALF:   Yeah, and I'm actually going to

6    turn my laptop so that the witness can see my screen,

7    because the screen he's using is quite far away.

8          MS. SAMUELS:   Okay.

9    BY MS. SAMUELS:

10   Q    Can you see this?

11   A    I can see it.  It's difficult to read.

12   Q    All right.  And so I'm showing you what's

13   been marked as City NK146.  Are you able to read this

14   handwriting?

15   A    I mean, I can make out some of it.

16   Q    To the best you can, can you just tell me

17   what it says?

18   A    Is that B?  I can't read the -- it says Arson

19   or Arason, or -- I can't -- is that B?  405 North

20   Mason, first floor.  It was with grandma.  Phone, (773)

21   I think, 809-4543, unemployed.

22         I don't know what the next word is.  And

23   I don't know -- I think the one word is prostitute.

24   And then I don't know what those initials are.  And

83

1    50275.

2          Do you want me to continue reading or --

3    Q    Yeah.  And that was pretty -- like, the first

4    paragraph or so, correct?

5    A    Yes.

6          MS. STALF:   I just want to insert my

7    objection to this witness translating what's written in

8    this report, if it hasn't been established that this

9    individual authored this report, nor has it been

10   established that he knows who authored the report, and

11   he's indicated that he can't read most of the writing.

12         With that being said, if you still want him

13   to do it...

14         MS. SAMUELS:   Yes.

15         THE WITNESS:   Out loud, or --

16         MS. STALF:   Yeah, out loud.  You want him to

17   read it out loud, right?

18         MS. SAMUELS:   Yes.  Please.

19         THE WITNESS:   "Sergeant Howdy" or --

20   "assigned to," I believe, "interview."  That's a guess.

21   And then "S-a-n-m-o-t," which doesn't make sense to me,

22   "Wright, W-r-i-g-h-t."

23         And then I can't read that word.  It's

24   like "pick" or "picked -- "picked up states.  She was

84

1    on worsen, voluntarily."  It looks like, "K03" or

2    "Paul," misspelled.

3          I -- "into the call to" -- it looks

4    like, "tells to us," but it's probably "talked to us."

5    It's "s-i-t-j-o-c-y."  I -- I can't read the word.  I

6    can't read this next word, "Patrons."

7          And I can't read that next word.  It

8    looks like "C-Q, something.  I see "A slash 4," which

9    would be Area 4.  And "PO", and I can't read the names.

10         It looks like an "s-o-r-u --

11   s-o-l-d-u-s-d-i," maybe a "y-a-t-n."  I believe that's

12   the word "understood."  I can't make out the next word.

13   "To talk with PRDs -- "talk with," it's either "P" or

14   "RDs" -- I know it's a "D."  I'm not sure what the

15   syllable is before.

16   BY MS. SAMUELS:

17   Q    That was the second paragraph, essentially,

18   correct?

19   A    Yes.

20   Q    All right.  Go ahead with the third

21   paragraph.

22   A    "States D" -- I don't know what -- "2M1" -- I

23   can't make out that next word.  I can't make out that

24   next word.  "Shot" -- I don't know if it's "un" --

85

1    "into a White boy on Ohio over drugs."
2              "So do sig(phonetic) knows" -- I can't
3    read that last name. "Know police, R-o-u-s-t" -- I
4    can't make out that other word.
5              Got to pull it little closer.
6         MS. STALF:    Yeah.
7         THE WITNESS:    "Doesn't know of" -- I can't
8    read that word, "human." It looks like "DIPI on" -- so
9    I'm in the next paragraph. I don't know what that
10   first word is, "to Donney Howl, 20716."
11            I can't read that next word, "no
12   description. Knowledge of." I don't know what that
13   word is. "2100 hours," that's the only other thing
14   I can make out.
15   BY MS. SAMUELS:
16        Q    All right. Thank you very much, sir.
17            I shared a second screen, and it -- that
18   capture saying, "Chicago Police Department Case
19   Supplementary Report;" can you see that?
20        A    Yes.
21        Q    All right. And it looks like this first
22   report is a three-page document, Bates Stamped City
23   NK283 to 285.
24            Is it easier if I do full page, or do

86

1    you need me to Zoom in?
2         A    Probably Zoom in.
3         Q    Okay. And so a Case Supplementary Report,
4    like the type that you are viewing, can that be
5    completed by hand, or is this completed on computer?
6         MS. STALF:    Objection. Form. Foundation.
7         THE WITNESS:    Computer.
8    BY MS. SAMUELS:
9         Q    Okay. And my understanding is Chicago Police
10   Department vehicles are equipped with computers inside
11   them; is that correct?
12        MS. STALF:    Objection. Form. Foundation.
13        THE WITNESS:    Now? Yes.
14   BY MS. SAMUELS:
15        Q    Okay. Is it fair to say you are not sure
16   whether or not in 2000 the police cars had computers in
17   them?
18        A    They could do these functions, yes.
19        Q    Okay. That was going to be my question.
20   Okay.
21            Is this one of the reports that you
22   mentioned that you would have reviewed?
23        MS. STALF:    Objection. Form. Foundation.
24        THE WITNESS:    I -- could you go back to the

87

1    top?
2    BY MS. SAMUELS:
3         Q    Yes, sir.
4         A    So -- I'm trying to see what -- could you
5    drag it down?
6         Q    Let me know if I'm going too fast or too
7    slow.
8         A    All right. Is that pretty much it?
9         Q    That's the first page, yeah.
10        A    All right.
11        Q    And so let me ask a better question:
12            Is this the case supplementary report
13   related to the investigation into the murder of Merak
14   Majdak?
15        A    I don't recall. But I would have to -- I
16   don't know the RD number to the case to identify it.
17        Q    Okay. Do you see this second box where it
18   says, "Victim slash Complainant slash Witness slash
19   Subject"?
20        A    Yes.
21        Q    Okay. And do you see where it says "Role
22   Victim"?
23        A    Yes.
24        Q    And it says name, Merak. And then it looks

