# EXHIBIT 51

Robert Bartik
June 15, 2022

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
XAVIER WALKER,               )
                             )
         Plaintiff,          )
                             )
         vs.                 ) No. 20 CV 7209
                             )
CITY OF CHICAGO, et al.,     ) Judge Guzman
                             )
         Defendants.         )
```

       The discovery deposition of ROBERT BARTIK, called by the Plaintiff for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Donna Wadlington Shavers, a Certified Shorthand Reporter, taken remotely via Zoom, Chicago, Illinois, on the 15th day of June, 2022, commencing at the hour of 10:00 a.m.

Robert Bartik
June 15, 2022

**Page 2**

```
1
2    APPEARANCES:
3
4        SAMUELS & ASSOCIATES, LTD.
5        BY: JEANETTE SAMUELS, ESQ.
6        53 West Jackson Boulevard, Suite 831
7        Chicago, Illinois 60604
8        (872) 588-8726
9        sam@chicivilrights.com
10       Appeared on behalf of the Plaintiff.
11
12
13       NATHAN & KAMIONSKI, LLP
14       BY: NATALIE ADEEYO, ESQ.
15           BREANA BRILL, ESQ.
16           NEHA LOCKE, ESQ.
17       33 West Monroe Street, Suite 1830
18       Chicago, Illinois 60603
19       (312) 612-2255
20       nadeeyo@nklawllp.com
21       bbrill@nklawllp.com
22       nlocke@nklawllp.com
23       Appeared on behalf of the Defendants.
24
```

**Page 3**

```
1
2        BORKAN & SCAHILL, LTD.
3        BY: GRAHAM MILLER, ESQ.
4            MISHA ITCHHAPORIA, ESQ.
5        Two First National Plaza
6        20 South Clark Street, Suite 1700
7        Chicago, Illinois 60603
8        (312) 580-1030
9        gmiller@borkanscahill.com
10       mitchhaporia@borkanscahill.com
11       Appeared on behalf of the Defendant,
12       Robert A. Bartik.
13
14   Also present:
15       Mr. Drew Wycoff
16       Mr. Ethan Fox
17
18
19
20
21
22
23
24
```

**Page 4**

```
1              I N D E X
2
3    ROBERT BARTIK              PAGE
4    Direct by Ms. Samuels        4
5    Cross by Mr. Miller        128
6
7
8
9            EXHIBITS
10       (No exhibits were marked.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 5**

```
1            (Witness duly sworn.)
2             ROBERT BARTIK,
3    called as a witness herein, having been first
4    duly sworn, was examined and testified as
5    follows:
6            DIRECT EXAMINATION
7    BY MS. SAMUELS:
8        Q. Can you please state and spell your
9    name for the record.
10       A. Robert, R-o-b-e-r-t, Bartik,
11   B-a-r-t-i-k.
12       MS. SAMUELS: All right. This is the
13   deposition of Robert Bartik taken in the case of
14   Xavier Walker versus City of Chicago, et al.,
15   Case No. 20 CV 7209. This deposition is taken
16   pursuant to notice and agreement of the parties
17   under all applicable rules.
18   BY MS. SAMUELS:
19       Q. Have you ever given a deposition
20   before, sir?
21       A. Yes.
22       Q. And about how many times?
23       A. Six or seven.
24       Q. All right.
```

2 (Pages 2 to 5)

Robert Bartik
June 15, 2022

**6**

1    A.  I believe.  Possibly.
2         MS. SAMUELS:  And I'm sorry.  Before
3    we get started, can we get everybody on the
4    record who's present.
5         MR. MILLER:  Yes.  So on behalf of
6    Officer Bartik, it is Graham Miller and Misha
7    Itchhaporia.  We have Drew Wycoff on there and,
8    we also have -- who's a clerk of ours -- and we
9    have another clerk Ethan Fox, who is in the room
10   with us.
11        MS. SAMUELS:  All right.
12        MS. ADEEYO:  Natalie Adeeyo, Breana
13   Bill, and Neha Locke on behalf of the Defendant,
14   City of Chicago.
15        MS. SAMUELS:  All right.  Thank you.
16   BY MS. SAMUELS:
17   Q.  All right.
18        And when was the last time
19   you've given a deposition, sir?
20   **A.  Sometime within the last year.**
21   Q.  All right.  Since it's been fairly
22   recently, I won't belabor you with the rules.
23   Just all your answers have to be verbal.  If
24   it's unclear, let me know.  If you want to take

**7**

1    break, also let me know.  Okay?
2    **A.  Yes, ma'am.**
3    Q.  All right.  And then, also, if you're
4    answering my question, I'll assume you
5    understood the question and your answer is
6    responsive to the question that's being asked.
7    Okay?
8    **A.  Okay.**
9    Q.  What's your current job?
10   **A.  I have none.**
11   Q.  All right.  When's the last time you
12   were employed?
13   **A.  December 15th, 2019.**
14   Q.  From December 15th, 2019, until today,
15   have you had any employment?
16   **A.  No.**
17   Q.  What year did you graduate high
18   school?
19   **A.  I'm sorry?**
20   Q.  What year did you graduate high
21   school?
22   **A.  I graduated high school in 1982.**
23   Q.  All right.  What high school?
24   **A.  Fenwick High School in Oak Park.**

**8**

1    Q.  All right.  After high school what did
2    you do?
3    **A.  Went to college.**
4    Q.  What college?
5    **A.  Rosary College in River Forest.**
6    Q.  How long did you go to college in
7    River Forest?
8    **A.  I graduated Rosary College in 1987.**
9    Q.  And what did you graduate with?
10   **A.  Bachelor's of liberal arts.**
11   Q.  Any specialization or concentration?
12   **A.  Political science.**
13   Q.  During the time that you were
14   attending Rosary, did you have any jobs?
15   **A.  I worked for -- I believe I worked for**
16   **a painting company for about a year.**
17   Q.  Okay.  Were you ever subject to any
18   discipline while you worked for that painting
19   company?
20   **A.  No.**
21   Q.  Were you ever subject to any
22   allegations of misconduct while studying at
23   Rosary?
24   **A.  No.**

**9**

1    Q.  After graduating with your bachelor's
2    in liberal arts, what did you do after that?
3    **A.  I then attended John Reid and**
4    **Associates School of Polygraph, Chicago,**
5    **Illinois.**
6    Q.  How did you learn about the School of
7    Polygraph?
8    **A.  I'm sorry.  I didn't hear the**
9    **question, ma'am.**
10   Q.  How did you learn about the School of
11   Polygraph?
12   **A.  Did I what?**
13   Q.  How did you learn about the school?
14   **A.  Oh, through my family.**
15   Q.  Do you have other members of your
16   family who have gone to that school?
17   **A.  Yes.**
18   Q.  All right.  Who?
19   **A.  My sister.**
20   Q.  Anyone else?
21   **A.  My brother-in-law.**
22   Q.  Anyone else?
23   **A.  No.**
24   Q.  Okay.  What's your sister's name?

3  (Pages 6 to 9)

Robert Bartik
June 15, 2022

---

10

1      A.  There is Roberta Bartik and Denise
2  Frances.
3      Q.  Which one went to the polygraph
4  school?
5      A.  Both of them.
6      Q.  And what's the name of your
7  brother-in-law?
8      A.  Richard Yinjieski (phonetic).
9      Q.  Can you spell the last name for me?
10     A.  Not really.  It's a Polish name.  Not
11 really.
12     Q.  Okay.
13     A.  You can sound it out.
14     Q.  And had both of your sisters gone to
15 the polygraph school before you went?
16     A.  Yes.
17     Q.  Okay.  At the time that you went to
18 the polygraph school, were your sisters employed
19 as polygraph technicians?
20     A.  I believe my -- I believe my one
21 sister was, yes.
22     Q.  Okay.  The sister that you believe --
23     A.  Denise.
24     Q.  Okay.  And where was she employed as a

---

11

1  polygraph technician?
2      A.  She was employed for a company, Barts
3  and Associates.
4      Q.  And do you know what Barts and
5  Associates does?
6      A.  They were a polygraph and detective
7  agency.
8      Q.  In the Chicago area?
9      A.  Yes.
10     Q.  Okay.  And the year that you first
11 attended John Reid and Associates, was that '87?
12     A.  I believe so.  Yes.
13     Q.  And how long did you attend John Reid
14 and Associates?
15     A.  The curriculum is a six-month course.
16     Q.  And do you recall what the curriculum
17 covered?
18     A.  Chart interpretation, human
19 physiology, anatomy, question formulation,
20 actual charts history of polygraphs, the general
21 makeup of the polygraph instrument at the time.
22     Q.  I'm sorry.  Did you say human anatomy
23 or human physiology?
24     A.  Yes.

---

12

1      Q.  I'm sorry, what was that?
2      A.  Both.
3      Q.  Both.  Okay.
4          What's the difference between
5  human anatomy and physiology?
6      A.  It's been a long time, ma'am.  I
7  couldn't really differentiate right now.  It's
8  been over thirty some odd years, forty I think.
9      Q.  All right.
10         Is there anything that you
11 learned during your coursework at John Reid and
12 Associates about polygraphs or becoming a
13 polygraph operator that has since been -- that
14 has since gone out of use?
15         MR. MILLER:  Object to the form of the
16 question.
17         THE WITNESS:  I don't believe so.
18         MS. SAMUELS:  All right.
19 BY MS. SAMUELS:
20     Q.  Is there anything that you've learned
21 during your coursework at John Reid and
22 Associates about polygraph or becoming a
23 polygraph operator that has since become
24 disfavored or debunked?

---

13

1          MR. MILLER:  Same objection.
2          THE REPORTER:  I'm sorry.  I can't
3  tell who's making the objection from the video.
4          MR. MILLER:  It's Graham Miller.
5          THE REPORTER:  Okay.  Thank you.
6          THE WITNESS:  Can you repeat the
7  question, ma'am?
8  BY MS. SAMUELS:
9      Q.  Yes.
10         Is there anything that you
11 learned during your coursework at John Reid and
12 Associates about polygraphs or being a polygraph
13 operator that has since become disfavored or has
14 been debunked?
15         MR. MILLER:  Object to form and
16 foundation.
17         THE WITNESS:  To my knowledge, no.
18 BY MS. SAMUELS:
19     Q.  All right.  And so is it fair to say
20 that the curriculum and the coursework that you
21 learned at John Reid and Associates, to your
22 knowledge, is still current and applicable for
23 polygraph operators today?
24     A.  To my knowledge, yes.

---

4  (Pages 10 to 13)

Robert Bartik
June 15, 2022

14

1      Q.  Okay.
2            How -- this is going to be an
3   incredibly vague question, but how do you read a
4   polygraph?
5            MR. MILLER:  Object to the form.
6            THE WITNESS:  You get trained to do
7   so.
8   BY MS. SAMUELS:
9      Q.  Right.  And so I understand that,
10   like -- well, let me pull one up and see if that
11   helps.  Give me one second.  If I can find it --
12   there we go.
13           So I'm going to show you --
14   I'm going to share screen on a polygraph.  Can
15   you see this?
16     A.  Yes.
17     Q.  Okay.  And it's fair to say you're
18   trained to read and interpret what this means?
19     A.  Yes.
20           MR. MILLER:  Can you zoom in or
21   whatever.
22   BY MS. SAMUELS:
23     Q.  Do you need me to zoom in more or can
24   you see it okay?

15

1      A.  That's fine.
2      Q.  Hold on.
3            And so my first question is,
4   this sheet that I'm looking at, which has been
5   Bates marked City NK 1535, what would you call
6   this chart?
7      A.  Those are the -- that is -- that is
8   half of an examination.  That's half of a
9   physiological recording of a subject that was
10   administered a polygraph examination.
11     Q.  Okay.  And when you are administering
12   a polygraph examination, are there -- what --
13   are there -- is there more than one thing that
14   you're measuring?
15     A.  Yes.
16     Q.  Okay.  What are the things that you're
17   measuring during a polygraph examination?
18     A.  Heart rate, blood pressure, breathing,
19   respiratory rate, breath suppressions, galvanic
20   skin response.
21     Q.  I'm sorry.  So heart rate, blood
22   pressure, respiratory rate.  Is that correct?
23     A.  Yes.
24     Q.  All right.  I'm sorry.  What were the

16

1   other things?
2      A.  Galvanic skin response.
3      Q.  Would you spell that, please?
4      A.  G-a-l-v-a-n-i-c s-k-i-n response.
5      Q.  Okay.  And heart rate is basically the
6   beats per minute for your heart, correct?
7      A.  Yes.
8      Q.  All right.  Blood pressure, I'm
9   thinking of, like, the normal blood pressure
10   reading you would take from a blood pressure
11   cuff or something like that?
12     A.  The instrument we use to measure is a
13   blood pressure cuff.
14     Q.  Okay.  How do you measure respiratory
15   rate?
16     A.  We attach two instruments.  They're
17   called pneumograph tubes around the subject.
18     Q.  Okay.  And what does a pneumograph
19   tube tell you?
20     A.  They measure breathing.
21     Q.  Okay.  Is that just how much you're
22   inhaling and exhaling in a given minute or
23   something like that?
24     A.  It measures your breathing.

17

1      Q.  Okay.  And galvanic skin response,
2   what is that?
3      A.  The galvanic skin response are two
4   small pedals that are attached to the -- most
5   likely the fore -- the forefinger and ring
6   finger, and it measures the -- it measures the
7   activity of the atrichial sweat glands.
8      Q.  And what are the atrichial sweat
9   glands?
10     A.  On your fingers.
11     Q.  Okay.  And so the galvanic skin
12   response, is that a measurement of just like how
13   much -- it's for to what extent somebody is
14   sweating?
15     A.  It could be, yes.
16     Q.  Okay.  Is there a standard rate or is
17   there a standard number that you would -- well,
18   let me first ask this.
19           What can a polygraph
20   examination determine?
21           MR. MILLER:  Object to the form of the
22   question.
23           THE WITNESS:  A polygraph examination
24   measures physiological responses to specific

Lightfoot Court Reporting, P.C.
312.701.1090

Robert Bartik
June 15, 2022

**18**

1  questions to determine physiological -- whether
2  or not that person is physiologically reacting
3  to those specific questions asked.
4  BY MS. SAMUELS:
5      Q.  Okay.  And when you're examining the
6  physiological responses, do you make certain
7  conclusions based upon those responses?
8      A.  Yes.
9      Q.  What determinations would you make?
10         MR. MILLER:  Object to the form of the
11  question.
12         THE WITNESS:  It could be
13  inconclusive, deceptive, or non-deceptive.
14  BY MS. SAMUELS:
15      Q.  All right.
16         Are there objective
17  indications for these determinations or do these
18  determinations depend on each individual?
19      A.  Can you repeat the question, Counsel?
20  I don't understand the question.
21      Q.  Sure.  So let me try to give you -- so
22  I guess what I'm asking is, like, so .08 is the
23  blood alcohol limit, right, regardless of who an
24  individual is, right?

