# EXHIBIT 52

```
 1           IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   XAVIER WALKER,                )
                                   )
 4               Plaintiff,        )
                                   )
 5          vs.                    ) No. 20 cv 7209
                                   )
 6   CITY OF CHICAGO, et al.,      )
                                   )
 7               Defendants.       )

 8

 9          The discovery deposition of BRYAN HOLY,

10   called by the Defendants for examination, taken

11   via Video Conferencing pursuant to notice and by

12   the provisions of the Rules of Civil Procedure for

13   the United States District Courts pertaining to

14   the taking of depositions, taken before Linda K.

15   Madison, CSR No. 084-000970 and Notary Public, on

16   Thursday, the 27th day of January 2022, at the

17   hour of 10:00 a.m.

18

19

20

21

22

23

24
```

```
 1    APPEARANCES:

 2         SCHILLER PRAYER PRATT & SAMUELS,
           BY:  JEANETTE SAMUELS, Esq.
 3         601 South California Street
           Chicago, Illinois 60612
 4         sam@spjslaw.com

 5             appeared for the Plaintiff;

 6         NATHAN & KAMIONSKI LLP
           BY:  ROBIN SHOFFNER, Esq.
 7         33 West Monroe Street, Suite 1830
           Chicago, Illinois 60603
 8         rshoffner@nlawllp.com

 9             appeared for the City of Chicago;

10         BORKAN & SCAHILL, LTD.
           BY:  GRAHAM MILLER Esq.
11         MISHA ITCHHAPORIA, Esq.
           KRISTA STALF, Esq.
12         20 South Clark Street, Suite 1700
           Chicago, Illinois 60603
13         312-580-1030

14             appeared for the Chicago Police Officers;

15         TRIBLER ORPETT and MEYER, P.C.
           BY:  WILLIAM B. OBERTS, Esq.
16         225 West Washington Street, Suite 2550
           Chicago, Illinois 60606
17         wboberts@tribler.com

18             appeared for BRZENIAK and MAHONEY.

19

20    ALSO PRESENT:

21      David Wright, Defendant Police Officer

22

23

24
```

```
1                    I   N   D   E   X

2    WITNESS

3    Bryan Holy

4         Examination by Ms. Samuels          4

5         Examination by Mr. Miller           88

6         Examination by Ms. Samuels          89

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1      THE COURT REPORTER:  My name is Linda

 2   Madison. I am a Certified Shorthand Reporter and

 3   this deposition is being held via video

 4   conferencing.  The witness and reporter are not in

 5   the same room.  The witness will be sworn remotely

 6   pursuant to agreement of all parries.  The parties

 7   stipulate that the testimony is being given as if

 8   the witness was sworn in person.

 9              Does everyone agree?

10         MS. SAMUELS:  So stipulated.

11         MR. MILLER:  Yeah, we agree.

12         MS. SHOFFNER:  The City agrees.

13         MR. OBERTS:  Brzeniak and Mahoney agree,

14   counsel on their behalf.

15                B R Y A N   H O L Y,

16   called as a witness herein, after having been

17   first duly sworn, was examined and testified as

18   follows:

19                    EXAMINATION

20   BY MS. SAMUELS:

21      Q    Can you please state and spell your name

22   for the record, sir?

23      A    My name is Bryan, B-r-y-a-n, Holy,

24   H-o-l-y.
```

1          MS. SAMUELS:  This is the deposition of

2    Bryan Holy taken in the case of Walker vs. City of

3    Chicago et al., case number 20 CV 7209.  This

4    deposition is taken pursuant to notice and

5    agreement of the parties under all applicable

6    rules.

7          Q     Have you ever given a deposition before,

8    sir?

9          A     Yes, ma'am, I have.

10         Q     About how many times?

11         A     Maybe 3 or 4.

12         Q     And when is the last time you gave a

13   deposition?

14         A     2018, 2019 I think.

15         Q     Since it's been a while, I'll go over

16   the rules real briefly.

17                Essentially it's the same as

18   testifying in court.  All your answers need to be

19   verbal.  If you don't understand any of my

20   questions, let me know so I can rephrase them for

21   you.  So the record is clear please wait until I

22   am done asking a question prior to providing your

23   answer.  Otherwise the record is going to be

24   unclear.  And if you want to take a break at any

1  time, just let me know.  Okay?

2       A    Yes, ma'am.

3       Q    Did you prepare at all for your

4  deposition today?

5       A    I did.

6       Q    All right.  How did you prepare?

7       A    I met with my attorneys and I read the

8  investigative file.

9       Q    Okay.  Did you watch any videos?

10      A    No, I did not.

11      Q    Did you look at any pictures?

12      A    No, I did not.  There are photocopies of

13  pictures in the investigative file.

14           MS. SHOFFNER:  Jeanette, just for the

15  benefit of the court reporter can the parties who

16  are attending represent themselves so that she

17  knows who is making objections and who's speaking?

18           MS. SAMUELS:  Sure.

19           MS. SHOFFNER:  Madam Court Reporter, my

20  name is Robin Shoffner and I represent the City of

21  Chicago.

22           MR. MILLER:  Graham Miller and Misha

23  Itchhaporia and Crystal Stalf on behalf of the

24  individual CPD defendants.

```
 1            MR. OBERTS:  Bill Oberts, O-b-e-r-t-s, on
 2     behalf of Mahoney and Brzeniak.
 3     BY MS. SAMUELS:
 4        Q     Besides your attorneys did you speak
 5     with anyone else about this case?
 6        A     No, ma'am.
 7        Q     When is the last time you met with your
 8     attorneys to prepare for this deposition?
 9        A     I'm sorry.  I didn't hear that.
10        Q     When is the last time you met with your
11     attorneys to prepare for this deposition?
12        A     Monday of this week.
13        Q     How long did you meet?
14        A     I don't remember.  A couple of hours.
15        Q     Did you read any of the testimony from
16     this -- any of the previous testimony from this
17     matter?
18        A     Can you repeat that please?
19        Q     Did you review any of the previous
20     testimony
21      from this matter?
22        A     No, I did not.
23        Q     The deposition that you last gave in
24     2018, 2019 what was that for?
```

```
 1        A     A police-involved shooting.

 2        Q     And what was your role in that?

 3        A     I was the supervising sergeant.

 4        Q     Were you a witness or a defendant?

 5        A     I was a witness.

 6              MR. MILLER:  We have somebody that

 7    needs --  I'm sorry to interrupt.  I think we have

 8    David Wright, one of the defendants, who wants to

 9    attend who is waiting in the waiting room.

10              MS. SAMUELS:  I don't see anybody.

11              MR. MILLER:  There's nobody in there?

12              MS. SAMUELS:  No.

13              MR. MILLER:  Okay.  Just if you see

14    somebody will you let them in?

15              MS. SAMUELS:  Yes.

16        Q     What's your current job title?

17        A     I'm retired, ma'am.

18        Q     So you don't work?

19        A     No, ma'am.  I'm retired from the police

20    department.

21        Q     In what year did you retire?

22        A     July of 2020.

23        Q     Since July of 2020, have you had any

24    other employment?
```

```
 1        A      Yes, ma'am.

 2        Q      All right.  Where?

 3        A      I work part time for the Fraternal Order

 4   of Police, Lodge 7.

 5        Q      What do you do for the FOP?

 6        A      I'm a critical incident field

 7   representative.

 8        Q      What does that mean?

 9        A      I'm a field representative for the

10   police officers involved in critical incidents.

11        Q      What's a critical incident?

12        A      It can be a variety of things, ma'am.

13        Q      Can you give me some examples?

14        A      Can you repeat that?

15        Q      Can you give me some examples?

16        A      Police-involved shootings are one of

17   them.  When a police officer is involved in an

18   incident and he contacts the Fraternal Order of

19   Police, one of four of us will respond.

20        Q      And what's your responsibility?

21        A      Advise the police officer of what the

22   normal chain of events involving the incident can

23   be.  Answer questions that he would have.

24   Generally there to support him.
```

```
 1        Q    All right.  So you advise police
 2   officers on the investigation process after a
 3   critical incident?
 4        A    No, ma'am.  I wouldn't use the term
 5   advise.
 6        Q    What term would you use?
 7        A    I would tell them what the course of
 8   events in an incident will be.
 9        Q    When you say "course of events," are you
10   talking about for administrative proceedings or
11   are you talking about for any possible
12   investigation into the incident that occurred?
13        A    Administrative proceedings.
14        Q    How did you get that job?
15        A    I was asked.  I was asked if I wanted
16   that job.
17        Q    By who?
18        A    John Farrell.
19        Q    How do you know John Farrell?
20        A    John Farrell is a retired captain from
21   the police department.  I worked for him.
22        Q    Who is the current FOP president?
23        A    John Catanzara.
24        Q    Do you know him?
```

```
 1        A    I'm sorry.  Excuse me?

 2        Q    Do you know him?

 3        A    I do know him.

 4        Q    As part of your job duties, do you have

 5   to work with him?

 6        A    No, I don't work with him.

 7        Q    Did you have to apply for the position

 8   or once you expressed interest was it sort of

 9   yours for the taking?

10        A    I was actually --  They held a vote by

11   the Board of Directors and they approved, like I

12   say approved my job.

13        Q    How much do you get paid?

14        A    I get paid by the hour so it's depending

15   upon when I work.

16        Q    How much do you get paid per hour?

17        A    Fifty dollars an hour.

18        Q    Say that again.

19        A    Fifty dollars an hour.

20        Q    One five or five zero?

21        A    Five zero.

22        Q    Does that job come with any benefits?

23        A    No, ma'am.

24        Q    Are you still in that position?
```

1          A      Yes, I am.

2          Q      Does that require you to provide any

3    statements to the press about any of these

4    critical incidents?

5          A      Ma'am, I do not talk to the press.

6          Q      Did you have to receive any sort of

7    training in order to gain this position?

8          A      I worked with John Farrell like I said

9    in an on-the-job training type scenario.

10          Q      How long was your on-the-job training?

11          A      I think for about a month.

12          Q      All right.  Now, when you respond to

13    critical incidents, do you respond by yourself or

14    do you respond with somebody else?

15          A      I respond by myself.  Most of the time

16    an FOP field representative who's a full-time

17    employee for the FOP will also respond.

18          Q      I'm sorry.  What is John Farrell's job

19    title?

20          A      He's a critical --  He's a critical

21    incident field representative.

22          Q      So are there field representatives and

23    then critical incident field representatives?

