# EXHIBIT 63

```
 1      STATE OF ILLINOIS   )
                            )   SS:
 2      COUNTY OF C O O K   )

 3          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 4              COUNTY DEPARTMENT - CRIMINAL DIVISION

 5      THE PEOPLE OF THE     )
        STATE OF ILLINOIS     )
 6                            )
                 vs.          )  No. 00 CR 20601
 7                            )
        XAVIER WALKER and     )
 8      JOVANIE LONG          )

 9

10                      REPORT OF PROCEEDINGS at the hearing of

11      the above-entitled cause, had before the HONORABLE

12      MARCUS R. SALONE on the 19th day of February 2003.

13

        A P P E A R A N C E S:
14          HON. RICHARD A. DEVINE
            State's Attorney of Cook County
15          BY:  MS. JENNIFER COLEMAN
                 Assistant State's Attorney
16               Appeared on behalf of the People;

17          MR. GREGORY WILSON
                 Appeared on behalf of the Defendant,
18               Xavier Walker;

19          MS. RITA FRY
            Cook County Public Defender
20          BY:  MR. JOHN CONNIFF
                 Assistant Public Defender
21               Appeared on behalf of the Defendant,
                 Jovanie Long.
22

23      JO ANN KROLICKI, CSR
        Official Court Reporter
24      Illinois License No. 084-002215
```

EE-1

CCSAO XAVIER WALKER 000981

```
1                    I N D E X

2

3    People vs. Xavier Walker and Jovanie Long

4    Date of Hearing:  2-19-03

5    Page Numbers:  EE-1 through EE-95

6

7                    PROCEEDINGS

8                                              PAGE

9    MOTION TO SUPPRESS EVIDENCE (Long)
     WITNESSES:                 DX    CX   RDX   RCX
10   MICHAEL PIETRYLA            9    31
     JOHN RIORDAN               51    63
11   ROBERT BARTIK              65    72
     JOHN RIORDAN               76
12   ARGUMENT                                85
     FINDING                                 88
13

14                    EXHIBITS
                                ID        REC.
15   People's 1                 18

16   People's 2                 54

17   People's 3                 68

18   Defendant's 1              72

19

20

21

22

23

24
```

EE-2

```
 1                    THE CLERK:  Xavier Walker.
 2                    THE COURT:  You don't have any motions?
 3                    MR. WILSON:  No.
 4                    MS. COLEMAN:  They're all done.
 5                    THE COURT:  Good morning, gentlemen.
 6                    THE DEFENDANT:  Good morning, sir.
 7                    MR. WILSON:  For the record, Gregory Wilson
 8         appearing on behalf of Xavier Walker present before
 9         the Court.
10                    MS. COLEMAN:  Judge, Mr. Long's matter is
11         set for motions, but with regard to both defendants,
12         we may have been premature setting this for trial.
13         We set it for trial April 30th for a bench trial.
14         With regard to Mr. Long, we are seeking the death
15         penalty on him.  We need to still have a management
16         conference with Mr. Conniff.  I spoke with Mr.
17         Conniff, and after his motion is done, we'll pick a
18         date for that.
19                    There is one item at the Crime Lab
20         that needs DNA tests completed.  I spoke to the
21         analyst and she said she will have it done at the end
22         of April.  Counsel needs to have that ahead of time.
23         That only goes to Mr. Long, also.
24                    So we're looking on setting it for a
```

EE-3

```
1    status date sometime maybe the end of March to make
2    sure they have all the discovery.  Hopefully, I'll
3    have the DNA done by then; although, I can't
4    guarantee that because the lab has a backlog of four
5    months.
6                    We were hoping to set a status date
7    on both defendants today.  Mr. Walker doesn't have a
8    motion today so he was hoping to just get a date now
9    since he's not involved in the motion.
10                   THE COURT:  Do you have a date in late
11   March you're going to be back?
12                   MR. WILSON:  We were looking at March 20th,
13   Judge.
14                   THE COURT:  You got it.
15                   MS. COLEMAN:  The other problem with the
16   trial date, Judge, is the victim's mother is going to
17   be out of the country that week.  So I told that to
18   counsels, and since we still don't know about the
19   DNA, I thought we'd hold off and set the trial date
20   after that date.
21                   THE COURT:  All right, gentlemen.
22                        (WHEREUPON, a recess was had
23                         in the above matter.)
24                   THE CLERK:  Jovanie Long.
```

EE-4

CCSAO XAVIER WALKER 000983

```
 1              THE COURT:  All right.  Speaker is on.
 2              MS. COLEMAN:  Judge, this is set today for
 3    a motion to suppress the statements.  I have talked
 4    to counsel ahead of time.  Detectives Riordan and
 5    Pietryla are here.
 6              There is another detective who is
 7    named in the motion.  I talked to the -- counsel and
 8    the detectives, and he's not really involved in this
 9    portion of the investigation.  So I believe at this
10    time he's being stricken from the motion.
11              Is that correct?
12              MR. CONNIFF:  Judge, I'm not striking him.
13    The state indicated they wouldn't call him.  I have
14    looked at the detective supplement, and the principal
15    witnesses appear to be Detectives Pietryla and
16    Riordan, so I believe the state can proceed with
17    them.  If he becomes relevant, we can ask him to come
18    in.
19              MS. COLEMAN:  On Page 2, Allegation C, I
20    did talk to counsel about making that portion more
21    specific.  During the periods of time that the
22    defendant was left alone while they were arranging a
23    polygraph examination, there is an allegation in that
24    paragraph that he was threatened at some point.
```

EE-5

CCSAO XAVIER WALKER 000984

```
 1                    Again, the two detectives who were
 2       working on this case at this period of time are
 3       here.  I don't know if they're the two he's
 4       talking about, and I'd just ask that portion be made
 5       more specific so I know who to rebut that allegation
 6       with.
 7                    THE COURT:  Do you have a description?
 8                    MR. CONNIFF:  Judge, I think Paragraph 2
 9       indicates the names of the detectives, and there are
10       only three names, Riordan and Pietryla and Krofel.
11       We've discussed Krofel, which leaves two, and I think
12       the names of the individuals and their star numbers
13       are a sufficient description.
14                    MS. COLEMAN:  Well, since this is my burden
15       and my case-in-chief, Krofel is not a part of this.
16       So I want to make it clear, if the defendant somehow
17       implicates Krofel, I can call him in rebuttal, but I
18       do not intend to call Krofel to rebut any of these
19       allegations at this point because he's just not
20       involved at this point in the investigation.
21                    THE COURT:  What I have heard in response
22       to your inquiry is that Krofel is not implicated in
23       these allegations, but either or both of the other
24       two may be.
```

CCSAO XAVIER WALKER 000985

```
 1              MS. COLEMAN:  Right, and they're here.
 2              THE COURT:  Okay.
 3              MS. COLEMAN:  I would ask that the
 4    defendant be sworn to the motion, Judge.
 5              THE COURT:  Raise your right hand, sir.
 6                   Do you solemnly swear that the facts
 7    contained in this motion are true and accurate to the
 8    best of your knowledge?
 9              THE DEFENDANT:  Yes.
10                   (Brief pause.)
11              MS. COLEMAN:  Judge, I would ask leave to
12    call Detective Pietryla.
13              THE COURT:  There's a motion to exclude
14    witnesses?
15              MR. CONNIFF:  Yes, Judge, motion to exclude
16    witnesses.
17              MS. COLEMAN:  For the record, I tendered
18    polygraph records to counsel .
19              THE COURT:  She tendered the polygraph
20    notes?
21              MR. CONNIFF:  Correct.  Those were tendered
22    this morning, Judge.
23                   Judge, members of the defendant's
24    family have been here on other court dates.  They are
```

CCSAO XAVIER WALKER 000986

```
 1    not here now.  I don't know whether they may have

 2    occasion to walk in during the hearing of the motion.

 3    If I see them at any point, I will notify the state

 4    and the Court.

 5              THE COURT:  Do you anticipate them

 6    testifying at trial?

 7              MR. CONNIFF:  At trial.  Not on the motion,

 8    Judge.

 9              THE COURT:  All right.  You don't have

10    any potential witnesses out there, do you,

11    Miss Coleman?

12              MS. COLEMAN:  No, Judge.

13              THE COURT:  Please raise your right hand.

14                    (Witness sworn.)

15              THE COURT:  Please be seated.

16              MS. COLEMAN:  May I proceed, Judge?

17              THE COURT:  Counsel, are you ready?

18              MR. CONNIFF:  Yes, Judge.

19              THE COURT:  Go right ahead.

20

21

22

23

24
```

CCSAO XAVIER WALKER 000987

```
 1     WHEREUPON,

 2                 MICHAEL PIETRYLA,

 3     called as a witness on behalf of the People of

 4     the State of Illinois, having been first duly sworn,

 5     under oath was examined and testified as follows:

 6                 DIRECT EXAMINATION

 7                 BY MS. COLEMAN:

 8         Q.    Detective, could you please tell the judge

 9     your full name and spell your last name and give us

10     your star number?

11         A.    Michael Pietryla, P-i-e-t-r-y-l-a, Star

12     Number 21209.

13         Q.    And where are you currently assigned?

14         A.    Area 4 Homicide.

15         Q.    What are your duties in Area 4?

16         A.    I'm a homicide detective, ma'am.

17         Q.    Back in April and May of the year 2000,

18     were you assigned to Area 4?

19         A.    Yes, I was.

20         Q.    On May 13th of 2000, were you assigned to

21     investigate the homicide of Marek Majdak which had

22     occurred on April 13th of 2000 at approximately

23     1:00  a.m. at 4721 West Ohio?

24         A.    Yes.
```

EE-9

1      Q.   And did you -- were you assigned to

2  investigate that case until the case was cleared and

3  closed?

4      A.   Yes, I was.

5      Q.   Now, I'm going to direct your attention to

6  the end of May of the year 2000.  By that point, was

7  the codefendant on the case, Xavier Walker, already

8  arrested and charged?

9      A.   Yes.

10     Q.   And was there a stop order out for a person

11  by the name of Jovanie Long?

12     A.   Yes.

13     Q.   Did you and your partners begin looking for

14  Jovanie Long?

15     A.   Yes.

16     Q.   Did you know an address for his mother of

17  4230 West Crystal?

18     A.   Yes.

19     Q.   Did you begin looking for the defendant at

20  that address?

21     A.   Yes, we did.

22     Q.   I'm going to direct your attention

23  specifically now to June 5th of 2000.  That evening,

24  did you speak to anybody at that address?

CCSAO XAVIER WALKER 000989

1      A.   Yes, I did.

2      Q.   Who did you speak to?

3      A.   I spoke to a woman who identified herself

4  as Regina Long, the mother of Jovanie.

5      Q.   Could you keep your voice up louder?

6      A.   Sure.

7      Q.   Did you speak to her in person or over the

8  phone on June 5th?

9      A.   Over the phone.

10     Q.   When you spoke to Regina Long over the

11 phone, what did you tell her?

12     A.   First we asked her if she knew the

13 whereabouts of her son and that he was implicated in

14 a homicide which occurred in May.

15     Q.   Did she tell you whether she knew where her

16 son was?

17     A.   She said she did not know where he was at,

18 but she had spoke with him.

19     Q.   And did she tell you that she would do

20 anything with the information you had given her?

21     A.   Yes.  We had asked her to contact her son

22 as soon as she could and have him call us or come in

23 to talk to us.

