# EXHIBIT 64

```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3     XAVIER WALKER,                    )
                                        )
4            Plaintiff,                 )
                                        )
5        vs.                            )No. 20 Cv 7209
                                        )Judge Guzman
6     CITY OF CHICAGO, STANLEY SANDERS, )
      MICHAEL PIETRYLA, DAVID WRIGHT,   )Magistrate
7     BRIAN HOLY, JOHN CRUZ, DONALD     )Judge Fuentes
      WOLVERTON, JOHN RIORDAN, ROBERT   )
8     BARTIK, ANTHONY BRZEZNIAK, THOMAS )
      MAHONEY, and COOK COUNTY,         )
9                                       )
             Defendant.                 )
10

11

12              The Discovery Deposition via Zoom

13    Electronic Telephone/Video Conferencing of

14                    ANTHONY BRZEZNIAK,

15    taken before ADRIENNE M. LIGHTFOOT, Certified Shorthand

16    Reporter and Notary Public, taken pursuant to the

17    provisions of the Federal Rules of Civil Procedure and

18    the Rules of the Supreme Court thereof, pertaining to

19    the taking of depositions for the purpose of discovery

20    held on the 27th day of June 2022, at the hour of 10:00

21    a.m. pursuant to notice.

22

23    Adrienne M. Lightfoot, CSR

24    Illinois License # 084-004276
```

```
 1                    A P P E A R A N C E S

 2
      REPRESENTING THE PLAINTIFF,
 3    XAVIER WALKER:

 4
                    SAMUELS & ASSOCIATES
 5                  Attorneys At Law
                    53 West Jackson Boulevard.
 6                  Suite 831
                    Chicago, Illinois 60604
 7                  (872)588-8726

 8                        By:   Jeanette S. Samuels, Esq.

 9

10    REPRESENTING THE DEFENDANT,
      CITY OF CHICAGO:
11
                    NATHAN & KAMIONSKI
12                  Special Assistant Corporation Counsel
                    33 West Monroe Street
13                  Suite 1830
                    Chicago, Illinois 60603
14                  (312)612-1079

15                        By:   Breana Brill, Esq.

16

17    REPRESENTING THE DEFENDANTS,
      INDIVIDUAL POLICE OFFICERS:
18
                    BORKAN & SCAHILL, LTD.
19                  Attorneys At Law
                    20 South Clark Street
20                  Suite 1700
                    Chicago, Illinois 60603
21                  (312)580-1030

22                        By:   Graham Miller, Esq.

23

24
```

1              A P P E A R A N C E S(CONT'D.)

2

   REPRESENTING THE DEFENDANTS,
3  BRZENIAK and MAHONEY:

4                    TRIBLER ORPETT & MEYER, P.C.
                     Attorneys At Law
5                    225 West Washington Street
                     Suite 2550
6                    Chicago, Illinois 60606
                     wboberts@tribler.com
7
                     By:  Bob Oberts, Esq.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                         **I N D E X**

2    **ANTHONY BRZEZNIAK**                          **PAGE**

3         **Examination by**
          **Ms. Samuels**                              **5**
4
          **Examination by**
5         **Mr. Oberts**                              **90**

6

7                     **E X H I B I T S**

8                      **(None Marked)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                LIGHTFOOT COURT REPORTING, P.C.
                     lightfootpc@att.net
                       (312)701-1090

```
 1                        (Witness Sworn)

 2                     ANTHONY BRZEZNIAK,

 3     called as a witness herein, after having been first

 4     duly sworn, was examined and testified as follows:

 5                        EXAMINATION

 6     BY MS. SAMUELS:

 7         Q    Can you please state and spell your name for

 8     the record, sir?

 9         A    Anthony Brzeniak.  Last name B-, like boy,

10     r-z-e-z-n-i-a-k.

11            MS. SAMUELS:  All Right.  This is the

12     deposition of Anthony Brzezniak taken in the case of

13     Xavier Walker versus City of Chicago, et al.  Case No.

14     20 CV 7209.

15                 This deposition is taken pursuit to

16     notice and agreement of the parties -- excuse me --

17     pursuant to subpoena and agreement of the parties under

18     all applicable rules.

19     BY MS. SAMUELS:

20         Q    Have you ever given a deposition before, sir?

21         A    Yes, ma'am.

22         Q    Okay.  About how many times?

23         A    I don't know.  A handful of times over the

24     course of my career.
```

1      Q     Okay.  Since you are fairly familiar with the
2  procedure, I won't belabor the rules.  All your answers
3  are verbal.
4           If my question is unclear, ask me to
5  rephrase it.  I'm going to assume your answer is
6  responsive.  And if at any time you want to take a
7  break, just let me know.  Okay?
8      A     Okay.
9      Q     All right.  Do you currently work anywhere?
10     A     No.  I'm retired.
11     Q     How long have you been retired?
12     A     Probably about five years now.
13     Q     All right.  Before that, what did you do?
14     A     I worked for Cook County for 30 years.  And I
15  retired as the Commander of the North area of Cook
16  County during that time.  And then I took a position as
17  the Chief of Police in Schiller Park.
18     Q     Okay.  When you first began working for Cook
19  County, what was your job title?
20     A     Correctional Officer.  That was in January
21  1982.
22     Q     All right.  How long were you a Correctional
23  Officer?
24     A     A little over two years.

1          Q    What was your next job title after that?

2          A    A Police Officer with the Cook County

3    Sheriff's Police Department.

4          Q    How is being a Police Officer different than

5    being a Correctional Officer?

6          A    Well, we make arrests on the street, and

7    we -- you know, we have to -- it's a different police

8    academy altogether than the Corrections academy that I

9    went through.  We learn about criminal law, probable

10   cause and procedures.  And, you know, we patrol -- the

11   Cook County Sheriff's Police control the unincorporated

12   areas of Cook County.

13         Q    Okay.  When you first became a Cook County

14   Sheriff's Police Officer, where were you assigned?

15         A    To field operations.  Our headquarters is

16   located in Maywood.

17         Q    All right.  What does Field Operations do?

18         A    Uniformed Patrol Officer.  We answer the

19   calls.

20         Q    All right.  Were you working out of the

21   headquarters in Maywood that is by the police

22   station -- the --

23         A    Out of 4th District Courthouse.  It's right

24   next door.  That's the Sheriff's Police headquarters.

```
 1        Q    All right.  And then someone just asked
 2   for -- to enter.  Mike, I think that's Officer
 3   Pietryla; is that correct?
 4             MR. MILLER:  Yeah, Mike Pietryla should be
 5   trying to get on.  So I assume -- I don't know what his
 6   name says.  But I'm guessing that's him.
 7             MS. SAMUELS:  Okay.  I just wanted to make
 8   sure it wasn't just random Mike.
 9   BY MS. SAMUELS:
10        Q    And so when you worked Field Operations, you
11   said that you responded to calls for service?
12        A    Correct.  Handled traffic accidents, things
13   like that.
14        Q    How long did you work out of Maywood doing
15   Field Operations?
16        A    Well, we all worked out of Maywood.  That was
17   our headquarters.  You know, we took home squad cars.
18   So, you know, we would go in there.  Okay.  It was like
19   for roll calls.
20             But normally you would just go 10/8,
21   like when you get in your squad car at home.  Meaning
22   that you are on duty.
23        Q    And how long were you assigned to Field
24   Operations?
```

1          A     Well, initially, I was out there probably

2     around four or five years, I would say.

3          Q     Okay.  And then what?

4          A     And then I got transferred to, I believe,

5     Fugitive Warrants at that time.  And we worked out of

6     26th and California, the criminal courts building

7     there.  We had an office located in the basement.

8          Q     And what did you do for Fugitive Warrants?

9          A     We looked for -- to apprehend any fugitives.

10    Everybody had a case file.  And then we would also do

11    extraditions throughout the country or within the

12    state.

13                    If it was -- if it was under 200 miles,

14    we would drive.  If it was over 200 miles, they would

15    fly us, and we'd spend a day or two out there to --

16    before we returned with the prisoner.

17         Q     And that would have been around '92, if I'm

18    not mistaking?

19         A     I guess.  I'm going from -- I had many

20    different -- I don't know if you want to the shorten

21    it.  I had many different assignments throughout my

22    career, you know, fugitive warrants, vice, criminal

23    intelligence, auto theft, Special Operation.

24                    I was detailed to the FBI in a cross

1    functional role for about a little over three years.  I

2    spent two years at the US Marshals in a cross

3    functional role also.

4                And also, I'm a graduate of Chicago

5    Detective Academy.  And I spent time in Area 4 as a

6    Homicide Detective after graduating from the academy.

7        Q    Okay.  And so before going to Chicago

8    Detective Academy, what were your roles -- or what were

9    your job titles?

10       A    All I would have -- it would have been -- I

11   would have been in Fugitive Warrant, Field Operations

12   and Auto Theft and the FBI Task Force, I believe.

13   Something like that.

14                I don't have a resume in front of me,

15   otherwise, I'd give you your chronological order,

16   whatever.

17       Q    No problem.  So vehicle theft.  Can you

18   briefly describe your job duties and where you were

19   working out of?

20       A    I was working out of Maywood.  And I was an

21   Auto Theft Detective.  So our particular function is we

22   would look for auto thieves, retagging vehicles, report

23   closely with NICB, which is the National Insurance

24   Client Bureau.

1          We would lock -- our -- specifically,

2   looking for thefts, carjackings and those sorts of law

3   crimes, VIN switches on vehicles, you know, stolen auto

4   parts, inspections of auto junk yards and everything

5   like that.

6          Q    Okay.  And when you are working with the FBI

7   and task force, what was that?

8          A    I was assigned to Violent Crimes Unit No. 5.

9   And we would do theft of interstate shipments, any

10  crimes that were committed at MCC, and a whole host of

11  other things.

12         And the people assigned to the task

13  forces, a lot of times if we didn't find a federal

14  violation on them, I would take and prosecute those

15  cases if we had probable cause at the local level.

16         Q    Okay.  And then, are there any other job

17  titles that you can think of that you had before going

18  to the Chicago Detective Academy?

19         A    I believe, off the top of my head, those were

20  the three things that I did, three or four things that

21  I did.

22         Q    Okay.  And do you remember when you went to

23  the Chicago Detective Academy?