88

1    like Merak Majdak?
2         A    That's probably what's confusing me is the
3    last name. It's combined.
4         Q    Gotcha. What I wanted to ask you -- and let
5    me know if you don't know any of this information --
6    is I'm trying to figure out what -- the questions that
7    I'm going to be asking --
8             I'm going to be asking you about what
9    part is automatically entered, if you know, or what
10   part are police officers?
11        A    What parts are automatically entered?
12        Q    Yeah. So like -- so when it says, "Report
13   Created By," is that something that is automatically in
14   the report because you put in your Star Number or
15   something, or do you, like, literally write, like I'm
16   the person writing this report; do you get what I'm
17   saying?
18        MS. STALF:    Objection. Form. Foundation.
19        THE WITNESS:    I mean, currently, that's how
20   it works. I don't recall if that's exactly how it
21   worked back in 2000.
22            I know that it does that now. But I
23   don't recall if it worked that way back in 2000.
24   BY MS. SAMUELS:

89

1    Q    Understood. Do you know what a Case Report
2  ID is?
3    A    I know what a RD number is. Case Report ID,
4  I don't recall what it is.
5  BY MS. SAMUELS:
6    Q    Okay. Can one RD number have multiple case
7  reports under it?
8         MS. STALF: Objection. Form. Foundation.
9         THE WITNESS: Generally speaking, one case
10 report would have one RD. But you could put several
11 RDs in an area or in other boxes of a case report.
12 So...
13 BY MS. SAMUELS:
14   Q    And so is the RD number something that the
15 officer would put in or something that's already there?
16        MS. STALF: Objection. Form. Foundation.
17        THE WITNESS: It depends, again. I'm
18 trying -- both, and depending on the circumstances.
19 BY MS. SAMUELS:
20   Q    Okay. What about when it says -- can you see
21 this little, like, bulls eye looking thingy as I move
22 it?
23   A    I'm sorry --
24   Q    I was just wondering if you can see the

90

1  cursor when I move it, when I'm indicating or not?
2    A    Yes -- yes, I can.
3    Q    Oh, okay. So when it says, "Date RO
4  arrived;" do you recall if that's something that's
5  automatically populated, or something that the RO would
6  put?
7         MS. STALF: Objection. Form. Foundation.
8         THE WITNESS: That would be something on a
9  case report that you would have to enter.
10 BY MS. SAMUELS:
11   Q    Okay. Do you know what a supplement -- I'm
12 guessing "SUP period" stands for "supplement ID"?
13   A    Supplementary.
14   Q    Okay?
15   A    Would you please repeat that? I'm sorry.
16   Q    Yeah. Do you know what Supplementary ID
17 stands for, what that number is indicating?
18        MS. STALF: Objection. Form. Foundation.
19        THE WITNESS: I -- I'm trying to find it. I
20 mean, it's probably an electronic identification for
21 this particular supplementary report.
22 BY MS. SAMUELS:
23   Q    Do you know what "Event Number" is referring
24 to?

91

1         MS. STALF: Objection. Form. Foundation.
2         THE WITNESS: An Event Number is generated
3  when an RD number is generated; not all the time. That
4  number is also generated for 911 calls. I lost her --
5  she --
6  BY MS. SAMUELS:
7    Q    I'm sorry. I didn't mean to interrupt you.
8    A    No. It's okay.
9    Q    Okay. And then "Occurrence date," is that
10 something that's automatically put in there, or that
11 the reporting officer would put in there?
12        MS. STALF: Objection. Form. Foundation.
13        THE WITNESS: Again, it depends if this is an
14 original case report or a sup case report, and there's
15 other factors. It's --
16 BY MS. SAMUELS:
17   Q    Okay. If it's an original case report, would
18 the Officer type it in?
19        MS. STALF: Objection. Form. Foundation.
20        THE WITNESS: Today? Yes. Back in 2000,
21 I -- I don't recall.
22 BY MS. SAMUELS:
23   Q    Okay. And if it's a supplementary case
24 report, would that be automatically populated because

92

1  it's linking to the original case report?
2         MS. STALF: Objection. Form. Foundation.
3         THE WITNESS: Again, today? Yes. Back in
4  2000. I couldn't tell you the specifics of that.
5  BY MS. SAMUELS:
6    Q    Okay. When it says "Unit Assigned," do you
7  know what that's referring to -- do you know what
8  that's referring to?
9         MS. STALF: Objection. Form. Foundation.
10        THE WITNESS: I believe that's a beat number.
11 BY MS. SAMUELS:
12   Q    Okay. When it says "IUCR Code;" do you know
13 what that's referring to?
14   A    Yes.
15   Q    What's that?
16   A    What's the IUCR Code, or what is the code
17 demonstrated?
18   Q    What's an IUCR code?
19   A    It's basically how we classify case reports.
20 It's an -- it's to bring compatibility with Police
21 Departments across the country, kind of, so they could
22 track crime. So it's a UCR code.
23   Q    Okay. So that -- okay. So these are -- two
24 are linked, where it says "0110" and then "homicide;"

WALKER vs. CITY OF CHICAGO, ET AL.                    JOHN RIORDAN                    December 16, 2021

Case: 1:20-cv-07209 Document #: 160-50 Filed: 05/16/23 Page 25 of 34 PageID #:3546

93

1    is that what that 0110 means?
2        A    Yes.
3        Q    Okay.  And then I think "Location Code" is
4    self-explanatory.
5            Okay.  As you sit here today, do you
6    have any specific recollection of reviewing this
7    report?
8        A    No, I do not.
9        Q    Okay.  Okay.  So going to the next part, it
10   looks like it's a four-page case supplementary report.
11   Begins with City NK315 and it goes to City NK318.  Can
12   you see that?
13       A    You have to blow it up.
14       Q    Sorry.
15       A    It's okay.
16       Q    Okay.  Just so you can see what I was seeing,
17   like, at the bottom right where it's stamped.  It goes
18   315 --
19       A    Correct.
20       Q    Three 16, 317 and then the end of the report
21   would be 318.  So --
22            And so this report, it looks like it was
23   created by Patrick Foleyo.  When it says "created by,"
24   does that mean that's the person who is authoring the