**19**

1         And so I guess what I'm
2  getting is, would you expect to see a certain
3  number in every individual where you say if they
4  meet that number then this means something, or
5  are you saying depending on each -- or does each
6  subject have their own baseline?
7      A.  Each subject has their own baseline.
8      Q.  Okay.  And then based upon that
9  subject, you determine whether their responses
10  tend to indicate whether it's inconclusive,
11  deceptive, or non-deceptive?
12      A.  Yes.
13      Q.  Okay.  Flipping to what's been marked
14  as FC -- I'm sorry, City NK 1529.  Can you still
15  see this?
16      A.  Yes.
17      Q.  Okay.  Can you tell if this is the
18  beginning of a chart?
19      A.  I believe that the -- what I'm looking
20  at there is a test chart.
21      Q.  Okay.  And what's a test chart?
22      A.  If you attach the individual to the
23  instrument, you hone in the instrument, you add
24  sensitivity, you sensor the parameters of the

**20**

1  pen, you make sure that the cuff is working and
2  what pressure the cuff needs to be before you
3  actually start the actual examination.
4      Q.  Okay.  And during this time are you
5  asking questions?
6      A.  No.
7      Q.  Okay.  And so this is essentially just
8  calibrating the machine or the different devices
9  to the individual?
10     A.  I wouldn't say calibrating.  You're
11  just making sure that the machine is getting the
12  proper recordings.
13     Q.  All right.  And how can you -- I
14  guess, what are you looking for to make sure
15  that the machine is getting the proper
16  recordings?
17     A.  All proper amplitudes so that you are
18  not getting straight lines.  You're getting
19  enough to where the -- where you can see the
20  responses.
21     Q.  And what about the document that you
22  are viewing now let's you know that this is the
23  test page?
24     A.  That the blood pressure cuff was only

**21**

1  on the subject for forty-seven seconds, that
2  there were no questions asked of the individual
3  during that forty-seven seconds, and I believe
4  there is a -- there's a mark, a notation, that
5  circle that says "TC," test chart.
6      Q.  Okay.  Is this -- where is the TC?
7  Where do you see it says "TC?"
8      A.  On the bottom of the page, there's two
9  circled -- there's two circled -- there's --
10  there is a number -- there's almost like a
11  fraction and then over to the left is the
12  circle, and directly above it that's says "TC."
13     Q.  Got you.  All right.  And then the
14  circle that's below it, do you know what that
15  means or what that would indicate?
16     A.  That would indicate the amount of
17  sensitivity that the examiner had brought in to
18  the response to make sure that he could see
19  whatever it was he needed to see.
20     Q.  All right.  And to the right, the
21  fraction, is that the blood pressure?
22     A.  That is after he placed the blood
23  pressure is the top number, and then he
24  distributes the air out of it to make sure that

6  (Pages 18 to 21)

Robert Bartik
June 15, 2022

22

1 it goes through the whole system. And that's
2 the one -- that's the resting number on the
3 chart.
4 Q. Okay. The chart has a number of
5 vertical lines. Do these indicate anything to
6 you?
7 A. Those are -- those are five-second
8 intervals.
9 Q. Okay. The chart also has a number of
10 horizontal lines. Do those indicate anything to
11 you?
12 A. No.
13 Q. The chart has a number of -- I guess
14 these would be readings. It looks like this
15 chart has four different readings. Is that
16 fair?
17 A. Four different readings?
18 Q. Yeah. Four different lines going
19 across the chart.
20 A. Those are the four parameters that we
21 measure.
22 Q. Okay. And so the most -- the highest
23 one, what does this measure?
24 A. That's breathing.

23

1 Q. Okay. The second one, what does that
2 measure?
3 A. Also breathing.
4 Q. All right. The third line, what does
5 that measure?
6 A. The galvanic skin response.
7 Q. And the fourth line, what does that
8 measure?
9 A. The blood pressure.
10 Q. Where is the respiratory rate? Where
11 would that be recorded?
12 A. The top two lines.
13 Q. Okay.
14 I'm sorry. Where would heart
15 rate be measured?
16 A. On the bottom. Blood pressure.
17 Q. Oh. So blood pressure and heart rate
18 are on the same line?
19 A. Yes.
20 Q. Okay. What happens if the machine
21 isn't calibrated enough? How would that affect
22 the results of the readings?
23 A. Calibrated how?
24 Q. So my understanding is you have to

24

1 sort of assess the machine to make sure that
2 it's reading an individual's response at the
3 right level or at an accurate level. Is that
4 fair?
5 A. We put the machine to the point where
6 we can see the responses, yes.
7 Q. Right.
8 And so if a machine is
9 calibrated too softly where you can't see --
10 well, let me ask that. Can you miscalibrate a
11 machine so that it's unable to accurately see a
12 response?
13 A. I suppose you could.
14 Q. How would that be done?
15 A. Well, when you attach the respiratory
16 bands around the -- the breathing or pneumograph
17 tubes could be put on the subject loosely. The
18 sensitivity measure could not be put up high
19 enough to where you can get a discernable
20 reading. You don't inflate the cuff enough to
21 where you get a high enough length for the blood
22 pressure and heart beat.
23 Q. What if -- that would result in not
24 being able to read or being able to discern the

25

1 results because it would be too insensitive. Is
2 that fair?
3 A. It's a possibility. It doesn't
4 necessarily mean that it's always. You know, if
5 you put the breathing tubes on a little loose,
6 you could crank the sensitivity up. Or if an
7 examiner sees that something happened, they can
8 readjust at any time.
9 Q. Okay. What happens if -- well, is it
10 possible to put the breathing tubes on too
11 tight?
12 A. I mean, anything's possible,
13 Counselor. But, I mean, if they're on too
14 tight, usually the person that you're giving the
15 examination to will -- you know, we'll get the
16 subject's complaints about it. Then you would
17 adjust it accordingly.
18 Q. How would putting on a breathing tube
19 too tight affect the reading?
20 A. Well, it would be expanding and
21 contracting of the tubes. So if the tube is
22 already expanded, it's not allowed to contract,
23 then you won't get necessarily the breathing.
24 Q. So would that result in a false --

7 (Pages 22 to 25)

Robert Bartik
June 15, 2022

26

1        So if the tube is attached too
2    tightly, if I'm understanding you correctly,
3    then it wouldn't be able to measure -- it would
4    result in a lower reading for breathing because
5    it couldn't measure it accurately?
6        **A. No. It means that the examiner would**
7    **see it and would have to readjust the attachment**
8    **to make sure that you can get good readings.**
9        Q. Right. And so I'm talking about if
10   it's not readjusted, how would that affect the
11   reading? Would it result in seeing too much
12   breathing or too little breathing?
13       **A. Well, I mean, first off, I'm a little**
14   **confused because the question is would a --**
15   **would an examiner put a tight breathing tube**
16   **around the person and not want to measure what**
17   **needs to be measured. That doesn't make sense**
18   **to -- you know, if you want the reading, you get**
19   **the reading. If the tube is too tight, you're**
20   **not going to see the peaks and valleys of the**
21   **breathing.**
22       Q. Right.
23       And so if I'm understanding
24   you correctly, having a tube too tight, as well

27

1    as having a tube too loose, would result in the
2    same, I guess, error where it's not able to
3    correctly pick up the breathing. Is that fair?
4        **A. It's possible, but that doesn't**
5    **necessarily mean that it's going to be that way**
6    **all the time.**
7        Q. Okay. So would it be fair to say if
8    someone placed the respiratory -- it's a
9    respiratory tube, correct?
10       **A. Pneumograph.**
11       Q. I'm sorry, pneumograph tube.
12       All right. So if the
13   pneumograph tube is pressed -- is applied too
14   tightly or too loosely, you would expect the
15   reading to show -- the reading not to be able to
16   show an accurate number or an accurate count for
17   breathing?
18       **A. No. I believe that if the pneumograph**
19   **tube was applied either too loosely or too**
20   **tightly that the examiner would get up and he**
21   **would adjust it on the person that he put it on**
22   **to make sure that it fits properly.**
23       Q. Sure.
24       And in a perfect world, we

28

1    would expect an individual to do that, but I'm
2    more concerned about if there was an error how
3    we would expect those things to play out. Does
4    that make sense?
5        MR. MILLER: I object to the form of
6    the question. Incomplete hypothetical. Calls
7    for speculation.
8        THE WITNESS: It all depends,
9    Counselor.
10   BY MS. SAMUELS:
11       Q. Okay.
12       And so if a tube is placed too
13   loosely, it can result in seeing -- I'm sorry.
14   If a pneumograph tube is placed too loosely, it
15   can result in seeing too much inhalation or too
16   little inhalation, it just depends on the
17   individual?
18       **A. A lot of it depends on the individual.**
19       Q. Okay. And same question. If a
20   pneumograph tube is placed too tightly, it can
21   result in seeing too much breathing or too
22   little breathing, it just depends on the
23   individual?
24       **A. It depends.**

29

1        Q. Okay. And same question for a blood
2    pressure cuff. If a blood pressure is placed
3    too lightly, would you expect that to result in
4    seeing erroneously high or an erroneously low
5    blood pressure?
6        **A. I would expect the examiner to adjust**
7    **the tension or the pressure of the polygraph --**
8    **of the blood pressure cuff to make sure that he**
9    **has the proper measurement coming off of the --**
10   **I mean, on to the instrument.**
11       Q. Understood.
12       But assuming that it wasn't
13   fixed to fit perfectly, if a blood pressure was
14   applied too loose, would you expect that to
15   result in an erroneously high or an erroneously
16   low reading?
17       **A. That all depends. I can't speculate**
18   **on that, Counselor.**
19       Q. Okay. Same question. If a blood
20   pressure cuff is placed too tightly, would you
21   expect that to result in an erroneously high or
22   an erroneously low reading?
23       **A. Once again, I can't speculate on that,**
24   **Counselor. I don't know.**

8 (Pages 26 to 29)

Robert Bartik
June 15, 2022

30

1  Q.  Okay.  And then I think the last thing
2  you mentioned was the galvanic skin response
3  that's clipped to your fingers, correct?
4  **A.  Yes.**
5  Q.  Okay.  Is it possible to place that
6  erroneously or incorrectly?
7  MR. MILLER:  Object to form but --
8  THE WITNESS:  I suppose anything is
9  possible.
10 BY MS. SAMUELS:
11 Q.  Okay.  I guess, how should that be
12 correctly applied?
13 **A.  I believe I already answered that**
14 **once.  You would attach it to the ring finger**
15 **and the pointer finger on the tips of the**
16 **finger, and you wrap -- they're wrapped around**
17 **on the -- on the pads of the bottom of the**
18 **fingers.**
19 Q.  Okay.  Does it have to be the ring
20 finger and the pointer finger?
21 **A.  No.**
22 Q.  Okay.  And so regardless of what
23 finger it's applied to, you would expect the
24 reading to essentially have the same response?

31

1  **A.  Yes.**
2  Q.  Okay.  Besides reading the indications
3  as a result to, excuse me, as it relates to
4  heart rate, blood pressure, respiratory rate,
5  and galvanic skin response, are you looking for
6  anything else while you're taking a polygraph
7  examination?
8  **A.  Those are the readings that we**
9  **measure.  Those are the parameters that we**
10 **measure.**
11 Q.  All right.  Are there any other
12 parameters that you take into consideration?
13 **A.  Those are the parameters that we**
14 **measure.**
15 Q.  Understood, sir.
16 My question is, are there any
17 other factors that you take into consideration?
18 **A.  When evaluating a polygraph**
19 **examination, those are the four parameters that**
20 **we measure.**
21 Q.  I understand that, sir.  So I can
22 measure something but also take into
23 consideration pitch or tone of the individual,
24 whether they're looking away or laughing or seem

32

1  nervous, right?  And so I understand that these
2  are things that you can objectively measure,
3  right?
4  My question is, when you're
5  examining somebody during the polygraph, is
6  there anything besides those four things you
7  mentioned that you take into consideration?
8  **A.  In order to determine truth or**
9  **deception, we use those four parameters.**
10 Q.  Okay.  And nothing else, fair?
11 **A.  That is correct.**
12 Q.  Okay.  Thank you, sir.
13 So after the six months at
14 John Reid and Associates, did you graduate?
15 **A.  Yes.**
16 Q.  Okay.  What did you do after
17 graduating from John Reid and Associates?
18 I can stop sharing this.
19 **A.  I became licensed and I -- in November**
20 **of 1988, I became a Chicago police officer.**
21 Q.  All right.  Was that your date of
22 appointment?
23 **A.  November 7th, 1988.**
24 Q.  Okay.  What made you decide to become

33

1  a police officer?
2  **A.  It was in the family.  My father was a**
3  **police officer and my sister was a police**
4  **officer.**
5  Q.  Which sister is a police officer?
6  **A.  Roberta Bartik.**
7  Q.  Okay.  Was she a polygraph examiner
8  with CPD as well?
9  **A.  Yes.**
10 Q.  Okay.  When you joined the police
11 department, did you join to become a polygraph
12 examiner?
13 **A.  No.**
14 Q.  Okay.  So where was your first area of
15 assignment?
16 **A.  I did my first training out of the**
17 **academy in the 19th District.**
18 Q.  All right.  Is that while you're still
19 on probation?
20 **A.  Yes.**
21 Q.  Okay.  After your probationary period
22 ended, where did you go?
23 **A.  I was transferred to the 24th**
24 **District.**

9  (Pages 30 to 33)

Robert Bartik
June 15, 2022

34

1    Q.  All right.  And how long did you stay
2  at the 24th District?
3    **A.  Approximately, I believe it was around**
4  **ten years.**
5    Q.  All right.  When you were first
6  transferred to the 24th District, was it as a
7  patrolman?
8    **A.  Yes.**
9    Q.  Okay.  When -- at the time that you
10  left the 24th District, did you -- was this
11  still as a patrolman?
12    **A.  Yes.**
13    Q.  Okay.  Were you ever assigned to any
14  special teams or anything like that while you
15  were at the 24th District?
16    **A.  No.**
17    Q.  All right.  Did you ever receive any
18  specialized training or any specialized
19  assignments while you were at the 24th District?
20    **A.  Other than the required roll call**
21  **trainings and trainings that I had to go down to**
22  **the academy, which, you know, would -- on a**
23  **normal basis they would have you do.**
24    Q.  All right.