24          A      Yes, ma'am.

```
 1        Q    Got you.  Since July of 2020, have you
 2   had any other positions?
 3        A    No, ma'am.
 4        Q    I'm sorry.  When did you get this job?
 5        A    I believe it was in August of 2020.
 6        Q    And then in your role as a critical
 7   incident field rep, have you had to respond or
 8   provide assistance to any of the current
 9   defendants in this case?
10        A    No.
11                  (Brief discussion off record.)
12        Q    What's your understanding of how Marek
13   Majdak was murdered?
14                  (The Court Reporter requested
15                   clarification.)
16             What's your understanding of how Marek
17   Majdak was murdered?
18        A    I can't understand you, ma'am.
19             MR. MILLER:  Mr. Holy is a little bit
20   hard of hearing so if you could just speak up.
21   I've got the volume up all the way but I don't
22   think it's that loud.
23             MS. SAMUELS:  Sorry.
24        Q    What's your understanding of how Marek
```

```
 1   Majdak was murdered?
 2        A    My understanding is that he was shot
 3   during the course of an armed robbery.
 4        Q    Do you know how he came to be -- how the
 5   robbery unfolded that led to his murder?
 6        A    Are you asking me what I know about what
 7   happened during the course of the robbery?
 8        Q    Yes, sir.
 9        A    That the victim in the homicide was
10   parked in the 4700 block of West Ohio.  That
11   Jovanie Long and Xavier Wright --  Jovanie Long
12   got into the automobile.  A struggle ensued with
13   the victim and Jovanie Wright -- I'm sorry,
14   Jovanie Long and Xavier Wright was a lookout in
15   accomplish of the robbery.  And that during the
16   course of the robbery the victim sustained two
17   gunshot wounds and had money stolen from him after
18   he was shot laying on the sidewalk on Ohio.
19        Q    How did he get from out of the car?
20             Well, let me ask this question.  Was
21   he shot --  Was the victim shot inside the
22   vehicle?
23             MR. MILLER:  Object to foundation.
24   Speculation.
```

```
 1              THE WITNESS:  I believe --  I don't know
 2     where he was shot, if he was shot in the car.  He
 3     may have been shot once in the car or shot at in
 4     the car.  I don't know that anybody knows that
 5     answer.
 6     BY MS. SAMUELS:
 7          Q    And then is it your understanding that
 8     during the course of the struggle I guess the
 9     victim exited the car and Jovanie Long I guess
10     pursued him?
11          A    Yes.
12          Q    And at that point he was shot and
13     killed?
14          A    Yes.
15          Q    And then when you say he was robbed, who
16     rob him?
17          A    I believe Xavier Wright did.
18          Q    Where was Xavier when all this was going
19     on in the car?
20          A    I'm sorry.  Excuse me?
21          Q    Where was Xavier when the struggle was
22     going on in the car?
23          A    He had approached the car I believe to
24     assist Jovanie Long in the struggle with the
```

```
1    victim.
2         Q    And then after the victim is shot your
3    understanding is Xavier robbed him?
4         A    Yes.
5         Q    And how was that accomplished?
6              MR. MILLER:  Object as to foundation,
7    calls for speculation.
8              THE WITNESS:  I believe that Xavier in
9    his video statement confession admitted to going
10   through the victim's pockets.
11   BY MS. SAMUELS:
12        Q    When the victim --  My understanding is
13   the victim was shot from behind.  Is that your
14   understanding?
15        A    At least one of the gunshot wounds was I
16   believe from behind, yes.
17        Q    And so when the victim landed on --  I
18   believe it was the sidewalk is where he was found,
19   is that correct?
20        A    Yes, ma'am.  That's my memory of that.
21        Q    So is it your understanding that he fell
22   face forward or he fell on his back first?
23        A    I don't know how he fell.  I believe
24   that when he was discovered he was face up.
```

**LIGHTFOOT COURT REPORTING, P.C. 312-701-1090**

1      Q   All right.  Was it your understanding

2  that the body was flipped?

3         MR. MILLER:  Object to foundation.  Calls

4  for speculation, form.

5         THE WITNESS:  Can you tell me what you --

6  Can you repeat that?  His body was what?

7  BY MS. SAMUELS:

8      Q   Flipped or turned over.

9      A   He was face up when he was discovered.

10  That is my understanding.

11      Q   Right.  My question is was it your

12  understanding that the body was ever turned over?

13         MR. MILLER:  Object to form, foundation.

14  Calls for speculation.

15         THE WITNESS:  I can't answer that.  I

16  don't know.

17  BY MS. SAMUELS:

18      Q   Did that ever come up during your

19  investigation?

20         MR. MILLER:  Object to form.

21         THE WITNESS:  I did not conduct an

22  investigation in this, ma'am.

23  BY MS. SAMUELS:

24      Q   What was your role in the investigation

```
 1  into the murder of Marek Majdak?

 2      A    I had a limited role.  I believe I

 3  assigned Detective Pietryla -- or informed

 4  Detective Pietryla that there was a witness in

 5  Area 4.  I knew that Pietryla was working on a

 6  job.  I would have told him that he was there and

 7  I accompanied detectives on the arrest of Xavier

 8  Walker.

 9      Q    And so my understanding is your role in

10  the investigation into the murder of Marek Majdak

11  is informing Detective Pietryla that there was a

12  witness in Area 4 and then going along with him

13  and others to arrest Xavier Walker, is that

14  correct?

15      A    To the best of my knowledge, yes, to the

16  best of my memory.

17      Q    And to the best of your recollection you

18  had no other roles in investigating the murder of

19  Marek Majdak?

20      A    Yes.

21      Q    Yes you had additional roles or yes my

22  statement was correct?

23      A    To the best of my memory that was the

24  only two incidents that I was involved in this
```

```
 1   case.
 2        Q     Did you participate in the questioning
 3   of Xavier Walker?
 4        A     No, I did not.
 5        Q     Why did you go along to arrest him?
 6        A     A lot of times the arrest of a homicide
 7   offender can be a very violent and very dangerous
 8   occurrence.  We try to take as many people as
 9   possible.
10        Q     So at the time you went to arrest Xavier
11   Walker you had probable cause to believe that he
12   had committed the murder?
13        A     Yes.
14        Q     And what was that based on?
15        A     Witness statements.
16        Q     Whose?
17        A     Ursula Byrd and I believe Mary Curry.
18   (Phonetic sp.)
19        Q     Okay.
20        A     There might have been others but those
21   are the two that I remember right now.
22        Q     How many people went to arrest Xavier?
23        A     Maybe six or seven.
24        Q     And that was standard procedure as far
```

1   as you knew?

2       A    There's really no standard procedure,

3   ma'am.  It depends upon the availability of

4   personnel but normally you want more than just one

5   or two people.

6       Q    Who all do you recall participating in

7   the arrest of Xavier Walker?

8       A    I believe it was Detective Cruz and

9   Wilberton, Bright and Sanders, Pietryla.  His

10  partner at the time was Cook County Sheriff's

11  Police Detective Brzeniak.  And myself. (Phonetic)

12      Q    Do you know how Brzeniak happened to be

13  partnered with Pietryla?

14      A    At the time there was a, uh, I don't

15  know if it was a program but for lack of a better

16  word there was a program where Cook County

17  sheriff's police detectives were detailed to the

18  Chicago Police Department Detective Division to

19  work in Violent Crimes.

20      Q    So this wasn't anything that was

21  irregular?

22           MR. MILLER:  Objection.  Vague and

23  foundation.

24           THE WITNESS:  No, I don't believe it was

```
 1   irregular.  It was sanctioned.
 2   BY MS. SAMUELS:
 3        Q    How did you come to be informed where
 4   Xavier Walker was?
 5        A    I don't recall.
 6        Q    All right.  What do you recall about the
 7   arrest of Xavier Walker?
 8        A    I have no independent memory of this
 9   arrest at all.
10        Q    Did you draft any reports about your
11   role or the actions that you took in the
12   investigation into the murder of Marek Majdak?
13        A    Excuse me, ma'am.  Can you repeat that?
14        Q    Did you draft any reports about your
15   role in the investigation into the murder of Marek
16   Majdak?
17        A    No, ma'am, I did not.
18        Q    Why not?
19        A    I wasn't involved in the investigation.
20        Q    You participated in the arrest though of
21   one of the suspects, correct?
22        A    Yes, I did.
23        Q    All right.  So how would you describe
24   that?
```

```
1              MR. MILLER:  Object to form.
2              THE WITNESS:  I don't understand what you
3    mean, what you want me to describe.
4    BY MS. SAMUELS:
5         Q    Right.  So when I say you participated
6    in the investigation into the murder of Marek
7    Majdak, you contend that you didn't participate in
8    the investigation, correct?
9         A    Yeah.  I didn't do any investigatory
10   steps in this investigation, that is correct.
11        Q    Right.  And so I guess I'm asking how
12   you would describe your role.
13             MR. MILLER:  Object.  Asked and answered.
14             Go ahead.
15             THE WITNESS:  Very minimal.
16   BY MS. SAMUELS:
17        Q    Did you have supervisory duties or roles
18   over the people who were investigating the murder
19   of Marek Majdak?
20        A    No, I was not the supervisor assigned to
21   this investigation to the best of my memory.
22        Q    Okay.  Did you ever assign any police
23   officers to engage in certain tasks for the
24   investigation?
```

1      A      Yes, I did.

2      Q      How did that come to be your

3   responsibility?

4      A      I don't know exactly.  I don't recall

5   but from reading the reports I assigned Detective

6   Pietryla who I knew was the assigned detective on

7   this investigation to interview a witness who was

8   in the Area.

9              So I would have come to work about

10   3:00 that afternoon and would have been informed

11   that there was a witness, there was a witness

12   present in the Detective Division area and it was

13   a witness in this homicide investigation.

14              I knew that Pietryla was assigned to

15   it.  When Detective Pietryla came to work that

16   evening, I would have told him --  I can't

17   remember the woman's name that was in the Area and

18   had Detective Pietryla interview her or she was

19   there to be interviewed.

20      Q      How did Marek Majdak come to be in the

21   4700 block of West Ohio, what was your

22   understanding?