24     Q.   At any time on that date, did you speak to

EE-11

CCSAO XAVIER WALKER 000990

1    the defendant, himself?

2         A.   No.

3         Q.   Now I'm going to direct your attention to

4    July 25th of 2000.  Did you go to the home at 4230

5    West Crystal on the third floor?

6         A.   Yes.

7         Q.   Who were you with?

8         A.   Detective Riordan.

9         Q.   And when you and Detective Riordan went to

10   that address, did you speak to somebody who

11   identified herself as Regina Long?

12        A.   Yes, we spoke with Regina Long.

13        Q.   When you spoke to Regina Long at that time,

14   did you ask her about her son, Jovanie Long?

15        A.   Yes, we did.

16        Q.   What did you tell her?

17        A.   We again explained to her why we wanted to

18   talk to him and that he had been implicated and that

19   there was an active stop order in relation to the

20   homicide and we needed to have him come in and talk

21   to us about this.

22        Q.   Now, during that conversation, did you or

23   Detective Riordan ever threaten Regina Long in any

24   way about wanting to kill her son?

CCSAO XAVIER WALKER 000991

1      A.   No.

2      Q.   On July 25th, did you or Detective Riordan

3 ever actually speak to Jovanie Long either in person

4 or over the phone?

5      A.   No.

6      Q.   On June 5th on that conversation that you

7 spoke about with the defendant's mother over the

8 phone, did you ever make any threats at all about

9 Jovanie Long?

10     A.   No.

11     Q.   Between June 5th and July 25th, did you or

12 Detective Riordan or anybody else working on this

13 case to your knowledge ever speak directly to the

14 defendant at all?

15     A.   No.

16     Q.   Now, on July 25th of the year 2000, did you

17 receive a phone call from anyone?

18     A.   Excuse me?

19     Q.   Did you receive a phone call from anyone?

20     A.   Yes, from Regina Long.

21     Q.   And did she call you at the area?

22     A.   Yes, she did.

23     Q.   When she called you, did she tell you

24 anything?

CCSAO XAVIER WALKER 000992

1       A.    She told me that she was working on trying

2    to get her son to turn himself in.

3       Q.    Did she give you a time frame about when he

4    may turn himself in?

5       A.    She said approximately a week, that she had

6    to make arrangements with some clergy member and that

7    he needed to get his affairs in order.

8       Q.    And did she tell you that she would contact

9    you again?

10      A.    Yes.

11      Q.    And on August 3rd of 2000 in the evening,

12   approximately 7:00 p.m., were you contacted again by

13   Regina Long?

14      A.    Yes, I was.

15      Q.    Was that again over the phone?

16      A.    Over the phone.

17      Q.    When she talked to you on that time, what

18   did she tell you?

19      A.    She told me that she would be coming in the

20   next day at noon with her son to turn himself in and

21   Reverend Major.  I don't recall his last name.

22      Q.    Is it Reverend Howard?  Major Howard?

23      A.    Yes.

24      Q.    Now, at the conversation on July 28th or

EE-14

CCSAO XAVIER WALKER 000993

1    August 3rd, did you make any threats at all

2    whatsoever with regard to Jovanie Long?

3         A.    No.

4         Q.    Did you ever actually speak to Jovanie Long

5    at any of those conversations?

6         A.    No.  No, I did not.

7         Q.    And you were the one who was actually

8    speaking to Regina Long; is that correct?

9         A.    Yes, I was.

10        Q.    Now, on August 4th of 2000, were you at

11   the area waiting for the defendant to turn himself

12   in?

13        A.    Yes.

14        Q.    At approximately 11:45 a.m., did anyone

15   show up at the station?

16        A.    Yes.

17        Q.    Who showed up?

18        A.    Jovanie Long, his mother, Regina, and the

19   Reverend.

20        Q.    That's Reverend Major Howard?

21        A.    Yes.

22        Q.    And did you have a conversation with the

23   defendant at any point?

24        A.    At that time?

EE-15

CCSAO XAVIER WALKER 000994

1      Q.    Yes.

2      A.    No.

3      Q.    What happened when they arrived at the

4    area?

5      A.    We took Jovanie into an interview room and

6    the Rev -- I don't -- he asked if the Reverend would

7    come along.  I said that would be fine, and we took

8    both of them into the interview room.

9      Q.    And were you working with Detective Riordan

10    that day?

11      A.    Yes.

12      Q.    Was Investigator Krofel working that

13    morning?

14      A.    No, he was not.

15      Q.    And when you took the defendant to the

16    interview room, it was just you, Riordan, and the

17    Reverend and the defendant; correct?

18      A.    That's correct.

19      Q.    The person you spoke about, Jovanie Long,

20    do you see that person in the courtroom today?

21      A.    Yes, I do.

22      Q.    Could you please point to him and describe

23    something he's wearing today?

24      A.    He's wearing a Cook County outfit and he

CCSAO XAVIER WALKER 000995

1    has a shaved head (indicating.)

2              MS. COLEMAN:  Judge, may the record reflect

3    the in-court identification of the defendant?

4              THE COURT:  It shall.

5    BY MS. COLEMAN:

6         Q.   Now, in the presence of the Reverend, did

7    you or Detective Riordan do anything?

8         A.   Detective Riordan read him his rights.

9         Q.   Read the defendant his rights?

10        A.   Yes, he did.

11        Q.   Did he do that by memory or from a

12   preprinted source?

13        A.   He did it from a preprinted card on the

14   back of our FOP book.

15        Q.   Do you have an FOP book with you?

16        A.   Yes, I do.

17        Q.   Could you please turn that book to the page

18   where the rights are listed?

19             MS. COLEMAN:  Judge, I'm asking that the

20   detective's FOP book be marked as People's Exhibit

21   Number 1.

22             THE COURT:  It shall.

23

24

CCSAO XAVIER WALKER 000996

1                        (WHEREUPON, People's Exhibit

2                        Number 1 was marked for

3                        identification.)

4            MS. COLEMAN:  I would ask that the

5    detective be allowed to read the rights out of the

6    FOP book.

7            MR. CONNIFF:  No objection.

8    BY MS. COLEMAN:

9        Q.    The rights in that book, are those the same

10   rights read to the defendant?

11       A.    Yes, they were.

12       Q.    Would you begin reading them?

13       A.    "Before we ask you any questions, it

14           is our duty to advise you of your rights.

15                "Number one:  Do you understand

16           that you have the right to remain silent?

17                "Number two:  Do you understand

18           that anything you say can and may be used

19           against you in a court or other

20           proceedings?

21                "Number three:  Do you

22           understand that you have the right to talk

23           to a lawyer before we ask you any

24           questions and to have him with you during

EE-18

CCSAO XAVIER WALKER 000997

1    questioning?

2              "Number four:  If you cannot

3    afford or otherwise obtain a lawyer and

4    you want one, a lawyer will be appointed

5    for you, and we will not ask you any

6    questions until he has been appointed.

7              "Number five:  If you decide to

8    answer now with or without a lawyer, you

9    still have the right to stop the

10   questioning at any time or to stop the

11   questioning for the purpose of consulting

12   a lawyer.

13             "Number six:  You may waive the

14   right to advice of counsel and your right

15   to remain silent, and you may answer

16   questions or make a statement without

17   consulting a lawyer if you so desire.

18             "Number seven:  Do you

19   understand each of these rights?

20             "Number eight:  Do you wish to

21   answer questions at this time?"

22   Q.   After each of those rights were read to the

23   defendant, did he indicate whether he understood each

24   of those rights?

CCSAO XAVIER WALKER 000998

```
 1          A.    Yes, he did.

 2          Q.    And this was in the presence of Reverend

 3     Howard?

 4          A.    Yes, it was.

 5          Q.    And did Detective Riordan read the rights

 6     just as you have read them today?

 7          A.    Yes, he did.

 8          Q.    Did the defendant agree to speak to you

 9     about the murder of Marek Majdak?

10          A.    Yes, he did.

11          Q.    What did the Reverend do at that time?

12          A.    The Reverend left the room.

13          Q.    And when the Reverend left, what did you

14     and Detective Riordan do?

15          A.    We escorted the Reverend back to where

16     Regina Long was at, and we told him that Jovanie

17     would be with us for awhile and we were going to

18     conduct some interviews with him, and that if they

19     chose to stay, that was okay.  If they chose to call

20     us, that would be okay, too.

21          Q.    What did you and Detective Riordan do

22     then?

23          A.    Then we went back in the room and talked to

24     Jovanie Long.
```

CCSAO XAVIER WALKER 000999

1       Q.   When you went back into the room, did the

2   defendant speak to you about what had happened on the

3   early morning hours of May 13th of 2000?

4       A.   Yes.

5       Q.   Would you characterize the statement that

6   he gave you as a denial?

7       A.   Yes.

8       Q.   Did he also give you a partial alibi?

9       A.   Yes, he did.

10      Q.   Did he name anybody in that alibi?

11      A.   Yes, he did.

12      Q.   Who did he name?

13      A.   Hersula Byrd.

14      Q.   Did he indicate who Hersula Byrd was to

15   him?

16      A.   He told us it was his girlfriend.

17      Q.   Did you tell the defendant anything about

18   other witnesses?

19      A.   Yes, we did.

20      Q.   What did you tell him?

21      A.   We told him that we had third party

22   admissions from him to other people and that they

23   have already given statements.

24      Q.   Did you tell him anything about the

CCSAO XAVIER WALKER 001000

1    codefendant, Xavier Walker?

2        A.    Yes, we did.

3        Q.    What did you tell him?

4        A.    We told him that Xavier Walker had been

5    arrested and charged for his participation in that

6    murder and that he had given a videotape recorded

7    statement implicating him as the shooter and the

8    person who robbed the victim.

9        Q.    When you say, "him," you're referring to

10   Jovanie Long?

11       A.    I'm referrig to Jovanie Long.

12       Q.    Did the defendant, Jovanie Long, ask

13   anything at that time?

14       A.    He wanted to see the videotaped statement.

15       Q.    And what did you and Detective Riordan do

16   then?

17       A.    We left the room, got the tape, and we

18   showed him the portion of the tape which -- in which

19   Xavier Long (sic) said that Jovanie shot him and

20   robbed him.

21       Q.    When you say, "him," you're referring to

22   the victim?

23       A.    To the victim, yes.

24       Q.    Did you ever show him the entire tape at

EE-22

CCSAO XAVIER WALKER 001001

1    all?

2         A.   No, we did not.

3         Q.   Did you ever actually show him any of the

4    statements of the people who the defendant had given

5    third party admissions to?

6         A.   No, we did not.

7         Q.   Now, after the defendant viewed the portion

8    of the statement where Xavier Walker implicated him,

9    what did the defendant say?

10        A.   I believe he said, Xay's tricking on me.

11        Q.   And then what did he say?

12        A.   He asked if he could take a polygraph

13   exam.

14        Q.   And did you tell him that he could?

15        A.   Yes, we did.

16        Q.   Did you schedule a polygraph exam?

17        A.   Yes, we did.

18        Q.   What time were you able to schedule the

19   polygraph exam for?

20        A.   It would have been the following morning at

21   about 8:00 o'clock.

22        Q.   Now, how long were your conversations with

23   the defendant on August 4th?

24        A.   No longer than 40 minutes at a time.

1   Q. And how many -- approximately how many

2 times did you speak to him for 40 minutes?

3   A. Two or three times.

4   Q. Now, did you tell him that the polygraph

5 would not be until the next morning?