24         A    I don't know.  Probably around maybe 1999,

```
 1    because this Walker case, I believe, was in 2000.  So

 2    somewhere in 1999 or 2000.  We had -- the whole point

 3    of the Sheriff's Police -- they sent about 30 officers,

 4    approximately -- to the ten-week Chicago Detective

 5    Academy.

 6               After taking an exam and graduating from

 7    the Detective Academy, each officer was assigned to an

 8    area.  I happened to get assigned to Area 4 as Homicide

 9    Detective.  It was strictly for observation and

10    training purposes.

11    Q    Okay.  Prior to being assigned to Area 4 of

12    the Chicago Police Department, had you ever worked any

13    violent crimes?

14    A    Well, I mean, you know, we did armed

15    hijackings.  And when I was at the FBI Task Force, I

16    mean, I had limited exposure.  I had -- I didn't have

17    any homicide experience, if that's what you are

18    working.

19               And that was one of the reasons that I

20    got assigned over there, to familiarize myself with

21    homicide procedures and investigative techniques.

22    Q    What do you remember about your training at

23    the Chicago Detective Academy?

24    A    They had state's attorneys doing
```

```
 1    presentations on juvenile law, on financial crime.
 2    They gave you exposure to all these different crimes.
 3    They brought in detectives.
 4                  We went to the morgue, went to the
 5    Chicago Crime Lab.  You know, a whole host of trying to
 6    give you a well-rounded, you know, robberies.  And they
 7    brought in detectives in each section who were experts
 8    in the field to give us presentations.
 9                  And at the end of the ten weeks, you had
10    to take a final exam.
11        Q    All right.  And how did you come to hear
12    about this opportunity?
13        A    I didn't hear about it.  I -- the Chief's
14    office said, hey, guess what, you are going to Chicago
15    Detective Academy.  I said, okay.  It wasn't like you
16    applied for this.
17                  I know there was like 30 individuals --
18    at the time, when I was on the Sheriff's Police, there
19    was approximately 600 Sheriff's Police Officers in the
20    county.  I don't know where they are at now.  But, you
21    know, I was just thankful that I was selected.
22        Q    Okay.  Prior to joining Area 4, were you
23    familiar with that geographic location?
24        A    Yeah, it was out of Harrison and Kedzie.  I
```

```
 1    mean, I wasn't, at all, familiar with every individual

 2    street, if that's what you are asking.

 3                    But I knew the general vicinity, because

 4    I worked and grew up in Chicago.

 5        Q     Do you have an independent recollection of

 6    working on this case?

 7        A     Just from what I reviewed, the reports and

 8    talking to my attorney.

 9        Q     And do that help you to remember some of

10    these events?

11        A     Some of them.

12        Q     Okay.  And I understand that you speak

13    Polish.

14        A     Correct.

15        Q     Okay.  And were you familiar with, primarily,

16    with Polish establishments in the city of Chicago?

17        A     I wasn't familiar with them.  But I mean,

18    that was part of our investigation that we to go to

19    some as part of this -- developing this timeline on the

20    Walker case, because the victim was Polish.

21        Q     So if I say Xavier Walker, do you know who

22    I'm referring to?

23        A     I -- yeah, I do now after reviewing my notes.

24    I couldn't tell you what he looks like if that's what
```

```
1    you are asking.

2         Q    Fair enough.  If I say Maurice Wright, do you

3    know who I'm referring to?

4         A    No, I do not.

5         Q    If I say Mirak Majdak, do you know who I'm

6    referring to?

7         A    Yes.  He's the victim.

8         Q    Okay.  To the best of your -- so what do you

9    recall about your role in this investigation?

10        A    Well, I was -- when I got to Area 4, I

11   believe it was Lieutenant Ferrell, who assigned me to

12   partner up with Detective Mike Pietryla.

13        Q    Okay.

14        A    And I basically followed him, and I was

15   trying to observe his actions during the course of many

16   investigations while I was assigned there.

17             And regarding the Walker investigation,

18   I believe the sergeants told us to do -- try and

19   develop a timeline on the victim of the shooting.

20        Q    Okay.

21        A    That was our primary focus, as I remember.

22        Q    Is there anything else you can recall?

23        A    I know that I never went to the crime scene.

24   We were not the lead investigators on it.  I believe
```

1    Sanders and Wright were the lead investigators on this

2    homicide.

3         Q    Okay.  Were you ever able to come up with a

4    timeline for the victim?

5         A    Well, yeah, we did.  We went to many -- we

6    went to his place of employment, which was located on

7    Pulaski, a remodeling joint.  We went to several

8    nightclubs, interviewed people who had seen him prior

9    to the homicide.

10             We talked to employees at his work.  I

11   believe we went up to Highland Park and talked to his

12   mother.  That's about it.  There's -- you know, I don't

13   remember each individual that we talked to, if that's

14   what you are -- during the course.  But it would have

15   been documented in our report.

16        Q    Besides the witnesses you spoke to regarding

17   the timeline for Mirak Majdak, do you remember speaking

18   to any other witnesses in this matter?

19        A    I'm sure.  You know, after reviewing my

20   reports, you know, I do know I was present for the

21   Walker interview.

22             I mean, you -- a specific, I don't know.

23   If you ask me, I could tell you if I remember him or

24   not.

1      Q    All right.  Do you remember being present for

2   the interview of Antoine Waddy?

3      A    No.  That doesn't -- I don't remember him.

4      Q    Do you remember being present for the

5   interview of Yvette Anderson?

6      A    I believe -- I believe with regard to Yvette

7   Anderson, we received information from Wright and

8   Sanders.  A lot -- they were the primary on it.  And a

9   lot of times, we'd come into role call.

10              And we would receive information from

11  Wright or Sanders on how their portion of the

12  investigation was going, and -- and/or the sergeant.

13              I think it was Holly, was the sergeant's

14  name, who would tell us, hey, this is what is happening

15  or whatever.

16     Q    Okay.  Do you remember communicating with

17  Anderson at all?

18     A    Not personally, no.

19     Q    Okay.  What about a Yvette Hill?

20     A    I remember the name just from reviewing my

21  reports.  Whatever contact I had, it would have been

22  documented and memorialized in those reports.

23     Q    All right.  What about Mary Curry?

24     A    I don't remember Mary Curry.

1        Q    Ashanti Wright?

2        A    I don't remember.  I remember her name coming

3   up in one of these reports when I was reviewing it.

4   Wasn't she the one that was supposedly asked to wipe

5   off some fingerprints or something, is what I remember

6   reading?

7             I don't know if she did or not, but you

8   know, that's -- and I couldn't tell you what she looks

9   like.  And I don't remember the statement other than

10  what I remember reading in reviewing these reports.

11       Q    Do you remember going to anyone's house to

12  speak with them?

13       A    To anyone's house to speak with them?  I

14  mean, I spoke -- went out to Highland Park, I know, to

15  speak to the victim's mother.  I do remember that.

16       Q    Is that the only house visit you remember

17  conducting?

18       A    I'm sure there was others, but not nothing

19  that I remember off the top of my head.

20       Q    All right.  So from my understanding, Wright

21  and Sanders were sort of the lead investigators, and

22  you and Pietryla were to follow leads that they told

23  you to follow; is that fair?

24       A    Well, or a sergeant -- I mean, they --

1    Sanders and Wright would tell us about things.  And

2    that's where it kind of filled in the blanks.

3                   I mean, our primary focus, from what I

4    remember with Pietryla and myself, was the timeline.

5    And I -- that was our focus.

6                   And on that, I do remember when they --

7    Sanders and Wright, I believe, developed information

8    about the whereabouts of Walker, and we went out there

9    with them to assist them.  That's what I remember.

10       Q    Okay.  And so after you were able to sort of

11   come up with a timeline before Pietryla -- excuse me --

12   for Mijak's whereabouts, what did you do with that

13   information?

14       A    We documented it in our -- in a report.  And

15   it was also documented in our GPRs, our general

16   progress reports.

17       Q    I forget who -- we've taken a lot of

18   depositions in this case, so you'll have to forgive me.

19   One of the officers testified that you guys would have

20   sort of, like, briefings, where you guys would meet

21   with each other and talk about updates that were going

22   on with the case.  Do you ever recall doing anything

23   like that?

24       A    Well, like I said, you know, at roll call,

LIGHTFOOT COURT REPORTING, P.C.
lightfootpc@att.net
(312)701-1090

1    we'd come in -- I know I was assigned to an afternoon

2    shift.  I believe -- I don't remember exactly.  I think

3    maybe we started around 4:00 in the afternoon or

4    something like that.

5              And I do remember the sergeant giving us

6    information.  And I remember talking to Sanders and

7    Wright.  What specific information they gave us on a

8    particular day, I don't remember that now.

9        Q    Okay.  Understood.

10             But essentially during those roll call

11   meetings is where you all would exchange information

12   with one another regarding the investigation?

13       A    Sometimes depending if -- you know, sometimes

14   guys didn't go to roll call if they had a lead already

15   on the street.  They would just call the sergeant and

16   say, "Hey, we got a hot lead" or something, you know.

17             This was not just the one investigation

18   that we had going at the time.  It's not like we are

19   just sitting there, this is the only homicide happened

20   in Chicago:  You'd have homicides coming in every week.

21   So it wasn't like you are working just one case.

22       Q    Understood.

23             And so -- before I take you through the

24   reports, I just want to make sure that we testify about

1    everything that you actually remember.

2                    And do you recall taking a videotaped

3    statement?

4         A    I personally don't recall it other than, I do

5    remember that I was present when Walker was

6    interviewed.  And the reason I -- it's clear is because

7    I remember vividly him saying -- talking about a hit

8    and lick.

9                    And I had never heard that term.  And I

10   had to ask my partner, Mike Pietryla, what a hit and

11   lick was.  That's why I know I was present during one

12   of those interviews.  I couldn't tell you which ones or

13   what date or any memory of that hit and lick is

14   engrained in my brain.

15        Q    All right.  So I'm going to take you through

16   some GPRs and sort of go through -- did I get this --

17   can you see this?

18        A    Yes, I could see that.

19        Q    Okay.  And I'm going to do it at full screen

20   mode.  Let me know if I need to zoom in more?

21        A    That's fine.

22        Q    Okay.  But this looks like it's a GPR that

23   relates to an interview that was done with Pula Szelaw?

24        A    Szelaw, yeah.

1        Q     And you've had a chance to review this prior

2   to your deposition, correct?

3        A     Correct.

4        Q     Sitting here today, do you remember talking

5   with this person?

6        A     I -- I -- it's my handwriting on the top

7   portion of this.  So that was my notes.  GPRs are used

8   as a note pad.  And that is made part of the case file.

9              So I did talk to him.  Do I remember,

10  today, look at this?  I don't remember it other than

11  what I have written down here.

12       Q     Okay.  And when you are talking to a

13  witness -- so under the name -- I see an address and a

14  phone number, correct?

15       A     Correct.

16       Q     Okay.  Now, that information that you get

17  from the witness, or do you, like, ask for an ID or

18  something like that?

19       A     We usually ask for a driver's license.

20       Q     Okay.  And so this would have been

21  information that was provided on some sort of official

22  documentation, or should be?

23       A     Correct.  That's how I would normally do it.

24       Q     Okay.  Do you recall, one way or another,

1   whether you did that with these witnesses?

2       A    I would imagine it was one of my first

3   homicides.  I would have done it by the driver's

4   license.

5       Q    Okay.

6       A    I don't remember if I did, but that's -- I

7   know I would have followed that kind of procedure.

8       Q    Okay.  And then having had a chance to review

9   this report, does this refresh your recollection about

10  any conversations you had with this individual?

11      A    Oh, it says that he was the victim's boss

12  from work and, you know -- and here's the -- that the

13  victim punched the time card; he left at 6:00 p.m.

14             Whatever I have written there, that's

15  what this subject answered in response to my questions.

16      Q    Okay.  And these notes would have been done

17  contemporaneously, correct?

18      A    That would have been done at the time that we

19  are talking to that person.

20      Q    Okay.  And then going to City NK132, same

21  question:  That's your handwriting at the top?

22      A    Correct.

23      Q    Okay.  Reading this -- go ahead.

24      A    This girl was the bartender.  I -- like I

1    said, I couldn't tell you what these people look like

2    or anything like that other than what I have written

3    down here.

4         Q    Okay.  That's what I was going to ask:  What

5    did Majdak do for a living?

6         A    He worked at the Remodeler's -- I forget the

7    exact name of the place.  It was located on Pulaski.

8    It was remodeling -- it would be almost, like, almost

9    like the Home Depot, I would liken it to, where you can

10   go get building materials and supplies.