94

1    supplementary report?
2            MS. STALF:   Objection.  Form.  Foundation.
3            THE WITNESS:   I believe, in general, yes.
4    BY MS. SAMUELS:
5        Q    Okay.  To your knowledge, did you have any
6    role in the creation of this supplementary report?
7            And I'm sort of scrolling through it.
8    Let me know if you want me to slow down.
9            Oh, that's what I was going to ask:  Is
10   there always a Youth Detective assigned to a case?
11           MS. STALF:   Objection.  Form.  Foundation.
12           THE WITNESS:   I -- I'm not sure what you are
13   talking about.  I'm trying to --
14   BY MS. SAMUELS:
15       Q    Sure.  So on --
16       A    Oh, oh.  That's -- no.  That's Detective
17   slash Youth Officer.
18       Q    Okay?
19       A    It's --
20       Q    So, basically, that's a Detective, but the
21   heading just says "Detective slash Youth Investigator;"
22   is that fair to say?
23       A    I believe so.
24       Q    Okay.  To your knowledge, would there have

95

1    been any reason to have the Youth Investigator involved
2    in this investigation?
3        A    Not that I recall.
4        Q    Okay.  I'm sorry.  And the Supplemental ID on
5    this report was 217124, correct?
6        A    I would have to see it.
7        Q    So you see that at the top right?  It sort of
8    goes, Case Report ID, RD Number, Supplemental ID.
9        A    Yes.
10       Q    Okay.  And that one you weren't involved in.
11           The next case report or supplement is a
12   three-page report.  It looks like it's City NK303 --
13   oop, what am I doing -- to City NK305; is that correct?
14       A    304?
15       Q    Yeah.  So 304 is Page 2.  And then Page 3 is
16   305; is that fair?
17       A    Yes.
18       Q    Do you recall working with Donald Wolverton
19   during the course of this investigation?
20           MS. STALF:   Objection.  Form.  Foundation.
21           THE WITNESS:   I believe I did not.
22   BY MS. SAMUELS:
23       Q    All right.  Had you ever worked with
24   detective Pietryla before?

96

1            MS. STALF:   Objection.  Form.  Foundation.
2            THE WITNESS:   Could you be more specific
3    about the timeframe?
4    BY MS. SAMUELS:
5        Q    Yes, sir.  So before this crime -- murder
6    investigation for Merak Majdak, had you ever worked
7    with Detective Pietryla before that?
8        A    No.
9        Q    And it looks like this case supplementary
10   report is --
11           Do you recall reviewing this case
12   supplementary report?
13           MS. STALF:   Objection.  Form.  Foundation.
14           THE WITNESS:   Is there a narrative?
15           MS. SAMUELS:   There is no narrative that I
16   can see.
17           THE WITNESS:   I don't -- I don't recall.
18   BY MS. SAMUELS:
19       Q    All right.  Do you know why some case
20   supplementary reports are stamped "Permanent Retention
21   File," while others aren't?
22           MS. STALF:   Objection.  Form.  Foundation.
23           THE WITNESS:   No, I don't.
24   BY MS. SAMUELS:

97

1    Q    After you are done with a murder
2  investigation, what do you do with the file?
3        A    I'm sorry? I lost part of that, the end of
4  it.
5        Q    Yeah, so once you are completed with an
6  investigation into a murder, what do you do with the
7  file?
8            MS. STALF:   Objection. Form. Foundation.
9            THE WITNESS:   Turn it in.
10 BY MS. SAMUELS:
11       Q    Who do you turn it in to? Is it like a
12 specific person it's supposed to be turned in to?
13           MS. STALF:   Same objection.
14           THE WITNESS:   At that time, a Supervisor. I
15 don't know if it's different now.
16 BY MS. SAMUELS:
17       Q    Okay. And then it looks like the next case
18 report, the next supplementary case report under this
19 RD number is an 11-page report with the Supplementary
20 ID of 222288.
21               I'm showing you Documents NK19 through
22 28 -- oh, I'm sorry -- to NK29. Just so you can see,
23 it's a full report. And then I'm just going to skip to
24 Page 4 of this report, which is the narrative section;

98

1  is that okay?
2        A    Do you know who it's created by?
3            MS. STALF:   Yeah, I mean, if you could let
4  the witness see the entire document, I think that would
5  probably be helpful, if you've got questions off the
6  document.
7            MS. SAMUELS:   Sure.
8  BY MS. SAMUELS:
9        Q    Do you still want me to Zoom it in, or do you
10 want the full page?
11       A    You'd have to Zoom it in. I can't read that
12 at all. I'm sorry.
13       Q    No problem. So it looks like this 11-page
14 supplement was created by Donald Wolverton; is that
15 correct?
16           MS. STALF:   Objection. Form. Foundation.
17           THE WITNESS:   Yes.
18 BY MS. SAMUELS:
19       Q    And then -- I would like -- are your
20 experience of the first few pages of the case
21 supplement the same, they contain the same information?
22           MS. STALF:   Objection. Form. Foundation.
23           THE WITNESS:   I don't recall.
24

99

1  BY MS. SAMUELS:
2        Q    Okay. And so I'm just trying to slowly
3  scroll through the first few pages until we get to the
4  narrative section. I don't think there's anything else
5  on this page.
6               All right. And then on Page 4, it looks
7  like there's a narrative; do you see this?
8        A    Yes.
9        Q    And so sort of -- you can see sort of the
10 first half of the narrative, which gives the date and
11 time assigned, some information about the victim, the
12 victim -- and it says wanted, unknown, person, and
13 that's in bracket's; do you see that?
14       A    Yes.
15       Q    As you sit here today, do you have any
16 recollection of whether or not you viewed this document
17 previously?
18           MS. STALF:   Objection. Form. Foundation.
19           THE WITNESS:   No.
20           MS. STALF:   Vague as to timeframe.
21           THE WITNESS:   Sorry.
22               No, I don't have a recollection.
23 BY MS. SAMUELS:
24       Q    Okay. And then the second half, I scrolled