35

1      So I guess it's, like -- they
2  have, like, general refresher courses that all
3  police officers are expected to go through.  Is
4  that fair?
5    **A.  Yes.**
6    Q.  Okay.  And that's what you're
7  referring to but nothing special that no one
8  else was expected to go through.  Is that fair?
9    **A.  Yes.**
10      MR. MILLER:  Object to form.
11  Foundation.
12      THE WITNESS:  That is correct.
13  BY MS. SAMUELS:
14    Q.  Okay.  After the 24th District, what
15  was your next area of assignment?
16    **A.  I was assigned to the polygraph unit.**
17    Q.  All right.  And that would have been
18  in or around 1999?
19    **A.  I believe so.  Somewhere around there,**
20  **yes.**
21    Q.  All right.  Where is the polygraph
22  unit based out of?
23    **A.  At that time it was located on the**
24  **fifth floor annex of 1121 South State Street.**

36

1    Q.  Was 11th and State, was that a -- what
2  building is that?  Is that a -- that's not a
3  district, is it?
4    **A.  It was police headquarters.**
5    Q.  Oh, okay.  It's before my time.  I'm
6  used to it being on 35th.
7      How did you -- did you have to
8  apply to become a member of the polygraph unit?
9    **A.  There was a notice issued**
10  **department-wide.  I put in my application with**
11  **my resume and I was brought down there.**
12    Q.  Okay.
13      Prior to joining the polygraph
14  unit, had you used your training or your
15  certification from John Reid and Associates to
16  operate as a polygraph examiner in any other
17  capacity?
18    **A.  Yes.**
19    Q.  All right.  How or when?
20    **A.  I was employed by Barts and Associates**
21  **on a part-time basis.**
22    Q.  When was that?
23    **A.  From the time that I was licensed**
24  **through, I believe, 2011.**

37

1    Q.  For your work as a -- I guess, did you
2  have an official job title for Barts and
3  Associates?
4    **A.  Polygraph examiner.**
5    Q.  Okay.  While you worked for -- as a
6  polygraph examiner for Barts and Associates, did
7  you ever investigate criminal matters?
8    **A.  Mostly what we -- what I was involved**
9  **with was domestic-type fidelity issues.**
10    Q.  Okay.  Did you ever have to give a
11  polygraph examination in any criminal matters?
12    **A.  It's been so long, Counselor, I don't**
13  **remember.  I don't believe I have.  I don't**
14  **think so.**
15    Q.  Okay.  While you were working -- are
16  there any courses or is there anything you are
17  required to do to maintain your certification as
18  a polygraph examiner?
19    **A.  Through the State of Illinois I have**
20  **to pay my fee.**
21    Q.  Okay.  Is there any, like, continuing
22  coursework or updated or refresher courses you
23  are required to take?
24    **A.  That I'm required to take, no.**

10  (Pages 34 to 37)

Robert Bartik
June 15, 2022

38

1    Q.  Yes, sir.
2         Okay.  And so, at the time
3    that you joined the polygraph unit in or around
4    1999, do you recall who else was assigned to
5    work in the polygraph unit?
6         A.  I was transferred in with Kevin
7    Howley.
8         Q.  Okay.
9         A.  And I believe we were -- we were
10   replacing two gentlemen, John Scout and Robert
11   Tovar.  However, they were also helping out in
12   the unit on a part-time basis.
13        Q.  So at the time that you joined the
14   unit, were the only two, I guess, full-time
15   members you and Howley?
16        A.  Yes.
17        Q.  Okay.  Did you have a supervisor or
18   someone you would normally report to while you
19   worked for the polygraph unit?
20        A.  Well, the polygraph unit was part of
21   the Forensic Services Division.  We had a
22   general string of command.
23        Q.  All right.  And who was the person you
24   were responsible for reporting to?

39

1         A.  At that time I was reporting to
2    Sergeant Curtis Gray.
3         Q.  Okay.  And how long, if you recall,
4    was Sergeant Gray your immediate supervisor?
5         A.  I cannot tell you.  Up until his
6    retirement, which I don't recall.
7         Q.  Who is your next supervisor after
8    Curtis Gray?
9         A.  I've been -- it was Lieutenant Jack
10   Huels.
11        Q.  I'm sorry.  Can you spell his last
12   name?
13        A.  H-u-e-l-s.
14        Q.  And how long did you report to
15   Lieutenant Huels?
16        A.  I want to say up until his retirement.
17   I don't know.  Couple years.
18        Q.  Who was your supervisor after
19   Lieutenant Huels?
20        A.  Well, Lieutenant Huels and Sergeant
21   Gray were my chain of command.
22        Q.  Okay.  So who replaced --
23        A.  My immediate sergeant after Sergeant
24   Gray was Sergeant Robert Conrad or Conrath.  I

40

1    don't know.
2         Q.  All right.  How long did you report to
3    Sergeant Conrath?
4         A.  A couple years up until his
5    retirement.
6         Q.  Who replaced Sergeant Conrath?
7         A.  Sergeant Ricardo Pabone.
8         Q.  P-a-b-o-n-e?
9         A.  I believe.  I don't know if there's an
10   E on there or not, ma'am.
11        Q.  Okay.  And how long did you report to
12   Sergeant Pabone?
13        A.  That was a couple years as well.
14        Q.  How long were you assigned to the
15   polygraph unit?
16        A.  I believe my total time in the
17   polygraph unit was a little bit under 15 years.
18        Q.  Okay.  So roughly from '99 to 2014?
19        A.  Yes.
20        Q.  Where did you go after the polygraph
21   unit?
22        A.  The 6th District.
23        Q.  What was your job title when you
24   transferred to the 6th District?

41

1         A.  Sergeant of police.
2         Q.  What role did you have as a sergeant
3    in the 6th District?
4         A.  I was supervising units on the streets
5    in the -- I was the desk sergeant.  I was over
6    all patrol.
7         Q.  How long were you a sergeant in the
8    6th District?
9         A.  For about one year.
10        Q.  Where did you go after that?
11        A.  I was transferred to the Central
12   Detention Unit, 18th and State.
13        Q.  Were you still a sergeant?
14        A.  Yes.
15        Q.  All right.  What did you do at the
16   Central Detention Unit?
17        A.  I was the shift supervisor, the
18   afternoon shift supervisor.  Afternoon,
19   sometimes midnight, sometimes days.  We were a
20   little short handed at that time.
21        Q.  All right.  Did your job
22   responsibilities change between being a sergeant
23   with the 6th District and going to Central
24   Detention?

11  (Pages 38 to 41)

Robert Bartik
June 15, 2022

42

1   A.  Yes.
2   Q.  All right.  How were your job
3   responsibilities different?
4   A.  I was supervising the detention aides,
5   supervising the intake of prisoners, supervising
6   the transfer of prisoners from the lockup to
7   Illinois Department of Corrections, monitoring
8   prisoners, monitoring prisoners who had tried to
9   commit suicide, all transgender fluid prisoners
10  were coming into our cells and pretty much about
11  that.
12  Q.  How long were you a sergeant for the
13  Central Detention Unit?
14  A.  Approximately four years.
15  Q.  All right.  Did you do that until your
16  retirement?
17  A.  Yes, ma'am.
18  Q.  When did you stop working for Barts
19  and Associates?
20  A.  I believe it was 2012, 2013.
21  Q.  Why did you stop working for them?
22  A.  Gentleman who owned the company died.
23  Q.  Did the company close?
24  A.  It closed.

43

1   Q.  While you worked at Barts and
2   Associates, were you ever subject to any
3   complaints?
4   A.  No.
5   Q.  Were you ever disciplined for any
6   work-related infractions while working for Barts
7   and Associates?
8   A.  No.
9   Q.  All right.  Is there a licensing board
10  or some type of agency that oversees polygraph
11  examiners?
12  A.  My license is issued through the
13  Department of Professional Regulations.
14  Q.  All right.  Have you ever received a
15  complaint from the Department of Regulation --
16  Department of Professional Regulations or been
17  subject to any investigation?
18  A.  No.
19  Q.  All right.  When you joined the
20  polygraph unit, did you have to receive any
21  additional -- I'm sorry.
22      Going back to CPD now.  When
23  you joined the polygraph unit, did you have to
24  receive any training, additional training?

44

1   A.  Yes.
2   Q.  All right.  And what was that?
3   A.  Just how to -- how to fill out the
4   paperwork that was required by the unit, how
5   to -- where to do the filing, the -- the
6   appointment schedules, things like that.
7   Q.  All right.
8       Was there a change in the
9   paperwork you were expected to fill out when
10  doing a polygraph examination during the time
11  you were in that unit for the Chicago Police
12  Department?
13  A.  Was there a change?  Most of the
14  paperwork that we were -- that we were filling
15  out stayed the same.
16  Q.  Okay.  So --
17  A.  However -- hold on.  Let me preface
18  that, ma'am.  There was -- when we -- when we
19  started administering the examination to the
20  recruits, we had to do additional different
21  paperwork other than what we were doing
22  criminally.
23  Q.  Okay.  So, specifically, from when
24  you're doing criminal examinations, to your

45

1   knowledge, did the paperwork stay the same
2   regarding what you were expected to fill out
3   during the time you were in the polygraph unit
4   for the Chicago Police Department?
5   A.  Yes.
6   Q.  Okay.  And what paperwork were you
7   expected to fill out for criminal polygraph
8   examinations?
9   A.  The things that we had at our disposal
10  that we used was the polygraph cover, the
11  examiner's worksheet, the polygraph subject
12  consent form, and then afterwards there would be
13  a small kind of report sent to the district.
14  Q.  I'm sorry.  So the cover, there's the
15  worksheet, the subject consent form, and what
16  else?
17  A.  There's the examiner's worksheets.
18  Q.  All right.  And so the polygraph
19  cover, what's that?
20  A.  You got to show me one, ma'am, if you
21  have one.  I don't -- I've been gone there for
22  quite some time.  If you can show me something,
23  I'll show you what it looks like and I can
24  acknowledge that that's what we used.

Lightfoot Court Reporting, P.C.
312.701.1090

Robert Bartik
June 15, 2022

---

46

1    Q.  Okay.  Polygraph worksheet, what's
2  that?
3      **A.  That's a worksheet that the examiners**
4  **would use during the administration of their**
5  **examination.**
6    Q.  Is that the graph that I showed you?
7  Is that what it is?
8      **A.  No.**
9    Q.  Okay.  The subject consent form, I'm
10 guessing that's a form that whoever you're
11 being -- whoever you're polygraphing they sign
12 saying they're okay with it?
13     **A.  They're consenting to be**
14 **administered -- they're volunteering --**
15 **volunteering to take the examination.**
16   Q.  All right.  Examiner's worksheet,
17 what's that?
18     **A.  I believe we just went over that.**
19   Q.  Oh.  That's the same thing as the
20 other one.
21   MR. MILLER:  Objection.  Form.
22 BY MS. SAMUELS:
23   Q.  So there's three -- is it fair to say
24 that there's three documents you would expect to

---

47

1  fill out for a -- what I'll ask a different
2  question.
3          Is it fair to say that there's
4  three documents you would expect to fill out
5  when you're conducting a criminal polygraph
6  examination?
7      **A.  If they're necessary.**
8    Q.  Okay.  Is there anything else besides
9  the polygraph cover, worksheet and subject
10 consent form that you would expect to fill out
11 or complete when you're doing a criminal
12 polygraph?
13     **A.  I believe that's it.**
14   Q.  Okay.  I think I have -- I'm going to
15 share screen again with you.
16   MR. MILLER:  Do you need a break?  Do
17 you mind if we take a break?
18   MS. SAMUELS:  Sure.
19   MR. MILLER:  Can we take a break?
20   MS. SAMUELS:  Go for it.
21   MR. MILLER:  Thank you.
22   MS. SAMUELS:  How long?
23   MR. MILLER:  Five minutes?
24   THE WITNESS:  Yeah.

---

48

1        MR. MILLER:  He's just got a bad back,
2  so he's got to take a break.  So five minutes.
3  Like 11:05.
4          (WHEREUPON, a brief recess
5          was held.)
6        MS. SAMUELS:  Back on the record.
7  BY MS. SAMUELS:
8    Q.  So when we left off, we were talking
9  about the type of paperwork you would expect to
10 fill out when conducting a criminal polygraph
11 examination, correct?
12     **A.  Yes, ma'am.**
13   Q.  Okay.  And those three things were the
14 subject consent form, the worksheet, and the
15 polygraph cover.  Is that fair?
16     **A.  I'm sorry?**
17   Q.  I said the three things that you said
18 you would expect to fill out or complete were
19 the polygraph cover, worksheet, and the subject
20 consent form?
21     **A.  Yes, if any of that was necessary.**
22 **Sometimes it's not necessary.**
23   Q.  Okay.  When would that not be
24 necessary?

---

49

1      **A.  Well, you wouldn't need to fill out an**
2  **examiner's worksheet if you walked in and the**
3  **guy says, I'm not taking your test.  So you walk**
4  **out.  So you're done.**
5    Q.  All right.  So, basically, you don't
6  do a worksheet if there's no polygraph?
7      **A.  No.  You just don't do a worksheet if**
8  **you -- if the amount of time you're there**
9  **doesn't require you to fill out a sheet at that**
10 **point.**
11   Q.  All right.  When would you be required
12 to fill out a worksheet?
13     **A.  So if you're going to be administering**
14 **the test, the worksheet is definitely required.**
15   Q.  Okay.  So in May of 2000 the polygraph
16 unit was still at 11th and State?
17     **A.  I don't know.**
18         **Ma'am, I'm pretty -- I'm very**
19 **bad at dates.  I know we went from 11th and**
20 **State to Homan Square.  At what point we went**
21 **to, I don't know.**
22   Q.  All right.  Let's do it this way.  Can
23 you describe -- was there a specific room you
24 were -- that you always gave a polygraph in?

---

Robert Bartik
June 15, 2022

---

50

1      A.  We had polygraph -- we had rooms where
2  we administered polygraph examinations.  We had
3  multiple rooms.
4      Q.  Okay.  Were all the rooms generally
5  the same?
6          MR. MILLER:  Object to form.
7          THE WITNESS:  The different locations
8  had different dimensions.
9  BY MS. SAMUELS:
10     Q.  Okay.  Would you expect the same
11  furniture and equipment to be in each room?
12     A.  For the most part, yes.
13     Q.  Okay.  At 11th and State how many
14  different rooms were there where you would give
15  a polygraph examination?
16     A.  We had two.
17     Q.  All right, two.
18         Where were they in relation to
19  each other?
20     A.  They were right next to each other.
21     Q.  All right.  And where were they in the
22  building at 11th and State?
23     A.  Fifth floor annex.
24     Q.  All right.  Can you describe what the

---

51

1  rooms looked like?
2      A.  At 11th and State?
3      Q.  Yes, sir.
4      A.  Very old.  Very old.  They were --
5  they had some -- what looked like yellowing
6  ceiling tile around all the walls to help
7  eliminate noise.  The desk would be actual
8  polygraph inside it, a large chair with a tie
9  back and arms that the subject would sit in, and
10  a chair that the examiner would sit in.
11     Q.  All right.  Do you recall if there
12  were windows in the room?
13     A.  Windows, no.
14     Q.  Okay.  How many ways were there to get
15  into the room?
16     A.  One.
17     Q.  All right.  And then the door that led
18  into the polygraph room, what did that lead to?
19         MR. MILLER:  Object to form.
20         THE WITNESS:  What -- what did the --
21  what was outside the polygraph room?  A hallway.
22  BY MS. SAMUELS:
23     Q.  Did you have an office at 11th and
24  State?