23      A      Nobody could ask him.  I would assume he

24   was there to buy narcotics.

```
 1        Q    Did you ever come to learn that there
 2   was a bite mark on Marek Majdak?
 3        A    Yes, in preparing for this case.
 4        Q    Did you ever --
 5        A    Or for this deposition.
 6        Q    Did you ever come to --
 7        A    I'm sorry.
 8        Q    I apologize.  If you want to complete
 9   your answer, go ahead.
10        A    I was made aware of it while preparing
11   for this inves -- or for this deposition.
12        Q    Did you ever come to understand where
13   that bite mark came from?
14             MR. MILLER:  Object.  Calls for
15   speculation, foundation.
16             THE WITNESS:  No.  I never knew where
17   that came from.
18   BY MS. SAMUELS:
19        Q    Is it fair to say that at the time that
20   you were investigating -- or at the time that you
21   were participating with the investigation into the
22   murder of Marek Majdak that you weren't aware of
23   the bite mark?
24        A    At the time --  so are you asking me
```

```
 1    during the course of the investigation into this
 2    murder if I was aware of that bite mark --
 3         Q    Yes, sir.
 4         A    (Continuing) -- or are you asking --
 5              You said I was participating in this
 6    investigation.  So I would --  I don't understand
 7    what you mean by my participation in this
 8    investigation of the homicide.
 9         Q    I believe I said participating with
10    because I believe you said that you assisted in
11    some ways even though you weren't one of the main
12    investigators.
13         A    All right.  So if you're asking me at
14    the time that I went on the arrest with the
15    detectives of Maurice Wright (sic) was I aware of
16    a bite mark?  No, I was not.
17         Q    At any point during May, June, July or
18    August of 2020 did you become aware of the bite
19    mark on the victim?
20         A    No, ma'am.  I wasn't a supervisor on the
21    case.  I wasn't aware of all the details of this
22    investigation.
23         Q    Who was the supervisor on the case?
24         A    I don't have a memory of who the
```

**LIGHTFOOT COURT REPORTING, P.C. 312-701-1090**

```
1   supervisor was.  I mean I don't believe it was me
2   I should say.  If it had been me, I would have
3   read the reports as they were being written.  I
4   would have approved them and I would have known
5   about that bite mark.
6       Q    The 4700 block of Ohio is that also a
7   large area of prostitution?
8       A    It may be.  There are prostitutes that
9   work Cicero Avenue.  I would assume, yes.
10      Q    Do you believe trying to identify how
11  the victim came to have a bite mark on him is a
12  reasonable avenue of inquiry for a murder
13  investigation?
14          MR. MILLER:  Object to the form of the
15  question.
16          THE WITNESS:  Yes.
17  BY MS. SAMUELS:
18      Q    So in May of 2000 what were your --  You
19  were a sergeant at that time, correct?
20      A    I was what?
21      Q    A sergeant at the time.
22      A    Yes, ma'am, I was.
23      Q    What were your job duties in May of
24  2000?
```

```
 1        A    I was a sergeant assigned to Area 4
 2   Violent Crimes.  I hadn't been there that long so
 3   I was handling basically I believe general
 4   assignments but at times I was the only sergeant
 5   working so I would assign detectives to jobs as
 6   they came in.
 7        Q    And when you say you were "handling
 8   general assignments," what does that mean?
 9        A    At the time Violent Crimes handled --
10   I believe at the time Violent Crimes handled
11   robberies, aggravated batteries, domestics,
12   homicides obviously, kidnappings, serious
13   batteries.  There are other crimes too.  There's a
14   whole list.
15        Q    And so your job was to assign detectives
16   to crimes as they occurred?
17        A    Depending upon whether or not detectives
18   were going to be assigned to respond immediately
19   to that job.  There were other methods in which
20   detectives were assigned to non-immediate
21   responses.
22        Q    What else were your job duties?
23        A    That's pretty much it.
24        Q    So all you did was assign people to
```

1    jobs?

2           MR. MILLER:  Objection.  Misstates the

3    testimony.

4           THE WITNESS:  Can you ask me that

5    question again?

6    BY MS. SAMUELS:

7       Q    I said all you did was assign people to

8    jobs?

9       A    Pretty much, yes.  If I was the only

10   sergeant working.  I was still a relatively new

11   sergeant in the Detective Division at that time.

12   I would review and approve certain reports.

13      Q    What reports?

14      A    What did you say?

15      Q    What reports?

16      A    Death investigations.  That was pretty

17   much it I think but I don't remember exactly.  It

18   wasn't homicides at that point.

19      Q    Okay.  What was your date of assignment?

20      A    To Area 4, ma'am, or to the police

21   department?

22      Q    To the police department.

23      A    2 May 1988.

24      Q    All right.  And where were you first

```
 1   assigned?
 2        A     After the academy, my first assignment
 3   was the 14th District.
 4        Q     How long were you there?
 5        A     Approximately two and a half years, two
 6   years I believe.
 7        Q     While you were there, did you have a
 8   regular partner?
 9        A     No, I did not.
10        Q     While you were there, did you have any
11   special assignments?
12        A     No, ma'am.  I was assigned to patrol.
13        Q     All right.  And do you remember who your
14   immediate supervisor was?
15        A     No.  No, ma'am, I do not.
16        Q     After the 14th District, what was your
17   next assignment?
18        A     I transferred to the 15th District.
19        Q     That would have been around 1990?
20        A     I believe it was early in 1990.
21        Q     How long were you in the 15th District?
22        A     Until I was promoted to sergeant in
23   1997.
24        Q     What were your job titles in the 15th
```

```
 1    District?
 2         A     I was a patrolman.
 3         Q     Anything else?
 4         A     No.  I was a patrolman until I was
 5    promoted to sergeant.
 6         Q     Were you ever assigned to any special
 7    units?
 8         A     I worked on a tact team and the gang
 9    team in 15.
10         Q     When were you assigned to the tact team?
11         A     When was I assigned to the tact team?  I
12    don't remember, ma'am.  Sometime in 1990.
13         Q     And how long were you on the tact team?
14         A     Mostly until I was promoted to sergeant
15    in 1997.
16         Q     So were you on the tact team and the
17    gang team at the same time?
18         A     No.  I went from one tact team to the
19    gang team.
20         Q     All right.  So when did you join the
21    tact team?
22               So you joined the tact team in 1990
23    you said?
24         A     Yes, ma'am.
```

```
 1      Q     And when did you join the gang team?

 2      A     Not long before I left in 1997.

 3      Q     All right.  And what --

 4      A     I don't remember how long it was.

 5      Q     And what were your job responsibilities

 6  as a member of the tact team?

 7      A     We pretty much --  The tact team we were

 8  pretty much directed by the district commander's

 9  discretion.

10            MS. SAMUELS:  I see somebody trying to

11  get in.  Is that your client?

12            MR. MILLER:  I can't see who is trying to

13  get in.  It's probably David.

14            MS. SAMUELS:  It is just a bunch of

15  numbers so I didn't want to just let anybody in.

16            MR. MILLER:  Let me check.

17            MS. SAMUELS:  All right.  Can you please

18  identify yourself?

19            MR. MILLER:  Oh, yeah.  That's David

20  Wright.

21                  You're fine, David.  Just put

22  yourself on mute.

23  BY MS. SAMUELS:

24      Q     So you said you --  I was asking what
```

**LIGHTFOOT COURT REPORTING, P.C. 312-701-1090**

```
 1    your responsibilities were as a member of the tact
 2    team and I believe you said you sort of acted at
 3    the direction of the district commander?
 4         A    Yes, ma'am.
 5         Q    All right.  And what were --
 6         A    Primarily narcotics and guns, that type
 7    of enforcement.
 8         Q    Did you have to receive any special
 9    training to become a member of that tact team?
10         A    No.
11         Q    And then you said towards the end of
12    your time at the 15th District you joined the gang
13    team?
14         A    Yes.
15         Q    Did you have to receive any special
16    training to become a member of the gang team?
17         A    No.
18         Q    What was the difference in being a
19    member of the gang team as opposed to the tactical
20    team?
21         A    There really wasn't much of a
22    difference.  I believe the gang teams didn't get
23    detailed out of the district from my memory of it.
24         Q    As a member of the gang team, did you
```

```
 1    receive any specialized training or learning on
 2    Chicago area gangs?
 3         A    No.
 4         Q    And then in '97 you became a sergeant,
 5    correct?
 6         A    Yes.
 7         Q    And where were you first assigned as a
 8    sergeant?
 9         A    To the 25th District.
10         Q    How long were you there?
11         A    Until I was sent to Area 4.  Probably in
12    August of 1998.
13         Q    And what were your responsibilities as a
14    sergeant in the 25th District?
15         A    I worked as a patrol sergeant, as a gang
16    sergeant and as a tact sergeant, tactical
17    sergeant.
18         Q    What does a patrol sergeant do?
19         A    Supervises patrolmen on a specific
20    watch.
21         Q    What does the gang sergeant do?
22         A    Supervises a gang team.
23         Q    I guess --  So when you say you
24    supervised patrolmen what is that?
```

```
 1         A    Conduct roll call, conduct roll call

 2    training, read and approve reports, respond to

 3    those officers' request for a supervisor.  I think

 4    that's pretty much it.

 5         Q    When you say that you supervised gang

 6    officers, what does that entail?

 7         A    Pretty much the same thing except for a

 8    smaller amount of individuals.  It was an 8 or 10

 9    man team normally.

10         Q    As a patrol sergeant, are you primarily

11    in the station or are you also out doing patrols

12    still?

13         A    So if you're the desk sergeant, you're

14    inside on a desk.  And if you're a field sergeant,

15    you're on the street.

16         Q    Which were you or would it just depend

17    on the day?

18         A    No, I think I only worked the desk a

19    couple of times so most of the time I was on the

20    street.

21         Q    As a gang sergeant, were you in the

22    field or were you in the station?

23         A    There was a lot more paperwork to do so

24    I split my time between inside the office and on
```

1    the street.

2         Q    Why was there more paperwork?

3         A    You had to do a weekly tally of the

4    officers' arrests and whatever other paperwork.

5    Complaint register numbers were sometimes assigned

6    to you.

7              Oh, that was another duty of a --

8    when I was on the street as a patrol sergeant.

9    You were assigned complaint register numbers to

10   investigate.

11        Q    Hold on.  So when you said that there

12   was a lot more paperwork, was that for as a patrol

13   sergeant or as a gang sergeant?

14        A    As a gang sergeant.

15        Q    Okay.  When you said you had a weekly

16   tally of arrests that you were supposed to keep

17   track of, was that as a patrol sergeant or as a

18   gang sergeant?

19        A    Yes, that was as a gang sergeant.  You

20   you still had to read their reports and approve

21   their reports also.