6   A. Yes.

7   Q. Now, that evening, where was the defendant?

8   A. He was in the interview room that we

9 brought him to originally.

10   Q. And what did you and Detective Riordan

11 begin doing that evening?

12   A. We began looking for Hersula Byrd.

13   Q. Did you spend that evening looking for

14 Hersula Byrd?

15   A. Yes.

16   Q. Were there points in time when you came

17 back to the area?

18   A. Yes.

19   Q. Was there anybody else in the area that

20 night who was working on this case aside from you and

21 Detective Riordan?

22   A. No, there was not.

23   Q. Was there any time during the evening

24 when you went to check on the defendant, Jovanie

EE-24

```
 1    Long?

 2         A.   Several times.

 3         Q.   Was there any time during that evening when

 4    you went in and threatened Jovanie Long?

 5         A.   No.

 6         Q.   Did you ever tell him that if he did not

 7    talk, that he would be held for an indefinite period

 8    of time?

 9         A.   No.

10         Q.   Also, Detective, was there ever a point in

11    time when the defendant told you that he would not

12    speak to you?

13         A.   No, there was not.

14         Q.   Now, was the defendant left alone that

15    evening until the next morning for the polygraph?

16         A.   Yes.

17         Q.   That evening was he fed at all?

18         A.   Yes.

19         Q.   And who fed him?

20         A.   I think we both fed him, Detective Riordan

21    and myself.

22         Q.   Do you recall what you fed him?

23         A.   Probably hamburgers.

24         Q.   Now, the next morning, on August 5, 2000,
```

CCSAO XAVIER WALKER 001004

```
1    you said the polygraph was scheduled for

2    8:00 o'clock; is that correct?

3         A.   That's correct.

4         Q.   Where did you have to take the defendant

5    for the polygraph exam?

6         A.   To Homan Square.

7         Q.   How far is Homan Square from Area 4?

8         A.   About five minutes by car.

9         Q.   Now, when you -- did you leave Area 4 with

10   the defendant to go to the polygraph?

11        A.   Yes, we did.

12        Q.   Who else was with you in the car?

13        A.   Just Detective Riordan and myself and

14   Jovanie Long.

15        Q.   Now, on the way to the polygraph exam --

16   you said it was about a five minute drive?

17        A.   About that.

18        Q.   At any point on the way to the polygraph

19   exam did you tell the defendant that if he passed the

20   exam that you would kill him and make it look like he

21   was killed attempting to escape?

22        A.   No, I did not.

23        Q.   Did Detective Riordan ever make those

24   claims to the defendant?
```

EE-26

CCSAO XAVIER WALKER 001005

1    A.    No, he did not.

2    Q.    Did you or Detective Riordan make any

3    threats at all to the defendant on the way to the

4    polygraph exam?

5    A.    No, we did not.

6    Q.    Was there anybody else in the car besides

7    you, Detective Riordan, and the defendant?

8    A.    No.

9    Q.    When you got to the polygraph exam, did you

10   meet with a polygraph investigator?

11   A.    Yes.

12   Q.    Who was that?

13   A.    Bartik.

14   Q.    When you met with Bartik, was that first at

15   approximately 8:15 in the morning?

16   A.    Yeah, about 8:15.

17   Q.    When you met with Bartik, where was the

18   defendant?

19   A.    When we met with Bartik, we put Jovanie

20   Long in the polygraph room.

21   Q.    And where did you and Detective Riordan and

22   Detective Bartik go?

23   A.    In his office.

24   Q.    Bartik's office?

CCSAO XAVIER WALKER 001006

1       A.    Yes.

2       Q.    And what did you do there?

3       A.    We explained the facts of the case, gave

4    him a copy of the case record, and briefly told him

5    that we were -- want him questioned in regards to his

6    implication as the shooter.

7       Q.    And did Investigator Bartik then leave you

8    and Detective Riordan alone?

9       A.    Yes, he did.

10      Q.    How long was Investigator Bartik gone

11   before he returned to his office?

12      A.    Five or ten minutes.

13      Q.    And when he returned to his office, what

14   did he say?

15      A.    He said, you better come back in here, he

16   made an admission.

17      Q.    Did you go into the room where the

18   defendant was sitting for the polygraph?

19      A.    Yes.

20      Q.    And did you say anything to the defendant?

21      A.    I asked him what he wanted to say,

22   and he told me that he shot -- he robbed him and

23   shot him.

24      Q.    And --


                              EE-28
CCSAO XAVIER WALKER 001007

```
 1          A.    And I asked him who, and he said, the white
 2    boy.
 3          Q.    What did you do then?
 4          A.    We explained to him that -- you know, what
 5    was going to be done now, that we would take him
 6    back.  He wasn't going to take the polygraph exam,
 7    and we were going to take him back to the area.
 8          Q.    Did you and Detective Riordan then take him
 9    back to the area?
10          A.    Yes.
11          Q.    When you took him back to the area, did you
12    or Detective Riordan advise him of anything?
13          A.    Detective Riordan advised him of his rights
14    again.
15          Q.    Was that in your presence?
16          A.    Yes.
17          Q.    Were those the same rights that you have
18    just read to us?
19          A.    Yes.
20          Q.    Did he begin reading them out of the FOP
21    book?
22          A.    Yes.
23          Q.    Did the defendant acknowledge he understood
24    each of those rights?
```

CCSAO XAVIER WALKER 001008

```
1        A.    Yes.

2        Q.    Did the defendant make a statement to you

3   about the murder of Marek Majdak?

4        A.    Yes, he did.

5        Q.    After that statement, what did you do?

6        A.    We contacted felony review and told him the

7   facts of the case, and they told us that they would

8   send out a State's Attorney.

9        Q.    And did a State's Attorney arrive at the

10  area at approximately 10:00 a.m.

11       A.    Yes.

12       Q.    Detective, was there ever a time when the

13  defendant was shown various statements from witnesses

14  until he was coached into giving a statement about

15  the murder of Marek Majdak?

16       A.    No.

17       Q.    In fact, the only statement that you showed

18  the defendant was whose statement?

19       A.    Xavier Walker's.

20       Q.    Was there ever a time when you even

21  showed the defendant the entire statement of Xavier

22  Walker?

23       A.    No, we did not.

24       Q.    Was there ever a time when the defendant
```

CCSAO XAVIER WALKER 001009

1    was in custody where you or anyone in your presence

2    threatened the defendant in any way that if he

3    refused to talk he'd be held for an indefinite period

4    of time?

5        A.    No.

6        Q.    And was there ever a time before the

7    defendant turned himself in where you or any other

8    detectives threatened to kill the defendant if they

9    found him?

10       A.    No.

11       Q.    Was the defendant ever in custody on August

12   2nd of the year 2000?

13       A.    No, he wasn't.

14             MS. COLEMAN:   I have no further questions

15   of this witness, Judge.

16                    CROSS EXAMINATION

17                    BY MR. CONNIFF:

18       Q.    Detective, how long have you been a Chicago

19   Police Officer?

20       A.    17 years.

21       Q.    How long have you been a detective?

22       A.    Eight years.

23       Q.    Your testimony was that the defendant

24   turned himself in; correct?

EE-31

```
 1           A.     That's correct.

 2           Q.     Now, when a defendant turns himself in or

 3     if anyone comes into the station to talk to you, what

 4     records are kept of the individual being in the

 5     station?

 6                  MS. COLEMAN:   I'm going to object to

 7     generally what records are kept as to relevance.

 8                  THE COURT:   Sustained.

 9                  MR. CONNIFF:   I can rephrase it, Judge.

10     BY MR. CONNIFF:

11           Q.     With respect to Mr. Long, what records

12     would be kept indicating that he was in the station

13     on August the 4th?

14           A.     Our General Progress Reports.

15           Q.     All right, sir.   If he comes into the

16     station, he has to appear at the desk first;

17     correct?

18           A.     Yes.

19           Q.     And you would be notified of his presence

20     in the station?

21           A.     Yes.

22           Q.     Does the desk sergeant make a notation of

23     who approaches him in the station and asks to talk

24     to the detective?   Is there any record kept at the
```

CCSAO XAVIER WALKER 001011

1    desk?

2         A.    I don't know.

3         Q.    In your experience as a police officer, you

4    don't know whether those records are kept?

5         A.    I don't believe so.

6         Q.    So if Mr. Long came in on a day other than

7    August the 4th, there would be no other record

8    maintained by the Chicago Police Department other

9    than your General Progress Reports as to when he was

10   in the station?

11             MS. COLEMAN:  Objection, calls for

12   speculation.

13             THE COURT:  He can tell us his

14   understanding.

15   BY THE WITNESS:

16        A.    Repeat the question again.

17   BY MR. CONNIFF:

18        Q.    If Mr. Long came into the station on a day

19   other than August the 4th --

20        A.    Mm-hmm.

21        Q.    -- would there be any other record

22   of the Chicago Police Department of his presence

23   in the station other than your General Progress

24   Reports?

CCSAO XAVIER WALKER 001012

1       A.     Depending upon what he came in for.

2       Q.     All right.  Let's assume he came in to turn

3  himself in.

4       A.     Then there would be General Progress

5  Reports by a detective.

6       Q.     So your answer, as I understand it, is the

7  only record of when a man is in the station when he

8  reports to turn himself in is the General Progress

9  Report which you prepared?

10       A.     Yes.

11       Q.     There's nothing -- no notation is made at

12  the desk?

13       A.     No.

14              MS. COLEMAN:  Objection, asked and

15  answered.

16              THE COURT:  Sustained.

17  BY MR. CONNIFF:

18       Q.     There's no notation made up in the Area 4

19  Violent Crimes Office, an official log of who was

20  present in the station?

21              MS. COLEMAN:  Objection, asked and

22  answered.

23              THE COURT:  I'll let him answer that.

24  BY THE WITNESS:

EE-34

CCSAO XAVIER WALKER 001013

```
 1          A.    Yes.
 2   BY MR. CONNIFF:
 3          Q.    Yes, there is such a log?
 4          A.    There is a log.
 5          Q.    And is that log kept on a daily basis?
 6          A.    Yes.
 7          Q.    All right.  And what does that log --
 8   describe the entries that are made in that log.
 9          A.    Date on which the -- whoever is coming
10   in -- what date that would be, his name and the
11   detective's name and what case.
12          Q.    All right.  And is that a book?
13          A.    No, it's not.  It's just a piece of paper
14   that they have just so that when people call to see
15   if somebody is there, they can say, yeah, he's here
16   or he's not here.
17          Q.    All right.  So I take it this happens every
18   day; right?
19                MS. COLEMAN:  Objection.
20   BY MR. CONNIFF:
21          Q.    These sheets are kept up there?
22                THE COURT:  Go ahead.
23   BY MR. CONNIFF:
24          Q.    Sheets are kept on a daily basis?
```

CCSAO XAVIER WALKER 001014

```
 1          A.    I assume so, yes.

 2          Q.    And kept on every shift?

 3          A.    Yes.

 4          Q.    And they indicate those persons who are

 5    present in Area 4 Violent Crimes on that date at a

 6    specific time?

 7          A.    Yes.

 8          Q.    Now, after Mr. Long turned himself in, you

 9    prepared General Progress Reports?

10          A.    Yes.

11          Q.    And do those General Progress Reports

12    document what you did with respect to Mr. Long?

13          A.    Yes.

14          Q.    And do you document -- generally speaking,

15    do you document in the General Progress Report, for

16    example, the time that you began an interview with

17    the defendant?

18          A.    Generally, I do.

19          Q.    All right.  Do you know whether you did in

20    this case?

21          A.    I don't recall.

22          Q.    Do you document the time that you conclude

23    an interview of a defendant?

24          A.    Yes, sometimes I do.
```

EE-36

CCSAO XAVIER WALKER 001015

1        Q.    Did you do it in this case?

2        A.    I don't recall.

3        Q.    You say sometimes you do.  Is there any

4    policy which the Chicago Police Department requires

5    that you do so?