11        Q    Okay.

12        A    And I know the only -- from what I remember

13   reading reviewing my reports, he had only worked there,

14   like, two or three weeks or something.  I don't know.

15        Q    And, again, just reading City NK132, does

16   this refresh your recollection at all with the

17   conversation you had with Barbara?

18        A    Not really, other than, you know, whatever I

19   asked her -- and those are her responses that I wrote

20   down.

21        Q    Okay.  Do you know why some people have a

22   Social Security number listed, and some don't?

23        A    You know, you -- and I don't know when it

24   happened, but years ago they used to have a Social

```
 1   Security listed on the driver's license, and then it
 2   was removed at some point.
 3             So I don't know why I have it listed for
 4   some and not for others.
 5        Q    Okay.  But if you have a Social Security
 6   number, it's probably something you got off their
 7   official documentation?
 8        A    Of course, or they said, "Hey, this is my
 9   Social Security number."  I -- I don't remember.
10        Q    Okay.  Following up with City NK133, again,
11   this is your handwriting in the body of the GPR?
12        A    Yes, it is.
13        Q    Okay.  And it looks like this is the owner of
14   Michella Terrace.
15        A    This happened -- I believe this was -- this
16   person was interviewed at the Michella Terrace.
17        Q    All right.
18        A    He is the owner, because I have it listed up
19   there.
20        Q    All right.  Reviewing this, does this refresh
21   your recollection at all about any conversations you
22   had with Andrew?
23        A    Whatever -- whatever I have written here
24   would have been included in a written report.
```

1      Q     Okay.  You are saying a written report

2  separate from this?

3      A     Well, yeah, everything is -- is in the --

4  these are GPRs, General Progress Reports.  We -- you

5  know, years ago, Detectives, used to use a little note

6  pad.

7            And then a lot of times, the notes

8  disappeared.  These GPRs are intended -- you write

9  right on them, they become part of the case fine, and

10  are maintained as part of the case file.

11      Q     All right.  Prior to, I guess, working on

12  this case, were you familiar with Michella Terrace --

13  or Michella Terrace?

14      A     I mean, I grew up on the northwest side of

15  the city, so I have an idea, from looking at the

16  address.  I grew up right off of Harlem and Irving.

17            So this is not too far from my residence

18  where I grew up.

19      Q     But were you familiar with that particular

20  business?

21      A     No, no, I -- did I frequent it?  No.

22      Q     No.  I mean, like -- so, like, I don't go to,

23  like, the Chicago Comedy Club, but I know it exist, if

24  that make sense.

1    A    Yeah, yeah, yeah.  I was aware of it, if

2  that's what you want to know.

3    Q    Okay.  And what type of establishment was it?

4    A    If I remember correctly, it was like a bar,

5  maybe Banquet Hall or something, you know.

6    Q    Okay.  Going to City NK134 and --

7         MR. OBERTS:  Can I just -- Counsel, could you

8  just blow it up a little bit?  I know he said he can

9  see it, I can't see it as well.  Maybe it's just poor

10 eyesight by me.

11         That's a little better.  Thank you.

12  BY MS. SAMUELS:

13    Q    And so it looks like this is a GPR, and its

14  got two individuals on it?

15    A    Correct.

16    Q    All right.  The one on top is Robert?

17    A    Correct.  He was the bouncer at the club.

18  And the one below was the victim's uncle.

19    Q    All right.  And do you know why these are on

20  the same GPR?

21    A    Because we interviewed these people on the --

22  on the same day, one after another.

23    Q    Okay.  Having had a chance to review this,

24  does this refresh your recollection, at all, about any

1    conversations you had with Robert?

2        A    I mean, just -- whatever I have written

3    there, it would have been documented in the initial

4    report.   These were my notes for the initial reports.

5        Q    Okay.  And do you recall -- does this refresh

6    your recollection, at all, within the conversations you

7    had with Slawdmir, his uncle?

8        A    Whatever -- whatever -- whatever he told me

9    is documented there, is what I can tell you.

10       Q    And so do you know why you were asking

11   everybody about whether or not Majdak used drugs?

12       A    I -- I don't -- I don't remember.  I can -- I

13   don't want to make an assumption.  It did come up with

14   everybody that everybody -- a lot of these people said

15   that he -- his brother was a heroin addict or

16   something, if I remember from reading my report.

17              So that's probably why we asked.

18       Q    All right.  Going to the next page, and this

19   looks -- I'm sorry, what is this:  NK -- City NK135.

20   This looks like a GPR for Marta Wojcicka; is that

21   correct?

22       A    Wojcicka.

23       Q    Sorry.  Wojcicka.

24       A    Amish/Polish spelling.

```
 1         Q    And this is, again, your handwriting up at
 2    the top?
 3         A    Yes, it is.
 4         Q    And it looks like she was a bartender for the
 5    Terrace?
 6         A    Correct.
 7         Q    All right.  And having seen this -- or having
 8    had a chance to review it, does this refresh your
 9    recollection regarding any discussions you had with
10    her?
11         A    No, other than it would have been in the
12    written report.  These were just my notes from my
13    talking to her.
14         Q    Okay.  And when you say the "written report,"
15    do you mean the case supplementary reports?
16         A    Correct.
17         Q    Okay.  Going to City NK136.  This looks like
18    another GPR; and this is your handwriting on it?
19         A    Yes, it is.
20         Q    Okay.  And this looks like a GPR for
21    Mr. Wonder?
22         A    Correct.
23         Q    All right.
24         A    And this took place at the Cardinal Club on
```

```
 1   Belmont Avenue.

 2        Q    Were you familiar with the Cardinal Club?

 3        A    Yes -- yes, I was.

 4        Q    All right.  What type of establishment was

 5   the Cardinal Club?

 6        A    It was a bar.

 7        Q    Having had the opportunity to review this

 8   report, does it refresh your recollection, at all,

 9   regarding anything Mr. Wander told you?

10        A    Other than what I have written there, that's

11   all that I can tell you that he told me.

12        Q    Okay.  Going to City NK137.  Do you recognize

13   your handwriting?

14        A    Yes, I do.

15        Q    Okay.  And that's essentially your

16   handwriting in the body of the report?

17        A    Correct.

18        Q    All right.  And this is for an interview with

19   Ursula; is that correct?

20        A    Correct.

21        Q    All right.  And she was a door person for the

22   Cardinal Club?

23        A    That's correct.

24        Q    Do you recall speaking with -- having had a
```

1   chance to review this, do you recall speaking with her

2   at all?

3          A    Just like all the others, just the name and,

4   you know, whatever I had -- talked to her is documented

5   in these notes.

6          Q    All right.  Turning to City NK138.

7               This is -- you are going to have to help

8   me out with the name.  I'm sorry.

9          A    Bogumila Widelka?

10         Q    Widelka.  All right.  Again, this is an

11  interview you had with Ms. Widelka?

12         A    Correct.

13         Q    This is your handwriting documenting that?

14         A    Yes.

15         Q    Do you have any recollection of speaking with

16  this individual?

17         A    Other than what I have here.  It's the same

18  as the prior individuals.

19         Q    Okay.  Going to City NK139.  Same questions:

20  This is your handwriting?

21         A    Yes, it is.

22         Q    Alesha?

23         A    Correct.

24         Q    Okay.  Do you recall speaking with her at

1    all?

2         A    The same as -- I spoke to her, because those

3    are my notes.  Whatever she told me is written in my

4    notes and memorialized in the supplemental reports.

5         Q    Okay.  But nothing separate from the reports;

6    fair to say?

7         A    It's been a long time.  So that's the thing.

8         Q    140.  This looks like an interview with Jacek

9    Adanski?

10        A    Adanski, it's called.

11        Q    That makes more sense.  This is your

12   interview with Adanski.  Do you remember -- well, these

13   are your notes, correct?

14        A    Correct.

15        Q    Do you remember speaking with him?

16        A    It's the same as the others.

17        Q    Nothing outside the reports, correct?

18        A    Correct.

19        Q    Okay.  And this would have been his coworker?

20   No?

21        A    It says that he was at the club, a singer.

22        Q    Oh, okay.  My bad.

23             Okay.  City NK141, what's this name?

24        A    Danuta.

```
1          Q      Okay.  Do you remember speaking with her?

2          A      The same as the others.

3          Q      Okay.  Do you know why you didn't get a

4     Social Security number or telephone number for this

5     individual?

6          A      I don't remember why.  Maybe she didn't know

7     it.  Maybe she didn't have it with her.  I don't know.

8          Q      Did it seem weird to you that everyone else

9     seemed to find that Mr. Majdak was intoxicated except

10    for this witness?

11              MR. MILLER:  Object to the form of the

12    question.

13              MR. OBERTS:  Yes, object to speculation, but

14    go ahead.

15              THE WITNESS:  What was the question again?

16    BY MS. SAMUELS:

17         Q      Did it seem weird to you that this witness

18    said that he didn't appear intoxicated, the victim?

19         A      That's totally up to her.  I mean, I just

20    asked the questions.  And if that her response, you

21    know -- I didn't see the victim that night.  She did.

22    I just wrote what they told me.

23         Q      But you didn't draw any conclusions based

24    upon the information that she provided?
```

LIGHTFOOT COURT REPORTING, P.C.
lightfootpc@att.net
(312)701-1090

 1          A      No, I did not.

 2          Q      Did it seem weird to you that she said she

 3   didn't know anything about him having any money?

 4                 MR. MILLER:  Object to the form of the

 5   question.

 6                 THE WITNESS:  Can you repeat the question?

 7   BY MS. SAMUELS:

 8          Q      Yeah.  So did it seem weird to you that she

 9   stated she didn't know anything about the victim having

10   money?

11          A      Like I said, I -- I don't know.  That's what

12   she told me.  That was her response.

13          Q      All right.  Did you ever check to see whether

14   or not this was a real address, 2544 West Belmont?

15          A      This -- I don't know.  I -- it looks like she

16   was a patron at the Cardinal Club for this.  So I don't

17   know if that's the same address as the Cardinal Club or

18   not; I don't know.

19          Q      Okay.  If somebody gave a fake address -- if

20   a witness gave a fake address, would you find that

21   suspicious?

22                 MR. OBERTS:  Object to speculation.

23                 MR. MILLER:  Object to the incomplete nature

24   of the hypothetical.

1          MR. OBERTS:  Mr. Brzezniak, you could go

2    ahead and answer if you can.

3          THE WITNESS:  I would -- if I learned -- I

4    would have looked into it further, if it was pertinent

5    to the investigation.

6    BY MS. SAMUELS:

7          Q    Follow-up with City NK142.  This looks like

8    it's Stephan?

9          A    Stephan.

10         Q    All right.  Again, this is your handwriting,

11    talking to the witness?

12         A    Yeah, except the bottom four lines.  That's

13    Pietryla's writing.

14         Q    Do you recall speaking with him separate and

15    apart from what's on the notes?

16         A    Again, he is just like all the other people I

17    interviewed.  Whatever responses he had are written

18    down here in the notes.

19         Q    Okay.  All right.  Following up with City

20    NK143O.  These are your notes for conversation with

21    Damian Verbicki?

22         A    Correct.

23         Q    And it looks like this is a coworker as well?

24         A    Correct.

1      Q    Okay.  Do you remember having any

2  conversations with him separate and apart from what's

3  on the paper?

4      A    Just what you see his response is; that's my

5  notes.

6      Q    Okay.  Were you familiar with the bar,

7  Extasy?

8      A    I believe we -- I heard the name or I read it

9  somewhere in my reports.  I don't -- I'm drawing a

10  blank on where it's at or anything like that.