100

1  down, is more information about the victim and the
2  medical examiner, correct?
3        A    Yes.
4        Q    And then it looks like the -- Page 5 of this
5  report is a notification of the victim's family member;
6  is that correct?
7        A    Yes, it appears correct.
8        Q    There's also some vehicle information. And
9  then I think Page 6 through -- well, let's just go --
10 do you --
11               Do you recall reviewing this case report
12 in preparation for your deposition?
13       A    Do I recall for my deposition?
14       Q    Yes, sir.
15       A    No.
16       Q    All right. Do you recall reviewing this at
17 the time that you were investigating the murder?
18       A    I can't recall.
19       Q    Okay. Do you recall ever speaking to any
20 witnesses in relation to this incident besides Jovanie,
21 his mother and her pastor?
22       A    I -- actually, I can answer that. No.
23       Q    No. So let's skip this case report, which --
24 well, the rest of it, which seems to be a canvas.

101

1    Let's go to -- the next document looks
2    to be -- or the next case report looks to be a ten-page
3    case report with the supplementary -- is it the same
4    thing?
5        That is the same thing. It's the same
6    Supplemental ID. So we are going to go to -- the next
7    case reports seems to be a four-page record with
8    Supplementary ID 228503, correct?
9        A    Correct.
10       Q    And it looks like this was reported by John
11   Cruz?
12       A    Correct.
13       Q    Do you recall working with John Cruz during
14   the course of this investigation?
15       MS. STALF:   Objection. Form. Foundation.
16       THE WITNESS:   No.
17   BY MS. SAMUELS:
18       Q    All right. Prior to this investigation into
19   the murder of Merak Majdak, had you ever worked with
20   John Cruz before?
21       MS. STALF:   Objection. Form. Foundation.
22       THE WITNESS:    To the best of my recollection,
23   no.
24

102

1    BY MS. SAMUELS:
2        Q    Okay. And then just scrolling through this
3    case report, which is City NK33 -- the same
4    information. And it looks like there's a narrative on
5    Page 3 of this report. And it says, "Subject to be
6    interviewed Yvette Hill," correct?
7        A    Yes.
8        Q    All right. And this goes from Page 3 in to
9    Page 4, I believe, briefly; is that fair?
10       A    Page -- yes.
11       Q    All right. Do you want me to give you a
12   chance to read it? I'm just going to ask if you
13   remember reading this.
14       A    I don't recall reading this.
15       Q    All right. And to be clear, I mean at the
16   time that you were investigating this murder, do you
17   recall reviewing this supplementary -- reviewing
18   information like this?
19       MS. STALF:   Object to the form of the
20   question.
21       THE WITNESS:   I can't specifically recall if
22   I read this at the time or not.
23   BY MS. SAMUELS:
24       Q    Do you recall ever speaking with a witness

103

1    known by Yvette Hill or any of those fake names under
2    Yvette Hill?
3        MS. STALF:   Objection. Foundation.
4        THE WITNESS:   No.
5    BY MS. SAMUELS:
6        Q    It looks like the next supplement is a 9-page
7    supplement 393-6611 is the Supplementary ID; do you see
8    that?
9        A    Yes.
10       Q    Also, created by John Cruz, correct?
11       MS. STALF:   Objection. Form. Foundation.
12       THE WITNESS:   Correct.
13   BY MS. SAMUELS:
14       Q    Okay. And then we are going to scroll
15   through the first two pages, which I believe just
16   relist the same stuff.
17       So that we can get to the narrative
18   section. And this report list Jovanie Long and Xavier
19   Walker as a suspect, correct?
20       A    Yes.
21       Q    And do you see where it says, under Jovanie
22   Long's name, "IDENT period through INPST period,
23   question mark"?
24       A    Yes.

104

1        Q    What does that mean? Or what's that supposed
2    to read? It looks like it's some sort of abbreviation.
3        MS. STALF:   Objection to form. Foundation.
4        THE WITNESS:   I'm not sure. This generation
5    report -- I can't recall.
6    BY MS. SAMUELS:
7        Q    Is this supposed to be identified through
8    investigation?
9        MS. STALF:   Objection. Form. Foundation.
10       THE WITNESS:   Counselor, I don't recall. And
11   some of these formats have changed, so --
12       And if the actual report creator fills
13   it in, or if an administrative person fills it in, this
14   has gone through some generations. I don't recall what
15   that means.
16   BY MS. SAMUELS:
17       Q    All right. That's just what I wanted to make
18   sure.
19       And then it looks like on Page 4 of this
20   report is where we start the narrative section; is that
21   correct?
22       A    Yes.
23       Q    Okay. It looks like, at this time, both,
24   Jovanie and Xavier are in custody?

WALKER vs. CITY OF CHICAGO, ET AL.        JOHN RIORDAN        December 16, 2021

Case: 1:20-cv-07209 Document #: 160-50 Filed: 05/16/23 Page 28 of 34 PageID #:3549

105

1      MS. STALF:   Objection. Form. Foundation.
2      THE WITNESS:   Yes, it appears so.
3   BY MS. SAMUELS:
4      Q    And it lists a number of witnesses. I don't
5   think I'm going to read them all, because there's a
6   few.
7          Oh, but, so -- but one question I do
8   want to ask: Is it looks like there was a sports shoe
9   that was inventoried as evidence; do you see that?
10     A    I see it, but I don't recall.
11     Q    All right. That was going to be my question
12  was whether you recall having any role in that.
13         And then -- I'm sorry. Go ahead.
14     A    Who? Me?
15     Q    No, I thought I cut you off.
16     A    Oh, no. Go ahead, Counsel.
17     Q    And so towards the end of the page, it goes
18  to investigation and then there seems to be a summary.
19  And I'm trying to scroll slower because there's a lot
20  of information in --
21         Do you want an opportunity to read this
22  or are you good?
23         MS. STALF:   I would ask that the witness be
24  given a minute to read it if he is going to be asked