---

52

1      A.  Yes.
2      Q.  All right.  Where would that be in
3  related -- where would that be located in
4  relation to the polygraph room?
5      A.  Across the hall from the polygraph
6  room.
7      Q.  Okay.  And I think you said there were
8  two rooms at 11th and State.  But, generally,
9  you would expect to see the same things in both
10  rooms?
11     A.  Yes.
12     Q.  Okay.  And then the polygraph rooms at
13  Homan Square, how many were there?
14     A.  Two.
15     Q.  Two.
16         Again, would you generally
17  expect to see the same things in each?
18     A.  Yes.
19     Q.  All right.  Can you describe the
20  polygraph room at Homan Square?
21     A.  They had the exact same furniture that
22  was taken over from 11th and State to Homan
23  Square.  The room was a tad bit smaller.  They
24  installed a large, two-way mirror -- one-way

---

53

1  mirror.  I don't know what the correct term is.
2  And there was a roll-down shade to keep the
3  mirror private -- to keep the room private.
4      Q.  Okay.  And so -- hold on.
5          So was there one window in the
6  room or were there two?
7      A.  There were no windows in the room.
8      Q.  Okay.  And so there was the -- when
9  you say the one-way mirror, I'm thinking the
10  mirrors were, like, you can see out but nobody
11  can see in?
12     A.  No.  The other way around.  You could
13  see into the room, but the room -- you couldn't
14  see out of the room.
15     Q.  Okay.
16     A.  It was an observation deck.
17     Q.  Okay.  Got it.  Okay.
18         And where were -- where was
19  your office in relation to the polygraph rooms
20  at Homan Square?
21     A.  Right next to the polygraph room.
22     Q.  Was your office on the other side of
23  the mirror?
24     A.  Yes.

---

14  (Pages 50 to 53)

Robert Bartik
June 15, 2022

54

1    Q. Okay. So when -- okay.
2        How would you expect to
3    receive an assignment to conduct a polygraph?
4    **A. Detectives would call for**
5    **appointments.**
6        Q. And that would be the general practice
7    in or around May of 2000?
8    **A. I believe so. Yes.**
9        Q. All right. And when they called for
10   appointments, what information would you need in
11   order to set up an appointment?
12   **A. We would discuss availability. We**
13   **would discuss with the -- I would discuss with**
14   **the detectives whether it was of an immediate**
15   **importance or if they could schedule it at a**
16   **later time or date, how many people they were**
17   **looking to have tested. Maybe I'd put the RD**
18   **number down there, contact phone number, what**
19   **area they were from.**
20       Q. Okay. And where would this
21   information be recorded?
22   **A. In our schedule book.**
23       Q. And is that literally just like a book
24   where you'd write down information?

55

1    **A. Yes.**
2        Q. Okay.
3        All right. And then after a
4    polygraph is scheduled, then what would be the
5    next step?
6    **A. The next step where? What do you**
7    **mean?**
8        Q. What would you expect to be the next
9    thing to happen in order to conduct a polygraph?
10   **A. Well, if a detective makes an**
11   **appointment with me, he will bring the person to**
12   **me.**
13       Q. Okay. And after the detective brings
14   the person who's going to be the subject of the
15   examination, what would you expect to happen
16   after that?
17   **A. The subject would be placed in a**
18   **polygraph examination room. The detectives**
19   **would accompany me to my office where they would**
20   **appraise [sic] me of whatever information is --**
21   **I needed or is necessary for me to give my**
22   **examination.**
23       Q. Okay. And so, essentially, the
24   detectives would tell you -- would they provide

56

1    you with, like, questions that they would want
2    you to ask?
3    **A. No.**
4        Q. Okay. So what would they tell you?
5    **A. It all depends.**
6        Q. Okay. What type of information would
7    they tell you?
8    **A. They would give me an RD number.**
9    **Sometimes they would have a case report**
10   **available to me. Time, date, place, the type of**
11   **incident, the issue. It could be a theft. It**
12   **could be an auto accident. It could be a sexual**
13   **abuse. It could be a child abuse. It could be**
14   **a homicide. Where, when, the victim, if there**
15   **was a victim in some cases, the -- the, you**
16   **know, the particulars on the person who I'm**
17   **giving the examination to.**
18       Q. Okay. And how would you determine
19   what questions -- what questions to ask?
20   **A. That would be -- well, with the**
21   **detectives they would want to know what -- a**
22   **certain issue, a lot of times, not necessarily**
23   **the particular question. And then I would -- I**
24   **develop my questions while I was talking to the**

57

1    **individual inside the polygraph room.**
2        Q. Okay. So, essentially, they would
3    brief you on the case and tell you about an
4    issue, and then while you are doing the
5    polygraph you would sort of fill out what
6    specific questions to ask?
7    **A. While I was talking to the individual**
8    **person, I would formulate my questions.**
9        Q. Okay.
10       All right. While you're
11   talking to the detective before the polygraph
12   examination, was it your general practice to
13   take notes?
14   **A. Sometimes yes. Sometimes no. It all**
15   **depends.**
16       Q. What are some factors that would
17   determine whether or not you took notes?
18   **A. The complexity of the case, whether I**
19   **have already been involved in it in some degree**
20   **or a couple of them. Quite a few reasons.**
21       Q. And so if this was the first time you
22   were involved in a case, would you expect
23   yourself to take notes?
24   **A. It all depends.**

15 (Pages 54 to 57)

Robert Bartik
June 15, 2022

58

1     Q. All right. After you sort of have the
2 meeting with the detectives, then what would you
3 expect to be the next step in conducting a
4 polygraph examination?
5     **A. I would go into the polygraph room**
6 **where the subject was.**
7     Q. All right. And then what?
8     **A. I would introduce myself.**
9     Q. Then what?
10    **A. I would explain to the person who was**
11 **being administered the test that this was a**
12 **voluntary thing and he didn't have to do it if**
13 **he didn't want to. If he agreed, I would then**
14 **present him with the polygraph subject consent**
15 **form, at which time I would read the entire**
16 **thing to him, verbatim for the most part. The**
17 **only thing I would change is during the Miranda**
18 **warnings, I change it from first person to**
19 **third. Instead of I, I'd say you. If they**
20 **agreed I would request that they sign this**
21 **document.**
22    Q. Okay. And then what?
23    **A. We would have a conversation.**
24    Q. Okay. And when you say you would have

59

1 a conversation, what does that mean or what does
2 that consist of?
3     **A. The purpose of the pretest interview**
4 **is to get the person accustomed to talking to**
5 **me, to make sure that they know specifically why**
6 **they are there, what the issue at hand is, to**
7 **ask questions so that if they have other**
8 **information that they want to get out of their**
9 **system or -- I shouldn't say out of their**
10 **system. That's a bad way to put it. If they**
11 **want to convey other information that they may**
12 **have forgot or whatever, they could do it now.**
13 **During this time we develop the actual questions**
14 **that we're going to ask them on the polygraph**
15 **examination.**
16        **I then go through some**
17 **suitability questions with them, at which time**
18 **after I feel, based on my suitability issues,**
19 **that they are okay to take the examination, I**
20 **will review the questions with them to help them**
21 **understand they have the right to change them at**
22 **any time, adjust them, to do whatever they need**
23 **to, and help them -- to help them to pass the**
24 **test.**

60

1      **After they know what the test**
2 **is all about and they understand, I will attach**
3 **them to the examination -- to the machine and I**
4 **will administer the actual examination to them.**
5     Q. Okay. So I believe you said this
6 portion is considered the pretest interview?
7     **A. Yes, ma'am.**
8     Q. Okay. And when you're doing the
9 pretest interview, are you ever -- are you
10 talking to them generally? Are you talking
11 about the case or both?
12       MR. MILLER: Object to form.
13       THE WITNESS: I don't know what you
14 mean by "generally."
15 BY MS. SAMUELS:
16    Q. Sure. So let me ask -- let me just
17 ask this.
18       So during the pretest
19 interview, are you talking to them about the
20 case or the reason why they are -- are you
21 talking to them about the criminal case?
22    **A. Yes.**
23    Q. Okay. And as you're talking to them
24 about the criminal case, I think you said that's

61

1 when you begin to develop the specific questions
2 you're going to ask during the examination?
3     **A. During the conversation that I'm**
4 **having with them questions start to develop,**
5 **yes.**
6    Q. Okay. And when you say -- I think you
7 said "sustainability questions." What does that
8 mean or what's that referring to?
9     **A. Suitability.**
10    Q. Suitability. I'm sorry.
11       When you say "suitability
12 questions," what's that referring to?
13    **A. I ask them questions to make sure that**
14 **they're okay at that point in time to be able to**
15 **take the examination.**
16    Q. Okay. So, for instance, if somebody
17 was intoxicated you wouldn't give them an
18 examination?
19    **A. That is correct.**
20    Q. All right. What are some other
21 indications you might see that someone should
22 not take a polygraph?
23    **A. Drug withdrawals is one. If**
24 **there's -- if they have major -- you know,**

16 (Pages 58 to 61)

Robert Bartik
June 15, 2022

---

**62**

1 congestive heart failure, there's health issues
2 that might have a problem, if they cannot sit
3 for a long period of time, if they have pain
4 issues, if they -- if they are falling asleep
5 during the interview, if they're belligerent, if
6 they're hostile. Those are just some of them.
7     Q. Do you have to take into consideration
8 cognitive function when determining whether
9 someone could take a polygraph?
10     MR. MILLER: Object to form.
11     THE WITNESS: What do you mean
12 "cognitive function?"
13 BY MS. SAMUELS:
14     Q. So, like, somebody's ability to
15 understand the questions that they are being
16 asked?
17     A. If they are not understanding the
18 question and they are conveying to me that they
19 are not understanding the question, there's no
20 reason -- there's no way that I can administer a
21 test. So I would probably have to say I think
22 probably yeah. That is -- that could be one of
23 them.
24     Q. Okay. Other than instances where the

---

**63**

1 individual has conveyed their inability to
2 understand questioning, do you recall any
3 instances where you got someone who wasn't able
4 to understand what was going on, and so you
5 didn't provide -- you didn't provide a polygraph
6 examination?
7     A. Okay. So you're saying -- I'm a
8 little bit confused, Counselor. You're saying
9 that have I experienced someone not understand
10 my questions? Is that what you're saying?
11     I don't understand. If you
12 can explain what you're saying.
13     Q. Right.
14     And so, I guess what I'm
15 thinking of is an individual who may have a lack
16 of learning or understanding, despite being an
17 adult, and you realize that they -- they're
18 incapable of understanding the questions that
19 you're asking. Does that make sense?
20     A. Okay. So most likely that would have
21 already been hashed out from the detectives who
22 were working the case. And if the detectives
23 thought that this person was not cognitively
24 able to understand, I don't necessarily think

---

**64**

1 they'd be bringing him to me in the first place.
2     Q. Okay. And so those sort of things you
3 would expect the detective to weed out?
4     A. Yeah, common sense. Sure.
5     Q. Okay. And then after the pretest
6 interview, I think you said after that is when
7 you would do the actual test?
8     A. Yes.
9     Q. Okay. Generally speaking, how long
10 would the pretest interview last?
11     A. Generally speaking, it could last from
12 twenty minutes to three hours.
13     Q. Okay. So it really just depends?
14     A. It really just depends.
15     Q. Why might a pretest interview take
16 three hours?
17     A. Depends on how much the person has to
18 say.
19     Q. Okay. And same question. How long
20 would you expect the actual polygraph
21 examination to last?
22     A. That depends.
23     Q. It really just depends on the number
24 of questions being asked?

---

**65**

1     A. Depends on the number of examinations
2 that are being issued.
3     Q. And when you say "examinations," those
4 are the questions that are being asked?
5     A. Yes. The number of times that the
6 test is being run.
7     Q. Oh, okay. When you are --
8     What does that mean, the
9 number of times the test is being run?
10     A. Well, after we attach a person to the
11 polygraph and we start asking the questions and
12 recording the physiology, that is one
13 examination. It usually lasts between three and
14 four minutes. State law requires that we
15 administer a minimum of two examinations.
16 However, we could actually administer up to six
17 if we need to.
18     Q. Okay. And so does each -- what are --
19 what is each examination comprised of?
20     A. The questions that were developed on
21 the examination -- on the pretest.
22     Q. Okay. And so for each examination are
23 you asking the same questions?
24     A. Yes.

---

17 (Pages 62 to 65)

Robert Bartik
June 15, 2022

66

1    Q.  I'm sorry?
2    **A.  Yes.**
3    Q.  Is there a limit or recommendation for
4  how many questions you're supposed to ask per
5  examination?
6    **A.  Usually the maximum is 11.**
7    Q.  All right.  When you're giving an
8  examination, would you expect each question to
9  be a yes or no answer?
10   **A.  Correct.**
11   Q.  Okay.  Are there any other best
12 practices related to questions that should --
13 that are asked during examination?
14       MR. MILLER:  Object to form.
15 Incomplete hypothetical.
16       THE WITNESS:  Best practices.  What
17 exactly do you mean by "best practices?"
18 BY MS. SAMUELS:
19   Q.  So, for instance, if I asked somebody
20 an open-ended question that would -- I'm
21 assuming that would not be the type of question
22 I should be asking, right?  I should be asking
23 yes or no questions, right?
24   **A.  Yes.  That's what I said, yes or no**

67

1  **questions.**
2    Q.  Right.
3        And so yes or no questions
4  would be sort of the best practices or the
5  expectation when you're asking somebody -- when
6  you're conducting a polygraph examination, fair?
7    **A.  Yes.**
8    Q.  Okay.  Is there anything else you can
9  think of where you would say if you're doing a
10 polygraph examination this is what I would
11 expect to be done?
12       MR. MILLER:  Object to form.
13 Incomplete nature of the hypothetical.
14       THE WITNESS:  All questions are yes
15 and no.
16 BY MS. SAMUELS:
17   Q.  Understood.
18       Is there anything else about
19 the questioning or the style of the examination
20 that you would expect to see in a polygraph
21 examination?
22       MR. MILLER:  Same objection.
23       THE WITNESS:  Based on your question,
24 I'm going to have to say no.

68

1  BY MS. SAMUELS:
2    Q.  Okay.
3        And then you said each
4  examination has to be done at least twice, but
5  it can be done up to six times, correct?
6    **A.  Yes.**
7    Q.  Okay.  And as you're doing each
8  examination, are you recording the responses
9  somewhere?
10   **A.  Yes.**
11   Q.  All right.  Where are the responses
12 recorded?
13   **A.  On that sheet of paper that you showed**
14 **me.  On paper.  Like at the time, 2000, on**
15 **paper, like that sheet of paper that you showed**
16 **me.**
17   Q.  Okay.  The graph with the heart rate
18 and all that other stuff?
19   **A.  Yes.**
20   Q.  Okay.
21   **A.  Yes.**
22   Q.  Okay.  During the pretest interview,
23 are you taking notes or are you recording
24 anywhere what's being told?