22        Q    And when you said that you were assigned

23   to investigate CRs, was that as a patrol sergeant

24   or a gang sergeant?

```
 1        A     More as a patrol sergeant.  But as a
 2   gang sergeant, if a member of your team had a CR
 3   number lodged against him, depending upon what it
 4   was, you might have to investigate that also.
 5        Q     Okay.  What happened with the tally of
 6   arrests that you did or were keeping track of?
 7        A     I'm sorry.  Excuse me?
 8        Q     What would you do after you tallied the
 9   arrests, how was that used?
10        A     It was turned into the front office.  I
11   don't know what happened to it.
12        Q     And then what was your job as a tactical
13   sergeant?
14        A     Pretty much the same thing.  The tact
15   teams and the gang teams were also, at that point
16   were starting to be detailed out a lot for
17   different festivals; Rush Street detail on the
18   weekends in the summertime, parades, stuff like
19   that.  So you would have to go to a meeting on
20   that and then supervise the members of that team
21   during that detail.
22        Q     And then you said you were --  This was
23   with the 25th District from approximately '97 to
24   '98, correct?
```

```
 1          A     Yes, ma'am.

 2          Q     After '98 where did you go?

 3          A     Area 4 Detective Division.

 4          Q     Is that the same thing as Area 4 Violent

 5    Crimes or is that different?

 6          A     Violent Crimes is part of Area 4

 7    Detective Division, yes.  I believe at the time

 8    there were Violent Crimes, Property Crimes and

 9    Youth.

10          Q     So Area 4 is all the Detective Division

11    and within that there is the Violent Crimes, Youth

12    Crimes and then other stuff?

13          A     Property Crimes, yes, ma'am.

14          Q     Oh, Property Crimes.  Thank you.

15                And how long were you with the Area 4

16    Detective Division?

17          A     So I was there until about 2003 when I

18    went to Area 5 Detective Division.

19          Q     And what were your --  Did you have

20    different job titles while you were at the Area 4

21    Detective Division?

22          A     At that time, no.  I was a Violent

23    Crimes sergeant I believe for most of the time

24    there.
```

1    Q    All right.  And what does a Violent

2    Crimes sergeant do?

3    A    Supervises detectives

4        MR. MILLER:  Objection to the form of the

5    question, the time frame.  Now or when he was a

6    sergeant?

7    BY MS. SAMUELS:

8    Q    At the time that you were with the Area

9    4 Detective Division what were your job

10   responsibilities?

11   A    So I had been assigned to Area 4 a

12   couple of different times.  Are you talking about

13   in -- when I first got there in 1998?

14   Q    Yes, sir.

15   A    I was a Violent Crimes sergeant when I

16   went there in 1998.

17   Q    And what did that entail?

18   A    Pretty much the same duties, supervising

19   detectives.

20   Q    You said that --  So did you have to do

21   a roll call?

22   A    Yes, I did roll calls at times.

23   Q    Reading and approving reports?

24   A    Yes.

```
 1        Q    Responding to requests for supervisors?
 2        A    From a detective, yes.
 3        Q    Okay.  Did you have to do tallies for
 4   arrests?
 5        A    No.  The Detective Division arrests
 6   weren't --  Yes, we didn't count arrests in the
 7   Detective Division.
 8        Q    Why not?  Do you know why?
 9             MR. MILLER:  Objection.  Calls for
10   speculation, foundation.
11             THE WITNESS:  No, I do not.
12   BY MS. SAMUELS:
13        Q    Was there some other factor that you
14   guys would generally measure as opposed to
15   arrests?
16             MR. MILLER:  Object to foundation.
17             THE WITNESS:  In regards to what, ma'am?
18   BY MS. SAMUELS:
19        Q    Was it like --  Did you keep track of
20   closed cases or anything like that that you had to
21   regularly report who was doing an arrest?
22             MR. MILLER:  Object to form.
23             THE WITNESS:  Myself, no, I did not.
24
```

```
 1    BY MS. SAMUELS:
 2         Q     Did anybody else in the division?
 3              MR. MILLER:  Object to foundation.
 4              THE WITNESS:  I don't know.  One of the
 5    things would be -- that I know was tracked in the
 6    Detective Division were things that were called
 7    late jobs but I don't know what other stats the
 8    Detective Division kept.
 9    BY MS. SAMUELS:
10         Q     Okay.  And what were late jobs?
11         A     A late job would be an assignment that
12    wasn't tied up would be one way to say it, wasn't
13    -- the investigation wasn't completed.
14              Now, that doesn't count homicides
15    because homicides always remain open unless it's
16    closed.
17              But late jobs --  The late job would
18    normally be for other cases.  Robberies,
19    aggravated batteries, domestics, armed robberies,
20    thefts, things of that nature would be tracked if
21    they remained open and that goes in the job
22    statuses but that weren't closed in one way or
23    another.
24         Q     Were you still getting assigned CRs to
```

```
 1    investigate?
 2         A    No.  I don't remember handling very many
 3    CRs in my entire career for length of time in the
 4    Detective Division.  You would get one
 5    occasionally.
 6         Q    All right.  So if I'm understanding you
 7    correctly, there weren't a lot to investigate but
 8    that would still be your job responsibility?
 9         A    I'm sorry.  Excuse me?
10         Q    I said if I'm understanding you
11    correctly there weren't many CRs to investigate
12    but that was still technically one of your job
13    responsibilities?
14         A    I would say there were a lot less CR
15    numbers in the Detective Division than in the
16    Patrol Division, yes.  Occasionally you would get
17    one but they were very few and far between.  I
18    don't necessarily remember being assigned any.
19         Q    I think we understand each other, okay.
20              And then from '03 you went to the
21    Area 5 Detective Division?
22         A    Yes.
23         Q    All right.  How long were you there?
24         A    A couple of years.  Maybe three or four.
```

```
 1          Q    So roughly '03 to '06?
 2          A    Yeah, I think so.  I don't remember.  I
 3    really don't remember, ma'am.
 4          Q    Were you still a Violent Crimes sergeant
 5    with the Area 5 Detective Division?
 6          A    Yes.
 7          Q    So basically the same job responsi-
 8    bilities that we just went over for what you did
 9    in Area 4?
10          A    Yes, ma'am.
11          Q    After Area 5 Detective Division, where
12    did you go?
13          A    I went back to Area 4 Detective
14    Division.
15          Q    How long were you back in Area 4?
16          A    Until it closed.
17          Q    When was that?
18          A    March of 2012.
19          Q    When you --  During the time that you
20    were at Area 4 Detective Division for your second
21    stint, were there changes in your responsibilities
22    as a Violent --  Well, I will ask that question
23    first.
24               Were you a Violent Crimes sergeant
```

1      when you came back to Area 4?

2           A     Yes.

3           Q     Okay.  During your time you were a

4      Violent Crimes sergeant at Area --

5           A     Actually at some point --  At some

6      point, I believe when I was in Area 4 the first

7      time, they renamed and reorganized each Detective

8      Division.  Violent Crimes was changed to Homicide,

9      Gangs and Sex.

10          Q     Was this during the first time or the

11     second time?

12          A     The first time I was in Area 4.

13          Q     All right.  And so when you came back

14     for the second time, what was your job title?

15          A     I was a sergeant in Homicide.  I believe

16     it was still called Homicide, Gangs and Sex.

17          Q     Okay.  And were there changes in your

18     job responsibilities during your second stint at

19     Area 4?

20          A     The responsibilities were pretty much

21     the same but yes.

22          Q     What were the differences, if any?

23          A     I predominantly supervised homicide

24     investigations.

1    Q    So is it fair to say the scope of what

2  you supervised changed but not necessarily what

3  you were doing as a supervisor?

4    A    Yes.

5    Q    Okay.  Did you stay that way during your

6  entire stint from '06 to -- from roughly '06 to

7  '12?

8    A    When I was in Area 5, I was on midnights

9  for a year or maybe two years, then went to days.

10 Midnights you kind of have to handle everything

11 when it comes in so --  But I would say

12 predominantly, yes, homicides.  What year it

13 started I don't remember.

14   Q    Okay.  Did your job title remain a

15 homicide sergeant -- well, Homicide, Gangs and Sex

16 from '06 to '12?