6              MS. COLEMAN:  Objection to the relevance.

7              THE COURT:  No, go ahead.  I'll let him

8    answer.

9    BY THE WITNESS:

10       A.    I -- I'm -- I don't know.

11   BY MR. CONNIFF:

12       Q.    Okay.  So with regard to a defendant giving

13   you a statement, sometimes you put down the time you

14   start and end and sometimes you don't?

15       A.    Yes.

16       Q.    And what guides you in making the

17   determination as to whether you document it?

18       A.    It just depends upon how busy I am and what

19   I'm doing.

20       Q.    All right.  So if it -- strike that.

21             Do you document each and every

22   separate conversation that you have with the

23   defendant?

24       A.    No.

CCSAO XAVIER WALKER 001016

1      Q.   So you could have more than one
2  conversation with the defendant and you would
3  summarize it as though you were having one
4  conversation; is that correct?
5           MS. COLEMAN:   Judge, I'm going to object to
6  what the detective generally does.
7           THE COURT:   Sustained.
8  BY MR. CONNIFF:
9      Q.   All right.  But with respect to whether or
10 not you document each separate conversation, your
11 answer was no?
12     A.   That's correct.
13     Q.   Do you document in the General Progress
14 Report times when defendants ask to go to the
15 bathroom?
16          MS. COLEMAN:   Again, objection to the
17 relevance of what the detective generally does.
18          THE COURT:   Sustained.
19 BY MR. CONNIFF:
20     Q.   Did the defendant ask to go to the bathroom
21 in this case?
22     A.   Oh, yes.
23     Q.   He did.  Did you note that in your General
24 Progress Report?

CCSAO XAVIER WALKER 001017

```
 1          A.    I would have to review my report.
 2          Q.    What is the instruction that you have
 3    been given by the Chicago Police Department as a
 4    detective with regard to documenting that particular
 5    subject?
 6          MS. COLEMAN:  Objection to relevance.
 7    BY MR. CONNIFF:
 8          Q.    What is the policy, the general policy?
 9          THE COURT:  He can answer.
10    BY THE WITNESS:
11          A.    Of going to the bathroom?
12    BY MR. CONNIFF:
13          Q.    Of noting in your General Progress Reports
14    your treatment of the defendant.  For example, his
15    request to go to the bathroom, what time it occurred,
16    and the fact that you let him go to the bathroom.
17    What's the general policy regarding General Progress
18    Reports?
19          A.    The general policy would be that we took
20    him to the bathroom, fed him, gave him cigarettes,
21    Coke, with no specific time or date.
22          Q.    So the general policy is to simply mention
23    it in the General Progress Reports?
24          A.    Yes.
```

EE-39

CCSAO XAVIER WALKER 001018

1    Q.  And there's no instruction to you to

2 keep a chronological log of -- by time and subject

3 exactly what you did with regard to the defendant

4 and conversations that were had and actions

5 that were taken concerning him in a chronological

6 fashion?

7    A.  That's correct.

8    Q.  You indicated that you began your

9 investigation on or about May the 13th, which is the

10 date of the homicide; correct?

11    A.  Yes.

12    Q.  And the first conversation that you had

13 with Regina Long was on June the 5th?

14    A.  That's correct.

15    Q.  Were there any prior conversations with

16 Regina Long by other detectives that you were aware

17 of?

18    A.  Not that I'm aware of.

19    Q.  Would Detective -- was Detective Sanders

20 involved in this investigation?

21    A.  Yes, he was.

22    Q.  Was Detective Wright?

23    A.  Yes, he was.

24    Q.  Did you have conversations with them

EE-40

CCSAO XAVIER WALKER 001019

1    concerning the conduct of the investigation?

2        A.   Yes, I did.

3        Q.   Did they ever tell you that they had talked

4    with Regina Long?

5            MS. COLEMAN:  Objection to the relevance,

6    Judge.  This detective is not named in the motion.

7            THE COURT:  Go ahead.  I'll allow it.

8    BY THE WITNESS:

9        A.   Not that I recall.

10   BY MR. CONNIFF:

11       Q.   Did you ever review any notes or General

12   Progress Reports that they had made concerning a

13   conversation with Regina Long before you talked to

14   her on June the 5th?

15       A.   No.

16       Q.   You indicated that you had a telephone

17   conversation with Regina Long on June the 5th;

18   correct?

19       A.   That's correct.

20       Q.   And she told you that she hadn't seen her

21   son?

22       A.   Yes.

23       Q.   And that she had talked to him on the

24   phone?

EE-41

CCSAO XAVIER WALKER 001020

```
 1        A.    That's correct.
 2        Q.    And that she told him that the police were
 3   looking for him?
 4        A.    I don't know what she said to her son.
 5        Q.    You don't know what she said?
 6        A.    All I know is what she told me.
 7        Q.    And what did she tell you?  Did she tell
 8   you that she had told her son that the police were
 9   looking for him?
10        A.    No, she did not.
11        Q.    She did not say that in that conversation?
12        A.    Not to me she did not.
13        Q.    Did she tell you whether she knew where he
14   was?
15        A.    She said she did not know.
16        Q.    You then had a conversation with Regina
17   Long on July the 25th?
18        A.    That's correct.
19        Q.    Now, between May the 13th and June the 5th,
20   what shift were you working during that period of
21   time?
22        A.    Third watch.
23        Q.    Third watch?
24        A.    Yes.
```

CCSAO XAVIER WALKER 001021

```
 1          Q.    Were the other detectives on first and
 2     second watch also working this case?
 3          A.    As far as Jovanie Long was concerned?
 4          Q.    As far as May the 13th through June the
 5     5th, the first contact with Regina Long?
 6          A.    Yes.
 7          Q.    And they came out on the street in the
 8     neighborhood looking for people to talk to?
 9          A.    Yes.
10                MS. COLEMAN:  Objection to the relevance.
11                THE COURT:  Sustained.
12     BY MR. CONNIFF:
13          Q.    Do you know -- you, yourself, were out on
14     the street looking for Jovanie Long during this
15     period?
16          A.    That's correct.
17          Q.    And from -- the same would be true of June
18     the 5th through July the 25th?
19          A.    That's correct.
20          Q.    And approximately how many people would you
21     say that you talked to in the neighborhood during
22     that period of time from May the 13th through July
23     25th?
24          A.    In whose neighborhood?
```

CCSAO XAVIER WALKER 001022

```
1          Q.    In the neighborhood where you were looking
2    for Jovanie Long?
3          A.    Approximately?
4          Q.    Yes.
5          A.    10, 15.
6          Q.    10 or 15 people?
7                Were any of those people brought into
8    the station and questioned?
9          A.    Yes.
10               MS. COLEMAN:  Objection to the relevance,
11   Judge.
12               THE COURT:  I'll reserve ruling.  I'm
13   giving you some latitude, but we're going to try to
14   stick to the written petition.
15   BY MR. CONNIFF:
16         Q.    Did you talk to neighbors?
17         A.    Whose neighbors?
18         Q.    Jovanie Long's neighbors?
19         A.    No, I did not.
20         Q.    You did not.
21               Did you talk to relatives?
22         A.    I did not.
23         Q.    You say you did not.  Are you aware of
24   someone else who did?
```

CCSAO XAVIER WALKER 001023

```
 1          A.    No, I'm not.

 2          Q.    So as far as you know, no one did?

 3                MS. COLEMAN:  Objection.

 4                THE COURT:  Sustained.

 5    BY MR. CONNIFF:

 6          Q.    You never talked to any cousins, nieces,

 7    uncles, aunts, anyone like that who purported to be a

 8    relative of Jovanie Long during that period of time?

 9    No one?

10          A.    Not that I recall.

11          Q.    And your testimony is that no one else did

12    as far as you know?

13          A.    As far as I know, yes.

14          Q.    So you, yourself, nor no one in your

15    presence ever threatened anyone in the neighborhood

16    with regard to Jovanie Long's presence or your

17    looking for him?

18          A.    No.

19          Q.    And you never nor did anyone else as far as

20    you know take anyone into custody with the objective

21    of trying to find out where Jovanie Long was?

22          A.    No.

23          Q.    And your testimony is that you never

24    threatened Regina Long's mother?
```

EE-45

CCSAO XAVIER WALKER 001024

1          A.    No, I did not.

2                THE COURT:  I'm sorry.  Never threatened

3     who?

4                MR. CONNIFF:  I'm sorry.  I misspoke,

5     Judge.  Jovanie Long's mother, Regina.

6     BY THE WITNESS:

7          A.    No, I never threatened her.

8     BY MR. CONNIFF:

9          Q.    All right.  You never suggested to her

10    that if Jovanie Long didn't turn himself in that he

11    might be shot on the street because this was a murder

12    case?

13         A.    No, I did not.

14         Q.    Did anyone else make that statement to her

15    in your presence?

16         A.    No.

17         Q.    And you never -- just so we're clear, you

18    never threatened any member of his family?

19         A.    No, I did not.

20         Q.    Nor did anyone else that you know about?

21         A.    No.

22         Q.    Now, you worked on the case from May the

23    13th until Jovanie Long turned himself in?

24         A.    That's correct.

EE-46

CCSAO XAVIER WALKER 001025

1    Q.    And did you work the same shift during that

2    period of time?

3    A.    I was assigned to the same shift.  I worked

4    various hours.

5    Q.    Did you work on this case every day?

6    A.    No.

7    Q.    About how many days out of every seven did

8    you work on this case would you estimate?

9    A.    Probably three to four.

10   Q.    Three to four.

11         And did you generate for those three

12   to four days each week General Progress Reports for

13   the shifts that that period of time would cover as to

14   what you were doing on the case during that period of

15   time?

16         MS. COLEMAN:  Objection to the relevance.

17         THE COURT:  Sustained.

18   BY MR. CONNIFF:

19   Q.    You transported Jovanie Long to the

20   polygraph examination?

21   A.    Yes, Detective Riordan and myself.

22   Q.    And were there conversations in the car

23   between yourself and the -- and Officer Riordan and

24   Jovanie Long?

CCSAO XAVIER WALKER 001026

1    A.   No.

2    Q.   Did you ever suggest to him on the way to

3  the polygraph examination that the results of the

4  examination would not matter?

5    A.   No, I did not.

6    Q.   Or words to that effect?

7    A.   No, I did not.

8    Q.   Did you ever suggest to him on the way to

9  the examination that Jovanie Long could be killed and

10  that you could make it appear as if he were trying to

11  escape?

12    A.   No, I did not.

13    Q.   You mentioned a couple of times in your

14  testimony that there was a stop order for Jovanie

15  Long?

16    A.   That's correct.

17    Q.   That is not a warrant for his arrest;

18  correct?

19    A.   No, it's not.

20    Q.   What is the meaning of a stop order in the

21  Chicago Police Department?

22    A.   It means that if he is stopped by another

23  police agency or Chicago, his name will appear that

24  we want him in questioning for -- and it will relate

EE-48

CCSAO XAVIER WALKER 001027

1    to the RD number which we're asking about.