11      Q    So I'm going to highlight a line; can you see

12  that?

13      A    Yes.

14      Q    And this says, "Victim stated, wanted to go

15  to Extasy," and then in parentheses, she says "Bar"?

16      A    Yeah, you know what -- wasn't that where they

17  went to lunch or something like that, across the street

18  or nearby their work or something?

19      Q    I'm not sure.

20      A    I -- I remember -- I think that might be it,

21  but I don't know off the top of my head.

22      Q    And so from my understanding, the victim,

23  afterward, went out drinking with two friends.  And

24  then he takes Damian to go get his car.  And then he

1    tells Damian he wants to go to Extasy Bar; is that

2    fair?

3          A    I guess if that's what I have written.

4          Q    Okay.  Do you remember going to Extasy Bar to

5    canvas any witnesses or see if they knew about

6    Mr. Majdak?

7          A    I don't remember.

8          Q    Okay.  As you sit here today, can you think

9    of a reason why you wouldn't have done that?

10         A    I don't remember.  I -- it's been a long

11   time.

12         Q    Do you know what type of bar Extasy was?

13         A    I -- I do not.

14         Q    All right.  Was it a strip club?

15         A    I don't know.

16         Q    All right.  Following up with City NK144.

17   This looks like it's the report from when you were

18   talking with his sister; is that fair to say?

19         A    From mom, sister and brother, it looks like.

20         Q    Okay.  And so did you speak to them

21   altogether, or one on one?

22         A    I don't remember if I spoke to them

23   separately or altogether.  I believe -- if it was the

24   mother -- I -- I thought we interviewed the mother up

1    in Highland Park, but I'm drawing a blank on it.

2        Q    Do you recall anything regarding the

3    substance of this conversation or the information you

4    learned from the victim's family separate and apart

5    from what's written on the page?

6        A    You know, whatever -- whatever I wrote are on

7    my notes from our conversation.  And the bottom lines

8    are from Mike Pietryla's handwriting.

9        Q    Did it seem weird to you that he was married

10   and had a girlfriend?

11           MR. MILLER:  Object to form of the question.

12           MR. OBERTS:  Objection.  Speculation.

13           THE WITNESS:  I -- this is life.  I mean,

14   people do what they have to do.  I mean, I don't agree

15   or disagree with it one way or another.  I'm not here

16   to judge anybody.

17   BY MS. SAMUELS:

18       Q    Did you ever find out how many girlfriends

19   Mr. Majdak had?

20       A    No, I did not.

21       Q    Do you know whether or not that was a line of

22   inquiry into his murder?

23       A    I do not, no.

24       Q    And then the last note that you write is that

```
 1    the victim had three scratch marks on his face opposite
 2    the wound.
 3                    Were you ever able to identify or
 4    determine where those scratch marks came from?
 5         A    No.  That was something that -- somebody
 6    who -- either the mom, sister or brother told me about.
 7    Because like I said, I -- I was never at the crime
 8    scene.
 9         Q    Do you know if identifying who had scratched
10    Mr. Majdak was an area of inquiry for this -- for
11    his -- for his murder investigation?
12         A    I don't know.
13         Q    All right.  Following up with City NK145.
14    This looks like this is --
15         A    Marjorak.
16         Q    There you go.
17                    Again, this is your interview with her,
18    and these are your notes, at least the top portion?
19         A    Correct.
20         Q    It looks like she was the victim's
21    girlfriend?
22         A    Correct.
23         Q    And that you -- do you recall having -- do
24    you have any conversations you had with her separate
```

1    and apart from what's written on this police -- this

2    piece of paper?

3       A    Just her responses is what she told me on

4    this note pad.

5       Q    Do you know why you didn't ask any of these

6    individuals to account for where they were at the time

7    of the murder?

8          MR. MILLER:   Object to assumes facts.

9          THE WITNESS:   I -- I -- I don't know.   I was

10   just asking that -- we were trying to determine who --

11   where he had gone, who had talked to him prior to his

12   murder.

13   BY MS. SAMUELS:

14       Q    All right.   Is that a -- so determining where

15   somebody is -- where a witness is at the time that the

16   victim died; is that a question you commonly ask?

17          MR. MILLER:   Object to form and incomplete

18   nature of the hypothetical.

19          THE WITNESS:   We were just trying to

20   determine where the victim went prior to him being

21   murdered.

22   BY MS. SAMUELS:

23       Q    Understood.   And so my question is:   During a

24   typical murder investigation, right, if you are dealing

1    with some of the last individuals to see a person

2    alive, would you expect -- would you expect those

3    individuals to be asked to account for their

4    whereabouts at the time of the murder?

5             MR. MILLER:  Same objection.  Foundation.

6             MR. OBERTS:  Join.

7             THE WITNESS:  If they were possibly involved;

8    is that your question?

9    BY MS. SAMUELS:

10       Q    No -- so, my understanding is Mirak Majdak

11   was last seen leaving the club roughly around 1:00 a.m.

12   by somebody at one of these clubs, right?

13       A    Correct.

14       Q    And so these are -- the people you are

15   interviewing are generally some of the last people to

16   see him alive, right.

17             He's found dead, like, ten minutes later

18   or 15 minutes later, something like that, correct?

19       A    Whatever I -- I don't know the exact amount

20   of time, from the time he left the club or whatever.

21       Q    Okay.  And so -- well, it's fair to say after

22   he leaves the club, the next time somebody sees him, he

23   is found dead that we know of; is that fair?

24             MR. MILLER:  Object to foundation.  Calls for

1     speculation.

2              MR. OBERTS:  Join.

3              THE WITNESS:  I couldn't -- I couldn't tell

4     you one way or another.  I mean -- you know.

5     BY MS. SAMUELS:

6         Q    All right.  So based upon the timeline that

7     you drew up regarding Mr. Majdak's whereabouts, after

8     he left the club, do you know anyplace else he went

9     before being found dead?

10        A    It would have been documented in a general

11    progress report, everyplace that we were able to

12    determine that he went from the time he left work to

13    the time he was found dead.

14        Q    Yes, sir.  We just went through those GPRs,

15    correct?

16        A    Correct.

17        Q    And so having had a chance to review those

18    GPRs, is it fair to say the last known place that

19    Majdak was seen alive was at these clubs?

20             MR. MILLER:  Objection.  Foundation.  Calls

21    for speculation.

22             MR. OBERTS:  Join.

23             THE WITNESS:  Yeah, I don't -- I don't know

24    if he -- you know, if he went somewhere after leaving

1    the club prior to going down to Ohio Street.  I have no

2    way to determine that.

3    BY MS. SAMUELS:

4        Q    Understood.  And so that's why I said the

5    last known place he was known to inhabit -- he was

6    known to visit were these clubs, fair?

7            MR. MILLER:  Same objections.

8            THE WITNESS:  I -- I -- that's what I would

9    assume.

10   BY MS. SAMUELS:

11       Q    Okay.  And so even -- we'll say even an hour

12   before his death, right, this is the last place that we

13   know for sure he was.

14            And so given those circumstances, would

15   you generally expect those individuals to be asked to

16   account for their whereabouts at the time of the

17   murder?

18            MR. MILLER:  Object to the form of the

19   question, the incomplete nature of the hypothetical,

20   calls for speculation.  Foundation.

21            MR. OBERTS:  Join.

22            THE WITNESS:  Yeah, I -- I -- I don't know.

23   I know -- I know he was at those -- at the club where

24   we talked to -- we interviewed them.  They documented

1    where they were at, where they seen him, and he was

2    subsequently found dead.

3    BY MS. SAMUELS:

4        Q    Okay.  And so based upon your training and

5    experience, one way or the other, you would have no

6    expectations regarding questions about an individual's

7    whereabouts at the time of the murder?

8            MR. MILLER:  Objection, mischaracterizes the

9    testimony.

10           MR. OBERTS:  Join and vague.  Objection,

11   vague.

12           THE WITNESS:  What was the question again?

13   BY MS. SAMUELS:

14       Q    So based upon your training and experience,

15   you would have no expectations, one way or another,

16   regarding questions about an individual's whereabouts

17   at the time of the murder?

18       A    No, I mean whatever -- whatever part of the

19   timeline we did, we documented it, who was the last

20   person, who he seen on -- leading up to his death.

21           That's what I could testify to.

22       Q    Yes, sir.  And what I'm trying to get is, you

23   did the ten-week course at the Chicago Police Academy

24   where they generally took you over Investigative

1    Procedures and how to be a Detective in cases like

2    this, correct?

3         A    Well, not just to be a Detective, but -- you

4    know, I was there as an observer.  This was my first

5    homicide that was actually -- that I worked on with

6    Detective Pietryla.

7              So I -- you know, I followed his lead,

8    so to speak.

9         Q    I completely understand that.  Right.  And so

10   all I'm trying to get at is whether what I'm seeing

11   here is common.  And you would think ten out of ten

12   investigations, I would expect it to go the same way,

13   or whether you would think, I would expect to see

14   something else occur.  Right.

15             And so that's sort of what I'm trying to

16   get at while I'm asking these questions.  And so when

17   you are doing a homicide investigation, and you are

18   dealing with a group of individuals who were the last

19   people known to have seen an individual alive, you

20   would not -- is it fair to say you would not expect to

21   see that those individuals are questioned about their

22   whereabouts at the time of a murder?

23             MR. MILLER:  Object to form, the incomplete

24   nature of the hypothetical and it assume facts.

1          THE WITNESS:  It would all depend on the

2    investigation.  Every investigation is different.

3    BY MS. SAMUELS:

4       Q    Okay.  And so one way or another, you

5    wouldn't expect to see, really, it's just a case by

6    case basis?

7       A    It would depend on the investigation.

8       Q    Okay.  So when you say "it would depend on

9    the investigation," what does that mean?

10      A    It means if I interviewed somebody and they

11   were at the nightclub working and he leaves, I would

12   have no reason to ask that person, or make an

13   assumption that they were involved if they continued to

14   work and he leaves.

15      Q    Well, I guess my question is:  Unless you ask

16   them, like, are you still here at the time of the

17   murder, how would you know that they didn't leave as

18   well?

19          MR. MILLER:  Object to form.

20          THE WITNESS:  I have no way to determine.

21   All I can tell you is if they tell me they are working,

22   I assume that they are working.

23   BY MS. SAMUELS:

24      Q    Okay.  Are you aware of any follow-up that

1   was done regarding any of the individuals who were

2   questioned while you are trying to put together the

3   timeline of Majdak's last night?

4           MR. MILLER:  Object to form.  Vague.

5           MR. OBERTS:  Join.

6           THE WITNESS:  And I don't -- I don't

7   remember.

8   BY MS. SAMUELS:

9       Q    And had there been a follow-up, would

10  there -- would there be a report there somewhere?

11      A    Correct.  There would have been a GPR on

12  anybody we interviewed which would have been

13  memorialized in the supplemental report.

14      Q    All right.  And is it fair to say that if

15  there's no additional GPRs and there's no additional

16  supplementary reports that there was no follow-up?

17          MR. MILLER:  Object to foundation.  Calls for

18  speculation.

19          MR. OBERTS:  And incomplete hypothetical.

20          THE WITNESS:  I can only tell you that if I

21  interviewed somebody, I did a GPR, and it was written

22  in the supplemental report.