106

1   some questions about it.
2          MS. SAMUELS:   I'm just going to ask if he
3   remembers whether he read it.
4          THE WITNESS:   In what timeframe, if I -- I
5   don't recall reading it 20 years ago. I don't believe
6   I read it recently. I don't know.
7   BY MS. SAMUELS:
8      Q    Okay. So that's all I was asking. And so
9   it's sort of -- this part, the narrative, goes through
10  the witness statements of Maurice Wright and Mary
11  Curry, and Ashanti Wright; does that change your answer
12  at all?
13     A    I may have -- may have read it when I was
14  doing the investigation, but I can't recall
15  specifically.
16     Q    Do you recall having any interactions,
17  whatsoever, with Antwoine Waddy?
18     A    No, I don't recall.
19     Q    Do you recall having any interactions,
20  whatsoever, with Mary Curry?
21     A    It's -- I don't think it's Jovanie's mom --
22  is that Jovanie's mom?
23     Q    I will stipulate that Jovanie's mother's name
24  is Regina Long.

107

1      A    I don't recall.
2      Q    All right. Do you recall having any
3   interactions, whatsoever, with Jermaica Wright?
4      A    No, I don't recall.
5      Q    All right. Do you recall having any
6   interactions, whatsoever, with -- excuse me -- Ashanti
7   Wright?
8      A    No. I don't believe I had any interactions
9   with Ashanti Wright.
10     Q    And this looks like it's -- the next
11  supplement looks like it's a six-page Case
12  Supplementary Report with Supplementary ID 460-312; is
13  that correct?
14     A    Where -- what number are you reading? I'm
15  sorry.
16     Q    I'm sorry. So in that first box in the
17  second line, all the way to the left, the Supplementary
18  ID says 460-312.
19     A    Okay. I see your thing now.
20     Q    All right. And so it looks like this report
21  was created by Michael Pietryla?
22         MS. STALF:   Objection. Form. Foundation.
23  BY MS. SAMUELS:
24     Q    Is that correct, sir?

108

1      A    I'm sorry. I didn't know that -- if --
2      Q    I know. It's pretty, for me, late, at this
3   point. Just trying to speed through these.
4          So in -- on Page 2 of this report, it
5   says, "Suspect in custody". It says, "Yes." And the
6   first suspect listed as Jovanie Long; do you see that?
7      A    Yes.
8      Q    All right. And then it gives a brief
9   description of his clothing where it says "Black
10  T-shirt". Do you see that?
11     A    I'm looking for it.
12         Can I pull this closer, please?
13         MS. STALF:   Yeah, go ahead.
14         THE WITNESS:   All right. I see it. Yes.
15  BY MS. SAMUELS:
16     Q    Is that what he was wearing -- would that be
17  indicating what he was wearing at the time he turned
18  himself in or at the time of the alleged offense?
19         MS. STALF:   Objection. Form. Foundation?
20         THE WITNESS:   I don't know.
21  BY MS. SAMUELS:
22     Q    All right. And then I'm scrolling through
23  this report to get to the narrative section. And it
24  looks like the narrative section starts on Page 5.

109

1            And it looks like it's an interview with
2    a bunch of individuals who knew the victim; is that
3    fair?
4            MS. STALF:   Objection. Form. Foundation.
5            THE WITNESS:   I don't know.
6    BY MS. SAMUELS:
7        Q    Do you recall reviewing this report at the
8    time that you were assisting with the murder
9    investigation?
10       A    No, I do not recall.
11       Q    Do you recall reviewing this report in
12   preparation for your deposition?
13       A    No, I don't recall.
14       Q    Do you recall which supplementary report you
15   did review that helped refresh your recollection?
16           MS. STALF:   Objection. Form. Foundation.
17           THE WITNESS:   Would be closing sup.
18   BY MS. SAMUELS:
19       Q    So let's skip to the end.
20       A    And one other sup -- or two other sups that I
21   was named in.
22       Q    All right. Do you recall authoring any
23   supplementary reports?
24           MS. STALF:   Objection. Form. Foundation.

110

1            THE WITNESS:   No, I do not.
2    BY MS. SAMUELS:
3        Q    That's not it. No, that's not you. Nope.
4    Was this -- nope.
5            Here we go. So I'm showing you Case
6    Supplementary Report 460 with the Supplementary ID
7    460370; do you see that?
8        A    Yes.
9        Q    And it looks like this report was authored by
10   Mike Pietryla?
11           MS. STALF:   Objection. Form. Foundation.
12           THE WITNESS:   Yes, I believe so.
13   BY MS. SAMUELS:
14       Q    Do you have any information to believe that
15   he didn't author this report?
16       A    Would you repeat? I'm sorry.
17       Q    Yes. Do you have any reason to believe that
18   Michael Pietryla did not author this report?
19       A    No, I -- no.
20       Q    I'm going to Page --
21           MS. STALF:   Jeanette, could you please
22   identify, for the record, which page numbers, Bates
23   Stamped numbers you are showing the witness?
24           MS. SAMUELS:   Sure. So this is City NK688

111

1    through -- well, it's mixed up, because 688 through
2    City NK71. And then Pages 5 and 6 are City NK215 and
3    216.
4    BY MS. SAMUELS:
5        Q    And so -- it looks -- so Page 5 and 6 --
6            And you see, it's the same Supplementary
7    ID 460370, correct?
8        A    Correct.
9        Q    Okay. Is this one of the reports that you
10   reviewed?
11       A    Could you keep going?
12       Q    Yes, sir.
13           Keep going?
14       A    Yeah.
15       Q    Okay.
16       A    Could you go back up to the top for the date
17   of this?
18       Q    Is this -- are you talking about the date and
19   time assigned?
20       A    No. The -- would you go further up, I think?
21   Is it -- top page.
22       Q    Do you want the first page?
23       A    Yeah, the first page.
24       Q    Okay.