69

1    **A.  In 2000 there was no recording**
2  **available to us.  There will be sometimes.  It**
3  **all depends on the note taking.**
4    Q.  Was it your general practice to take
5  notes during the pretest interview?
6    **A.  I felt that when a person was talking**
7  **to you that it was easier that they would talk**
8  **to you when you weren't writing things down.  So**
9  **by not necessarily writing down every word they**
10 **said, it helped them to talk easier.**
11   Q.  After the polygraph examination, then
12 what?
13       MR. MILLER:  Object to form.
14       THE WITNESS:  At that point the
15 examination -- I would read the results or read
16 the results of the chart and offer an opinion.
17 BY MS. SAMUELS:
18   Q.  So are you reading the results to the
19 person being examined or to detectives?
20   **A.  I'm looking at the results to**
21 **determine whether there's truth or deception.**
22 **And then I will, depending on how the detectives**
23 **request, I'll either let the person know or I'll**
24 **let the detectives know.**

18  (Pages 66 to 69)

Robert Bartik
June 15, 2022

---

70

1     Q.  Okay.  So is it fair to say as you're
2  doing the examination you are not evaluating it,
3  that you do the evaluation after you have
4  completed it all?
5     **A.  You can see when they are -- when the**
6  **chart is being recorded a lot of times whether**
7  **or not the person is reacting to certain**
8  **questions.  Sometimes it's not as clear cut.  So**
9  **there's sometimes when the reactions are so**
10  **strong that you can tell right away as they are**
11  **coming -- as the charts are being recorded**
12  **whether the person is telling the truth or not,**
13  **and then there are other times you can't where**
14  **you'll have to look at it and make a**
15  **determination, you know, look at it a little bit**
16  **closely, a little more closely.**
17     Q.  And when you say you would report your
18  results to the detectives, would you generally
19  do that orally?  Was it a written report?  How
20  would you convey the results?
21     **A.  At the time the test was concluded, I**
22  **would let the detectives know orally.  And then**
23  **later on at a later time I would generate a**
24  **small cover-sheet-type report that I would send**

---

71

1  **to the detective area.**
2     Q.  Okay.  And then after you convey the
3  results to the detectives, are there any further
4  steps you would take?
5     **A.  Like what?**
6     Q.  I have no idea.  I'm just asking.
7     **A.  Well, if there's detectives that want**
8  **me to go in and -- look, for example, if a**
9  **person didn't pass the test, they'll ask -- they**
10  **may ask to go in and talk to them, or they may**
11  **go in and talk to them themselves while they're**
12  **still in the polygraph room.  Other than that,**
13  **my -- my interaction with that person is done.**
14     Q.  All right.  Assuming that you took
15  notes during a pretest interview or any other
16  part of the polygraph examination, what would
17  you do with those notes?
18     **A.  They would be on the back of the**
19  **examiner's worksheet, and then they would be**
20  **filed along with all of the other paperwork.**
21     Q.  And assuming you took notes during the
22  session with the detectives, where they apprise
23  you of what happened, what would you do with
24  those notes?

---

72

1     **A.  They would also be on the back of the**
2  **examiner's worksheet.**
3     Q.  Okay.  Did you prepare at all for your
4  deposition today?
5     **A.  Yes.**
6     Q.  All right.  How did you prepare?
7     **A.  I'm sorry?**
8     Q.  How did you prepare?
9     **A.  Oh, I met with my attorneys.**
10     Q.  When did you meet with them?
11     **A.  A couple hours Monday, couple hours**
12  **yesterday.**
13     Q.  Did you review anything in preparation
14  for your deposition?
15     **A.  Yes.**
16     Q.  What did you review?
17     **A.  The paperwork for Jovanie Long's**
18  **polygraph examination.**
19     Q.  Anything else?
20     **A.  My trial testimony at his trial.**
21     Q.  Do you have an independent
22  recollection of the examination you did on
23  Jovanie Long?
24     **A.  No, ma'am.  I do not.**

---

73

1     Q.  When you reviewed the reports and your
2  testimony, did that refresh your recollection?
3     **A.  No.**
4     Q.  Is there anything about the testimony
5  that you provided at Jovanie Long's trial that
6  you thought was inaccurate?
7     **A.  No.**
8     Q.  Based upon the testimony you reviewed,
9  is it your understanding that Jovanie Long
10  confessed to the murder of Marek Madjak during
11  the pretest interview?
12     **A.  I believe that's what the paperwork**
13  **says.  Yes.**
14     Q.  And so that would have been before you
15  asked him any questions?
16     **A.  Before I asked him any questions?**
17     Q.  Yeah.
18     **A.  You -- I don't understand.  So you**
19  **mean, like, he just spontaneously jumped up and**
20  **decided to confess?  I don't understand what you**
21  **mean, ma'am.**
22     **I mean, I was -- obviously, I**
23  **was talking to the gentleman.  I don't know to**
24  **what extent I was talking to him during the**

---

19  (Pages 70 to 73)

Robert Bartik
June 15, 2022

74

1    pretest. **Somewhere during that he made the**
2    **admission to me.**
3        Q.  Is it common for people to make
4    admissions during the pretest interview?
5        **A.  I don't know if the word common is a**
6    **thing, but it does occur.**
7        Q.  Okay.  So I'm sharing with you the
8    report.  Can you see this?
9        **A.  Yes.**
10       Q.  And this looks like -- is this the
11   cover sheet you were talking about?
12       **A.  Yes.**
13       Q.  Okay.  And so this would be completed
14   after you're done with an examination?
15       **A.  Yes.**
16       Q.  All right.  And in this instance it
17   says examination results was no examination?
18       **A.  That is correct.**
19       Q.  Do you recall the first time someone,
20   I guess, had made an admission that didn't
21   require you to take a polygraph examination?
22       **A.  No, ma'am.  I don't.**
23       Q.  Has that happened before?
24           MR. MILLER:  Object to form.  Before

75

1    what?
2    BY MS. SAMUELS:
3        Q.  So other than Jovanie, are there other
4    people who have made admissions that didn't
5    require a polygraph examination?
6        **A.  Yes.**
7        Q.  Okay.  And so this wasn't the first
8    time that this has happened to you, is that fair
9    to say, Jovanie Long making an admission?
10       **A.  I don't know at what point Jovanie was**
11   **there, whether or not people had made statements**
12   **to me before I talked to Jovanie or after, I**
13   **don't know.  I can't say this was the first,**
14   **second, third, fourth, last.  I just don't have**
15   **that information.**
16       Q.  All right.  Is this the worksheet you
17   were talking about?
18       **A.  This is the case review.**
19       Q.  Okay.  When would you fill out a
20   polygraph case review?
21       **A.  A lot of the information on the top of**
22   **that page would be given to me and gleaned when**
23   **the detective came in.**
24       Q.  Okay.

76

1        **A.  And then the stuff on the bottom would**
2    **be after the person left.**
3        Q.  All right.  And so would you expect to
4    fill out a polygraph case review in every
5    instance when you are doing a polygraph
6    examination?
7        **A.  Yes.**
8        Q.  Okay.  And that's regardless of
9    whether or not an examination is completed?
10       **A.  Yes.**
11       Q.  Okay.  And so the top information is
12   the date and time, essentially, that you first
13   meet with the individual.  Is that fair to say?
14       **A.  Yes.**
15       Q.  Okay.  And it looks like for Jovanie
16   Long that was 8:15 on August 5th, 2000?
17       **A.  Actually, it was more when he was**
18   **brought into the office or the time that I got**
19   **into the office that day.  However, it may be.**
20       Q.  Let me ask it this way.
21           Did you have a general or a
22   standard practice for how you would fill out a
23   polygraph case review?
24       **A.  In regards to what?**

77

1        Q.  The information that you would expect
2    it to contain?
3        **A.  We would fill in the necessary**
4    **parameters on that sheet.**
5        Q.  All right.
6           And so the box that says "in,"
7    what would you -- what did you understand that
8    box to mean?
9        **A.  That's when the individual came in**
10   **with the detectives and was placed in the room.**
11       Q.  Okay.  And the box that says "out,"
12   what did you understand that to mean?
13       **A.  That's when he left my office.**
14       Q.  Okay.  And so that's not necessarily
15   the time you complete the polygraph examination,
16   but that's the time he leaves the polygraph
17   section.  Is that fair?
18       **A.  Yes.**
19       Q.  Okay.  And, again, 8:15 isn't the time
20   you begin the examination, it's the time he's
21   brought into the polygraph section.  Fair?
22       **A.  Yes.**
23       Q.  Okay.  And then the information at the
24   top where it says, "offense" and "RD number,"

20  (Pages 74 to 77)

Robert Bartik
June 15, 2022

78

1  you would -- that information you would get
2  during the time that the case that you take
3  the -- that you take the -- that's the time that
4  they scheduled it, correct?
5      **A.  No.**
6      Q.  Okay.  When would you get that
7  information?
8      **A.  When the detectives give me the**
9  **information which is immediately prior to**
10 **administering the test.**
11     Q.  Okay.  Same with the "victim" and
12 "location," is that when you get that
13 information?
14     **A.  Yes.**
15     Q.  All right.  Same with "manner" and
16 "date and time," is that when you would get that
17 information?
18     **A.  Yes.**
19     Q.  Okay.  Regarding "subject, address,
20 sex, race, age," when would you get that
21 information?
22     **A.  Same time.**
23     Q.  Okay.  "Investigator and agency," when
24 would you get that information?

79

1      **A.  At the same time.**
2      Q.  Regarding "remarks," what information
3  would you put into remarks?
4      **A.  I would put something very general**
5  **concerning the incident.  Sometimes if**
6  **there's -- if I've done multiple tests, I just**
7  **make -- I say it's an ongoing investigation at**
8  **this point.  Somehow the detectives convey to me**
9  **that he was a possible offender.**
10     Q.  Okay.  And so remarks would be
11 information that you learned from the
12 detectives.  Is that fair to say?
13     **A.  Yes.**
14     Q.  Okay.  And then "results," that is --
15 would be done generally after an examination is
16 completed, correct?
17     **A.  Yes.**
18     Q.  Okay.  So everything before results
19 you would expect to be completed before you
20 begin an examination?
21     **A.  Yes.**
22     Q.  And then it says "Results:  No
23 examination," and in parenthesis are your
24 initials.  Is that fair to say?

80

1      **A.  Yes.**
2      Q.  Why did you place your initials there?
3      **A.  To indicate that I was the person who**
4  **filled it all out.**
5      Q.  Okay.  And then when it says subject
6  stated he did shoot victim during the course of
7  a robbery, what does that mean or indicate to
8  you?
9      **A.  That indicates that he told me that he**
10 **had shot this gentleman during the course of a**
11 **robbery.**
12     Q.  Okay.  I guess, is it -- do you know
13 that that occurred during the pretest period
14 because it says "no examination?"
15     **A.  Yes.**
16     Q.  All right.  And so say during the
17 examination someone makes an inculpatory
18 statement, would you continue on with the
19 examination?
20     MR. MILLER:  Object to the nature --
21 incomplete nature of the hypothetical, but go
22 ahead.
23     THE WITNESS:  If what you're saying is
24 while I'm administering the examination the

81

1  person actually says something inculpatory, I
2  would immediately stop the examination and talk
3  to them.
4  BY MS. SAMUELS:
5      Q.  Okay.  And if that were the case, how
6  would you define it?  Would it still be no
7  examination?  Would it say partial examination?
8  What would it say?
9      MR. MILLER:  Same objection.
10     THE WITNESS:  Well, it all depends on
11 whether the examination was completed or not.
12 Sometimes the person makes -- you know, may make
13 statements that are not necessarily in their own
14 best interest, but it doesn't go to the issue at
15 hand.  So you would hash it out and then
16 continue on with the examination.
17     Sometimes the person --
18 sometimes the person says, I'm done, I don't
19 want to do it, okay.  We take it off and he's
20 done.
21     If we have administered two
22 examinations, then we are clearly seen on the
23 chart, then that is a polygraph examination.
24 That is a legal polygraph that we could try to

21  (Pages 78 to 81)

Robert Bartik
June 15, 2022

82

1    score, and so we would be -- there would be an
2    examination.
3    BY MS. SAMUELS:
4        Q.  Right.
5            And so I guess my question is,
6    when you begin an examination, but for whatever
7    reason you don't get to the two complete
8    examinations that are required, how would that
9    be indicated or what would you expect to see
10   written on the polygraph case review?
11       **A.  That is an interesting question.  I**
12   **don't know how necessarily -- I'm sure that**
13   **would be earmarked just the way you said it, you**
14   **know.  During whatever test he declined, decided**
15   **he didn't want to do it anymore, so the**
16   **examination was terminated.**
17       Q.  Okay.  And then turning to the next
18   page, this is the polygraph consent form?
19       **A.  Yes.**
20       Q.  And then is it fair to say you filled
21   out everything except for this signature of
22   examinee?
23       **A.  Also the blank in number one.**
24       Q.  Okay.  So the blank in number one

83

1    is -- I'm sorry.  I didn't mean to cut you off.
2        **A.  The blank in number one and his**
3    **signature are what he filled out.**
4        Q.  Okay.  And so -- and so as a polygraph
5    examiner, are you competent to evaluate the
6    results of an examination that you did not
7    conduct?
8            MR. MILLER:  Object to form.
9            THE WITNESS:  I am able to look at
10   charts of other people and to try to make a
11   determination, yes.
12   BY MS. SAMUELS:
13       Q.  Okay.  Hold on.
14           So the polygraph examiner
15   worksheet, this is what you were talking about
16   before as one of the forms that should always be
17   filled out, correct?
18           MR. MILLER:  Object.  Misstates prior
19   testimony.
20           THE WITNESS:  Not always.
21   BY MS. SAMUELS:
22       Q.  All right.  When wouldn't this be
23   filled out?
24       **A.  When there's --**

84

1            MR. MILLER:  Object.  Asked and
2    answered.
3            THE WITNESS:  When there is no
4    information that needs to be put on there that
5    has been given yet.
6    BY MS. SAMUELS:
7        Q.  Okay.
8            And so did you have a common
9    custom or practice that you used to fill out a
10   polygraph examiner's worksheet?
11           MR. MILLER:  Object to form.
12           THE WITNESS:  Did I have shorthand?
13   Did I put different questions in the same spot?
14   Yeah.
15   BY MS. SAMUELS:
16       Q.  Okay.  And so it's fair to say -- I
17   understand you didn't conduct this examination,
18   but this is the only example I have.
19           So for a polygraph examiner's
20   worksheet, when would you normally put in
21   information about the subject?
22           MR. MILLER:  Object to foundation.
23           THE WITNESS:  When I was in the room.
24