17   A    At some point they changed the name

18 again.  I believe that was when we went back to --

19 In 2012, they reorganized the whole Detective

20 Division again and then it went back to Violent

21 Crimes again.  Instead of Homicide, Gangs and Sex

22 it went back to Violent Crimes, Property Crimes,

23 SVU.  Those were the three offices.

24   Q    You stayed with Violent Crimes?

```
1          A     Yes.
2          Q     What was your next area of assignment or
3    job title?
4          A     So in March of 2012 the police
5    department reorganized the Detective Division
6    again from five Detective Division areas down to
7    three and they renamed them and I went to Area
8    North Violent Crimes.
9          Q     How long were you --
10         MS. ITCHHAPORIA:  This is Misha.  Sorry
11   to interrupt.  David Wright got kicked off and
12   needs to get back in.
13         MS. SAMUELS:  Okay.
14         Q     When did you --  How long were you with
15   Area North Violent Crimes?
16         A     Until another reorganization in the
17   Chicago Police Department Detective Division in --
18   I went back to Area 4.  I believe it was in
19   February of 2020.  The Area opened in I believe
20   April of 2020.
21         Q     So from roughly March 2012 to February
22   2020 you were with Area North Violent Crimes?
23         A     Yes, I had a homicide team there.
24         Q     What was your job title?
```

```
1        A    I was a sergeant.

2        Q    And you said you had a homicide team.

3   What does that mean?

4        A    I had a team of detectives that were --

5   for the most part in a perfect world would only be

6   assigned to homicide investigations.  It never

7   worked out that way but on paper that's the way it

8   was supposed to work.

9        Q    And was that part of the reorganization

10  where they changed that or is that --

11       A    Yes, that was part of the

12  reorganization.

13       Q    Okay.  Did your job responsibilities

14  change when you started working for Area 4 Violent

15  Crimes?

16       A    No, just the amount of area that we

17  covered and the amount of cases.

18       Q    And then from February 2020 what was

19  your next assignment?

20       A    I went back --  In another

21  reorganization, under the Chicago Police

22  Department's Detective Division they expanded the

23  Detective Division areas back to having five

24  Detective Division areas and I went back to Area 4
```

```
 1    Homicide.
 2        Q    And did you do that until your
 3    retirement?
 4        A    Yes, ma'am.
 5        Q    All right.  Were you in charge of a
 6    homicide team with Area 4 during the third stint?
 7        A    I was the supervising sergeant of a
 8    homicide team in Area 4, yes.
 9        Q    And was there any change in your job
10    responsibilities as a supervising sergeant for the
11    Area 4 homicide team?
12        A    Were there any responsibilities?
13        Q    Was there any change in
14    responsibilities?
15        A    No.
16        Q    Did you ever receive any training on how
17    to conduct a homicide investigation?
18        A    On-the-job training.
19        Q    All right.  When was that?
20        A    Pretty much the entire time that I was
21    in Area 4 -- I mean in the Detective Division.
22        Q    Oh, I'm sorry.  So you essentially just
23    were learning the ropes while doing the job, not
24    like a special course that they had you take or
```

```
1    anything like that?

2        A    No, ma'am.

3        Q    Have you ever received any training on

4    how to conduct interrogations?

5        A    No, ma'am.

6        Q    What about interviewing suspects?

7        A    No, ma'am.

8        Q    Have you received any training on how to

9    conduct or use lie detector tests?

10       A    No, ma'am.  That's a specific job in the

11   Chicago Police Department.

12       Q    Does CPD still use lie detectors?

13       A    The polygraph exam, ma'am?  I don't

14   know.  I have been retired for a year and a half.

15   I don't know what they currently do.

16       Q    At the time that you retired did CPD

17   still use polygraphs?

18       A    Were they using polygraphs at the time I

19   retired; is that your question, ma'am?

20       Q    Yes.

21            MR. GRAHAM:  Object to foundation.

22            THE WITNESS:  Yes.

23   BY MS. SAMUELS:

24       Q    Have you ever received any training on
```

```
 1    Brady obligations?
 2         A    On what, ma'am?
 3         Q    On Brady obligations.
 4         A    No, ma'am.
 5         Q    So part of --
 6              MR. MILLER:  Can we take a break?  Are we
 7    close to like a break time?
 8              MS. SAMUELS:  Sure, we can take a break.
 9    How long do you need?
10              MR. MILLER:  Probably just like five
11    minutes to use the restroom.
12              MS. SAMUELS:  All right.
13                   (Whereupon, a recess was had.)
14         Q    Did you ever receive any training on how
15    to conduct CR investigations?
16         A    Yes.
17         Q    Okay.  When was that?
18         A    When I was in sergeant school.
19         Q    To the best of your recollection have
20    you ever sustained a CR?
21         A    As an investigator --
22         Q    Yes, sir.
23         A    (Continuing) -- do you mean or against
24    myself?
```

```
 1        Q    No, as an investigator.

 2             MR. MILLER:  Object to foundation.

 3             THE WITNESS:  I believe I did on an

 4   escape.

 5   BY MS. SAMUELS:

 6        Q    So essentially somebody was in custody

 7   and they got away from the officer?

 8        A    From what I remember, yes.

 9        Q    Have you ever sustained a CR where it

10   was a complaint from a citizen against an officer?

11             MR. MILLER:  Object to foundation.

12             THE WITNESS:  That I don't remember.

13   BY MS. SAMUELS:

14        Q    Was it ever your job to review use of

15   force reports or to approve them?

16        A    So the only use of force report that I

17   know of is called a TRR, a Tactical Response

18   Report.  I don't believe I've ever --  Those

19   aren't approved at the sergeant's level.  They're

20   reviewed by a sergeant and I don't remember ever

21   doing one.

22        Q    Meaning never reviewing them?

23        A    While I was working, no, I don't

24   remember being the reviewing sergeant or
```

```
 1    supervisor on a TRR.  I may have but I don't

 2    remember it.  It's a relatively new report,

 3    probably within the last 5 or 10 years.

 4         Q    Have you ever been trained on how to

 5    interact with a confidential informant?

 6              MR. MILLER:  Object to form.

 7              THE WITNESS:  Like most of the training

 8    that I received on the job in the Detective

 9    Division, a lot of it was on-the-job training.  I

10    don't specifically remember anything on a

11    confidential informant.

12    BY MS. SAMUELS:

13         Q    So is it fair to say that the knowledge

14    you gained on how to use or interact with a

15    confidential informant was gained through your

16    experience as a police officer?

17         A    Yes.

18         Q    Okay.  And based upon that if an officer

19    came to you and they say I have somebody who wants

20    to be a confidential informant can you sort of

21    walk me through the process of how that would be

22    handled?

23              MR. MILLER:  Object to foundation.

24              THE WITNESS:  I could only say what I
```

```
1   dealt with in confidential informants.
2   BY MS. SAMUELS:
3        Q    Sure.  So can you walk me through that?
4             MR. MILLER:  Object to form, foundation,
5   incomplete hypothetical.
6             THE WITNESS:  I've used the term
7   confidential informants to obtain search warrants
8   when I was working in the 15th District or a John
9   Doe warrant.  That process would be a citizen who
10  did not want to be identified who had reliable
11  information.  We didn't deal with CIs a lot,
12  ma'am.
13  BY MS. SAMUELS:
14       Q    So to your knowledge is there any
15  official procedure or protocol for handling
16  someone so that they can be classified as a
17  confidential informant?
18            MR. MILLER:  Object to foundation, form.
19            THE WITNESS:  So the term confidential
20  informant is used pretty loosely, if I remember
21  right.  I know that some people --  I don't know
22  how to answer that, I really don't.
23  BY MS. SAMUELS:
24       Q    I understand and I think I get what
```

```
1   you're getting at so we're going to try to work
2   through this.
3              Confidential informant is that term
4   sometimes used loosely to describe someone who may
5   provide you information but doesn't want their
6   name -- or they don't want it to get out that they
7   have spoken with the police?
8       A    That's my understanding of it.  And it
9   can be my understanding of it.  I know that --
10  I'm done.
11      Q    And I guess the question that I was
12  getting at is was there more official confidential
13  informant process during the time that you were a
14  Chicago police officer?
15             MR. MILLER:  Object to foundation, form.
16             THE WITNESS:  There is something that's
17  referred to as a registered confidential informant
18  that I know of.
19  BY MS. SAMUELS:
20      Q    What's a registered confidential
21  informant?
22      A    My understanding of it, and I have no
23  direct knowledge of narcotics use, the Narcotics
24  Unit uses registered confidential informants.  I
```

1    believe in my understanding, though I'm not an

2    expert on it and have never dealt with it, I

3    believe those individuals are -- can be paid.  I

4    really don't know how that works.

5        Q    So if someone came with critical

6    information in a homicide investigation but they

7    didn't want their name to get out, would that

8    information be kept anywhere?

9            MR. MILLER:  Object to form, foundation,

10   incomplete nature of the hypothetical.

11           THE WITNESS:  What information, ma'am?

12   BY MS. SAMUELS:

13       Q    The identity of the person providing

14   information.

15       A    Sometimes those people --  My knowledge

16   of that, I don't have any but I would assume --

17           I know of instances where people have

18   talked to detectives on the scene and refused to

19   identify themselves; but you would have to ask

20   that individual if you're asking something

21   specific in this investigation, the individual who

22   used that term CI or confidential informant.

23           What my understanding and what the

24   detective that authored a specific report, his

1   meaning of the term CI is only going to be known

2   to him and not to me.

3       Q    Right, I understand that.  I guess I'm

4   asking more generally based upon your

5   understanding of homicide investigations, right.

6   And so --

7       A    Yes.

8       Q    (Continuing) -- on the one hand you have

9   the interest of the person who is giving the

10  information as their privacy or security concerns,

11  correct?

12      A    Could be.  Again, it's going to be --

13  My use of the term CI in a homicide investigation,

14  I don't think I've ever used that term in any

15  report I have ever authored.

16      Q    I guess --  Let me just ask my question

17  because here's what it is, right.  So as a police

18  officer, you understand that if a case goes -- if

19  a person gets charged or if a case goes to trial,

20  you have a responsibility to turn over evidence to

21  the defendant down the line, correct?

22      A    That's absolutely.

23      Q    All right.  And so if part of building

24  your case is relying on information from a person

```
 1   who doesn't want to be identified, how do you
 2   handle that?
 3            MR. MILLER:  Object to the incomplete
 4   nature of the hypothetical, form.
 5            THE WITNESS:  If somebody provided you
 6   with information, you would have to substantiate
 7   that through --  Nobody is going to get charged on
 8   word of mouth or someone who -- Under the
 9   constitution, you have to provide that complainant
10   or witness or the person providing it for a trial.
11            So that homicide investigation,
12   though it may give you a piece of information, you
13   have to find somebody that will testify to that
14   information.  So it could be a lead but it's not
15   going to get a case charged on your term of a CI.
16   BY MS. SAMUELS:
17       Q    I appreciate that.  I guess what I'm
18   getting at is so say they say I saw so and so
19   shoot somebody, right, but I don't want to be a
20   part of this, I don't want my name coming out and
21   if you go over to this location, you'll find the
22   gun, right.  And so you're able to independently
23   corroborate what they said because you find the
24   gun and it's got fingerprints or whatever.
```

1           How would you handle the

2    confidentiality portion of that?

3           MR. MILLER:  Object to form, incomplete

4    hypothetical.

5           THE WITNESS:  So we have had information

6    where a citizen --  I've had instances where a

7    citizen who refused to be identified stated that,

8    you know, and it would just be written pretty much

9    that way; a person who wished to remain anonymous

10   is what I would do.

11   BY MS. SAMUELS:

12       Q    Is there a difference between a person

13   who wishes to remain anonymous and a confidential

14   informant?

15       A    To me, yes, but confidential informant

16   would be somebody that I would know.  But again,

17   like I said before, the person who uses that in a

18   report may have an entirely different meaning of

19   that.

20       Q    Right.  Is it fair to say that in --

21   throughout your history as a police officer and

22   your understanding of the use of the term,

23   confidential informant refers to someone who's

24   working with a police officer or with the police

```
 1   department on a matter?

 2          MR. MILLER:  Object to form, misstates

 3   prior testimony.

 4              Go ahead.

 5          THE WITNESS:  Again, if I was reviewing a

 6   report and you as the detective used the term

 7   confidential informant, I would ask that detective

 8   what do you mean by confidential informant.

 9              I can't answer your question because

10   to you it may have an entirely different meaning

11   than it does to me, whether your experience is the

12   same as mine or greater than mine.  I can't answer

13   that.

14   BY MS. SAMUELS:

15      Q    Right.  So I'm asking what your

16   understanding of the term is as a police officer?

17          MR. MILLER:  Objection.  Asked and

18   answered.

19              Go ahead.

20          THE WITNESS:  My understanding of a

21   confidential informant is somebody that comes to

22   me and gives me information and I know who that

23   individual is.

24   BY MS. SAMUELS:
```

1    Q    All right.  And so --  We spoke about

2    your role in helping with the investigation.  How

3    about --  I'll just ask the question.

4             During your review of the case, did

5    you come to learn or understand that Marek Majdak

6    had been murdered on the night of May 12th going

7    into the early morning of May 13th, 2000?

8    A    Yes.  I would have been aware of that

9    homicide.  I don't know when I came to work or

10   when I was working but eventually I would have

11   been aware that there was a recent homicide at

12   that location.

13   Q    Can you explain the general steps in a

14   homicide investigation such as this?  Well, I

15   don't know that such as this even makes sense

16   because I suppose homicides take place in all

17   different ways.

18            But when you have a shooting that

19   took place in public, are there general steps that

20   you would expect to see in every investigation of

21   the homicide?

22            MR. MILLER:  Object to the form of the

23   question.

24            THE WITNESS:  So each homicide is

1    different.  So it would depend on the

2    circumstances of that homicide.  So you'd have to

3    be a little more specific in that, ma'am.  That's

4    kind of really general.

5    BY MS. SAMUELS:

6        Q    Okay.  So I guess I'm asking regardless

7    of circumstances are there certain things you

8    would expect to see in every homicide

9    investigation?

10               MR. MILLER:  Object to the form of the

11   question.

12               THE WITNESS:  Yes.

13   BY MS. SAMUELS:

14       Q    Okay.  And what are some of those

15   things?