2         Q.   All right.  So if he's at another

3    station, you'll be notified, and you'll go pick him

4    up there?

5         A.   If -- yes.

6         Q.   And finally, Detective, you pulled out the

7    book of Miranda warnings, and you testified -- you

8    read those rights from the book; correct?

9         A.   That's correct.

10        Q.   And you said that the way you read the

11   rights today is the way you saw Officer Riordan read

12   them to the defendant?

13        A.   Yes.

14        Q.   He actually pulled out his book and read

15   them to the defendant?

16        A.   Yes, he did.

17        Q.   Do you know how long Officer Riordan has

18   been a police officer?

19        A.   I believe he's been a police officer for 12

20   or 14 years, somewhere around there.

21        Q.   Not -- strike that.

22             Not with respect to Officer Riordan,

23   but with respect to yourself, in all of your years as

24   a Chicago Police Officer, do you still pull out the

CCSAO XAVIER WALKER 001028

1     book and read from the book to each and every person

2     that you give the rights to?

3          A.    I always do.

4          Q.    You never give them from memory?

5          A.    Never.

6          Q.    And why is that?

7          A.    Because my --

8                MS. COLEMAN:  Objection to the relevance.

9                THE COURT:  He can answer.

10    BY THE WITNESS:

11         A.    Because I don't want to miss anything.

12    BY MR. CONNIFF:

13         Q.    You don't want to miss any?

14         A.    A word of the rights.  I do not want to

15    miss not one word.

16               MR. CONNIFF:  I have nothing further.

17               MS. COLEMAN:  I have nothing based on that,

18    Judge.

19               THE COURT:  Thank you, sir.

20                    (Witness excused.)

21               MS. COLEMAN:  We'd ask leave to call

22    Detective Riordan.  The testimony will be very brief,

23    but I'd ask the foundation be laid for the videotaped

24    statement, so I'd ask to set up the video.  It's all


EE-50

CCSAO XAVIER WALKER 001029

1    ready to go.

2            THE COURT:  Okay.

3                    (Brief pause.)

4            MS. COLEMAN:  I don't believe the detective

5    has been sworn.

6            THE COURT:  Would you stand and raise your

7    right hand.

8                    (Witness sworn.)

9            THE COURT:  Please be seated.

10   WHEREUPON,

11                   JOHN RIORDAN,

12   called as a witness on behalf of the People of

13   the State of Illinois, having been first duly sworn,

14   under oath was examined and testified as follows:

15                   DIRECT EXAMINATION

16                   BY MS. COLEMAN:

17       Q.   Detective, could you please tell the judge

18   your name, star number, and unit of assignment?

19       A.   Gang specialist John Riordan,

20   R-i-o-r-d-a-n, Star Number 60040.  I'm assigned to

21   Area 4 Violent Crimes.

22       Q.   Now, on August 5th of the year -- August

23   4th and 5th of the year 2000, were you assigned to

24   Area 4?

EE-51

CCSAO XAVIER WALKER 001030

1       A.    Yes.

2       Q.    And on those days, were you working on the

3  murder of Marek Majdak which had occurred on May 13th

4  of 2000 at 4721 West Ohio?

5       A.    Yes.

6       Q.    Were you working with a partner on those

7  days?

8       A.    Yes, I was.

9       Q.    Who was that?

10       A.    Detective Michael Pietryla.

11       Q.    Detective, at any point during your -- do

12  you see the person that was in custody on those days

13  in the courtroom today?  You can get up if you have

14  to.

15       A.    Yes, the gentleman in the brown top and

16  brown bottom (indicating.)

17            MS. COLEMAN:  Judge, may the record reflect

18  the in-court identification of the defendant?

19            THE COURT:  It shall.

20  BY MS. COLEMAN:

21       Q.    Detective, when you met with the defendant

22  on August 4th and 5th of 2000, at any time did you

23  threaten the defendant in any way that if he refused

24  to talk he would be held for an indefinite period of

EE-52

CCSAO XAVIER WALKER 001031

1    time?

2         A.   No.

3         Q.   Was there ever a time when the defendant

4    said to you that he had nothing to say about this

5    investigation?

6         A.   No.

7         Q.   Was there ever a time before August 4th

8    that you, yourself, ever saw or spoke to the

9    defendant on the phone or in person at all?

10        A.   No.

11        Q.   Was there ever a time when you showed the

12   defendant various statements of all the witnesses in

13   the case and then coached the defendant to make a

14   statement?

15        A.   No.

16        Q.   Now I'm going to direct you specifically to

17   August 5th of the year 2000.  Did you call a -- did

18   you and your partner call a State's Attorney to go to

19   that station that morning?

20        A.   Yes.

21        Q.   And did an ASA by the name of Jim Navarre

22   arrive at the area?

23        A.   Yes.

24        Q.   At approximately 4:30 that afternoon was a

CCSAO XAVIER WALKER 001032

1    videotaped statement taken from the defendant

2    regarding the murder of Marek Majdak?

3         A.    Yes.

4         Q.    Were you present for that videotaped

5    statement?

6         A.    Yes, I was.

7                        (WHEREUPON, People's Exhibit

8                         Number 2 was marked for

9                         identification.)

10   BY MS. COLEMAN:

11        Q.    Now, before you testified, did you view

12   what has been marked as People's Exhibit Number 2,

13   the videotaped statement of Jovanie Long?

14        A.    Yes.

15        Q.    And did you have a chance to both view it

16   and listen to it?

17        A.    Yes.

18        Q.    And does that People's Exhibit Number 2,

19   does it truly and accurately show the statement that

20   the defendant gave to ASA Navarre on August 5th of

21   the year 2000?

22        A.    Yes, it does.

23        Q.    Does it show what everyone looked like?

24        A.    Yes.

CCSAO XAVIER WALKER 001033

1      Q.   Does it also show what everyone was saying

2   in the video?

3      A.   Yes.

4           MS. COLEMAN:  Judge, at this time, I'm

5   going to ask leave to publish the end of the

6   videotaped statement.

7           MR. CONNIFF:  Judge, I'd object.  Can I

8   voir dire for one second on the foundation?

9           THE COURT:  Go right ahead.

10              VOIR DIRE EXAMINATION

11              BY MR. CONNIFF:

12     Q.   Is it Detective Riordan?

13     A.   Gang Specialist, sir.

14     Q.   You have seen this videotaped statement?

15     A.   Yes.

16     Q.   And this videotape only covers the actual

17  statement that the defendant made at the end of his

18  custody, what was recorded on that tape at the end of

19  his custody; correct?

20     A.   Correct.

21     Q.   It's not a videotape that commences at the

22  beginning of his custody and continues through to the

23  end of his custody, is it?

24     A.   No.

CCSAO XAVIER WALKER 001034

1          Q.    It is only the portion that you and the

2     State's Attorney decided to videotape; correct?

3                MS. COLEMAN:   Objection to the form of that

4     question.

5                THE COURT:   Sustained.

6                MR. CONNIFF:   Judge, I have nothing

7     further.   I'd object to publishing a portion of a

8     videotape which the entirety of the videotape is a

9     portion -- only a portion of the defendant's entire

10    custody, and if -- as part of the foundation, we

11    would ask that the Court rule that the -- in order to

12    introduce any portion of a videotape, obviously, this

13    defendant is in custody for a period of time and the

14    vast majority of that period of time is not on

15    videotape.

16                The only thing on videotape is what

17    the state selects to put on videotape, and,

18    therefore, because there is not a videotape which

19    covers the entire period of the custody, this is only

20    a self-serving portion, and, therefore, the

21    foundation should be that there is a videotape which

22    commences at the time that the defendant is brought

23    into the room which encompasses all the transactions,

24    conversations, suggestions, question and answers,

CCSAO XAVIER WALKER 001035

1   that are posed to the defendant and answers given by

2   the defendant and not simply a portion of that

3   custody at the end, which is a prearranged portion by

4   the Chicago Police Station and the State's Attorney's

5   Office.

6              So we would object to publishing only

7   a portion which is captured on videotape which does

8   not represent that -- there's no other videotape

9   available to impeach anything which is on this

10  portion which is selected by the State's Attorneys.

11             THE COURT:  Miss Coleman?

12             MS. COLEMAN:  Judge, the proper foundation

13  has been laid to show the portion of the defendant's

14  interrogation which was videotaped.

15             The fact that the entire

16  interrogation was not videotaped does not take away

17  from the fact that the proper foundation was laid.

18  It may go to the weight, but it doesn't go to the

19  foundation as to whether this portion of the

20  videotape could be admitted.

21             THE COURT:  You have the last word.

22             MR. CONNIFF:  Judge, the defendant

23  obviously has no ability to request that any other

24  portion of his custody be videotaped.  This is all

CCSAO XAVIER WALKER 001036

```
 1    within the control of the Chicago Police Department,
 2    and obviously, again, they're only videotaping a
 3    small portion of the proceedings, obviously, to
 4    create evidence to present in court.  It's
 5    self-serving.
 6                    They're calling it authentication.  I
 7    don't think this is truly authentication, and I would
 8    ask that it be excluded unless all of the custody is
 9    videotaped so that the defendant could be treated
10    fairly and possibly selecting other portions of an
11    available videotape which might cast doubt on the
12    portion that the state now wants to show you.
13                    And we obviously don't have that
14    available because the defendant doesn't have
15    videotape equipment.  He doesn't have the ability to
16    do that.
17                    And I don't think that it's fair to
18    create a videotape with the defendant on it which
19    covers only a portion of his custody when he's
20    obviously in an adverse position and he has no
21    ability to present any evidence himself, bring it
22    into a courtroom, and then show it to your Honor and
23    then argue that it proves something.
24                    I just don't think that we -- we have
```

CCSAO XAVIER WALKER 001037

1   no ability to impeach that is what I'm saying.

2          THE COURT:  So you're saying unless the

3   entire transaction or interaction between the police

4   and a suspect is videoed, then there should not be

5   any portions of a video permitted in a possible

6   proceeding against a suspect?

7          MR. CONNIFF:  Yes.

8          THE COURT:  All right.  I don't think that

9   goes to the weakening of the foundation.  It is, as

10  Miss Coleman points out, I think, perhaps, the

11  subject of argument as it relates to credibility,

12  weight, et cetera.

13             But I do believe that the foundation

14  has been laid, and it will be admitted.

15         MS. COLEMAN:  Judge, so the record is

16  clear, I'm only showing the end of the videotape that

17  relates to the defendant's statements.

18         MR. CONNIFF:  Judge, can Mr. Long be

19  allowed to step over by the jury box to view the

20  videotape?

21         MS. COLEMAN:  Judge, per the

22  court reporter's request, it is Page 12 beginning at

23  line 6 until the end.