23  BY MS. SAMUELS:

24      Q    Yes, sir.  And so conversely, if there is no

1    GPR, then there was no follow-up interview, fair?

2              MR. MILLER:  Object to foundation.

3              MR. OBERTS:  Object to speculation.

4              THE WITNESS:  Again, I can only tell you that

5    if I interview somebody, I would have done the GPR, and

6    then it would have been put in the sup.

7                   I can't speculate on what somebody else

8    might have or might not have done.

9    BY MS. SAMUELS:

10       Q    And the people that you interviewed, they

11   were generally primarily Polish speakers?

12       A    Primarily.  But a lot of them were bilingual.

13             MR. OBERTS:  Counsel, just -- I don't want to

14   break your flow, but within the next five, ten minutes,

15   can we take a break whenever you are done with your

16   topic area.

17             MS. SAMUELS:  We can take one now.

18             MR. OBERTS:  Thank you.

19             MS. SAMUELS:  All right.  It's like 11:20

20   now.  So 11:30?

21             MR. OBERTS:  Very good.  Thank you.

22                   (WHEREUPON, off the record.)

23             MS. SAMUELS:  Go back on the record.

24             MR. OBERTS:  Yes.

```
 1   BY MS. SAMUELS:
 2        Q    Back on the record.  Mr. Brzezniak, did you
 3   have a chance to consult with your attorney over the
 4   break?
 5        A    No, I did not.
 6        Q    When we left off, we were talking about the
 7   questioning of witnesses in a murder investigation and
 8   what you could or could not expect to see; is that fair
 9   enough, or a fair description?
10        A    Well, I could only answer questions on what I
11   did.  I can't answer any questions on what somebody
12   else might have done.
13        Q    Okay.  How long were you in Area 4?
14        A    I know it was summertime.  I don't know.
15   Maybe -- maybe two months.  I know we all got pulled
16   back to our department.  We all got returned to our
17   department.
18        Q    I'm sorry.  When you were pulled back to your
19   department, what was your assignment?
20        A    I believe I would have been Special
21   Operations, maybe.
22        Q    What does Special Ops do?
23        A    We do investigations with confidential
24   informants.  And we kind of -- there was -- I had --
```

```
 1   there was probably ten of us.  And we got to do
 2   whatever investigations that were assigned out of the
 3   Chief's office to us.
 4                 Some were confidential in nature.
 5   Other -- you know, we did auto theft investigations,
 6   counterfeit merchandise investigations, burglary
 7   investigations.
 8                 It all mattered what was happening in
 9   our area that they needed to focus on.
10        Q    All right.  And so when you say you do these
11   different types of investigations, are you saying that
12   all those types of investigations involved a
13   confidential informant?
14        A    No, no, no.  No, no.
15        Q    All right.  So that was just one type,
16   like --
17        A    I'm just telling you sometimes you would get
18   information; sometimes you wouldn't.
19        Q    Gotcha.  And when you say "Confidential
20   Informant," what do you understand that to mean?
21        A    Well, there's all different kinds of
22   different Confidential Informants.  There's
23   Confidential Informants that work for money.
24                 There's Confidential Informants that are
```

1    in a position to testify.  There's Confidential

2    Informants that are not in a position to testify.  You

3    know, to name a few.

4         Q    All right.  Have you ever worked with

5    Confidential Informants you were unable to identify at

6    a later date?

7         A    I don't understand the question.

8         Q    Okay.  And so I understand you say there's

9    Confidential Informants who work for money, correct?

10        A    Correct.

11        Q    And my understanding is for those types of

12   Confidential Informants, it's usually, like, some sort

13   of approval process in order to make sure that they get

14   the money --

15        A    Correct.

16        Q    -- authorized, right?

17        A    Correct.  And most Confidential Informants,

18   they have a number associated with them.  So they are

19   signed up by the Department.  So you don't refer to

20   them by their name.  And they have a number that's

21   assigned to them.

22        Q    Okay.  Have you ever worked -- and so even

23   though their name's' not listed, someplace, if you

24   needed to, you would be able to go back and identify

1    who that individual is?

2        A    Correct.  At least that was the procedure.

3    That's how I was taught at the FBI when I was on the

4    Task Force.

5        Q    Okay.

6        A    I don't know what Chicago's procedure is for

7    that if that's what you are going to ask.

8            MR. OBERTS:  Let her ask the question.  Let

9    Counsel ask questions.  So we'll take it from there.

10   BY MS. SAMUELS:

11       Q    Have you ever worked with Confidential

12   Informants where you didn't record their name or have

13   some way to be able to identify them in the future?

14       A    Personally, I always was able to identify

15   them in the future.

16       Q    Okay.  Have you ever been trained -- or

17   learned any -- let's start with this:

18            Have you ever been trained to work with

19   Confidential Informants in a manner where you weren't

20   -- you didn't record their name or you weren't -- you

21   wouldn't be able to identify who they were in the

22   future?

23            MR. OBERTS:  Objection, form and vague.

24            MR. MILLER:  Join.

```
 1              THE WITNESS:  No, I do not.  I've always
 2   worked where they were identifiable.
 3                   Now, you have to clarify, you know,
 4   because they do have sources of information other than
 5   Confidential Informants.  It's the people that call up
 6   and give the information.  And they just, you know --
 7   so I don't know exactly what you are referring to.
 8   BY MS. SAMUELS:
 9        Q    All right.  So people who just call up and
10   give you information, is there a term that you would
11   generally use to -- to refer to them?
12        A    A source of information.
13        Q    All right.  And do you understand that to be
14   something different than a Confidential Informant?
15        A    Yes.
16        Q    All right.  So I'm going to screen share,
17   again, with you to look at some more GPRs.  I'm sorry.
18   But this is why we get paid the big bucks.
19                   So going to City NK148, can you see that
20   all right?
21        A    Yes.  That's -- that's Pietryla's
22   handwriting.
23        Q    Yes, sir.
24              MR. OBERTS:  Counsel, could you just expand
```

```
 1    that more for me.
 2            MS. SAMUELS:  Yeah.  I blew it up to 60; do
 3    you still need some more?
 4            MR. OBERTS:  Yeah.  I was looking for my
 5    cheaters during the break, and I couldn't find them.
 6            MS. SAMUELS:  Is that better?
 7            MR. OBERTS:  Yes.
 8    BY MS. SAMUELS:
 9       Q    And are you able to read Officer Pietryla's
10    handwriting?
11       A    Some of it.
12       Q    Okay.  So it looks like it says, "RDs,
13    Pietryla, Brzezniak, Sanders and Wright assigned to
14    follow-up on homicide;" do you see that?
15       A    Yes.
16       Q    And it said, "Hill, comma, Yvette, stated
17    Look for Darnell," end quotes, and then "Brad," end
18    quotes?
19       A    If that's what's written there. I -- I -- I
20    can't make out those two names.
21       Q    Okay.  We'll just say two names, end quotes;
22    fair enough?
23       A    Okay.
24       Q    All right.  Do you recall any to assigned to
```

1    followup on the homicide by looking for these two

2    individuals?

3         A    It's clear that I was there by what's written

4    in that GPR.

5         Q    Okay.  And the next line says, "Canvas"

6    something "Cicero and Lake" -- well, it looks like you

7    are canvassing Cicero and Lake.

8         A    Something like that.  I can't make it out.

9    That's not my hand -- that's not my handwriting.

10        Q    Understood.  Do you recall participating in a

11   canvas in the Cicero and Lake area?

12        A    I -- I -- I don't recall that off the top of

13   my head.  But that's -- I know it says "canvas," and

14   I -- and I can make out the word "Cicero and Lake," so

15   I assume that's what it's saying.

16        Q    All right.  And at this time, you would have

17   still been partnered with Pietryla, correct?

18        A    Correct.  We would have been in -- Pietryla

19   and I would have been in one squad car.  And Sanders

20   and Wright would have been in another squad car.

21        Q    All right.  And so during your canvas, would

22   you still be working together, or would you have

23   separated?

24        A    I don't remember.

1    Q    During a canvas, would you take notes of what
2  the people are telling you?
3    A    We -- we did.  It looks to me like it's
4  Pietryla's handwriting, so he was the one taking the
5  notes on this day.
6    Q    All right.  If you have no notes from a
7  canvas that was conducted on this date, does that
8  suggest to you that you were working with -- in tandem
9  with Pietryla to conduct the canvas?
10   A    I would have been with Pietryla.  Like I
11 said, we would have had our -- one squad would have
12 myself and Pietryla.  And the other squad would have
13 been Sanders and Wright.
14   Q    Okay.  And when you conduct a canvas, do you
15 separate from your partner, or do you each question the
16 people together?
17   A    We -- in this, he's taking -- he's taking the
18 note, so I would have been with him.
19   Q    Okay.  Do you recall talking to a
20 Confidential Informant?
21   A    No, I do not.
22   Q    Do you recall talking to an individual who
23 described one of the murderers as -- or one of the
24 people involved with the death of Mirak Majdak as being

1    Hershula Berg's boyfriend?  Or -- yeah.

2         A    Are you referring to this GPR here in front

3    of me?

4         Q    Yes, sir.

5         A    I don't -- I don't remember.

6         Q    All right.  Do you ever recall speaking or

7    interacting with a Hershula Berg?

8         A    I remember the name from reading the reports,

9    but I really don't remember the interview.  Is -- yeah,

10   that's about all I could tell you on that.  If I did

11   interview her, I was present, it would have been

12   documented in a supplementary report.

13        Q    All right.  And it looks like the girlfriend

14   Hershula Berg, was picked up.  Do you recall being a

15   part of that?

16        A    Well, the GPR says I was there.  So I must

17   have been part of it.

18        Q    Okay.  But you just have no recollection of

19   that?

20        A    Correct.

21        Q    If someone identifies somebody as a murderer,

22   do you think you would remember that?

23             MR. MILLER:  Object to the incomplete nature

24   of the hypothetical.  Calls for speculation.

```
 1              MR. OBERTS:  Join.
 2              THE WITNESS:  I -- a lot of time has gone by.
 3   So that's why I'm trying to recall.  I'm drawing a
 4   blank.
 5   BY MS. SAMUELS:
 6        Q    Yes, sir.  This would have been one of the
 7   first murder investigations you were involved in,
 8   correct?
 9        A    One of them, correct.
10        Q    All right.  And prior to this, has anybody
11   ever confessed that they knew who committed the murder
12   to you?
13        A    Prior to this?
14        Q    Yes, sir.
15        A    I don't -- I don't know.  There's no -- I
16   can't read this writing on this GPR.  So I don't know
17   what you are referring to, really.
18        Q    So this GPR states that a Confidential
19   Informant informed them that two Black males killed the
20   White boy on Ohio.
21        A    Okay.
22        Q    And it describes the two Black males.
23        A    Okay.
24        Q    Which is someone identifying a murderer,
```

1    fair?

2        A    Well, there are -- they could be suspects at

3    this point.  I don't know -- you'd need to corroborate

4    who is what.

5        Q    Sure.  But you have no recollection of this

6    whatsoever?

7             MR. MILLER:  Object.  Asked and answered.

8             THE WITNESS:  No, I don't remember it.

9    BY MS. SAMUELS:

10       Q    Okay.  And then going to 147.  I understand

11   that this is Pietryla handwriting as well, correct?

12       A    Yes.

13       Q    Okay.  And down here it says, "Brzezniak's

14   Sanders, Wright on scene."  I take that to mean that

15   you would have been present during this conversation

16   with Yvette Hill; is that your understanding as well?