112

1        A    And then if you can go to the narrative.
2        Q    So this is the first page.
3        A    All right. Can you just slowly scroll
4    through it to the narrative?
5        Q    Gotcha.
6        A    You can go a little more, see what we got.
7            You can stop it at -- you can stop there
8    for a second.
9        Q    All right.
10       A    Thank you.
11       Q    No problem.
12       A    Okay.
13       Q    Is this one of the requests that you reviewed
14   in preparation for your deposition?
15       A    Yes.
16       Q    All right. And so scrolling up where it
17   says -- where did it go? When it says date and time
18   assigned, is that the time that somebody told you to
19   call Regina Long?
20           Let me just ask this straighter
21   question: When it says day and time assigned, what do
22   you understand that to mean?
23           MS. STALF:   Objection. Form. Foundation.
24           THE WITNESS:   I believe that's the date and

113

1  time that -- we started the shift and then we are
2  working on this. So...
3      BY MS. SAMUELS:
4          Q    And then under "assigned," it says Detective
5  M. Pietryla and then it also says GCSP, J. Riordan,
6  correct?
7          A    Correct.
8          Q    What does GCSP stand for?
9          A    Gang Crime Specialist.
10         Q    Okay. Do you recall how you were able to get
11 Regina Long's phone number?
12             MS. STALF:  Objection. Form. Foundation.
13             THE WITNESS:   No, no.
14     BY MS. SAMUELS:
15         Q    Do you recall how many times you had spoken
16 with Regina Long prior to the 5th of June 2000?
17         A    I don't believe at all.
18         Q    And it list -- this says the report of
19 Detective Pietryla and also yourself, correct?
20         A    Correct.
21         Q    Generally speaking, do you have a chance to
22 review a report before it's finalized?
23             MS. STALF:  Objection. Form. Foundation.
24             THE WITNESS:   Before it's finalized, or

114

1  before it's -- I don't recall.
2      BY MS. SAMUELS:
3          Q    All right. Do you know, one way or another,
4  whether you had a chance to review this report before
5  it was submitted?
6          A    I wouldn't recall.
7          Q    Okay. And then that ends that report.
8              Let's see -- I don't think this report
9  talks about you.
10             MS. STALF:   Jeanette, just so I'm clear for
11 housekeeping purposes for each of these reports that we
12 are looking at, are you marking them separate exhibits
13 to the deposition, or is this whole chunk of sup
14 reports being marked as a single exhibit.
15             MS. SAMUELS:   I'm not marking any of them as
16 exhibits.
17             MS. STALF:   Okay.
18     BY MS. SAMUELS:
19         Q    All right. And then I'm showing you -- it's
20 a six-page report. And it looks likes its Case
21 Supplementary ID is 460381, correct?
22         A    Correct.
23         Q    And this report was created by Michael
24 Pietryla?

115

1              MS. STALF:  Objection. Form. Foundation.
2              THE WITNESS:   That's what it indicates on the
3  report, but I don't recall specifically.
4      BY MS. SAMUELS:
5          Q    And then scrolling to the 5th page of this
6  report is where the narrative section begins, correct?
7          A    Yes, I believe so.
8              MS. STALF:   And, again, for the record, could
9  you identify that Bates Stamped document. Again, if
10 you're not going to be marking these as exhibits, we're
11 going to have no idea what the witness is talking about
12 in the deposition transcript --
13             MS. SAMUELS:   City NK 217, 218, 219, 220, 221
14 and 222 is this six-page supplementary report that was
15 previously identified by its Case Supplementary ID.
16     BY MS. SAMUELS:
17         Q    All right. And then again, this looks like
18 one of the reports where you were assigned, correct?
19         A    Yes, I believe so.
20         Q    All right. Do you want to take a chance to
21 review the narrative under "Investigation"?
22         A    Sure.
23         Q    All right. Let me know when you want me to
24 scroll.

116

1          A    You can scroll up.
2              Could you scroll back up to the top of
3  this? A little more. Yeah, a little more. I want to
4  see. All right.
5          Q    All right. That's good?
6          A    That's good.
7          Q    All right. And, again, when you reviewed
8  this report and it says, "Date and time assigned," what
9  do you take that to mean?
10         A    Basically, the date and time that we started
11 working on this investigation.
12         Q    All right. So when you -- do you mean the
13 investigation in general, or this particular narrative
14 portion?
15         A    I believe in general, because that's the
16 start of our shift.
17         Q    Okay. And, essentially, this -- the
18 narrative portion relays a conversation that you had
19 with Regina Long, fair?
20         A    Yes.
21         Q    All right. And this indicates status of the
22 report of, both, you and Detective Pietryla; is that
23 correct?
24         A    Correct.

117

```
 1    Q    Having reviewed the report, is there anything
 2  you like to add, edit or change?
 3         MS. STALF:  Objection.  Form.  Foundation.
 4         THE WITNESS:  No.
 5  BY MS. SAMUELS:
 6    Q    It can't be that many reports left, I swear.
 7         All right.  So this next report is a
 8  six-page case supplementary, with a Case Supplementary
 9  ID of 460387; do you see that?
10    A    Okay.  Yes.
11    Q    I'm going to scroll through the report that
12  begins on Bates Stamp City NK223, City NK224, City
13  NK225, City NK226.  And City NK227 is Page 5 of the
14  report, correct?
15    A    Correct.
16    Q    Do you want me to slowly scroll through for
17  it -- for you?
18    A    Just go up a little bit so I could --
19  all right.  You could scroll down a little bit.
20         You can stop for a second.  Thank you.
21    Q    No problem.
22    A    Okay.
23    Q    So it looks like the date and time assigned
24  was 28, July, 2016, 30 hours, correct?
```