85

1    BY MS. SAMUELS:
2        Q.  Okay.  Would that be during the
3    pretest or during the actual polygraph
4    examination?
5        **A.  No, it would be during the pretest.**
6        Q.  Okay.  And so when you're conducting a
7    pretest or if you get to the point where you're
8    doing a pretest interview with someone, would
9    you expect there to be a polygraph examiner's
10   worksheet completed?
11           MR. MILLER:  Object to foundation.
12   Form.
13           THE WITNESS:  Yes.
14   BY MS. SAMUELS:
15       Q.  Okay.  And during the pretest is a
16   common question you would ask about how the
17   individual was feeling?
18       **A.  Yes.**
19       Q.  All right.  During the pretest is it
20   common to ask questions about the education
21   level of the individual?
22       **A.  Yes.**
23       Q.  All right.  During a pretest is it
24   common to ask questions about the employment

22  (Pages 82 to 85)

Robert Bartik
June 15, 2022

86

1    history of an individual?
2        **A.  Not the employment history.**
3        Q.  Okay.
4             So, to my understanding, there
5    was no polygraph examiner's worksheet that was
6    started for Jovanie Long.  Is that your
7    understanding as well?
8        **A.  There is none, so it's my**
9    **understanding that we did not proceed to that**
10   **point in the pretest interview.**
11       Q.  Okay.  Is there something that comes
12   before asking questions, such as the subject's
13   name, in a pretest interview?
14       **A.  I'm sorry.  I don't understand.  Can**
15   **you say that again, ma'am?**
16       Q.  Is there something that comes before
17   asking a subject's name in a pretest interview?
18       **A.  Does what come before asking a**
19   **subject's name?**
20       Q.  Like, is there anything that comes
21   before that in the pretest interview?
22       **A.  Is there anything -- yeah.  I**
23   **explained to you this before.**
24       Q.  Okay.  And so what comes before asking

87

1    the subject's name?
2            MR. MILLER:  Objection to asked and
3    answered.
4            THE WITNESS:  Once again, when you
5    know, I walk in there I introduce myself.  I
6    tell them who I am.  I explain to them what
7    they're doing there, that it's voluntary.  They
8    fill out a consent form.  They sign their names
9    on the consent form so I know who they are from
10   the signature of the consent form.
11           I'm still not understanding
12   the question very much.
13   BY MS. SAMUELS:
14       Q.  Okay.  So you consider the
15   introduction and signing the consent form to be
16   part of the pretest interview?
17       **A.  Oh, absolutely.**
18       Q.  Okay.  And so based upon the lack of a
19   polygraph examiner's worksheet, can you make any
20   conclusions about how far you got into the
21   pretest interview with Jovanie Long?
22       **A.  No, I can't.**
23       Q.  Okay.  And so did you have a normal
24   practice to ask people about their personal

88

1    information prior to begin talking about the
2    case with them?
3        **A.  Actually, no.  That was all given to**
4    **me from the detectives.**
5        Q.  Okay.  And so your normal practice in
6    May of 2000 would be to begin talking about the
7    case during the pretest interview prior to
8    asking information about how they feel and their
9    name and asked for their information?
10       **A.  Yes.**
11       Q.  Okay.  And you see the -- I guess the
12   numbers would indicate questions that are asked
13   during the interview or during the examination.
14   Is that fair to say?
15           MR. MILLER:  Object to foundation.
16           THE WITNESS:  The numbers?
17   BY MS. SAMUELS:
18       Q.  Yes.  Can you --
19       **A.  What numbers, ma'am?**
20       Q.  Do you still see this sheet?
21       **A.  Yes.**
22       Q.  Okay.  And then there's, I think,
23   numbers 1 through 11 that are circled.  Do you
24   see that?

89

1        **A.  There's numbers 1 through 8 and then**
2    **number 11.  Yes.**
3        Q.  Okay.  Well, what do numbers 1 through
4    8 indicate to you?
5            MR. MILLER:  Object to foundation.
6            THE WITNESS:  Those are the -- all the
7    questions that are on -- that are written on
8    this form are the questions that were asked
9    during the polygraph examination, questions 1
10   through 8 and number 11.
11   BY MS. SAMUELS:
12       Q.  All right.  Do you know why there's no
13   questions nine or ten?
14       **A.  Yes.**
15       Q.  All right.  Why is that?
16       **A.  Those spots are reserved for**
17   **additional relevant questions that could be**
18   **used, if necessary.  And if they don't use them,**
19   **they don't put them in.**
20       Q.  So it would be common to skip numbers
21   for the questions in a polygraph examination?
22           MR. MILLER:  Object to form.
23   Foundation.
24           THE WITNESS:  Common to skip numbers?

23  (Pages 86 to 89)

Robert Bartik
June 15, 2022

---

90

1      MS. SAMUELS: Yeah.
2      THE WITNESS: I don't understand the
3  question. What do you mean?
4  BY MS. SAMUELS:
5      Q. So it goes from eight to eleven,
6  right?
7      A. Yes.
8      Q. All right. And you would agree that
9  numbers nine and ten are skipped?
10     A. Yes.
11     Q. So when you are conducting a polygraph
12 examination, it would be common to see numbers
13 skipped. Is that fair to say?
14     **A. I don't know if it's common, but there**
15 **is -- there's always time when you don't**
16 **necessarily ask multiple questions, that if you**
17 **can get the questions that's the minimal -- of**
18 **the minimal amount you don't have to ask five**
19 **relevant questions.**
20     Q. Right.
21     But my question is, if you --
22 so if you're only going to ask five questions
23 during a polygraph examination, is there ever a
24 reason not to use numbers one through five to

---

91

1  indicate those questions?
2      **A. No, it's not.**
3      Q. Okay. And so if I show one, three,
4  five -- one, three, five, seven, nine, right,
5  would that indicate to you that nine questions
6  were asked or five questions were asked?
7      **A. I still don't understand the question,**
8  **ma'am. I'm really -- you've got me lost here.**
9      Q. Sure.
10     And so my question is, can you
11 tell from this worksheet how many questions were
12 asked?
13     **A. Yes.**
14     Q. How many?
15     **A. Nine.**
16     Q. Nine. Okay.
17     And so because there's no
18 questions written down for nine and ten, that
19 means that no questions were asked?
20     **A. Okay.**
21     Q. No. I'm asking you is that what it
22 means?
23     MR. MILLER: Object to foundation.
24     THE WITNESS: Yes.

---

92

1  BY MS. SAMUELS:
2      Q. Okay. Is it possible that questions
3  nine and ten were asked but they weren't written
4  down?
5      **A. No.**
6      Q. Okay. Are you only supposed to write
7  down the questions that you ask someone during
8  the examination?
9      MR. MILLER: Object to form.
10     THE WITNESS: Yes.
11 BY MS. SAMUELS:
12     Q. All right. And do you see next to the
13 question where it says a plus or a minus in a
14 circle?
15     **A. Yes.**
16     Q. What do you understand that to mean?
17     **A. That is the verbal answer that was**
18 **given by the subject in response to the question**
19 **that was asked to him or her by the examiner.**
20     Q. Okay.
21     And would you use that same
22 shorthand generally while you were -- for your
23 polygraph examiner's worksheets?
24     **A. Yes.**

---

93

1      Q. Okay. And do you see this sheet?
2      **A. Yes.**
3      Q. All right. What did -- how do you
4  differentiate between when questions are being
5  asked on a sheet such as this?
6      **A. The numbers at the bottom of the page.**
7      Q. Okay. So the number -- can you see
8  where my cursor is indicating?
9      **A. Yes.**
10     Q. All right. What does that number
11 indicate to you?
12     **A. I can't see that number.**
13     Q. Okay. Do you see the number where my
14 cursor is indicating now?
15     **A. Yes.**
16     Q. All right. What does that number mean
17 to you?
18     **A. That's number three.**
19     Q. Number three?
20     **A. Yes.**
21     Q. Okay. Do you see the one next to the
22 three?
23     **A. That's not a one.**
24     Q. What is that?

---

24  (Pages 90 to 93)

Robert Bartik
June 15, 2022

---

**94**

1    A.  That is an indication by the examiner
2  as to when he started asking his questions
3  verbally to the subject.
4    Q.  Okay.  Got you.
5        And so over here it looks like
6  that's a 1-1?
7    A.  I can't tell being that close to the
8  edge of the paper, ma'am.  You're giving me
9  partial charts here.  You're giving me
10 photocopies of stuff, and it's very hard to
11 disseminate.  I can't -- and to be quite honest
12 with you, it's unfair to have me do something
13 like this because I don't -- I wouldn't know
14 what that is.
15   Q.  Do you see where my cursor is
16 indicating where there's an M located?
17   A.  Yes.
18   Q.  What do you understand that to mean?
19   A.  That's the examiner earmarking that
20 the subject made some type of movement, which --
21 he did some kind of irregular thing to, excuse
22 me, the polygraph chart.
23   Q.  Okay.  And do you see the 1-6?
24   A.  I see a 6.

---

**95**

1    Q.  You don't see a 1 next to the 6?
2    A.  It's not a 1 next to the 6.  That's
3  the earmark by the examiner as to when he
4  started his question.
5    Q.  Got you.  Okay.
6        And so that let's you know
7  that he's starting question number 6.  Is that
8  fair to say?
9    A.  Yes, ma'am.
10   Q.  Okay.  Do you see this underline or
11 this indication that's going horizontally?
12   A.  Yes.
13   Q.  I'm sorry?
14   A.  Yes.
15   Q.  All right.
16       What does that mean to you?
17   A.  That is the subject's verbal response
18 where he actually responded to the question of
19 that to him on the examination.
20   Q.  Okay.  And then do you see -- let me
21 blow it up.  Can you see this?  It looks like
22 it's 60 with a line under it and some -- maybe
23 an NM or something like that?
24   A.  I don't know.

---

**96**

1    Q.  All right.  6-0 with a line under it,
2  does that indicate anything to you?
3    A.  I believe the 60 dictates what the
4  blood pressure cuff pressure was at the end of
5  the examination.
6    Q.  Okay.  And then -- I'm sorry.  I think
7  it switched screens on me.  It did.  Sorry.  I
8  think it switched screens.
9        Okay.  And so this would
10 indicate that this is the end of this
11 examination.  Is that fair to say?
12       MR. MILLER:  Object to foundation.
13       THE WITNESS:  That would be the end of
14 the test, yes.
15 BY MS. SAMUELS:
16   Q.  Okay.  And because -- can you tell
17 which examination this is?
18   A.  No.
19   Q.  Okay.  Do you see this number printed
20 up here, the 1-2?
21   A.  Yes.
22   Q.  What does that mean to you?
23   A.  That is how many rolls -- how many
24 speeds are left in the roll of paper that's

---

**97**

1  rolling off of the polygraph chart.
2    Q.  Okay.  So a higher number would
3  indicate that it -- that the -- that this is
4  earlier in the examination?
5    A.  Yeah.
6    Q.  Okay.
7        THE WITNESS:  Can we take a break?
8        MR. MILLER:  Yeah.  Can we take a
9  break?
10       MS. SAMUELS:  Yeah.  Five minutes?
11       MR. MILLER:  Yeah, five is fine.
12       (WHEREUPON, a brief recess
13       was held.)
14       MS. SAMUELS:  Back on the record.
15 BY MS. SAMUELS:
16   Q.  Okay.  And so I think when we left off
17 I was asking you about what certain things on a
18 polygraph chart meant; fair?
19   A.  Uh-huh.
20   Q.  Okay.
21       And so I'm showing you another
22 polygraph chart.  This one at the top says "13,"
23 correct?
24   A.  Yes.

---

25  (Pages 94 to 97)

Robert Bartik
June 15, 2022

98

1    Q.  So that would seem to indicate that
2    this -- these readings happened before the one
3    on 12; is that fair?
4        A.  Yes.
5        Q.  Okay.  And then at the bottom it says
6    number -- or it looks like the "#3 MQ" and then
7    circled.  Do you see that?
8        A.  Yes.
9        Q.  All right.  What does that indicate or
10   mean to you?
11       **A.  That indicates that it is the third**
12   **examination that is being administered in this**
13   **series, and the MQ stands for mixed question.**
14       Q.  All right.  What's a mixed question?
15       **A.  Instead of asking the questions in the**
16   **order that he had previously done, he's**
17   **alternating the order of the questions that he's**
18   **asking.**
19       Q.  Okay.  Was that a standard practice?
20       A.  Yes.
21       Q.  All right.  Is there a reason you
22   might alternate the order of questions?
23       A.  Yes.
24       Q.  All right.  And why is that?

99

1        **A.  To determine whether or not the**
2    **position in which you ask each individual**
3    **question during the test could elicit a**
4    **response.  So by switching the positions of the**
5    **questions up, you're eliminating that problem.**
6        Q.  Okay.  And do you see where my cursor
7    is indicating?
8        A.  Yes.
9        Q.  Okay.  And it looks like it's got that
10   sort of demarcation line with the eight and a
11   horizontal line going under it, correct?
12       A.  Yes.
13       Q.  All right.  What does that indicate to
14   you?
15       **A.  Question eight.**
16       Q.  Okay.  And then to the immediate left,
17   do you see where my cursor is indicating?
18       A.  Yes.
19       Q.  All right.  Can you read that and tell
20   me what it indicates to you?
21       **A.  I don't know.**
22       MR. MILLER:  Object to foundation.
23       THE WITNESS:  I can't -- I can't -- I
24   know the one part, the one top is -- that right

100

1    there, that's him moving the needle up.  That
2    straight line on the cardio, that's him actually
3    manipulating charts.  What's underneath I don't
4    see -- I can't -- you'll have to ask him.
5    BY MS. SAMUELS:
6        Q.  Fine.
7        **A.  I don't know what exactly the question**
8    **is.**
9        Q.  And when you move the chart up, what
10   does that mean?
11       **A.  That means that you are manually**
12   **manipulating the chart yourself so that it**
13   **becomes -- so that it goes higher into the**
14   **section where it won't go -- the pen stops**
15   **because this is a pen making the chart**
16   **recording.**
17       Q.  Okay.  Would that affect the reading
18   at all?
19       **A.  No.  He's earmarked it.  He's putting**
20   **it on the charts that I did this.  This is my**
21   **manipulation of this.**
22       Q.  Okay.  And so do you see where my
23   cursor is indicating?
24       **A.  Yes.**

101

1        Q.  All right.  Can you read that and tell
2    me what that indicates to you.
3        **A.  I believe that's -- I believe, now,**
4    **like I said, his writing is -- I believe that's**
5    **question number four.**
6        Q.  Okay.  And then the 80 over 60, that
7    would be the blood pressure?
8        A.  Yes.
9        Q.  All right.  Can you see where my
10   cursor is indicating?
11       A.  Yes.
12       Q.  Can you read that and tell me what
13   that indicates to you?
14       **A.  That is the 20.  That means the**
15   **sensitivity unit that he has put this particular**
16   **examination on, the 20 sensitivity unit.**
17       Q.  Okay.  Does that indicate a change or
18   just what the number is?
19       **A.  No idea.**
20       Q.  Okay.  Why might you indicate what the
21   sensitivity is in that examination?
22       **A.  So that you know what your sensitivity**
23   **is.  So -- I mean, if you put it down to zero,**
24   **you're going to get a straight line during the**

26  (Pages 98 to 101)

Robert Bartik
June 15, 2022

102

1    polygraph or -- so by pulling it up to a
2    sensitivity of 20, you can then have some kind
3    of -- you could show some kind of reaction.
4         Q.  Okay.  All right.  And then I'm
5    showing you a graph, and at the top it says
6    "16," correct?
7         A.  Uh-huh.
8         Q.  All right.  And there looks to be some
9    handwriting, and this is just the name of the
10   individual on this graph, correct?
11        MR. MILLER:  Object to foundation.
12        THE WITNESS:  Okay.
13   BY MS. SAMUELS:
14        Q.  Well, I'm guessing, would you -- did
15   you have a common practice of writing on a graph
16   the name of the individual being examined?
17        A.  Yes.
18        Q.  Okay.  And the date indicated here,
19   was it your common practice to indicate the date
20   the examination was occurring?
21        A.  Yes.
22        Q.  Okay.  And then it looks like an F
23   dash and a bunch of numbers.  Do you know what
24   that would generally be used to indicate?