16       A    The list of --  Well, I mean the

17   victim's name if it's known.  Eventually it should

18   be known.  The date, time and location of the

19   occurrence, the detectives who responded, who

20   assigned the detectives, who was on the scene, the

21   condition of the body, the suspected manner of

22   death, cause of death and manner and what steps

23   were initially taken by the responding detectives.

24       Q    I guess for a homicide that took place

```
 1    on a sidewalk or on the street, would you expect

 2    there to be a canvass of that area?

 3            MR. MILLER:  Object to the form, the

 4    incomplete nature of the hypothetical.

 5            THE WITNESS:  Again, depending upon the

 6    type of area that it was, yes.

 7    BY MS. SAMUELS:

 8        Q    From what you know of the murder of

 9    Marek Majdak, would you expect there to have been

10    a canvass?

11        A    Yes.

12        Q    And when are canvasses supposed to be

13    conducted?

14            MR. MILLER:  Object to form, foundation,

15    incomplete nature of the hypothetical.

16            THE WITNESS:  They're normally done at

17    some point upon the arrival of -- at the scene.

18    Sometimes they're done the next day, they have to

19    locate --  A recanvass sometimes is done if you

20    get no answers or the person that was home was at

21    work when you went there.  There could be a

22    variety of times but normally to at least

23    initially conduct it at the time of the arrival of

24    the detectives on the scene.
```

1    BY MS. SAMUELS:

2        Q    And I would just like to make sure we

3    are on the same page.  When I say canvass, what do

4    you understand that to mean?

5        A    Canvass means an attempt to locate

6    witnesses.  If it's a residential neighborhood, it

7    would include knocking on doors.  It would also

8    include in today's age looking for video sources.

9    But predominantly to locate an eyewitness to the

10   event or circumstantial witness also.

11       Q    So I believe earlier, correct me if I'm

12   wrong, that you recall participating in the arrest

13   of Xavier Walker -- I'm sorry -- participating in

14   the arrest of Xavier Walker, assigning Detective

15   Pietryla and assigning Detective Pietryla to talk

16   to somebody who came into Area 4, is that correct?

17            MR. MILLER:  Was the question you asked

18   if he testified to that or whether he remembers

19   it, was that the question?

20            MS. SAMUELS:  If that's what he recalls

21   his role being in the investigation.

22            THE WITNESS:  It is not an independent

23   memory.  It's from reading the reports but yes.

24

**LIGHTFOOT COURT REPORTING, P.C. 312-701-1090**

```
 1   BY MS. SAMUELS:
 2        Q    Do you have any independent recollection
 3   of your role in the investigation into the murder
 4   of Marek Majdak?
 5        A    None whatsoever, ma'am.
 6        Q    Can you describe your appearance in May
 7   of 2000?
 8        A    I had hair.  Probably 6' 1, 200 pounds.
 9   I would have had a mustache and I wore glasses,
10   eyeglasses.  The hair would have been brown, my
11   eyes are green and I'm a male white.
12        Q    When did you first learn that this case
13   was being re-looked at?
14        A    I believe I was contacted at some point
15   by the Cook County State's Attorney.
16        Q    Who were you contacted by?
17        A    I'm not certain but I believe it was
18   Jennifer Ravin.
19        Q    Is it normal procedure for you to be
20   contacted when a murder investigation is being
21   re-looked at?
22             MR. MILLER:  Object to foundation, form.
23   Calls for speculation.
24             THE WITNESS:  That's the first time I've
```

```
 1    ever had that occurrence.
 2    BY MS. SAMUELS:
 3        Q    I guess --  Do you have any prior --
 4    Well, do you know Jennifer Ravin or do you have
 5    any prior relationship?
 6        A    I don't have a relationship with her.
 7    She's a Cook County State's Attorney and I believe
 8    to this day but I'm not certain.
 9             I might have had a trial with her
10    before and I believe I dealt with her while she
11    was assigned to Felony Review.
12        Q    When you say you "dealt with her" when
13    she was on Felony Review, what does that mean?
14        A    She would have been in the Detective
15    Division area that I was working with a case that
16    was being reviewed by the Cook County State's
17    Attorney's Office for charging purposes or for
18    witness interviews.
19        Q    And to be clear, I'm not trying to imply
20    or impute any sort of personal relationship.  What
21    I mean by relationship was like have you worked
22    together; did you know her or was this just some
23    random person calling you, if that makes sense?
24        A    I knew her professionally in her role as
```

1   a Cook County State's Attorney.  I believe I had

2   had a trial with her.

3        Q    Okay.  Do you recall when that trial

4   was?

5        A    No, ma'am, I do not.

6        Q    And when you say "you had a trial with

7   with her," I assume that she was prosecuting a

8   case you had investigated?

9        A    That I was part of.  I have never been

10  assigned as a criminal --  I have never been

11  assigned as a primary investigator to a homicide

12  case.  It would have been during the course of a

13  trial.

14       Q    And so what did you and Attorney Ravin

15  talk about?

16       A    I believe, and I don't have a vivid

17  memory of it, I believe that she informed me that

18  this case was coming up either for review or trial

19  and if I remembered anything about it.

20       Q    Do you know why she was reaching out to

21  you instead of --  Well, what did you tell her --

22  I'm sorry.  I'm asking like six questions and I

23  keep stopping.

24                 So when she asked you if you

1    remembered anything about the case, what did you

2    respond?

3         A    No, I did not remember anything about

4    the case.

5         Q    Did you discuss anything else during

6    that call?

7         A    Not to the best of my memory, no.

8         Q    Did you have any --  Was that the first

9    time you had discussed the case with anybody from

10   the Cook County State's Attorney's Office since it

11   had I guess closed?

12        A    I believe we discussed it but --  I

13   guess in the correct term we did.  I never

14   testified in this case and I was never called as a

15   witness in this case so that's the first time I

16   ever remember talking to a Cook County State's

17   Attorney about this case.

18        Q    So to the best of your recollection how

19   long was this conversation?

20        A    Minutes, a couple of minutes.

21        Q    Did she give you any materials to

22   review?

23        A    No.

24        Q    After the conversation, did you look up

1    the case?

2        A    I don't remember if I did or not.  It

3    didn't sound like I was going to be testifying or

4    anything to that point.  She said she would get

5    back to me I believe.  I don't believe I looked it

6    up.  I might have but I don't believe I did.

7        Q    And then what happened?

8            MR. MILLER:  Object to form.

9            THE WITNESS:  I don't know what you mean,

10   ma'am.

11   BY MS. SAMUELS:

12       Q    Did you have any further conversations

13   with Miss Ravin?

14       A    No, I have not.

15       Q    Did you have any other conversations

16   with any other State's Attorney regarding the

17   case?

18       A    Not to the best of my knowledge, no, I

19   did not.

20       Q    Did you have any other communications

21   with Miss Ravin regarding the case?

22       A    Again, not to the best of my knowledge.

23   No, I did not.

24       Q    Did you ever speak with Mr. Walker's

1   attorney about the case?

2        A    Aren't you his attorney, ma'am?

3        Q    I'm sorry.  His criminal attorney.

4        A    Who's his attorney?  Who was his

5   criminal attorney?

6        Q    Julie Koehler.

7        A    I remember getting notified that I

8   believe it was my CR file was requested by a

9   Public Defender and I believe it was Koehler.

10       Q    Who notified you that your CR file was

11  being requested?

12       A    I believe it was an email from the

13  police department's general counsel's office.

14       Q    Do you always get an email when somebody

15  is looking at your CRs?

16       A    I believe you do.  I'm not certain but I

17  believe you do.  And also, you know, if your

18  records are FOIA'd.

19       Q    And does that email inform you of who is

20  requesting the information?

21       A    I believe it does.  I mean I don't

22  specifically remember it but I believe it does.

23       Q    What did you do after you received that

24  email?

```
 1              MR. MILLER:  Object to form.
 2              MS. SAMUELS:  Oh, I'm sorry.  Mr. Wright
 3    got kicked out again.  I'll let him in right now.
 4        Q    After you received the notification that
 5    your CR file had been requested, then what
 6    happened?
 7              MR. MILLER:  Object to form.
 8              THE WITNESS:  What do you --  Did I do
 9    something?  I don't know.  I might have gone and
10    got a cup of coffee but I don't understand what
11    you mean.
12    BY MS. SAMUELS:
13        Q    Sure.  Did you contact anybody after you
14    learned that?
15        A    I did.
16        Q    Who did you contact?
17        A    A couple of times I tried to call the
18    person that was requesting it so I assume that's
19    Koehler.
20        Q    Okay.  And why did you try to contact
21    her?
22        A    When did I try to contact her?
23        Q    Why?
24        A    Because I wanted to know what it was
```

```
 1    about.
 2         Q    And did you ever get in touch with her?
 3         A    I believe I did, yes.
 4         Q    What happened during that --
 5         A    I --
 6         Q    Go ahead.
 7         A    I don't remember exactly what happened.
 8    I would have asked her why was she requesting my
 9    CR file.
10         Q    So you have no recollection of the
11    conversation you had with Miss Koehler?
12         A    Well, I do remember that she was very
13    rude and didn't want to tell me what it was about
14    if that's what you mean.
15         Q    Was that the first time your CRs had
16    been requested by someone?
17              MR. MILLER:  Object to foundation, calls
18    for speculation.
19              THE WITNESS:  No, but I --  Not that I
20    know of.  I know that my CR file has been given
21    out in lawsuits that I've been involved in.  I
22    don't know if you --  I mean I don't even know if
23    you have my CR file but I think that's a common
24    practice.
```

**LIGHTFOOT COURT REPORTING, P.C. 312-701-1090**

1    BY MS. SAMUELS:

2        Q    Have you ever contacted anybody else

3    that requested your CR file?

4        A    This is the only time that I know for

5    sure that somebody requested my CR file.

6        Q    So it's fair to say this is the only

7    person you've ever contacted about requesting your

8    CR file?

9        A    Yes, that I know of.

10           THE WITNESS:  Can we take a break?

11           MR. MILLER:  Yeah.

12               Can we take a break, Jeanette?

13           MS. SAMUELS:  Sure.

14                   (Whereupon, a recess was had.)

15       Q    Is there anything else you recall about

16   your interactions with Miss Koehler?

17       A    I believe I asked her for the RD number

18   on this case and I don't know if she gave it to me

19   or not.  She wasn't very --  She wanted to know

20   why I was calling her.  I said because you

21   subpoenaed my CR file, what is this in regards to,

22   was professional.  She was very rude, didn't want

23   to answer any questions.  She seemed to be very

24   upset that I called her.