24



                          EE-59

CCSAO XAVIER WALKER 001038

```
 1
 2                              (WHEREUPON, the following is the
 3                              transcript of the portion of
 4                              Exhibit 2 which was played for
 5                              the Court:)
 6                      "Question:  Okay.  Now, did you
 7          come here to the police station yesterday?
 8                      "Answer:  Yes.
 9                      "Question:  Okay.  And you came
10          here on your own?
11                      "Answer:  Yeah.
12                      "Question:  Okay.  Why is that?
13                      "Answer:  Cause I had to.  I
14          felt bad about what happened.
15                      "Question:  How have the police
16          treated you?
17                      "Answer:  They've treated me
18          fair.
19                      "Question:  And how have I
20          treated you?
21                      "Answer:  Fair.
22                      "Question:  Have you been given
23          anything to eat?
24                      "Answer:  Yeah.
```

EE-60

CCSAO XAVIER WALKER 001039

```
 1                    "Question:  What have you had to

 2          eat?

 3                    "Answer:  McDonald's and

 4    Burger King.

 5                    "Question:  You had anything to

 6          drink?

 7                    "Answer:  Yeah.

 8                    "Question:  What have you had to

 9          drink?

10                    "Answer:  Some pops, fruit pop

11          and some water.

12                    "Question:  Okay.  Have you had

13          any cigarettes?

14                    "Answer:  Yeah.

15                    "Question:  Okay.  Have you been

16          allowed to use the bathroom?

17                    "Answer:  Yeah.

18                    "Question:  More than once?

19                    "Answer:  Yeah.

20                    "Question:  Okay.  Have you been

21          able to get any sleep?

22                    "Answer:  Yeah.

23                    "Question:  Okay.  Are you

24          giving this statement freely and
```

EE-61

CCSAO XAVIER WALKER 001040

```
 1          voluntarily?
 2                    "Answer:  Yeah.
 3                    "Question:  Any threats or
 4          promises been made to you in exchange for
 5          this statement?
 6                    "Answer:  No.
 7                    "Question:  Okay.  Are you under
 8          the influence of alcohol or drugs?
 9                    "Answer:  No.
10                    "Question:  This now concludes
11          the statement of Jovonie Long."
12                    (End of tape.)
13                    DIRECT EXAMINATION (Cont.)
14                    BY MS. COLEMAN:
15          Q.   So, Detective, in that videotaped
16     statement, the defendant acknowledges that he
17     arrived at the area the day before that statement;
18     correct?
19          A.   Correct.
20          Q.   And that statement was taken on August 5th;
21     correct?
22          A.   Correct.
23          Q.   And in that videotaped statement, he
24     acknowledges he was not threatened --
```

CCSAO XAVIER WALKER 001041

```
 1              MR. CONNIFF:  Judge, I'd object to the
 2    State's Attorney rephrasing what is on the tape.
 3    Your Honor had an opportunity to view the videotape.
 4              THE COURT:  All right.  Your objection is
 5    noted.
 6              Go on.
 7    BY MS. COLEMAN:
 8         Q.   On that videotape, the defendant
 9    acknowledged to the State's Attorney that he was not
10    threatened in any way by the police; correct?
11         A.   Correct.
12         Q.   In fact, he acknowledged he was not
13    threatened in any way before the statement;
14    correct?
15         A.   Correct.
16              MS. COLEMAN:  No further questions, Judge.
17              CROSS EXAMINATION
18              BY MR. CONNIFF:
19         Q.   Detective, were you present when the
20    defendant turned himself in?
21         A.   Yes.
22         Q.   There are sheets kept up in Area 4 Violent
23    Crimes to log in individuals who come up to Area 4
24    Violent Crimes and turn themselves in and are being
```

CCSAO XAVIER WALKER 001042

1    questioned there; correct?

2              MS. COLEMAN:  Judge, I'm going to object to

3    beyond the scope of this witness.

4              THE COURT:  It is.

5    BY MR. CONNIFF:

6         Q.   Did you make any notation at the time that

7    the defendant turned himself in?

8         A.   Yes.

9         Q.   And where did you make that notation?

10        A.   It was made in GPRs.

11        Q.   I'm sorry?

12        A.   It was made in the General Progress Report.

13        Q.   The General Progress Report?

14              Did you make any notation on any

15   other form which is kept in Area 4?

16              MS. COLEMAN:  Judge, again, objection to

17   beyond the scope.

18              MR. CONNIFF:  Judge, this is what the

19   detective testified to concerning records of -- which

20   are kept in Area 4 Violent Crimes which --

21              THE COURT:  He didn't.  He didn't testify

22   to it nor was he asked about it.

23              MR. CONNIFF:  Right.  Judge, I'd ask to ask

24   him briefly about whether he, himself, made any

CCSAO XAVIER WALKER 001043

```
 1    notations on those forms and whether those forms

 2    existed on that day.

 3              THE COURT:  You can call him as your

 4    witness.

 5              MR. CONNIFF:  All right.  No further

 6    questions.

 7              MS. COLEMAN:  I have nothing further,

 8    Judge, from this witness.

 9              THE COURT:  Step down, sir.

10                   (Witness excused.)

11              MS. COLEMAN:  Judge, I have one other brief

12    witness.  It's the polygraph examiner.

13              THE COURT:  Okay.

14                   (Brief pause.)

15              THE COURT:  Please raise your right hand.

16                   (Witness sworn.)

17              THE COURT:  Please be seated.

18    WHEREUPON,

19                   ROBERT BARTIK,

20    called as a witness on behalf of the People of

21    the State of Illinois, having been first duly sworn,

22    under oath was examined and testified as follows:

23                   DIRECT EXAMINATION

24                   BY MS. COLEMAN:
```

EE-65

CCSAO XAVIER WALKER 001044

1        Q.    Officer, could you please tell the judge

2    your name, your star number, and your unit of

3    assignment?

4        A.    Police Officer Robert Bartik, B-a-r-t-i-k,

5    Star Number 3078, Chicago Police Department, Forensic

6    Services Division.

7        Q.    And what do you do in the Forensic Services

8    Division?

9        A.    I'm a polygraph examiner.

10       Q.    So do you administer polygraph exams?

11       A.    Yes, ma'am.

12       Q.    I'm going to direct your attention now to

13    August 5th of the year 2000.  Were you called to

14    administer a polygraph exam to a subject by the name

15    of Jovanie Long?

16       A.    Yes, ma'am.

17       Q.    Was there an arrangement for the detectives

18    to bring Jovanie Long to Homan Square on August 5th

19    of 2000 at approximately 8:00 a.m.

20       A.    Yes, ma'am.

21       Q.    What time did you arrive at Homan Square

22    that morning?

23       A.    About 8:15.

24       Q.    When you arrived at Homan Square, did you

CCSAO XAVIER WALKER 001045

1    meet with anybody?

2         A.    When I got there, Detectives Riordan and

3    Pietlak (sic) were already there with Mr. Long.  I

4    escorted them into my office.  I put Mr. Long into

5    the polygraph laboratory and met with Detective

6    Riordan and Pietlak in my office.

7         Q.    When you say, "Pietlak," is that Pietryla?

8         A.    Yes.

9         Q.    The detective that was in the back room?

10        A.    Yes, ma'am.

11        Q.    Do you see the person that you indicated

12   was Jovanie Long in the courtroom today?

13        A.    Um, yeah.  The gentleman in the beige

14   Department of Corrections suit (indicating.)

15             MS. COLEMAN:  Judge, may the record reflect

16   the in-court identification of the defendant?

17             THE COURT:  It shall.

18   BY MS. COLEMAN:

19        Q.    When the defendant -- you said the

20   defendant was put in one room; correct?

21        A.    He was placed in the polygraph laboratory.

22        Q.    Where did you, Detective Riordan, and

23   Detective Pietryla go?

24        A.    They were in my private office.

EE-67

1         Q.    What did you do then?

2         A.    They apprised me of the situation, of the

3   facts of the case.

4         Q.    Where -- was the defendant in the room at

5   that time?

6         A.    No, ma'am.

7         Q.    After they apprised you of the facts in the

8   case, what did you do?

9         A.    After I got all the necessary information,

10   I then entered the polygraph laboratory.  I

11   introduced myself to Mr. Long as a police officer,

12   told him that I was here to administer a polygraph

13   examination to him, that the taking of a polygraph

14   examination was a voluntary thing, that he did not

15   have to take it if he did not wish to.

16              I then presented him with a polygraph

17   subject consent form which I read to him verbatim

18   from the form.

19         Q.    During this conversation with the

20   defendant, was there anybody else present besides you

21   and the defendant?

22         A.    No, ma'am.

23                   (WHEREUPON, People's Exhibit

24                   Number 3 was marked for

CCSAO XAVIER WALKER 001047

```
 1                     identification.)

 2

 3    BY MS. COLEMAN:

 4        Q.   I'm going to show you what I have marked as

 5    People's Exhibit Number 3 for identification.

 6             MS. COLEMAN:  May I approach?

 7             THE COURT:  Go right ahead.

 8    BY MS. COLEMAN:

 9        Q.   Officer, I'm going to show you People's

10    Number 3.  Do you recognize that?

11        A.   Yes.

12        Q.   What is that?

13        A.   This is the photocopy of the polygraph

14    subject consent form of Mr. Jovanie Long.

15        Q.   Is there anything that you read to the

16    defendant on that form before he signs it?

17        A.   Yes, ma'am.  I read the entire form

18    verbatim, including the Miranda warnings.

19        Q.   And what else does that form tell him

20    besides Miranda warnings?

21        A.   That he has -- that he is volunteering for

22    the test, that I can give the information to the

23    proper people, a form of release, and that he has a

24    right to have a copy of the results of the polygraph
```

EE-69

CCSAO XAVIER WALKER 001048

1    himself.

2         Q.   And after you advised him of that, did he

3    sign that form?

4         A.   Yes, ma'am, on two different spots.

5         Q.   And after that, did you then begin asking

6    him questions?

7         A.   I then went into a pretest interview, yes,

8    ma'am.

9         Q.   What is a pretest interview?

10        A.   Well, the polygraph is actually broken up

11   into two different phases.  The first phase is an

12   interview where we get the subject accustomed to

13   being there talking to us.  We want to make sure that

14   he knows what the issue at hand is, why he's taking a

15   polygraph test.

16             We do a small background health check

17   to make sure that he's suitable to take the test.  We

18   develop questions that we're going to ask him on the

19   test.  We review the questions on the test with him

20   before we actually administer the polygraph

21   examination.

22             The second phase is the actual

23   administration of the test.

24        Q.   And when you begin administering the

CCSAO XAVIER WALKER 001049

1    test -- what did you do here?

2         A.    I started talking to him, interviewing him,

3    and explaining to him the process, talking to him

4    about the situation.

5         Q.    Now, at any point in time did you ask him

6    specific questions about this event, about the event

7    that happened on May 13th of 2000?

8         A.    Yes.

9         Q.    What did you ask him?

10        A.    I asked him if he did it.

11        Q.    And what did the defendant tell you?

12        A.    The defendant made a statement.

13        Q.    What did he tell you?

14        A.    He told me that during the robbery, he did

15    shoot the victim.

16        Q.    Now, after the defendant made that

17    statement to you -- first of all, when he made that

18    statement, was he in any way hooked up to any kind of

19    machine?

20        A.    No, ma'am.

21        Q.    So the polygraph had not actually begun

22    yet?