17             MR. OBERTS:  Objection.  Speculation.

18             THE WITNESS:  Yes.

19   BY MS. SAMUELS:

20       Q    Okay.  And my understanding is this

21   interview -- and I just zoomed in a little bit -- with

22   Yvette Hill, occurred at her address.

23       A    I don't know where it occurred.  That might

24   be her address.  I don't know if this was -- took place

```
 1   at Area 4 or not.  I don't know.

 2        Q    Okay.  If an interview takes place at Area 4;

 3   would you expect it to say "on scene"?

 4             MR. MILLER:  Object to foundation.  Calls for

 5   speculation.

 6             MR. OBERTS:  Join.

 7             THE WITNESS:  It might -- if it took place in

 8   Area 4, it might be in the supplemental report that

 9   it -- where it took place.

10   BY MS. SAMUELS:

11        Q    Okay.  Well --

12        A    These are notes to jog somebody's memory.

13        Q    I'm sorry.  I missed that last part.  Say

14   that again.

15        A    When we take these notes, it's to jog our

16   memory for when we do the supplementary report.  That's

17   how I do it.

18        Q    And so, based on this GPR, is it fair to say

19   you can't tell, one way or the other, where the

20   interview took place?

21        A    I don't remember the interview based on this

22   GPR, so I can't tell you.

23        Q    Okay.  Going to City NK60.  And this is the

24   Case Supplementary Report relating to the interview of
```

1    Yvette Hill.

2        A    Okay.

3        Q    I'm going to give you the chance to review

4    this.

5        A    Okay.

6        Q    And just so you know, the last page just

7    says, "This investigation continues."  So that's the

8    end of the narrative.

9             By having reviewed that inter -- the

10   supplementary report now in addition to the GPR, can

11   you tell where this interview took place?

12       A    Can you scroll down to the top?

13       Q    Scroll up to the top?

14       A    Yeah, I just wanted to see.

15            I believe it would have -- we would have

16   interviewed her -- it's saying 4638 West Ohio.

17       Q    Right.  Just -- for --

18       A    Oh, this -- which occurred -- okay.  Yeah,

19   yeah.  That's how I -- that's what I would assume where

20   it happened then, I guess.

21       Q    Okay.  And 4638 West Ohio is right down the

22   block from where Mirak Majdak was murdered, correct?

23       A    A block away or so, I guess.

24       Q    Okay.  And so while you were down there, did

1    you visit the murder scene?

2        A    I -- I don't remember.

3        Q    Is that something you would have expected to

4    do?

5            MR. MILLER:  Object to form.  Incomplete

6    nature hypothetical, also speculation.

7            MR. OBERTS:  Join.

8            MS. SAMUELS:  I'm sorry.

9            THE WITNESS:  I said no.  If I was the lead,

10   I would have definitely gone to the scene.

11   BY MS. SAMUELS:

12       Q    Okay.  And then see here now that -- it's

13   saying that you went into her residence; does it jog

14   your memory at all about what occurred?

15           SKWRAO:  Miller, Object to misstates the

16   record.

17           THE WITNESS:  I still don't remember.  I

18   don't know if we interviewed her on her front porch or

19   in the building.  I don't remember.

20   BY MS. SAMUELS:

21       Q    Okay.  Have you been trained to take -- I'm

22   going to stop sharing that.  If you don't remember, you

23   don't remember.

24               Okay.  Were you trained take handwritten

LIGHTFOOT COURT REPORTING, P.C.
lightfootpc@att.net
(312)701-1090

```
 1   statements?
 2        A    From who?  From offenders?  From victims?  I
 3   mean, I don't -- I don't understand the question.
 4        Q    Well, that's a good question.
 5             Do you know who you should take a
 6   handwritten statement from, or could you just take one
 7   from anyone?
 8             MR. MILLER:  Object to form.
 9             MR. OBERTS:  An Incomplete hypothetical.
10             MS. BRILL:  Join, all those objections.
11             MS. SAMUELS:  Three for three.
12             THE WITNESS:  You are asking me who I would
13   take a written statement from?
14             MS. SAMUELS:  Yes, sir.
15             THE WITNESS:  I guess somebody who witnessed
16   a crime.
17   BY MS. SAMUELS:
18        Q    Okay.  And when -- prior to taking a
19   handwritten statement -- and if you don't recall, you
20   can just tell me you don't recall.
21             Were there any things that you were
22   supposed to do in preparation for a handwritten
23   statement?
24             MR. MILLER:  Object to form.  Incomplete
```

```
 1    nature of the hypothetical.
 2            MR. OBERTS:  And just objection, vague, with
 3    regards to the term "handwritten statement" whether
 4    it's his written statement or the person that he's
 5    interviewing.
 6            THE WITNESS:  I don't know.  I couldn't
 7    answer that.
 8    BY MS. SAMUELS:
 9        Q    Okay.  Do you remember anything Pietryla
10    might have told you about how to take a handwritten
11    statement from a witness?
12        A    I don't remember.
13        Q    Do you know if it's still considered a
14    handwritten statement if the witness doesn't write it
15    in their own hand?
16            MR. MILLER:  Object to form.  Foundation.
17            MR. OBERTS:  Speculation.
18            MS. BRILL:  Join.
19            THE WITNESS:  I believe it's still a hand --
20    a handwritten statement is a handwritten statement.
21    And as long as that person would sign and attest that
22    that was his writing or his thoughts, you know.
23    BY MS. SAMUELS:
24        Q    Okay.  And so I'm sharing with you, the
```

```
 1    statement of Maurice Wright.  Are you familiar with

 2    this?

 3         A    I don't remember Maurice Wright at all.

 4         Q    But are you familiar with this document?

 5         A    Yes, I'm familiar with it.

 6         Q    Okay.  And it looks like the statement was

 7    taken at Area 4, Violent Crimes?

 8         A    Correct, by Thomas Mahoney.

 9         Q    Right.  And then under that it says

10    "Detective Toney Brzezniak," correct?

11         A    Correct.

12         Q    And so what was your role in taking the

13    statement?

14         A    I was strictly an observer.  That statement

15    was taken by the State's attorney, I believe.  I just

16    sat and observed.

17         Q    And is that your understanding of why a

18    Police Officer would be present during the taking of a

19    handwritten statement?

20              MR. MILLER:  Object to form.  Vague,

21    incomplete nature of a hypothetical.  Speculation.

22    Foundation.

23              MR. OBERTS:  Join.

24              MS. BRILL:  Join.
```

```
 1            THE WITNESS:  I was in training, so I wanted
 2   to see exactly how it was done.
 3   BY MS. SAMUELS:
 4        Q    Okay.  And so you were just there to learn;
 5   is that fair to say?
 6        A    Correct.
 7        Q    Do you have any recollection of interacting
 8   with ASA Thomas Mahoney?
 9        A    Not really.  I couldn't even tell you what he
10   looks like.
11            I mean, I --
12            THE WITNESS:  Can you excuse me for a minute?
13   Somebody's at my front door.
14                 (WHEREUPON, there was a pause.)
15            MS. SAMUELS:  Okay.  I'm back.  I'm sorry.
16   The dogs got riled up.  That's all.
17   BY MS. SAMUELS:
18        Q    And so I was asking about ASA Thomas Mahoney.
19   You don't remember meeting him at all?
20        A    Oh, I met him on -- in Area 4, right, you
21   know, at the time.
22        Q    Okay.  Do you remember that, or you just know
23   it occurred because you see your name is on the sheets?
24        A    I know it occurred, because I'm -- my name is
```

1    here.

2         Q     Okay.  It's fair to say you have no

3    independent recollection of him?

4         A     Correct.

5         Q     All right.  Hold on.  I thought you were on

6    afternoon shifts.  What time did afternoon shifts

7    begin?

8         A     Well, this was happened at 1:00 in the

9    morning, is what is written there.  I think maybe we

10   started at, like, 4:00 or something like that.  But

11   if -- if you ran over you had to do -- stay late.

12        Q     All right.  So it's just one of those things.

13                    I'm going to go ahead and stop sharing.

14                    Besides -- do you know the process for

15   calling in an Assistant State's Attorney to assist with

16   the case?

17        A     You would normally call Felony Review.

18        Q     Okay.  Besides ASA Mahoney, do you recall

19   interacting with any other Assistant State's Attorneys

20   relative to the murder of Mirak Majdak?

21        A     No, I do not.

22        Q     Do you recall participating in the arrest of

23   Xavier Walker?

24        A     Wait.  Can you repeat that?

1      Q      Do you recall participating in the arrest of

2  Xavier Walker?

3      A      Yes.

4      Q      What do you recall about that?

5      A      I know that they were -- Wright and Sanders

6  were looking for him, and they had information that he

7  was staying, I believe, on Patomac.  And we went out

8  there, Pietryla and myself, to assist them.  And they

9  seen him walking down a sidewalk or right by the

10 building.  And they went -- we all got out of our

11 squads, and they went to stop him, and he took off

12 running.  After a short foot pursuit, we were able to

13 apprehend him.

14     Q      Okay.  Can you describe Officer Wright?

15            SKWRAO:  Miller, Object to vague.

16            THE WITNESS:  He was -- what do you want, a

17 physical description of him?  Is that what you are

18 looking for?

19            MS. SAMUELS:  Yes, sir.

20            THE WITNESS:  He was probably, like, 5'9",

21 5'10", male, Black.  I mean, I don't know what clothes

22 he was wearing.

23 BY MS. SAMUELS:

24     Q      Body type?

```
 1        A     Pardon me?

 2        Q     Body type?

 3              MR. MILLER:  Object to vague.

 4              THE WITNESS:  He was -- he wasn't a muscular

 5    guy or anything like that.

 6    BY MS. SAMUELS:

 7        Q     Okay.

 8        A     At least not back in 2000, that I know of

 9    when I knew him.

10        Q     All right.  And what about Officer Wright,

11    can you provide his description?

12              MR. OBERTS:  That was Wright.

13              MS. SAMUELS:  Oh, I'm sorry.

14    BY MS. SAMUELS:

15        Q     Officer Sanders.

16        A     Sanders was a little bit bigger and a little

17    bit darker.

18        Q     When you say "little bigger" do you mean

19    taller?

20        A     A little bit -- a little bit -- a couple

21    inches taller.  A little bit darker skin.

22        Q     What about body type?

23        A     He was medium, I would say.  Smaller than my

24    body type.
```

1      Q      When you and Pietryla would go out, would you

2  be in a marked squad car?

3      A      It would be in a marked squad car.

4      Q      What's that called?  A sedan?

5      A      Well, it was an unmarked squad car, which had

6  lights and siren.  But it wasn't like they were readily

7  visible.

8      Q      Okay.  And then when you went out, would you

9  be in plain clothes?

10     A      Correct.  With our vest, with our duty rigs,

11 with our credentials, visible for all to see.

12     Q      Do you recall transporting Xavier Walker?

13     A      I do not.

14     Q      When is the next time you recall interacting

15 with him?

16     A      Well, I do remember bringing him back to Area

17 4.  And I do remember sitting in -- on one of the

18 interviews.  I don't know how many times he was

19 interviewed.

20            But, like I said that -- I know I was

21 present because of the hit and lick statement that he

22 stated, and I had to ask Pietryla what that meant.  I

23 had never heard of that terminology be used before.

24     Q      Were you trained on how to document custodial

1    interviews?

2         A    Well, that was -- that was one of the reasons

3    that I was assigned to Area 4, was to learn and train

4    and observe.

5         Q    And how did you learn to document custodial

6    interviews?