118

```
 1    A    Correct.
 2    Q    And what do you understand date and time
 3  assigned to reflect?
 4    A    I believe it's the day and the start of my
 5  shift, because our shift started at -- around 4:30, so
 6  16:30 hours.
 7    Q    Okay.  It looks like, both, you and Detective
 8  Pietryla, were assigned this particular task; is that
 9  fair?
10    A    Correct.
11    Q    All right.  And the narrative section recalls
12  in summary, a conversation with Regina Long; is that
13  fair?
14    A    Yes.
15    Q    And I believe this report indicates that she
16  had spoken with Jovanie, and he intends to turn himself
17  in on approximately August 3rd or 4th, 2000; fair?
18    A    Yes.
19    Q    And at the bottom, it states that this is the
20  report of, both, you and Detective Pietryla?
21         MS. STALF:  Objection.  Form.  Foundation.
22         THE WITNESS:  Yes.
23  BY MS. SAMUELS:
24    Q    Is this one of the reports that you reviewed
```

119

```
 1  in preparation for your deposition?
 2    A    Yes.
 3    Q    All right.  As you sit here today, do you
 4  have any reason to believe that anything indicated in
 5  this report is inaccurate?
 6         MS. STALF:  Objection.  Form.  Foundation.
 7         THE WITNESS:   As I sit here today, no.
 8  BY MS. SAMUELS:
 9    Q    Okay.  And I believe this is our last
10  supplementary report, at last.  It's a nine-page case
11  report indicated by Supplementary ID 460407; do you see
12  that?
13    A    I'm looking for it.  Give me one second.
14  46 -- okay.  Could you repeat the number we are looking
15  at?
16    Q    460407.
17    A    All right.
18    Q    And it looks like this report was authored by
19  Detective Pietryla.
20         MS. STALF:  Objection.  Form.  Foundation.
21         THE WITNESS:  Yes.
22  BY MS. SAMUELS:
23    Q    All right.  And it begins with City NK229.
24  And we are going to scroll to the narrative section,
```

120

```
 1  which begins on City NK232.
 2         Is this the case -- is this the cleared
 3  case -- is this the clear closed supplementary report
 4  you were referring to earlier?
 5    A    Yes.
 6    Q    All right.  And I'm gonna -- do you need a
 7  chance to review it?
 8    A    I would -- actually, I would like to use the
 9  washroom really quick before we go through this --
10         MS. SAMUELS:  Yeah, no problem.
11         THE WITNESS:  -- for a few minutes.  Thank
12  you.
13         MS. STALF:  Going off the record?
14         Are we going off the record?
15         MS. SAMUELS:  Oh, yeah.
16         (WHEREUPON, off the record.)
17         MS. SAMUELS:  Everybody here?  Good to go.
18  BY MS. SAMUELS:
19    Q    So where we left off, you were reviewing case
20  report with supplementary ID 406407?
21    A    Correct.
22         MS. STALF:  I'm sorry.  I just want to make
23  sure Madam Court Reporter is back, right, and we're on
24  the record?
```

WALKER vs. CITY OF CHICAGO, ET AL    JOHN RIORDAN                                December 16, 2021

Case: 1:20-cv-07209 Document #: 160-50 Filed: 05/16/23 Page 32 of 34 PageID #:3553

121

1       THE COURT REPORTER:   Yes.
2       MS. SAMUELS:   Yes, she's here.
3       THE COURT REPORTER:   Yes. Thank you.
4       MS. STALF:   I have a limited view of the
5   screen right now. I apologize.
6       MS. SAMUELS:   No problem.
7   BY MS. SAMUELS:
8       Q     And you indicated that this was one of the
9   reports that you reviewed in preparation for your
10  deposition, correct?
11      A     Can I read more of the narrative, please?
12      Q     Do you want me to scroll up or down?
13      A     That's fine. Then I can start from here.
14            Okay. Could you go to the next
15  paragraph? Could you go to the next paragraph?
16            You could scroll up a little bit.
17  Pause.
18            You can scroll up a little bit. Pause
19  again.
20            Can you scroll up a little bit more?
21      MS. STALF:   We lost the exhibit on our end.
22  It looks like we lost Jeanette.
23                (WHEREUPON, there was a pause.)
24      MS. SAMUELS:   So I apologize. My computer

122

1   just died suddenly. I just logged in on my phone. So
2   I'm unable to bring that report back up.
3            But, actually, let me see if I can do
4   that. Let me figure this out.
5            Can I flip this?
6   BY MS. SAMUELS:
7       Q     Can you see the report now?
8       A     Very minimally. I can't -- I probably
9   wouldn't be able to read it. I'm sorry.
10      Q     All right. It was worth a shot. Were you
11  able to finish reading what was on that page?
12      A     I'm not sure. I -- I think so, but I'm not
13  sure. I'd asked you to move it up, and then you went
14  out, so I --
15      Q     Okay. Did you get to the part about the ASA?
16      MS. STALF:   Objection. Form. Foundation.
17      THE WITNESS:   I read something about the ASA,
18  yeah, but I don't know if the complete statement.
19  BY MS. SAMUELS:
20      Q     Gotcha. So I'm going to read the complete
21  paragraph about the ASA, which concludes the report,
22  for the Witness' education, since I can no longer bring
23  it up.
24      MS. SAMUELS:   Ms. Court Reporter, you don't

123

1   have to report, verbatim, what I'm saying; is that okay
2   with you?
3       MS. ADEEYO:   Can we just get the Bates Stamp
4   also?
5       MS. SAMUELS:   It's City NK236 to 237, that's
6   the end of the report.
7       MS. STALF:   And I think anything that's said
8   on the record has to be taken down verbatim. I
9   wouldn't agree to there being an informal reading of
10  anybody's statements being made on the record.
11  BY MS. SAMUELS:
12      Q     How about we leave it at this: From
13  reviewing the report, did that refresh your
14  recollection regarding any other specific instances or
15  interactions you had with Jovanie Long?
16      A     Yes.
17      Q     What else did you specifically recall after
18  reviewing the report?
19      A     It's hard to -- I would probably need the
20  report. Basically, that the ASA's name, Jim Nebar -- I
21  don't know.
22      Q     Let me ask it this way: Is there anything
23  not in the report that you now remember because you
24  read the report?