103

1         A.  I would assume that was the RD number.
2         Q.  Okay.  And it looks like the initials.
3    Would that generally be used to indicate the
4    person who's conducting the examination?
5         A.  I believe that's him.
6         Q.  Okay.  And then under the first line,
7    it looks like there's an X where my cursor is
8    indicating.  Do you see that?
9         A.  Uh-huh.
10        Q.  Okay.  Do you know what that would
11   generally be used to indicate?
12        A.  Yeah.  Like I previously stated
13   before, he manipulated the charts himself, so he
14   put an X there.
15        Q.  Okay.  And so is it fair to say any
16   time you see an X indicated on a chart like this
17   that would suggest that there's been some type
18   of manipulation to the machine doing the
19   reading?
20        MR. MILLER:  Object to foundation.
21   Calls for speculation.
22        THE WITNESS:  Most likely, yes.
23   BY MS. SAMUELS:
24        Q.  Okay.  And when you see sort of then a

104

1    number in a circle, like is indicated here,
2    would you generally expect that to mean the
3    reading or the sensitivity of the machine?
4         MR. MILLER:  Same objection.
5         THE WITNESS:  It could be the
6    sensitivity.  It could be the pressure on the
7    cuff.  It could be the number of tests that
8    you're running.
9    BY MS. SAMUELS:
10        Q.  Okay.
11        All right.  Do you see this,
12   what I'm indicating at the bottom left in the
13   circle right here?
14        A.  Yes.
15        Q.  Can you read that and tell me what you
16   understand that to mean?
17        A.  Test chart.
18        Q.  That's what?
19        A.  Test chart.
20        Q.  I'm sorry.  I can't hear you.
21        A.  Test chart.
22        Q.  What does that mean?
23        A.  It means he created a test chart prior
24   to actually administering the examination.

105

1         Q.  All right.  What's a test chart?
2         A.  It's about twenty, thirty seconds that
3    you have everything running the way it's
4    supposed to to make sure that the machine is
5    working properly, that you have proper amplitude
6    and sensitivity for the person you're giving the
7    examination to.
8         Q.  Okay.  Was it your common practice to
9    have a test chart?
10        A.  Yes.
11        Q.  Okay.  And test charts, are they
12   always done before you begin an examination?
13        A.  Yes.
14        Q.  All right.  Is there ever a time when
15   you would do a test chart in the middle of an
16   examination or between two examinations?
17        A.  No.
18        Q.  Okay.
19        A.  Well, if you had -- if you had
20   something where one of the -- one of the
21   attachments fell off, sometimes that happens,
22   they roll, then you would have to put it back on
23   and, you know, maybe do a test -- a little test
24   chart there.  Or you would just make sure that

27 (Pages 102 to 105)

Robert Bartik
June 15, 2022

---

106

1 the one parameter that you fixed is working
2 properly.
3           But for the most part, in
4 general, no, you would just do a test chart at
5 the beginning.
6        Q.   Okay.
7           All right.  And so because --
8 how can you tell if you're looking at a complete
9 chart for a polygraph examination?
10        A.   Well, the blood pressure turns on, all
11 the questions are listed on the bottom, and then
12 the blood pressure turns off.
13        Q.   Okay.  So looking at this chart now,
14 is this the first chart for this examination?
15           MR. MILLER:  Object to foundation.
16 Calls for speculation.
17           THE WITNESS:  This is part of the
18 first examination.
19 BY MS. SAMUELS:
20        Q.   Okay.  Is this the highest number we
21 have?  So this is the highest number we have.
22           Based upon the readings, would
23 this indicate that this is the first chart or
24 was -- is there a page before this?

---

107

1        A.   No.  This is the beginning.  This is
2 his beginning of his chart.  It has the person's
3 name, the date, the test chart, the first
4 straight group of tests is about to begin and
5 has begun.
6        Q.   All right.  So do you know it's the
7 first chart because this is where her name is
8 written or based upon these lines?
9        A.   Based upon the fact that there's a
10 number one.
11        Q.   Okay.  And so can you tell a first
12 chart based upon any of the readings indicated,
13 or would it always be based upon the writings of
14 the examiner?
15        A.   Okay.  I'm a little confused,
16 Counselor.
17           You want me to know if I can
18 look at this -- if I can look at the parameters
19 and see whether or not this is the first
20 examination without looking at any of the
21 markings the examiner made.  No, I can't do
22 that.
23        Q.   Okay.
24           And so the first chart should

---

108

1 be the test chart, correct?
2        A.   Usually, yes, for the most part.  For
3 the most part, the first chart is the test chart
4 to determine the person is responding and you're
5 getting good recordings, yes.
6        Q.   Okay.  Is there a way you would
7 generally expect a test chart to look?
8        A.   It would look -- well, I don't
9 understand your question.  It's going to look
10 like the recordings on the polygraph machine.
11        Q.   Okay.  Do you see this area
12 indicated -- I'm sorry.  Do you see this
13 indicated right here?  It looks like the line
14 and then a number with that horizontal line
15 going under it?
16        A.   Yes.
17        Q.   What would that indicate to you?
18        A.   Question three.
19        Q.   Okay.  And if that's a question -- are
20 these charts read left to right or right to
21 left?
22        A.   Left to right.
23        Q.   Okay.  And so can you tell where the
24 test period on this chart ends?

---

109

1        A.   No.
2        Q.   Okay.  Can you tell where the test
3 period on this chart begins?
4        A.   Yes.
5        Q.   Okay.  Where does it begin?
6        A.   Where the number one, and it says
7 number one, ST and it's circled.  And then the
8 straight line on the cardio or the blood
9 pressure cuff starts up and then you start
10 getting recordings there.
11        Q.   Okay.  So am I indicating correctly
12 where this chart -- where the evaluation begins?
13        A.   Yes.
14        Q.   Okay.  And so about three-quarters of
15 the way it begins, and then that period before
16 it is that test period.  Fair enough?
17        A.   Yes.
18        Q.   Okay.  Got you.
19           Do you have any recollection
20 about any of your interactions with Jovanie Long
21 in this matter?
22        A.   No.
23        Q.   All right.  Do you have any reason to
24 dispute Jovanie Long's recitation of his

---

Robert Bartik
June 15, 2022

110

1    interactions with you?
2        **A. I'm sorry?**
3        Q.  Do you have any reason to dispute --
4            MR. MILLER:  Object to form.
5    Foundation.
6    BY MS. SAMUELS:
7        Q.  Do you have any reason to dispute
8    Johnny -- Jovanie Long's recitation of his
9    interactions with you?
10           MR. MILLER:  Object to form.
11           THE WITNESS:  Well, if you want to
12   tell me what that was because I don't know what
13   his recitation of his interaction with me was.
14   BY MS. SAMUELS:
15       Q.  Okay.
16           When you talk with an
17   individual during the pretest interview, you say
18   you talk to them about the facts of the case and
19   why they're there?
20       **A.  I inform them, yes.**
21       Q.  Okay.  Do you ever talk about the
22   possible consequences of a conviction or
23   anything like that?
24       **A.  No.  I don't think -- I don't think**

112

1        Q.  Okay.  Do you know why you're involved
2    in this lawsuit?
3            MR. MILLER:  Object to form and to the
4    extent that it calls for attorney-client
5    privileged information.
6                Go ahead and answer to the
7    extent you can.
8            THE WITNESS:  Actually, no.
9    BY MS. SAMUELS:
10       Q.  Are you aware of anybody confessing to
11   crimes to you where they were later exonerated?
12       **A.  Where they were later exonerated?**
13       Q.  Yes.
14       **A.  No.**
15       Q.  Are you aware of anyone confessing to
16   any crime to you when they were later found not
17   guilty or the charges were dropped?
18       **A.  Yes.**
19       Q.  All right.  How many times?
20       **A.  I believe one I know.**
21       Q.  When was that?
22       **A.  It was awhile back.**
23       Q.  How long is awhile?
24       **A.  Like, years.**

111

1    **I've ever done that.**
2        Q.  All right.  But if somebody is there
3    because they're a suspect in a murder, you would
4    let them know that?
5        **A.  Yeah.**
6        Q.  Do you talk to people during the
7    pretest interview to make sure they understand
8    the effects of a polygraph examination?
9            MR. MILLER:  Object to form.
10           THE WITNESS:  What do you mean by the
11   word "effects?"
12   BY MS. SAMUELS:
13       Q.  Like what it -- what it would mean how
14   their results are read?
15       **A.  How their results are read?  I**
16   **don't -- once again, I don't necessarily**
17   **understand your question.  Can you rephrase it,**
18   **please?**
19       Q.  Sure.
20           Do you let people know that
21   after they give a polygraph examination you're
22   going to be able to tell whether they're being
23   deceptive or not?
24       **A.  Yes.**

113

1        Q.  What do you recall about that case?
2        **A.  He killed his next door neighbor.  He**
3    **confessed to killing his next door neighbor.  He**
4    **confessed to myself and two other detectives.**
5            **And as luck would have it, by**
6    **the time he got back to the Area there was a**
7    **lawyer and he never gave any other statement**
8    **other than that.**
9        Q.  And, to your knowledge, the charges
10   were eventually dropped against him?
11       **A.  He was found not guilty.**
12       Q.  Okay.
13           When he confessed to you, was
14   that during the examination?
15       **A.  That was immediately upon me entering**
16   **the room, yes.**
17       Q.  Okay.  So even before the pretest?
18       **A.  I'm sorry?**
19       Q.  I said so that was before the pretest
20   interview?
21       **A.  Yes.  No, that was during the pre --**
22   **that was during the -- during the interview**
23   **before the test.**
24       Q.  Okay.  Do you still hold an opinion

29  (Pages 110 to 113)

Robert Bartik
June 15, 2022

114

1  one way or another regarding that individual's
2  confession he gave to you?
3      **A. Yes.**
4      Q. What's your opinion?
5      **A. He killed her.**
6      Q. Okay. Is that -- do you remember the
7  name of that individual?
8      **A. Donnie McGee.**
9      Q. Okay. Do you remember any other
10  instances where someone confessed to you and
11  they were later found not guilty or the
12  charges -- had the charges dropped?
13      **A. Now, when you say "charges dropped,"**
14  **this is the criminal charges?**
15      Q. Yes, sir.
16      **A. I think it was Danny Lonza. He didn't**
17  **confess to me.**
18      Q. Can you tell me about that?
19      **A. Danny Lonza was brought in by a**
20  **detective. It was an interpreter case. And**
21  **during the course of the detective talking to**
22  **Danny Lonza, prior to administering the test, he**
23  **confessed to the detective in Spanish about what**
24  **he had done.**

116

1  BY MS. SAMUELS:
2      Q. Right.
3          So I'm talking about when --
4  like, once they bring a person in for a
5  polygraph, right, and they are at 11th and State
6  and they are -- right. And so you do the
7  paperwork that says the time that they're in,
8  right.
9          After they're brought in, was
10  it usual to have detectives talk to a person
11  who's brought in for a polygraph?
12      MR. MILLER: Object to form.
13      THE WITNESS: I don't know the word
14  "usual" is correct. There are times when
15  detectives will go in and talk to the subject,
16  yes.
17  BY MS. SAMUELS:
18      Q. All right. It would just depend on
19  the detective?
20      **A. Excuse me?**
21      Q. It would just depend on the detective?
22      **A. The detectives, the circumstances, the**
23  **situation.**
24      Q. All right.

115

1          **From what I understand, he**
2  **fled the country years later. Somebody else**
3  **decided to confess to a bunch of number of**
4  **things and decided to include this one in it as**
5  **well.**
6      Q. Okay. Was it common to have
7  detectives talk to the person being examined
8  before conducting the polygraph?
9      MR. MILLER: Object to form.
10  Foundation.
11      THE WITNESS: I don't know when
12  detectives talk to people. I mean, if they are
13  in the Area in the interview rooms, detectives
14  are talking to them.
15  BY MS. SAMUELS:
16      Q. Yes.
17          But specifically for someone
18  who's coming for a polygraph examination, is it
19  usual to have detectives talk to that person?
20      MR. MILLER: Same objection.
21      THE WITNESS: I can't control what
22  detectives do in the Area or in squad cars
23  bringing them down.
24

117

1          Under what circumstances or
2  situations would you expect to have a detective
3  talk to someone at the polygraph unit but before
4  taking the polygraph examination?
5      **A. I've had detectives come in who**
6  **have -- they -- they have not yet sat down and**
7  **talked to any individual. So they, you know,**
8  **scheduled the polygraph. However, before**
9  **they -- before they gave it they sat down and**
10  **they interviewed them.**
11      Q. Okay.
12      **A. And then after the interview, then**
13  **they offered the polygraph to them.**
14      Q. So sometimes detectives would
15  interview people at the polygraph unit?
16      **A. It wasn't inside the polygraph room,**
17  **but sometimes they would have them meet there,**
18  **they would sit outside. They would talk to them**
19  **or they would -- they would go to their office.**
20  **They would meet them at their office. They had**
21  **the polygraph already scheduled. They said, I**
22  **got this case and the gentleman's meeting me**
23  **here at 5:00 o'clock. I'm going to interview**
24  **him. I'm going to offer him a polygraph**

30 (Pages 114 to 117)

Robert Bartik
June 15, 2022

---

118

1    examination. Can I make the appointment for
2    7:30. Okay.
3            So the detective would talk to
4    him. I would know that. The detective would
5    talk to him and then he would bring him down to
6    me.
7        Q. All right. If a detective is talking
8    to a person who's already been brought to you
9    for a polygraph examination, would you note or
10   indicate that anywhere?
11           MR. MILLER: Object to the incomplete
12   nature of the hypothetical.
13           THE WITNESS: I don't see any reason
14   why I would.
15   BY MS. SAMUELS:
16       Q. Okay.
17           When a person has been brought
18   for a polygraph examination and a detective
19   wants to speak with him, would you be present or
20   would they be allowed to speak with that
21   individual alone?
22       A. When would the detective want to speak
23   to him? I don't understand the question.
24       Q. Right.