1    Q    I take it you called her on her work
2    number?
3    A    That's the only number that I would have
4    had.  I might have had to call the Public
5    Defender's Office.  I never had her direct number
6    that I know of.  I believe every time I called
7    there it might have been --  I called a couple of
8    times and left messages -- left at least one
9    message, and then eventually I called again and
10   the receptionist said she was in from what I
11   remember of it.
12   Q    After you spoke with Miss Koehler, did
13   you receive any communications from the Cook
14   County State's Attorney's Office about that
15   interaction?
16   A    No.
17   Q    Besides --  I think I already asked you
18   that.  Well, to be on the safe side.  Besides the
19   one conversation with Miss Ravin did you have any
20   other communications with her about this case?
21   A    You have to ask that again.  You got
22   really garbled.
23   Q    Besides the telephone call you testified
24   about with Miss Rabin did you have any further

1    communications with her about this case?

2        A    With State's Attorney Rabin?

3        Q    Yes, sir.

4        A    No, I do not believe so at all.

5        Q    What about anybody else from the SAO?

6        A    The Cook County State Attorney's office,

7    is that what SAO means?

8        Q    Yes, sir.

9        A    No, I do not believe I had any

10    conversation with anybody.  I might have but I

11    don't have any memory of it.

12        Q    When did you learn that the convictions

13    had been overturned?

14        A    When I got notified by my attorneys.  I

15    believe that's when I learned of it.

16        Q    And which attorneys were those?

17        A    Borkan & Scahill, the firm.  I don't

18    remember which attorney notified me.

19        Q    Is it common --  Well, is it common for

20    suspects to be questioned in their homes?

21        MR. MILLER:  Objection to form,

22    foundation and the incomplete nature of the

23    hypothetical.

24        THE WITNESS:  Suspects, ma'am?

```
 1   BY MS. SAMUELS:
 2        Q    Yes, sir.
 3        A    It's not --  I don't even know how to
 4   put that in context.  Are we talking about
 5   something in this investigation or in this
 6   lawsuit?
 7        Q    I'm talking generally through your
 8   experience as a police officer who has handled
 9   hundreds, unfortunately probably thousands, of
10   homicide investigations.
11             MR. MILLER:  Same objection.
12             THE WITNESS:  Each investigation is
13   different.  So I have been on scenes where a
14   suspect is initially interviewed in his residence.
15   So as to how common or --  How common it is I
16   don't know.
17   BY MS. SAMUELS:
18        Q    Would you expect that person to
19   eventually be taken to the police station for
20   further questioning?
21             MR. MILLER:  Object to form, foundation
22   and incomplete nature of the hypothetical.
23             THE WITNESS:  It would depend on the
24   circumstances.  If there was probable cause to
```

1  arrest somebody or to detain them.  Some people

2  use the word detain them.  It would not be

3  uncommon.

4  BY MS. SAMUELS:

5      Q    All right.  Would it be common to

6  question witnesses in their home?

7          MR. MILLER:  Object to form, foundation

8  and incomplete nature of the hypothetical.

9          THE WITNESS:  Yes, that's not uncommon at

10  all.

11  BY MS. SAMUELS:

12      Q    Is it common to bring State's Attorneys

13  with police officers to question witnesses at

14  their home?

15          MR. MILLER:  Same objection.

16          THE WITNESS:  That's not uncommon either.

17  Some witnesses will not go into a police station

18  to be interviewed or for various reasons can't go

19  into a police station to be interviewed, the

20  Detective Division area.

21  BY MS. SAMUELS:

22      Q    So when a witness cannot or will not go

23  to a police station, it's common to make

24  arrangements to question them at whatever location

```
 1    they are at?
 2            MR. MILLER:  Objection to form,
 3    foundation, misstates the testimony, incomplete
 4    nature of the hypothetical.
 5            THE WITNESS:  I would say it would not be
 6    an uncommon practice.
 7    BY MS. SAMUELS:
 8        Q    And when you say it would not be an
 9    uncommon practice, do you just --  How do I put
10    this?
11        A    Did you ask me a question, ma'am?
12        Q    I didn't.  I'm thinking.  I'm sorry.
13        A    Okay.
14        Q    So in May of 2000 how often would you
15    expect to see detectives working with State's
16    Attorneys for questioning witnesses?
17            MR. MILLER:  Object to form.
18            THE WITNESS:  So the -- I can't say
19    normal but the way it would work is normally a
20    detective would interview a witness and/or an
21    offender; and depending upon the nature of the
22    case, the Cook County State's Attorney's Office
23    very well may also want to interview that witness.
24    So detectives obviously would work in conjunction
```

```
 1    with the Cook County -- an Assistant Cook County

 2    State's Attorney.  So that would not be an

 3    uncommon occurrence.

 4    BY MS. SAMUELS:

 5         Q    And so in May of 2000 you would expect

 6    to see State's Attorneys and detectives working

 7    together to question witnesses?

 8              MR. MILLER:  Object to form.

 9              THE WITNESS:  It would depend on the

10    case, ma'am.

11    BY MS. SAMUELS:

12         Q    I guess what I'm getting at is if you

13    saw a State's Attorney and a detective working

14    together to question a witness no red flags would

15    be going off in your head; is that fair to say?

16         A    That's correct.

17         Q    Okay.  In May of 2000, was there a

18    procedure for documenting when a witness or a

19    suspect alleged that they were injured in police

20    custody?

21         A    If he made that allegation to a police

22    supervisor then, yes, there was a procedure that

23    should be followed.

24         Q    Okay.  And what would be the procedure?
```

```
 1        A    If it was made to me as a supervisor, I
 2   would physically look at the individual.  I would
 3   interview that individual.  I would have an
 4   evidence technician called to photograph that
 5   individual.  And I would contact --  I don't
 6   believe -- I don't know if it was COPA or not.
 7   No, it wasn't COPA.  It was -- I believe at that
 8   time it would have been the Office of Professional
 9   Standards or OPS and obtain at the time it was
10   called a CR number.
11               And obviously, if the individual was
12   injured, you would seek medical attention for that
13   individual.
14               I don't know, I don't recall exactly
15   what the written procedures were but I believe
16   that's pretty close to it.
17        Q    Okay.  And if a person was in custody
18   and their attorney alleged that they were injured
19   during the course of being in police custody,
20   would the procedure be the same?
21          MR. MILLER:  Object to form, incomplete
22   nature of the hypothetical.
23               Go ahead.
24          THE WITNESS:  It would depend upon -- If
```

1  you're telling me that a client's -- that a

2  defendant's attorney, an offender's attorney came

3  to me and said my client got beat up, is that what

4  you're asking me?

5  BY MS. SAMUELS:

6      Q    Yes, sir.

7      A    Then I would do those same procedures.

8  And obviously I would interview the complaining

9  witness, in this case would be that attorney.

10     Q    During your review of the case file, did

11 you come across copies of the pictures of Xavier

12 Walker?

13     A    They're so distorted that they're really

14 not easy to see anything of.  But, no, I don't

15 believe --  Any of the photos in there I should

16 say.  I don't remember seeing a picture of Xavier

17 Walker in a copy of my investigative file.

18     Q    As you sit here today, do you understand

19 that he alleges he was abused while in police

20 custody?

21     A    Yes.  I believe that's the crux of this

22 lawsuit.

23     Q    As you sit here today, did you know that

24 photos were taken of him while he was in police

1   custody, some Pola -- I guess Polaroids?

2       A    By whom?

3       Q    Well, that was going to be my question.

4       A    So I know he would have had photos taken

5   of him when he was booked in the 11th District

6   lockup.  I don't know if I've seen any Polaroid

7   photographs of Mr. Walker.

8       Q    All right.  I guess the question that I

9   wanted to ask is when you said you would have an

10  evidence technician come and photograph him, those

11  wouldn't have been Polaroids, is that fair?

12          MR. MILLER:  Object to foundation.

13          THE WITNESS:  No, the evidence

14  technicians I believe at the time were using 35

15  millimeter cameras.  I don't believe they used

16  Polaroids at any time.  I could be wrong.

17  BY MS. SAMUELS:

18      Q    I understand you don't have an

19  independent recollection of this but there are

20  some things I'm just going to run through.

21          As you sit here today, do you have an

22  independent recollection of learning about the

23  murder of Marek Majdak in or around May 13, 2000?