23        A.    No, ma'am.

24        Q.    What did you do after the defendant made

EE-71

CCSAO XAVIER WALKER 001050

```
 1    that statement to you?
 2         A.   I immediately opened up the polygraph
 3    laboratory door.  I summoned Detective Pietlak and
 4    Riordan into the polygraph laboratory.
 5              Once they entered the room, I told
 6    Mr. Jovanie Long, tell the detectives what you just
 7    told me.  At which point, he repeated what he had
 8    just told me.
 9         Q.   Again, he made another admission?
10         A.   Yes, ma'am.
11         Q.   What did you do then?
12         A.   I left the room.
13         Q.   And was there ever a polygraph examination
14    given of the defendant that day?
15         A.   No, ma'am.
16         Q.   Why not?
17         A.   He had made an admission.
18              MS. COLEMAN:  I have no further questions,
19    Judge.
20                   (WHEREUPON, Defendant's Exhibit
21                   Number 1 was marked for
22                   identification.)
23              CROSS EXAMINATION
24              BY MR. CONNIFF:
```

CCSAO XAVIER WALKER 001051

1          Q.    Is it Officer Bartik?

2          A.    Yes.

3          Q.    Let me show you what I have marked as

4     Defendant's Exhibit 1 for identification.

5               MR. CONNIFF:  May I approach, Judge?

6               THE COURT:  Sure.  Do you want to show that

7     to counsel?

8               MS. COLEMAN:  I think I see it.

9               MR. CONNIFF:  Sorry.

10              MS. COLEMAN:  That's okay.  I see it.

11    BY MR. CONNIFF:

12         Q.    Officer, let me ask you, are those notes

13    that you, yourself, made?

14         A.    Yes, sir.

15         Q.    And do you see at the top of those notes

16    what appears to be a fax transmission date?

17         A.    Yes.

18         Q.    And what is the date of that fax

19    transmission date?

20         A.    February 16, 2003.

21         Q.    So just a couple of days ago?

22         A.    Yes, sir.

23         Q.    So these notes were made by you on or about

24    August the 5th of the year 2000?

EE-73

CCSAO XAVIER WALKER 001052

1          A.    Yes, sir.

2          Q.    And they were just transmitted by fax

3    to the State's Attorney on February the 16th of

4    2003?

5                MS. COLEMAN:  Objection to the relevance,

6    Judge.

7                THE COURT:  I'll allow it.  I'm hard-

8    pressed to see the relevance.

9    BY MR. CONNIFF:

10         Q.    When did you make these notes?

11         A.    Immediately prior and after talking to

12   Mr. Long.

13         Q.    And in this particular note, Defendant's

14   Exhibit 1, this contains your report of the alleged

15   statement which Mr. Long made to you?

16         A.    A paraphrase, yes, sir.

17         Q.    And the first time you made known to the

18   State's Attorney that you had notes which referenced

19   that statement was when?

20               MS. COLEMAN:  Objection to the relevance.

21               THE COURT:  Sustained.

22   BY MR. CONNIFF:

23         Q.    What -- where were these notes kept from

24   August the 5th, 2000, until you produced them?

CCSAO XAVIER WALKER 001053

```
 1              MS. COLEMAN:  Objection to the relevance.
 2              THE COURT:  Sustained.
 3    BY MR. CONNIFF:
 4         Q.   Did anyone tell you to make this
 5    notation of this alleged statement that Mr. Long made
 6    to you?
 7         A.   No.
 8         Q.   You have done this in other cases?
 9              MS. COLEMAN:  Objection to the relevance.
10              THE COURT:  Sustained.
11    BY MR. CONNIFF:
12         Q.   If you have made notes of statements which
13    defendants make to you in other cases, what have you
14    been instructed to do with regard to the notes of
15    those statements?
16              MS. COLEMAN:  Objection, relevance.
17              THE COURT:  Sustained.
18    BY MR. CONNIFF:
19         Q.   Did you cause this note of the alleged
20    statement which is Defendant's Exhibit 1 to be
21    transmitted to any supervisor or anyone above
22    you or State's Attorney following your making this
23    note?
24              MS. COLEMAN:  Objection, relevance.
```

CCSAO XAVIER WALKER 001054

```
 1                    THE COURT:  Sustained.

 2                    MR. CONNIFF:  I have nothing further,

 3       Judge.

 4                    MS. COLEMAN:  I have nothing further,

 5       Judge.

 6                    THE COURT:  Thank you, sir.

 7                    THE WITNESS:  Thank you.

 8                         (Witness excused.)

 9                    MS. COLEMAN:  Judge, at this time, the

10       People rest in our case-in-chief.

11                    MR. CONNIFF:  Judge, we call Detective

12       Riordan.

13                    THE COURT:  Okay.

14                         (Brief pause.)

15                    THE COURT:  Sir, you remain under oath to

16       tell the truth.

17                    THE WITNESS:  Yes, sir.

18       WHEREUPON,

19                    JOHN RIORDAN,

20       called as a witness on behalf of the Defendant,

21       having been first duly sworn, under oath was examined

22       and testified as follows:

23                    DIRECT EXAMINATION

24                    BY MR. CONNIFF:
```

CCSAO XAVIER WALKER 001055

1       Q.    Detective Riordan, you were present when

2   Jovanie Long turned himself in?

3       A.    Yes.

4       Q.    And what documents are maintained in Area 4

5   Violent Crimes to note the presence of an individual

6   who is being questioned at that location?

7           MS. COLEMAN:  Judge, again, I'm going to

8   object to generally what's taken as opposed to what's

9   taken in this case.

10         THE COURT:  Establish if there's a

11  department policy.

12         MR. CONNIFF:  Judge, I think the allegation

13  in the motion is that the defendant turned himself in

14  on August the 2nd, and according to the reports and

15  the state's evidence, it was August the 4th.

16            So I think it's relevant to the

17  motion whether or not -- I think the detective

18  already testified that there is a document in the

19  nature of a log which is routinely kept on every

20  shift in Area 4 which indicates people who are

21  present being questioned in Area 4 by name, time,

22  et cetera.

23         THE COURT:  Go ahead.  I'll allow it.

24  BY MR. CONNIFF:

CCSAO XAVIER WALKER 001056

1       Q.    All right.   Having heard the colloquy

2    between myself and the judge, are you familiar with

3    that document?

4       A.    Yes.

5       Q.    And that's kept on every shift?

6       A.    It's just a clipboard with boxes that you

7    fill in.

8       Q.    I'm sorry?

9       A.    It's just a piece of paper kept on a

10   clipboard.

11      Q.    Right.   But it's a Chicago Police

12   Department form?

13      A.    No.

14      Q.    It's not a police department form?

15      A.    It's not, like, an official police

16   department form to the best of my knowledge, no.

17      Q.    But it's kept on every shift?

18      A.    Yes.

19      Q.    And the purpose of that is so that you can

20   document individuals who are in the area in case

21   people call looking for those people; correct?

22      A.    Yes.

23      Q.    And those records are kept in the course of

24   business?

CCSAO XAVIER WALKER 001057

1    A.   I don't believe so.

2    Q.   Did you, yourself, make any notation of

3  Jovanie Long's presence in Area 4 when he turned

4  himself in on anything other than a General Progress

5  Report?

6    A.   No.

7    Q.   Did you make any notation on this clipboard

8  that you have testified about?

9    A.   No.

10    Q.   Did you see anybody else do so?

11    A.   No.

12    Q.   So as far as you know, there is no

13  requirement that that sheet that you have testified

14  about be kept; is that correct?

15    A.   No.

16    Q.   And who -- who directs that that sheet be

17  put in the clipboard at the beginning of every

18  shift?

19    A.   It's just a -- it's like a stack of -- it's

20  like a stack of lists that you fill in for whoever is

21  in the area, witnesses, offenders, so you can keep

22  track of people.

23    Q.   Right.

24    A.   It's not an official form.  It's just,

CCSAO XAVIER WALKER 001058

```
 1    like, a Xeroxed piece of paper.
 2         Q.    All right.  But it is a form --
 3         A.    It's --
 4         Q.    -- right?
 5         A.    It's formatted like a -- with boxes that --
 6         Q.    Okay.  Well, how is it formatted?  What
 7    information is at the top of that form?
 8         A.    It's just a sheet with boxes in them.
 9         Q.    All right.  But what is the printing at the
10    very top of the form?  You have seen it.  What does
11    it say?
12         A.    It doesn't say anything.
13         Q.    It doesn't say anything?
14         A.    No.
15         Q.    It's a sheet of paper that has boxes on it
16    that doesn't say anything?
17         A.    Right.
18         Q.    And how many -- what are the boxes?  How
19    many boxes are on the sheet?
20         A.    Like, four.
21               I have to correct myself.  I believe
22    it says -- I believe it says, "room number," or --
23    "room number, detective, and person's name."  That's
24    all it says.  Something very similar to that.
```

CCSAO XAVIER WALKER 001059

1      Q.   All right.  And those are kept -- those are

2  preprinted forms; correct?

3           MS. COLEMAN:  Objection, asked and answered

4  and relevance.

5           THE COURT:  It has been answered.

6  BY MR. CONNIFF:

7      Q.   And what -- are those destroyed?

8      A.   To the best of my knowledge, once

9  they're -- once every -- everything on that sheet's

10  been accounted for, it's thrown away.

11     Q.   All right.  So is it your understanding

12  that at the end of every shift those sheets are

13  thrown out?  Every week?  Every day?  How often?

14     A.   I couldn't give you an exact time frame

15  they keep those things.

16     Q.   All right.  What is the first document

17  you're aware of, official document that is maintained

18  and kept regarding an individual's presence in the

19  station?

20           MS. COLEMAN:  Objection to general

21  principles, Judge.

22           THE COURT:  Sustained.

23  BY MR. CONNIFF:

24     Q.   Would the first official document be when

CCSAO XAVIER WALKER 001060

```
 1    he is booked into the lockup?
 2                MS. COLEMAN:  Judge, I'm going to have to
 3    object to relevance and definition of official
 4    document.  The detective has testified that he writes
 5    on the GPRs.  That's an official document.
 6                MR. CONNIFF:  There's an issue here about
 7    how long he was in the station.
 8                THE COURT:  Yes, I understand.  The
 9    objection as to the form of the question is
10    sustained.
11                MR. CONNIFF:  All right.
12    BY MR. CONNIFF:
13        Q.   After an individual has been charged and
14    taken to the lockup, there is an official record
15    which is begun at that point; correct?
16        A.   Correct.
17        Q.   And those records are maintained; correct?
18        A.   Correct.
19        Q.   All right.  But anything prior to that time
20    is not kept; is that your testimony?
21                MS. COLEMAN:  Objection to the relevance
22    and asked and answered.
23                THE COURT:  No, he can answer.
24    BY THE WITNESS:
```

CCSAO XAVIER WALKER 001061

1           A.    No, that's not correct.

2

3     BY MR. CONNIFF:

4           Q.    All right.  What document is it that is

5     contemporaneously prepared and kept which documents

6     an individual's presence in the police station prior

7     to the time he's taken to the lockup?

8           A.    It would be probably our General Progress

9     Reports.

10          Q.    All right.  And that is a document that you

11    prepared; right?

12          A.    Correct.

13          Q.    Only as to this case; correct?

14          A.    They're prepared during investigations on

15    each case, each separate case.

16          Q.    Right.  But there is no document which, for

17    example, is prepared on each shift which lists an

18    individual and then above that individual's name and

19    below that individual's name other individuals which

20    aren't keyed to any specific case but are keyed to

21    just who is present in the station during a given

22    period of time?  There are no such documents that are

23    kept, are there?