7              MR. MILLER:  Object to vague.  Form.

8              THE WITNESS:  I -- I -- I -- I just -- I

9    guess I don't understand your question.  Is it how to

10   document?

11             I mean, if you take a written statement,

12   if you are interviewing him, he's got to go to the

13   bathroom, we document it.  If we feed him, we document

14   it.  I mean, I don't understand what exactly your point

15   of this question is.

16   BY MS. SAMUELS:

17        Q    Let's break it down.  So you said if someone

18   is being fed, you document it, correct?

19        A    Correct.

20        Q    How do you document that?

21        A    It would be in -- in one of the reports that

22   he was fed, that he went to the bathroom or whatever.

23        Q    Okay.  Do you need to put the time or

24   anything like that, or you just write that down?

1          MR. MILLER:  Object to foundation.

2          THE WITNESS:  No -- I -- I, personally, if I

3    was doing it, I would have written a time down.  I

4    can't speculate what was done.

5    BY MS. SAMUELS:

6        Q    Okay.  Same with bathroom, where would you

7    expect that to be documented?

8          MR. MILLER:  Object to foundation.  Calls for

9    speculation.  Incomplete nature of hypothetical.

10          MR. OBERTS:  Join.

11          THE WITNESS:  The same thing.  If I was

12   documenting it, I would have documented it and the

13   time.

14   BY MS. SAMUELS:

15       Q    Okay.  And so I understand that if someone is

16   being interrogated over --

17              So how can I put this?  So sometimes you

18   have a person, like, over the course of a number of

19   hours, they are questioned multiple times; is that

20   fair?

21       A    Sometimes.

22       Q    Okay.  How would you expect that to be

23   documented?

24          MR. MILLER:  Object to foundation.  Calls for

```
 1    speculation.  Incomplete nature of a hypothetical.

 2              MR. OBERTS:  Join.

 3              MS. BRILL:  Join.

 4              THE WITNESS:  It would have been documented

 5    in the reports.

 6    BY MS. SAMUELS:

 7        Q    All right.  And so if I talk to a witness six

 8    different times, should there be -- should there be

 9    documentation that reflects that?

10              MR. MILLER:  Object to form.  Incomplete

11    nature of a hypothetical.  Foundation, and calls for

12    speculation.

13              MR. OBERTS:  Join.

14              MS. BRILL:  Join.

15              THE WITNESS:  If I interviewed somebody

16    multiple times on multiple dates, I would have written

17    it.  That's what I would have done.

18              MS. SAMUELS:  Okay.  Is that different than

19    how you were trained?

20              THE WITNESS:  No.  That's how -- that's how I

21    would do it.

22    BY MS. SAMUELS:

23        Q    Do you ever remember going to the Polygraph

24    Unit?
```

```
 1        A    To which Polygraph Unit?
 2        Q    The one on -- I think it's 11th and State or
 3   something like that.
 4        A    I don't remember going there.  I know that
 5   the Polygraph operator came to Area 4.
 6        Q    When was that?
 7        A    Multiple times, I'd see him in there for
 8   different investigations.  The Polygraph guy came out
 9   today to the area when I was there.
10        Q    Do you remember him coming for this
11   investigation?
12        A    I do not.  I don't know.
13        Q    I don't know, as in I'm not sure, or I don't
14   remember that occurring?
15        A    I don't remember.
16        Q    When you say "the Polygraph guy," who do you
17   remember?
18        A    He was a Polygraph operator from Chicago.
19   That's all I remember.
20        Q    If I say the name, do you think you would
21   remember it?
22        A    Possibly.  I don't know off the top of my
23   head.
24        Q    Does the name Kevin Holly ring any bells?
```

1      A      No, it doesn't.  A Sergeant's name was Holly.

2      Q      Does the name Robert Bartik ring any bells?

3      A      I believe that -- I believe Bartik was the

4  Polygraph operator.

5      Q      The entire time you were with Area 4, were

6  you with Pietryla the entire time, or did you have any

7  other partners?

8      A      Oh, I had -- I had -- when -- when -- I was

9  also partnered up with Swiderick(Phonetic) when -- it

10  depended if Pietryla was off on vacation or is RDOs, or

11  what have you, I would get partnered up with somebody

12  else.

13              Regular Day Off.  I'm sorry.  If

14  Pietryla had a personal day or a vacation day or a

15  regular day off, and I was working, I would get

16  assigned to Detective Swiderick.  So I would work with

17  him on -- if Pietryla was not there.

18      Q      So my understanding, and correct me if I'm

19  getting this wrong, is that Pietryla was your

20  primarily.

21              But if for whatever reason he was

22  unavailable or not there, then you would work with

23  Swidereck?

24      A      Correct.

1     Q    Okay.  Give me just a second.  I'm going to

2  pull up another report.

3              Oh, I'm sorry.  I know we just took a

4  break, but can we give five minutes; come back at

5  12:15?  Thanks.

6              MR. OBERTS:  Okay.

7                   (WHEREUPON, off the record.)

8              MS. SAMUELS:  Back on the record.

9  BY MS. SAMUELS:

10     Q    And so I asked you, briefly, sort of about

11  the arrest of Xavier Walker.  And so I just want to go

12  into that in more -- in more detail.

13              Do you recall -- I think you said you

14  and Pietryla were there to provide backup to Sanders

15  and Wright, essentially?

16     A    Correct.  That's how I remember it.

17     Q    Okay.  Do you recall where you and -- were

18  you on foot at this time while you are waiting, or are

19  you waiting in your vehicle?

20     A    No.  We all got out of our vehicles.  If I

21  remember correctly, we kind of got a little

22  surveillance.  And then when he -- I think either

23  Sanders or Wright said, "Hey, there he is.  He's

24  walking."

1          So that's when we all got out of the

2   cars.

3       Q    Okay.  And do you recall where your car had

4   been parked or located?

5       A    I -- I would imagine it was on the street.

6   I -- I don't remember where the car was parked.

7       Q    Right.  Do you remember if it was the east or

8   west side of the block?

9       A    No.  I do remember it was like Patomac,

10  somewhere on Patomac.

11      Q    Okay.

12      A    I don't remember where we parked it there,

13  whatever.

14      Q    Do you recall if when you first saw Xavier,

15  he was walking towards you or away from you?

16      A    I don't remember.  I thought he -- I thought

17  he was, like, walking towards -- towards a house or

18  something like that.

19      Q    Okay.  And when you first see him, is he in a

20  yard?  Is he on the street?  Is he on the sidewalk?

21  Where is he when you first see him?

22      A    I -- I think -- if I remember, when they

23  called it out, it was like on the sidewalk or something

24  like that.

```
 1          Q     Okay.  He was on the sidewalk.  Okay.
 2                      And then, as you pictured him, is he
 3     coming toward you or away from you?
 4          A     I don't remember.
 5          Q     Do you recall what he was wearing?
 6          A     No, I do not.
 7          Q     Do you recall what he looked like at all?
 8          A     No, I don't.
 9          Q     And you said that he took -- you see him
10     walking down the sidewalk.  And then after a short foot
11     pursuit, you guys were able to apprehend him, correct?
12          A     That's what I remember.
13          Q     Okay.  Were Sanders and Wright coming from
14     the same direction as you were towards Xavier Walker,
15     or from a different direction?
16          A     I don't remember, but I know we would have
17     been set up to cover whatever area of escape he was
18     gonna go.
19          Q     Okay.  And do you recall what direction you
20     saw Xavier Walker run?
21          A     No, I do not.
22          Q     Do you recall how far he went?
23          A     No, I do not.
24          Q     Do you recall where he was stopped?
```

```
 1          A     No, I don't.

 2          Q     Do you recall how he was stopped?

 3          A     I -- from reviewing my report, I remember

 4    that there was a short foot pursuit.  And I don't even

 5    know who handcuffed him or anything like that.  I don't

 6    remember that.

 7          Q     So do you recall there actually being a foot

 8    pursuit, or do you just know there was one because it

 9    was in the reports?

10          A     No, I remember, because I remember getting

11    out of the car and everything on Patomac there.

12          Q     Okay.

13          A     I just don't remember who was in closer

14    proximity, and you know, therefore, I don't know.  It's

15    been a long time since it occurred.

16          Q     All right.  Do you recall what time of day it

17    was?

18          A     No, I don't.  I -- I would -- I thought it

19    was in the afternoon, but I'd be speculating, so I

20    really don't remember.

21          Q     Okay.  Do you remember there still being some

22    daylight out?

23          A     I don't remember.

24          Q     Do you recall any specific actions you took
```

1    to help get custody of Xavier Walker?

2        A    Not that I recall.  I mean, other than to

3    limit his area of escape.  He definitely didn't come

4    running towards me, I'll tell you that.

5        Q    What was your understanding of why you were

6    out there?

7            MR. MILLER:  Object to the form of the

8    question.

9            THE WITNESS:  My understanding is Wright and

10   Sanders wanted him picked up in regard to the homicide

11   for questioning.  And I believe the Sergeant --

12              Or somehow we were asked to go and

13   assist him.  How that came about is really -- I don't

14   remember.

15   BY MS. SAMUELS:

16       Q    Right.  Do you recall working with a John

17   Cruz at all in the Majdak investigation?

18       A    No, I do not.

19       Q    Do you recall working with a Donald

20   Wolverton?

21       A    No, I do not.

22       Q    Do you ever recall hearing Xavier Walker

23   complain of how he was being treated while he was in

24   custody?

```
 1        A     No.  No, I do not.
 2        Q     All right.  Do you recall whether or not he
 3   was handcuffed when he was being questioned?
 4              MR. OBERTS:  Objection.  Foundation.
 5   Speculation.
 6              Go aware head.
 7              THE WITNESS:  I don't remember.
 8   BY MS. SAMUELS:
 9        Q     Do you recall whether he was left in the
10   interrogation room all night?
11        A     I do not remember.
12        Q     At that time, was there a place you could put
13   people who were being questioned overnight?
14              MR. MILLER:  Object to foundation.
15              THE WITNESS:  They would normally hold them
16   in the interview room.
17   BY MS. SAMUELS:
18        Q     Okay.  And at that time, do you know whether
19   or not they had cots that they could provide for people
20   to sleep on or pads?
21        A     I do not, no.
22        Q     Do you ever recall hearing anyone curse at
23   Xavier Walker?
24        A     You mean while we are in the station or in
```

1    the interview room or anything?

2        Q    In the interview room.

3        A    No, I don't recall anybody swearing at him.

4        Q    Do you recall anybody hitting him?

5        A    No, I do not.

6        Q    Do you recall anybody threatening him?

7        A    No, I do.

8        Q    Do you recall anybody taking his clothes?

9        A    No, I don't remember that at all.

10       Q    Would you normally take some articles of

11   clothing prior to leaving somebody in an interview

12   room?

13            MR. MILLER:  Object to foundation.  Calls for

14   speculation.  Incomplete nature of the hypothetical.

15            MR. OBERTS:  Join.

16            MS. BRILL:  Join.

17            THE WITNESS:  It happens if there's evidence

18   of a crime on their clothes.

19   BY MS. SAMUELS:

20       Q    Okay.  What about like shoelaces or things

21   like that, would you normally leave that on somebody?