124

1       MS. ADEEYO:   Objection. Form.
2       THE WITNESS:   Not that I recall now, no.
3   BY MS. SAMUELS:
4       Q     All right. Who is GCSP Krofol(Phonetic)?
5       MS. STALF:   Objection. Form. Foundation.
6       THE WITNESS:   She is a Gang Specialist
7   assigned to Area 4.
8   BY MS. SAMUELS:
9       Q     Do you know why that Gang Specialist was
10  assisting with the investigation?
11      MS. STALF:   Objection. Form. Foundation.
12      THE WITNESS:   I don't recall why, no.
13  BY MS. SAMUELS:
14      Q     Have you ever seen any other Chicago Police
15  Officer engage in any misconduct in the course and
16  scope of their duties?
17      MS. ADEEYO:   Objection to form, foundation.
18      MS. STALF:   Join.
19      THE WITNESS:   Sorry, Counsel, could you
20  repeat? I lost the last word, or last couple words you
21  said.
22  BY MS. SAMUELS:
23      Q     Have you ever seen a CPD Officer engage in
24  misconduct in the course or scope of their duties?

WALKER vs. CITY OF CHICAGO ET AL.                    JOHN RIORDAN                    December 16, 2021

Case: 1:20-cv-07209 Document #: 160-50 Filed: 05/16/23 Page 33 of 34 PageID #:3554

125

1          MS. ADEEYO:   Same objection.

2          MS. STALF:   Join.

3          THE WITNESS:   Nothing that I can recall off

4   the top of my head.

5   BY MS. SAMUELS:

6      Q      Have you ever engaged in misconduct in the

7   course and scope of your duties as a Chicago Police

8   Officer?

9          MS. STALF:   Objection. Form. Foundation.

10         MS. ADEEYO:   Join.

11         THE WITNESS:   Not that I recall.

12  BY MS. SAMUELS:

13     Q    Did you ever work with Chicago Police Officer

14  Jerome Finnegan?

15     A    Oh, I worked in the same unit with him, yes.

16  And I've been on details with him, yes.

17         MS. SAMUELS:   Okay.  No further questions.

18  Thank you for your time, sir.

19         THE WITNESS:   Thank you.

20         MS. STALF:   Anybody else have any questions?

21         MR. OBERT:   No questions.

22         MS. ADEEYO:   None from us.

23         MS. STALF:   We don't have any questions

24  either.

126

1          We will reserve signature.

2                (WHEREUPON, the deposition

3                adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

127

1   XAVIER WALKER,                    )
2          Plaintiff,                 )
3      vs.                            )No. 20 Cv 7209
                                      )Judge guzman
4   CITY OF CHICAGO, STANLEY SANDERS, )
    MICHAEL PIETRYLA, DAVID WRIGHT,   )Magistrate
5   BRIAN HOLY, JOHN CRUZ, DONALD     )Judge Fuentes
    WOLVERTON, JOHN RIORDAN, ROBERT   )
6   BARTIK, ANTHONY BRZENIAK, THOMAS  )
    MAHONEY, and COOK COUNTY,         )
7          Defendant.                 )
8
9          C E R T I F I C A T E
10         I, JOHN RIORDAN, do hereby certify that I
11  have read the foregoing transcript in the
12  above-entitled cause and do assert that this is my
13  testimony except as I have so indicated on the errata
14  sheets provided herein.
15
16         _____
17         JOHN RIORDAN
18  No corrections (Please initial)_____
19  Number of errata sheets submitted_____(pages)
20  SUBSCRIBED AND SWORN TO
21  BEFORE ME THIS_____DAY
22  OF_____, 2022.
23  _____
24    NOTARY PUBLIC

128

1            E R R A T A

2   DEPOSITION OF:  John Riordan

3   DATE TAKEN:  December 16, 2021

4

5   PAGE LINE

6   ___  ___   CHANGE: _____

7    REASON: _____

8   ___  ___   CHANGE: _____

9    REASON: _____

10  ___  ___   CHANGE: _____

11   REASON: _____

12  ___  ___   CHANGE: _____

13   REASON: _____

14  ___  ___   CHANGE: _____

15   REASON: _____

16  ___  ___   CHANGE: _____

17   REASON: _____

18  ___  ___   CHANGE: _____

19   REASON: _____

20  ___  ___   CHANGE: _____

21   REASON: _____

22

23  DEPONENT'S SIGNATURE_____

24    DATE:_____

WALKER vs. CITY OF CHICAGO, ET AL.    JOHN RIORDAN                December 16, 2021

Case: 1:20-cv-07209 Document #: 160-50 Filed: 05/16/23 Page 34 of 34 PageID #:3555

```
                                              129                                                          130
1        E R R A T A                                 1    STATE OF ILLINOIS    )
                                                                              )SS
2    DEPOSITION OF:  John Riordan                    2    COUNTY OF C O O K    )

3    DATE TAKEN:  December 16, 2021                  3

4                                                    4              C E R T I F I C A T E

5    PAGE LINE                                       5

6    ___  ___  CHANGE: _____      6         The within and deposition was taken

7      REASON: _____       7    before ADRIENNE M. LIGHTFOOT, Certified Shorthand

8    ___  ___  CHANGE: _____      8    Reporter in the City of Chicago, County of Cook and

9      REASON: _____       9    State of Illinois; and there were present at the

10   ___  ___  CHANGE: _____      10   deposition Counsel as previously set forth?

11     REASON: _____       11          The witness reserved signature.

12   ___  ___  CHANGE: _____      12          The undersigned is not interested in the

13     REASON: _____       13   within case nor of kin or counsel to any of the

14   ___  ___  CHANGE: _____      14   parties.

15     REASON: _____       15          IN TESTIMONY WHEREOF, I have hereunto

16   ___  ___  CHANGE: _____      16   set my hand this 3rd day of June 2022.

17     REASON: _____       17

18   ___  ___  CHANGE: _____      18   _____

19     REASON: _____       19       ADRIENNE M. LIGHTFOOT

20   ___  ___  CHANGE: _____      20       No. 084-004276

21     REASON: _____       21

22                                                   22

23   DEPONENT'S SIGNATURE_____         23

24      DATE:_____          24
```