---

119

1            So you said sometimes
2    detectives would speak to somebody who had been
3    brought in for a polygraph unit. Either
4    sometimes they might speak with them in the
5    room, sometimes they might sit outside the room
6    and talk to them, right?
7        A. Well, I have never had them -- I
8    have -- I can say for sure that I have never had
9    them sitting in the room where the polygraph is
10   talking to them prior to being administered. I
11   mean, unless -- let me put it -- unless they
12   were requested by the person. You know,
13   detective, can I talk to you or something.
14   Sure.
15           But I don't -- I'm not in that
16   room with them at that point. I don't need to
17   be.
18       Q. Okay. And so do they ever talk to
19   witnesses in your office? Or I shouldn't say
20   witnesses. The person who's being brought for
21   the polygraph examination, would they ever use
22   your office to talk to someone?
23       A. Would they bring them in -- instead of
24   going to their own -- to their own office?

---

120

1            MR. MILLER: Object to form.
2    BY MS. SAMUELS:
3        Q. Yes.
4        A. I do polygraph examinations. I'm not
5    there for them to do their investigations.
6        Q. Okay.
7            And so was there a holding
8    cell or place where individuals could be brought
9    when they're at the polygraph station or, I
10   guess, that area that was separate and apart
11   from the polygraph examination room?
12       A. Holding cell, no.
13       Q. Okay. And so if a person was being
14   brought for a polygraph examination, you would
15   expect them to either be held in the polygraph
16   examination room?
17           MR. MILLER: Object to form.
18           THE WITNESS: Yes.
19   BY MS. SAMUELS:
20       Q. Okay. Is there any --
21       A. They would --
22           MR. MILLER: Go ahead and finish.
23           THE WITNESS: They would be sitting in
24   the chair waiting for me to come in where the

---

121

1    polygraph was at.
2    BY MS. SAMUELS:
3        Q. All right. Is there any place you
4    would expect someone to wait who has been
5    brought in for a polygraph examination?
6        A. Expect them to wait. That's a very
7    general question, Counselor. Are they -- are
8    they in custody, are they not in custody, are
9    they early, are they late, you know.
10           I don't necessarily -- I can't
11   answer that question. It's too broad.
12       Q. Okay.
13           So if a person is in custody,
14   right, and they're being brought for a polygraph
15   examination, during the time when you're talking
16   with the detectives and they're telling you
17   about why they need you to question that person,
18   is there anyplace besides the polygraph
19   examination room where you would expect to find
20   the person who's being subjected to the
21   polygraph examination?
22       A. We have no other place to put any
23   individual other than that.
24       Q. Okay. And then how were you

---

Lightfoot Court Reporting, P.C.
312.701.1090

Robert Bartik
June 15, 2022

---

122

1   implicated in the -- I think you said his name
2   was Lonza.  You said he didn't confess to you,
3   correct?
4       **A.  I don't speak Spanish and the**
5   **confession he made to the detective was in**
6   **Spanish.**
7       Q.  Okay.  Were you there?
8       **A.  Yes.**
9       Q.  Okay.  So if I'm understanding you
10  correctly, he came in to do a polygraph
11  examination; is that correct?
12      **A.  Yes.**
13      Q.  Can you just explain to me briefly
14  what happened because I'm confused, with Danny
15  Lonza.
16      **A.  He was brought in.  He doesn't speak**
17  **English.  There was a detective there with him**
18  **who was serving as my interpreter.  And while I**
19  **was talking to him and he was talking to**
20  **Mr. Lonza, they started a conversation.  And the**
21  **conversation looked like it was progressing, at**
22  **which time I was informed by Mr. -- well, by the**
23  **detective that he had confessed to whatever**
24  **the -- I think it was -- it was a child sexual**

---

123

1   **abuse or assault.**
2       Q.  Okay.  And so --
3       **A.  So at that point -- at that point**
4   **there was -- I was no longer necessary.**
5       Q.  Okay.  And so, essentially, a
6   detective was serving as your interpreter for
7   the pretest part?
8       **A.  Yes.**
9       Q.  Okay.  And then during that you noted
10  that they're sort of just having their own
11  conversation, and then you learned later that he
12  confesses when they were talking?
13      **A.  Yes.**
14      MS. SAMUELS:  Okay.  I think I'm just
15  about done with you, sir.  Give me, like, five,
16  ten minutes to look over my notes.  Come back at
17  1:00 o'clock.  Is that fair?
18      THE WITNESS:  Yes.  Sure.
19      MS. SAMUELS:  Okay.
20          (WHEREUPON, a brief recess
21          was held.)
22      MS. SAMUELS:  Back on the record.
23  BY MS. SAMUELS:
24      Q.  Do you remember any words that you

---

124

1   said to Jovanie Long?
2       **A.  No.**
3       Q.  Do you remember any words that Jovanie
4   Long said to you?
5       **A.  No.**
6       Q.  Do you remember how Jovanie Long
7   looked?
8       **A.  No, ma'am.  I don't.**
9       Q.  Do you remember anything about Jovanie
10  Long's demeanor?
11      **A.  No, ma'am.**
12      Q.  Do you remember anything about Jovanie
13  Long's appearance or his state?
14      **A.  No, ma'am.**
15      Q.  Okay.  Do you remember any words you
16  told the detectives regarding Jovanie Long?
17      **A.  No, I don't.**
18      Q.  Do you know any words that said -- do
19  you recall anything the detectives told you
20  regarding Jovanie Long?
21      **A.  At this moment in time, no.**
22      Q.  All right.  Is there something that
23  might refresh your recollection?
24      **A.  No, ma'am.**

---

125

1       MR. MILLER:  Object to form.
2   BY MS. SAMUELS:
3       Q.  Do you recall which detectives you
4   spoke to regarding Jovanie Long?
5       **A.  I'm assuming that, based on my**
6   **paperwork, that I had talked to a detective -- I**
7   **think it's Pietryla.  I think Detective**
8   **Pietryla or Pietrylka -- I don't know.  All I --**
9   **all I -- based on the paperwork of my polygraph**
10  **sheet.**
11      Q.  Okay.
12          Is it fair to say you do not
13  have a recollection of talking with any
14  detective?
15      **A.  I'm sorry.  I didn't hear the last**
16  **word.  Ma'am, you cut out.**
17      MR. MILLER:  I think she kicked the
18  microphone or something.
19      THE WITNESS:  Is that her?
20      MR. MILLER:  No.  She just went
21  underneath the desk.
22      MS. ADEEYO:  Can we go off the record.
23      MR. MILLER:  Okay.
24

---

32  (Pages 122 to 125)

Robert Bartik
June 15, 2022

126

1           (WHEREUPON, a brief recess
2           was held.)
3           MS. SAMUELS: Okay. I'm back. I
4    don't know what happened. Are we still on the
5    record?
6           THE REPORTER: Yes. We're back on the
7    record.
8           MS. SAMUELS: Okay. Thank you.
9    BY MS. SAMUELS:
10      Q.   Is it fair to say that you know you
11   talked to Pietryla based upon the report you
12   reviewed, but you don't have an independent
13   recollection of talking to him?
14      **A.   I believe that would be the case.**
15   **Yes.**
16      Q.   Okay. Do you have any recollection of
17   any information you shared regarding Jovanie
18   Long to anyone?
19      **A.   I have no recollection.**
20      Q.   And my understanding is you would have
21   given the officers an oral report and then you
22   would have sent them the case -- you would
23   have -- and then you would have sent them the
24   polygraph cover; is that fair?

127

1       **A.   Yes, ma'am.**
2       Q.   Okay. Is there anywhere else you
3    would write up your findings or -- no, bad
4    question.
5            Is there anywhere else you
6    would expect -- that you would record your
7    findings related to a polygraph examination?
8       **A.   I don't believe so.**
9           **(Technical difficulties.)**
10          **Did we lose her again?**
11          THE REPORTER: Ms. Samuels, we can't
12   hear you.
13          MR. MILLER: You're on mute. What's
14   going on?
15          THE WITNESS: I don't know what's
16   going on.
17          MR. MILLER: Do you know that you're
18   on mute, Jeanette?
19          **(Technical difficulties.)**
20          MS. SAMUELS: Can you hear me okay? I
21   don't know why I keep getting locked out.
22          MR. MILLER: Now we can hear you.
23          THE WITNESS: Now we can hear you.
24          MS. SAMUELS: Are we back on the

128

1    record?
2           THE REPORTER: Yes.
3    BY MS. SAMUELS:
4       Q.   Is there anyplace else you would
5    record your findings for -- in relation to a
6    polygraph besides the -- I think it was called
7    the cover sheet.
8       **A.   No, I don't believe so.**
9       Q.   Okay. Is there anything else in
10   relation to your interactions with Jovanie Long
11   that you recall that we haven't testified
12   about -- that you haven't testified about
13   already?
14          MR. MILLER: Object to form.
15          THE WITNESS: I don't believe so, no.
16          MS. SAMUELS: Okay. No further
17   questions.
18          MS. ADEEYO: I have nothing based on
19   that.
20          MR. MILLER: I have, like, three
21   questions.
22          CROSS-EXAMINATION
23   BY MR. MILLER:
24      Q.   So, Mr. Bartik, earlier you testified

129

1    that you had testified at Jovanie Long's
2    criminal trial. Was it actually the trial
3    itself or was it a suppression hearing that you
4    testified at?
5       **A.   It was a suppression hearing. It was**
6    **not the trial. I never testified at a trial.**
7       Q.   Okay. And did you ever testify at any
8    criminal proceeding with regard to Xavier
9    Walker?
10      **A.   No.**
11      Q.   Did you have any involvement in
12   obtaining the confession of Xavier Walker in
13   this matter?
14      **A.   No.**
15          MR. MILLER: Those are the only
16   questions I have.
17          Is there anything else from
18   anybody?
19          MS. SAMUELS: No.
20          THE REPORTER: Signature?
21          MR. MILLER: We will reserve
22   signature, and we can go off the record.
23          (WHEREUPON, the deposition
24          concluded at 1:08 p.m.)

33 (Pages 126 to 129)

Robert Bartik
June 15, 2022

---

**130**

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2             EASTERN DIVISION
3
4    XAVIER WALKER,              )
                                 )
5         Plaintiff,             )
                                 )
6    vs.              ) No. 20 CV 7209
                                 )
7    CITY OF CHICAGO, et al.,   ) Judge Guzman
                                 )
8         Defendants.            )
9
10        I hereby certify that I have read the
     foregoing transcript of my deposition given on
11   June 15, 2022, consisting of pages 1 through
     133, inclusive, and I do again subscribe and
12   make oath that the same is a true, correct and
     complete transcript of my deposition given as
13   aforesaid, with corrections, if any, appearing
     on the attached correction sheet(s).
14
15        _____ Correction sheet(s) attached.
16
17        _____
              ROBERT BARTIK
18
19
     Subscribed and sworn to
20   before me this _____ day
     of _____, 2022.
21
22   _____
23   Notary Public
24

---

**131**

1              ERRATA SHEET
2    Examination of: Robert Bartik
     Date taken: 6-15-22
3
4    Page Line
5    ____ ____ Change: _____
6         ____ Reason: _____
7    ____ ____ Change: _____
8         ____ Reason: _____
9    ____ ____ Change: _____
10        ____ Reason: _____
11   ____ ____ Change: _____
12        ____ Reason: _____
13   ____ ____ Change: _____
14        ____ Reason: _____
15   ____ ____ Change: _____
16        ____ Reason: _____
17   ____ ____ Change: _____
18        ____ Reason: _____
19   ____ ____ Change: _____
20        ____ Reason: _____
21   ____ ____ Change: _____
22        ____ Reason: _____
23   Deponent's
     Signature_____ Date _____
24

---

**132**

1              ERRATA SHEET
2    Examination of: Robert Bartik
     Date taken: 6-15-22
3
4    Page Line
5    ____ ____ Change: _____
6         ____ Reason: _____
7    ____ ____ Change: _____
8         ____ Reason: _____
9    ____ ____ Change: _____
10        ____ Reason: _____
11   ____ ____ Change: _____
12        ____ Reason: _____
13   ____ ____ Change: _____
14        ____ Reason: _____
15   ____ ____ Change: _____
16        ____ Reason: _____
17   ____ ____ Change: _____
18        ____ Reason: _____
19   ____ ____ Change: _____
20        ____ Reason: _____
21   ____ ____ Change: _____
22        ____ Reason: _____
23   Deponent's
     Signature_____ Date _____
24

---

**133**

1    STATE OF ILLINOIS )
                       ) SS:
2    COUNTY OF C O O K )
3
4         I, DONNA WADLINGTON SHAVERS, a
5    Certified Shorthand Reporter within and for the
6    County of Cook and State of Illinois, do hereby
7    certify that heretofore, to-wit, on the 15th of
8    June, 2022, remotely appeared before me via Zoom
9    videoconferencing, in the City of Chicago,
10   County of Cook and State of Illinois, ROBERT
11   BARTIK, produced as a witness for examination in
12   said cause.
13        I further certify that the
14   said witness, ROBERT BARTIK, was by me first
15   duly sworn to testify the truth, the whole truth
16   and nothing but the truth in the cause aforesaid
17   before the taking of the examination under oath;
18   that the testimony was reduced to writing in the
19   presence of said witness by means of machine
20   shorthand and afterwards transcribed into
21   typewriting, and that the foregoing is a true
22   and correct transcript of the testimony given by
23   said witness.
24        I further certify that I am

34 (Pages 130 to 133)

Robert Bartik
June 15, 2022

134

1    not counsel for nor in any way related to any of
2    the parties to this suit, nor am I in any way
3    interested in the outcome thereof.
4            I further certify that my
5    certificate annexed hereto applies to the
6    original and court-reporter produced copies of
7    transcripts only.  I assume no responsibility
8    for the accuracy of any reproduced copies not
9    made under my control or direction.
10           In testimony whereof, I have
11   hereunto set my hand this 3rd day of August,
12   2022.
13
14
15
16           DONNA WADLINGTON SHAVERS
             CSR #084-002443
17
18
19
20
21
22
23
24



Lightfoot Court Reporting, P.C.
312.701.1090