24      A    I --

```
 1                  MR. MILLER:  Hold on.

 2                  So I'm just going to object inasmuch

 3      as we're going to go through some question about,

 4      you know, learning things that could call for

 5      privileged communication.

 6                  I think what she's asking you is

 7      based on your independent recollection or your

 8      review of the file only as opposed to anything

 9      that you talked to your attorneys about.  She's

10      asking you about that.

11                  Correct me if I am wrong.

12                  MS. SAMUELS:  Yes.

13                  THE WITNESS:  So let me --

14                  MS. SAMUELS:  Hold on.  Because I want to

15      make sure that we're all on the same page.

16          Q    So what I'm asking you, and I'm going to

17      be asking you a series of questions, is do you

18      independently remember that back in 2000 when this

19      stuff was occurring, do you independently remember

20      that this stuff occurred back in 2000?

21                  Does that make sense?  Not I read a

22      report and, therefore, I know what happened or

23      somebody --

24          A    You're asking me do I independently
```

```
 1   remember the murder, this specific murder?  No, I
 2   do not.
 3       Q    And so I'm just going to run through a
 4   bunch of stuff because I have to; but moving
 5   forward that's what I'm asking, okay?
 6       A    Yes, ma'am.
 7       Q    Do you have any recollection of any
 8   events that took place to investigate the murder
 9   of Marek Majdak from May 13th to May 27th, 2000?
10       A    I have no independent memory of that.
11       Q    Do you have independent recollection of
12   learning how -- of how Xavier Walker became a
13   suspect in the murder of Marek Majdak in May of
14   2000?
15       A    No, ma'am, I do not.
16       Q    Do you have any independent recollection
17   of going to arrest Xavier Walker for the murder of
18   Marek Majdak on May 28, 2000?
19       A    No, ma'am, I do not.
20       Q    Do you have any independent recollection
21   of the questioning of Xavier Walker in relation to
22   the murder of Marek Majdak in May of 2000?
23       A    No, ma'am, I do not.
24       Q    Do you have any independent recollection
```

```
 1    of the questioning of Maurice Wright in relation
 2    to the murder of Marek Majdak in May of 2000?
 3         A    No, ma'am, I do not.
 4         Q    Do you have any independent recollection
 5    of your questioning of the -- excuse me, of your
 6    questioning of Antwoine Waddy in the murder of
 7    Marek Majdak -- in relation to the murder of Marek
 8    Majdak in May of 2000?
 9         A    You asked me of my questioning of
10    Mr. Waddy.  Do you mean of the questioning of or
11    specifically if I asked Mr. Waddy any questions?
12         Q    If you asked Mr. Waddy any questions.
13         A    No, ma'am, I don't remember asking
14    Mr. Waddy any questions at all.
15         A    Do you remember questioning anybody in
16    relation to the murder of Marek Majdak.
17         A    No, not at all.
18         Q    Do you remember meeting with any
19    witnesses in relation to the murder of Marek
20    Majdak?
21         A    I have no independent memory of that at
22    all.
23         Q    After a murder inves --
24              Well, do you have an independent
```

```
 1    recollection of questioning Jovanie Long in
 2    relation to the murder of Marek Majdak?
 3         A    No, ma'am, I do not.
 4         Q    All right.  Once a murder investigation
 5    is --  Well, let me ask the first question.
 6              My first question is once suspects
 7    are arrested in a murder investigation is that
 8    generally the last step or are there additional
 9    steps that need to be taken?
10              MR. MILLER:  Object to the incomplete
11    nature of the hypothetical, foundation, form.
12              THE WITNESS:  There's always going to be
13    at least a typing to document the arrest and
14    charging of the case, if in fact it's charged.
15    But it's kind of hard to give a one-color-all
16    answer to that question, ma'am.  It would depend
17    upon each individual case but at the very least
18    you would have to type the closing supplementary
19    report of that case.
20    BY MS. SAMUELS:
21         Q    And so you arrest the suspects, you type
22    the closing supplementary report.  Then what would
23    happen with a case file generally?
24              MR. MILLER:  Object to form and the
```

```
 1    incomplete nature of the hypothetical, foundation.
 2             THE WITNESS:  Again, it depends upon each
 3    case.  The evidence might have to be worked up.
 4    Other people might have to be interviewed.  I
 5    can't answer a general question about a homicide
 6    because each homicide is different.
 7    BY MS. SAMUELS:
 8         Q    At the conclusion of a homicide case, in
 9    getting prepared or as you're preparing it for the
10    State's Attorney Office or as you're preparing it
11    for prosecution, are there certain things or
12    certain steps that you would always expect to see?
13             MR. MILLER:  Object to the form of the
14    question.
15             THE WITNESS:  So I don't know what your
16    definition is of when a homicide case is
17    completed.  Again each case is going to be
18    different, ma'am.  It's almost impossible to say
19    that there are certain things that in every case
20    would be done.
21                 The detectives would sit down with
22    the State's Attorneys and they would go over the
23    investigation.  That is going to happen, assuming
24    that there is an offender that is going to stand
```

```
 1   trial.
 2              Some cases are closed and the
 3   defendant for whatever reason, and there could be
 4   a variety of reasons, doesn't stand trial.
 5              I can't answer a general question
 6   like that, ma'am.  You would have to ask me
 7   something specific.
 8   BY MS. SAMUELS:
 9       Q    As you sit here today, do you know who
10   Xavier Walker is?
11       A    Yes.
12       Q    Do you recall having any interactions
13   with him ever?
14       A    I don't ever remember having any
15   interaction with Xavier Walker.
16       Q    Do you recall having --
17              As you sit here today, do you know
18   who Jovanie Long is?
19       A    Yes, I know who Jovanie Long is.
20       Q    Do you ever recall having any
21   interactions with him?
22       A    No, ma'am, I do not.
23       Q    As you sit here today, do you know who
24   Maurice Wright is?
```

```
 1          A    Yes, I do.

 2          Q    Do you ever recall having any

 3    interactions with him?

 4          A    No, ma'am, I do not.

 5          Q    As you sit here today, do you know who

 6    Antwoine Waddy is?

 7          A    Yes, I do.

 8          Q    Do you ever recall having any

 9    interactions with him?

10          A    No, ma'am, I do not.

11          Q    As you sit here today, do you know who

12    Ursula Byrd is? (Phonetic sp.)

13          A    Yes, I do.

14          Q    Do you ever recall having interactions

15    with her?

16          A    No, ma'am, I do not.

17          Q    As you sit here today, do you know who

18    Ashante Wright is?

19          A    Yes, ma'am, I do.

20          Q    Do you ever recall having any

21    interactions with her?

22          A    No, ma'am I do not.

23          Q    As you sit here today, do you know who

24    Yvette Lu is? (Phonetic sp.)
```

```
 1        A     Yes, ma'am, I do.
 2        Q     Do you ever recall having interactions
 3   with her?
 4        A     No, ma'am, I do not.
 5        Q     As you sit here today, do you know who
 6   Yvette Anderson is?
 7        A     Can you say that name again?
 8        Q     Yvette Anderson.
 9        A     Yes, ma'am, I do.
10        Q     Do you ever recall having any
11   interactions with her?
12        A     No, ma'am, I do not.
13        Q     The murder of Marek Majdak, did you
14   understand that to be gang related at any time?
15             MR. MILLER:  Object to foundation.
16             THE WITNESS:  No, ma'am, I don't believe
17   I ever knew that that was gang related.
18             MS. SAMUELS:  I don't think I have any
19   further questions.  Give me like two minutes to
20   look over my notes.
21                   (Whereupon, a recess was had.)
22             I don't have any further questions.
23             MR. MILLER:  Bill or Robin, do you have
24   any questions?
```

1          MR. OBERTS:  No questions.

2          MS. SHOFFNER:  No questions from the

3    City.

4          MR. GRAHAM:  Okay.  I just want to clear

5    up two things very briefly.

6                          EXAMINATION

7    BY MR. MILLER:

8        Q    Mr. Holy, at the beginning of this

9    matter you referred to an individual by the name

10   of Xavier Wright?

11       A    Xavier Walker.

12       Q    Okay.  That was my question.  There's a

13   number of Wrights and Walkers involved in this

14   case.

15       A    I must have messed it up.

16       Q    So let me ask you to be clear.  When you

17   referred to Xavier Wright, were you referring to

18   Xavier Walker?

19       A    Yes, sir.

20       Q    The only other thing is you were asked

21   by counsel whether you had had any Brady training.

22   I believe counsel was referring to the name of a

23   case, Brady vs. Maryland.

24                Notwithstanding that, are you aware

```
 1   that a criminal defendant has a constitutional

 2   right to access to all of the evidence that is

 3   collected by the police in their investigation?

 4        A    I am.  Now I know what --  When she said

 5   Brady --  If she had said Brady v Maryland, I

 6   probably would have said yes.  You can't hide

 7   evidence in a criminal case against someone.

 8        Q    And I believe you spoke to it a little

 9   later and you understand that's the case whether

10   it's inculpatory or exculpatory evidence, right?

11        A    Absolutely.

12        Q    You have in fact over the course of your

13   career been trained on that?

14        A    Yes.

15             MR. MILLER:  All right.  That's all I

16   have.

17             MS. SAMUELS:  So I have follow-up on

18   that.

19                        EXAMINATION

20   BY MS. SAMUELS:

21        Q    So when did you receive training on

22   Brady?

23        A    So in the academy, in sergeant's school,

24   on the job throughout my time in the Detective
```

**LIGHTFOOT COURT REPORTING, P.C. 312-701-1090**

```
 1    Division.  Probably somewhere else along the line
 2    but I don't remember.
 3         Q    All right.  And what type of --  And
 4    what did that training consist of?
 5         A    So my understanding of Brady, I'm not a
 6    lawyer so, uh, is that the evidence used against
 7    someone, all the evidence in a case is supposed to
 8    be made available to that individual.
 9         Q    Right.  So what did your training
10    consist of, how were you trained; can you explain
11    the process?
12         A    Numerous hours of law in the academy
13    when you first come on the job and then throughout
14    my experiences as a policeman and throughout
15    dealing with State's Attorneys and throughout my
16    experience as a policeman assigned to the
17    Detective Divisions.
18         Q    I guess what like --  Did they --
19         A    I don't recall if I had a specific class
20    entitled Brady vs. The State Maryland, I don't
21    remember that.
22         Q    What do you mean?
23         A    So Miranda vs. Arizona we had a class on
24    that, like Miranda warnings; but I don't think I
```

**LIGHTFOOT COURT REPORTING, P.C. 312-701-1090**

1  ever had a class entitled Brady vs. The State of

2  Maryland.

3      Q    All right.  So is it fair to say as a

4  police officer you have a general understanding

5  that you're supposed to turn over evidence but you

6  don't ever remember receiving any specific

7  training on that?

8          MR. MILLER:  Object.  Misstates the

9  testimony.

10         THE WITNESS:  No, I believe that that was

11  in some sort of presentation in the academy when

12  you first come on the job.

13             But it's pretty common sense that you

14  can't hide evidence in a case so I would assume I

15  learned that on the police department, but I might

16  have learned that in grammar school or high

17  school.

18  BY MS. SAMUELS:

19      Q    Do you remember any specific training

20  you received as a homicide sergeant or a Violent

21  Crimes sergeant in relation to Brady?

22      A    No.  Not specifically, no.

23         MS. SAMUELS:  No further questions.

24         MR. MILLER:  Okay.  We will reserve

```
1    signature.
2                        (Which were all the proceedings
3                        in the above-entitled matter.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1

2          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION

   XAVIER WRIGHT,              )
4                             )
               Plaintiff,      )
5                             )
          vs.                  ) No. 20 cv 7209
6                             )
   CITY OF CHICAGO, et al.,    )
7                             )
               Defendants.     )
8

9          I, BRYAN HOLY, state that I have read the

10   foregoing transcript of the testimony give by me

11   at my deposition on January 27, 2022, and that

12   said transcript constitutes a true and correct

13   record of the testimony given by me at said

14   deposition except as I have so indicated on the

15   errata sheet provided herein.

16

17                              _____

18                                   BRYAN HOLY

19
   No corrections (Please initial) _____
20   Number of errata sheets submitted
   _____ (pgs)
21   SUBSCRIBED AND SWORN TO
   Before me this    day
22   of _____, 2022

23

24   _____
   Notary Public

**LIGHTFOOT COURT REPORTING, P.C. 312-701-1090**

```
 1   STATE OF ILLINOIS    )
                          )  ss:
 2   COUNTY OF COOK       )

 3          I, LINDA K. MADISON, CSR No. 084-000970,

 4   Certified Shorthand Reporter certify:

 5          That the foregoing proceedings were taken

 6   before me via Video Conferencing at the time set

 7   forth, at which time the witness was put under

 8   oath by me;

 9          That the testimony of the witness, the

10   questions propounded, and all objections and

11   statements made at the time of the examination

12   were recorded stenographically by me and were

13   thereafter transcribed;

14          That the foregoing is a true and correct

15   transcript of my shorthand notes so taken.

16          I further certify that I am not a

17   relative or employee of any attorney of the

18   parties, nor financially interested in the action.

19          I declare under penalty of perjury under

20   the laws of Illinois that the foregoing is true

21   and correct.

22          Dated this 8th day of February 2022.

23                      _____
                        Linda K. Madison
24                      CSR No. 084-000970.
```

**LIGHTFOOT COURT REPORTING, P.C. 312-701-1090**