24          A.    No official documents like that, no.

CCSAO XAVIER WALKER 001062

```
 1          Q.   That's the document you said that was

 2    on the clipboard that is destroyed soon after the

 3    shift?

 4          A.   I don't know --

 5               MS. COLEMAN:  Objection.  That's

 6    mischaracterizing his testimony.

 7               THE COURT:  Sustained.

 8    BY MR. CONNIFF:

 9          Q.   Why is it that those documents are

10    destroyed, Detective?

11          A.   I don't know.  It's to assist the office

12    personnel basically.

13          Q.   All right.  How long is it, your

14    understanding, that an individual can be kept in the

15    station with no official record made of his presence

16    in the station?

17               MS. COLEMAN:  Objection.

18               THE COURT:  Sustained.

19    BY MR. CONNIFF:

20          Q.   Is it possible that a defendant can come

21    into a station on a given date and there be no record

22    of his being present in the station, but him actually

23    being in the station?

24               MS. COLEMAN:  Objection, speculation.
```

CCSAO XAVIER WALKER 001063

```
 1                    THE COURT:  Sustained.
 2                    MR. CONNIFF:  Nothing further.
 3                    MS. COLEMAN:  Judge, I have nothing based
 4        on that.
 5                    THE COURT:  Thank you, sir.
 6                         (Witness excused.)
 7                    THE COURT:  Call your next witness, sir.
 8                    MR. CONNIFF:  Judge, we would rest on the
 9        motion.
10                    THE COURT:  Okay.
11                    MS. COLEMAN:  We have no rebuttal, Judge.
12                    THE COURT:  Both sides rest?
13                    MR. CONNIFF:  Yes, Judge.
14                    THE COURT:  Argument?
15                    MR. CONNIFF:  Judge, very briefly.
16                         Your Honor has heard the testimony.
17        This was a sworn motion to suppress statements.  You
18        have heard the testimony of Detective Bartik.  You
19        have seen the allegations of the motion.  And what is
20        left dangling, I suggest to your Honor, is the issue
21        of the defendant's presence in the station, which he
22        alleges was on August the 2nd.
23                         You have heard the testimony of both
24        detectives, and it appears that there are records
```

CCSAO XAVIER WALKER 001064

1    which are kept concerning presence at the station

2    which are destroyed.  We would submit that

3    those are records which support the allegation in

4    this motion.  Those are not records which should be

5    destroyed.

6              Detective Bartik, his testimony was

7    that that was an official record which is done every

8    day every shift.  Detective Riordan says it's simply

9    a document which appears to be a form and there's no

10   writing on it, which is maintained apparently, if you

11   believe his testimony, only for the convenience of

12   the police officers to be able to answer questions

13   about who was present in the station.

14             And I submit to your Honor that what

15   you have before you is a conflict in the testimony

16   concerning the date that the defendant was in the

17   Area 4, and the state hasn't shown that this

18   defendant was not in the station on August the 2nd as

19   he alleges, and due to that fact, due to the

20   destruction of these documents which would

21   corroborate and, indeed, support the allegations of

22   the motion coupled with -- with the selective

23   videotaping of defendants present in the area, we

24   would ask that your Honor suppress the statement.

CCSAO XAVIER WALKER 001065

1              THE COURT:  Miss Coleman?

2              MS. COLEMAN:  Judge, you have before you

3     absolutely no documents at all that in any way

4     impeach the credible testimony of the three officers

5     who testified before you as to the time frame of

6     when the defendant turned himself in, when he was

7     given the polygraph exam, and when he ultimately

8     confessed.

9              What you have is three people who

10    came in here and rebutted every single allegation in

11    the defendant's motion, and the defendant has thrown

12    out to you nothing but conjecture and speculation not

13    supported by anything.

14             These officers were not impeached in

15    any way as to any dates, as to a police report that

16    ever said the defendant was in custody on August 2nd,

17    as to any GPRs, as to any sups, lockup keeper's

18    records.  There is nothing to indicate that the

19    defendant was in custody at any time before August

20    4th.

21             What you do have is his statement in

22    his videotaped statement where he is asked by the

23    State's Attorney, did you turn yourself in yesterday.

24    Yesterday being the day before the videotape, which

CCSAO XAVIER WALKER 001066

```
1    was given August 5th.

2               Again, there is absolutely no

3    evidence to the contrary.  In fact, in the

4    defendant's motion, he indicates that the video is

5    August 5th, and in the videotape, the defendant

6    clearly says he turned himself in the day before.

7               The defense has given you nothing but

8    speculation and conjecture, Judge, and it does not

9    rebut what the state's witnesses have presented to

10   you, which is a complete denial of every single one

11   of the defendant's allegations.

12              We'd ask that you deny the

13   defendant's motion.

14         THE COURT:  Okay.  Thank you all.

15              There is no evidence to support the

16   assertion that the defendant was in custody on August

17   2nd.  As Miss Coleman argues and the testimony of the

18   state's witnesses here today support, none of those

19   called to testify today had any contact with --

20   either by a telephone or in person with the defendant

21   prior to August 4th.

22              There is absolutely no showing of

23   psychological or physical coercion, and the videotape

24   supports this Court's conclusion that the defendant's
```

EE-88

CCSAO XAVIER WALKER 001067

1    willpower was not overborne, that, in fact, the

2    statement was given knowingly and voluntarily.

3              The police officers have

4    categorically denied each assertion of the

5    defendant's motion to suppress statement without

6    impeachment or rebuttal of any shape or form.

7    Accordingly, this motion is respectfully denied.

8              MR. CONNIFF:  Judge, we would ask that the

9    records which were testified to which are maintained

10   on every shift in Area 4, that those records be

11   produced.  First of all, as to the relevant time

12   period in question, and if it's the position of the

13   officers that those records have been destroyed, I

14   would ask that your Honor order that records --

15   contemporaneous records so that there is some

16   indication what is being done routinely be either

17   submitted to the Court in camera and perhaps sealed.

18   That if this is going on on a daily basis now where

19   these records are being maintained, to make that part

20   of this record, and if those records are being

21   routinely destroyed such that evidence which could be

22   available to a defendant to corroborate his

23   allegation that he was in the station prior to the

24   time that the detectives say he was, that becomes

CCSAO XAVIER WALKER 001068

1    critical evidence in the case.

2              So we would ask that your Honor order

3    that those records be produced for the relevant time

4    period, and if not -- if they have been destroyed,

5    that they produce records which are substantially

6    similar records in camera and to be sealed so that

7    they become part of the evidence in this case as to

8    what the ongoing procedures in Area 4 are.

9         MS. COLEMAN:  Judge, first of all, just

10   because Mr. Conniff calls a piece of paper a record

11   does not make it a record.  The detectives testified

12   it's something that the office personnel at the area

13   use, and when all the people in that piece of paper

14   are accounted for, it's destroyed.

15             It's obviously just something that

16   they can use so they know who is in which interview

17   room at what given period of time.  It's certainly

18   not evidence.

19             And I think it would be ridiculous to

20   ask people to recreate records that may never have

21   existed in the first place.  There's certainly no

22   evidence that there's any evidentiary value, and I

23   would point out that there are two witnesses that

24   were listed in the -- that the detective talked about

EE-90

CCSAO XAVIER WALKER 001069

1    that if the defendant was alleging he was there on a

2    different day, rather than records, maybe he should

3    call this reverend to testify.

4                But I don't see why or how we can ask

5    the detectives at this point to recreate a piece of

6    paper that may never have existed in the first place,

7    and I think it would be inappropriate, at best, for

8    the detectives to be expected to do that.

9                MR. CONNIFF:  Judge, with all due respect,

10   I fail to see how records which are maintained -- the

11   state says they're not records.  Well, obviously, if

12   it's a routine that it be done, then it's done every

13   day on every shift.

14                There's a reason why those records

15   are being kept.  Obviously, those are records of who

16   is in a station that are not case specific, are not

17   GPRs, that are not prepared by the detectives.  They

18   would be authenticated, and I think the credibility

19   would be enhanced by contemporaneous names.  You

20   would have a list of names which would indicate a

21   corroboration for a defendant's claims.

22                I can't think of a better way to

23   refute defendant's claim that he was kept in custody

24   prior to the time any official record other than the

CCSAO XAVIER WALKER 001070

1       GPR was made as to the date of his report.  It's

2       interesting that those records are disposed of and

3       thrown away.

4               THE COURT:  I think this video of the

5       defendant goes not just a long way in refuting your

6       assertion, but, in fact, destroyed it.

7               I will say to you, Miss Coleman, that

8       while it may not be policy of the Chicago Police

9       Department, it appears that it is policy of Area 4 to

10      memorialize in some way those who come into the area.

11      My understanding is that this document goes to all of

12      those who are in the area.  That may not be true.  It

13      may be only for suspects.  It may be only for

14      arrestees.  But certainly, it's clear that it has

15      become the policy of Area 4, at least, Violent

16      Crimes.

17              It is also abundantly clear to me

18      that now, two and a half years later, those records

19      no longer exist.  I don't know that they would shed

20      much light on any particular case, and as it relates

21      to this case in particular, it would be of absolutely

22      no value because, as I have said, the defendant in

23      his own video recorded statement I think refuted his

24      claim that he was present in the station two days

CCSAO XAVIER WALKER 001071

1   before it is documented that he was, in fact, in

2   custody.  Nothing could be any more clear to me, and

3   so I'm not going to order the production of documents

4   which I know do not exist.

5              Now, as for the question of records,

6   I think the written record is clear that such

7   documentation, at least in August of '02, did exist.

8              MS. COLEMAN:  2000, Judge.

9              THE COURT:  Of 2000.  So I don't know what

10  the practice is now.  It could very well be that

11  as I speak they're continuing to use this log,

12  but I do not believe that would have any value at all

13  to the matter before this Court.  So that's my

14  ruling.

15             MS. COLEMAN:  Judge, in terms of

16  scheduling, I talked to Mr. Conniff ahead of time

17  about the trial date that we have, that that probably

18  will not work because the victim's mother will be out

19  of town that week, and, also, there are some DNA lab

20  results we're still expecting, and with regard to

21  Mr. Long, we still have to do a management conference

22  because it is still a death penalty case.

23             The codefendant got March 21st.  I

24  don't know that that works for Mr. Conniff, or we can

EE-93

CCSAO XAVIER WALKER 001072

```
 1    do a different day since he has different issues.
 2             MR. CONNIFF:  That's fine.  March 21st is
 3    fine, Judge.
 4             MS. COLEMAN:  I will try to get the DNA
 5    results by that day, but I don't know --
 6             THE COURT:  All right.  By agreement, 3-21.
 7    Is it 20 or 21?
 8             MS. COLEMAN:  Oh, you know what?  It is
 9    the 20th.
10             MR. CONNIFF:  By agreement, Judge.
11                       (WHEREUPON, the above matter
12                        was continued to
13                        March 20, 2003.)
14
15
16
17
18
19
20
21
22
23
24
```

EE-94

CCSAO XAVIER WALKER 001073

```
1    STATE OF ILLINOIS   )

2                         ) SS:

3    COUNTY OF C O O K   )

4            I, JO ANN KROLICKI, an Official Shorthand

5    Reporter for the Circuit Court of Cook County, County

6    Department, Criminal Division, do hereby certify that

7    I reported in shorthand the proceedings had in the

8    above-entitled cause, and that the foregoing is a

9    true and correct transcript of my shorthand notes so

10   taken before Judge Marcus R. Salone on February 19,

11   2003.

12

13                                                    _____

14           JO ANN KROLICKI, CSR, RPR
             OFFICIAL COURT REPORTER
15           ILLINOIS LICENSE NO. 084-002215

16

17

18

19

20

21

22

23

24
```

EE-95

CCSAO XAVIER WALKER 001074