22            MR. MILLER:  Same objection.

23            MR. OBERTS:  Join.

24            MS. BRILL:  Join.

```
 1            THE WITNESS:  I know it's common practice
 2   that they remove the shoelaces so they can't use it to
 3   harm themselves.
 4   BY MS. SAMUELS:
 5       Q    Is it fair to say you don't recall, one way
 6   or the other whether that happened here?
 7       A    Pardon me?
 8       Q    I said is it fair to say, one way or the
 9   other, whether that happened here?
10       A    Correct.
11       Q    Besides the phrase 'hit a lick," do you
12   recall anything else about the interrogation of Xavier
13   Walker?
14       A    No.  No, I do not.
15       Q    Do you recall -- ever recall seeing anybody
16   take notes while they were interviewing Xavier Walker?
17            MR. OBERTS:  Objection.  Foundation.
18            THE WITNESS:  I don't remember.
19   BY MS. SAMUELS:
20       Q    Is there any reason why you wouldn't take
21   notes during an interrogation with a potential suspect?
22            MR. MILLER:  Object to foundation.  Calls for
23   speculation.  Incomplete nature of a hypothetical.
24            MR. OBERTS:  Join and vague with respect to
```

1    if you're saying "you" as to him or just in general.

2              MS. BRILL:  Join.

3              MS. SAMUELS:  Using it in the third person

4    sense.

5              THE WITNESS:  If I was doing the interview, I

6    would take notes.

7    BY MS. SAMUELS:

8         Q    So I understand that you were working with

9    Pietryla to sort of learn the ropes of how to do these

10   types of investigations, right?

11        A    Correct.  He was my partner.

12        Q    Okay.  Did he train you, one way or another,

13   about taking notes during a suspect's interrogation?

14        A    We did take notes on other cases.  But I

15   don't remember with Xavier Walker, because again, we're

16   not had the lead detectives in this case, so I don't --

17   I don't remember what anybody else did.  I can only

18   speak for what I would normally do.

19        Q    All right.  When you say "we did take notes

20   in other cases," what are you referring to?

21        A    If -- if it was a case assigned to Pietryla

22   and myself, you know, and we had somebody, and we were

23   interviewing them, we would take notes on the GPRs.

24        Q    Prior to assisting with the murder of Mirak

```
 1    Majdak, had you heard the name Xavier Walker before?

 2         A    No.  That was the first time it came up.

 3         Q    Were you -- since working on the

 4    investigation into the murder of Mirak Majdak, have you

 5    had any other interactions with Xavier Walker?

 6         A    No, I did not.

 7         Q    Okay.  Do you know who Jovanie Long is?

 8         A    I mean, I -- I know he was the other suspect

 9    in the case, the shooter.

10         Q    Did you have any interactions with him?

11         A    I don't remember having any interaction with

12    him.

13         Q    Do you recall having any interactions with

14    Jerimaca Wright?

15         A    No, I do not.

16         Q    Do you recall having any interactions with

17    Simeon Dorsey?

18         A    No, I do not.

19         Q    Marvin Mosley?

20         A    No, I do not.

21         Q    Antoine -- I don't remember if I asked --

22    well, let's ask it again -- Antoine Waddy?

23         A    No, I do not.

24         Q    And I think you said you didn't remember
```

```
 1   Hershula Berg, correct?
 2        A    I remember the name from reading the report
 3   when I was reviewing it.
 4        Q    All right.  No independent recollection,
 5   fair?
 6        A    Yes.
 7        Q    Do you ever recall being subpoenaed to
 8   testify about this matter?
 9        A    I never testified in this -- in the Walker
10   and Long case.
11        Q    Yes, sir.
12             But were you ever subpoenaed to testify?
13        A    No.  I don't remember ever getting a
14   subpoena.
15        Q    Do you ever recall talking with any State's
16   Attorneys about the investigation into the murder of
17   Mirak Majdak?
18        A    No, I did not.
19        Q    Did you ever come to learn that Xavier
20   Walker's conviction had been overturned?
21        A    I -- yeah, when I got called by the State's
22   Attorney's office a few months ago.
23        Q    Were you surprised?
24        A    Very surprised.
```

1      Q     Why?

2      A     Because he gave a voluntary statement and

3  confession.  He put himself at the scene of the crime.

4      Q     Do you remember what the room looked like

5  where videotaped statements were taken?

6      A     It had a door.  I don't remember if there was

7  any windows.  And it was probably -- maybe an 11 by 11

8  room with a -- with a bench and a table in there, with

9  a couple chairs.

10     Q     All right.  And where would the camera be

11 placed?

12     A     I don't even remember.  It -- I'd be

13 speculating on that.  I don't recall where the camera

14 was.

15     Q     Do you recall what the interview rooms looked

16 like?

17     A     Like I said, it was an 11 by 11 room,

18 approximately.  And it had a wooden bench, and it had a

19 table and a couple chairs in there.

20     Q     Okay.  Was there a handcuffering; do you

21 recall?

22     A     There was a handcuffering on the -- attached

23 to the bench.

24     Q     When you say "attached to the bench," what

1    does that mean?

2         A    There was a bench with a metal ring that was

3    attached to the wood portion of the bench.

4         Q    Besides what you've testified to about today,

5    do you have any recollection -- do you have any other

6    specific recollections of your involvement in the

7    investigation of the murder of Mirak Majdak?

8         A    No, I do not.

9         Q    Is there anything about your testimony that

10   you'd like to clarify or edit?

11             MR. MILLER:  Object to form.

12             THE WITNESS:  I testified to the best of my

13   knowledge on what I remember.

14   BY MS. SAMUELS:

15        Q    All right.  Are you still in contact with

16   Officer Pietryla?

17        A    We became friends over the years.  I attended

18   his son's wedding -- one of his sons.  And I did work

19   side jobs with him over the years.

20        Q    During your time as Cook County Sheriff

21   Police Officer, were you ever subject to any

22   discipline?

23        A    No.

24        Q    All right.  During your time as the Chief of

1   Police for something with an S --

2        A    Wait.  What?

3        Q    Where were you Chief of Police Officer at?

4        A    I was the Chief of Police in Schiller Park,

5   right by O'Hare.

6        Q    During your time when you were Chief of

7   Police for Schiller Park, were you ever subject to any

8   discipline?

9        A    No.

10       Q    Have you ever been fired from any job?

11       A    Fired from where?

12       Q    From any job.

13       A    No.

14       Q    Have you ever been suspended or had an

15  investigation into your Law Enforcement powers?

16       A    No, not that I remember.  I had a steadily

17  rise throughout my career.

18       Q    All right.  Did you ever see any injuries on

19  Xavier Walker?

20       A    Not that I remember.

21            MS. SAMUELS:  No further questions.

22            MR. MILLER:  Maybe just give me five minutes

23  to look over notes.  I may not have any questions.

24  'Til 12:40?

```
 1              MS. SAMUELS:  That's fair.

 2              MR. OBERTS:  You're good?  We'll be back in

 3    five minutes.

 4              THE WITNESS:  Okay.

 5              MR. MILLER:  Oh, I don't have any questions.

 6    I don't know if Brandon does.

 7              MS. BRILL:  The City has no further

 8    questions.

 9              MR. OBERTS:  I just have one question.

10                        EXAMINATION

11    BY MR. OBERTS:

12        Q    Mr. Brzezniak, initially, you stated that you

13    worked for Cook County for 30 years.  You actually

14    worked for the Cook County Sheriff's Department,

15    correct?

16        A    Correct.

17              MR. OBERTS:  No other questions.

18              MS. SAMUELS:  Do you want to explain waive or

19    reserve?

20              MR. OBERTS:  We'll reserve signature.

21              MS. SAMUELS:  All right.  Thank you very much

22    for your time, sir.

23              THE WITNESS:  Thanks.

24              MR. OBERTS:  Thank you.  Have a good day,
```

1    everyone.

2             Oh, wait.  Everyone, are we still confirmed

3    for Mahoney on the 30th, I believe?

4             MS. SAMUELS:  Correct.

5             MR. OBERTS:  Very good.  Thank you.

6             THE WITNESS:  All right.  Thank you.

7                      (WHEREUPON, the deposition

8                       adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1
 2  XAVIER WALKER,                      )
                                        )
 3          Plaintiff,                  )
                                        )
 4     vs.                              )No. 20 Cv 7209
                                        )Judge guzman
 5  CITY OF CHICAGO, STANLEY SANDERS,   )
    MICHAEL PIETRYLA, DAVID WRIGHT,     )Magistrate
 6  BRIAN HOLY, JOHN CRUZ, DONALD       )Judge Fuentes
    WOLVERTON, JOHN RIORDAN, ROBERT     )
 7  BARTIK, ANTHONY BRZENIAK, THOMAS    )
    MAHONEY, and COOK COUNTY,           )
 8                                      )
            Defendants.                 )
 9
10             C E R T I F I C A T E
11          I, ANTHONY BRZEZNIAK, do hereby certify that
12  I have read the foregoing transcript in the
13  above-entitled cause and do assert that this is my
14  testimony except as I have so indicated on the errata
15  sheets provided herein.
16
17          _____
18                      ANTHONY BRZEZNIAK
19  No corrections (Please initial)_____
20  Number of errata sheets submitted_____(pages)
21  SUBSCRIBED AND SWORN TO
22  BEFORE ME THIS_____DAY
23  OF_____, 2023.
24  _____
```

LIGHTFOOT COURT REPORTING, P.C.
lightfootpc@att.net
(312)701-1090

NOTARY PUBLIC

**E R R A T A**

DEPOSITION OF:  Anthony Brzezniak

DATE TAKEN:  June 27, 2022


PAGE LINE

____  ____  CHANGE:  _____

REASON:  _____

____  ____  CHANGE:  _____

REASON:  _____

____  ____  CHANGE:  _____

REASON:  _____

____  ____  CHANGE:  _____

REASON:  _____

____  ____  CHANGE:  _____

REASON:  _____

____  ____  CHANGE:  _____

REASON:  _____

____  ____  CHANGE:  _____

REASON:  _____

____  ____  CHANGE:  _____

REASON:  _____


DEPONENT'S SIGNATURE _____

```
 1        DATE:_____

 2                      E R R A T A

 3   DEPOSITION OF:  Anthony Brzezniak

 4   DATE TAKEN:  June 27, 2022

 5

 6   PAGE LINE

 7   ___ ___    CHANGE:  _____

 8      REASON:  _____

 9   ___ ___    CHANGE:  _____

10      REASON:  _____

11   ___ ___    CHANGE:  _____

12      REASON:  _____

13   ___ ___    CHANGE:  _____

14      REASON:  _____

15   ___ ___    CHANGE:  _____

16      REASON:  _____

17   ___ ___    CHANGE:  _____

18      REASON:  _____

19   ___ ___    CHANGE:  _____

20      REASON:  _____

21   ___ ___    CHANGE:  _____

22      REASON:  _____

23

24   DEPONENT'S SIGNATURE_____
```

```
 1        DATE:_____
 2    STATE OF ILLINOIS    )
                           )SS
 3    COUNTY OF C O O K    )

 4

 5                 C E R T I F I C A T E

 6

 7              The within deposition was taken before

 8    ADRIENNE M. LIGHTFOOT, Certified Shorthand Reporter in

 9    the City of Chicago, County of Cook and State of

10    Illinois; and there were present at the deposition

11    Counsel as previously set forth?

12              The witness, ANTHONY BRZEZNIAK, reserved

13    signature.

14              The undersigned is not interested in the

15    within case nor of kin or counsel to any of the

16    parties.

17              IN TESTIMONY WHEREOF, I have hereunto

18    set my hand this 2nd day of May 2023.

19

20        _____

21             ADRIENNE M. LIGHTFOOT

22             No. 084-004276

23

24
```